**THE INSTITUTE FOR JUSTICE**
Robert Frommer*
rfrommer@ij.org
Michael Greenberg*
mgreenberg@ij.org
Joseph Gay^
jgay@ij.org
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

* *Admitted pro hac vice.*
^*Pro hac vice application pending.*

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Tel. (424) 258-5190

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **PAUL SNITKO, JENNIFER SNITKO, JOSEPH RUIZ, TYLER GOTHIER, JENI VERDON-PEARSONS, MICHAEL STORC, and TRAVIS MAY,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, TRACY L. WILKISON, in her official capacity as Acting United States Attorney for the Central District of California, and KRISTI KOONS JOHNSON, in her official capacity as an Assistant Director of the Federal Bureau of Investigation,**<br><br>Defendants. | Case No. 2:21-cv-04405-RGK-MAR<br><br><br>**PLAINTIFFS' OPENING BRIEF PURSUANT TO COURT'S ORDER OF NOVEMBER 12, 2021**<br><br><br><br>Judge: Hon. R. Gary Klausner<br>Trial: August 23, 2022<br>Complaint Filed: May 27, 2021<br>Amended Complaint Filed: June 9, 2021 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. ii

I.    INTRODUCTION ....................................................................... 1

II.   FACTS ....................................................................................... 2

      A.   The Government's Investigation of US Private Vaults. .............. 2

      B.   The Pre-Seizure Forfeiture Determination. .............................. 3

      C.   The Government Fails To Share Its Plan With
           Magistrate Kim. ..................................................................... 4

      D.   The Government Prepares To Strike. ....................................... 5

      E.   The Government's "Inventory" Search..................................... 7

      F.   Forfeiture Proceedings, Investigation, and Property
           Return. ................................................................................. 10

      G.   The Instant Litigation. ........................................................... 12

III.  LEGAL STANDARD .................................................................. 13

IV.   ARGUMENT ............................................................................. 13

      A.   THE GOVERNMENT FLAGRANTLY VIOLATED THE
           FOURTH AMENDMENT ..................................................... 13

           i.    The Government Misled The Magistrate And Disregarded The
                 Express Limits Of The Warrant.......................................... 14

           ii.   The Government's Inventory Was A Sham And A Pretext.... 16

           iii.  There Should Be No Need To Inventory A Locked Vault. ..... 18

      B.   THE SEGRAGATION OR DESTRUCTION OF RECORDS IS AN
           APPROPRIATE REMEDY FOR THIS VIOLATION .............. 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bernhard v. City of Ontario*,
  270 F. App'x 518 (9th Cir. 2008) ........................................................ 13

*Colorado v. Bertine*,
  479 U.S. 367 (1987) ............................................................................ 16

*Commonwealth v. Davis*,
  481 Mass. 210, 114 N.E.3d 556 (2019) .............................................. 17

*Demaree v. Pederson*,
  887 F.3d 870 (9th Cir. 2018) .............................................................. 15

*Florida v. Royer*,
  460 U.S. 491 (1983) ............................................................................ 16

*Florida v. Wells*,
  495 U.S. 1 (1990) ................................................................................ 16

*Ramsden v. United States*,
  2 F.3d 322 (9th Cir. 1993) .................................................................. 20

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
  306 F.3d 99 (2d Cir. 2002) ................................................................. 12

*South Dakota v. Opperman*,
  428 U.S. 364 (1976) ............................................................................ 19

*United States v. Comprehensive Drug Testing, Inc.*,
  621 F.3d 1162 (9th Cir. 2010) (*en banc*) ............................... 15, 19, 20

*United States v. Garay*,
  938 F.3d 1108 (9th Cir. 2019) ............................................................ 16

*United States v. Gladding*,
  775 F.3d 1149 (9th Cir. 2014) ............................................................ 20

*United States v. Johnson*,
  889 F.3d 1120 (9th Cir. 2018) ............................................................ 16

*United States v. Mancera-Londono*,
  912 F.2d 373 (9th Cir. 1990) .............................................................. 16

*United States v. McCarty*,
  648 F.3d 820 (9th Cir. 2011) .............................................................. 17

*United States v. Nieto-Rojas*,
  470 F. App'x 674 (9th Cir. 2012) ....................................................... 17

*United States v. Rettig*,
  589 F.2d 418 (9th Cir. 1978) .............................................................. 15

ii

*United States v. Roberts*,
430 F. Supp. 3d 693 (D. Nev. 2019)..................................................18

*United States v. Roberts*,
No. 20-10026 (9th Cir. Mar. 18, 2020)...............................................18

*United States v. Stanert*,
762 F.2d 775 (9th Cir. 1985)..............................................................14

*United States v. Tamura*,
694 F.2d 591 (9th Cir. 1982)..............................................................14

*United States v. U.S. Private Vaults, Inc.*,
No. 2:21-cr-00106-MCS (Mar. 3, 2022).............................................11

*United States v. Wanless*,
882 F.2d 1459 (9th Cir. 1989).............................................................16

*United States v. Zucker*,
161 U.S. 475 (1896)............................................................................15

**Rules**

Fed. R. Civ. P. 43(a)............................................................................13

**Statutes**

18 U.S.C. § 983(j)...............................................................................18

18 U.S.C. § 1963(d)............................................................................18

**Other Authorities**

FBI, *Privacy Impact Assessment for the SENTINEL System* (2014),
https://perma.cc/8D9W-YFC5............................................................13

## I.   INTRODUCTION

On March 22, 2021, the government indiscriminately seized the contents of hundreds of safe-deposit boxes based on allegations that the company offering the boxes—US Private Vaults, Inc., or USPV—had engaged in wrongdoing. Now, as a result, the government retains the sensitive personal information of hundreds of box renters. The government will retain that information indefinitely for agents to access for investigative purposes.

The government has callously disregarded the Fourth Amendment rights of Plaintiffs and the broader class. It deliberately misled Magistrate Judge Kim in its warrant application by ███████████████████████████████████████████████ ████████████████████████████████████████████████████ The government promised its search would "extend no further than necessary to determine ownership," Ex. F at 502:26-28 n.40,[1] but it rummaged through class members' boxes even after finding letters identifying them. And the government ignored the warrant's express statement that it did "not authorize a criminal search or seizure of the contents of the safety deposit boxes." Ex. E at 289. It told agents that "[a]nything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." Ex. D. at 284. It arranged to have drug dogs on site to sniff currency. *Id*. And it collected that evidence while seizing every single box renter's property as part of its ██████████████████████████ ███████████████████████████

Indeed, the evidence shows that the search—while justified as an inventory— was not conducted as an inventory at all. Agents took detailed notes of facts (such as how cash was packaged, or its smell) with no valid inventory purpose, but made only cursory notes of the amount or type of property in the boxes. The resulting records are practically worthless as inventories, but invaluable as investigative

---

[1] Citations to "Ex." refer to exhibits to the Declaration of Robert Frommer filed contemporaneously with this brief.

tools. In other words, the "inventory" was a sham. Indeed, the whole idea of inventorying the vault was unreasonable on its face, as the best way to serve the purposes of an inventory would have been to leave the property safely locked away and appoint a receiver to wind down USPV's business without invasion of privacy.

Because the search violated the Fourth Amendment, Plaintiffs are entitled to have the government "sequester and return," or otherwise destroy, records containing personal information about class members and their property that it possesses as a result of its search. ECF 75 at 6 (order on MTD). The Court should enter judgment ordering the government to do exactly that.

## II.     FACTS

### A.     The Government's Investigation of US Private Vaults.

The government began its investigation of US Private Vaults, the company, in 2019, after "almost five years of—of going after individual customers." Ex. K at 875:3-12. Those earlier investigations of USPV customers had ████████████████ ████████████████████ Ex. M at 1221:13-19. The government shifted its focus to the business itself after deciding that its initial approach of investigating box holders was not "effective." Ex. K at 875:12; ████████████████ .

Even after the government shifted focus to the business, the government remained interested in box holders. As one agent agreed, ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Ex. L at 1122:18-23. The lead agent on the case "anticipated that there would be criminal proceeds in the safe deposit boxes." Ex. K at 890:3-7. Although the actual investigation of the business was ████████████████████████, *see* Ex. L at 1121:14-19, ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ Ex. L at 1116:4-16.

**B.    The Pre-Seizure Forfeiture Determination.**

During the summer of 2020—months before the warrant application was submitted—████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. O at 1525:15-1526:5; *see also id.* at 1527:10-18. ██████████████████████████████████████████

██████████████████████████████████ *Id.* at 1526:23-1527:3.

During that same timeframe, ██████████████████████████ the government also made plans to apply for a warrant to seize the relatively worthless nest of safe-deposit boxes—*i.e.*, the superstructure that held box renters' property. ████████████████ ; *see also* Ex. K at 985:9-16. The FBI's own Domestic Investigations and Operations Guide mandates that agents employ the least intrusive technique that would let them fulfill their investigative purpose. Ex. K at 868:7-14.[2] And, in this case, a less intrusive option was available: The government could have seized the entire business of USPV, sought the appointment of a receiver to wind down its operations, and returned property without any need to search the boxes. However, the government failed to consider this or any other less-intrusive option. ████████████████████████████████████████████████████████

████████████████████████ ; Ex. K at 899:9-13; ████████████████ This, in the words of one agent, was ██████████████████████████████

████████████████ . Ex. L at 1135:10-19 ████████████████████████

████████ *id*. at 1135:22-25 ██████████████████████████████████

Once the affidavit to support the application for a seizure warrant was drafted, Murray, the head of the forfeiture unit, ████████████████████████████████

████████████████████████████████████████████████████████████

_____

    [2] *See* FBI, Domestic Investigations and Operations Guide § 4.1.1(e) (2013), *available at* https://perma.cc/RWD8-XHDC.



1   █████████████████████████████████████████

2   ████████████████████ Ex. O at 1534:25-1535:12; *see also id.* at 1533:8-14, *id.*

3   at 1534:21-24. ████████████████████████████

4   ██████████████████████████ *Id.* at 1537:14-16.

5       In other words, as Murray explained, by the time the search occurred, ██████

6   █████████████████████████████████████████

7   █████████████████████████████████████████

8   █████████████████████████████████████████

9   ██████████████████████████ *Id.* at 1562:1-17 (emphasis

10  added); *see also id.* at 1560:2-15, *id.* at 1563:16-21, *id.* at 1564:4-7. ████████

11  █████████████████████████████████████████

12  ████████████████████████ *Id.* at 1494:3-1495:7. ██

13  █████████████████████████████████████████

14  █████████████████████████, even though it had no idea who

15  those box renters were or what, if anything, they may have done.

16      **C.    The Government Fails To Share Its Plan With Magistrate Kim.**

17      Months later, in early 2021, the government applied for the seizure warrant.

18  The affidavit in support was drafted by the lead FBI case agent, Lynne Zellhart, and

19  by AUSA Andrew Brown. Ex. K at 884:14-23. That affidavit alleged acts of

20  wrongdoing by USPV and its principals, but it made no such allegations against the

21  customers. Nor did the warrant application or the affidavit in support ever hint at ██

22  ████████████████████

23      Instead, AUSA Brown wrote in the affidavit that the government merely

24  intended to conduct an inventory of box renters' property. *See* Ex. K at 884:14-23.

25  The supporting affidavit asserted that "[t]he warrants authorize the seizure of the

26  nests of the boxes themselves, <u>not</u> their contents." Ex. F at 501:15-16. It stated that

27  agents would "follow their written inventory policies to protect their agencies from

28  claims of theft or damage to the contents of the boxes, and to ensure that no hazardous

4

1    items are unknowingly stored in a dangerous manner." *Id.* at 501:19-22. It also

2    claimed that agents would try to "notify the lawful owners of the property stored in

3    the boxes [about] how to claim their property," *id.* at 501:22-24, and that, pursuant to

4    FBI policy, the "inspection" of the boxes "should extend no further than necessary to

5    determine ownership." *Id.* at 502:26-28 n.40.

6         In line with those representations, the seizure warrant signed by Judge Kim

7    stated that it "***does not authorize*** a criminal search or seizure of the contents of the

8    safety deposit boxes." Ex. E at 289. It instructed agents to "follow their written

9    inventory policies to protect their agencies and the contents of the boxes," and it

10   clarified that agents could "inspect the contents of the boxes," not to search for

11   potential violations of law, but simply to "identify their owners in order to notify

12   them so that they can claim their property." *Id.* ████████████████████

13   ████████████████████████████████████████, but

14   Magistrate Kim was unaware of that fact, as the government did not disclose it.

15        Notably, ████████████████ The FBI's Domestic Investigative and

16   Operations Guide states that, if "there is probable cause to believe an inventory search

17   would also yield items of evidence or contraband, agents" should seek a warrant

18   allowing them to conduct a criminal search. Ex. G at 527. The government, however,

19   ████████████████████████████████████████

20   ████████████████████████

21   ## D.    The Government Prepares To Strike.

22        The government's plan in place, it started taking steps to execute the warrant.

23   The government's lead case agent, Lynne Zellhart, created "Supplemental

24   Instructions on Box Inventory" that the government used to guide agents' behavior

25   in executing the warrant. Ex. K at 919:11-12; Ex. M at 1215:3-9 ███████████

26   ████████████████████████. Zellhart failed to even look

27   at the DIOG while drafting these Instructions. Ex. K at 847:13-17; ███████████

28   ██. In addition, while Zellhart has helped to execute "[l]ots of dozens" of criminal

5

search warrants, Ex. K at 822:23-823:2, she could not recall **ever** having conducted an inventory search apart from the search at USPV, *id.* at 827:17-19.

The Supplemental Instructions instructed the agents to look for information that would be relevant to forfeiture proceedings. The instructions stated that "[a]gents anticipate USPV boxes to contain a large amount of US Currency" and instructed that "[a]nything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." Ex. D. at 284. In particular, the Instructions told agents to note "how the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.)." *Id.*; *see also* ████████

██████. Zellhart agreed that the Instructions told agents to note these odors because they are "potentially indicative of that money being in the proximity of drugs." Ex. K at 962:12-16. The Supplemental Instructions also instructed that cash over $5,000 should be sniffed by a "canine unit," Ex. D at 284, and the government arranged with multiple local police departments to ensure that canine units would in fact be available for the search. Ex. K at 924:7-20; ████████████.[3]

The government admitted it wanted to collect this information for potential use in civil forfeiture proceedings, noting that once currency left the facility, the cash would be deposited and the government's ability to collect this evidence would disappear. Ex. K at 1218:12-16; *see also* ████████████
████████████████████████████
████████████████████████████. The head of the forfeiture unit explained that, while the government ████████
████████████████████████████
████████████████████████████.
Ex. O at 1554:4-11, 1556:13-16, 1557:21-23.

████████████████████████████
████████████████████████████
████████████████████████████

In contrast to these detailed instructions for gathering evidence to support forfeiture, the "Supplemental Instructions on Box Inventory" offered only cursory guidance as to how to conduct an inventory. The Instructions stated that agents, while "taking care to preserve possible fingerprint evidence," should "identify the contents of each box, creating an inventory list," and that "[a] copy of the paperwork will go to Asset Forfeiture." Ex. D. at 283. But the Instructions offered almost no guidance as to *how* agents should go about "creating an inventory list." *Id.*; *see also* ████████ ████████ After the fact, in a subsequent deposition, the lead case agent stated that █████████████████████████████████████████████████████████████ Ex. M at 1251:16-25. ██████████████████████████████ ████████████████████████████ *Id.* at 1249:24-1250:9.

The government also specially created another form, "Agent Observations and Notes," for use in executing the search. *See* Ex. Q at 1627. This form included space for "Cash Observations," where "[a]gents should note things such as how the cash is bundled," "if it has a strong odor," or "if there appears to be drug residue." *Id.* The form also included space for agents to note a drug dog alert. *Id.* Such information does not help identify the owner or forestall claims of theft and loss, ████████ █████████████████████████ Instead, as the head of the forfeiture unit agreed, █████████████████████████████████████████████████████████████ Ex. O at 1557:16-23. By contrast, the form had no place to record information that would actually be useful to defend against claims of theft and loss.

**E.     The Government's "Inventory" Search.**

On March 22, 2021, the government executed the US Private Vaults seizure warrant. In doing so, the government removed the door from every single safe-deposit box in the USPV facility and then scoured the contents of the boxes.

In many cases, box holders had taped an executor letter—a document identifying both the box renter and his or her beneficiary—to the outside of the box's interior sleeve. Ex. J at 695:15-18, 697:1-4. The government knew these letters

existed even before the search. Ex. K at 950:5-9. However, even though both internal FBI policies and the government's warrant application state that agents' "inspection should extend no further than necessary to determine ownership," Ex. F 502:26-28 n.40, agents continued the search even after encountering these letters. Ex. J at 701:2-7; *see also, e.g.*, Ex. A at 44, 145, 177, 224, 247. Video-recordings confirm that agents would even open and examine the contents of boxes *before* bothering to examine the affixed executor letter. *E.g.*, Ex. B.5 at 0:30, 3:30-4:00; Ex. B.7 at 0:20, 1:00-1:25.

Once inside that interior sleeve, agents searched through—and made photographic records of—personal documents or other possessions contained within the boxes. As examples, the FBI's inventory record contains photographs of password lists for online accounts, Ex. A at 176, 178, 223, 227; what appear to be hand-written notes of financial transactions, *id.* at 17, 18, 140, 144, 215, 217; debit cards and checks, *id.* at 170, 172, 173; vaccination records, *id.* at 220; a prenuptial agreement, *id.* at 171; a will, *id.* at 175; a letter to a judge in a family-law case, *id.* at 239; a receipt for goods deposited with a pawn shop, *id.* at 137-139; a commercial real estate agreement, *id.* at 174; a personal note concerning the establishment of a financial trust, *id.* at 141; trust documents, photographed alongside a receipt from a coin exchange, *id.* at 206; and a newspaper clipping about a criminal case, photographed alongside a personal note, *id.* at 143. The inventory record for one box alone contains dozens of close-up photographs of intimate, personal documents, including receipts and personal ledgers containing handwritten notes, pay stubs, immigration paperwork, a marriage license, and bank statements. *Id.* at 48-130. In another box, agents encountered an executor letter affixed to the outside, *see id.* at 7-8, but pressed on to open a sack containing a person's cremated remains, *see id.* at 9-10. In another box, agents photographed a "Receipt of Cremated Remains." *Id.* at 221.

Video records of the searches show this intrusive foray into box holders' personal lives. In one video, an agent holds each document in a large stack up to the camera one-by-one, flipping upside-down documents over so that the camera would

1   capture the text. *See* Ex. B.2 at 5:55-9:15. In another, an agent holds up to the camera

2   each card in a stack of debit or credit cards, flipping some over so that the camera

3   can capture both sides. *See* Ex. B.8 at 15:15-16:50. In another, the agent captures

4   video recordings of password lists. Ex. B.8 at 11:15, 12:30, 12:50. In one video, the

5   inventorying agent can be seen studying a document found inside a box before

6   holding it up for the camera. *See* Ex. B.3 at 1:43-1:55. In other instances, agents rifled

7   through and emptied the contents of wallets found inside the boxes. *See* Ex. B.4 at

8   14:00-14:45; Ex. B.8 at 3:00-3:40.

9       As instructed, agents also documented the condition of cash. Agents took notes

10   on the cash on the "Observations and Notes" form. *See*, *e.g.*, Ex. A at 11 ("$20 bills

11   bound by rubber bands, partitioned in $2000 bundles"), at 15 ("Assorted

12   denomination held in bundles and wrapped in paper, with rubber bands"), at 25

13   ("sealed in bank pouches"), at 29 ("[p]laced in different envelopes, broken down by

14   ~1000, sticky notes w/amounts"). Agents also took photographs to document the

15   condition of the cash; in several instances, for example, agents took photographs of

16   hand-written notes containing apparent financial information that were found

17   alongside cash. *See id.* at 58, 60, 199, 200, 201, 215, 216. Agents also ran the cash

18   by drug dogs, *see* Ex. J at 683:21-684:12, made note of positive alerts on the

19   Observations and Notes, *see*, *e.g.*, Ex. A at 11, 15, 19, 25, 29, and affixed affidavits

20   from drug-dog handlers to the inventory documents, *see id.* at 12-13, 20-22, 26, 30-

21   31.

22       In contrast with the above, the inventory records do ***not*** provide anything even

23   approaching a complete inventory of the property. Rather than documenting details

24   that might be helpful to guard against claims of theft and loss—like the quantity of

25   an item or a specific description—agents used terms like "miscellaneous coins" and

26   "miscellaneous jewelry." *E.g.*, Ex. A at 131-133 ("Miscellaneous coins" and

27   "Miscellaneous jewelry,"); *id.* at 134-136 ("Miscellaneous jewelry" and

28   "Miscellaneous coins"); *id.* at 177 ("assorted jewelry and packaging" and

1  "miscellaneous cash and coin"); *id.* at 228 ("misc jewelry and metal bars/coin"). Even
2  less helpfully, some inventories refer only to "miscellaneous items." *E.g.*, *id.* at 44
3  ("Miscellaneous general items"), 6 ("miscellaneous itmes [sic]").

4       Similarly, when agents photographed valuable property in the box, they often
5  photographed it in a way that makes it impossible to tell the amount of the property
6  from the photograph. *E.g.*, *id.* at 179, 184 (inventory lists "uncounted gold coins" and
7  photograph depicts a jumble of coins); *id.* at 32-39 (inventory lists "white metal
8  coins" and photograph shows a jumble of coins); *id.* at 153-164 (inventory lists
9  "[y]ellow metal coins and silver-colored metal coins-uncounted" and photograph
10  shows stacks of indeterminate height); *id.* at 185-192 (inventory lists "Jewelry" and
11  photograph shows pile of bags); *id.* at 193-197 (inventory lists "Gold Color metal
12  plates and coins" and photograph shows stack of plates of indeterminate number); *id.*
13  at 207-212 (inventory lists "precious metals" and photograph shows stack of bars,
14  where only top of stack is visible); *id.* at 229-237 (inventory lists coins and jewelry,
15  but no such items are photographed).

16       Ultimately, it appears the FBI did not even try to generate a meaningful
17  inventory of the contents of the boxes. *See* Ex. M at 1249:24-1250:9 █████████████
18  █████████████████████████████████████████████████████████████████████████
19  ████████████   Rather, the FBI relied on the integrity of its chain-of-custody
20  procedures—*not* the inventory—to protect against claims of theft and loss. *See*, *e.g.*,
21  Ex. K at 861:17-862:11; Ex. J at 623:4-23.

22       **F.    Forfeiture Proceedings, Investigation, And Property Return.**

23  ████████████████████████████████████████████████████████████████████
24  ████████████████████████████████████████████████████████████████████
25  ████████████████████████████████████████████████████████████████████
26  █████████████████████████████████████████████████████████████   Ex. O
27  at 1562:1-17; *see also id.* at 1563:22-1564:7. ████████████████████████████
28  ███████████████████   largely frustrated, however, after a series of legal setbacks,

1    including this Court's ruling that the government's administrative forfeiture notices

2    did not satisfy due process. *See* ECF 52; ECF 58; ECF 60.[4]

3        The government thus began a process of determining which of the boxes

4    should be subjected to additional *judicial* forfeiture proceedings, and, in doing so,

5    made use of information gathered during the "inventory." ███████████████

6    ██████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████

8    █████████████████████████████████████ Where box holders came

9    forward and provided their identities, the FBI also used that information to conduct

10   additional investigation, including by running those individuals through government

11   databases. Ex. K at 980:7-20. However, the investigation was ultimately driven by

12   the information gleaned from the "inventory"; as the lead case agent testified, "if I'm

13   looking at a pile of cash … I'm interested in where did that cash come from," so "it

14   had less to do with the person than with the contents of the box." *Id.* at 981:19-23;

15   *see also* ████████████████

16       The experience of one named Plaintiff, Joseph Ruiz, shows how information

17   from the "inventory" factored into the forfeiture determination. After this Court

18   ordered the government to show cause why it should not be forced to return the cash

19   seized from Joseph's box, *see* ECF 60, the government filed an affidavit from the

20   lead case agent asserting the government's belief that it had probable cause based on

21   a positive drug-dog sniff (obtained during the inventory) and based on the results of

22   a Google search of Joseph's email address, which the government learned from

23   paperwork in the box, *see* ECF 64-1. The government only agreed to return Joseph's

24

25       ⁴ USPV, the business, also filed a claim to all the box contents in its capacity
26   as a bailee, which should have had the effect of terminating all administrative
     forfeiture proceedings. However, it appears the government forced USPV to
27   withdraw that claim as a condition of its plea agreement—a dubious tactic that
     essentially used USPV's legal exposure to force USPV to compromise its duties to
28   its customers. *See United States v. U.S. Private Vaults, Inc.*, No. 2:21-cr-00106-MCS,
     ECF No. 85, at 4-5 (Mar. 3, 2022) (plea agreement).

1    property after he filed a declaration with supporting exhibits proving an innocent

2    source for the property. *See* ECF 65-1; ECF 65-2; ECF 65-3.

3        **G.    The Instant Litigation.**

4        In this case, the Court has certified a class consisting of all USPV box renters

5    who have identified themselves to the government and had their property returned.

6    *See* ECF 78. This class consists of hundreds of individuals. *See id.* at 7.

7        Named Plaintiffs are members of the certified class. As with the broader class,

8    the government's inventory records include (among other things) photographs of

9    their property, *see* Ex. A at 32-43, 145-152, 240-246, 247-256, videos of the search

10   of their property, *see id.* at 202,[5] and records of drug-dog sniffs conducted on their

11   property, *see id.* at 148-149, 250, 254-256. The retention of this information is an

12   invasion of their privacy rights and causes them anxiety and stress. *See* P. Snitko

13   Decl. ¶¶ 19-20; J. Snitko Decl. ¶¶ 18-19; Ruiz Decl. ¶¶ 21-22, Gothier Decl. ¶¶ 12-

14   13; May Decl. ¶¶ 20-21; Pearsons Decl. ¶¶ 21-23; Storc. Decl. ¶¶ 20-21.

15       As a remedy for the violation of their Fourth Amendment rights, named

16   plaintiffs and the class seek an order requiring the destruction or segregation of

17   records generated during—or as a result of—the government's unconstitutional

18   actions. ECF 33 ¶ I.[6] The government will retain such information indefinitely in the

19   FBI's files, including a database called Sentinel, *see* Ex. J at 715:3-21; ▮▮▮▮▮▮

---

[5] The inventory of Plaintiff Tyler Gothier's box was videotaped, *see* Ex. A at 202, but, despite representations that videos would be timely produced, *see e.g.*, ECF 101 at ¶ 12, the government failed to produce that video in time for it to be included in the record for this case, *see* ECF 109 ¶ 13. The same is true of numerous other videos. *See id.* The appropriate remedy for the government's discovery violation is an adverse inference that these videos would have shown additional violations of class members' privacy rights. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) (holding that "purposeful sluggishness" resulting in failure to produce discovery materials could support adverse inference instruction); *see also* ECF 99 (questioning why Defendants brought discovery "to a screeching halt").

[6] This includes the government inventory records, and it also includes information that was submitted to the government in subsequent proceedings that only occurred because of the Fourth Amendment violation. Named Plaintiffs Jeni Pearsons and Michael Storc, for instance, submitted additional documentary evidence along with the claim that they submitted to terminate the government's administrative forfeiture proceedings. *See* Pearsons Decl. ¶ 11; Storc Decl. ¶ 10.

1  ██████████—a computerized system that "provides capabilities for search and

2  intelligence analysis" and that "can be used to identify connections between cases

3  and patterns of activity." FBI, *Privacy Impact Assessment for the SENTINEL System*

4  (2014), https://perma.cc/8D9W-YFC5. Unless instructed otherwise, government

5  officials will be able to access those files for investigative purposes. *Id.*; *see also* ██

6  ██████████

7  ### III.   LEGAL STANDARD

8      In the current procedural posture of this case, the Court should apply the

9  standard for motions for summary judgment—meaning that the Court must

10 determine whether the undisputed facts are sufficient to establish a constitutional

11 violation. *See*, *e.g.*, *Bernhard v. City of Ontario*, 270 F. App'x 518, 519 (9th Cir.

12 2008). If there are disputed issues of material fact, the Court should set the case for

13 trial with live testimony. *See* Fed. R. Civ. P. 43(a). Plaintiffs believe, however, that

14 the facts showing Plaintiffs' entitlement to relief should be undisputed, such that the

15 case can properly be resolved under the summary judgment standard.[7]

16 ### IV.   ARGUMENT

17     Section A explains that the government's behavior towards Plaintiffs and the

18 broader class deliberately violated their Fourth Amendment rights. Section B then

19 addresses the issue of remedy and explains that this Court is authorized to order the

20 segregation or destruction of records containing class members' private personal

21 information due to these shocking Fourth Amendment violations.

22 ### A.   THE GOVERNMENT FLAGRANTLY VIOLATED THE

23 ### FOURTH AMENDMENT.

24     The government's behavior before, during, and after execution of the USPV

25 seizure warrant has been an affront to both Plaintiffs and the broader class. It also

26 ───────────────

27 [7] Plaintiffs note that the Court's scheduling order directed the parties to file a "Joint Separate Statement of Undisputed and Disputed Facts" on the date that opposition briefs are due. ECF 82 at 6. Plaintiffs understand this direction to supersede the separate statement requirement of L.R. 56-1.

28

violated the Fourth Amendment. The government misled the Court ████████

████████ when applying for the seizure warrant, intentionally disregarded the

warrant's substantive limitations, and conducted a pretextual sham "inventory" while

searching for evidence of criminality. The government's entire scheme was

unreasonable, given that it had no need to "inventory" a locked safe-deposit vault

and, instead, could have appointed a receiver to wind down USPV's operations.

> **1. The Government Misled The Magistrate And Disregarded The Express Limits Of The Warrant.**

Officials owe courts a duty of candor in seeking a warrant. They must present

facts truthfully, and not fail to disclose material facts. *See*, *e.g.*, *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). Then, once a warrant is issued, officials

also must comply with any limitations imposed by the warrant. *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982).

The government's conduct failed on both counts. As described *supra* pp. 3-4,

███████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. O at

1562:1-17. Yet the government failed to disclose that fact and, instead, suggested that

the purpose of its search was merely to conduct an "inventory." Then, when Judge

Kim issued a warrant directing that officials should not conduct "a criminal search or

seizure of the contents of the safety deposit boxes," Ex. E at 289, the government

proceeded to scour the contents of each box for evidence to ████████

████ *See supra* p. 7-10. Indeed, the plans for the search gave agents detailed

instructions on how to collect evidence that might show an unlawful source for seized

cash, *see* Ex. D at 284, and the government also went so far as to bring in drug dogs

from across Southern California for the search, *see* Ex. K at 924:7-20.

This was a "criminal search," in violation of the warrant, and it was also a

"criminal seizure." After all, when the government executed the warrant, it ████████

███████████████████████████████████████████████████████

1   ████████████████████████████████████ Given that "suits for

2   penalties and forfeitures" fall "within the reason of criminal proceedings for all the

3   purposes of the fourth amendment," *United States v. Zucker*, 161 U.S. 475, 479

4   (1896), seizure ██████████████████████ plainly

5   constituted the type of "criminal seizure" prohibited by the warrant. Indeed, it is hard

6   to imagine what other type of "criminal seizure" the warrant might forbid.

7       All of this is strikingly analogous to an *en banc* Ninth Circuit case, *United*

8   *States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010), *overruled*

9   *in part on other grounds as recognized by Demaree v. Pederson*, 887 F.3d 870, 876

10  (9th Cir. 2018) (hereinafter, "*CDT*"). There, the government applied for a search

11  warrant in an investigation into steroid use by baseball players but, in doing so, failed

12  to disclose certain facts in order to create the false impression that "unless the data

13  were seized at once, it would be lost." *Id.* at 1178 (Kozinski, J., concurring).

14  Unsurprisingly, the warrant issued, but it also specified procedures to be followed

15  during the search to avoid unnecessary exposure of data beyond the ten players who

16  were the investigative focus. *Id.* at 1171 (majority op.). The government disregarded

17  those limits and seized records for hundreds of players on the ground that they were

18  in "plain view." *Id.* Indeed, the Ninth Circuit observed that the "agents obviously

19  were counting on the search to bring constitutionally protected data into the plain

20  view of the investigating agents." *Id.* This violated the Fourth Amendment, as "an

21  obvious case of deliberate overreaching by the government in an effort to seize data

22  as to which it lacked probable cause." *Id.* at 1172.

23       This case is also analogous to *United States v. Rettig*, 589 F.2d 418 (9th Cir.

24  1978) (Kennedy, J.). In *Rettig*, after officials unsuccessfully applied for a federal

25  warrant to search a home for evidence of cocaine trafficking, the officials asked a

26  different court for a warrant to investigate a separate charge of marijuana possession.

27  *Id.* at 420. Yet when agents executed the warrant, their focus remained on the initial

28  cocaine charge. *Id.* at 421. The Ninth Circuit held this to be unreasonable, stating that

15

1   in "determining whether or not a search is confined to its lawful scope, it is proper to

2   consider both the purpose disclosed in the application for a warrant's issuance and

3   the manner of its execution." *Id*. at 423 (cleaned up). The Court criticized the failure

4   "to disclose an intent to conduct a search the purposes and dimensions of which are

5   beyond that set forth in the affidavits," as it made it impossible for the court to

6   "perform the function of issuing a warrant particularly describing the places to be

7   searched and the things to be seized." *Id.* Moreover, because the agents did not

8   truthfully disclose their intentions, they failed to "confine their search in good faith

9   to the objects of the warrant" and instead "substantially exceeded any reasonable

10  interpretation of its provisions." *Id.* So too here.

11          **2.     The Government's Inventory Was A Sham And A Pretext.**

12          The government sought to justify its foray into the class members' private safe-

13  deposit boxes as an "inventory," but inventory searches "are consistent with the

14  Fourth Amendment only if they are not used as an excuse to rummage for evidence."

15  *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019), *cert. denied*, 140 S. Ct.

16  976 (2020). The facts of this case show that the government designed its search to

17  engage in just such impermissible rummaging here.

18          The scope of an inventory search must be "limited in scope to that which is

19  justified by the particular purposes" served by the inventory. *Florida v. Royer*, 460

20  U.S. 491, 500 (1983). In other words, the "purpose of such a search must be unrelated

21  to criminal investigation." *United States v. Johnson*, 889 F.3d 1120, 1128 (9th Cir.

22  2018). To ensure that non-investigatory purpose, all "[i]nventory searches must be

23  conducted according to standard agency procedures," *United States v. Mancera-*

24  *Londono*, 912 F.2d 373, 375 (9th Cir. 1990), and any discretion exercised by officials

25  must be exercised "according to standard criteria and on the basis of something other

26  than suspicion of evidence of criminal activity." *Id*. (quoting *Colorado v. Bertine*, 479

27  U.S. 367, 375 (1987)). Inventory searches not carried out according to those criteria

28

PLAINTIFFS' OPENING BRIEF

1  are unconstitutional. *See Florida v. Wells*, 495 U.S. 1, 4 (1990); *United States v.*
2  *Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989).

3      The government's instructions to agents conducting the search demonstrate
4  that this was planned, from the start, as a search for evidence of wrongdoing. The
5  instruction to agents specifically directed that "[a]nything which suggests the cash
6  may be criminal proceeds should be noted and communicated to the Admin team"
7  and specifically instructed agents to take notes on facts that courts often view as
8  indicia of drug trafficking. Ex. D at 284. At the same time, the government
9  specifically planned to have "canine units on scene," and the instructions for the
10  search provided that all cash over $5,000 should be run past the drug dogs. Ex. D at
11  284.[8] The government also specifically created a form—separate and apart from the
12  usual inventory forms—to record the results of this criminal search. *See* Ex. Q. Then,
13  during the inventory, the agents made records of the contents of a host of personal
14  documents. *See supra* pp. 8-9 (citing examples). None of this is consistent with an
15  inventory search. *See United States v. McCarty*, 648 F.3d 820, 836 (9th Cir. 2011)
16  (finding that actions taken with investigatory motive "clearly fell outside the
17  permissible scope of the lawful administrative search and violated McCarty's Fourth
18  Amendment rights").

19      Moreover, the government did not just add a criminal search onto its inventory,
20  but also failed to conduct any meaningful inventory. Agents marked down only the
21  most basic of information; they failed to count how many items were present, and

23      [8] The uniform, pre-meditated nature of these drug-dog sniffs distinguishes this
24  case from *United States v. Nieto-Rojas*, 470 F. App'x 674 (9th Cir. 2012), where the
dog's presence had been requested for independent reasons and was not a pre-planned
25  extension of an inventory search. *See Commonwealth v. Davis*, 481 Mass. 210, 219,
114 N.E.3d 556, 566 (2019) (holding inventory search invalid after stating that "[t]he
26  use of a drug detection dog to conduct what is supposedly a search to safeguard
property – and not a search for drugs – raises a red flag"). The use of drug dogs also
27  departed from the FBI's own policies, as the Domestic Investigations and Operations
28  Guide does not contemplate using drug dogs for an inventory. *See* Ex. G at 526-527.

17

1 instead would write down vague, useless descriptors like "Miscellaneous general

2 items." Ex. A at 44; *see also supra* pp. 9-10 (citing examples). The photographs that

3 agents took of property likewise often make it impossible to determine the amount

4 of property seized. *See supra* p. 10 (citing examples); *see also United States v.*

5 *Roberts*, 430 F. Supp. 3d 693, 707 (D. Nev. 2019), appeal voluntarily dismissed, No.

6 20-10026 (9th Cir. Mar. 18, 2020) (failure to properly and completely document

7 property indicated that inventory search was pretextual).[9] During depositions, when

8 pressed to explain how exactly the records from the search helped to guard against

9 claims of theft and loss, the lead case agent pointed to "the integrity of our process,"

10 including there being "multiple people present," "signatures," "countersignatures,"

11 and "bar codes." Ex. K at 861:17-862:11; *see also* Ex. J at 635:3-10. Of course, none

12 of that has anything to do with the search of class members' property, which was not,

13 in point of fact, an inventory search. Instead, the search was a pretext for an

14 unconstitutional investigation into Plaintiffs and other class members.

**3. There Should Be No Need To Inventory A Locked Vault.**

16 Lastly, the entire premise of the government's search was objectively

17 unreasonable and cannot be squared with the premise of an inventory search.

18 Plaintiffs' property was not lying about unsecured; it was locked inside a vault. The

19 entire reason Plaintiffs and the broader class kept their property in that vault was

20 because it safeguarded their property from the possibility of theft and loss. Therefore,

21 by seizing the nest and cracking open the boxes inside, agents created the very risk

22 of theft and loss that their actions were meant to guard against.

23 As an alternative to seizing the nest, the government could have applied to the

24 court to appoint a receiver to take possession of the vault, and the receiver could then

25 have wound down USPV's business and allowed customers to retrieve their property

---

26 [9] This is, perhaps, unsurprising given that the lead case agent could not recall
27 having ever conducted an inventory search before, *see* Ex. K at 827:10-19, and one
of the agents who conducted the inventory could not recall ever receiving any training
28 on how to conduct an inventory other than a search incident to arrest, *see* Ex. J at
583:1-4, 584:14-18.

in an orderly way. *See* 18 U.S.C. §§ 983(j), 1963(d). In doing so, the government would have better advanced all the purposes traditionally associated with an inventory: (1) the protection of the owner's property; (2) the protection of the police against claims of lost or stolen property; and (3) the protection of the police from potential danger. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). After all, there would have been far less risk of theft or loss if property had been kept locked in the vault, and, similarly, it is difficult to imagine what realistic "danger" would have been posed by leaving the property locked away.[10] Yet the government failed to even consider this alternative, even though the FBI's Domestic Investigations and Operations Guide tells agents that, when their actions would "intrude on privacy," they should employ the least intrusive investigative technique capable of achieving the government's objective. Ex. K at 868:6-14, 870:2-871:2. ██████████████

██████████████████████████████

## B.  THE SEGREGATION OR DESTRUCTION OF RECORDS IS AN APPROPRIATE REMEDY FOR THIS VIOLATION

The government has captured the fruits of its search—the personal information of Plaintiffs and hundreds of class members—inside its Sentinel database, and that information will remain in the government's files unless this Court orders otherwise. *See supra* pp. 12-13. This Court can, and should, exercise its inherent "civil equitable jurisdiction," *CDT*, 621 F.3d at 1172, to remedy this violation by directing the government to "sequester and return" the records, ECF 75 at 6.

Specifically, as set out in the proposed judgment, Plaintiffs propose that the government be ordered to sequester records obtained as a result of its search so that they are no longer available for investigative use. While these records are—as detailed above, *supra* pp. 9-10—practically useless as inventories, some pictures or video generated in the search might nevertheless be of some limited use to box

████████████████████

████████████████████████████████████

1   holders to address claims of theft and loss (claims of theft and loss that, it bears
2   repeating, would not exist but for the decision to "inventory" the boxes). The records
3   should remain available only for the limited, constitutionally valid purpose of
4   responding to such claims. Then, when all such claims have been resolved, the
5   government should be ordered to return or destroy the records.

6       There can be no real question that the Court has authority to enter this relief.
7   *See CDT*, 621 F.3d at 1172 (citing *Ramsden v. United States*, 2 F.3d 322, 325 (9th
8   Cir. 1993)); *see also United States v. Gladding*, 775 F.3d 1149, 1152 (9th Cir. 2014).
9   In fact, the Court already decided that such relief is potentially available. The
10  government previously moved to dismiss on the ground that the Court lacked
11  authority or jurisdiction to enter the requested relief. ECF 75 at 5-6. The Court
12  disagreed, noting that, in *CDT*, the Ninth Circuit had upheld equitable relief ordering
13  the government to "sequester and return" unlawfully obtained evidence. *Id*. at 6.
14  Whether that relief was in fact available would, of course, depend on whether the
15  evidence bore out Plaintiffs' Fourth Amendment allegations.

16      As explained above, the evidence more than bears out Plaintiffs' allegations,
17  with the result that the remedy awarded in *CDT* is equally applicable in this case. As
18  in this case, the government in *CDT* made "representation[s] in the warrant …
19  obviously designed to reassure the issuing magistrate that the government wouldn't
20  sweep up large quantities of data in the hope of dredging up information it could not
21  otherwise lawfully seize." 621 F.3d at 1172. Also as in this case, the government in
22  *CDT* then "failed to follow the warrant's protocol." *Id*. As in this case, the search in
23  *CDT* was an "obvious case of deliberate overreaching by the government in an effort
24  to seize data as to which it lacked probable cause." *Id*. Finally, as in this case, the
25  Fourth Amendment violations exhibit a "callous disregard for the rights of third
26  parties." *Id*. at 1174. Given these violations, the government "must not be allowed to
27  benefit from its own wrongdoing by retaining the wrongfully obtained evidence or
28  any fruits thereof." *Id*.

Dated: July 19, 2022

Respectfully Submitted,

/s/ Robert Frommer

**THE INSTITUTE FOR JUSTICE**
Robert Frommer*
rfrommer@ij.org
Michael Greenberg*
mgreenberg@ij.org
Joseph Gay^
jgay@ij.org
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

*Admitted pro hac vice.*
^Motion for pro hac vice pending.

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Tel. (424) 258-5190

*Attorneys for Plaintiffs*

PLAINTIFFS' OPENING BRIEF