# Exhibit F

**to Declaration of Robert Frommer**

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| **3/17/21** |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ ev _____ DEPUTY |

In the Matter of the Search of          )
*(Briefly describe the property to be searched or identify the*          )
*person by name and address)*          )          Case No. 2:21-MJ-01302
9182 W. OLYMPIC BLVD.,          )
BEVERLY HILLS, CALIFORNIA          )
          )
          )
          )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1343, 1956; 21 U.S.C. §§ 841, 846; 31 U.S.C. §§ 5324 and 5331. | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Lynne Zellhart
_____
*Applicant's signature*

Special Agent Lynne Zellhart, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   March 17, 2021
_____
                                                                    _____
                                                                    *Judge's signature*

City and state: Los Angeles, CA
_____                    Hon. Steve Kim, U.S. Magistrate Judge
                                                                    *Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

**Exhibit F
293**

**USAO 000015**

**ATTACHMENT A - USPV**

The premises to be searched is:

   The storefront located at 9182 W. OLYMPIC BLVD., BEVERLY HILLS, CALIFORNIA, which houses the businesses known as Olympic Gold & Jewelry and U.S. Private Vaults in a single retail space with only one entrance.  The premises to be searched is a retail space in a strip mall located on the south side of Olympic Blvd. between S. Palm Drive and S. Oakhurst Drive.  It bears the current street number "9182" over the glass entry door on the left side of the space, and the former street number "9186" towards the right.  Above the premises to be searched on the stucco wall is the sign "US PRIVATE VAULTS" in red and blue letters.  The front of the premises to be searched is all glass, some of it darkly tinted.  The glass windows bear the additional signs "OLYMPIC GOLD & JEWELRY" and "US PRIVATE VAULTS."  The premises to be searched is between the stores "Silver Nails" to the east and "Mail Service" to the west, and is pictured in the attached photographs:

**USAO 000016**





USAO 000017

**ATTACHMENT B--USPV**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of <u>18 U.S.C. §§ 371</u>, <u>1343</u>, and <u>1956</u>; <u>21</u> U.S.C. §§ 841, 846; and <u>31 U.S.C. §§ 5324</u> and <u>5331</u> (money laundering, distribution of controlled substances, wire fraud, structuring, and conspiracy to commit the same) (the "SUBJECT OFFENSES"), namely:

a.   Narcotics and controlled substances, such as cocaine and THC, and related paraphernalia such as scales, pay-owe sheets, packaging material such as vape cartridges, and documents referring or relating to them, such as their manufacture or sale, or maintaining premises for the same;

b.   Records referring or relating to countersurveillance of law enforcement, obstructing investigations, warning persons of law enforcement inquiries or activities such as serving subpoenas or search warrants, or hiding, altering, or destroying evidence;

c.   Money counters, cash over $10,000, bitcoin and other digital currency as well as related documents and programs, and records referring or relating the preceding items or to IRS form 8300, Currency Transaction Reports and other Bank Security Act (BSA) requirements, currency reporting requirements generally, structuring transactions to circumvent those requirements, such as instructions to keep transactions under $10,000 in cash, anti-money laundering programs and how to evade them, investigations by financial institutions and the closure or threatened closure of financial accounts, and, since 2019, records of cash payments and receipts;

**Exhibit F
296**

USAO 000018

1        d.    Firearms, ammunition, and related paraphernalia such

2    as holsters and magazines, and records referring or relating to the

3    same;

4        e.    Documents and records referring or relating to actual

5    or threatened violence, such as those to enforce a criminal debt;

6        f.    Documents and records referring or relating to the

7    conversion of cash to financial instruments such as checks and wire

8    transfers, and vice versa, for a percentage of the dollar value

9    converted, including such conversions when there is an intermediate

10   medium such as precious metals, whether real or purported;

11       g.    Records reflecting or relating to the escheatment of

12   property to the state of California including the requirement to do

13   so, returning property to a named designee, the disposition of

14   contents of abandoned/unpaid safety deposit boxes, and complaints

15   that items were missing from a safety deposit box;

16       h.    Records referring or relating to criminals, crimes,

17   prison, arrests, criminal investigations, criminal charges, and asset

18   forfeiture;

19       i.    Biometric scanning equipment and records, and

20   documents referring or relating to them;

21       j.    Digital or video security systems, recordings of

22   forcing open safety deposit boxes and the removal of contents of

23   boxes for any purpose including abandonment or incapacity of the

24   customer and documents referring or relating to the same, and, since

25   2019, surveillance video;

26       k.    Nests of safety deposit boxes and keys, and documents

27   and records referring or relating to them since 2019.  This warrant

28   does not authorize a criminal search or seizure of the contents of

USAO 000019

1    the safety deposit boxes.  In seizing the nests of safety deposit

2    boxes, agents shall follow their written inventory policies to

3    protect their agencies and the contents of the boxes.  Also in

4    accordance with their written policies, agents shall inspect the

5    contents of the boxes in an effort to identify their owners in order

6    to notify them so that they can claim their property;

7            l.   Records referring or relating to CARES Act relief

8    programs, such as the Paycheck Protection Program and Small Business

9    Administration loans;

10           m.   Records referring or relating to the ownership or

11   control of U.S. PRIVATE VAULTS or OLYMPIC GOLD & JEWELRY or parent or

12   subsidiary entity, including employment records, and records of

13   corporate actions such as corporate minutes and votes;

14           n.   Since 2019, documents and records referring or

15   relating to financial or monetary transactions involving U.S. PRIVATE

16   VAULTS or OLYMPIC GOLD & JEWELRY, including records referring to or

17   identifying their customers;

18           o.   Records referring or relating to Beltran or a cartel,

19   or since 2019 to MJ Real Estate Investors Inc. (MJRE), Emerald Fund

20   LLC, Alta Quality Growers, MGP Management, MGP Consulting, MGP

21   Filling and Packaging, Bachelor Valley Fund LLC, Antares Topanga

22   Group LLC, dba Valley Collective Care, Rogue Bioscience, and

23   Sportsware Inc.;

24           p.   Records relating to wealth and the movement of wealth

25   since 2019, such as tax returns and forms, crypto-currency accounts

26   and transfers, other digital wealth storage and transfer methods

27   including PayPal and Venmo, money orders, brokerage and financial

28   institution statements, wire transfers, currency exchanges, deposit

**USAO 000020**

1  slips, cashier's checks, transactions involving prepaid cards, and/or

2  other financial documents related to depository bank accounts, lines

3  of credit, credit card accounts, real estate mortgage initial

4  purchase loans or loan refinances, residential property leases,

5  escrow accounts, the purchase, sale, or leasing of automobiles or

6  real estate, or auto loans, and investments, or showing or referring

7  to purchases or transactions for more than $1,000;

8         q.   Records or items containing indicia of occupancy,

9  residency or ownership of any location or vehicle being searched,

10  such as keys, rental agreements, leases, utility bills, identity

11  documents, cancelled mail, and surveillance video;

12         r.   Documents and records showing electronic and telephone

13  contacts and numbers called or calling, such as SIM cards, address

14  books, call histories, telephone bills, and Signal, ICQ, Telegram,

15  and email addresses.

16         s.   Any digital device which is itself or which contains

17  evidence, contraband, fruits, or instrumentalities of the Subject

18  Offenses, and forensic copies thereof.

19     2.   With respect to any digital device containing evidence

20  falling within the scope of the foregoing categories of items to be

21  seized:

22         a.   evidence of who used, owned, or controlled the device

23  at the time the things described in this warrant were created,

24  edited, or deleted, such as logs, registry entries, configuration

25  files, saved usernames and passwords, documents, browsing history,

26  user profiles, e-mail, e-mail contacts, chat and instant messaging

27  logs, photographs, and correspondence;

28

**Exhibit F
299**

**USAO 000021**

1   b. evidence of the presence or absence of software that

2 would allow others to control the device, such as viruses, Trojan

3 horses, and other forms of malicious software, as well as evidence of

4 the presence or absence of security software designed to detect

5 malicious software;

6   c. evidence of the attachment of other devices;

7   d. evidence of counter-forensic programs (and associated

8 data) that are designed to eliminate data from the device;

9   e. evidence of the times the device was used;

10   f. passwords, encryption keys, biometric keys, and other

11 access devices that may be necessary to access the device;

12   g. applications, utility programs, compilers,

13 interpreters, or other software, as well as documentation and

14 manuals, that may be necessary to access the device or to conduct a

15 forensic examination of it;

16   h. records of or information about Internet Protocol

17 addresses used by the device;

18   i. records of or information about the device's Internet

19 activity, including firewall logs, caches, browser history and

20 cookies, "bookmarked" or "favorite" web pages, search terms that the

21 user entered into any Internet search engine, and records of user-

22 typed web addresses.

23  3. As used herein, the terms "records," "documents,"

24 "programs," "applications," and "materials" include records,

25 documents, programs, applications, and materials created, modified,

26 or stored in any form, including in digital form on any digital

27 device and any forensic copies thereof.

28

**Exhibit F
300**

**USAO 000022**

4.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

**USAO 000023**

1        b.   The search team will conduct the search only by using

2 search protocols specifically chosen to identify only the specific

3 items to be seized under this warrant.

4        i.   The search team may subject all of the data

5 contained in each digital device capable of containing any of the

6 items to be seized to the search protocols to determine whether the

7 device and any data thereon falls within the list of items to be

8 seized.  The search team may also search for and attempt to recover

9 deleted, "hidden," or encrypted data to determine, pursuant to the

10 search protocols, whether the data falls within the list of items to

11 be seized.

12        ii.  The search team may use tools to exclude normal

13 operating system files and standard third-party software that do not

14 need to be searched.

15        iii. The search team may use forensic examination and

16 searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit),

17 which tools may use hashing and other sophisticated techniques.

18        c.   If the search team, while searching a digital device,

19 encounters immediately apparent contraband or other evidence of a

20 crime outside the scope of the items to be seized, the team will not

21 search for similar evidence outside the scope of the items to be

22 seized without first obtaining authority to do so.

23        d.   If the search determines that a digital device does

24 not contain any data falling within the list of items to be seized,

25 the government will, as soon as is practicable, return the device and

26 delete or destroy all forensic copies thereof.

27        e.   If the search determines that a digital device does

28 contain data falling within the list of items to be seized, the

**USAO 000024**

1   government may make and retain copies of such data, and may access

2   such data at any time.

3        f.   If the search determines that a digital device is (1)

4   itself an item to be seized and/or (2) contains data falling within

5   the list of other items to be seized, the government may retain the

6   digital device and any forensic copies of the digital device, but may

7   not access data falling outside the scope of the other items to be

8   seized (after the time for searching the device has expired) absent

9   further court order.

10       g.   The government may also retain a digital device if the

11  government, prior to the end of the search period, obtains an order

12  from the Court authorizing retention of the device (or while an

13  application for such an order is pending), including in circumstances

14  where the government has not been able to fully search a device

15  because the device or files contained therein is/are encrypted.

16       h.   After the completion of the search of the digital

17  devices, the government shall not access digital data falling outside

18  the scope of the items to be seized absent further order of the

19  Court.

20   6.   The review of the electronic data obtained pursuant to this

21  warrant may be conducted by any government personnel assisting in the

22  investigation, who may include, in addition to law enforcement

23  officers and agents, attorneys for the government, attorney support

24  staff, and technical experts.  Pursuant to this warrant, the

25  investigating agency may deliver a complete copy of the seized or

26  copied electronic data to the custody and control of attorneys for

27  the government and their support staff for their independent review.

28

**Exhibit F**
**303**

**USAO 000025**

7.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8.   During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, and HILLARY and STEVE BARTH onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of those persons with their eyes open to activate the facial-,

USAO 000026

iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant, and do not apply to any other search of digital devices.

**USAO 000027**

1

A F F I D A V I T

2     I, Lynne K. Zellhart, being duly sworn and under oath, hereby

3 depose and say as follows:

**AFFIANT'S BACKGROUND**

4

5     1.   I am a Special Agent ("SA") with the FBI, and have been so

6 employed since May 2004.  I am currently assigned to a White Collar

7 Crime squad, which investigates money-laundering facilitation.  Prior

8 to this assignment, I was assigned to the Southwest Border Anti-Money

9 Laundering Task Force ("SWBAMLTF") in Los Angeles, which investigated

10 large-scale, money-laundering activities associated with Mexican

11 Criminal Enterprises ("MCE"), and was comprised of Special Agents

12 from the FBI and deputies from the Los Angeles County Sheriff's

13 Office.  Prior to my assignment with the SWBAMLTF, I was assigned to

14 a Los Angeles High Intensity Drug Trafficking Area ("HIDTA") group,

15 which investigated drug trafficking organizations.  I have also been

16 assigned to a criminal enterprise (Bloods and Crips) task force in

17 Los Angeles, as well as the Northern Ohio Law Enforcement Task Force,

18 which is also engaged in investigations of drug trafficking

19 organizations.  In addition to Special Agent training at Quantico,

20 Virginia, I have attended DEA-sponsored Basic Narcotics Investigator

21 School, a 40-hour intensive training for federal narcotics

22 investigators.  I have also attended a 40-hour Asset Forfeiture/Money

23 Laundering class, two week-long money laundering facilitation

24 conferences and several other conferences sponsored by the various

25 anti-money laundering interests.  I have made presentations on money

26 laundering investigations at several training conferences including

27 the *Asset Forfeiture Summit for Law Enforcement Executives* (March

28

**USAO 000028**

**Exhibit F**

**306**

1   2018), the *Advanced Money Laundering Conference* (May 2018), and *Money*

2   *Laundering Across Investigative Programs* (October 2018).

3       2.   I have participated in numerous investigations of criminal

4   enterprises, including violent criminal street gangs, drug-

5   trafficking organizations, and businesses that are facilitating the

6   laundering of criminal proceeds.  During the course of these

7   investigations, I have identified co-conspirators through the use of

8   telephone records and bills, financial records, photographs, and

9   other documents.  I have directed and assisted in the handling of

10  confidential sources to successfully infiltrate various-sized

11  criminal enterprises via intelligence gathering, participation in

12  consensual recordings, and the monitored purchase of a controlled

13  substance.  I have participated in debriefings of cooperating

14  defendants.  I have executed search warrants for controlled

15  substances, documents, digital records and the proceeds of drug

16  trafficking and other crimes.  I have conducted physical and

17  electronic surveillance.  I have also conducted investigations in

18  which I have used Global Positioning System ("GPS") information to

19  locate and track persons who are the subjects of criminal

20  investigations.  I have directed and participated in investigations

21  involving the use of court-authorized interception of wire

22  communications.  I have engaged in extensive document-based

23  investigations, collecting, reviewing and analyzing bank documents,

24  wire transfers, employment records, e-mail, and database research.

25  I.   **PURPOSE OF AFFIDAVIT: SEARCH AND SEIZURE WARRANTS**

26      3.   This affidavit is made in support of search warrants for

27  the business U.S PRIVATE VAULTS ("USPV"), and the homes of USPV's

28  principals MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ (also known as

USAO 000029

1   JORGE VASQUEZ), STEVE BARTH and HILLARY BARTH, for evidence of

2   violations of 18 U.S.C. §§ 371, 1343, 1956; 21 U.S.C. §§ 841, 846;

3   and 31 U.S.C. §§ 5324 and 5331 (hereafter, the SUBJECT OFFENSES), as

4   described more fully in Attachment B, which is incorporated by

5   reference.  The locations to be searched (collectively, the "SUBJECT

6   PREMISES"), described more fully in Attachments A which are also

7   incorporated by reference, are:

8         a.   U.S. PRIVATE VAULTS, 9182 W. OLYMPIC BLVD., BEVERLY

9   HILLS, CALIFORNIA ("USPV").

10         b.   ███████████████████████████████

11   ███████████████████

12     ██   ███████████████████████

13   ████████████████████████

14     ██   ██████████████████████

15   ████████████████

16     ██   ███████████████████████████

17   ███████████████.

18     4.   This affidavit is also made in support of a seizure warrant

19   for the business computers, money counters, nests of safety deposit

20   boxes and keys, digital and video surveillance and security equipment

21   and biometric scanners located at USPV, 9182 West Olympic Blvd.,

22   Beverly Hills, CA 90212, which are subject to seizure pursuant to 18

23   U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C. § 5317(c) and

24   forfeiture pursuant to 18 U.S.C. § 1956 (money laundering), 21 U.S.C.

25   § 841 (drug trafficking) and 31 U.S.C. § 5324 (structuring) because

26   there is probable cause to believe that those items were used or

27   intended to be used to facilitate violations of 18 U.S.C. §§ 1956, 21

28   U.S.C. § 841 and 31 U.S.C. § 5324, and conspiracy to commit the same.

**Exhibit F**
**308**

USAO 000030

5.   The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports, and information provided by others, including other law enforcement partners.  As this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

**II.   Summary of investigation**

6.   U.S. Private Vaults is a business in a strip mall that rents safety deposit boxes anonymously.  It is owned and managed by criminals who engage in money laundering, drug trafficking, and structuring, among other offenses.  Its business model is designed to appeal to criminals for customers.  It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law enforcement investigations, and structure transactions for them to avoid filing currency reports--in addition to providing them a place to store criminal proceeds anonymously.  USPV also launders for its customers cash that is purported to be drug proceeds by converting it into precious metals or wire transfers.  The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it uses to pay its operating expenses.  By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering

USAO 000031

## III.  PROBABLE CAUSE

### A.  US PRIVATE VAULTS HAS BEEN INDICTED

7.  The Grand Jury indicted corporate defendant U.S. PRIVATE VAULTS INC. for Conspiracy to Launder Money, Conspiracy to Distribute Controlled Substances, and Conspiracy to Structure Transactions on March 9, 2021.  The indictment also contained forfeiture allegations against certain business equipment located at USPV, which the Grand Jury explicitly found were supported by probable cause.  The indictment is attached and incorporated by reference.  AUSA Andrew Brown informed me that:

a.  The Ninth Circuit held in *United States v. Seybold*, 726 F.2d 502, 504-05 (1983), that magistrates may consider the information contained in an indictment in making a subsequent probable cause determination, such as for search and seizure warrants.

b.  The legislative history of forfeiture statute 21 U.S.C. § 853 indicates that Congress intended a grand jury's finding in support of forfeiture to be given considerable weight:

> For the purposes of issuing a restraining order, the probable cause established in the indictment . . . is to be determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based.

S. Rep. No. 225, 98th Cong., 2d Sess. 203 (1984), reprinted in 1984 U.S. Code Cong. & Administrative News 3182, 3386.

Here, the description of the USPV business equipment that I seek to seize by seizure warrant is identical to the description of the USPV business equipment that the Grand Jury found probable cause to forfeit in their indictment.

USAO 000032

1          **B.    INVESTIGATION BACKGROUND**

2          8.    In approximately 2015, several state and federal law

3   enforcement agencies including the Federal Bureau of Investigation

4   ("FBI"), the Drug Enforcement Administration ("DEA"), the United

5   States Postal Inspections Service ("USPIS"), the Los Angeles Police

6   Department ("LAPD"), and the Los Angeles County Sheriff's Department

7   ("LASD") learned that the targets of criminal investigations were

8   employing the services of U.S. PRIVATE VAULTS ("USPV") to store

9   criminal proceeds.  Separate and unrelated investigations into drug

10  trafficking, human trafficking, illegal gambling, racketeering,

11  computer intrusion, insurance fraud and identity theft led

12  investigators to the doorstep of USPV.  Search warrants executed on

13  individual boxes within USPV consistently produced criminal proceeds

14  and evidence of criminal conduct.

15         9.    The following individuals have an ownership or management

16  interest in USPV as described:

17         a.    Mark PAUL – PAUL is the owner and founder of USPV.

18  According to California Secretary of State records, PAUL is the CEO

19  and registered agent of USPV.  PAUL has held himself out to be the

20  owner of USPV publicly and privately.  PAUL told CS-1, discussed

21  later in this affidavit, that he has the ability to monitor

22  activities inside USPV remotely from his residence at █████████████

23  ████████████████████████████████████████████.

24         b.    Michael POLIAK - In 2019 POLIAK became a co-owner of

25  USPV.  POLIAK purchased a 50% interest in the business – 25% from

26  Hilary BARTH (HILLARY BARTH) and Steve BARTH (STEVE BARTH) and 25%

27  from Mark PAUL.  POLIAK himself stated that he paid $475,000 for his

28  share of the business - "two-seventy-five clean; two hundred dirty."

**USAO 000033**

9

1   Bank records show that in April 2019, Michael POLIAK transferred
2   $225,000 to USPV's business bank account. Agents believe the
3   remainder was paid in cash (i.e. "dirty") to PAUL and the BARTHs.
4   POLIAK was a USPV customer for two years before becoming an owner.

5          c.   George VASQUEZ - VASQUEZ is employed at USPV as
6   manager and armed guard.  He works Tuesday through Saturday during
7   business hours and handles new customers, sales, security, and all
8   matters of operation.  Secretary of State records (2019) list VASQUEZ
9   as "manager" of USPV.  The Beverly Hills Chamber of Commerce website
10  lists VASQUEZ as USPV's Vice President.

11         d.   Matt BONVICIN – BONVICIN is a partner at USPV and its
12  Chief Technology Officer.  Bank records show that BONVICIN's company,
13  SPORTSWARE INC., receives regular payments from USPV, including two
14  large payments after POLIAK bought in to the company in April 2019.

15         e.   HILLARY BARTH and STEVE BARTH owned a 25% interest in
16  USPV prior to POLIAK buying them out.  They operate OLYMPIC GOLD &
17  JEWELRY on a daily basis, and operate USPV on VASQUEZ's day off.
18  OLYMPIC GOLD & JEWELRY is located at the same physical location as
19  USPV and engages in buying and selling gold and silver, often to USPV
20  customers.  STEVE BARTH is listed on a 2016 Secretary of State filing
21  as "Secretary" of USPV.  HILLARY BARTH is listed as a
22  "representative" of USPV on the Beverly Hills Chamber of Commerce
23  website.

24         **C.   HOW USPV OSTENSIBLY OPERATES**

25         10.  According to its own advertising literature, website and
26  statements made to investigators, USPV operates as follows:

27

28

USAO 000034

1          a.   Customers may rent a safe deposit box ranging in size

2   in inches between 3 x 5 x 22 (smallest) and 10 x 10 x 22 (largest)

3   for $575 to $1,800 a year, respectively.

4          b.   An iris scan provides the customer with access to the

5   vault.  No personal information, social security number, driver's

6   license or other forms of identification are required to rent or

7   access a box.

8          c.   The customer keeps all keys.  The keys do not contain

9   or denote box numbers on them.

10         d.   A hand scan is taken as a second form of biometric

11  identification, in the event iris data is lost or a customer loses an

12  eye.

13         e.   A second person may have access to a box, if the

14  customer so chooses, and the second individual is present with the

15  customer when access is arranged; the second party's access is also

16  through iris scan; and the customer may revoke the second party's

17  access at any time.

18         f.   USPV has 24/7 electronic monitoring, 24/7 armed

19  response, and the vault is time locked when not open.

20         g.   In the event of non-payment for three months, USPV

21  will drill open the box.  USPV recommends that customers leave

22  contact information inside the box to account for this situation.

23  However, "If no contact information is found, we will store the

24  contents of your box in our private safe for three years. Thereafter,

25  we are required to escheat (forward) the contents to the State of

26  California."  (USPV Website, Frequently Asked Questions).

27

28

**Exhibit F**
**313**

USAO 000035

### D.   US Private Vaults (USPV) Is Designed to Appeal to and Cater to Criminals

11.   USPV's primary pitch to customers is anonymity: "Complete Privacy; Biometric Identification; No ID Required.[1]"   By providing and promoting total anonymity, USPV caters to and attracts criminals, who seek to keep their identities and the source of their cash beyond the reach of banks, regulators, the IRS, and law enforcement.

12.   On USPV's website[2], Chief Technology Officer Matt BONVICIN[3] boasts, "Our business is one of very few where we don't even want to know your name.  For your privacy and the security of your assets in our vault, **the less we know the better**."   The statement by USPV "the less we know, the better" suggests they know that their customers are using the vault for criminal purposes, such as storing illegal proceeds.  This practice appeals to those engaged in activities which they wish to hide from legal authorities and law-abiding financial institutions.

13.   USPV puts forth a similar rationale with regard to use of USPV safe deposit boxes versus bank safe deposit boxes.  On its website, another USPV executive[4] posted "Four Reasons to Store Your Gold At USPV," asserting: "Banks require clients to provide their

---

[1] USPV website, www.usprivatevaults.com

[2] usprivatevaults.com/uspv-news

[3] This post on the USPV web page was written by Matt Bonvicin who is described at the end of the post as follows: "Matt is an entrepreneur, programmer, and database/systems admin who enjoys toying with technologies.  He is a partner at U.S. Private Vaults as well as its Chief Technology Officer."

[4] This post on the USPV website (usprivatevaults.com) was written by Kent Martin, who is described at the end of the post as follows: "A serial entrepreneur with a background in investment banking, Kent is a founding partner of U.S. Private Vaults and serves as its Chief Executive Officer."  We believe Martin is no longer USPV's Chief Executive Officer; however, the post remains on their website.

USAO 000036

1   social security number and a photo identification as a condition for

2   renting a safe deposit box. Your information is then filed in the

3   bank's central data system. This information can be easily accessed

4   by government agencies (such as the IRS) or attorneys armed with

5   court orders. If no one is aware you have a safe deposit box, the

6   contents (your gold) are much safer."  By advocating a service which

7   circumvents the IRS and persons "armed with court orders," USPV

8   tacitly acknowledges that criminal proceeds (which the government has

9   a legitimate interest in) can be secreted at USPV, but not at banks

10  or law abiding financial institutions.

11      14.  In the same post ("Four Reasons to Store Your Gold At

12  USPV"), the same USPV executive wrote:  "As government chartered

13  institutions, banks are now required to file 'suspicious activity

14  reports.' . . . . U.S. Private Vaults is not subject to federal

15  banking laws and would only cooperate with the government under court

16  order."  In this way, USPV is marketing its service to criminals and

17  those operating outside the law.

18      15.  THE USPV website also contains a link to an article titled,

19  "The Los Altos Vault and Safe Deposit Co. up for sale."  The article

20  attributes the following comment to USPV owner MARK PAUL: "Another

21  growing segment of private safety deposit renters is legal cannabis

22  distributors. Although their business may be sanctioned in the state

23  of California, it's not legal on the federal level, so they can't

24  conduct business through banks."  In this statement, PAUL invites

25  those engaged in violations of federal law to utilize private vaults,

26  (such as USPV).  Additionally, as discussed in more detail later,

27  cannabis distributors operating legally under California law may

28  theoretically exist and use private vaults, but the reality is that

**Exhibit F**
10
**315**

**USAO 000037**

many engaged in secreting cannabis sale proceeds at USPV are acting outside California law as well as federal law.  Indeed, all of the identified marijuana traffickers and their associates linked to USPV in this investigation are operating outside the law of California, as described in more detail later.

**E.   Other Safety Deposit Box Companies Do Not Permit Anonymous Users as USPV Does**

16.   Private safe deposit boxes are not in and of themselves illegal or suspicious.  In fact, investigators have identified businesses which offer this service in a manner which does not cater to or attract criminals.  For example, Ultra Vault[5] provides similar services, but requires customers to fill out registration forms, and provide sufficient information for Ultra Vault to conduct due diligence or "Know Your Customer ("KYC")."  Conducting due diligence or "KYC" would likely deter criminals, rather than attract them, as this type of inquiry might expose the illegal source of funds; customer's lack of employment or legitimate income; criminal history; residence or citizenship; or other factors which a criminal customer would not want known.  Additionally, Ultra Vault has some physical locations, but also offers removable box pick-up and delivery.  While this would be convenient to a law-abiding, legitimate customer, it would not appeal to someone engaged in criminal activity, as it would expose additional details about him/her such as address details, home environment, family, etc.  Thus the policies and procedures of a company such as Ultra Vault would likely repel, rather than attract, criminal actors.

---

[5] https://www.ultra-vault.com/how-it-works/

USAO 000038

17.  Similarly, BlueVault, which has locations in San Diego and Orange County, provides similar services, including co-located gold and silver exchange.  However, in contrast to USPV, BlueVault requires "An acceptable photo ID showing a US address[6]" in order to rent a safe deposit box or vault.  Elsewhere on the website, it again notes "A valid US Driver's License (or equivalent) is required." Requiring both a photo ID and a valid address will deter criminals who do not want to be identified, who live outside the US and may be moving criminal proceeds across the border, or who do not want law enforcement to be able to identify or find them as part of a criminal investigation.  Thus, in contrast to USPV, BlueVault has policies in place which would deter rather than attract criminal clientele.

18.  Similarly, traditional banks and financial institutions which provide safe deposit boxes, do so in a manner which does not cater to and attract criminals.  For example, many explicitly prohibit the storage of cash:  Wells Fargo prohibits "cash, coin and currency;" JP Morgan Chase requires a renter to "agree not to use the box to store money, coin or currency unless it is of a collectable nature;" and HSBC requires renters to agree "that you will not place into the Box: cash, currency or legal tender of any country or jurisdiction.[7]" Furthermore, safe deposit box rental agreements at most major financial institutions explicitly advise that the bank will comply with all subpoenas, search warrants and legal process, and that the bank reserves the right to enter into the box if it has reason to believe that the box contains any prohibited or dangerous

---

[6] https://www.bluevaultsecure.com/

[7] Statements taken from Safe Deposit Box rental agreements.

item.  Rental agreements also frequently include language referring the "Know Your Customer" rules of identification, investigation and due diligence, all of which would deter criminals from using their safe deposit boxes in the manner employed by USPV customers.

19.  State banking regulations in New York and New Jersey also prohibit *anonymous* safe deposit boxes.  Both Mark PAUL and Michael POLIAK have acknowledged as much, during discussions about expanding USPV to other states.  During such a discussion, which included PAUL, POLIAK, VASQUEZ and a Confidential Source ("CS-1")[8], PAUL stated explicitly that they could not open a branch in New York because of the banking laws.  Similarly, POLIAK, who is from the New York/New Jersey area told CS-1 that he hired attorneys to figure out a way to open a business similar to USPV in New York or New Jersey and concluded it was impossible, as the laws do not permit anonymity.  POLIAK emphasized that anonymity is the key to the business model.  POLIAK therefore decided NOT to expand to New York/New Jersey because he determined that the laws preventing anonymity would have rendered his business model for a private vault unprofitable.

---

[8] During the course of this investigation, agents obtained information and operational assistance from an undisclosed Confidential Source (CS-1).  CS-1 has provided information to the USPIS since 2008.  CS-1 has provided information and expertise regarding criminal investments, monetary practices, accounting and money laundering.  CS-1's information has led to the seizure of assets, including $200,000 in a mortgage fraud case.  CS-1's information has been corroborated by independent sources such as law enforcement database checks, review of other records, recordings, surveillance, interviews and other investigative activity.  CS-1's information has never been found to be false or misleading.  CS-1 has no criminal history.  I believe CS-1's information is highly credible.

**USAO 000040**

### F.   USPV and its Principals Profit from Patrons' Willingness to Pay a Premium for Anonymity

22.   A survey of safe deposit box pricing demonstrates that patrons of USPV could rent a safe deposit box at a major financial institution for a fraction of the cost.  For example, a 10 x 10 box at JP Morgan Chase rents for $350; at PNC for $146; at TD Bank for $150-$360 depending on location; and at Bank of America for $300-360 depending on location[9].  In November 2020, a representative from a Wells Fargo branch in Los Angeles advised that a 14 x 9 safe deposit box (most comparable size) rents for $200 a year.  By contrast, USPV charges between $1800 (if paid annually) and $2000 (if paid quarterly) for the same/similar 10 x 10 box.  USPV charges six to ten times what major banks charge, banks which offer security, a national presence, experience, years in business, and are often American institutions.  By contrast, USPV has been in business for ten years, is located in a strip-mall, and its owners are generally unknown to customers.  As discussed throughout this affidavit, USPV charges a premium for its services because it offers something which legitimate banks do not: anonymity, a place to store illegally obtained cash, counter-surveillance, tips and assistance for avoiding law enforcement, money laundering through the co-located gold and silver trade, and a stated willingness to look the other way with regard to all kinds of criminal conduct.

---

[9] "BANKING 101: WHAT DOES A SAFE DEPOSIT BOX COST? AVERAGE RATE BY SIZE" by Dillon Thompson.  March 1, 2020.  www.depsositaccounts.com

USAO 000041

Exhibit F
319

### G.   USPV Has, In Fact, Been Used By Criminals to Store Criminal Proceeds

20.   As set forth above, USPV is designed to appeal to and cater to criminals, and has been successful in doing so.  Numerous federal, state and local investigations have led law enforcement to USPV repeatedly.  The contents of specific USPV boxes have been forfeited to the government because they are the proceeds of criminal activity. The cases below exemplify this.  According to court documents and law enforcement reports:

a.   OWEN HANSON -- On September 9, 2015 federal agents executed a federal search warrant for three separate safe deposit boxes located at USPV. The boxes belonged to OWEN HANSON who was the leader and organizer of ODOG ENTERPRISE, an association existing for the purpose of importing and exporting controlled substances; conducting an illegal gambling business; bookmaking; promoting racketeering activities; and money laundering.  As part of the enterprise, HANSON's organization distributed methamphetamine, heroin, cocaine and ecstasy.  HANSON was indicted and pleaded guilty to Racketeering Conspiracy and Conspiracy to Distribute Illegal Narcotics.  As a result of the search warrants at USPV, agents seized a $5,000 bond; approximately 400 one-ounce silver coins; and twenty-six ten-ounce silver bars.  The contents of HANSON's USPV boxes were forfeited as criminal proceeds[10].

b.   CYRUS IRANI -- On October 28, 2015, federal agents executed a federal search warrant on Box 2105 at USPV.  The box belonged to CYRUS IRANI who was the master bookmaker and head of an

---

[10] UNITED STATES OF AMERICA v. OWEN HANSON, Case No. 15cr2310-WQH, U.S. District Court, Southern District of California

USAO 000042

Exhibit F
320

1  illegal gambling organization.  IRANI's organization operated both

2  internet and traditional bookmaking operations, and engaged in money

3  laundering.  IRANI had well over 1500 gambling accounts under his

4  ultimate supervision.  IRANI pleaded guilty to Enterprise Corruption;

5  fourteen others in the IRANI organization were also convicted of

6  various gambling, money laundering and enterprise corruption charges.

7  As a result of the search warrant at USPV, agents seized $500,000 in

8  U.S. currency; a box containing 15 gold coins and 22 gold bars; and

9  documents.  The contents of IRANI's USPV box were forfeited as

10 criminal proceeds.

11        c.   NATHAN HOLTZ -- On November 3, 2015 a state search

12 warrant was executed at USPV on a box rented by NATHAN HOLTZ.  HOLTZ

13 had been arrested earlier that day for a violation of California

14 Health & Safety code §11370.9 (possession of narcotics proceeds),

15 after leaving USPV. HOLTZ had $55,200 in his vehicle, as well as keys

16 to his USPV box.  A search of HOLTZ's USPV box resulted in the

17 seizure of an additional $200,100.  HOLTZ was on active probation for

18 a prior marijuana sales conviction and admitted that the cash was

19 proceeds of interstate transportation and sale of marijuana[11].  The

20 cash was forfeited as criminal proceeds.

21        d.   GERALD LEBOWITZ -- On November 12, 2015 GERALD

22 LEBOWITZ consented to a search of his box at USPV, stating at the

23 time that cash in the vault was brought into the country illegally to

24 avoid taxes.  Agents from the DEA seized $1,543,400 from LEBOWITZ's

25 box, which he disclaimed.  Further investigation into LEBOWITZ

26 revealed that he was part of a conspiracy to manufacture and

27

28        [11] Note that these events pre-date the legalization of marijuana in California, and involve illegal interstate sales in any case.

USAO 000043

Exhibit F
321

distribute methaqualone, a controlled substance.  During the course

of the investigation, agents seized over 45 kilograms of methaqualone

powder and 12 canisters of the chemical o-Taluidine, both chemical

precursors.  In addition, agents seized over $4 million, beyond that

disclaimed at USPV.  In 2017 LEBOWITZ pleaded guilty to possession

with intent to distribute methaqualone and money laundering.  All

assets were forfeited as criminal proceeds[12].

     e.   Prostitution Ring -- In 2014, FBI Newark initiated an

investigation into a network of individuals engaged in facilitation

of prostitution, including child prostitution; Mann Act violations;

money laundering and possession of child pornography.  FBI Newark

identified the leader of the organization (Newark Target Subject,

hereafter "Newark TS") who operated a high-end escort service and

provided prostitutes to clients nationally.  Based on information

from multiple confidential sources, investigators learned that Newark

TS has had as many as five different boxes at USPV.  Additionally,

investigators learned that Newark TS accessed his USPV boxes

approximately 50 times between July 2012 and December 2016.  On one

occasion, an FBI Confidential Source[13] ("CS-2") went to USPV with

---

[12] UNITED STATES OF AMERICA v. GERALD LEBOWITZ, Case No. 2:17-cr-00053-CAS, U.S. District Court, Central District of California

[13] CS-2 provided information to FBI Newark.  The information CS-2 provided to the FBI about Newark TS's prostitution business has proved to be accurate and reliable based on corroboration from several independent sources.  For instance, CS-2's description of Newark TS's efforts to recruit CS-2 for prostitution from the adult film industry has been corroborated by open sources of information, including social media websites, identifying CS-2 as a performer in the adult film industry. Moreover, CS-2 contacted law enforcement of his/her own volition and provided information concerning Newark TS's criminal activities and his/her criminal activities without any promise of immunity from prosecution, remuneration, or other benefits.  Federal agents have been able to corroborate the vast majority of information provided by CS-2 through public records, U.S. passport and foreign travel records, and business

USAO 000044

1  Newark TS and personally saw what he/she estimated to be $250,000 US

2  currency in Newark TS's USPV box. On a separate occasion, CS-2 went

3  to USPV with Newark TS and saw what he/she estimated to be $500,000

4  in US currency.  Further, CS-2 observed computer discs, digital

5  devices and back-up computer hard drives in Newark TS's USPV box.

6  CS-2 was aware that Newark TS used these digital devices to store

7  photos, videos and other data associated with prostitution,

8  pornography, and child pornography.  CS-2 was also aware that Newark

9  TS stored client lists, pornographic photos and pornographic videos

10 of clients, for possible use as leverage and/or blackmail.  Based on

11 business records obtained in January 2020, Newark TS continues to

12 rent a box at USPV.  FBI Newark's investigation into this subject is

13 on-going.

14         f.   MIKHAIL MALYKHIN -- On September 1, 2016 federal

15 agents executed a federal search warrant on box 5005 at USPV.  The

16 box belonged to MIKHAIL MALYKHIN who was the leader of an identity

17 theft/computer intrusion fraud ring.  MIKHAIL and others were

18 involved in a complex scheme which involved altering hacked "Flexible

19 Spending Account" debit cards from a health insurance provider and

20 altering the codes to cash out the debit cards.  MIKHAIL was also

21 involved in credit card fraud, ATM fraud, tax fraud, computer

22 intrusion and other similar crimes.  MIKHAIL was indicted for

23 conspiracy to commit access device fraud and pleaded guilty.  As a

24 result of the September 1, 2016 search warrant at USPV, agents seized

25 $266,150 United States Currency; four one-ounce gold bars; various

26

27 incorporation records, Internet searches of social media pages and
   websites, and information provided by other witnesses.  Accordingly, Your
28 Affiant submits that CS-2's information is credible and reliable under the
   totality of the circumstances.

**Exhibit F**

USAO 000045

1   gift cards which had been loaded with over $20,000 in value; two

2   Russian passports; a car Certificate of Title for a 1966 Ford

3   Mustang; two digital devices (flash drives) containing evidence of

4   the offenses; and four more gold keys, identical to those used at

5   USPV.  Additional warrants were obtained for the additional USPV

6   boxes.  Those warrants resulted in the seizure of $592,450 US

7   Currency from one box and $435,190 from another.  The contents of all

8   of MIKHAIL's USPV boxes were forfeited as criminal proceeds and used

9   to pay restitution to victims[14].

10          g.   VINCENT RAMOS -- On March 6, 2018 federal agents

11   executed a federal Seizure Warrant for the contents of Box 314 at

12   USPV.  The box belonged to VINCENT RAMOS who was the CEO of Phantom

13   Secure, a criminal enterprise which facilitated the importation,

14   exportation and distribution, internationally, of wholesale

15   quantities of cocaine, heroin and methamphetamine.  Phantom Secure

16   provided encrypted communications devices to drug trafficking

17   organizations to further international drug trafficking, while

18   obstructing and impeding law enforcement.  RAMOS was indicted for and

19   pleaded guilty to Racketeering and Drug Trafficking.  As a result of

20   the search warrants at USPV, agents seized $101,080 in US Currency

21   and 26 one-ounce gold coins.  The contents of RAMOS's USPV box were

22   forfeited as criminal proceeds[15].

23          h.   ALLAN NEYMAN et al. -- On April 24, 2019, Victim S.S.

24   was kidnapped in San Diego, California and taken against his will to

25   a warehouse in Los Angeles.  While being held in the warehouse, S.S.

26

27          [14] UNITED STATES v. MIKHAIL KONSTANTIVOV MALYKHIN, No. 16-0688-
DMG, United States District Court, Central District of California

28          [15] UNITED STATES v. VINCENT RAMOS, Case No. 18CR1404-WQH, United
States District Court, Southern District of California

USAO 000046

1  was brutally tortured.  He was hit with sticks and baseball bats;

2  stripped naked; tasered on his penis and testicles; hit with a hammer

3  on his toes; doused in a flammable liquid; set on fire; and anally

4  penetrated with a foreign object.  S.S. had been employed by a group

5  of people who were engaged in the distribution of counterfeit

6  marijuana vaping cartridges.  This group believed that S.S. stole a

7  suitcase full of cash, which a vape cartridge customer left at the

8  warehouse.  S.S. had a portion of the money with him in San Diego;

9  the rest was left with his ex-wife, who placed the cash in a safe

10  deposit box at USPV.  At the direction of the kidnappers, she

11  retrieved the cash from USPV and delivered it as ransom.  S.S.

12  eventually escaped from the warehouse.  Detectives identified ALLAN

13  NEYMAN and four others who participated in the kidnapping and

14  torture.  They were arrested and charged with violations of

15  California Penal Code 209(a) - Kidnap for Ransom; P.C 664/187(a) -

16  Attempt Murder; P.C. 206 - Torture; and P.C. 205 - Aggravated Mayhem.

17  Investigators believe that the money stored at USPV was the proceeds

18  of criminal activity; stolen; the cause of brutal violence; and used

19  as ransom.  During the course of this investigation, agents also

20  learned that NEYMAN is an associate of USPV owner Michael POLIAK.  In

21  conversations with CS-1, POLIAK described in detail, the April 2019

22  kidnapping/torture and attributed the crime to his business

23  associate, NEYMAN.  POLIAK told CS-1 that he purchased vape

24  cartridges and packaging (but not THC oil) from NEYMAN ("my guy who

25  owned the warehouse") for his marijuana vape business.  Furthermore,

26  POLIAK said to CS-1, "you want to hear the funny thing?  The money

27  was in my vault! His wife put money into my vault," explicitly

28  acknowledging USPV's role in the crime.  Additionally, on or about

USAO 000047

January 27, 2020, CS-1 met NEYMAN with POLIAK and discussed various internet-based fraud schemes which might generate income.  POLIAK and CS-1 had previously discussed taking over NEYMAN's business interests due to NEYMAN's pending incarceration.

i.   MATTHEW BEAVER -- On July 1, 2019, agents of the DEA and LAPD seized $215,653 in US currency from MATTHEW BEAVER, who was observed entering and leaving USPV.  BEAVER was arrested for violations of California Health & Safety Code Section §11370.6, transportation of narcotics proceeds greater than $100,000.  Pursuant to his arrest, agents seized the cash, as well as eight cell phones and keys which were similar to the keys which open boxes at USPV.  On July 8, 2019 a state search warrant was served on USPV boxes #6515 and #7111.  Agents seized $1,448,700 from those boxes.  Subsequent search warrants executed on BEAVER's phones revealed evidence of his involvement in marijuana trafficking.  BEAVER has a criminal history and is not licensed to distribute or grow marijuana in California or any other state.  Per the California Employment Development Department (EDD), BEAVER has no employment which would generate the income represented by this cash seizure.  BEAVER admitted his participation in an illegal marijuana business.  BEAVER admitted that the cash was the proceeds of unlawful criminal activity.  The cash was therefore forfeited.

j.   Between February 1, 2020 and February 26, 2021, agents conducted surveillance at USPV.  Agents identified many current USPV customers who, based on my training and experience, are likely engaged in criminal activity and storing criminal proceeds or evidence of crimes at USPV.  For example, on February 12, 2020, agents observed a couple enter USPV who were subsequently identified

1  and linked to an FBI San Diego healthcare fraud investigation.

2  Similarly, agents observed subject H.T. at USPV on three separate

3  occasions; H.T. is the subject of a current healthcare fraud

4  investigation by FBI Los Angeles.  A third healthcare fraud suspect

5  appeared at USPV on May 28, 2020.  On June 9, 2020, agents identified

6  a USPV customer who was subsequently linked to a current, on-going

7  investigation into dark-web drug trafficking.  Agents also identified

8  a USPV customer who is closely associated with a group being

9  investigated for the theft of thousands of cell phones. Another

10  individual identified has been associated to an FBI Los Angeles

11  (Russian) counterintelligence investigation.  Another customer

12  identified in February 2021 was referred to FBI Los Angeles for a

13  possible Ponzi scheme.  Furthermore, on multiple occasions agents

14  observed USPV patrons in vehicles with out of state license plates,

15  specifically Illinois, Ohio and Nevada.  Based on my training and

16  experience in money laundering investigations, Chicago, Illinois is a

17  hub of both drug trafficking and money laundering.  I believe these

18  patrons were using their USPV box to store drug proceeds.  Agents

19  also observed a number of USPV patrons in rental cars.  Based on my

20  training and experience, drug traffickers often rent vehicles to

21  transport drugs and cash, in an effort to remain anonymous, and hide

22  their identities from law enforcement.

23

24

25

26

27

28

**USAO 000049**

## H. USPV Principals Are Aware That Their Customers Are Engaged in Criminal Conduct and Store Criminal Proceeds at USPV

### 1. MARK PAUL described his customers as bookies, prostitutes, and weed guys

21. During the course of this investigation, agents spoke with a Cooperating Witness ("CW-1")[16]. According to CW-1, prior to his/her arrest and incarceration, CW-1 rented multiple safe deposit boxes at USPV. CW-1 became acquainted with USPV owner, MARK PAUL, and they became friends. Based on conversations CW-1 had with PAUL, PAUL was aware that USPV customers, including CW-1, were engaged in criminal activity. PAUL told CW-1 that his best USPV customers were "bookies," "prostitutes," and "weed guys." PAUL designed the business to appeal to people operating outside the law or "in the gray area." PAUL specifically told CW-1 that the business was designed to help people hide money from the IRS and the FBI. Based on their conversations, CW-1 described PAUL as an advocate of not paying taxes on one's cash.

22. CW-1 routinely discussed his/her illegal gambling business with PAUL, and PAUL was aware that CW-1 earned money from running an

---

[16] CW-1 has provided information to the FBI since 2015. CW-1 hopes to reduce his/her current sentence by providing information to the FBI. Specifically, CW-1 has provided information leading to the indictment of 5 individuals involved in drug trafficking and money laundering. The credibility of CW-1's testimony, however, is limited because CW-1 has omitted (and outright lied about) key facts when those facts implicated relatives or close friends who were continuing to run his/her criminal organization after his/her arrest. Although the United States does not possess any evidence to suggest CW-1 lied about the information discussed herein, CW-1's credibility is effectively limited to only testimony that can be corroborated by other independent evidence. To that end, much of CW-1's information has been corroborated by independent sources such as law enforcement database checks, interviews and evidence gathered in other related FBI investigations, review of business records, surveillance, and other investigative activity.

USAO 000050

1  illegal gambling business.  PAUL was further aware that CW-1 used

2  USPV to store the proceeds of that business.

3    23.  CW-1 also referred many clients to PAUL, including many

4  bookies from CW-1's illegal gambling organization.  Based on

5  conversations CW-1 had with PAUL, PAUL was aware that these

6  individuals (USPV customers) also earned money from an illegal

7  gambling business, and stored the proceeds of that business at USPV.

8  On one occasion, PAUL asked CW-1 if he/she "had any more bookies"

9  that CW-1 could refer to USPV.  This shows that PAUL was aware of the

10  criminal activities of his clients and was eager to do more business

11  with them.

12    24.  In addition to numerous individuals engaged in various

13  aspects of illegal gambling, CW-1 also referred 1) an individual whom

14  CW-1 personally knew to be a pimp; 2) a cocaine dealer; and 3) an

15  individual involved in facilitating a sophisticated drug trafficking

16  organization.  With regard to the pimp, CW-1 specifically described

17  him as a "pimp" to PAUL and they discussed that he was engaged in

18  promoting high-end prostitution.  Furthermore, CW-1 knows that the

19  pimp in fact rented several boxes at USPV because CW-1 and PAUL

20  discussed the pimp's efforts to negotiate a better price.

21  PAUL told CW-1 that many of his USPV clients were "weed dealers."

22  PAUL told CW-1 that he liked doing business with "weed guys" because

23  they always rented the larger boxes which were more profitable for

24  PAUL.  PAUL made similar statements to CS-1 in late 2019, thus

25  corroborating CW-1's information.  On one occasion before the

26  legalization of marijuana in California, CW-1 specifically referred

27  an individual to PAUL, telling him the guy was "in the green

28

**Exhibit F
329**

USAO 000051

24

1  business," or words to that effect, by which CW-1 meant in the

2  marijuana business.

3      25.  PAUL also told CW-1 that he thought wealthy Beverly Hills-

4  based "Persians" or Iranians were hiding "dirty money" or "revolution

5  money" at USPV.  CW-1 did not know if PAUL had specific conversations

6  with those customers or if he was just speculating.  In either case,

7  however, it shows that PAUL had no objections or qualms about

8  facilitating clients who may have been violating federal or

9  international laws.

10     26.  PAUL was aware that CW-1 was laundering his/her illegal

11  proceeds through the purchase of gold and silver, and encouraged CW-1

12  to do this.  PAUL told CW-1 that he "liked what you are doing with

13  the gold" and "gold is the way to go" with regard to laundering

14  money.  CW-1 also purchased gold for others in order to assist them

15  in laundering their own criminal proceeds.  PAUL was aware of this

16  and handed out business cards advertising CW-1's gold-investment

17  "business," which CW-1 described as a front for laundering money.

18  Furthermore, CW-1 advertised the storage of gold as part of the

19  services of his/her "business" and listed 9182 Olympic Blvd., Beverly

20  Hills, California (location of USPV) as the storage location. PAUL

21  was aware of this and thus participated with CW-1 in the laundering

22  of other people's criminal proceeds.

23     27.  In November 2019, PAUL met with CS-1.  The meeting was

24  recorded and reviewed by investigators.  During the meeting, PAUL

25  told CS-1 that a lot of the USPV clientele came from the cannabis

26  industry and comprised approximately a third of the business at USPV.

27  Additionally, PAUL told CS-1, "Whatever you put in [the vault], I

28  don't want to know."

**Exhibit F**
**330**

USAO 000052

28.   During the same November 2019 meeting, PAUL also made a number of exculpatory statements to CS-1, whom he had just met.  For example, PAUL said a number of times that his business was on the up and up; that he paid his taxes; that he declared all the cash he deposited; and that he was in the business of self-storage with a high level of security.  Based on my training and experience, criminals who hold themselves out as legitimate businessmen often falsely deny their criminality, particularly with persons they do not know or trust.  This has proven to be the case with PAUL, who in subsequent meetings with CS-1, admitted to participation in the marijuana industry and tacit knowledge of money laundering and other criminal conduct by his USPV business partner, Mike POLIAK.

    2.   <u>MICHAEL POLIAK bragged about bringing drug traffickers to USPV as customers</u>

29.   On or about December 17, 2019, CS-1 met with Michael POLIAK.  The meeting was consensually recorded and reviewed by investigators.  During that conversation, POLIAK made the following statements demonstrating his knowledge that criminal proceeds are being stored at USPV:

    a.   POLIAK told CS-1 that "Mark [PAUL] made no money until I came in. . . . None! . . . For seven years, made nothing.  I changed that whole business . . . he was making forty grand a year.  With me he makes fifteen thousand a month himself.  I turned it from, from three thousand a month to thirty thousand a month[17].  The business.  All I did was call marijuana lawyers and they sent me

---

[17] In September 2020, POLIAK told CS-1 that he was the best thing that ever happened to Mark PAUL, in that, prior to his co-ownership of USPV, PAUL was making $60,000 a year as a 100% owner; but now, as a 50% owner, he is making $20,000 a month and the business is growing.

USAO 000053

1  customers.  That's all I did.  And those people, I met up with them

2  and they gave me referrals."  During this exchange about operating

3  USPV, CS-1 said, "Yeah, he [PAUL] was telling me, like, when, back

4  then, I didn't know you were his partner, he was saying 'my partner'

5  brought in, you know, a lot of marijuana, cocaine people who have,

6  who have money."  POLIAK replied, "Yeah."  Shortly after, POLIAK

7  said, "When I joined in, this guy [PAUL] had maybe one-third the

8  boxes full.  Two-thirds empty.  Now it's maybe sixty, sixty-three

9  percent full."   This clearly demonstrates not only that POLIAK is

10  aware that marijuana and cocaine proceeds are held at USPV, but that

11  this occurs by design, in order to make the business more profitable.

12       b.   Shortly after the exchange described above, POLIAK

13  added, **"Listen, you don't want every drug dealer in your place**

14  **either.  You need normal people too."**   The expressed idea that "you

15  need normal people too" suggests that drug dealers comprise the

16  majority of USPV customers, and the business has to make an effort to

17  attract a non-criminal clientele as well, so as not to be too obvious

18  a haven for criminals.

19       c.   While discussing the possibility of opening a second

20  location of USPV, POLIAK said, "You have to pre-sell one third of the

21  place to break even."  He asked CS-1, rhetorically, "who's your

22  customer base?  Five guys that are laundering money?  That's not

23  going to fill the business."  CS-1 said, "Not five. I have a lot."

24  POLIAK replied, "Thirty guys?  Still not gonna fill a business."

25  This exchange shows that POLIAK is aware of and specifically

26  anticipates USPV customers' use of the vault by criminals who need to

27  launder money. It further shows POLIAK's position that USPV needs to

28

**Exhibit F**
**332**

USAO 000054

1  attract more than money launderers – they also need drug dealers

2  storing cash.

3          d.   In September 2020, POLIAK and CS-1 met again.  That

4  meeting was recorded and reviewed by investigators.  During that

5  meeting, POLIAK told CS-1 that they planned to expand USPV by taking

6  over the Mail Boxes Etc. store immediately adjacent to USPV, further

7  indicating that POLIAK's strategy of bringing in drug

8  dealer/customers has been successful.  Moreover, POLIAK told CS-1 he

9  planned to turn one of two "privacy rooms" inside USPV (used by

10 customers to access their boxes in private) into a separately rented

11 secure space.  POLIAK plans to charge $10,000 a month for the room.

12 With regard to what POLIAK's customer was going to keep in the room,

13 POLIAK said, "I don't know.  I don't ask. But I'm charging ten grand

14 for that little room!  Hundred and twenty grand a year."  CS-1

15 commented that the room could hold $20 million dollars in cash.

16 POILIAK replied, "I really don't care what he do.  He might put gold

17 in there.  I don't know."

18          3.   <u>POLIAK describes PAUL as a legitimate looking "face"</u>
              <u>for USPV that obscures POLIAK's illegal conduct and</u>
19            <u>ownership of USPV</u>

20          e.   During the December 17, 2019 meeting, which was

21 recorded and reviewed by investigators, POLIAK told CS-1 that he was

22 a customer at USPV for two years before buying in to the business.

23 POLIAK told CS-1, "You know, I wanted Mark, [as a] partner. I didn't

24 want to do it on my own.  Because again, **I have illegal businesses** at

25 the time, like my vape shit, and I was back doing everything from New

26 York, I wanted a face.  Mark's a great face."  Here, POLIAK admits

27 that he is personally engaged in "illegal businesses" and was storing

28 proceeds at USPV.  In fact, POLIAK told CS-1 he had approximately $8

USAO 000055

1  million stored in six boxes at USPV, and another $2 million which he

2  used to purchase property (discussed later).

      4.  POLIAK remarks that it is funny that the drug money
          stolen from his business associate, which led to the
          kidnapping and torture, happened to be stored at SPV

5      f.  During the December 17, 2019 meeting with CS-1,

6  discussed above, POLIAK described in great detail the kidnap and

7  torture event described above.  POLIAK admitted that he was doing

8  business with ALLAN NEYMAN who owned the warehouse and was present

9  throughout the torture.  POLIAK told CS-1, "He [the victim] left the

10  [stolen] money – you want to hear the funny thing?  The money was in

11  my vault!  His wife put the money into my vault."

**PROBLEMS WITH CS-3 IN A DIFFERENT CASE**

13     30.  From communicating with other law enforcement officers and

14  AUSAs, I learned that in a different investigation, on more than one

15  occasion, CS-3 exchanged sexts with the target.  CS-3 did not provide

16  these and other communications with the target to his handler. CS-3

17  later admitted to his handler and the government that he had deleted

18  some of his communications with the target that were sexual in

19  nature.  CS-3 failed to follow explicit instructions from a handler

20  on at least one instance, and failed to contemporaneously notify the

21  handler that he was doing so.  CS-3 falsely told the target that CS-3

22  had cancer to induce her to pay CS-3 thousands of dollars for

23  fictitious medical treatments.  CS-3 has informed the handler and the

24  government that he did this in an attempt recover money that CS-3 had

25  advanced on behalf of the target, but this "justification" has not

26  been verified.  CS-3 contacted the target from an unknown phone

27  number and email address, pretending to be other persons in order to

28  buttress his lies about the cancer treatment.  CS-3 failed to notify

**USAO 000056**

1  his handlers of these issues before they came to light, and when

2  initially confronted, did not disclose the full scope of his conduct.

3  There is also evidence that CS-3 fraudulently used another person's

4  credit card.

5      31.  CS-3 has provided information to the DEA since 2018 and,

6  aside from the problems set forth above, has proven reliable.  His

7  work led the seizure of drugs and weapons.  In the instant

8  investigation, CS-3's information has been regularly corroborated by

9  independent sources such as law enforcement database checks, review

10 of other records, recordings, surveillance, interviews and

11 information and operational assistance provided by other Confidential

12 Sources, unknown to CS-3.  As described below, CS-3 was repeatedly

13 paired with an undercover task force officer, who was also a witness

14 to CS-3's undercover work.

15     <u>GEORGE VASQUEZ</u>

16     32.  CS-3 has had numerous conversations with USPV manager,

17 GEORGE VASQUEZ.  Many of those conversations reveal that VASQUEZ is

18 aware that USPV customers engage in unlawful activity and maintain

19 the proceeds of unlawful activity in their USPV safe deposit boxes.

20 Conversations between CS-3 and VASQUEZ on June 28, August 9, and

21 August 22, 2019, were all consensually recorded and reviewed by

22 investigators.  The following examples demonstrate VASQUEZ's

23 knowledge and awareness of the criminal activity which USPV

24 facilitates.

25     33.  On June 28, 2019 CS-3 spoke to VASQUEZ about the purchase

26 of marijuana vape cartridges (discussed more fully herein).  During

27 the conversation, CS-3 said, "I don't know about this shit [vape

28 cartridges].  I'm just the money laundering *mijo*.  The real big thing

**USAO 000057**

1  is the other shit [drugs, not marijuana] for me."  During this

2  conversation, CS-3 unambiguously stated that he/she is the "money

3  laundering *mijo*."  This statement conveys specific knowledge to

4  VASQUEZ that CS-3 is engaged in criminal activity, specifically money

5  laundering.  Additionally, CS-3 contrasts his/her ignorance of the

6  cannabis oil business with his/her conduct in "other shit."  Based on

7  my training and experience, as well as a comprehensive de-brief of

8  CS-3, CS-3 was referring to hard drugs, not cannabis oil, when he

9  said "The real big thing is the other shit for me."  Furthermore, CS-

10  3 believes that VASQUEZ was aware that CS-3 was referring to non-

11  cannabis drug trafficking.

12          5.   VASQUEZ warns CS-3 about "asset forfeiture"

13      34.  On August 9, 2019, CS-3 spoke to USPV manager GEORGE

14  VASQUEZ about difficulties in transporting cash.  VASQUEZ told CS-3

15  that USPV owners planned to expand their business into other cities,

16  including Chicago[18].  CS-3 said, "So let me tell you what I'm doing.

17  I can't fuckin' drive with this kind of cash, from fuckin' east coast

18  down here . . . 'cause I get pulled over, just like you just said."

19

20          [18] Based on my experience investigating drug trafficking and
21  money laundering organizations, I know that drug trafficking and
    money laundering activities are concentrated in certain cities.
22  These include cities on or near the U.S.-Mexico border, such as
    Laredo, San Diego and Los Angles.  In addition, other cities
23  throughout the United States serve as "hubs," or center points where
    drug distribution and money collection are concentrated. For example,
24  drugs are often sent to Chicago, Illinois, before being further
    distributed to other cities in the mid-west, such as Cleveland or
25  Milwaukee.  Likewise, the proceeds of drug sales are often collected
    and concentrated in Chicago as well.  Based on my experience
26  investigating money laundering, I know that millions of dollars in
    drug proceeds are processed through banks in Chicago. Adding a USPV
27  branch in Chicago would likely be profitable in that it would further
    facilitate drug trafficking and money laundering. USPV owner Michael
28  POLIAK expressed this to CS-1 numerous times during conversations
    with him/her in late 2019.

USAO 000058

1    VASQUEZ added, "Asset forfeiture."  CS-3 continued, "And I just have

2    to fuckin' walk away.  And I'm not trying to take that loss anymore.

3    . . . So anywhere that he's [MARK PAUL] willing, you know, to go in

4    to it [private vault business], I want dibs."  Based on my training

5    and experience, as well as a comprehensive debrief of CS-3, I believe

6    that CS-3 was telling VASQUEZ about the difficulties in transporting

7    drug proceeds (cash) across the United States, and the possibilities

8    of those proceeds being seized by law enforcement.  Further, I

9    believe that VASQUEZ was aware that CS-3 was referring to the

10   transport of criminal proceeds, and his comment, "Asset forfeiture"

11   demonstrates that he is aware that law enforcement can seize and

12   forfeit money that is criminally derived.

13              6.   VASQUEZ explains that USPV would not work in New York
                     because anonymous safety deposit box rentals there are
14                   prohibited

15        35.  On August 9, 2019 CS-3 spoke to USPV manager GEORGE VASQUEZ

16   about expanding USPV's business.  During the course of the

17   conversation, VASQUEZ explained why USPV's business model would not

18   work in New York.  VASQUEZ said, "You know, we had already talked

19   about several cities, you know.  We tried New York . . . And it can't

20   be like us.  It can't be anonymous and private.  . . . In New York.

21   We tried that.  That's what Mike [POLIAK] wanted first[19].  New York

22   and Jersey and all that area around there."  Based on my training and

23   experience, as well as a comprehensive debrief of CS-3, I believe

24   VASQUEZ is aware of and referencing a New York state law which

25   prohibits operating private safe deposit box vault in the manner that

26

27   _____

28        [19] MICHAEL POLIAK is from the New York and New Jersey area and
     relocated to California.

**Exhibit F**

**337**

USAO 000059

1  USPV operates, with anonymity, the particular quality which appeals

2  to criminals.

3        7.   <u>VASQUEZ and CS-3 openly discuss drug trafficking,
            money movement and money laundering</u>

4

5     36.   On August 22, 2019, CS-3 spoke to USPV manager GEORGE

6  VASQUEZ about crossing the US-Mexico border.  During the conversation

7  CS-3 asked VASQUEZ, "You drive through? [the US-Mexico border].

8  VASQUEZ replied, "Yeah."  CS-3 asked, "And they don't sweat you at

9  all?"  VASQUEZ replied, "Not really."  Later in the conversation,

10 VASQUEZ asked CS-3, "Do you go there [Mexico] much?"  CS-3 replied,

11 "I do, but now I got Primo who does that so like I'm not even trying

12 to fuck with any of that . . . he's the one who runs back and forth."

13 Based on my training and experience as well as a comprehensive

14 debrief of CS-3, CS-3 was discussing the challenges of crossing drugs

15 into the United States from Mexico. Further, CS-3 believes that

16 VASQUEZ understood that CS-3 was making references to smuggling drugs

17 across the US-Mexico border.

18    37.   On August 22, 2019, USPV manager GEORGE VASQUEZ spoke to

19 CS-3 about the need to hide money from both law enforcement and

20 people in one's own organization.  During the conversation CS-3 said,

21 ". . . buddy of mine just got fuckin' hit, not by fuckin' feds but by

22 fuck his own fuckin' team.  And what are you gonna do, call the

23 fuckin' cops?"  VASQEZ replied, "Yeah."  Later in the conversation

24 CS-3 said, "Doesn't even fuckin' trust anyone.  Everybody told him,

25 hey you're stupid, you fuckin', find a stash pad, something."

26 VASQUEZ replied, "Yeah.  That's what happened with Mike [POLIAK].

27 That's how Mike got here. You know.  He was referred by one of my

28 other clients . . . He's like, hey man, you're getting too big

USAO 000060

1  already . . . You guys go put it away somewhere.  That's how he came

2  by.  Most of my clients are word of mouth, you know?"  Based on my

3  training and experience as well as a comprehensive debrief of CS-3,

4  CS-3 was talking to VASQUEZ about the difficulties in hiding criminal

5  proceeds both from law enforcement and from individuals in one's own

6  criminal organization.  Additionally, VASQUEZ's comments show that

7  USPV co-owner MIKE POLIAK had difficulty finding a place to put large

8  amounts of cash, presumably criminal proceeds.  Finally, VASQUEZ

9  confirmed that most of the USPV clients learn about USPV from other

10  clients, who may also be engaged in criminal activity.

11       38.  On August 22, 2019, CS-3 spoke to USPV manager GEORGE

12  VASQUEZ about needing to move money.  During the conversation CS-3

13  said, "My biggest thing right now is how do I fuckin' move it [money]

14  out.  . . . because I told you, I bought a fuckin' car, but actually

15  it gets old after a while . . . And I can only buy a certain amount

16  of cars before I need a fuckin' dealer's license."  Based on my

17  training and experience as well as a comprehensive debrief of CS-3,

18  CS-3 was talking to VASQUEZ about finding ways to launder criminal

19  proceeds, specifically drug money.  CS-3 referenced purchasing

20  vehicles as a method for laundering criminal proceeds, and the

21  difficulties that poses.  CS-3 believes that VASQUEZ was aware and

22  understood that CS-3 was talking about ways to launder criminal

23  proceeds.

24            8.   <u>VASQUEZ acknowledges the likely storage of drug
              proceeds at USPV</u>

25

26       39.  During the course of this investigation, agents obtained

27  information and operational assistance from an undisclosed

28

USAO 000061

1  Confidential Source ("CS-4")[20].  On or about February 25, 2020, CS-4,

2  who had previously rented a large 10 x 10 box at USPV, spoke to

3  VASQUEZ about a sign at USPV saying they employed the use of drug-

4  sniffing dogs.  CS-4 asked VASQUEZ when was the last time they had a

5  drug dog in USPV, and VASQUEZ said he couldn't remember.

6  **I.   USPV Principals Brokered and Supplied Illegal Drugs (THC**

7  **and Cocaine) from SUBJECT PREMISES Including USPV**

8  40.   In June 2019, CS-3 cultivated a friendly business

9  relationship with USPV manager GEORGE VASQUEZ.  During that time, CS-

10  3 spoke to VASQUEZ about purchasing marijuana vaping products.

11  VASQUEZ offered to provide CS-3 with samples of vaping products.

12  1.   USPV Manager VASQUEZ displayed marijuana cartridges
      for sale in the private view room of USPV

13  41.   On June 28, 2019, CS-3 went to USPV in person to obtain the

14  vaping samples from VASQUEZ.  The meeting was consensually recorded

15  and subsequently reviewed by the Affiant.  At approximately 11:40

16  a.m. CS-3 arrived at USPV where he/she was immediately met at the

17  front door by VASQUEZ. VASQUEZ was holding a small cardboard box in

18  his hands and directed CS-3 back to the secure vault. VASQUEZ was

19  armed at the time of this transaction with a semiautomatic pistol

20  that was in an open carry holster on his right hip alongside an

21  unknown type of badge. Investigators have noticed that VASQUEZ is

22  always armed in this fashion during his work hours as part of his

23

24  [20] CS-4 has provided information to the FBI since 2015.
25  Specifically, CS-4 has provided information which has identified
    participants in various money-laundering schemes, as well as the
    methods for pursuing those schemes. CS-4's information and
26  operational assistance have been used in numerous investigations. CS-
    4's information has been corroborated by independent sources such as
27  law enforcement database checks, review of other records, recordings,
    surveillance, interviews and other investigative activity.  CS-4's
28  information has never been found to be false or misleading.  I
    believe CS-4's information is highly credible.

USAO 000062

1  purported duties as the security manager for USPV. VASQUEZ and CS-3

2  proceeded to the private viewing rooms in the back of the actual

3  vault.

4      42.  Once inside the room VASQUEZ placed the box on the small

5  desk and opened it revealing six small packages of various sizes with

6  different advertising boxes. CS-3 knew this to be the Butane Hash Oil

7  ("BHO") containing THC vape cartridges he/she was there to acquire

8  from VASQUEZ. The cartridges were packaged differently and displayed

9  different brand names and TCH yields on the packaging. They appeared

10  ready for retail sale in a marijuana dispensary.

11      43.  During the meeting, VASQUEZ said, "So I'll text you the

12  prices right now . . . They're like from ten to seven, the prices."

13  Later VASQUEZ said, "He [the supplier] told me do whatever you want.

14  He can make pretty much whatever you want."  CS-3 asked for

15  information about the product and VASQUEZ said, "that's Danka

16  [brand].  I think that's like seven.  . . . He says the ones that are

17  ten bucks, which is the Brass Knuckles [brand]—" CS-3 said, "Which is

18  probably the good stuff."  VASQUEZ agreed, "The good stuff . . . The

19  good quality . . . these others are kind of cheesy quality. . . . The

20  VSOP and Eurekas are the good stuff . . . so check it out."  CS-3

21  agreed and accepted the samples.

22          2.   USPV Manager VASQUEZ hints that USPV Owner POLIAK is
               the source of the marijuana cartridges

23

24      44.  CS-3 then asked about making a larger purchase.  "Like, he

25  [supplier] got supply? . . . like could he produce the numbers?"

26  VASQUEZ replied, "I can tell you this.  He's a partner here."  CS-3

27  and VASQUEZ then discussed having CS-3 speak directly with the

28

USAO 000063

1   supplier.  VASQUEZ referred to the supplier as "Mike·," subsequently

2   identified as MICHAEL POLIAK, co-owner of USPV.

3       45.  Immediately after the meeting, DEA agents took into custody

4   six samples of BHO containing THC vape cartridges.  The samples

5   included 1) Dank Vapes, Green Crack (90.66% THC); 2) Kingpen,

6   Trainwreck (71.72% THC); 3) Space Vape, V.S.O.P. (98.4% THC); 4)

7   Eureka, Purple Punch (92.3% THC); 5) Space Vape, Alien Alaskan

8   Thunderfuck (91.18% THC) and 6) Brass Knuckles, Jack Herer (1000 mg

9   cannabis distillate).

10          3.  <u>USPV Owner POLIAK meets a customer at USPV and then
            leads him to the USPV parking lot to view marijuana</u>
11          <u>cartridges</u>

12      46.  On July 26, 2019, CS-3 went to USPV to purchase a large

13  quantity of BHO THC containing vape cartridges.  The meeting was

14  consensually recorded and subsequently reviewed by the Affiant.

15  Shortly after arriving at USPV and making contact with VASQUEZ, CS-3

16  was introduced to MICHAEL POLIAK.  During the conversation, POLIAK

17  said, "Hey it's [the vaping cartridges] in my trunk, in boxes. . . .

18  Like five boxes, two hundred each."  About three minutes after

19  arriving at USPV, agents observed CS-3 and POLIAK in the USPV parking

20  lot at POLIAK's vehicle, a white 2017 BMW 740i four door sedan

21  bearing California license plate ███████████████████████████

22  █████████████████████████████████████████████████████████

23  ██████████████████).  Agents observed CS-3 and POLIAK transfer five

24  boxes from POLIAK's vehicle into CS-3's vehicle.

25      47.  After transferring the boxes, CS-3 and POLIAK went back

26  inside USPV.  CS-3 asked, "You got a money counter here, right? Yeah,

27  there it is right there.  Eight."  CS-3 then gave POLIAK $8,000 for

28  the five boxes, as previously agreed.  POLIAK said, "I can feel money

USAO 000064

1  already."  CS-3 said, "I'll let you know how it goes and I'll put in

2  a bigger one for you, okay?"  CS-3 departed from USPV and provided

3  DEA agents with 1000 units of BHO vape cartridges containing THC that

4  was purchased by from Michael POLIAK and George VASQUEZ at USPV.  DEA

5  took the boxes into evidence, and the DEA Lab determined that the

6  products contained THC.

    4. <u>USPV Owner POLIAK sold 1000 marijuana cartridges from
      the parking lot of POLIAK'S RESIDENCE</u>

  48.  On October 31, 2019, CS-3 purchased an additional 1000

units of BHO THC-containing vape pen cartridges from USPV owner

Michael POLIAK.  The operation was consensually recorded and reviewed

by investigators.  CS-3 met POLIAK in the parking lot of ███████

███████████████████████ adjacent to the residence of Michael

POLIAK.  CS-3 purchased vape pen cartridges with brand name KingPen.

KingPen has been identified by the California Department of Consumer

Affairs (CDCA), Department of Investigations, as one of the several

unlicensed brands of vape pen cartridges that have led to multiple

hospitalizations nationwide.  Through this investigation, agents have

determined that POLIAK is not a licensed marijuana distributor in

California.

  49.  The cartridges were immediately taken into DEA custody and

sent to the DEA lab for analysis, where they tested positive for THC.

  50.  Additionally, DEA sent eight samples of vape cartridges

seized from each of the three transactions described above (June 28,

July 26, and October 31) to the California Department of Public

Health, Food and Drug Laboratory Branch for additional testing.  The

testing showed that five of the eight samples contained Vitamin E

acetate oil, which the Center for Disease Control has linked to lung

**USAO 000065**

1  damage and death.[21] This health crisis was particularly acute in the

2  summer and fall of 2019, when POLIAK and VASQUEZ sold these products

3  to CS-3.  At least one sample from each of the three transactions

4  tested positive for Vitamin E acetate oil.

5       51.  Based on conversations POLIAK had with CS-1 on December 17,

6  2019, which were recorded and reviewed by investigators, POLIAK is

7  clearly aware of the unlawful and dangerous nature of the BHO THC-

8  containing products he was selling.  During that meeting POLIAK told

9  CS-1, "I don't have anything.  Nothing to move.  I shut everything

10 down.  I'm not doing anything right now."  CS-1 asked, "Why?"  POLIAK

11 replied, "I don't want the liability.  . . . I mean, enough [money].

12 It's never enough, but I don't want the liability this stage of my

13 life cause I was making vapes.  . . . They brought lung diseases now.

14 People are having—- there's commercials, you know? I don't need the

15 liability."  This demonstrates POLIAK's awareness that the product he

16 was recently selling was linked to "lung diseases" and potential

17 liability.  POLIAK also seems to be referring to Public Service

18 Announcements (PSAs) alerting the public to the dangers of marijuana

19

20       [21] See *The New York Times*, "Vaping Illnesses are Linked to

21 Vitamin E Acetate, C.D.C. Says," Denise Grady, November 8, 2019;
   www.nytimes.com/2019/11/08/health/vaping-illnes-cdc.html;

22      "A form of vitamin E has been identified as a 'very strong
   culprit' in lung injuries related to vaping THC, health officials

23 reported on Friday, a major advance in a frightening outbreak that
   has killed 40 people and sickened 2,051.  . . . The outbreak has

24 revealed the existence of a vast, unregulated, shadowy marketplace of
   illicit or bootleg vaping products that are essentially a stew of

25 unknown chemicals concocted, packed and sold by unknown manufacturers
   and sellers.  . . . Hundreds of state and federal health

26 investigators have been deployed to find out what has cause such
   extensive damage to patients' lungs, which researchers have likened

27 to the chemical burns suffered by soldiers attacked with mustard gas
   in World War I.  . . . Many of the products used by those who became

28 ill were illicitly obtained, public health experts have said, by
   patients who bought them from friends or on the streat."

USAO 000066

Exhibit F
344

vape products.  Additionally, during a discussion about the kidnap/torture event (discussed above), POLIAK said, "He [NEYMAN] was the one selling the cartridges and the packaging.  Not the oil, you know?  I would make my own oil and inject."  Because the oil itself is believed to be causing the lung damage, POLIAK effectively admitted his role in manufacturing this dangerous product.

        5.   <u>USPV Owner POLIAK discussed with a USPV customer selling flavored cocaine while at POLIAK'S RESIDENCE</u>

52.  In October 2019, CS-3 and USPV co-owner MICHAEL POLIAK first discussed the sale of "flavored cocaine" or "Flavado."  On or about October 11, 2019, CS-3 and POLIAK met for lunch.  After lunch, they returned to POLIAK's RESIDENCE at ███████████████ ██.  While approaching POLIAK's unit, they passed the mailboxes and POLIAK commented to CS-3 about the cocaine residue on his mailbox key.  POLIAK explained that he uses the key routinely to snort cocaine, and the key therefore has coke residue.  CS-3 expressed an interest in purchasing cocaine.

53.  POLIAK then told CS-3 about "Flavado," with which CS-3 was unfamiliar.  POLIAK described it as flavored cocaine which softens the drug's effects, without diluting them.  POLIAK told CS-3 that women love it and he recommended the strawberry flavored coke. CS-3 expressed an interest in purchasing flavored cocaine.  POLIAK called "Casey" in the presence of CS-3 and identified "Casey" as the person who could "hook [CS-3] up."  POLIAK told CS-3 that he would connect CS-3 with Casey when CS-3 was ready to buy, and CS-3 should just let POLIAK know.

54.  On or about November 5, 2019, CS-3 contacted POLIAK and asked him if he could hook CS-3 up with Casey in order to purchase

the flavored cocaine they had previously discussed.  POLIAK asked how
much CS-3 needed and CS-3 told him he was looking for "a zip" [one
ounce].  POLIAK told CS-3 that Casey didn't sell it like that—- he
breaks it down into per-use quantities.  CS-3 asked for $1000 worth
and POLIAK agreed.

55.  On or about November 15, 2019, CS called POLIAK to follow-
up on the requested cocaine purchase.  POLIAK advised that he was
having family issues he was dealing with, and didn't have time to
arrange the deal.

56.  On or about December 11, 2019, CS-3 and POLIAK again
discussed the purchase of flavored cocaine.  During that phone
conversation, POLIAK suggested CS-3 communicate with him using a
wireless application called "Signal."  CS-3 agreed, and further
discussion about the flavored cocaine purchase occurred over Signal,
an encrypted application popular with drug traffickers. POLIAK and
CS-3 continued to discuss the cocaine deal over Signal, often
including the third-party supplier; however, POLIAK never allowed CS-
3 to deal directly with anyone – POLIAK was always involved.  CS-3
believes this was intentional in order for POLIAK to protect his
financial cut in the deal.

6.   <u>USPV Owner POLIAK set up a cocaine deal at USPV, but
then moved it when USPV Manager VASQUEZ Objected to
the location</u>

57.  On or about December 16, 2019, POLIAK told CS-3, "Come to
the vault [USPV]; we'll do it [cocaine deal] here."  CS-3 agreed.
However, a little later, George VASQUEZ called CS-3 and expressed his
objection to CS-3 and POLIAK conducting a cocaine deal at USPV.
VASQUEZ felt that POLIAK was not being careful and that he was
possibly bringing unwanted attention from law enforcement onto the

USAO 000068

1   business.  VASQUEZ told CS-3 to "do the deal quickly – pick it up and

2   get out of here," or words to that effect. Shortly after, POLIAK

3   contacted CS-3 and said they could not do the deal at USPV.

4        58.  On or about December 18, 2019, in a conversation with CS-3,

5   which was recorded and reviewed, POLIAK instructed CS-3 to meet with

6   an unknown associate of his at ████████████████████████████

7   ████████████  in order to obtain one ounce of flavored cocaine.  CS-3

8   was able to make arrangements for a DEA Task Force Officer, working

9   in an undercover capacity ("TFO-UC"), and posing as an associate of

10  CS-3, to make the purchase for $2,200.  TFO-UC arrived at the

11  location and met with an individual who was later identified as

12  Daniel SAVAGE and obtained a quantity of suspected cocaine in a white

13  shopping bag, hidden beneath a pair of black gym shorts.  DEA agents

14  took custody of the suspected cocaine which was in a clear plastic

15  sandwich baggie that had been tied in a knot.  The white substance

16  and the sandwich baggies weighed 29 grams.  The suspected cocaine was

17  sent to the DEA lab for processing.  The substance tested positive

18  for cocaine HCL.

19       **J.   USPV Owner Mark PAUL Leases Property for the Purposes of
20            Manufacturing, Producing and Distributing Controlled
             Substances**

21       59.  On or about February 20, 2020, PAUL met with CS-1.  The

22  meeting was consensually recorded and reviewed by investigators.

23  During that meeting, PAUL told CS-1, "I've been doing cannabis

24  deals," but then described himself as "just a landlord."  PAUL went

25  on to describe one location as an "amazing property" that everyone in

26  the marijuana business wanted because of its location.  However, it

27  was located near a Gymboree – a business which falls under California

28  Health & Safety Code 11362.3(3), prohibiting marijuana possession

USAO 000069

within 1,000 feet of a school, day care or youth center – so no one in the cannabis business could buy the location.  PAUL then explained how he bought the Gymboree, left the signage in place, and then bought the "amazing property" for the dispensary.  He did not remove the Gymboree sign until the dispensary was open for business. PAUL told CS-1 that he paid $250,000 for the Gymboree (which he closed), and $4.5 million for the other property, as well as $700,000 in improvements.  PAUL told CS-1 that he earns $62,000 a month renting the property to the dispensary owners[22].

   60.  During the same consensually recorded meeting in February 2020, PAUL said, "I have another deal – I have a dispensary--" then he stopped speaking abruptly, as though he thought better of admitting that he had a marijuana dispensary.  PAUL then changed the focus of his comments to the company in Oregon rather than his role. PAUL went on to describe "the largest marijuana processing company in Oregon" with whom he partnered.  PAUL told CS-1 that this business could process 5 to 10 million pounds of marijuana a month with the use of a kiln that quickly dries wet hemp.  Further, he told CS-1 that the group was conducting $2 million a month in business, but had contracts for $10 million a month that they could not meet.  PAUL told CS-1 that he invested $5.5 million in the business.

---

[22] Based on specific descriptions, agents have identified the marijuana dispensary as The Atrium at 5441 Topanga Canyon, Woodland Hills.  Mike POLIAK corroborated PAUL's association with this business to CS-1 in September 2020, telling CS-1 that PAUL purchased land "up north" for a marijuana grow, but refused to finance the equipment.  Now, according to POLIAK, PAUL's partners are having trouble paying the lease on the land, their "finance guy" has taken over the Atrium dispensary, and there is a power struggle for control.

USAO 000070

61.  On or about April 22, 2020, CS-4 spoke with George VASQUEZ while at USPV to pay rent on a safe deposit box.  This conversation was not recorded, but was reported to the Affiant immediately after it occurred.  VAQUEZ informed CS-4 that "his boss" recently purchased six or seven hundred acres in Colorado for the cultivation of marijuana and was looking for individuals interested in providing security.  Based on conversations VASQUEZ has had with CS-3 and CS-4, VASQUEZ refers to Mark PAUL as his boss.

62.  During the course of this investigation, investigators reviewed and analyzed PAUL's business, banking and financial activity.  PAUL's businesses include MJ Real Estate Investors Inc. ("MJRE")[23], a marijuana real estate investment company; Emerald Fund, LLC; Bachelor Valley Fund LLC; and Mark Paul Holdings, Inc.  An analysis of banking records shows over $700,000 in transactions between MJRE and Antares Topanga Group, LLC, aka Valley Collective Care, which public records show doing business as The Atrium, a marijuana dispensary.  MJRE also conducts business with Emerald Fund LLC (both owned by PAUL).  Emerald Fund remitted funds for a 67-acre purchase in Oregon. Emerald also has financial transactions with Rogue Bioscience, a Medford-Oregon based industrial hemp processor. Bachelor Valley Fund has financial transactions with a company in Denver, Colorado. This analysis supports statements PAUL and VASQUEZ made to CS-1 and CS-4.

63.  Based on information provided by the California Department of Consumer Affairs – Cannabis Enforcement, which enforces marijuana

---

[23] USPV former owner and OLYMPIC GOLD & JEWELRY owner, Steve BARTH, is also a principal at MJRE.

USAO 000071

laws in California, PAUL is not licensed to "have a dispensary" or otherwise participate legally in the cannabis industry.

**K.   USPV Owner Michael POLIAK is a Professional Criminal**

POLIAK's Criminal Activity

64.   In addition to brokering a cocaine deal for CS-3 and selling 1000 units of BHO THC-containing vape pen cartridges on two occasions (discussed above), POLIAK continues to engage in criminal activity.  The following examples demonstrate this:

1.   POLIAK studied how to commit deceptive online marketing

a.   During a December 2019 meeting with CS-1, which was recorded and reviewed by investigators, POLIAK described a possible new business deal, which involved fraud: "I have a guy that's a master at driving traffic on-line.  . . . But he does deceptive marketing.  He'll fake some shit, like he'll put Dr. Oz promoting his product or Ellen [DeGeneres] or some shit like that.  And he'll sell the fuck out of it, but you burn a lot of merchant accounts. . . . But merchant accounts is the problem.  It's – you burn a lot of them. You constantly need a flow of merchant accounts.  Cause the [credit card] charge-backs are gonna be like crazy."  POLIAK advised that he had a business meeting arranged with this person for the following day, in order to learn how to take over his business, before he goes to jail[24].  In January 2020, POLIAK introduced CS-1 to Allen NEYMAN, and they discussed possible business deals.  That meeting was recorded and reviewed by investigators.

---

[24] The person running the fraud scheme as described by POLIAK is ALLAN NEYMAN who was involved with the torture/kidnapping discussed above.

USAO 000072

1           2.   POLIAK's Paycheck Protection Program scheme

2           b.   On or about September 15, 2020 CS-1 met with POLIAK.

3    The meeting was consensually recorded and reviewed by investigators.

4    During the meeting, POLIAK described obtaining almost $70,000 from

5    Payroll Protection Plan (PPP) for his "employment" at MGP Management.

6    POLIAK admitted to CS-1 that he only made $1,000 a month, and didn't

7    have any employees, but submitted an application and received

8    $68,700. When CS-1 asked how he did it, POLIAK replied "Cause I

9    filed. That I had hardships."  Additionally, POLIAK applied for and

10   received three SBA (Small Business Administration) loans for his

11   other businesses, though he acknowledged they were loans.  POLIAK

12   described them as "free money," and at an interest rate of 3.75%,

13   could earn more than that through one of his "investments."

14   Throughout this conversation, POLIAK bragged to CS-1 about committing

15   fraud.

16          3.   POLIAK's marijuana trafficking

17          c.   On or about January 27, 2020 CS-1 met with POLIAK.

18   The meeting was consensually recorded and reviewed by investigators.

19   During the meeting, POLIAK spoke to Memory Buss using the speaker

20   function on his cell phone.  CS-1 witnessed both sides of the

21   conversation.  Based on my review of the conversation, as well as

22   information provided by the California Department of Consumer Affairs

23   ("CDCA"), Buss is licensed under CalCannabis for Provisional Adult

24   Use – Nursery; Processor; and Specialty Indoor – but not retail or

25   manufacturing.  Further, POLIAK leases property in Los Angeles which

26   he subleases to Buss for use in her Cannabis business.

27          d.   Buss recently ended a partnership in her Cannabis

28   business because her partners were operating outside the law.  She

USAO 000073

1  told POLIAK, "I'm staying compliant by getting rid of them.  I would
2  have lost my license if they would have stayed because they broke the
3  law so many times."

4          e.    During the conversation, POLIAK offered to sell Buss
5  filling machines for $5,000 each.  He first denied having any, "I
6  just got rid of everything when I closed out.  They weren't legal
7  anyway."  But then he said, "I have three laying around," which she
8  asked to buy.  Based on information provided by CDCA, "filling
9  machines" are outside the scope of Buss's license; POLIAK is not
10 licensed to possess these machines at all.

11         f.    POLIAK also offered to broker the sale of 20,000 pre-
12 rolled joints.  While POLIAK was adamant that he did not want to
13 "hold" more than a few samples –"you can drop off samples.  But I
14 don't need to store fuckin' tons of shit.  A couple samples, yeah, no
15 problem.  I'll just hand it over to the guy."  As the conversation is
16 wrapping up, POLIAK tells Buss to bring the samples and he'll give
17 them to a couple of guys.

18         g.    This demonstrates POLIAK's on-going business dealings
19 in the marijuana industry which are outside California law, as he is
20 not licensed.

21         4.    <u>USPV Owner POLIAK bragged about his drug cartel
              connections</u>
22
23 65.  In December 2019, POLIAK discussed with CS-1 his various
24 business deals, including one involving the import of produce from
   Mexico.  During that conversation, which was recorded and reviewed by
25 investigators, POLIAK told CS-1 that he was affiliated with the
26 Beltran-Leyva drug cartel.  During a conversation, CS-1 said, "These
27 guys [referring to CS-1's phone], their mother is from cartel."
28

USAO 000074

POLIAK responded, "That's how I am. I'm Beltran.  Beltran are my
people.  Google Beltran, you'll see how big they are.  Guadalajara."
POLIAK then told CS-1 that the cartels control everything in Mexico
and you can't work there without them.  POLIAK's self-proclaimed
association with a well-known Mexican drug cartel suggests his
participation in money laundering or drug trafficking.  While POLIAK
refers to the subject of this business as involving "produce" or
"avocadoes," based on my training and experience, produce is often
used by Mexican drug cartels as a "cover" load to disguise transport
of drugs or currency.

66.  During the course of this investigation, agents have
obtained and reviewed financial records related to USPV principals,
including records related to Michael G. POLIAK and numerous business
entities associated with him (e.g. MGP Consulting, MGP Management).
A review of financial records associated with MGP Consulting revealed
a January 25, 2019 check for $125,000 payable to AA Consulting Group,
Inc.  Public records show that AA Consulting Group, Inc. belongs to
Aram Abgaryan, who was arrested and charged with murder in October
2019.  Those charges stem from Abgaryan's involvement in an explosion
at a sophisticated cannabis extraction plant in Chatsworth,
California, which resulted in the death of one of the participants[25].

---

[25] See www.nbclosangeles.com\news, "Five Men Charged For Deadly Honey
Oil Lab Explosion in Chatsworth," October 31, 2019.

"Five men have been charged with murder following a deadly explosion at an illegal honey oil lab in
September that killed a man they were working with, authorities announced Thursday.

The defendants and the victim had been operating a lab in Chatsworth, where they extracted THC, the
high-inducing chemical found in marijuana, from cannabis plants for at least two months, the Los

USAO 000075

1   That POLIAK was participating in this illegal and dangerous

2   enterprise is supported not only by the check he wrote to AA

3   Consulting, but by statements he made to CS-1 in December 2019.  In a

4   conversation between POLIAK and CS-1, which was recorded and reviewed

5   by investigators, POLIAK described an "unlucky" guy who used to "make

6   oil" for him using solvents.  According to POLIAK, the man had a

7   heart attack prior to the chemical explosion, but the others were

8   being charged with murder anyway because the death occurred during

9   the commission of a crime.

10       POLIAK's Money Laundering

11       67.  In multiple conversations with CS-1, which were

12   consensually recorded and reviewed by investigators, POLIAK admits to

13   laundering money, often referring to money as "clean" or "dirty," and

14   speaking plainly about the need to "clean my money."  The following

15   provide specific examples from conversations between CS-1 and POLIAK:

16

17   _____

18   Angeles district attorney's office said in a statement.

19   The lab exploded Sept. 21 while four of the men and the victim, Dados Aroutiounov, 62, were inside.
20   Aroutiounov's remains, burned beyond recognition, were found the following day under a pile of debris
     after investigators received information that someone may have been killed in the fire.

21   The cannabis allegedly was being turned into a potent concentrate known as hash oil or honey oil that
22   can be used in vape pens, edibles, waxes and other products.

23   A rise in vaping illnesses nationwide has caused federal investigators to probe the black market for
24   THC products, especially illegal vaping cartridges.

25   Aram Abgaryan, 30, Vadim Klebanov, 59, Arsen Terejyan, 43, Rafael Mailyan, 32, and Stepan
     Mailyan, 65, were arrested Tuesday and charged with murder and manufacturing a controlled
26   substance, concentrated cannabis. Authorities also seized $3.2 million and gold bars Tuesday from a
     storage unit connected to the case.

27   Each faces 23 years to life in prison. They remain in jail on $2 million bail."

28

**Exhibit F**
**354**

USAO 000076

a.   During a meeting in December 2019, POLIAK told CS-1 that he has monthly income in the form of a $50,000 check.  "I get checks for fifty-thousand a month.  Forty-five gets me fifty."  Later in the conversation, CS-1 asked, "But how do you have fifty a month?"  POLIAK replied, "I'm telling you, between like all my things I'll make like six hundred this year."  CS-1 asked, "You give them cash, they give you check, is that what—"  POLIAK replied, "*No, no that's just to clean my money . . . that I don't even count as income*."

5.   USPV Owner POLIAK admits he uses a shell business to launder money

68.   POLIAK further discussed both the "forty-five-for-fifty" deal, and other aspects of money laundering with CS-1 on or about January 27, 2020, during a meeting which was recorded and reviewed by investigators.  After a detailed description of his involvement in the cannabis industry, POLIAK said, "I took home 200-something thousand in key money and ten thousand a month income every month."  CS-1 asked, "So how do you manage, where do you put your money?"  POLIAK exclaimed, "I own a vault!"  CS-1 asked, "I'm not talking about the cash."  POLIAK replied, "It's all cash!  It's all cash.  Why do you think I bought the vault?"   POLIAK then described some of his shell corporations: "I have MGP.  *Because I have to clean the money*.  Put money into MGP so I can pay half the rents.  Half the rent is in cash and half the rent is clean."

69.   Later in the same conversation with CS-1, POLIAK said, "I wash $50,000 through my consulting.  Remember, I pay 45 for 50?"  POLIAK continued, "So fifty thousand--" CS-1 finished, "you put into MGP."  POLIAK corrected, "No, I put into MGP Consulting.  MGP Consulting pays MGP Management for rent.  Talking about $10,000 a

USAO 000077

1   month.  And that goes to the landlords." CS-1 said, "So you're paying

2   the landlords--" POLIAK finished, "--through my consulting." CS-1

3   said, "So you're getting paid cash . . . you give some fucker cash--"

4   POLIAK finished, "He cuts me a check.  Fifty thousand for forty-five

5   cash."  It is important to note POLIAK's use of various shell

6   corporations such as MGP Management and MGP Consulting.  Based on my

7   training and experience investigating money laundering organizations,

8   I know that it is common for criminals to create multiple "shell"

9   corporations to "layer" criminal proceeds, thereby obscuring their

10  criminal origins.  Additionally, in this exchange, POLIAK again

11  openly admits cleaning his money, something which does not need to be

12  done with lawfully earned income.

13      70.  A review of Michael POLIAK's bank accounts (specifically

14  MGP Consulting) corroborates his description of this activity.

15  Between February 15, 2018 and January 2020, MGP Consulting received

16  $50,000 a month (forty-two $25,000 checks) from Corporation A and

17  Corporation B, both owned by the same individual.  I learned through

18  conversations with FBI agents that the individual is the target

19  subject of a current FBI Healthcare Fraud investigation (hereafter TS

20  HCF)[26].  TS HCF's signature is on checks from both companies.  Based

21  on conversations I've had with agents who investigate healthcare

22  fraud, I know that those engaged in healthcare fraud schemes often

23  need cash and will pay a premium for it (e.g. $50,000 for $45,000 in

24  cash) because they need to make cash payments to "patients" seeking

25  healthcare services which are being over-billed.  They cannot

26

27      [26] FBI agents who are investigating TS HCF asked that the
    identity of the target of their investigation, as well as his/her
28  related business entities, remain undisclosed in order to protect the
    integrity of their investigation.

**USAO 000078**

1  withdraw the amount of cash they need without bringing attention to

2  their scheme.  This leads them to look for other sources of cash.

3      71.  POLIAK has a large amount of cash which he stores at USPV.

4  On or about December 17, 2019, CS-1 met with Michael POLIAK.  The

5  meeting was consensually recorded and subsequently reviewed by

6  investigators.  During the meeting POLIAK told CS-1 that as a

7  customer of USPV (prior to buying in to the business), POLIAK had

8  four boxes at USPV.  He further stated that he now has "six boxes in

9  the place myself!  I was a customer.  I'm telling you, I have six

10 ten-by-tens myself."   POLIAK added, "Let me put it this way, the

11 reason also why I wanted to buy it [USPV], I got a lot of fucking

12 money now."  Earlier in the conversation, POLIAK said, "I wish I had

13 fifty [million] right now.  That would be nice."  CS-1 replied,

14 "Yeah?  In your twenties or what?"  POLIAK said, "No, not even, bro.

15 Like ten.  . . .  I have like **two clean, eight like dirty**.  I put

16 most of it in the house."  Based on my review of the recording and a

17 debrief of CS-1, I believe that POLIAK has $10 million: $2 million

18 which he laundered through the purchase of property (discussed below)

19 and $8 million in cash stored in six 10 x 10 boxes at USPV.

20 Additionally, POLIAK himself describes the $8 million as "dirty," by

21 which I believe he means it was not legally derived and in the form

22 of cash – not laundered to appear legitimately earned.

23      72.  Based on my training and experience, my review of bank

24 records and recordings, I believe that the cash POLIAK is sending to

25 TS-HCF is the proceeds of his self-professed "illegal businesses,"

26 likely drug trafficking, which he stores at USPV.  Thus, drug

27 trafficking proceeds are being used to further healthcare fraud; and

28

USAO 000079

1    the fraud proceeds are being further laundered by POLIAK to make

2    purchases (such as USPV) and advance his other criminal interests.

3         73.   Michael POLIAK described efforts to launder his money

4    through a real estate purchase to CS-1.  On or about December 17,

5    2019 and again on September 15, 2020, Michael POLIAK met with CS-1.

6    The meetings were consensually recorded and reviewed by

7    investigators.  During those meetings, POLIAK described to CS-1 his

8    plans to launder cash through the purchase, renovation and sale of

9    property located at ███████████████████████████████████ .

10        74.   During the earlier conversation, POLIAK told CS-1 that the

11   property was listed at $2 million, but he offered the sellers $1.7

12   million "tomorrow – no inspection."  POLIAK said, "I literally did

13   one day close. Can you imagine?  One day close?"  In the subsequent

14   meeting, POLIAK further explained that he put $600,000 down and took

15   out a mortgage of about $1.2 million[27].  He also told CS-1 that he

16   spent about $1.5 million renovating the property.

17        75.   In September 2020, with renovations complete, POLIAK told

18   CS-1 he was listing the property for $3.6 million, but expected a

19   bidding war.  POLIAK believed the property was worth closer to $4

20   million.

21        76.   With regard to the property purchase and massive renovation

22   under way when CS-1 first saw the property in December 2019, CS-1

23   commented, "You could, basically what you could do is, one-point-

24   seven, you could easily clean your money through it."  POLIAK

25   replied, "That's what I'm doing with the construction.  Why do you

26   think I'm doing half a million construction?"  CS-1 said, "Half a

27

28        [27] This is supported by financial analysis which revealed a
     mortgage on this property.

**USAO 000080**

1   million cash." POLIAK said, "I want to do one or two projects like

2   this a year." CS-1 said, "That's a million dollar give-away. And

3   you-" POLIAK interrupted, "Ten-thirty-one-exchange[28]." POLIAK added,

4   "And I can wash it off the construction company. On top of the ten-

5   thirty-one exchange." CS-1 asked, "You're giving him cash?" POLIAK

6   said, "I write off Jacob," referring to his contractor. CS-1 said,

7   "Yeah, you take his check. You give him cash." POLIAK said, "Yep.

8   . . . We do profit sharing . . . Yeah, on the house. It's gonna be

9   like this and it comes back clean . . . I pay all his subs in cash.

10  I've been paying all his subs in cash all year already."

11       77.  It is worth noting that POLIAK himself uses phrases such as

12  "I can **wash** it" and "it comes back **clean**," showing his own awareness

13  and acknowledgement of money laundering. Additionally, when CS-1

14  says "you could easily **clean** your money through it," POLIAK eagerly

15  agrees, saying "That's what I'm doing with the construction. Why do

16  you think I'm doing half a million construction?" Finally, by

17  admitting that he is paying sub-contractors ("subs") in cash and has

18  been doing so all year, POLIAK is specifically describing how he uses

19  (illegal) cash to increase the value of his property which he will

20  later sell for a profit and claim as legitimate income, thus

21  "cleaning" his "dirty" money.

22       78.  Finally, during their September 2020 meeting, which was

23  recorded and reviewed, CS-1 inquired whether POLIAK's asking price

24  would be reduced if a buyer came in with a million or two million in

25  cash. POLIAK told CS-1 he would require "a premium" if someone came

26

27

28       [28] A 1031 Exchange refers to section 1031 of the IRS Code which
     allows a real estate investor to avoid capital gains taxes as long as
     the profit is used to purchase another "like kind property."

USAO 000081

in with cash – he would charge $4.2 million.  "I don't— Nobody needs cash.  . . . I have a ton of cash.  . . . I'm doing business to get rid of my cash."  This further demonstrates POLIAK's on-going efforts to laundering money through his various projects.

**L.    USPV Owner Michael POLIAK Used Criminal Proceeds to Buy His Interest in USPV**

79.  In April 2019, Michael POLIAK purchased a 50% ownership in USPV.  POLIAK described the deal to CS-1 in a consensually recorded conversation which investigators reviewed.  During that conversation, CS-1 asked, "How did you meet him [PAUL], turn around and become a partner? . . . Did you have to pay him?"  POLIAK replied, "Yeah, I gave him $475,000.  . . .  two-seventy-five clean.  Two hundred dirty."  Later in the conversation, POLIAK explained, "Mark [PAUL] owned 75%.  Hillary [BARTH] and her husband [STEVE BARTH] owned 25%. I bought twenty-five from Mark, and I bought twenty-five from them. I said, 'Mark, I can't buy the place unless I get at least 50%.'"

80.  A review of bank records supports POLIAK's claim.  On April 2, 2019, $225,000 was deposited into USPV's JP Morgan Chase bank account ending in #7511.  The deposit included a Wells Fargo Bank cashier's check in the amount of $125,000, payable to U.S. Private Vaults, purchased by Michael POLIAK; and a check issued from Michael POLIAK's Wells Fargo Bank account #7496 in the name of MGP Consulting LLC, for $100,000, payable to U.S. Private Vaults.  Based on POLIAK's statements, agents believe that the remainder of the $475,000 was paid in cash.  Agents also believe STEVE BARTH and HILLARY BARTH were paid in cash.

81.  As set forth above, there are numerous factors which indicate that all of POLIAK's income is derived from illegal sources.

USAO 000082

1   The cash in particular cannot be sourced to any lawful pursuit.

2   However, close examination of POLIAK's bank records reveal the

3   following:

4         a.    The check for $100,000 from MGP Consulting LLC, can be

5   traced to healthcare fraud, as described above.  Between February 15,

6   2019 and April 1, 2019, POLIAK received three checks from Corporation

7   A, and one from Corporation B., each for $25,000, payable to MGP

8   Consulting. These checks are part of the "forty-five-for-fifty"

9   healthcare fraud/money laundering scheme POLIAK himself described.

10  These deposits funded the $100,000 check from MGP Consulting to U.S.

11  Private Vaults.

12        b.    In addition, the $125,000 cashier's check from

13  POLIAK's Wells Fargo account can be traced to a $300,000 E-deposit

14  made in New York on 10/20/2018.  Financial investigators traced this

15  check to Alta Quality Growers, LLC of Elgin, Illinois, whose

16  principal is John Fasano of Brooklyn, NY.  Fasano has a criminal

17  history which involves drug trafficking (marijuana and ecstasy), as

18  well as a financial history which includes a pattern of structured

19  deposits and withdrawals and large wires to Mexico, with no business

20  purpose.  Additionally, Alta Quality Growers, LLC has no website and

21  little internet presence.  It's notable that the company, supposedly

22  located in Illinois, has a (956) area code phone number – 956 covers

23  much of the Texas-Mexico border.  Based on my training and experience

24  in both drug and money laundering investigations, I believe that Alta

25  Quality Growers, LLC is a drug/money laundering front.  The money

26  therefore which funded POLIAK's Wells Fargo Bank account and was used

27  in part to purchase USPV, is likely also criminal proceeds.

28

USAO 000083

**M. None of the Individuals Associated with USPV, as Principals
or Patrons, who are Participating in the Marijuana
Industry, is Licensed by the State of California to do so.**

82. During the course of this investigation, federal agents
consulted with the California Department of Consumer Affairs,
Cannabis Enforcement.  Through that consultation, we learned that
none of the following individuals is licensed to participate in the
California cannabis trade, either with regard to cultivation,
manufacture, or retail[29]:  MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ,
STEVE BARTH, HILLARY BARTH, Allan NEYMAN, Matthew BEAVER, Aram
ABGARYAN, Alta Quality Growers, John FASANO.

**N. USPV Principals Have Counseled Clients on Strategies to
Circumvent BSA Reporting Requirements and Have Themselves
Failed to Comply with Reporting Requirements**

1. USPV Manager VASQUEZ instructs a customer to structure
gold purchases to avoid currency transaction reports

83. On August 9, 2019, CS-3 talked to USPV manager GEORGE
VASQUEZ about buying gold at OLYMPIC GOLD & JEWELRY.  The
conversation was consensually recorded and reviewed by investigators.
During the conversation, CS-3 said, "My Primo's gonna want to talk to
her [HILLARY BARTH] because we spoke about buying some gold. . . . He
[Primo] needs to get rid of a lot of shit . . . and I'm hoping you
guys have some fuckin' creative ideas on how to do it."  VASQUEZ
clarified, "Well, depends on—what—okay—he's got to get rid of some
money?"  CS-3 replied, "Yeah."  VASQUEZ said, "He wants to buy gold?"
CS-3 said, "Yes."  VASQUEZ said, "Okay.  **Keep it at under ten
thousand dollars.**"  CS-3 asked, "How often?"  VASQUEZ replied, "About
– I would—it's, it's supposed to be every 24 hours . . . but I

---

[29] Valley Collective Care (Antares Topanga Group) which operates
The Atrium at 5441 Topanga Canyon Blvd., Woodland Hills, CA.,
discussed herein is a licensed cannabis retailer.

USAO 000084

1  suggest at least 48 hours." VASQUEZ added, "Yeah. But not all the
2  time. **So let's say like 9,000 or 9,500.**" CS-3 said, "**Break it**
3  **down.**" VASQUEZ replied, "Break it down . . . Cause **you don't want**
4  **that paperwork shit.**" (Emphasis added.) Based on my training and
5  experience, as well as a comprehensive debrief of CS-3, CS-3 was
6  talking to VASQUEZ about laundering criminal proceeds through the
7  purchase of gold. Furthermore, I believe that VASQUEZ understood
8  that CS-3 was talking about laundering criminal proceeds. Finally,
9  it is indisputable from this conversation that VASQUEZ was coaching
10 CS-3 how to "structure[30]" his purchases in order to avoid the Bank
11 Secrecy Act (BSA) reporting requirements, specifically telling CS-3
12 to "keep in under $10,000" because "you don't want that paperwork
13 shit."

14       84.  In addition to coaching CS-3 on how to avoid BSA
15 requirements, VASQUEZ's statements show a clear knowledge of and
16 participation in money laundering. USPV is using its co-located
17 business, OLYMPIC GOLD & JEWELRY as an outlet for USPV customers to
18 launder criminal proceeds, by exchanging cash for gold or silver.
19 That there is a pattern and practice of this is evidenced by the
20 seizure of gold and silver from USPV boxes in the cases described
21 earlier. Furthermore, based on my training and experience
22 investigating money laundering, I know that the purchase and sale of
23 gold and silver is a common method which criminals employ to launder
24 criminal proceeds. Gold and silver are difficult to trace, portable,

25

26 _____

27    [30] Structured deposits refers to multiple deposits under $10,000,
   made on the same day or consecutive days, which add up to over
28 $10,000 – generally structured in order to avoid Bank Secrecy Act
   (BSA) requirements, such as providing identification and filing a
   Currency Transaction Report (CTR) or IRS Form 8300.

USAO 000085

fairly easy to re-sell, and often traded in a manner which, like

USPV, caters to criminals' need for anonymity.

2.   HILLARY BARTH and VASQUEZ instruct a customer to
structure gold purchases to avoid currency transaction
reports

85.   On or about January 13, 2020 CS-4 went to USPV to pay rent

on a previously-rented safe deposit box.  While there, CS-4 spoke to

HILLARY BARTH about the possibility of investing approximately

$20,000 in gold or silver.  This conversation was not recorded, but

was reported to the Affiant immediately after it occurred.  HILLARY

BARTH, who had never previously met CS-4, told CS-4 that it didn't

matter whether CS-4 purchased gold or silver – one came in coins, the

other in bars – but he/she should not purchase $20,000 at one time.

HILLARY BARTH specifically advised CS-4 not to purchase more than

$10,000 worth of gold or silver at a time, otherwise, CS-4 would have

to fill out the paperwork[31].   This shows that HILLARY BARTH is

coaching USPV/OLYMPIC GOLD & JEWELRY clients on strategies for

evading BSA reporting requirements.  It's important to note that

HILLARY BARTH had not previously met CS-4, because this suggests that

she gives this advice to *all* USPV/OLYMPIC GOLD & JEWELRY clients.

86.   On February 25, 2020, CS-4 went to USPV to access a

previously-rented box.  While there, CS-4 spoke to George VASQUEZ

about the possibility of purchasing gold.   This conversation was not

recorded, but was reported to the Affiant immediately after it

occurred.  VASQUEZ asked how much CS-4 wanted to purchase and CS-4

said he/she might have about $23,000 to invest. CS-4 relayed to

---

[31] Note, CS-4 was not coached or prompted in any way to inquire
about breaking up a purchase. CS-4 was instructed to mention that
he/she expected to have $20,000 to invest and would like information
about purchasing gold or silver.

USAO 000086

1   VASQUEZ what Hillary BARTH had previously told CS-4 -- that he/she

2   should keep the purchases under $10,000 in order to avoid doing

3   paperwork. VASQUEZ agreed with that and told CS-4 that he could help;

4   specifically, CS-4 could deposit $9,000 and give the rest to VASQUEZ,

5   who would make the deposits, so no paperwork would be filed. VASQUEZ

6   added that CS-4 should "throw me a little," meaning of the cash

7   because "I help you, you help me." VASQUEZ said he had such an

8   arrangement with someone else and it worked well[32]. VASQUEZ also added

9   that CS-4 would not even have to put his/her name on the receipt for

10  the gold; he/she could just use initials, and that way no one would

11  know -- there would be no paperwork.

12          3.   STEVE BARTH and VASQUEZ instruct a customer to
                 structure gold purchases to avoid currency transaction
13               reports

14       87.  Similarly, on January 28, 2020, a DEA employee, posing as a

15  potential customer, went to USPV to discuss purchasing gold.  The

16  meeting was recorded and reviewed by investigators.  The DEA Agent

17  first told George VASQUEZ that he wanted to purchase $18,000 worth of

18  gold. VASQUEZ then advised the Agent that, "You can buy that but I

19  advised you to buy under 10 [$10,000]. Because if you're buying under

20  10 [$10,000], we don't have to do paperwork. No information is going

21  to IRS. So you could buy 9 [$9,000], and a couple days, come buy

22  another 9 [$9,000]."  VASQUEZ then logged on the computer and showed

23  the Agent the gold prices[33].  A few minutes later, STEVE BARTH arrived

24  _____

25      [32]    Note this conversation took place after the
    January/February gold purchase, discussed below, in which VASQUEZ was
26  "tipped" in cash for his assistance.
        [33]    The fact that VASQUEZ was able to go behind the counter of
27  OLYMPIC GOLD AND JEWELRY and log onto the computer led the Agent to
    believe that the VASQUEZ was an employee of both USPV and OLYMPIC
28  GOLD AND JEWELRY and/or the two businesses were essentially one.

1    at the business. VASQUEZ introduced STEVE BARTH to the Agent and

2    departed the display room.  STEVE BARTH told the Agent that he sells

3    gold, silver, platinum and different types of gold. The Agent told

4    STEVE BARTH that he wanted to purchase $18,000 worth of gold. STEVE

5    BARTH advised the Agent, if someone gives you $10,000 or more there's

6    a form you have to fill out. "If you buy less than $10,000 then

7    there's no form."  The Agent then told STEVE BARTH that he didn't

8    have any problem with filling out the form. STEVE BARTH then told the

9    Agent that, "Some people don't want to alert the IRS or whatever, so

10   they keep it under, most people." STEVE BARTH then advised the Agent,

11   "If you like to, you can buy $9,000 one day and then $9,000 you

12   know." The Agent then asked STEVE BARTH if he could purchase $9,000

13   of gold in one day then do another $9,000 worth of gold the very next

14   day. Steve BARTH said, "Yes, you could do that."  Later, STEVE BARTH

15   added, "I recommend you stay under 10,000 in cash and then you could

16   just do some one day and a few days later you could do the other.

17   That's what I would recommend." STEVE BARTH then said, "Anytime,

18   there's more than 10,000 dollars in cash, they get suspicious, so

19   they want to know. You fill out the form and the form goes to the

20   government and even though, it's legitimate."

21       88.  In addition to coaching customers on methods for evading

22   BSA requirements, HILLARY BARTH violated 31 U.S.C. §5331 by failing

23   to file IRS Form 8300 after conducting a cash transaction at OLYMPIC

24   GOLD & JEWELRY.  On or about December 4, 2019, CS-1 purchased

25   jewelry from OLYMPIC GOLD & JEWELRY[34].  CS-1 and HILLARY BARTH

26   _____

27

28       [34] The purchase was not recorded, but CS-1 exchanged text
     messages with HILLARY BARTH negotiating and leading up to the

negotiated the sale for approximately $11,900.  CS-1 paid for the jewelry in cash.  HILLARY BARTH gave CS-1 a document certifying that the jewelry was authentic.  However, HILLARY BARTH did not provide an invoice or obtain the information necessary to complete the Form 8300 (CS-1's identification, etc.). No Form 8300 was in fact filed, based on a database search for any Form 8300s filed (at any time) by either STEVE or HILLARY BARTH.  I believe HILLARY BARTH is aware of the requirement to file Form 8300 for cash transactions in excess of $10,000 based on her discussions with CS-4 and others.  Moreover, HILLARY BARTH's failure to provide CS-1 with a receipt, invoice or other paperwork suggests that the sale was "under the table" and that any income earned from the cash transaction was not declared to the IRS.

### O.   USPV Principals Laundered Cash Represented to be Criminal Proceeds Through OLYMPIC GOLD & JEWELRY

#### 1.   January/February 2020 Gold Buy

89.  On or about January 29, 2020, CS-3 and TFO-UC (posing as an associate of CS-3) went to USPV to discuss the purchase of gold with cash purportedly derived from the sale of methamphetamine.  The meeting was recorded and reviewed by investigators.

a.   After discussing the difference between gold coins and gold bars, CS-3 told George VASQUEZ that gold bars were more desirable for melting down, and mentioned that TFO-UC needed the gold bars as payment for a debt.  CS-3 then asked VASQUEZ about crossing gold "down south" [Mexico].  VASQUEZ asked CS-3, "How much are you planning to take?" He then instructed CS-3 to, "Keep it under 10,"

purchase; investigators received and reviewed copies of the text messages.

referring to the monetary value of $10,000 in cash, when purchasing gold. VASQUEZ then instructed CS-3 and TFO-UC to conduct two separate "orders" under the amount of $10,000 each, when purchasing the gold. CS-3 then asked VASQUEZ, "What do you mean?" VASQUEZ then continued, "Yeah, if you keep it under $10,000, there is no paperwork. That way you don't have to give no social security, no ID. All that shit goes to the IRS." At this time, CS-3 and TFO-UC simultaneously expressed their interest in conducting the gold purchase without having to fill out paperwork.

b.   CS-3 stated, "Nah.. Nah.. Nah.. fuck that! This is all 'skante' money. I can't even fuck with that." VASQUEZ then reiterated, "Keep it under 10. You want to buy gold? Keep it under 10."  Based on training and experience, TFO-UC recognized "skante[35]," to be street vernacular commonly utilized for crystal methamphetamine.

c.   At this time, TFO-UC asked VASQUEZ, "Does she [HILLARY] know the get down?" TFO-UC was referring to HILLARY BARTH's understanding of the structuring of gold purchases under $10,000 to avoid any reporting paperwork. VASQUEZ responded, "Yeah.. Yeah.. Yeah.. She will tell you." VASQUEZ then referred to HILLARY BARTH'S husband, STEVE BARTH.  CS-3 indicated that STEVE BARTH instructed them on purchasing under $10,000 of gold at a time to avoid paperwork during a previous phone conversation.  VASQUEZ continued to instruct CS-3 and TFO-UC to "keep it under 10."  CS-3 then asked VASQUEZ if

---

[35] The Urban Dictionary defines "skante" as slang for crystal meth. The DEA Drug Slang Code Words 2018 also defines "skante" as crystal meth.

USAO 000090

1  HILLARY BARTH would question them in regards to where they obtained

2  the money. VASQUEZ responded by saying, "She don't need to know. She

3  ain't gonna ask you."

4          d.   TFO-UC then asked VASQUEZ what the turn-around was on

5  an order of gold. TFO-UC expressed to VASQUEZ he was under time

6  constraints. VASQUEZ indicated the gold would be ready by the

7  following morning, referring to January 30, 2020. TFO-UC stated he

8  needed to get the gold down to Mexico. VASQUEZ then asked, "You guys

9  are going to pay whoever you guys owe in gold? I am just curious."

10 CS-3 then explained to VASQUEZ, "I moved a bunch of skante, and I did

11 really good. The guy who fronted us is down south. He's gotta take

12 the paper back. We don't wanna go down with paper 'cause I got

13 pinched like that." VASQUEZ replied, "Right, so you'll take the

14 gold." CS-3 responded, "Gold, cause the fuckin' dog won't pick up on

15 it. VASQUEZ replied, "Right. Right. Whichever you like."

16         e.   Based my training and experience and a debrief of TFO-

17 UC, it was clear to TFO-UC that CS-3 was explaining to VASQUEZ that

18 the money was obtained by selling crystal methamphetamine.

19 Furthermore, CS-3 explained that the individual who sourced the

20 crystal methamphetamine was in Mexico, and expecting payment for the

21 crystal methamphetamine. CS-3 explained that TFO-UC was tasked with

22 paying the source of the methamphetamine, adding that CS-3 and TFO-UC

23 did not want to drive the bulk U.S. currency down to Mexico because

24 CS-3 had previously been detained transporting narcotic proceeds, and

25 lost the proceeds. Furthermore, CS-3 explained their desire to

26 convert the narcotic proceeds into gold to repay the outstanding drug

27 debt because the gold would more easily avoid detection by trained

28 narcotic detecting K9's utilized by law enforcement personnel

USAO 000091

1    f.   Following the above referenced conversation, VASQUEZ
2  escorted CS-3 and TFO-UC to HILLARY BARTH, who was waiting at the
3  display of OLYMPIC GOLD AND JEWELRY.  TFO-UC told HILLARY BARTH he
4  wanted to convert $16,000 in cash into a gold purchase. TFO-UC stated
5  there were time constraints due to needing to get the gold bars
6  delivered. HILLARY BARTH expressed an ability to have the gold by the
7  following morning. HILLARY BARTH then went on to describe the
8  different types of gold product they offered and the current value.
9  HILLARY BARTH then explained, "Now up to $10,000 cash, uh, up to
10  that, uh, is not reportable. If you go, if you buy more than that
11  with cash, there is a form you need to fill out, the government
12  requires because they want to know where this cash is going. Uh, so
13  anything under ten thousand there is no paperwork to fill out except
14  that you're signing the purchase order for me, for my records. So
15  that I show I am making a buy for a client. Uh, if you want to do
16  your sixteen thousand all at once, uh, if you want to wire it, uh, I
17  don't believe you have to fill out that form. It's a cash buy. We
18  don't do credit, nobody would take a credit card or a check until it
19  clears for bullion."   HILLARY BARTH then explained for $10,000 TFO-
20  UC could buy approximately "six," referring to ounces of gold,
21  depending on what gold product TFO-UC was interested in purchasing.
22  TFO-UC expressed an interest in purchasing the gold bars.

23    g.   CS-3 asked HILLARY BARTH how long TFO-UC would have to
24  wait to conduct a second purchase of gold, following the initial
25  purchase of under $10,000. TFO-UC told HILLARY BARTH he was not
26  interested in filling out any paper work for the gold purchase.
27  HILLARY BARTH recommended waiting until "next week, a few days,"
28  adding, "it's not recommended, they say, don't come in every day,"

1   HILLARY BARTH went on to say, "what they look for is a pattern of

2   someone who with intention is trying to get around..." HILLARY BARTH

3   did not finish her sentence. Instead, she added, "I am just

4   disseminating information." During this communication, it was

5   apparent TFO-UC that HILLARY BARTH appeared uneasy with the

6   conversation. HILLARY BARTH consistently looked up and away from CS-3

7   and TFO-UC. Furthermore, HILLARY BARTH became selective in her word

8   choice, referring to "they" repeatedly when referring to the cash

9   transaction report process.

10          2.   VASQUEZ suggests splitting the $16,000 Cash Purchase
               between CS-3 and TFO-UC to avoid the $10,000 reporting
11             requirement

12          h.   During the conversation between HILLARY BARTH, CS-3,

13   and TFO-UC, VASQUEZ stood approximately five feet west of the Olympic

14   Gold and Jewelry display, listening to the transaction take place. As

15   HILLARY BARTH explained to keep the purchase under $10,000, she

16   advised TFO-UC he could purchase six gold bars for $9,840. TFO-UC

17   explained again, his time constraints to get all $16,000 worth of

18   gold delivered by Friday referring to January 31, 2020. At this time,

19   VASQUEZ motioned over to CS-3 to come talk to him. CS-3 approached

20   VASQUEZ, who in Spanish instructed CS-3 to have TFO-UC purchase "8"

21   referring to $8,000 in gold, and CS-3 purchase the other "8"

22   referring to $8,000 in gold. Thereby making two simultaneous

23   transactions by two parties that would both fall under the $10,000

24   threshold.

25          i.   CS-3 then returned to the display where BARTH was

26   explaining to TFO-UC that the purchase of nine gold ounce bars would

27   amount to approximately $14,760. She then reiterated if TFO-UC

28   conducted the purchase on one transaction "paper work," would have to

**Exhibit F**
**371**

USAO 000093

1   be filled out. At this time, CS-3 motioned to TFO-UC to go and talk

2   to VASQUEZ. TFO-UC approached VASQUEZ, who instructed TFO-UC to split

3   the gold purchase into two separate transactions of $8,000. While

4   TFO-UC was speaking with VASQUEZ, HILLARY BARTH was explaining to CS-

5   3 that any cash transaction over $10,000 would require the cash

6   transaction report. HILLARY BARTH further explained, the cash

7   transaction report was the result of the Patriot Act. She added, she

8   "never" utilizes the cash transaction reporting form because her

9   clients do not typically purchase greater than $10,000.

10          3.   HILLARY BARTH agrees to the structuring so long as CS-
               3 and TFO-UC hand her the cash separately

11

12          j.   At this time, TFO-UC returned and asked HILLARY BARTH

13   if he could split the purchase into two separate transactions

14   conducted separately by TFO-UC and CS-3. TFO-UC proposed that he

15   could purchase five gold bars and CS-3 could purchase four gold bars.

16   HILLARY BARTH indicated she would have to inquire to confirm if she

17   was capable of conducting such a transaction. She then proceeded to

18   operate her cellular phone through text messaging. She then stated,

19   "Yes, as long as you hand me the money," meaning separately. She then

20   explained she would fill out a receipt for the two separate

21   transactions, which would only require a first name and last initial.

22   HILLARY BARTH stressed the receipt was only for internal bookkeeping.

23          k.   CS-3 then asked if he/she would have to be present to

24   pick up the gold bars. HILLARY BARTH explained it would be okay for

25   TFO-UC to take possession of the total purchase by presenting both

26   receipts.  HILLARY BARTH explained to TFO-UC that he would have to

27   sign the receipts at the time of pick up. Following the agreement to

28   conduct the purchase of $14,760 worth of gold in two separate orders,

**Exhibit F**
**372**

USAO 000094

1    HILLARY BARTH suggested they conduct the transaction in the back

2    office for "privacy."

3         l.   At this time, HILLARY BARTH, TFO-UC, CS-3, and VAZQUEZ

4    entered the back office.  Once inside the office, TFO-UC sat next to

5    HILLARY BARTH to conduct the first gold purchase. HILLARY BARTH

6    advised TFO-UC the first transaction of six one ounce Suisse bars

7    would total $9,843. TFO-UC retrieved 99 one hundred dollar bills in

8    U.S. currency ($9,900) of Official Advanced Funds (OAF) from a black

9    backpack and handed it to HILLARY BARTH as payment for the gold bars.

10   HILLARY BARTH placed the U.S. currency in a money counter and

11   confirmed the total. HILLARY BARTH then asked TFO-UC for a first name

12   and last initial for a hand written receipt for the transaction. TFO-

13   UC advised BARTH his name was, "Andres V."  HILLARY BARTH proceeded

14   to hand write a receipt for the purchase (ORDER # 1001). HILLARY

15   BARTH then instructed TFO-UC to sign the "received by," section of

16   the handwritten receipt. TFO-UC then initialed "AV" in cursive

17   writing.

18        m.   For the second transaction, CS-3 sat down in the chair

19   closest to HILLARY BARTH. HILLARY BARTH advised CS-3 that the

20   transaction of three one ounce Suisse bars would total $4,920. TFO-UC

21   retrieved 61 one hundred dollar bills in U.S. Currency ($6,100) of

22   OAF from a black backpack and handed it to CS-3 in plain and direct

23   sight of HILLARY BARTH. At this time, CS-3 asked TFO-UC, "How much is

24   it?" TFO-UC responded, "61," referring to $6,100 in U.S. currency.

25   CS-3 then removed 11 one hundred bills in U.S. currency ($1,100) from

26   the OAF and handed it back to TFO-UC. CS-3 then handed HILLARY BARTH

27   50 one hundred dollar bills, ($5,000) as payment for the three gold

28   bars. HILLARY BARTH placed the U.S. currency in a money counter and

USAO 000095

1   confirmed the total. HILLARY BARTH then asked CS-3 for a first name

2   initial and last name for a hand written receipt for the transaction.

3   CS-3 advised HILLARY BARTH to write, "D.Rossi." HILLARY BARTH

4   proceeded to hand write a receipt for the purchase (ORDER # 1002).

5   HILLARY BARTH did not instruct CS-3 to sign the "received by" section

6   of the handwritten receipt. CS-3 then handed the receipt to TFO-UC in

7   direct and plain sight of HILLARY BARTH.

8         n.   TFO-UC confirmed with HILLARY BARTH that he, alone,

9   would be picking up the full order of gold the following day, January

10  30, 2020. HILLARY BARTH confirmed the entire order, nine gold Suisse

11  bars, would be available for pick up before 12:00 p.m.  The following

12  day, January 30, 2020, TFO-UC received nine ounces of gold bullion

13  from HILLARY BARTH at USPV.

14        87.  On February 5, 2020, TFO-UC returned to USPV and

15  compensated George VASQUEZ for his assistance in facilitating the

16  gold deal the previous week.  TFO-UC gave VASQUEZ $1000 cash and

17  said, "This is for you man.  I appreciate you walking us through that

18  shit.  It worked out fucking perfect, so uh . . . we'll probably do

19  it again."  TFO-UC suggested that he might conduct another gold

20  transaction soon.  VASQUEZ said he would let the BARTHS know ahead of

21  time.  TFO-UC said, "Just as long as I keep it under—" and VASQUEZ

22  interjected, "Yeah, yeah.  Keep it under 10.  And if you have to, do

23  it twice.  Now let's say you need more than 10, but you're by

24  yourself.  Come in.  Call me and say, "Hey George, I am gonna need

25  15.  Give me whatever, what else.  Break it in half.  Give me half.

26  And I'll have her buy it for me, and then I'll give it to you right

27  there."

28

USAO 000096

**P.    VASQUEZ and STEVE BARTH Arrange to Launder Cash for Wire Transfers for CS-3 for 15%**

90.   In October 2020, CS-3 approached VASQUEZ about conducting a second gold purchase through OLYMPIC GOLD & JEWELRY.  CS-3 stressed to VASQUEZ that while he/she was cool with the earlier transaction, it had "too many moving parts" and he/she was looking for something simpler. CS-3 met VASQUEZ on or about October 8, 2020 to discuss this.  The meeting was recorded and reviewed by investigators, which showed:

a.    During the meeting CS-3 suggested to VASQUEZ that he/she provide VASQUEZ with the total amount of cash CS-3 wanted to use to purchase gold and VASQUEZ could structure the cash payment (under $10,000) over multiple days, on behalf of CS-3, so that CS-3 did not have to go to USPV multiple times in the same week.  VASQUEZ agreed to this saying, "that's my point, I don't want you to have to go all the time."

b.    CS-3 then said, "you don't even have to go get it. Just cut me a receipt that I purchased it, and then tax me whatever the fuck it is," i.e. charge a fee for converting the cash into a clean financial transfer.  VASQUEZ replied, "run that by me again. Do you want the gold or not?"  CS-3 indicated that he/she did not want the gold.  "I just want the receipt and then I sell it back to you, and you take your cut however it is."  CS-3 asked if this was possible, and VASQUEZ said, "Maybe."  He later added ". . . maybe, but I'm not sure.  I will have to talk to Steve, Hillary's husband." As noted elsewhere STEVE BARTH and HILLARY BARTH own and run OLYMPIC GOLD & JEWELRY.  CS-3 told VASQUEZ to "find out (from STEVE BARTH) and get back to me."

**Exhibit F**
**375**

USAO 000097

1          c.   CS-3 and VASQUEZ continued discussing the proposed

2    deal and VASQUEZ clarified, "you just want to clean it."   CS-3

3    replied, "that's exactly what it is."   CS-3 added that he/she did not

4    want to continue laundering money through casinos, auctions and car

5    dealerships.   VASQUEZ said, "Let me talk to Steve (BARTH), I don't

6    know, cause Steve is – as much as he can—" CS-3 said, "I get it," and

7    indicated that if they had to do it the way they did last time

8    (referring to the February 2020 transaction) that was fine, but "it's

9    about moving parts."

10          d.   Later in the conversation, VASQUEZ suggested CS-3

11   speak to Steve BARTH.   CS-3 indicated that he/she preferred VASQUEZ

12   to speak to STEVE BARTH on his/her behalf.   Your Affiant believes

13   this indicates that the decision to launder CS-3's money is STEVE

14   BARTH's decision and that VASQUEZ is subordinate to BARTH.

15          e.   VASQUEZ and CS-3 continued to discuss details such as

16   the percentage that CS-3 would be charged, whether CS-3 would receive

17   one check or multiple checks.   VASQUEZ stated that the purchases

18   would have to be "under ten total. . . . I mean no paperwork and all

19   that stuff."   CS-3 confirmed that the transaction would not be

20   reported.   VASQUEZ said, "they have to at least take your first name

21   down."   VASQUEZ added that he would "talk to Steve.  I won't talk to

22   Hillary."   Finally, VASQUEZ concluded, "we can do it.  I think we

23   can.  We do it that way a couple of times and it helps you out.  We

24   all make a little bit."

25          f.   As the meeting was wrapping up, VASQUEZ said, "I will

26   talk to Steve."   CS-3 said, "if you can do me a favor, just try to

27   fucking wash my shit."   VASQUEZ said he would try.

28

**Exhibit F
376**

**USAO 000098**

91.   On or about November 12, 2020 CS-3 met with VASQUEZ at USPV to confirm the previously-discussed money laundering operation.  The meeting was recorded and reviewed by investigators.  During the meeting, CS-3 indicated that the money would be ready the following week, and they discussed the date and time for the transaction.  They also discussed the percentage which would be charged and VASQUEZ stated he still needed to talk to Steve (BARTH) to finalize that aspect.  As VASQUEZ walked CS-3 to the door, CS-3 told VASQUEZ he/she appreciated the arrangement because he/she just sold a large load of "skante" for some people down south and he/she needed to clean the money as soon as possible.  VASQUEZ told CS-3 not to worry about it and it would be taken care.

92.   On or about November 17, 2020 CS-3 and TFO-UC went to USPV with $25,000 U.S. currency.  They met with VASQUEZ.  The meeting was recorded and reviewed by investigators.  The following took place:

a.   CS-3 asked VASQUEZ what percentage of the $25,000 would OLYMPIC GOLD AND JEWLERY charge, if they laundered all $25,000 at one time. VASQUEZ stated approximately 12 percent. CS-3 and TFO-UC initially balked at such a high percentage being charged. VASQUEZ replied by saying, "Well, first, we are not even supposed to be doing this, right? Second . ." VASQUEZ then stopped talking and utilized a calculator to determine the amount of money OLYMPIC GOLD AND JEWLERY would charge at a 12 percent rate. VASQUEZ then stated, "it's about three grand. We are going to go with 12 percent at this time, because we are going to have to go buy it (referring to the gold bullion)." VASQUEZ then inquired if CS-3 and TFO-UC were still interested in conducting the laundering of the $25,000.  TFO-UC told VASQUEZ that he still wanted to do the transaction.

**Exhibit F**
**377**

**USAO 000099**

      b.   TFO-UC then retrieved the $25,000 from a backpack and handed it to VASQUEZ. VASQUEZ took possession of the U.S. currency and placed it in a money counter on his desk. Upon verifying the amount of $25,000, VASQUEZ remained in possession of the money. VASQUEZ inquired if TFO-UC wanted a receipt for the transaction. TFO-UC said that he did not want any paperwork at all.

      c.   VASQUEZ then went on to explain based on the daily fluctuation of the price of gold and that they won't know exactly how much the business may earn and / or lose when purchasing and reselling the gold bullion, which is why Steve [BARTH] is charging 12 percent for the transaction[36]. VASQUEZ explained that OLYMPIC GOLD AND JEWLERY would utilize the $25,000 to purchase gold bullion, in multiple structured purchases under $10,000 to avoid mandated reporting paperwork. VASQUEZ stated once the gold bullion is purchased from a third party source, OLYMPIC GOLD AND JEWLERY would then "sell" the gold bullion, and wire the transaction amount to an account belonging to CS-3. CS-3 and TFO-UC expressed to VASQUEZ they did not want to touch nor see the gold bullion, and were only

---

[36] CS-3's initial understanding of the deal, based on conversations with VASQUEZ (which were not recorded) was that CS-3 would give the cash to VASQUEZ who would give it to BARTH, who would disguise the placement of the funds into the OLYMPIC GOLD AND JEWELRY business account as legitimate precious metals sales. VASQUEZ told CS-3 that STEVE BARTH would structure the funds to avoid reporting requirements and disguise the transactions on paper as anonymous gold and silver purchases. VASQUEZ assured CS-3 that no gold would actually change hands. VASQUEZ further told CS-3 that once the money had been structured into the OLYMPIC GOLD AND JEWELRY business account that a wire transfer, or series of wire transfers could be utilized to return the money to CS-3 into a bank account that CS-3 would provide VASQUEZ. VASQUEZ told CS-3 that the wire transfer would be made to look like a sale of precious metals to OLYMPIC GOLD AND JEWELRY. VASQUEZ told CS-3 that the entire circle of transactions would exist on paper only and would be clean and disguised as normal commerce.

USAO 000100

1  interested in a time frame in which they could expect the money to be

2  wired to the account.  VASQUEZ stated he understood and gave an

3  approximate two week time frame for the approximate $22,000 to be

4  wired to the account.  VASQUEZ explained the time frame depended on

5  how much bullion was in stock at OLYMPIC GOLD AND JEWLERY and how

6  much would have to be purchased from the third party source. VASQUEZ

7  further stated he could only conduct one cash purchase of gold

8  bullion under $10,000 a day and that OLYMPIC GOLD AND JEWLERY is only

9  open twice a week.

10         d.  CS-3 then provided VASQUEZ with account information to

11  receive the wire transfer.  VASQUEZ then inquired if TFO-UC wanted

12  the $3,000 charge to come out of the $25,000 that he just handed

13  VASQUEZ, or did he want to pay that separate, so that VASQUEZ knew

14  how to structure the purchases.  CS-3 and TFO-UC advised VASQUEZ to

15  take the 12 percent charge ($3,000) out of the $25,000 that TFO-UC

16  just handed VASQUEZ.  VASQUEZ acknowledged he understood and

17  indicated he would be in contact with CS-3 about updates.

18         e.  As TFO-UC and CS-3 were leaving USPV, CS-3 handed

19  VASQUEZ $500 for facilitating the transaction.   VASQUEZ accepted the

20  money.

21         f.  On or about December 2, 2020 CS-3 went to USPV to ask

22  VASQUEZ when CS-3 would see the money.  This meeting was not

23  recorded, but CS-3 reported it to investigators the same day, and

24  also provided a "screen shot" of a later communication which

25  corroborated his account, discussed below.  During the meeting,

26  VASQUEZ told CS-3 he needed the address on CS-3's bank account

27  because Steve BARTH needed it to complete the wire transfer.  CS-3

28  provided the information to VASQUEZ.  Later that day, CS-3 received a

USAO 000101

text message from VASQUEZ with a picture of a computer screen.  On the screen CS-3 saw a tracking number – 0W0001073359382 and the words "bullion purchase" and "pending."  Agents have preserved and reviewed the photo which VASQUEZ sent.  In the photo, agents observed a reflection of VASQUEZ looking over the shoulder of someone who appears to be STEVE BARTH.

      g.    VASQUEZ advised that the first wire transfer was for $10,000.  The rest would follow.

      h.    On December 4, 2020 agents received confirmation that two wires, one for $10,000 and one for $12,000 had been wired into the under-cover bank account which was being utilized for this operation.

      **Q.    USPV Principals Help Its Customers Evade Law Enforcement**

      95.    During the period of time in which CW-1 rented safe deposit boxes at USPV (2012-2015), federal agents were investigating CW-1 and contacted MARK PAUL about CW-1's boxes.  According to CW-1, PAUL told CW-1 that he stalled in replying to the FBI and instructed GEORGE VASQUEZ to "slow down in order to alert people."  PAUL specifically told CW-1 to get his/her stuff out of USPV because the FBI had come by.  Furthermore, PAUL told CW-1 to call another USPV customer whom CW-1 had referred, to tell that customer to remove the contents of his boxes quickly before the FBI could execute warrants.

      96.    On August 9, 2019, USPV manager GEORGE VASQUEZ counseled CS-3 on how to evade law enforcement.  During a recorded conversation between VASQUEZ and CS-3, VASQUEZ said, "Piece of advice for you. You know where you keep that [USPV safety deposit box] key, here? [indicating under his shirt on a chain around his neck] . . . Called, uh, asset forfeiture.  You ever heard about that?"  CS-3 said, "No,

USAO 000102

what?" VASQUEZ explained, "Well. Let's say you get pulled over for a [unintelligible], right?  Cop checking you out, things like that. Hey, empty your pockets. They see your key, they know it's a safe deposit box.  They don't know where.  But then, they escalate it towards – they'll call someone from their department, say hey, you know what, we got this guy for whatever, whatever. . . . And then they start looking in to things. You know, and then they'll say, oh well, we'll confiscate whatever you have, this and that, and then they'll scare you and say hey, you know, you don't tell us where this key belongs to, you know, you're gonna do twenty, fifteen years." Later in the conversation, VASQUEZ added, "It's happened before. Just to let you know.  . . . Yeah, just to give you a heads up. That's why we—we make sure we – I take care of our people, man." Based on my training and experience as well as a comprehensive debrief of CS-3, I believe that VASQUEZ was coaching CS-3 on how to evade law enforcement.

   97.  On August 30, 2019, CS-3 spoke to USPV manager GEORGE VASQUEZ.  The conversation was recorded and reviewed by investigators.  During the conversation VASQUEZ coached CS-3 on how to evade law enforcement.  VASQUEZ said, "Like I told you.  Be careful when you go out.  This is between us.  Mike [POLIAK]—you know he—he saw somebody get pulled over."  CS-3 asked, "Is it hot here or what?  Should I be worried?"  VASQUEZ replied, "No, no, no.  No it's just the people that do stuff."  CS-3 asked, "They get followed in?" VASQUEZ replied, "Yeah!  They're fuckin' stupid.  You know.  Not, not, not the place itself."  Later in the conversation, CS-3 remarked, "You got to tell everybody to fuckin', shit, fuckin' watch their back."  VASQUEZ replied, "I tell everybody . . . I take care of

USAO 000103

people, man." Later VASQUEZ, discussing a person who was pulled over and then let go said, "But it's just that I tell them, even though they let him go, like, why did they pull you over in the first place? Has to be a reason . . . Cause you did something fuckin' stupid . . . And one other guy said oh he had tinted windows – too tinted. One didn't have a fuckin' front license plate . . . Little shit." CS-3 agreed, saying, "They'll find something to fuckin' jam you up and then they find something and from that they run." VASQUEZ replied, "That's what I tell them, *perro*! But what do I know? Right?"

98.   In July 2019, CS-3 was at USPV. While there, George VASQUEZ showed CS-3 the USPV security monitors and pointed out a number of vehicles which VASQUEZ said he believed belonged to law enforcement. VASQUEZ, in fact, identified a number of law enforcement vehicles which were in the area due to CS-3's presence there. VASQUEZ explained to CS-3 that he looks for vehicles parked in one spot too long; vehicles which park, but no one exits; tinted windows; and other factors.

99.   On or about October 21, 2020, George VASQUEZ explicitly warned CS-4 that law enforcement officers were asking about him/her and that he/she should remove the contents of his/her box. The meeting between VASQUEZ and CS-4 was recorded and reviewed by investigators.

a.   Specifically, on or about October 16, 2020 local law enforcement officers went to USPV and represented themselves to be narcotics investigators seeking information about a person they asserted they had followed to USPV. The officers presented VASQUEZ with a photograph of CS-4. VASUQEZ first indicated that he could not give information about clients. As the officers were leaving

USAO 000104

1   however, VASQUEZ walked them out and stated that he had seen the

2   person in the photo at USPV.  He added that customers often remove

3   the contents of their boxes and never return.

4           b.    Shortly after the local law enforcement officers left

5   USPV, VASQUEZ contacted CS-3, who had talked about coming to USPV to

6   see VASQUEZ that day.  Using coded language and communicating via

7   text message, VASQUEZ told CS-3 not to come, that the area was "hot"

8   right now.

9           c.    On or about October 19, 2020, CS-4 sent VASQUEZ a text

10  message indicating that CS-4 intended to pay rent on his/her box that

11  week.  VASQUEZ replied via text message and told CS-4 to delete all

12  text communications between them.  This communication has been

13  reviewed and preserved.

14          d.    On October 21, 2020, CS-4 went to USPV to pay

15  quarterly rent on his/her box.  VASQUEZ spoke to CS-4 in the office[37]

16  area and coached him/her through a dialogue whereby VASQUEZ said,

17  "Pay close attention, okay? Pay attention.  It's going to be $5,000."

18  CS-4 expressed surprise and confusion.  VASQUEZ said, "Yes.  Pay

19  attention.  You say it's too expensive and you'd rather not do

20  business with me.  Okay?"  CS-4 was confused by this charade, but

21  followed VASQUEZ's instructions. When CS-4 asked why, VASQUEZ said,

22  "I'm doing you a favor, man.  . . .  I'm doing you a favor, dude,

23  don't say anything. Okay?"  VASQUEZ added, "When you leave here,

24  delete my number.  I'm doing you a favor, okay?  If you want to go in

25  the bathroom and leave something for me, that's fine."  CS-4

26

27

28      [37]  Conversations between CS-4 and VASQUEZ occurred in Spanish.
    Calls were translated into English by Spanish-language translators
    working on behalf of the FBI.

**Exhibit F**

**383**

USAO 000105

1  continued to press for an explanation.  VASQUEZ said, "I'm telling
2  you, the heat is hot.  . . . Things are hot here, I want you to
3  cancel your box.  . . . They're after you, man."  CS-4 asked, "Who?"
4  VASQUEZ replied, "The cops, dude."  CS-4 asked whether he/she could
5  rent a box later.  VASQUEZ said, "Another day, later on.  While
6  things clam down. . . . I'm doing you a favor.  They'll come again.
7  . . .  They showed me your photo and everything, so."  CS-4 asked,
8  "And the owners are the ones who made the decision?"  VASQUEZ said,
9  "No, man.  I'm making it, to protect you, man. . . . I'm just telling
10  you because if they come here, they're after you.  Okay? . . .
11  They're going to come.  They already said that when they're after
12  you, they're going to come back."  CS-4 asked again about renting a
13  box later.  VASQUEZ concluded with "I know, dude.  They're looking
14  for you.  I don't know.  The cops are looking for you, for real.  I'm
15  not going to lie to you."  CS-4 agreed and left.  Conversations
16  between VASQUEZ and law enforcement, as well as CS-4 were
17  consensually recorded and reviewed.  Text messages have been reviewed
18  and preserved.

19          e.   On November 12, 2020, VASQUEZ related these events to
20  CS-3, as well[38].  This communication between VASQUEZ and CS-3 was
21  recorded and reviewed by investigators.  During that conversation,
22  VASQUEZ described how the police had come to USPV looking for a USPV
23  customer (CS-4).  VASQUEZ speculated that the police had stopped the
24  customer and found his/her key or followed him/her to USPV.  VASQUEZ
25  assured CS-3 that he/she shouldn't worry about it, as the police had
26  not returned.

27

28

---

[38] CS-3 and CS-4 are completely unknown to each other.

USAO_000106

100. Based on discussions Michael POLIAK had with CS-1, it appears part of his motivation in buying into USPV was to protect both his own money, and that of his "friends." In a December 2019 meeting which was recorded and reviewed by investigators, POLIAK told CS-1, "the reason why I wanted to buy it [USPV], I got a lot of fucking money now.  Not only — I don't just want to be a customer, I wanted to be the owner . . . cause that way, if anything fucking happens, I know first.  And it's good for all my customers that I know first.  Cause I'm not Mark [PAUL]."  CS-1 said, "You see, I mean, you only yourself have what, ten million, eight million?"  POLIAK said, "Yeah."  CS-1 continued, "And your friends?"  POLIAK replied, "A lot."  CS-1 said, "Think about that. Your friends.  . . . It's your ass.  It's your friends."  CS-1 said, "Worry-wise I don't care, but again, you have to have your eyes in there because you have to monitor their money,  But if you're a client—"  POLIAK added, "But it's also — how many people trust anybody with that kind of money? Anonymously?  **I mean, it's not like we're Chase Bank.  . . . So why do they come?**  Cause of me. They're like, Mike {POLIAK}? You're there, okay.  I'm good with that." This exchange suggests that POLIAK anticipates being able to warn his "friends" if there is some reason their money is in jeopardy.

101. On or about September 16, 2020, in a conversation which was recorded and reviewed by investigators, Michael POLIAK told CS-1 that he would remove all but $5,000 of the contents of a client's box, for that client, if he became aware of pending legal process. Specifically, POLIAK and CS-1 were talking about having "a guy like me [POLIAK]" watching customers' money. POLIAK indicated that if someone had a problem he would "move it to another box.

USAO 000107

1   would leave like five grand in the box.  . . .  Five grand.  Take it.

2   See you later. At least they can't say 'Oh, it was empty.'"   POLIAK

3   then told CS-1 about agents from Homeland Security who came to USPV

4   with a subpoena.  POLIAK said the agents showed a picture of the

5   person whose box they were interested in, but POLIAK told them that

6   USPV has no information about who holds which box and the agents

7   needed to bring the person to USPV, physically, to have his eye

8   scanned.

9       **R.   It Would Be Irrational for Non-Criminal Customers to Choose
         USPV**

10      102.   As suggested above by USPV owner POLIAK, there is no

11  reason for non-criminal clients to use USPV, whose selling points

12  are: anonymity, instructions on how to structure cash transactions to

13  evade cash reporting requirements, tips on how to avoid asset

14  forfeiture, and ownership and management by drug traffickers.

15  Legitimate customers need not pay to store cash, but can receive

16  interest and insurance by depositing it in a money market or other

17  financial account.  Only those who wish to hide their wealth from the

18  DEA, IRS, or creditors would instead chose to *pay* to store actual

19  cash at a single storefront operation owned by the likes of MARK PAUL

20  and MICHAEL POLIAK who might go bankrupt, close the business for any

21  reason, or steal their valuables and run off.  No organization stands

22  behind the boxes at USPV in the way that Chase Bank, which has a

23  nearly 150-year history and almost 200,000 employees, stands behind

24  its safety deposit boxes, to say nothing of its bank accounts, which

25  are insured by the FDIC.  As stated by USPV owner POLIAK, it is his

26  standing among drug traffickers, as well as USPV's criminal-friendly

27

28

**Exhibit F
386**

91

USAO 000108

1    policies, that entice criminals to store their millions in cash, as

2    described earlier in the previous forfeitures section, at USPV.

3        **S.   USPV Falsely Claims It Either Returns the Unclaimed**
         **Contents of Boxes to a Designee, or Escheats it to the**
4        **State.**

5        103. On its company website USPV claims that the contents of

6    unclaimed boxes will be turned over to a designee or to the State of

7    California.  Specifically, under "Frequently Asked Questions – What

8    happens to the contents of my box if I die or become physically or

9    mentally incapacitated?" – USPV states,

10       "You should provide your attorney, beneficiary, or custodian

11       with information about the existence of your box (for an example

12       letter, visit our Customer Resources page). However, knowledge

13       of the existence of your box does not constitute permission to

14       access it. USPV will require a court authorization letter to

15       release the contents of your box to ANYONE other than the

16       renter.

17       "If you choose not to provide this information, USPV will open

18       your box due to nonpayment of rent (after a six month grace

19       period has elapsed). If you have provided contact information

20       within your box (suggested), USPV will attempt to locate you. If

21       no contact information is found, we will store the contents of

22       your box in our private safe for three years. Thereafter, we are

23       required to escheat (forward) the contents to the State of

24       California."

25       104. USPV employee GEORGE VASQUEZ, made similar statements to

26   FBI agents during an interview on or about July 1, 2016.

27   Specifically, VASQUEZ told agents that if a client fails to pay for

28   his/her safety deposit box for three months, USPV will drill out the

USAO 000109

1  lock and try to contact the client if they find identifying

2  documentation on the box. If not, USPV will keep the contents on hold

3  for three years and then forfeit it to the State of California.

4      105. CW-1 alleged that these assertions by USPV and its

5  principals are false.  CW-1 reported that he/she and another

6  individual rented a USPV box to which CW-1 had both keys. CW-1 also

7  paid all the rent and fees for the box.  Furthermore, CW-1 affixed a

8  sticker onto the box with instructions for CW-1's spouse or father to

9  be contacted in the event that CW-1 failed to pay rent on the box.

10 CW-1 has not paid rent on the box in five years because CW-1 is

11 incarcerated.  Neither CW-1's spouse nor father were ever contacted.

12 The other person whose biometrics were used to rent the box has

13 passed away.  The U.S. government did not seize the contents of the

14 box, and there is no record of the property being forfeited to the

15 State of California (which should not have happened because a

16 designee was identified).  Thus it appears that USPV may have kept

17 the contents of CW-1's box.  Furthermore, statements MARK PAUL made

18 to CW-1 support this, described below.

19     106. PAUL told CW-1 that in the event of non-payment, after

20 allowing a grace period, PAUL would drill open the box, a process he

21 said he would video record.  In the absence of contact instructions,

22 he would place the contents into his own safe deposit box.  CW-1

23 reported that PAUL himself has several USPV boxes.  CW-1 believes

24 that PAUL keeps the contents of these boxes for himself.  CW-1

25 believes that the USPV stated policy concerning unpaid rent is false.

26          1.  <u>USPV Has Never Escheated Property</u>

27     107.  Based on information obtained from the California State

28 Controller's Office – Unclaimed Property division, USPV has never

USAO 000110

escheated property to the state[39].  USPV has been in business since 2012; discounting the six month and three year waiting periods, this means that in approximately five years, no one who failed to identify a contact person has ever 1) abandoned a box; 2) failed to pay rent on a box; 3) been arrested; 4) been deported; 5) died; or 6) become incapacitated.  This seems unlikely, particularly given the types of customers using USPV, as described herein.   A more logical explanation is that PAUL places the contents of abandoned boxes in his own safe deposit box for the three-year waiting period, but never releases them to the state.

### T.   NOTIFYING USPV CUSTOMERS HOW TO CLAIM THEIR PROPERTY

108. The search and seizure warrants the government seeks list the nests of safety deposit boxes at USPV among the items to be seized.  These nests of safety deposit boxes are evidence and instrumentalities of USPV's criminality.  The warrants authorize the seizure of the nests of the boxes themselves, not their contents.  By seizing the nests of safety deposit boxes, the government will necessarily end up with custody of what is inside those boxes initially.  Agents will follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner.  Agents will attempt to notify the lawful owners of the property stored in the boxes how to claim their property, such as by posting that information on the internet or at

[39] I ran a search on the Unclaimed Property Website and spoke with a representative from the State Controller's Office, who also ran a search.  Both searches revealed no results.  In other words, USPV has never escheated property to the State of California, as it claims.

USAO 000111

1   USPV itself, or by contacting the owners directly.  In order to

2   notify the owners directly, agents will, in accordance with their

3   policies regarding an unknown person's property, look for contact

4   information or something which identifies the owner.[40]   (USPV

5   recommends that box renters include their or their designees'

6   telephone numbers on a note in the box in the event that USPV removes

7   the contents for nonpayment of rental fees.)

8      **U.    REQUEST FOR AFTER-HOURS SEARCH WARRANT FOR USPV LOCATION
           ONLY**

9

10      109.    I request permission to complete the search and seizure

11  warrants at the USPV location outside of normal searching hours.

12  Because that facility is secured and advertises that it is on a time-

13  lock, agents will not be able to begin executing any warrants there

14  until after its normal opening time, 10:00am.  Further, because it is

15  secured, I expect that removing some business equipment, especially

16  the nests of safety deposit boxes, will be unusually time consuming,

17  so that agents may not be able to complete their tasks before

18  10:00pm.  Accordingly, for the USPV location only, I request

19  permission for agents to continue executing search and seizure

20  warrants beyond 10:00pm.

21      **USPV OWNER MARK PAUL LIVES AT PAUL'S RESIDENCE**

22      110.    ███████████████████████████████████████

23  ███████████████████████████████   ████████████

24  ███████████████████████████████████████████████

25  ███████████████████████████████████████████

26  ─────────────────────

27      [40] The FBI policy regarding taking custody of an unknown person's
    property provides, in part, that agents "inspect the property as
    necessary to identify the owner and preserve the property for

28  safekeeping."  The inspection "should extend no further than
    necessary to determine ownership."

USAO 000112

1

2

3

4

**USPV OWNER MICHAEL POLIAK LIVES AT POLIAK'S RESIDENCE**

6   111.

7

8

9

10

11

12

13

14

**USPV MANAGER GEORGE VASQUEZ LIVES AT VASQUEZ'S RESIDENCE**

16   112.

17

18

19

20

21

22

23

24

**HILLARY AND STEVE BARTH LIVE AT THE BARTHS' RESIDENCE**

26   113.

27

28

USAO 000113

1 ██████████████████████████████████

2 ████████      ████████████████████████████████

3 ███████████████████████████████████

4 ██████████████████████████████████

5 ███████████████████████████████████

6 █████████████████████████████████████

7 ███████████████████████████████████

8 ████████ .

9 **TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES**

10     114. In my training and experience, persons involved in money

11 laundering, drug trafficking, and structuring must maintain records

12 of their activities just to manage their day-to-day criminal business

13 affairs, and to keep track of their finances.  Commonly they maintain

14 both written and electronic records, usually on computers and smart

15 phones or tablets.  Typically they store these records where they

16 feel is safe and near at hand, most often their residences, places of

17 business, and vehicles.  Persons with illicit wealth often attempt to

18 hide it from the authorities by storing it in the form of cash,

19 precious metals, or digital currencies such as bitcoin.  Persons

20 involved in criminal conspiracies must of necessity maintain the

21 contact information of their co-conspirators in the form of telephone

22 numbers, email addresses, and user names for communication

23 applications, such as Signal, WhatsApp, and Facebook.  Most often

24 they maintain this contact information on their computers or smart

25 phones.

26 **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

27     115. Based on my training, experience, and information from

28 those involved in the forensic examination of digital devices, I know

USAO 000114

1   that the following electronic evidence, inter alia, is often

2   retrievable from digital devices:

3         a.   Forensic methods may uncover electronic files or

4   remnants of such files months or even years after the files have been

5   downloaded, deleted, or viewed via the Internet.  Normally, when a

6   person deletes a file on a computer, the data contained in the file

7   does not disappear; rather, the data remain on the hard drive until

8   overwritten by new data, which may only occur after a long period of

9   time.  Similarly, files viewed on the Internet are often

10  automatically downloaded into a temporary directory or cache that are

11  only overwritten as they are replaced with more recently downloaded

12  or viewed content and may also be recoverable months or years later.

13        b.   Digital devices often contain electronic evidence

14  related to a crime, the device's user, or the existence of evidence

15  in other locations, such as, how the device has been used, what it

16  has been used for, who has used it, and who has been responsible for

17  creating or maintaining records, documents, programs, applications,

18  and materials on the device.  That evidence is often stored in logs

19  and other artifacts that are not kept in places where the user stores

20  files, and in places where the user may be unaware of them.  For

21  example, recoverable data can include evidence of deleted or edited

22  files; recently used tasks and processes; online nicknames and

23  passwords in the form of configuration data stored by browser, e-

24  mail, and chat programs; attachment of other devices; times the

25  device was in use; and file creation dates and sequence.

26        c.   The absence of data on a digital device may be

27  evidence of how the device was used, what it was used for, and who

28  used it.  For example, showing the absence of certain software on a

USAO 000115

1   device may be necessary to rebut a claim that the device was being

2   controlled remotely by such software.

3           d.   Digital device users can also attempt to conceal data

4   by using encryption, steganography, or by using misleading filenames

5   and extensions.  Digital devices may also contain "booby traps" that

6   destroy or alter data if certain procedures are not scrupulously

7   followed.  Law enforcement continuously develops and acquires new

8   methods of decryption, even for devices or data that cannot currently

9   be decrypted.

10      116. Based on my training, experience, and information from

11  those involved in the forensic examination of digital devices, I know

12  that it is not always possible to search devices for data during a

13  search of the premises for a number of reasons, including the

14  following:

15          a.   Digital data are particularly vulnerable to

16  inadvertent or intentional modification or destruction.  Thus, often

17  a controlled environment with specially trained personnel may be

18  necessary to maintain the integrity of and to conduct a complete and

19  accurate analysis of data on digital devices, which may take

20  substantial time, particularly as to the categories of electronic

21  evidence referenced above.  Also, there are now so many types of

22  digital devices and programs that it is difficult to bring to a

23  search site all of the specialized manuals, equipment, and personnel

24  that may be required.

25          b.   Digital devices capable of storing multiple gigabytes

26  are now commonplace.  As an example of the amount of data this

27  equates to, one gigabyte can store close to 19,000 average file size

28  (300kb) Word documents, or 614 photos with an average size of 1.5MB.

**Exhibit F**
**394**

**USAO 000116**

117. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, and HILLARY and STEVE BARTH on the device(s); and (2) hold the device(s) in front of those persons' faces with their

USAO 000117

1  eyes open to activate the facial-, iris-, and/or retina-recognition

2  feature.

3      118. Other than what has been described herein, to my knowledge,

4  the United States has not attempted to obtain this data by other

5  means.

6                      **CONCLUSION**

7      119. Based upon the foregoing facts and my training and

8  experience, I believe there is probable cause to believe that

9  evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as

10 listed in Attachment B, will be found at the SUBJECT PREMISES.  I

11 further respectfully submit that there is probable cause to believe

12 that the business computers, money counters, nests of safety deposit

13 boxes and keys, digital and video surveillance and security equipment

14 and biometric scanners located at USPV, 9182 West Olympic Blvd.,

15 Beverly Hills, CA 90212 were used or intended to be used to

16 facilitate violations of 18 U.S.C. § 1956, 21 U.S.C. § 841, and 31

17 U.S.C. § 5324, and conspiracy to commit the same.  As a result, those

18 items are subject to seizure and forfeiture to the United States

19 pursuant to 18 U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C.

20 § 5317(c).

21

22 Attested to by the applicant in accordance
   with the requirements of Fed. R. Crim. P. 4.1

23 by telephone on this ___17___ day of March, 2021.

24

25

26

27 STEVE KIM
   UNITED STATES MAGISTRATE JUDGE

28

**USAO 000118**

FILED

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:___DM___DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:21-cr-00106-MCS |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1956(h): Conspiracy to Launder Money; 21 U.S.C. § 846: Conspiracy to Distribute Controlled Substances; 18 U.S.C. 371: Conspiracy to Structure Transactions; 18 U.S.C. § 982(a)(1), 21 U.S.C. §§ 853 and 881(a)(6), 28 U.S.C. § 2461(c) and 31 U.S.C. § 5317(c): Criminal Forfeiture] |
| U.S. PRIVATE VAULTS, INC., California Corporate Number C3405297, | |
| Defendant. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

b.   Co-conspirator USPV Officer was an officer of USPV and

USAO 000119

Exhibit F
397

1   one of its owners.  USPV Officer dealt in marijuana, in violation of
2   the laws of California, as well as cocaine.

3        c.   Co-conspirator USPV Manager was the manager of USPV.
4   USPV Manager helped USPV Officer arrange drug deals within USPV, and
5   helped USPV customers avoid detection by law enforcement, including
6   by advising them to structure their cash purchases to avoid reporting
7   requirements.

8        d.   Co-conspirator Gold Business was a dealer in precious
9   metals and jewelry, and shared the same space as USPV, as well as
10  some employees.  Gold Business helped USPV customers convert their
11  cash into gold, and structured their cash transactions to avoid
12  federal reporting requirements.

13       e.   Co-conspirator USPV Representative One was a
14  representative of USPV, and an owner of co-conspirator Gold Business.
15  USPV Representative One instructed USPV customers how to structure
16  transactions to avoid federal reporting requirements.

17       f.   Co-conspirator USPV Representative Two was a
18  representative of USPV, and an owner of co-conspirator Gold Business.
19  USPV Representative Two instructed USPV customers how to structure
20  transactions to avoid federal reporting requirements.

21  B.   THE OBJECTS OF THE CONSPIRACY

22       2.   Beginning in or before 2019, and continuing through the
23  date of this Indictment, in Los Angeles County, within the Central
24  District of California, and elsewhere, defendant USPV conspired with
25  others known and unknown to the Grand Jury to launder money, in
26  violation of Title 18, United States Code, Section 1956, namely:

27       a.   to knowingly conduct and attempt to conduct financial
28  transactions involving the proceeds of a specified unlawful activity,

USAO 000120

1  that is, the distribution of controlled substances, with the intent

2  to promote the carrying on of that specified unlawful activity, in

3  violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

4       b.   to knowingly conduct and attempt to conduct financial

5  transactions involving the proceeds of specified unlawful activity,

6  that is, the distribution of controlled substances, knowing that the

7  transactions were designed in whole or in part to conceal and

8  disguise the nature, location, source, ownership, and control of the

9  proceeds of specified unlawful activity, in violation of Title 18,

10  United States Code, Section 1956(a)(1)(B)(i); and

11       c.   to knowingly conduct and attempt to conduct financial

12  transactions involving the proceeds of specified unlawful activity,

13  that is, the distribution of controlled substances, knowing that the

14  transactions were designed in whole or in part to avoid a transaction

15  reporting requirement under Federal law, in violation of Title 18,

16  United States Code, Section 1956(a)(1)(B)(ii).

17  C.   <u>MANNER AND MEANS OF THE CONSPIRACY</u>

18       3.   The objects of the conspiracy were carried out and were to

19  be carried out, in substance, as follows:

20       a.   Defendant USPV would adopt business practices that

21  attracted customers in possession of proceeds from criminal offenses,

22  including drug trafficking, and not law-abiding persons.  Such

23  practices included: (1) touting the anonymity of the safety deposit

24  rentals that defendant USPV would provide, including by advertising

25  "we don't even want to know your name"; (2) boasting that, unlike

26  banks, its anonymous safety deposit box rentals did not require

27  customer information that "can be easily accessed by government

28  agencies (such as the IRS)"; (3) making arrangements for the payment

USAO 000121

1  of the rental fees in cash and other ways that would be untraceable;

2  (4) issuing safety deposit box keys that were unmarked and unnumbered

3  so that law enforcement could not determine that the keys unlocked

4  safety deposit boxes at USPV; and (5) charging safety deposit box

5  rental rates several times higher than those at banks.

6        b.   USPV Officer would capitalize defendant USPV with the

7  proceeds of his illegal drug trafficking.

8        c.   USPV Officer would invite other drug traffickers who

9  knew and trusted him because of his illegal drug trafficking to store

10  the proceeds of their drug trafficking at defendant USPV.

11        d.   Employees of defendant USPV would conduct counter

12  surveillance of the neighborhood and warn customers when they

13  observed law enforcement.

14        e.   Agents of defendant USPV would instruct customers to

15  structure transactions to avoid currency transaction reports

16  including by purchasing gold and other precious metals through Gold

17  Business, which would structure transactions and not file required

18  currency reports.

19        f.   If agents of defendant USPV learned that law

20  enforcement was interested in searching or seizing the contents of a

21  particular customer's safety deposit box, they would attempt to warn

22  the customer, delay law enforcement, or even remove all but a nominal

23  amount of cash from the box for the customer, to prevent law

24  enforcement from discovering and seizing the bulk of the cash.

25        g.   Defendant USPV would deposit the cash proceeds it

26  received from its customers for safety deposit box rentals, which

27  included proceeds from the distribution of controlled substances,

28  into its bank account, and then use those proceeds to maintain USPV's

1  anonymous storage facilities for its criminal customers.

2          h.   USPV Officer and USPV Manager would negotiate drug

3  deals illegal under California law within the secured space of USPV,

4  and USPV Officer would store the cash proceeds from drug deals within

5  a safety deposit box at USPV.

6          i.   USPV Manager would accept cash purportedly from

7  illegal drug sales, and structure transfers of it to Gold Business in

8  amounts not greater than $10,000 at a time in exchange for wire

9  transfers that purported to be for the sale of precious metals.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[21 U.S.C. § 846]

4.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

defendant USPV could provide in bulk.

Overt Act No. 2:  On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC.  USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3:  On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4:  On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5:  On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6:  On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

**Exhibit F**
**403**

**USAO 000125**

COUNT THREE

[18 U.S.C. § 371]

8.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

9.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.   MANNER AND MEANS OF THE CONSPIRACY

10.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

11.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

**Exhibit F**
**404**

USAO 000126

not limited to the following:

Overt Act No. 1:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

USAO 000127

$10,000:  "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

**Exhibit F**
**406**

**USAO 000128**

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)

USAO 000129

1  defendant USPV shall forfeit substitute property, up to the value of

2  the property described in paragraph 2 above if, as the result of any

3  act or omission of defendant USPV, the property described in

4  paragraph 2 above or any portion thereof (a) cannot be located upon

5  the exercise of due diligence; (b) has been transferred, sold to, or

6  deposited with a third party; (c) has been placed beyond the

7  jurisdiction of the court; (d) has been substantially diminished in

8  value; or (e) has been commingled with other property that cannot be

9  divided without difficulty.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit F**
**408**
12

USAO 000130

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

///

USAO 000131

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

           a.    The business computers;

           b.    The money counters;

           c.    The nests of safety deposit boxes and keys;

           d.    The digital and video surveillance and security equipment; and

           e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

USAO 000132

Exhibit F
410

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

USAO 000133

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
_____
Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section

**Exhibit F**
**412**

**USAO 000134**

# United States District Court

**CENTRAL**     **DISTRICT OF**     **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Certain business equipment located at
U.S. Private Vaults, Inc.,
9182 West Olympic Blvd.,
Beverly Hills, CA 90212

**SEIZURE WARRANT**

**CASE NUMBER:**    2:21-MJ-01307

TO: any Authorized Officer of the United States, Affidavit(s) having been made before me by <u>Special Agent Lynne Zellhart</u> who has reason to believe that in the Central District of California there is now certain property which is subject to forfeiture to the United States, namely, the business equipment described in the attachment,

**which are** subject to seizure and forfeiture pursuant to <u>18 U.S.C. § 982(b)</u>, <u>21 U.S.C. § 853(f)</u> and <u>31 U.S.C. § 5317(c)</u>.

**concerning violations of** <u>18 U.S.C. § 1956</u>, <u>21 U.S.C. § 841</u>, and <u>31 U.S.C. § 5324</u>, and conspiracy to commit the same.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

YOU ARE HEREBY COMMANDED to seize within **14** days the property specified, serving this warrant and making the seizure in the daytime - 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant and inventory to the United States Magistrate on duty at the time of the return through a filing with the Clerk's Office.

March 17, 2021 11:48 a.m.         at   Los Angeles, California

**Date and Time Issued**

Honorable Steve Kim, U.S. Magistrate Judge

**Name and Title of Judicial Officer**        **Signature of Judicial Officer**

**Exhibit F**
**413**

**USAO 000135**

AUSA Andrew Brown, x0102, 11th Floor

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PROPERTY SEIZED PURSUANT TO THE WARRANT

## CERTIFICATION

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date:_____        _____
                                     Executing officer's signature


                                     _____
                                     Printed name and title

**Exhibit F**
**414**

USAO 000136

## ATTACHMENT—USPV SEIZURE WARRANT

**ITEMS TO BE SEIZED**

The items to be seized are the following pieces of business equipment located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys.  This warrant does not authorize a criminal search or seizure of the contents of the safety deposit boxes.  In seizing the nests of safety deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes.  Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners.

**Exhibit F**
**415**

**USAO 000137**

# United States District Court

FILED
CLERK, U.S. DISTRICT COURT

**3/17/21**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ev ___ DEPUTY

**CENTRAL** _____ **DISTRICT OF** _____ **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Certain business equipment located at
U.S. Private Vaults, Inc.,
9182 West Olympic Blvd.,
Beverly Hills, CA 90212

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:**   2:21-MJ-01307

**I, Lynne Zellhart, being duly sworn depose and say:**

I am a Special Agent with the Federal Bureau of Investigation and have reason to believe that in the Central District of California there is now certain property, namely, the business equipment described in the attachment,

**which are (state one or more bases for seizure under United States Code)**

subject to seizure and forfeiture pursuant to <u>18 U.S.C. § 982(b)</u>, <u>21 U.S.C. § 853(f)</u> and <u>31 U.S.C. § 5317(c)</u>.

**concerning violations of** <u>18 U.S.C. § 1956</u>, <u>21 U.S.C. § 841</u>, and <u>31 U.S.C. § 5324</u>, and conspiracy to commit the same.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

(See attached affidavit which is incorporated by reference)

*/s Lynne Zellhart*
**Signature of Affiant**

**Attested to by the applicant in accordance with the requirements of <u>Fed. R. Crim. P. 4.1</u> by telephone.**

March 17, 2021 at 11:48 a.m.
**Date and Time Issued**

at   Los Angeles, California

Honorable Steve Kim, U.S. Magistrate Judge
**Name and Title of Judicial Officer**

**Signature of Judicial Officer**

AUSA Andrew Brown (x0102, 11th Floor)

**Exhibit F
416**

**USAO 000138**

## ATTACHMENT—USPV SEIZURE WARRANT

**ITEMS TO BE SEIZED**

The items to be seized are the following pieces of business equipment located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212:

       a.    The business computers;

       b.    The money counters;

       c.    The nests of safety deposit boxes and keys.  This warrant does not authorize a criminal search or seizure of the contents of the safety deposit boxes.  In seizing the nests of safety deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes.  Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property;

       d.    The digital and video surveillance and security equipment; and

       e.    The biometric scanners.

**Exhibit F**
**417**

**USAO 000139**

<u>A F F I D A V I T</u>

I, Lynne K. Zellhart, being duly sworn and under oath, hereby depose and say as follows:

**<u>AFFIANT'S BACKGROUND</u>**

1.  I am a Special Agent ("SA") with the FBI, and have been so employed since May 2004.  I am currently assigned to a White Collar Crime squad, which investigates money-laundering facilitation.  Prior to this assignment, I was assigned to the Southwest Border Anti-Money Laundering Task Force ("SWBAMLTF") in Los Angeles, which investigated large-scale, money-laundering activities associated with Mexican Criminal Enterprises ("MCE"), and was comprised of Special Agents from the FBI and deputies from the Los Angeles County Sheriff's Office.  Prior to my assignment with the SWBAMLTF, I was assigned to a Los Angeles High Intensity Drug Trafficking Area ("HIDTA") group, which investigated drug trafficking organizations.  I have also been assigned to a criminal enterprise (Bloods and Crips) task force in Los Angeles, as well as the Northern Ohio Law Enforcement Task Force, which is also engaged in investigations of drug trafficking organizations.  In addition to Special Agent training at Quantico, Virginia, I have attended DEA-sponsored Basic Narcotics Investigator School, a 40-hour intensive training for federal narcotics investigators.  I have also attended a 40-hour Asset Forfeiture/Money Laundering class, two week-long money laundering facilitation conferences and several other conferences sponsored by the various anti-money laundering interests.  I have made presentations on money laundering investigations at several training conferences including the *Asset Forfeiture Summit for Law Enforcement Executives* (March

USAO 000140

1    2018), the *Advanced Money Laundering Conference* (May 2018), and *Money*
2    *Laundering Across Investigative Programs* (October 2018).

3        2.    I have participated in numerous investigations of criminal
4    enterprises, including violent criminal street gangs, drug-
5    trafficking organizations, and businesses that are facilitating the
6    laundering of criminal proceeds.  During the course of these
7    investigations, I have identified co-conspirators through the use of
8    telephone records and bills, financial records, photographs, and
9    other documents.  I have directed and assisted in the handling of
10   confidential sources to successfully infiltrate various-sized
11   criminal enterprises via intelligence gathering, participation in
12   consensual recordings, and the monitored purchase of a controlled
13   substance.  I have participated in debriefings of cooperating
14   defendants.  I have executed search warrants for controlled
15   substances, documents, digital records and the proceeds of drug
16   trafficking and other crimes.  I have conducted physical and
17   electronic surveillance.  I have also conducted investigations in
18   which I have used Global Positioning System ("GPS") information to
19   locate and track persons who are the subjects of criminal
20   investigations.  I have directed and participated in investigations
21   involving the use of court-authorized interception of wire
22   communications.  I have engaged in extensive document-based
23   investigations, collecting, reviewing and analyzing bank documents,
24   wire transfers, employment records, e-mail, and database research.

25   **I.    PURPOSE OF AFFIDAVIT: SEARCH AND SEIZURE WARRANTS**

26       3.    This affidavit is made in support of search warrants for
27   the business U.S PRIVATE VAULTS ("USPV"), and the homes of USPV's
28   principals MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ (also known as

USAO 000141

1   JORGE VASQUEZ), STEVE BARTH and HILLARY BARTH, for evidence of

2   violations of 18 U.S.C. §§ 371, 1343, 1956; 21 U.S.C. §§ 841, 846;

3   and 31 U.S.C. §§ 5324 and 5331 (hereafter, the SUBJECT OFFENSES), as

4   described more fully in Attachment B, which is incorporated by

5   reference.  The locations to be searched (collectively, the "SUBJECT

6   PREMISES"), described more fully in Attachments A which are also

7   incorporated by reference, are:

8           a.   U.S. PRIVATE VAULTS, 9182 W. OLYMPIC BLVD., BEVERLY

9   HILLS, CALIFORNIA ("USPV").

10          b.   ██████████████████████████████████████

11  ████████████████████████

12          ██         ██████████████████████████████

13  ███████████████████████████████████

14          ██      ████████████████████████████

15  ███████████████████████

16          ██      ██████████████████████████████████

17  ███████████████████.

18      4.   This affidavit is also made in support of a seizure warrant

19  for the business computers, money counters, nests of safety deposit

20  boxes and keys, digital and video surveillance and security equipment

21  and biometric scanners located at USPV, 9182 West Olympic Blvd.,

22  Beverly Hills, CA 90212, which are subject to seizure pursuant to 18

23  U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C. § 5317(c) and

24  forfeiture pursuant to 18 U.S.C. § 1956 (money laundering), 21 U.S.C.

25  § 841 (drug trafficking) and 31 U.S.C. § 5324 (structuring) because

26  there is probable cause to believe that those items were used or

27  intended to be used to facilitate violations of 18 U.S.C. §§ 1956, 21

28  U.S.C. § 841 and 31 U.S.C. § 5324, and conspiracy to commit the same.

USAO 000142

5.   The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports, and information provided by others, including other law enforcement partners.  As this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

**II.   Summary of investigation**

6.   U.S. Private Vaults is a business in a strip mall that rents safety deposit boxes anonymously.  It is owned and managed by criminals who engage in money laundering, drug trafficking, and structuring, among other offenses.  Its business model is designed to appeal to criminals for customers.  It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law enforcement investigations, and structure transactions for them to avoid filing currency reports--in addition to providing them a place to store criminal proceeds anonymously.  USPV also launders for its customers cash that is purported to be drug proceeds by converting it into precious metals or wire transfers.  The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it uses to pay its operating expenses.  By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering

**USAO 000143**

**III. PROBABLE CAUSE**

    **A.   US PRIVATE VAULTS HAS BEEN INDICTED**

    7.   The Grand Jury indicted corporate defendant U.S. PRIVATE VAULTS INC. for Conspiracy to Launder Money, Conspiracy to Distribute Controlled Substances, and Conspiracy to Structure Transactions on March 9, 2021.  The indictment also contained forfeiture allegations against certain business equipment located at USPV, which the Grand Jury explicitly found were supported by probable cause.  The indictment is attached and incorporated by reference.  AUSA Andrew Brown informed me that:

    a.   The Ninth Circuit held in *United States v. Seybold*, 726 F.2d 502, 504-05 (1983), that magistrates may consider the information contained in an indictment in making a subsequent probable cause determination, such as for search and seizure warrants.

    b.   The legislative history of forfeiture statute 21 U.S.C. § 853 indicates that Congress intended a grand jury's finding in support of forfeiture to be given considerable weight:

> For the purposes of issuing a restraining order, the probable cause established in the indictment . . . is to be determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based.

S. Rep. No. 225, 98th Cong., 2d Sess. 203 (1984), reprinted in 1984 U.S. Code Cong. & Administrative News 3182, 3386.

    Here, the description of the USPV business equipment that I seek to seize by seizure warrant is identical to the description of the USPV business equipment that the Grand Jury found probable cause to forfeit in their indictment.

**USAO 000144**

**B.   INVESTIGATION BACKGROUND**

8.   In approximately 2015, several state and federal law enforcement agencies including the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), the United States Postal Inspections Service ("USPIS"), the Los Angeles Police Department ("LAPD"), and the Los Angeles County Sheriff's Department ("LASD") learned that the targets of criminal investigations were employing the services of U.S. PRIVATE VAULTS ("USPV") to store criminal proceeds.  Separate and unrelated investigations into drug trafficking, human trafficking, illegal gambling, racketeering, computer intrusion, insurance fraud and identity theft led investigators to the doorstep of USPV.  Search warrants executed on individual boxes within USPV consistently produced criminal proceeds and evidence of criminal conduct.

9.   The following individuals have an ownership or management interest in USPV as described:

a.   Mark PAUL – PAUL is the owner and founder of USPV. According to California Secretary of State records, PAUL is the CEO and registered agent of USPV.  PAUL has held himself out to be the owner of USPV publicly and privately.  PAUL told CS-1, discussed later in this affidavit, that he has the ability to monitor activities inside USPV remotely from his residence at █████████ ████████████████████████████████████████████ .

b.   Michael POLIAK - In 2019 POLIAK became a co-owner of USPV.  POLIAK purchased a 50% interest in the business – 25% from Hilary BARTH (HILLARY BARTH) and Steve BARTH (STEVE BARTH) and 25% from Mark PAUL.  POLIAK himself stated that he paid $475,000 for his share of the business – "two-seventy-five clean; two hundred dirty."

USAO 000145

1   Bank records show that in April 2019, Michael POLIAK transferred

2   $225,000 to USPV's business bank account. Agents believe the

3   remainder was paid in cash (i.e. "dirty") to PAUL and the BARTHs.

4   POLIAK was a USPV customer for two years before becoming an owner.

5       c.   George VASQUEZ - VASQUEZ is employed at USPV as

6   manager and armed guard.  He works Tuesday through Saturday during

7   business hours and handles new customers, sales, security, and all

8   matters of operation.  Secretary of State records (2019) list VASQUEZ

9   as "manager" of USPV.  The Beverly Hills Chamber of Commerce website

10  lists VASQUEZ as USPV's Vice President.

11      d.   Matt BONVICIN – BONVICIN is a partner at USPV and its

12  Chief Technology Officer.  Bank records show that BONVICIN's company,

13  SPORTSWARE INC., receives regular payments from USPV, including two

14  large payments after POLIAK bought in to the company in April 2019.

15      e.   HILLARY BARTH and STEVE BARTH owned a 25% interest in

16  USPV prior to POLIAK buying them out.  They operate OLYMPIC GOLD &

17  JEWELRY on a daily basis, and operate USPV on VASQUEZ's day off.

18  OLYMPIC GOLD & JEWELRY is located at the same physical location as

19  USPV and engages in buying and selling gold and silver, often to USPV

20  customers.  STEVE BARTH is listed on a 2016 Secretary of State filing

21  as "Secretary" of USPV.  HILLARY BARTH is listed as a

22  "representative" of USPV on the Beverly Hills Chamber of Commerce

23  website.

24      **C.   HOW USPV OSTENSIBLY OPERATES**

25      10.  According to its own advertising literature, website and

26  statements made to investigators, USPV operates as follows:

27

28

**Exhibit F**
**424**

USAO 000146

1          a.   Customers may rent a safe deposit box ranging in size

2    in inches between 3 x 5 x 22 (smallest) and 10 x 10 x 22 (largest)

3    for $575 to $1,800 a year, respectively.

4          b.   An iris scan provides the customer with access to the

5    vault.  No personal information, social security number, driver's

6    license or other forms of identification are required to rent or

7    access a box.

8          c.   The customer keeps all keys.  The keys do not contain

9    or denote box numbers on them.

10         d.   A hand scan is taken as a second form of biometric

11   identification, in the event iris data is lost or a customer loses an

12   eye.

13         e.   A second person may have access to a box, if the

14   customer so chooses, and the second individual is present with the

15   customer when access is arranged; the second party's access is also

16   through iris scan; and the customer may revoke the second party's

17   access at any time.

18         f.   USPV has 24/7 electronic monitoring, 24/7 armed

19   response, and the vault is time locked when not open.

20         g.   In the event of non-payment for three months, USPV

21   will drill open the box.  USPV recommends that customers leave

22   contact information inside the box to account for this situation.

23   However, "If no contact information is found, we will store the

24   contents of your box in our private safe for three years. Thereafter,

25   we are required to escheat (forward) the contents to the State of

26   California."  (USPV Website, Frequently Asked Questions).

27

28

**USAO 000147**

### D.   US Private Vaults (USPV) Is Designed to Appeal to and Cater to Criminals

11.   USPV's primary pitch to customers is anonymity: "Complete Privacy; Biometric Identification; No ID Required.[1]"   By providing and promoting total anonymity, USPV caters to and attracts criminals, who seek to keep their identities and the source of their cash beyond the reach of banks, regulators, the IRS, and law enforcement.

12.   On USPV's website[2], Chief Technology Officer Matt BONVICIN[3] boasts, "Our business is one of very few where we don't even want to know your name.  For your privacy and the security of your assets in our vault, **the less we know the better.**"   The statement by USPV "the less we know, the better" suggests they know that their customers are using the vault for criminal purposes, such as storing illegal proceeds.  This practice appeals to those engaged in activities which they wish to hide from legal authorities and law-abiding financial institutions.

13.   USPV puts forth a similar rationale with regard to use of USPV safe deposit boxes versus bank safe deposit boxes.  On its website, another USPV executive[4] posted "Four Reasons to Store Your Gold At USPV," asserting: "Banks require clients to provide their

---

[1] USPV website, www.usprivatevaults.com

[2] usprivatevaults.com/uspv-news

[3] This post on the USPV web page was written by Matt Bonvicin who is described at the end of the post as follows: "Matt is an entrepreneur, programmer, and database/systems admin who enjoys toying with technologies.  He is a partner at U.S. Private Vaults as well as its Chief Technology Officer."

[4] This post on the USPV website (usprivatevaults.com) was written by Kent Martin, who is described at the end of the post as follows: "A serial entrepreneur with a background in investment banking, Kent is a founding partner of U.S. Private Vaults and serves as its Chief Executive Officer."  We believe Martin is no longer USPV's Chief Executive Officer; however, the post remains on their website.

**Exhibit F**
426

USAO 000148

social security number and a photo identification as a condition for renting a safe deposit box. Your information is then filed in the bank's central data system. This information can be easily accessed by government agencies (such as the IRS) or attorneys armed with court orders. If no one is aware you have a safe deposit box, the contents (your gold) are much safer."  By advocating a service which circumvents the IRS and persons "armed with court orders," USPV tacitly acknowledges that criminal proceeds (which the government has a legitimate interest in) can be secreted at USPV, but not at banks or law abiding financial institutions.

14.   In the same post ("Four Reasons to Store Your Gold At USPV"), the same USPV executive wrote:  "As government chartered institutions, banks are now required to file 'suspicious activity reports.' . . . . U.S. Private Vaults is not subject to federal banking laws and would only cooperate with the government under court order."  In this way, USPV is marketing its service to criminals and those operating outside the law.

15.   THE USPV website also contains a link to an article titled, "The Los Altos Vault and Safe Deposit Co. up for sale."  The article attributes the following comment to USPV owner MARK PAUL: "Another growing segment of private safety deposit renters is legal cannabis distributors. Although their business may be sanctioned in the state of California, it's not legal on the federal level, so they can't conduct business through banks."  In this statement, PAUL invites those engaged in violations of federal law to utilize private vaults, (such as USPV).  Additionally, as discussed in more detail later, cannabis distributors operating legally under California law may theoretically exist and use private vaults, but the reality is that

USAO 000149

many engaged in secreting cannabis sale proceeds at USPV are acting
outside California law as well as federal law.  Indeed, all of the
identified marijuana traffickers and their associates linked to USPV
in this investigation are operating outside the law of California, as
described in more detail later.

**E.   Other Safety Deposit Box Companies Do Not Permit Anonymous
Users as USPV Does**

16.   Private safe deposit boxes are not in and of themselves
illegal or suspicious.  In fact, investigators have identified
businesses which offer this service in a manner which does not cater
to or attract criminals.  For example, Ultra Vault[5] provides similar
services, but requires customers to fill out registration forms, and
provide sufficient information for Ultra Vault to conduct due
diligence or "Know Your Customer ("KYC")."  Conducting due diligence
or "KYC" would likely deter criminals, rather than attract them, as
this type of inquiry might expose the illegal source of funds;
customer's lack of employment or legitimate income; criminal history;
residence or citizenship; or other factors which a criminal customer
would not want known.  Additionally, Ultra Vault has some physical
locations, but also offers removable box pick-up and delivery.  While
this would be convenient to a law-abiding, legitimate customer, it
would not appeal to someone engaged in criminal activity, as it would
expose additional details about him/her such as address details, home
environment, family, etc.  Thus the policies and procedures of a
company such as Ultra Vault would likely repel, rather than attract,
criminal actors.

---

[5] https://www.ultra-vault.com/how-it-works/

USAO 000150

17.   Similarly, BlueVault, which has locations in San Diego and Orange County, provides similar services, including co-located gold and silver exchange.  However, in contrast to USPV, BlueVault requires "An acceptable photo ID showing a US address[6]" in order to rent a safe deposit box or vault.  Elsewhere on the website, it again notes "A valid US Driver's License (or equivalent) is required." Requiring both a photo ID and a valid address will deter criminals who do not want to be identified, who live outside the US and may be moving criminal proceeds across the border, or who do not want law enforcement to be able to identify or find them as part of a criminal investigation.  Thus, in contrast to USPV, BlueVault has policies in place which would deter rather than attract criminal clientele.

18.   Similarly, traditional banks and financial institutions which provide safe deposit boxes, do so in a manner which does not cater to and attract criminals.  For example, many explicitly prohibit the storage of cash:  Wells Fargo prohibits "cash, coin and currency;" JP Morgan Chase requires a renter to "agree not to use the box to store money, coin or currency unless it is of a collectable nature;" and HSBC requires renters to agree "that you will not place into the Box: cash, currency or legal tender of any country or jurisdiction.[7]" Furthermore, safe deposit box rental agreements at most major financial institutions explicitly advise that the bank will comply with all subpoenas, search warrants and legal process, and that the bank reserves the right to enter into the box if it has reason to believe that the box contains any prohibited or dangerous

---

[6] https://www.bluevaultsecure.com/

[7] Statements taken from Safe Deposit Box rental agreements.

item.  Rental agreements also frequently include language referring the "Know Your Customer" rules of identification, investigation and due diligence, all of which would deter criminals from using their safe deposit boxes in the manner employed by USPV customers.

19.  State banking regulations in New York and New Jersey also prohibit *anonymous* safe deposit boxes.  Both Mark PAUL and Michael POLIAK have acknowledged as much, during discussions about expanding USPV to other states.  During such a discussion, which included PAUL, POLIAK, VASQUEZ and a Confidential Source ("CS-1")[8], PAUL stated explicitly that they could not open a branch in New York because of the banking laws.  Similarly, POLIAK, who is from the New York/New Jersey area told CS-1 that he hired attorneys to figure out a way to open a business similar to USPV in New York or New Jersey and concluded it was impossible, as the laws do not permit anonymity.  POLIAK emphasized that anonymity is the key to the business model.  POLIAK therefore decided NOT to expand to New York/New Jersey because he determined that the laws preventing anonymity would have rendered his business model for a private vault unprofitable.

---

[8] During the course of this investigation, agents obtained information and operational assistance from an undisclosed Confidential Source (CS-1).  CS-1 has provided information to the USPIS since 2008.  CS-1 has provided information and expertise regarding criminal investments, monetary practices, accounting and money laundering.  CS-1's information has led to the seizure of assets, including $200,000 in a mortgage fraud case.  CS-1's information has been corroborated by independent sources such as law enforcement database checks, review of other records, recordings, surveillance, interviews and other investigative activity.  CS-1's information has never been found to be false or misleading.  CS-1 has no criminal history.  I believe CS-1's information is highly credible.

**Exhibit F**
**430**

USAO 000152

### F.   USPV and its Principals Profit from Patrons' Willingness to Pay a Premium for Anonymity

22.   A survey of safe deposit box pricing demonstrates that patrons of USPV could rent a safe deposit box at a major financial institution for a fraction of the cost.  For example, a 10 x 10 box at JP Morgan Chase rents for $350; at PNC for $146; at TD Bank for $150-$360 depending on location; and at Bank of America for $300-360 depending on location[9].  In November 2020, a representative from a Wells Fargo branch in Los Angeles advised that a 14 x 9 safe deposit box (most comparable size) rents for $200 a year.  By contrast, USPV charges between $1800 (if paid annually) and $2000 (if paid quarterly) for the same/similar 10 x 10 box.  USPV charges six to ten times what major banks charge, banks which offer security, a national presence, experience, years in business, and are often American institutions.  By contrast, USPV has been in business for ten years, is located in a strip-mall, and its owners are generally unknown to customers.  As discussed throughout this affidavit, USPV charges a premium for its services because it offers something which legitimate banks do not: anonymity, a place to store illegally obtained cash, counter-surveillance, tips and assistance for avoiding law enforcement, money laundering through the co-located gold and silver trade, and a stated willingness to look the other way with regard to all kinds of criminal conduct.

---

[9] "BANKING 101: WHAT DOES A SAFE DEPOSIT BOX COST? AVERAGE RATE BY SIZE" by Dillon Thompson.  March 1, 2020.  www.depsositaccounts.com

**USAO 000153**

**Exhibit F**

**431**

### G.  USPV Has, In Fact, Been Used By Criminals to Store Criminal Proceeds

20.  As set forth above, USPV is designed to appeal to and cater to criminals, and has been successful in doing so.  Numerous federal, state and local investigations have led law enforcement to USPV repeatedly.  The contents of specific USPV boxes have been forfeited to the government because they are the proceeds of criminal activity. The cases below exemplify this.  According to court documents and law enforcement reports:

a.  OWEN HANSON -- On September 9, 2015 federal agents executed a federal search warrant for three separate safe deposit boxes located at USPV. The boxes belonged to OWEN HANSON who was the leader and organizer of ODOG ENTERPRISE, an association existing for the purpose of importing and exporting controlled substances; conducting an illegal gambling business; bookmaking; promoting racketeering activities; and money laundering.  As part of the enterprise, HANSON's organization distributed methamphetamine, heroin, cocaine and ecstasy.  HANSON was indicted and pleaded guilty to Racketeering Conspiracy and Conspiracy to Distribute Illegal Narcotics.  As a result of the search warrants at USPV, agents seized a $5,000 bond; approximately 400 one-ounce silver coins; and twenty-six ten-ounce silver bars.  The contents of HANSON's USPV boxes were forfeited as criminal proceeds[10].

b.  CYRUS IRANI -- On October 28, 2015, federal agents executed a federal search warrant on Box 2105 at USPV.  The box belonged to CYRUS IRANI who was the master bookmaker and head of an

---

[10] UNITED STATES OF AMERICA v. OWEN HANSON, Case No. 15cr2310-WQH, U.S. District Court, Southern District of California

USAO 000154

illegal gambling organization.  IRANI's organization operated both internet and traditional bookmaking operations, and engaged in money laundering.  IRANI had well over 1500 gambling accounts under his ultimate supervision.  IRANI pleaded guilty to Enterprise Corruption; fourteen others in the IRANI organization were also convicted of various gambling, money laundering and enterprise corruption charges. As a result of the search warrant at USPV, agents seized $500,000 in U.S. currency; a box containing 15 gold coins and 22 gold bars; and documents.  The contents of IRANI's USPV box were forfeited as criminal proceeds.

     c.  NATHAN HOLTZ -- On November 3, 2015 a state search warrant was executed at USPV on a box rented by NATHAN HOLTZ.  HOLTZ had been arrested earlier that day for a violation of <u>California Health & Safety code §11370.9</u> (possession of narcotics proceeds), after leaving USPV. HOLTZ had $55,200 in his vehicle, as well as keys to his USPV box.  A search of HOLTZ's USPV box resulted in the seizure of an additional $200,100.  HOLTZ was on active probation for a prior marijuana sales conviction and admitted that the cash was proceeds of interstate transportation and sale of marijuana[11].  The cash was forfeited as criminal proceeds.

     d.  GERALD LEBOWITZ -- On November 12, 2015 GERALD LEBOWITZ consented to a search of his box at USPV, stating at the time that cash in the vault was brought into the country illegally to avoid taxes.  Agents from the DEA seized $1,543,400 from LEBOWITZ's box, which he disclaimed.  Further investigation into LEBOWITZ revealed that he was part of a conspiracy to manufacture and

_____

[11] Note that these events pre-date the legalization of marijuana in California, and involve illegal interstate sales in any case.

USAQ 000155

Exhibit F
433

distribute methaqualone, a controlled substance.  During the course of the investigation, agents seized over 45 kilograms of methaqualone powder and 12 canisters of the chemical o-Taluidine, both chemical precursors.  In addition, agents seized over $4 million, beyond that disclaimed at USPV.  In 2017 LEBOWITZ pleaded guilty to possession with intent to distribute methaqualone and money laundering.  All assets were forfeited as criminal proceeds[12].

     e.   Prostitution Ring -- In 2014, FBI Newark initiated an investigation into a network of individuals engaged in facilitation of prostitution, including child prostitution; Mann Act violations; money laundering and possession of child pornography.  FBI Newark identified the leader of the organization (Newark Target Subject, hereafter "Newark TS") who operated a high-end escort service and provided prostitutes to clients nationally.  Based on information from multiple confidential sources, investigators learned that Newark TS has had as many as five different boxes at USPV.  Additionally, investigators learned that Newark TS accessed his USPV boxes approximately 50 times between July 2012 and December 2016.  On one occasion, an FBI Confidential Source[13] ("CS-2") went to USPV with

---

[12] UNITED STATES OF AMERICA v. GERALD LEBOWITZ, Case No. 2:17-cr-00053-CAS, U.S. District Court, Central District of California

[13] CS-2 provided information to FBI Newark.  The information CS-2 provided to the FBI about Newark TS's prostitution business has proved to be accurate and reliable based on corroboration from several independent sources.  For instance, CS-2's description of Newark TS's efforts to recruit CS-2 for prostitution from the adult film industry has been corroborated by open sources of information, including social media websites, identifying CS-2 as a performer in the adult film industry.  Moreover, CS-2 contacted law enforcement of his/her own volition and provided information concerning Newark TS's criminal activities and his/her criminal activities without any promise of immunity from prosecution, remuneration, or other benefits.  Federal agents have been able to corroborate the vast majority of information provided by CS-2 through public records, U.S. passport and foreign travel records, and business

USAO 000156

Exhibit F
434

1  Newark TS and personally saw what he/she estimated to be $250,000 US

2  currency in Newark TS's USPV box. On a separate occasion, CS-2 went

3  to USPV with Newark TS and saw what he/she estimated to be $500,000

4  in US currency.  Further, CS-2 observed computer discs, digital

5  devices and back-up computer hard drives in Newark TS's USPV box.

6  CS-2 was aware that Newark TS used these digital devices to store

7  photos, videos and other data associated with prostitution,

8  pornography, and child pornography.  CS-2 was also aware that Newark

9  TS stored client lists, pornographic photos and pornographic videos

10  of clients, for possible use as leverage and/or blackmail.  Based on

11  business records obtained in January 2020, Newark TS continues to

12  rent a box at USPV.  FBI Newark's investigation into this subject is

13  on-going.

14        f.   MIKHAIL MALYKHIN -- On September 1, 2016 federal

15  agents executed a federal search warrant on box 5005 at USPV.  The

16  box belonged to MIKHAIL MALYKHIN who was the leader of an identity

17  theft/computer intrusion fraud ring.  MIKHAIL and others were

18  involved in a complex scheme which involved altering hacked "Flexible

19  Spending Account" debit cards from a health insurance provider and

20  altering the codes to cash out the debit cards.  MIKHAIL was also

21  involved in credit card fraud, ATM fraud, tax fraud, computer

22  intrusion and other similar crimes.  MIKHAIL was indicted for

23  conspiracy to commit access device fraud and pleaded guilty.  As a

24  result of the September 1, 2016 search warrant at USPV, agents seized

25  $266,150 United States Currency; four one-ounce gold bars; various

26

27  incorporation records, Internet searches of social media pages and
   websites, and information provided by other witnesses.  Accordingly, Your

28  Affiant submits that CS-2's information is credible and reliable under the
   totality of the circumstances.

**Exhibit F**

**435**

USAO 000157

1    gift cards which had been loaded with over $20,000 in value; two

2    Russian passports; a car Certificate of Title for a 1966 Ford

3    Mustang; two digital devices (flash drives) containing evidence of

4    the offenses; and four more gold keys, identical to those used at

5    USPV.  Additional warrants were obtained for the additional USPV

6    boxes.  Those warrants resulted in the seizure of $592,450 US

7    Currency from one box and $435,190 from another.  The contents of all

8    of MIKHAIL's USPV boxes were forfeited as criminal proceeds and used

9    to pay restitution to victims[14].

10         g.   VINCENT RAMOS -- On March 6, 2018 federal agents

11    executed a federal Seizure Warrant for the contents of Box 314 at

12    USPV.  The box belonged to VINCENT RAMOS who was the CEO of Phantom

13    Secure, a criminal enterprise which facilitated the importation,

14    exportation and distribution, internationally, of wholesale

15    quantities of cocaine, heroin and methamphetamine.  Phantom Secure

16    provided encrypted communications devices to drug trafficking

17    organizations to further international drug trafficking, while

18    obstructing and impeding law enforcement.  RAMOS was indicted for and

19    pleaded guilty to Racketeering and Drug Trafficking.  As a result of

20    the search warrants at USPV, agents seized $101,080 in US Currency

21    and 26 one-ounce gold coins.  The contents of RAMOS's USPV box were

22    forfeited as criminal proceeds[15].

23         h.   ALLAN NEYMAN et al. -- On April 24, 2019, Victim S.S.

24    was kidnapped in San Diego, California and taken against his will to

25    a warehouse in Los Angeles.  While being held in the warehouse, S.S.

26

27       [14] UNITED STATES v. MIKHAIL KONSTANTIVOV MALYKHIN, No. 16-0688-
DMG, United States District Court, Central District of California

28       [15] UNITED STATES v. VINCENT RAMOS, Case No. 18CR1404-WQH, United
States District Court, Southern District of California

USAO 000158

was brutally tortured.  He was hit with sticks and baseball bats; stripped naked; tasered on his penis and testicles; hit with a hammer on his toes; doused in a flammable liquid; set on fire; and anally penetrated with a foreign object.  S.S. had been employed by a group of people who were engaged in the distribution of counterfeit marijuana vaping cartridges.  This group believed that S.S. stole a suitcase full of cash, which a vape cartridge customer left at the warehouse.  S.S. had a portion of the money with him in San Diego; the rest was left with his ex-wife, who placed the cash in a safe deposit box at USPV.  At the direction of the kidnappers, she retrieved the cash from USPV and delivered it as ransom.  S.S. eventually escaped from the warehouse.  Detectives identified ALLAN NEYMAN and four others who participated in the kidnapping and torture.  They were arrested and charged with violations of California Penal Code 209(a) – Kidnap for Ransom; P.C 664/187(a) – Attempt Murder; P.C. 206 – Torture; and P.C. 205 – Aggravated Mayhem. Investigators believe that the money stored at USPV was the proceeds of criminal activity; stolen; the cause of brutal violence; and used as ransom.  During the course of this investigation, agents also learned that NEYMAN is an associate of USPV owner Michael POLIAK.  In conversations with CS-1, POLIAK described in detail, the April 2019 kidnapping/torture and attributed the crime to his business associate, NEYMAN.  POLIAK told CS-1 that he purchased vape cartridges and packaging (but not THC oil) from NEYMAN ("my guy who owned the warehouse") for his marijuana vape business.  Furthermore, POLIAK said to CS-1, "you want to hear the funny thing?  The money was in my vault! His wife put money into my vault," explicitly acknowledging USPV's role in the crime.  Additionally, on or about

USAO 000159

January 27, 2020, CS-1 met NEYMAN with POLIAK and discussed various internet-based fraud schemes which might generate income.  POLIAK and CS-1 had previously discussed taking over NEYMAN's business interests due to NEYMAN's pending incarceration.

i.   MATTHEW BEAVER -- On July 1, 2019, agents of the DEA and LAPD seized $215,653 in US currency from MATTHEW BEAVER, who was observed entering and leaving USPV.  BEAVER was arrested for violations of California Health & Safety Code Section §11370.6, transportation of narcotics proceeds greater than $100,000.  Pursuant to his arrest, agents seized the cash, as well as eight cell phones and keys which were similar to the keys which open boxes at USPV.  On July 8, 2019 a state search warrant was served on USPV boxes #6515 and #7111.  Agents seized $1,448,700 from those boxes.  Subsequent search warrants executed on BEAVER's phones revealed evidence of his involvement in marijuana trafficking.  BEAVER has a criminal history and is not licensed to distribute or grow marijuana in California or any other state.  Per the California Employment Development Department (EDD), BEAVER has no employment which would generate the income represented by this cash seizure.  BEAVER admitted his participation in an illegal marijuana business.  BEAVER admitted that the cash was the proceeds of unlawful criminal activity.  The cash was therefore forfeited.

j.   Between February 1, 2020 and February 26, 2021, agents conducted surveillance at USPV.  Agents identified many current USPV customers who, based on my training and experience, are likely engaged in criminal activity and storing criminal proceeds or evidence of crimes at USPV.  For example, on February 12, 2020, agents observed a couple enter USPV who were subsequently identified

USAO 000160

1  and linked to an FBI San Diego healthcare fraud investigation.

2  Similarly, agents observed subject H.T. at USPV on three separate

3  occasions; H.T. is the subject of a current healthcare fraud

4  investigation by FBI Los Angeles.  A third healthcare fraud suspect

5  appeared at USPV on May 28, 2020.  On June 9, 2020, agents identified

6  a USPV customer who was subsequently linked to a current, on-going

7  investigation into dark-web drug trafficking.  Agents also identified

8  a USPV customer who is closely associated with a group being

9  investigated for the theft of thousands of cell phones. Another

10 individual identified has been associated to an FBI Los Angeles

11 (Russian) counterintelligence investigation.  Another customer

12 identified in February 2021 was referred to FBI Los Angeles for a

13 possible Ponzi scheme.  Furthermore, on multiple occasions agents

14 observed USPV patrons in vehicles with out of state license plates,

15 specifically Illinois, Ohio and Nevada.  Based on my training and

16 experience in money laundering investigations, Chicago, Illinois is a

17 hub of both drug trafficking and money laundering.  I believe these

18 patrons were using their USPV box to store drug proceeds.  Agents

19 also observed a number of USPV patrons in rental cars.  Based on my

20 training and experience, drug traffickers often rent vehicles to

21 transport drugs and cash, in an effort to remain anonymous, and hide

22 their identities from law enforcement.

23

24

25

26

27

28

**Exhibit F**
**439**

**USAO 000161**

**H.   USPV Principals Are Aware That Their Customers Are Engaged in Criminal Conduct and Store Criminal Proceeds at USPV**

1.   <u>MARK PAUL described his customers as bookies, prostitutes, and weed guys</u>

21.   During the course of this investigation, agents spoke with a Cooperating Witness ("CW-1")[16].  According to CW-1, prior to his/her arrest and incarceration, CW-1 rented multiple safe deposit boxes at USPV.  CW-1 became acquainted with USPV owner, MARK PAUL, and they became friends.  Based on conversations CW-1 had with PAUL, PAUL was aware that USPV customers, including CW-1, were engaged in criminal activity.  PAUL told CW-1 that his best USPV customers were "bookies," "prostitutes," and "weed guys." PAUL designed the business to appeal to people operating outside the law or "in the gray area." PAUL specifically told CW-1 that the business was designed to help people hide money from the IRS and the FBI.  Based on their conversations, CW-1 described PAUL as an advocate of not paying taxes on one's cash.

22.   CW-1 routinely discussed his/her illegal gambling business with PAUL, and PAUL was aware that CW-1 earned money from running an

---

[16] CW-1 has provided information to the FBI since 2015.  CW-1 hopes to reduce his/her current sentence by providing information to the FBI.  Specifically, CW-1 has provided information leading to the indictment of 5 individuals involved in drug trafficking and money laundering.  The credibility of CW-1's testimony, however, is limited because CW-1 has omitted (and outright lied about) key facts when those facts implicated relatives or close friends who were continuing to run his/her criminal organization after his/her arrest.  Although the United States does not possess any evidence to suggest CW-1 lied about the information discussed herein, CW-1's credibility is effectively limited to only testimony that can be corroborated by other independent evidence.  To that end, much of CW-1's information has been corroborated by independent sources such as law enforcement database checks, interviews and evidence gathered in other related FBI investigations, review of business records, surveillance, and other investigative activity.

USAO 000162

1   illegal gambling business.  PAUL was further aware that CW-1 used

2   USPV to store the proceeds of that business.

3       23.  CW-1 also referred many clients to PAUL, including many

4   bookies from CW-1's illegal gambling organization.  Based on

5   conversations CW-1 had with PAUL, PAUL was aware that these

6   individuals (USPV customers) also earned money from an illegal

7   gambling business, and stored the proceeds of that business at USPV.

8   On one occasion, PAUL asked CW-1 if he/she "had any more bookies"

9   that CW-1 could refer to USPV.  This shows that PAUL was aware of the

10  criminal activities of his clients and was eager to do more business

11  with them.

12      24.  In addition to numerous individuals engaged in various

13  aspects of illegal gambling, CW-1 also referred 1) an individual whom

14  CW-1 personally knew to be a pimp; 2) a cocaine dealer; and 3) an

15  individual involved in facilitating a sophisticated drug trafficking

16  organization.  With regard to the pimp, CW-1 specifically described

17  him as a "pimp" to PAUL and they discussed that he was engaged in

18  promoting high-end prostitution.  Furthermore, CW-1 knows that the

19  pimp in fact rented several boxes at USPV because CW-1 and PAUL

20  discussed the pimp's efforts to negotiate a better price.

21  PAUL told CW-1 that many of his USPV clients were "weed dealers."

22  PAUL told CW-1 that he liked doing business with "weed guys" because

23  they always rented the larger boxes which were more profitable for

24  PAUL.  PAUL made similar statements to CS-1 in late 2019, thus

25  corroborating CW-1's information.  On one occasion before the

26  legalization of marijuana in California, CW-1 specifically referred

27  an individual to PAUL, telling him the guy was "in the green

28

USAO 000163

1  business," or words to that effect, by which CW-1 meant in the

2  marijuana business.

3      25.  PAUL also told CW-1 that he thought wealthy Beverly Hills-

4  based "Persians" or Iranians were hiding "dirty money" or "revolution

5  money" at USPV.  CW-1 did not know if PAUL had specific conversations

6  with those customers or if he was just speculating.  In either case,

7  however, it shows that PAUL had no objections or qualms about

8  facilitating clients who may have been violating federal or

9  international laws.

10      26.  PAUL was aware that CW-1 was laundering his/her illegal

11  proceeds through the purchase of gold and silver, and encouraged CW-1

12  to do this.  PAUL told CW-1 that he "liked what you are doing with

13  the gold" and "gold is the way to go" with regard to laundering

14  money.  CW-1 also purchased gold for others in order to assist them

15  in laundering their own criminal proceeds.  PAUL was aware of this

16  and handed out business cards advertising CW-1's gold-investment

17  "business," which CW-1 described as a front for laundering money.

18  Furthermore, CW-1 advertised the storage of gold as part of the

19  services of his/her "business" and listed 9182 Olympic Blvd., Beverly

20  Hills, California (location of USPV) as the storage location. PAUL

21  was aware of this and thus participated with CW-1 in the laundering

22  of other people's criminal proceeds.

23      27.  In November 2019, PAUL met with CS-1.  The meeting was

24  recorded and reviewed by investigators.  During the meeting, PAUL

25  told CS-1 that a lot of the USPV clientele came from the cannabis

26  industry and comprised approximately a third of the business at USPV.

27  Additionally, PAUL told CS-1, "Whatever you put in [the vault], I

28  don't want to know."

**USAO 000164**

28.   During the same November 2019 meeting, PAUL also made a number of exculpatory statements to CS-1, whom he had just met.  For example, PAUL said a number of times that his business was on the up and up; that he paid his taxes; that he declared all the cash he deposited; and that he was in the business of self-storage with a high level of security.  Based on my training and experience, criminals who hold themselves out as legitimate businessmen often falsely deny their criminality, particularly with persons they do not know or trust.  This has proven to be the case with PAUL, who in subsequent meetings with CS-1, admitted to participation in the marijuana industry and tacit knowledge of money laundering and other criminal conduct by his USPV business partner, Mike POLIAK.

       2.   MICHAEL POLIAK bragged about bringing drug traffickers to USPV as customers

29.   On or about December 17, 2019, CS-1 met with Michael POLIAK.  The meeting was consensually recorded and reviewed by investigators.  During that conversation, POLIAK made the following statements demonstrating his knowledge that criminal proceeds are being stored at USPV:

       a.   POLIAK told CS-1 that "Mark [PAUL] made no money until I came in. . . . None! . . . For seven years, made nothing.  I changed that whole business . . . he was making forty grand a year. With me he makes fifteen thousand a month himself.  I turned it from, from three thousand a month to thirty thousand a month[17].  The business.  All I did was call marijuana lawyers and they sent me

---

[17] In September 2020, POLIAK told CS-1 that he was the best thing that ever happened to Mark PAUL, in that, prior to his co-ownership of USPV, PAUL was making $60,000 a year as a 100% owner; but now, as a 50% owner, he is making $20,000 a month and the business is growing.

USAO 000165

1   customers.  That's all I did.  And those people, I met up with them

2   and they gave me referrals."  During this exchange about operating

3   USPV, CS-1 said, "Yeah, he [PAUL] was telling me, like, when, back

4   then, I didn't know you were his partner, he was saying 'my partner'

5   brought in, you know, a lot of marijuana, cocaine people who have,

6   who have money."  POLIAK replied, "Yeah."  Shortly after, POLIAK

7   said, "When I joined in, this guy [PAUL] had maybe one-third the

8   boxes full.  Two-thirds empty.  Now it's maybe sixty, sixty-three

9   percent full."   This clearly demonstrates not only that POLIAK is

10  aware that marijuana and cocaine proceeds are held at USPV, but that

11  this occurs by design, in order to make the business more profitable.

12          b.   Shortly after the exchange described above, POLIAK

13  added, **"Listen, you don't want every drug dealer in your place**

14  **either.  You need normal people too."**   The expressed idea that "you

15  need normal people too" suggests that drug dealers comprise the

16  majority of USPV customers, and the business has to make an effort to

17  attract a non-criminal clientele as well, so as not to be too obvious

18  a haven for criminals.

19          c.   While discussing the possibility of opening a second

20  location of USPV, POLIAK said, "You have to pre-sell one third of the

21  place to break even."  He asked CS-1, rhetorically, "who's your

22  customer base?  Five guys that are laundering money?  That's not

23  going to fill the business."  CS-1 said, "Not five. I have a lot."

24  POLIAK replied, "Thirty guys?  Still not gonna fill a business."

25  This exchange shows that POLIAK is aware of and specifically

26  anticipates USPV customers' use of the vault by criminals who need to

27  launder money. It further shows POLIAK's position that USPV needs to

28

**Exhibit F**
**444**

1  attract more than money launderers – they also need drug dealers

2  storing cash.

3          d.   In September 2020, POLIAK and CS-1 met again.  That

4  meeting was recorded and reviewed by investigators.  During that

5  meeting, POLIAK told CS-1 that they planned to expand USPV by taking

6  over the Mail Boxes Etc. store immediately adjacent to USPV, further

7  indicating that POLIAK's strategy of bringing in drug

8  dealer/customers has been successful.  Moreover, POLIAK told CS-1 he

9  planned to turn one of two "privacy rooms" inside USPV (used by

10  customers to access their boxes in private) into a separately rented

11  secure space.  POLIAK plans to charge $10,000 a month for the room.

12  With regard to what POLIAK's customer was going to keep in the room,

13  POLIAK said, "I don't know.  I don't ask. But I'm charging ten grand

14  for that little room!  Hundred and twenty grand a year."  CS-1

15  commented that the room could hold $20 million dollars in cash.

16  POILIAK replied, "I really don't care what he do.  He might put gold

17  in there.  I don't know."

18          3.   <u>POLIAK describes PAUL as a legitimate looking "face"
                 for USPV that obscures POLIAK's illegal conduct and</u>

19              <u>ownership of USPV</u>

20          e.   During the December 17, 2019 meeting, which was

21  recorded and reviewed by investigators, POLIAK told CS-1 that he was

22  a customer at USPV for two years before buying in to the business.

23  POLIAK told CS-1, "You know, I wanted Mark, [as a] partner.  I didn't

24  want to do it on my own.  Because again, **I have illegal businesses** at

25  the time, like my vape shit, and I was back doing everything from New

26  York, I wanted a face.  Mark's a great face."  Here, POLIAK admits

27  that he is personally engaged in "illegal businesses" and was storing

28  proceeds at USPV.  In fact, POLIAK told CS-1 he had approximately $8

**USAO 000167**

1    million stored in six boxes at USPV, and another $2 million which he

2    used to purchase property (discussed later).

                4.    <u>POLIAK remarks that it is funny that the drug money</u>

3                         <u>stolen from his business associate, which led to the</u>

4                         <u>kidnapping and torture, happened to be stored at SPV</u>

5         f.    During the December 17, 2019 meeting with CS-1,

6    discussed above, POLIAK described in great detail the kidnap and

7    torture event described above.  POLIAK admitted that he was doing

8    business with ALLAN NEYMAN who owned the warehouse and was present

9    throughout the torture.  POLIAK told CS-1, "He [the victim] left the

10    [stolen] money – you want to hear the funny thing?  The money was in

11    my vault!  His wife put the money into my vault."

12                    **PROBLEMS WITH CS-3 IN A DIFFERENT CASE**

13       30.    From communicating with other law enforcement officers and

14    AUSAs, I learned that in a different investigation, on more than one

15    occasion, CS-3 exchanged sexts with the target.  CS-3 did not provide

16    these and other communications with the target to his handler. CS-3

17    later admitted to his handler and the government that he had deleted

18    some of his communications with the target that were sexual in

19    nature.  CS-3 failed to follow explicit instructions from a handler

20    on at least one instance, and failed to contemporaneously notify the

21    handler that he was doing so.  CS-3 falsely told the target that CS-3

22    had cancer to induce her to pay CS-3 thousands of dollars for

23    fictitious medical treatments.  CS-3 has informed the handler and the

24    government that he did this in an attempt recover money that CS-3 had

25    advanced on behalf of the target, but this "justification" has not

26    been verified.  CS-3 contacted the target from an unknown phone

27    number and email address, pretending to be other persons in order to

28    buttress his lies about the cancer treatment.  CS-3 failed to notify

**USAO 000168**

1   his handlers of these issues before they came to light, and when

2   initially confronted, did not disclose the full scope of his conduct.

3   There is also evidence that CS-3 fraudulently used another person's

4   credit card.

5       31.  CS-3 has provided information to the DEA since 2018 and,

6   aside from the problems set forth above, has proven reliable.  His

7   work led the seizure of drugs and weapons.  In the instant

8   investigation, CS-3's information has been regularly corroborated by

9   independent sources such as law enforcement database checks, review

10  of other records, recordings, surveillance, interviews and

11  information and operational assistance provided by other Confidential

12  Sources, unknown to CS-3.  As described below, CS-3 was repeatedly

13  paired with an undercover task force officer, who was also a witness

14  to CS-3's undercover work.

15      GEORGE VASQUEZ

16      32.  CS-3 has had numerous conversations with USPV manager,

17  GEORGE VASQUEZ.  Many of those conversations reveal that VASQUEZ is

18  aware that USPV customers engage in unlawful activity and maintain

19  the proceeds of unlawful activity in their USPV safe deposit boxes.

20  Conversations between CS-3 and VASQUEZ on June 28, August 9, and

21  August 22, 2019, were all consensually recorded and reviewed by

22  investigators.  The following examples demonstrate VASQUEZ's

23  knowledge and awareness of the criminal activity which USPV

24  facilitates.

25      33.  On June 28, 2019 CS-3 spoke to VASQUEZ about the purchase

26  of marijuana vape cartridges (discussed more fully herein).  During

27  the conversation, CS-3 said, "I don't know about this shit [vape

28  cartridges].  I'm just the money laundering *mijo*.  The real big thing

USAO 000169

1    is the other shit [drugs, not marijuana] for me."  During this

2    conversation, CS-3 unambiguously stated that he/she is the "money

3    laundering *mijo*."  This statement conveys specific knowledge to

4    VASQUEZ that CS-3 is engaged in criminal activity, specifically money

5    laundering.  Additionally, CS-3 contrasts his/her ignorance of the

6    cannabis oil business with his/her conduct in "other shit."  Based on

7    my training and experience, as well as a comprehensive de-brief of

8    CS-3, CS-3 was referring to hard drugs, not cannabis oil, when he

9    said "The real big thing is the other shit for me."  Furthermore, CS-

10   3 believes that VASQUEZ was aware that CS-3 was referring to non-

11   cannabis drug trafficking.

12        5.   VASQUEZ warns CS-3 about "asset forfeiture"

13        34.  On August 9, 2019, CS-3 spoke to USPV manager GEORGE

14   VASQUEZ about difficulties in transporting cash.  VASQUEZ told CS-3

15   that USPV owners planned to expand their business into other cities,

16   including Chicago[18].  CS-3 said, "So let me tell you what I'm doing.

17   I can't fuckin' drive with this kind of cash, from fuckin' east coast

18   down here . . . 'cause I get pulled over, just like you just said."

19

20   _____

21        [18] Based on my experience investigating drug trafficking and
     money laundering organizations, I know that drug trafficking and
     money laundering activities are concentrated in certain cities.
22   These include cities on or near the U.S.-Mexico border, such as
     Laredo, San Diego and Los Angles.  In addition, other cities
23   throughout the United States serve as "hubs," or center points where
     drug distribution and money collection are concentrated. For example,
24   drugs are often sent to Chicago, Illinois, before being further
     distributed to other cities in the mid-west, such as Cleveland or
25   Milwaukee.  Likewise, the proceeds of drug sales are often collected
     and concentrated in Chicago as well.  Based on my experience
26   investigating money laundering, I know that millions of dollars in
     drug proceeds are processed through banks in Chicago. Adding a USPV
27   branch in Chicago would likely be profitable in that it would further
     facilitate drug trafficking and money laundering. USPV owner Michael
28   POLIAK expressed this to CS-1 numerous times during conversations
     with him/her in late 2019.

USAO 000170

1  VASQUEZ added, "Asset forfeiture."  CS-3 continued, "And I just have

2  to fuckin' walk away.  And I'm not trying to take that loss anymore.

3  . . . So anywhere that he's [MARK PAUL] willing, you know, to go in

4  to it [private vault business], I want dibs."  Based on my training

5  and experience, as well as a comprehensive debrief of CS-3, I believe

6  that CS-3 was telling VASQUEZ about the difficulties in transporting

7  drug proceeds (cash) across the United States, and the possibilities

8  of those proceeds being seized by law enforcement.  Further, I

9  believe that VASQUEZ was aware that CS-3 was referring to the

10  transport of criminal proceeds, and his comment, "Asset forfeiture"

11  demonstrates that he is aware that law enforcement can seize and

12  forfeit money that is criminally derived.

13        6.   VASQUEZ explains that USPV would not work in New York

14  because anonymous safety deposit box rentals there are prohibited

15     35.  On August 9, 2019 CS-3 spoke to USPV manager GEORGE VASQUEZ

16  about expanding USPV's business.  During the course of the

17  conversation, VASQUEZ explained why USPV's business model would not

18  work in New York.  VASQUEZ said, "You know, we had already talked

19  about several cities, you know.  We tried New York . . . And it can't

20  be like us.  It can't be anonymous and private.  . . . In New York.

21  We tried that.  That's what Mike [POLIAK] wanted first[19].  New York

22  and Jersey and all that area around there."  Based on my training and

23  experience, as well as a comprehensive debrief of CS-3, I believe

24  VASQUEZ is aware of and referencing a New York state law which

25  prohibits operating private safe deposit box vault in the manner that

28     [19] MICHAEL POLIAK is from the New York and New Jersey area and relocated to California.

USAO 000171

**Exhibit F**
**449**

USPV operates, with anonymity, the particular quality which appeals
to criminals.

7.  <u>VASQUEZ and CS-3 openly discuss drug trafficking,
money movement and money laundering</u>

36.  On August 22, 2019, CS-3 spoke to USPV manager GEORGE
VASQUEZ about crossing the US-Mexico border.  During the conversation
CS-3 asked VASQUEZ, "You drive through? [the US-Mexico border].
VASQUEZ replied, "Yeah."  CS-3 asked, "And they don't sweat you at
all?"  VASQUEZ replied, "Not really."  Later in the conversation,
VASQUEZ asked CS-3, "Do you go there [Mexico] much?"  CS-3 replied,
"I do, but now I got Primo who does that so like I'm not even trying
to fuck with any of that . . . he's the one who runs back and forth."
Based on my training and experience as well as a comprehensive
debrief of CS-3, CS-3 was discussing the challenges of crossing drugs
into the United States from Mexico. Further, CS-3 believes that
VASQUEZ understood that CS-3 was making references to smuggling drugs
across the US-Mexico border.

37.  On August 22, 2019, USPV manager GEORGE VASQUEZ spoke to
CS-3 about the need to hide money from both law enforcement and
people in one's own organization.  During the conversation CS-3 said,
". . . buddy of mine just got fuckin' hit, not by fuckin' feds but by
fuck his own fuckin' team.  And what are you gonna do, call the
fuckin' cops?"  VASQEZ replied, "Yeah."  Later in the conversation
CS-3 said, "Doesn't even fuckin' trust anyone.  Everybody told him,
hey you're stupid, you fuckin', find a stash pad, something."
VASQUEZ replied, "Yeah.  That's what happened with Mike [POLIAK].
That's how Mike got here. You know.  He was referred by one of my
other clients . . . He's like, hey man, you're getting too big

USAO 000172

**Exhibit F
450**

1  already . . . You guys go put it away somewhere.  That's how he came

2  by.  Most of my clients are word of mouth, you know?"  Based on my

3  training and experience as well as a comprehensive debrief of CS-3,

4  CS-3 was talking to VASQUEZ about the difficulties in hiding criminal

5  proceeds both from law enforcement and from individuals in one's own

6  criminal organization.  Additionally, VASQUEZ's comments show that

7  USPV co-owner MIKE POLIAK had difficulty finding a place to put large

8  amounts of cash, presumably criminal proceeds.  Finally, VASQUEZ

9  confirmed that most of the USPV clients learn about USPV from other

10  clients, who may also be engaged in criminal activity.

11      38.  On August 22, 2019, CS-3 spoke to USPV manager GEORGE

12  VASQUEZ about needing to move money.  During the conversation CS-3

13  said, "My biggest thing right now is how do I fuckin' move it [money]

14  out.  . . . because I told you, I bought a fuckin' car, but actually

15  it gets old after a while . . . And I can only buy a certain amount

16  of cars before I need a fuckin' dealer's license."  Based on my

17  training and experience as well as a comprehensive debrief of CS-3,

18  CS-3 was talking to VASQUEZ about finding ways to launder criminal

19  proceeds, specifically drug money.  CS-3 referenced purchasing

20  vehicles as a method for laundering criminal proceeds, and the

21  difficulties that poses.  CS-3 believes that VASQUEZ was aware and

22  understood that CS-3 was talking about ways to launder criminal

23  proceeds.

24          8.   <u>VASQUEZ acknowledges the likely storage of drug
            proceeds at USPV</u>

25

26      39.  During the course of this investigation, agents obtained

27  information and operational assistance from an undisclosed

28

**USAO 000173**

Confidential Source ("CS-4")[20].  On or about February 25, 2020, CS-4, who had previously rented a large 10 x 10 box at USPV, spoke to VASQUEZ about a sign at USPV saying they employed the use of drug-sniffing dogs.  CS-4 asked VASQUEZ when was the last time they had a drug dog in USPV, and VASQUEZ said he couldn't remember.

**I.   USPV Principals Brokered and Supplied Illegal Drugs (THC and Cocaine) from SUBJECT PREMISES Including USPV**

40.   In June 2019, CS-3 cultivated a friendly business relationship with USPV manager GEORGE VASQUEZ.  During that time, CS-3 spoke to VASQUEZ about purchasing marijuana vaping products.  VASQUEZ offered to provide CS-3 with samples of vaping products.

1.   USPV Manager VASQUEZ displayed marijuana cartridges for sale in the private view room of USPV

41.   On June 28, 2019, CS-3 went to USPV in person to obtain the vaping samples from VASQUEZ.  The meeting was consensually recorded and subsequently reviewed by the Affiant.  At approximately 11:40 a.m. CS-3 arrived at USPV where he/she was immediately met at the front door by VASQUEZ. VASQUEZ was holding a small cardboard box in his hands and directed CS-3 back to the secure vault. VASQUEZ was armed at the time of this transaction with a semiautomatic pistol that was in an open carry holster on his right hip alongside an unknown type of badge. Investigators have noticed that VASQUEZ is always armed in this fashion during his work hours as part of his

---

[20] CS-4 has provided information to the FBI since 2015. Specifically, CS-4 has provided information which has identified participants in various money-laundering schemes, as well as the methods for pursuing those schemes. CS-4's information and operational assistance have been used in numerous investigations. CS-4's information has been corroborated by independent sources such as law enforcement database checks, review of other records, recordings, surveillance, interviews and other investigative activity.  CS-4's information has never been found to be false or misleading.  I believe CS-4's information is highly credible.

USAO 000174

1  purported duties as the security manager for USPV. VASQUEZ and CS-3

2  proceeded to the private viewing rooms in the back of the actual

3  vault.

4      42.  Once inside the room VASQUEZ placed the box on the small

5  desk and opened it revealing six small packages of various sizes with

6  different advertising boxes. CS-3 knew this to be the Butane Hash Oil

7  ("BHO") containing THC vape cartridges he/she was there to acquire

8  from VASQUEZ. The cartridges were packaged differently and displayed

9  different brand names and TCH yields on the packaging. They appeared

10  ready for retail sale in a marijuana dispensary.

11      43.  During the meeting, VASQUEZ said, "So I'll text you the

12  prices right now . . . They're like from ten to seven, the prices."

13  Later VASQUEZ said, "He [the supplier] told me do whatever you want.

14  He can make pretty much whatever you want."  CS-3 asked for

15  information about the product and VASQUEZ said, "that's Danka

16  [brand].  I think that's like seven.  . . . He says the ones that are

17  ten bucks, which is the Brass Knuckles [brand]—" CS-3 said, "Which is

18  probably the good stuff."  VASQUEZ agreed, "The good stuff . . . The

19  good quality . . . these others are kind of cheesy quality. . . . The

20  VSOP and Eurekas are the good stuff . . . so check it out."  CS-3

21  agreed and accepted the samples.

22      2.  <u>USPV Manager VASQUEZ hints that USPV Owner POLIAK is
          the source of the marijuana cartridges</u>

23

24      44.  CS-3 then asked about making a larger purchase.  "Like, he

25  [supplier] got supply? . . . like could he produce the numbers?"

26  VASQUEZ replied, "I can tell you this.  He's a partner here."  CS-3

27  and VASQUEZ then discussed having CS-3 speak directly with the

28

USAO 000175

1  supplier.  VASQUEZ referred to the supplier as "Mike·," subsequently

2  identified as MICHAEL POLIAK, co-owner of USPV.

3      45.  Immediately after the meeting, DEA agents took into custody

4  six samples of BHO containing THC vape cartridges.  The samples

5  included 1) Dank Vapes, Green Crack (90.66% THC); 2) Kingpen,

6  Trainwreck (71.72% THC); 3) Space Vape, V.S.O.P. (98.4% THC); 4)

7  Eureka, Purple Punch (92.3% THC); 5) Space Vape, Alien Alaskan

8  Thunderfuck (91.18% THC) and 6) Brass Knuckles, Jack Herer (1000 mg

9  cannabis distillate).

10          3.  <u>USPV Owner POLIAK meets a customer at USPV and then</u>

11              <u>leads him to the USPV parking lot to view marijuana</u>
               <u>cartridges</u>

12      46.  On July 26, 2019, CS-3 went to USPV to purchase a large

13  quantity of BHO THC containing vape cartridges.  The meeting was

14  consensually recorded and subsequently reviewed by the Affiant.

15  Shortly after arriving at USPV and making contact with VASQUEZ, CS-3

16  was introduced to MICHAEL POLIAK.  During the conversation, POLIAK

17  said, "Hey it's [the vaping cartridges] in my trunk, in boxes. . . .

18  Like five boxes, two hundred each."  About three minutes after

19  arriving at USPV, agents observed CS-3 and POLIAK in the USPV parking

20  lot at POLIAK's vehicle, a white 2017 BMW 740i four door sedan

21  bearing California license plate ███████████████████████████

22  ███████████████████████████████████████████████████████████████

23  ███████████████████).  Agents observed CS-3 and POLIAK transfer five

24  boxes from POLIAK's vehicle into CS-3's vehicle.

25      47.  After transferring the boxes, CS-3 and POLIAK went back

26  inside USPV.  CS-3 asked, "You got a money counter here, right? Yeah,

27  there it is right there.  Eight."  CS-3 then gave POLIAK $8,000 for

28  the five boxes, as previously agreed.  POLIAK said, "I can feel money

**Exhibit F**
**454**

USAO 000176

1  already." CS-3 said, "I'll let you know how it goes and I'll put in

2  a bigger one for you, okay?" CS-3 departed from USPV and provided

3  DEA agents with 1000 units of BHO vape cartridges containing THC that

4  was purchased by from Michael POLIAK and George VASQUEZ at USPV. DEA

5  took the boxes into evidence, and the DEA Lab determined that the

6  products contained THC.

        4.  <u>USPV Owner POLIAK sold 1000 marijuana cartridges from</u>
7                <u>the parking lot of POLIAK'S RESIDENCE</u>

8

9     48.  On October 31, 2019, CS-3 purchased an additional 1000

10  units of BHO THC-containing vape pen cartridges from USPV owner

  Michael POLIAK. The operation was consensually recorded and reviewed
11
  by investigators. CS-3 met POLIAK in the parking lot of ██████████
12
  ████████████████████████████████ adjacent to the residence of Michael
13
  POLIAK. CS-3 purchased vape pen cartridges with brand name KingPen.
14
  KingPen has been identified by the California Department of Consumer
15
  Affairs (CDCA), Department of Investigations, as one of the several
16
  unlicensed brands of vape pen cartridges that have led to multiple
17
  hospitalizations nationwide. Through this investigation, agents have
18
  determined that POLIAK is not a licensed marijuana distributor in
19
  California.
20
     49.  The cartridges were immediately taken into DEA custody and
21
  sent to the DEA lab for analysis, where they tested positive for THC.
22
     50.  Additionally, DEA sent eight samples of vape cartridges
23
  seized from each of the three transactions described above (June 28,
24
  July 26, and October 31) to the California Department of Public
25
  Health, Food and Drug Laboratory Branch for additional testing. The
26
  testing showed that five of the eight samples contained Vitamin E
27
  acetate oil, which the Center for Disease Control has linked to lung
28

USAO 000177

1   damage and death.[21] This health crisis was particularly acute in the

2   summer and fall of 2019, when POLIAK and VASQUEZ sold these products

3   to CS-3.  At least one sample from each of the three transactions

4   tested positive for Vitamin E acetate oil.

5       51.  Based on conversations POLIAK had with CS-1 on December 17,

6   2019, which were recorded and reviewed by investigators, POLIAK is

7   clearly aware of the unlawful and dangerous nature of the BHO THC-

8   containing products he was selling.  During that meeting POLIAK told

9   CS-1, "I don't have anything.  Nothing to move.  I shut everything

10  down.  I'm not doing anything right now."  CS-1 asked, "Why?"  POLIAK

11  replied, "I don't want the liability.  . . . I mean, enough [money].

12  It's never enough, but I don't want the liability this stage of my

13  life cause I was making vapes.  . . . They brought lung diseases now.

14  People are having—- there's commercials, you know? I don't need the

15  liability."  This demonstrates POLIAK's awareness that the product he

16  was recently selling was linked to "lung diseases" and potential

17  liability.  POLIAK also seems to be referring to Public Service

18  Announcements (PSAs) alerting the public to the dangers of marijuana

19

20       [21] See *The New York Times*, "Vaping Illnesses are Linked to

21  Vitamin E Acetate, C.D.C. Says," Denise Grady, November 8, 2019;
    www.nytimes.com/2019/11/08/health/vaping-illnes-cdc.html;

22       "A form of vitamin E has been identified as a 'very strong
    culprit' in lung injuries related to vaping THC, health officials

23  reported on Friday, a major advance in a frightening outbreak that
    has killed 40 people and sickened 2,051.  . . . The outbreak has

24  revealed the existence of a vast, unregulated, shadowy marketplace of
    illicit or bootleg vaping products that are essentially a stew of

25  unknown chemicals concocted, packed and sold by unknown manufacturers
    and sellers.  . . . Hundreds of state and federal health

26  investigators have been deployed to find out what has cause such
    extensive damage to patients' lungs, which researchers have likened

27  to the chemical burns suffered by soldiers attacked with mustard gas
    in World War I.  . . . Many of the products used by those who became

28  ill were illicitly obtained, public health experts have said, by
    patients who bought them from friends or on the street."

USAO 000178

vape products.  Additionally, during a discussion about the kidnap/torture event (discussed above), POLIAK said, "He [NEYMAN] was the one selling the cartridges and the packaging.  Not the oil, you know?  I would make my own oil and inject."  Because the oil itself is believed to be causing the lung damage, POLIAK effectively admitted his role in manufacturing this dangerous product.

        5.     USPV Owner POLIAK discussed with a USPV customer selling flavored cocaine while at POLIAK'S RESIDENCE

52.  In October 2019, CS-3 and USPV co-owner MICHAEL POLIAK first discussed the sale of "flavored cocaine" or "Flavado."  On or about October 11, 2019, CS-3 and POLIAK met for lunch.  After lunch, they returned to POLIAK's RESIDENCE at ████████████████████. While approaching POLIAK's unit, they passed the mailboxes and POLIAK commented to CS-3 about the cocaine residue on his mailbox key.  POLIAK explained that he uses the key routinely to snort cocaine, and the key therefore has coke residue.  CS-3 expressed an interest in purchasing cocaine.

53.  POLIAK then told CS-3 about "Flavado," with which CS-3 was unfamiliar.  POLIAK described it as flavored cocaine which softens the drug's effects, without diluting them.  POLIAK told CS-3 that women love it and he recommended the strawberry flavored coke. CS-3 expressed an interest in purchasing flavored cocaine.  POLIAK called "Casey" in the presence of CS-3 and identified "Casey" as the person who could "hook [CS-3] up."  POLIAK told CS-3 that he would connect CS-3 with Casey when CS-3 was ready to buy, and CS-3 should just let POLIAK know.

54.  On or about November 5, 2019, CS-3 contacted POLIAK and asked him if he could hook CS-3 up with Casey in order to purchase

USAO 000179

the flavored cocaine they had previously discussed.  POLIAK asked how much CS-3 needed and CS-3 told him he was looking for "a zip" [one ounce].  POLIAK told CS-3 that Casey didn't sell it like that—- he breaks it down into per-use quantities.  CS-3 asked for $1000 worth and POLIAK agreed.

55.  On or about November 15, 2019, CS called POLIAK to follow-up on the requested cocaine purchase.  POLIAK advised that he was having family issues he was dealing with, and didn't have time to arrange the deal.

56.  On or about December 11, 2019, CS-3 and POLIAK again discussed the purchase of flavored cocaine.  During that phone conversation, POLIAK suggested CS-3 communicate with him using a wireless application called "Signal."  CS-3 agreed, and further discussion about the flavored cocaine purchase occurred over Signal, an encrypted application popular with drug traffickers. POLIAK and CS-3 continued to discuss the cocaine deal over Signal, often including the third-party supplier; however, POLIAK never allowed CS-3 to deal directly with anyone – POLIAK was always involved.  CS-3 believes this was intentional in order for POLIAK to protect his financial cut in the deal.

6.  <u>USPV Owner POLIAK set up a cocaine deal at USPV, but
then moved it when USPV Manager VASQUEZ Objected to
the location</u>

57.  On or about December 16, 2019, POLIAK told CS-3, "Come to the vault [USPV]; we'll do it [cocaine deal] here."  CS-3 agreed. However, a little later, George VASQUEZ called CS-3 and expressed his objection to CS-3 and POLIAK conducting a cocaine deal at USPV. VASQUEZ felt that POLIAK was not being careful and that he was possibly bringing unwanted attention from law enforcement onto the

USAO 000180

1  business.  VASQUEZ told CS-3 to "do the deal quickly – pick it up and

2  get out of here," or words to that effect. Shortly after, POLIAK

3  contacted CS-3 and said they could not do the deal at USPV.

4      58.  On or about December 18, 2019, in a conversation with CS-3,

5  which was recorded and reviewed, POLIAK instructed CS-3 to meet with

6  an unknown associate of his at ████████████████████████████████

7  ████████████  in order to obtain one ounce of flavored cocaine.  CS-3

8  was able to make arrangements for a DEA Task Force Officer, working

9  in an undercover capacity ("TFO-UC"), and posing as an associate of

10  CS-3, to make the purchase for $2,200.  TFO-UC arrived at the

11  location and met with an individual who was later identified as

12  Daniel SAVAGE and obtained a quantity of suspected cocaine in a white

13  shopping bag, hidden beneath a pair of black gym shorts.  DEA agents

14  took custody of the suspected cocaine which was in a clear plastic

15  sandwich baggie that had been tied in a knot.  The white substance

16  and the sandwich baggies weighed 29 grams.  The suspected cocaine was

17  sent to the DEA lab for processing.  The substance tested positive

18  for cocaine HCL.

19      **J.  USPV Owner Mark PAUL Leases Property for the Purposes of
          Manufacturing, Producing and Distributing Controlled
20          Substances**

21      59.  On or about February 20, 2020, PAUL met with CS-1.  The

22  meeting was consensually recorded and reviewed by investigators.

23  During that meeting, PAUL told CS-1, "I've been doing cannabis

24  deals," but then described himself as "just a landlord."  PAUL went

25  on to describe one location as an "amazing property" that everyone in

26  the marijuana business wanted because of its location.  However, it

27  was located near a Gymboree – a business which falls under California

28  Health & Safety Code 11362.3(3), prohibiting marijuana possession

USAO 000181

1  within 1,000 feet of a school, day care or youth center – so no one

2  in the cannabis business could buy the location.  PAUL then explained

3  how he bought the Gymboree, left the signage in place, and then

4  bought the "amazing property" for the dispensary.  He did not remove

5  the Gymboree sign until the dispensary was open for business. PAUL

6  told CS-1 that he paid $250,000 for the Gymboree (which he closed),

7  and $4.5 million for the other property, as well as $700,000 in

8  improvements.  PAUL told CS-1 that he earns $62,000 a month renting

9  the property to the dispensary owners[22].

10      60.  During the same consensually recorded meeting in February

11 2020, PAUL said, "I have another deal – I have a dispensary--" then

12 he stopped speaking abruptly, as though he thought better of

13 admitting that he had a marijuana dispensary.  PAUL then changed the

14 focus of his comments to the company in Oregon rather than his role.

15 PAUL went on to describe "the largest marijuana processing company in

16 Oregon" with whom he partnered.  PAUL told CS-1 that this business

17 could process 5 to 10 million pounds of marijuana a month with the

18 use of a kiln that quickly dries wet hemp.  Further, he told CS-1

19 that the group was conducting $2 million a month in business, but had

20 contracts for $10 million a month that they could not meet.  PAUL

21 told CS-1 that he invested $5.5 million in the business.

22

23

24      [22] Based on specific descriptions, agents have identified the

25 marijuana dispensary as The Atrium at 5441 Topanga Canyon, Woodland
   Hills.  Mike POLIAK corroborated PAUL's association with this

26 business to CS-1 in September 2020, telling CS-1 that PAUL purchased
   land "up north" for a marijuana grow, but refused to finance the

27 equipment.  Now, according to POLIAK, PAUL's partners are having
   trouble paying the lease on the land, their "finance guy" has taken

28 over the Atrium dispensary, and there is a power struggle for
   control.

USAO 000182

61.  On or about April 22, 2020, CS-4 spoke with George VASQUEZ while at USPV to pay rent on a safe deposit box.  This conversation was not recorded, but was reported to the Affiant immediately after it occurred.  VAQUEZ informed CS-4 that "his boss" recently purchased six or seven hundred acres in Colorado for the cultivation of marijuana and was looking for individuals interested in providing security.  Based on conversations VASQUEZ has had with CS-3 and CS-4, VASQUEZ refers to Mark PAUL as his boss.

62.  During the course of this investigation, investigators reviewed and analyzed PAUL's business, banking and financial activity.  PAUL's businesses include MJ Real Estate Investors Inc. ("MJRE")[23], a marijuana real estate investment company; Emerald Fund, LLC; Bachelor Valley Fund LLC; and Mark Paul Holdings, Inc.  An analysis of banking records shows over $700,000 in transactions between MJRE and Antares Topanga Group, LLC, aka Valley Collective Care, which public records show doing business as The Atrium, a marijuana dispensary.  MJRE also conducts business with Emerald Fund LLC (both owned by PAUL).  Emerald Fund remitted funds for a 67-acre purchase in Oregon. Emerald also has financial transactions with Rogue Bioscience, a Medford-Oregon based industrial hemp processor. Bachelor Valley Fund has financial transactions with a company in Denver, Colorado. This analysis supports statements PAUL and VASQUEZ made to CS-1 and CS-4.

63.  Based on information provided by the California Department of Consumer Affairs – Cannabis Enforcement, which enforces marijuana

---

[23] USPV former owner and OLYMPIC GOLD & JEWELRY owner, Steve BARTH, is also a principal at MJRE.

USAO 000183

laws in California, PAUL is not licensed to "have a dispensary" or otherwise participate legally in the cannabis industry.

**K.    USPV Owner Michael POLIAK is a Professional Criminal**

POLIAK's Criminal Activity

64.    In addition to brokering a cocaine deal for CS-3 and selling 1000 units of BHO THC-containing vape pen cartridges on two occasions (discussed above), POLIAK continues to engage in criminal activity.  The following examples demonstrate this:

1.    POLIAK studied how to commit deceptive online marketing

a.    During a December 2019 meeting with CS-1, which was recorded and reviewed by investigators, POLIAK described a possible new business deal, which involved fraud: "I have a guy that's a master at driving traffic on-line.  . . . But he does deceptive marketing.  He'll fake some shit, like he'll put Dr. Oz promoting his product or Ellen [DeGeneres] or some shit like that.  And he'll sell the fuck out of it, but you burn a lot of merchant accounts. . . . But merchant accounts is the problem.  It's – you burn a lot of them. You constantly need a flow of merchant accounts.  Cause the [credit card] charge-backs are gonna be like crazy."  POLIAK advised that he had a business meeting arranged with this person for the following day, in order to learn how to take over his business, before he goes to jail[24].  In January 2020, POLIAK introduced CS-1 to Allen NEYMAN, and they discussed possible business deals.  That meeting was recorded and reviewed by investigators.

---

[24] The person running the fraud scheme as described by POLIAK is ALLAN NEYMAN who was involved with the torture/kidnapping discussed above.

1               2.    POLIAK's Paycheck Protection Program scheme

2         b.    On or about September 15, 2020 CS-1 met with POLIAK.

3 The meeting was consensually recorded and reviewed by investigators.

4 During the meeting, POLIAK described obtaining almost $70,000 from

5 Payroll Protection Plan (PPP) for his "employment" at MGP Management.

6 POLIAK admitted to CS-1 that he only made $1,000 a month, and didn't

7 have any employees, but submitted an application and received

8 $68,700. When CS-1 asked how he did it, POLIAK replied "Cause I

9 filed. That I had hardships."  Additionally, POLIAK applied for and

10 received three SBA (Small Business Administration) loans for his

11 other businesses, though he acknowledged they were loans.  POLIAK

12 described them as "free money," and at an interest rate of 3.75%,

13 could earn more than that through one of his "investments."

14 Throughout this conversation, POLIAK bragged to CS-1 about committing

15 fraud.

16               3.    POLIAK's marijuana trafficking

17         c.    On or about January 27, 2020 CS-1 met with POLIAK.

18 The meeting was consensually recorded and reviewed by investigators.

19 During the meeting, POLIAK spoke to Memory Buss using the speaker

20 function on his cell phone.  CS-1 witnessed both sides of the

21 conversation.  Based on my review of the conversation, as well as

22 information provided by the California Department of Consumer Affairs

23 ("CDCA"), Buss is licensed under CalCannabis for Provisional Adult

24 Use – Nursery; Processor; and Specialty Indoor – but not retail or

25 manufacturing.  Further, POLIAK leases property in Los Angeles which

26 he subleases to Buss for use in her Cannabis business.

27         d.    Buss recently ended a partnership in her Cannabis

28 business because her partners were operating outside the law.  She

USAO 000185

told POLIAK, "I'm staying compliant by getting rid of them.  I would have lost my license if they would have stayed because they broke the law so many times."

      e.   During the conversation, POLIAK offered to sell Buss filling machines for $5,000 each.  He first denied having any, "I just got rid of everything when I closed out.  They weren't legal anyway."  But then he said, "I have three laying around," which she asked to buy.  Based on information provided by CDCA, "filling machines" are outside the scope of Buss's license; POLIAK is not licensed to possess these machines at all.

      f.   POLIAK also offered to broker the sale of 20,000 pre-rolled joints.  While POLIAK was adamant that he did not want to "hold" more than a few samples –"you can drop off samples.  But I don't need to store fuckin' tons of shit.  A couple samples, yeah, no problem.  I'll just hand it over to the guy."  As the conversation is wrapping up, POLIAK tells Buss to bring the samples and he'll give them to a couple of guys.

      g.   This demonstrates POLIAK's on-going business dealings in the marijuana industry which are outside California law, as he is not licensed.

      4.   <u>USPV Owner POLIAK bragged about his drug cartel connections</u>

65.  In December 2019, POLIAK discussed with CS-1 his various business deals, including one involving the import of produce from Mexico.  During that conversation, which was recorded and reviewed by investigators, POLIAK told CS-1 that he was affiliated with the Beltran-Leyva drug cartel.  During a conversation, CS-1 said, "These guys [referring to CS-1's phone], their mother is from cartel."

**USAO 000186**

1   POLIAK responded, "That's how I am. I'm Beltran.  Beltran are my

2   people.  Google Beltran, you'll see how big they are.  Guadalajara."

3   POLIAK then told CS-1 that the cartels control everything in Mexico

4   and you can't work there without them.  POLIAK's self-proclaimed

5   association with a well-known Mexican drug cartel suggests his

6   participation in money laundering or drug trafficking.  While POLIAK

7   refers to the subject of this business as involving "produce" or

8   "avocadoes," based on my training and experience, produce is often

9   used by Mexican drug cartels as a "cover" load to disguise transport

10  of drugs or currency.

11      66.  During the course of this investigation, agents have

12  obtained and reviewed financial records related to USPV principals,

13  including records related to Michael G. POLIAK and numerous business

14  entities associated with him (e.g. MGP Consulting, MGP Management).

15  A review of financial records associated with MGP Consulting revealed

16  a January 25, 2019 check for $125,000 payable to AA Consulting Group,

17  Inc.  Public records show that AA Consulting Group, Inc. belongs to

18  Aram Abgaryan, who was arrested and charged with murder in October

19  2019.  Those charges stem from Abgaryan's involvement in an explosion

20  at a sophisticated cannabis extraction plant in Chatsworth,

21  California, which resulted in the death of one of the participants[25].

22

23  ─────────────────────

24  [25] See www.nbclosangeles.com\news, "Five Men Charged For Deadly Honey
    Oil Lab Explosion in Chatsworth," October 31, 2019.

25

26  "Five men have been charged with murder following a deadly explosion at an illegal honey oil lab in
    September that killed a man they were working with, authorities announced Thursday.

27

28  The defendants and the victim had been operating a lab in Chatsworth, where they extracted THC, the
    high-inducing chemical found in marijuana, from cannabis plants for at least two months, the Los

**Exhibit F**
465

USAO 000187

1   That POLIAK was participating in this illegal and dangerous

2   enterprise is supported not only by the check he wrote to AA

3   Consulting, but by statements he made to CS-1 in December 2019.  In a

4   conversation between POLIAK and CS-1, which was recorded and reviewed

5   by investigators, POLIAK described an "unlucky" guy who used to "make

6   oil" for him using solvents.  According to POLIAK, the man had a

7   heart attack prior to the chemical explosion, but the others were

8   being charged with murder anyway because the death occurred during

9   the commission of a crime.

10      POLIAK's Money Laundering

11      67.  In multiple conversations with CS-1, which were

12   consensually recorded and reviewed by investigators, POLIAK admits to

13   laundering money, often referring to money as "clean" or "dirty," and

14   speaking plainly about the need to "clean my money."  The following

15   provide specific examples from conversations between CS-1 and POLIAK:

16

17   _____

     Angeles district attorney's office said in a statement.

18

19   The lab exploded Sept. 21 while four of the men and the victim, Dados Aroutiounov, 62, were inside.

20   Aroutiounov's remains, burned beyond recognition, were found the following day under a pile of debris
     after investigators received information that someone may have been killed in the fire.

21   The cannabis allegedly was being turned into a potent concentrate known as hash oil or honey oil that

22   can be used in vape pens, edibles, waxes and other products.

23   A rise in vaping illnesses nationwide has caused federal investigators to probe the black market for
     THC products, especially illegal vaping cartridges.

24
     Aram Abgaryan, 30, Vadim Klebanov, 59, Arsen Terejyan, 43, Rafael Mailyan, 32, and Stepan
25   Mailyan, 65, were arrested Tuesday and charged with murder and manufacturing a controlled
     substance, concentrated cannabis. Authorities also seized $3.2 million and gold bars Tuesday from a
26   storage unit connected to the case.

27   Each faces 23 years to life in prison. They remain in jail on $2 million bail."

28

**USAO 000188**

a.   During a meeting in December 2019, POLIAK told CS-1 that he has monthly income in the form of a $50,000 check.  "I get checks for fifty-thousand a month.  Forty-five gets me fifty."  Later in the conversation, CS-1 asked, "But how do you have fifty a month?"  POLIAK replied, "I'm telling you, between like all my things I'll make like six hundred this year."  CS-1 asked, "You give them cash, they give you check, is that what—"  POLIAK replied, "***No, no that's just to clean my money . . . that I don't even count as income.***"

5.   <u>USPV Owner POLIAK admits he uses a shell business to launder money</u>

68.   POLIAK further discussed both the "forty-five-for-fifty" deal, and other aspects of money laundering with CS-1 on or about January 27, 2020, during a meeting which was recorded and reviewed by investigators.  After a detailed description of his involvement in the cannabis industry, POLIAK said, "I took home 200-something thousand in key money and ten thousand a month income every month."  CS-1 asked, "So how do you manage, where do you put your money?"  POLIAK exclaimed, "I own a vault!"  CS-1 asked, "I'm not talking about the cash."  POLIAK replied, "It's all cash!  It's all cash.  Why do you think I bought the vault?"  POLIAK then described some of his shell corporations: "I have MGP.  ***Because I have to clean the money***.  Put money into MGP so I can pay half the rents.  Half the rent is in cash and half the rent is clean."

69.   Later in the same conversation with CS-1, POLIAK said, "I wash $50,000 through my consulting.  Remember, I pay 45 for 50?"  POLIAK continued, "So fifty thousand--" CS-1 finished, "you put into MGP."  POLIAK corrected, "No, I put into MGP Consulting.  MGP Consulting pays MGP Management for rent.  Talking about $10,000 a

USAO 000189

1  month.  And that goes to the landlords." CS-1 said, "So you're paying

2  the landlords--" POLIAK finished, "--through my consulting." CS-1

3  said, "So you're getting paid cash . . . you give some fucker cash--"

4  POLIAK finished, "He cuts me a check.  Fifty thousand for forty-five

5  cash."  It is important to note POLIAK's use of various shell

6  corporations such as MGP Management and MGP Consulting.  Based on my

7  training and experience investigating money laundering organizations,

8  I know that it is common for criminals to create multiple "shell"

9  corporations to "layer" criminal proceeds, thereby obscuring their

10 criminal origins.  Additionally, in this exchange, POLIAK again

11 openly admits cleaning his money, something which does not need to be

12 done with lawfully earned income.

13      70.  A review of Michael POLIAK's bank accounts (specifically

14 MGP Consulting) corroborates his description of this activity.

15 Between February 15, 2018 and January 2020, MGP Consulting received

16 $50,000 a month (forty-two $25,000 checks) from Corporation A and

17 Corporation B, both owned by the same individual.  I learned through

18 conversations with FBI agents that the individual is the target

19 subject of a current FBI Healthcare Fraud investigation (hereafter TS

20 HCF)[26].  TS HCF's signature is on checks from both companies.  Based

21 on conversations I've had with agents who investigate healthcare

22 fraud, I know that those engaged in healthcare fraud schemes often

23 need cash and will pay a premium for it (e.g. $50,000 for $45,000 in

24 cash) because they need to make cash payments to "patients" seeking

25 healthcare services which are being over-billed.  They cannot

26

27      [26] FBI agents who are investigating TS HCF asked that the
    identity of the target of their investigation, as well as his/her
28  related business entities, remain undisclosed in order to protect the
    integrity of their investigation.

**USAO 000190**

1   withdraw the amount of cash they need without bringing attention to

2   their scheme.  This leads them to look for other sources of cash.

3       71.  POLIAK has a large amount of cash which he stores at USPV.

4   On or about December 17, 2019, CS-1 met with Michael POLIAK.  The

5   meeting was consensually recorded and subsequently reviewed by

6   investigators.  During the meeting POLIAK told CS-1 that as a

7   customer of USPV (prior to buying in to the business), POLIAK had

8   four boxes at USPV.  He further stated that he now has "six boxes in

9   the place myself!  I was a customer.  I'm telling you, I have six

10  ten-by-tens myself."   POLIAK added, "Let me put it this way, the

11  reason also why I wanted to buy it [USPV], I got a lot of fucking

12  money now."  Earlier in the conversation, POLIAK said, "I wish I had

13  fifty [million] right now.  That would be nice."  CS-1 replied,

14  "Yeah?  In your twenties or what?"  POLIAK said, "No, not even, bro.

15  Like ten.  . . .  I have like **two clean, eight like dirty**.  I put

16  most of it in the house."  Based on my review of the recording and a

17  debrief of CS-1, I believe that POLIAK has $10 million: $2 million

18  which he laundered through the purchase of property (discussed below)

19  and $8 million in cash stored in six 10 x 10 boxes at USPV.

20  Additionally, POLIAK himself describes the $8 million as "dirty," by

21  which I believe he means it was not legally derived and in the form

22  of cash – not laundered to appear legitimately earned.

23      72.  Based on my training and experience, my review of bank

24  records and recordings, I believe that the cash POLIAK is sending to

25  TS-HCF is the proceeds of his self-professed "illegal businesses,"

26  likely drug trafficking, which he stores at USPV.  Thus, drug

27  trafficking proceeds are being used to further healthcare fraud; and

28

USAO 000191

1  the fraud proceeds are being further laundered by POLIAK to make

2  purchases (such as USPV) and advance his other criminal interests.

3      73.   Michael POLIAK described efforts to launder his money

4  through a real estate purchase to CS-1.  On or about December 17,

5  2019 and again on September 15, 2020, Michael POLIAK met with CS-1.

6  The meetings were consensually recorded and reviewed by

7  investigators.  During those meetings, POLIAK described to CS-1 his

8  plans to launder cash through the purchase, renovation and sale of

9  property located at ███████████████████████████████ .

10      74.   During the earlier conversation, POLIAK told CS-1 that the

11  property was listed at $2 million, but he offered the sellers $1.7

12  million "tomorrow – no inspection."  POLIAK said, "I literally did

13  one day close. Can you imagine?  One day close?"  In the subsequent

14  meeting, POLIAK further explained that he put $600,000 down and took

15  out a mortgage of about $1.2 million[27].  He also told CS-1 that he

16  spent about $1.5 million renovating the property.

17      75.   In September 2020, with renovations complete, POLIAK told

18  CS-1 he was listing the property for $3.6 million, but expected a

19  bidding war.  POLIAK believed the property was worth closer to $4

20  million.

21      76.   With regard to the property purchase and massive renovation

22  under way when CS-1 first saw the property in December 2019, CS-1

23  commented, "You could, basically what you could do is, one-point-

24  seven, you could easily clean your money through it."  POLIAK

25  replied, "That's what I'm doing with the construction.  Why do you

26  think I'm doing half a million construction?"  CS-1 said, "Half a

27  ─────────────

28     [27] This is supported by financial analysis which revealed a
mortgage on this property.

USAO 000192

1  million cash." POLIAK said, "I want to do one or two projects like
2  this a year." CS-1 said, "That's a million dollar give-away. And
3  you-" POLIAK interrupted, "Ten-thirty-one-exchange[28]." POLIAK added,
4  "And I can wash it off the construction company. On top of the ten-
5  thirty-one exchange." CS-1 asked, "You're giving him cash?" POLIAK
6  said, "I write off Jacob," referring to his contractor. CS-1 said,
7  "Yeah, you take his check. You give him cash." POLIAK said, "Yep.
8  . . . We do profit sharing . . . Yeah, on the house. It's gonna be
9  like this and it comes back clean . . . I pay all his subs in cash.
10  I've been paying all his subs in cash all year already."

11      77.  It is worth noting that POLIAK himself uses phrases such as
12  "I can **wash** it" and "it comes back **clean**," showing his own awareness
13  and acknowledgement of money laundering. Additionally, when CS-1
14  says "you could easily **clean** your money through it," POLIAK eagerly
15  agrees, saying "That's what I'm doing with the construction. Why do
16  you think I'm doing half a million construction?" Finally, by
17  admitting that he is paying sub-contractors ("subs") in cash and has
18  been doing so all year, POLIAK is specifically describing how he uses
19  (illegal) cash to increase the value of his property which he will
20  later sell for a profit and claim as legitimate income, thus
21  "cleaning" his "dirty" money.

22      78.  Finally, during their September 2020 meeting, which was
23  recorded and reviewed, CS-1 inquired whether POLIAK's asking price
24  would be reduced if a buyer came in with a million or two million in
25  cash. POLIAK told CS-1 he would require "a premium" if someone came
26
27  ───────────────
28  [28] A 1031 Exchange refers to section 1031 of the IRS Code which
allows a real estate investor to avoid capital gains taxes as long as
the profit is used to purchase another "like kind property."

USAO 000193

1  in with cash – he would charge $4.2 million.  "I don't— Nobody needs

2  cash.  . . . I have a ton of cash.  . . . I'm doing business to get

3  rid of my cash."  This further demonstrates POLIAK's on-going efforts

4  to laundering money through his various projects.

   **L.    USPV Owner Michael POLIAK Used Criminal Proceeds to Buy His Interest in USPV**

7      79.  In April 2019, Michael POLIAK purchased a 50% ownership in

8  USPV.  POLIAK described the deal to CS-1 in a consensually recorded

9  conversation which investigators reviewed.  During that conversation,

10 CS-1 asked, "How did you meet him [PAUL], turn around and become a

11 partner? . . . Did you have to pay him?"  POLIAK replied, "Yeah, I

12 gave him $475,000.  . . .  two-seventy-five clean.  Two hundred

13 dirty."  Later in the conversation, POLIAK explained, "Mark [PAUL]

14 owned 75%.  Hillary [BARTH] and her husband [STEVE BARTH] owned 25%.

15 I bought twenty-five from Mark, and I bought twenty-five from them.

16 I said, 'Mark, I can't buy the place unless I get at least 50%.'"

17     80.  A review of bank records supports POLIAK's claim.  On April

18 2, 2019, $225,000 was deposited into USPV's JP Morgan Chase bank

19 account ending in #7511.  The deposit included a Wells Fargo Bank

20 cashier's check in the amount of $125,000, payable to U.S. Private

21 Vaults, purchased by Michael POLIAK; and a check issued from Michael

22 POLIAK's Wells Fargo Bank account #7496 in the name of MGP Consulting

23 LLC, for $100,000, payable to U.S. Private Vaults.  Based on POLIAK's

24 statements, agents believe that the remainder of the $475,000 was

25 paid in cash.  Agents also believe STEVE BARTH and HILLARY BARTH were

26 paid in cash.

27     81.  As set forth above, there are numerous factors which

28 indicate that all of POLIAK's income is derived from illegal sources.

USAO 000194

**Exhibit F**

**472**

1  The cash in particular cannot be sourced to any lawful pursuit.

2  However, close examination of POLIAK's bank records reveal the

3  following:

4         a.   The check for $100,000 from MGP Consulting LLC, can be

5  traced to healthcare fraud, as described above.  Between February 15,

6  2019 and April 1, 2019, POLIAK received three checks from Corporation

7  A, and one from Corporation B., each for $25,000, payable to MGP

8  Consulting. These checks are part of the "forty-five-for-fifty"

9  healthcare fraud/money laundering scheme POLIAK himself described.

10  These deposits funded the $100,000 check from MGP Consulting to U.S.

11  Private Vaults.

12         b.   In addition, the $125,000 cashier's check from

13  POLIAK's Wells Fargo account can be traced to a $300,000 E-deposit

14  made in New York on 10/20/2018.  Financial investigators traced this

15  check to Alta Quality Growers, LLC of Elgin, Illinois, whose

16  principal is John Fasano of Brooklyn, NY.  Fasano has a criminal

17  history which involves drug trafficking (marijuana and ecstasy), as

18  well as a financial history which includes a pattern of structured

19  deposits and withdrawals and large wires to Mexico, with no business

20  purpose.  Additionally, Alta Quality Growers, LLC has no website and

21  little internet presence.  It's notable that the company, supposedly

22  located in Illinois, has a (956) area code phone number – 956 covers

23  much of the Texas-Mexico border.  Based on my training and experience

24  in both drug and money laundering investigations, I believe that Alta

25  Quality Growers, LLC is a drug/money laundering front.  The money

26  therefore which funded POLIAK's Wells Fargo Bank account and was used

27  in part to purchase USPV, is likely also criminal proceeds.

28

**Exhibit F**
56
**473**

**USAO 000195**

**M. None of the Individuals Associated with USPV, as Principals or Patrons, who are Participating in the Marijuana Industry, is Licensed by the State of California to do so.**

82. During the course of this investigation, federal agents consulted with the California Department of Consumer Affairs, Cannabis Enforcement. Through that consultation, we learned that none of the following individuals is licensed to participate in the California cannabis trade, either with regard to cultivation, manufacture, or retail[29]: MARK PAUL, MICHAEL POLIAK, GEORGE VASQUEZ, STEVE BARTH, HILLARY BARTH, Allan NEYMAN, Matthew BEAVER, Aram ABGARYAN, Alta Quality Growers, John FASANO.

**N. USPV Principals Have Counseled Clients on Strategies to Circumvent BSA Reporting Requirements and Have Themselves Failed to Comply with Reporting Requirements**

1. USPV Manager VASQUEZ instructs a customer to structure gold purchases to avoid currency transaction reports

83. On August 9, 2019, CS-3 talked to USPV manager GEORGE VASQUEZ about buying gold at OLYMPIC GOLD & JEWELRY. The conversation was consensually recorded and reviewed by investigators. During the conversation, CS-3 said, "My Primo's gonna want to talk to her [HILLARY BARTH] because we spoke about buying some gold. . . . He [Primo] needs to get rid of a lot of shit . . . and I'm hoping you guys have some fuckin' creative ideas on how to do it." VASQUEZ clarified, "Well, depends on—what—okay—he's got to get rid of some money?" CS-3 replied, "Yeah." VASQUEZ said, "He wants to buy gold?" CS-3 said, "Yes." VASQUEZ said, "Okay. **Keep it at under ten thousand dollars.**" CS-3 asked, "How often?" VASQUEZ replied, "About – I would—it's, it's supposed to be every 24 hours . . . but I

---

[29] Valley Collective Care (Antares Topanga Group) which operates The Atrium at 5441 Topanga Canyon Blvd., Woodland Hills, CA, discussed herein is a licensed cannabis retailer.

1  suggest at least 48 hours." VASQUEZ added, "Yeah. But not all the
2  time. **So let's say like 9,000 or 9,500.**" CS-3 said, "**Break it**
3  **down.**" VASQUEZ replied, "Break it down . . . Cause **you don't want**
4  **that paperwork shit.**" (Emphasis added.) Based on my training and
5  experience, as well as a comprehensive debrief of CS-3, CS-3 was
6  talking to VASQUEZ about laundering criminal proceeds through the
7  purchase of gold. Furthermore, I believe that VASQUEZ understood
8  that CS-3 was talking about laundering criminal proceeds. Finally,
9  it is indisputable from this conversation that VASQUEZ was coaching
10  CS-3 how to "structure[30]" his purchases in order to avoid the Bank
11  Secrecy Act (BSA) reporting requirements, specifically telling CS-3
12  to "keep in under $10,000" because "you don't want that paperwork
13  shit."

14     84. In addition to coaching CS-3 on how to avoid BSA
15  requirements, VASQUEZ's statements show a clear knowledge of and
16  participation in money laundering. USPV is using its co-located
17  business, OLYMPIC GOLD & JEWELRY as an outlet for USPV customers to
18  launder criminal proceeds, by exchanging cash for gold or silver.
19  That there is a pattern and practice of this is evidenced by the
20  seizure of gold and silver from USPV boxes in the cases described
21  earlier. Furthermore, based on my training and experience
22  investigating money laundering, I know that the purchase and sale of
23  gold and silver is a common method which criminals employ to launder
24  criminal proceeds. Gold and silver are difficult to trace, portable,
25

26  _____
27     [30] Structured deposits refers to multiple deposits under $10,000,
   made on the same day or consecutive days, which add up to over
   $10,000 – generally structured in order to avoid Bank Secrecy Act
28  (BSA) requirements, such as providing identification and filing a
   Currency Transaction Report (CTR) or IRS Form 8300.

USAO 000197

1  fairly easy to re-sell, and often traded in a manner which, like

2  USPV, caters to criminals' need for anonymity.

3        2.   HILLARY BARTH and VASQUEZ instruct a customer to
             structure gold purchases to avoid currency transaction
4            reports

5        85.  On or about January 13, 2020 CS-4 went to USPV to pay rent

6  on a previously-rented safe deposit box.  While there, CS-4 spoke to

7  HILLARY BARTH about the possibility of investing approximately

8  $20,000 in gold or silver.  This conversation was not recorded, but

9  was reported to the Affiant immediately after it occurred.  HILLARY

10 BARTH, who had never previously met CS-4, told CS-4 that it didn't

11 matter whether CS-4 purchased gold or silver – one came in coins, the

12 other in bars – but he/she should not purchase $20,000 at one time.

13 HILLARY BARTH specifically advised CS-4 not to purchase more than

14 $10,000 worth of gold or silver at a time, otherwise, CS-4 would have

15 to fill out the paperwork[31].  This shows that HILLARY BARTH is

16 coaching USPV/OLYMPIC GOLD & JEWELRY clients on strategies for

17 evading BSA reporting requirements.  It's important to note that

18 HILLARY BARTH had not previously met CS-4, because this suggests that

19 she gives this advice to *all* USPV/OLYMPIC GOLD & JEWELRY clients.

20       86.   On February 25, 2020, CS-4 went to USPV to access a

21 previously-rented box.  While there, CS-4 spoke to George VASQUEZ

22 about the possibility of purchasing gold.   This conversation was not

23 recorded, but was reported to the Affiant immediately after it

24 occurred.  VASQUEZ asked how much CS-4 wanted to purchase and CS-4

25 said he/she might have about $23,000 to invest. CS-4 relayed to

26

27       [31] Note, CS-4 was not coached or prompted in any way to inquire
    about breaking up a purchase. CS-4 was instructed to mention that
28  he/she expected to have $20,000 to invest and would like information
    about purchasing gold or silver.

**Exhibit F**
476

USAO 000198

1  VASQUEZ what Hillary BARTH had previously told CS-4 -- that he/she
2  should keep the purchases under $10,000 in order to avoid doing
3  paperwork. VASQUEZ agreed with that and told CS-4 that he could help;
4  specifically, CS-4 could deposit $9,000 and give the rest to VASQUEZ,
5  who would make the deposits, so no paperwork would be filed. VASQUEZ
6  added that CS-4 should "throw me a little," meaning of the cash
7  because "I help you, you help me." VASQUEZ said he had such an
8  arrangement with someone else and it worked well[32]. VASQUEZ also added
9  that CS-4 would not even have to put his/her name on the receipt for
10  the gold; he/she could just use initials, and that way no one would
11  know -- there would be no paperwork.

     3.  **STEVE BARTH and VASQUEZ instruct a customer to
         structure gold purchases to avoid currency transaction
         reports**

14  87.  Similarly, on January 28, 2020, a DEA employee, posing as a
15  potential customer, went to USPV to discuss purchasing gold.  The
16  meeting was recorded and reviewed by investigators.  The DEA Agent
17  first told George VASQUEZ that he wanted to purchase $18,000 worth of
18  gold. VASQUEZ then advised the Agent that, "You can buy that but I
19  advised you to buy under 10 [$10,000]. Because if you're buying under
20  10 [$10,000], we don't have to do paperwork. No information is going
21  to IRS. So you could buy 9 [$9,000], and a couple days, come buy
22  another 9 [$9,000]."  VASQUEZ then logged on the computer and showed
23  the Agent the gold prices[33].  A few minutes later, STEVE BARTH arrived

---

[32]    Note this conversation took place after the
January/February gold purchase, discussed below, in which VASQUEZ was
"tipped" in cash for his assistance.
[33]    The fact that VASQUEZ was able to go behind the counter of
OLYMPIC GOLD AND JEWELRY and log onto the computer led the Agent to
believe that the VASQUEZ was an employee of both USPV and OLYMPIC
GOLD AND JEWELRY and/or the two businesses were essentially one.

USAO 000199

1   at the business. VASQUEZ introduced STEVE BARTH to the Agent and

2   departed the display room.  STEVE BARTH told the Agent that he sells

3   gold, silver, platinum and different types of gold. The Agent told

4   STEVE BARTH that he wanted to purchase $18,000 worth of gold. STEVE

5   BARTH advised the Agent, if someone gives you $10,000 or more there's

6   a form you have to fill out. "If you buy less than $10,000 then

7   there's no form."  The Agent then told STEVE BARTH that he didn't

8   have any problem with filling out the form. STEVE BARTH then told the

9   Agent that, "Some people don't want to alert the IRS or whatever, so

10  they keep it under, most people." STEVE BARTH then advised the Agent,

11  "If you like to, you can buy $9,000 one day and then $9,000 you

12  know." The Agent then asked STEVE BARTH if he could purchase $9,000

13  of gold in one day then do another $9,000 worth of gold the very next

14  day. Steve BARTH said, "Yes, you could do that."  Later, STEVE BARTH

15  added, "I recommend you stay under 10,000 in cash and then you could

16  just do some one day and a few days later you could do the other.

17  That's what I would recommend." STEVE BARTH then said, "Anytime,

18  there's more than 10,000 dollars in cash, they get suspicious, so

19  they want to know. You fill out the form and the form goes to the

20  government and even though, it's legitimate."

21      88.  In addition to coaching customers on methods for evading

22  BSA requirements, HILLARY BARTH violated 31 U.S.C. §5331 by failing

23  to file IRS Form 8300 after conducting a cash transaction at OLYMPIC

24  GOLD & JEWELRY.  On or about December 4, 2019, CS-1 purchased

25  jewelry from OLYMPIC GOLD & JEWELRY[34].  CS-1 and HILLARY BARTH

---

[34] The purchase was not recorded, but CS-1 exchanged text
messages with HILLARY BARTH negotiating and leading up to the

USAO 000200

1  negotiated the sale for approximately $11,900.  CS-1 paid for the

2  jewelry in cash.  HILLARY BARTH gave CS-1 a document certifying that

3  the jewelry was authentic.  However, HILLARY BARTH did not provide an

4  invoice or obtain the information necessary to complete the Form 8300

5  (CS-1's identification, etc.). No Form 8300 was in fact filed, based

6  on a database search for any Form 8300s filed (at any time) by either

7  STEVE or HILLARY BARTH.  I believe HILLARY BARTH is aware of the

8  requirement to file Form 8300 for cash transactions in excess of

9  $10,000 based on her discussions with CS-4 and others.  Moreover,

10  HILLARY BARTH's failure to provide CS-1 with a receipt, invoice or

11  other paperwork suggests that the sale was "under the table" and that

12  any income earned from the cash transaction was not declared to the

13  IRS.

14      **O.   USPV Principals Laundered Cash Represented to be Criminal Proceeds Through OLYMPIC GOLD & JEWELRY**

15

16          1.   January/February 2020 Gold Buy

17      89.  On or about January 29, 2020, CS-3 and TFO-UC (posing as an

18  associate of CS-3) went to USPV to discuss the purchase of gold with

19  cash purportedly derived from the sale of methamphetamine.  The

20  meeting was recorded and reviewed by investigators.

21          a.   After discussing the difference between gold coins and

22  gold bars, CS-3 told George VASQUEZ that gold bars were more

23  desirable for melting down, and mentioned that TFO-UC needed the gold

24  bars as payment for a debt.  CS-3 then asked VASQUEZ about crossing

25  gold "down south" [Mexico].  VASQUEZ asked CS-3, "How much are you

26  planning to take?" He then instructed CS-3 to, "Keep it under 10,"

27

28  purchase; investigators received and reviewed copies of the text messages.

**Exhibit F**
**479**

referring to the monetary value of $10,000 in cash, when purchasing gold. VASQUEZ then instructed CS-3 and TFO-UC to conduct two separate "orders" under the amount of $10,000 each, when purchasing the gold. CS-3 then asked VASQUEZ, "What do you mean?" VASQUEZ then continued, "Yeah, if you keep it under $10,000, there is no paperwork. That way you don't have to give no social security, no ID. All that shit goes to the IRS." At this time, CS-3 and TFO-UC simultaneously expressed their interest in conducting the gold purchase without having to fill out paperwork.

    b.   CS-3 stated, "Nah.. Nah.. Nah.. fuck that! This is all 'skante' money. I can't even fuck with that." VASQUEZ then reiterated, "Keep it under 10. You want to buy gold? Keep it under 10."  Based on training and experience, TFO-UC recognized "skante[35]," to be street vernacular commonly utilized for crystal methamphetamine.

    c.   At this time, TFO-UC asked VASQUEZ, "Does she [HILLARY] know the get down?" TFO-UC was referring to HILLARY BARTH's understanding of the structuring of gold purchases under $10,000 to avoid any reporting paperwork. VASQUEZ responded, "Yeah.. Yeah.. Yeah.. She will tell you." VASQUEZ then referred to HILLARY BARTH'S husband, STEVE BARTH.  CS-3 indicated that STEVE BARTH instructed them on purchasing under $10,000 of gold at a time to avoid paperwork during a previous phone conversation.  VASQUEZ continued to instruct CS-3 and TFO-UC to "keep it under 10."  CS-3 then asked VASQUEZ if

---

[35] The Urban Dictionary defines "skante" as slang for crystal meth. The DEA Drug Slang Code Words 2018 also defines "skante" as crystal meth.

USAO 000202

1    HILLARY BARTH would question them in regards to where they obtained
2    the money. VASQUEZ responded by saying, "She don't need to know. She
3    ain't gonna ask you."

4         d.    TFO-UC then asked VASQUEZ what the turn-around was on
5    an order of gold. TFO-UC expressed to VASQUEZ he was under time
6    constraints. VASQUEZ indicated the gold would be ready by the
7    following morning, referring to January 30, 2020. TFO-UC stated he
8    needed to get the gold down to Mexico. VASQUEZ then asked, "You guys
9    are going to pay whoever you guys owe in gold? I am just curious."
10   CS-3 then explained to VASQUEZ, "I moved a bunch of skante, and I did
11   really good. The guy who fronted us is down south. He's gotta take
12   the paper back. We don't wanna go down with paper 'cause I got
13   pinched like that." VASQUEZ replied, "Right, so you'll take the
14   gold." CS-3 responded, "Gold, cause the fuckin' dog won't pick up on
15   it. VASQUEZ replied, "Right. Right. Whichever you like."

16        e.    Based my training and experience and a debrief of TFO-
17   UC, it was clear to TFO-UC that CS-3 was explaining to VASQUEZ that
18   the money was obtained by selling crystal methamphetamine.
19   Furthermore, CS-3 explained that the individual who sourced the
20   crystal methamphetamine was in Mexico, and expecting payment for the
21   crystal methamphetamine. CS-3 explained that TFO-UC was tasked with
22   paying the source of the methamphetamine, adding that CS-3 and TFO-UC
23   did not want to drive the bulk U.S. currency down to Mexico because
24   CS-3 had previously been detained transporting narcotic proceeds, and
25   lost the proceeds. Furthermore, CS-3 explained their desire to
26   convert the narcotic proceeds into gold to repay the outstanding drug
27   debt because the gold would more easily avoid detection by trained
28   narcotic detecting K9's utilized by law enforcement personnel

USAO 000203

f.   Following the above referenced conversation, VASQUEZ escorted CS-3 and TFO-UC to HILLARY BARTH, who was waiting at the display of OLYMPIC GOLD AND JEWELRY.  TFO-UC told HILLARY BARTH he wanted to convert $16,000 in cash into a gold purchase. TFO-UC stated there were time constraints due to needing to get the gold bars delivered. HILLARY BARTH expressed an ability to have the gold by the following morning. HILLARY BARTH then went on to describe the different types of gold product they offered and the current value. HILLARY BARTH then explained, "Now up to $10,000 cash, uh, up to that, uh, is not reportable. If you go, if you buy more than that with cash, there is a form you need to fill out, the government requires because they want to know where this cash is going. Uh, so anything under ten thousand there is no paperwork to fill out except that you're signing the purchase order for me, for my records. So that I show I am making a buy for a client. Uh, if you want to do your sixteen thousand all at once, uh, if you want to wire it, uh, I don't believe you have to fill out that form. It's a cash buy. We don't do credit, nobody would take a credit card or a check until it clears for bullion."   HILLARY BARTH then explained for $10,000 TFO-UC could buy approximately "six," referring to ounces of gold, depending on what gold product TFO-UC was interested in purchasing. TFO-UC expressed an interest in purchasing the gold bars.

g.   CS-3 asked HILLARY BARTH how long TFO-UC would have to wait to conduct a second purchase of gold, following the initial purchase of under $10,000. TFO-UC told HILLARY BARTH he was not interested in filling out any paper work for the gold purchase. HILLARY BARTH recommended waiting until "next week, a few days," adding, "it's not recommended, they say, don't come in every day,"

1   HILLARY BARTH went on to say, "what they look for is a pattern of

2   someone who with intention is trying to get around..." HILLARY BARTH

3   did not finish her sentence. Instead, she added, "I am just

4   disseminating information." During this communication, it was

5   apparent TFO-UC that HILLARY BARTH appeared uneasy with the

6   conversation. HILLARY BARTH consistently looked up and away from CS-3

7   and TFO-UC. Furthermore, HILLARY BARTH became selective in her word

8   choice, referring to "they" repeatedly when referring to the cash

9   transaction report process.

10          2.   <u>VASQUEZ suggests splitting the $16,000 Cash Purchase
             between CS-3 and TFO-UC to avoid the $10,000 reporting</u>

11          <u>requirement</u>

12          h.   During the conversation between HILLARY BARTH, CS-3,

13   and TFO-UC, VASQUEZ stood approximately five feet west of the Olympic

14   Gold and Jewelry display, listening to the transaction take place. As

15   HILLARY BARTH explained to keep the purchase under $10,000, she

16   advised TFO-UC he could purchase six gold bars for $9,840. TFO-UC

17   explained again, his time constraints to get all $16,000 worth of

18   gold delivered by Friday referring to January 31, 2020. At this time,

19   VASQUEZ motioned over to CS-3 to come talk to him. CS-3 approached

20   VASQUEZ, who in Spanish instructed CS-3 to have TFO-UC purchase "8"

21   referring to $8,000 in gold, and CS-3 purchase the other "8"

22   referring to $8,000 in gold. Thereby making two simultaneous

23   transactions by two parties that would both fall under the $10,000

24   threshold.

25          i.   CS-3 then returned to the display where BARTH was

26   explaining to TFO-UC that the purchase of nine gold ounce bars would

27   amount to approximately $14,760. She then reiterated if TFO-UC

28   conducted the purchase on one transaction "paper work," would have to

**Exhibit F**
**483**

**USAO 000205**

be filled out. At this time, CS-3 motioned to TFO-UC to go and talk
to VASQUEZ. TFO-UC approached VASQUEZ, who instructed TFO-UC to split
the gold purchase into two separate transactions of $8,000. While
TFO-UC was speaking with VASQUEZ, HILLARY BARTH was explaining to CS-
3 that any cash transaction over $10,000 would require the cash
transaction report. HILLARY BARTH further explained, the cash
transaction report was the result of the Patriot Act. She added, she
"never" utilizes the cash transaction reporting form because her
clients do not typically purchase greater than $10,000.

      3.   <u>HILLARY BARTH agrees to the structuring so long as CS-
3 and TFO-UC hand her the cash separately</u>

     j.  At this time, TFO-UC returned and asked HILLARY BARTH
if he could split the purchase into two separate transactions
conducted separately by TFO-UC and CS-3. TFO-UC proposed that he
could purchase five gold bars and CS-3 could purchase four gold bars.
HILLARY BARTH indicated she would have to inquire to confirm if she
was capable of conducting such a transaction. She then proceeded to
operate her cellular phone through text messaging. She then stated,
"Yes, as long as you hand me the money," meaning separately. She then
explained she would fill out a receipt for the two separate
transactions, which would only require a first name and last initial.
HILLARY BARTH stressed the receipt was only for internal bookkeeping.

     k.  CS-3 then asked if he/she would have to be present to
pick up the gold bars. HILLARY BARTH explained it would be okay for
TFO-UC to take possession of the total purchase by presenting both
receipts.  HILLARY BARTH explained to TFO-UC that he would have to
sign the receipts at the time of pick up. Following the agreement to
conduct the purchase of $14,760 worth of gold in two separate orders,

**USAO 000206**

1   HILLARY BARTH suggested they conduct the transaction in the back

2   office for "privacy."

3        l.   At this time, HILLARY BARTH, TFO-UC, CS-3, and VAZQUEZ

4   entered the back office.  Once inside the office, TFO-UC sat next to

5   HILLARY BARTH to conduct the first gold purchase. HILLARY BARTH

6   advised TFO-UC the first transaction of six one ounce Suisse bars

7   would total $9,843. TFO-UC retrieved 99 one hundred dollar bills in

8   U.S. currency ($9,900) of Official Advanced Funds (OAF) from a black

9   backpack and handed it to HILLARY BARTH as payment for the gold bars.

10  HILLARY BARTH placed the U.S. currency in a money counter and

11  confirmed the total. HILLARY BARTH then asked TFO-UC for a first name

12  and last initial for a hand written receipt for the transaction. TFO-

13  UC advised BARTH his name was, "Andres V."  HILLARY BARTH proceeded

14  to hand write a receipt for the purchase (ORDER # 1001). HILLARY

15  BARTH then instructed TFO-UC to sign the "received by," section of

16  the handwritten receipt. TFO-UC then initialed "AV" in cursive

17  writing.

18       m.   For the second transaction, CS-3 sat down in the chair

19  closest to HILLARY BARTH. HILLARY BARTH advised CS-3 that the

20  transaction of three one ounce Suisse bars would total $4,920. TFO-UC

21  retrieved 61 one hundred dollar bills in U.S. Currency ($6,100) of

22  OAF from a black backpack and handed it to CS-3 in plain and direct

23  sight of HILLARY BARTH. At this time, CS-3 asked TFO-UC, "How much is

24  it?" TFO-UC responded, "61," referring to $6,100 in U.S. currency.

25  CS-3 then removed 11 one hundred bills in U.S. currency ($1,100) from

26  the OAF and handed it back to TFO-UC. CS-3 then handed HILLARY BARTH

27  50 one hundred dollar bills, ($5,000) as payment for the three gold

28  bars. HILLARY BARTH placed the U.S. currency in a money counter and

USAO 000207

1   confirmed the total. HILLARY BARTH then asked CS-3 for a first name

2   initial and last name for a hand written receipt for the transaction.

3   CS-3 advised HILLARY BARTH to write, "D.Rossi." HILLARY BARTH

4   proceeded to hand write a receipt for the purchase (ORDER # 1002).

5   HILLARY BARTH did not instruct CS-3 to sign the "received by" section

6   of the handwritten receipt. CS-3 then handed the receipt to TFO-UC in

7   direct and plain sight of HILLARY BARTH.

8          n.   TFO-UC confirmed with HILLARY BARTH that he, alone,

9   would be picking up the full order of gold the following day, January

10  30, 2020. HILLARY BARTH confirmed the entire order, nine gold Suisse

11  bars, would be available for pick up before 12:00 p.m. The following

12  day, January 30, 2020, TFO-UC received nine ounces of gold bullion

13  from HILLARY BARTH at USPV.

14         87.  On February 5, 2020, TFO-UC returned to USPV and

15  compensated George VASQUEZ for his assistance in facilitating the

16  gold deal the previous week. TFO-UC gave VASQUEZ $1000 cash and

17  said, "This is for you man. I appreciate you walking us through that

18  shit. It worked out fucking perfect, so uh . . . we'll probably do

19  it again." TFO-UC suggested that he might conduct another gold

20  transaction soon. VASQUEZ said he would let the BARTHS know ahead of

21  time. TFO-UC said, "Just as long as I keep it under—" and VASQUEZ

22  interjected, "Yeah, yeah. Keep it under 10. And if you have to, do

23  it twice. Now let's say you need more than 10, but you're by

24  yourself. Come in. Call me and say, "Hey George, I am gonna need

25  15. Give me whatever, what else. Break it in half. Give me half.

26  And I'll have her buy it for me, and then I'll give it to you right

27  there."

28

**USAO 000208**

**P.   VASQUEZ and STEVE BARTH Arrange to Launder Cash for Wire Transfers for CS-3 for 15%**

90.   In October 2020, CS-3 approached VASQUEZ about conducting a second gold purchase through OLYMPIC GOLD & JEWELRY.  CS-3 stressed to VASQUEZ that while he/she was cool with the earlier transaction, it had "too many moving parts" and he/she was looking for something simpler. CS-3 met VASQUEZ on or about October 8, 2020 to discuss this.  The meeting was recorded and reviewed by investigators, which showed:

a.   During the meeting CS-3 suggested to VASQUEZ that he/she provide VASQUEZ with the total amount of cash CS-3 wanted to use to purchase gold and VASQUEZ could structure the cash payment (under $10,000) over multiple days, on behalf of CS-3, so that CS-3 did not have to go to USPV multiple times in the same week.  VASQUEZ agreed to this saying, "that's my point, I don't want you to have to go all the time."

b.   CS-3 then said, "you don't even have to go get it. Just cut me a receipt that I purchased it, and then tax me whatever the fuck it is," i.e. charge a fee for converting the cash into a clean financial transfer.  VASQUEZ replied, "run that by me again. Do you want the gold or not?"  CS-3 indicated that he/she did not want the gold.  "I just want the receipt and then I sell it back to you, and you take your cut however it is."  CS-3 asked if this was possible, and VASQUEZ said, "Maybe."  He later added ". . . maybe, but I'm not sure.  I will have to talk to Steve, Hillary's husband." As noted elsewhere STEVE BARTH and HILLARY BARTH own and run OLYMPIC GOLD & JEWELRY.  CS-3 told VASQUEZ to "find out (from STEVE BARTH) and get back to me."

**USAO 000209**

1    c. CS-3 and VASQUEZ continued discussing the proposed

2 deal and VASQUEZ clarified, "you just want to clean it."  CS-3

3 replied, "that's exactly what it is."  CS-3 added that he/she did not

4 want to continue laundering money through casinos, auctions and car

5 dealerships.  VASQUEZ said, "Let me talk to Steve (BARTH), I don't

6 know, cause Steve is – as much as he can—" CS-3 said, "I get it," and

7 indicated that if they had to do it the way they did last time

8 (referring to the February 2020 transaction) that was fine, but "it's

9 about moving parts."

10    d. Later in the conversation, VASQUEZ suggested CS-3

11 speak to Steve BARTH.  CS-3 indicated that he/she preferred VASQUEZ

12 to speak to STEVE BARTH on his/her behalf.  Your Affiant believes

13 this indicates that the decision to launder CS-3's money is STEVE

14 BARTH's decision and that VASQUEZ is subordinate to BARTH.

15    e. VASQUEZ and CS-3 continued to discuss details such as

16 the percentage that CS-3 would be charged, whether CS-3 would receive

17 one check or multiple checks.  VASQUEZ stated that the purchases

18 would have to be "under ten total. . . . I mean no paperwork and all

19 that stuff."  CS-3 confirmed that the transaction would not be

20 reported.  VASQUEZ said, "they have to at least take your first name

21 down."  VASQUEZ added that he would "talk to Steve.  I won't talk to

22 Hillary."  Finally, VASQUEZ concluded, "we can do it.  I think we

23 can.  We do it that way a couple of times and it helps you out.  We

24 all make a little bit."

25    f. As the meeting was wrapping up, VASQUEZ said, "I will

26 talk to Steve."  CS-3 said, "if you can do me a favor, just try to

27 fucking wash my shit."  VASQUEZ said he would try.

28

USAO 000210

91.   On or about November 12, 2020 CS-3 met with VASQUEZ at USPV to confirm the previously-discussed money laundering operation.  The meeting was recorded and reviewed by investigators.  During the meeting, CS-3 indicated that the money would be ready the following week, and they discussed the date and time for the transaction.  They also discussed the percentage which would be charged and VASQUEZ stated he still needed to talk to Steve (BARTH) to finalize that aspect.  As VASQUEZ walked CS-3 to the door, CS-3 told VASQUEZ he/she appreciated the arrangement because he/she just sold a large load of "skante" for some people down south and he/she needed to clean the money as soon as possible.  VASQUEZ told CS-3 not to worry about it and it would be taken care.

92.   On or about November 17, 2020 CS-3 and TFO-UC went to USPV with $25,000 U.S. currency.  They met with VASQUEZ.  The meeting was recorded and reviewed by investigators.  The following took place:

a.   CS-3 asked VASQUEZ what percentage of the $25,000 would OLYMPIC GOLD AND JEWLERY charge, if they laundered all $25,000 at one time. VASQUEZ stated approximately 12 percent. CS-3 and TFO-UC initially balked at such a high percentage being charged. VASQUEZ replied by saying, "Well, first, we are not even supposed to be doing this, right? Second . ."  VASQUEZ then stopped talking and utilized a calculator to determine the amount of money OLYMPIC GOLD AND JEWLERY would charge at a 12 percent rate. VASQUEZ then stated, "it's about three grand. We are going to go with 12 percent at this time, because we are going to have to go buy it (referring to the gold bullion)." VASQUEZ then inquired if CS-3 and TFO-UC were still interested in conducting the laundering of the $25,000.  TFO-UC told VASQUEZ that he still wanted to do the transaction.

**Exhibit F**
**489**

**USAO 000211**

b.   TFO-UC then retrieved the $25,000 from a backpack and handed it to VASQUEZ. VASQUEZ took possession of the U.S. currency and placed it in a money counter on his desk. Upon verifying the amount of $25,000, VASQUEZ remained in possession of the money. VASQUEZ inquired if TFO-UC wanted a receipt for the transaction. TFO-UC said that he did not want any paperwork at all.

c.   VASQUEZ then went on to explain based on the daily fluctuation of the price of gold and that they won't know exactly how much the business may earn and / or lose when purchasing and reselling the gold bullion, which is why Steve [BARTH] is charging 12 percent for the transaction[36].  VASQUEZ explained that OLYMPIC GOLD AND JEWLERY would utilize the $25,000 to purchase gold bullion, in multiple structured purchases under $10,000 to avoid mandated reporting paperwork.  VASQUEZ stated once the gold bullion is purchased from a third party source, OLYMPIC GOLD AND JEWLERY would then "sell" the gold bullion, and wire the transaction amount to an account belonging to CS-3.  CS-3 and TFO-UC expressed to VASQUEZ they did not want to touch nor see the gold bullion, and were only

---

[36] CS-3's initial understanding of the deal, based on conversations with VASQUEZ (which were not recorded) was that CS-3 would give the cash to VASQUEZ who would give it to BARTH, who would disguise the placement of the funds into the OLYMPIC GOLD AND JEWELRY business account as legitimate precious metals sales.  VASQUEZ told CS-3 that STEVE BARTH would structure the funds to avoid reporting requirements and disguise the transactions on paper as anonymous gold and silver purchases.  VASQUEZ assured CS-3 that no gold would actually change hands.  VASQUEZ further told CS-3 that once the money had been structured into the OLYMPIC GOLD AND JEWLERY business account that a wire transfer, or series of wire transfers could be utilized to return the money to CS-3 into a bank account that CS-3 would provide VASQUEZ.  VASQUEZ told CS-3 that the wire transfer would be made to look like a sale of precious metals to OLYMPIC GOLD AND JEWLERY.  VASQUEZ told CS-3 that the entire circle of transactions would exist on paper only and would be clean and disguised as normal commerce.

USAO 000212

1   interested in a time frame in which they could expect the money to be

2   wired to the account.  VASQUEZ stated he understood and gave an

3   approximate two week time frame for the approximate $22,000 to be

4   wired to the account.  VASQUEZ explained the time frame depended on

5   how much bullion was in stock at OLYMPIC GOLD AND JEWLERY and how

6   much would have to be purchased from the third party source. VASQUEZ

7   further stated he could only conduct one cash purchase of gold

8   bullion under $10,000 a day and that OLYMPIC GOLD AND JEWLERY is only

9   open twice a week.

10          d.   CS-3 then provided VASQUEZ with account information to

11  receive the wire transfer.  VASQUEZ then inquired if TFO-UC wanted

12  the $3,000 charge to come out of the $25,000 that he just handed

13  VASQUEZ, or did he want to pay that separate, so that VASQUEZ knew

14  how to structure the purchases.  CS-3 and TFO-UC advised VASQUEZ to

15  take the 12 percent charge ($3,000) out of the $25,000 that TFO-UC

16  just handed VASQUEZ.  VASQUEZ acknowledged he understood and

17  indicated he would be in contact with CS-3 about updates.

18          e.   As TFO-UC and CS-3 were leaving USPV, CS-3 handed

19  VASQUEZ $500 for facilitating the transaction.   VASQUEZ accepted the

20  money.

21          f.   On or about December 2, 2020 CS-3 went to USPV to ask

22  VASQUEZ when CS-3 would see the money.  This meeting was not

23  recorded, but CS-3 reported it to investigators the same day, and

24  also provided a "screen shot" of a later communication which

25  corroborated his account, discussed below.  During the meeting,

26  VASQUEZ told CS-3 he needed the address on CS-3's bank account

27  because Steve BARTH needed it to complete the wire transfer.  CS-3

28  provided the information to VASQUEZ.  Later that day, CS-3 received a

**Exhibit F**
**491**

1    text message from VASQUEZ with a picture of a computer screen.  On

2    the screen CS-3 saw a tracking number – 0W0001073359382 and the words

3    "bullion purchase" and "pending."  Agents have preserved and reviewed

4    the photo which VASQUEZ sent.  In the photo, agents observed a

5    reflection of VASQUEZ looking over the shoulder of someone who

6    appears to be STEVE BARTH.

7        g.   VASQUEZ advised that the first wire transfer was for

8    $10,000.  The rest would follow.

9        h.   On December 4, 2020 agents received confirmation that

10   two wires, one for $10,000 and one for $12,000 had been wired into

11   the under-cover bank account which was being utilized for this

12   operation.

13       **Q.   USPV Principals Help Its Customers Evade Law Enforcement**

14       95.  During the period of time in which CW-1 rented safe deposit

15   boxes at USPV (2012-2015), federal agents were investigating CW-1 and

16   contacted MARK PAUL about CW-1's boxes.  According to CW-1, PAUL told

17   CW-1 that he stalled in replying to the FBI and instructed GEORGE

18   VASQUEZ to "slow down in order to alert people."  PAUL specifically

19   told CW-1 to get his/her stuff out of USPV because the FBI had come

20   by.  Furthermore, PAUL told CW-1 to call another USPV customer whom

21   CW-1 had referred, to tell that customer to remove the contents of

22   his boxes quickly before the FBI could execute warrants.

23       96.  On August 9, 2019, USPV manager GEORGE VASQUEZ counseled

24   CS-3 on how to evade law enforcement.  During a recorded conversation

25   between VASQUEZ and CS-3, VASQUEZ said, "Piece of advice for you.

26   You know where you keep that [USPV safety deposit box] key, here?

27   [indicating under his shirt on a chain around his neck] . . . Called,

28   uh, asset forfeiture.  You ever heard about that?"  CS-3 said, "No,

**USAO 000214**

what?" VASQUEZ explained, "Well. Let's say you get pulled over for a
[unintelligible], right?  Cop checking you out, things like that.
Hey, empty your pockets. They see your key, they know it's a safe
deposit box.  They don't know where.  But then, they escalate it
towards – they'll call someone from their department, say hey, you
know what, we got this guy for whatever, whatever. . . . And then
they start looking in to things. You know, and then they'll say, oh
well, we'll confiscate whatever you have, this and that, and then
they'll scare you and say hey, you know, you don't tell us where this
key belongs to, you know, you're gonna do twenty, fifteen years."
Later in the conversation, VASQUEZ added, "It's happened before.
Just to let you know.  . . . Yeah, just to give you a heads up.
That's why we—we make sure we – I take care of our people, man."
Based on my training and experience as well as a comprehensive
debrief of CS-3, I believe that VASQUEZ was coaching CS-3 on how to
evade law enforcement.

     97.  On August 30, 2019, CS-3 spoke to USPV manager GEORGE
VASQUEZ.  The conversation was recorded and reviewed by
investigators.  During the conversation VASQUEZ coached CS-3 on how
to evade law enforcement.  VASQUEZ said, "Like I told you.  Be
careful when you go out.  This is between us.  Mike [POLIAK]—you know
he—he saw somebody get pulled over."  CS-3 asked, "Is it hot here or
what?  Should I be worried?"  VASQUEZ replied, "No, no, no.  No it's
just the people that do stuff."  CS-3 asked, "They get followed in?"
VASQUEZ replied, "Yeah!  They're fuckin' stupid.  You know.  Not,
not, not the place itself."  Later in the conversation, CS-3
remarked, "You got to tell everybody to fuckin', shit, fuckin' watch
their back."  VASQUEZ replied, "I tell everybody . . . I take care of

**Exhibit F**
**493**

USAO 000215

people, man."  Later VASQUEZ, discussing a person who was pulled over and then let go said, "But it's just that I tell them, even though they let him go, like, why did they pull you over in the first place? Has to be a reason . . . Cause you did something fuckin' stupid . . . And one other guy said oh he had tinted windows – too tinted.  One didn't have a fuckin' front license plate . . . Little shit."  CS-3 agreed, saying, "They'll find something to fuckin' jam you up and then they find something and from that they run."  VASQUEZ replied, "That's what I tell them, *perro*!  But what do I know?  Right?"

98.  In July 2019, CS-3 was at USPV.  While there, George VASQUEZ showed CS-3 the USPV security monitors and pointed out a number of vehicles which VASQUEZ said he believed belonged to law enforcement.  VASQUEZ, in fact, identified a number of law enforcement vehicles which were in the area due to CS-3's presence there.  VASQUEZ explained to CS-3 that he looks for vehicles parked in one spot too long; vehicles which park, but no one exits; tinted windows; and other factors.

99.  On or about October 21, 2020, George VASQUEZ explicitly warned CS-4 that law enforcement officers were asking about him/her and that he/she should remove the contents of his/her box.  The meeting between VASQUEZ and CS-4 was recorded and reviewed by investigators.

a.  Specifically, on or about October 16, 2020 local law enforcement officers went to USPV and represented themselves to be narcotics investigators seeking information about a person they asserted they had followed to USPV.  The officers presented VASQUEZ with a photograph of CS-4.  VASUQEZ first indicated that he could not give information about clients.  As the officers were leaving

USAO 000216

1   however, VASQUEZ walked them out and stated that he had seen the

2   person in the photo at USPV.  He added that customers often remove

3   the contents of their boxes and never return.

4          b.   Shortly after the local law enforcement officers left

5   USPV, VASQUEZ contacted CS-3, who had talked about coming to USPV to

6   see VASQUEZ that day.  Using coded language and communicating via

7   text message, VASQUEZ told CS-3 not to come, that the area was "hot"

8   right now.

9          c.   On or about October 19, 2020, CS-4 sent VASQUEZ a text

10  message indicating that CS-4 intended to pay rent on his/her box that

11  week.  VASQUEZ replied via text message and told CS-4 to delete all

12  text communications between them.  This communication has been

13  reviewed and preserved.

14         d.   On October 21, 2020, CS-4 went to USPV to pay

15  quarterly rent on his/her box.  VASQUEZ spoke to CS-4 in the office[37]

16  area and coached him/her through a dialogue whereby VASQUEZ said,

17  "Pay close attention, okay? Pay attention.  It's going to be $5,000."

18  CS-4 expressed surprise and confusion.  VASQUEZ said, "Yes.  Pay

19  attention.  You say it's too expensive and you'd rather not do

20  business with me.  Okay?"  CS-4 was confused by this charade, but

21  followed VASQUEZ's instructions. When CS-4 asked why, VASQUEZ said,

22  "I'm doing you a favor, man.  . . .  I'm doing you a favor, dude,

23  don't say anything. Okay?"  VASQUEZ added, "When you leave here,

24  delete my number.  I'm doing you a favor, okay?  If you want to go in

25  the bathroom and leave something for me, that's fine."  CS-4

26

27         _____

28         [37]  Conversations between CS-4 and VASQUEZ occurred in Spanish.
    Calls were translated into English by Spanish-language translators
    working on behalf of the FBI.

USAO 000217

1  continued to press for an explanation.  VASQUEZ said, "I'm telling
2  you, the heat is hot.   . . . Things are hot here, I want you to
3  cancel your box.  . . . They're after you, man."  CS-4 asked, "Who?"
4  VASQUEZ replied, "The cops, dude."  CS-4 asked whether he/she could
5  rent a box later.  VASQUEZ said, "Another day, later on.  While
6  things clam down. . . . I'm doing you a favor.  They'll come again.
7  . . .  They showed me your photo and everything, so."  CS-4 asked,
8  "And the owners are the ones who made the decision?"  VASQUEZ said,
9  "No, man.  I'm making it, to protect you, man. . . . I'm just telling
10  you because if they come here, they're after you.  Okay? . . .
11  They're going to come.  They already said that when they're after
12  you, they're going to come back."  CS-4 asked again about renting a
13  box later.  VASQUEZ concluded with "I know, dude.  They're looking
14  for you.  I don't know.  The cops are looking for you, for real.  I'm
15  not going to lie to you."  CS-4 agreed and left.  Conversations
16  between VASQUEZ and law enforcement, as well as CS-4 were
17  consensually recorded and reviewed.  Text messages have been reviewed
18  and preserved.

19          e.   On November 12, 2020, VASQUEZ related these events to
20  CS-3, as well[38].  This communication between VASQUEZ and CS-3 was
21  recorded and reviewed by investigators.  During that conversation,
22  VASQUEZ described how the police had come to USPV looking for a USPV
23  customer (CS-4).  VASQUEZ speculated that the police had stopped the
24  customer and found his/her key or followed him/her to USPV.  VASQUEZ
25  assured CS-3 that he/she shouldn't worry about it, as the police had
26  not returned.

27

28
─────────────────────
[38] CS-3 and CS-4 are completely unknown to each other.

100. Based on discussions Michael POLIAK had with CS-1, it appears part of his motivation in buying into USPV was to protect both his own money, and that of his "friends." In a December 2019 meeting which was recorded and reviewed by investigators, POLIAK told CS-1, "the reason why I wanted to buy it [USPV], I got a lot of fucking money now.  Not only – I don't just want to be a customer, I wanted to be the owner . . . cause that way, if anything fucking happens, I know first.  And it's good for all my customers that I know first.  Cause I'm not Mark [PAUL]."  CS-1 said, "You see, I mean, you only yourself have what, ten million, eight million?" POLIAK said, "Yeah."  CS-1 continued, "And your friends?"  POLIAK replied, "A lot."  CS-1 said, "Think about that. Your friends.  . . . It's your ass.  It's your friends."  CS-1 said, "Worry-wise I don't care, but again, you have to have your eyes in there because you have to monitor their money,  But if you're a client—"  POLIAK added, "But it's also – how many people trust anybody with that kind of money? Anonymously?  **I mean, it's not like we're Chase Bank.  . . . So why do they come?**  Cause of me. They're like, Mike {POLIAK]? You're there, okay.  I'm good with that." This exchange suggests that POLIAK anticipates being able to warn his "friends" if there is some reason their money is in jeopardy.

101. On or about September 16, 2020, in a conversation which was recorded and reviewed by investigators, Michael POLIAK told CS-1 that he would remove all but $5,000 of the contents of a client's box, for that client, if he became aware of pending legal process. Specifically, POLIAK and CS-1 were talking about having "a guy like me [POLIAK]" watching customers' money. POLIAK indicated that if someone had a problem he would "move it to another box,

USAO 000219

would leave like five grand in the box.  . . .  Five grand.  Take it.

See you later. At least they can't say 'Oh, it was empty.'"  POLIAK

then told CS-1 about agents from Homeland Security who came to USPV

with a subpoena.  POLIAK said the agents showed a picture of the

person whose box they were interested in, but POLIAK told them that

USPV has no information about who holds which box and the agents

needed to bring the person to USPV, physically, to have his eye

scanned.

    **R.  It Would Be Irrational for Non-Criminal Customers to Choose
USPV**

    102.    As suggested above by USPV owner POLIAK, there is no

reason for non-criminal clients to use USPV, whose selling points

are: anonymity, instructions on how to structure cash transactions to

evade cash reporting requirements, tips on how to avoid asset

forfeiture, and ownership and management by drug traffickers.

Legitimate customers need not pay to store cash, but can receive

interest and insurance by depositing it in a money market or other

financial account.  Only those who wish to hide their wealth from the

DEA, IRS, or creditors would instead chose to *pay* to store actual

cash at a single storefront operation owned by the likes of MARK PAUL

and MICHAEL POLIAK who might go bankrupt, close the business for any

reason, or steal their valuables and run off.  No organization stands

behind the boxes at USPV in the way that Chase Bank, which has a

nearly 150-year history and almost 200,000 employees, stands behind

its safety deposit boxes, to say nothing of its bank accounts, which

are insured by the FDIC.  As stated by USPV owner POLIAK, it is his

standing among drug traffickers, as well as USPV's criminal-friendly

**USAO 000220**

1  policies, that entice criminals to store their millions in cash, as

2  described earlier in the previous forfeitures section, at USPV.

3      **S.   USPV Falsely Claims It Either Returns the Unclaimed**

            **Contents of Boxes to a Designee, or Escheats it to the**

4              **State.**

5      103. On its company website USPV claims that the contents of

6  unclaimed boxes will be turned over to a designee or to the State of

7  California.  Specifically, under "Frequently Asked Questions – What

8  happens to the contents of my box if I die or become physically or

9  mentally incapacitated?" – USPV states,

10      "You should provide your attorney, beneficiary, or custodian

11      with information about the existence of your box (for an example

12      letter, visit our Customer Resources page). However, knowledge

13      of the existence of your box does not constitute permission to

14      access it. USPV will require a court authorization letter to

15      release the contents of your box to ANYONE other than the

16      renter.

17      "If you choose not to provide this information, USPV will open

18      your box due to nonpayment of rent (after a six month grace

19      period has elapsed). If you have provided contact information

20      within your box (suggested), USPV will attempt to locate you. If

21      no contact information is found, we will store the contents of

22      your box in our private safe for three years. Thereafter, we are

23      required to escheat (forward) the contents to the State of

24      California."

25      104. USPV employee GEORGE VASQUEZ, made similar statements to

26  FBI agents during an interview on or about July 1, 2016.

27  Specifically, VASQUEZ told agents that if a client fails to pay for

28  his/her safety deposit box for three months, USPV will drill out the

**USAO 000221**

1    lock and try to contact the client if they find identifying

2    documentation on the box. If not, USPV will keep the contents on hold

3    for three years and then forfeit it to the State of California.

4        105. CW-1 alleged that these assertions by USPV and its

5    principals are false.  CW-1 reported that he/she and another

6    individual rented a USPV box to which CW-1 had both keys. CW-1 also

7    paid all the rent and fees for the box.  Furthermore, CW-1 affixed a

8    sticker onto the box with instructions for CW-1's spouse or father to

9    be contacted in the event that CW-1 failed to pay rent on the box.

10   CW-1 has not paid rent on the box in five years because CW-1 is

11   incarcerated.  Neither CW-1's spouse nor father were ever contacted.

12   The other person whose biometrics were used to rent the box has

13   passed away.  The U.S. government did not seize the contents of the

14   box, and there is no record of the property being forfeited to the

15   State of California (which should not have happened because a

16   designee was identified).  Thus it appears that USPV may have kept

17   the contents of CW-1's box.  Furthermore, statements MARK PAUL made

18   to CW-1 support this, described below.

19       106. PAUL told CW-1 that in the event of non-payment, after

20   allowing a grace period, PAUL would drill open the box, a process he

21   said he would video record.  In the absence of contact instructions,

22   he would place the contents into his own safe deposit box.  CW-1

23   reported that PAUL himself has several USPV boxes.  CW-1 believes

24   that PAUL keeps the contents of these boxes for himself.  CW-1

25   believes that the USPV stated policy concerning unpaid rent is false.

26         1.   <u>USPV Has Never Escheated Property</u>

27       107.   Based on information obtained from the California State

28   Controller's Office – Unclaimed Property division, USPV has never

USAO 000222

1   escheated property to the state[39].  USPV has been in business since
2   2012; discounting the six month and three year waiting periods, this
3   means that in approximately five years, no one who failed to identify
4   a contact person has ever 1) abandoned a box; 2) failed to pay rent
5   on a box; 3) been arrested; 4) been deported; 5) died; or 6) become
6   incapacitated.  This seems unlikely, particularly given the types of
7   customers using USPV, as described herein.  A more logical
8   explanation is that PAUL places the contents of abandoned boxes in
9   his own safe deposit box for the three-year waiting period, but never
10  releases them to the state.

11      **T.   NOTIFYING USPV CUSTOMERS HOW TO CLAIM THEIR PROPERTY**

12      108. The search and seizure warrants the government seeks list
13  the nests of safety deposit boxes at USPV among the items to be
14  seized.  These nests of safety deposit boxes are evidence and
15  instrumentalities of USPV's criminality.  The warrants authorize the
16  seizure of the nests of the boxes themselves, <u>not</u> their contents.  By
17  seizing the nests of safety deposit boxes, the government will
18  necessarily end up with custody of what is inside those boxes
19  initially.  Agents will follow their written inventory policies to
20  protect their agencies from claims of theft or damage to the contents
21  of the boxes, and to ensure that no hazardous items are unknowingly
22  stored in a dangerous manner.  Agents will attempt to notify the
23  lawful owners of the property stored in the boxes how to claim their
24  property, such as by posting that information on the internet or at

25

26      [39] I ran a search on the Unclaimed Property Website and spoke
    with a representative from the State Controller's Office, who also
27  ran a search.  Both searches revealed no results.  In other words,
    USPV has never escheated property to the State of California, as it
28  claims.

USAO 000223

**Exhibit F**
**501**

1    USPV itself, or by contacting the owners directly.  In order to

2    notify the owners directly, agents will, in accordance with their

3    policies regarding an unknown person's property, look for contact

4    information or something which identifies the owner.[40]   (USPV

5    recommends that box renters include their or their designees'

6    telephone numbers on a note in the box in the event that USPV removes

7    the contents for nonpayment of rental fees.)

8    **U.    REQUEST FOR AFTER-HOURS SEARCH WARRANT FOR USPV LOCATION**
     **ONLY**

9

10   109.    I request permission to complete the search and seizure

     warrants at the USPV location outside of normal searching hours.

11   Because that facility is secured and advertises that it is on a time-

12   lock, agents will not be able to begin executing any warrants there

13   until after its normal opening time, 10:00am.  Further, because it is

14   secured, I expect that removing some business equipment, especially

15   the nests of safety deposit boxes, will be unusually time consuming,

16   so that agents may not be able to complete their tasks before

17   10:00pm.  Accordingly, for the USPV location only, I request

18   permission for agents to continue executing search and seizure

19   warrants beyond 10:00pm.

20             **USPV OWNER MARK PAUL LIVES AT PAUL'S RESIDENCE**

21   110.    ██████████████████████████████████████████████████

22   █████████████████████████████████████       █████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

26

27   _____
       [40] The FBI policy regarding taking custody of an unknown person's
     property provides, in part, that agents "inspect the property as
     necessary to identify the owner and preserve the property for
28   safekeeping."  The inspection "should extend no further than
     necessary to determine ownership."

USAO 000224



**USPV OWNER MICHAEL POLIAK LIVES AT POLIAK'S RESIDENCE**

111.

**USPV MANAGER GEORGE VASQUEZ LIVES AT VASQUEZ'S RESIDENCE**

112.

**HILLARY AND STEVE BARTH LIVE AT THE BARTHS' RESIDENCE**

113.

1 ████████████████████████████████████████████

2 ██████     ██████████████████████████████████████

3 ████████████████████████████████████████████

4 ███████████████████████████████████████████

5 ████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████ .

9          **TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES**

10         114. In my training and experience, persons involved in money

11 laundering, drug trafficking, and structuring must maintain records

12 of their activities just to manage their day-to-day criminal business

13 affairs, and to keep track of their finances.  Commonly they maintain

14 both written and electronic records, usually on computers and smart

15 phones or tablets.  Typically they store these records where they

16 feel is safe and near at hand, most often their residences, places of

17 business, and vehicles.  Persons with illicit wealth often attempt to

18 hide it from the authorities by storing it in the form of cash,

19 precious metals, or digital currencies such as bitcoin.  Persons

20 involved in criminal conspiracies must of necessity maintain the

21 contact information of their co-conspirators in the form of telephone

22 numbers, email addresses, and user names for communication

23 applications, such as Signal, WhatsApp, and Facebook.  Most often

24 they maintain this contact information on their computers or smart

25 phones.

26          **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

27         115. Based on my training, experience, and information from

28 those involved in the forensic examination of digital devices, I know

**Exhibit F**
**504**

**USAO 000226**

that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a

USAO 000227

1  device may be necessary to rebut a claim that the device was being

2  controlled remotely by such software.

3        d.   Digital device users can also attempt to conceal data

4  by using encryption, steganography, or by using misleading filenames

5  and extensions.  Digital devices may also contain "booby traps" that

6  destroy or alter data if certain procedures are not scrupulously

7  followed.  Law enforcement continuously develops and acquires new

8  methods of decryption, even for devices or data that cannot currently

9  be decrypted.

10     116. Based on my training, experience, and information from

11  those involved in the forensic examination of digital devices, I know

12  that it is not always possible to search devices for data during a

13  search of the premises for a number of reasons, including the

14  following:

15        a.   Digital data are particularly vulnerable to

16  inadvertent or intentional modification or destruction.  Thus, often

17  a controlled environment with specially trained personnel may be

18  necessary to maintain the integrity of and to conduct a complete and

19  accurate analysis of data on digital devices, which may take

20  substantial time, particularly as to the categories of electronic

21  evidence referenced above.  Also, there are now so many types of

22  digital devices and programs that it is difficult to bring to a

23  search site all of the specialized manuals, equipment, and personnel

24  that may be required.

25        b.   Digital devices capable of storing multiple gigabytes

26  are now commonplace.  As an example of the amount of data this

27  equates to, one gigabyte can store close to 19,000 average file size

28  (300kb) Word documents, or 614 photos with an average size of 1.5MB.

USAO 000228

**Exhibit F**
**506**

1    117. The search warrant requests authorization to use the

2  biometric unlock features of a device, based on the following, which

3  I know from my training, experience, and review of publicly available

4  materials:

5         a.   Users may enable a biometric unlock function on some

6  digital devices.  To use this function, a user generally displays a

7  physical feature, such as a fingerprint, face, or eye, and the device

8  will automatically unlock if that physical feature matches one the

9  user has stored on the device.  To unlock a device enabled with a

10  fingerprint unlock function, a user places one or more of the user's

11  fingers on a device's fingerprint scanner for approximately one

12  second.  To unlock a device enabled with a facial, retina, or iris

13  recognition function, the user holds the device in front of the

14  user's face with the user's eyes open for approximately one second.

15         b.   In some circumstances, a biometric unlock function

16  will not unlock a device even if enabled, such as when a device has

17  been restarted or inactive, has not been unlocked for a certain

18  period of time (often 48 hours or less), or after a certain number of

19  unsuccessful unlock attempts.  Thus, the opportunity to use a

20  biometric unlock function even on an enabled device may exist for

21  only a short time.  I do not know the passcodes of the devices likely

22  to be found in the search.

23         c.   Thus, the warrants I am applying for would permit law

24  enforcement personnel to, with respect to any device that appears to

25  have a biometric sensor and falls within the scope of the warrant:

26  (1) depress the thumb and/or fingers of MARK PAUL, MICHAEL POLIAK,

27  GEORGE VASQUEZ, and HILLARY and STEVE BARTH on the device(s); and

28  (2) hold the device(s) in front of those persons' faces with their

USAO 000229

1    eyes open to activate the facial-, iris-, and/or retina-recognition

2    feature.

3        118. Other than what has been described herein, to my knowledge,

4    the United States has not attempted to obtain this data by other

5    means.

6                                    **CONCLUSION**

7        119. Based upon the foregoing facts and my training and

8    experience, I believe there is probable cause to believe that

9    evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as

10   listed in Attachment B, will be found at the SUBJECT PREMISES.  I

11   further respectfully submit that there is probable cause to believe

12   that the business computers, money counters, nests of safety deposit

13   boxes and keys, digital and video surveillance and security equipment

14   and biometric scanners located at USPV, 9182 West Olympic Blvd.,

15   Beverly Hills, CA 90212 were used or intended to be used to

16   facilitate violations of 18 U.S.C. § 1956, 21 U.S.C. § 841, and 31

17   U.S.C. § 5324, and conspiracy to commit the same.  As a result, those

18   items are subject to seizure and forfeiture to the United States

19   pursuant to 18 U.S.C. § 982(b)(1), 21 U.S.C. § 853(f) and 31 U.S.C.

20   § 5317(c).

21

22   Attested to by the applicant in accordance
     with the requirements of Fed. R. Crim. P. 4.1
23   by telephone on this ___17___ day of March, 2021.

24

25

26

27   _____
     STEVE KIM
28   UNITED STATES MAGISTRATE JUDGE

**Exhibit F**

USAO 000230

FILED

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:   DM   DEPUTY

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                    January 2020 Grand Jury

11   UNITED STATES OF AMERICA,          CR 2:21-cr-00106-MCS

12            Plaintiff,                I N D I C T M E N T

13            v.                        [18 U.S.C. § 1956(h): Conspiracy
                                        to Launder Money; 21 U.S.C. § 846:
14   U.S. PRIVATE VAULTS, INC.,         Conspiracy to Distribute
       California Corporate             Controlled Substances; 18 U.S.C.
15     Number C3405297,                 371: Conspiracy to Structure
                                        Transactions; 18 U.S.C.
16            Defendant.                § 982(a)(1), 21 U.S.C. §§ 853 and
                                        881(a)(6), 28 U.S.C. § 2461(c) and
17                                      31 U.S.C. § 5317(c): Criminal
                                        Forfeiture]
18

19        The Grand Jury charges:

20                           COUNT ONE

21                      [18 U.S.C. § 1956(h)]

22   A.   INTRODUCTORY ALLEGATIONS

23        1.   At times relevant to this Indictment:

24             a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada

25   Corporation registered with the California Secretary of State, was in

26   the business of renting safety deposit boxes to individuals who

27   wished to do so anonymously.

28             b.   Co-conspirator USPV Officer was an officer of USPV and

USAO 000231

Exhibit F
509

1   one of its owners.  USPV Officer dealt in marijuana, in violation of

2   the laws of California, as well as cocaine.

3          c.   Co-conspirator USPV Manager was the manager of USPV.

4   USPV Manager helped USPV Officer arrange drug deals within USPV, and

5   helped USPV customers avoid detection by law enforcement, including

6   by advising them to structure their cash purchases to avoid reporting

7   requirements.

8          d.   Co-conspirator Gold Business was a dealer in precious

9   metals and jewelry, and shared the same space as USPV, as well as

10  some employees.  Gold Business helped USPV customers convert their

11  cash into gold, and structured their cash transactions to avoid

12  federal reporting requirements.

13         e.   Co-conspirator USPV Representative One was a

14  representative of USPV, and an owner of co-conspirator Gold Business.

15  USPV Representative One instructed USPV customers how to structure

16  transactions to avoid federal reporting requirements.

17         f.   Co-conspirator USPV Representative Two was a

18  representative of USPV, and an owner of co-conspirator Gold Business.

19  USPV Representative Two instructed USPV customers how to structure

20  transactions to avoid federal reporting requirements.

21  B.   THE OBJECTS OF THE CONSPIRACY

22         2.   Beginning in or before 2019, and continuing through the

23  date of this Indictment, in Los Angeles County, within the Central

24  District of California, and elsewhere, defendant USPV conspired with

25  others known and unknown to the Grand Jury to launder money, in

26  violation of Title 18, United States Code, Section 1956, namely:

27         a.   to knowingly conduct and attempt to conduct financial

28  transactions involving the proceeds of a specified unlawful activity,

USAO 000232

1  that is, the distribution of controlled substances, with the intent

2  to promote the carrying on of that specified unlawful activity, in

3  violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

4      b.  to knowingly conduct and attempt to conduct financial

5  transactions involving the proceeds of specified unlawful activity,

6  that is, the distribution of controlled substances, knowing that the

7  transactions were designed in whole or in part to conceal and

8  disguise the nature, location, source, ownership, and control of the

9  proceeds of specified unlawful activity, in violation of Title 18,

10  United States Code, Section 1956(a)(1)(B)(i); and

11      c.  to knowingly conduct and attempt to conduct financial

12  transactions involving the proceeds of specified unlawful activity,

13  that is, the distribution of controlled substances, knowing that the

14  transactions were designed in whole or in part to avoid a transaction

15  reporting requirement under Federal law, in violation of Title 18,

16  United States Code, Section 1956(a)(1)(B)(ii).

17  C.  MANNER AND MEANS OF THE CONSPIRACY

18      3.  The objects of the conspiracy were carried out and were to

19  be carried out, in substance, as follows:

20      a.  Defendant USPV would adopt business practices that

21  attracted customers in possession of proceeds from criminal offenses,

22  including drug trafficking, and not law-abiding persons.  Such

23  practices included: (1) touting the anonymity of the safety deposit

24  rentals that defendant USPV would provide, including by advertising

25  "we don't even want to know your name"; (2) boasting that, unlike

26  banks, its anonymous safety deposit box rentals did not require

27  customer information that "can be easily accessed by government

28  agencies (such as the IRS)"; (3) making arrangements for the payment

USAO 000233

1   of the rental fees in cash and other ways that would be untraceable;

2   (4) issuing safety deposit box keys that were unmarked and unnumbered

3   so that law enforcement could not determine that the keys unlocked

4   safety deposit boxes at USPV; and (5) charging safety deposit box

5   rental rates several times higher than those at banks.

6          b.   USPV Officer would capitalize defendant USPV with the

7   proceeds of his illegal drug trafficking.

8          c.   USPV Officer would invite other drug traffickers who

9   knew and trusted him because of his illegal drug trafficking to store

10  the proceeds of their drug trafficking at defendant USPV.

11         d.   Employees of defendant USPV would conduct counter

12  surveillance of the neighborhood and warn customers when they

13  observed law enforcement.

14         e.   Agents of defendant USPV would instruct customers to

15  structure transactions to avoid currency transaction reports

16  including by purchasing gold and other precious metals through Gold

17  Business, which would structure transactions and not file required

18  currency reports.

19         f.   If agents of defendant USPV learned that law

20  enforcement was interested in searching or seizing the contents of a

21  particular customer's safety deposit box, they would attempt to warn

22  the customer, delay law enforcement, or even remove all but a nominal

23  amount of cash from the box for the customer, to prevent law

24  enforcement from discovering and seizing the bulk of the cash.

25         g.   Defendant USPV would deposit the cash proceeds it

26  received from its customers for safety deposit box rentals, which

27  included proceeds from the distribution of controlled substances,

28  into its bank account, and then use those proceeds to maintain USPV's

**Exhibit F**
**512**

USAO 000234

1  anonymous storage facilities for its criminal customers.

2          h.    USPV Officer and USPV Manager would negotiate drug

3  deals illegal under California law within the secured space of USPV,

4  and USPV Officer would store the cash proceeds from drug deals within

5  a safety deposit box at USPV.

6          i.    USPV Manager would accept cash purportedly from

7  illegal drug sales, and structure transfers of it to Gold Business in

8  amounts not greater than $10,000 at a time in exchange for wire

9  transfers that purported to be for the sale of precious metals.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**USAO 000235**

COUNT TWO

[21 U.S.C. § 846]

4.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

USAO 000236

defendant USPV could provide in bulk.

Overt Act No. 2:  On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC.  USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3:  On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4:  On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5:  On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6:  On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

USAO 000237

1                            COUNT THREE

2                          [18 U.S.C. § 371]

3        8.   The Grand Jury realleges paragraph 1 of this Indictment

4   here.

5   A.   OBJECTS OF THE CONSPIRACY

6        9.   Beginning in or before 2019, and continuing through the

7   date of this Indictment, in Los Angeles County, within the Central

8   District of California, and elsewhere, defendant U.S. PRIVATE VAULTS,

9   INC. conspired with others known and unknown to the Grand Jury to

10  knowingly and for the purpose of evading the reporting requirements

11  of Section 5331 of Title 31, United States Code, and the regulations

12  promulgated thereunder: (1) cause and attempt to cause a nonfinancial

13  trade or business to fail to file a report required under Section

14  5331 of Title 31, and any regulation prescribed under any such

15  Section, in violation of Title 31, United States Code, Section

16  5324(b)(1); and (2) structure, assist in structuring, and attempt to

17  structure and assist in structuring, transactions with one or more

18  nonfinancial trades or businesses, in violation of Title 31, United

19  States Code, Section 5324(b)(3).

20  B.   MANNER AND MEANS OF THE CONSPIRACY

21       10.  The objects of the conspiracy were carried out, and to be

22  carried out, as described in paragraph 3 of this Indictment, which

23  the Grand Jury realleges here.

24  C.   OVERT ACTS

25       11.  In furtherance of the conspiracy and to accomplish the

26  objects of the conspiracy, on or about the following dates, defendant

27  USPV, acting through its officers and managers, committed various

28  overt acts within the Central District of California, including but

**Exhibit F**
**516**

USAO 000238

1  not limited to the following:

2      Overt Act No. 1:  On December 4, 2019, Gold Business sold

3  jewelry for $11,900 in cash to a customer of USPV who was also a

4  confidential informant working with law enforcement ("Confidential

5  Informant 1"), and did not file the required IRS Form 8300.

6      Overt Act No. 2:  On January 13, 2020, USPV Representative One

7  told a customer of USPV who was also a confidential informant working

8  with law enforcement ("Confidential Informant 4"), and who expressed

9  an interest in buying $20,000 worth of precious metals in cash, to

10 purchase only $10,000 at a time to avoid paperwork.

11     Overt Act No. 3:  On January 28, 2020, USPV Representative Two

12 told a DEA agent who was posing as a USPV customer and said he wanted

13 to purchase $18,000 in gold, "I recommend you stay under $10,000 in

14 cash and then you could just do some one day, and a few days later

15 you could do the other," and explained, "If you buy less than $10,000

16 then there's no form."

17     Overt Act No. 4:  On January 29, 2020, USPV Manager instructed

18 Confidential Informant 3, who wanted to buy gold to pay a "skante"

19 debt "down south," meaning a debt in Mexico for methamphetamine, to

20 keep his purchases under $10,000 each:  "That way you don't have to

21 give no social security, no ID. All that shit goes to the IRS."  USPV

22 Manager introduced Confidential Informant 3 to co-conspirator USPV

23 Representative One to purchase the gold.

24     Overt Act No. 5:  On January 29, 2020, USPV Representative One

25 explained to Confidential Informant 3 and his friend, who was

26 actually an undercover police officer ("Undercover Officer"), that it

27 was better to space out his cash purchases and keep each one under

28

**Exhibit F**
**517**

**USAO 000239**

$10,000:  "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

**Exhibit F**
**518**

**USAO 000240**

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)

USAO 000241

1  defendant USPV shall forfeit substitute property, up to the value of

2  the property described in paragraph 2 above if, as the result of any

3  act or omission of defendant USPV, the property described in

4  paragraph 2 above or any portion thereof (a) cannot be located upon

5  the exercise of due diligence; (b) has been transferred, sold to, or

6  deposited with a third party; (c) has been placed beyond the

7  jurisdiction of the court; (d) has been substantially diminished in

8  value; or (e) has been commingled with other property that cannot be

9  divided without difficulty.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit F**
**520**

**USAO 000242**

1

FORFEITURE ALLEGATION TWO

2

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

3

and 21 U.S.C. § 853]

4

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby

5

given to defendant U.S. PRIVATE VAULTS, INC. that the United States

6

will seek forfeiture as part of any sentence in accordance with Title

7

21, United States Code, Section 881(a)(6), Title 28, United States

8

Code, Section 2461(c), and Title 21, United States Code, Section 853,

9

in the event of defendant USPV's conviction under Count Two of this

10

Indictment.

11

2.   Defendant USPV shall forfeit to the United States the

12

following property:

13

a.   All right, title, and interest in any and all property,

14

real or personal:

15

i.   constituting, or derived from, any proceeds

16

obtained, directly or indirectly, as a result of the offense set

17

forth in Count Two of this Indictment, including, without limitation,

18

the property set forth in paragraph 3 below; or

19

ii.   used, or intended to be used, in any manner or

20

part, to commit, or to facilitate the commission of the offense set

21

forth in Count Two of this Indictment, including, without limitation,

22

the property set forth in paragraph 3 below; and

23

b.   A sum of money equal to the total value of the property

24

described in subparagraph a above.

25

///

26

27

28

**USAO 000243**

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

USAO 000244

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2. Defendant USPV shall forfeit to the United States the following property:

    a. All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

    b. A sum of money equal to the total value of the property described in subparagraph a above.

3. The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

    a.   The business computers;

    b.   The money counters;

    c.   The nests of safety deposit boxes and keys;

    d.   The digital and video surveillance and security equipment; and

    e.   The biometric scanners

4. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

USAO 000245

1   5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),

2   defendant USPV shall forfeit substitute property, up to the value of

3   the property described in paragraph 2 above if, as the result of any

4   act or omission of defendant USPV, the property described in

5   paragraph 2 above or any portion thereof (a) cannot be located upon

6   the exercise of due diligence; (b) has been transferred, sold to, or

7   deposited with a third party; (c) has been placed beyond the

8   jurisdiction of the court; (d) has been substantially diminished in

9   value; or (e) has been commingled with other property that cannot be

10  divided without difficulty.

                              A TRUE BILL

                              /S/
                              _____
                              Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section

**Exhibit F**
**524**

**USAO 000246**