# Exhibit J

**to Declaration of Robert Frommer**

```
                                                    Page 1

 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                      WESTERN DIVISION
 4
      PAUL SNITKO, JENNIFER SNITKO, )
 5    JOSEPH RUIZ, TYLER GOTHIER,   )
      JENI VERDON-PEARSONS, MICHAEL )
 6    STORC, and TRAVIS MAY,        ) Case No.
                                    ) 2:21-cv-04405-RGK-MAR
 7              Plaintiffs,         )
                                    )
 8    vs.                           )
                                    )
 9    UNITED STATES OF AMERICA,     )
      TRACY L. WILKISON, in her     )
10    official capacity as Acting   )
      United States Attorney for    )
11    the Central District of       )
      California, and KRISTI KOONS  )
12    JOHNSON, in her official      )
      capacity as an Assistant      )
13    Director of the Federal       )
      Bureau of Investigation,      )
14                                  )
                Defendants.         )
15    _____)
16
17
18          REMOTE DEPOSITION OF JUSTIN PALMERTON
19                   April 28, 2022
20
21
22
23
24
25    Reported By: Amy E. Simmons, CSR, RPR, CRR, CRC
```

Page 2

1              REMOTE DEPOSITION OF JUSTIN PALMERTON

2

3              BE IT REMEMBERED that the remote deposition of

4     JUSTIN PALMERTON was taken via videoconference by the

5     Plaintiffs before Veritext Legal Solutions, Amy E.

6     Simmons, Court Reporter and Notary Public in and for

7     the County of Ada, State of Idaho, on Thursday, the

8     28th day of April, 2022, commencing at the hour of

9     9:19 a.m. Pacific Daylight Time in the above-entitled

10    matter.

11

12

13    APPEARANCES (Remotely):

14

      For the Plaintiffs:   THE INSTITUTE FOR JUSTICE

15                          By:  Robert Frommer, Esq.

                                 Joseph R. Gay, Esq.

16                          901 North Glebe Road, Suite 900

                            Arlington, Virginia  22203

17                          Telephone:  (703) 682-9320

                            rfrommer@ij.org

18                          jgay@ij.org

19

                            THE INSTITUTE FOR JUSTICE

20                          By:  Robert E. Johnson, Esq.

                            16781 Chagrin Blvd., Suite 256

21                          Shaker Heights, Ohio  44120

                            Telephone:  (703) 682-9320

22                          rjohnson@ij.org

23

24

25

Exhibit J
553

Page 3

```
 1     APPEARANCES (Contd.):

 2

       For the Defendants:    UNITED STATES ATTORNEY'S OFFICE
 3                            By:  Victor Rodgers, AUSA
                                   Maxwell Coll, AUSA
 4                                 Andrew Brown, AUSA
                              312 North Spring Street, 14th Floor
 5                            Los Angeles, California  90012
                              Telephone:  (213) 894-2569
 6                            Facsimile:  (213) 894-0142
                              victor.rodgers@usdoj.gov
 7                            maxwell.coll@usdoj.gov
                              andrew.brown@usdoj.gov
 8

 9                            FEDERAL BUREAU OF INVESTIGATION
                              OFFICE OF GENERAL COUNSEL
10                            By:  Meghan Campbell
                              935 Pennsylvania Avenue N.W., Room 10140
11                            Washington, District Columbia  20535
                              Telephone: (202) 324-8952
12                            mcampbell5@fbi.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit J
554

Page 4

1                            I N D E X

2                     E X A M I N A T I O N

3

    JUSTIN PALMERTON                                    PAGE

4

5    By:  Mr. Frommer......................................5

6

7                       E X H I B I T S

8    NO.                                               PAGE

9    1.   Excerpt from Domestic Investigations.............61

         and Operations Guide (2 pages)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit J
555

```
                                                Page 5

  1                  P R O C E E D I N G S

  2

  3                  JUSTIN PALMERTON,

  4     a witness having been first duly sworn remotely to

  5     tell the truth, the whole truth and nothing but the

  6     truth, was examined and testified as follows:

  7

  8                      EXAMINATION

  9     BY MR. FROMMER:

 10        Q.   Hello, Special Agent Palmerton.  I'm

 11     Robert Frommer.  I'm a senior attorney at The

 12     Institute For Justice.

 13             Before we get started, could you just

 14     please state your full name and title, please, for

 15     the record.

 16        A.   My name is Justin Palmerton.  I'm a

 17     special agent with the FBI.

 18        Q.   Okay.  And so, like I said, I'm Robert

 19     Frommer.  I'm with The Institute For Justice, a

 20     nonprofit public interest law firm, and we're

 21     representing the Plaintiffs in this class action

 22     challenge concerning the government's execution of

 23     a seizure warrant at US Private Vaults back in May

 24     of 2021.

 25             MR. FROMMER:  Before we begin, actually,
```

Page 6

1    Victor, I had a question.  I know we tried to

2    reach out to you about the motion to continue and

3    the additional relief that we were talking about

4    the potential for a live trial and more -- and

5    also the -- clarifying the different orders, so

6    the scheduling conference versus the court's trial

7    order.

8             And I just wanted to know if you had any

9    updates on whether Defendants were willing -- were

10   opposed to that or unopposed.

11            MR. RODGERS:  If you want to go off the

12   record to discuss this, that is fine.  But we're

13   in a deposition today, and I'm not going to

14   discuss this during the deposition.

15            In addition, I want to note that you

16   said -- you talked about the execution of a

17   seizure or search warrant in May of 21.

18            MR. FROMMER:  My apologies.

19            MR. RODGERS:  It was March 2021.

20            MR. FROMMER:  Yes.  I realize I just said

21   the wrong word.  I apologize for that.

22            And, Victor, okay.  We'll follow up with

23   this once we hit a break.

24       Q.   (BY MR. FROMMER)  So, Special Agent

25   Palmerton, before we begin, let me ask you this:

Page 7

1    Have you ever had your deposition taken before?

2         A.   No.

3         Q.   Oh, okay.  I figured given your history

4    with the FBI that you might have.

5              Let me go over some of the ground rules

6    for a deposition so we have the same

7    understanding.  Okay?

8              I'll be asking you questions, obviously.

9    And the court reporter will be recording my

10   questions as well as your answers.  To assist the

11   court reporter, I'll be sure to speak clearly and

12   audibly, and would kindly ask that you do the

13   same.

14             Also, please answer each question

15   verbally.  This is something in the natural course

16   of conversation often happens, that people will

17   say "uh-huh" or nod their head or shake their

18   head.  And of course the court reporter can't take

19   that down.  So make sure that you say "yes" or

20   "no" instead of things like "um-hmm" or

21   "huh-uh."

22             So will you be sure to provide clear and

23   verbal responses?

24        A.   Yes.

25        Q.   Okay.  Thank you.  And normally when we

Page 8

```
1    talk with people -- and I think this is
2    particularly the case in the world of Zoom --
3    we'll often talk over each other.  And it's hard
4    to understand that in the real world, you know,
5    for a court reporter to get that down in the real
6    world; I think it's even harder in the Zoom
7    deposition world.
8              So we often will interrupt as part of the
9    normal flow of conversation.  We want to avoid
10   that here.  So it's very important that you wait
11   until I finish my question before you begin
12   answering.  That's even if you think you know what
13   I'm about to ask.
14             And by the same token, I'll let you
15   finish your answer before I go on to another
16   question.
17             Do you understand?
18        A.   Yes.
19        Q.   Great.
20             MR. RODGERS:  I'm sorry, can we hold for
21   just a second?  I'm getting emails coming through,
22   and they're making noise, and I just want to turn
23   them off.  Can you give me a second to do that?
24             MR. FROMMER:  Yes.
25             (Brief pause in the proceedings.)
```

Page 9

1          Q.   (BY MR. FROMMER)  So Special Agent

2     Palmerton, you were sworn in a moment ago by the

3     court reporter.

4               Do you understand that you've been given

5     an oath that requires you to answer my questions

6     truthfully and completely?

7          A.   Yes.

8          Q.   I heard you say yes, but I think I'm

9     getting some delays in the video because I heard

10    you say yes.

11               MR. FROMMER:  Can we go off the record

12    for a second?

13                    (Discussion held off the record.)

14          Q.   (BY MR. FROMMER)  So Special Agent

15    Palmerton, do you understand that the oath that

16    you just took is the same oath you'd take if you

17    were going to testify in court before a judge?

18          A.   Yes.

19          Q.   Now, if you don't understand a question,

20    please let me know, and I'll either ask the court

21    reporter to read it back or rephrase to clarify

22    the question.

23               So will you tell me if you do not

24    understand a question?

25          A.   Yes.

Page 10

1          Q.   Okay.  And if you don't know the answer
2    to a question, that's fine.  I mean -- and you can
3    say so.  But if you do know the answer to a
4    question, you have to provide that answer.  So
5    unless you say otherwise, I'll assume that you
6    understand my question.
7               Now, if you want to talk to Victor, your
8    lawyer, that's fine.  But if there's a question
9    pending or if you're in the middle of an answer,
10   you have to finish that answer before speaking to
11   your lawyer.
12              Because it's important to get full,
13   complete, and accurate answers, I have to ask, are
14   you taking any medication or is there any other
15   reason you wouldn't be able to give full and
16   complete and accurate testimony today?
17         A.   No.
18         Q.   Okay.  Good.  Now, periodically, Victor
19   or another one of the government's attorneys may
20   state objections after I ask a question.  That
21   doesn't mean that you don't have to answer that
22   question.  The purpose of the objection is simply
23   to record it so that if we have to use your answer
24   later on, the government can argue that the
25   question was improper based on the rules of

Page 11

1    evidence.

2              Do you understand?

3         A.   Yes.

4         Q.   Sometimes you'll remember additional

5    information or maybe some clarification that you

6    want to provide to an earlier question.  And that,

7    again, is fine.  But if it happens, please let me

8    know that, that you'd like to add something, and

9    we can do that while it's still fresh in your

10   mind.  Okay?

11        A.   Understood.

12        Q.   All right.  If you'd like to take a break

13   at any time, please just let me know.  I'll finish

14   my line of questions if we're in the middle of it,

15   and then I'll let you finish your answer and we

16   can then adjourn for a break.

17             Do you understand?

18        A.   Yes.

19        Q.   Okay.  Now, during our conversation, you

20   might think of some documents or materials like a

21   calendar or appointment book that would help you

22   provide a more accurate answer.  If that's the

23   case, tell me.  And it's possible that we might be

24   able to get those materials for you so you can

25   answer completely and accurately.

Page 12

1           Will you do that?

2      A.   Yes.

3      Q.   Okay.  Now, do you have any other

4   questions for me right now?

5      A.   No.

6           MR. FROMMER:  Okay.  And I would say -- I

7   want to make one point on the record, that we're

8   doing this deposition on April 28th.  We're doing

9   this deposition of Special Agent Palmerton largely

10  without any documents being produced in this

11  matter.

12          I know we can quibble about the few docs

13  that have been produced, but we substantially

14  haven't received documents in this case.  So there

15  is a potential that when we receive those

16  documents, we might have to reopen this

17  deposition.

18     Q.   (BY MR. FROMMER)  Now, before we begin

19  talking about everything, I just want to get

20  some -- well, some background about you.  I know

21  you're special agent Justin Palmerton.

22          Is "Justin Palmerton" your full name?

23     A.   Yes.

24     Q.   Okay.  And if you don't mind me asking,

25  how old are you?

Page 13

1        A.    I'm 33.

2        Q.    Okay.  And can you tell me a bit about

3    your education, maybe starting from -- you don't

4    have to tell me about high school and everything,

5    but after high school, what's your educational

6    background?

7        A.    Right.  So I have an undergraduate degree

8    in accounting and management information systems.

9        Q.    Where is that from?

10       A.    Western Washington University.

11       Q.    Oh, okay.  And was coming to the FBI your

12   first job out of college?

13       A.    No.

14       Q.    So what did you do -- why don't you give

15   me a history of where you have worked and what

16   you've done.

17       A.    Yes.  Prior to going to the FBI, I was a

18   CPA at a public accounting firm for approximately

19   five years.

20       Q.    And what kind of work were you doing

21   there?

22       A.    A variety of work.  Tax accounting and

23   auditing functions.

24       Q.    And so you said you were there for five

25   years?

Exhibit J
564

Page 14

1          A.    Approximately, yes.

2          Q.    And was it after -- and did you come to

3     the FBI immediately following, after those five

4     years?

5          A.    Yes.

6          Q.    Okay.  And can you tell me, your official

7     position name is special agent, correct?

8          A.    Correct.

9          Q.    All right.  And how long have you been in

10    your current position as a special agent?

11         A.    About four and a half years.

12         Q.    So is that pretty much the entirety of

13    your time after training?

14         A.    The entirety of my time after training is

15    about -- actually close to four years.

16         Q.    Okay.  So -- and you might -- it seems

17    that everyone there is named -- or has a title of

18    special agent.  It seems like a lot of people at

19    different -- who seem to be functioning at

20    different levels all have the title special agent.

21              So is there -- can you give me a general

22    idea of, like, for instance, in your office, like,

23    what's the structure of your office in terms of,

24    like, an organizational chart?  Like, who do you

25    report to, for instance?

Page 15

1          A.   So I report to my SSA, supervisory

2    special agent.

3          Q.   And who is that?

4          A.   Currently it's SSA Ryan Heaton.

5          Q.   Okay.  And who does Ryan report to?

6          A.   He reports to ASAC, or assistant special

7    agent in charge.

8          Q.   And when I'm asking that, I'm asking you,

9    like, what's the name of the person as well as the

10   title of the person.

11         A.   I don't recall off the top of my head.

12   She's relatively new.

13         Q.   Okay.  Don't know, relatively new.

14              And then who would that person report to?

15         A.   The special agent in charge, and that's

16   Matthew Moon.

17         Q.   Okay.  And so is Kristi Johnson the head

18   of the overall office?

19         A.   Yes.  She's the assistant director in

20   charge.

21         Q.   Okay.  And so would Matthew report to

22   Ms. Johnson?

23         A.   Yes.

24         Q.   Okay.  Can you tell me -- I'm just trying

25   to figure this out.  Can you tell me where -- do

Page 16

1    you report to Lynne Zellhart?

2         A.   I do not.

3         Q.   Now, why is that?  Are you in different

4    areas of the office?

5         A.   No.  Lynne's a special agent as well, so

6    I wouldn't report to another special agent.

7         Q.   I see.  So you and Lynne, for instance,

8    are sort of -- are at the same level within the

9    FBI office?

10        A.   Yes.

11        Q.   Okay.  And so does Lynne Zellhart, then,

12   report to Ryan Eden [sic]?

13        A.   Yes, and it's Ryan Heaton, with an H.

14   Sorry if I misspoke.

15        Q.   Thank you.  Ryan Heaton.  I'll try and

16   remember that.  Very good.

17             Okay.  And can you tell me, give me sort

18   of a general overview of what your

19   responsibilities are as a special agent at the

20   FBI?

21        A.   Yeah.  Generally, I mean, so the squad

22   that we work on is white collar crime.  So my job

23   is -- primarily as a special agent is to gather

24   and collect evidence related to white collar

25   crimes.

Page 17

1       Q.   Okay.  So were you involved in gathering

2   and collecting evidence on the US Private Vaults

3   matter?

4       A.   Yes.

5       Q.   And was that -- how far back would you

6   say your involvement in that went?  Was that prior

7   to the indictment?

8            MR. RODGERS:  Objection; lacks

9   foundation.

10      Q.   (BY MR. FROMMER)  Special Agent

11  Palmerton, you said that you worked on gathering

12  and collecting evidence with regards to US Private

13  Vaults, correct?

14      A.   Yes.

15      Q.   Can you tell me when -- what month and

16  year you began working to gather and collect

17  evidence on the US Private Vaults matter?

18      A.   Well, March 2021 was when I gathered and

19  collected evidence, but I did have initial -- at

20  least became aware of the case sometime in 2019.

21      Q.   Now, did you -- sorry.

22           MR. FROMMER:  Can you guys hear me still?

23           THE WITNESS:  Yes.

24           MR. FROMMER:  Can you see me?

25           THE WITNESS:  Yes.

```
                                           Page 18

 1              MR. FROMMER:  Unfortunately, my computer
 2      continues to be rather --
 3              MR. JOHNSON:  Would it be possible --
 4              MR. FROMMER:  Let's go off the record for
 5      a moment.
 6                (Discussion held off the record.)
 7              (Break taken from 9:37 a.m. to 9:43 a.m.)
 8              MR. FROMMER:  Back on the record, please.
 9          Q.  (BY MR. FROMMER)  I think where we left
10      off was -- you were telling me when you started
11      gathering and collecting evidence on the US
12      Private Vaults matter.
13              And you said that you started gathering,
14      collecting evidence in March of 2021, but you
15      became aware of the matter in 2019.
16              Is that accurate?
17          A.  Yes.
18          Q.  Okay.  So did you have any involvement in
19      any of the investigatory work that led to the
20      indictment against US Private Vaults?
21          A.  No.
22          Q.  Okay.  All right.  We'll come back,
23      obviously, to that later on, find out what you've
24      done.  I just wanted to get sort of a sense of a
25      general timeline.
```

Page 19

1             So let me ask this, more generally:  When
2      you joined the FBI, did you have to undertake some
3      sort of training?
4         A.   Yes.
5         Q.   Where did you take that training?
6         A.   It was at Quantico.
7         Q.   Okay.  And that was approximately five
8      years ago?
9         A.   About four and a half years ago.
10        Q.   And how long is the overall training?
11        A.   It's approximately -- I mean, it varies,
12     but my training was about five months.
13        Q.   About 20 weeks?
14        A.   Yes.
15        Q.   So what happens -- so I understand you go
16     through the training.
17             And are you called a cadet at that point?
18        A.   Our technical title is new agent trainee.
19        Q.   So what happens when you complete the 21
20     weeks or -- at Quantico?  What happens then?
21        A.   You go to your assigned field office.
22     And in my case, it was Los Angeles.
23        Q.   And so once you're done with the
24     training, you get denoted as special agent; is
25     that correct?

Page 20

1          A.    Yes, upon completion and training and
2     after the graduation ceremony, you're handed your
3     credentials and officially become a special agent.
4          Q.    And then they ship you off to where they
5     need you?
6          A.    Yes.
7          Q.    Okay.  Let me talk about that initial
8     training, because I'm interested in what they
9     train you -- how they train you in this.
10          Can you tell me, describe to me -- and
11     here I'm talking about, like, Quantico, your
12     initial training, not any kind of continuing
13     training.
14          But can you describe to me the topics or
15     subjects that the FBI trains you on at Quantico?
16          A.    Yes.  I mean, generally it's legal
17     training, firearms training, tactical training, a
18     lot of physical training, and defensive tactics
19     training.
20          Q.    Okay.  Maybe we can break these out one
21     by one.
22          So it sounded like you said legal
23     training, firearms training -- and what were the
24     other ones again?
25          A.    Tactical training.

Exhibit J
571

Page 21

1          Q.   Yes.

2          A.   Sorry.  What was that?

3          Q.   Please go ahead.

4          A.   Defensive tactics.  And just physical

5     training, but that's just exercise.

6          Q.   Okay.  That one seems pretty straight

7     forward.

8          A.   It is.

9          Q.   So let me take these one at a time.

10              The firearms training, is that just to

11    become proficient in the use of a firearm?

12         A.   Yes.

13         Q.   For your, like, service weapon?

14         A.   Yes.

15         Q.   Okay.  Do they train you on other

16    firearms while you're there, or is it just your

17    sidearm?

18         A.   No, we're trained on a carbine rifle as

19    well as a shotgun.

20         Q.   Oh, okay.  And you mentioned tactical.

21    They train you on tactical.

22              Can you describe for me a little bit

23    about what that is?

24         A.   Tactical training is generally how to

25    clear rooms, deal with resisting subjects, deal

Page 22

1    with compliant subjects, execute arrests and

2    search warrants -- and this is primarily done at

3    Hogan's Alley.

4        Q.   Okay.  And Hogan's Alley is the -- it's

5    like a fake village, right, or a fake -- it's a

6    practice area that simulates a small town?

7        A.   Yes.

8        Q.   Okay.  And so when you're saying you

9    engage intact calendar training, like, for

10   instance, to execute a search warrant, is the

11   purpose of the tactical training to establish the

12   physical how you execute the warrant?

13       A.   Yes.

14       Q.   Okay.  And by that I mean not, like, any

15   of the legal details behind the warrant, but just

16   like how you go and execute a warrant.

17           For that, when you go through that, is it

18   all just hands-on training?  Or do they give you

19   materials that explain, like, how you're supposed

20   to clear a room or execute a warrant?

21       A.   Yes.  I mean, there were materials

22   provided, yeah.

23       Q.   Okay.  There were?  And I assume that's

24   the case, that materials were provided

25   for -- maybe not for physical training, but for

Page 23

1    all the areas that you previously mentioned, legal

2    firearms, tactical, and defensive tactics; is that

3    correct?

4         A.   Yes.

5         Q.   Okay.  Now, you mentioned -- how much

6    time does the FBI spend on each of those different

7    sort of topic areas during your 21 weeks?

8         A.   I couldn't tell you exactly how much time

9    on each.  They're interspersed kind of throughout

10   the 21 weeks.  I couldn't give you a definite

11   answer.

12        Q.   Oh, so on any given day, you might do

13   some legal, some firearms, some tactical; is that

14   correct?

15        A.   Yes.

16        Q.   Okay.  Now, you did mention legal as one

17   of the areas that they train you on.

18             Can you sort of generally describe to me

19   what that legal training is about?

20        A.   Yeah.  So a portion of it was on the

21   constitution and the parts that generally apply to

22   us and what our roles will be as special agents.

23             And then a good chunk of it was also on

24   our deadly force policy, a good chunk of it was

25   spent on that as well.

Page 24

1        Q.   Understandable.  So why do they have the

2    sort of legal training at Quantico?

3             MR. RODGERS:  Objection; lacks

4    foundation, calls for speculation.

5             MR. FROMMER:  That's a fair point.

6        Q.   (BY MR. FROMMER)  So they have legal

7    training at Quantico.  And you said, for instance,

8    they train you on excessive force policy; is that

9    correct?

10       A.   Yeah, or deadly force policy, yes.

11       Q.   Deadly force policy, yeah.

12            And do they teach you or new cadets or

13   new trainees about the legality of, like, the

14   Fourth Amendment, for instance?

15       A.   Yes.

16       Q.   Okay.  And do they teach about -- and is

17   the purpose for that so that -- because when

18   you're out in the field you need to know how to

19   comport your activities consistent with the

20   constitution?

21       A.   Yes.

22       Q.   Okay.  So you mentioned legal, and I want

23   to drill down a little bit into that.

24            So is some of that legal training about

25   substantive law?  And by that I mean, like,

Page 25

1    various offenses of law and what elements make up

2    those offenses?

3            A.   Yes.

4            Q.   Is some of the legal training -- and I

5    think you've already said this -- what I'd call

6    procedural law, such as how to investigate crime?

7            A.   Yes.

8            Q.   Okay.  Is it fair to say the reason or at

9    least part of the reason that you learn this

10   procedural law is so that when you're

11   investigating crime, you do so consistent with

12   people's constitutional rights?

13           A.   Yes.

14           Q.   Okay.  As part of that, do they teach you

15   how to make an arrest?

16           A.   Yes, they do.

17           Q.   Okay.  And is it the case, then, that the

18   tactical training would be about the physical act

19   of making an arrest?

20           A.   Yes.

21           Q.   And then the legal training would be

22   about when it's appropriate to make an arrest?

23           A.   Yes.

24           Q.   Okay.  And the tactical training, sounds

25   like you would need that for the physical act of

Exhibit J
576

Page 26

1      arresting someone so that you and the arrestee

2      remain safe; is that correct?

3              A.   Yes.

4              Q.   And is the point, then, of the legal side

5      of the training regarding arrests to ensure that

6      you don't violate the arrestee's or other person's

7      rights in the course of making that arrest?

8              A.   Yes.

9              Q.   I'd like to go a little bit more

10     into -- when I say "procedural law," how you

11     investigate, how you comport yourself.

12              Do you understand what I mean generally

13     by that term?

14              A.   Yes.

15              Q.   Okay.  So I'm wondering if there are

16     other areas of legal training, procedural legal

17     training that -- outside of the arrest context

18     that they have you train on.

19              Do they teach you, for instance, like,

20     how you should apply for a search warrant?

21              A.   Yes.

22              Q.   Okay.  And do they teach you -- on the

23     legal side, that is -- about how to execute a

24     search warrant?

25              A.   Yes.

Exhibit J
577

Page 27

1      Q.   Okay.  And again, is that -- is the

2  purpose of that to make sure that when you're

3  applying for a search warrant or executing a

4  search warrant, you do so consistent with the

5  constitution?

6      A.   Yes.

7      Q.   Now, when you get into this procedural

8  law regarding arrests, applying for a warrant,

9  executing a warrant, for instance, do they use any

10 sort of educational materials for that?

11     A.   Yes.

12     Q.   Okay.  Could you give me sort of a

13 general sense of, like, what kind of materials

14 we're talking about?

15     A.   I'll think of an example.  There were

16 examples of case law, examples of warrants that

17 have been executed in the past.

18     Q.   Were there any kinds of training guides

19 or manuals?

20     A.   Yes.

21     Q.   Okay.  Do you recall, by any chance, the

22 names of any of those?

23     A.   I don't.

24     Q.   It's been four and a half years.  It's

25 understandable.

Page 28

1              Okay.  And so you do all this for 21

2     weeks or so at Quantico.  They give you your

3     diploma.  You're a special agent.

4     Congratulations.  They fly you out to California.

5              Is that the end of all your training?

6          A.   No.

7          Q.   Okay.  So you continue -- is there

8     continuing training obligations that you have as

9     an FBI special agent?

10         A.   Yes, there are.

11         Q.   Okay.  Can you give me some examples of

12    what types of continuing training they have you

13    undertake?

14         A.   There's -- I mean, just off the top of my

15    head, just document retention training; again,

16    deadly force training; certain training I guess I

17    can't discuss because it's secret, classified.

18         Q.   Well, I'm not asking the specifics of any

19    given training.  I'm just asking, like, the broad

20    categories of training that you're undertaking.

21    I'm not asking for any, like, secrets

22    about -- specific secrets.

23         A.   Yeah, I mean, it's -- administrative

24    training.  Again, I'm just thinking document

25    retention, because that was one of the last ones

Page 29

1       that I did.  But there was again, like, legal

2       training, legal updates, and firearms training

3       quarterly, defensive tactics training, and

4       tactical training.

5            Q.   Okay.  So it's fair to say, then, that a

6       range of subjects that you trained on at Quantico,

7       they continue to provide continuing training to

8       keep you updated; is that correct?

9            A.   Yes.

10           Q.   And it sounds to me -- you said legal

11      updates.  So when there's a change in the law,

12      does the FBI provide training so that you and

13      other special agents are -- know of that legal

14      change?

15           A.   Yes.

16           Q.   Okay.  Let me step back just for a second

17      because I'm talking now about, like, what you do

18      now that you're out in LA, but I want to go back

19      to Quantico.

20                And we talked a lot about the legal

21      training, you know, with regard to making arrests,

22      applying for search warrants, executing a search

23      warrant.

24                I wanted to ask, did they give you any

25      training at Quantico about how to conduct a -- do

Page 30

1      an inventory?

2             A.   Yes.

3             Q.   And if you could just tell me in sort of

4      broad strokes, like, what were the -- what did

5      they say -- I'm trying to figure out how to ask

6      this question.

7                  What kind of subjects or lessons did they

8      provide as part of that how to properly do an

9      inventory?

10            A.   The primary one that comes to mind is an

11     inventory subject -- or incident to arrest.

12            Q.   Oh, when you have an arrestee and you

13     take -- have to inventory the personal property on

14     the arrestee?

15            A.   Yes.

16            Q.   And what do they say about that?  What

17     are you supposed to do in that situation?

18            A.   Generally after someone is arrested and

19     they have personal property on them, it's -- that

20     person becomes our responsibility along with the

21     items that are on them.

22                 So we take inventory of what is on their

23     person, you know, generally, like a wallet with

24     cards in it or cash.  So we basically take custody

25     of that and keep it somewhere in FBI custody for

**Exhibit J**
**581**

Page 31

1    safekeeping.

2        Q.    Okay.   So it's for safekeeping purposes,

3    primarily, to make sure that no property is lost

4    or gets misplaced?

5        A.    Yes.   And I didn't mention, but it's at

6    least our policy to give that person a receipt for

7    property listing out generally what was taken off

8    their person.

9        Q.    And in that training, did they have you

10   give that receipt sort of contemporaneously?  In

11   other words, you do the inventory and then

12   immediately give the receipt to the person?

13       A.    Yes.

14       Q.    Are the purposes behind inventories,

15   whether it's incident to an arrest or just an

16   inventory generally -- maybe you come across an

17   abandoned vehicle, for instance.  Are the purposes

18   of an inventory search the same in both

19   situations?

20            MR. RODGERS:   Objection; lacks

21   foundation, calls for a legal conclusion, and

22   calls for speculation.

23       Q.    (BY MR. FROMMER)  I understand that they

24   trained you on doing inventory searches incident

25   to an arrest.

Page 32

1                  Did you do any legal training regarding
2      inventory searches that were not incident to
3      arrest?
4          A.   I don't recall.
5          Q.   You don't recall, okay.
6                  So you said a second ago that you
7      continue to do continuing training on the various
8      areas that -- the legal firearms, tactical
9      defenses that you've trained on at Quantico; is
10     that correct?
11         A.   Yes.
12         Q.   Now, similar to what I asked about
13     Quantico, when they provide that continuing
14     training, does the FBI provide you with materials
15     for you to review and use?
16         A.   Yes.
17         Q.   Okay.  And again, what kinds of materials
18     are these?  Are these training guides?  Are they
19     manuals?  How would you describe them?
20         A.   I would call them manuals.
21         Q.   Okay.  And do those manuals go into
22     things like executing a search warrant or doing an
23     inventory?
24         A.   I couldn't say.  I don't know.
25         Q.   Okay.  Would those subjects be -- would

Page 33

```
 1    executing a search warrant or doing an inventory

 2    be something that would potentially be part of

 3    continuing training, your continuing training?

 4              MR. RODGERS:  Objection; calls for

 5    speculation, lacks foundation.

 6         Q.   (BY MR. FROMMER)  You can answer.

 7         A.   It could be.

 8         Q.   Okay.  Do you recall ever receiving any

 9    training -- continuing training, that is -- on

10    either how to execute a warrant or to do an

11    inventory search?

12         A.   I don't.

13         Q.   Well, let me just clarify that.

14              So is it that you do not recall or

15    that -- is your answer that you haven't received

16    any continuing training on executing a warrant or

17    doing an inventory search?

18         A.   No, yeah, I just don't recall.

19         Q.   All right.  So you said you've been with

20    the FBI for about four and a half years; is that

21    right?

22         A.   Yes.

23         Q.   Okay.  And as a special agent, you said

24    that you gather and collect evidence of criminal

25    violations; is that correct?
```

Page 34

1          A.    Yes.

2          Q.    Are there other things you do at the FBI?

3          A.    There is a -- yes.

4          Q.    Such as what?  Can you list for me, other

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    at the FBI?

8          A.    It's hard to say.  Generally it is

9    investigating crimes to which the U.S. is party.

10   That's the most general way I can think of stating

11   what I do on a day-to-day basis.

12         Q.    Okay.  So jumping back, I understand that

13   you had training at Quantico and potentially also

14   continuing training about how to do an inventory

15   that's incident to an arrest; is that correct?

16         A.    Yes.

17         Q.    Did you have any training either at

18   Quantico or since you've been a special agent

19   about how to conduct an inventory that is not

20   incidental to an arrest?

21         A.    I don't recall.

22         Q.    Okay.  So you don't recall any instances

23   in which you were providing training about how to

24   conduct an inventory outside the context of an

25   arrest?

1      A.   No, I don't.  I don't recall.

2      Q.   Okay.  So you said you've been at the FBI

3  for four and a half years.  You said you were a

4  forensic accountant, right, before you came to the

5  FBI?

6           Do you ever use your forensic accounting

7  skills in your job as a special agent?

8           MR. RODGERS:  Objection.  Slightly

9  mischaracterizes his testimony.  I'm not sure he

10  said he was a forensic accountant.  I think he

11  said he was a CPA.

12           MR. FROMMER:  CPA, I'm sorry.  Let me

13  rephrase.

14      Q.   (BY MR. FROMMER)  Do you ever use any of

15  your CPA training and skills as part of your job

16  as a special agent?

17      A.   Yes.

18      Q.   Could you describe to me how you do that,

19  in what ways?

20      A.   Primary skill is just using Excel, just

21  having knowledge of terminology, financial

22  terminology, and just a basic understanding of tax

23  accounting is helpful in investigating a crime.

24      Q.   I would think so.  And you said you

25  specialize in sort of the white collar crime area,

Page 36

1    right?

2         A.   Yes.

3         Q.   So that training would be particularly

4    useful there?

5         A.   Yes.

6         Q.   Have you participated in any arrests

7    since you've been a special agent?

8         A.   Yes.

9         Q.   How many?  Best guess.

10        A.   Dozens.  Dozens of arrests.

11        Q.   Okay.  We're at the point where a number

12   would not be -- giving me a single number would

13   not be really particularly accurate?

14        A.   Yes.

15        Q.   That's fine.  So when you were making

16   those arrests, how did you know what to do?

17        A.   Just using my -- I mean, the first arrest

18   was utilizing training as well as senior agents.

19   And then subsequent arrests was just building upon

20   that training and knowledge and information from

21   other agents.

22        Q.   Okay.  So when you're conducting these

23   arrests, you're relying on the training you

24   received both at Quantico and any continuing

25   training that you received; is that correct?

Exhibit J
587

1        A.    Yes.

2        Q.    And have you applied for warrants before

3    during your time as a special agent?

4        A.    Yes.

5        Q.    Do you know how many, approximately?

6        A.    Again, not a specific number.  Probably

7    dozens as well.

8        Q.    Okay.  I really don't know very much

9    about this area.  What all is involved with

10   applying for either a search or seizure warrant?

11        MR. RODGERS:  Objection; calls for a

12   narrative.

13        You can answer.

14        Q.    (BY MR. FROMMER)  Well, please answer.

15        A.    I mean, generally it's taking the

16   evidence that we've collected during our

17   investigation, at least a portion of that

18   evidence, putting it into an affidavit, working

19   with the attorneys, the AUSAs, generally working

20   with AUSAs to then get that affidavit in front of

21   a judge who then swears me out and signs off on

22   the warrant, whether it's an arrest, search, or

23   seizure warrant.

24        Q.    Okay.  So when you're creating a warrant,

25   is it your responsibility to take the first pass

Page 38

1      at, for lack of a better term -- do you write the

2      warrant application yourself?

3                  MR. RODGERS:  Objection; lacks

4      foundation.

5            Q.   (BY MR. FROMMER)  Who writes the warrant

6      application?

7                  MR. RODGERS:  Same objection.

8            Q.   (BY MR. FROMMER)  Please answer.

9            A.   I would say it's a combination between

10     the agents and the attorneys.

11           Q.   And who has the primary responsibility

12     for drafting that affidavit?  In other words,

13     who -- is it your responsibility to put the

14     initial information in the affidavit in support of

15     the warrant application, and then you work with

16     the attorneys to put the full warrant application

17     together?

18                 MR. RODGERS:  Same objection; overbroad.

19                 THE WITNESS:  I'd say generally the agent

20     puts the facts down because they have a fair

21     amount of case knowledge, and then AUSAs review

22     it.  Again, it's a tandem project.

23           Q.   (BY MR. FROMMER)  Okay.  Just a quick

24     question:  Were you involved in helping put

25     together the warrant application for the seizure

Page 39

1    warrant in US Private Vaults?

2         A.    I was not.

3         Q.    You were not.  Do you know who was?

4         A.    I don't.

5         Q.    Do you know if Lynne Zellhart was

6    involved with that?

7         A.    Not specifically, no.

8         Q.    And by that you mean you don't know

9    whether she was or was not?  Not that she wasn't?

10        A.    Yeah, I just don't know.

11        Q.    Okay.  When you're applying for a

12   warrant, does that, again, rely upon your training

13   and the training you received at both Quantico and

14   the continuing training?

15        A.    Yes.

16        Q.    And I would assume it also relies on the

17   experience that you've obtained while on the job

18   as well, correct?

19        A.    Yes.

20        Q.    Okay.  The FBI is a big place.  I would

21   assume -- you can tell me if I'm wrong -- that

22   when you're doing a warrant application, writing

23   an affidavit, do you have to -- are you starting

24   with a completely blank piece of paper?

25             MR. RODGERS:  Objection; lacks

Page 40

1    foundation, overbroad.

2          Q.   (BY MR. FROMMER)  Please answer.

3          A.   No.  Generally not just a blank piece of

4    paper.

5          Q.   So when you begin an affidavit as part of

6    a warrant application, are you using some kind of

7    form or other example that your FBI office has?

8               MR. RODGERS:  Same objection.

9               THE WITNESS:  Yeah, we would

10   use -- generally I would use a previous warrant as

11   an example.

12         Q.   (BY MR. FROMMER)  Okay.  And that's so it

13   helps guide you when applying for the warrant?

14              MR. RODGERS:  Same objection.

15              MR. FROMMER:  Let me rephrase that.

16         Q.   (BY MR. FROMMER)  So when you use a

17   previous warrant as a template, if you will, is

18   that used so that it helps guide you when you're

19   applying for the warrant?

20              MR. RODGERS:  Same objection.

21              THE WITNESS:  Yeah, it can help guide

22   you.

23         Q.   (BY MR. FROMMER)  Okay.  And I know you

24   said you applied for one, and I know you've done a

25   lot of arrests.

Page 41

1           I don't recall -- did I ask how many

2     warrants do you think you've applied for?

3           A.   Yes, and I don't recall a specific

4     number.

5           Q.   Are we in the dozens and dozens?

6           A.   Yes, I would say dozens of warrants

7     applied for.

8           Q.   So you've arrested dozens and dozens of

9     people, and you've applied for warrants dozens and

10    dozens of times.

11          Have you executed search and/or seizure

12    warrants while at the FBI?  And I'm not talking

13    about the US Private Vaults one; I'm just talking

14    generally.

15          A.   Yes.

16          Q.   At the risk of hearing the same term, do

17    you have an idea of approximately how many search

18    and/or seizure warrants you have executed while

19    being a special agent?

20          A.   Again, I don't have an approximate

21    number.  Dozens, likely.

22          Q.   And are -- of those dozens -- and I know

23    we're dealing with a big number here -- are most

24    of those warrants that you helped execute, were

25    most of them search warrants or search -- warrants

1    that provide for both search and seizure?  Let me

2    try and do this -- let me rephrase, because I want

3    to try and make sure this is understandable.

4              You said you have executed dozens and

5    dozens of warrants, correct?

6         A.   Yes.

7         Q.   What percentage of those would you say

8    are solely seizure warrants?

9         A.   I don't know.

10        Q.   Do you execute more seizure warrants than

11   search warrants or fewer?

12        A.   I don't know.  Or I don't recall.

13        Q.   Well, think back over your time.  If

14   you've done dozens and dozens, have you done

15   dozens and dozens of warrants that were just

16   seizure warrants?

17        A.   I've done seizure warrants.  And yes,

18   sometimes there are search and seizure warrants

19   that are the same.  So I would say if you're

20   looking at search and seizure warrants and search

21   warrants separated from just seizure warrants, I

22   would say I've done more just search warrants.

23        Q.   Okay.

24        A.   Than strictly seizure warrants.

25        Q.   So strictly seizure warrants you would

Page 43

1    say is in the minority of the overall warrants

2    you've executed?

3         A.   Yes.

4         Q.   And again, I'm fresh to all this.  I

5    don't really know much about how warrants get

6    executed.

7              But when the FBI executes a warrant, do

8    FBI agents execute that warrant solely with other

9    FBI agents?  Or are there times that the FBI would

10   work to execute the warrant in conjunction with

11   other agencies?

12             MR. RODGERS:  Objection; lacks

13   foundation, calls for speculation, overbroad.

14             THE WITNESS:  Yes, it would.

15        Q.   (BY MR. FROMMER)  I'm sorry.  I sort of

16   asked an either/or question, so "yes" doesn't

17   quite make sense there.

18             So when the FBI executes a warrant, on

19   some occasions does it do that, execute that

20   warrant in conjunction with other agencies?

21             MR. RODGERS:  Same objections.

22             THE WITNESS:  Sometimes we do, yes.

23        Q.   (BY MR. FROMMER)  And would those other

24   agencies with whom you execute the warrant be

25   federal agencies?

Exhibit J
594

Page 44

1       A.    Sometimes, yes.   Sometimes state
2   agencies.
3       Q.    That was my next question is is it
4   sometimes state agencies as well.
5             Okay.   Let me take a step -- so you're
6   executing a warrant.   Let's say you're executing a
7   warrant, just you and another FBI agent, no other
8   agency involved.
9             Can you just walk me through the steps
10  you have to take when you're executing a warrant?
11            MR. RODGERS:   Objection; lacks
12  foundation, poses an incomplete hypothetical.
13      Q.    (BY MR. FROMMER)   Well, what I'm asking
14  here is tell me -- let's say you have a seizure
15  warrant in hand -- again, I'm just talking general
16  seizure warrant in hand -- and you are going to go
17  execute that warrant presumably with another FBI
18  agent.   Well, let me ask that.
19            Usually when you execute a warrant, a
20  seizure or search warrant, does one FBI agent tend
21  to do that on their own, or do they do that
22  alongside other FBI agents?
23            MR. RODGERS:   Objection; lacks
24  foundation, vague and ambiguous, incomplete
25  hypothetical.

Page 45

1               THE WITNESS:  It depends on the warrant.

2          Q.   (BY MR. FROMMER)  Okay.

3          A.   What we're seizing or searching.

4          Q.   So is there any instance when a single

5     FBI agent, special agent, would go execute a

6     warrant on his or her own --

7               MR. RODGERS:  Same objection.

8          Q.   (BY MR. FROMMER)  -- in your experience?

9               MR. RODGERS:  Same objections.

10              THE WITNESS:  Yes, there would be.

11         Q.   (BY MR. FROMMER)  Can you describe to me,

12    like, the circumstances in which an FBI agent

13    would execute a warrant by themselves without any

14    other agents?

15              MR. RODGERS:  Same objections.

16              THE WITNESS:  Seizure warrant for a bank

17    account in which there's fraudulent proceeds or

18    attempting to seize.  It could be as simple as

19    delivering the seizure warrant to the bank.  And

20    an agent could do that themselves.

21         Q.   (BY MR. FROMMER)  Okay.  A relatively

22    small -- so is it fair to say that a single agent

23    could execute a warrant when it's sort of a small,

24    discrete task that doesn't pose a threat of risk

25    or injury to the agent?

Page 46

1          MR. RODGERS:  Same objections,

2     mischaracterizes the testimony.

3          THE WITNESS:  It could.

4     Q.   (BY MR. FROMMER)  That's fine.  Let me go

5     back.  I got into a little aside about single

6     agents versus multiple agents.

7          But based on your training -- and I want

8     to understand this.  So let's say you've applied

9     for and obtained a seizure warrant.  Okay?  And

10    you and some other FBI special agents are going to

11    go execute that warrant.

12         Can you walk me through the steps of how

13    you and the other agents would plan on how to

14    execute that warrant?  Would there be

15    discussions -- let me ask -- I'll do this one step

16    at a time.

17         Prior to executing a warrant, would you

18    have discussions or meetings with other FBI agents

19    about how you wish to execute that warrant?

20         MR. RODGERS:  Objection; lacks

21    foundation, overbroad, assumes facts not in

22    evidence.

23         THE WITNESS:  Do you mean like a seizure

24    warrant, a search warrant?

25    Q.   (BY MR. FROMMER)  Well, let's start with,

Page 47

1    like, a search warrant, for instance, and then
2    we'll move to the seizure warrant.
3            So let's say you have a search warrant
4    for a residence and you are planning to execute
5    that warrant.
6            Is there going to be a meeting where you
7    discuss how to execute that warrant before its
8    execution?
9        A.   Yes.
10           MR. RODGERS:  The answer is already in,
11   but objection and motion to strike; poses an
12   incomplete hypothetical, assumes facts not in
13   evidence.
14       Q.   (BY MR. FROMMER)  And at that meeting
15   where you are -- you and other agents are
16   discussing how to execute the warrant, what are
17   the -- what are some of the subjects that would be
18   discussed?
19           MR. RODGERS:  Same objection.  In
20   addition, calls for speculation.
21           THE WITNESS:  Again, depending on -- if
22   this was just a search warrant, it could be the
23   approach -- if it's a residential search warrant,
24   the approach to the residence, any individuals
25   that might be inside, copies of the search

Page 48

1    warrants, and then -- I mean, a lot of it is

2    primarily regarding agent safety, but also items

3    to be searched or areas to be searched.

4        Q.   (BY MR. FROMMER)  And potentially seizure

5    if it's a search and seizure warrant, correct?

6        A.   Yes.

7        Q.   Okay.  So I just want to make sure I

8    understand this.

9            So you obtain a search warrant.  You

10   would then have a meeting or some other discussion

11   with the other FBI agents about how to execute

12   that warrant?

13           Would there be a memorandum or an action

14   plan that you and the other agents would put

15   together for how you plan to execute the warrant?

16           MR. RODGERS:  Same objection; poses an

17   incomplete hypothetical, overbroad.

18           THE WITNESS:  There would be what we call

19   an operational plan put in place, the details of

20   the plan in place to execute the warrant.

21       Q.   (BY MR. FROMMER)  An operational plan?

22   Okay.  So this is a plan that is meant to guide

23   the agents?

24       A.   Yes.

25       Q.   Okay.  So in any instance, have you,

Page 49

1    alongside fellow FBI special agents, created an

2    operational plan, I believe you called it, for

3    executing a warrant?

4         A.   Yes.

5         Q.   And is creating an operational plan a

6    routine part of the execution process?

7              MR. RODGERS:  Objection; calls for

8    speculation, assumes facts not in evidence, lacks

9    foundation.

10        Q.   (BY MR. FROMMER)  In your experience, do

11   you regularly meet and confer with FBI agents and

12   create an operational plan prior to the execution

13   of a warrant?

14        A.   Yes.

15        Q.   Thank you.  And I want to walk through

16   that operational plan a little bit.

17             When you have conferred with other FBI

18   agents and created an operational plan in the

19   past, do you and the other agents discuss the

20   specific language appearing in the search warrant?

21        A.   I'm sorry.  Can you repeat it really

22   quick?

23        Q.   What I'm trying to figure out is, okay,

24   you have your warrant in your hand, and you're

25   starting the process of figuring out how you're

Page 50

1     going to execute this warrant.  So you and the

2     other FBI agents meet and start figuring out your

3     operational plan.

4              When you do that, would you regularly

5     look at the language in the warrant to see what it

6     authorizes or doesn't authorize?

7              MR. RODGERS:  Objection; overbroad, lacks

8     foundation, poses an incomplete hypothetical.

9              THE WITNESS:  During the preparation of

10    the ops plan, I don't think we would look at the

11    specific language in the warrant, no.

12       Q.   (BY MR. FROMMER)  But wouldn't that

13    warrant provide the parameters that guide the

14    contours of how you can execute that search

15    warrant?

16             MR. RODGERS:  Same objections, and calls

17    for a legal conclusion.

18       Q.   (BY MR. FROMMER)  Special Agent

19    Palmerton, you've been a special agent now for

20    four and a half years, correct?

21       A.   Yes.

22       Q.   And you've executed dozens of warrants,

23    correct?

24       A.   Yes.

25       Q.   I'm asking in your experience when you

1    are developing an operational plan, in any

2    instance have you not consulted, not looked at the

3    language within the warrant?

4              MR. RODGERS:  Objection; vague and

5    ambiguous with respect to -- well, vague and

6    ambiguous and same objections.

7              THE WITNESS:  Possible, yeah, when

8    preparing the ops plan we've -- or I've looked at

9    or used, yeah, direct language from the warrant.

10        Q.   (BY MR. FROMMER)  I'm trying to figure

11   out, so is it true that in the majority of

12   instances where you have created an operational

13   plan in the past, you have referenced or referred

14   to the language in the warrant when coming up with

15   that operational plan?

16             MR. RODGERS:  Same objections.

17             THE WITNESS:  It's possible.

18        Q.   (BY MR. FROMMER)  What factors would

19   determine whether you would or would not consult

20   the language in the warrant when developing the

21   operational plan?

22        A.   Well, just the operational plan is purely

23   logistics of how to execute the warrant.  It's not

24   really referring to the details of the warrant

25   itself.

Exhibit J
602

Page 52

1            The agents, we review the warrant prior

2       to the execution of the warrant.

3            Q.   Okay.  So you're saying -- let me make

4       sure I understand.

5            So you're saying that as -- to create the

6       operational plan, you might not refer to the

7       warrant.

8            But is it true that in every instance

9       when you have executed a warrant, you have

10      reviewed the language within that warrant?

11           A.   Yes.

12           Q.   And why do you do that?

13           A.   To understand the parameters for which,

14      you know, we're allowed or authorized to search.

15           Q.   So when you execute a warrant, do you

16      have to follow the instructions and limits that

17      are written into the warrant?

18           A.   Yes.

19           MR. FROMMER:  Let's take about, like, a

20      ten-minute break and we'll come on back.  Thank

21      you.

22           MR. RODGERS:  Okay.

23        (Break taken from 10:31 a.m. to 10:44 a.m.)

24           MR. FROMMER:  Back on the record.

25           Q.   (BY MR. FROMMER)  So we've talked a bit

Page 53

1    about executing warrants and also how you plan for
2    them, how do you plan to execute them, how do you
3    actually execute them.
4              Let me shift gears a little bit.  We
5    talked about this a little bit, but I wanted to
6    come back to it.
7              So have you conducted inventory searches
8    before?  And let me clarify that, because I
9    understand that you've done inventories incident
10   to arrest.
11             I'm wondering, have you conducted
12   inventory searches before that were not tied to
13   any arrest?
14        A.   Not in -- no.
15        Q.   You have not?
16        A.   No.
17        Q.   Didn't you conduct an inventory search
18   with regards to US Private Vaults?
19        A.   My understanding is just an inventory,
20   not an inventory search.
21        Q.   Okay.  Sorry.  That's a fair point.  I
22   apologize for the nomenclature.
23             Have you conducted an inventory before
24   that wasn't incident to an arrest?
25        A.   Yes.

Page 54

```
 1         Q.   How many times do you think you've
 2    conducted an inventory that was not incident to an
 3    arrest?
 4         A.   I recall just the one at USPV.
 5         Q.   So was US Private Vaults the first time
 6    you had conducted an inventory that wasn't tied to
 7    an arrest?
 8         A.   Yes.
 9         Q.   And so then I think it's fair to say that
10    you have not conducted sort of a warrantless
11    inventory?
12              MR. RODGERS:  Objection; mischaracterizes
13    the testimony.
14         Q.   (BY MR. FROMMER)  Was there a seizure
15    warrant in conjunction with the US Private Vaults
16    action?
17         A.   I don't recall specifically.
18         Q.   Well, under what authority did you go in
19    and seize things if there wasn't a warrant
20    authorizing that seizure?
21              MR. RODGERS:  Objection; mischaracterizes
22    the testimony, calls for a legal conclusion,
23    assumes facts not in evidence.
24         Q.   (BY MR. FROMMER)  Please answer.
25         A.   I recall we had a search warrant.  We had
```

Page 55

1     a search warrant for USPV, which then gave us

2     authority to go into the building.

3               And I assume --

4          Q.   Please continue.

5               MR. RODGERS:  If you have an estimate,

6     please answer.  Please do not speculate.

7               THE WITNESS:  I know we had a search

8     warrant and a seizure -- I just really don't

9     recall the specifics of that warrant.

10         Q.   (BY MR. FROMMER)  Do you recall reviewing

11    any sort of seizure warrant in conjunction with

12    the action at US Private Vaults?

13         A.   Yes.

14         Q.   Okay.  So before when you said the only

15    inventory you had done not incident to arrest was

16    at Private Vaults, that was done with a seizure

17    warrant; is that correct?

18         A.   I don't recall.

19         Q.   Okay.  Do you recall reviewing any

20    seizure warrant as part of the actions at US

21    Private Vaults?

22         A.   I don't recall specifically if it was a

23    seizure warrant.

24         Q.   Okay.  Stepping back for a second, are

25    you familiar with -- you're familiar with

Page 56

1    inventories, correct?

2         A.   Yes.

3         Q.   Okay.  Just from your training and

4    experience, can you tell me what the purposes for

5    an inventory are?

6              MR. RODGERS:  Objection; calls for a

7    legal conclusion, assumes facts not in evidence,

8    lacks foundation.

9         Q.   (BY MR. FROMMER)  Please answer.

10        A.   The purpose of an inventory -- and again,

11   this is incident to an arrest -- is safekeeping of

12   that person's property.

13        Q.   I understand that.  I'm asking when you

14   conduct an inventory that's not incident to

15   arrest.

16             From your training -- and just to loop

17   back, did you specifically have training on how to

18   conduct an inventory that was not part of an

19   arrest?

20        A.   I don't recall.

21        Q.   So is it fair to say, then, that -- are

22   you familiar with what purposes are behind doing

23   an inventory when it's not part of an arrest?

24             MR. RODGERS:  Same objection; lacks

25   foundation, poses an incomplete hypothetical,

Page 57

1    calls for speculation.

2              THE WITNESS:  My assumption would be that

3    it is -- per my understanding is that it is

4    similar to an inventory incident to an arrest, is

5    to take safekeeping of those items.

6         Q.   (BY MR. FROMMER)  Well, let me just walk

7    through that.

8              So do you think it's fair to say that the

9    purpose for an inventory is to protect the FBI

10   from any accusations that they lost or misplaced

11   property?

12             MR. RODGERS:  Objection; calls for a

13   legal conclusion, lacks foundation, poses an

14   incomplete hypothetical, calls for speculation,

15   overbroad.

16        Q.   (BY MR. FROMMER)  Please answer.

17        A.   My understanding is that, yes, we want to

18   take safekeeping of those items to protect us,

19   yeah, from any accusations.

20        Q.   Accusations of what?

21        A.   Of theft or -- I mean, primarily theft or

22   misplacing items.

23        Q.   Okay.  Is it fair to say that based on

24   your training and experience, that a purpose of an

25   inventory is to make sure that the property that's

Page 58

1    being stored in an FBI space doesn't pose a threat

2    to agents or other FBI employees?

3                MR. RODGERS:  Objection; poses an

4    incomplete hypothetical, vague and ambiguous with

5    respect to the time of inventory, lacks

6    foundation, calls for a legal conclusion.

7                THE WITNESS:  Yes, that would be part of

8    it as well.

9         Q.   (BY MR. FROMMER)  And is it fair to say

10   that part of an inventory, one of the purposes,

11   based upon your training and experience, is to

12   look for any contraband or evidence of criminal

13   violations?

14               MR. RODGERS:  Same objections.

15               THE WITNESS:  No, not to look for

16   contraband.

17        Q.   (BY MR. FROMMER)  Not to look for

18   contraband?  What about to look for evidence of

19   criminal wrongdoing?

20               MR. RODGERS:  Same objections.

21               THE WITNESS:  No.

22        Q.   (BY MR. FROMMER)  So let me just sort of

23   recap this so that I understand.

24               So based on your training and experience,

25   although -- based on your training and experience,

Page 59

```
 1    you believe that the purpose for an FBI inventory
 2    is to keep, you know, the person's property safe
 3    from possible loss or theft, and also to keep FBI
 4    agents safe when the property is stored; is that
 5    correct?
 6              MR. RODGERS:  Same objections, poses an
 7    incomplete hypothetical, assumes facts not in
 8    evidence, calls for a legal conclusion, vague and
 9    ambiguous with respect to the type of inventory,
10    and calls for speculation.
11              THE WITNESS:  Yes, that's my
12    understanding.
13         Q.   (BY MR. FROMMER)  Are there any other
14    purposes for an inventory other than item
15    safekeeping and officer safety?
16              MR. RODGERS:  Same objections.
17              THE WITNESS:  No.  No, I think those are
18    the two primary -- or really the only two I can
19    think of.
20         Q.   (BY MR. FROMMER)  Okay.  Now, we talked
21    about this a little bit before.  You had
22    said -- and correct me if I'm wrong; I don't want
23    to misstate anything -- but you had had training
24    on how to do an inventory incident to an arrest;
25    is that correct?
```

Page 60

1        A.   Yes, I believe so.

2        Q.   Now, did you get training on how to do an

3   inventory that was not incident to an arrest?

4             MR. RODGERS:  Asked and answered.

5             THE WITNESS:  I don't recall.

6        Q.   (BY MR. FROMMER)  Okay.  So you don't

7   recall -- you wouldn't recall -- if you had such

8   training, you wouldn't recall when you received it

9   or from whom you received it; is that correct?

10            MR. RODGERS:  Same objections.

11            THE WITNESS:  That's correct, yes.

12       Q.   (BY MR. FROMMER)  And you wouldn't recall

13  whether you'd been provided any materials as part

14  of any such training; is that correct?

15       A.   That's correct.

16       Q.   Okay.  Let me ask you this:  You've been

17  at the FBI now for almost five years.  So I don't

18  know how much experience -- it seems like that's a

19  decent amount of time for the FBI.  I don't really

20  know the career paths there.

21            But given that you've been there for four

22  and a half years, have you ever taught anyone

23  else, another agent or anyone at the FBI, about

24  how to conduct an inventory that's not incident to

25  arrest?

Page 61

1        A.    No.

2        Q.    Okay.  And again, you know, I believe you

3    said this before.  Is it fair to say that the

4    inventory done at US Private Vaults was the first

5    time you had done an inventory that was not

6    incident to an arrest?

7        A.    Yes.

8        Q.    Do you know if there's any guidance for

9    how to conduct an inventory?  Let me rephrase

10   that.

11        Do you know if the FBI has any guidance

12   on how an agent is supposed to conduct an

13   inventory?

14        MR. RODGERS:  Objection; vague and

15   ambiguous, overbroad.

16        THE WITNESS:  I don't know.

17        MR. FROMMER:  Okay.  I'm going to

18   introduce an exhibit here.

19        (Deposition Exhibit No. 1 was marked.)

20        MR. FROMMER:  I've just introduced

21   Exhibit 1 for the Palmerton deposition.  You

22   should have access to that.  Please let me know.

23        MR. RODGERS:  I do not yet have access.

24   Let's go off the record.

25        (Break taken from 10:59 a.m. to 11:11 a.m.)

Page 62

1          Q.   (BY MR. FROMMER)  So you should have in

2    front of you -- please tell me if I am correct in

3    this -- Exhibit 1, Palmerton, which I will purport

4    is a two-page excerpt from the 2016 Domestic

5    Investigations and Operations Guide which we

6    received in discovery from Defendants.

7               Can you take a look at that?  Does that

8    seem -- is that an accurate description of the

9    exhibit?

10         A.   Yeah, that seems accurate.

11         Q.   Okay.  So before I'd asked is there

12   guidance how to do an inventory, and I believe

13   your answer was that you weren't sure if there

14   was.

15              Now that you see Exhibit 1, which is the

16   excerpt from the DIOG, does this provide guidance

17   about how to perform an inventory?

18              MR. RODGERS:  Objection; lacks

19   foundation, calls for a legal conclusion, calls

20   for speculation.

21              THE WITNESS:  I mean, I'd have to review

22   it.

23         Q.   (BY MR. FROMMER)  I'm sorry.  Please,

24   take your time.  It's been a while.  So please

25   take a minute or two, review the document, and

Page 63

1      then I'll ask you questions about it.

2           A.   Yeah, I haven't seen it prior to today.

3           Q.   Okay.  So you haven't seen this before?

4           A.   No.

5           Q.   Okay.  Would you say it's accurate that

6      this guide discusses how to conduct an inventory?

7                MR. RODGERS:  Objection; lacks

8      foundation, assumes facts not in evidence, calls

9      for a legal conclusion.

10               THE WITNESS:  It appears so, yes.

11          Q.   (BY MR. FROMMER)  Now, can you look at

12     the -- in the footnote on the first page,

13     page 247, the next to last sentence, can you read

14     that for me?

15          A.   I believe "Although the procedures for

16     conducting an inventory of an arrestee's personal

17     property and effects may in fact be similar, their

18     legal justification is different and they must

19     therefore be treated differently."

20          Q.   Okay.  And before you had said you had

21     had training on how to do an inventory of

22     arrestee's personal property; is that correct?

23          A.   That's correct.

24          Q.   And is it fair to say that you have not

25     had training on how to conduct an inventory

Page 64

1    outside the context of an arrest?

2         A.   I don't recall any training.

3         Q.   Now, do you think you would remember if

4    you had had any training on how to conduct an

5    inventory?

6         A.   No.

7              MR. RODGERS:  Objection; calls for

8    speculation, lacks foundation.

9              THE WITNESS:  Not particularly.  We get a

10   ton of training, so...

11        Q.   (BY MR. FROMMER)  Okay.  But you don't

12   recall any training on how to do an inventory?

13             MR. RODGERS:  Vague and ambiguous, asked

14   and answered.

15             THE WITNESS:  Just aside from the

16   inventory incident to arrest, that's all I recall.

17        Q.   (BY MR. FROMMER)  But is it fair to say

18   that you've had no training about how to conduct

19   an inventory outside the context of an incident to

20   arrest?

21             MR. RODGERS:  Asked and answered.

22             THE WITNESS:  Again, I don't recall if I

23   had training on that or not.

24        Q.   (BY MR. FROMMER)  Okay.  Do you know if

25   there's other materials that the FBI provides that

Page 65

```
1     also provides guidance for how to conduct an
2     inventory outside the arrest context?
3          A.   I don't.
4          Q.   Are you familiar with the Legal Handbook
5     for Special Agents?
6          A.   Possibly.  If it's what I'm thinking of,
7     yes.
8          Q.   Okay.  Now, do you know if the Legal
9     Handbook for Special Agents, does it contain
10    information about how to do an inventory outside
11    the incident-to-arrest context?
12         A.   I don't know.
13         Q.   Okay.  Is it fair to say that you did not
14    review the DIOG prior to executing the seizure
15    warrant at US Private Vaults?
16         A.   Yes.
17         Q.   Is it fair to say you didn't consult the
18    Legal Handbook for Special Agents prior to
19    executing the seizure warrant at US Private
20    Vaults?
21         A.   Yes.
22         Q.   Did the team -- when you had meetings
23    about how to execute the seizure warrant at US
24    Private Vaults, was there any discussion of the
25    guidance in either the DIOG or legal handbook?
```

Page 66

1          A.   I don't recall.

2          Q.   Do you think you would remember if that

3     had come up?

4               MR. RODGERS:  Objection; speculation,

5     lacks foundation.

6               THE WITNESS:  It may have come up, yeah.

7     Yes.

8          Q.   (BY MR. FROMMER)  But you can't recall if

9     it did, in fact, come up?

10         A.   Not specifically.

11         Q.   Okay.  Have you seen any exemplars of an

12    FD-597 that's been filled out pursuant to an

13    inventory?

14         A.   Yes.

15         Q.   And in what context have you seen those

16    exemplars?

17         A.   That would have been for searches

18    incident to arrest.  Our FD-597s are generally the

19    same.  I mean, the form is the same.

20         Q.   Okay.  Have you seen any exemplars of

21    FD-597s that were filled out for inventories

22    conducted outside the arrest context?

23         A.   I don't recall.

24         Q.   Okay.  Do you recall during preparation

25    for executing the seizure warrant at US Private

Page 67

```
 1    Vaults any dissemination of a sample inventory
 2    sheet in order to tell agents this is how your
 3    inventory sheet should be put together?
 4        A.   I don't recall.
 5        Q.   Do you think you would recall if someone
 6    had given you an example of how to conduct or how
 7    to write out the inventory as one executing a
 8    seizure warrant at US Private Vaults?
 9             MR. RODGERS:  Objection; calls for
10    speculation, lacks foundation.
11             THE WITNESS:  I might, yes.
12        Q.   (BY MR. FROMMER)  You might what?  I'm
13    sorry.
14        A.   Yeah, I might recall.  I guess maybe if I
15    saw a document or something.
16        Q.   Okay.  Unfortunately I have no documents
17    to provide you.
18             But just so that I'm sure, so that I'm
19    clear, you do not recall seeing -- scratch that.
20             When preparing to execute the seizure
21    warrant at US Private Vaults, do you recall
22    seeing -- being provided with or discussing any
23    legal guidelines for inventory examples to help
24    guide how you would execute the warrant?
25        A.   I do have a vague recollection of prior
```

Page 68

1      to executing the seizure warrant discussing an

2      inventory search, like, "This is what this is

3      going to be."

4          Q.   And who did you have those discussions

5      with?

6          A.   I can't recall everyone that was there,

7      but I would say Agent Lynne Zellhart is one for

8      sure.  The others I couldn't recall.

9          Q.   Okay.  So is it fair to say, then, that

10     you did have meetings about how to execute the

11     seizure warrant prior to its execution on

12     March 22nd, 2021?

13         A.   Yes.

14         Q.   Do you recall if there was one meeting or

15     multiple meetings?

16         A.   I really just recall one meeting

17     specifically, and that's just -- our

18     preoperational execution briefing is what we call

19     it.

20         Q.   And when would that preoperational

21     briefing occur?  Did that occur immediately before

22     the execution of the warrant?

23         A.   Yeah.  So I don't recall specifically the

24     time, but it would have been the morning of, yeah,

25     execution of the warrant.

Page 69

1           Q.   And when you were involved with the
2      execution of the warrant -- this warrant was
3      executed on the morning of March 22nd, 2021,
4      correct?
5           MR. RODGERS:  Objection; lacks
6      foundation, calls for speculation.
7           THE WITNESS:  Possibly, yes.  To the best
8      of my knowledge, yes.
9           Q.   (BY MR. FROMMER)  You were involved with
10     the execution of the warrant, right?
11          A.   Yes.
12          Q.   What time did you leave the FBI office to
13     execute the warrant?
14          A.   I mean, I want to say approximately
15     9:00 a.m.
16          Q.   Okay.  So any meeting to discuss
17     executing the warrant would have occurred that
18     morning prior to you leaving at approximately
19     9:00 a.m.?
20          A.   Yes.
21          Q.   And you said that you recall that Special
22     Agent Zellhart was there, but that you do not
23     recall who else was there?
24          A.   Not specifically, no.
25          Q.   How many people in total were at that

Page 70

```
 1     meeting, approximately, as I understand you don't
 2     recall exactly?
 3         A.   Approximately, I would say, there was a
 4     handful.  Maybe approximately nine or ten.
 5         Q.   And were they all FBI agents?
 6         A.   I believe so, yes, or FBI employees.
 7         Q.   Or FBI employees, okay.
 8              Do you recall anyone from any other
 9     federal or state agencies being at that
10     preoperational meeting?
11         A.   No.
12         Q.   Do you think you would recall if they
13     were, in fact, there?
14         A.   Yeah, I think I would.
15         Q.   I would think so, because all of a sudden
16     it's a bunch of strangers coming into the FBI
17     building.  Who are these people?
18         A.   Yes.
19         Q.   So can you walk me through -- can you
20     just walk me through the general process of how
21     you conduct an inventory that is not part of the
22     incident to arrest context?
23              MR. RODGERS:  Objection; lacks
24     foundation, assumes facts not in evidence.
25              THE WITNESS:  The process, to my
```

Page 71

1    understanding, would be similar to the

2    incident-to-arrest inventory, and that we are

3    trying to take items for safekeeping and storage

4    to protect the agents.

5              So it would be to take the items, list

6    generally what was taken and then stored, produce

7    the FD-597 as well as just additional inventory

8    lists.  Like, you have a lot of

9    duplicates -- would have had duplicates of

10   everything to list, and then photographs and/or

11   video taken during the inventory.

12             And then those items are transported to

13   an FBI facility.

14        Q.   (BY MR. FROMMER)  And you were previously

15   a CPA, right?  You worked with numbers?

16        A.   Yes.

17        Q.   And so I assume that being an accountant

18   is a very sort of precise profession since you're

19   dealing with specific numbers, correct?

20        A.   Yes.

21        Q.   When you're putting together an inventory

22   that's meant to protect the FBI from complaints of

23   loss or theft, would that inventory need to be

24   fairly detailed in order to serve that purpose?

25             MR. RODGERS:  Objection; calls for a

Page 72

1    legal conclusion, lacks foundation, assumes facts
2    not in evidence.
3              THE WITNESS:  No, not necessarily.
4         Q.   (BY MR. FROMMER)  Well, how would an
5    inventory that doesn't provide a complete and
6    accurate list of the items that have been taken
7    serve the purpose of protecting the FBI from
8    claims of theft and loss?
9              MR. RODGERS:  Objection; lacks
10   foundation, assumes facts not in evidence, poses
11   an incomplete hypothetical, calls for a legal
12   conclusion, argumentative.
13             THE WITNESS:  Well, again, I mentioned
14   the photos and videos of the items that are taken.
15             In addition to that, the FD-597 and
16   inventory property list is put together.
17             It's then handed to our evidence
18   technicians, and those items are then assigned a
19   bar code and they're sealed up.  And those -- then
20   they're shipped to, again, our facility.
21             So the bar code is connected to those
22   items which are connected to wherever we seized it
23   from or took it from.
24        Q.   (BY MR. FROMMER)  Okay.  I get that.
25             So you're saying that the inventory

Page 73

1    sheet, the FD-597 -- is it fair to say that the

2    FD-597 is one piece of evidence that the FBI uses

3    in order to protect itself against claims of loss

4    and theft?

5         A.   That's one piece, yes.

6         Q.   And that the videos and photographs would

7    be additional evidence they would use to protect

8    themselves against claims of loss and theft?

9         A.   Yes.

10        Q.   So to the extent you're going to use a

11   video for that purpose, the video would need to

12   completely and accurately capture the things that

13   are being seized, correct?

14        A.   Yes.

15        Q.   Thank you.

16             So how does the inventorying process

17   change, if at all, based on the value of the items

18   that are being inventoried?

19             MR. RODGERS:  Objection; lacks

20   foundation, calls for a legal conclusion, assumes

21   facts not in evidence, poses an incomplete

22   hypothetical.

23             THE WITNESS:  Yeah, so there are

24   different classifications of items in that --

25   there's general items and there's also valuable

Page 74

1    items.  We would treat valuable items differently.
2         Q.   (BY MR. FROMMER)  How do you treat
3    valuable items differently?
4              MR. RODGERS:  Same objections.
5              THE WITNESS:  For one, they're sent to a
6    different storage facility that's more secure, and
7    they're also sealed up in plastic bags, sealed so
8    they can't be opened.  And if they are opened, it
9    has to be documented as to when and why they're
10   opened.
11        Q.   (BY MR. FROMMER)  I understand that.
12   That's once it's left the facility and is
13   being -- is put away for safekeeping.  I get that.
14             I'm talking about the inventory process
15   itself, when you're creating that inventory in the
16   first place.
17             How does that inventorying process, those
18   beginning stages of the inventorying process
19   change, if at all, based on the value of the items
20   being inventoried?
21             MR. RODGERS:  Objection; lacks
22   foundation, calls for a legal conclusion, assumes
23   facts not in evidence, poses an incomplete
24   hypothetical.
25             THE WITNESS:  My knowledge of the

Page 75

1    inventory process is the same.

2         Q.    (BY MR. FROMMER)  Do you know if there's

3    any requirement that multiple agents inventory

4    valuable items in the presence of one another?

5    And let me rephrase that because that's ugly.

6             When the FBI is inventorying items deemed

7    to be valuable, is it the case that the FBI is

8    supposed to have multiple agents do that review

9    and inventory process?

10            MR. RODGERS:  Assumes facts not in

11   evidence, lacks foundation, calls for a legal

12   conclusion, incomplete hypothetical.

13            THE WITNESS:  I don't know for inventory

14   specifically if another agent is required.

15        Q.    (BY MR. FROMMER)  Okay.  Can you look at

16   Palmerton Exhibit No. 1, second page,

17   second -- first full paragraph.  And can you read

18   me that first sentence, please.

19        A.    Yeah.  "Where practicable, the inventory

20   search should be conducted by two agents/officers

21   particularly when dealing with property of

22   specific monetary value."

23            Examples given are money, jewelry,

24   electronics, vehicles, et cetera.

25        Q.    So is it fair to say that you weren't

Page 76

1    familiar with this particular requirement of the

2    DIOG?

3              MR. RODGERS:  Lacks foundation, poses an

4    incomplete hypothetical, calls for a legal

5    conclusion, assumes facts not in evidence.

6              THE WITNESS:  Yeah, I haven't seen this

7    document before today.

8         Q.   (BY MR. FROMMER)  You haven't seen this

9    previously; is that correct?

10        A.   No.  I haven't seen this document

11   specifically.

12        Q.   Oh, this is an excerpt.  So have you seen

13   the DIOG generally?

14        A.   Yes.

15        Q.   Okay.  You just haven't -- you don't

16   recall reviewing this particular section of the

17   DIOG previously; is that correct?

18        A.   No.  The DIOG is, like, 10,000 pages

19   long.

20        Q.   So does an inventory that you put

21   together, is it supposed to be complete in terms

22   of the items that were seized?

23             MR. RODGERS:  Objection, overbroad,

24   assumes facts, lacks foundation, poses an

25   incomplete hypothetical.

Page 77

```
 1              THE WITNESS:  Yeah, I don't know what you
 2      mean by complete.
 3          Q.   (BY MR. FROMMER)  Let's say I have 100
 4      items there -- okay? -- that are being seized.
 5              Should the inventory sheet be completed
 6      in the sense -- the FD-597, should that fully list
 7      out the items that were being seized?
 8              MR. RODGERS:  Same objections.
 9              THE WITNESS:  No.
10          Q.   (BY MR. FROMMER)  Why do you say no?
11          A.   That's just how we do it, or how I've
12      done it.
13          Q.   Would an incomplete inventory, FD-597, be
14      useful to protect the FBI against claims of loss
15      and theft?
16              MR. RODGERS:  Objection; poses an
17      incomplete hypothetical, argumentative, lacks
18      foundation, assumes facts not in evidence, calls
19      for a legal conclusion.
20              THE WITNESS:  Yeah, it's not an
21      incomplete 597 if it generally lists all of the
22      items that were there.
23          Q.   (BY MR. FROMMER)  What do you mean
24      by -- let's drill down on that word "generally,"
25      because I'm a little confused by that.
```

Page 78

```
 1              So let's say I have -- I don't know.  I'm
 2      just trying to come up with something.  Let's say
 3      I have comic books in there.  Let's say I have 20
 4      comic books.
 5              Would it be sufficient just to write "20
 6      comic books," or -- would that be sufficient on an
 7      FD-597?
 8              MR. RODGERS:  Objection.  Same
 9      objections.
10              THE WITNESS:  That would be sufficient,
11      yes.
12          Q.  (BY MR. FROMMER)  What if it just
13      said -- what if the 597 just said "Miscellaneous
14      comic books," didn't provide a number?
15              MR. RODGERS:  Same objections.
16              THE WITNESS:  Yeah, I think that would be
17      sufficient.
18          Q.  (BY MR. FROMMER)  Why do you say that?
19              MR. RODGERS:  Same objections,
20      argumentative, calls for a legal conclusion.
21              THE WITNESS:  Partially because we're
22      relying on the other pieces of documentation that
23      we have in place to preserve.  So there's the
24      chain of custody, for one, which tracks that item,
25      as well as our evidence bar code and any photos
```

Exhibit J
629

Page 79

1    and videos we took.

2         Q.   (BY MR. FROMMER)  How many -- well,

3    should FD-597s be consistent?

4              And by that I mean let's say you have the

5    same items that are being seized and you had two

6    different agents separately filling out FD-597s.

7              Should those FD-597s be similar or

8    consistent with one another in terms of what is

9    listed?

10             MR. RODGERS:  Objection; lacks

11   foundation, poses an incomplete hypothetical,

12   calls for speculation, legal conclusion.

13             THE WITNESS:  They could be consistent,

14   but different agents might do something different.

15        Q.   (BY MR. FROMMER)  Do you receive any

16   training about -- does the FBI provide any

17   training to ensure that agents provide

18   consistent -- or fill out FD-597s in a consistent

19   way?

20             MR. RODGERS:  Same objections.

21             THE WITNESS:  I don't know.

22        Q.   (BY MR. FROMMER)  Do you recall ever

23   receiving such training?

24        A.   I believe at Quantico I did.

25        Q.   You believe at Quantico you were

Page 80

1        instructed as to how to fill out an FD-597?

2            A.   Instructed how to fill out an FD-597 in

3        regards to a search warrant.

4            Q.   The inventory to send back to the judge

5        on the return?  I'm just trying to understand.

6            A.   No.  So we -- the FD-597 is the receipt

7        for property.  And we provide an FD-597 for a

8        search and seizure, generally.  The items are

9        listed out and a receipt is given to the

10       individuals that -- let's just say the residents.

11           Q.   Okay.  So you believe that you received

12       some training on how to fill out an FD-597 at

13       Quantico; is that correct?

14           A.   Yes.

15           Q.   Do you recall receiving any training,

16       subsequent training, on how to fill out an FD-597

17       since you graduated from Quantico?

18           A.   I don't.

19           Q.   Do you believe you would recall having

20       received such training?

21           A.   I think I would.

22           Q.   Thank you.

23               MR. FROMMER:  You guys are at 11:40 your

24       time, right?  Let's go off the record.

25               (Lunch break taken from 11:41 a.m. to 12:46 p.m.)

Page 81

1      Q.   (BY MR. FROMMER)  Welcome back, Special
2    Agent Palmerton.  I wanted to go back to something
3    we were talking about before.
4           We were talking about the whole inventory
5    chain, as it were, from the inventory, the
6    photographs, the videos.  And then you were
7    talking about some of the steps involved in the
8    chain of custody as part of it.
9           And I was wondering if you could sort of,
10   for my own edification, explain once an inventory
11   has been completed, what happens in terms of chain
12   of custody going forward.
13     A.   Once the inventory is complete, you have
14   the documentation prepared, we have the FD-597
15   inventory list and then we have the chain of
16   custodies prepared, which is essentially exactly
17   what it states, just chain of custody, keeping
18   track of that item, where it was discovered and
19   then where it went and where it, you know, could
20   go in the future, and then who may have
21   transported it or opened or had custody of it at a
22   certain time.
23           I mean, and generally, like, as an
24   example, it's collected at a spot, says it was
25   found here in this spot at this date and time by

Page 82

1    this person.  And then it's transported to the FBI

2    evidence facility, and then it's checked into our

3    FBI evidence facility.  And that's it.  That's all

4    the chain of custody document is.

5         Q.   I wanted to explore that part of it.  You

6    say it's sent to the -- what do you call it,

7    evidence team?  Evidence unit at the FBI?  Is that

8    correct?

9         A.   Yeah.  I mean, I call it our evidence

10   facility.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit J
633



Page 83

Page 84

1

2

3      Q.    Okay.  So is it fair to say that the main

4  way that the FBI guards against claims of theft

5  and loss is through that chain of custody control?

6              MR. RODGERS:  Objection; speculation,

7  lacks foundation, calls for a legal conclusion.

8              THE WITNESS:  I would say it's that as

9  well as all the other documentation we use to

10  track pieces of evidence or items that are taken.

11      Q.    (BY MR. FROMMER)  Okay.  And that chain

12  of custody obviously, it keeps the items secure

13  only to the extent that they made it to the

14  evidence facility; is that correct?

15              MR. RODGERS:  Same objections.

16

17

18

19

20

21

22

23

24

25



Page 85

16      Q.    Okay.  All right.  Let me shift gears a
17   little bit.  And we talked about some of this
18   before.  So I beg your forgiveness if I ask some
19   questions -- if I thread upon ground we've already
20   walked upon.
21           I believe you said you first heard about
22   the US Private Vaults case or investigation back
23   in 2019; is that right?
24      A.    Yes.
25      Q.    Can you tell me what you recall hearing

Page 86

1    in 2019 about the US Private Vaults matter?

2          A.   Yeah.   I mean, my first, I guess becoming

3    aware of the USPV case is from Agent Lynne

4    Zellhart.   She mentioned she was working a case

5    regarding USPV.   I was a newer agent at the time,

6    and she asked if I wanted to do what's called the

7    spot check, which is just a drive-by to kind of

8    note the location and any activity.

9          And then she just drove me there.   We

10   looked at it.   She said, you know, this is a spot

11   for, you know, potential money laundering, and

12   we're looking at investigating it, and then drove

13   me back to the office.

14         And that was the extent of my involvement

15   until basically March 2021 when the warrant was

16   executed.

17         Q.   Why did she take you out for this spot

18   check only to have no further involvement by you

19   on the investigation?

20         MR. RODGERS:   Objection; calls for

21   speculation.

22         Q.   (BY MR. FROMMER)   Well, okay.   Let me ask

23   this:   Did Special Agent Zellhart explain her

24   reason for taking you out to do that spot check?

25         A.   She did, yes.

Page 87

1          Q.   What did she say?

2          A.   Initially I believe -- well, what she

3     told me was the plan was to have me become what's

4     called a co-case on the investigation.  And at the

5     time, I had more free time, but I ended up getting

6     more involved in my own cases and couldn't take on

7     that role.

8          Q.   And what was that term?  I hadn't heard

9     it before.

10          A.   Which term?

11          Q.   I think you said co-case?

12          A.   Right.  A co-case agent.

13          Q.   Oh, so you mean that she was potentially

14     asking you to help -- to join her in the

15     investigation; is that correct?

16          A.   Yes.  Yes.

17          Q.   Okay.  But you're saying that you had to

18     decline because you had your own matters that gave

19     you a full plate?

20          A.   Yes.

21          Q.   Okay.  I understand.  And after that spot

22     check, did you hear anything else about Private

23     Vaults before March of 2021?

24          A.   The only thing was maybe in February of

25     2021 discussing that there could potentially be a

Exhibit J
638

Page 88

```
 1      warrant sometime in March, to kind of prepare your

 2      schedule accordingly.

 3           Q.   And who was that conversation with?

 4           A.   I don't recall specifically.

 5           Q.   Was it with Special Agent Zellhart?

 6           A.   It could have been.

 7           Q.   Okay.  Do you recall what agents in your

 8      office you spoke to about the USPV matter before

 9      March of 2021?  Was it just Special Agent

10      Zellhart, or did you speak with other officials in

11      your office?

12           A.   I did speak with other agents, and I can

13      only think of one specifically.  And that's

14      Special Agent Madison MacDonald.

15           Q.   I'm always bad with names like Madison.

16      Is Madison MacDonald a he or a she?

17           A.   A she.

18           Q.   Okay.  Was Special Agent MacDonald, was

19      she helping to investigate US Private Vaults?

20                MR. RODGERS:  Objection; calls for

21      speculation.

22           Q.   (BY MR. FROMMER)  Well, to your

23      knowledge, was Special Agent MacDonald involved in

24      the US Private Vaults investigation at the time

25      you spoke to her?
```

Page 89

1          A.   I mean, yes.

2          Q.   Okay.  So Special Agent MacDonald was on

3     the US Private Vaults investigation prior to the

4     events of March 2021; is that correct?

5          A.   She was assisting with the investigation.

6          Q.   And who was the primary on the

7     investigation?

8          A.   That would have been Lynne Zellhart,

9     Agent Lynne Zellhart.

10         Q.   Okay.  So Special Agent MacDonald would

11    have been assisting Special Agent Zellhart on the

12    investigation.  Okay.  Thank you.

13              So it sounds -- and you can just tell me

14    if I'm correct.

15              Did you help investigate US Private

16    Vaults in any way other than that spot check you

17    were talking about prior to its indictment on

18    March 9th, 2021?

19         A.   No.

20         Q.   Okay.  And did you have any involvement

21    or did you help put together the application for

22    the seizure warrant for US Private Vaults?

23         A.   No.

24         Q.   Okay.  Now I want you to -- so once the

25    seizure warrant had been issued from Magistrate

Page 90

1    Kim, can you describe to me what steps the FBI

2    office took to prepare to execute that warrant?

3              MR. RODGERS:  Objection; speculation.

4         Q.   (BY MR. FROMMER)  To the best of your

5    knowledge.

6         A.   Yeah.  I mean, I was not a primary

7    decision-maker in this at all.  I mean, so to the

8    best of my knowledge is it was a canvass for

9    agents to assist with a search.  And at the time

10   it was tentatively planned for sometime in March

11   2021.

12        Q.   And what do you mean by a canvass?  By

13   that do you mean there was just a broad call for

14   special agents to help execute the warrant?

15        A.   Yes.  So, yes.  Like a communication sent

16   out saying there's potentially going to be a

17   search at this location and, you know, we're

18   asking for agents to assist.

19        Q.   Okay.  Do you recall when that

20   communication was sent out approximately?

21        A.   No.

22        Q.   Do you happen to recall if it was during

23   the month of March 2021?

24        A.   I don't.  It could have been February.

25   It could have been March.  I don't know.

Page 91

1          Q.   Okay.  Going back to the origins of this,
2     you said on the spot check, I believe it was
3     called, that Zellhart drove past and said that
4     there was suspicion of money laundering, and
5     that's what she was investigating.
6               Who exactly did she -- well, let me ask
7     this based on your knowledge:  Did she identify to
8     you who she suspected of engaging in money
9     laundering?
10         A.   I mean, I want to say it was the business
11    itself.
12         Q.   Are you just -- do you recall her saying
13    that, or are you just --
14         A.   No.
15         Q.   -- guessing?
16         A.   No, I don't recall specifically who she
17    said or what she said.  This was my recollection
18    of conversations I've had with Lynne, you know,
19    over the course of my time there in the
20    investigation.
21         Q.   I don't want to put words in your mouth.
22              So you believe that the investigation was
23    regarding money laundering offenses by US Private
24    Vaults, the corporation itself; is that correct?
25         A.   That was my understanding at the time.

Page 92

1      Q.   All right.  So I know you helped execute

2      the warrant.

3             Who else in your office at the FBI was

4      involved in executing the warrant at US Private

5      Vaults?

6      A.   I mean, there was dozens and dozens of

7      agents.  I couldn't tell you specifically every

8      person that was there.

9      Q.   And I wouldn't expect you to.  I couldn't

10     tell you everyone in a large crowd either.  But I

11     will ask, you know, to the extent -- can you

12     recall -- I'm sure you recall some of the

13     individuals, other individuals who were involved

14     since you work with these people every day.

15            I'm not asking for a global list, but to

16     the extent you can identify other FBI agents who

17     were involved in the execution of the warrant,

18     please provide their names.

19     A.   Yeah.  So there would have been

20     myself -- I mean, our squad, White Collar 1,

21     was -- that's our squad with Lynne.  There would

22     have been myself; Special Agent Mark Strickland,

23     at the time he was Special Agent Ryan Heaton, who

24     is now our supervisor; Special Agent Madison

25     MacDonald; Special Agent Kate Bailey; Special

Page 93

1    Agent Elias Guerrero; and Special Agent Young Oh.

2    Those are people from my squad I know participated

3    in it.

4            And then -- that's really all I can

5    recall right now.

6        Q.   Who was that last individual you said?

7    Was it Young Oh?

8        A.   Yes, Special Agent Young Oh.

9        Q.   Okay.  His last name is what, O-h?

10       A.   Her last name is O-h, yes.

11       Q.   Her, okay.  So the members of your

12   squad -- so I didn't realize this.

13           So you're organized at the FBI in terms

14   of squads; is that correct?

15       A.   I mean generally, yes, in our field

16   office, yes.

17       Q.   And those squads are tied to, like, the

18   specific kinds of cases that they work; is that

19   correct?

20       A.   Yes.

21       Q.   So you work, for instance, you said the

22   White Collar 1; is that right?

23           Is that also -- is there, like, a squad

24   leader?  Is there someone who's, like, in charge

25   of the squad?  Or is everyone in the squad sort of

Exhibit J
644

Page 94

1    the same rank?

2         A.   The supervisor, the SSA, oversees the

3    squad.

4         Q.   Who's the SSA for White Collar 1?

5         A.   Ryan Heaton.

6         Q.   Ryan Heaton.  Okay.  I remember you

7    mentioning Mr. Heaton before.

8              Is Lynne Zellhart in White Collar 1?

9         A.   She is.

10        Q.   So is Ryan Heaton the current SSA?

11        A.   He is.

12        Q.   Who was the SSA in March 2021 when the

13   warrant was executed?

14        A.   It would have been SSA Richard Alexander.

15        Q.   Okay.  And you said that there were

16   also -- Mr. Alexander, or SSA Alexander, where is

17   he now?

18        A.   He retired.

19        Q.   He retired?  When did he retire?

20        A.   December of last year, 2021.

21        Q.   How long had he been at the FBI?

22        A.   I don't know.  It was a long, long time.

23   I'd say 20-plus years.

24        Q.   Okay.  So he was just retiring to enjoy

25   his golden years?

Page 95

1        A.   Yes.

2        Q.   Okay.  I got it.

3             So you said the squad White Collar 1 was

4    involved in the execution of the warrant.

5             Were there other squads that were also

6    involved in executing the warrant?

7        A.   Yes.

8        Q.   Okay.  Do you recall the names of those

9    squads?

10       A.   There is only two I recall specifically.

11   I know there were other agents from other squads,

12   but it would have been White Collar 2 and White

13   Collar 5.

14       Q.   Okay.  How many white collar squads are

15   there?

16       A.   There are five.

17       Q.   Okay.  So 1, 2, and 5 were involved in

18   this?

19       A.   Yes.

20       Q.   Where were 3 and 4 at?

21       A.   I assume they were there, but I really

22   don't know.

23       Q.   That's fine.  And so I think you

24   said -- and correct me if I'm wrong -- that there

25   were dozens of agents involved in executing the

Exhibit J
646

Page 96

1    warrant; is that right?

2         A.   Yes.

3         Q.   Do you know if any other state or federal

4    agencies were involved in executing the warrant?

5         A.   Yes.

6         Q.   What agencies are those that you recall?

7         A.   I recall DEA, U.S. Postal Service

8    Inspectors -- the U.S. Postal Inspector Service,

9    and Beverly Hills Police Department.  And that's

10   all I can recall specifically.  I know there were

11   other state agencies and possibly other federal

12   agents, but that's just what I recall.

13        Q.   Okay.  And obviously you were executing

14   the warrant; you wouldn't have that perspective.

15             Who would have that sort of perspective

16   about all the agencies who were involved in

17   executing the warrant?

18             MR. RODGERS:  Objection; speculation.

19        Q.   (BY MR. FROMMER)  Well, let me ask this:

20   Lynne Zellhart was in charge of the US Private

21   Vaults investigation, correct?  Or she was lead

22   investigator?  She is lead investigator on the US

23   Private Vaults matter?

24        A.   She was the FBI case agent for USPV, yes.

25        Q.   Would Special Agent Zellhart be in a

Page 97

1      better position than you to identify all the state

2      and federal agencies that were involved in

3      executing the warrant?

4           A.   Yes.

5           Q.   Okay.  Are there other individuals at the

6      FBI who you similarly think would be able to

7      provide a more complete accounting of all the

8      state and federal agencies involved in the

9      execution of the warrant?

10          A.   I would say our supervisor at the time,

11     Rich Alexander.

12          Q.   Okay.

13          A.   And that's who I think would have

14     been -- to the best of my knowledge, just where I

15     was at, that would be my, again, kind of a guess

16     as to who would have the best knowledge of the

17     agencies that participated.

18          Q.   Can you explain to me based on your

19     experience at the FBI, why were there agencies

20     other than the FBI involved in executing the

21     warrant?

22               MR. RODGERS:  Lacks foundation, calls for

23     speculation.

24               THE WITNESS:  I mean, the FBI, we work

25     with other agencies all the time, and especially

Page 98

1    in large-scale investigations.  It's primarily a

2    resource issue in that, you know, just

3    having -- typically it's like one case agents.

4    You might have two case agents on an

5    investigation.

6             It helps to have additional investigative

7    agencies and their capabilities to help with an

8    investigation.  They might just have tools or

9    people and processes that they can just assist us

10   in an investigation.  And just provide bodies to

11   execute search warrants or arrest warrants or any

12   other type of warrants.

13        Q.   (BY MR. FROMMER)  Okay.  So I think you

14   mentioned several different groups.  I think you

15   mentioned DEA, postal inspection; I think you said

16   Beverly Hills PD, and it sounds like there might

17   be others, but that you can't recall.

18             So what extent were agencies, like the

19   other agencies, the DEA or postal inspectors or

20   the Beverly Hills PD, to what extent were they

21   included in the FBI's discussions about how to

22   execute the warrant?

23        A.   I don't know.

24        Q.   Did you ever go to a meeting to discuss

25   how to execute the warrant at USPV where

Page 99

1    representatives from those other agents, DEA,

2    USPIS, or Beverly Hills PD were there?

3          A.    No.

4          Q.    Okay.  And I recall before lunch you had

5    mentioned the day of you had a meeting.  I forget

6    what you called it.  Was it an operational control

7    meeting?  What was the term?  I don't want to

8    misspeak.

9          A.    Yeah, we call it just a briefing.

10         Q.    Okay.

11         A.    Pre-operation briefing.

12         Q.    Okay.  So there was a -- and I want to

13   make sure I get this correct.

14               So it was your testimony that the morning

15   of the US Private Vaults warrant execution, you

16   had a preoperational briefing with other FBI

17   officials; is that correct?

18         A.    Yes.

19         Q.    Did you have any other meetings regarding

20   execution of the warrant other than that

21   pre-operational briefing?

22         A.    I did not, no.

23         Q.    You did not?

24         A.    I didn't.

25         Q.    Are you aware of any other meetings about

1    how to execute the warrant at US Private Vaults?

2    Are you aware of any that occurred, even if you

3    didn't necessarily participate in them?

4        A.   Yes.  I'm aware that they occurred, but I

5    couldn't tell you who was there or when they

6    happened or what was discussed.

7        Q.   Then how are you aware that they

8    occurred?

9        A.   Just knowledge from, likely, Lynne

10   Zellhart.

11       Q.   Okay.  So you believe that Lynne Zellhart

12   informed you in some way that there had been other

13   meetings where the execution of the USPV warrant

14   was discussed?

15       A.   Yes.

16       Q.   Okay.  But for more information about

17   that, I should probably talk to Special Agent

18   Zellhart?

19       A.   Yes.

20       Q.   Okay.  So since you only had the

21   preoperational briefing, that's the only briefing

22   you recall attending about the warrant execution,

23   do you know if anyone at the FBI or elsewhere

24   discussed, like, possible alternatives for

25   executing the warrant in the way it was executed

Page 101

1      here?

2           A.   No.

3           Q.   Okay.  Like, for instance I was thinking,

4      like, if there was anyone -- if there was ever a

5      meeting or if anyone ever suggested that the FBI

6      could simply take over the business and install a

7      receiver.

8                Did you ever hear any discussion of that

9      possible option?

10          A.   No.

11          Q.   All right.  So you said at the

12     preoperational briefing.

13               That was just members of your fellow FBI

14     agents; is that correct?

15          A.   Yeah, to the best of my recollection, it

16     would have been FBI employees.

17          Q.   All right.  Do you recall if anyone ever

18     sent out instructions, like, written instructions

19     about how to execute the warrant at US Private

20     Vaults?

21          A.   I mean, no.  Aside from the operational

22     plan, no.  I don't recall.

23          Q.   So let me get back to that.  The

24     operational -- there is a lot of operations here,

25     so I'm trying to understand.  So there's the

Page 102

1    preoperational briefing, and that's the meeting

2    that occurs the day -- the morning of the raid.

3    Then there is the operational -- what do you call

4    it?  Operational plan?  Is that correct?

5        A.   So at the preoperational briefing is when

6    the operational plan is discussed or reviewed by

7    the agents.

8        Q.   Okay.  So you're saying the day of

9    the -- of warrant execution you go to this

10   briefing in the morning, then they hand you a

11   piece -- do they hand you, like, a piece of paper

12   called the operational plan?

13       A.   It's usually -- and again, generally in

14   my experience it's either emailed to us the day

15   before and/or it's printed out and we get copies

16   of it the day of the operation or warrant.

17       Q.   Okay.  Do you recall in this instance

18   whether that was emailed to you or it was handed

19   to you at the meeting?

20       A.   Yeah, I don't recall.

21       Q.   Okay.  But by one of those methods you

22   would have gotten a copy of the operational plan,

23   either prior to or at the same time as the

24   preoperational briefing?

25       A.   Yes.

Page 103

1       Q.   And what is typically included in the

2    operational plan?  Let me be more specific in the

3    context of this.

4            What was included in the operational plan

5    for executing the USPV warrant?

6       A.   Yeah, this was, like, over a year ago.

7    But I recall it would have had the name of the

8    investigation.

9            It would have listed the case agent,

10   which was Lynne Zellhart, the actual address where

11   the warrant was going to be executed.

12           It would have listed the members of the

13   team, the operational team.

14           It would have reviewed our deadly force

15   policy, and we would have had a discussion about

16   how the building was going to be secured prior to

17   the search warrant being executed.

18      Q.   Do you know, as part of the operational

19   plan, if you were given a copy of the warrant?

20      A.   Yes.

21      Q.   You were?

22      A.   Yes.

23      Q.   Okay.  And was it expected that the

24   agents would review the warrant prior to executing

25   the warrant?

Page 104

1    A.   Yes.

2    Q.   Do you recall if you, in fact, reviewed

3    the warrant prior to its execution?

4    A.   Yes.

5    Q.   Okay.  So at that preoperational

6    briefing, a couple of things.

7         At the preoperational briefing or in the

8    operational plan, were you told what you

9    specifically were supposed to do at US Private

10   Vaults when the warrant -- as part of the warrant

11   execution process?

12   A.   Yes.  There is a portion in the ops plan

13   that details specific duties for each agent.

14   Q.   And what were your duties, if you recall?

15   A.   Mine was pretty general.  It was just to

16   search the office.  Search and then seize items

17   pursuant to the search and seizure warrant.

18   Q.   Okay.  So when you say "the office," you

19   mean the -- I haven't been inside the space, so

20   I'm trying to figure out -- when you say "the

21   office," is that a space that's separate and

22   distinct from the vaults themselves?

23   A.   Yes.

24   Q.   Okay.  And you were involved in going

25   through and looking for items listed in the

Page 105

1   seizure warrant that were in the office; is that

2   correct?

3          A.   Yes.

4          Q.   Okay.  In the operational plan or at the

5   preoperational briefing, since they seem to be

6   related, were there any instructions about how to

7   conduct the inventory at US Private Vaults?

8          A.   Not for the search of the office, no.

9   We -- I mean, we would have had a brief discussion

10  about the inventory of the boxes.

11         Q.   Do you recall anything about that

12  discussion?

13         A.   Not specifically.

14         Q.   Who do you think would be a better person

15  to speak to about that?

16         A.   Likely Agent Lynne Zellhart.

17         Q.   Okay.  Would the substance of the

18  preoperational briefing be fairly reflected in the

19  operational plan?

20         A.   Yeah, I would think so for sure.

21         Q.   Okay.  So a copy of the operational

22  plan -- how long is an operational plan?

23         A.   It depends on a variety of factors.

24         Q.   Well, let me make it more specific.

25               Do you recall how long the operational

Page 106

1    plan was for executing the warrant at US Private

2    Vaults?

3         A.   Not specifically, no.

4         Q.   Do you recall, since you've seen many of

5    these things, was it longer or shorter than the

6    usual operational plan?

7         A.   I would say -- I mean, I recall it being

8    pretty standard, like not longer or shorter than a

9    typical ops plan.

10        Q.   All right.  Give me just a second.  I

11   just want to go back, because I want to make sure

12   I've got this correctly.

13             You think that the preoperational

14   briefing had some discussion of how to inventory

15   the safe deposit boxes; is that correct?

16        A.   Yes.

17        Q.   Okay.  Do you recall if the operational

18   plan had instructions for how to inventory the

19   boxes?

20        A.   No.  I mean, I don't think so.

21        Q.   Okay.  But a review of the -- but looking

22   at the operational plan would clearly show that,

23   correct?

24        A.   It would, yes.

25        Q.   Okay.  Let's say we're past the

Page 107

1      operational briefing and you're on your way to

2      Olympic Boulevard.  I just want you to walk me

3      through step by step how the FBI -- actually, let

4      me back up.

5              To what extent were these other groups,

6      like DEA -- I understand they have different

7      capabilities.  But when the warrant was executed,

8      did they have delineated responsibilities as part

9      of that operation?

10             MR. RODGERS:  Speculation.

11         Q.   (BY MR. FROMMER)  To your knowledge, did

12     the operational plans merely discuss what the FBI

13     agents would be doing with regard to executing the

14     warrant, or did the operational plan also discuss

15     these other groups, they're going to be doing X

16     and Y?

17         A.   No.  It wouldn't delineate in our ops

18     plan.  The ops plan could have -- and again, I

19     don't recall specifically, but it could have

20     stated DEA or whatever other law enforcement

21     agencies were present, but it wouldn't state

22     specifically what -- at least to the best of my

23     knowledge it wouldn't state specifically what they

24     would be doing.

25         Q.   Well, when you got there, when you were

Page 108

1    actually executing the warrant, did you happen to

2    have opportunity to interact with any of the other

3    agencies that were there?

4         A.   Yes.

5         Q.   Okay.  And can you describe -- like,

6    which agencies did you have an opportunity to

7    interact with?

8         A.   Yeah, so it was just the ones that I

9    recalled:  DEA, Postal Service, Beverly Hills PD,

10   and yeah, the other state agencies that I just

11   don't recall.

12        Q.   That's fine.  For instance, was the DEA,

13   did the agents from the DEA, did they have a

14   different set of responsibilities when executing

15   the warrant than you and your squad?

16        A.   Yeah, I don't know.

17        Q.   Did you see, like, DEA agents doing the

18   same activities, the same inventorying that FBI

19   agents were doing?

20        A.   Yes, them and Postal.

21        Q.   Okay.  I'm going to come back to that.

22             So after the preoperational briefing,

23   you, as part of your squad and everyone else, you

24   go to Olympic, Olympic Boulevard, to the store

25   all together, not just FBI -- well, let me start

Page 109

1      just in terms of number of FBI agents.

2              How many FBI officials were involved in

3      executing the search warrant or the warrant?  A

4      rough approximation.

5          A.   I mean, yeah, I would say dozens if not

6      over 100 different agents throughout the course of

7      that week.

8          Q.   So over 100 agents over the course of the

9      week, you think?

10         A.   Yeah.

11         Q.   And in terms of that, we're just talking

12     for that, just FBI agents, correct?

13         A.   Yes.

14         Q.   How many -- and again, I'm not trying to

15     pin you down on a specific number.  I understand

16     that's very difficult.

17              But approximately how many individuals

18     from agencies other than the FBI would you say

19     were involved in the execution of the warrant?

20         A.   I mean, yeah, total other agencies, yeah,

21     probably -- I mean, yeah, broken record, but I'm

22     thinking dozens of other law enforcement officers

23     and just officials, law enforcement employees.

24         Q.   So between the FBI agents involved and

25     individuals from other organizations, we're

Page 110

1    talking well over 100 individuals, it sounds like.

2              Is that a relatively accurate number?

3         A.   Yes.  And again, that's -- I just want to

4    clarify, over the course of the week.  So there

5    wasn't, like, over 100 people there in one day.

6         Q.   Oh, okay.  So let's say the day of, the

7    day everything got kicked off, which I believe was

8    March 22nd, how many FBI agents went to US Private

9    Vaults that morning, roughly?

10        A.   Our squad -- yeah, I mean, I would just

11   again say there were dozens of agents.  Our squad,

12   which was the agents I listed, as well as other

13   squads that showed up subsequent.

14        Q.   So there were dozens of FBI officials

15   down there on March 22nd?

16        A.   Yes.

17        Q.   Okay.  And is it fair to say there were

18   dozens of officials from other organizations also

19   there on March 22nd?

20        A.   Yes.

21        Q.   So a lot of people in a parking lot?

22        A.   There was a lot of people there, yes.

23        Q.   Do you recall when -- not you personally,

24   but when the FBI began to execute the warrant?

25        A.   It would have been -- yeah, I'm kind of

Page 111

1    speculating because I really can't recall.

2              MR. RODGERS:  Don't speculate.  If you

3    have an estimate, please provide it.  Please don't

4    speculate.

5         Q.   (BY MR. FROMMER)  Yeah.  Was it in the

6    morning?

7         A.   Yeah.  It would have been prior to us,

8    our squad heading there at around 9:00 a.m. or

9    whatever that was, later in the morning.

10        Q.   Oh, so your squad was not the

11   first -- was not the first presence of FBI agents

12   at US Private Vaults that day?

13        A.   No.

14        Q.   What group would have been?

15        A.   What I recall is it would be our SWAT

16   team secured the premises.  And then once the

17   premises was secured, we were given notification

18   the property was secure and safe and that we could

19   come and execute the actual warrant.

20        Q.   So was that FBI SWAT team, or that was,

21   like, from a local agency?

22        A.   I recall it being FBI SWAT.

23        Q.   Okay.  I didn't realize you guys had a

24   SWAT.  I know about hostage rescue, but I didn't

25   know you had a separate SWAT unit.

Page 112

1           Okay.  And so they have would gone first,

2     secured the location, and then called and said,

3     "Location is secure.  You can come down and start

4     executing the seizure warrant"?

5           A.    Yes.

6           Q.    So you said you arrived there at

7     approximately 9:00 a.m.?

8           A.    Yes.

9           Q.    Okay.  And if you can just walk me

10    through the steps you took once you got on

11    location.

12          A.    So we arrived there.  As noted, the

13    parking lot was very full, so parking was at a

14    premium.

15          Went and parked, walked into the

16    premises, got an idea of where things were at, and

17    then started bringing in our supplies to basically

18    execute the warrant in the office.

19          Because again, that was day one.  That

20    was putting out our evidence bags and tape, all

21    the different paperwork that we were going to need

22    to fill out.  And then just started searching the

23    office pursuant to the parameters of the warrant.

24          Q.    Do you know when you were executing the

25    warrant, was it done sequentially?

1           And by that I mean first you went through

2     the office, seized items listed in the warrant.

3     And then, only then, moved onto, like, other areas

4     of the facility?  Or was this all happening at the

5     same time?

6           A.   I would say we started with the office.

7     And then later in the day the inventory process

8     for the boxes and the back began, yeah, sometime

9     in the afternoon.

10          Q.   The afternoon of March 22nd?

11          A.   Again, to the best of my knowledge.  I

12    was -- I mean, the majority of my time was spent

13    in the office, which was a separate part of the

14    building.  So I was aware that there were people

15    going in to where the boxes were at, other agents

16    and law enforcement officers.

17          Q.   Okay.  So it sounds like you're uncertain

18    as to whether there were other agents

19    operating -- executing the warrant in other areas

20    of US Private Vaults at the same time as you.

21          A.   Only there was other law enforcement

22    agents, yeah, other agents from our squad

23    executing the warrant in the office.  And then I

24    was aware they were working on the boxes in the

25    back, or starting to.

Page 114

1          Q.    Okay.  Were you aware of the presence of

2    a biometric scanner at US Private Vaults?

3          A.    Yes.

4          Q.    And it's my understanding that the

5    biometric scanner had been -- was disabled.  Is

6    that your understanding?

7          A.    Yes.

8          Q.    Do you know why the FBI disabled the

9    biometric scanner?

10         A.    I don't.

11         Q.    Who would be the right person to ask

12   about that?

13         A.    I don't know.

14         Q.    Would Special Agent Zellhart be the

15   person to talk to about that?

16         A.    She would have more knowledge than I

17   would about that decision.

18         Q.    Who would have -- well, let me ask that.

19               Who would be authorized to make a

20   decision like that to disable the biometric

21   scanner?

22         A.    Yeah, I don't know.

23         Q.    Okay.  So you said -- is it correct to

24   say that to fully execute the warrant at US

25   Private Vaults took five business days, from

Page 115

1       March 22nd to March 26th?

2            A.   Yes.

3            Q.   Does it usually take that long to execute

4       a seizure warrant?

5                 MR. RODGERS:  Objection; foundation.

6            Q.   (BY MR. FROMMER)  Let me ask this:  You

7       have engaged in executing many warrants.

8                 Does it usually take five days to execute

9       a warrant?

10                MR. RODGERS:  Same objection.

11                THE WITNESS:  It depends on the warrant

12      and what we are searching for and what we are

13      attempting to seize, the size of the property.

14           Q.   (BY MR. FROMMER)  Okay.  Have you

15      previously been involved with execution of seizure

16      warrants that took five days to execute?

17           A.   No.

18           Q.   Okay.  So is it fair to say that

19      this -- that the execution of this warrant was the

20      longest in terms of time in your -- that you've

21      experienced?

22           A.   Yes.

23           Q.   Okay.  And since you were there and

24      you -- so I understand that you helped seize items

25      listed in the warrant from the office; is that

Page 116

1    correct?

2         A.   Yes.

3         Q.   Did you also help inventory safe deposit

4    boxes while you were there?

5         A.   I did, yes.

6         Q.   Okay.  And you said the whole process

7    took five days.

8              What was it about US Private Vaults that

9    required that much time to execute the warrant, in

10   your opinion?

11        A.   Well, there was a couple different things

12   at hand we had to consider.  One, was it was tight

13   working quarters.  You could only get so many

14   bodies back there to work on the boxes.

15             Two, the boxes are secured within -- we

16   call them nests, these, like, metal platforms.

17             And then, three, the longest was just

18   opening and inventorying each and every box and

19   documenting all of that in the paperwork, which

20   we've already discussed, and trying to make sure

21   that all of our chains of custody and FD-597s and

22   all the paperwork was in order.

23        Q.   And do you have a rough idea of how many

24   safe deposit boxes -- not you personally, but were

25   inventoried as per the full execution of the

Page 117

1    warrant?

2         A.   I mean, it would have been hundreds of

3    boxes.

4         Q.   Okay.  And so it took so long because you

5    had to inventory hundreds of boxes; is that

6    correct?

7         A.   Yes, whether or not they were empty or

8    had items in them.

9         Q.   And how many agents were involved in

10   inventorying each box?

11        A.   I mean, again, it varied.  There could

12   have been teams of three or four to a box at any

13   given time.

14        Q.   Were there any boxes where it was just a

15   single agent responsible for the inventorying?

16        A.   I don't know.

17        Q.   Did you personally observe any instances

18   where a single agent was inventorying a box by him

19   or herself?

20        A.   No.

21        Q.   So how long did it take -- would it take

22   on average -- and I understand that some boxes

23   were empty, which makes it very quick -- but how

24   long on average would it take to inventory a box?

25              MR. RODGERS:  Lacks foundation.

Exhibit J
668

Page 118

1               THE WITNESS:  Yeah, no, that's difficult

2      to answer because an empty box could be as quick

3      as five minutes, and then a box with a number of

4      different items in it, valuables, could take half

5      an hour, 40 minutes.

6          Q.   (BY MR. FROMMER)  Okay.  Let me ask this.

7      Let me ask it this way, then:  So is it true that

8      inventorying a box could take as little as five

9      minutes if the box were empty?

10              MR. RODGERS:  Lacks foundation,

11     speculation.

12         Q.   (BY MR. FROMMER)  I'm asking about your

13     lived experience doing this.

14         A.   Yes, I would say five to ten minutes if

15     it was an empty box.

16         Q.   And for those boxes that, you know, had a

17     lot of valuables and things like that in them,

18     what's the longest you recall it taking to

19     inventory a single box?

20         A.   Probably -- there may have been one that

21     was, like, 40, 45 minutes.

22         Q.   And walk me through that process.

23              Okay.  So you're at the box.  When you're

24     in the vault, was the process -- how did you get

25     access to the items that were within each box?

Page 119

1        Sorry if that's a little vague.

2               I'm trying to figure out sort of the

3        step-by-step actions that were taken with regards

4        to the boxes.

5               Was the first step to take all the doors

6        off the boxes?

7        A.   Yeah.  And again, I'm just trying to go

8        back to that time.

9               No, the first step was basically breaking

10       apart the nests.  We call them nests because there

11       was -- like, each nest contained a number of

12       boxes, and it varied.

13              And we would take the nest out of the

14       vault, bring it to somewhere in the office or

15       somewhere on the premises, and then we proceed to

16       take off each -- from what I recall, my experience

17       was we would take off the door and then pull the

18       actual box out, which was -- sometimes it's metal;

19       oftentimes plastic.

20              And yeah, that was essentially the steps

21       for getting into each box.

22       Q.   Okay.  I'm a little confused here because

23       you say that the first thing you would do

24       is -- not you personally, but the team would

25       extract the nest, the superstructure containing

Page 120

1    all the boxes, you would take that, remove it from

2    the vault, and take it into a different space?

3         A.   Yes.   Sorry.   There were some agents or

4    instances where you were opening the boxes or

5    gaining access to the boxes all in the vault.   And

6    then just trying to get more room, we would take a

7    nest of boxes out of the vault just so you could

8    have more bodies work on, like, that nest of

9    boxes.

10        Q.   Okay.   And was there any rhyme or reason

11   as to when a nest would be removed and taken out

12   of the vault versus where the agents would

13   inventory boxes while still inside the vault?

14        A.   Yeah, I don't know.

15        Q.   I don't want to sound like a broken

16   record, but who would be the right person to speak

17   to about that?   Would that be Special Agent

18   Zellhart?

19        A.   She would have more knowledge, yeah,

20   about those decisions than I would.

21        Q.   Let me ask this:   Who was in charge of

22   running the on-the-ground operations and executing

23   the warrant from March 22nd to March 26th?   Who

24   was the person in charge?

25        A.   I mean, yeah, I would say the case agent,

Page 121

1      Lynne Zellhart.  She was assisted by our
2      supervisor at the time as well as other members of
3      executive management.
4          Q.   What do you mean by "executive
5      management"?  I don't know that phrase.
6          A.   Just upper levels of our management to
7      include, like, our legal team, just in order to
8      make decisions.
9          Q.   Okay.  So the FBI had its legal team
10     there to advise Special Agent Zellhart and others
11     about how to conduct the warrant execution?
12         A.   I don't know if the legal team was there.
13     I just know that Lynne would have conferred with
14     our legal team.
15         Q.   But you're not sure if they were on-site?
16         A.   Yeah.  I mean, I didn't see them there.
17         Q.   Okay.  But you might have been talking
18     with them via telephone or other means?
19         A.   Yes.
20         Q.   Okay.  And obviously for more information
21     on that, I should speak to Special Agent Zellhart?
22         A.   Yes.
23         Q.   Okay.  Do you happen to know -- so how
24     did -- okay.  So you take the nest.  I understand
25     some agents did the inventorying inside the vault.

Page 122

1    But you take the nest and you remove it and take

2    it to the office or some other space so there's

3    more room.

4         How, then -- what did you do to get

5    access to the interior sleeves, into the actual

6    interior sleeves inside the box?  How did you open

7    those doors?

8         A.   Yeah, I didn't -- I wasn't -- that wasn't

9    my job.  I know there were people with the tools

10   and the skill set to open the box doors, or at

11   least get them unlocked.

12        And then generally it was just taking the

13   box door off -- after getting them detached from

14   the nest or whatever you call it, to get access to

15   the sleeves which contained the items.

16        Q.   Okay.

17        A.   I know there were power tools being used

18   to access -- you removed the nest and then you had

19   to get access to the sleeves in each side.

20        Q.   Is it fair to say that the process ended

21   up destroying the nests?  I mean, you're talking

22   about power tools and ripping doors off using

23   power tools.  It sounds like the nest wouldn't be

24   really much of a thing anymore after that.

25        A.   Yeah.  I mean, yeah, I don't know.  I'm

Page 123

1    not, like, a structural engineer or something --
2    or anything, but yeah, I don't know if you could
3    use them again or not to store boxes.
4        Q.   Do you think it's likely that you could
5    reuse these nests after -- you saw what they did
6    to them.  So do you think that you could put that
7    back together again and it would be in working
8    order?
9        A.   Yeah, I don't know.
10       Q.   Well, I'm just asking because you were
11   there and you saw it.  I didn't see this.
12            MR. RODGERS:  Objection; asked and
13   answered.
14       Q.   (BY MR. FROMMER)  So, yeah,
15   after -- well, let me walk through the
16   door-opening process, because I want to understand
17   that.
18            The people who were involved in opening
19   the doors, did they just open up all the doors,
20   like, one after another?
21       A.   Yeah.  I think it was more they would cut
22   the nest out -- and again, this is just an
23   example.  They would cut, like, a nest out.  We'd
24   get it down using a forklift or something, into
25   the office.

Exhibit J
674

Page 124

1          And then once the nest was basically

2     taken off, then you could just open the door.  I

3     think we could just pop it open with, like, a

4     screwdriver.  And from there you would just go

5     door by door opening it open.

6          Q.  So okay.  I get it.  So there's these

7     power tools, and it sounds like the power tools

8     you used to sort of free the nest.

9          And you have a forklift that moves -- and

10    I understand this isn't for all of the boxes, but

11    for the ones you were dealing with, it moves the

12    nest into an office or some other space, and then

13    somebody comes with a screwdriver and pops off all

14    the doors?

15         Is that accurate?

16         A.  Yeah.  Or, like, each team was working on

17    a box.  You have a nest with let's say, for

18    example, 20 boxes, you know.  You say, okay,

19    here's box XYZ.  We pop open the door, pull the

20    sleeve out, inventory the contents, and then pull

21    the next one out.  We would open them

22    sequentially.

23         Q.  That's what I was wondering, if you were

24    popping all of them and then looking at the boxes

25    or if you'd only pop one door at a time and then

Exhibit J
675

Page 125

1       inspect the boxes.

2                   Well, when you were there and you saw

3       this nest after all the doors popped, what did

4       they look like?

5           A.   I mean, yeah, it's just a big -- again,

6       from what I recall, it's just a big chunk of

7       metal, like a square piece of metal with different

8       spots for each box.

9           Q.   Wouldn't popping the doors off with a

10      screwdriver, like, bust the hinges?

11          A.   Yeah.  I do recall, yes, some of the

12      hinges were busted.  They would break.  Other

13      times they wouldn't, and the door would just open.

14          Q.   So there was no way, though, that you

15      could then just reattach the doors and you have

16      a -- there is no easy way to just reattach the

17      doors and now all of a sudden the nest is good

18      again?

19                   MR. RODGERS:  Speculation.

20                   THE WITNESS:  Yeah, no.  I mean, yeah, I

21      don't know if there's an easy way to do it.

22          Q.   (BY MR. FROMMER)  Okay.  So I did want to

23      ask this:  Do you happen to know if anyone

24      came -- I mean like a member of the public or a

25      box holder -- came to try to collect their

Page 126

```
1     property?  Because I'm assuming some people might
2     have just shown up to do an ordinary transaction
3     to get something out of their box and all of a
4     sudden are confronted by you all.
5              Do you recall that ever happening?
6         A.   Yes.
7         Q.   Were those people allowed to come in and
8     get their items?
9         A.    Not to the best of my knowledge, no.
10        Q.   Okay.  So if somebody came with their key
11    and said, "Hey, my box is in there; I want to get
12    my stuff," the response would have been, "I'm
13    sorry; you can't go in; you have to leave"?
14             MR. RODGERS:  Objection; speculation,
15    lacks foundation.
16        Q.   (BY MR. FROMMER)  I'm asking based on
17    your knowledge and your experience at the event,
18    at the execution.
19        A.   Yes.  No, we wouldn't have let them come
20    in.
21        Q.   Why not?
22        A.    Well, it's kind of standard procedure
23    for -- when we're executing a search
24    warrant -- it's more for agent safety.
25             It would be like if we were executing a
```

Page 127

1      search warrant at a residence and the neighbor

2      came by and said, "Hey, I want to get my lawnmower

3      out of the shed," we're not going to let that

4      individual go in there because we don't know if

5      there's a gun or something in there.

6              That would be like the same -- what if we

7      let someone go into their box and pull out a gun

8      and start firing on agents.  We're not going to

9      let that happen.

10         Q.   I understand that.  Well, we can

11     speculate on whether there were ways you could

12     have allowed that person to have access to their

13     stuff without running that risk, but I understand

14     that.

15             So essentially if anyone came to collect

16     their items, they were turned away; is that

17     correct?

18         A.   To the best of my knowledge, yes.

19         Q.   Okay.  And you said you did some work

20     executing the seizure warrant in the office, and

21     then you also helped with inventorying the safe

22     deposit boxes; is that correct?

23         A.   Yes.

24         Q.   Okay.  And when you were doing the

25     inventorying on the safe deposit boxes, were you

Page 128

1    always part of the group that would work on, for

2    lack of a better term, the fork-lifted nests?  Let

3    me rephrase.

4           Did you ever do any inventorying inside

5    the vault itself?

6           A.   Yes.  No, I did.

7           Q.   You did?  Okay.  And I think you said

8    something about -- can you explain to

9    me -- because I think before you said it was

10   cramped in there.  Like I said, I haven't been in

11   there, so I don't know.

12          So can you describe what the physical

13   nature of the vault is?

14          A.   Yeah.  Again, I'm trying to remember.

15   There was a big vault door.  And you would go in,

16   and there was a pathway straight forward.

17          And then on each side there was, again,

18   these nests of boxes.

19          And in the middle there was multiple

20   nests of boxes stacked together.

21          So on each side of that middle piece you

22   had, like, a small pathway, and then in the back

23   part of that vault there were two rooms.  I want

24   to say there was, like, little tables in each

25   room, presumably for customers or people going in

Exhibit J
679

Page 129

1    to look at their stuff.

2         Q.   That makes sense.

3         A.   But it was -- like, you couldn't walk two

4    people abreast down those little pathways along

5    the sides to the back rooms.

6         Q.   Oh, that sounds very cramped.

7         A.   Yes.  Yes.  I mean, you had less than

8    probably four feet between, like, the width of

9    those spaces.

10        Q.   Yeah.  And you said some teams of agents

11   would do inventorying while inside the vault?

12        A.   Yes.

13        Q.   That must have made for a very difficult

14   process.

15        A.   Initially, yes, until we -- until more of

16   the nests were removed and there was more space to

17   work.

18        Q.   Oh, I see.  So essentially you guys

19   fork-lifted out enough nests that there was

20   finally enough free space where you could spread

21   out a little bit inside the vault; is that

22   correct?

23        A.   Yes.

24        Q.   Okay.  And I understand the outside of

25   the vault, once you got the fork-lifted nests

Page 130

```
1    outside, you'd pop them with a screwdriver.

2            Do you know how they would open the doors

3    for the nests that were inside the vault?

4        A.   No, I don't.  I know I worked on a

5    handful of them, but I want to say the doors were

6    already unlocked, at least by the time I got

7    there, on those ones that I was working on.

8        Q.   Oh, so there were boxes that had -- by

9    the time you got to them had already been opened?

10       A.   Only because there was, like, a team

11   working on it.  And I arrived, and they said,

12   "Hey, they need help in the back."  So I would go

13   and help that team.

14       Q.   Okay.  But you don't know how precisely

15   they opened those boxes?

16       A.   I don't.

17       Q.   Okay.  I mean, you saw what they did with

18   the boxes that they fork-lifted with the

19   screwdriver and popping it.

20           Did it look similar to the -- did the

21   state of the nests in the vault look -- post-door

22   removal look similar to the ones in the office?

23       A.   Yes, I would say they looked similar.

24       Q.   Okay.  So it's possible that they were

25   using the same technique?
```

Page 131

1          A.    Yes.

2          Q.    Okay.  That doesn't seem like a very

3     secure vault if you could pop it with a

4     screwdriver.

5               Were you there all five days?

6          A.    Yes, I was.

7          Q.    Were you inventorying the entire time?

8          A.    Primarily the entire time.  I did have

9     transport duties of some of the cash we had

10    seized.

11         Q.    Okay.  So where did the cash go to?

12         A.    The cash went to a cash counting

13    facility.

14         Q.    Okay.  So you -- with the cash then, is

15    it fair to say that the FBI, during the

16    inventorying process, wasn't counting the cash on

17    site?

18    ██    ██   ████████████████████████████████████████

19    ███████████████████████████████████████████████

20    ██████████████████████████    █████████████████████

21    ████████████████████████████████████████

22    █████████████████████████████████████████████

23    ████████████████████████████████████████

24    ████████████████████████████████████████████

25    ████████████████████████████████████████████

Exhibit J
682

Page 132

1 ████████████████████████████████

2 ██████████████████████████████████████████

3 ██████████████████████████████████████

4 ████████████  ██████████████████████████████

5 ████████████████████

6        Q.   At the cash counting place?

7        A.   Correct.

8        Q.   Were you involved in the cash counting?

9        A.   I was for two of the runs.

10       Q.   Two of the runs, okay.

11            And so I've read in the declarations that

12       there were drug dogs there.

13            Were the drug dogs -- so you get cash out

14       of the box, right?

15       A.   Um-hmm.

16       Q.   And I know you're going to eventually

17       take it off to the cash counting place.

18            So when does the drug dog come into play

19       here?  You get the cash and then you take it over

20       to Fido?

21       A.   Yes.  So we would actually take

22       the -- again, I'm trying to remember exactly how

23       this worked, but once we inventoried everything,

24       had our paperwork in order, we would then take

25       everything out to our evidence technicians who

Exhibit J
683

Page 133

```
 1      were set up in the parking lot right outside the
 2      facility.  We would go over to where the drug
 3      dogs, the K-9s were at, have them sniff the cash
 4      while those law enforcement officers would do
 5      their process of having the cash sniffed by the
 6      K-9s and let us know if they had hit or detected
 7      drugs or not.
 8              They would sign their little affidavit;
 9      we would check a box on our paperwork; and then,
10      yeah, then the cash was sealed and then stored in
11      the back until transported to the cash counting
12      facility.
13          Q.   Okay.  So let me make sure I have all
14      this correct.
15              So you get the -- you do a particular
16      box.  There's a lot of cash in the box.
17              So you get all your items together; you
18      fill out your FD-597; then you take everything
19      out -- you said outside to the parking lot, right?
20          A.   Yes.
21          Q.   And in the parking lot is where the drug
22      dogs are.  Were they FBI drug dogs, or were they
23      from another agency?
24          A.   No, they were all from -- there was a
25      couple different or a few different state or local
```

Page 134

1     law enforcement agencies that were -- had the drug
2     K-9s.  We didn't have any of ours there.
3          Q.   Okay.  So some of the state agencies,
4     maybe the DEA?
5          A.   I actually don't think the DEA did.  I
6     think it was just -- again, to the best of my
7     recollection, it was local law enforcement.  And
8     the reason explained to me for the different
9     agencies was to rotate the dogs out so they
10    wouldn't get tired.
11         Q.   Okay.  Were there any dogs inside the
12    facility?
13         A.   None that I observed while I was there.
14         Q.   Okay.  And you were there all five days,
15    right?
16         A.   Yes.
17         Q.   So, I mean, unless one snuck in during
18    those brief times when you were making a run with
19    the cash, there weren't any dogs inside?
20         A.   Yeah, again, none that I saw.
21         Q.   Okay.  So I understand you were
22    inventorying pretty much most of the time.  You
23    did some cash runs.
24              And it sounds like you did several of
25    those; is that right?

Page 135

1          A.   Of the cash runs?

2          Q.   Yeah.

3          A.   No, I only did two.

4          Q.   Oh, two, okay.  Sorry.  I forgot

5     "several" means more than two.

6               Wow, you were there five days.  So how

7     many boxes -- and I'm not -- obviously I'm not

8     going to ask for a precise number here, but

9     approximately how many boxes did you personally

10    inventory as part of a team?

11         A.   Yeah, no, it's hard to remember

12    specifically.  At the risk of sounding repetitive,

13    I'd say dozens, dozens of boxes.

14         Q.   Makes sense.  But, like, if we look at

15    the 597s, you could have signed the 597, right?

16         A.   Yes.

17         Q.   So we could count up all the 597s with

18    your signature and deduce how many boxes you were

19    involved with?

20         A.   Yes.

21         Q.   Okay.  So you take the cash out; then you

22    take it over to the drug dog.  The drug dog does

23    whatever the drug dog is going to do, either

24    alerts or not alerts.  And you make a note of

25    that.  It sounds like you seal the cash, then.

Exhibit J
686

Page 136

1           Was the cash sealed prior to coming out,

2       or was it --

3           A.    To evidence?

4           Q.    Yeah.

5           A.    Actually, no, we did have it sealed.  But

6       at least the bags I did, we did have it sealed,

7       but we would run the cash -- apparently -- my

8       understanding of what was explained to me is the

9       dogs could smell through the plastic what we had.

10      But just to make sure everything was good, we

11      would rub the cash on the outside of the plastic

12      bag before we sealed it and then sealed it up and

13      gave it to the K-9 handler and watched them send

14      their dogs out to sniff it.

15          Q.    Either alert or not alert, okay.

16                And then after the dog does that, and

17      whichever way it goes, then what happened to the

18      cash?

19          A.    Then we just took it back into

20      the -- those two rooms that were in the back, the

21      room on the right side, which is where we were

22      storing all the cash, we had an agent there posted

23      at all times keeping an eye on the bags of cash.

24      And once the room got full enough and we couldn't

25      fit any more, we would make what we called a cash

Page 137

1    run to the cash counting facility.

2         Q.   Okay.  Before the money was put back in

3    that room -- you might have just said that and it

4    slipped my mind -- it was sealed at that point?

5              Oh, you're saying it was sealed before

6    the dogs got it and you rubbed the cash on the

7    outside and then you took the bag after the dogs

8    did their business and took it to the room in the

9    back?

10        A.   Yes.

11        Q.   Until you got enough of it to justify a

12   cash run?

13        A.   Yes.  Yep.

14        Q.   Okay.  I got you.  So I remember you

15   saying, like, as part of the inventory process,

16   you have the FD-597, you have the photographs, and

17   you have video.

18             Did you videotape the inventory process,

19   you personally?

20        A.   No.

21        Q.   Were there other FBI agents who were

22   responsible for videotaping the inventory process?

23        A.   It was -- I actually want to say DEA may

24   have been doing the videotaping.

25        Q.   DEA might have been doing the

Page 138

1     videotaping.  Okay.

2              Now, from your understanding, the purpose

3     of that was -- of the videotaping was to help

4     create a complete record of what was seized; is

5     that correct?

6        A.   Yes.

7        Q.   Okay.  Do you happen to know if, like,

8     every box that was inventoried was -- let me try

9     to say this in a way that's actually good.

10             Was each and every box inventoried

11    videotaped during that inventory?

12       A.   No, it wasn't.

13       Q.   What percentage of boxes would be

14    videotaped during the inventory process?

15       A.   Yeah, I have no idea.

16       Q.   Well, you inventoried, it sounds like,

17    dozens and dozens of boxes.  So let's just talk

18    about the boxes you inventoried.

19             For the ones you inventoried, what

20    percentage -- again, I'm not asking for any

21    precision.  What percentage of those boxes, of

22    those inventoried, were videotaped?

23       A.   I don't recall any of mine being

24    videotaped.

25       Q.   And you did dozens and dozens, correct?

Page 139

1          A.    Yeah, we took photographs.

2          Q.    You took photographs?

3          A.    Yeah.

4          Q.    Okay.  So in some instances, the

5     inventorying process was videotaped; and in other

6     instances, the inventorying process was

7     photographed?

8          A.    Yes.  I want to say the boxes inside the

9     vault were the ones that were primarily

10    videotaped, that remained inside.

11         Q.    And why would they -- do you know why

12    they videotaped inside the vault as opposed to

13    outside the vault?

14         A.    I mean, I recall a conversation with

15    Lynne -- I mean, one of the larger boxes was

16    inside the vault, so I think we wanted a good

17    record of those.

18              But also it was kind of a resource issue

19    in that we only had so many of those

20    high-definition cameras for recording.

21         Q.    Okay.  So the ones in the vault were

22    generally videotaped; the ones outside the vault

23    were generally photographed.

24              Do you know if, for the inventorying of

25    each box, every box, that there is a videotape or

Page 140

1     photographs?

2          A.   I don't know for every box, but I would

3     say the majority, yes.

4          Q.   Say that again, please.  I'm sorry.

5          A.   I would say the majority of the boxes,

6     yes, they were either photographed or videotaped.

7          Q.   Were all the boxes you inventoried

8     photographed?

9          A.   Yes, to the best of my knowledge.

10         Q.   Okay.  Would you have been the one

11    responsible for photographing, or would that have

12    been someone else?

13         A.   It varied.  Sometimes I took photographs;

14    sometimes other agents or law enforcement officers

15    took the photographs.

16         Q.   Okay.  And so for those photos and

17    videos, like for those to be useful, those would

18    have to capture sort of everything you're doing,

19    right?

20              MR. RODGERS:  Objection; legal

21    conclusion.

22              MR. FROMMER:  Victor, fine, but it is not

23    a legal conclusion to ask him if -- for the camera

24    to serve the purposes the FBI put the cameras

25    there for, if they would need to actually be --

Page 141

1    complete a full videotape.

2           MR. RODGERS:  I'm not going to make

3    speaking objections.

4       Q.   (BY MR. FROMMER)  So let me ask this:  To

5    create a -- this isn't a legal conclusion.  I'm

6    just asking you as an FBI agent who has had years

7    of experience in this.

8           In order to create a complete record, the

9    camera, whether it's a video camera or, you know,

10   a regular camera taking photographs, would have to

11   capture -- substantively capture everything that

12   you're doing, correct?

13          MR. RODGERS:  Same objection.

14          THE WITNESS:  No, we're using it in

15   conjunction with the FD-597, the inventory list.

16      Q.   (BY MR. FROMMER)  So if a list says, you

17   know, stuff, it just says "Miscellaneous comic

18   books," going back to our example, if the video

19   camera doesn't capture an image or the photograph

20   doesn't capture an image of all my 20 comic books,

21   how can I have a complete record?

22          MR. RODGERS:  Objection; argumentative,

23   legal conclusion, assumes facts not in evidence,

24   incomplete hypothetical.

25          THE WITNESS:  We're, again, relying on

Page 142

1    all the other documentation we have in place to

2    track that -- the FD-597, the chain of custody,

3    the bar codes.  And then in addition to, you have

4    video and/or photographs of what was there.

5         Q.   (BY MR. FROMMER)  That's what I'm asking.

6    Wouldn't the photographs and videotape need to

7    sort of have a good view of everything you're

8    doing and the items that are being seized in order

9    to serve that purpose?

10             MR. RODGERS:  Same objections.

11             THE WITNESS:  I think they would

12    corroborate what was in our documentation.  So if

13    you took a video and it showed cash and we wrote

14    down "Comic books," that would be an issue.

15             But I would think the video would

16    corroborate if you videotaped and you showed comic

17    books, we wrote down "Comic books" and our

18    evidence facility had comic books.

19         Q.   (BY MR. FROMMER)  Well, I don't need to

20    belabor the point.

21             If the FD-597 just says "Miscellaneous

22    comic books," and the camera just captures, I

23    don't know, like a fleeting image where you can't

24    tell how many comic books are there, how can we

25    have a complete record of everything that was

Exhibit J
693

Page 143

1   seized?

2            MR. RODGERS:  Same objections.

3            THE WITNESS:  I mean, the camera and the

4   photographs are not the end-all/be-all of our

5   records.

6        Q.   (BY MR. FROMMER)  Well, the FD-597 says

7   "Miscellaneous" and the camera does not show all

8   the comic books.

9        A.   Right.

10       Q.   How do I have a complete record?

11       A.   You have a chain of custody that says

12  that it was taken or seized by this agent on this

13  date at this time from this place.  This is the

14  evidence item.

15            Here's the FD-597 associated with that.

16            Here's the bar code associated with that

17  597.

18            Here's the chain of custody that shows it

19  being transported to our evidence facility where

20  it's been stored securely for X number of days.

21            And then here's a video that shows a

22  fleeting picture of what appears to be a comic

23  book.

24            To me, I think that's a pretty secure way

25  of determining what was in your box, if that's

Exhibit J
694

Page 144

1    what we're discussing.

2        Q.   So you're relying, then, on the chain of

3    custody to do some of the work in terms of

4    preventing theft and loss; is that correct?

5        A.   Yes.

6        Q.   And in my hypothetical, it's doing a lot

7    of the work; isn't that correct?

8            MR. RODGERS:  Same objections; improper

9    hypothetical.

10           MR. FROMMER:  I'll withdraw it.

11           MR. RODGERS:  Thank you.

12       Q.   (BY MR. FROMMER)  So you said you

13   inventoried dozens of boxes, right?

14       A.   Um-hmm, yes.

15       Q.   Did you ever see any, like, slips or

16   envelopes on top of the boxes?  And by that I

17   mean, like, those interior sleeves.

18       A.   Yes.

19       Q.   Like, what percentage of the boxes that

20   you did, since you did dozens of them, would you

21   say had a slip or an envelope on top of that

22   interior sleeve?

23       A.   Best guess is maybe -- I mean, yeah, I

24   couldn't even give you a best guess.  I just know

25   I saw them on some of the boxes.

Page 145

1           Q.   Would I be able to see that in the
2      photographs and videotapes?
3           A.   On some of them, yes.
4           Q.   Why not on all of them?
5           A.   I mean, the photographs -- I mean, the
6      photographs just might not represent the box as it
7      was -- I mean, I guess I'm trying to think of
8      how -- if the box was taken out, there could have
9      been a piece of paper on it, but it could have
10     fallen off or something and we didn't see it until
11     later.  So then we took a picture of the box
12     without it having that piece of paper on it.
13          Q.   So it's possible, in removing the box,
14     that, like, the envelope could have fallen away
15     and then you wouldn't have seen it?
16          A.   Yes.  Or I know there were instances
17     where we would pull out the sleeve, and since it
18     was like -- tape was used, sometimes it would get
19     stuck to, like, the top of where the sleeve was
20     held, like, inside the nest, if that makes sense.
21          Q.   Yeah.
22          A.   And then we would find that thing later.
23          Q.   Okay.  But there were a decent -- I
24     understand you can't give me a firm percentage,
25     and it's understandable.

Page 146

1          But at least some of the boxes had slips
2    or envelopes on the top of the interior sleeve; is
3    that right?
4          A.    Yes.
5          Q.    Okay.  And would you, as part of the
6    inventorying process, open that exterior envelope?
7          A.    Yes.
8          Q.    And I understand I'm not asking for the
9    100 percent, because who knows what people put in
10   those, but what would usually be in those
11   envelopes were be beneficiary forms; is that
12   correct?
13         A.    Yes.
14         Q.    And what kind of information was on those
15   forms?
16         A.    Usually some type of identifying
17   information for the beneficiary of that box, which
18   might include a name, phone number, or sometimes a
19   driver's license number, from what I recall.
20         Q.    From the box holder?
21         A.    The box holder and -- I'm assuming the
22   intended beneficiary of the contents of the box.
23         Q.    Okay.  So the beneficiary form would
24   have, like, basic contact information for both box
25   holder and the beneficiary?

Page 147

1          A.   Yes.  Sometimes either/or.  Sometimes
2     just for the box, and sometimes just for the
3     beneficiary.
4          Q.   Now, before you executed -- before you
5     began executing the warrant at Vaults, were you or
6     other people told that some of the boxes would
7     have slips or envelopes on top?
8               MR. RODGERS:  Compound.  Objection;
9     compound question.
10              THE WITNESS:  I don't think -- no, not
11    prior to the search, I don't remember being told
12    there would be slips of paper.
13         Q.   (BY MR. FROMMER)  Okay.  Were you
14    surprised when you first saw an envelope or a slip
15    of paper on top of an interior sleeve?
16              "Surprise" might be a strong word, but
17    was it -- was that something you had expected to
18    see?
19         A.   No, not something I expected.  I guess,
20    if anything, I would have expected it to be on the
21    inside of the box.
22         Q.   Okay.  Be on the inside of the box.
23              And you weren't told about these, the
24    presence of these envelopes ahead of time,
25    correct?

Page 148

1          A.    No.

2          Q.    So then there wasn't anything that you

3     were told about what you should do if and when you

4     encountered, like, a slip or an envelope like this

5     with the box holder's contact information, for

6     instance?

7          A.    Not that I recall specifically, no.

8          Q.    Okay.  Do you recall when you would run

9     across those slips, those envelopes that had the

10    box holder's contact information or the

11    beneficiary or both on them, would you record any

12    of that information anywhere?

13         A.    Yes.

14         Q.    Where, if you could tell me?

15         A.    We had a -- I keep calling it an

16    inventory sheet, but it was essentially that sheet

17    I was talking about earlier where we could check

18    if the drug dog hit or detected drugs or not.

19    There was also a section that contained agent

20    notes, and that's where we would record the

21    identifying information for that person.

22         Q.    And that form, so that's not an FD-597,

23    right?

24         A.    No.

25         Q.    What is that form called?

Page 149

1           A.    I call it our inventory sheet.  And then

2    again, it's re-createable, basically, on the

3    FD-597.  It would have a section for the drug dog

4    detection as well as agent notes.

5           Q.    Okay.  So it's reflective of the FD-597,

6    but it also has more additional information upon

7    it?

8           A.    Yes.

9           Q.    I got you.  So there would be an

10   inventory sheet, then, for each and every box; is

11   that correct?

12          A.    Yes.

13          Q.    Okay.  Would that even be for the empty

14   boxes?

15          A.    Yes.

16          Q.    Oh, really?  Okay.

17          A.    Yeah.  Those were the easy ones to fill

18   out.

19          Q.    Just nothing, nothing, nothing, sign,

20   done.  I bet you were happy every time you came

21   across an empty box.

22          A.    Yes.

23          Q.    Okay.  So you would see the slip or

24   envelope.  It would have, like, the box holder's

25   name on it.  And I know that you'd end up

Page 150

1    reporting that information on the inventory sheet.

2            But would you continue to go through a

3    box after encountering one of those slips or

4    envelopes?  Would you continue the inventorying

5    process with respect to the rest of the -- to the

6    contents inside the interior sleeve?

7        A.   Yes.

8        Q.   Sorry, just give me a second.

9            All right.  So let's move past that

10   initial slip.  You've opened the interior sleeve,

11   and now you're looking at the contents of the box.

12           And let's say you found another envelope

13   inside, like, a letter, standard letter, envelope

14   that -- standard letter envelope.

15           Would you open an envelope that -- like

16   that that you found inside the box?

17       A.   Yes.

18       Q.   Were you instructed to do that?

19       A.   I don't recall if we were instructed to

20   do that.

21       Q.   Okay.  I guess the question is, why did

22   you do that?

23       A.   Kind of -- and I go back to the incident

24   to arrest inventory procedures, kind of for agent

25   safety.  We don't know if there's drugs in there,

Page 151

1    plus we don't know if there's valuables in there,

2    plus anything else that could be dangerous.  Also

3    just to accurately reflect what could be in that

4    envelope.

5         Q.   Okay.  So you're opening an envelope to

6    see if there's any, like --

7         A.   Drugs, valuables, or dangerous items,

8    essentially.

9         Q.   Yeah, like hazardous items or things that

10   you want to make sure don't disappear.  Okay.  I

11   get that.

12        So let's say you get into the envelope.

13   You open the envelope.  And surprise, surprise,

14   the envelope just has, you know, well, papers.

15   Just papers in it.  It doesn't have anything else.

16        What would you do at that point with the

17   letter?

18        A.   Honestly, it was kind of nice if we did

19   find something like that because we could just

20   write "Miscellaneous paper" as opposed to it being

21   a bunch of cash, drugs, or something dangerous,

22   because it was just less paperwork to fill out and

23   less steps to do.  So it would be "Miscellaneous

24   paperwork," and it goes in the general evidence

25   bag, which is sealed and sent to the general

Page 152

1    evidence facility.

2         Q.   Now, would you take, like, a picture of

3    the letter or anything like that?

4         A.   No.

5         Q.   Do you know if other agents did videotape

6    or photograph the letters that they came across?

7         A.   Not specifically, no.

8         Q.   What do you mean "not specifically"?

9         A.   I'm thinking they could have taken a

10   picture of -- you know, laid out all of the items

11   that are in the box and taken just an overview

12   shot of everything that was in there.  And yeah,

13   they may have opened the envelope and pulled the

14   papers out to show there was no cash inside the

15   envelope or any valuables or anything like that.

16        Q.   But you agree it would be inappropriate

17   to, like, record or take a photograph of a letter

18   such that you just have a photograph with that

19   letter?

20             MR. RODGERS:  Objection; calls for a

21   legal conclusion.

22        Q.   (BY MR. FROMMER)  I'm asking your

23   personal opinion.  Would that be appropriate or

24   not?

25             MR. RODGERS:  Same objection.  Poses an

**Exhibit J**
**703**

Page 153

1    incomplete hypothetical as well.

2            THE WITNESS:  Yeah, I mean, my personal

3    opinion, I don't know if it would be improper,

4    necessarily.  I mean, just -- again, just depends

5    on what's on the letter.  If there's, like, a

6    manifest on there of, like, blowing something up,

7    I think we're going to take a picture of it.  You

8    can't turn a blind eye to something like that.

9        Q.   (BY MR. FROMMER)  Okay.  Would there be

10   any instance in which it would be appropriate for

11   you to read the letter?

12           MR. RODGERS:  Same objection.

13           THE WITNESS:  I just don't think we would

14   generally read the letter if we saw it was

15   miscellaneous paperwork.  We would probably move

16   on unless we saw -- if you opened it and you saw

17   something that said "kill" or "death" or "murder"

18   or something, then we would probably read the

19   letter.  But otherwise we were just confirming

20   there was nothing dangerous or valuable in that

21   envelope.

22       Q.   (BY MR. FROMMER)  Okay.  And you said you

23   never -- you only worked with -- you never worked

24   with -- did you ever inventory any boxes where it

25   was -- where the process was videotaped?

Page 154

1        A.    I don't think I did, no.

2        Q.    And that's consistent with what I think

3   you told me before, that you were -- that the

4   envelope -- sorry, not the envelopes, but the

5   boxes you inventoried were photographed by and

6   large; is that correct?

7        A.    Yes.  Yes.

8        Q.    Okay.  Do you know what agents happened

9   to work in the vault?

10       A.    I want to say I know that a couple agents

11  on my squad worked in a vault, and it would have

12  been -- really just Special Agent Mark Strickland,

13  I know he was in there.  That's really the only

14  agent I could think of.

15            Specifically, like, I know faces, but FBI

16  Los Angeles has a bunch of agents that I know the

17  face but I don't know the name.  And they came

18  from all over, Orange County, our other

19  sub-offices.  So I know their faces, but I just

20  don't know their names.

21       Q.    With everybody who was involved in the

22  inventory process, were they -- I mean the people

23  inside, not, like, the drug dogs and all that, but

24  everybody who was doing the inventory inside the

25  vaults, were they all FBI officials?

Exhibit J
705

Page 155

1          A.    No.  It was DEA, U.S. Postal Service.

2     And again, there may have been other federal

3     agencies, like OOIG, possibly.  Again, that's --

4          Q.    OOIG?

5          A.    Office of Inspector General.

6          Q.    Okay.  So it's possible there were

7     multiple federal agencies inside US Private Vaults

8     during the inventorying process?

9          A.    Yes.

10          Q.    And potentially some state agencies as

11     well?

12          A.    Yes, possibly.

13          Q.    Okay.  And I'm starting to sound like a

14     broken record like this.

15                Who do you think would, at the FBI, have

16     better knowledge than you about this?

17          A.    Probably Lynne Zellhart.

18          Q.    Okay.  So you said you used a lot of

19     photographs when you were doing the inventory, not

20     that you were necessarily photographing yourself.

21                So let's say you came across a box where

22     inside the sleeve, you open it, there were a bunch

23     of gold coins.

24                Would you photograph -- or your team

25     would you photograph the gold coins?

Page 156

1        A.   Yes, we would.

2        Q.   Would you count the gold coins?

3        A.   I mean, me personally, based on the boxes

4    I did, I think I would just say

5    "Miscellaneous" -- and I would say "Yellow colored

6    coins," because I'm not a metallurgist.  I don't

7    know if they're gold or not.  But I would make the

8    assumption they were valuable and treat them as

9    valuables.

10        Q.   Sure.  That makes sense.  You come across

11   a gold-colored coin that somebody put in a safe

12   deposit box --

13        A.   Right.  Yeah.

14        Q.   All right.  So you would photograph.

15             Is it fair to say, then, if you came

16   across gold coins in a box, you'd photographed

17   them, but you wouldn't count them?  And on the

18   FD-597 you might write something like

19   "Miscellaneous" -- I think you said

20   "yellow-colored coins"?

21        A.   Yes.  I would say if we were going to

22   count them, it's because you opened them up and

23   there was, like, five.  You'd automatically write

24   "Five gold-colored coins" there.  I might write

25   that down.

Page 157

1          Again, it just kind of varied.  If there

2     were a whole bunch of coins in a sleeve, we're not

3     going to count that, again.  We're trying to be

4     efficient and speedy about inventorying what was

5     in the boxes and move on to the next one.

6          Q.   I understand that.  There were hundreds

7     of boxes there, and this was taking multiple days.

8          So processing boxes quickly seems to have

9     been at a premium; is that right?

10         A.   Yes.

11         Q.   Yeah, 800 boxes, that's a lot of boxes.

12         So when you would photograph -- let's go

13    back to the thing -- like gold coins, for

14    instance.  You run into a bunch of gold coins, and

15    you're going to take a photograph of them.

16         Would you spread them out, so, like, from

17    the photograph it would be relatively

18    apparent -- like, if somebody went back to the

19    photograph, they could actually count out how many

20    coins there were?

21         A.   No.  I mean, again, it depended on the

22    box.  If the coins were already out, we might take

23    a photograph.  But if they were in all those

24    sleeves, we might just take a picture of -- here's

25    all the contents of the box.  You can see the gold

Page 158

1    coins and anything else that was in there.

2              And then we would note it in our

3    inventory sheet, the FD-597, and then I may move

4    on to the next box.

5         Q.   Okay.  And part of the reason you didn't

6    go through the laborious process of, like,

7    counting them all, is you can't stay there until

8    the end of the universe; you have to get this

9    process done in a relatively constrained time

10   frame?

11        A.   Yeah, we were taking up the whole parking

12   lot, and the local businesses were getting upset.

13   So we were trying to be cognizant of that and move

14   as quick as we could to get their lives back to

15   normal too.

16        Q.   Understandable.

17             Okay.  We talked about money before, if

18   it was less than 5,000, you would do it locally.

19   If it was more than 5,000, you'd send it to the

20   cash counting place.

21             And do you know whose idea it was to have

22   drug dogs out in the parking lot?

23        A.   No, I don't.

24        Q.   Is that another question for maybe

25   Zellhart?

Page 159

1          A.   Yes.

2          Q.   Okay.  And I'm assuming since you weren't

3     involved in getting the dogs there, you don't know

4     what types of drugs the dogs were trained to alert

5     on?

6          A.   I don't.  I think those were listed in,

7     like, the individual affidavits for each K-9 and

8     their handler.

9          Q.   Okay.  And were those included as part

10    of, like, in the inventory sheets?

11         A.   Yes.  So each box had a packet of

12    paperwork, which was the FD-597, the inventory

13    sheet.  That affidavit would have been included

14    had the drug dog detected.  That was pretty much

15    it.

16         But then this is also reflected in our

17    FD302s, which essentially consolidates all that

18    documentation to include the videos and

19    photographs.

20         Q.   Oh, okay.  So there are FD-597s that you

21    created, but there are also FD-302s that you

22    created as part of this?

23         A.   Yes.

24         Q.   And so let me understand, like, what the

25    302s contained.

Page 160

1          So the 597 is just the -- is the listing

2     of the property found in the box.

3          Then the inventory sheet also has whether

4     the drug dog alerted, plus the agent's notes.

5          Is it correct to say, then, you would

6     then prepare a 302 that encapsulated all the

7     information in the 597 and inventory sheet?

8          A.   Yes.

9          Q.   And did you say also it would

10    incorporate, like, a summary of whatever the

11    photograph or videotape revealed?

12         A.   I don't know if I would say revealed.  I

13    think it would just note if that box had been

14    photographed or videoed, essentially just noting

15    it and that it was available to be looked at.

16         Q.   Okay.  So it would note, "We made a

17    videotape," or "We made photographs."

18         It wouldn't summarize -- attempt to

19    summarize what that video or photographs depicted,

20    though?  It would just say, "Here are these piles;

21    you can go look at them if you want"?

22         A.   Yeah, they're very bland and generic,

23    just saying -- for example, like, this box

24    number -- it would really list out what was in the

25    FD-597 and was the box photographed or videotaped.

Page 161

1     And I want to say that's pretty much it.  It was

2     very generic.

3          Q.   Okay.  But the 302 sounds like it would

4     be sort of -- for lack of a better term, a

5     one-stop shop in the sense that it has the

6     contents of the FD-597; it has the drug dog alert;

7     it has any notes you would have had; and it would

8     have a reference to any photographs or videotape

9     that was taken of the inventory for that box?

10         A.   Yeah.  So, I mean, when I say the FD-302

11    would have it, like, there's a 302, and then it

12    would have its attachments, including the FD-597

13    and the other documents.

14         Q.   But if I want to get a real overall,

15    overarching view of everything involved with a

16    box, I would want to look at that 302 and its

17    attachments?

18         A.   I mean, yeah, I would say that would be a

19    good spot to start.

20         Q.   Okay.  Because the 597 is just giving me

21    one piece of the overall picture?

22         A.   Yes.

23         Q.   Got it.  So when you did the 597s, were

24    you doing the 597s contemporaneous with the

25    inventorying process?

Page 162

1          A.    Yes.

2          Q.    You slipped into the nod --

3          A.    Yeah.

4          Q.    I know, it's been a while.  I'm sure I've

5     done it too.

6                So sorry, Ms. Simmons.

7                Let me just -- I'll make that cleaner.

8                Is it true that you would fill out the

9     FD-597 contemporaneously throughout the

10    inventorying process?

11         A.    Yes.

12               MR. FROMMER:  Okay.  Let me just take a

13    five-minute break.

14         (Break taken from 2:42 p.m. to 2:50 p.m.)

15         Q.    (BY MR. FROMMER)  Thank you, Agent

16    Palmerton.  I have a few more questions.

17               A second ago, we had talked about, like,

18    the FD-302s, the FD-597s, the inventory sheets,

19    the photographs, the videotapes.

20               Where exactly would those things be kept

21    at the FBI?

22         A.    Yeah, primarily they would all be

23    serialized into the investigative case file in our

24    system that stores those.

25         Q.    Okay.  So would each box have its own

Page 163

1    separate investigative case file, or would there
2    be one overall?
3          A.   No, there would be one overall.  And
4    then -- and I just know this from looking at the
5    case file.  There's hundreds and hundreds of -- I
6    mean, if not thousands of entries into that
7    investigative case file.
8               So to answer your question, yeah, each
9    box would have its own 302 which would be in that
10   one investigative case file.
11         Q.   And the investigative case file, does
12   that include -- I assume from the name, that
13   includes everything related to the USPV
14   investigation from, like, 2019 when you first
15   heard about it on; is that correct?
16         A.   I would say it would have most of the
17   activity, potentially not all.  I mean, there
18   might be some stuff kept on, like, a shared file
19   on our internal servers, which -- I mean, I'm just
20   thinking that would include -- it's primarily the
21   file constraints on investigative file system.
22   Those, like, videos and photographs, they might be
23   retained on that shared file on the server.
24              So you would just reference it in the
25   FD-302 in the case file, and if you wanted to look

Exhibit J
714

Page 164

1    at it, you'd just go on that shared folder to

2    review the video if needed.

3         Q.   Okay.  So the case file, that exists on,

4    like, some central server?

5         A.   Yes.

6         Q.   Is that Sentinel?

7         A.   It is Sentinel.

8         Q.   And but the files -- the videotapes and

9    the photographs, you're saying, would not be on

10   Sentinel?

11        A.   Some of the photographs could be on

12   there, but I just know that generally videos, just

13   due to the file constraints of uploading into the

14   software, it kind of will kick it back.

15             So, I mean, I know that most of the

16   videos, if not all of them, were kept on just a

17   shared folder where, you know, it would have a box

18   number that connected just with the 302.

19             So if you're looking at 302, it would say

20   "See video stored here," and you'd just go find

21   it.

22        Q.   Got it.  And that server, that's local to

23   the FBI office in LA?

24        A.   Yes.

25        Q.   Okay.  So are there access restrictions

Exhibit J
715

Page 165

1    to Sentinel?  Can any FBI special agent go onto
2    Sentinel and pull up any case file?
3        A.   I mean, I don't know specifically.  I
4    know that there are access restrictions depending
5    on the case.  So you can restrict either certain
6    people or groups of people, or you can only allow
7    the case agent and maybe a supervisor to view the
8    case, just depending on what type of investigation
9    it is.
10       Q.   You mean like the sensitivity of the
11   investigation?
12       A.   Yes.  So, I mean, yeah, if it's like a
13   classified investigation involving something like
14   national security-related, it's very restricted.
15   But if it's just a standard bank fraud
16   investigation, generally most people in the FBI
17   could access that system.
18       Q.   Okay.  And where does this case fall?  I
19   would assume that this case falls in sort of the
20   more standard bank fraud area than, like, national
21   security.
22       A.   Yeah, I don't know.  And that's not to
23   say that criminal investigations can't be
24   restricted.  And this one could have been, but I
25   just don't know.

Exhibit J
716

Page 166

1          Q.   But you don't know the access

2     restrictions for the case file here?

3          A.   I don't.

4          Q.   And I'm going to say what I've said many

5     times.  I'm assuming that Special Agent Zellhart

6     would be in a better position to talk about that?

7          A.   Yes.

8          Q.   Okay.  A moment ago you talked about that

9     you had recently reviewed the document retention

10    policies for the FBI.

11         A.   Yes, that was one of my more recent

12    trainings.

13         Q.   Oh, okay.  And can you tell me -- because

14    I'm interested in trying to figure out the -- you

15    know, the documents, photographs, other things

16    created as a result of the execution of the

17    warrant since you just went through this.

18              Can you give me some idea of, like, how

19    that document retention policy would apply to, for

20    instance, you know, documents referring -- either

21    describing what was in the box or maybe pictures

22    of a box?

23         A.   I mean, yeah, I couldn't specifically

24    tell you, because, again, it's almost more of an

25    administrative training.  I know the document

Page 167

1    retention policies are pretty strict, and then we

2    try not to get rid of anything, obviously,

3    primarily for purposes of discovery because we

4    have to turn over pretty much everything to

5    defense counsel once an investigation moves to

6    that stage.

7            Generally everything is kept in its -- I

8    mean, the one thing I remember is it's supposed to

9    be kept safe and secure in the facility.  And for

10   us, that's usually on our servers, which I like to

11   think are fairly secure.  And they would be stored

12   there for a significant period of time until

13   they're required to be disposed of.

14           I want to say there's stuff going back to

15   2009, just administrative stuff still being held

16   onto, stuff that's case stuff.  There's stuff

17   going back to the '50s and '60s that's still out

18   there.

19      Q.   So the stuff in the individual case file

20   for this case could sit on Sentinel, then, for

21   decades, potentially?

22      A.   Potentially, yes.

23      Q.   Okay.  And honestly, depending on how the

24   case was classified, that would determine the

25   degree of access that could be had to those files;

Page 168

1     is that correct?

2          A.   Yes, and those restrictions, I mean, can

3     change over time too.

4          Q.   Let me move a little bit past that week.

5     Well, somewhat past that week.  Because I recall

6     the first time I was there, I saw, like, a page on

7     the front door.  And it said something about --

8     like if you want to file a claim to get your stuff

9     back from the FBI, go to this website and fill out

10    this information.

11              Did you have any role in that informal

12    claim process?

13         A.   No.

14         Q.   Do you know who did?

15         A.   That would have been Agent Zellhart.

16         Q.   Okay.  Do you know if she would have

17    consulted with anyone about that?

18         A.   Yes, she would have.  I couldn't tell you

19    exactly who.

20         Q.   Would that be SSA Alexander?

21         A.   Possibly.  I would say possibly also or

22    likely our legal team as well.

23         Q.   Okay.  The legal team?

24         A.   Yeah, and probably some folks at

25    headquarters in order to set up that website.

Page 169

1      Q.   Okay.  So potentially some folks

2   over -- are they still at the Hoover building?

3   That building still exists, right?  You're talking

4   the J. Edgar Hoover building over in D.C.?

5      A.   Yeah, that still exists.

6      Q.   Hasn't fallen down yet, somehow?

7      A.   No, not yet.

8      Q.   Okay.  So to put up that website, Special

9   Agent Zellhart would have probably talked with

10   some higher-ups in the field office and then also

11   some folks at headquarters in D.C.; is that

12   accurate?

13      A.   Yes.

14      Q.   And as with many other things in this, if

15   I wanted to get more information about it, I

16   should probably speak to Special Agent Zellhart?

17      A.   Yes.

18      Q.   Okay.  Now, as you might be aware, a few

19   months after the warrant was executed, there was a

20   notice -- there were notices of administrative

21   forfeiture put out for a subset of the boxes.  I

22   forget the amount.

23         But did you have any role in deciding

24   which boxes would be subject to administrative

25   forfeiture proceedings?

Page 170

1        A.    No.

2        Q.    Do you know who would?

3        A.    I don't, no.

4        Q.    Is that something the FBI would make a

5    determination of or would that be a determination

6    made by the USAO?

7        A.    Yeah, I don't know.

8        Q.    Okay.  Do you happen to know who's the

9    head of the forfeiture section of the United

10   States Attorney's Office?

11       A.    I don't.

12       Q.    Okay.  But they might have information

13   about who made those decisions, you would say?

14       A.    They might, yeah.

15       Q.    Okay.  So obviously you don't know what,

16   if any, sort of investigation they would have

17   under -- whoever decided would have undertaken

18   before making a decision about whether to engage

19   in administrative forfeiture proceedings?

20       A.    Yeah, I wouldn't know.

21       Q.    You weren't involved in any of that?

22       A.    No.

23       Q.    Okay.  And you don't really know who at

24   FBI might have been?  Maybe Lynne?

25       A.    Maybe Lynne.  Or she would have more

Page 171

1       information than I would have.

2           Q.   Okay.  Here's a little bit of a happier

3       part.  I know some of the stuff went to an

4       administrative forfeiture, and other boxes got

5       returned to, you know, to the box holders.

6                Now, I'm hoping -- were you involved in

7       the returning property to these folks?

8           A.   I did return a couple of boxes.

9           Q.   Okay.  You returned a couple of boxes?

10          A.   Yes.

11          Q.   And do you know, like, other agents who

12      helped return boxes?

13          A.   Yes.  We have -- I mean, there were other

14      agents that returned boxes, a number of agents

15      that returned boxes.

16          Q.   Okay.  Do you recall any by name, per

17      chance?

18          A.   I know Agent Zellhart.  We have a newer

19      agent who has handled a lot of the box returns,

20      Crystal Morelos, Agent Sarah Plantz.  And then

21      there was dozens of other agents that were

22      involved in box returns too.  There was so many,

23      the work was spread out.

24          Q.   Makes sense.  So you said you were

25      involved in at least a couple of returns, right?

Page 172

1          A.    Yes.

2          Q.    Can you tell me, how did you verify that

3     the -- that you were giving the box to somebody

4     who was entitled to have the contents of the box?

5          A.    I want to say for my boxes, I looked at

6     the FD-302, if there was, like, any identifying

7     info in there, you would note it.

8               And then the attorney -- in the instances

9     I returned it, there was an attorney representing

10    the box holder.  The attorney was bringing a key

11    as well as copies of the -- some type of

12    identification, usually a driver's license that

13    matched identifying information we had in the box.

14              And then we tested the key to make sure

15    it worked, and then we returned the items

16    back -- in my case, back to the attorney.

17         Q.    So in both of your instances, was it an

18    attorney who was identifying his or her client?

19         A.    Yes.

20         Q.    Were there instances where there might be

21    an attorney but they didn't want to reveal the

22    name of their client who came to pick up property?

23         A.    Not that I recall.

24         Q.    So it sounds like the key, having the key

25    was an important part of getting property back; is

Page 173

1       that right?

2              A.    Yes.

3              Q.    Being able to show you had the key and it

4       fit the lock for the particular door of the nest;

5       is that correct?

6              A.    Yes.

7              Q.    I just realized something.  If you guys

8       were holding onto the keys -- or you weren't,

9       obviously, but in order for that to work, that

10      meant you were holding onto all of the doors;

11      isn't that correct?

12             A.    Yes.

13             Q.    So again, the nests are sitting there

14      basically with ripped-off doors, and they have

15      been ever since March of 2021?

16             A.    Yes.  I want to say they're stored in our

17      general evidence facility, actually, along with

18      the boxes.  We would take the box door, put it

19      inside the sleeve, tape it, tape it shut so we

20      knew if we needed it returned, we could easily

21      open the sleeve and have the key -- do a key test.

22             Q.    Okay.  But those poor nests are still

23      torn apart?

24             A.    Yes.

25             Q.    Okay.  And have you heard about any

Page 174

```
 1    claims from people who have said that their
 2    property has gone missing after -- as a result of
 3    the warrant execution?
 4         A.   I've heard about it, but yeah, I couldn't
 5    tell you specifically which boxes or which --
 6         Q.   Oh, no, and I wouldn't expect you to.
 7    I'm just wondering have you heard of stories like
 8    that.
 9         A.   Yes.
10         Q.   More than one?
11         A.   I really can just think of one that I was
12    told.
13         Q.   Well, what was that one?
14         A.   I think it was gold coins.  Someone said
15    they were missing gold coins.
16         Q.   All right.  But that's the only one you
17    can recall hearing about?
18         A.   Yes.
19         Q.   Okay.  Can you briefly tell me, who is
20    Bailey Dress?
21         A.   She is an agent on the squad.  I think I
22    said Agent Kate Bailey earlier is one of the
23    agents who participated.  She's Kate Bailey-Dress.
24    She was married right before that.  Anyway, it's
25    the same individual.
```

Page 175

1      Q.   And she's on your squad, you said?

2      A.   She is.

3      Q.   Who is Desmond Beverly?

4      A.   I actually have no idea.

5      Q.   That's fair if you don't know.

6           So who is -- I think we talked about her

7    before, but Krysti Hawkins?

8      A.   Krysti was our assistant special agent in

9    charge until leaving just recently.  We have the

10   new ASAC that I mentioned earlier who I just

11   remembered her name.

12     Q.   Okay.  All right.  So Ms. Hawkins left?

13     A.   She did.

14     Q.   And I think we previously talked about

15   Richard Alexander.

16          He left as well, correct?

17     A.   Yes.

18     Q.   When did Ms. Hawkins leave?

19     A.   Krysti left -- she actually may have left

20   before Richard did, approximately around the end

21   of last year as well.  I really don't recall

22   specifically.

23     Q.   Okay.  And do you happen to know where

24   Ms. Hawkins is now?

25     A.   I don't.

Page 176

1      Q.   Okay.  So Ms. Hawkins, she didn't retire

2    like SSA Alexander, did she?  Did she go to a

3    different job?

4      A.   To the best of my knowledge, I think she

5    transferred to -- I believe headquarters,

6    actually.

7      Q.   Okay.  So you think she's still with the

8    FBI, just in D.C. rather than in LA?

9      A.   Yeah, again, to the best of my knowledge.

10     Q.   Okay.  And do you know who Todd Boyett

11   is?

12     A.   I don't.

13     Q.   Okay.  That's fine.  Or Noah Thompson?

14     A.   No.

15     Q.   And we've talked about Ryan Heaton.  And

16   he's your current SSA, right?

17     A.   He is, yes.

18     Q.   Okay.  I just want to make sure I

19   understood that.

20          Who is Jesse Murray?

21     A.   I think she's involved with our asset

22   forfeiture folks.  But actually I don't even

23   really know her personally, I think just by name

24   and reputation.

25     Q.   Okay.  In your LA office or at

Page 177

1    headquarters?

2           A.    I think LA.

3           Q.    So you think she's part of the asset

4    forfeiture unit over in the LA FBI office?

5           A.    Yes.

6           Q.    Okay.  Thank you for that.

7                 MR. FROMMER:  I think we're about done.

8    Let me take a very short break just to confer with

9    my colleagues and then hopefully we'll be able to

10   wrap things up.  Okay?

11                THE WITNESS:  Okay.

12                (Break taken from 3:12 p.m. to 3:15 p.m.)

13                MR. FROMMER:  We are, in fact, all done.

14   Thank you very much, Special Agent Palmerton.

15   You've been very helpful on this.  I appreciate

16   your time.  Thank you for taking the time on this.

17                And with that, I'll conclude the

18   deposition with the caveat that we might need to

19   call you back, depending on what the documents

20   that we have yet to obtain say.  I don't expect

21   that, but I just want to leave that as a

22   possibility.

23                With that, thank you for your attendance

24   today.

25                THE WITNESS:  Thank you.

Exhibit J
728

Page 178

1        (The remote deposition concluded at 3:15 p.m.)

2                            * * *

3                    (Signature was requested.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 179

1                         VERIFICATION
2

        STATE OF _____)
3                               )  ss.
        COUNTY OF _____)
4

5           I, JUSTIN PALMERTON, being first duly sworn
6       remotely on my oath, depose and say:
7           That I am the witness named in the foregoing
8       remote deposition taken the 28th day of April, 2022,
9       consisting of pages numbered 1 to 178, inclusive; that
10      I have read the said deposition and know the contents
11      thereof; that the questions contained therein were
12      propounded to me; that the answers to said questions
13      were given by me, and that the answers as contained
14      therein (or as corrected by me therein) are true and
15      correct.
16
            Corrections Made:  Yes_____ No_____
17
18
            _____
19                      JUSTIN PALMERTON
20
        Subscribed and sworn to before me this _____
21
        day of _____, 2022, at _____, Idaho.
22
23
                        _____
24                      Notary Public for Idaho
                        Residing at_____, Idaho
25                      My Commission Expires: _____.

Exhibit J
730

Page 180

1                    REPORTER'S CERTIFICATE

2

     STATE OF IDAHO  )

3                    )  ss.

     COUNTY OF ADA   )

4

5          I, AMY E. SIMMONS, Certified Shorthand Reporter

6    and Notary Public in and for the State of Idaho, do

7    hereby certify:

8          That prior to being examined, the witness named in

9    the foregoing deposition was by me duly sworn remotely to

10   testify to the truth, the whole truth and nothing but the

11   truth;

12         That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction, and

15   that the foregoing transcript contains a full, true

16   and verbatim record of said deposition.

17         I further certify that I have no interest in the

18   event of the action.

19         WITNESS my hand and seal this 3rd day of May,

20   2022.

21

22                      AMY E. SIMMONS

                        CSR, RPR, CRR, CRC and Notary

23                      Public in and for the

                        State of Idaho.

24

25   My Commission Expires: 06-13-2022

Page 181

1    Victor Rodgers, Esq.

2    victor.rodgers@usdoj.gov

3                    May 3, 2022

4    RE: Snitko, Paul Et Al  v. United States Of America Et Al

5        4/28/2022, Special Agent Justin  Palmerton (#5199043)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

```
                                                      Page 182

1     Snitko,  Paul  Et  Al   v.  United  States  Of  America  Et  Al

2     Special  Agent  Justin   Palmerton  (#5199043)

3                      E R R A T A   S H E E T

4     PAGE_____  LINE_____  CHANGE_____

5     _____

6     REASON_____

7     PAGE_____  LINE_____  CHANGE_____

8     _____

9     REASON_____

10    PAGE_____  LINE_____  CHANGE_____

11    _____

12    REASON_____

13    PAGE_____  LINE_____  CHANGE_____

14    _____

15    REASON_____

16    PAGE_____  LINE_____  CHANGE_____

17    _____

18    REASON_____

19    PAGE_____  LINE_____  CHANGE_____

20    _____

21    REASON_____

22

23    _____     _____

24     Justin  Palmerton                            Date

25
```

Page 183

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Special Agent Justin  Palmerton (#5199043)

3                   ACKNOWLEDGEMENT OF DEPONENT

4      I, Special Agent Justin Palmerton, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Special Agent Justin  Palmerton        Date

13   *If notary is required

14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                   _____ DAY OF _____, 20___.

16

17

18                   _____

19                   NOTARY PUBLIC

20

21

22

23

24

25

[04405 - accurate]

Page 1

**0**

**04405**   1:6
**06-13-2022**   180:25

**1**

**1**   4:9 61:19,21
62:3,15 75:16
92:20 93:22 94:4
94:8 95:3,17
179:9
**10,000**   76:18
**100**   77:3 109:6,8
110:1,5 146:9
**10140**   3:10
**10:31**   52:23
**10:44**   52:23
**10:59**   61:25
**11030**   180:21
**11:11**   61:25
**11:40**   80:23
**11:41**   80:25
**12:46**   80:25
**14th**   3:4
**16781**   2:20
**178**   179:9

**2**

**2**   4:9 95:12,17
**20**   19:13 78:3,5
94:23 124:18
141:20 183:15
**2009**   167:15
**2016**   62:4
**2019**   17:20 18:15
85:23 86:1 163:14
**202**   3:11
**2021**   5:24 6:19
17:18 18:14 68:12
69:3 86:15 87:23
87:25 88:9 89:4
89:18 90:11,23
94:12,20 173:15

**2022**   1:19 2:8
179:8,21 180:20
181:3
**20535**   3:11
**21**   6:17 19:19 23:7
23:10 28:1
**213**   3:5,6
**22203**   2:16
**22nd**   68:12 69:3
110:8,15,19
113:10 115:1
120:23
**247**   63:13
**256**   2:20
**26th**   115:1 120:23
**28**   1:19
**28th**   2:8 12:8
179:8
**2:21**   1:6
**2:42**   162:14
**2:50**   162:14

**3**

**3**   95:20 181:3
**30**   181:17
**302**   160:6 161:3,10
161:11,16 163:9
163:25 164:18,19
172:6
**302s**   159:21,25
162:18
**312**   3:4
**324-8952**   3:11
**33**   13:1
**3:12**   177:12
**3:15**   177:12 178:1
**3rd**   180:19

**4**

**4**   95:20
**4/28/2022**   181:5

**40**   118:5,21
**44120**   2:21
**45**   118:21

**5**

**5**   4:5 95:13,17
**5,000**   131:19,21
158:18,19
**50s**   167:17
**5199043**   181:5
182:2 183:2
**597**   66:12 71:7
72:15 73:1,2 77:6
77:13,21 78:7,13
80:1,2,6,7,12,16
81:14 133:18
135:15 137:16
141:15 142:2,21
143:6,15,17
148:22 149:3,5
156:18 158:3
159:12 160:1,7,25
161:6,12,20 162:9
**597s**   66:18,21 79:3
79:6,7,18 116:21
135:15,17 159:20
161:23,24 162:18

**6**

**60s**   167:17
**61**   4:9
**682-9320**   2:17,21

**7**

**703**   2:17,21

**8**

**800**   157:11
**894-0142**   3:6
**894-2569**   3:5

**9**

**9**   136:13 159:7
**900**   2:16
**90012**   3:5
**901**   2:16
**935**   3:10
**9:00**   69:15,19
111:8 112:7
**9:19**   2:9
**9:37**   18:7
**9:43**   18:7
**9s**   133:3,6 134:2
**9th**   89:18

**a**

**a.m.**   2:9 18:7,7
52:23,23 61:25,25
69:15,19 80:25
111:8 112:7
**abandoned**   31:17
**able**   10:15 11:24
83:7 97:6 145:1
173:3 177:9
**abreast**   129:4
**access**   61:22,23
85:8 118:25 120:5
122:5,14,18,19
127:12 164:25
165:4,17 166:1
167:25
**account**   45:17
**accountant**   35:4
35:10 71:17
**accounting**   13:8
13:18,22 35:6,23
97:7
**accumulated**
132:2
**accuracy**   181:9
**accurate**   10:13,16
11:22 18:16 36:13

[accurate - answer]                                                                    Page 2

62:8,10 63:5 72:6
110:2 124:15
169:12
**accurately**  11:25
73:12 151:3
**accusations**  57:10
57:19,20
**acknowledgement**
183:3
**acknowledgment**
181:12
**act**  25:18,25
**acting**  1:10
**action**  5:21 48:13
54:16 55:12
180:18
**actions**  55:20
119:3
**activities**  24:19
108:18
**activity**  86:8
163:17
**actual**  103:10
111:19 119:18
122:5
**ada**  2:7 180:3
**add**  11:8
**addition**  6:15
47:20 72:15 142:3
**additional**  6:3
11:4 71:7 73:7
98:6 149:6
**additions**  183:6
**address**  103:10
**adjourn**  11:16
**administrative**
28:23 166:25
167:15 169:20,24
170:19 171:4
**advise**  121:10

**affidavit**  37:18,20
38:12,14 39:23
40:5 133:8 159:13
**affidavits**  159:7
**afternoon**  113:9
113:10
**agencies**  43:11,20
43:24,25 44:2,4
70:9 96:4,6,11,16
97:2,8,17,19,25
98:7,18,19 107:21
108:3,6,10 109:18
109:20 134:1,3,9
155:3,7,10
**agency**  44:8
111:21 133:23
**agent**  5:10,17 6:24
9:1,14 12:9,21
14:7,10,18,20 15:2
15:7,15 16:5,6,19
16:23 17:10 19:18
19:24 20:3 28:3,9
33:23 34:18 35:7
35:16 36:7 37:3
38:19 41:19 44:7
44:18,20 45:5,5,12
45:20,22,25 48:2
50:18,19 60:23
61:12 68:7 69:22
75:14 81:2 86:3,5
86:23 87:12 88:5
88:9,14,18,23 89:2
89:9,10,11 92:22
92:23,24,25 93:1,1
93:8 96:24,25
100:17 103:9
104:13 105:16
114:14 117:15,18
120:17,25 121:10
121:21 126:24
136:22 141:6

143:12 148:19
149:4 150:24
154:12,14 162:15
165:1,7 166:5
168:15 169:9,16
171:18,19,20
174:21,22 175:8
177:14 181:5
182:2 183:2,4,12
**agent's**  160:4
**agents**  23:22 29:13
36:18,21 38:10
43:8,9 44:22
45:14 46:6,6,10,13
46:18 47:15 48:11
48:14,23 49:1,11
49:18,19 50:2
52:1 58:2 59:4
65:5,9,18 67:2
70:5 71:4 75:3,8
75:20 79:6,14,17
85:11,12 88:7,12
90:9,14,18 92:7,16
95:11,25 96:12
98:3,4 99:1
101:14 102:7
103:24 107:13
108:13,17,19
109:1,6,8,12,24
110:8,11,12
111:11 113:15,18
113:22,22 117:9
120:3,12 121:25
127:8 129:10
132:5 137:21
140:14 152:5
154:8,10,16
171:11,14,14,21
174:23
**ago**  9:2 19:8,9
32:6 103:6 162:17

166:8
**agree**  152:16
**ahead**  21:3 147:24
**al**  181:4,4 182:1,1
183:1,1
**alert**  136:15,15
159:4 161:6
**alerted**  160:4
**alerts**  135:24,24
**alexander**  94:14
94:16,16 97:11
168:20 175:15
176:2
**alley**  22:3,4
**allotted**  181:20
**allow**  165:6
**allowed**  52:14
126:7 127:12
**alongside**  44:22
49:1
**alternatives**
100:24
**ambiguous**  44:24
51:5,6 58:4 59:9
61:15 64:13
**amendment**  24:14
**america**  1:9 181:4
182:1 183:1
**amount**  38:21
60:19 169:22
**amy**  1:25 2:5
180:5,22
**andrew**  3:4
**andrew.brown**
3:7
**angeles**  3:5 19:22
154:16
**answer**  7:14 8:15
9:5 10:1,3,4,9,10
10:21,23 11:15,22
11:25 23:11 33:6

[answer - authorized]

33:15 37:13,14
38:8 40:2 47:10
54:24 55:6 56:9
57:16 62:13 118:2
163:8
**answered** 60:4
64:14,21 123:13
**answering** 8:12
**answers** 7:10
10:13 179:12,13
**anymore** 122:24
**anyway** 174:24
**apart** 119:10
173:23
**apologies** 6:18
**apologize** 6:21
53:22
**apparent** 157:18
**apparently** 136:7
**appear** 83:1
**appearances** 2:13
3:1
**appeared** 131:19
**appearing** 49:20
**appears** 63:10
143:22
**appended** 183:7
**applicable** 181:8
**application** 38:2,6
38:15,16,25 39:22
40:6 89:21
**applied** 37:2 40:24
41:2,7,9 46:8
**apply** 23:21 26:20
166:19
**applying** 27:3,8
29:22 37:10 39:11
40:13,19
**appointment**
11:21

**appreciate** 177:15
**approach** 47:23
47:24
**appropriate** 25:22
152:23 153:10
**approximate**
41:20
**approximately**
13:18 14:1 19:7
19:11 37:5 41:17
69:14,18 70:1,3,4
90:20 109:17
112:7 135:9
175:20
**approximation**
109:4
**april** 1:19 2:8 12:8
179:8
**area** 22:6 35:25
37:9 165:20
**areas** 16:4 23:1,7
23:17 26:16 32:8
48:3 113:3,19
**argue** 10:24
**argumentative**
72:12 77:17 78:20
141:22
**arlington** 2:16
**arrest** 25:15,19,22
26:7,17 30:11
31:15,25 32:3
34:15,20,25 36:17
37:22 53:10,13,24
54:3,7 55:15
56:11,15,19,23
57:4 59:24 60:3
60:25 61:6 64:1
64:16,20 65:2,11
66:18,22 70:22
71:2 98:11 150:24

**arrested** 30:18
41:8
**arrestee** 26:1
30:12,14
**arrestee's** 26:6
63:16,22
**arresting** 26:1
**arrests** 22:1 26:5
27:8 29:21 36:6
36:10,16,19,23
40:25
**arrived** 112:6,12
130:11
**asac** 15:6 175:10
**aside** 46:5 64:15
101:21
**asked** 32:12 43:16
60:4 62:11 64:13
64:21 86:6 123:12
**asking** 7:8 12:24
15:8,8 28:18,19,21
44:13 50:25 56:13
87:14 90:18 92:15
118:12 123:10
126:16 138:20
141:6 142:5 146:8
152:22
**asset** 176:21 177:3
**assign** 84:24
**assigned** 19:21
72:18 82:15,18
131:25
**assist** 7:10 90:9,18
98:9
**assistant** 1:12 15:6
15:19 175:8
**assisted** 121:1
**assisting** 89:5,11
**associated** 143:15
143:16

**assume** 10:5 22:23
39:16,21 55:3
71:17 95:21
163:12 165:19
**assumes** 46:21
47:12 49:8 54:23
56:7 59:7 63:8
70:24 72:1,10
73:20 74:22 75:10
76:5,24 77:18
141:23
**assuming** 126:1
146:21 159:2
166:5
**assumption** 57:2
156:8
**attached** 181:11
**attachments**
161:12,17
**attempt** 160:18
**attempting** 45:18
115:13
**attendance** 177:23
**attending** 100:22
**attorney** 1:10 5:11
172:8,9,10,16,18
172:21 181:13
**attorney's** 3:2
170:10
**attorneys** 10:19
37:19 38:10,16
**audibly** 7:12
**auditing** 13:23
**ausa** 3:3,3,4
**ausas** 37:19,20
38:21
**authority** 54:18
55:2
**authorize** 50:6
**authorized** 52:14
114:19

[authorizes - boxes]                                                      Page 4

**authorizes** 50:6
**authorizing** 54:20
**automatically**
  156:23
**available** 160:15
  181:6
**avenue** 3:10
**average** 117:22,24
**avoid** 8:9
**aware** 17:20 18:15
  86:3 99:25 100:2
  100:4,7 113:14,24
  114:1 169:18

**b**

**b** 4:7
**back** 5:23 9:21
  17:5 18:8,22
  29:16,18 34:12
  42:13 46:5 52:20
  52:24 53:6 55:24
  56:17 80:4 81:1,2
  85:22 86:13 91:1
  101:23 106:11
  107:4 108:21
  113:8,25 116:14
  119:8 123:7
  128:22 129:5
  130:12 131:24
  133:11 136:19,20
  137:2,9 141:18
  150:23 157:13,18
  158:14 164:14
  167:14,17 168:9
  172:16,16,25
  177:19
**background** 12:20
  13:6
**bad** 88:15
**bag** 83:2,13,19,20
  131:22 136:12
  137:7 151:25

**bags** 74:7 83:4
  112:20 136:6,23
**bailey** 92:25
  174:20,22,23
**bank** 45:16,19
  165:15,20
**bar** 72:19,21 78:25
  82:15,18 83:1
  131:25 142:3
  143:16
**based** 10:25 46:7
  57:23 58:11,24,25
  73:17 74:19 91:7
  97:18 126:16
  156:3
**basic** 35:22 146:24
**basically** 30:24
  86:15 112:17
  119:9 124:1 149:2
  173:14
**basis** 34:11
**becoming** 86:2
**beg** 85:18
**began** 17:16
  110:24 113:8
  147:5
**beginning** 74:18
**belabor** 142:20
**believe** 49:2 59:1
  60:1 61:2 62:12
  63:15 70:6 79:24
  79:25 80:11,19
  85:21 87:2 91:2
  91:22 100:11
  110:7 176:5
**beneficiary**
  146:11,17,22,23
  146:25 147:3
  148:11
**best** 36:9 69:7 90:4
  90:8 97:14,16

101:15 107:22
  113:11 126:9
  127:18 134:6
  140:9 144:23,24
  176:4,9
**bet** 149:20
**better** 38:1 97:1
  105:14 128:2
  155:16 161:4
  166:6
**beverly** 96:9 98:16
  98:20 99:2 108:9
  175:3
**big** 39:20 41:23
  125:5,6 128:15
**biometric** 114:2,5
  114:9,20
**bit** 13:2 21:22
  24:23 26:9 49:16
  52:25 53:4,5
  59:21 85:17
  129:21 168:4
  171:2
**bland** 160:22
**blank** 39:24 40:3
**blind** 153:8
**blowing** 153:6
**blvd** 2:20
**bodies** 98:10
  116:14 120:8
**book** 11:21 143:23
**books** 78:3,4,6,14
  141:18,20 142:14
  142:17,17,18,22
  142:24 143:8
**boulevard** 107:2
  108:24
**box** 116:18 117:10
  117:12,18,24
  118:2,3,8,9,15,19
  118:23,25 119:18

119:21 122:6,10
  122:13 124:17,19
  125:8,25 126:3,11
  127:7 132:14
  133:9,16,16 138:8
  138:10 139:25,25
  140:2 143:25
  145:6,8,11,13
  146:17,20,21,22
  146:24 147:2,21
  147:22 148:5,10
  149:10,21,24
  150:3,11,16
  152:11 155:21
  156:12,16 157:22
  157:25 158:4
  159:11 160:2,13
  160:23,25 161:9
  161:16 162:25
  163:9 164:17
  166:21,22 171:5
  171:19,22 172:3,4
  172:10,13 173:18
**boxes** 105:10
  106:15,19 113:8
  113:15,24 116:4
  116:14,15,24
  117:3,5,14,22
  118:16 119:4,6,12
  120:1,4,5,7,9,13
  123:3 124:10,18
  124:24 125:1
  127:22,25 128:18
  128:20 130:8,15
  130:18 135:7,9,13
  135:18 138:13,17
  138:18,21 139:8
  139:15 140:5,7
  144:13,16,19,25
  146:1 147:6
  149:14 153:24

[boxes - claims]

154:5 156:3 157:5
157:7,8,11,11
169:21,24 171:4,8
171:9,12,14,15
172:5 173:18
174:5
**boyett** 176:10
**break** 6:23 11:12
11:16 18:7 20:20
52:20,23 61:25
80:25 125:12
162:13,14 177:8
177:12
**breaking** 119:9
**brief** 8:25 105:9
134:18
**briefing** 68:18,21
99:9,11,16,21
100:21,21 101:12
102:1,5,10,24
104:6,7 105:5,18
106:14 107:1
108:22
**briefly** 174:19
**bring** 119:14
**bringing** 112:17
172:10
**broad** 28:19 30:4
90:13
**broken** 109:21
120:15 155:14
**brown** 3:4
**building** 36:19
55:2 70:17 103:16
113:14 169:2,3,4
**bunch** 70:16
151:21 154:16
155:22 157:2,14
**bureau** 1:13 3:9
**business** 91:10
101:6 114:25

137:8
**businesses** 158:12
**bust** 125:10
**busted** 125:12

**c**

**c** 5:1
**cadet** 19:17
**cadets** 24:12
**calendar** 11:21
22:9
**california** 1:2,11
3:5 28:4
**call** 25:5 32:20
48:18 68:18 82:6
82:9 90:13 99:9
102:3 116:16
119:10 122:14
149:1 177:19
**called** 19:17 49:2
86:6 87:4 91:3
99:6 102:12 112:2
136:25 148:25
**calling** 148:15
**calls** 24:4 31:21,22
33:4 37:11 43:13
47:20 49:7 50:16
54:22 56:6 57:1
57:12,14 58:6
59:8,10 62:19,19
63:8 64:7 67:9
69:6 71:25 72:11
73:20 74:22 75:11
76:4 77:18 78:20
79:12 84:7 86:20
88:20 97:22
152:20
**camera** 140:23
141:9,9,10,19
142:22 143:3,7
**cameras** 139:20
140:24

**campbell** 3:10
**canvass** 90:8,12
**capabilities** 98:7
107:7
**capacity** 1:10,12
**capture** 73:12
140:18 141:11,11
141:19,20
**captures** 142:22
**carbine** 21:18
**cards** 30:24
**career** 60:20
**case** 1:6 8:2 11:23
12:14 17:20 19:22
22:24 25:17 27:16
38:21 75:7 85:22
86:3,4 87:4,11,12
96:24 98:3,4
103:9 120:25
131:22 162:23
163:1,5,7,10,11,25
164:3 165:2,5,7,8
165:18,19 166:2
167:16,19,20,24
172:16
**cases** 87:6 93:18
**cash** 30:24 83:14
131:9,11,12,12,14
131:16,19 132:3,6
132:8,13,17,19
133:3,5,10,11,16
134:19,23 135:1
135:21,25 136:1,7
136:11,18,22,23
136:25 137:1,6,12
142:13 151:21
152:14 158:20
**categories** 28:20
**caveat** 177:18
**central** 1:2,11
164:4

**ceremony** 20:2
**certain** 28:16
81:22 165:5
**certificate** 180:1
**certified** 180:5
**certify** 180:7,17
**cetera** 75:24
**chagrin** 2:20
**chain** 78:24 81:5,8
81:11,15,17 82:4
83:25 84:5,11,17
84:22 85:1,2
142:2 143:11,18
144:2
**chains** 116:21
**challenge** 5:22
**chance** 27:21
171:17
**change** 29:11,14
73:17 74:19 168:3
182:4,7,10,13,16
182:19
**changes** 181:10
183:6
**charge** 15:7,15,20
93:24 96:20
120:21,24 175:9
**chart** 14:24
**check** 83:23 84:19
84:21 86:7,18,24
87:22 89:16 91:2
133:9 148:17
**checked** 82:2
**checking** 85:9
**chunk** 23:23,24
125:6
**circumstances**
45:12
**claim** 168:8,12
**claims** 72:8 73:3,8
77:14 84:4 174:1

Exhibit J
739

clarification  11:5
clarify  9:21 33:13
  53:8 110:4
clarifying  6:5
class  5:21
classifications
  73:24
classified  28:17
  165:13 167:24
cleaner  162:7
clear  7:22 21:25
  22:20 67:19
clearly  7:11
  106:22
client  172:18,22
close  14:15
code  72:19,21
  78:25 82:15,18
  83:1 131:25
  143:16
codes  142:3
cognizant  158:13
coin  156:11
coins  155:23,25
  156:2,6,16,20,24
  157:2,13,14,20,22
  158:1 174:14,15
coll  3:3
collar  16:22,24
  35:25 92:20 93:22
  94:4,8 95:3,12,13
  95:14
colleagues  177:9
collect  16:24 17:16
  33:24 125:25
  127:15
collected  17:19
  37:16 81:24
collecting  17:2,12
  18:11,14 34:5

college  13:12
colored  156:5,11
  156:20,24
columbia  3:11
combination  38:9
come  14:2 18:22
  31:16 52:20 53:6
  66:3,6,9 78:2
  108:21 111:19
  112:3 126:7,19
  132:18 156:10
comes  30:10
  124:13
comic  78:3,4,6,14
  141:17,20 142:14
  142:16,17,18,22
  142:24 143:8,22
coming  8:21 13:11
  51:14 70:16 136:1
commencing  2:8
commission
  179:25 180:25
communication
  90:15,20
complaints  71:22
complete  10:13,16
  19:19 72:5 76:21
  77:2 81:13 97:7
  138:4 141:1,8,21
  142:25 143:10
  183:8
completed  77:5
  81:11 181:17
completely  9:6
  11:25 39:24 73:12
completion  20:1
compliant  22:1
comport  24:19
  26:11
compound  147:8,9

computer  18:1
concerning  5:22
conclude  177:17
concluded  178:1
conclusion  31:21
  50:17 54:22 56:7
  57:13 58:6 59:8
  62:19 63:9 72:1
  72:12 73:20 74:22
  75:12 76:5 77:19
  78:20 79:12 84:7
  140:21,23 141:5
  141:23 152:21
conduct  29:25
  34:19,24 53:17
  56:14,18 60:24
  61:9,12 63:6,25
  64:4,18 65:1 67:6
  70:21 105:7
  121:11
conducted  53:7,11
  53:23 54:2,6,10
  66:22 75:20
conducting  36:22
  63:16
confer  49:11 177:8
conference  6:6
conferred  49:17
  121:13
confirming  153:19
confronted  126:4
confused  77:25
  119:22
congratulations
  28:4
conjunction  43:10
  43:20 54:15 55:11
  141:15
connected  72:21
  72:22 164:18

consider  116:12
consistent  24:19
  25:11 27:4 79:3,8
  79:13,18,18 154:2
consisting  179:9
consolidates
  159:17
constitution  23:21
  24:20 27:5
constitutional
  25:12
constrained  158:9
constraints  163:21
  164:13
consult  51:19
  65:17
consulted  51:2
  168:17
contact  146:24
  148:5,10
contain  65:9
contained  119:11
  122:15 148:19
  159:25 179:11,13
containing  119:25
contains  180:15
contd  3:1
contemporaneous
  161:24
contemporaneou...
  31:10 162:9
contents  124:20
  146:22 150:6,11
  157:25 161:6
  172:4 179:10
context  26:17
  34:24 64:1,19
  65:2,11 66:15,22
  70:22 103:3
continue  6:2 28:7
  29:7 32:7 55:4

[continue - declarations]                                              Page 7

150:2,4
**continues** 18:2
**continuing** 20:12
28:8,12 29:7 32:7
32:13 33:3,3,9,16
34:14 36:24 39:14
**contours** 50:14
**contraband** 58:12
58:16,18
**control** 84:5 99:6
**conversation** 7:16
8:9 11:19 88:3
139:14
**conversations**
91:18
**copies** 47:25
102:15 172:11
181:14
**copy** 102:22
103:19 105:21
**corporation** 91:24
**correct** 14:7,8
17:13 19:25 23:3
23:14 24:9 26:2
29:8 32:10 33:25
34:15 36:25 39:18
42:5 48:5 50:20
50:23 55:17 56:1
59:5,22,25 60:9,11
60:14,15 62:2
63:22,23 69:4
71:19 73:13 76:9
76:17 80:13 82:8
83:21 84:14 87:15
89:4,14 91:24
93:14,19 95:24
96:21 99:13,17
101:14 102:4
105:2 106:15,23
109:12 114:23
116:1 117:6

127:17,22 129:22
132:7 133:14
138:5,25 141:12
144:4,7 146:12
147:25 149:11
154:6 160:5
163:15 168:1
173:5,11 175:16
179:15 183:8
**corrected** 179:14
**corrections** 179:16
183:6
**correctly** 106:12
**corroborate**
142:12,16
**counsel** 3:9 167:5
181:14
**count** 131:20
135:17 156:2,17
156:22 157:3,19
**counted** 131:18
132:3,4
**counting** 131:12
131:16 132:3,6,8
132:17 133:11
137:1 158:7,20
**county** 2:7 154:18
179:3 180:3
**couple** 104:6
116:11 133:25
154:10 171:8,9,25
**course** 7:15,18
26:7 91:19 109:6
109:8 110:4
**court** 1:1 2:6 7:9
7:11,18 8:5 9:3,17
9:20
**court's** 6:6
**cpa** 13:18 35:11,12
35:15 71:15

**cramped** 128:10
129:6
**crc** 1:25 180:22
**create** 49:12 52:5
138:4 141:5,8
**createable** 149:2
**created** 49:1,18
51:12 159:21,22
166:16
**creating** 37:24
49:5 74:15
**credentials** 20:3
**crime** 16:22 25:6
25:11 35:23,25
**crimes** 16:25 34:9
**criminal** 33:24
58:12,19 165:23
**crowd** 92:10
**crr** 1:25 180:22
**crystal** 171:20
**cs** 181:15
**csr** 1:25 180:22
**current** 14:10
94:10 176:16
**currently** 15:4
**custodies** 81:16
**custody** 30:24,25
78:24 81:8,12,17
81:21 82:4 83:25
84:5,12,17,18,22
84:25 85:1,2
116:21 142:2
143:11,18 144:3
**customers** 128:25
**cut** 123:21,23
**cv** 1:6

| d |
|---|

**d** 4:1 5:1
**d.c.** 169:4,11 176:8
**dangerous** 151:2,7
151:21 153:20

**date** 81:25 143:13
182:24 183:12
**day** 2:8 23:12
34:11,11 92:14
99:5 102:2,8,14,16
110:5,6,7 111:12
112:19 113:7
179:8,21 180:19
183:15
**daylight** 2:9
**days** 114:25 115:8
115:16 116:7
131:5 134:14
135:6 143:20
157:7 181:17
**dea** 96:7 98:15,19
99:1 107:6,20
108:9,12,13,17
134:4,5 137:23,25
155:1
**deadly** 23:24
24:10,11 28:16
103:14
**deal** 21:25,25
**dealing** 41:23
71:19 75:21
124:11
**death** 153:17
**decades** 167:21
**december** 94:20
**decent** 60:19
145:23
**decided** 170:17
**deciding** 169:23
**decision** 90:7
114:17,20 170:18
**decisions** 120:20
121:8 170:13
**declarations**
132:11

declare 183:4
decline 87:18
deduce 135:18
deemed 75:6
 183:6
defendants 1:14
 3:2 6:9 62:6
defense 167:5
defenses 32:9
defensive 20:18
 21:4 23:2 29:3
definite 23:10
definition 139:20
degree 13:7
 167:25
delays 9:9
delineate 107:17
delineated 107:8
delivering 45:19
denoted 19:24
department 96:9
depended 157:21
depending 47:21
 82:20 165:4,8
 167:23 177:19
depends 45:1
 105:23 115:11
 153:4
depicted 160:19
deponent 181:13
 183:3
depose 179:6
deposing 181:13
deposit 106:15
 116:3,24 127:22
 127:25 156:12
deposition 1:18
 2:1,3 6:13,14 7:1
 7:6 8:7 12:8,9,17
 61:19,21 177:18
 178:1 179:8,10

180:9,12,16
describe 20:10,14
 21:22 23:18 32:19
 35:18 45:11 90:1
 108:5 128:12
described 131:23
describing 166:21
description 62:8
desmond 175:3
destroyed 85:4
destroying 122:21
detached 122:13
detailed 71:24
details 22:15
 48:19 51:24
 104:13
detected 133:6
 148:18 159:14
detection 149:4
determination
 170:5,5
determine 51:19
 167:24
determining
 143:25
developing 51:1
 51:20
different 6:5 14:19
 14:20 16:3 23:6
 63:18 73:24 74:6
 79:6,14,14 98:14
 107:6 108:14
 109:6 112:21
 116:11 118:4
 120:2 125:7
 133:25,25 134:8
 176:3
differently 63:19
 74:1,3
difficult 109:16
 118:1 129:13

digital 82:19
digitized 82:18
diog 62:16 65:14
 65:25 76:2,13,17
 76:18
diploma 28:3
direct 51:9
direction 180:14
director 1:13
 15:19
disable 114:20
disabled 114:5,8
disappear 151:10
discovered 81:18
discovery 62:6
 167:3
discrete 45:24
discuss 6:12,14
 28:17 47:7 49:19
 69:16 98:24
 107:12,14
discussed 47:18
 100:6,14,24 102:6
 116:20
discusses 63:6
discussing 47:16
 67:22 68:1 87:25
 144:1
discussion 9:13
 18:6 48:10 65:24
 101:8 103:15
 105:9,12 106:14
discussions 46:15
 46:18 68:4 98:21
disposed 85:4
 167:13
dissemination
 67:1
distinct 104:22
district 1:1,2,11
 3:11

division 1:3
docs 12:12
document 28:15
 28:24 62:25 67:15
 76:7,10 82:4
 84:17 166:9,19,25
documentation
 78:22 81:14 82:17
 84:9 142:1,12
 159:18
documented 74:9
documenting
 116:19
documents 11:20
 12:10,14,16 67:16
 82:19 161:13
 166:15,20 177:19
dog 132:18 135:22
 135:22,23 136:16
 148:18 149:3
 159:14 160:4
 161:6
dogs 132:12,13
 133:3,22,22 134:9
 134:11,19 136:9
 136:14 137:6,7
 154:23 158:22
 159:3,4
doing 12:8,8 13:20
 31:24 32:22 33:1
 33:17 39:22 56:22
 83:24 107:13,15
 107:24 108:17,19
 118:13 127:24
 137:24,25 140:18
 141:12 142:8
 144:6 154:24
 155:19 161:24
domestic 4:9 62:4
door 119:17
 122:13 123:16

[door - example]                                                                 Page 9

124:2,5,5,19,25
125:13 128:15
130:21 168:7
173:4,18
**doors** 119:5 122:7
122:10,22 123:19
123:19 124:14
125:3,9,15,17
130:2,5 173:10,14
**dozens** 36:10,10
37:7 41:5,5,6,8,8,9
41:10,21,22 42:4,5
42:14,14,15,15
50:22 92:6,6
95:25 109:5,22
110:11,14,18
135:13,13 138:17
138:17,25,25
144:13,20 171:21
**drafting** 38:12
**dress** 174:20,23
**drill** 24:23 77:24
**drive** 86:7
**driver's** 146:19
172:12
**drove** 86:9,12 91:3
**drug** 132:12,13,18
133:2,21,22 134:1
135:22,22,23
148:18 149:3
154:23 158:22
159:14 160:4
161:6
**drugs** 133:7
148:18 150:25
151:7,21 159:4
**due** 164:13
**duly** 5:4 179:5
180:9
**duplicates** 71:9,9

**duties** 104:13,14
131:9

**e**

**e** 1:25 2:5,20 4:1,2
4:7 5:1,1 180:5,22
182:3,3,3
**earlier** 11:6
148:17 174:22
175:10
**easily** 173:20
**easy** 125:16,21
149:17
**eden** 16:12
**edgar** 169:4
**edification** 81:10
**education** 13:3
**educational** 13:5
27:10
**effects** 63:17
**efficient** 157:4
**either** 9:20 33:10
34:17 37:10 43:16
65:25 92:10
102:14,23 135:23
136:15 140:6
147:1 165:5
166:20
**electronics** 75:24
**elements** 25:1
**elias** 93:1
**emailed** 102:14,18
**emails** 8:21
**employees** 58:2
70:6,7 101:16
109:23
**empty** 117:7,23
118:2,9,15 149:13
149:21
**encapsulated**
160:6

**encountered** 148:4
**encountering**
150:3
**ended** 87:5 122:20
**enforcement**
107:20 109:22,23
113:16,21 133:4
134:1,7 140:14
**engage** 22:9
170:18
**engaged** 115:7
**engaging** 91:8
**engineer** 123:1
**enjoy** 94:24
**ensure** 26:5 79:17
**enter** 82:16
**entire** 131:7,8
**entirety** 14:12,14
**entitled** 2:9 172:4
**entries** 163:6
**envelope** 144:21
145:14 146:6
147:14 148:4
149:24 150:12,13
150:14,15 151:4,5
151:12,13,14
152:13,15 153:21
154:4
**envelopes** 144:16
146:2,11 147:7,24
148:9 150:4 154:4
**errata** 181:11,13
181:17
**erratas** 181:15
**especially** 97:25
**esq** 2:15,15,20
181:1
**essentially** 81:16
82:16 119:20
127:15 129:18
148:16 151:8

159:17 160:14
**establish** 22:11
**estimate** 55:5
111:3
**et** 75:24 181:4,4
182:1,1 183:1,1
**event** 126:17
180:18
**events** 89:4
**eventually** 132:16
**everybody** 154:21
154:24
**evidence** 11:1
16:24 17:2,12,17
17:19 18:11,14
33:24 34:5 37:16
37:18 46:22 47:13
49:8 54:23 56:7
58:12,18 59:8
63:8 70:24 72:2
72:10,17 73:2,7,21
74:23 75:11 76:5
77:18 78:25 82:2
82:3,7,7,9,12,21
83:2,14,23 84:1,10
84:14,20,23 85:2
112:20 131:24
132:1,25 136:3
141:23 142:18
143:14,19 151:24
152:1 173:17
**exactly** 23:8 70:2
81:16 91:6 132:22
162:20 168:19
**examination** 5:8
**examined** 5:6
180:8
**example** 27:15
40:7,11 67:6
81:24 123:23
124:18 141:18

[example - fbi]                                                                 Page 10

160:23
examples 27:16,16
  28:11 67:23 75:23
excel 35:20
excerpt 4:9 62:4
  62:16 76:12
excessive 24:8
execute 22:1,10,12
  22:16,20 26:23
  33:10 41:24 42:10
  43:8,10,19,24
  44:17,19 45:5,13
  45:23 46:11,14,19
  47:4,7,16 48:11,15
  48:20 50:1,14
  51:23 52:15 53:2
  53:3 65:23 67:20
  67:24 68:10 69:13
  90:2,14 92:1
  98:11,22,25 100:1
  101:19 110:24
  111:19 112:18
  114:24 115:3,8,16
  116:9
executed 27:17
  41:11,18 42:4
  43:2,6 50:22 52:9
  69:3 86:16 94:13
  100:25 103:11,17
  107:7 147:4
  169:19
executes 43:7,18
executing 27:3,9
  29:22 32:22 33:1
  33:16 44:6,6,10
  46:17 49:3 53:1
  65:14,19 66:25
  67:7 68:1 69:17
  92:4 95:6,25 96:4
  96:13,17 97:3,20
  100:25 103:5,24

106:1 107:13
108:1,14 109:3
112:4,24 113:19
113:23 115:7
120:22 126:23,25
127:20 147:5
execution 5:22
  6:16 47:8 49:6,12
  52:2 68:11,18,22
  68:25 69:2,10
  92:17 95:4 97:9
  99:15,20 100:13
  100:22 102:9
  104:3,11 109:19
  115:15,19 116:25
  121:11 126:18
  166:16 174:3
executive 121:3,4
exemplars 66:11
  66:16,20
exercise 21:5
exhibit 61:18,19
  61:21 62:3,9,15
  75:16
exists 164:3 169:3
  169:5
expect 92:9 174:6
  177:20
expected 103:23
  147:17,19,20
experience 39:17
  45:8 49:10 50:25
  56:4 57:24 58:11
  58:24,25 60:18
  97:19 102:14
  118:13 119:16
  126:17 131:21
  141:7
experienced
  115:21

expires 179:25
  180:25
explain 22:19
  81:10 86:23 97:18
  128:8
explained 134:8
  136:8
explore 82:5
extent 73:10 84:13
  86:14 92:11,16
  98:18,20 107:5
exterior 146:6
extract 119:25
eye 136:23 153:8

f

face 154:17
faces 154:15,19
facility 71:13
  72:20 74:6,12
  82:2,3,10,12,24
  83:24 84:14,20,23
  85:3 113:4 131:13
  132:3 133:2,12
  134:12 137:1
  142:18 143:19
  152:1 167:9
  173:17
facsimile 3:6
fact 63:17 66:9
  70:13 104:2
  177:13
factors 51:18
  105:23
facts 38:20 46:21
  47:12 49:8 54:23
  56:7 59:7 63:8
  70:24 72:1,10
  73:21 74:23 75:10
  76:5,24 77:18
  141:23

fails 181:19
fair 24:5 25:8 29:5
  38:20 45:22 53:21
  54:9 56:21 57:8
  57:23 58:9 61:3
  63:24 64:17 65:13
  65:17 68:9 73:1
  75:25 84:3 110:17
  115:18 122:20
  131:15 156:15
  175:5
fairly 71:24
  105:18 167:11
fake 22:5,5
fall 165:18
fallen 145:10,14
  169:6
falls 165:19
familiar 55:25,25
  56:22 65:4 76:1
far 17:5
fbi 5:17 7:4 13:11
  13:17 14:3 16:9
  16:20 19:2 20:15
  23:6 28:9 29:12
  30:25 32:14 33:20
  34:2,7 35:2,5
  39:20 40:7 41:12
  43:7,8,9,9,18 44:7
  44:17,20,22 45:5
  45:12 46:10,18
  48:11 49:1,11,17
  50:2 57:9 58:1,2
  59:1,3 60:17,19,23
  61:11 64:25 69:12
  70:5,6,7,16 71:13
  71:22 72:7 73:2
  75:6,7 77:14
  79:16 82:1,3,7
  84:4 85:7 90:1
  92:3,16 93:13

94:21 96:24 97:6
97:19,20,24 99:16
100:23 101:5,13
101:16 107:3,12
108:18,25 109:1,2
109:12,18,24
110:8,14,24
111:11,20,22
114:8 121:9
131:15 133:22
137:21 140:24
141:6 154:15,25
155:15 162:21
164:23 165:1,16
166:10 168:9
170:4,24 176:8
177:4
**fbi's** 98:21
**fbi.gov** 3:12
**fd** 66:12,18,21
71:7 72:15 73:1,2
77:6,13 78:7 79:3
79:6,7,18 80:1,2,6
80:7,12,16 81:14
116:21 133:18
137:16 141:15
142:2,21 143:6,15
148:22 149:3,5
156:18 158:3
159:12,20,21
160:25 161:6,10
161:12 162:9,18
162:18 163:25
172:6
**fd302s** 159:17
**february** 87:24
90:24
**federal** 1:13 3:9
43:25 70:9 96:3
96:11 97:2,8
155:2,7

**feet** 129:8
**fellow** 49:1 101:13
**fewer** 42:11
**fido** 132:20
**field** 19:21 24:18
93:15 169:10
**figure** 15:25 30:5
49:23 51:10 83:8
104:20 119:2
166:14
**figured** 7:3
**figuring** 49:25
50:2
**file** 162:23 163:1,5
163:7,10,11,18,21
163:21,23,25
164:3,13 165:2
166:2 167:19
168:8
**files** 164:8 167:25
**fill** 79:18 80:1,2,12
80:16 112:22
133:18 149:17
151:22 162:8
168:9
**filled** 66:12,21
**filling** 79:6
**finally** 129:20
**financial** 35:21
**find** 18:23 145:22
151:19 164:20
**fine** 6:12 10:2,8
11:7 36:15 46:4
95:23 108:12
140:22 176:13
**finish** 8:11,15
10:10 11:13,15
**firearm** 21:11
**firearms** 20:17,23
21:10,16 23:2,13
29:2 32:8

**firing** 127:8
**firm** 5:20 13:18
145:24
**first** 5:4 13:12
36:17 37:25 54:5
61:4 63:12 74:16
75:17,18 85:21
86:2 111:11,11
112:1 113:1 119:5
119:9,23 147:14
163:14 168:6
179:5
**fit** 136:25 173:4
**five** 13:19,24 14:3
19:7,12 60:17
95:16 114:25
115:8,16 116:7
118:3,8,14 131:5
134:14 135:6
156:23,24 162:13
**fleeting** 142:23
143:22
**floor** 3:4
**flow** 8:9
**fly** 28:4
**folder** 164:1,17
**folks** 168:24 169:1
169:11 171:7
176:22
**follow** 6:22 52:16
**following** 14:3
**follows** 5:6
**footnote** 63:12
**force** 23:24 24:8
24:10,11 28:16
103:14
**foregoing** 179:7
180:9,15 183:5
**forensic** 35:4,6,10
**forfeiture** 169:21
169:25 170:9,19

171:4 176:22
177:4
**forget** 99:5 169:22
**forgiveness** 85:18
**forgot** 135:4
**fork** 128:2 129:19
129:25 130:18
**forklift** 123:24
124:9
**form** 40:7 66:19
146:23 148:22,25
**forms** 146:11,15
**forward** 21:7
81:12 128:16
**found** 81:25
150:12,16 160:2
**foundation** 17:9
24:4 31:21 33:5
38:4 40:1 43:13
44:12,24 46:21
49:9 50:8 56:8,25
57:13 58:6 62:19
63:8 64:8 66:5
67:10 69:6 70:24
72:1,10 73:20
74:22 75:11 76:3
76:24 77:18 79:11
84:7 97:22 115:5
117:25 118:10
126:15
**four** 14:11,15 19:9
27:24 33:20 35:3
50:20 60:21
117:12 129:8
**fourth** 24:14
**frame** 158:10
**fraud** 165:15,20
**fraudulent** 45:17
**free** 87:5 124:8
129:20

**fresh** 11:9 43:4
**frommer** 2:15 4:5
5:9,11,19,25 6:18
6:20,24 8:24 9:1
9:11,14 12:6,18
17:10,22,24 18:1,4
18:8,9 24:5,6
31:23 33:6 35:12
35:14 37:14 38:5
38:8,23 40:2,12,15
40:16,23 43:15,23
44:13 45:2,8,11,21
46:4,25 47:14
48:4,21 49:10
50:12,18 51:10,18
52:19,24,25 54:14
54:24 55:10 56:9
57:6,16 58:9,17,22
59:13,20 60:6,12
61:17,20 62:1,23
63:11 64:11,17,24
66:8 67:12 69:9
71:14 72:4,24
74:2,11 75:2,15
76:8 77:3,10,23
78:12,18 79:2,15
79:22 80:23 81:1
84:11 85:5 86:22
88:22 90:4 96:19
98:13 107:11
111:5 115:6,14
118:6,12 123:14
125:22 126:16
140:22 141:4,16
142:5,19 143:6
144:10,12 147:13
152:22 153:9,22
162:12,15 177:7
177:13
**front** 37:20 62:2
168:7

**full** 5:14 10:12,15
12:22 38:16 75:17
87:19 112:13
116:25 136:24
141:1 180:15
**fully** 77:6 114:24
**functioning** 14:19
**functions** 13:23
**further** 86:18
180:17
**future** 81:20

**g**

**g** 5:1
**gaining** 120:5
**gather** 16:23
17:16 33:24
**gathered** 17:18
**gathering** 17:1,11
18:11,13 34:5
**gay** 2:15
**gears** 53:4 85:16
**general** 3:9 14:21
16:18 18:25 27:13
34:10 44:15 70:20
73:25 82:21,23
104:15 151:24,25
155:5 173:17
**generally** 16:21
19:1 20:16 21:24
23:18,21 26:12
30:18,23 31:7,16
34:8 37:15,19
38:19 40:3,10
41:14 66:18 71:6
76:13 77:21,24
80:8 81:23 93:15
102:13 122:12
139:22,23 153:14
164:12 165:16
167:7

**generic** 160:22
161:2
**getting** 8:21 9:9
87:5 119:21
122:13 158:12
159:3 172:25
**give** 8:23 10:15
13:14 14:21 16:17
22:18 23:10 27:12
28:2,11 29:24
31:6,10,12 106:10
144:24 145:24
150:8 166:18
**given** 7:3 9:4
23:12 28:19 60:21
67:6 75:23 80:9
103:19 111:17
117:13 179:13
183:9
**giving** 36:12
161:20 172:3
**glebe** 2:16
**global** 92:15
**go** 6:11 7:5 8:15
9:11 18:4 19:15
19:21 21:3 22:16
22:17 26:9 29:18
32:21 44:16 45:5
46:4,11 54:18
55:2 61:24 80:24
81:2,20 98:24
102:9 106:11
108:24 119:7
124:4 126:13
127:4,7 128:15
130:12 131:11
133:2 150:2,23
157:12 158:6
160:21 164:1,20
165:1 168:9 176:2

**goes** 84:23 136:17
151:24
**going** 6:13 9:17
13:17 44:16 46:10
47:6 50:1 61:17
68:3 73:10 81:12
85:11 90:16 91:1
103:11,16 104:24
107:15 108:21
112:21 113:15
127:3,8 128:25
132:16 135:8,23
141:2,18 153:7
156:21 157:3,15
166:4 167:14,17
**gold** 155:23,25
156:2,7,11,16,24
157:13,14,25
174:14,15
**golden** 94:25
**good** 10:18 16:16
23:23,24 125:17
136:10 138:9
139:16 142:7
161:19
**gothier** 1:5
**gotten** 102:22
**government** 10:24
**government's** 5:22
10:19
**graduated** 80:17
**graduation** 20:2
**great** 8:19
**ground** 7:5 85:19
120:22
**group** 111:14
128:1
**groups** 98:14
107:5,15 165:6
**guards** 84:4

[guerrero - incident]                                                      Page 13

**guerrero** 93:1
**guess** 28:16 36:9
  67:14 86:2 97:15
  144:23,24 145:7
  147:19 150:21
**guessing** 91:15
**guidance** 61:8,11
  62:12,16 65:1,25
**guide** 4:9 40:13,18
  40:21 48:22 50:13
  62:5 63:6 67:24
**guidelines** 67:23
**guides** 27:18 32:18
**gun** 127:5,7
**guys** 17:22 80:23
  111:23 129:18
  173:7

**h**

**h** 4:7 16:13 93:9
  93:10 182:3
**half** 14:11 19:9
  27:24 33:20 35:3
  50:20 60:22 118:4
**hand** 44:15,16
  49:24 102:10,11
  116:12 180:19
**handbook** 65:4,9
  65:18,25
**handed** 20:2 72:17
  102:18
**handful** 70:4
  130:5
**handled** 171:19
**handler** 136:13
  159:8
**hands** 22:18
**happen** 90:22
  108:1 121:23
  125:23 127:9
  138:7 170:8
  175:23

**happened** 100:6
  136:17 154:8
**happening** 113:4
  126:5
**happens** 7:16 11:7
  19:15,19,20 81:11
**happier** 171:2
**happy** 149:20
**hard** 8:3 34:8
  135:11
**harder** 8:6
**hawkins** 175:7,12
  175:18,24 176:1
**hazardous** 151:9
**head** 7:17,18
  15:11,17 28:15
  170:9
**heading** 111:8
**headquarters**
  168:25 169:11
  176:5 177:1
**hear** 17:22 87:22
  101:8
**heard** 9:8,9 85:21
  87:8 163:15
  173:25 174:4,7
**hearing** 41:16
  85:25 174:17
**heat** 83:13,14,20
  131:23
**heaton** 15:4 16:13
  16:15 92:23 94:5
  94:6,7,10 176:15
**heights** 2:21
**held** 9:13 18:6
  145:20 167:15
**hello** 5:10
**help** 11:21 40:21
  67:23 87:14 89:15
  89:21 90:14 98:7
  116:3 130:12,13

  138:3
**helped** 41:24 92:1
  115:24 127:21
  171:12
**helpful** 35:23
  177:15
**helping** 38:24
  88:19
**helps** 40:13,18
  98:6
**hereto** 183:7
**hey** 126:11 127:2
  130:12
**high** 13:4,5 139:20
**higher** 169:10
**hills** 96:9 98:16,20
  99:2 108:9
**hinges** 125:10,12
**history** 7:3 13:15
**hit** 6:23 133:6
  148:18
**hmm** 7:20 132:15
  144:14
**hogan's** 22:3,4
**hold** 8:20
**holder** 125:25
  146:20,21,25
  172:10
**holder's** 148:5,10
  149:24
**holders** 171:5
**holding** 173:8,10
**honestly** 151:18
  167:23
**hoover** 169:2,4
**hopefully** 177:9
**hoping** 171:6
**hostage** 111:24
**hour** 2:8 118:5
**how's** 82:12

**huh** 7:17,21
**hundreds** 117:2,5
  157:6 163:5,5
**hypothetical**
  44:12,25 47:12
  48:17 50:8 56:25
  57:14 58:4 59:7
  72:11 73:22 74:24
  75:12 76:4,25
  77:17 79:11
  141:24 144:6,9
  153:1

**i**

**idaho** 2:7 179:21
  179:24,24 180:2,6
  180:23
**idea** 14:22 41:17
  112:16 116:23
  138:15 158:21
  166:18 175:4
**identification**
  172:12
**identify** 91:7
  92:16 97:1
**identifying** 146:16
  148:21 172:6,13
  172:18
**ij.org** 2:17,18,22
**image** 141:19,20
  142:23
**immediately** 14:3
  31:12 68:21
**important** 8:10
  10:12 172:25
**impossible** 83:17
**improper** 10:25
  144:8 153:3
**inappropriate**
  152:16
**incident** 30:11
  31:15,24 32:2

Exhibit J
747

34:15 53:9,24
54:2 55:15 56:11
56:14 57:4 59:24
60:3,24 61:6
64:16,19 65:11
66:18 70:22 71:2
150:23
**incidental** 34:20
**include** 121:7
146:18 159:18
163:12,20
**included** 98:21
103:1,4 159:9,13
**includes** 163:13
**including** 161:12
**inclusive** 179:9
**incomplete** 44:12
44:24 47:12 48:17
50:8 56:25 57:14
58:4 59:7 72:11
73:21 74:23 75:12
76:4,25 77:13,17
77:21 79:11
141:24 153:1
**incorporate**
160:10
**indictment** 17:7
18:20 89:17
**individual** 93:6
127:4 159:7
167:19 174:25
**individuals** 47:24
80:10 92:13,13
97:5 109:17,25
110:1
**info** 172:7
**informal** 168:11
**information** 11:5
13:8 36:20 38:14
65:10 100:16
121:20 146:14,17

146:24 148:5,10
148:12,21 149:6
150:1 160:7
168:10 169:15
170:12 171:1
172:13
**informed** 100:12
**initial** 17:19 20:7
20:12 38:14
150:10
**initially** 87:2
129:15
**injury** 45:25
**inside** 47:25
104:19 120:13
121:25 122:6
128:4 129:11,21
130:3 134:11,19
139:8,10,12,16
145:20 147:21,22
150:6,13,16
152:14 154:23,24
155:7,22 173:19
**inspect** 125:1
**inspection** 98:15
**inspector** 96:8
155:5
**inspectors** 96:8
98:19
**install** 101:6
**instance** 14:22,25
16:7 22:10 24:7
24:14 26:19 27:9
31:17 45:4 47:1
48:25 51:2 52:8
93:21 101:3
102:17 108:12
148:6 153:10
157:14 166:20
**instances** 34:22
51:12 117:17

120:4 139:4,6
145:16 172:8,17
172:20
**institute** 2:14,19
5:12,19
**instructed** 80:1,2
150:18,19
**instructions** 52:16
101:18,18 105:6
106:18
**intact** 22:9
**intended** 146:22
**interact** 108:2,7
**interest** 5:20
180:17
**interested** 20:8
166:14
**interior** 122:5,6
144:17,22 146:2
147:15 150:6,10
**internal** 163:19
**interrupt** 8:8
**interspersed** 23:9
**introduce** 61:18
**introduced** 61:20
**inventoried** 73:18
74:20 116:25
132:23 138:8,10
138:16,18,19,22
140:7 144:13
154:5
**inventories** 31:14
53:9 56:1 66:21
**inventory** 30:1,9
30:11,13,22 31:11
31:16,18,24 32:2
32:23 33:1,11,17
34:14,19,24 53:7
53:12,17,19,20,23
54:2,6,11 55:15
56:5,10,14,18,23

57:4,9,25 58:5,10
59:1,9,14,24 60:3
60:24 61:4,5,9,13
62:12,17 63:6,16
63:21,25 64:5,12
64:16,19 65:2,10
66:13 67:1,3,7,23
68:2 70:21 71:2,7
71:11,21,23 72:5
72:16,25 74:14,15
75:1,3,9,13,19
76:20 77:5,13
80:4 81:4,5,10,13
81:15 105:7,10
106:14,18 113:7
116:3 117:5,24
118:19 120:13
124:20 135:10
137:15,18,22
138:11,14 141:15
148:16 149:1,10
150:1,24 153:24
154:22,24 155:19
158:3 159:10,12
160:3,7 161:9
162:18
**inventorying**
73:16 74:17,18
75:6 108:18
116:18 117:10,15
117:18 118:8
121:25 127:21,25
128:4 129:11
131:7,16 134:22
139:5,6,24 146:6
150:4 155:8 157:4
161:25 162:10
**investigate** 25:6
26:11 88:19 89:15
**investigating**
25:11 34:9 35:23

86:12 91:5
**investigation** 1:13
3:9 37:17 85:22
86:19 87:4,15
88:24 89:3,5,7,12
91:20,22 96:21
98:5,8,10 103:8
163:14 165:8,11
165:13,16 167:5
170:16
**investigations** 4:9
62:5 98:1 165:23
**investigative** 98:6
162:23 163:1,7,10
163:11,21
**investigator** 96:22
96:22
**investigatory**
18:19
**involved** 17:1 37:9
38:24 39:6 44:8
69:1,9 81:7 87:6
88:23 92:4,13,17
95:4,6,17,25 96:4
96:16 97:2,8,20
104:24 109:2,19
109:24 115:15
117:9 123:18
132:8 135:19
154:21 159:3
161:15 170:21
171:6,22,25
176:21
**involvement** 17:6
18:18 86:14,18
89:20
**involving** 165:13
**issue** 98:2 139:18
142:14
**issued** 89:25

**item** 59:14 78:24
81:18 84:19 85:2
132:1 143:14
**items** 30:21 48:2
57:5,18,22 71:3,5
71:12 72:6,14,18
72:22 73:17,24,25
74:1,1,3,19 75:4,6
76:22 77:4,7,22
79:5 80:8 82:25
83:19 84:10,12
104:16,25 113:2
115:24 117:8
118:4,25 122:15
126:8 127:16
133:17 142:8
151:7,9 152:10
172:15

**j**
**j** 169:4
**jeni** 1:5
**jennifer** 1:4
**jesse** 176:20
**jewelry** 75:23
**jgay** 2:18
**job** 13:12 16:22
35:7,15 39:17
122:9 176:3
**johnson** 1:12 2:20
15:17,22 18:3
**join** 87:14
**joined** 19:2
**joseph** 1:5 2:15
**judge** 9:17 37:21
80:4
**jumping** 34:12
**justice** 2:14,19
5:12,19
**justification** 63:18
**justify** 137:11

**justin** 1:18 2:1,4
4:3 5:3,16 12:21
12:22 179:5,19
181:5 182:2,24
183:2,4,12

**k**
**k** 133:3,6 134:2
136:13 159:7
**kate** 92:25 174:22
174:23
**keep** 29:8 30:25
59:2,3 82:13
148:15
**keeping** 81:17
136:23
**keeps** 84:12
**kept** 162:20
163:18 164:16
167:7,9
**key** 126:10 172:10
172:14,24,24
173:3,21,21
**keys** 173:8
**kick** 164:14
**kicked** 110:7
**kill** 153:17
**kim** 90:1
**kind** 13:20 20:12
23:9 27:13 30:7
40:6 86:7 88:1
97:15 110:25
126:22 139:18
146:14 150:23,24
151:18 157:1
164:14
**kindly** 7:12
**kinds** 27:18 32:17
93:18
**knew** 173:20
**know** 6:1,8 8:4,12
9:20 10:1,3 11:8

11:13 12:12,20
15:13 24:18 29:13
29:21 30:23 32:24
36:16 37:5,8 39:3
39:5,8,10 40:23,24
41:22 42:9,12
43:5 52:14 55:7
59:2 60:18,20
61:2,8,11,16,22
64:24 65:8,12
75:2,13 77:1 78:1
79:21 81:19 82:13
86:10,11 90:17,25
91:18 92:1,11
93:2 94:22 95:11
95:22 96:3,10
98:2,23 100:23
103:18 108:16
111:24,25 112:24
114:8,13,22
117:16 118:16
120:14 121:5,12
121:13,23 122:9
122:17,25 123:2,9
124:18 125:21,23
127:4 128:11
130:2,4,14 132:16
133:6 138:7
139:11,24 140:2
141:9,17 142:23
144:24 145:16
149:25 150:25
151:1,14 152:5,10
153:3 154:8,10,13
154:15,16,17,19
154:20 156:7
158:21 159:3
160:12 162:4
163:4 164:12,15
164:17 165:3,4,22
165:25 166:1,15

166:20,25 168:14
168:16 170:2,7,8
170:15,20,23
171:3,5,11,18
175:5,23 176:10
176:23 179:10
**knowing** 83:7
**knowledge** 35:21
36:20 38:21 69:8
74:25 88:23 90:5
90:8 91:7 97:14
97:16 100:9
107:11,23 113:11
114:16 120:19
126:9,17 127:18
140:9 155:16
176:4,9
**knows** 146:9
**koons** 1:11
**kristi** 1:11 15:17
**krysti** 175:7,8,19

**l**

**l** 1:9
**la** 29:18 164:23
176:8,25 177:2,4
**laborious** 158:6
**lack** 38:1 128:2
161:4
**lacks** 17:8 24:3
31:20 33:5 38:3
39:25 43:12 44:11
44:23 46:20 49:8
50:7 56:8,24
57:13 58:5 62:18
63:7 64:8 66:5
67:10 69:5 70:23
72:1,9 73:19
74:21 75:11 76:3
76:24 77:17 79:10
84:7 97:22 117:25
118:10 126:15

**laid** 152:10
**language** 49:20
50:5,11 51:3,9,14
51:20 52:10
**large** 92:10 98:1
154:6
**largely** 12:9
**larger** 139:15
**laundering** 86:11
91:4,9,23
**law** 5:20 24:25
25:1,6,10 26:10
27:8,16 29:11
107:20 109:22,23
113:16,21 133:4
134:1,7 140:14
**lawnmower** 127:2
**lawyer** 10:8,11
**lead** 96:21,22
**leader** 93:24
**learn** 25:9
**leave** 69:12 126:13
175:18 177:21
**leaving** 69:18
175:9
**led** 18:19
**left** 18:9 74:12
175:12,16,19,19
**legal** 2:5 20:16,22
22:15 23:1,13,16
23:19 24:2,6,22,24
25:4,21 26:4,16,16
26:23 29:1,2,10,13
29:20 31:21 32:1
32:8 50:17 54:22
56:7 57:13 58:6
59:8 62:19 63:9
63:18 65:4,8,18,25
67:23 72:1,11
73:20 74:22 75:11
76:4 77:19 78:20

79:12 84:7 121:7
121:9,12,14
140:20,23 141:5
141:23 152:21
168:22,23 181:23
**legality** 24:13
**lessons** 30:7
**letter** 150:13,13,14
151:17 152:3,17
152:19 153:5,11
153:14,19
**letters** 152:6
**level** 16:8
**levels** 14:20 121:6
**license** 146:19
172:12
**lifted** 128:2 129:19
129:25 130:18
**limits** 52:16
**line** 11:14 182:4,7
182:10,13,16,19
**list** 34:4 71:5,10
72:6,16 77:6
81:15 92:15
141:15,16 160:24
**listed** 79:9 80:9
103:9,12 104:25
110:12 113:2
115:25 159:6
**listing** 31:7 160:1
**lists** 71:8 77:21
**little** 21:22 24:23
26:9 46:5 49:16
53:4,5 59:21
77:25 85:17 118:8
119:1,22 128:24
129:4,21 133:8
168:4 171:2
**live** 6:4
**lived** 118:13

**lives** 158:14
**local** 111:21
133:25 134:7
158:12 164:22
**locally** 158:18
**location** 86:8
90:17 112:2,3,11
**lock** 173:4
**logistics** 51:23
**long** 14:9 19:10
76:19 94:21,22,22
105:22,25 115:3
117:4,21,24
**longer** 106:5,8
**longest** 115:20
116:17 118:18
**look** 50:5,10 58:12
58:15,17,18 62:7
63:11 75:15 125:4
129:1 130:20,21
130:22 135:14
160:21 161:16
163:25
**looked** 51:2,8
86:10 130:23
160:15 172:5
**looking** 42:20
86:12 104:25
106:21 124:24
150:11 163:4
164:19
**loop** 56:16
**los** 3:5 19:22
154:16
**loss** 59:3 71:23
72:8 73:3,8 77:14
84:5 144:4
**lost** 31:3 57:10
**lot** 14:18 20:18
29:20 40:25 48:1
71:8 101:24

[lot - month]                                                                    Page 17

110:21,21,22
112:13 118:17
133:1,16,19,21
144:6 155:18
157:11 158:12,22
171:19
**lunch**  80:25 99:4
**lynne**  16:1,7,11
39:5 68:7 86:3
89:8,9 91:18
92:21 94:8 96:20
100:9,11 103:10
105:16 121:1,13
139:15 155:17
170:24,25
**lynne's**  16:5

**m**

**m**  4:2
**macdonald**  88:14
88:16,18,23 89:2
89:10 92:25
**madison**  88:14,15
88:16 92:24
**magistrate**  89:25
**main**  84:3
**majority**  51:11
113:12 140:3,5
**maker**  90:7
**making**  8:22 25:19
26:7 29:21 36:15
134:18 170:18
**management**  13:8
121:3,5,6
**manifest**  153:6
**manuals**  27:19
32:19,20,21
**mar**  1:6
**march**  6:19 17:18
18:14 68:12 69:3
86:15 87:23 88:1
88:9 89:4,18

90:10,23,25 94:12
110:8,15,19
113:10 115:1,1
120:23,23 173:15
**mark**  92:22
154:12
**marked**  61:19
**married**  174:24
**matched**  172:13
**materials**  11:20,24
22:19,21,24 27:10
27:13 32:14,17
60:13 64:25
**matter**  2:10 12:11
17:3,17 18:12,15
86:1 88:8 96:23
**matters**  87:18
**matthew**  15:16,21
**maxwell**  3:3
**maxwell.coll**  3:7
**mcampbell5**  3:12
**mean**  10:2,21
16:21 19:11 20:16
22:14,21 24:25
26:12 28:14,23
36:17 37:15 39:8
46:23 48:1 57:21
62:21 66:19 69:14
77:2,23 79:4
81:23 82:9,16,22
83:16,25 86:2
87:13 89:1 90:6,7
90:12,13 91:10
92:6,20 93:15
97:24 101:21
104:19 105:9
106:7,20 109:5,20
109:21 110:10
113:1,12 117:2,11
120:25 121:4,16
122:21,25 125:5

125:20,24 129:7
130:17 134:17
139:14,15 143:3
144:17,23 145:5,5
145:7 152:8 153:2
153:4 154:22
156:3 157:21
161:10,18 163:6
163:17,19 164:15
165:3,10,12
166:23 167:8
168:2 171:13
**means**  121:18
135:5
**meant**  48:22 71:22
173:10
**medication**  10:14
**meet**  49:11 50:2
**meeting**  47:6,14
48:10 68:14,16
69:16 70:1,10
98:24 99:5,7
101:5 102:1,19
**meetings**  46:18
65:22 68:10,15
99:19,25 100:13
**meghan**  3:10
**member**  125:24
**members**  93:11
101:13 103:12
121:2
**memorandum**
48:13
**mention**  23:16
31:5
**mentioned**  21:20
23:1,5 24:22
72:13 86:4 98:14
98:15 99:5 175:10
**mentioning**  94:7

**merely**  107:12
**metal**  116:16
119:18 125:7,7
**metallurgist**  156:6
**methods**  102:21
**michael**  1:5
**middle**  10:9 11:14
128:19,21
**mind**  11:10 12:24
30:10 137:4
**mine**  104:15
138:23
**minority**  43:1
**minute**  52:20
62:25 162:13
**minutes**  118:3,5,9
118:14,21
**miscellaneous**
78:13 141:17
142:21 143:7
151:20,23 153:15
156:5,19
**mischaracterizes**
35:9 46:2 54:12
54:21
**misplaced**  31:4
57:10
**misplacing**  57:22
**missing**  174:2,15
**misspeak**  99:8
**misspoke**  16:14
**misstate**  59:23
**moment**  9:2 18:5
166:8
**monetary**  75:22
**money**  75:23
86:11 91:4,8,23
137:2 158:17
**month**  17:15
90:23

**months** 19:12 169:19
**moon** 15:16
**morelos** 171:20
**morning** 68:24 69:3,18 99:14 102:2,10 110:9 111:6,9
**motion** 6:2 47:11
**mouth** 91:21
**move** 47:2 150:9 153:15 157:5 158:3,13 168:4
**moved** 113:3
**moves** 124:9,11 167:5
**multiple** 46:6 68:15 75:3,8 128:19 155:7 157:7
**murder** 153:17
**murray** 176:20

**n**

**n** 4:1,2,2 5:1
**n.w.** 3:10
**name** 5:14,16 12:22 14:7 15:9 93:9,10 103:7 146:18 149:25 154:17 163:12 171:11 172:22 175:11 176:23
**named** 14:17 179:7 180:8,13
**names** 27:22 88:15 92:18 95:8 154:20
**narrative** 37:12
**national** 165:14,20
**natural** 7:15
**nature** 128:13

**necessarily** 72:3 84:16 100:3 153:4 155:20
**necessary** 183:6
**need** 20:5 24:18 25:25 71:23 73:11 112:21 130:12 140:25 142:6,19 177:18
**needed** 164:2 173:20
**neighbor** 127:1
**nest** 119:11,13,25 120:7,8,11 121:24 122:1,14,18,23 123:22,23 124:1,8 124:12,17 125:3 125:17 145:20 173:4
**nests** 116:16 119:10,10 122:21 123:5 128:2,18,20 129:16,19,25 130:3,21 173:13 173:22
**never** 153:23,23
**new** 15:12,13 19:18 24:12,13 175:10
**newer** 86:5 171:18
**nice** 151:18
**nine** 70:4
**noah** 176:13
**nod** 7:17 162:2
**noise** 8:22
**nomenclature** 53:22
**nonprofit** 5:20
**normal** 8:9 158:15
**normally** 7:25

**north** 2:16 3:4
**notary** 2:6 179:24 180:6,22 183:13 183:19
**note** 6:15 86:8 135:24 158:2 160:13,16 172:7 181:10
**noted** 112:12 183:7
**notes** 148:20 149:4 160:4 161:7
**notice** 169:20
**notices** 169:20
**notification** 111:17
**noting** 84:1 160:14
**number** 36:11,12 37:6 41:4,21,23 78:14 109:1,15 110:2 118:3 119:11 132:1 135:8 143:20 146:18,19 160:24 164:18 171:14
**numbered** 179:9
**numbers** 71:15,19

**o**

**o** 4:2 5:1 93:9,10
**oath** 9:5,15,16 179:6
**objection** 10:22 17:8 24:3 31:20 33:4 35:8 37:11 38:3,7,18 39:25 40:8,14,20 43:12 44:11,23 45:7 46:20 47:11,19 48:16 49:7 50:7 51:4 54:12,21 56:6,24 57:12

58:3 61:14 62:18 63:7 64:7 66:4 67:9 69:5 70:23 71:25 72:9 73:19 74:21 76:23 77:16 78:8 79:10 84:6 86:20 88:20 90:3 96:18 115:5,10 123:12 126:14 140:20 141:13,22 147:8 152:20,25 153:12
**objections** 10:20 43:21 45:9,15 46:1 50:16 51:6 51:16 58:14,20 59:6,16 60:10 74:4 77:8 78:9,15 78:19 79:20 84:15 141:3 142:10 143:2 144:8
**obligations** 28:8
**observe** 117:17
**observed** 134:13
**obtain** 48:9 177:20
**obtained** 39:17 46:9
**obviously** 7:8 18:23 84:12 96:13 121:20 135:7 167:2 170:15 173:9
**occasions** 43:19
**occur** 68:21,21
**occurred** 69:17 100:2,4,8
**occurs** 102:2
**offenses** 25:1,2 91:23
**office** 3:2,9 14:22 14:23 15:18 16:4

16:9 19:21 40:7
69:12 86:13 88:8
88:11 90:2 92:3
93:16 104:16,18
104:21 105:1,8
112:18,23 113:2,6
113:13,23 115:25
119:14 122:2
123:25 124:12
127:20 130:22
155:5 164:23
169:10 170:10
176:25 177:4
**officer** 59:15
**officers** 75:20
109:22 113:16
133:4 140:14
**offices** 154:19
**official** 1:10,12
14:6
**officially** 20:3
**officials** 85:8
88:10 99:17 109:2
109:23 110:14,18
154:25
**oftentimes** 119:19
**oh** 7:3 13:11 21:20
23:12 30:12 76:12
87:13 93:1,7,8
110:6 111:10
129:6,18 130:8
135:4 137:5
149:16 159:20
166:13 174:6
**ohio** 2:21
**okay** 5:18 6:22 7:3
7:7,25 10:1,18
11:10,19 12:3,6,24
13:2,11 14:6,16
15:5,13,17,21,24
16:11,17 17:1

18:18,22 19:7
20:7,20 21:6,15,20
22:4,8,14,23 23:5
23:16 24:16,22
25:8,14,17,24
26:15,22 27:1,12
27:21 28:1,7,11
29:5,16 31:2 32:5
32:17,21,25 33:8
33:23 34:12,22
35:2 36:11,22
37:8,24 38:23
39:11,20 40:12,23
42:23 44:5 45:2
45:21 46:9 48:7
48:22,25 49:23
52:3,22 53:21
55:14,19,24 56:3
57:23 59:20 60:6
60:16 61:2,17
62:11 63:3,5,20
64:11,24 65:8,13
66:11,20,24 67:16
68:9 69:16 70:7
72:24 75:15 76:15
77:4 80:11 82:11
83:4,18 84:3,11
85:5,16 86:22
87:17,21 88:7,18
89:2,10,12,20,24
90:19 91:1 93:9
93:11 94:6,15,24
95:2,8,14,17 96:13
97:5,12 98:13
99:4,10,12 100:11
100:16,20 101:3
102:8,17,21
103:23 104:5,18
104:24 105:4,17
105:21 106:17,21
106:25 108:5,21

110:6,17 111:23
112:1,9 113:17
114:1,23 115:14
115:18,23 116:6
117:4 118:6,23
119:22 120:10
121:9,17,20,23,24
122:16 124:6,18
125:22 126:10
127:19,24 128:7
129:24 130:14,17
130:24 131:2,11
131:14 132:10
133:13 134:3,11
134:14,21 135:4
135:21 136:15
137:2,14 138:1,7
139:4,21 140:10
140:16 145:23
146:5,23 147:13
147:22 148:8
149:5,13,16,23
150:21 151:5,10
153:9,22 154:8
155:6,13,18 158:5
158:17 159:2,9,20
160:16 161:3,20
162:12,25 164:3
164:25 165:18
166:8,13 167:23
168:16,23 169:1,8
169:18 170:8,12
170:15,23 171:2,9
171:16 173:22,25
174:19 175:12,23
176:1,7,10,13,18
176:25 177:6,10
177:11
**old** 12:25
**olympic** 107:2
108:24,24

**once** 6:23 19:23
74:12 81:10,13
82:11 89:24
111:16 112:10
124:1 129:25
132:1,23 136:24
167:5
**ones** 20:24 28:25
108:8 124:11
130:7,22 138:19
139:9,21,22
149:17
**ooig** 155:3,4
**open** 83:6,19
85:12 122:6,10
123:19 124:2,3,5
124:19,21 125:13
130:2 146:6
150:15 151:13
155:22 173:21
**opened** 74:8,8,10
81:21 130:9,15
150:10 152:13
153:16 156:22
**opening** 116:18
120:4 123:16,18
124:5 151:5
**operating** 113:19
**operation** 99:11
102:16 107:9
**operational** 48:19
48:21 49:2,5,12,16
49:18 50:3 51:1
51:12,15,21,22
52:6 99:6,21
101:21,24 102:3,4
102:6,12,22 103:2
103:4,13,18 104:8
105:4,19,21,22,25
106:6,17,22 107:1
107:12,14

operations  4:9
  62:5 101:24
  120:22
opinion  116:10
  152:23 153:3
opportunity  108:2
  108:6
opposed  6:10
  139:12 151:20
ops  50:10 51:8
  104:12 106:9
  107:17,18
option  101:9
orange  154:18
order  6:7 67:2
  71:24 73:3 116:22
  121:7 123:8
  132:24 141:8
  142:8 168:25
  173:9
orders  6:5
ordinary  126:2
organizational
  14:24
organizations
  109:25 110:18
organized  93:13
origins  91:1
outside  26:17
  34:24 64:1,19
  65:2,10 66:22
  83:1 129:24 130:1
  133:1,19 136:11
  137:7 139:13,22
overall  15:18
  19:10 43:1 161:14
  161:21 163:2,3
overarching
  161:15
overbroad  38:18
  40:1 43:13 46:21

48:17 50:7 57:15
  61:15 76:23
oversees  94:2
overview  16:18
  152:11

p

p  5:1
p.m.  80:25 162:14
  162:14 177:12,12
  178:1
pacific  2:9
packet  159:11
page  4:3,8 62:4
  63:12,13 75:16
  168:6 182:4,7,10
  182:13,16,19
pages  4:9 76:18
  179:9
palmerton  1:18
  2:1,4 4:3 5:3,10
  5:16 6:25 9:2,15
  12:9,21,22 17:11
  50:19 61:21 62:3
  75:16 81:2 84:24
  162:16 177:14
  179:5,19 181:5
  182:2,24 183:2,4
  183:12
paper  39:24 40:4
  82:17 102:11
  145:9,12 147:12
  147:15 151:20
papers  151:14,15
  152:14
paperwork  112:21
  116:19,22 132:24
  133:9 151:22,24
  153:15 159:12
paragraph  75:17
parameters  50:13
  52:13 112:23

parked  112:15
parking  110:21
  112:13,13 133:1
  133:19,21 158:11
  158:22
part  8:8 25:9,14
  30:8 33:2 35:15
  40:5 49:6 55:20
  56:18,23 58:7,10
  60:13 70:21 81:8
  82:5 103:18
  104:10 107:8
  108:23 113:13
  128:1,23 135:10
  137:15 146:5
  158:5 159:9,22
  171:3 172:25
  177:3
partially  78:21
participate  100:3
participated  36:6
  93:2 97:17 174:23
particular  76:1,16
  133:15 173:4
particularly  8:2
  36:3,13 64:9
  75:21
parts  23:21
party  34:9
pass  37:25
paths  60:20
pathway  128:16
  128:22
pathways  129:4
paul  1:4 181:4
  182:1 183:1
pause  8:25
pd  98:16,20 99:2
  108:9
pearsons  1:5

pending  10:9
pennsylvania  3:10
people  7:16 8:1
  14:18 41:9 69:25
  70:17 92:14 93:2
  98:9 110:5,21,22
  113:14 122:9
  123:18 126:1,7
  128:25 129:4
  146:9 147:6
  154:22 165:6,6,16
  174:1
people's  25:12
percent  146:9
percentage  42:7
  138:13,20,21
  144:19 145:24
perform  62:17
performed  34:6
period  167:12
periodically  10:18
person  15:9,10,14
  30:20,23 31:6,8,12
  82:1 92:8 105:14
  114:11,15 120:16
  120:24 127:12
  148:21
person's  26:6
  56:12 59:2
personal  30:13,19
  63:16,22 152:23
  153:2
personally  110:23
  116:24 117:17
  119:24 135:9
  137:19 156:3
  176:23
perspective  96:14
  96:15
phone  146:18

**photograph**
  141:19 152:6,17
  152:18 155:24,25
  156:14 157:12,15
  157:17,19,23
  160:11
**photographed**
  139:7,23 140:6,8
  154:5 156:16
  160:14,25
**photographing**
  140:11 155:20
**photographs**
  71:10 73:6 81:6
  137:16 139:1,2
  140:1,13,15
  141:10 142:4,6
  143:4 145:2,5,6
  155:19 159:19
  160:17,19 161:8
  162:19 163:22
  164:9,11 166:15
**photos** 72:14
  78:25 140:16
**phrase** 121:5
**physical** 20:18
  21:4 22:12,25
  25:18,25 128:12
**pick** 172:22
**picture** 143:22
  145:11 152:2,10
  153:7 157:24
  161:21
**pictures** 166:21
**piece** 39:24 40:3
  73:2,5 82:21
  84:19 102:11,11
  125:7 128:21
  145:9,12 161:21
**pieces** 78:22 84:10

**piles** 160:20
**pin** 109:15
**place** 39:20 48:19
  48:20 74:16 78:23
  132:6,17 142:1
  143:13 158:20
  180:13
**plaintiffs** 1:7 2:5
  2:14 5:21
**plan** 46:13 48:14
  48:15,19,20,21,22
  49:2,5,12,16,18
  50:3,10 51:1,8,13
  51:15,21,22 52:6
  53:1,2 87:3
  101:22 102:4,6,12
  102:22 103:2,4,19
  104:8,12 105:4,19
  105:22,22 106:1,6
  106:9,18,22
  107:14,18,18
**planned** 90:10
**planning** 47:4
**plans** 107:12
**plantz** 171:20
**plastic** 74:7
  119:19 136:9,11
**plate** 87:19
**platforms** 116:16
**play** 132:18
**please** 5:14,14
  7:14 9:20 11:7,13
  18:8 21:3 37:14
  38:8 40:2 54:24
  55:4,6,6 56:9
  57:16 61:22 62:2
  62:23,24 75:18
  92:18 111:3,3
  140:4
**plus** 94:23 151:1,2
  160:4

**point** 12:7 19:17
  24:5 26:4 36:11
  53:21 137:4
  142:20 151:16
**police** 96:9
**policies** 166:10
  167:1
**policy** 23:24 24:8
  24:10,11 31:6
  103:15 166:19
**poor** 173:22
**pop** 124:3,19,25
  130:1 131:3
**popped** 125:3
**popping** 124:24
  125:9 130:19
**pops** 124:13
**portion** 23:20
  37:17 104:12
**pose** 45:24 58:1
**poses** 44:12 47:11
  48:16 50:8 56:25
  57:13 58:3 59:6
  72:10 73:21 74:23
  76:3,24 77:16
  79:11 152:25
**position** 14:7,10
  97:1 166:6
**possibility** 177:22
**possible** 11:23
  18:3 51:7,17 59:3
  83:6 100:24 101:9
  130:24 145:13
  155:6
**possibly** 65:6 69:7
  96:11 155:3,12
  168:21,21
**post** 130:21
**postal** 96:7,8
  98:15,19 108:9,20
  155:1

**posted** 136:22
**potential** 6:4
  12:15 86:11
**potentially** 33:2
  34:13 48:4 87:13
  87:25 90:16
  155:10 163:17
  167:21,22 169:1
**power** 122:17,22
  122:23 124:7,7
**practicable** 75:19
**practice** 22:6
**pre** 99:11,21
**precise** 71:18
  135:8
**precisely** 130:14
**precision** 138:21
**premises** 111:16
  111:17 112:16
  119:15
**premium** 112:14
  157:9
**preoperational**
  68:18,20 70:10
  99:16 100:21
  101:12 102:1,5,24
  104:5,7 105:5,18
  106:13 108:22
**preparation** 50:9
  66:24
**prepare** 88:1 90:2
  160:6
**prepared** 81:14,16
**preparing** 51:8
  67:20
**presence** 75:4
  111:11 114:1
  147:24
**present** 85:12
  107:21 132:5

**presented** 82:23
**preserve** 78:23
**presumably** 44:17
  128:25
**pretty** 14:12 21:6
  104:15 106:8
  134:22 143:24
  159:14 161:1
  167:1,4
**preventing** 144:4
**previous** 40:10,17
**previously** 23:1
  71:14 76:9,17
  115:15 175:14
**primarily** 16:23
  22:2 31:3 48:2
  57:21 98:1 131:8
  139:9 162:22
  163:20 167:3
**primary** 30:10
  35:20 38:11 59:18
  89:6 90:6
**printed** 102:15
**prior** 13:17 17:6
  46:17 49:12 52:1
  63:2 65:14,18
  67:25 68:11 69:18
  89:3,17 102:23
  103:16,24 104:3
  111:7 136:1
  147:11 180:8
**private** 5:23 17:2
  17:12,17 18:12,20
  39:1 41:13 53:18
  54:5,15 55:12,16
  55:21 61:4 65:15
  65:19,24 66:25
  67:8,21 85:22
  86:1 87:22 88:19
  88:24 89:3,15,22
  91:23 92:4 96:20

96:23 99:15 100:1
  101:19 104:9
  105:7 106:1 110:8
  111:12 113:20
  114:2,25 116:8
  155:7
**probably** 37:6
  100:17 109:21
  118:20 129:8
  153:15,18 155:17
  168:24 169:9,16
**procedural** 25:6
  25:10 26:10,16
  27:7
**procedure** 83:12
  126:22 131:18
**procedures** 63:15
  150:24
**proceed** 84:21
  119:15
**proceedings** 8:25
  169:25 170:19
**proceeds** 45:17
**process** 49:6,25
  70:20,25 73:16
  74:14,17,18 75:1,9
  104:11 113:7
  116:6 118:22,24
  122:20 123:16
  129:14 131:16
  133:5 137:15,18
  137:22 138:14
  139:5,6 146:6
  150:5 153:25
  154:22 155:8
  158:6,9 161:25
  162:10 168:12
**processes** 98:9
**processing** 157:8
**produce** 71:6

**produced** 12:10
  12:13
**profession** 71:18
**proficient** 21:11
**project** 38:22
**properly** 30:8
  132:4
**property** 30:13,19
  31:3,7 56:12
  57:11,25 59:2,4
  63:17,22 72:16
  75:21 80:7 82:11
  82:13 111:18
  115:13 126:1
  160:2 171:7
  172:22,25 174:2
**propounded**
  179:12
**protect** 57:9,18
  71:4,22 73:3,7
  77:14
**protecting** 72:7
**provide** 7:22 10:4
  11:6,22 29:7,12
  30:8 32:13,14
  42:1 50:13 62:16
  67:17 72:5 78:14
  79:16,17 80:7
  92:18 97:7 98:10
  111:3
**provided** 22:22,24
  60:13 67:22
**provides** 64:25
  65:1
**providing** 34:23
**public** 2:6 5:20
  13:18 125:24
  179:24 180:6,23
  183:19
**pull** 119:17 124:19
  124:20 127:7

145:17 165:2
**pulled** 152:13
**purely** 51:22
**purport** 62:3
**purpose** 10:22
  22:11 24:17 27:2
  56:10 57:9,24
  59:1 71:24 72:7
  73:11 138:2 142:9
**purposes** 31:2,14
  31:17 56:4,22
  58:10 59:14
  140:24 167:3
**pursuant** 66:12
  104:17 112:23
**put** 38:13,16,24
  48:14,19 67:3
  72:16 74:13 76:20
  83:20 89:21 91:21
  123:6 131:22
  137:2 140:24
  146:9 156:11
  169:8,21 173:18
**puts** 38:20
**putting** 37:18
  71:21 112:20

**q**

**quantico** 19:6,20
  20:11,15 24:2,7
  28:2 29:6,19,25
  32:9,13 34:13,18
  36:24 39:13 79:24
  79:25 80:13,17
**quarterly** 29:3
**quarters** 116:13
**question** 6:1 7:14
  8:11,16 9:19,22,24
  10:2,4,6,8,20,22
  10:25 11:6 30:6
  38:24 43:16 44:3
  147:9 150:21

Exhibit J
756

158:24 163:8
**questions**  7:8,10
    9:5 11:14 12:4
    63:1 85:19 162:16
    179:11,12
**quibble**  12:12
**quick**  38:23 49:22
    117:23 118:2
    158:14
**quickly**  157:8
**quite**  43:17

**r**

**r**  2:15 5:1 182:3,3
**raid**  102:2
**range**  29:6
**rank**  94:1
**reach**  6:2
**read**  9:21 63:13
    75:17 132:11
    153:11,14,18
    179:10 181:9
    183:5
**real**  8:4,5 161:14
**realize**  6:20 93:12
    111:23
**realized**  173:7
**really**  36:13 37:8
    43:5 49:21 51:24
    55:8 59:18 60:19
    68:16 93:4 95:21
    111:1 122:24
    149:16 154:12,13
    160:24 170:23
    174:11 175:21
    176:23
**reason**  10:15 25:8
    25:9 86:24 120:10
    134:8 158:5
    181:11 182:6,9,12
    182:15,18,21

**reattach**  125:15
    125:16
**recall**  15:11 27:21
    32:4,5 33:8,14,18
    34:21,22 35:1
    41:1,3 42:12 54:4
    54:17,25 55:9,10
    55:18,19,22 56:20
    60:5,7,7,8,12 64:2
    64:12,16,22 66:1,8
    66:23,24 67:4,5,14
    67:19,21 68:6,8,14
    68:16,23 69:21,23
    70:2,8,12 76:16
    79:22 80:15,19
    85:25 88:4,7
    90:19,22 91:12,16
    92:12,12 93:5
    95:8,10 96:6,7,10
    96:12 98:17 99:4
    100:22 101:17,22
    102:17,20 103:7
    104:2,14 105:11
    105:25 106:4,7,17
    107:19 108:11
    110:23 111:1,15
    111:22 118:18
    119:16 125:6,11
    126:5 138:23
    139:14 146:19
    148:7,8 150:19
    168:5 171:16
    172:23 174:17
    175:21
**recalled**  108:9
**recap**  58:23
**receipt**  31:6,10,12
    80:6,9 181:18
**receive**  12:15
    79:15

**received**  12:14
    33:15 36:24,25
    39:13 60:8,9 62:6
    80:11,20
**receiver**  101:7
**receiving**  33:8
    79:23 80:15
**recollection**  67:25
    91:17 101:15
    134:7
**record**  5:15 6:12
    9:11,13 10:23
    12:7 18:4,6,8
    52:24 61:24 80:24
    109:21 120:16
    138:4 139:17
    141:8,21 142:25
    143:10 148:11,20
    152:17 155:14
    180:16
**recording**  7:9
    139:20
**records**  143:5
**reduced**  180:14
**refer**  52:6
**reference**  161:8
    163:24
**referenced**  51:13
    181:6
**referred**  51:13
**referring**  51:24
    166:20
**reflect**  151:3
**reflected**  105:18
    159:16
**reflective**  149:5
**regard**  29:21
    107:13
**regarding**  26:5
    27:8 32:1 48:2
    86:5 91:23 99:19

**regards**  17:12
    53:18 80:3 119:3
**regular**  141:10
**regularly**  49:11
    50:4
**related**  16:24
    105:6 163:13
    165:14
**relatively**  15:12,13
    45:21 110:2
    157:17 158:9
**relief**  6:3
**relies**  39:16
**rely**  39:12
**relying**  36:23
    78:22 141:25
    144:2
**remain**  26:2
**remained**  139:10
**remember**  11:4
    16:16 64:3 66:2
    94:6 128:14
    132:22 135:11
    137:14 147:11
    167:8
**remembered**  2:3
    175:11
**remote**  1:18 2:1,3
    178:1 179:8
**remotely**  2:13 5:4
    179:6 180:9
**removal**  130:22
**remove**  120:1
    122:1
**removed**  120:11
    122:18 129:16
**removing**  145:13
**reopen**  12:16
**repeat**  49:21
**repetitive**  135:12

**rephrase** 9:21
35:13 40:15 42:2
61:9 75:5 128:3
**report** 14:25 15:1
15:5,14,21 16:1,6
16:12
**reported** 1:25
**reporter** 2:6 7:9
7:11,18 8:5 9:3,21
180:5
**reporter's** 180:1
**reporting** 150:1
**reports** 15:6
**represent** 145:6
**representatives**
99:1
**representing** 5:21
172:9
**reputation** 176:24
**requested** 178:3
**required** 75:14
116:9 167:13
183:13
**requirement** 75:3
76:1
**requires** 9:5
**rescue** 111:24
**residence** 47:4,24
127:1
**residential** 47:23
**residents** 80:10
**residing** 179:24
**resisting** 21:25
**resource** 98:2
139:18
**respect** 51:5 58:5
59:9 150:5
**response** 126:12
**responses** 7:23
**responsibilities**
16:19 107:8

108:14
**responsibility**
30:20 37:25 38:11
38:13
**responsible**
117:15 137:22
140:11
**rest** 150:5
**restrict** 165:5
**restricted** 165:14
165:24
**restrictions**
164:25 165:4
166:2 168:2
**result** 166:16
174:2
**retained** 163:23
**retention** 28:15,25
166:9,19 167:1
**retire** 94:19 176:1
**retired** 94:18,19
**retiring** 94:24
**return** 80:5 171:8
171:12 181:13,17
**returned** 85:4
171:5,9,14,15
172:9,15 173:20
**returning** 85:13
171:7
**returns** 171:19,22
171:25
**reuse** 123:5
**reveal** 172:21
**revealed** 160:11
160:12
**review** 32:15
38:21 52:1 62:21
62:25 65:14 75:8
84:25 103:24
106:21 164:2
181:7

**reviewed** 52:10
102:6 103:14
104:2 166:9
**reviewing** 55:10
55:19 76:16
**rfrommer** 2:17
**rgk** 1:6
**rhyme** 120:10
**rich** 97:11
**richard** 94:14
175:15,20
**rid** 167:2
**rifle** 21:18
**right** 11:12 12:4
13:7 14:9 18:22
22:5 33:19,21
35:4 36:1 69:10
71:15 80:24 85:16
85:23 87:12 92:1
93:5,22 96:1
101:11,17 106:10
114:11 120:16
132:14 133:1,19
134:15,25 135:15
136:21 140:19
143:9 144:13
146:3 148:23
150:9 156:13,14
157:9 169:3
171:25 173:1
174:16,24 175:12
176:16
**rights** 25:12 26:7
**ripped** 173:14
**ripping** 122:22
**risk** 41:16 45:24
127:13 135:12
**rjohnson** 2:22
**road** 2:16
**robert** 2:15,20
5:11,18

**rodgers** 3:3 6:11
6:19 8:20 17:8
24:3 31:20 33:4
35:8 37:11 38:3,7
38:18 39:25 40:8
40:14,20 43:12,21
44:11,23 45:7,9,15
46:1,20 47:10,19
48:16 49:7 50:7
50:16 51:4,16
52:22 54:12,21
55:5 56:6,24
57:12 58:3,14,20
59:6,16 60:4,10
61:14,23 62:18
63:7 64:7,13,21
66:4 67:9 69:5
70:23 71:25 72:9
73:19 74:4,21
75:10 76:3,23
77:8,16 78:8,15,19
79:10,20 84:6,15
86:20 88:20 90:3
96:18 97:22
107:10 111:2
115:5,10 117:25
118:10 123:12
125:19 126:14
140:20 141:2,13
141:22 142:10
143:2 144:8,11
147:8 152:20,25
153:12 181:1
**role** 87:7 168:11
169:23
**roles** 23:22 34:6
**room** 3:10 22:20
120:6 122:3
128:25 136:21,24
137:3,8

**rooms** 21:25
128:23 129:5
136:20
**rotate** 134:9
**rough** 109:4
116:23
**roughly** 110:9
**routine** 49:6
**rpr** 1:25 180:22
**rub** 136:11
**rubbed** 137:6
**ruiz** 1:5
**rules** 7:5 10:25
**run** 134:18 136:7
137:1,12 148:8
157:14
**running** 120:22
127:13
**runs** 132:9,10
134:23 135:1
**ryan** 15:4,5 16:12
16:13,15 92:23
94:5,6,10 176:15

**s**

**s** 4:7 5:1 182:3
**sa** 84:24
**safe** 26:2 59:2,4
82:14 106:15
111:18 116:3,24
127:21,25 156:11
167:9
**safekeeping** 31:1,2
56:11 57:5,18
59:15 71:3 74:13
**safety** 48:2 59:15
126:24 150:25
**sample** 67:1
**sarah** 171:20
**saw** 67:15 123:5
123:11 125:2
130:17 134:20

144:25 147:14
153:14,16,16
168:6
**saying** 22:8 52:3,5
72:25 83:16 87:17
90:16 91:12 102:8
137:5,15 160:23
164:9
**says** 81:24 141:16
141:17 142:21
143:6,11
**scale** 98:1
**scanner** 114:2,5,9
114:21
**schedule** 88:2
**scheduling** 6:6
**school** 13:4,5
**scratch** 67:19
**screwdriver** 124:4
124:13 125:10
130:1,19 131:4
**seal** 83:13,20
135:25 180:19
**sealed** 72:19 74:7
74:7 83:14 133:10
136:1,5,6,12,12
137:4,5 151:25
**sealing** 85:13
131:23
**search** 6:17 22:2
22:10 26:20,24
27:3,4 29:22,22
31:18 32:22 33:1
33:11,17 37:10,22
41:11,17,25,25
42:1,11,18,20,20
42:22 44:20 46:24
47:1,3,22,23,25
48:5,9 49:20
50:14 52:14 53:17
53:20 54:25 55:1

55:7 68:2 75:20
80:3,8 90:9,17
98:11 103:17
104:16,16,17
105:8 109:3
126:23 127:1
147:11
**searched** 48:3,3
**searches** 31:24
32:2 53:7,12
66:17
**searching** 45:3
112:22 115:12
**second** 8:21,23
9:12 29:16 32:6
55:24 75:16,17
106:10 150:8
162:17
**secret** 28:17
**secrets** 28:21,22
**section** 76:16
148:19 149:3
170:9
**secure** 74:6 82:24
84:12 111:18
112:3 131:3
143:24 167:9,11
**secured** 103:16
111:16,17 112:2
116:15
**securely** 143:20
**security** 165:14,21
**see** 16:7 17:24
50:5 62:15 108:17
121:16 123:11
129:18 144:15
145:1,10 147:18
149:23 151:6
157:25 164:20
**seeing** 67:19,22

**seen** 63:2,3 66:11
66:15,20 76:6,8,10
76:12 106:4
145:15
**seize** 45:18 54:19
104:16 115:13,24
**seized** 72:22 73:13
76:22 77:4,7 79:5
113:2 131:10
138:4 142:8 143:1
143:12
**seizing** 45:3
**seizure** 5:23 6:17
37:10,23 38:25
41:11,18 42:1,8,10
42:16,17,18,20,21
42:24,25 44:14,16
44:20 45:16,19
46:9,23 47:2 48:4
48:5 54:14,20
55:8,11,16,20,23
65:14,19,23 66:25
67:8,20 68:1,11
80:8 89:22,25
104:17 105:1
112:4 115:4,15
127:20
**send** 80:4 136:13
158:19
**senior** 5:11 36:18
**sense** 18:24 27:13
43:17 77:6 129:2
135:14 145:20
156:10 161:5
171:24
**sensitivity** 165:10
**sent** 74:5 82:6
90:15,20 101:18
151:25 181:14
**sentence** 63:13
75:18

**sentinel** 164:6,7,10 165:1,2 167:20
**separate** 104:21 111:25 113:13 163:1
**separated** 42:21
**separately** 79:6
**sequentially** 112:25 124:22
**sequestered** 82:14
**serialized** 162:23
**serve** 71:24 72:7 140:24 142:9
**server** 163:23 164:4,22
**servers** 163:19 167:10
**service** 21:13 96:7 96:8 108:9 155:1
**set** 108:14 122:10 133:1 168:25
**shake** 7:17
**shaker** 2:21
**shared** 163:18,23 164:1,17
**shed** 127:3
**sheet** 67:2,3 73:1 77:5 148:16,16 149:1,10 150:1 158:3 159:13 160:3,7 181:11
**sheets** 159:10 162:18
**shift** 53:4 85:16
**ship** 20:4
**shipped** 72:20
**shop** 161:5
**short** 177:8
**shorter** 106:5,8
**shorthand** 180:5 180:13

**shot** 152:12
**shotgun** 21:19
**show** 106:22 143:7 152:14 173:3
**showed** 110:13 142:13,16
**shown** 126:2
**shows** 143:18,21
**shut** 173:19
**sic** 16:12
**side** 26:4,23 122:19 128:17,21 136:21
**sidearm** 21:17
**sides** 129:5
**sign** 133:8 149:19 181:12
**signature** 135:18 178:3 180:21
**signed** 135:15 181:20
**significant** 167:12
**signs** 37:21
**similar** 32:12 57:4 63:17 71:1 79:7 130:20,22,23
**similarly** 97:6
**simmons** 1:25 2:6 162:6 180:5,22
**simple** 45:18
**simply** 10:22 101:6
**simulates** 22:6
**single** 36:12 45:4 45:22 46:5 117:15 117:18 118:19
**sit** 167:20
**site** 121:15 131:17 132:4
**sitting** 173:13

**situation** 30:17 83:18
**situations** 31:19
**size** 115:13
**skill** 35:20 122:10
**skills** 35:7,15
**sleeve** 124:20 144:22 145:17,19 146:2 147:15 150:6,10 155:22 157:2 173:19,21
**sleeves** 122:5,6,15 122:19 144:17 157:24
**slightly** 35:8
**slip** 144:21 147:14 148:4 149:23 150:10
**slipped** 137:4 162:2
**slips** 144:15 146:1 147:7,12 148:9 150:3
**small** 22:6 45:22 45:23 85:7 128:22
**smell** 136:9
**sniff** 133:3 136:14
**sniffed** 133:5
**snitko** 1:4,4 181:4 182:1 183:1
**snuck** 134:17
**software** 164:14
**solely** 42:8 43:8
**solutions** 2:5 181:23
**somebody** 84:24 124:13 126:10 156:11 157:18 172:3
**somewhat** 168:5

**sorry** 8:20 16:14 17:21 21:2 35:12 43:15 49:21 53:21 62:23 67:13 119:1 120:3 126:13 135:4 140:4 150:8 154:4 162:6
**sort** 16:8,17 18:24 19:3 23:7,18 24:2 27:10,12 30:3 31:10 35:25 43:15 45:23 54:10 55:11 58:22 71:18 81:9 93:25 96:15 119:2 124:8 140:18 142:7 161:4 165:19 170:16
**sound** 120:15 155:13
**sounded** 20:22
**sounding** 135:12
**sounds** 25:24 29:10 89:13 98:16 110:1 113:17 122:23 124:7 129:6 134:24 135:25 138:16 161:3 172:24
**space** 58:1 104:19 104:21 120:2 122:2 124:12 129:16,20
**spaces** 129:9
**speak** 7:11 88:10 88:12 105:15 120:16 121:21 169:16
**speaking** 10:10 141:3
**special** 5:10,17 6:24 9:1,14 12:9

Exhibit J
760

12:21 14:7,10,18
14:20 15:2,6,15
16:5,6,19,23 17:10
19:24 20:3 23:22
28:3,9 29:13
33:23 34:18 35:7
35:16 36:7 37:3
41:19 45:5 46:10
49:1 50:18,19
65:5,9,18 69:21
81:1 86:23 88:5,9
88:14,18,23 89:2
89:10,11 90:14
92:22,23,24,25,25
93:1,8 96:25
100:17 114:14
120:17 121:10,21
154:12 165:1
166:5 169:8,16
175:8 177:14
181:5 182:2 183:2
183:4,12
**specialize** 35:25
**specific** 28:22 37:6
41:3 49:20 50:11
71:19 75:22 93:18
103:2 104:13
105:24 109:15
**specifically** 39:7
54:17 55:22 56:17
66:10 68:17,23
69:24 75:14 76:11
88:4,13 91:16
92:7 95:10 96:10
104:9 105:13
106:3 107:19,22
107:23 135:12
148:7 152:7,8
154:15 165:3
166:23 174:5
175:22

**specifics** 28:18
55:9
**speculate** 55:6
111:2,4 127:11
**speculating** 111:1
**speculation** 24:4
31:22 33:5 43:13
47:20 49:8 57:1
57:14 59:10 62:20
64:8 66:4 67:10
69:6 79:12 84:6
86:21 88:21 90:3
96:18 97:23
107:10 118:11
125:19 126:14
**speedy** 157:4
**spend** 23:6
**spent** 23:25
113:12
**spoke** 88:8,25
**spot** 81:24,25 86:7
86:10,17,24 87:21
89:16 91:2 161:19
**spots** 125:8
**spread** 129:20
157:16 171:23
**spring** 3:4
**squad** 16:21 92:20
92:21 93:2,12,23
93:25,25 94:3
95:3 108:15,23
110:10,11 111:8
111:10 113:22
154:11 174:21
175:1
**squads** 93:14,17
95:5,9,11,14
110:13
**square** 125:7
**ss** 179:3 180:3

**ssa** 15:1,4 94:2,4
94:10,12,14,16
168:20 176:2,16
**stacked** 128:20
**stage** 167:6
**stages** 74:18
**standard** 106:8
126:22 150:13,14
165:15,20
**start** 46:25 50:2
108:25 112:3
127:8 161:19
**started** 5:13 18:10
18:13 112:17,22
113:6
**starting** 13:3
39:23 49:25
113:25 155:13
**state** 2:7 5:14
10:20 44:1,4 70:9
96:3,11 97:1,8
107:21,23 108:10
130:21 133:25
134:3 155:10
179:2 180:2,6,23
**stated** 107:20
**states** 1:1,9,10 3:2
81:17 170:10
181:4 182:1 183:1
**stating** 34:10
**stay** 158:7
**step** 29:16 44:5
46:15 107:3,3
119:3,3,5,9
**stepping** 55:24
**steps** 44:9 46:12
81:7 82:12 90:1
112:10 119:20
151:23
**sticks** 85:2

**stop** 161:5
**storage** 71:3 74:6
**storc** 1:6
**store** 108:24 123:3
**stored** 58:1 59:4
71:6 82:22,24
133:10 143:20
164:20 167:11
173:16
**stores** 162:24
**stories** 174:7
**storing** 131:24
136:22
**straight** 21:6
128:16
**strangers** 70:16
**street** 3:4
**strickland** 92:22
154:12
**strict** 167:1
**strictly** 42:24,25
**strike** 47:11
**strokes** 30:4
**strong** 147:16
**structural** 123:1
**structure** 14:23
**stuck** 145:19
**stuff** 126:12
127:13 129:1
141:17 163:18
167:14,15,16,16
167:16,19 168:8
171:3
**sub** 154:19
**subject** 30:11
169:24
**subjects** 20:15
21:25 22:1 29:6
30:7 32:25 47:17
**subscribed** 179:20
183:14

**subsequent** 36:19 80:16 110:13
**subset** 85:7 169:21
**substance** 105:17
**substantially** 12:13
**substantive** 24:25
**substantively** 141:11
**sudden** 70:15 125:17 126:4
**sufficient** 78:5,6 78:10,17
**suggested** 101:5
**suite** 2:16,20
**summarize** 160:18 160:19
**summary** 160:10
**superstructure** 119:25
**supervisor** 92:24 94:2 97:10 121:2 165:7
**supervisory** 15:1
**supplies** 112:17
**support** 38:14
**supposed** 22:19 30:17 61:12 75:8 76:21 104:9 167:8
**sure** 7:11,19,22 27:2 31:3 35:9 42:3 48:7 52:4 57:25 62:13 67:18 68:8 92:12 99:13 105:20 106:11 116:20 121:15 133:13 136:10 151:10 156:10 162:4 172:14 176:18

**surprise** 147:16 151:13,13
**surprised** 147:14
**suspected** 91:8
**suspicion** 91:4
**swat** 111:15,20,22 111:24,25
**swears** 37:21
**sworn** 5:4 9:2 179:5,20 180:9 183:14
**system** 82:16 162:24 163:21 165:17
**systems** 13:8

**t**

**t** 4:2,7 182:3,3
**tables** 128:24
**tactical** 20:17,25 21:20,21,24 22:11 23:2,13 25:18,24 29:4 32:8
**tactics** 20:18 21:4 23:2 29:3
**take** 7:18 9:16 11:12 19:5 21:9 30:13,22,24 37:25 44:5,10 52:19 57:5,18 62:7,24,25 71:3,5 82:13 83:19 84:25 86:17 87:6 101:6 115:3 115:8 117:21,21 117:24 118:4,8 119:5,13,16,17 120:1,2,6 121:24 122:1,1 132:17,19 132:21,24 133:18 135:21,22 152:2 152:17 153:7 157:15,22,24

162:12 173:18 177:8
**taken** 2:4 7:1 18:7 31:7 52:23 61:25 71:6,11 72:6,14 80:25 82:20 84:10 85:15 119:3 120:11 124:2 143:12 145:8 152:9,11 161:9 162:14 177:12 179:8 180:12
**talk** 8:1,3 10:7 20:7 83:11 100:17 114:15 138:17 166:6
**talked** 6:16 29:20 52:25 53:5 59:20 85:17 158:17 162:17 166:8 169:9 175:6,14 176:15
**talking** 6:3 12:19 20:11 27:14 29:17 41:12,13 44:15 74:14 81:3,4,7 83:9 85:10 89:17 109:11 110:1 121:17 122:21 148:17 169:3
**tamper** 83:5
**tampering** 83:16
**tandem** 38:22
**tape** 112:20 131:24 145:18 173:19,19
**taped** 83:15
**task** 45:24
**tasks** 34:6
**taught** 60:22

**tax** 13:22 35:22
**teach** 24:12,16 25:14 26:19,22
**team** 65:22 82:7 103:13,13 111:16 111:20 119:24 121:7,9,12,14 124:16 130:10,13 135:10 155:24 168:22,23
**teams** 117:12 129:10
**technical** 19:18
**technicians** 72:18 84:1 132:25
**technique** 130:25
**telephone** 2:17,21 3:5,11 121:18
**tell** 5:5 9:23 11:23 13:2,4 14:6 15:24 15:25 16:17 17:15 20:10 23:8 30:3 39:21 44:14 56:4 62:2 67:2 85:25 89:13 92:7,10 100:5 142:24 148:14 166:13,24 168:18 172:2 174:5,19
**telling** 18:10
**template** 40:17
**ten** 52:20 70:4 118:14
**tend** 44:20
**tentatively** 90:10
**term** 26:13 38:1 41:16 87:8,10 99:7 128:2 161:4
**terminology** 35:21 35:22

**terms**  14:23 76:21
79:8 81:11 93:13
109:1,11 115:20
144:3
**test**  173:21
**tested**  172:14
**testified**  5:6
**testify**  9:17 180:10
**testimony**  10:16
35:9 46:2 54:13
54:22 99:14 181:9
181:18 183:8
**thank**  7:25 16:15
49:15 52:20 73:15
80:22 89:12
144:11 162:15
177:6,14,16,23,25
**theft**  57:21,21 59:3
71:23 72:8 73:4,8
77:15 84:4 144:4
**thereof**  179:11
**thing**  87:24 119:23
122:24 145:22
157:13 167:8
**things**  7:20 32:22
34:2 54:19 73:12
104:6 106:5
112:16 116:11
118:17 151:9
162:20 166:15
169:14 177:10
**think**  8:1,6,12 9:8
11:20 18:9 25:5
27:15 34:10 35:10
35:24 41:2 42:13
50:10 54:1,9 57:8
59:17,19 64:3
66:2 67:5 70:12
70:14,15 78:16
80:21 85:5 87:11
88:13 95:23 97:6

97:13 98:13,14,15
105:14,20 106:13
106:20 109:9
123:4,6,21 124:3
128:7,9 134:5,6
139:16 142:11,15
143:24 145:7
147:10 153:7,13
154:1,2,14 155:15
156:4,19 159:6
160:13 167:11
174:11,14,21
175:6,14 176:4,7
176:21,23 177:2,3
177:7
**thinking**  28:24
65:6 101:3 109:22
152:9 163:20
**thompson**  176:13
**thousands**  163:6
**thread**  85:19
**threat**  45:24 58:1
**three**  116:17
117:12 132:5
**thursday**  2:7
**tied**  53:12 54:6
93:17
**tight**  116:12
**time**  2:9 11:13
14:13,14 21:9
23:6,8 37:3 42:13
46:16 54:5 58:5
60:19 61:5 62:24
68:24 69:12 80:24
81:22,25 85:3
86:5 87:5,5 88:24
90:9 91:19,25
92:23 94:22 97:10
97:25 102:23
113:5,12,20
115:20 116:9

117:13 119:8
121:2 124:25
130:6,9 131:7,8
134:22 143:13
147:24 149:20
158:9 167:12
168:3,6 177:16,16
180:13 181:19
**timeframe**  181:8
**timeline**  18:25
**times**  41:10 43:9
54:1 125:13
134:18 136:23
166:5
**tired**  134:10
**title**  5:14 14:17,20
15:10 19:18
**today**  6:13 10:16
63:2 76:7 177:24
**todd**  176:10
**token**  8:14
**told**  87:3 104:8
147:6,11,23 148:3
154:3 174:12
**ton**  64:10
**tools**  98:8 122:9,17
122:22,23 124:7,7
**top**  15:11 28:14
144:16,21 145:19
146:2 147:7,15
**topic**  23:7
**topics**  20:14
**torn**  173:23
**total**  69:25 109:20
**town**  22:6
**track**  81:18 82:19
84:10 85:14 142:2
**tracks**  78:24 84:18
**tracy**  1:9
**train**  20:9,9 21:15
21:21 23:17 24:8

26:18
**trained**  21:18 29:6
31:24 32:9 159:4
**trainee**  19:18
**trainees**  24:13
**training**  14:13,14
19:3,5,10,12,16,24
20:1,8,12,13,17,17
20:17,18,19,23,23
20:25 21:5,10,24
22:9,11,18,25
23:19 24:2,7,24
25:4,18,21,24 26:5
26:16,17 27:18
28:5,8,12,15,16,16
28:19,20,24 29:2,2
29:3,4,7,12,21,25
31:9 32:1,7,14,18
33:3,3,9,9,16
34:13,14,17,23
35:15 36:3,18,20
36:23,25 39:12,13
39:14 46:7 56:3
56:16,17 57:24
58:11,24,25 59:23
60:2,8,14 63:21,25
64:2,4,10,12,18,23
79:16,17,23 80:12
80:15,16,20
166:25
**trainings**  166:12
**trains**  20:15
**transaction**  126:2
**transcript**  180:15
181:6,20 183:5,8
**transferred**  176:5
**transport**  131:9
132:2
**transported**  71:12
81:21 82:1 133:11
143:19

travis 1:6
treat 74:1,2 156:8
treated 63:19
trial 6:4,6
tried 6:1 83:5
true 51:11 52:8
  118:7 162:8
  179:14 180:15
  183:8
truth 5:5,5,6
  180:10,10,11
truthfully 9:6
try 16:15 42:2,3
  125:25 138:8
  167:2
trying 15:24 30:5
  49:23 51:10 71:3
  78:2 80:5 101:25
  104:20 109:14
  116:20 119:2,7
  120:6 128:14
  132:22 145:7
  157:3 158:13
  166:14
turn 8:22 153:8
  167:4
turned 127:16
two 59:18,18 62:4
  62:25 75:20 79:5
  85:11,12 95:10
  98:4 116:15
  128:23 129:3
  132:4,9,10 135:3,4
  135:5 136:20
tyler 1:5
type 59:9 98:12
  146:16 165:8
  172:11
types 28:12 159:4
typewriting
  180:14

typical 106:9
typically 98:3
  103:1

**u**

u.s. 34:9 96:7,8
  155:1
ugly 75:5
uh 7:17,21
um 7:20 132:15
  144:14
uncertain 113:17
undergraduate
  13:7
understand 8:4,17
  9:4,15,19,24 10:6
  11:2,17 19:15
  26:12 31:23 34:12
  46:8 48:8 52:4,13
  53:9 56:13 58:23
  70:1 74:11 80:5
  85:6 87:21 101:25
  107:6 109:15
  115:24 117:22
  121:24 123:16
  124:10 127:10,13
  129:24 134:21
  145:24 146:8
  157:6 159:24
understandable
  24:1 27:25 42:3
  145:25 158:16
understanding 7:7
  35:22 53:19 57:3
  57:17 59:12 71:1
  91:25 114:4,6
  136:8 138:2
understood 11:11
  176:19
undertake 19:2
  28:13

undertaken
  170:17
undertaking 28:20
unfortunately
  18:1 67:16
unit 82:7 111:25
  177:4
united 1:1,9,10 3:2
  170:9 181:4 182:1
  183:1
universe 158:8
university 13:10
unlocked 122:11
  130:6
unopposed 6:10
update 83:24
  84:21 85:1
updated 29:8
updates 6:9 29:2
  29:11
uploading 164:13
upper 121:6
ups 169:10
upset 158:12
usao 170:6
usdoj.gov 3:6,7,7
  181:2
use 10:23 21:11
  27:9 32:15 35:6
  35:14 40:10,10,16
  73:7,10 84:9
  123:3
useful 36:4 77:14
  140:17
uses 73:2
uspis 99:2
uspv 54:4 55:1
  86:3,5 88:8 96:24
  98:25 100:13
  103:5 163:13

usual 106:6
usually 44:19
  102:13 115:3,8
  146:10,16 167:10
  172:12
utilizing 36:18

**v**

v 181:4 182:1
  183:1
vague 44:24 51:4,5
  58:4 59:8 61:14
  64:13 67:25 119:1
valuable 73:25
  74:1,3 75:4,7
  82:21,22,25 83:10
  83:11 153:20
  156:8
valuables 85:10,11
  85:13 118:4,17
  131:22 151:1,7
  152:15 156:9
value 73:17 74:19
  75:22
varied 117:11
  119:12 140:13
  157:1
varies 19:11
variety 13:22
  105:23
various 25:1 32:7
vault 82:23 85:8
  118:24 119:14
  120:2,5,7,12,13
  121:25 128:5,13
  128:15,23 129:11
  129:21,25 130:3
  130:21 131:3,25
  139:9,12,13,16,21
  139:22 154:9,11
vaults 5:23 17:2
  17:13,17 18:12,20

39:1 41:13 53:18
54:5,15 55:12,16
55:21 61:4 65:15
65:20,24 67:1,8,21
85:22 86:1 87:23
88:19,24 89:3,16
89:22 91:24 92:5
96:21,23 99:15
100:1 101:20
104:10,22 105:7
106:2 110:9
111:12 113:20
114:2,25 116:8
147:5 154:25
155:7
**vehicle**  31:17
**vehicles**  75:24
**verbal**  7:23
**verbally**  7:15
**verbatim**  180:16
**verdon**  1:5
**verification**  179:1
**verify**  172:2 181:9
**veritext**  2:5
181:14,23
**veritext.com.**
181:15
**versus**  6:6 46:6
120:12
**victor**  3:3 6:1,22
10:7,18 140:22
181:1
**victor.rodgers**  3:6
181:2
**video**  9:9 71:11
73:11,11 137:17
141:9,18 142:4,13
142:15 143:21
160:19 164:2,20
**videoconference**
2:4

**videoed**  160:14
**videos**  72:14 73:6
79:1 81:6 140:17
159:18 163:22
164:12,16
**videotape**  137:18
139:25 141:1
142:6 152:5
160:11,17 161:8
**videotaped**  138:11
138:14,22,24
139:5,10,12,22
140:6 142:16
153:25 160:25
**videotapes**  145:2
162:19 164:8
**videotaping**
137:22,24 138:1,3
**view**  142:7 161:15
165:7
**village**  22:5
**violate**  26:6
**violations**  33:25
58:13
**virginia**  2:16
**vs**  1:8

**w**

**wait**  8:10
**walk**  44:9 46:12
49:15 57:6 70:19
70:20 107:2 112:9
118:22 123:15
129:3
**walked**  85:20
112:15
**wallet**  30:23
**want**  6:11,15 8:9
8:22 10:7 11:6
12:7,19 24:22
29:18 42:2 46:7
48:7 49:15 57:17

59:22 69:14 89:24
91:10,21 99:7,12
106:11,11 107:2
110:3 120:15
123:16 125:22
126:11 127:2
128:23 130:5
137:23 139:8
151:10 154:10
160:21 161:1,14
161:16 167:14
168:8 172:5,21
173:16 176:18
177:21
**wanted**  6:8 18:24
29:24 53:5 81:2
82:5 86:6 139:16
163:25 169:15
**warrant**  5:23 6:17
22:10,12,15,16,20
26:20,24 27:3,4,8
27:9 29:23 32:22
33:1,10,16 37:10
37:22,23,24 38:2,5
38:15,16,25 39:1
39:12,22 40:6,10
40:13,17,19 43:7,8
43:10,18,20,24
44:6,7,10,15,16,17
44:19,20 45:1,6,13
45:16,19,23 46:9
46:11,14,17,19,24
46:24 47:1,2,3,5,7
47:16,22,23 48:5,9
48:12,15,20 49:3
49:13,20,24 50:1,5
50:11,13,15 51:3,9
51:14,20,23,24
52:1,2,7,9,10,15
52:17 54:15,19,25
55:1,8,9,11,17,20

55:23 65:15,19,23
66:25 67:8,21,24
68:1,11,22,25 69:2
69:2,10,13,17 80:3
86:15 88:1 89:22
89:25 90:2,14
92:2,4,17 94:13
95:4,6 96:1,4,14
96:17 97:3,9,21
98:22,25 99:15,20
100:1,13,22,25
101:19 102:9,16
103:5,11,17,19,24
103:25 104:3,10
104:10,17 105:1
106:1 107:7,14
108:1,15 109:3,3
109:19 110:24
111:19 112:4,18
112:23,25 113:2
113:19,23 114:24
115:4,9,11,19,25
116:9 117:1
120:23 121:11
126:24 127:1,20
147:5 166:17
169:19 174:3
**warrantless**  54:10
**warrants**  22:2
27:16 29:22 37:2
41:2,6,9,12,18,24
41:25,25 42:5,8,10
42:11,15,16,17,18
42:20,21,21,22,24
42:25 43:1,5 48:1
50:22 53:1 98:11
98:11,12 115:7,16
**washington**  3:11
13:10
**watched**  136:13

**way**  34:10 79:19 84:4 89:16 100:12 100:25 107:1 118:7 125:14,16 125:21 136:17 138:9 143:24

**ways**  35:19 127:11

**we've**  37:16 51:8 52:25 85:19 116:20 176:15

**weapon**  21:13

**website**  168:9,25 169:8

**week**  109:7,9 110:4 168:4,5

**weeks**  19:13,20 23:7,10 28:2

**welcome**  81:1

**went**  17:6 81:19 110:8 112:15 113:1 131:12 157:18 166:17 171:3

**western**  1:3 13:10

**whichever**  136:17

**white**  16:22,24 35:25 92:20 93:22 94:4,8 95:3,12,12 95:14

**width**  129:8

**wilkison**  1:9

**willing**  6:9

**wish**  46:19

**withdraw**  144:10

**witness**  5:4 17:23 17:25 38:19 40:9 40:21 43:14,22 45:1,10,16 46:3,23 47:21 48:18 50:9 51:7,17 55:7 57:2 58:7,15,21 59:11

59:17 60:5,11 61:16 62:21 63:10 64:9,15,22 66:6 67:11 69:7 70:25 72:3,13 73:23 74:5,25 75:13 76:6 77:1,9,20 78:10,16,21 79:13 79:21 84:8,16 97:24 115:11 118:1 125:20 141:14,25 142:11 143:3 147:10 153:2,13 177:11 177:25 179:7 180:8,19 181:8,10 181:12,19

**wondering**  26:15 53:11 81:9 124:23 174:7

**word**  6:21 77:24 147:16

**words**  31:11 38:12 91:21

**work**  13:20,22 16:22 18:19 38:15 43:10 92:14 93:18 93:21 97:24 116:14 120:8 127:19 128:1 129:17 144:3,7 154:9 171:23 173:9

**worked**  13:15 17:11 71:15 130:4 132:23 153:23,23 154:11 172:15

**working**  17:16 37:18,19 86:4 113:24 116:13 123:7 124:16

130:7,11

**world**  8:2,4,6,7

**wow**  135:6

**wrap**  177:10

**wrapped**  83:15

**wrapping**  131:23

**write**  38:1 67:7 78:5 151:20 156:18,23,24

**writes**  38:5

**writing**  39:22

**written**  52:17 101:18

**wrong**  6:21 39:21 59:22 95:24

**wrongdoing**  58:19

**wrote**  142:13,17

**x**

**x**  4:1,2,7 107:15 143:20

**xyz**  124:19

**y**

**y**  107:16

**yeah**  16:21 22:22 23:20 24:10,11 28:23 33:18 39:10 40:9,21 51:7,9 57:19 62:10 63:2 66:6 67:14 68:23 68:24 70:14 73:23 75:19 76:6 77:1 77:20 78:16 82:9 83:12,22 84:16 85:14 86:2 90:6 92:19 99:9 101:15 102:20 103:6 105:20 108:8,10 108:16 109:5,10 109:20,20,21 110:10,25 111:5,7

113:8,22 114:22 118:1 119:7,20 120:14,19,25 121:16 122:8,25 122:25 123:2,9,14 123:21 124:16 125:5,11,20,20 128:14 129:10 133:10 134:20 135:2,11 136:4 138:15 139:1,3 144:23 145:21 149:17 151:9 152:12 153:2 156:13 157:11 158:11 160:22 161:10,18 162:3 162:22 163:8 165:12,22 166:23 168:24 169:5 170:7,14,20 174:4 176:9

**year**  17:16 94:20 103:6 175:21

**years**  13:19,25 14:4,11,15 19:8,9 27:24 33:20 35:3 50:20 60:17,22 94:23,25 141:6

**yellow**  156:5,20

**yep**  137:13

**young**  93:1,7,8

**z**

**zellhart**  16:1,11 39:5 68:7 69:22 86:4,23 88:5,10 89:8,9,11 91:3 94:8 96:20,25 100:10,11,18 103:10 105:16 114:14 120:18

**[zellhart - zoom]**                                                          Page 33

121:1,10,21
155:17 158:25
166:5 168:15
169:9,16 171:18
**zoom**   8:2,6

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit J**
**768**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit J**
**769**