# Exhibit K

**to Declaration of Robert Frommer**

**Exhibit K**
**770**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4                         -oOo-

5

   PAUL SNITKO, JENNIFER SNITKO, :

6  JOSEPH RUIZ, TYLER GOTHIER,   :

   JENI VERDON-PEARSONS, MICHAEL :

7  STORC, AND TRAVIS MAY,        :

                                 :

8                  Plaintiffs,   :

                                 :

9  vs.                           :  Case No.

                                 :  2:21-cv-04405-RGK-MAR

10 UNITED STATES OF AMERICA,     :

   TRACY L. WILKISON, in her     :

11 official capacity as Acting   :

   United States Attorney for the:

12 Central District of California:

   and KRISTI KOONS JOHNSON, in  :

13 her official capacity as an   :

   Assistant Director of the     :

14 Federal Bureau of             :

   Investigation,                :

15                               :

                   Defendants.   :

16 =======================================================

17

18      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

19                LYNNE K. ZELLHART

20             FRIDAY, MAY 6, 2022

21        WITNESS APPEARING REMOTELY FROM

22           LOS ANGELES, CALIFORNIA

23 REPORTED BY:        SUSAN E. BELINGHERI, CCR #655

                       NV Firm Lic. #1F

24

25

Exhibit K
771

Page 2

1                    APPEARANCES:
2          (all appearances via videoconference)
3
                   For the Plaintiffs:
4
          THE INSTITUTE FOR JUSTICE
5                 Attorneys at Law
          By:  ROBERT FROMMER, ESQ.
6          901 N. Glebe Road, Suite 900
                 Arlington, VA 22203
7
8                  For the Defendants:
9        ASSISTANT UNITED STATES ATTORNEY
                ASSET FORFEITURE SECTION
10          By:  VICTOR RODGERS, ESQ.
          312 North Spring Street, 14th Floor
11          Los Angeles, California 90012
12
          FEDERAL BUREAU OF INVESTIGATION
13             OFFICE OF GENERAL COUNSEL
          By:  MEGHAN CAMPBELL, ESQ.
14
15
                   The Videographer:
16
          VERITEXT LEGAL SOLUTIONS
17             By:  TERRI PERKINS
18
               The Veritext Concierge:
19
                    ROB BENIMOFF
20
21
22
23
24
25

Exhibit K
772

Page 3

1                            I N D E X

2

3      EXAMINATION:                                    PAGE

4      By Mr. Frommer                                      6

5

6

7      EXHIBITS:                                       PAGE

8      Exhibit 3.......................................   38

       Exhibit 4.......................................   75

9      Exhibit 5.......................................   97

       Exhibit 6.......................................  161

10     Exhibit 7.......................................  181

       Exhibit 8.......................................  199

11     Exhibit 9.......................................  201

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1           PURSUANT TO NOTICE, and on Friday, the 6th

2     day of May, 2022, at the hour of 9:08 a.m. of said day,

3     at the offices of Bonanza Reporting & Videoconference

4     Center, 1111 Forest Street, Reno, Nevada, before me,

5     Susan E. Belingheri, a notary public, appeared LYNNE K.

6     ZELLHART via videoconference.

7                               -oOo-

8

9           THE VIDEOGRAPHER:  Good morning.  We are on

10    the record.  The time is 9:08 a.m. on Friday, May 6th,

11    2022.

12          Please note that this deposition is being

13    conducted virtually.  Quality of recording depends on

14    the quality of camera and internet connection of

15    participants.  What is seen from the witness and heard

16    on screen is what will be recorded.  Audio and video

17    recording will continue to take place unless all parties

18    agree to go off the record.

19          This is media unit number one of the video

20    recorded deposition of Special Agent Lynne Zellhart,

21    taken by counsel for plaintiffs, in the matter of

22    Snitko, et al. versus United States of America, et al.,

23    filed in the United States District Court for the

24    Central District of California, Western Division.  Case

25    Number:  2:21-cv-04405-RGK-MAR.

Exhibit K
774

Page 5

1               This deposition is being conducted remotely,

2     using virtual technology.  My name is Terri Perkins,

3     representing Veritext Legal Solutions, and I'm the

4     videographer.  The court reporter is Susan Belingheri

5     from the firm Veritext Legal Solutions.  I am not

6     related to any party in this action, nor am I

7     financially interested in the outcome.

8               If there are any objections to proceeding,

9     please state them at the time of your appearance.

10              Counsel and all present, including remotely,

11     will now state their appearances and affiliations for

12     the record, beginning with the noticing attorney.

13              MR. FROMMER:  Hello.  My name is Robert

14     Frommer.  I represent Plaintiffs Paul and Jennifer

15     Snitko, and the other in this class -- class action.

16     And I'm with The Institute for Justice.

17              MR. RODGERS:  Assistant United States

18     Attorney Victor Rodgers, appearing on behalf of the

19     defendants.  And Meghan Campbell is here as well from

20     the Federal Bureau of Investigation.

21              THE VIDEOGRAPHER:  Will the court reporter

22     please swear in the witness.  And then, counsel, you may

23     proceed.

24

25

```
                                             Page 6

 1                  LYNNE K. ZELLHART,

 2            having been remotely duly sworn,

 3          was examined and testified as follows:

 4

 5                     EXAMINATION

 6    BY MR. FROMMER:

 7      Q.  Thank you.  And thank you for being here today.

 8    I really appreciate it.

 9          If we could, if you could just tell me -- state

10    your full name and title for the record, please.

11      A.  Sure.  Lynne K. Zellhart.  Z-e-l-l-h-a-r-t.  I'm

12    a special agent with the FBI.

13      Q.  Okay.  And I'm Robert Frommer.  My name is Robert

14    Frommer.  I'm an attorney with The Institute for

15    Justice.  We're a nonprofit public interest law firm.

16    And as I just stated, we represent the plaintiffs in

17    this class action challenge concerning the government's

18    execution of a seizure warrant at U.S. Private Vaults

19    back in March 2021.

20          Now, before we begin, I want to give some ground

21    rules.  Have you -- well, let me ask a question first.

22    Have you ever been deposed before?

23      A.  I have.

24      Q.  How many times would you say, approximately?

25      A.  Once.
```

Page 7

1      Q.  Oh, just once.  Okay.  With FBI agents, I always

2   figure you guys get, like, deposed all the time.  So,

3   yeah, when I talked to the other agent, he had never

4   been deposed, and -- so that's interesting.

5           Okay.  Well, let me go through some ground rules,

6   then, for this deposition, just so we're -- have the --

7   the same understanding.

8           I will be asking you questions, and the court

9   reporter will be recording my questions -- well, and as

10  well as your answers.  To assist the court reporter,

11  I'll be sure to speak clearly and audibly, and would

12  kindly ask that you do the same.  Also, please answer

13  each question verbally.  I have a bad habit of this

14  myself, I'll go "uh-huh" or "uh-uh," but the court

15  reporter can't record gestures like that.  So -- like

16  shaking your head or nodding.  So will you be sure to

17  provide clear and verbal responses, "yes" and "no,"

18  answers like that?

19      A.  Yes.

20      Q.  Okay.  Thank you.

21          Another issue, and one I have noticed is

22  particularly pitched with Zoom depositions, is, you

23  know, normally when we talk with people, we talk over

24  each other and interrupt as part of the normal flow of

25  conversation, but in a deposition, that's really

Page 8

1    difficult for the court reporter to get everything down.

2    Probably be even worse here.  So, therefore, it's

3    important that you wait until I finish a question before

4    you begin answering, even if you kind of know where I'm

5    going.  And by the same token, I'll -- I'll do my best

6    to let you finish your answer before I start asking

7    another question.  Do you understand?

8         A.  Yes.

9         Q.  Okay.  Great.

10             Now, you were sworn in a moment ago by the court

11   reporter.  Do you understand that you've given an oath

12   that requires you to answer my questions truthfully and

13   completely?

14        A.  Yes.

15        Q.  It's interesting, right?  Because when an FBI --

16   like, if somebody -- if you're interviewing somebody and

17   they lie to you in the course of the investigation, it's

18   a federal law -- it's a violation of federal law.  But

19   this is, like, one of the rare situations where I ask

20   you questions and you lie -- not that I expect you to --

21   that would itself be a violation of federal law.  I

22   just -- I -- that struck me earlier today.

23             And you understand this is the exact same oath

24   you would take if we were in court and you were

25   testifying in front of a judge; correct?

Page 9

1     A.  Yes.

2     Q.  Now, if you don't understand the question, please

3  let me know.  I'll either ask the court reporter to read

4  it back or I'll rephrase to clarify the question.  But

5  the important thing is I -- I want to make sure you

6  understand the question I've asked.  And so will you

7  tell me if you don't understand the question?

8     A.  Yes.

9     Q.  All right.  Now, if you just don't know the

10  answer to a question, you know, you can say that.  But

11  if you do know the answer, you have to provide that

12  answer in good faith.  And so unless you say otherwise,

13  I'm going to assume that you understand my question, so

14  please let me know if at any point you don't.

15        Now, if you want to talk to Victor, that's fine,

16  but if there's a question pending or if you're in the

17  middle of an answer, you have to finish that answer

18  before speaking to your lawyer.

19        Now, because it's important to get full,

20  complete, and accurate answers, I have to ask whether --

21  are you taking any medication or is there any other

22  reason why you wouldn't be able to give full, complete,

23  and accurate testimony today?

24     A.  No, no reason why I couldn't.

25     Q.  Okay.  Now, periodically the government's

Exhibit K
779

Page 10

1      attorney might state an objection after I ask a

2      question.  That doesn't mean you don't have to answer

3      it.  All that means is the purpose of that objection is

4      simply to record it so that if we decide to use the

5      answer to a question in the future, the government can

6      argue that the question was improper based on the rules

7      of evidence.  Do you understand?

8          A.  Yes.

9          Q.  In fact, did you -- you went to law school;

10     right?

11         A.  I did.

12         Q.  Oh, okay.  Where did you go to law school?

13         A.  UC Davis.

14         Q.  Oh, okay.  All right.  Okay.  Well, I'm sure that

15     will come up after that, later.

16             Now, sometimes you might remember additional

17     information, or maybe you want to clarify your answer to

18     a previous question, and if that happens, just let me

19     know that you'd like to add something and we'll -- we'll

20     -- we'll do that right away so it's still fresh in your

21     mind.  Will you do that?

22         A.  Yes.

23         Q.  Okay.  Now, if you'd like to take a break at any

24     time, just let me know.  It sounds like we're going to

25     have a hard 90-minute break every 90 minutes.  But I'll

**Exhibit K**

**780**

Page 11

1   finish my line of questioning, if we're in the middle of

2   a line of questioning, and let you finish your answer,

3   and then we can adjourn for a break.  Do you understand?

4       A.  Yes.

5       Q.  All right.  And during our conversation you may

6   think of some documents or materials that might help you

7   better remember an answer.  If you think of a -- oh,

8   there is something that would better help me answer

9   this -- please let me know, because it's possible that

10  we might have those materials.  Even though we just got

11  documents from Defendants yesterday, we might be able to

12  go through and see if we can find those to help you

13  craft a better answer.  So will you do that, let me

14  know?

15      A.  Yes.

16      Q.  Okay.  Okay.  Well, before we begin, then, let me

17  ask you -- I've just asked you a bunch of questions.  Do

18  you have any questions for me?

19      A.  No.

20      Q.  All right.  Fine.  Didn't have to.  Not going to

21  hold it against you.

22          All right.  Now, before we begin talking, I want

23  to get some basic background.  And I know I already

24  asked this a little bit, but -- so could you give me

25  your full name again, please?

Exhibit K
781

```
                                                    Page 12

 1        A.   Sure.   Lynne K. Zellhart.

 2        Q.   What's the "K" for?

 3        A.   Kathryn.

 4        Q.   Oh, okay.  And -- I always hate asking people

 5   this.  Your age?

 6        A.   Fifty-four.

 7        Q.   Okay.  And where are you from originally?

 8        A.   I was born in Detroit.

 9        Q.   Oh, really?  Okay.  I was born in Toledo, Ohio.

10   So right down -- the Tigers were my favorite, the team

11   of my youth.

12        A.   Yeah.

13        Q.   And the Lions were, you know, my -- the bane of

14   my existence.

15             So -- okay.  So when did you move out to

16   California?

17        A.   My family moved to California when I was about

18   eight.

19        Q.   Oh, okay.  So -- oh, so pretty early.  So you

20   lived most of your life in California, then.

21        A.   Correct.  Yes.

22        Q.   In -- in sort of the L.A. area?

23        A.   Orange County.

24        Q.   Orange County.  All right.

25             And in terms of, like, your education, I don't
```

Exhibit K
782

Page 13

1   need to know everything from, like, grade school on,

2   but -- you know, we talked about this a little bit.  Can

3   you tell me, like, your college -- you went to --

4   college degree?  And I know we just said you went to law

5   school, so if you'd just go through those for me.

6       A.  Sure.  I went to college at University of

7   California, Santa Cruz.  I double majored in English and

8   politics.  And then I went to law school at UC Davis.

9       Q.  And when did you graduate from law school?

10      A.  1993.

11      Q.  1993.  Okay.

12          And are you -- did you practice -- have you

13  practiced -- let me give you a cleaner question than

14  that.

15          Once you got your law degree, did you practice

16  law?

17      A.  Yeah.  So I've been licensed in the state of

18  Michigan and the state of California, and I did practice

19  law.  Both of my -- both my licenses are currently

20  inactive.

21      Q.  Oh, okay.  All right.

22          And is that just because you don't really need to

23  have them be active while working as an FBI agent?

24      A.  Correct.

25      Q.  Okay.  I'm inactive in one jurisdiction for the

Exhibit K
783

Page 14

1    same reason.  I'm just -- well, I'm not an FBI agent,

2    but I'm living in one place, not the other.  So that

3    makes sense.

4         A.  Expensive.

5         Q.  Tell me about it.  I always lament seeing those

6    bar dues come in.

7              So you said you're a special agent; is that

8    correct?

9         A.  Correct.

10        Q.  And how long have you been with the FBI?

11        A.  Since 2004.

12        Q.  Okay.  All right.  And I think I understand this,

13   but when you come into the FBI, you come in as a special

14   agent; is that right?

15        A.  Correct.

16        Q.  After -- after you go through training and all

17   that.

18        A.  Yes.

19        Q.  Okay.  I get very -- I get very tripped up by the

20   term "special agent," because every -- all the agents

21   are special agents, which is very confusing to me

22   sometimes.

23             Now, how long -- and -- how long have you been in

24   your -- well, could you say where in the FBI you

25   currently work?

Page 15

1    A.   Los Angeles.

2    Q.   And is there a particular unit that you work in

3    at the L.A. field office?

4    A.   Yes.  I'm in the white collar crime squad.

5    Q.   Okay.  And are there -- is there just one white

6    collar crime squad, or are there multiple?

7    A.   There are multiple.  I'm in white collar one.

8    Q.   And how many white collar units are there in the

9    L.A. office?

10   A.   Two.

11   Q.   Okay.  Two.

12        And so you -- you're currently with white collar

13   crime one.  And can you tell me what you did at the FBI

14   before you joined white collar crime one?

15   A.   Sure.  And if I can, it's probably going to be

16   easier to start at the beginning and go forward than to

17   start at the end and go back.

18   Q.   That's fine.  Whichever way you want to go.

19   A.   Okay.  So -- so out of the academy my first

20   office was Cleveland, I was in the Cleveland division,

21   where I worked on a drug trafficking squad, task force.

22   So I worked drug trafficking cases in Cleveland for

23   about three and a half years.  And then I was

24   transferred to the Los Angeles office, where I was

25   assigned to a safe streets task force, which

Page 16

1    investigated gangs, basically.  And worked the safe

2    streets task force for probably about two or

3    three years.

4         And then I worked on another drug task force.

5    It's called a HIDTA, which it stands for high intensity

6    drug trafficking.  So I worked on a HIDTA squad.  From

7    my time in the HIDTA squad, I started working money

8    laundering cases, because the drug trafficking and the

9    money laundering are frequently connected.  And so I

10   began working money laundering emphasis off of my HIDTA

11   squad, and was assigned to a money laundering task force

12   with -- in conjunction with L.A. County Sheriff's.  So I

13   was the sheriff's federal person on their money

14   laundering task force.

15        At -- while I was on that task force, money

16   laundering became a white collar offense rather than a

17   drug offense, so they sort of reconceived it at the FBI,

18   and that's how I got to the white collar squad.

19   Q.  Oh, okay.  So it wasn't so much that your job

20   changed, but as -- as the classification.

21   A.  A little bit.  But while on a white collar squad,

22   I do -- I do all the white collar crimes.  So I also

23   investigate bank fraud, and credit card fraud, and --

24   but primarily money laundering.  Money laundering is --

25   is my -- is my primary focus.

Page 17

```
 1        Q.   Okay.
 2        A.   Most of my cases are money laundering cases.
 3        Q.   All right.  So you said you were in Cleveland,
 4   and I think you said you were on a task force there;
 5   correct?
 6        A.   Correct.
 7        Q.   And then you were -- did the safe streets task
 8   force.  And then you did the -- the high intensity --
 9   I'm not even going to try to say it -- the high
10   intensity drug task force.
11        A.   Correct.
12        Q.   And then -- and now you're on an anti-money
13   laundering task force with -- with L.A. -- with the L.A.
14   Police Department?
15        A.   L.A. County Sheriff's.
16        Q.   Oh, L.A. County Sheriff's.
17        A.   And that task force resolved around, probably
18   about 2016 or 2017.  They were on a grant, and the grant
19   expired.  So once the grant expired, the task force
20   expired, but I continued working money laundering.
21        Q.   Oh, okay.  And you did that through white collar
22   crime one.
23        A.   Correct.
24        Q.   Okay.  I think I get it now.  All right.  So that
25   is a -- that's a long task force.
```

1      So you said that you worked on all white collar

2  crimes, but it sounds like you have sort of a special

3  focus on anti-money laundering; is that -- is that fair

4  to say?

5      A.  Correct.

6      Q.  Okay.  Now, often -- like, I know that with money

7  laundering there's often elements of, like, asset

8  forfeiture involved with -- well, obviously, because if

9  money -- if it's dirty money, then it's subject to

10 forfeiture.  And what's your familiarity with, like --

11 with, like, civil forfeiture, asset forfeiture?

12     A.  Prior to this case, almost none.  You know,

13 everything I've -- almost everything I know about it I

14 know from working U.S. Private Vaults.

15     Q.  Really?  So in the previous task force that you

16 were involved with, you didn't really have a connection

17 to any civil forfeiture work?

18     A.  No, we did.  I did, I just don't -- there -- we

19 have people at our office who do that.  We have agents

20 who -- or they're -- they're paralegals, or sometimes

21 they're retired agents who come back who handle it.  And

22 so a lot of times our job is to tell them what's going

23 on, and then they sort of take the baton and run.

24     Q.  I see.  So it sounds like -- so you're -- you're

25 familiar with asset forfeiture, it's not your work

Exhibit K
788

Page 19

1    however; is that correct to say?

2        A.  Right.  Right.  So -- so I will -- I will let

3    them know when there's a forfeiture, or there's

4    forfeiture potential, or there might be forfeiture, and

5    then they sort of run the program.  And may come back to

6    me to ask me this or that, but they kind of run the

7    show.

8        Q.  Okay.  All right.  And who -- so there's a

9    specialized unit at -- in the L.A. field office that's

10   dedicated to asset forfeiture?

11       A.  Correct.

12       Q.  Who runs that?

13       A.  The supervisor is -- is Jessie Murray.

14       Q.  And you had said that you didn't really have all

15   that much interaction with civil forfeiture or the asset

16   forfeiture team prior to the U.S. Private Vaults case;

17   is that correct?

18       A.  I mean, that's -- that's true.  I -- again, I

19   know who the asset forfeiture people are, I have spoken,

20   you know, over the course of my career with the asset

21   forfeiture AUSAs, but it's -- it's not primary.  It's

22   usually, like:  I have this asset forfeiture thing.

23   Hey, what do I do?  And then they -- they kind of run

24   it.

25       Q.  I see.  So it's more like you identify a

Exhibit K
789

Page 20

1   potential forfeiture issue, and then you hand it off to

2   them, and then they -- and then they, as you said, take

3   the baton and run with it.

4       A.  Correct.  And they will come back to me with --

5   one in particular that was an ongoing investigation, and

6   we kind of had to file continuances with the court, it

7   was under seal, and it would come back to me and I would

8   explain where we were in the investigation.  So there's

9   back and forth, but I'm not -- I never am leading that

10  part of the investigation.

11      Q.  Okay.  So, you know, you said that you would

12  identify, for Jessie Murray's team, potential forfeiture

13  issues, or potential situations where there might be

14  forfeiture.

15          Before Private Vaults, like, how many -- before

16  the Private Vaults situation in particular, how many

17  times would you say you identified forfeiture issues

18  to -- to them, or others, at the FBI?

19      A.  Less than ten.

20      Q.  Okay.  All right.  And I'm not holding you to a

21  specific number.

22          So it sounds like it's a -- it wasn't that common

23  of a recurrence.

24      A.  Correct.  And also working on different task

25  forces, as I described.  A lot of times it also wouldn't

Page 21

1    be us.  So if I'm working on a task force, it may be one

2    of the other agencies who handle the forfeiture.  So,

3    for example, on drug task forces, we tend to seize a lot

4    of money in drug cases, but I don't remember being very

5    involved with that.

6        Q.  Do you know in those situations what -- who is

7    handling the asset forfeiture piece of it?

8        A.  No.  And, again, I'm kind of going back into the

9    early parts of my career.

10       Q.  Okay.

11       A.  And --

12       Q.  Well, I want -- I guess I want to focus -- let me

13   ask this:  Since you've been in the L.A. field office,

14   how many times have you sort of -- have you identified

15   forfeiture issues?

16       A.  Again, I've been in the L.A. field office since

17   2008, so --

18       Q.  So it's not that much different than what -- than

19   the --

20       A.  No.

21       Q.  -- less than ten?

22       A.  Correct.

23       Q.  Okay.  All right.

24           And have you gotten training on asset forfeiture

25   before?

Page 22

1      A.   Not specifically.   I've been to a bunch of

2      trainings that will do money laundering and asset

3      forfeiture, so I guess yes.   Sometimes U.S. Attorney's

4      Office will hold one.   I think I've been to one or two

5      here.   Sometimes FBI will have big, like, week-long

6      trainings, and -- and asset forfeiture might be a block

7      of it.   So -- so, yes, I've probably been to some

8      training.

9      Q.   Okay.   All right.

10          Is that -- and that's -- is that pretty common,

11     for people in the money laundering, drug interdiction

12     space, to have some training on asset forfeiture?   In

13     your experience.

14     A.   Probably.

15     Q.   Okay.   And can you explain, like, what -- what --

16     what motivated you to join the FBI?

17     A.   Well, 9/11 was part of it.   Kind of everybody who

18     came in when I did at least had some motivation from

19     9/11.   I thought it would be a good -- a good use of all

20     of my skills; writing skills, speaking skills.   I'm an

21     athlete, so I thought I could pass the physical part of

22     it.   I thought it would be a good use of my skills and

23     that I might be able to do some good.

24     Q.   Oh.   That's -- that's very laudable.   Thank you

25     for doing that.

Page 23

1          And so -- all right.  So what did you do before

2      you joined the FBI?  Were you in private practice?

3      A.   Yeah.  Just prior to joining the FBI I worked for

4      a law firm in Sacramento called Friedman, Collard,

5      Cutter & Panneton.  I worked for, specifically for John

6      Panneton, who's an attorney in Sacramento.

7      Q.   Okay.  What kind of work was that?

8      A.   It was primarily civil litigation, plaintiff

9      civil litigation.  A little bit of white collar defense.

10      Q.   So plaintiff civil litigation.  Let me ask you

11      this:  Have you ever taken a deposition before?

12      A.   Yes.

13      Q.   Okay.  All right.  Thank you for that.

14          So when you joined the FBI -- I understand, like,

15      when people join the FBI there's some pretty intense

16      training.  Did you undertake some type of training?

17      A.   Yes.  Sixteen weeks at Quantico.

18      Q.   Okay.  Sixteen weeks.  Wow.

19          So what -- when you were at Quantico, like -- can

20      you sort of describe to me the different sort of

21      subjects that -- that the FBI would train you on?

22      A.   Sure.  So a lot of block -- a lot of instruction

23      on firearms, a lot of instruction on defensive tactics,

24      there's a lot of physical fitness training.  And then

25      the classroom training is -- is legal, investigative.

Page 24

1    They sort of cover everything.  Counterintelligence,

2    counterterrorism, regular crime, all different types of

3    crime, handling informants.  And then there's a

4    practical portion of it where you're out doing practical

5    applications of what you're learning in the classroom.

6        Q.  Is that in, like, that Hogan's Alley that I've

7    heard about?

8        A.  Correct.

9        Q.  Okay.  That sounds like a -- that sounds like it

10   would be really something.  It would be -- it would be

11   quite a learning experience, I would think.

12           What was your impression of Hogan's Alley?

13       A.  When you're there, you're training, so it's

14   actually not that much fun.

15       Q.  Oh.  I can understand that.  Having, like, the

16   instructors look you over and making -- and saying

17   everything you did wrong makes it a slightly more

18   stressful situation.

19           So you said all that was occurring over, like,

20   four months?

21       A.  Correct.

22       Q.  Okay.  And I know you mentioned that they train

23   new cadets on the law; is that right?

24       A.  Yes.

25       Q.  Why do they teach -- why do they teach the -- the

Page 25

1    cadets -- well, first off, can you explain, when you say

2    "the law," the law, as you and I both know, is a rather

3    broad thing.  So, like, what aspects of the law would

4    they sort of -- would they teach to the cadets?

5        A.  There's two blocks of instruction that are --

6    that are called "legal."  It's mostly criminal

7    procedure, but it also includes a lot of -- of things

8    that are particular to us, like use of deadly force.

9    Most of it's criminal procedure, jurisdiction, what we

10   have -- you know, we don't have -- we can't make traffic

11   stops.  We can't -- we can't arrest somebody for

12   shoplifting at Costco.  We don't have jurisdiction.

13   So -- so a lot of it's -- it's jurisdiction, it's lot of

14   criminal procedure, and it's a lot of, like, deadly

15   force and -- and use of force.  And there's some other

16   things as well.

17       Q.  Oh, okay.  So it sounds like a lot of it, then,

18   is -- the jurisdiction one would be very helpful.  That

19   would be a bad thing to accidentally act when you

20   shouldn't have.  But it sounds like a lot of it, then,

21   is about, as you said, criminal procedure, sort of the

22   rules and laws surrounding how you investigate crime,

23   how you arrest people, how you, you know, search and

24   seize.  Is that generally correct?

25       A.  Correct.

1       Q.  Okay.  And is it fair to say that they teach you

2   that, those areas of law, the criminal procedure, so

3   that you and the other -- once you're FBI agents, you

4   don't inadvertently violate someone's constitutional

5   rights?

6               MR. RODGERS:  Objection, speculation, lacks

7   foundation.

8   BY MR. FROMMER:

9       Q.  I'm asking -- I'm asking you personally.  Do you

10  believe that that's one of the reasons -- is that one of

11  the reasons you --

12      A.  Yes.

13      Q.  -- understood that?  Yeah.

14          And do they teach you substantive -- like,

15  substantive criminal law?  Like, what -- what are the

16  various crimes?

17      A.  Not exactly.  That would be more in the

18  investigative training unit, where they kind of come in

19  and you'll get a block of instruction on, like, white

20  collar crime, and you'll get a block of instruction on

21  drug trafficking, and how you might investigate that.

22  But it's more geared towards how you might investigate

23  it, not what the laws are.  So --

24      Q.  Okay.

25      A.  -- they don't drag out the code books and, you

Page 27

1    know.

2        Q.  Thankfully.  Okay.  That makes sense.  I

3    understand.

4        So they're teaching you -- to the extent they

5    teach you substantive law, it's in -- it's in the

6    context of how to investigate potential violations of

7    those laws.

8        A.  Correct.

9        Q.  Okay.  So when you -- when you did Hogan's Alley,

10   and -- those were all those criminal procedure, do they

11   teach you how to make an arrest?

12       A.  Well, I'm not -- I'm not really sure what you

13   mean by that.

14       Q.  Well, I mean --

15       A.  They teach us how to put handcuffs on somebody,

16   is that what you mean?

17       Q.  Yeah.  Well, yeah.  Literally, like if there's a

18   crime -- you know, if you're arresting someone for a

19   crime you -- you handcuff them, you read them their

20   Miranda rights.  You know, do they teach you those

21   various sort of steps in arresting someone?

22       A.  Yes.

23       Q.  Okay.  And is it fair to say that the reason they

24   teach that, in your opinion, is so that you don't

25   accidentally make a bad arrest, an arrest that would

Page 28

1    later potentially get tossed out?

2        A.   No.  Actually, I really wouldn't characterize it

3    like that.  So what we do is so different from what

4    police do.  I mean, we're generally going in with a

5    warrant already.  So we usually have these big

6    investigations that end with an indictment and arrest

7    warrants.  And so what we're doing in Hogan's Alley and

8    that type of training, they usually start the scenario

9    with:  You have an arrest warrant for this guy, you have

10   information that he's in this location, go do it.

11       Q.   Oh, okay.  So it's mostly about -- they teach you

12   how to make an arrest just for the -- to make sure you

13   do the arrest correctly; is that fair?

14       A.   Safely and correctly, yes.

15       Q.   Okay.  And do they teach you how to apply for a

16   search or seizure warrant?  Let me -- let me correct

17   that.

18            When you're doing training at Quantico, did they

19   teach you how to apply for a search or seizure warrant?

20       A.   Not exactly, no.

21       Q.   You said "not exactly," so it seems like there's

22   something that --

23       A.   They teach you how to investigate -- investigate

24   the case.  And they would tell you that at this point,

25   you know, you have enough information, get with your

1    AUSA and get a warrant.  But they don't go through the

2    nuts and bolts.  You don't really do that until you get

3    in the field and work a case and work with the United

4    States Attorney's Office.

5        Q.  Oh, okay.  That makes sense.  Until you're in the

6    field, you can't really -- it's a little bit of

7    on-the-job training?

8        A.  Correct.

9        Q.  Okay.  Well, do they -- okay.  So I understand

10   the applying part.  That's more of what happens --

11   applying for a warrant, that's more of what happens with

12   the AUSA once you're out of Quantico and you're

13   assigned.

14       When you're at Quantico, do they teach you how to

15   execute a search or seizure warrant?

16       A.  I mean, yes.  Again, that's -- that's the

17   tactical part.  So they would start with:  You have a

18   warrant.  You know, go execute it.

19       Q.  I hope they give you a little more instruction

20   than that.

21       A.  I don't -- I kind of don't know what you're

22   asking.  I don't know where you're going.  I don't know

23   what you're trying to get to.  So I'm trying to answer

24   the questions like it's not -- how to do this really --

25   you really learn this more in the field than you learn

Exhibit K
799

Page 30

1    it at Quantico.

2       Q.  Okay.  When they -- I get that, but, like, do

3    they give -- does Quantico provide, like, materials?

4    You said you have these blocks.  Like, do they give you,

5    like, training guides or manuals to explain how to do

6    things like make an arrest or execute a warrant?

7       A.  No, not really.  I don't -- I never got a manual

8    at --

9       Q.  You never --

10      A.  -- Quantico.

11      Q.  You never got a manual at Quantico?

12      A.  I got a manual in the field, but I never got a

13   manual -- we didn't study off a -- of a written --

14      Q.  Oh.

15      A.  -- book.

16      Q.  Okay.  What was the manual you got once you

17   were -- got into the field?

18      A.  It's call a DIOG.  The Domestic Investigations

19   Operations Guide.

20      Q.  Oh, okay.  All right.  So the DIOG is where an

21   FBI special agent would turn to basically see what FBI

22   policy is about how to conduct some aspect of an

23   investigation --

24               MR. RODGERS:  Objection --

25

Page 31

1    BY MR. FROMMER:

2        Q.   -- is that correct?

3              MR. RODGERS:  Objection, overbroad,

4    speculation.

5    BY MR. FROMMER:

6        Q.   Please, go ahead and answer it.

7        A.   The DIOG is big -- is a big, fat manual with lots

8    of information in it.  And yes, you -- you consult it.

9    So if you have a question about something, you -- you

10   might go into the DIOG and look for the answer.

11       Q.   Okay.  So, for instance, if you wanted to know

12   how am I supposed to do this arrest, or what's the

13   arrest procedures, you would look to the relevant

14   portion of the DIOG for guidance.

15       A.   You could, but you wouldn't.  You'd go to an

16   agent who's -- who's -- you would go to a senior agent.

17   Like, it's a -- it's very much on-the-job training.

18   Like, when you start, you have a -- you have a training

19   agent, and you're with other senior agents, and you

20   learn from them, and you learn the process and the

21   procedures.

22             You can consult the DIOG if you have a question.

23   If there's something -- something unusual, something you

24   don't do all the time, something that nobody knows how

25   to do, or there's a -- there's a question, there's an

Page 32

1    issue, you would go to the DIOG and look it up and see,

2    well, what does the DIOG say.

3           But in general, the -- the training is -- is real

4    life.  It's you just go do the job.  And you do it under

5    the supervision -- supervisory of training agents.  You

6    know, you bring in whatever skills you have, and you --

7    you work through your time as a probationary agent.

8        Q.  Okay.  I think that makes sense.

9           So is it fair to say, then, that while the DIOG

10   exists, although the DIOG exists, that often -- in your

11   experience, at least -- you would learn how to do things

12   by getting advice from other FBI agents?

13       A.  Correct.

14       Q.  Okay.  And that the DIOG was there more as a --

15   as a resource if you wanted it; is that correct?

16       A.  Correct.

17       Q.  Okay.  How many times would you say that you

18   referred to the DIOG, actually looked up stuff,

19   something in the DIOG, since you've been in the L.A.

20   field office?

21       A.  Fewer than ten.

22       Q.  Okay.  So it's -- yeah.  And, again, I'm not

23   asking for a precise number, but --

24       A.  It's like an encyclopedia.  You go to it -- it's

25   a resource.  "Resource" is great word.  It's like a

Exhibit K
802

Page 33

1    dictionary, or encyclopedia, or a thesaurus.  If you

2    need it, it's there.  You go to it, you -- you find it,

3    and you look it up.

4        Q.  Okay.

5        A.  But there's other ways to get answers to

6    questions.

7        Q.  Rather than going through a 1,200 page tome?

8        A.  Correct.

9        Q.  So -- all right.  So I know you -- you did the

10   four months at Quantico, you graduated.  Then you become

11   an FBI special agent, and it sounds like you've been --

12   gone quite a few different places.

13       Once you're a special agent, do -- do they give

14   you -- does the FBI provide any type of continuing

15   training?

16       A.  Yes.  There's training -- there's mandatory

17   trainings we have to take every year, there's -- that

18   are online, there's continuing stuff, there's trainings

19   on all kinds of different topics that might be specific

20   to what you're -- what you're doing or investigating.

21   Trainings offered all the time.

22       Q.  Okay.  And I was going to ask, like, is

23   continuing training regular, and it sounds like it is in

24   fact a regular activity.

25       Do they -- does the FBI, when they provide this

Page 34

1    continuing training, do they give training on, like,

2    changes in the law?  Like, to the extent it affects

3    how -- criminal procedure?

4      A.  Hundred percent, yes.  We get legal training, I

5    think, every quarter.  And that's one of the main things

6    they do, is they'll say:  Oh, the Supreme Court case,

7    the Booker case came out.  This is what it is, this is

8    what it means, this is how it affects you, you know.

9      Q.  Okay.  And --

10             MR. RODGERS:  I'm sorry.  Can we hold for

11   just a second?  Are you seeing my emails that are

12   popping up?

13             MR. FROMMER:  No.

14             MR. RODGERS:  They're not popping up?

15   Because they're popping up on our screen.

16             MR. FROMMER:  No.  All -- the only thing we

17   see is -- I see your shoulder and Special Agent

18   Zellhart.  That's all I see.  Well, and the backpack

19   over there behind you.

20             THE VERITEXT CONCIERGE:  Yeah, I'll confirm

21   that.  This is the concierge, tech support.  I can

22   confirm that we are not seeing your emails.

23             MR. RODGERS:  Thank you.  I thought I shut

24   that off, but I'm having problems.  I'm sorry.  Go

25   ahead.

Page 35

1              MR. FROMMER:  Oh, no.  It's fine.  I can
2      understand.  That would be a slight concern.
3              MR. RODGERS:  Right.
4      BY MR. FROMMER:
5      Q.  So they give you -- it's fair to say, then, that
6      the FBI regularly provides training on legal changes.
7      A.  Yes.
8      Q.  And is the -- do you understand that the -- the
9      purpose for that to be so that when you're conducting
10     FBI business, you do so consistent with the laws and
11     constitution?
12     A.  Correct.
13     Q.  Okay.  Now, I know for Quantico a minute ago you
14     said that they didn't really have very many training
15     materials, but when you do this sort of continuing
16     training, do they provide you with materials to review
17     or use?
18     A.  Not really.  I mean, they'll have -- sometimes
19     they'll have, like, a PowerPoint presentation that they
20     show you.  But there's -- it's not -- there's not like a
21     book, or anything.
22     Q.  Oh, okay.  All right.
23     A.  That's the same thing at Quantico.  I could add
24     that most of the instruction is by PowerPoint, or was in
25     2004.  I don't know what they're doing now.  But they

Page 36

1   would do a PowerPoint presentation.  But you didn't, you

2   didn't -- you didn't have it.  It wasn't handed out.  It

3   wasn't --

4       Q.  They didn't give you copies of the slides?

5       A.  No.

6       Q.  Okay.  That's -- that's interesting.

7           Oh, yeah, I -- I talked a little bit about -- we

8   talked a little bit about, like, asset forfeiture

9   training generally, but, like, when you've done this

10  continuing training, have there been any modules

11  regarding asset forfeiture?

12      A.  I think so, yes.

13      Q.  Do you remember when, approximately, your last

14  training concerning asset forfeiture was?

15      A.  I don't.  I'm pretty sure we've done -- it was --

16  came up in legal at some point, but I don't remember

17  when.

18      Q.  Okay.  That's fine.

19          All right.  Let me -- so you have been with the

20  FBI since -- is 2004, is that correct?

21      A.  Correct.

22      Q.  All right.  And based on your history, your

23  employment history while at the FBI, you know, Cleveland

24  and then the L.A. safe streets, and the drug -- high

25  intensity drug task force, is it fair to say that you're

Exhibit K
806

Page 37

1   very experienced in drug interdiction and anti-money

2   laundering investigations?

3      A.  Yes.

4      Q.  Is it fair to say you're very experienced on

5   asset forfeiture?

6      A.  I'm getting there.  No.  I mean, I wouldn't -- I

7   wouldn't characterize it that way.  I am -- I'm

8   considered a money laundering subject matter expert at

9   the FBI, and I am not considered an asset forfeiture

10  anything.

11       But at this -- but like everything we do, I've

12  done it a lot now in the last year, I've dealt with it a

13  lot, and so what happens is people who have questions

14  will come to me and say:  Hey, Lynne, you know, I'm

15  having this happen.  What do I do or who do I talk to?

16  And then I usually direct them to one of the asset

17  forfeiture people.

18     Q.  Okay.  So is it fair to say, like, you have

19  learned enough so as to -- let me -- let me -- I want to

20  make sure this actually is a clean question.

21       Is it fair to say that with regards to asset

22  forfeiture you've learned enough so as to properly set

23  up a case to be able to hand it over to the asset

24  forfeiture people?

25     A.  I mean, yeah.  I think so, yeah.

Exhibit K
807

Page 38

1      Q.  Okay.  Well, it sounds like -- and you know

2    enough about asset forfeiture to, when other people come

3    to you with an asset forfeiture question, to either

4    answer it or send them over to the asset forfeiture

5    people.

6      A.  Yeah.  The question is usually:  Who over there

7    should I talk to?

8      Q.  Not a particularly substantive question.

9      A.  Yeah.  That's correct.

10      Q.  Okay.  All right.

11            MR. FROMMER:  Okay.  Give me just a second,

12    please.  All right.

13            All right.  I am about to introduce an

14    exhibit.  Hopefully this goes well.

15            (Exhibit 3 marked at this time.)

16    BY MR. FROMMER:

17      Q.  All right.  You should have in that folder now an

18    exhibit marked Exhibit 3, Zellhart Exhibit 3.  And this

19    is the warrant and supporting application for the U.S.

20    Private Vaults case.  Do you see Exhibit 3?

21      A.  Yes.

22            THE VERITEXT CONCIERGE:  Counsel, do you

23    want that screen shared?

24            MR. RODGERS:  We have it.

25            THE VERITEXT CONCIERGE:  I'm asking the

Page 39

1    questioning attorney, do you want this screen shared for

2    the picture in picture purposes?

3                    MR. FROMMER:  Yeah, please.

4                    THE VERITEXT CONCIERGE:  Okay.  Stand by.

5    One second.

6                    Terri, good?

7                    THE VIDEOGRAPHER:  Got it.  Thank you.

8                    MR. FROMMER:  And can we go to -- do I have

9    control over the exhibit, or --

10                   THE VERITEXT CONCIERGE:  I'll give you

11   control, sir.

12                   MR. FROMMER:  Okay.  Let me go down to --

13   I'm going to go down --

14   BY MR. FROMMER:

15     Q.  Well, first, Special Agent Zellhart, I purport to

16   say that this is the warrant and supporting application.

17   Does that -- does -- for the U.S. Private Vaults seizure

18   warrant.  Do you agree that this is what that document

19   is?  And you can take a few minutes to go through it, if

20   you'd like.

21                   MR. RODGERS:  I'm sorry.  Could you identify

22   that -- that again?  We're going through the exhibit

23   and, quite frankly, I missed your identification.  Did

24   you ask if this was the warrant for the U.S. Private

25   Vaults matter?

Page 40

1          MR. FROMMER:  Yes.  I asked if this is the

2     warrant, the warrant application, the underlying

3     affidavit, for the U.S. Private Vaults matter.

4     BY MR. FROMMER:

5        Q.  And take your time to look through it.

6           Did you have a chance to review the document?

7          MR. RODGERS:  We're -- we're still going

8     through it.

9              THE WITNESS:  Okay.

10         MR. RODGERS:  The witness can answer, but

11    this appears to be the -- the search warrant, the

12    application for the search warrant, the affidavit in

13    support of the application for the search warrant.  The

14    seizure warrant, the application for the seizure

15    warrant, the affidavit in support of the application for

16    the seizure warrant.

17         MR. FROMMER:  You are being far more

18    exhaustive than I am, Victor, so thank you.

19    BY MR. FROMMER:

20       Q.  But Special Agent Zellhart, do you agree with

21    your counselor's representation about what this document

22    is?

23       A.  Yes.

24       Q.  Okay.  So I know before that you said you'd had

25    some training on anti-money laundering and asset

Page 41

1    forfeiture.  And so can you go to page 28?  And it's

2    lines 22 through 25 that I'm focused on.

3                MR. RODGERS:  Are you referring to Bates

4    stamped page 28?

5                MR. FROMMER:  USAO 28, yeah.  Sorry about

6    that.

7                MR. RODGERS:  We are on that page.

8                MR. FROMMER:  Okay.

9    BY MR. FROMMER:

10   Q.  And can you read the sentence that begins on line

11   22 and ends on line 25?

12   A.  Sure.

13        I have also attended a 40-hour asset

14   forfeiture/money laundering class, two week-long money

15   laundering facilitation conferences, and several other

16   conferences sponsored by the various anti-money

17   laundering interests.

18   Q.  Okay.  And I assume, since you put that in your

19   affidavit, that's true; correct?

20   A.  Correct.

21   Q.  Can you tell me a little bit about -- it says,

22   "several other conferences sponsored by the various

23   anti-money laundering interests," and I was just

24   wondering if you can describe to me who some of those

25   groups might be and the conferences you attended.

Exhibit K
811

Page 42

1       A.   Sure.   When I was with the Los Angeles County

2    Sheriff's task force, that task force was set up by

3    funding from a lawsuit Arizona -- Phoenix, Arizona did

4    with Western Union.   As part of the settlement, Western

5    Union funded anti-money laundering task forces across

6    the southwest.   So they were in Phoenix, they were in

7    San Diego, they were in Los Angeles, they were in New

8    Mexico, I think we had one in Texas.   So the entire

9    southwest border was funded with money laundering --

10   anti-money laundering task forces.

11       And those groups met -- as a group met, I think,

12   every six months to, you know, to exchange information,

13   to, you know, give progress reports, updates, best

14   practices, that type of thing.   I didn't go to all of

15   those, but I went to many of them.

16       Q.   Okay.   So when you were talking about the

17   conferences, you were thinking specifically about the

18   ones with the other task force dealing with money

19   laundering issues in the southwest; is that correct?

20       A.   Correct.

21       Q.   Okay.   And in the next sentence it says -- I'll

22   just read this:

23       I have made presentations on money laundering

24   investigations at several training conferences,

25   including the asset forfeiture summit for law

Exhibit K
812

Page 43

```
 1    enforcement executives --

 2          And I believe -- let me see if I can turn the

 3    page.

 4          -- in March of 2018.

 5          So can you tell me a little bit about that

 6    training that you gave?

 7    A.   Yes.  I gave the money laundering portion of the

 8    training.  They -- the law enforcement officers, I

 9    think, were there for the asset forfeiture, but I was

10    there -- I was the money laundering block of

11    instruction.  So my presentation --

12    Q.   Okay.

13    A.   -- was on money laundering.

14    Q.   Got it.  All right.  Very good.

15          Do you happen to have any of the materials that

16    were used at those conferences?

17    A.   I don't know.

18    Q.   Okay.  That's fine.

19          I have a, just sort of a general question, and

20    maybe you can help me with it, because I -- I saw --

21    I've seen some -- a term that I hadn't heard about

22    before.  It was a -- it was CATS.  It was, like, one of

23    those acronyms, but it was called CATS.  Do you -- do

24    you know what CATS is?

25    A.   I know what it is, but I don't know what it
```

Page 44

1    stands for.  So CATS ID number is a -- is an

2    identification number we use to identify an asset.  But

3    I don't know what the acronym stands for.

4        Q.  Okay.  And do you know who runs that system?

5        A.  I don't.

6        Q.  Okay.  Is it -- it's a DoJ system; correct?

7        A.  I don't know.

8        Q.  Okay.  You don't know?

9            Okay.  And you said that's where all assets

10   are -- is the purpose of CATS to create a record of

11   every asset that has been seized by, I guess, the FBI

12   and other participating agencies?

13           MR. RODGERS:  Objection, lacks foundation,

14   calls for speculation.

15           THE WITNESS:  And I'm not sure.

16   BY MR. FROMMER:

17       Q.  Okay.

18       A.  Like I said, I know from -- from a practical

19   point of view, when we have an asset it needs a CATS ID

20   number.  And that's why you call the asset forfeiture

21   team and tell them what you're doing, and then they jump

22   into action.

23       Q.  Does every single item -- let's say I have, I

24   don't know, you know, just like a magazine.  Like a

25   comic book.  Okay?  And -- and for some reason there's

Page 45

1    an inventory done, and my comic book is there.  Would

2    that get a CATS number?

3                    MR. RODGERS:  Lacks foundation, calls for

4    speculation.

5                    THE WITNESS:  Not necessarily.

6    BY MR. FROMMER:

7      Q.  So I guess the question is, what do you mean

8    by -- what is -- when you use the term "asset" with

9    regards to CATS, what -- what is your understanding of

10   what the term "asset" means?

11                   MR. RODGERS:  Same objections.

12                   THE WITNESS:  And I don't -- I don't -- I

13   don't know how to answer that.  Like, my job is very

14   practical.  If I'm, say, in a drug case and we're

15   seizing drug proceeds, that's -- cash is clearly an

16   asset, and it's -- it's subject to forfeiture because

17   it's proceeds of a crime.  So I know that.

18                   The nuts and bolts of how that works

19   internally is someone else's specialty.  So what I need

20   to know is I need to identify, hey, this is proceeds of

21   a crime, it's cash, it's valuable.  I don't want to give

22   this back to the bad guy.  I think this -- I think this

23   needs a CATS ID, I think this needs asset forfeiture to

24   be involved, and then I get them involved.

25

Page 46

1    BY MR. FROMMER:

2       Q.  Okay.  So is it fair to say, then -- so if you

3    find a piece of evidence, just a piece of evidence,

4    in -- while investigating a crime, do all -- does every

5    piece of evidence that you find get a CATS number?

6              MR. RODGERS:  Objection --

7    BY MR. FROMMER:

8       Q.  Can you -- I'm sorry.  Let me rephrase.

9           Let's say you find a piece of evidence.  You're

10   going to seize the piece of evidence as part of the

11   investigation.  Does it -- would that evidence get a

12   CATS number?

13             MR. RODGERS:  Objection, lacks foundation,

14   calls for speculation, assumes facts not in evidence.

15             THE WITNESS:  And the answer is no.

16   BY MR. FROMMER:

17      Q.  Okay.  So items --

18      A.  No.

19      Q.  -- that are seized -- is it fair to say, then,

20   that items that are seized for just evidentiary purposes

21   are not given a CATS number?

22             MR. RODGERS:  Same objections.

23   BY MR. FROMMER:

24      Q.  Based on your understanding of being an FBI agent

25   for 18 years.

Page 47

1          MR. RODGERS:  Same objections.

2          THE WITNESS:  So it could be both.  Right?

3     So it could have both evidentiary value and it could

4     have forfeiture -- asset forfeiture potential.  For

5     example, if I seize cash that had dye pack on it from

6     a -- from a -- which explodes in a bank robbery, that

7     has both evidentiary value and it has potential

8     forfeiture value.  So -- so some -- it's very dependent

9     on the circumstances of -- of what I'm doing.  But I can

10    seize all kinds of general evidence that doesn't have

11    any -- any value, any forfeiture value, and that will

12    never get a CATS ID.

13    BY MR. FROMMER:

14    Q.  Okay.  So whether something -- is it fair to say,

15    then, based on your experience as an FBI agent, that

16    whether something gets a CATS number turns on whether

17    it's merely evidence versus -- let me -- let me rephrase

18    that.  I was saying that poorly.

19         Is it fair to say, based on your experience, that

20    CATS numbers are given to seize property where there's a

21    potential for asset forfeiture to become involved?

22          MR. RODGERS:  Objection, calls for

23    speculation, lacks foundation, assumes facts not in

24    evidence, and may call for a legal conclusion.

25          THE WITNESS:  Yes.

Page 48

```
 1              MR. FROMMER:  Susan, can you do me a favor
 2     and read my last question again, just so that I can make
 3     sure that I understand that -- I'm a little confused
 4     about the "yes" here, so...
 5          (Whereupon the reporter read the record.)
 6     BY MR. FROMMER:
 7       Q.  And that -- your answer to that was "yes;"
 8     correct?
 9              MR. RODGERS:  Same objections.
10              THE WITNESS:  Yes.
11     BY MR. FROMMER:
12       Q.  Okay.  Thank you.  All right.
13          So I know that you have -- you've -- have you
14     arrested people before?
15       A.  Yes.
16       Q.  Okay.  How many, do you think?
17       A.  I don't know.  A lot.
18       Q.  Probably --
19       A.  I mean, me -- so there's a difference.  So -- so
20     particularly early in my career when I was working big
21     drug trafficking organizations, our cases would often
22     end in arrests of 50 or 60 people.
23       Q.  Wow.
24       A.  I didn't personally put handcuffs on 50 or 60
25     people.  But the cases I've worked have resulted in
```

Exhibit K
818

Page 49

1       those kind of numbers.

2            And then contrarily, I have been on teams, arrest

3       teams, that -- for cases I didn't work.  So somebody

4       else worked a case and they're arresting ten people next

5       week, and they need -- they need agents to go help them

6       do arrests, and I will be on an arrest team.

7            So it's pretty hard to put a number on that.

8       It's -- it's, you know -- it's -- it could be a lot.

9       Q.  Okay.  That's fine.  I'm not looking for a

10      precise number, I was just -- I figured that you had

11      been involved with a number of arrests.  I just wanted

12      to make sure that that was the case.

13      A.  Correct.

14      Q.  So have you -- let me ask this question:  Do --

15      does an FBI agent apply for a warrant, or does -- well,

16      let me ask that.  I'll just leave it there.

17           When -- does an FBI agent apply for a warrant, or

18      is that done by someone else?

19      A.  So the U.S. Attorney's Office handles the

20      application.  The FBI agent provides the affidavit, and

21      occasionally some exhibits, maybe a photograph or

22      something else.  That gets applied to the U.S.

23      Attorney's Office, and then the AUSA that you're working

24      with prepares the actual warrant, the application for

25      warrant, the proposed order, everything else that goes

1    with it, if there's a sealing order.  All of that is

2    done at the U.S. Attorney's Office.

3        Q.  Okay.  So your participation in the warrant

4    application process seems -- is limited to crafting an

5    affidavit in support of the warrant application; is that

6    fair to say?

7        A.  Correct.  And swearing it out in front of a

8    judge.

9        Q.  And how did you learn how to write a good

10   affidavit in support of a warrant application?

11       A.  Well, I had a good education, I was a good writer

12   in school.  I -- I wrote one early on.  I wrote a Title

13   III affidavit within a few months of starting the FBI.

14   I didn't do it alone, I had some -- I had something to

15   go by, I had a training agent, I had a supervisor, I had

16   an AUSA working with us.  But I wrote that one, and then

17   from there you're just sort of off to the races.  You,

18   like -- you know.

19       Q.  Okay.  So it's training -- it sounds, then, that

20   you get familiarity for how to write out an affidavit

21   based on training and experience; is that correct?

22       A.  Correct.

23       Q.  Okay.  And you said that the first few times you

24   might work with other FBI officials in crafting the

25   affidavit; is that correct?

Exhibit K
820

Page 51

1      A.   Correct.

2      Q.   Do you know if there are any forms or exemplars

3    that FBI field offices have that are meant to guide

4    agents when they're swearing out or writing an affidavit

5    in support of a warrant application?

6      A.   There might be.  There probably are.  I don't --

7    I don't know for sure.

8      Q.   Okay.  So there -- there may potentially be

9    guidelines or materials to help people write an

10   affidavit in support of a warrant application, but

11   you're just not aware of them, personally.

12     A.   Correct.

13     Q.   Okay.  Well, we just talked about applying for a

14   warrant, so I guess let's talk about the other, the flip

15   side of that, which is executing one.

16          Not to assume -- well, I will assume.  Have you

17   executed warrants while at the FBI?

18     A.   Yes.

19     Q.   Yeah, I'm -- yeah, I'm not talking about, like,

20   this specific one, I just meant generally.

21          You know where I'm -- how many, approximately?

22   Again, ballpark.  I'm not going to hold you to a

23   specific number.

24     A.   A lot.

25     Q.   Okay.

Page 52

1      A.  The same reason.  I -- especially working a lot

2   of drug cases, you -- you know, you get a lot of

3   warrants.  And, again, I'm not always executing the

4   warrants that -- that are part of my investigations.  We

5   also help other groups when they have -- you know, very

6   frequently in your case you'll have, say, four locations

7   that you would like to search.  This is somebody else's

8   case, and they -- so they need four groups of people.

9   And so, you know, you raise your hand and say yes,

10  I'll -- I'll help.  You know, and then you go out and

11  help on a warrant.  I -- honestly, very difficult to put

12  a number on that after 18 years.

13     Q.  Oh.

14     A.  Because we -- we raise our hand a lot.  I do --

15  I've done health care fraud warrants, I've done, you

16  know, public corruption cases.  It doesn't matter, I'll

17  do anybody's case.  If they need help you -- you

18  volunteer to help, if you can.  And then you go out and

19  help execute the warrant.

20     Q.  Okay.  Well, that's -- and that's a good office

21  culture, where people, you know, step up and volunteer

22  to help one another out.

23          So it sounds like we can say this is in the

24  dozens, if not potentially hundreds of warrants that

25  you've helped execute.

Page 53

1      A.  Correct.  It's probably not hundreds, but it's

2      dozens.  Lots of dozens.

3      Q.  Now, I remember a second ago you said that, you

4      know, you raise your hand, you know, when -- like, the

5      specific FBI agent, special agent, who -- whose case it

6      is needs to execute multiple search or seizure warrants

7      at the same time.  Is it always the case that -- does

8      the FBI only execute warrants in conjunction with other

9      FBI personnel?

10     A.  No.  I mean, we do work in task forces, we have

11     quite a few task forces with other local police

12     departments.  So I -- I know -- it's not -- and we work

13     with other federal agencies as well, so it's not

14     exclusive.

15     Q.  So there could be times where the FBI works with

16     either other federal agencies or state and local

17     agencies as part of a task force to execute a warrant;

18     is that correct?

19     A.  Correct.

20     Q.  Okay.  Is that a -- is the FBI working with other

21     state or federal agencies to execute warrants a -- a

22     common occurrence, in your experience?

23            MR. RODGERS:  Objection, lacks foundation,

24     relevance, assumes facts not in evidence.  Go ahead.

25            THE WITNESS:  Yes.

Page 54

1    BY MR. FROMMER:

2        Q.   Okay.   So you said that you've executed warrants

3    before.   When you execute a warrant, is one of things

4    you have to do is read the warrant?

5        A.   Yes.

6        Q.   Why do you need to read the warrant?

7        A.   Well, I'll sort of distinguish.   If I wrote it,

8    then, you know, I probably know it pretty well.   If

9    you're executing somebody else's warrant, you need to

10   know the -- you need to know the details, you need to

11   know the items to be seized.   What are you looking for?

12   Is this a -- is this health care fraud?   Is it -- is it

13   a documents warrant?   Is it a drug warrant?   Are we

14   looking for drugs, guns, and money?   Are we looking for

15   paper?   What are we looking for?

16          So you need -- you need to understand what we're

17   looking for, where we're going to be.   Like, you're

18   going to need to know what -- are we going to an

19   apartment?   Are we going to a house?   Are we going to an

20   office building?   What time are we going?   So all of

21   those kinds of details.

22       Q.   Okay.   So it sounds like there's multiple reasons

23   to read a warrant before executing it; is that fair to

24   say?

25       A.   Correct.

Exhibit K
824

Page 55

1      Q.  And one of them -- it sounds like one reason to

2    read the warrant is to know the logistical details of

3    how the warrant should be executed.  Is that fair to

4    say?

5      A.  Well, not too much of that is going to be in the

6    warrant.  The warrant's pretty -- pretty bland.  It

7    doesn't -- it's not -- usually not heavy on those kinds

8    of details.

9      Q.  Oh, okay.

10      A.  Actually, we'll prepare a plan for how to execute

11   the warrant.

12      Q.  Oh, okay.  So the -- the FBI actually prepares a

13   plan -- once it receives a warrant, an agent will

14   prepare a plan about how to execute that warrant; is

15   that correct?

16      A.  Correct.

17      Q.  Okay.  And -- and that operational plan, that

18   would have more details as to the logistics around

19   executing a warrant; is that fair to say?

20      A.  Correct.

21      Q.  Okay.  Is another reason to read the warrant --

22   and I think you already mentioned this, but is one

23   reason to read the warrant also to ensure that you

24   follow the instructions and limitations that are written

25   into the warrant?

**Exhibit K**
**825**

Page 56

1        A.  If there -- if there are any.  I don't know

2    what -- what kind, I guess, kinds of limitation.

3        Q.  Well, it also might say you can go here and not

4    here.  Like a specific location that you can search, or

5    specific items that you are looking for.

6            Wouldn't you need to read the warrant to know

7    where to search and what items are subject -- subject to

8    seizure?

9        A.  Right.  That's the most important.  So the -- we

10   usually call it Attachment B, it's usually what it ends

11   up being.  And that's the list of things -- like I said,

12   that's what you're there to search for.  So are we --

13   what are we looking for today?  Are we looking for --

14   for documents?  Are we looking for files?  Are we

15   looking for only files with these names on them, or

16   these business names?  Are we looking for drugs?  Are we

17   looking for money?  Are we looking for guns?  Are we

18   looking for OJ's bloody knife?  Like, what are we

19   looking for?  That is specified in the warrant.  And

20   that -- yes.  We -- we definitely look at that.

21       Q.  Okay.  And it's fair to say that, you know, your

22   authority to execute a warrant is limited by the

23   instructions and limits that are written into the

24   warrant; is that correct?

25            MR. RODGERS:  Objection, legal conclusion.

Exhibit K
826

Page 57

1          THE WITNESS:  Yes, if there are any.

2     BY MR. FROMMER:

3          Q.  Sure.  To the extent there are any.

4          But to the extent there are any limitations in

5     the warrant, you would have to read the warrant so that

6     you don't transgress them; is that correct?

7          MR. RODGERS:  Same objections.

8          THE WITNESS:  Correct.

9     BY MR. FROMMER:

10         Q.  Have you ever conducted an inventory before?

11         A.  Prior to U.S. Private Vaults?

12         Q.  Just -- yeah, generally.  Just ever.  As -- let

13     me rephrase.

14         During your time as an FBI agent, from 2004 to

15     the -- to the present day -- or let's -- let's exclude

16     Private Vaults, actually.

17         So from 2004 up to March 22nd, 2021, did you ever

18     conduct an inventory before?

19         A.  I don't think so.

20         Q.  Okay.  Why do you say that?

21         A.  Well, I don't -- I don't have the specific

22     recollection of doing so, and it doesn't -- it doesn't

23     kind of come up regularly in the course of our jobs.  We

24     don't do car stops, generally.  We can, but we generally

25     don't do car stops.  We don't do probable cause arrests,

Exhibit K
827

Page 58

1    where we just arrest somebody on the street.  So it

2    doesn't -- it doesn't come up very often in the course

3    of our jobs.

4         And the only reason I hesitate is having worked

5    on so many task forces with -- with local law

6    enforcement, I'm trying to recall if I did one with

7    them, but I don't think so.  I can't think of a time --

8    I can't recall a specific time when I conducted an

9    inventory search.

10   Q.  Okay.  That's fair.

11        My next question was how many, but it sounds like

12   the how many is you don't recall, and your best guess is

13   zero.

14   A.  Correct.

15   Q.  Can you tell me, you know, based on your

16   training -- well, and your law degree -- can you

17   describe to me what the purpose -- what are the purposes

18   behind inventory?

19             MR. RODGERS:  Objection to the extent it

20   calls for a legal conclusion.

21             THE WITNESS:  Sure.  So an inventory search,

22   you're taking -- we are taking custody of property.  So

23   we want to identify the property, we want to protect the

24   property from damage, we want to get a record of it so

25   that we can recall it again later.  We want to protect

Exhibit K
828

Page 59

```
 1    ourselves from anything that -- like, hazardous

 2    material, and we want to also protect ourselves from an

 3    accusation later that, hey, what happened to my, you

 4    know, whatever, gold watch.  So -- so it's a -- it's a

 5    process to account for property that we are taking

 6    custody of.

 7    BY MR. FROMMER:

 8       Q.   Okay.  Is -- so I heard, and correct me if I'm

 9    wrong, that the purposes are, you know, protect the FBI

10    from accusations that, you know, property went missing,

11    make sure the property -- keep FBI agents safe, you

12    know, from potentially dangerous property.

13            Is the purpose of an inventory also to search for

14    contraband or potential evidence of criminality?

15       A.   No, but we're not required to ignore it either.

16    So it's not the purpose of an inventory search, but we

17    don't have to pretend we don't see it.  We don't have to

18    turn a blind eye.  If it's in plain view, it's in plain

19    view.

20       Q.   Well, I guess that's an interesting question.

21    What does the term "plain view" mean to you?

22               MR. RODGERS:  Legal conclusion.

23               You can answer.

24               THE WITNESS:  Well, so if I -- if I --

25    this -- in the modern day, this is -- this is easy.  If
```

Page 60

1    I'm looking at a thumb drive, it's a thumb drive.  I

2    can't go into it and see what's on the thumb drive.  So

3    the thumb drive's in plain view.  The digital matter

4    inside it is clearly not.  That would require an

5    additional search warrant.  But if I'm looking at stuff

6    and it's -- it's there, and I can see it and smell it

7    and touch it, then it's in plain view.

8    BY MR. FROMMER:

9        Q.  Okay.  So if -- so like with a thumb drive, you

10   would have to take some action to learn what was -- what

11   the thumb drive contains; right?

12       A.  Correct.

13       Q.  And that would not be plain view; is that right?

14       A.  Correct.

15       Q.  Okay.  So if you have an envelope, like a sealed

16   envelope, and -- that, you know, it feels like it has a

17   letter in it, is it -- is it similarly the case that you

18   can look at the envelope, because there's the envelope,

19   but you can't open the envelope up to see what's inside?

20       A.  Not necessarily.  Because if the envelope

21   contains cash, I have to take an inventory of the cash,

22   again to protect myself from an accusation that, hey,

23   what happened to my 50 bucks.  Or if it contains some

24   other valuable thing.  What happened to my birth

25   certificate?  Or, you know, whatever.  So --

Page 61

1      Q.  So in that situation it would be, pursuant to the

2    inventory policy, you might need to open the envelope to

3    see if cash is inside?

4      A.  Right.  Or some other -- some other item.

5      Q.  Yeah.

6      A.  It could be a birth certificate, driver's

7    license.  Yeah, I don't -- I don't know.  Again, it

8    could also contain -- it could contain Anthrax, or

9    Fentanyl, or -- you know, you don't know what.  So I do

10   think you have to open the envelope.

11     Q.  Okay.  I -- I -- but the contents of the envelope

12   aren't in plain view; correct?  You had to --

13     A.  Correct.

14     Q.  You had to undertake some action to get to the

15   contents of the envelope.

16     A.  Right.  It's part of the inventory.

17     Q.  That's part of the inventory.

18         And so, for instance, if you opened up an

19   envelope to see if there's some cash in there -- I think

20   that was what you'd mentioned -- then that would be

21   limited to opening the envelope and just seeing if

22   there's any cash in there; right?

23     A.  No.  I mean, no.  It -- like I said, it's not

24   just cash.  It's, like -- you need to know what's in the

25   envelope.  If you're doing -- if you're inventorying the

Exhibit K
831

Page 62

1    contents of whatever it is you're inventorying, you need

2    to know what's there.  So is it -- cash is one thing it

3    could be.  It could be, like I said, a driver's license,

4    or a birth certificate.  Or it could -- it could be

5    white -- a white powdery substance that's unidentified.

6    I don't know what it is.

7         And that's why you have to check, because for the

8    same reasons underlying the basic policy, you're

9    protecting -- we're protecting ourselves from hazardous

10   material, we're protecting ourselves from an accusation

11   of -- of theft or loss.

12        You also need to -- there's a different way to

13   process valuables, like cash, than there is

14   non-valuables, for us.  So you have to know which bucket

15   it goes into.  Does it go into -- into the protective

16   vault where valuables are, or does it go into the

17   general evidence?  And if you open it up and there's

18   nothing in there but a bunch of papers, then you're,

19   like:  Okay.  It's an envelope full of papers.  And --

20   and then it's -- then it's just an envelope full of

21   papers, or an envelope with a -- with a letter.

22   Q.   Okay.  I -- I think I understand.

23        So you're opening up the envelope because you

24   need to know what's inside because there are two --

25   let's say, put it this way, there are two buckets of

Page 63

1    evidence.  There's regular -- there's, like, common

2    evidence and there's valuables.  And so you need to open

3    up the -- the letter, the envelope, so that you can see

4    whether it contains valuables or not.  Is that fair?

5        A.  That's one reason, yes.

6        Q.  Okay.  But what's the other -- what's the other

7    reason?

8        A.  If it contains something dangerous, or

9    potentially dangerous, that we wouldn't want to put

10   into -- you know, that could be, again, airborne --

11       Q.  Yeah.

12       A.  -- white powdery substance, Fentanyl.  Those

13   types of things.  And even if it's -- even if it's a

14   driver's license or a birth certificate, or something

15   like that, we're still protecting ourselves against an

16   accusation of -- of loss.  Like:  Hey, you know, you

17   lost my birth certificate.  Now I can't, you know, get a

18   license, or whatever.

19       Q.  So --

20       A.  So --

21       Q.  Sorry.  I didn't mean to interrupt.

22       A.  So you're -- it's the same inventory.  It's for

23   the same purposes.  It's to protect the FBI, it's to get

24   an accounting of what's actually there, it's to protect

25   us against an accusation of theft or loss, it's to

Page 64

1    protect us against a hazardous material, and it's -- you

2    know, and it's to get a full, you know, a full

3    accounting of what's there when we return it.

4        Q.  Okay.  I -- so -- but you said a second ago --

5    so --

6        A.  I guess it -- to me it doesn't matter if it's in

7    an envelope.

8        Q.  It doesn't matter if it's in an envelope.  So

9    let's say you opened up an envelope and there's just --

10   you know, it's just a -- like a little paper with some

11   crypto-keys on it.  You know, for cryptocurrency.  Would

12   that be considered a valuable paper?

13       A.  It is now.

14       Q.  What -- because Bitcoin has gone so much up in

15   price?

16       A.  Yeah.  I mean, they actually -- the -- the -- I

17   think -- yes.  Like, that -- that is now considered

18   valuable.  It just looks like a list of fourth grade

19   spelling words, but I think we are now putting those in

20   valuables.  We're treating those as a valuable now.

21       Q.  Okay.  So -- so you're going through, you're

22   looking for valuable items, or items that could be

23   considered valuable, like a birth certificate or these

24   crypto-keys that we were just talking about.  And the

25   idea -- and you're also looking for potential dangers,

**Exhibit K**
**834**

Page 65

```
 1    whether it's the Anthrax spores that we were talking
 2    about, or Fentanyl.
 3          But would it generally be appropriate to just --
 4    you know, it's a -- you open the envelope and it's a
 5    letter.  Would it be appropriate to, you know, unfold
 6    the paper, the letter, and read it?
 7       A.  No.
 8       Q.  Why not?
 9       A.  Because once I -- once I can categorize it --
10    okay, it's a letter, it's a piece of paper -- that's
11    all -- that's all I need to know.
12       Q.  Okay.
13       A.  It's an envelope with a piece of paper.
14       Q.  All right.  And it would be inappropriate to try
15    to read the letter to see if it had any indicia of,
16    like, criminal wrongdoing; is that correct?
17       A.  Correct.  Now, just to add, like sometimes if you
18    don't know -- I know there's an exception if you don't
19    know whose -- whose property it is, you can look to see
20    if there's information on it that -- you know, dear
21    so-and-so, love so-and-so.  Or there's an address or
22    return address or some kind of -- something that would
23    indicate whose property this is, if you don't know.
24       Q.  Okay.
25       A.  But in general, I wouldn't read the letter to
```

Page 66

1    find out what the person's up to.

2        Q.  And you wouldn't do that -- you wouldn't do that

3    especially if you had already been able to identify the

4    owner of the property through some other means; is that

5    correct?

6        A.  That's correct.

7        Q.  Okay.

8             MR. FROMMER:  All right.  I know we're

9    coming up on our 90 minutes.  Let's go off the record.

10            Let's take, like, a -- let's just take,

11   like, a ten-minute break, and -- and then we'll do a

12   block and then you can go -- and then you can go get

13   some lunch.  Okay?

14            THE WITNESS:  Okay.

15            MR. FROMMER:  All right.

16            THE VIDEOGRAPHER:  We are -- we are off the

17   record.  The time is 10:37 a.m.

18        (A short break was taken at this time.)

19            THE VIDEOGRAPHER:  We are back on the

20   record.  The time is 10:48 a.m.

21            MR. FROMMER:  Thank you.

22   BY MR. FROMMER:

23        Q.  I'm going to briefly follow up on something we've

24   been just previously discussing about the valuables

25   versus not valuables that you'd find, encounter in

 1    inventory.

 2         I'm guessing this is probably true for a lot of

 3    valuables, but I want to sort of focus on, like, cash,

 4    for instance.  So let's say you're doing an inventory

 5    and you find some cash.  As part of that inventory,

 6    what -- I -- it sounds like at the end of day it's

 7    supposed to go into the vault, or something.  Or -- but

 8    can you sort of walk me through, like, the steps of what

 9    you're supposed to do in an inventory when you encounter

10    a valuable item like cash?

11    A.  The only inventory I can talk about is U.S.

12    Private Vaults.  So if you want to talk about U.S.

13    Private Vaults, like, we can do that.

14    Q.  No, I just mean -- I mean, you've been an FBI --

15    I don't want to talk about Private Vaults.  I'm just

16    talking generally about the inventory process, and I'm

17    trying to understand, like, when during an inventory you

18    come across a valuable like cash, for instance, what --

19    what are the steps that you're supposed to take?

20              MR. RODGERS:  I'm going to object, lacks

21    foundation, assumes facts not in evidence, calls for a

22    legal conclusion.

23              THE WITNESS:  So cash is a little different

24    from everything else.  So if it's a valuable that's not

25    cash, say a -- a watch, that's going to be put in a --

Page 68

1    in -- that's going to be stored differently.  It's going

2    to be stored in a vault.  It's going to be stored as

3    valuables.  Right?  So we talked about things that are

4    considered valuable.

5              Cash is a little bit different.  You don't

6    want to have cash in the form of cash because it's -- it

7    can get wet, or shredded, or lost, or blow away, or

8    burnt, or --

9    BY MR. FROMMER:

10       Q.  Yes.

11       A.  -- stolen.  Any number of things can happen to

12   cash.  So cash needs to go into a financial institution.

13         For us at the FBI, we have a contract with

14   Loomis, which is, like, Brinks.  It's a -- it's a

15   currency, armored car-like institution.  And so for us,

16   cash gets put into the noncash form as quickly as

17   possible.  I don't want cash.  I don't -- I don't -- I

18   want cash in the form of cash for as short a time as is

19   humanly possible.  I want it someplace safe where it

20   can't get lost, stolen, or damaged.

21       Q.  Okay.  So -- so let's say you come across some

22   cash; right?  And I understand you're just, like, I

23   don't want any part of this cash, for all the reasons

24   you just said.

25       A.  Correct.

Page 69

1       Q.  So I'm just trying to figure out, walk through,

2   do you -- would an agent count the cash him- or herself?

3              MR. RODGERS:  Same objection.

4   BY MR. FROMMER:

5       Q.  -- upon finding the cash?

6              MR. RODGERS:  Same objection.

7              THE WITNESS:  So it depends how much it is.

8   Right?  So there's some amount of cash that I'm

9   confident I could count accurately.  Like, without

10  making a mistake.  And -- so probably under $5,000, I'm

11  pretty sure that myself and another agent could count

12  it, twice, and come up with the right amount.  Because

13  that's the issue, is if we count it wrong, it creates a

14  liability for us.  So generally speaking, $5,000 is

15  something that we would count.

16             $100,000, I'm never counting.  So that is

17  going to be uncounted cash until we can get it to Loomis

18  that has these big machines that count and separate and

19  come up with a completely reliable, accurate amount.

20  BY MR. FROMMER:

21      Q.  Okay.  So you're saying, like, the procedure

22  differs a little bit about how much cash there is;

23  right?

24      A.  Correct.

25      Q.  And --

Page 70

```
 1              MR. RODGERS:  Objection, for purposes of a
 2     motion to strike, lacks foundation, calls for
 3     speculation, assumes facts not in evidence.
 4     BY MR. FROMMER:
 5       Q.  And is it fair to say when it's a small amount of
 6     cash -- I think you said 5,000 -- agents would count
 7     that by hand, they'd confirm the amount, and then they
 8     would send that money to Loomis?
 9              MR. RODGERS:  Same objections.
10              THE WITNESS:  Or, at a smaller amount, it
11     could be held by the FBI.
12     BY MR. FROMMER:
13       Q.  Okay.  It goes somewhere safe.
14       A.  Correct.
15              MR. RODGERS:  Same objections, for purpose
16     of motion to strike.
17              THE WITNESS:  Correct.
18     BY MR. FROMMER:
19       Q.  Okay.  And let's say there's cash that, by
20     appearances, is more than 5,000.  In that situation is
21     it fair to say that you -- that an FBI agent would, for
22     lack of a better word, bag the cash and send it to
23     Loomis?
24              MR. RODGERS:  Same objections.
25              THE WITNESS:  Yes.
```

Page 71

1      BY MR. FROMMER:

2        Q.   Okay.  So -- so if an FBI agent -- if you came

3      across a big pile of cash, too big to count, you and

4      your fellow FBI agent -- it's -- let me -- let me ask

5      the question.

6           Is it fair to say that the inventory is generally

7      supposed to be conducted with at least two agents?

8                   MR. RODGERS:  Same objection, calls for

9      speculation, overbroad.

10                  THE WITNESS:  Yes.  And any time we handle

11     cash, or valuables, or drugs, you have -- you have more

12     than one agent present.

13     BY MR. FROMMER:

14       Q.   Okay.  So if you and the fellow agent come across

15     a large amount of cash -- by "large," I mean more than

16     you would feel comfortable counting -- you and the other

17     agent would put the cash in some sort of bag, sounds

18     like it might get a CATS number, and -- and off it goes

19     to -- to Loomis; is that fair?

20                  MR. RODGERS:  Same objections.

21                  THE WITNESS:  It might first be temporarily

22     stored at the FBI, because you have to make an

23     appointment with Loomis.  They need to know you're

24     coming.  So it might have a -- it might have a

25     temporary -- it might be temporarily placed in the vault

Exhibit K
841

Page 72

```
 1     until we can get an appointment to Loomis, and then take

 2     it to Loomis.

 3     BY MR. FROMMER:

 4        Q.  Okay.  So then it -- so it's basically, for cash

 5     that you can't count, it's bag it, store it somewhere

 6     safe -- the vault, the FBI vault, for instance -- and

 7     then, at a first available opportunity, get that cash

 8     over to Loomis so that they can do the -- the automated

 9     counting and turn it into noncash.

10                 MR. RODGERS:  Same objections.

11                 THE WITNESS:  Correct.

12     BY MR. FROMMER:

13        Q.  Okay.  All right.  Do you remember if you ever

14     got training on how to do an inventory when you were at

15     Quantico?

16        A.  No, I don't remember.

17        Q.  Okay.  Do you remember ever doing, like, a

18     continuing training about how to do an inventory?

19        A.  I don't remember.

20        Q.  Okay.  Then based on those, I'm saying it's

21     probably fair to say -- and you can tell me if I'm

22     wrong.  Have you ever taught anyone else about how to

23     conduct an inventory?

24        A.  No.

25        Q.  Okay.  Do you know if there's any guidance that
```

Exhibit K
842

Page 73

1      FBI special agents would have that they could turn to to

2      determine how to properly conduct an inventory?

3          A.  So, it's the same -- it's going to be the same

4      process that we use to process evidence, because we are

5      going to create a record, we're going to secure the

6      valuables, we're going to have labels, we have bar

7      codes, we have forms we fill out.  Procedurally, it's

8      going to be the same.  So yes, there's a whole bunch of

9      procedures that we're all trained on on how to process

10     items that are coming into our possession.

11         Q.  The -- is it fair to say that the purposes for an

12     inventory are different than the purposes if, for

13     instance, you were seizing items pursuant to, like, a

14     criminal seizure warrant?

15         A.  Correct.  But the process for securing them is

16     the same.

17         Q.  Okay.  Is it fair to say, though, that in the --

18     when you are inventorying those seized items pursuant

19     to, like, just an inventory, as opposed to a criminal

20     search warrant, is there certain investigatory actions

21     that would be inappropriate in -- for an inventory, but

22     would be appropriate when you're conducting a criminal

23     seizure?

24         A.  I mean, so, again, the -- like, the thumb drive.

25     Right?  If I -- if I have a search warrant and my search

1    warrant includes going into a phone or a computer or a

2    thumb drive, then I can take those next steps.  I can

3    stick that thumb drive into a computer and look at it.

4    Which I can't do in an inventory search.

5        Q.  Okay.  So is it similarly the case, then, that --

6    going back to our letter that we talked about before.

7    If you had, like, a criminal search and seizure warrant,

8    is it fair to say that you would be able to read -- read

9    that letter, whereas during an inventory you would not

10   be allowed to read that letter other than for the

11   purpose of potentially identifying the owner if you

12   didn't know who that was already?

13       A.  Right.  That's probably true.  I'd have to know

14   what the warrant said and what I was doing, but

15   generally speaking, yes, that's probably true.  If I had

16   a search warrant, I could probably read the letter.

17       Q.  Okay.  Do you know if there are guidelines out

18   there that you could turn to for how to do an inventory?

19       A.  Yes.  It's addressed in the DIOG.

20           MR. FROMMER:  Let me actually introduce

21   that.  Give me just a second, please.

22           Sorry.  I'm trying to figure out a place for

23   the stamp where it doesn't obscure anything else in the

24   exhibit.  All right.

25           THE VERITEXT CONCIERGE:  I can do that for

Exhibit K
844

```
 1    you, sir, if you want me to.
 2                MR. FROMMER:  I -- I think I got it.
 3                (Exhibit 4 marked at this time.)
 4    BY MR. FROMMER:
 5       Q.  So Exhibit 4 should now be in your folder.  You
 6    might need to hit "refresh," from what I recall.
 7                THE VERITEXT CONCIERGE:  Hold on a second.
 8                Counsel, you have control of my computer.
 9                MR. FROMMER:  Okay.  Great.
10    BY MR. FROMMER:
11       Q.  So this is Exhibit 4.  I -- this is an excerpt
12    from the DIOG that Defendants produced to us during
13    discovery.  Can you take a moment, look through it, and
14    tell me if that seems true and accurate?
15                MR. RODGERS:  We're just trying to open it.
16                MR. FROMMER:  Take your time.
17                MR. RODGERS:  We're just trying to scroll up
18    and down the document.  We're having trouble.
19                MR. FROMMER:  Are you having any more luck?
20                MR. RODGERS:  Oh.  It looks like we're
21    viewing someone's screen, and someone's moving the
22    exhibit up and down, but we have no control over it.
23                MR. FROMMER:  Yeah, that's me.  I have
24    control over it.
25                MR. RODGERS:  Oh.  Okay.
```

1                THE VERITEXT CONCIERGE:  Can I chime in for

2    a second about this?  So what's going on is that if you

3    folks are on a Windows device, you just go down to your

4    task bar.  Make sure that you're on your own web browser

5    and not on Zoom, and you'll be able to independently

6    control the document.

7                MR. FROMMER:  Why don't we go off the

8    record.

9                MR. RODGERS:  Great.

10               MR. FROMMER:  Yeah, just because I want you

11   guys to figure this stuff out, and there's no reason to

12   keep a record of us fumbling through technology.  Yeah,

13   just --

14               THE VIDEOGRAPHER:  Okay.  Let me -- let

15   me -- let me go off the record real quick.

16               We are off the record.  The time is

17   11:03 a.m.

18     (An off the record discussion was held at this time.)

19               THE VIDEOGRAPHER:  We are back on the

20   record.  The time is 11:16 a.m.

21               MR. FROMMER:  Thank you for bearing with us

22   while we work through some of these technical issues.

23               I just introduced an exhibit, Exhibit Number

24   4, which is a portion of the Domestic Investigations and

25   Operations Guide that we received from Defendants in

1    discovery.

2    BY MR. FROMMER:

3         Q.  Special Agent Zellhart, have you had an

4    opportunity to look over this excerpt?

5         A.  I have.

6         Q.  Okay.  And do you recognize it?

7         A.  Yes.

8         Q.  When would you say is the last time you looked at

9    this section of the DIOG?

10        A.  Yesterday.

11        Q.  Okay.  To prepare for this deposition?

12        A.  Yes.

13        Q.  Okay.  Don't want to know anything about that.

14             But other than yesterday when you were preparing

15    for the deposition, when was -- when -- when was the

16    last time you looked at this section of the DIOG?

17        A.  In the late summer of 2020.

18        Q.  In the late summer of 2020?

19        A.  Correct.

20        Q.  And can you tell me why you were reviewing this

21    section of the DIOG in summer of 2020?

22             MR. RODGERS:  I want to caution the witness

23    that to the extent the reason would require her to

24    reveal an attorney-client communication, I'm instructing

25    the witness not to answer.

Page 78

1    BY MR. FROMMER:

2       Q.  Is the -- were you told to look at this?

3              MR. RODGERS:  Same instruction.

4              MR. FROMMER:  I'm -- I'm --

5    BY MR. FROMMER:

6       Q.  To the extent an attorney instructed you to look

7    at this, or advised you to look at this, who was that

8    attorney?

9              MR. RODGERS:  Same objection.

10   BY MR. FROMMER:

11      Q.  Please answer.

12             MR. RODGERS:  I'm instructing the witness

13   not to answer.

14             MR. FROMMER:  The identity of an attorney is

15   not subject to the attorney-client privilege, and you

16   know that, Victor.

17   BY MR. FROMMER:

18      Q.  Please answer the question.

19             MR. RODGERS:  Same instruction.  I have --

20             MR. FROMMER:  So --

21             MR. RODGERS:  I have no objection to you

22   asking her whether she looked at it in 2020.

23             MR. FROMMER:  And I'm asking --

24   BY MR. FROMMER:

25      Q.  Tell me the circumstances behind your review of

Exhibit K
848

1     this document in summer of 2020, to the extent you can

2     do so without revealing a client -- attorney-client

3     privileged material.

4         A.  I -- I looked at it in the late summer of 2020

5     while I was drafting the seizure warrant affidavit for

6     U.S. Private Vaults.

7         Q.  Okay.  Did you review this at the request of

8     Andrew Brown?

9             MR. RODGERS:  Same objection, same

10    instruction.

11            MR. FROMMER:  I would note for the record

12    that this is an improper base of the attorney-client

13    privilege.  It does not call for the -- any client

14    confident material -- confidential material.  I'm simply

15    asking the identity of the person who asked her to look

16    at this.  And, again, the identity of -- of an attorney

17    is not privileged.

18            MR. RODGERS:  If you can answer the

19    question, Special Agent Zellhart, by merely identifying

20    an attorney with whom you spoke concerning this

21    document, then you can provide that information, and

22    nothing more.

23            THE WITNESS:  It was Andrew Brown.

24    BY MR. FROMMER:

25        Q.  And what were you hoping to learn from your

1    review of this document in summer of 2020?

2        A.  Nothing.  I wasn't hoping to learn anything.

3        Q.  So you read this for no purpose whatsoever?

4        A.  No.

5        Q.  So what were you hoping to gain from reading this

6    document, this excerpt of the DIOG in summer of 2020?

7                MR. RODGERS:  If you can answer that

8    question without revealing the contents of an

9    attorney-client communication, then please do so.

10   Otherwise, I instruct you not to answer.

11               THE WITNESS:  Yeah, I'm sorry.  I can't

12   answer that without getting into discussions.

13   BY MR. FROMMER:

14       Q.  Was there any document that you were drafting at

15   the time you reviewed this -- the DIOG excerpt in summer

16   of 2020?

17       A.  Yes.  As I said, I was -- I was drafting the

18   affidavit to the U.S. Private Vaults' search warrant,

19   seizure warrant.

20       Q.  And you -- I understand you read this -- is it

21   true that you read this excerpt of the DIOG per the

22   instructions of Andrew Brown?

23               MR. RODGERS:  If that requires you to reveal

24   the content of an attorney-client communication, I

25   instruct you not to answer.

Exhibit K
850

Page 81

1    BY MR. FROMMER:

2        Q.  Well, let me ask this:  What did you -- what did

3    you do with this excerpt from the DIOG in summer of

4    2020?

5        A.  I sent it to Andrew Brown.

6        Q.  You sent this excerpt of the DIOG to Andrew Brown

7    in the summer of 2020?

8        A.  Correct.

9        Q.  Did this excerpt from the DIOG help inform the

10   drafting of your affidavit in support of the -- in

11   support of the U.S. Private Vaults action?

12       A.  No.

13       Q.  What document were you drafting at the -- in

14   summer of 2020, once again?

15       A.  The search warrant affidavit and seizure warrant

16   affidavit, which is the same affidavit.

17       Q.  Yeah.

18           Were -- did you consult -- did you review this

19   excerpt of the DIOG for the purposes of drafting or

20   helping to draft those affidavits?

21       A.  No.

22       Q.  Did you -- did you -- did you review this

23   document and/or -- let me -- that's compound.

24           Did you review this document in support of the

25   overall warrant application in the U.S. Private Vaults

Page 82

```
 1   matter?
 2       A.  I reviewed it because I was sending it to AUSA
 3   Andrew Brown.
 4       Q.  So is it fair to say, then, that you reviewed it
 5   only because you were sending it along to AUSA Andrew
 6   Brown?
 7       A.  Correct.
 8       Q.  Do you know if there are any other legal
 9   documents -- give me one moment.  Scratch that last
10   question.
11          Okay.  Are you aware of any other legal documents
12   that also provide for -- that -- that give guidance as
13   to how to conduct an inventory?
14       A.  No.
15       Q.  Do you know what "The Legal Handbook For Special
16   Agents" is?
17       A.  No.
18       Q.  Have you -- have you seen exemplars of FD-597s,
19   filled out FD-597s, that were filled out pursuant to an
20   inventory?
21       A.  With regard to U.S. Private Vaults, yes.
22       Q.  I mean generally, have you --
23       A.  Yes.
24       Q.  -- seen --
25       A.  I'm familiar with the FD-597, yes.
```

Page 83

1      Q.  Have you seen -- have you seen examples of filled

2   out FD-597s in the inventory, that were filled out for

3   the purposes of conducting an inventory, other than --

4   in any situation other than the U.S. Private Vaults

5   matter?

6      A.  No.  And if I can explain, it's -- it's, again,

7   it's this process.  The process is the same.  The FD-597

8   is a receipt of property form that's used in a variety

9   of situations, whether it's an inventory search or an

10  other kind of search, or we're taking property, or

11  leaving property, or giving property back, frankly.

12  It's -- it's -- so I would -- I -- if I saw one that was

13  specific to an inventory search, it wouldn't be distinct

14  from one that was prepared for some other purpose.

15     Q.  Okay.  Thank you for that.

16         Before I think we talked about that -- about

17  inventorying valuable items; correct?

18     A.  Correct.

19     Q.  How does an inventorying -- the inventory process

20  change, if at all, based on the belief that valuable

21  items are going to be inventoried?

22         MR. RODGERS:  Objection, vague and ambiguous

23  as to time, calls for a legal conclusion.

24         THE WITNESS:  So if I suspect there's going

25  to be valuables -- it doesn't -- again, it doesn't

Exhibit K
853

1    matter if it's an inventory search or it's another kind

2    of search.  Right?  Those are purpose.  Those are why

3    we're doing it.  The process is the same.  If I know or

4    suspect that there's going to be valuables, then it's --

5    it's more important to have extra witnesses available.

6           And, again, cash cannot be handled by one

7    person.  That -- cash and valuables cannot be handled by

8    one person.  So if you know there's -- there's a high

9    likelihood of cash and valuables, you know, two people.

10   Generally speaking, there's two people there anyway.

11   You don't usually do these processings alone.  But when

12   there's -- but the -- the hard rule is cash, valuables,

13   drugs, cannot be handled by one person.

14   BY MR. FROMMER:

15   Q.  Okay.  So it sounds like when there's

16   valuables -- or drugs, valuables, that you want to have

17   multiple agents doing the inventory simultaneously

18   together; is that correct?

19   A.  At least two, yes.

20   Q.  Okay.  And is one of -- is one of the reasons for

21   that so as to prevent valuable items from somehow

22   disappearing during an inventory?

23   A.  Or the appearance of it, or the accusation of it.

24   It's just good practice to have an extra witness.

25   Q.  Okay.  And it should -- so that -- and that's so

1     that you have two people who can independently

2     corroborate the items that they inventoried; is that

3     correct?

4        A.  Correct.  And our forms require two signatures on

5     those items.  Two signatures on drugs, two signatures on

6     valuables.

7        Q.  Okay.  And in order to prevent either the actual

8     disappearing of items or, you know, the accusation that

9     items have disappeared, that -- would specificity on the

10    FD-97, being specific about what was seized, would that

11    help guard against claims of loss or theft?

12       A.  Not necessarily.

13       Q.  Why do you say that?

14       A.  Because when we're out in the field doing things,

15    you're not in ideal circumstances.  So this is the same

16    as not counting cash.  You count cash and you get it

17    wrong, you've created a problem that there didn't need

18    to be.

19          So if you are -- if you're overly specific and

20    you're wrong, because you're in field where -- where

21    conditions aren't ideal, lighting is not ideal, you

22    know, you're not in an office, you're not in a secure

23    spot, then that's when mistakes can be made.

24          And it's also not the point of the inventory.

25    It's not, like, an evaluation of valuables.  Like --

Page 86

1    like, it's not an appraisal.  Okay?  It's not -- we're

2    not trying to get an appraisal.  I'm not trying to

3    decide if this is a diamond or if it's cubic zirconia.

4    I don't have the expertise to do it.

5         So you just want something that's descriptive,

6    that you can identify again later.  And that's also part

7    of our entire process.  You put it in a bag or a box or

8    a container, and you're identifying that item number --

9    and it gets an item number.  Item number one.  And --

10   and you describe it so that you can then find item

11   number one.  And it gets an evidence number, and it gets

12   a bar code.

13        There's -- there's three levels of redundancy to

14   locate and find that piece of property -- or that

15   combination of pieces of property, sometimes we

16   combine -- in order to know where it is at all times, to

17   track it and to maintain its safety.

18   Q.  Okay.  You said there are three layers of

19   redundancy.  Can you walk me through what those layers

20   are?

21   A.  There's at least three, but yes.  On a piece of

22   evidence there's a -- it receives an evidence number,

23   what we call the 1-B number.  It receives a bar code,

24   which is separate.  And both of those things track it

25   through our evidence system.  There's also an evidence

1    log which the agents fill out.  There's a chain of

2    custody log, which is separate, which shows who has

3    handled it at every given time.  There's also the

4    FD-597, which is the receipt of property, which contains

5    the exact same information.  And then there's a written

6    report.

7          So there's actually six ways to capture this

8    event of taking property into custody.  Whether it's an

9    inventory search or it's some other kind of search, it

10   doesn't matter, our process is the same.

11   Q.  Okay.  I'm just trying to figure this out.  It

12   seems like the purpose of the FD-597 would be to make it

13   clear what property had been taken; is that fair?

14   A.  Or given back, yes.

15   Q.  Yeah.  Or given back.  Absolutely.

16          So that FD-597 should be complete in -- in the

17   terms of what was seized; is that correct?

18   A.  Complete, but it's not exhaustive.  So, for

19   example, if I'm on a search warrant on a documents

20   warrant and I take all the documents in your file

21   cabinet because my warrant allows me to do that, that's

22   going to be called miscellaneous documents from

23   drawer -- from the top drawer in room B.  We'll specify

24   where it came from and what it is, but we're not going

25   to sit there and go through each piece of paper and tell

1    you what each piece of paper is.  Like, not even close.

2       Q.  No, I -- I understand that.  That would be an --

3    a Sisyphean task.  It would be incredibly difficult to

4    do.

5         But I'm wondering, like, you know, if I -- again,

6    I -- I like comic books.  So let's say, you know,

7    there's, like, some comic books are being seized, and

8    for -- as part of an inventory.  And let's say I had 20

9    comic books, you know.  Should the FD-597 -- would it be

10   okay if the FD-597 just said "some comic books."

11      A.  Yeah.  I would expect that item to be "comic

12   books."

13      Q.  But no description of how many comic books there

14   were?

15      A.  Correct.  Because if I count 19 and there's 20,

16   or I count 20 and there's 19, I've created a problem.

17   That's not my job in the field.  My job is to bag and

18   tag the property.  So I'm going to put it in a bag, and

19   I'm going to tag it.  And if it's comic books, it may be

20   valuable, so it may get -- it may get a valuable tag and

21   a heat seal, and it's going to get 1-B number, and a bar

22   code, and all the paperwork that goes with it, but I

23   would be expecting it to be called "comic books."

24      Q.  Okay.  So in my example, I guess, then, I'm

25   thinking I had 20 comic books there, and, you know, and

Exhibit K
858

Page 89

1    they're being seized, and just write -- and it's just

2    written, you know, "comic books."  It doesn't provide

3    any sort of number.  How do -- how does that protect

4    against one of the agents saying, "Oh, I love this

5    edition -- this issue of Spiderman," and putting it in

6    his or her back pocket?

7                    MR. RODGERS:  Objection, asked and answered.

8                    THE WITNESS:  I don't -- I don't know how

9    to -- I don't know how to answer that.  I mean, we

10   don't -- first of all, I guess if, you know, if you --

11   if you want to be a thief, I mean, anybody, I guess,

12   could be a thief.  But it's not going to happen, because

13   we have other procedures.  There's also -- there's

14   photographs, there's other people present, there's

15   signatures and countersignatures.

16                    So, you know, am I going to say that could

17   never happen ever, ever?  I mean, no.  But it doesn't

18   change our policy.  It doesn't change our procedures.

19   Our procedure is you identify the item, you put it in a

20   bag, you seal it, you label it, you do all the

21   appropriate paperwork, you countersign it if it's -- if

22   it's valuables, and you place it in a safe place.

23                    And the description is so that we know we

24   can match it up.  So, you know, item number whatever is

25   comic books.  Oh, here's my comic books.  Item number

Page 90

1    two is watches.  Oh, here's my watches.  Item number

2    three, miscellaneous coins.  Oh, here's my coins.

3    BY MR. FROMMER:

4        Q.  I guess that's what I keep coming back to,

5    because I'm thinking, like -- with my comic books, for

6    instance.  Let's say I have my 20 comic books and, you

7    know, and the agents who are doing the inventorying just

8    write down "comic books," and they put 19 of the comic

9    books in the bag, but they -- but one of them takes the

10   20th comic book.  Okay?  And later on when the FBI is

11   giving me my comic books back, I say, "Hey, a comic book

12   is missing."  How -- how does the FD-597 help us resolve

13   that dispute at that point?

14       A.  It doesn't.

15             MR. RODGERS:  Objection, asked and answered.

16   BY MR. FROMMER:

17       Q.  Okay.  So an FD-597 would not, in some

18   circumstances, would not be useful for actually -- would

19   that turn -- let me ask this:

20             Would the -- would the utility of the FD-597 to

21   resolve our hypothetical comic book dispute turn on what

22   the FD-597 said?  If it said 19 comic books, or -- or if

23   it said -- if it gave a specific number of comic books,

24   would it then have utility in resolving that dispute?

25             MR. RODGERS:  Objection, poses an incomplete

1    hypothetical, overbroad, assumes facts not in evidence,

2    calls for speculation.

3                You can answer.

4                THE WITNESS:  And the -- the answer is still

5    no.  Because even in your -- even in your example, if

6    somebody's going to be dishonest and steal the

7    Spiderman, then what's to stop him from writing the

8    wrong number of comic books on the FD-597?  If he's --

9    if that's what he's going to do -- or two agents are

10   going to, or four agents, or however many are there, are

11   going to do it in concert, then what's to stop them from

12   fabricating the FD-597?  So --

13   BY MR. FROMMER:

14      Q.  So -- sorry.  Please continue.

15      A.  Yeah, that's all.  So --

16      Q.  Okay.  I get that.

17           So -- I mean, I guess -- I guess there's a couple

18   of questions, which is what -- one, which is if the

19   FD-597 isn't going to stop, you know, theft, and it's

20   not going to really help resolve accusations of loss or

21   theft, then what step in the process does help resolve

22   those accusations of loss or theft?

23                MR. RODGERS:  Calls for speculation, poses

24   an incomplete hypothetical, lacks foundation, assumes

25   facts not in evidence.

Page 92

1              THE WITNESS:  Well, see, it's the whole

2    process.  Right?  It's not just the FD-597.  There's an

3    entire process here on how we do this.  There are

4    multiple people present, there are procedures that are

5    followed, there's -- again, there's signatures, there's

6    countersignatures, there's six pieces of paper, there's

7    bar codes, there's photographs, you know.  And warrants,

8    it doesn't matter whether it's an inventory search or a

9    regular search warrant, we take photographs.  There's

10   lots of documentary evidence that we use to show our

11   process and to show the integrity of our process.

12   BY MR. FROMMER:

13     Q.  Okay.  I follow that.

14          Let's take it from, like, your perspective.

15   Like, you know, you're not the person who did the

16   inventorying, but, you know -- you know, I claim, you

17   know, that there are 20 comic books, and, you know, the

18   FD-597 just says "comic books."  And you go to the bag,

19   and you open up the bag, and there are 19 comic books in

20   there.  Can you truthfully say that there -- that the

21   FBI agents only took 19 comic books?

22              MR. RODGERS:  Same objections, and also

23   asked and answered.

24              THE WITNESS:  I mean, if I wasn't there and

25   I didn't do it, I can't say anything about it, for sure.

Page 93

1   BY MR. FROMMER:

2       Q.  So you couldn't swear under oath the FBI agents

3   only -- only seized 19 comic books, because you in fact

4   wouldn't have personal knowledge of whether they seized

5   19 comic books or if there was a 20th comic book that

6   just made it into one of their back pockets; is that

7   correct?

8               MR. RODGERS:  Same objections.

9               THE WITNESS:  Correct.

10  BY MR. FROMMER:

11      Q.  Is that correct?

12      A.  Yes.

13      Q.  Oh, sorry.  I thought you were talking to Victor

14  instead of me.  My apologies.

15          And -- okay.  Let me ask -- so I understand the

16  thing about the inventories, about FD-597s.  Are

17  FD-597s, when they're filled out, are they supposed to

18  be filled out in a consistent manner?  And let me

19  explain what I mean by that.  I mean, like, if I have

20  two agents who are conducting an inventory and filling

21  out the FD-597s, should those agents produce the same or

22  substantially similar inventory for a given box?

23              MR. RODGERS:  Objection, unclear whether the

24  inventory relates to the FD-597 or something else.

25              MR. FROMMER:  I can rephrase.

Exhibit K
863

Page 94

1           THE WITNESS:  You've also got to understand,

2     because two agents wouldn't -- you wouldn't have two

3     different agents writing the same --

4           MR. FROMMER:  I -- okay.  Let me rephrase.

5     BY MR. FROMMER:

6     Q.  Let's say you have two -- let's say you have two

7     identical boxes.  Okay?  They have the same contents in

8     them --

9     A.  All right.

10    Q.  -- each box.  And you have two agents who are

11    each inventorying one of the boxes.  Should the FD-597s

12    they produce be either the same or substantially

13    similar?

14          MR. RODGERS:  Objection, vague and ambiguous

15    with respect to the "substantially similar," assumes

16    facts not in evidence, calls for a legal conclusion.

17          THE WITNESS:  Yes.

18    BY MR. FROMMER:

19    Q.  Was that "yes" to me?

20    A.  Yes, it is.

21    Q.  Okay.

22    A.  Recognizing, like, you know, agents are human

23    beings, so, you know, some -- there's going to be little

24    variations, but they should be substantially the same.

25    Q.  Okay.  But -- okay.  They should be substantially

Exhibit K
864

Page 95

1      the same.

2           You wouldn't want, like, different levels of

3      specificity on the FD-597 just based on who happened to

4      do the inventory and fill out that 597; is that right?

5                MR. RODGERS:  Objection, incomplete

6      hypothetical, calls for a legal conclusion, assumes

7      facts not in evidence, lacks foundation.

8                THE WITNESS:  And that's a more complicated

9      answer.  Some agents are more specific and thorough than

10     other agents, and it depends on a variety of things.

11     Again, it can depend on, like, where -- like, sometimes

12     when we're in the field, we're in a -- in a -- at a

13     table with a chair, and lots of help, and lots of time,

14     and you can sit there and open up a cell phone and write

15     its serial number down.  Other times that's not going to

16     happen.  So there's some variation depending on overall

17     circumstances.

18                But in general, if two agents were opening a

19     box that had substantially the same property in it, I

20     would expect the FD-597 to look substantially the same.

21     BY MR. FROMMER:

22     Q.   Okay.  Thank you for that.

23           Is there -- does the FBI provide any training

24     about -- concerning how to write an FD-597 in a

25     consistent manner?  Let me rephrase.  That was --

Page 96

1          Does the FBI provide any training as to best

2     practices for filling out an FD-597 so that those

3     resulting 597s that are produced would be the same or

4     substantially similar?

5               MR. RODGERS:  Vague and ambiguous,

6     incomplete hypothetical.

7               THE WITNESS:  And I -- I don't know.  I

8     mean, we get training on -- I know, you know, at

9     Quantico you do training on searches, we're all familiar

10    with the FD-597, but I don't specifically recall a

11    specific training on how to fill out a 597.

12    BY MR. FROMMER:

13    Q.  Okay.  So if you don't recall any training --

14    so --

15    A.  Right.

16    Q.  -- on how to -- so, therefore, you don't

17    recall -- is it fair to say you don't recall any

18    training on the requisite level of specificity that you

19    should have when filling out an FD-597?

20    A.  Correct.

21               MR. FROMMER:  Okay.  All right.  Give me

22    just a moment, please.  And I know we're running up on

23    noon out there, so I will keep you only for a few more

24    minutes, and then I'll release you to lunch.  I just

25    want to talk about one document.

Page 97

1              (Exhibit 5 marked at this time.)

2       BY MR. FROMMER:

3          Q.   Okay.  I have just introduced Exhibit 5.

4       Zellhart Exhibit 5.  So -- tell me when you have a

5       minute to look.

6                    MR. RODGERS:  All right.

7       BY MR. FROMMER:

8          Q.   Now, I will purport that this is a copy, part one

9       of two, of the 2013 version of the DIOG that I acquired

10      from the FBI Vault website.  If you could take a minute

11      or two to go through, and let me know whether you agree

12      that that's what I -- that what I purport it to be it

13      is.

14                   MR. RODGERS:  Well, this is a two hundred --

15      this document appears to be two -- hundreds and hundreds

16      and hundreds of pages.  So -- it's 700 pages.  It's not

17      possible for us to be able to say that it was downloaded

18      from the website.  I mean, you can represent whatever

19      you want to represent about it, but we can't answer that

20      question.

21      BY MR. FROMMER:

22         Q.   Okay.  Have you ever looked at the 2013 version

23      of the DIOG?

24         A.   Probably.

25         Q.   Okay.

Exhibit K
867

Page 98

1      A.   Probably back in 2013.

2      Q.   Yeah.

3      A.   I think that's when it came out.

4      Q.   Yeah.  And my understanding is it got superseded

5      in 2016 by the current version of the DIOG.

6           All right.  Let me turn to page -- well, before I

7      ask, are you aware of any FBI policy that requires --

8      requires agents, special agents, to use the least

9      intrusive investigative technique that is capable of

10     achieving the FBI's objective?

11              MR. RODGERS:  Objection, overbroad, lacks

12     foundation.  If there's -- lacks foundation, calls for

13     speculation.

14              THE WITNESS:  Yes.

15              MR. FROMMER:  I'm sorry.  Was that answer to

16     us?  I -- I --

17              THE WITNESS:  Yes, it was.  Yes.

18              MR. FROMMER:  Okay.  I think I'm -- I think

19     I'm having -- we're having a hard time hearing you.

20     Yeah, you might want to move --

21              THE WITNESS:  I'll try to speak up.

22              MR. FROMMER:  Okay.  All right.

23     BY MR. FROMMER:

24     Q.   Now I just forgot what my last question was.  Oh.

25          Are you aware of any FBI policy that requires

Page 99

1    agents to use the least intrusive techniques, consistent

2    with the FBI's objectives, and I believe you said yes.

3              MR. RODGERS:  Same objections.

4              THE WITNESS:  Yes.  But yes.

5    BY MR. FROMMER:

6       Q.  Okay.

7       A.  The answer's yes.

8       Q.  Okay.  All right.  Well, let me turn to page 77

9    of Exhibit 5.

10             THE WITNESS:  He's scrolling.

11             MR. FROMMER:  I'm going as fast as I can.

12   Sorry.  I went a little bit too -- okay.

13             MR. RODGERS:  Before -- now that you're on

14   that page, could you identify the page number at the

15   bottom of the page you were on?  Because we're scrolling

16   through it ourselves.

17             MR. FROMMER:  Sure.  It is 4-1.  I had it

18   listed as page 77 of the PDF in my notes, if that is

19   helpful to you.

20             MR. RODGERS:  It doesn't really help us.

21   Okay.  We're close.

22             Okay.  We are on page four -- 4-1.

23             MR. FROMMER:  Okay.

24   BY MR. FROMMER:

25      Q.  Okay.  If you could look at 4.1.1, sub E).  So

Page 100

1     that's the -- about two-thirds of the way down the page,

2     and it reads:  Employ the least intrusive.  Could you

3     read that -- that subpart E) to us, please?

4        A.  Sure.

5           Assuming a lawful intelligence or evidence

6     collection objective, i.e., an authorized purpose,

7     strongly consider the method, technique, employed to

8     achieve that objective that is the least intrusive

9     available, particularly if there's a potential to

10    interfere with protected speech and association, damage

11    someone's reputation, intrude on privacy, or interfere

12    with the sovereignty of foreign government, while still

13    being operationally sound and effective.

14       Q.  Okay.  So is it fair to say that the FBI policy

15    is that to the extent an investigative technique could

16    intrude on privacy, that FBI special agents should

17    consider a technique, the least -- the -- should strive

18    to employ the least intrusive technique available that

19    would meet the FBI's goals?

20           MR. RODGERS:  Objection, calls for

21    speculation, lacks foundation, calls for a legal

22    conclusion, assumes facts not in evidence.

23           THE WITNESS:  And to answer that, I would

24    just re-read that paragraph.  So your question was what

25    is FBI policy, and unless this has been superseded, FBI

Exhibit K
870

1   policy in regards to that is sitting there in sub

2   paragraph E).

3   BY MR. FROMMER:

4       Q.  Okay.

5       A.  That is my understanding of the policy, and I've

6   been trained on it.

7       Q.  Okay.  And you -- and -- so you've been trained

8   that when conducting -- the use of any technique should

9   be minimally invasive when there are speech or privacy

10  concerns; is -- is that fair to say?

11              MR. RODGERS:  Objection, poses an incomplete

12  hypothetical, assumes facts not in evidence, lacks

13  foundation, calls for speculation, calls for a legal

14  conclusion.

15              THE WITNESS:  Right.  And, again, I would

16  just -- I would just point to paragraph E).  What --

17  what it says in paragraph E) is the FBI's policy.  And

18  I'm familiar with the policy, I've been trained on the

19  policy, and -- and as it's written in sub paragraph E),

20  I totally agree with.

21              MR. FROMMER:  Okay.  All right.  Okay.

22  Let's see.

23              All right.  It's just about noon your time,

24  so why don't we -- and I know we're about to hit our

25  90 minutes, so it seems like it's a perfect time to

Page 102

1    break, to go get lunch.  Last time, Victor, I think we

2    took an hour.  I'm fine with that.  If you --

3                    MR. RODGERS:  Good.

4                    MR. FROMMER:  -- want to do that.

5                    MR. RODGERS:  Yes.

6                    MR. FROMMER:  Oh, sorry.  Yeah, let's go off

7    the record.

8                    THE VIDEOGRAPHER:  We are off the record.

9    The time is 11:58 a.m.

10             (A lunch break was taken at this time.)

11                   THE VIDEOGRAPHER:  We are back on the

12   record.  The time is 12:59 p.m.

13                   MR. FROMMER:  Thank you.  And I hope you --

14   like I just said, I hope you had a good lunch.

15   BY MR. FROMMER:

16     Q.  I want to shift gears a little bit, here.  And

17   we've been talking about general topic stuff up until

18   now.  I want to get a little bit more specific.  So let

19   me start with this:  When did you first hear about U.S.

20   Private Vaults?

21     A.  2015.

22     Q.  And can you tell -- can you tell me what you had

23   heard?

24     A.  Yeah.  I was working with the sheriff's

25   department on a task force, and their drug squad, or

Exhibit K
872

Page 103

1    drug group, had an investigation that led back to U.S.

2    Private Vaults.

3         And so one of the sheriff's deputies that I work

4    with was telling me about the place, and that it was

5    totally anonymous, and you got in with an -- with an eye

6    scan, and that they were not -- the U.S. Private Vaults

7    was not recognizing the legal process, they were --

8    they -- that they were having all kinds of problems

9    getting into the box that they had a warrant for because

10   of the nature of the business.

11   Q.  So was it because they had a hard time

12   identifying which specific box was the one that they

13   were trying to seize?

14   A.  Right, because of the anonymity of it.  And they

15   were not getting cooperation from the -- the company at

16   all.

17   Q.  Okay.  So you first heard about USPV in 2015 as

18   part of a separate investigation.  When did you

19   personally start -- begin investigating U.S. Private

20   Vaults?

21   A.  2019.

22   Q.  Could you say roughly when in 2019 you began?

23   A.  Around April.

24   Q.  Okay.  And you -- you're the lead case agent on

25   the U.S. Private Vaults matter; right?  Is that correct?

Page 104

1        A.   For the FBI, yes.

2        Q.   Oh, okay.   So there are other lead case agents

3    for other agencies?

4        A.   Yes.

5        Q.   Do you know who those people are?

6        A.   Yes.   So DEA was the -- DEA was the primary

7    investigative agency pretty much through the

8    investigative period.   So this was actually a DEA case

9    that the FBI was participating with them.   And U.S.

10   Postal Inspector was also participating, in addition to

11   some -- some local law enforcement as -- sometimes as

12   needed.   But this was primarily a DEA investigation when

13   I joined it.

14       Q.   Okay.   I'm -- so -- so this was primarily --

15   well, I -- I -- okay.   So it was primarily -- so was the

16   DEA already investigating U.S. Private Vaults prior to

17   April of 2019?

18       A.   Yes.   And I -- I can -- if I can explain this, I

19   think it will -- it will make it clear.

20            Lots of law enforcement agencies were aware of

21   U.S. Private Vaults, going back to 2015.   And many

22   agencies had -- were aware of U.S. Private Vaults, were

23   aware that criminals were regularly using U.S. Private

24   Vaults to store criminal proceeds, and agencies had

25   different investigations open on individual customers,

**Exhibit K**
**874**

Page 105

1      and that includes the DEA, who had a pretty -- a pretty

2      significant case, or cases, against some individual

3      customers.  But the -- the investigation against the

4      corporation, U.S. Private Vaults as a business entity,

5      didn't start until approximately April of 2019.

6         Q.  So was it you who were -- the one who initiated

7      the investigation of U.S. Private Vaults the

8      corporation?

9         A.  No.  It was everybody together.  So basically we

10     concluded that after almost five years of -- of going

11     after individual customers, we weren't -- we weren't

12     doing anything effective.  I mean, there's some good

13     cases, some good individual cases, but the problem was

14     the business itself.  And so we -- the three agencies

15     came together, along with the U.S. Attorney's Office, to

16     try to come up with how do we address the real problem.

17          The underlying problem in a money laundering case

18     is the money laundering facilitator, and U.S. Private

19     Vaults was a facilitator.  In my world of money

20     laundering, the facilitator is not the guy who's

21     laundering his own dirty money, it's the lawyer, the

22     accountant, the banker, the businessman who is -- is

23     supposedly legitimate but is enabling the criminal, or

24     in this case, a lot of criminals, to conduct their

25     criminal business.

Page 106

1          So the question was, in that spring of that year,

2     how do we address the real problem here, which isn't all

3     these people, but it's the money laundering facilitator,

4     which is U.S. Private Vaults, the business.  And

5     frankly, that was -- that was the concern when it was

6     first brought to my attention in 2015.  That's the --

7     that's the question the sheriff's were asking as well.

8     It was, like:  Hey, what do we do about this business?

9     We can't have this kind of business that attracts this

10    kind of criminal and protects this kind of criminal.

11       Q.  Okay.  I understand that.

12          So in April 2019, then, the investigation of

13    Private Vaults, the corporation, began.  And is it

14    correct to say that that investigation spanned multiple

15    federal agencies, including DEA, FBI, and USPIS?

16       A.  Correct.

17       Q.  Are there other federal agencies that were

18    involved?

19       A.  No.

20       Q.  Were there any state or local agencies that were

21    involved in the investigation?

22       A.  From time to time we would -- we would get the

23    assistance of different local police departments.  For

24    example, DEA is actually on a task force with El Monte

25    Police Department, and so a lot of times on our

1    different, like, operations, El Monte PD would be

2    helping us.

3        Q.   Okay.  And is that because you're operating under

4    sort of that task force umbrella?

5        A.   Correct.  And, like, a lot of times they can --

6    it helps us to provide additional personnel.  So -- so

7    we don't -- we're not bringing -- so you have -- you

8    have federal case agents, but you have local police

9    officers and task force officers helping when you need a

10   lot of people.

11       Q.   Okay.  So is it fair to say, then, that the

12   investigation that began in April of 2019 was being

13   conducted by the task force?

14       A.   No.  I would say that the investigation was being

15   conducted jointly by FBI, DEA, and U.S. Postal

16   Inspector.

17       Q.   Okay.  All right.  And you said from time to time

18   local agencies who might be in a task force, I think you

19   said with DEA, might provide assistance.

20       A.   Correct.

21       Q.   Okay.  But it wasn't being -- but the

22   investigation itself wasn't being done under the aegis

23   of the -- of any particular task force; is that right?

24       A.   That's correct.

25       Q.   Okay.  And so is it true, then, that you helped

Page 108

1    investigate U.S. Private Vaults from April 2019 all the

2    time up until its indictment in March 2021?

3       A.  Yes.

4       Q.  Okay.  And did you present evidence or testimony

5    to the grand jury as part of the acquisition of the

6    indictment against U.S. Private Vaults?

7               MR. RODGERS:  Objection, cannot reveal grand

8    jury --

9    BY MR. FROMMER:

10      Q.  I'm not asking about the substance of any -- of

11   any testimony you would have provided, I'm just asking

12   did you ever talk to them.

13              MR. RODGERS:  Can't identify the witnesses

14   in front of the grand jury.  It's a violation of Rule

15   6(e).

16   BY MR. FROMMER:

17      Q.  Were you a central figure in the U.S. Private

18   Vaults investigation?

19      A.  Yes.

20      Q.  Okay.  And was the indictment that issued, did it

21   reflect facts that you had learned through your

22   investigation?

23              MR. FROMMER:  If you have an objection,

24   Victor, say it, but I prefer you not confer with the

25   witness off camera.

Page 109

1          MR. RODGERS:  I'm not conferring.  The

2     problem is you are asking her questions about a

3     document, but she needs to look at the document to

4     answer your question.  The indictment is attached to the

5     search warrant affidavit, and -- and it's an exhibit to

6     the affidavit.

7          MR. FROMMER:  Okay.  I mean, we could

8     continue -- I could show you that, the indictment, if

9     you wanted to, but it's fair to say -- but I -- I don't

10    think it's worth the -- it seems that --

11    BY MR. FROMMER:

12    Q.  Do you agree that you were a central part of the

13    investigation, and that the investigation culminated in

14    an indictment against U.S. Private Vaults, the

15    corporation?

16    A.  Yes.

17    Q.  Okay.  And just so I can be clear, the indictment

18    was -- that issued, and your investigation was against

19    U.S. Private Vaults, the corporation; is that right?

20    A.  Correct.  Yes.

21    Q.  It -- the -- your investigation and the

22    indictment were not about any particular U.S. Private --

23    or U.S. Private Vaults customers; is that correct?

24    A.  That's correct.

25    Q.  And can you explain to me, like, with U.S.

Page 110

1    Private Vaults -- you called them a facilitator.  And I

2    hadn't heard that term before, so I was wondering if you

3    could just sort of go through it for me one more time.

4    Tell me, like, how -- what -- what a money laundering

5    facilitator is and how USPV was a money laundering

6    facilitator.

7        A.   Sure.  So when you look at -- when you look at a

8    money laundering investigation, you can have -- you can

9    have money laundering charges against a criminal who

10   launders their own money.  So, for example -- drug cases

11   are super easy to understand.  So I'm a drug dealer, but

12   I also have a flower shop, and I'm claiming that my

13   flower shop is making oodles of money, but it doesn't

14   really do anything.  All of that money is from my drug

15   sales.  So I'm the money launderer, but I launder my own

16   criminal proceeds.  So that's one type of -- of money

17   launderer.

18          And -- and there's other ways.  You can -- you

19   can take your criminal proceeds and buy a boat, or a

20   plane, or a car.  That's also money laundering.  Right?

21   But in those cases you're laundering your own money.

22          And as a -- as a money laundering investigator

23   doing money laundering cases, we're -- our mission is

24   more directed, if we're good and we're successful, at

25   the money laundering facilitator.  And this is going to

Page 111

1    be the company, the big company, for example, that

2    launders everybody's money.

3         Here in Los Angeles, the -- you may read in the

4    newspapers, the garment district here is -- is quite

5    famous for taking loads of drug money and swapping

6    clothes in Mexico for drugs up here.  It's called

7    trade-based money laundering, or sometimes it's called

8    black market peso exchange.  Those are examples of a

9    money laundering facilitator.  The business is the

10   facilitator.  They make the system go.  So they are not

11   the underlying criminal, but they are the -- the

12   mechanism that makes it go.  Particularly important in

13   the money realm, because money is what makes this --

14   what makes the crimes go.

15        So we looked at U.S. Private Vaults as a -- a

16   criminal facilitator.  Right?  They're making it easy

17   and accessible and very convenient for criminals to

18   maintain their criminal proceeds and further their

19   criminal conduct.  So in that sense, U.S. Private Vaults

20   was a facilitator.

21     Q.  I see.  Okay.  I get it.

22        And so -- and what you're saying they were

23   facilitating is money laundering by the customers of

24   U.S. Private Vaults; is that right?

25     A.  Correct.

Page 112

1      Q.  Got it.  Okay.  Okay.  That -- that -- that makes
2      a bit more sense to me.
3      A.  And the co-located gold and jewelry exchange was
4      an intimate part of it because, as we proved, people
5      were also trading their cash for gold, their criminal
6      proceeds, and switching them from cash into gold, and
7      then storing them at U.S. Private Vaults.  So it was
8      another layer of the criminal facilation.  And the
9      customers were being coached by the employees at U.S.
10     Private Vaults on how to do this and avoid bank
11     reporting requirements.
12     Q.  Okay.  Yeah.  Like how to avoid -- doing it under
13     a $10,000 amount?
14     A.  Correct.
15     Q.  So it sounds, then, like your concern about this
16     place is that it was facilitating the criminal
17     activities -- U.S. Private Vaults and -- was it Olympic
18     Gold and Coin, I believe?
19     A.  (No audible response.)
20     Q.  That those two businesses together were
21     facilitating criminal activity by customers.
22     A.  Correct.
23     Q.  Okay.  All right.  And I know we had a bit of a
24     discussion earlier about the warrant application.  I
25     understand now that the warrant application is put

Page 113

1    together by the U.S. Attorney's Office, but that the

2    affidavit is your creation, and your contribution to it.

3              MR. FROMMER:  So let me go back to -- let me

4    see which exhibit this was.  It's Exhibit 3, if we could

5    pull that one back up.

6              MR. RODGERS:  We have it on screen.

7              MR. FROMMER:  Okay.  All right.

8    BY MR. FROMMER:

9       Q.  And I wanted to -- there's a couple parts in here

10   that I wanted to talk about.  If you could turn -- let

11   me see.  Do I have control right now?  Yeah.  So here on

12   page six -- I've already highlighted it, so I have --

13   this is part of the seizure warrant.  And it says --

14   it's describing the nests and the criminal search --

15   does not authorize a criminal search of the contents.

16             MR. RODGERS:  Can you hang on just a second?

17             MR. FROMMER:  Yeah.

18             MR. RODGERS:  I'm not sure that this is part

19   of the seizure warrant.

20             MR. FROMMER:  Is it the search warrant?

21             MR. RODGERS:  I think it's the search

22   warrant.

23             MR. FROMMER:  Okay.  Well, let me move down,

24   then.  Because this is -- let's go off the record just

25   for a minute.

Page 114

1          MR. RODGERS:  Yes.

2          MR. FROMMER:  I just want to clear this up,

3     because I don't want to be pointing at one thing when I

4     should be pointing at another.

5          THE VIDEOGRAPHER:  We are off -- sorry.  We

6     are off the record.  The time is 1:17 p.m.

7      (An off the record discussion was held at this time.)

8          THE VIDEOGRAPHER:  We are back on the

9     record.  The time is 1:18 p.m.

10         MR. FROMMER:  All right.  If you could go to

11    page 139 of this exhibit.

12         MR. RODGERS:  We are on that page.

13    BY MR. FROMMER:

14      Q.  All right.  And I was wondering, the language in

15    C here, talking about the warrant doesn't authorize a

16    criminal search or seizure of the contents of the safety

17    deposit box, and the continuing language.  Did you draft

18    this language, Special Agent Zellhart?

19      A.  No.

20      Q.  Okay.  Do you know who did?

21      A.  Yes.

22      Q.  Who is that?

23      A.  Andrew Brown.

24      Q.  Oh, okay.  All right.

25          And then -- and then if you could, go down to --

Exhibit K
884

Page 115

1    it's -- this is a large document -- the page, 224.  USAO

2    224.  And just tell me when you're there.

3              MR. RODGERS:  Okay.  Hold on a second.

4              We are on 224.

5              MR. FROMMER:  All right.

6    BY MR. FROMMER:

7       Q.  All right.  And I had a question about -- this is

8    part of your affidavit; is that correct?

9       A.  Correct.

10      Q.  Okay.  And so the language in -- can you read the

11   language that begins on line one and ends at line four?

12      A.  In order to notify the owners directly, agents

13   will, in accordance with their policies regarding an

14   unknown person's property, look for contact information

15   or something which identifies the owner.

16      Q.  And then if you could, like, briefly -- if you

17   could briefly read the footnote 40.

18      A.  The FBI policy regarding taking custody of an

19   unknown person's property provides, in part, that

20   agents, quote, inspect the property as necessary to

21   identify the owner and preserve the property for

22   safekeeping, close quote.  The inspection should, quote,

23   extend no further than necessary to determine ownership,

24   close quote.

25      Q.  And for those -- did you write those two passages

Page 116

1    that you just read?

2        A.   I did not.

3        Q.   You did not?  Isn't this your affidavit?

4        A.   It is.

5        Q.   I'm -- I'm confused then.  If you -- who -- who

6    wrote those portions of the affidavit, if you didn't?

7        A.   Andrew Brown drafted those portions.  I reviewed

8    them.

9        Q.   Okay.

10       A.   And agreed with them.

11       Q.   Okay.  While we're already here, let's -- sorry

12   for jumping around so much in this document, but in your

13   affidavit -- let me -- in your affidavit, in support of

14   the warrant application, did you suggest that everyone

15   who had a safe deposit box at U.S. Private Vaults was a

16   criminal?

17             MR. RODGERS:  Objection, the document speaks

18   for itself.  Go ahead.

19             THE WITNESS:  I described situations where I

20   was aware of criminal investigations going back to U.S.

21   Private Vaults.  So I described situations where I knew

22   that criminals were keeping their criminal proceeds at

23   U.S. Private Vaults.

24   BY MR. FROMMER:

25       Q.   I understand in your affidavit there are a number

Page 117

1   of paragraphs concerning specific -- specific instances

2   where criminals were using the facilities at U.S.

3   Private Vaults in some way.  But I'd like to go to page

4   10 -- USAO 108.

5           MR. RODGERS:  We are on page 108.

6   BY MR. FROMMER:

7   Q.  Okay.  Can you read me the header on line -- line

8   nine?

9   A.  Sure.

10          It would be irrational for noncriminal customers

11  to choose USPV.

12  Q.  So given that statement, was it your opinion that

13  most of the people who rented from U.S. Private Vaults

14  were criminals in some way?

15          MR. RODGERS:  Objection.  The document

16  speaks for itself, mischaracterizes the terms of the

17  document.

18          THE WITNESS:  It was our position that U.S.

19  Private Vaults was a -- sort of a criminal magnet.  That

20  they marketed themselves to criminals, they protected

21  criminals, they obstructed law enforcement.  Mike

22  Poliak, one of the co-owners, specifically brought

23  criminals into the business when he became a co-owner,

24  which increased their profits.

25          So I was aware that there were probably a

Page 118

```
 1    lot of criminals secreting criminal proceeds at this
 2    business.  But I would add that Mike Poliak himself
 3    said, and I quoted in here:  You can't have every drug
 4    dealer in here, you need normal people, too.  So even
 5    the co-owner acknowledged that it was a mix.
 6    BY MR. FROMMER:
 7      Q.  Well, I'm -- I'm -- but I guess -- let me -- I
 8    understand that, but let me just ask that question
 9    again.
10          So in your opinion, as reflected in this -- your
11    affidavit, was it your opinion that most of the people
12    who rented safe deposit boxes from U.S. Private Vaults
13    were criminals in some way?
14              MR. RODGERS:  Same objections.
15              THE WITNESS:  So I don't know -- like,
16    most -- I mean, I don't know.  I know there were --
17    there were -- I was expecting a lot of criminals.  I
18    don't know about most.  I don't know, like, what I was
19    expecting.  I knew that criminals used this business,
20    and that the business protected criminals.
21    BY MR. FROMMER:
22      Q.  Okay.  Well, if you can see, it says there on
23    lines -- well, it's not really lines 10 and 11, it
24    doesn't line up.  But in your affidavit you state,
25    quote:
```

Page 119

```
 1          There's no reason for noncriminal clients to use
 2     USPV.
 3                 MR. RODGERS:  Objection, mischaracterizes --
 4     BY MR. FROMMER:
 5       Q.  Doesn't that -- doesn't that suggest that you
 6     thought that over -- that the overwhelming people --
 7     number of people, or percentage of people who were using
 8     U.S. Private Vaults would be criminals?
 9                 MR. RODGERS:  Objection, mischaracterizes
10     the testimony, the document speaks for itself,
11     argumentative.
12                 THE WITNESS:  So, again, I fully expected
13     there to be criminal customers at this business, but I
14     don't know -- I don't sort of know how to answer your
15     question as to whether it was all of them, it was most
16     of them.  I don't -- I don't have a percentage.  I
17     know -- I know there were criminals using this
18     business --
19     BY MR. FROMMER:
20       Q.  Okay.
21       A.  -- to secrete criminal proceeds.  And I knew that
22     at the time.  I was -- that was -- I was aware of that
23     at the time.
24       Q.  Okay.  And I think you said a second ago that you
25     were expecting a lot of criminals, I think is the way
```

Page 120

1    you phrased it; is that right?

2        A.  Yes.

3        Q.  Okay.  You mean as in expecting to find a lot of

4    proceeds of criminal activity in the safe deposit boxes

5    at U.S. Private Vaults?

6        A.  Yes.  I anticipated that there would be criminal

7    proceeds in the safe deposit boxes.

8        Q.  I want to talk very briefly, and let me see if I

9    can find the -- I'm trying to go back to the seizure

10   warrant, so give me just a moment.

11            Okay.  If you could go to page USAO 137.

12                MR. RODGERS:  We are on that page.

13   BY MR. FROMMER:

14       Q.  Okay.  And I just wanted to talk about the items

15   that the warrant authorized seizure for.  Why don't we

16   just take these, I think, in order.

17            First off, it says the business computers.

18   Why -- why -- why did -- why did you want to seize the

19   business computers as part -- as part -- when executing

20   the warrant?

21       A.  So if I can answer more generally.  The -- the

22   items to be seized were what we decided were the

23   facilities of this business, that this business needed

24   to be in business.  So our thinking was what is the core

25   of this -- what is the engine of this business?  What do

1  you need to take away from them to take them out of

2  business?  Because the goal of the investigation was

3  essentially to put U.S. Private Vaults out of business.

4  And so these were the items that we came up with that

5  sort of, either alone or in conjunction, without which

6  they could not continue to do business.

7     Q.  So is it the case that you seized these items not

8  for their evidentiary value, but in order to bring

9  the -- bring the business to a screeching halt?

10    A.  Correct.  And that's the difference between the

11  search warrant and the seizure warrant.  The search

12  warrant authorizes search for -- as part of the criminal

13  investigation as to looking for evidence.  The seizure

14  warrant was what we were seizing from the business as

15  the facilities that the corporation used to conduct its

16  criminal business for which it was indicted.

17        So the -- so it was indicted for a set of crimes,

18  and these are the things it needed to commit those

19  crimes.  And so this list is generated, as I said, as

20  what do they need to continue facilitating crime.  Like,

21  what -- what do they need to do?  How do we take them

22  out of business?  What is the core engine of their

23  business?

24    Q.  So was the purpose in seizing the nest of safe

25  deposit boxes to prevent the continued operation of U.S.

Page 122

1    Private Vaults?

2        A.   Correct.  If we had not taken the boxes, they

3    could have replaced the computers, the money counters,

4    the eyeball scanners, and they would have been back in

5    business on April 1st, and probably had more business.

6    So the nest of security boxes was part and parcel of

7    taking this company out of business.

8        Q.   Couldn't the FBI just have taken over U.S.

9    Private Vaults, appointed a receiver, and the business

10   is out of operation?  Wouldn't that have just --

11   wouldn't that have -- given that you're saying the

12   purpose of these seizures is to stop U.S. Private Vaults

13   from continuing to operate as it had, couldn't you have

14   equally effectuated that purpose by simply taking over

15   the business, adopting a receiver to run the place, and

16   U.S. Private Vaults, as it was, is no more?  So why --

17   why wasn't that -- why didn't you do that?

18              MR. RODGERS:  Objection, lacks foundation.

19              THE WITNESS:  So we don't -- so we don't,

20   like, take over businesses.  I don't -- I'm not aware of

21   that happening.  Putting something through receivership

22   is a -- is a legal thing that I don't -- I don't know

23   how that happens.  I'm not aware of it happening, and

24   I'm not aware of the FBI taking over a business.

25

Exhibit K
892

Page 123

1    BY MR. FROMMER:

2       Q.  Are you aware of any parts of the DIOG that

3    discuss, you know, appointing a receiver, or operating a

4    business -- or operating a business in lieu of

5    conducting a seizure of this sort?

6       A.  No.

7       Q.  Would you be surprised if those portions of the

8    DIOG exist?

9       A.  Yes.

10      Q.  Okay.  Do you agree that whether or not you're

11   aware that the DIOG discusses appointing a receiver, do

12   you agree that from -- that appointing a receiver to

13   basically tell everyone, you know, come get your stuff,

14   U.S. Private Vaults, as it was, is out of business,

15   would have been less intrusive as to -- as to the box

16   holders than the seizure that -- the seizure of the nest

17   that the seizure warrant authorized?

18             MR. RODGERS:  Objection, lacks foundation,

19   calls for a legal conclusion, assumes facts not in

20   evidence.

21             THE WITNESS:  And I don't -- I don't -- I

22   don't know the answer to that.  I don't know the process

23   of appointing a receiver.  I've never known that to be

24   done.  I don't know how to do that.  I don't know

25   whether that would be less intrusive or more intrusive,

Exhibit K
893

Page 124

1    or any different from what the ultimate outcome was.  So

2    I don't -- I don't know.

3    BY MR. FROMMER:

4        Q.  Did you ever explore alternatives to cracking

5    open the nest of safety deposit boxes?

6        A.  Once we -- once we completed or got our

7    investigation into U.S. Private Vaults, as a

8    corporation, to a certain point, then the question for

9    us was how do we take -- how do we dismantle this

10   criminal organization.  That's our goal.  That's the

11   mission, is to disrupt and dismantle.  So how do we

12   dismantle this criminal organization.

13          And there was, in my mind, no way to do it other

14   than to remove the nest of safe deposit boxes, which was

15   part and parcel of the business.  That was the point of

16   the business.  It was the whole business.

17       Q.  I understand that, but you never explored -- you

18   know, before lunch we talked about the 2013 DIOG, and

19   it's -- and a statement which I think you agree

20   continues to be --

21       A.  Right.

22       Q.  -- in effect, that you should be minimally

23   intrusive, particularly when areas involving privacy are

24   implicated.

25       A.  Right.

Exhibit K
894

Page 125

1      Q.  Did you undertake --

2      A.  So --

3      Q.  Did you -- I -- did you undertake any attempt, or

4   you or the people that you worked with on this

5   investigation, make any attempt to come up with a less

6   intrusive way of bringing U.S. Private Vaults' business

7   to a halt?

8      A.  So to our investigative thinking, this was the

9   only way to achieve the goals and objectives of the

10  mission.

11     Q.  Did you ever explore the possibility of -- of

12  appointing a receiver?

13          MR. RODGERS:  Objection, assumes facts not

14  in evidence and lacks foundation.

15          THE WITNESS:  The answer to the question,

16  though, is yes.  We did talk about different ways to do

17  this, and concluded that this was the only way to

18  achieve the goals and missions of the investigation.

19  BY MR. FROMMER:

20     Q.  Well, tell me who you discussed that with, and

21  what were some of those alternatives.  Let's start with

22  the first.

23          Who -- you're saying you had discussions about

24  various ways of accomplishing your overall goal of

25  shuttering U.S. Private Vaults, of ceasing its

Page 126

1    operations.  So who -- with whom did you have those

2    conversations?

3                MR. RODGERS:  Objection.  To the extent the

4    conversations were with Andrew Brown, I object and

5    instruct the witness -- or any other attorney, I

6    instruct the witness not to provide the contents of that

7    conversation, because they're protected by the

8    attorney-client privilege.

9    BY MR. FROMMER:

10   Q.  I only -- I'm asking who did you speak to.  I'm

11   not asking about the substance of communications.

12   A.  I spoke with Andrew Brown.

13   Q.  Anyone else?

14   A.  Justin Carlson at the DEA.

15   Q.  Who is -- and what's Mr. Carlson's position at

16   the DEA?

17   A.  Special agent.

18   Q.  Anyone else?

19   A.  Probably Lyndon Versoza, who's an inspector with

20   U.S. Postal Inspector.

21   Q.  Yeah.  Okay.

22        And when you were discussing this with them, why

23   did you -- why did the group come to the conclusion that

24   there was no lesser intrusive -- less intrusive way of

25   bringing U.S. Private Vaults' operations to an end?

Page 127

1      A.  Well, I don't know -- I don't know how to answer

2    that.  I know we had discussions about it, I know we had

3    discussions about the best way to do this, I know we had

4    discussions about, really, the big picture, how do we do

5    this, what -- what are our options, and this is -- this

6    is what we came to.  And I don't sort of have enough --

7    I can't recall -- I don't know how else to answer your

8    question.

9      Q.  Do you recall any of the alternatives that you

10   discussed?

11     A.  I do discuss -- I do recall discussing taking

12   over the business.

13     Q.  Oh, so the -- what I was proposing.  To what --

14     A.  Well, I don't know about the receivership part of

15   it.  See, I don't -- I don't really understand that.

16   So -- so I don't sort of know how to answer your

17   question.

18     Q.  Well, what I'm suggesting is -- and whether it's

19   done through a receiver -- I mean, there's multiple ways

20   it could happen.  The FBI could take over a business.

21   I'm guessing the FBI doesn't like running businesses.

22     A.  Correct.

23     Q.  Or the FBI could hire someone to essentially run

24   the business and wind up the operations.  And that's

25   what I'm talking about.  You know, whether it's taking

Page 128

1    over the business with a receivership, those both seem

2    to have the same end of closing the business, closing

3    its operations.  Would you agree about that?

4              MR. RODGERS:  Objection, lacks foundation,

5    calls for a legal conclusion.

6              THE WITNESS:  I -- yeah, again, I don't -- I

7    know I'm not being very helpful here.  I know -- I know

8    we had discussions about it, we had discussions about

9    how -- how can we do this, and this is what we concluded

10   was, really, the only feasible way, or the best feasible

11   way, to achieve our goals.  Why we didn't choose

12   something else, I don't -- I can't really tell you that.

13   BY MR. FROMMER:

14     Q.  Okay.  So you mentioned taking over the business

15   as an alternative.

16          Were there any other alternatives that were --

17   that you and the other people you identified, that you

18   discussed?

19     A.  Yes.  We discussed nuisance abatement, which is

20   something that we occasionally use in gang

21   investigations when -- or in drug investigations where,

22   for example, you have a -- a drug house on the street.

23   You can sometimes get the city government involved and

24   get the place declared a nuisance, and then they, like,

25   they take it.  The city takes it and they abate it.

Page 129

1      We talked about that, but concluded it wasn't

2   feasible in this case because we weren't dealing with a

3   house where there was -- you know, it wasn't a crack

4   house, it was a business.  And the City of Beverly Hills

5   doesn't really have that kind of a program the way, say,

6   the City of Los Angeles does.  There was a number of

7   reasons why we considered that and concluded it was not

8   going to meet our goals and objectives.

9      Q.  Were there -- okay.  So I have taking over the

10   business and nuisance abatement.  Were there any other

11   alternatives that you discussed about how to bring U.S.

12   Private Vaults' operation to a halt?

13      A.  Not that I can think of.

14      Q.  And was there any -- was this a situation where

15   the four of you would reach consensus, or was there a

16   single decision maker?

17      A.  I think consensus.

18      Q.  And I understand the -- I understand the -- the

19   nuisance abatement alternative being unfeasible,

20   especially since you'd have to go into court and get --

21   prove that out and get -- and that would have to be done

22   by the local authorities.  I understand that.  But I

23   don't understand why you couldn't -- why -- why you

24   couldn't have taken over the business as an alternative.

25   That doesn't seem to have the -- the practical

Page 130

1    difficulty that a nuisance abatement action would have.

2    So can you explain to me what --

3                  MR. RODGERS:  Objection --

4                  MR. FROMMER:  I'm not done, Victor.

5    BY MR. FROMMER:

6      Q.  So can you explain to me why -- what wasn't

7    feasible about taking over the business as an

8    alternative to seizing the nest?

9                  MR. RODGERS:  Objection, lacks foundation,

10   calls for speculation, assumes facts not in evidence,

11   and calls for a legal conclusion.

12                 THE WITNESS:  Right.  The best I can tell

13   you is that the FBI is just not in the business of

14   taking over businesses.  We're not in the business of

15   running a business, or taking over a business.  And to

16   the -- the extent -- what we did effectively and

17   efficiently took U.S. Private Vaults out of business, as

18   opposed to the amount of just the personnel and the time

19   and the complications of taking over a business.  We

20   don't run businesses.  We don't have the personnel for

21   it.  We don't, like -- it's just not something that we

22   do with any regularity.  And I'm not familiar with it.

23   And in my training and experience, I've never seen it

24   done.

25

Page 131

1    BY MR. FROMMER:

2        Q.   So is it fair to say, then, it's not an issue of

3    impracticality or a FAR, like the nuisance action, it's

4    just something that -- that taking over a business was

5    not something that was done in the FBI's usual course of

6    business; is that correct?

7                MR. RODGERS:  Objection.  Same objections.

8    Plus that poses an incomplete hypothetical.

9                THE WITNESS:  Yes.  I mean, it's just --

10   again, in my experience, I don't know of an instance

11   where we had gone in and taken over a business.  I'm not

12   saying it hasn't happened, I'm just saying I don't know

13   of an instance where it's been done.  And just in terms

14   of resources and personnel, it -- it -- it's not

15   feasible.  It's less feasible than what we actually did.

16   BY MR. FROMMER:

17       Q.   All right.  Can you describe to me -- okay.  So

18   let's move a little bit past the application for the

19   seizure warrant, and let's talk about the steps that

20   were undertaken in preparing to execute the warrant.

21   The seizure warrant.

22       A.   Okay.

23       Q.   Okay.  My first question is a pretty basic one,

24   is that who at the FBI was involved in the discussions

25   about how to execute the seizure warrant?

Page 132

1        A.   Myself, my supervisor at the time, Rich Rod- --

2   or, I'm sorry, Rich Alexander.   Another agent on my

3   squad who was assisting, Madison MacDonald.   People in

4   our evidence group.

5        Q.   What do you mean by "evidence group"?   You mean,

6   like, evidence control?

7        A.   Yeah.   We have -- we have a whole team of -- of

8   employees who are in charge of our evidence.   They're

9   not agents, they're evidence technicians.   So they were

10  involved.   Our facilities people were involved, who do

11  things like bring equipment and tables and chairs and --

12  honestly, the -- I could go on and on with this.   The,

13  like, the whole field office was -- was sort of

14  involved.   I mean, not everybody, but there were a lot

15  of levels of -- of people involved in the planning.   The

16  planning was very complicated.

17       Q.   Why was the planning so complicated?

18       A.   Because we understood that this was going to be a

19  big undertaking, and that it was going to take time, and

20  it was going to take people, and it was going to -- we

21  also didn't know -- you know, there was a lot of unknown

22  things.   Like we didn't know how difficult or easy it

23  was going to be to get into the vault area.   There were

24  just a lot of moving parts.

25            We were also executing residential search

Page 133

1    warrants on the U.S. Private Vaults' principals at the

2    same time.  So there was that that was going on.  There

3    was -- it was -- it was very complicated.  They were a

4    lot of people involved.  And, you know, if I could sit

5    down and make a list, that would be different.  I mean,

6    off the top of my head, I'm just saying there were a lot

7    of different parts of the FBI which were involved in the

8    planning of the execution of these warrants.

9         Q.  Okay.  Let me just run a few names by you, and

10   you can tell me if they're involved or not.

11        A.  Sure.

12        Q.  I understand that giving a comprehensive list

13   could be difficult.

14            Ryan Heaton?

15        A.  So Ryan was the team leader of the group that

16   searched U.S. Private Vaults.  So, again, we had the

17   search warrant where we're searching for evidence of a

18   crime, and then we had the seizure warrants.  So it's

19   slightly two different things.  But Ryan was the team

20   leader of the search team that was searching U.S.

21   Private Vaults, like, the business, for evidence.

22        Q.  Uh-huh.  Okay.

23            And you previously mentioned Rich Alexander.

24        A.  Correct.

25        Q.  Krysti Hawkins?

Page 134

1      A.  So she's -- she's Rich Alexander's boss.  So

2   she's an assistant special agent in charge, or an ASAC,

3   for short.  She's the next level of supervisor.  She was

4   certainly, you know, aware and briefed on -- on what we

5   were doing, but I wouldn't necessarily say she had any

6   hands-on involvement.  She -- she was present at least

7   part of every day we were executing, and she was

8   involved in -- in helping solve problems.  She was kind

9   of as high as we usually needed to go if we were having

10  a -- having an issue or having some problem that needed

11  to be solved.  So she was involved to that extent.

12     Q.  Okay.  So in more of a supervisory role.

13     A.  Correct.  Yes.

14     Q.  And you previously mentioned Madison MacDonald.

15         How about Brent James?

16     A.  So Brent James was the team leader of the group

17  that executed the search warrant at the residence of

18  Mark Paul, who was one of the owners of U.S. Private

19  Vaults.

20     Q.  Okay.  So he was involved with the search warrant

21  at one of the principals.  So was he involved in how to

22  execute the seizure warrant at the business?

23     A.  I believe he also participated in the inventory

24  search for a shift.  So the searches were done in -- the

25  inventory searches were done in six-hour shifts, and a

Page 135

1    variety of agents participated in that.  And so I

2    believe that in addition to doing the warrant at Mark

3    Paul's house, I believe he also did one, or maybe two,

4    shifts on inventory search.

5        Q.   Okay.  A second ago you said something.  You

6    mentioned that Ms. Hawkins, Krysti Hawkins, would help,

7    I think the phrase you used was solve problems.

8        A.   Correct.

9        Q.   And I was wondering, like, what kind of problems

10   are you talking about?

11       A.   So, for example, the evidence wasn't getting

12   processed fast enough.  It was backlogged.  And

13   because -- because the computers were slow, or because

14   we didn't have enough people, we were not processing and

15   moving the evidence through fast enough.  It was -- it

16   was a -- a log jam.  And so she had the authority to

17   come in and tell the evidence people, like, how to get

18   past this.

19           So, for example, as I said, there's a number of

20   redundancies in our system.  So where there was a log

21   jam, we went with a bar code, and then we generated the

22   secondary number later.  We didn't stop the process

23   because both numbers weren't generated.  You needed a

24   supervisor to be able to authorize that.  So both -- the

25   redundancy still existed, it's just we didn't have to

Page 136

1    wait for the second number to move the process along.

2         And that's the kind of thing -- I know that's

3    very -- very bureaucratic, but that's the kind of thing

4    only a supervisor, somebody at a higher level, can

5    authorize.  So -- so when that became -- that was a

6    problem, and that was the solution, and she instructed

7    the evidence people:  Put a bar code on it, generate the

8    1-B number later, but don't hold up the process because

9    it doesn't have a number.

10   Q.   The 1-B number being the CATS number?

11   A.   No.  CATS number is totally different.  A 1-B

12   number is just an internal number.  We still -- as I

13   said, we have redundancies in our system.  So there's --

14   there's a -- every evidence item has a bar code and a

15   bar code number, and then separately it has a different

16   number.  We have two sets of numbers on every piece of

17   property that -- evidence property that we take into our

18   custody.  And in case one fails, the other is still

19   there.

20   Q.   I see.

21        And so when you're saying that you had a log jam

22   that Krysti helped solve --

23   A.   Yes.

24   Q.   -- was that with respect to processing -- doing

25   the inventories, processing the inventories for the

Exhibit K
906

Page 137

1      seizure of -- of the nest, of the content of the nest?

2          A.  Yes.  For, like, for getting it -- for example,

3      for getting valuables into the valuables vault.  They

4      need to go through this process.  They needed to have

5      all of the process complete.  And we don't want -- we

6      don't want valuables piling up, we want them completed

7      and into the vault.  You know, in a safe place.

8              The same thing with the cash, we needed to get

9      the cash -- like I said, I did not want to be sitting on

10     cash one second longer than necessary.  So it was

11     important that that be taken away safely and put in a

12     safe place as quickly as possible.  And she helped make

13     a lot of that happen when it was not happening fast

14     enough.

15         Q.  Okay.  I understand that.

16             So it sounds like -- it sounds like the execution

17     of the seizure warrant was sort of a priority action

18     item for the L.A. field office; is that correct?

19         A.  Yes.

20         Q.  Were there members of the computer analysis and

21     response team, were they involved in any of the planning

22     regarding the execution of the seizure warrant?

23         A.  Yes.

24         Q.  How so?

25         A.  So we understood, or we had information that Mark

Exhibit K
907

Page 138

1    Paul could control U.S. Private Vaults remotely from his

2    house.  So it was a concern of ours, did he have a --

3    did he have a -- a kill switch?  Did he have -- did he

4    have remote surveillance?  This was something we had to

5    consider, because we had information about it.

6         So we called our CART guys in to assist with

7    that.  And also we understood that the -- that the

8    computers at U.S. Private Vaults were, you know, were

9    something that we were interested in.  And so if you can

10   get the CART team to help you on site, it's better.

11   Because for somebody like me, I'm not very

12   technologically -- you know, it's not my best thing.  So

13   if I can get somebody who's more expert in that than I

14   am to help me on site, then, you know, then I will do

15   that.

16   Q.  Okay.  So they were involved -- the CART members

17   were involved -- because I understand the thing about

18   the kill switch and remote control.  So were they

19   involved in the execution of both the search warrant at

20   Private Vaults and the seizure warrant at Private

21   Vaults?

22   A.  They were there.  A CART agent was at the

23   business while we were doing the search warrant to help

24   us navigate the computers, which was -- which was also

25   one of the items on the seizure list.  So that's one

Page 139

1    area where the two things actually overlapped.

2        Q.  Okay.  And before we had talked about evidence

3    control.  Was Ricardo Maldonado involved in the

4    discussions about how to execute the seizure warrant?

5        A.  So he's an evidence guy.  I don't know that he

6    would have been -- I know that he -- yes.  I mean, in

7    the broad sense, yes.  The evidence guys aren't

8    necessarily involved in, like, execution in terms of,

9    like, tactical, but they certainly had to be involved in

10   this case with regard to all the procedural things that

11   we've talked about.

12            So all of the process, the -- the chain of

13   custody, the evidence log, the FD-597, the bar codes,

14   the 1-B numbers, the packaging, the sealing, the double

15   signatures, all of that is -- that's the kingdom of the

16   evidence.  And so agents, of course, know how to do

17   this.  We do this -- this is what we do.  But the

18   evidence techs are there to help us, and they are the

19   quality control on that.  If you don't do it right, they

20   will bring it back to you and say:  No, you need two

21   signatures.  Or:  No, this has to be sealed this way.

22   Or the tape has to go in this direction.  They are the

23   experts at that.

24            So they were -- they were on site, on hand at all

25   times.  And also involved in the planning, because they

Exhibit K
909

Page 140

1    had -- they had to schedule out -- just for scheduling

2    purposes.

3        Q.  At the FBI, were there any other people that you

4    can think of that really stand out as being people who

5    were involved in the planning of how to execute the

6    seizure warrant?

7        A.  Yes.

8        Q.  People who we haven't previously discussed --

9        A.  Yes.  Asset forfeiture paralegals were also on

10   site and were consulted in advance, because we

11   anticipated that there would be cash.

12       Q.  Why -- why -- why does the presence of cash

13   necessitate having asset forfeiture paralegals on site?

14       A.  Right.  So this gets into -- this kind of might

15   help explain your sort of earlier question about CATS ID

16   numbers.  It's complicated, but this is -- this is the

17   thing.

18           I don't -- as I said, I don't want cash in the

19   form of cash any longer than I have to.  So to -- to put

20   it into Loomis, which is our contract, you know,

21   currency bank, it has to have the CATS ID number.  It

22   doesn't mean it's going to be forfeited, it's for

23   identification purposes.  And so -- but it does have to

24   have -- it's like -- it's like starting the process.  It

25   has to have that ID number to get it to Loomis.  So in

Page 141

1    order for us to get the cash that we found to Loomis, it

2    had to have a deposit slip and a CATS ID number so that

3    we can trace it through the system and we don't lose

4    track of it.  And I don't have the details on how that

5    exactly works, but I know that for me to take it to

6    Loomis, it has to have a deposit slip and a CATS ID

7    number, which was generated by our asset forfeiture

8    paralegals who were there.

9    ███ ████████████████████████████████████

10   ███████████████████████████████████████

11   ███████████████████ ████████████████████

12   ████

13   ██ ███████ ████████████████████████ ████

14   ███████████████████████████████████████

15   ███████████████████████████████████████

16   ███████████████ ███████████████████████

17   ██████████████████████████████████████

18   ██████████████████████

19   ██ ██████ ████████████████████████████

20   ███████████████████████████████████████

21   ███████████

22   ██ ██████████

23       Q.  All right.  How many asset forfeiture paralegals

24   were on site?

25       A.  Well, one at a time.  You know, they worked in

Page 142

1      shifts.  So there was always one there.  And there may

2      have been more than one, I don't know that for sure, but

3      there was always one there.

4          Q.  Okay.  Was -- so we talked about the FBI

5      agents -- or FBI personnel who were involved in talking

6      about how to execute this warrant.  Was anyone from the

7      U.S. Attorney's Office involved in discussions about how

8      to execute the seizure warrant?

9              MR. RODGERS:  Again, you can identify

10     persons, but please do not identify the content of any

11     communications with those persons.

12             THE WITNESS:  Well, I mean, the answer is

13     Andrew Brown.  Andrew Brown was the AUSA in this case.

14     So --

15     BY MR. FROMMER:

16         Q.  Okay.

17         A.  I think he's always the answer.

18         Q.  How about Victor, was he involved in any of these

19     conversations?

20         A.  Not about execution.

21         Q.  Can I -- let me move back a little bit to the

22     paralegal point.  The asset forfeiture paralegals, was

23     their role limited to just cash?

24         A.  Yes.  On site?  Yeah.  During execution, yes.

25         Q.  Okay.  So if you found a bunch of high-end

Exhibit K
912

Page 143

1    watches, for instance, or a huge rack of gold coins,

2    would the asset forfeiture paralegals, would they have

3    been involved with that property at all?

4        A.  No, not at all.

5    ███  ████████████████████████████

6    ███  ████████████████████████████  █████████

7    ██████████████████████████████████

8    ████████████  ██████████████████████████████

9    ██████████████████████████████

10   ████████████████████████████████████

11   ███████

12       Q.  Were there other federal agencies that were

13   involved in the discussions about how to execute the

14   seizure warrants, such as the DEA or USPIS?

15       A.  Yes.  Both.

16       Q.  Okay.  Was group supervisor Todd Boyette involved

17   in the conversations about how to execute the seizure

18   warrant?

19       A.  Yes.

20       Q.  How about group supervisor Noah Thompson, over at

21   USPIS?

22       A.  Yes.

23       Q.  And what aspect of the execution of the seizure

24   warrant -- were -- were they -- scratch that.  I'll come

25   back to that.

Page 144

1        Were there any state and local agencies that were

2    involved in the discussions about how to execute the

3    warrant, seizure warrant?

4        A.   No, not in the planning phases, but they may have

5    been consulted separately for a specific role.   For

6    example, El Monte Police Department provided security

7    for the location.   They -- black and white marked units.

8    Beverly Hills police department also provided perimeter

9    security and marked units.   So they may have been

10   brought in in separate discussions, but not the planning

11   phase.

12       Q.   Okay.   So when it's closer to the time of

13   execution, someone would have -- well, did you reach out

14   to Beverly Hills PD or El Monte PD about --

15       A.   I did not.

16       Q.   Okay.

17       A.   I have not.   My partners handled that.

18       Q.   Madison MacDonald?

19       A.   No.   So DEA and Postal handled that.   They had --

20   they reached out to the other enforcement -- local law

21   enforcement agencies to get their -- their assistance.

22       Q.   Okay.   And Beverly Hills PD -- I think you said

23   El Monte --

24       A.   Yes.

25       Q.   -- is that right?

**Exhibit K**
**914**

Page 145

1      A.   Right.

2      Q.   -- the DEA and USPIS, are they all in, like, a

3   common task force?

4      A.   No.

5      Q.   No, they're not.  Okay.

6      A.   El Monte is in a task force with DEA.

7      Q.   Okay.  Is Beverly Hills PD in a task force

8   with --

9      A.   No.  But, I mean, we were in their back yard,

10   so --

11      Q.   Yeah.

12      A.   -- you want to let them know what's going on.

13      Q.   Yes.  That -- that's understandable.

14          Did -- I'm assuming, as part of these -- how far

15   is El Monte from Beverly Hills?

16      A.   Half-hour.

17      Q.   Okay.

18      A.   Thirty miles, maybe.

19      Q.   Isn't, like, the LAPD, wouldn't they be much

20   closer than El Monte?

21      A.   Right.  But El Monte was in a task force with

22   DEA, so they already had a working relationship, and

23   they were -- had already participated in the

24   investigative phase.

25      Q.   Okay.  Oh, El Monte had been involved in the

Exhibit K
915

Page 146

1    investigative phase of the USP investigation.

2        A.   Correct.

3    ██  ████  ██████████████████████████████████

4    ████████████████████████████████

5    █  ███  ██████████████████████████████████████

6    ████████████████████████████████████

7    ████████████████████████████  █████████████████

8    ██████████████████████████████████████

9    █████████████████████  █████████████████████

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   █████████████████████████  ████████████████

13   ████████████████████████████████████████████

14   ██████████████████████  ████████████████████████

15   ██████████████████████████████████████████████

16   ██████

17       Q.   Okay.  So I'm trying to -- I'm trying to get a

18   sense of, like, everyone who's involved in this.  So we

19   had FBI people, we had DEA people, we had USPIS, we had

20   El Monte there, we had the Beverly Hills PD.  Were there

21   any other groups -- I mean, that's five different

22   agencies.  Is -- are there -- are there other agencies

23   that I don't know about that were involved?

24       A.   Yes, because we had, as I'm sure you know, we had

25   K-9 handlers on site, and the K-9 handlers came from, in

Page 147

1       addition to El Monte Police Department, they also came

2       from -- LAPD, Glendale PD, and Chino Police Department

3       all provided K-9 handlers.

4           Q.  So El Monte, LAPD, Chino -- and what was the

5       other one?

6           A.  Glendale.

7           Q.  Glendale.  Okay.

8               And those police departments, are they in any

9       sort of task force with either the FBI or the DEA?

10          A.  Not -- not in regards to this case.  They may be

11      in different task forces, but not -- not with regard to

12      this investigation.

13          Q.  Okay.  It sounds like a big operation.  It sounds

14      like it was a -- were you -- were you -- let me ask just

15      a very basic point.

16              Were you, like, the point person on the ground

17      for, I think it was -- what is it, team six?

18          A.  I don't know what team six is, but I was the

19      point person on the ground for -- for the entire time,

20      pretty much, of the searches.  Except I did -- I did

21      leave to sleep a few hours a day.  But yes --

22          Q.  So --

23          A.  -- I was the point person on the ground during

24      the execution of the warrants.

25          Q.  Okay.  That's -- yeah, that's what I was asking.

Page 148

1    I had seen some document that talked about different

2    teams, and I think it talked about the seizure team as

3    being team six.

4         So it sounds like there had to have been a lot of

5    manpower needed to execute the warrant; is that fair to

6    say?

7         A.  That's correct.

8         Q.  And so as part of that, did the team leaders --

9    you know, it sounds like you were a team leader -- and

10   if I'm wrong on that, let me -- you can correct me.

11   But, like, did the team leaders create, like, tactical

12   operation plans for how they were going to execute their

13   part of the warrant?

14        A.  Right.  So that -- that's a little bit different.

15   So that's the -- the search warrants, which there were

16   four residential search warrants, one for each -- for

17   the two owners -- for Mike Poliak, for Mark Paul, for

18   George Vasquez, who was the manager, and for the Barths.

19   There were four -- there were residential search

20   warrants.  And then the fifth one being the business,

21   the office space of U.S. Private Vaults, which, as I

22   said, Ryan Heaton was the team leader on that.

23        The other four locations, Mark Paul was covered

24   by FBI; Mike Poliak was covered by DEA, with El Monte

25   PD; George Vasquez was done by Postal; and the Barths

Exhibit K
918

Page 149

1    were also done by DEA.  So they would have had their own

2    separate tactical plan to execute those specific

3    residential warrants.

4        Q.  Then I think I need to be more precise.  Was

5    there a tactical operation plan crafted for executing

6    the seizure warrant at U.S. Private Vaults?

7        A.  So, yes.  There's -- there is an overall

8    operations plan, which encompassed the whole thing.

9    The -- all of it.  The residential warrants, the search

10   of the office, and the seizure portion of it.

11          And then there was a -- I -- I drafted a very

12   specific, sort of a supplemental process, or operation

13   plan, for the inventory of the boxes, because I

14   understood that that was going to be the bulk of the

15   work, and that it was, frankly, different from what we

16   do every day.  The residential warrants are very typical

17   of what we do, but the seizure of the business was

18   different, and so I wrote a separate op plan for that.

19       Q.  Okay.  So you wrote an operations plan, some sort

20   of supplemental plan for inventorying the boxes --

21       A.  Correct.

22       Q.  -- is that right?

23       A.  Yes.

24       Q.  Okay.  And so since you created the overall plan

25   for this, I assume that when you were executing the

Page 150

1    seizure warrant, you have to secure a site.  To secure

2    the site, you have to seize the items.  And then it

3    sounded, from what you were just telling me, that, like,

4    inventorying the boxes was the -- the biggest time

5    commitment.  How much time did you expect to devote to

6    inventorying?

7        A.  We had it scheduled from Monday at -- I think we

8    anticipated starting at noon, and going to Thursday at

9    6:00 p.m.

10       Q.  So four days; is that correct?

11       A.  Correct.

12           And it -- it went past that a little bit.  It

13   went into Friday morning.

14       Q.  Okay.  And what were the hours of operation

15   during that week?

16       A.  Around the clock.

17       Q.  Wow.  So you had agents inventorying boxes

18   24 hours a day?

19       A.  Correct.

20       Q.  Must have been hard to recruit some of those

21   graveyard shifts.

22           So you expected it to take a number of days, and

23   in fact took a -- inventorying boxes, you expected it to

24   take a few days, and in fact it took a little bit longer

25   than you expected; is that fair to say?

Page 151

1      A.  That's correct.

2      Q.  Okay.  And so -- well, let me just ask this sort

3   of directly.  We -- well, I'm trying to figure this part

4   out.  Who -- was it only FBI personnel who were doing

5   the actual inventorying of boxes at U.S. Private Vaults?

6      A.  So FBI agents have to -- there's certain things

7   that had to be done by FBI agents.  Only FBI agents can

8   sort of initiate the -- the paperwork process.  So every

9   inventory team was -- was FBI agents.  Or FBI personnel.

10  So if you had two agents, you could have a third person

11  who was not an agent who was maybe -- I know we had,

12  like, some of our analysts came out to assist.  And they

13  could assist by -- by helping, but they couldn't really

14  be -- they -- they were -- they were a third person.

15  They couldn't be primary one or primary two.  So every

16  inventory team had two to four FBI agents on it.

17     Q.  And -- oh.  So did the size -- so the size of the

18  inventory teams wasn't consistent?  They varied in size?

19     A.  Yeah.  It had to have at least three, plus we --

20  you know, I can explain the video situation -- but three

21  was ideal.  But if you had a fourth person, you would --

22  you could put a fourth person on that team and it makes

23  it go a little bit faster.  But if you have three teams

24  that have a fourth person, you could break off one and

25  create a new team, which helped you go faster.

Page 152

```
1        So it had to do with how much personnel we had on
2    site at the time, and it fluctuated.  So we created as
3    many three-person teams as we could in order to speed up
4    the process.  If you had an odd number of people, you --
5    then you had a four-man team and you just had an extra
6    set of hands getting through it.
7        Q.  Got it.  Okay.  So were there any DEA or USPIS
8    agents that were helping to inventory boxes?
9        A.  So DEA was responsible for -- for the video.  And
10   they took that whole project.  So they -- DEA obtained
11   the video cameras, they trained their personnel on them,
12   they got the SIM cards, and they scheduled a video
13   person, two video persons, around the clock for as long
14   as we were there.  So -- so the DEA agent was also
15   another person on the team, in the sense that they were
16   creating the video record.
17       Q.  Got it.  So they weren't doing the physical
18   inventorying themselves, they were -- they were
19   capturing -- or they were supposed to capture what the
20   FBI agents were doing.
21       A.  Correct.
22       Q.  Okay.  And then the local agencies, like El Monte
23   and Beverly Hills, their role was to, essentially to
24   provide security at -- at the -- at the facility; is
25   that correct?
```

Page 153

1      A.   Correct.   Local -- local agencies didn't

2      participate in the inventory process at all.

3      Q.   Okay.   But the locals were the ones who brought

4      the K-9 units; correct?

5      A.   Correct.

6      Q.   Okay.   The -- the drug dogs.

7      A.   Correct.

8      Q.   Okay.   All right.   And -- all right.   And I think

9      you already answered this, but the seizure -- the

10     execution of the seizure warrant, it sounds like a lot

11     of these groups were members of some task force, but was

12     the execution of the seizure warrant done under the

13     aegis of -- of a task force, or was it -- well, just let

14     me leave it there.

15     A.   FBI.   It was FBI.

16     Q.   Okay.   So did you have conversations with these

17     other agencies about how they would be included in the

18     FBI's execution of the warrant?

19     A.   Yes.

20     Q.   You personally?

21     A.   Yes.

22     Q.   Okay.   So you would have talked to DEA about

23     their role in executing the seizure warrant.

24     A.   Yes.

25     Q.   And the same with the -- the local police

Exhibit K
923

Page 154

1     departments.

2         A.  I didn't talk with the local police departments,

3     I talked with DEA and Postal about how we were going

4     to -- you know, how we were going to do this.  How we

5     were going to divide the labor.  What everybody could

6     contribute to the execution of the -- of the warrant.

7         Q.  Okay.  You said that the locals were the ones who

8     brought the K-9 units.  Who -- which agency was it that,

9     well, asked the locals to bring the K-9 units?

10        A.  Postal Inspector organized that.

11        Q.  So USPIS ran point on drug dogs.

12        A.  Correct.

13        Q.  Okay.  And -- now, was that something that USPIS

14    came up with on its own, or was it something that you

15    had all discussed and it was just that USPIS were the

16    ones to actually reach out?

17        A.  Right, it was -- it was, again, discussions of

18    what -- you know, who's going to do what, and Postal

19    said I'll take care of that.  I'll -- we've got the

20    contacts, we'll contact them, we'll get that organized.

21        Q.  Okay.  So I guess what I was -- yeah.  So -- so

22    basically the group -- by that I mean the FBI, DEA,

23    USPIS, and Andrew -- you all discussed how to execute

24    the warrant, came to some resolution that we should have

25    K-9 units there, and then USPIS said we know the right

Page 155

1    people, we'll reach out and get the -- the dogs there.

2    Is that a fair and accurate statement?

3              MR. RODGERS:  If you have to include in your

4    answer the communications or contents with Andrew, I

5    instruct you not to answer on attorney-client privilege

6    grounds.

7              You can answer otherwise.

8              THE WITNESS:  Yes.  That's -- that's

9    accurate.

10   BY MR. FROMMER:

11     Q.  Okay.  All right.

12          So once you had come up, you and the team, had

13   come up with how to execute the seizure warrant, did you

14   send out -- well, I think you said you had created

15   instructions on how to do the box inventory; is that

16   correct?

17     A.  Correct.

18     Q.  Okay.  And -- and who did those instructions go

19   out to?

20     A.  So prior to -- approximately a week prior to the

21   execution of the warrants, we had a, like a team

22   meeting, and agents who had volunteered to assist came

23   to the meeting.  I'll say normally we would have had one

24   big meeting, but because of COVID we had, like, ten

25   small meetings.  But basically agents who had -- who had

Page 156

1    volunteered to assist came to a meeting, and we -- and I

2    went through the instructions with them.

3        And I'll say not just the -- there was meetings

4    for the agents who had volunteered to do the inventory,

5    but there were also meetings with the -- with the --

6    with the more technical, with the -- with the

7    property -- the facilities people, and the evidence

8    people.  And there was the meeting sort of directed at

9    that, there was a meeting directed at the groups that

10   were going to do the residential search warrants, and

11   then there was meetings, plural, for the agents who had

12   volunteered to do inventory search.

13       Q.  Okay.  So there were meetings where the people

14   who were going to be doing the inventories met to

15   discuss how to do those inventories; is that right?

16       A.  Correct.  Yes.

17       Q.  Okay.  And who headed up those meetings?

18       A.  I did.

19       Q.  Okay.  You did.

20       And is it fair to say, then, that you were using

21   those supplemental instructions on box inventory to --

22   as part of that training?

23       A.  Yes.

24       Q.  Okay.  Now, did you share a copy of the seizure

25   warrant with the FBI officials who were tasked with

Page 157

1    inventorying?

2        A.  I'm not sure.  The -- the Attachment B, the items

3    to be seized, would have been present at the location.

4    I don't think I had it yet when I did the briefing, the

5    team briefing.  So I would not have shared it with them

6    at the team briefing, because I don't think the warrant

7    had been sworn out yet.  But I -- honestly, the timeline

8    is a little fuzzy there.  I don't quite remember.

9        Q.  Do you know if there were -- well, when these

10   officials showed up at USPV to do the inventorying, do

11   you know if at that point they were provided with a copy

12   of the seizure warrant?

13       A.  Not -- I mean, not specifically.  I don't think

14   they were handed a copy of the seizure warrant as they

15   showed up to do inventory.

16       Q.  Okay.  So is it fair to say, then, that you're

17   not sure if the FBI officials who were tasked with

18   inventorying ever saw a copy of the seizure warrant?

19       A.  I don't know the answer to that.

20       Q.  Okay.  But you -- you don't -- is it fair to say

21   you don't know whether this -- a copy of the seizure

22   warrant was ever disseminated to those FBI officials

23   tasked with inventorying?

24       A.  It was -- it was present at the site.  So a copy

25   would have been there.  And it is -- it is our practice

Page 158

1    at warrants to review, as I said, what we call the --

2    the items to be seized, but I don't -- I don't have

3    specific knowledge about that.

4       Q.  Okay.  Do you -- is there somebody who might have

5    better information about whether the FBI --

6       A.  Like, each --

7       Q.  -- officials involved with inventorying actually

8    received a copy of the seizure warrant?

9       A.  Each individual person probably could -- could

10   tell you that.

11        And, again, this is a little bit different from

12   what we normally do, because it's an inventory.  It's

13   not -- it's not -- so when we're searching, we need to

14   know very specifically:  What am I searching for.  This

15   is an inventory, so it was less important because it

16   didn't matter, it was bagged and tagged.

17        So everything that was in the nest of boxes was

18   going to be bagged and tagged according to procedure.

19   It didn't really matter -- it's not like -- like, for

20   example, when I go on a health care fraud warrant, I use

21   this, because these are really difficult.  They will

22   specifically say I'm looking for -- I'm looking for the

23   files with these people's names on it.  And then you

24   really need to consult the warrant.

25        This was less important because it didn't matter,

Page 159

1      it was -- it didn't matter what it was, you were going

2      to inventory it.  We didn't know what it was.  We didn't

3      know what it was going to be.  You open it, you bag it,

4      you tag it, you process it, you secure it, and you move

5      on.

6           So the -- I'm sure the warrant was there, but I'm

7      not sure who reviewed it, and I didn't hand it out to

8      everybody.

9      Q.  But you did hand out the supplemental

10     instructions on the boxed inventory.

11     A.  Correct, I did hand that out.

12     Q.  So that was, really, sort of their guiding -- for

13     the FBI officials doing the inventorying, that was sort

14     of their guiding document; isn't that correct?

15     A.  Correct.  Yes.

16     Q.  Okay.  And -- all right.  Let me see what page

17     we're on.  And I know we're coming up on 90 minutes, so

18     just let me know and we'll take a short break then.

19          I wanted to go a little bit back in Exhibit 3

20     to -- here we go.  Okay.  So this is paragraph 108, I

21     believe, of your affidavit; is that right?

22               MR. RODGERS:  Paragraph 108 or page 108?

23               MR. FROMMER:  Sorry.  Paragraph 108, USAO

24     111.

25               MR. RODGERS:  We are on that page.

Page 160

1     BY MR. FROMMER:

2          Q.  Okay.  All right.  So -- so, actually, what I

3     want is to -- it's, again, the -- it's actually on the

4     next page, 112.  It's that footnote 40.  And it states

5     that the inspection, quote:

6               Should extend no further than necessary to

7     determine ownership.

8               Do you see that there?

9          A.  Yes.

10         Q.  Okay.  And I think you previously said that -- I

11    think you had said that Andrew Brown had drafted that,

12    but you agreed with the substance of it; is that

13    correct?

14         A.  That's correct.

15         Q.  Okay.  Because you reviewed it as part of -- as

16    part of this work.  As part of submitting the affidavit.

17         A.  Correct.

18         Q.  Now, if we could go up on -- here -- if you look

19    up on this page, page 112, lines four through seven.

20    It's the phrase that's in parenthesis.

21              MR. RODGERS:  We are there.

22    BY MR. FROMMER:

23         Q.  If you could just read that real briefly.

24         A.  The USPV recommends that box renters include

25    their designees' telephone numbers on a note in the box

Exhibit K
930

Page 161

1    in the event the USPV removes the contents for

2    nonpayment of rental fees.

3        Q.  Okay.  Let me actually introduce another exhibit.

4    Give me just one moment.

5              (Exhibit 6 marked at this time.)

6              MR. FROMMER:  Okay.  This is Exhibit 6.

7    Just let me know when you have it -- when you see it.

8              MR. RODGERS:  We have it.

9              MR. FROMMER:  Okay.

10   BY MR. FROMMER:

11       Q.  So Special Agent Zellhart, you had said in

12   that -- in your affidavit -- I'll just read it again:

13       USPV recommends that box renters include their --

14   their designees' telephone numbers on a note in their

15   box in the event that USPV removes the contents for

16   non-payment of rental fees.

17       When you were thinking of that, were you

18   referring to an executor conservator notification

19   letter, like the one here in Exhibit 6?

20       A.  Yes.

21       Q.  Okay.  And you would agree with me -- you can

22   take time to review it -- that this provides contact

23   information for both the executor on page one, and then

24   on page two the contact information for the owner; is

25   that correct?

Exhibit K
931

Page 162

1      A.  Yes.

2      Q.  Okay.  So my question is this:  Let's say agents

3      pull out a box from the nest, and on this box is the

4      conservator letter, like this one here.  Once agents

5      encounter a letter like this, your words in your

6      affidavit that the inspection should, quote, should

7      extend no further than necessary to determine ownership,

8      once agents encounter a letter like this, your own words

9      state that the inspection of that should stop at that

10     point; correct?

11              MR. RODGERS:  Objection, mischaracterizes

12     the document, which speaks for itself.

13              THE WITNESS:  So I'll just say, having done

14     this, that where there was an executor conservator

15     notification letter, that was extremely helpful to us,

16     in most instances, in identifying the box holder.

17     However, there were a number of situations where there

18     was also, for example, a photocopy of a driver's license

19     with a different name on it, or a photocopy of a

20     passport, or multiple passports, with different names on

21     it.  We also encountered executor conservator

22     notification letters that were from the last party to

23     rent that box and it got left in there.

24              So it's a -- it's a great starting point in

25     terms of who the box holder is, but it, as it turned

Page 163

1    out, is not the last word in it.

2              And then also to answer your question, it

3    doesn't -- it doesn't stop us from needing to inventory

4    the box.  It's indicative of ownership, but we still

5    need to process what's in the box for all the reasons we

6    discussed this morning, such as to protect the property

7    itself, to protect us from accusations of loss or theft,

8    to protect us from hazardous materials.  So everything

9    still needs to be bagged and tagged and processed

10   according to our evidence procedures, with all of the

11   redundancies and paperwork.

12             But with regard to ownership, the executor

13   conservator notification letter is -- is really good,

14   but, as it turns out, not the last word in the every

15   box.

16   BY MR. FROMMER:

17     Q.  Let me ask this, because, you know, as you know,

18   we had our -- some of our clients come and pick up

19   property, and when they did that, the -- the FBI

20   requested that they bring a copy of the key, and the key

21   was then placed in the -- the door for their box.

22     A.  Correct.

23     Q.  And that -- and, you know, and the FBI agent

24   would then check to see if, you know, it turned the

25   lock.  So it sounds as if the FBI was using the key to

Page 164

1    resolve any issues regarding is this a proper -- is this

2    the -- the right person to get this box.  Isn't that

3    correct?

4        A.  Right.  So there's -- there's -- it's a -- it's

5    a -- it's a multi-factor thing.  It's a totality of

6    circumstances, if you will.  There are -- it is really

7    important for us to make sure that we return property to

8    the correct owner.  And I have situations where there

9    was a -- a husband and a wife in a divorce.  I've had

10   two brothers, and the father passed away.  I've had

11   family disputes.  I've had two former lovers who both

12   had an interest in it.  So it's really important for us

13   to not return property to the wrong party, and then have

14   the second party come to us later and say, hey, you gave

15   my money, or whatever, my gold watch, to my ex-husband,

16   that, you know, sneaky thief, or whatever.

17        So we are -- we are -- our process was to do

18   everything we could to ensure that property was being

19   returned to the correct person.  So, for example, if

20   somebody had the executor conservator notification

21   letter and the key -- actually, both keys -- that's

22   pretty good.  That's pretty solid.  We're pretty

23   confident, in that situation, that somebody else is not

24   going to show up later and lay claim to that property.

25        Q.  Let me ask you this:  Did -- did the FBI ever

Page 165

1   refuse to give somebody the property that was in a safe

2   deposit box when that person showed up with a key that

3   fit the lock of that box?

4       A.  So I'm going to have trouble answering this,

5   because we've returned about 500 boxes, and I haven't

6   personally done them, but I do oversee the process.  And

7   I'm not sure about that, if that has happened or not.

8   If --

9       Q.  Okay.

10      A.  -- it did, there was a reason for it, is all I

11  can tell you.  We were committed to getting the property

12  back to the correct person.  We -- we are committed to

13  that.  And, you know, we don't want it in our evidence

14  locker.  It's taking up space.  And I'm actually under a

15  considerable amount of pressure to get it back.  We want

16  to get it back into the hands of the people it belongs

17  to.  But at the same time, we can't give it to the wrong

18  person, or take the chance that it's going to the wrong

19  person, or that it's going to -- it's -- it's a little

20  bit complicated, so I can't totally answer your

21  question.

22      Q.  I understand that, but -- and we're going to take

23  a break in just a couple minutes, because I know we're

24  hitting a hard limit.

25          Weren't there instances where an attorney would

Page 166

1    show up with a key, without you -- without the FBI

2    really knowing who the underlying owner was?

3        A.  Yes.

4        Q.  And you released the contents of the box based on

5    the key fitting into the lock; correct?

6        A.  And the representation by the attorney that the

7    attorney represented the box holder.  And there were

8    generally other factors as well.  So I'd have to know

9    specifically the circumstances.  Again, totality of

10   circumstances, multiple factors.  But we did require

11   attorneys to -- to sign something that says:  I in fact

12   represent the person who rented this box and whose

13   property this is.

14       Q.  Okay.  But you --

15       A.  Because that was a grave concern to us, that we

16   were returning property to -- to anonymous people

17   through their attorneys.

18       Q.  Okay.  Do you recall -- well, that's --

19            MR. FROMMER:  Okay.  Why don't we take our

20   break.  Why don't we take, like -- why don't we take ten

21   minutes, and then we'll come back on the record.  Okay?

22            MR. RODGERS:  Okay.

23            THE VIDEOGRAPHER:  We are off the record.

24   The time is 2:45 p.m.

25            (A short break was taken at this time.)

Page 167

1          THE VIDEOGRAPHER:  We are back on the

2    record.  The time is 2:56 p.m.

3    BY MR. FROMMER:

4    Q.  Okay.  All right.  We've talked a lot about

5    the -- the application for the seizure warrant, and

6    talked about the planning on the execution of the

7    seizure warrant.  I briefly wanted to just go -- have

8    you walk me through the day that the FBI and the other

9    agencies we've been talking about executed the USPV

10   seizure warrant.  So if you could just give me a general

11   description of how that proceeded through -- from the

12   time the place was secured, through the beginnings of

13   the inventory process.

14   A.  Okay.  So the residential warrants were scheduled

15   to go at 6:00 a.m., and they did.  And, again, there was

16   some concern with the Mark Paul location, that he might

17   have some kind of a kill switch, or something of that

18   nature, so the -- it was important to get his sort of

19   digital set-up, like, under our control.

20          But the four locations were executed

21   simultaneously.  The Postal Inspector had the George

22   Vasquez location, and secured his cooperation in getting

23   us into the business so that we didn't have to breach

24   doors.  He agreed -- he -- he got in every day, so he

25   agreed to assist us.  Ultimately, I think Mark Paul also

Page 168

1    was cooperative in that, and I actually think the Barths

2    were also willing to cooperate.  But basically we

3    secured cooperation to get into the business so that we

4    didn't have to breach doors.

5         And so eventually -- I mean, it took a little bit

6    of time for this to roll out, but probably around, I

7    would say, 8:00 a.m. we had started having a number of

8    people at the business.  And we got into the business,

9    at which point our search team that was doing the search

10   of the business for -- for criminal purposes executed

11   their business -- their business search warrant for

12   records and, you know, the types of things they were

13   looking for.

14        At the same time, that's about the time we got

15   into the vault section where the nest of boxes were

16   located, and we had some personnel helping us figure out

17   how to open them.  How to -- how to breach them.  And so

18   that took some time.

19        And -- and as that's going on, our other

20   personnel were starting to set up.  Like, our evidence

21   techs arrive, and we were getting computers set up on

22   site.  We're basically putting our -- our system

23   together until -- probably around 9:00 or 10:00 we had

24   the first two teams set up with video cameras to start

25   doing box inventory.

Page 169

1     And the first couple, you know, I was there for

2     to get the process going. It was a little bit different

3     for us. Again, we had drawn it up on the -- the

4     supplemental instructions, that everybody had, and had

5     copies of, and also had it on their phone. So we had --

6     like, we had a process set up. And it was a matter of

7     establishing the process. Like everything we do, a --

8     you do it a couple of reps, you get it down, and then,

9     you know, you've got a system together.

10    Q. Okay.

11    A. And so that's probably, I would say, around

12    10:00 a.m.-ish we started that process. And --

13    Q. Okay.

14    A. -- it continued on.

15    Q. For -- until the morning of the Friday the 26th;

16    is that right?

17    A. The -- the -- my understanding, the last box was

18    inventoried right around midnight, Thursday night going

19    into Friday, and then the rest of that time was

20    clean-up, breakdown, finish, like, processing the

21    evidence. Again, it needs bar codes, it needs 1-B

22    numbers, it needs paperwork being generated. Stuff's

23    got to be moved out. So the last, you know, the last

24    eight hours was breaking it down and getting it all put

25    away.

Page 170

1        Q.   Okay.  So the inventorying took basically from

2    Monday at 10:00 a.m. until Thursday at midnight.

3        A.   That's correct.

4        Q.   How many boxes -- I don't -- how many boxes did

5    the -- did the FBI inventory over that period?

6        A.   Right around 700.

7        Q.   Around 700 boxes?

8        A.   That's --

9        Q.   Okay.

10       A.   -- ballpark.  But it's -- it's a good ballpark.

11       Q.   Yeah.  It's a lot of boxes.

12           Did anybody, do you know -- so you said there was

13   700 boxes that were inventoried.  And how many boxes

14   ultimately were the contents returned to the -- the box

15   holder?

16       A.   So that's --

17              MR. RODGERS:  I just want to object.  To the

18   extent these questions call for speculation, I'm

19   objecting on that basis.  When you ask about the FBI,

20   this witness doesn't necessarily know -- have personal

21   knowledge of that, but she can testify based upon what

22   she's heard from other people.

23              MR. FROMMER:  I understand.

24              MR. RODGERS:  Okay.  You can -- you can

25   answer the question.

Exhibit K
940

Page 171

1            THE WITNESS:  So it's a -- it's a changing

2    number, because we continue to return property, as of, I

3    think, yesterday.  I mean, we -- we are continuing to

4    return property.  I think right now it's in the

5    neighborhood of 400, 430, that have been returned.

6    BY MR. FROMMER:

7        Q.  About 430 returned?

8        A.  I think that's --

9        Q.  And I believe -- oh, sorry.

10       A.  I think that's right.  But, again, I have a list

11   somewhere, I have a record of it.  I'm just recalling.

12   I think it's like that.

13       Q.  Okay.  And you were -- you've been, I think -- I

14   think you might have used this word, and if you didn't,

15   correct me if I'm wrong, but I think you said before

16   that you had -- you were -- had been overseeing the

17   property return process; is that accurate?

18       A.  That's accurate.

19       Q.  Okay.  All right.  So you had -- you would be in

20   a good position to know how many boxes were inventoried

21   and how many were returned.

22       A.  Correct.

23       Q.  All right.  So I know you were there, like, all

24   the time, except for those brief sleep -- that brief bit

25   of sleep that you got.  When you were there, did you --

Exhibit K
941

Page 172

1    were you helping to secure the area?  I'm -- let me just

2    ask more generally:  Was your role sort of to coordinate

3    the other agents and other agencies that were involved

4    with executing the seizure warrant?

5        A.  No, I wouldn't characterize it like that.  I

6    mean, my role was -- I had the everything role.  I

7    answered all the questions, I -- I oversaw the process.

8    I helped wherever I could.  I took out garbage, if

9    garbage needed to be taken out.  I talked to the ASAC

10   when things needed to be done.  I communicated it, the

11   high level and the low level.

12       Q.  Okay.  So is it fair to say, then -- is it fair

13   to characterize you as sort of the person in charge as

14   to the execution of the seizure warrant?

15       A.  I think that's true, yes.

16       Q.  Okay.  All right.  Did you ever happen to

17   inventory a box yourself?

18       A.  I did.

19       Q.  Oh, really?  Like, how many?  Just one -- just

20   the one or two at the beginning that you said?

21       A.  Probably about five --

22       Q.  Okay.

23       A.  -- times in -- yeah.  Not very much.

24       Q.  I know it took pretty much almost a full four

25   days to inventory the boxes, and I -- I think you said

Page 173

1   that it was longer than you had originally expected it

2   to take.  What -- what -- what were the snafus that made

3   it take longer than expected?

4       A.  Our process is very thorough, and it -- it just

5   takes time.  To fill out all the paperwork, to fill it

6   out, you know, more than once with the same information.

7   The boxes -- I just don't think we wrapped our mind

8   around how many boxes were going to have content in

9   them.  The processing of valuables is an extra step,

10  and -- and so you have to be extra careful with it.

11          So there were things like that that -- I think

12  we -- we just -- it just took longer than -- it just

13  took longer than expected.  There were certain boxes

14  that took the team up to 45 minutes to process one box

15  properly.  And so that -- and then other boxes, no.

16  Other boxes, more quickly.  But it just took longer

17  than -- than we had anticipated.

18      Q.  Okay.  That's understandable.  Jobs always seem

19  to take longer than you originally expect them to.

20          Now, I think you -- in -- in the instance -- I

21  understand some boxes were -- you know, you could do

22  very quickly.  But, like, why would a box take as long

23  as 45 minutes?

24      ██   ████████████████████████████████████████████

25  ███████████████████████████     ████████████████████████████

Exhibit K
943

Page 174



18    Q.   Yeah.

19    A.   So you could do jewelry -- you could do jewelry

20    is one type of thing, but you can't mix jewelry and

21    coins.

22    Q.   Got it.

23         Okay.  And you had said before, I think, that the

24    DEA had sort of taken point on videotaping the inventory

25    process.  Is -- is that --

Page 175

1      A.   Correct.

2      Q.   That's correct?

3      A.   (No audible response.)

4      Q.   Did agents also, did they -- did DEA do just

5    videotape, or did they also do photographs?

6      A.   So DEA did the video.  Because we were limited to

7    two cameras, we went with photos where we didn't have

8    cameras.  So where there are photographs, that's FBI.

9    So that would be a team that was a complete team to do

10   an inventory, but there was not a video camera

11   available, so they photographed.

12     Q.   Okay.  So your goal was to videotape everything,

13   but reality got in the way, and you essentially --

14     A.   Yes.

15     Q.   -- ended up having FBI officials just do

16   photographs?

17     A.   Correct.

18     Q.   Okay.  And what percentage of the boxes would you

19   say were videotaped as part of the inventorying process

20   versus the percentage that were just photographs?

21     A.   Slightly more than half were videotaped.

22     Q.   Okay.  So there should be videotape for -- you

23   said it was roughly 700 boxes that were inventoried, so

24   somewhere around 350 to 400 videotapes.  Or not

25   videotapes, it's --

Page 176

1      A.   Recordings.   Digital.

2      Q.   Recordings.   I -- I'm a child of the '80s.   I

3    still think in terms of the videotape.

4          Okay.   And then about another 300 would be

5    pictures.   All right.

6      A.   Yes.

7      Q.   And so your plan had been to videotape them all.

8      A.   Yes.

9      Q.   Okay.   But you just had a limit on cameras?

10     A.   Yes.

11     Q.   Oh, okay.

12         So in order to have, like, a complete record,

13   then, whether it's videotape or, you know, photographs,

14   like, they would need to actually be able to capture

15   what was going on throughout the inventorying process;

16   isn't that right?

17     A.   Well, I mean, the idea is to get -- yes, is to --

18   is to get the -- the picture -- again with your comic

19   book example, it's just another way to document what the

20   process is.

21     Q.   Yeah.   So in my example, my comic book example,

22   as you put it, like, you would want that videographer

23   to -- to take a picture such that you could see, oh -- I

24   think in our hypo it was 19 comic books.   You would want

25   them to confirm that -- take a video as such that it

Exhibit K
946

Page 177

1    showed 19 comic books, because that would reinforce the

2    19 comic -- that would -- that would help prove that

3    there were in fact 19 comic books that you seized; is

4    that correct?

5        A.   No.  What you would see is the agent taking a

6    stack of comic books from the box and putting it into a

7    bag, and then sealing the bag.

8        Q.   Okay.  So we're still talking in terms of overall

9    types of property.  It's -- so the videotapes weren't an

10   attempt to try to get a complete overview of, like, how

11   much of each thing was there?

12       A.   No.  They were to -- to record the process,

13   really, in a lot of ways, to protect us, because we

14   understood there was going to be cash and valuables.

15       Q.   Uh-huh.

16       A.   And so it's very much video of us putting

17   property from the box into the bag.  Or from the box

18   into a different box that's then going to get taped,

19   labeled, bar coded, and processed.

20       Q.   Okay.  I get that.

21            But then -- so the camera would then need to be

22   able to capture you putting all those various items,

23   taking them out of the box and putting them into the

24   bag.

25       A.   Right.  That was the idea.

Page 178

1      Q.  Okay.  Yeah.  Because if -- if it's missing after

2   that, it's not very useful; right?

3      A.  Right.

4      Q.  So who has possession of all those video records,

5   is that the FBI or the DEA?

6      A.  We both have it.

7      Q.  Oh, okay.  So both DEA and FBI have it.  Okay.

8          Now, where were -- and both agencies have all the

9   videos; is that correct?

10     A.  Yes.

11     Q.  Okay.  Where exactly were the agents actually

12  doing the inventorying of the boxes, was it in the vault

13  itself, or elsewhere?

14     A.  So the -- the original two teams set up with

15  video cameras were back in the vault area.  So all of

16  the video recorded inventories are in the vault area.

17  The -- in order to create more teams and more space,

18  because the vault was very crowded, we removed whole,

19  like, crates of boxes to a different part of the

20  business, to the front part, where teams of agents

21  worked from there.

22     Q.  Okay.  So was the original plan to have all the

23  inventorying being done in the vault?

24     A.  Correct.

25     Q.  And then you -- and then not you personally, but

Page 179

1    then it sounds like the FBI realized this is just --

2    this is going to take too long if we --

3       A.  Correct.

4       Q.  We need to increase our -- our throughput.  And

5    so --

6       A.  Correct.

7       Q.  -- you set another group up to operate in the

8    front area.

9       A.  Correct.

10      Q.  And that group was just taking photographs

11   instead of videotaping.

12      A.  Generally, yeah.  Yes.

13      Q.  Okay.  Having two teams in the vault, isn't

14   that -- wasn't that space cramped?

15      A.  Yes.

16      Q.  It would make it -- it seems like that would make

17   it real hard to operate in there.

18      A.  Yes.  As -- as time went on, it became more empty

19   and there was more space.  It was better.  It was better

20   towards the end than at the beginning.  At the beginning

21   it was very cramped.

22      Q.  Okay.  I don't -- I don't envy them.

23          And do you know, like, when your agents were

24   doing the inventorying, did they come across, you know,

25   the conservator letters, like the one I previously

**Exhibit K**
**949**

Page 180

1    showed as exhibit, I think it's Exhibit 6?

2        A.  Yes.

3        Q.  Okay.  And they -- would they review that

4    conservator letter once they came across it?

5        A.  So in our -- in our briefing I had briefed the

6    inventory agents that -- that these executor conservator

7    letters might exist, and that we were looking for

8    indicia as to who the box owner was, and so could they

9    please pay attention to this.  And many of them did, but

10   not all of them.  So it's -- during the process many

11   times they noted it.  Like, many times they took a photo

12   of it, or they wrote a note:  There seems to be -- this

13   seems to be the box holder, or there seems to be indicia

14   for this person, or this phone number, or whatever.  But

15   not always.

16       Q.  And that was -- so was that, whether they would

17   record that information, it really turned on, like, the

18   particular team that was doing the inventorying?

19       A.  Yes.

20       Q.  Okay.  And did you have anything in the

21   supplemental instructions about what to do when

22   confronted with a -- a conservator letter, or the

23   equivalent?

24       A.  So I want to say probably it would help if I

25   could see the -- my supplemental instructions could tell

Page 181

1      you exactly.

2         Q.  Okay.  Well, I'm -- I'm trying to remember.

3      So -- I'm trying to -- with the supplemental

4      instructions, those were supposed to walk people through

5      what to do; right?

6         A.  Yes.

7         Q.  So it had, it would have in it, like, when people

8      went in to the -- to inventory, and, like, when they

9      found cash, what to do with it; right?

10            Did it mention -- did the supplemental

11     instructions mention anything about drug dogs, or --

12               MR. RODGERS:  I -- go ahead.  I want to

13     raise an objection.  If you're going to ask her

14     questions about the document, please show her the

15     document.

16               MR. FROMMER:  Well, I'm just -- she's the

17     author of the document.  I'm just asking, like,

18     generally, like, was there information about that in

19     there.

20               MR. RODGERS:  This is not a guessing game.

21     If there's a document which says specifically what is in

22     it, please show it to her.

23               (Exhibit 7 marked at this time.)

24               MR. FROMMER:  Okay.  All right.  I will

25     introduce -- here is Exhibit 7.  So let me know when you

Page 182

1    have that.

2              MR. RODGERS:  We have it.

3              MR. FROMMER:  Okay.

4    BY MR. FROMMER:

5        Q.  And so there you are as FBI case agent.  And

6    is -- is this the -- so this is Exhibit 7.  I misstated

7    the PDF, so my apologies on that.  But it's the

8    supplemental instructions on box inventory.

9          Is this the document that you drafted?

10       A.  Yes.

11       Q.  Okay.  Okay.  Prepared by you and Madison

12   MacDonald.

13         All right.  So I see in here you have the search

14   team, you have admin team, you have security team, and

15   you talk about in here -- yeah, okay.  So you process

16   the evidence, and then you put it in a privacy room.

17   And then you see at the bottom here it says:

18         The FBI evidence techs and asset forfeiture

19   agents will be working to enter evidence into Sentinel

20   and generate CATS ID numbers for all cash.

21       A.  Right.

22       Q.  And what I'm wondering is was -- we know that

23   there were drug dogs on site; right?  You previously

24   testified to that, and there are public filings about

25   that.  I'm wondering if this mentions anything about

**Exhibit K**
**952**

Page 183

1    drug dogs.

2         Did your -- I mean, now that you have the

3    document in front of you, did you discuss drug dogs in

4    the supplemental instructions?

5    A.   Can you scroll it up?

6    Q.   Up?  Up.

7    A.   Sorry.  Down.  I'm sorry.  Down.

8    Q.   Down, down.

9    A.   I don't see it.

10   Q.   You don't see anything about the drug dogs?

11   A.   I don't.  Am I missing it?

12   Q.   Is that because it's redacted?

13   A.   Maybe.

14   Q.   Is it this:

15        There will be blank on screen.  If blank is

16   available, the cash will be taken by blank agents to the

17   blank.

18        Is that referring to drug dogs?  It's in the

19   section about cash --

20   A.   Yes.

21   Q.   -- and you told me that all cash was --

22   A.   Very likely.  Very likely.

23   Q.   You're the author of the document.

24   A.   Yes.

25   Q.   And you're the best -- person in the best

Exhibit K
953

Page 184

1      position to tell me if this -- this paragraph on cash,

2      right under the 5,000, which we talked about, you need

3      to get a CATS number, is that talking about any cash

4      that needed to get a CATS number would be run by drug --

5      by the drug dogs?

6          A.  So I wrote the document over a year ago.  I think

7      that's what it says, but it's redacted so I can't tell

8      you for sure.  But I do think that's probably what it's

9      addressing.

10         Q.  Okay.  Let me -- where am I?  Okay.  This is 59.

11     Let me go to 58, here.  All right.  I had a quick

12     question about -- for 58, it says at the top:

13             Teams will remove the box itself, label and seize

14     it, taking care to preserve possible fingerprint

15     evidence.

16             I'm -- I'm wondering, is that -- is -- is looking

17     for latent fingerprints a standard part of FBI inventory

18     policy?

19         A.  No, but this was in anticipation of really not

20     knowing the total anonymity of the property.  So it

21     would be one other possible thing that you could use to

22     identify who the box holder is.

23         Q.  And were any latent fingerprints taken from boxes

24     used solely for the purpose of identifying the

25     individuals who owned those boxes?

**Exhibit K**

**954**

Page 185

1      A.   No.   None of this happened.

2      Q.   Okay.   Did you -- so I know that they were -- you

3   had DEA and the FBI officials either videotaping or

4   photographing as the inventory went forward.   Are you

5   aware of instances where DEA agents, or FBI agents,

6   either photographed or videotaped documents that were

7   found inside -- inside a box?

8      A.   Yes.

9      Q.   In what circumstances would they videotape or

10   photograph documents found inside a box?

11      A.   If they were indicia.   So the -- the executor

12   conservator paperworks were often photographed or

13   videotaped.   They would try to hold it up to the -- to

14   the camera.   Copies of driver's license, copies of

15   passports.   Occasionally there might be something else

16   that had somebody's name on it.

17      Q.   Okay.   So is it fair to say, then, that the -- to

18   the extent a document that was found inside a box was

19   either videotaped or photographed, it should have been

20   done solely for the purpose of establishing who owns the

21   box?

22      A.   Correct.

23      Q.   Okay.   So it would have been inappropriate for

24   agents to videotape or photograph any documents for

25   purposes other than identification of the owner.   For

Page 186

1     instance, to memorialize the contents of that document.

2        A.   Right.   But -- but it's still -- we're still

3     memorializing the process of the inventory itself, too.

4     So if it's -- if this -- I've got this box, and it

5     contains documents, I'm -- I would expect the agent to

6     hold up the documents:   I've got documents.   They're

7     going in the bag.

8            Just to show -- to show the inventory.   Right?

9     So they wouldn't be photographing it for the content of

10    what's in it except for indicia, but they would be

11    photographing the whole thing as part of the inventory.

12    Does that make sense?

13       Q.   Partially.   I understand the -- the indicia of

14    ownership.   But are you suggesting, Lynne, that if

15    agents came across a document inside the box, that they

16    could flip -- flip through every page of that document

17    and put that -- put each page in front of the camera?

18       A.   No.

19       Q.   That would be inappropriate.

20       A.   Correct.   But they could show that it -- like:

21    I've got a notebook here.   Or:   I've got a stack of

22    papers here.   You know, it's -- again, it's a general,

23    and it's going in this bag.

24       Q.   Okay.   So they -- to the extent they shouldn't be

25    videotaping or -- they should not have been videotaping

**Exhibit K**
**956**

Page 187

1    or photographing the contents of documents beyond that

2    which was necessary or useful to establish ownership of

3    the box; is that correct?

4        A.  Correct.

5        Q.  And that's because photographing or videotaping

6    the contents of documents inside the box outside of the

7    context of establishing ownership would be outside the

8    purposes of an inventorying; is that correct?

9        A.  Correct.

10       Q.  So if you had -- if you had gold coins in a box,

11   for instance, were your instructions that, you know, the

12   videographer or the photographer should memorialize the

13   contents of the box -- let me say that a little more

14   cleanly.

15           So, for instance, let's say there's a gold --

16   there's a bunch of gold coins in a box.  Would -- did

17   you tell the videographers and photographers to

18   photograph -- to make photographs such that you could

19   see all the gold coins in the box?

20       A.  No.

21       Q.  But wouldn't taking a photograph that actually

22   showed all the coins in the box be the best evidence of,

23   like, what kind and how many coins were in that box?

24           MR. RODGERS:  Objection, calls for a legal

25   conclusion.

Page 188

1                    THE WITNESS:  And then it would be a search,

2       right?  So for us, like, if you get too -- too deep into

3       the weeds --

4                         (Cell phone rings.)

5                    THE WITNESS:  -- sorry about that -- you

6       know, you start getting into, like -- yeah.  No.

7                    The goal was to document what was being

8       taken from the box and put into an evidence bag.  That

9       was -- that was the goal.  That's -- that was the

10      instructions to the videographer, was to memorialize the

11      process of the inventory, not each little thing.

12      BY MR. FROMMER:

13         Q.  So they wouldn't videotape or photograph -- you

14      know, let's say I have ten rolls of gold coins, they

15      wouldn't necessarily take a picture of all those rolls

16      of gold coins, but they would take pictures of

17      documents, even -- even -- even in the instance where

18      they first found a conservator letter.

19         A.  No, I don't agree with that statement.

20         Q.  Okay.  Well, I -- I'm struggling here that if the

21      purpose of an inventory is to protect against claims of

22      theft and loss, then how isn't taking a photograph of

23      the contents of the box the best protection for the FBI

24      against claims of -- of theft and loss?

25                    MR. RODGERS:  Objection, asked and answered.

Page 189

1              THE WITNESS:  Well, it is.  So that was the

2      point of taking the photographs or the videos --

3      right? -- is to take a picture of the contents of the

4      box.  So we had -- we had to memorialize.  But not --

5      BY MR. FROMMER:

6        Q.  Okay.

7        A.  -- not each separate coin --

8        Q.  Oh, no.

9        A.  -- if that's what you're asking.

10       Q.  It's not what I was asking.  That would be -- in

11     my professional legal opinion, that would be insane, to

12     videotape each and every single coin, one at a time.

13            Can we -- okay.  I'm here.  Let's return to

14     Exhibit 7.  And I'm on page FBI 58.  And in the middle

15     of the document there's a sentence that says:

16            A copy of the paperwork will go to asset

17     forfeiture.

18            And this -- it appears to be a copy of all the --

19     the inventory, the 597s.  Why do these -- why do your

20     supplemental instructions direct that a copy of all the

21     paperwork go to asset forfeiture?

22       A.  I think that was only true if it was -- obviously

23     if it was cash.  Otherwise, they wouldn't have anything

24     to do with it.  But I think the asset forfeiture team

25     needed the paperwork -- our -- our set of paperwork to

Page 190

1     do their set of paperwork.

2          So -- so basically our admin team, as I've called

3     them, were -- were evidence people, asset forfeiture

4     people, some agents, some support staff, who were doing

5     the paperwork -- a lot of the paperwork, generating the

6     paperwork process to this.  And I believe that was a

7     request from the asset forfeiture team, to have copies

8     of the paperwork.

9        Q.  Okay.  All right.  And, again, like -- and this

10    is consistent with what I think you told me before.  At

11    the bottom of page 58 it says:

12          FBI evidence techs and asset forfeiture agents

13    will be working to enter evidence into Sentinel and

14    generate CATS ID numbers for all cash.

15          Is that --

16       A.  Correct.

17       Q.  -- generally --

18          And by -- by that, you meant cash that exceeded

19    $5,000?

20       A.  Correct.

21       Q.  Okay.  All right.  Let me -- give me one second.

22    I actually lost something I wanted to ask about.

23          Here.  On page 59, the next page.  It states --

24    and this is the last sentence of the paragraph right

25    after the -- all the redactions.  It says:

Page 191

1      Anything which suggests the cash may be criminal

2   proceeds should be noted and communicated to the admin

3   team.

4      Where would the admin team put information

5   like -- any -- that -- that sort of information?

6   A.  In a 302.

7   Q.  Did they -- did they have a spreadsheet that they

8   were creating?

9   A.  No.

10  Q.  Okay.  So -- so you told agents that they should

11  report anything that suggests cash may be criminal

12  proceeds, to tell that to the admin team; is that

13  correct?

14  A.  Well, they would note it.  So it was -- it was

15  put down in, like, agent notes, that then went to the

16  admin team, who was preparing, or helping to prepare,

17  the FD-302.

18  Q.  Okay.  And did you ask for this information so

19  that the FBI could pursue civil forfeiture against box

20  holders?

21  A.  Possibly.  And because I knew that once the cash

22  is gone, once it's in Loomis, it's gone.  So whatever

23  condition it's in, needs to be noted right now.  So if

24  it smells like chemicals, if it's wet, if it has dye

25  pack on it, if it's got marijuana seeds mixed in with

Exhibit K
961

1   it.  Whenever condition it's in, that is notable, needs

2   to be noted now, because tomorrow it's going to be gone.

3       Q.  Because it's off to Loomis.

4       A.  Correct.

5       Q.  Okay.  Can you -- I just want to ask very

6   briefly, I don't want to spend too much time on this,

7   but -- so you -- you say in this that agents should note

8   things such as how cash is bundled, such as rubber bands

9   or bank bands.  And then also if it has a strong odor,

10   like marijuana, soil, gasoline, coffee, chemical.

11       A.  Correct.

12       Q.  Is that list that you have there of marijuana,

13   soil, gasoline, coffee, chemical, are these all odors

14   that are indicative, or potentially indicative of that

15   money being in the proximity of drugs?

16       A.  Yes.  Based on my training and experience, those

17   are the kinds of things that -- for example, bank

18   teller's note.  Regularly, or frequently, when I -- so,

19   yes, those are things that get noted, the condition of

20   the cash, and how it's bundled and processed and

21   packaged.

22       Q.  Okay.  So you're having agents tell you, when --

23   when you're inventorying the cash, note how it's

24   wrapped, note if it smells like drugs, note anything

25   that suggests it's criminal proceeds, and tell all of

Page 193

1      that to the admin team; is that correct?

2          A.  Correct.  Or communicate it.  I think -- I think

3      it got written down and then handed to the admin team.

4          Q.  Okay.  Communicated rather than told.  But -- but

5      that information was given to the admin team.

6          A.  Correct.

7          Q.  Okay.  And we've talked about drug dogs being on

8      site at USPV before, and you were sort of the person in

9      charge of the scene.  And so was it your idea to have

10     drug dogs there?

11         A.  That was discussed with the whole team.  I -- I

12     can't say whose idea it was.  It was consensus that that

13     should be done.

14         Q.  So you -- do you not recall who originally came

15     up with the idea to have drug dogs on scene?

16         A.  Like, I'll say this:  Whenever we come across --

17     whenever in my entire career I've come across a large

18     amount of cash, it's standard procedure to get a drug

19     dog to run past it, if it's possible to do so.  It's

20     something that the courts in California, I think, have

21     come to expect, to the extent that if you don't do it

22     there will be a question, like, why didn't you have a

23     drug dog go past, or did you have a drug dog go past it.

24             So it's something that is -- was available to us,

25     and we thought it was prudent to do.  And you certainly

Exhibit K
963

Page 194

1    don't want to wait and do it some other time, you want

2    to do it immediately.  If it's feasible to do that.  So

3    it's a little bit our standard practice, and -- and I do

4    believe that when you don't do it, you get asked why

5    didn't you do it.

6        Q.  I mean, you said that it would be a question --

7    like, if you didn't run the -- the money by dogs, that a

8    judge might question you later on.  Like, what judge are

9    you talking about?

10       A.  Any judge who may be involved in any future thing

11   that we do with the money or the person attached to the

12   money.

13       Q.  So like a -- like a judge in a forfeiture action,

14   for instance.

15       A.  Right.  Any judge.

16       Q.  Okay.

17       A.  Or any defense attorney, you know.

18       Q.  Okay.  Let me jump a little bit.  I think I need

19   to go back to Exhibit 3.  If we could go back to

20   Exhibit 3, please.

21           And for this -- I just had some questions about

22   the digital devices.  We talked a little bit about USB

23   keys before, and some other digital -- I know that some

24   people probably had, like, little portable hard drives,

25   all that stuff, in their boxes.

Page 195

1          Did the FBI search or otherwise inspect the

2     digital devices that were located inside safe deposit

3     boxes?

4          A.  Not without an additional warrant, no.

5          Q.  Okay.  So -- so as part of the inventory process,

6     there was no -- nobody would plug in a USB key to see

7     what files might be on it?

8          A.  Nope.

9          Q.  And did the FBI seek out -- couldn't the --

10    couldn't the USB key have potentially had -- because

11    before you were saying you were looking at paper

12    documents for indicia of ownership, but couldn't the USB

13    key also have provided indicia of ownership?

14         A.  It might have, but we didn't search them.  We did

15    not look at -- we did not look at any -- any digital

16    evidence, digital devices, hard drives, thumb drives,

17    discs, without an additional warrant.

18         Q.  Okay.  So you're looking at papers for indicia of

19    ownership, but not looking at any digital devices for

20    indicia of ownership.

21         A.  Correct.

22              MR. FROMMER:  Can we go back to Exhibit 7,

23    please?

24              Oh.  Did I do that somehow?

25              Let's go off the record for a second.  Yeah,

Page 196

1    it just seemed like the wrong exhibit popped up.

2              THE VIDEOGRAPHER:  We are off the -- I'm

3    sorry.  We are off the record --

4              THE VERITEXT CONCIERGE:  Yeah, no -- hold on

5    for a second.

6              THE VIDEOGRAPHER:  Do you want me to stay on

7    the record?

8              THE VERITEXT CONCIERGE:  This is 7.

9              MR. FROMMER:  Yeah, if we're -- if we're --

10   yeah.  Now that we have the correct exhibit up, we can

11   just stay on the record.  That's fine.

12   BY MR. FROMMER:

13     Q.  All right.  We're back to Exhibit 7, Special

14   Agent Zellhart, and I had a quick question about -- let

15   me make sure this is -- okay.  The second paragraph

16   here, about digital currency, says:

17          Evidence of digital currency, like a Bitcoin

18   wallet, will be inventoried in the same manner as

19   valuable evidence.  Inventory agents shall note the

20   likelihood of the presence of digital currency and

21   ensure that the admin team notes this on the Excel

22   spreadsheet.

23          My -- I guess my question is:  Why did you

24   instruct them to -- to inventory in the same manner as

25   valuable evidence and to ensure the admin team noted

Page 197

1    its -- the presence of -- possible presence of digital

2    currency on the Excel spreadsheet?  Let me break those

3    out, since that was the very definition of a compound

4    question.

5           First off, can you explain to me why you told the

6    agents in this instructions to inventory digital

7    currency in the same manner as valuable evidence?

8    A.   Yeah, because that's new.  So we're in a new

9    world.  At least a year ago we were more so than now,

10   even.  But I don't -- digital -- there's -- we have

11   three categories of -- three.  We have more than three.

12   But digital is its own category of evidence.  You have

13   general evidence, digital evidence, you have valuables,

14   you have firearms, you have drugs.

15          We -- we had just moved to classifying likely

16   cryptocurrency as valuable rather than digital.  So that

17   was the point of that explanation, was to let everybody

18   know if it looks like cryptocurrency, we need to treat

19   it as valuable now, not digital or general.

20   Q.   Okay.  That makes sense.  Thank you.

21          And then the second sentence says:

22          Inventory agents shall note the likelihood of the

23   presence of digital currency and ensure that the admin

24   team notes this on the Excel spreadsheet.

25          So there's an Excel spreadsheet that contains

Page 198

1    notes about digital currency?

2        A.   No.   The Excel spreadsheet never materialized.

3    It was planned for, but it never -- it -- it never

4    happened.   It never even got started.   There were too

5    many other things going on.   And it was -- it was meant

6    to -- to basically give those classifications that I

7    just said.   Is this general?   Is this valuable?   Is this

8    digital?   Is this drug?   Is this, you know, firearm?

9    And so it was supposed to be noted in a spreadsheet that

10   never was created.

11               MR. FROMMER:   Okay.   Let's see.   Why don't

12   we take a short five-minute break, if you don't mind,

13   and we'll come back.   All right?

14               THE VIDEOGRAPHER:   We are off the record.

15   The time is 3:49 p.m.

16        (A short break was taken at this time.)

17               THE VIDEOGRAPHER:   We are back on the

18   record.   The time is 3:57 p.m.

19   BY MR. FROMMER:

20        Q.   All right.   Thank you, Special Agent Zellhart.

21        I want to jump forward a little bit in time.

22   Well, not really that much, but I want to talk about

23   the, what -- what I would call the informal claim

24   process.   And by that I mean the claim form that was put

25   up telling people if you had property at USPV to, I

Exhibit K
968

Page 199

1    think, email a certain email address at the FBI.

2              MR. FROMMER:  And so let me introduce that

3    as Exhibit 8.  Just let me know when you have that.

4              (Exhibit 8 marked at this time.)

5              MR. RODGERS:  We have it.

6              MR. FROMMER:  Okay.

7    BY MR. FROMMER:

8      Q.  All right.  So do you recognize this form?

9      A.  Actually, I have not seen this form, this

10   specific form, before.

11     Q.  Oh.  Did you see --

12     A.  But I know it exists.  I'm familiar -- I mean, I

13   am aware of it, but I haven't actually looked at it

14   myself.

15     Q.  All right.  Okay.

16          But you recognize that this is a claim form that

17   was put out at U.S. Private Vaults instructing people

18   to, you know -- well, this is actually the claim form

19   that was on the website.  But this would -- do you

20   understand this to be part of the process by which box

21   holders were to reach out to the FBI about the status of

22   their boxes?

23     A.  Yes.

24     Q.  Okay.  And did you come up with the idea of

25   the -- this informal claim process by which box holders

Page 200

1    would fill out an online form with their contact

2    information?

3        A.  So I'm not sure who came up with it.  We had

4    discussions about how we were going to get property back

5    to the property owners.  And we knew we had to get

6    something in place, and we knew that we -- we had to

7    have -- so this -- so I don't know who came up with

8    this.  I'm sure I was part of the process or the

9    discussions about it, but I -- I can't say for sure who

10   decided that this was going to be the best way to do it.

11       Q.  Do you recall who -- with whom you had

12   discussions about this?

13       A.  So my supervisor, Rich Alexander, the co-case

14   agent, Madison MacDonald, the -- FBI headquarters had to

15   approve whatever we were doing, our technical people had

16   to be involved with it because it had to do with

17   connecting to the -- the sort of grander FBI website.

18   So there were -- there were quite a few people involved

19   with it.  And I -- I don't know that I've named all of

20   them even.

21       Q.  Okay.  So I heard that you had a number of people

22   involved with agent MacDonald and your other colleagues

23   at the FBI, about this.  Did you have discussions with

24   Andrew Brown about this claim form?

25                   MR. RODGERS:  Objection.  To the extent this

Page 201

1    requires the witness to reveal the contents of a

2    communication with Mr. Brown, please do not answer that

3    question.  I instruct you not to answer on

4    attorney-client privilege grounds.

5                    THE WITNESS:  So, yes.

6    BY MR. FROMMER:

7        Q.  So yes, you did discuss this with Andrew Brown?

8        A.  Yes.

9                    MR. FROMMER:  Let me introduce -- sorry for

10   the size of this exhibit, but Exhibit 9.

11               (Exhibit 9 marked at this time.)

12                    MR. FROMMER:  And please let me know when

13   you have that.

14                    MR. RODGERS:  We have it.

15                    MR. FROMMER:  Okay.  Great.  I'm going to go

16   down to -- please bear with me.  Here we go.

17   BY MR. FROMMER:

18       Q.  This is FBI 61, and this appears to be an email

19   from you to a Ms. Eimiller.  First off, can I ask who is

20   Laura Eimiller?

21       A.  Yeah.  She's our media liaison.

22       Q.  Okay.  And the -- the content of this says:

23           We -- Laura, we worked with our AUSA on the

24   attached flier, which we plan to post at the business

25   after we depart.

Page 202

1              Is the AUSA you're referring to here Andrew

2     Brown?

3        A.  Yes.

4        Q.  Okay.  So you worked with Andrew Brown on the

5     language of a flier to -- that was to be posted at U.S.

6     Private Vaults; is that correct?

7              MR. RODGERS:  Objection, mischaracterizes

8     the document.

9     BY MR. FROMMER:

10       Q.  Who is the "we" here in this -- in -- in FBI 61?

11       A.  Like, I guess, like, the whole team.  I mean,

12    like I said, we were trying to figure out a way to

13    inform the public of how to, you know, how to start the

14    process of getting their property back.  And so there

15    were discussions.  Obviously Laura Eimiller is our -- is

16    our media liaison person, so I didn't name her before.

17    Richard Alexander is my supervisor.  I'm sure there were

18    other people involved.  Like I said, the tech guys had

19    to be involved.  We were trying to come up with a

20    process to do this, and so we were getting input from

21    lots of people.

22       Q.  Okay.  And one of those people was Andrew Brown;

23    correct?

24       A.  Correct.

25       Q.  Okay.  And -- so I understand that -- is this

Page 203

1    attachment here -- so it appears that this email that

2    you sent had two attachments.  Do you see that,

3    "Attached," and then there's two documents listed?

4        A.   Okay.

5        Q.   And then it says:  USPclaimform.doc.  And then:

6    FlyerUSPVdraft.docx.

7        A.   Uh-huh.

8        Q.   And so is this the -- this is one version of the

9    claim form, is that correct, that was put up?

10       A.   Yeah.  That appears to be an -- an early draft.

11       Q.   That appears -- this one, the --

12       A.   Yes.

13       Q.   The claim form at FBI 62 appears to be an early

14   draft?

15       A.   Yes.

16       Q.   And what about this claim -- this notice on FBI

17   63?  What can you tell me about this document, which was

18   attached to your email?

19       A.   I don't really remember.  I don't really remember

20   this.

21       Q.   You sent this; correct?

22       A.   Yup.

23       Q.   Did you create this?

24       A.   I'm not sure.

25       Q.   Do you know who might have created this?

Exhibit K
973

Page 204

1              MR. RODGERS:  Objection, speculation.

2              THE WITNESS:  I don't -- I don't know.  I'd

3     have to look back and see.

4     BY MR. FROMMER.

5       Q.  Okay.

6       A.  I may have created it.  I don't -- I don't

7     remember it.

8       Q.  Is it possible that emails -- okay.

9           It's possible that this might have come from

10    someone else other than you?

11      A.  It's possible.  And then I just forwarded it

12    because I'm the point person.  So that's possible.

13      Q.  Okay.  And -- now, before you told me, I believe,

14    that the execution of the seizure warrant was not done

15    under the aegis of a joint task force; isn't that

16    correct?

17      A.  That's true.

18      Q.  But then can you reconcile that for me with the

19    language here at the top of 63 that states, "A joint

20    task force is investigating crimes committed at and

21    through U.S. Private Vaults"?

22              MR. RODGERS:  Objection, lacks foundation,

23    calls for speculation, assumes facts not in evidence.

24              THE WITNESS:  And -- and the answer is I

25    don't know.  That's why -- I don't -- I don't know.  I'm

Exhibit K
974

Page 205

1    not familiar with this document.  And I don't deny that

2    I attached it to an email.  And I -- I don't know where

3    this came from.  I really don't have a lot of comment

4    about it.  I really don't know where that came from.  It

5    didn't get posted.

6    BY MR. FROMMER:

7       Q.  I understand that it didn't get posted.  I'm

8    wondering -- this notice of criminal seizure, would you

9    say it's fair to -- to say that this states that the

10   safety deposit boxes at U.S. Private Vaults were seized

11   pursuant to a federal -- I'm trying to figure out the

12   right way to say this.

13        Does this -- does the language in bold in FBI 63

14   imply that the safety deposit at U.S. -- safety deposit

15   boxes at U.S. Private Vaults had been seized pursuant to

16   a -- because there was a violation of criminal law?

17             MR. RODGERS:  Objection, lacks foundation.

18   The witness, or anybody else, can review this document

19   and make a guess and make an argument as to whether it's

20   consistent with something else.  The witness has

21   testified she did not prepare this document.

22             MR. FROMMER:  Thank you for -- no speaking

23   objections, please.

24             MR. RODGERS:  The next objection is going to

25   be to instruct her not to answer.

Page 206

1          MR. FROMMER:  That's great.

2    BY MR. FROMMER:

3      Q.  Special Agent Zellhart, you said you don't recall

4    drafting this.  Do you know who might have drafted this?

5          MR. RODGERS:  Objection, speculation.

6    BY MR. FROMMER:

7      Q.  You consulted with a number of people concerning

8    the FBI claim form; correct?

9          MR. RODGERS:  Objection, speculation.  Might

10   have drafted.  Anyone might have drafted a document.

11   BY MR. FROMMER:

12     Q.  Would one of the people with whom you consulted

13   been the person to draft this?

14         MR. RODGERS:  Could you re-read that

15   question?

16       (Whereupon the reporter read the record.)

17         MR. RODGERS:  Objection, speculation, lacks

18   foundation, asked and answered five times now.

19   BY MR. FROMMER:

20     Q.  Tell me every single person you talked to

21   concerning the FBI claim form process.

22     A.  Okay.  So, again, to the best of my recollection,

23   Rich Alexander, who was my supervisor at the time,

24   Madison MacDonald, Laura Eimiller, Andrew Brown, our

25   tech guys -- and I can't be more specific than that,

Exhibit K
976

Page 207

1    because I don't deal with them that often.  But we had

2    to get the technical thing.  And there were people also

3    at headquarters who had to do an approval.  And I think

4    that's all.

5         Q.  A review of your emails may -- would show -- if

6    you didn't draft this document, would a review of your

7    emails show where this document originated from?

8                    MR. RODGERS:  Objection, speculation, lacks

9    foundation, assumes facts not in evidence.

10                   THE WITNESS:  I don't think my emails would

11   show that, because obviously this was emailed from me.

12   So I emailed this.  So I clearly emailed this as an

13   attachment.  But I don't -- like I said, I don't know

14   that I created it.  I -- I may have, or somebody else

15   could have created it and I attached it.

16   BY MR. FROMMER:

17        Q.  So --

18        A.  So I don't --

19        Q.  Okay.

20        A.  I don't know.

21        Q.  Okay.  So a review of the FBI system files could

22   potentially determine who was the original author of

23   this; is that correct?

24                   MR. RODGERS:  Objection, speculation, lacks

25   foundation.

Exhibit K
977

Page 208

1          THE WITNESS:  Yes.

2     BY MR. FROMMER:

3        Q.  Okay.  And it's fair to say that it's possible

4     that Andrew Brown drafted this; isn't that correct?

5          MR. RODGERS:  Same objections.

6          THE WITNESS:  Yes.

7     BY MR. FROMMER:

8        Q.  Moving back to FBI 62, this Exhibit 9, can -- I

9     see on here that there's a lot of information being

10    sought, like name, date of birth, social security

11    number, and it lists -- but one thing it lists is U.S.

12    Private Vaults box numbers.  And do you agree that

13    having the person -- a claimant provide their box number

14    would be a good way to -- would be prudent if you're

15    trying to reconnect box holders with their property?

16       A.  Yes.

17       Q.  Okay.  Can we go back to Exhibit 8, please?

18          Okay.  This is Exhibit 8, which we were just

19    previously discussing.  This was the actual claim form

20    on the FBI website.  I've looked at this document

21    several times, and it nowhere asks for a box holder's

22    box number.  Is that correct?

23       A.  That is correct.

24       Q.  So the claim form failed -- is it true, then,

25    that the claim form failed to ask for the box number,

Exhibit K
978

Page 209

1    which I think you previously stated would be important

2    for reuniting box holders with their property?

3        A.   Yes.

4        Q.   Okay.   Once agents got information from these

5    informal claim forms -- okay?   Once people filled them

6    out and that information came in to the FBI agents, what

7    did you have agents do with that information?

8        A.   So sometimes we were able to, with their

9    information and what we already had from, like, the

10   executor conservator notices, match them up to a box.

11   Other times we had to contact them with the contact

12   information that they left, and try to get more

13   information, such as what box numbers do you have.

14       Q.   Okay.   Did you ever take -- did you ever have

15   agents take the information that was on this claim form

16   and use it to investigate the person who filed the

17   informal claim?

18       A.   Not specifically.   So that sort of

19   mischaracterizes what -- what we do.   So, no, I didn't

20   instruct an agent:   Hey, take this list and go

21   investigate these people.   I did not do that.

22       Q.   Did you ever -- did -- so what -- would agents --

23   would agents, whether you instructed them to or not,

24   would they investigate the people who -- the information

25   provided on these claim forms to -- in order to figure

Exhibit K
979

Page 210

1    out who this person is and whether they had engaged in

2    any activities that might be -- cause the funds to be --

3    the property found inside the box to be subject to civil

4    forfeiture?

5        A.   Yes.  We -- when -- we did basic records checks

6    of people, known box holders, in many cases, yes.

7        Q.  And so, for instance, you would -- is it the case

8    that you would have FBI agents run the contact

9    information through databases to -- to find out what

10   they could about the person who submitted the form?

11       A.  That's correct.

12       Q.  Does that include criminal databases?

13       A.  Sometimes.

14       Q.  Okay.  For instance, databases that it would

15   indicate past arrests or convictions?

16       A.  Yes.  Sometimes, yes.

17       Q.  Do you know what database specifically?

18       A.  So it depended.  So sometimes -- sometimes we ran

19   criminal history databases, sometimes we ran other

20   databases.

21       Q.  What's the name of the criminal history

22   databases?

23       A.  NCIC.

24       Q.  And what percentage -- in what percentage of

25   instances -- well, that's -- before I get to that...

**Exhibit K**
**980**

Page 211

1          So you said NCIC is the criminal database, and

2     you said sometimes you have them check with other

3     databases.  What were the -- specifically, what were

4     those other databases?

5          A.  FinCEN, sometimes LexisNexis, or sometimes just a

6     Google search.  Sometimes we just straight would do a

7     Google search.

8          Q.  For -- for FinCEN, are -- what were -- what were

9     they looking for in FinCEN?

10         A.  Suspicious activity, financial suspicious

11    activity reports.

12         Q.  So whether an SAR had ever been filed against the

13    claimant?

14         A.  That would be one thing, yes.

15         Q.  Or if there were any CTRs that referenced the

16    claimant?

17         A.  Yes.

18         Q.  Okay.  And what was the purpose for that?

19         A.  So it depended, too, on what was in the box.  So,

20    again, if I'm looking at a pile of cash, a million

21    dollars in cash, I'm interested in where did that cash

22    come from.  So it had less to do with the person than

23    with the contents of the box.

24         Q.  So is it fair to say, then, you were

25    investigating the claimant so as to make a determination

Page 212

1    about whether you viewed the contents of the box to be

2    criminal proceeds or not?

3        A.   That's correct.

4        Q.   And the same purpose with NCIC?

5        A.   Correct.

6        Q.   And was the purpose for that to determine, you

7    know, whether to initiate civil forfeiture proceedings

8    against the property that was associated with the

9    particular claimant?

10       A.   That was part of it, yes.

11       Q.   Now, did you have any role in deciding which

12   boxes, or the property in the boxes, would be subject to

13   civil forfeiture proceedings?

14       A.   Yes.  I had a role, yes.

15       Q.   You had a role.  Were there other people other

16   than you involved in that decision?

17       A.   Yes.

18       Q.   Okay.  Who -- who were those people?

19       A.   So our asset forfeiture people at the FBI.

20   Again, there's a whole team of people who -- who were

21   involved with that.  And then there are asset forfeiture

22   attorneys at the U.S. Attorney's Office who had the

23   ultimate decision.

24       Q.   And who are the asset forfeiture attorneys at the

25   USAO?

Page 213

1          A.   Victor Rodgers.

2          Q.   So Victor Rodgers was involved in the decision of

3     which boxes the property -- let me rephrase.

4               So was Victor Rodgers involved in the decision

5     about whether to pursue civil forfeiture as to the

6     contents of the boxes that were inventoried?

7                    MR. RODGERS:   Objection, lacks foundation,

8     vague and ambiguous --

9                    MR. FROMMER:   Okay.  Victor, she

10    literally --

11                   MR. RODGERS:   Let me -- let me --

12                   MR. FROMMER:   -- just said you were

13    involved.

14                   MR. RODGERS:   Counselor, let me complete my

15    objection.  You're the one who asked the question.  I'm

16    entitled to assert objections.

17                   Lacks foundation, assumes facts not in

18    evidence, vague and ambiguous with respect to the words

19    "civil forfeiture."  Go ahead.

20                   MR. FROMMER:   Okay.

21    BY MR. FROMMER:

22         Q.   With that, was Victor Rodgers one of the people

23    who helped decide which boxes to move on through civil

24    forfeiture?

25                   MR. RODGERS:   Same objections.

Page 214

1              THE WITNESS:  He was part of the -- part of

2      the process, yes.

3      BY MR. FROMMER:

4         Q.  Okay.  Was Andrew Brown part of the process?

5              MR. RODGERS:  Same objections.

6              THE WITNESS:  No.

7      BY MR. FROMMER:

8         Q.  Okay.  So Victor Rodgers, the person who's

9      defending this deposition, was involved in the decision

10     of whether to move forward on civil forfeiture of

11     property that was inventoried at U.S. Private Vaults?

12             MR. RODGERS:  Objection, vague and ambiguous

13     as to "civil" forfeiture, assumes facts not in evidence,

14     lacks foundation, poses an incomplete hypothetical,

15     overbroad.

16             You can answer the question.

17             THE WITNESS:  Yes.  I think the answer was

18     yes.

19             MR. RODGERS:  I think the answer was yes,

20     too.

21     BY MR. FROMMER:

22        Q.  Can you tell me, when was the very first time

23     that you recall discussing asset forfeiture, civil

24     forfeiture, whatever you want to call it, in connection

25     with the -- with the safe deposit box at U.S. -- safe

Page 215

1    deposit boxes at U.S. Private Vaults?

2              MR. RODGERS:  Objection, vague and ambiguous

3    with respect to the use of the word "civil" forfeiture,

4    assumes facts not in evidence, calls for -- poses an

5    incomplete hypothetical.

6              You can answer.

7              THE WITNESS:  Summer of 2020.

8    BY MR. FROMMER:

9       Q.  So summer of 2020 was when you first had a

10   conversation about using asset forfeiture as -- against

11   the property contained in the boxes at U.S. Private

12   Vaults?

13             MR. RODGERS:  Same objections.

14             THE WITNESS:  Yes.  I believe, to the best

15   of my recollection, the first time it was discussed

16   would have been summer of 2020.

17   BY MR. FROMMER:

18      Q.  And who was that discussion with?

19             MR. RODGERS:  To the extent the discussion

20   was with an attorney, I instruct you not to answer.

21   BY MR. FROMMER:

22      Q.  I take it, then, from your nonanswer, that your

23   conversation about civil forfeiture was with an

24   attorney.

25      A.  And other team members.  So, again, Justin

Page 216

1      Carlson from DEA, Lyndon Versoza from Postal.  Possibly

2      other people from their agencies or mine.  It was a,

3      sort of a group.

4          Q.  Was this discussion in the presence of an

5      attorney?

6          A.  Yes.

7                  MR. RODGERS:  I instruct the witness --

8      BY MR. FROMMER:

9          Q.  Who were the non-attorneys involved in this

10     process of deciding when to move -- to use civil asset

11     forfeiture as to some of the property seized in the U.S.

12     Private Vaults -- from the U.S. Private Vaults facility?

13                 MR. RODGERS:  Objection.  To the extent this

14     question is about meetings that occurred, one or two, or

15     whatever, in the summer of 2020, if an attorney was

16     present, I instruct the witness not to answer on the

17     attorney-client privilege.

18                 MR. FROMMER:  I'm asking who -- what

19     non-attorneys were involved in the initial conversation

20     in the summer of 2020 to use civil asset forfeiture

21     against some of the property seized at U.S. Private

22     Vaults.

23                 MR. RODGERS:  Your question requires the

24     disclosure of an attorney-client communication.

25                 MR. FROMMER:  I do not -- Victor --

Page 217

1          MR. RODGERS:  I instruct the witness not to

2     respond on attorney-client grounds.

3          MR. FROMMER:  Victor, I'm asking for the

4     identity of non-attorneys.  That in no way reveals a

5     privilege.

6          MR. RODGERS:  I disagree.  A discussion

7     concerning, as your question asked, whether to use asset

8     forfeiture in the presence of an attorney requires a

9     discussion of the contents of the communications.  That

10    is privileged by the attorney-client privilege.

11         MR. FROMMER:  Okay.  We can -- we can keep

12    fighting about this, but I'll rephrase.

13    BY MR. FROMMER:

14    Q.  Tell me the first conversation that you recall

15    having without attorneys present regarding the decision

16    to use civil asset forfeiture as to the property seized

17    at U.S. Private Vaults.

18         MR. RODGERS:  Objection, vague and ambiguous

19    with respect to the use of the word "civil" asset

20    forfeiture.

21         THE WITNESS:  So it's -- it's hard to -- I

22    wouldn't characterize it like that.  We would

23    occasionally have meetings where we discussed the

24    investigation, where we were with the investigation,

25    what still needed to be done, where we were headed, when

Exhibit K
987

Page 218

1     we thought we were going to get there, and what, you

2     know, what we were going to do next.

3              And so the first time anybody would have

4     ever discussed anything having to do with asset

5     forfeiture would have been summer of 2020, during one of

6     these meetings, but I don't have a specific recollection

7     about it, or what was said.  But --

8     BY MR. FROMMER:

9        Q.  Would you have -- oh, I'm sorry.  I didn't mean

10    to interrupt you.

11       A.  But -- but it was discussed.

12       Q.  Would you have a date book or an Outlook calendar

13    that would identify any such meeting and who the

14    attendees were?

15              MR. RODGERS:  I'll let her answer that.

16    Anything else I will instruct the witness not to answer

17    on attorney-client privilege grounds.  And the law

18    enforcement investigatory privilege as well.

19              THE WITNESS:  I could probably find the

20    date, but I don't -- I won't know who all was there.

21    BY MR. FROMMER:

22       Q.  All right.  I might be asking for that.

23       A.  Other than who I've already identified.

24       Q.  Okay.  Do you recall -- let me start with a, just

25    a -- I want to be -- make sure we're all on the same

Page 219

1    page.  When I say "civil forfeiture," or "civil asset

2    forfeiture," you understand what I'm talking about; is

3    that correct?

4              MR. RODGERS:  Objection, vague and

5    ambiguous, lacks foundation, assumes facts not in

6    evidence, calls for speculation.

7              THE WITNESS:  Yes, I think so.

8    BY MR. FROMMER:

9       Q.  Okay.  From -- okay.  As the period leading up to

10   the search in March 2021 occurred -- so I understand you

11   had your initial conversations about civil forfeiture in

12   the summer of 2020.  Were there -- excuse me -- any

13   conversations about the use of civil forfeiture as to

14   the property that was seized at U.S. Private Vaults

15   subsequent to the conversations in summer of 2020 during

16   the lead-up towards the execution of the warrant?

17             MR. RODGERS:  Same objections.  Vague and

18   ambiguous with respect to "civil" asset forfeiture,

19   assumes facts not in evidence, calls for -- lacks

20   foundation, invades the criminal investigatory

21   privilege.  And to the extent you had discussions where

22   attorneys were present, please do not answer the

23   question.

24   BY MR. FROMMER:

25      Q.  So did you -- were there any situations in which

Page 220

1    you had conversations about civil forfeiture during the

2    run-up to the execution of the seizure warrant in

3    March 2021 that did not involve attorneys?

4       A.  So there would have been, you know, procedural

5    issues.  I mean, we anticipated lots of cash, and we

6    anticipated that some of the cash was going to be

7    proceeds of a crime.  And so, for example, you know, we

8    contemplated the idea that cash and drugs might be in

9    the same box, and so that would be -- that's the easy

10   case -- right? -- for us.

11          I don't -- I mean, we had a lot of meetings and a

12   lot of discussions about this case.  We did a lot of

13   planning.  And, you know, I can tell you that myself,

14   Justin Carlson, Lyndon Versoza, and, to some extent,

15   Madison MacDonald, discussed this case a lot in the

16   months leading up to the execution of warrants.

17      Q.  How many times do you think that you discussed

18   the issue of civil asset forfeiture with regards to U.S.

19   Private Vaults with those individuals between the summer

20   of 2020 to the execution of the warrant?

21          MR. RODGERS:  To the extent those

22   discussions include an attorney, I instruct you not to

23   answer.  Vague and ambiguous, and lacks foundation, and

24   assumes facts not in evidence with the reference to

25   "civil" asset forfeiture proceedings.

Page 221

1                    THE WITNESS:  And -- and, yeah, I can't -- I

2        can't give you a hard answer on that because it's hard

3        for me to separate out discussions we had with attorneys

4        versus just discussing among ourselves.  Among ourselves

5        the discussions were very practical.  Like, everything

6        leading up to the execution of warrants was getting down

7        to the nuts and bolts of -- of how do we execute this.

8        So they would not -- we wouldn't have -- we would have

9        been -- not that many discussions.  We weren't talking

10       about it.  It wasn't -- it was there, we knew it was

11       there, we knew it was part of the thing, and we were

12       planning for it.  The way I described this morning we

13       planned for things is when I find something that may be

14       criminal proceeds, I get my asset forfeiture team

15       involved.

16       BY MR. FROMMER:

17          Q.  Okay.  So when information from the claim forms

18       came in, did you or other FBI agents investigate the --

19       the claimants in order to determine whether you should

20       bring civil asset forfeiture proceedings, whether

21       through administrative forfeiture or judicial

22       forfeiture?

23                    MR. RODGERS:  That's a compound question,

24       vague and ambiguous, assumes facts not in evidence.

25                    MR. FROMMER:  Let me -- let me rephrase.

Page 222

1    BY MR. FROMMER:

2        Q.  Did you --

3        A.  It also depended what was in the box.  So -- so I

4    think I already kind of answered this.  It depended what

5    was in the box.  So if they put a claim in and I

6    connected them with a box that had legal documents, or

7    comic books, collectibles, personal jewelry, no.  I

8    didn't do any investigation.  I put them in a -- on a

9    list of people to get their property back.

10       Q.  Okay.  But if there was, let's say, in the

11   claimant's -- in the box that's associated with the

12   claimant, there was, let's say, a large amount of cash,

13   let's say 50,000 -- $100,000 in cash.

14       A.  Okay.

15       Q.  In that situation would you or would you have

16   other FBI agents take the information from the claim

17   form and investigate to see whether the claimant --

18   whether the government should move forward on civil

19   asset forfeiture proceedings as to that claimant's

20   property, cash?

21           MR. RODGERS:  Objection, vague and ambiguous

22   with respect to the use of the word "civil" asset

23   forfeiture proceedings, invades the law enforcement

24   investigatory privilege, lacks foundation, assumes facts

25   not in evidence.

Page 223

1              THE WITNESS:  Yes.

2              MR. FROMMER:  Okay.  Can -- Susan, can you

3     read back my question?  I just want to make sure that

4     the "yes" is in reference to something -- to a clean

5     question.

6          (Whereupon the reporter read the record.)

7     BY MR. FROMMER:

8      Q.  And you answered "yes;" correct?

9              MR. RODGERS:  Same objections.  I'll add --

10    same objections.

11    BY MR. FROMMER:

12     Q.  So I'm going to just ask it one more time so it's

13    a little cleaner.

14          In situations where there was a large amount of

15    cash or other valuable items in a box, such as gold

16    coins, or gold bars, would you personally, or would you

17    have other FBI agents investigate the box holder so as

18    to determine whether to bring forfeiture proceedings

19    as -- against his or her property?

20              MR. RODGERS:  Objection, vague and ambiguous

21    with respect to the use of the word "forfeiture

22    proceedings," assumes facts not in evidence, lacks

23    foundation, calls for information protected by the law

24    enforcement investigatory privilege.

25              You can answer.

Page 224

1          THE WITNESS:  So cash is -- cash more so

2     than -- you lumped them together, cash and gold.  Cash

3     certainly more so.  My experience in law enforcement is

4     that cash, a big pile of cash, I don't walk past a big

5     pile of cash without asking some questions about it.

6          So -- so to the extent I found cash, a large

7     amount of cash in a box, yes, I would do due diligence

8     on the box holder to see if I could determine the source

9     of the cash.

10    BY MR. FROMMER:

11       Q.  Okay.

12       A.  That's how I would characterize it.  I wouldn't

13    characterize it, necessarily, as an investigation.  I

14    would do some database searches, open-source, Google,

15    maybe run criminal history, to basically do some due

16    diligence to try to determine, if possible, the source

17    of the cash.

18       Q.  And that includes querying the NCIC database?

19       A.  Some --

20          MR. RODGERS:  Same objections.

21          THE WITNESS:  Sometimes, yes.

22    BY MR. FROMMER:

23       Q.  And the FinCEN database as well?

24          MR. RODGERS:  Same objections.

25          THE WITNESS:  Sometimes, yes.

Exhibit K
994

Page 225

1    BY MR. FROMMER:

2       Q.  Who were the non-lawyers who would make -- at the

3    FBI -- make the ultimate determination as to whether to

4    proceed with administrative forfeiture proceedings as to

5    a claimant's property?

6       A.  Me.

7       Q.  You -- so you were the decision maker as to

8    whether to move forward on administrative forfeiture

9    proceedings with respect to a claimant's property?

10      A.  So I'm the triage.  So I did the first cut.  So I

11   did the due diligence, the initial -- the initial look

12   to decide if this needs further looking.  So does this

13   look like it might be criminal proceeds, do we need to

14   take a deeper look.  Versus this clearly needs to go

15   back right now.  So I did the original triage, I made

16   those decisions, and that was -- that was my role.

17      Q.  Okay.  And who would help you with that?

18      A.  Different agents on the squad would help me with

19   the database searches in doing -- doing that type of

20   thing.  I think the decision was mine.

21      Q.  Okay.  So you would use information from the

22   claim form to do that; correct?

23              MR. RODGERS:  Objection, overbroad,

24   compound.

25              MR. FROMMER:  Let me -- I'll withdraw the

Exhibit K
995

Page 226

1    question.

2    BY MR. FROMMER:

3        Q.  You mentioned agents would help you.  Which

4    agents specifically would help you in determining

5    whether to bring forfeiture proceedings?

6                MR. RODGERS:  Objection, vague and ambiguous

7    with respect to the use of the word "forfeiture

8    proceedings."

9                THE WITNESS:  So probably just Madison

10   MacDonald and myself did the vast majority of this.

11   Other agents would do the sort of leg work.  They would,

12   you know, maybe look at the databases, run the Google

13   searches, sort of give us what they had.  And then we

14   would take a look at it and make -- try to make a

15   determination.

16   BY MR. FROMMER:

17       Q.  Okay.  So let me ask one more question.  So in

18   that process, when you're deciding whether to bring

19   forfeiture proceedings, I understand that you would

20   query databases and do some Google, Lexis searches.

21          Would you or other FBI agents use any information

22   or documents that were in a claimant's safe deposit box

23   in determining whether to bring forfeiture proceedings

24   as to some or all of that claimant's property?

25                MR. RODGERS:  Objection, vague and ambiguous

Page 227

1      with respect to the use of the word "forfeiture

2      proceedings."

3                   THE WITNESS:  And so also to be clear, I

4      don't make that decision.  Right?  I look at -- I look

5      at it and I make a determination as to whether I think

6      the -- the property is proceeds of a crime.  That's --

7      that's what I'm looking at.  I'm looking at the totality

8      of circumstances and do I -- why do I think -- or do I

9      think that this cash is or may be proceeds of a crime.

10     And I present my, you know, my evidence of that.  This

11     is why I think these are proceeds of a crime.

12                  And then I push that forward to both our

13     forfeiture team and the U.S. Attorney's Office.  I don't

14     make an ultimate decision.  I triage the box holders,

15     but I -- what I'm doing is I'm assessing whether there's

16     probable cause to believe that the contents of this box

17     are the proceeds of a crime.

18     BY MR. FROMMER:

19        Q.  Okay.  And when you say "our forfeiture team," do

20     you mean the asset forfeiture specialists within the

21     FBI's L.A. field office?

22        A.  Correct.  And I believe there are head -- there's

23     a headquarters person who may also be involved.  Again,

24     that's -- like, I give that to asset forfeiture and

25     they -- they run their show.

Page 228

1      Q.  Okay.  And you said that you don't make the

2    ultimate determination about whether to initiate

3    forfeiture proceedings, civil forfeiture proceedings, as

4    to some or all of the claimant's property; correct?

5               MR. RODGERS:  Objection, vague and ambiguous

6    with respect to the use of the words "civil forfeiture

7    proceedings," assumes facts not in evidence, and lacks

8    foundation.

9               THE WITNESS:  But, yes, that's correct, I

10   don't make that determination.

11   BY MR. FROMMER:

12     Q.  Okay.  I want to sort of drill down a little bit

13   here so I can understand who we're talking about.  When

14   you said "our forfeiture team," you said there were

15   people in both -- I think you said there were people

16   both in the L.A. field office, and I think you said

17   there was one person, maybe, at headquarters here in

18   D.C.

19          Who specifically are these people?  Can you

20   identify them for me?

21     A.  So Jessie Murray is the supervisor of the

22   forfeiture squad in Los Angeles, and beneath her are

23   asset forfeiture paralegals.  There's, I think, three to

24   five of them who have done -- who do different work

25   under her.  But their role is more administrative.  And

Page 229

1    then there's a headquarters person whose name I don't

2    recall.

3        Q.  All right.  But you believe they're at -- they're

4    at the D.C. headquarters.

5        A.  I do.

6        Q.  Okay.  Jessie Murray is, you said, the supervisor

7    for forfeiture in the L.A. field office; is that

8    correct?

9        A.  Correct.

10       Q.  Is she an attorney?

11       A.  I don't know.

12       Q.  So was she one of the people who would make the

13   ultimate determination of whether to proceed with

14   administrative forfeiture proceedings as to some or all

15   of the claimant's property?

16       A.  I don't -- I don't know.  And -- and there's

17   two -- there's two processes here, too.  There's a

18   petition and a claim.

19       Q.  Yeah.

20       A.  And I just learned this this year, but I know one

21   of them is -- is administrative, and one of them is

22   legal and goes through the U.S. Attorney's Office.  So

23   one goes through the U.S. Attorney's Office and one does

24   not.

25       Q.  Yeah.

Exhibit K
999

Page 230

1            MR. RODGERS:  I just want to caution the

2     witness.  Please do not speculate.  If you have an

3     estimate, please provide it.

4            THE WITNESS:  I don't know any more than

5     that.  I -- so I don't know how to answer your question

6     about what Jessie Murray's authority is.  It depends on

7     what it is.

8     BY MR. FROMMER:

9       Q.  Well, you would provide -- it's correct to say

10    that you would provide sort of your analysis as to

11    whether property was criminal proceeds; correct?

12      A.  Right.  Whether I believed there was probable

13    cause to believe that the property was criminal

14    proceeds.

15      Q.  And then who --

16      A.  Yes.

17      Q.  I apologize.

18          Who would you tell that to?

19      A.  That went to Jessie Murray and the asset

20    forfeiture team.

21      Q.  Okay.  Now, I have a question:  Are you aware

22    that in, I believe it was late May of 2021, the FBI

23    published an omnibus forfeiture notice as to some of the

24    property at U.S. Private Vaults?

25      A.  Yes, I'm aware of that.

Exhibit K
1000

Page 231

1      Q.  Do you know who produced that omnibus notice?

2      A.  Asset forfeiture team from the FBI.

3      Q.  From the L.A. field office?

4      A.  I'm not sure.

5      Q.  Okay.  So would Jessie Murray be one of the

6    people who would be involved with creating of that

7    omnibus forfeiture notice?

8      A.  I'm not sure.  But she would know.

9      Q.  But she would -- she would be the right person to

10   talk to about that?

11     A.  I think so.

12     Q.  Okay.  And is it also -- would she also have a

13   better idea of who the asset forfeiture person at the

14   headquarters might be?

15     A.  Yes.

16     Q.  Okay.  Was -- was Jessie Murray involved in the

17   planning of the execution of the seizure warrant?

18     A.  Yes.

19     Q.  Okay.  What was her -- what was her involvement,

20   if you could -- to the best of your knowledge?

21     A.  So we -- again, we understood that there was

22   likely going to be cash, that the cash was going to need

23   a deposit slip and a CATS ID number, which forfeiture

24   generates.  And so her team was going to need to be

25   involved.  So we contacted her during the planning phase

Page 232

1    to say this is what we're doing, we need you guys

2    involved.  Because the earlier you get -- you know, you

3    want to be ahead of these things, not behind them.

4        Q.  Okay.  Did Jessie Murray, or anyone on her team,

5    provide input to you as to the contents of the

6    supplemental instructions for box inventory?

7        A.  No.

8        Q.  Did Jessie Murray have any involvement in the

9    decision to have drug dogs on site at U.S. Private

10   Vaults?

11       A.  No.

12       Q.  So you said there were a number of different

13   groups at -- that were involved in executing the seizure

14   warrant; right?  There was -- there was the DEA, USPIS,

15   the FBI, obviously.  I believe there was the LAPD, El

16   Monte PD, Glendale PD.  Am I missing any?

17       A.  Beverly Hills PD.

18       Q.  Oh, yeah.  Oh, and Chino, the Chino PD; right?

19       A.  Correct.

20       Q.  So let me ask this question, because I just want

21   to square this away.  If assets from U.S. Private

22   Vaults, claimants' assets, are forfeited through either

23   administrative forfeiture or a judicial forfeiture

24   proceeding, would the FBI get some of those forfeiture

25   proceeds?

Page 233

1          MR. RODGERS:  Objection, lacks foundation,

2     calls for speculation, irrelevant.

3          THE WITNESS:  No, I don't think so.

4     BY MR. FROMMER:

5     Q.  What's your familiarity with how asset forfeiture

6     money is distributed?  And if the answer is "I don't

7     really know that," that's fine, just say.

8     A.  Again, I'm just learning on this, so I know some

9     but I'm not -- I'm not an expert at it.  I don't do it a

10    lot.  My understanding is that there's a -- there's a

11    system by which local law enforcement can receive some

12    portion of money which has been forfeited.

13    Q.  Okay.  So is it fair to say that your -- you

14    understand that there's some mechanism by which local

15    agencies could receive some percentage of the forfeiture

16    proceeds, but you're not sure as to the FBI itself?

17         MR. RODGERS:  Objection, speculation, lacks

18    foundation, assumes facts not in evidence, irrelevant.

19         You can answer.

20         THE WITNESS:  And I don't -- it's not the

21    FBI.  I think it's -- it's the bigger umbrella.  I think

22    it's DoJ.  So there's some -- some mechanism.  It's

23    called equitable sharing, I know that.  And it's a --

24    it's a system -- I know it's there.  Really, the asset

25    forfeiture guys are the better people to ask about that.

Page 234

1    BY MR. FROMMER:

2        Q.   Okay.  So -- so you mentioned, like, the local

3    agencies here, and -- so it's your understanding that

4    they would be the ones who would be able to receive

5    forfeiture proceeds through equitable sharing; is that

6    correct?

7                MR. RODGERS:  Objection, mischaracterizes

8    her testimony, lacks foundation, assumes facts not in

9    evidence.

10               THE WITNESS:  But, yes, that's my

11   understanding, is that they can receive a portion of --

12   of forfeited assets.

13   BY MR. FROMMER:

14       Q.   Yeah.  Are you aware if the local agency -- same

15   local agencies that were involved in the execution of

16   the seizure warrant, if they would be entitled to

17   receive equitable sharing payments?

18               MR. RODGERS:  Absent -- absent a showing of

19   relevancy, I'm going to instruct her not to answer these

20   questions.  This goes far afield of the only cause of

21   action that remains in this case.  The only cause of

22   action pertains to an inventory search.  Nothing else.

23   If you can make a showing of relevancy, fine.

24   Otherwise, I'm going to instruct her not to answer.  It

25   lacks foundation, completely irrelevant to any issues in

**Exhibit K**
**1004**

Page 235

1    this case, assumes facts not in evidence, calls for

2    speculation.  If you want to make a showing, please do

3    so.

4    BY MR. FROMMER:

5       Q.  Special Agent Zellhart, I'm sorry to say that

6    you've been instructed not to answer.  This may require

7    us to bring you back at a later point to discuss that in

8    more detail, after we discuss that.

9           Who would be the best person to know about --

10   would Jessie Murray be the right person to speak to

11   about the potential distribution of forfeiture proceeds

12   from -- that -- that were forfeited as -- from the U.S.

13   Private Vaults seizure?

14             MR. RODGERS:  Objection, speculation.  Same

15   objections as before.

16             THE WITNESS:  Jessie Murray and one of the

17   asset forfeiture paralegals has done it a little bit

18   more than everybody else, knows -- knows more about the

19   procedure.

20   BY MR. FROMMER:

21      Q.  Do you remember --

22      A.  We don't do it as much as DEA does, so it's -- I

23   don't know.  Like, it's -- it's not our best thing.

24      Q.  Okay.  Do you know what the asset forfeiture

25   paralegal, do you know who that -- that person's name?

Page 236

1        A.   Yes.   Judy Scott.

2        Q.   Judy Scott.   Okay.

3             And how long -- okay.   That's fine.   Thank you

4    for that.

5                 MR. FROMMER:   All right.   Let me -- let me

6    take a five-minute break.   I -- I think we're almost --

7    almost done, but give me five minutes and we'll come

8    back.   Okay?

9                 THE WITNESS:   Sure.

10                THE VIDEOGRAPHER:   We are off the record.

11   The time is 4:56 p.m.

12             (A short break was taken at this time.)

13                THE VIDEOGRAPHER:   We are back on the

14   record.   The time is 5:03 p.m.

15                MR. FROMMER:   All right.   Thank you for

16   answering my questions.   I think we're done for today,

17   with two caveats.

18             The first is that counsel for defendants

19   instructed you not to answer certain questions regarding

20   meetings.   We might have to recall you to ask you

21   questions about that later on.

22             The second, which I had mentioned, is that

23   we just received 3,000 pages of documents yesterday, and

24   it might be, once we've done a fuller review of those

25   documents, we might need to bring you back to answer

Page 237

1    some additional questions.

2              But with that, we have no more further

3    questions, and thank you for bearing with me today.

4              THE VIDEOGRAPHER:  Are you --

5              THE WITNESS:  Thank you.

6              THE VIDEOGRAPHER:  Are you --

7              MR. RODGERS:  I need to just say -- I just

8    need to say for the record, and I'm not necessarily

9    asserting this objection, but I need to do it in order

10   to avoid waiving it.  Under the Federal Rules of Civil

11   Procedure, depositions are limited to seven hours.  To

12   the extent we go over that period, or to the extent we

13   already have, I need to preserve my objection.  I'm not

14   asserting it at this point, but I need to preserve it.

15   Otherwise, it's waived.

16             THE VIDEOGRAPHER:  Are you ready for me to

17   conclude?

18             MR. FROMMER:  I am.

19             THE VIDEOGRAPHER:  This concludes --

20             MR. RODGERS:  I -- I -- I'm sorry.  I am as

21   well.

22             THE VIDEOGRAPHER:  This concludes today's

23   testimony given by Special Agent Lynne Zellhart.  The

24   number of media used was eight, and will be retained by

25   Veritext Legal Solutions.

**Exhibit K**
**1007**

Page 238

1          We are off the record at 5:05 p.m.

2              (Deposition concludes.)

3                    -oOo-

**Exhibit K**
**1008**

Page 239

1                              -oOo-

2

3              I, LYNNE K. ZELLHART, hereby declare under

4    penalty of perjury that I have read the foregoing pages

5    6 through 238; that any changes made herein were made

6    and initialed by me; that I have hereunto affixed my

7    signature.

8

9              Dated:  _____

10

11

12         _____

13                   LYNNE K. ZELLHART

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit K**
**1009**

Page 240

1                          ERRATA SHEET/CORRECTIONS

2

3        PAGE    LINE

4        _____   _____    _____

5        _____   _____    _____

6        _____   _____    _____

7        _____   _____    _____

8        _____   _____    _____

9        _____   _____    _____

10       _____   _____    _____

11       _____   _____    _____

12       _____   _____    _____

13       _____   _____    _____

14       _____   _____    _____

15       _____   _____    _____

16       _____   _____    _____

17       _____   _____    _____

18       _____   _____    _____

19       _____   _____    _____

20       _____   _____    _____

21       _____   _____    _____

22       _____   _____    _____

23       _____   _____    _____

24       _____   _____    _____

25       _____   _____    _____

Exhibit K
1010

Page 241

1    STATE OF NEVADA      )

                          ) ss.

2    COUNTY OF WASHOE     )

3

4          I, SUSAN E. BELINGHERI, a Certified Court

5    Reporter for the State of Nevada, do hereby certify;

6          That on Friday, the 6th day of May, 2022, at the

7    hour of 9:08 a.m. of said day, at the offices of Bonanza

8    Reporting & Videoconference Center, 1111 Forest Street,

9    Reno, Nevada, appeared LYNNE K. ZELLHART via

10   videoconference, who was duly remotely sworn by me, was

11   thereupon deposed in the matter entitled herein, and

12   that before the proceeding's completion the reading and

13   signing of the deposition has not been requested by the

14   deponent or party;

15         That the foregoing transcript, consisting of

16   pages 1 through 241, is a full, true, and correct

17   transcript of my stenotype notes of said deposition to

18   the best of my knowledge, skill, and ability.

19         I further certify that I am not an attorney or

20   counsel for any of the parties, nor a relative or

21   employee of any attorney or counsel connected with the

22   action, nor financially interested in the action.

23         DATED:  At Reno, Nevada, this 6th day of May,

24   2022.

                    <%406,Signature%>

25              _____

                SUSAN E. BELINGHERI, CCR #241

[& - 75]

**&**

**&** 4:3 23:5 241:8

**0**

**04405** 1:9 4:25

**1**

**1** 86:23 88:21 136:8,10,11 139:14 169:21 241:16
**1,200** 33:7
**10** 117:4 118:23
**10,000** 112:13
**100,000** 69:16 222:13
**108** 117:4,5 159:20 159:22,22,23
**10:00** 168:23 169:12 170:2
**10:37** 66:17
**10:48** 66:20
**11** 118:23
**111** 159:24
**1111** 4:4 241:8
**112** 160:4,19
**11:03** 76:17
**11:16** 76:20
**11:58** 102:9
**12:59** 102:12
**137** 120:11
**139** 114:11
**14th** 2:10
**161** 3:9
**18** 46:25 52:12
**181** 3:10
**19** 88:15,16 90:8 90:22 92:19,21 93:3,5 176:24 177:1,2,3
**199** 3:10

**1993** 13:10,11
**1:17** 114:6
**1:18** 114:9
**1f** 1:23
**1st** 122:5

**2**

**20** 88:8,15,16,25 90:6 92:17
**2004** 14:11 35:25 36:20 57:14,17
**2008** 21:17
**201** 3:11
**2013** 97:9,22 98:1 124:18
**2015** 102:21 103:17 104:21 106:6
**2016** 17:18 98:5
**2017** 17:18
**2018** 43:4
**2019** 103:21,22 104:17 105:5 106:12 107:12 108:1
**2020** 77:17,18,21 78:22 79:1,4 80:1 80:6,16 81:4,7,14 215:7,9,16 216:15 216:20 218:5 219:12,15 220:20
**2021** 6:19 57:17 108:2 219:10 220:3 230:22
**2022** 1:20 4:2,11 241:6,24
**20th** 90:10 93:5
**22** 41:2,11
**22203** 2:6
**224** 115:1,2,4
**22nd** 57:17

**238** 239:5
**24** 150:18
**241** 241:16,25
**25** 41:2,11
**26th** 169:15
**28** 41:1,4,5
**2:21** 1:9 4:25
**2:45** 166:24
**2:56** 167:2

**3**

**3** 3:8 38:15,18,18 38:20 113:4 159:19 194:19,20
**3,000** 236:23
**300** 176:4
**302** 191:6,17
**312** 2:10
**350** 175:24
**38** 3:8
**3:49** 198:15
**3:57** 198:18

**4**

**4** 3:8 75:3,5,11 76:24
**4-1** 99:17,22
**4.1.1** 99:25
**40** 41:13 115:17 160:4
**400** 171:5 175:24
**406** 241:24
**430** 171:5,7
**45** 173:14,23
**4:56** 236:11

**5**

**5** 3:9 97:1,3,4 99:9
**5,000** 69:10,14 70:6,20 141:13,14 141:16,19 184:2 190:19

**50** 48:22,24 60:23 141:9
**50,000** 222:13
**500** 165:5
**58** 184:11,12 189:14 190:11
**59** 184:10 190:23
**597** 82:25 83:7 87:4,12,16 88:9,10 90:12,17,20,22 91:8,12,19 92:2,18 93:24 95:3,4,20,24 96:2,10,11,19 139:13
**597s** 82:18,19 83:2 93:16,17,21 94:11 96:3 189:19
**5:03** 236:14
**5:05** 238:1

**6**

**6** 1:20 3:4,9 108:15 161:5,6,19 180:1 239:5
**60** 48:22,24
**61** 201:18 202:10
**62** 203:13 208:8
**63** 203:17 204:19 205:13
**655** 1:23
**6:00** 150:9 167:15
**6th** 4:1,10 241:6 241:23

**7**

**7** 3:10 181:23,25 182:6 189:14 195:22 196:8,13
**700** 97:16 170:6,7 170:13 175:23
**75** 3:8

**77**  99:8,18

**8**

**8**  3:10 199:3,4
208:17,18
**80s**  176:2
**8:00**  168:7

**9**

**9**  3:11 146:25,25
147:3 153:4 154:8
154:9,25 201:10
201:11 208:8
**9/11**  22:17,19
**90**  10:25,25 66:9
101:25 159:17
**900**  2:6
**90012**  2:11
**901**  2:6
**97**  3:9 85:10
**9:00**  168:23
**9:08**  4:2,10 241:7

**a**

**a.m.**  4:2,10 66:17
66:20 76:17,20
102:9 167:15
168:7 169:12
170:2 241:7
**abate**  128:25
**abatement**  128:19
129:10,19 130:1
**ability**  241:18
**able**  9:22 11:11
22:23 37:23 66:3
74:8 76:5 97:17
135:24 176:14
177:22 209:8
234:4
**absent**  234:18,18
**absolutely**  87:15
**academy**  15:19

**accessible**  111:17
**accidentally**  25:19
27:25
**accomplishing**
125:24
**account**  59:5
**accountant**  105:22
**accounting**  63:24
64:3
**accurate**  9:20,23
69:19 75:14 155:2
155:9 171:17,18
**accurately**  69:9
141:14
**accusation**  59:3
60:22 62:10 63:16
63:25 84:23 85:8
**accusations**  59:10
91:20,22 163:7
**achieve**  100:8
125:9,18 128:11
**achieving**  98:10
**acknowledged**
118:5
**acquired**  97:9
**acquisition**  108:5
**acronym**  44:3
**acronyms**  43:23
**act**  25:19
**acted**  146:8
**acting**  1:11
**action**  5:6,15 6:17
44:22 60:10 61:14
81:11 130:1 131:3
137:17 194:13
234:21,22 241:22
241:22
**actions**  73:20
**active**  13:23
**activities**  112:17
210:2

**activity**  33:24
112:21 120:4
211:10,11
**actual**  49:24 85:7
151:5 208:19
**add**  10:19 35:23
65:17 118:2 223:9
**addition**  104:10
135:2 147:1
**additional**  10:16
60:5 107:6 195:4
195:17 237:1
**address**  65:21,22
105:16 106:2
199:1
**addressed**  74:19
**addressing**  184:9
**adjourn**  11:3
**admin**  182:14
190:2 191:2,4,12
191:16 193:1,3,5
196:21,25 197:23
**administrative**
221:21 225:4,8
228:25 229:14,21
232:23
**adopting**  122:15
**advance**  140:10
**advice**  32:12
**advised**  78:7
**aegis**  107:22
153:13 204:15
**affidavit**  40:3,12
40:15 41:19 49:20
50:5,10,13,20,25
51:4,10 79:5
80:18 81:10,15,16
81:16 109:5,6
113:2 115:8 116:3
116:6,13,13,25
118:11,24 159:21

160:16 161:12
162:6
**affidavits**  81:20
**affiliations**  5:11
**affixed**  239:6
**afield**  234:20
**age**  12:5
**agencies**  21:2
44:12 53:13,16,17
53:21 104:3,20,22
104:24 105:14
106:15,17,20
107:18 143:12
144:1,21 146:22
146:22 152:22
153:1,17 167:9
172:1 178:8 216:2
233:15 234:3,15
**agency**  104:7
154:8 234:14
**agent**  4:20 6:12
7:3 13:23 14:1,7
14:14,20 30:21
31:16,16,19 32:7
33:11,13 34:17
39:15 40:20 46:24
47:15 49:15,17,20
50:15 53:5,5
55:13 57:14 69:2
69:11 70:21 71:2
71:4,12,14,17 77:3
79:19 103:24
114:18 126:17
132:2 134:2
138:22 151:11
152:14 161:11
163:23 177:5
182:5 186:5
191:15 196:14
198:20 200:14,22
206:3 209:20

Exhibit K
1013

[agent - appears]                                                                    Page 3

235:5 237:23
**agents**   7:1 14:20
  14:21 18:19,21
  26:3 31:19 32:5
  32:12 49:5 51:4
  59:11 70:6 71:7
  73:1 82:16 84:17
  87:1 89:4 90:7
  91:9,10 92:21
  93:2,20,21 94:2,3
  94:10,22 95:9,10
  95:18 98:8,8 99:1
  100:16 104:2
  107:8 115:12,20
  132:9 135:1
  139:16 141:15
  142:5 150:17
  151:6,7,7,9,10,16
  152:8,20 155:22
  155:25 156:4,11
  162:2,4,8 172:3
  174:7 175:4
  178:11,20 179:23
  180:6 182:19
  183:16 185:5,5,24
  186:15 190:4,12
  191:10 192:7,22
  196:19 197:6,22
  209:4,6,7,15,22,23
  210:8 221:18
  222:16 223:17
  225:18 226:3,4,11
  226:21
**ago**   8:10 35:13
  53:3 64:4 119:24
  135:5 184:6 197:9
**agree**   4:18 39:18
  40:20 97:11
  101:20 109:12
  123:10,12 124:19
  128:3 161:21

188:19 208:12
**agreed**   116:10
  160:12 167:24,25
**ahead**   31:6 34:25
  53:24 116:18
  181:12 213:19
  232:3
**airborne**   63:10
**al**   4:22,22
**alexander**   132:2
  133:23 200:13
  202:17 206:23
**alexander's**   134:1
**alley**   24:6,12 27:9
  28:7
**allowed**   74:10
**allows**   87:21
**alternative**   128:15
  129:19,24 130:8
**alternatives**   124:4
  125:21 127:9
  128:16 129:11
**ambiguous**   83:22
  94:14 96:5 213:8
  213:18 214:12
  215:2 217:18
  219:5,18 220:23
  221:24 222:21
  223:20 226:6,25
  228:5
**america**   1:10 4:22
**amount**   69:8,12,19
  70:5,7,10 71:15
  112:13 130:18
  165:15 193:18
  222:12 223:14
  224:7
**analysis**   137:20
  230:10
**analysts**   151:12

**andrew**   79:8,23
  80:22 81:5,6 82:3
  82:5 114:23 116:7
  126:4,12 142:13
  142:13 154:23
  155:4 160:11
  200:24 201:7
  202:1,4,22 206:24
  208:4 214:4
**angeles**   1:22 2:11
  15:1,24 42:1,7
  111:3 129:6
  228:22
**anonymity**   103:14
  184:20
**anonymous**   103:5
  166:16
**answer**   7:12 8:6
  8:12 9:10,11,12,17
  9:17 10:2,5,17
  11:2,7,8,13 29:23
  31:6,10 38:4
  40:10 45:13 46:15
  48:7 59:23 77:25
  78:11,13,18 79:18
  80:7,10,12,25 89:9
  91:3,4 95:9 97:19
  98:15 100:23
  109:4 119:14
  120:21 123:22
  125:15 127:1,7,16
  142:12,17 155:4,5
  155:7 157:19
  163:2 165:20
  170:25 201:2,3
  204:24 205:25
  214:16,17,19
  215:6,20 216:16
  218:15,16 219:22
  220:23 221:2
  223:25 230:5

233:6,19 234:19
  234:24 235:6
  236:19,25
**answer's**   99:7
**answered**   89:7
  90:15 92:23 153:9
  172:7 188:25
  206:18 222:4
  223:8
**answering**   8:4
  165:4 236:16
**answers**   7:10,18
  9:20 33:5
**anthrax**   61:8 65:1
**anti**   17:12 18:3
  37:1 40:25 41:16
  41:23 42:5,10
**anticipated**   120:6
  140:11 150:8
  173:17 220:5,6
**anticipation**
  184:19
**anybody**   89:11
  170:12 205:18
  218:3
**anybody's**   52:17
**anyway**   84:10
**apartment**   54:19
**apologies**   93:14
  182:7
**apologize**   230:17
**appearance**   5:9
  84:23
**appearances**   2:1,2
  5:11 70:20
**appeared**   4:5
  241:9
**appearing**   1:21
  5:18
**appears**   40:11
  97:15 189:18

Exhibit K
1014

201:18 203:1,10
203:11,13
**application**  38:19
39:16 40:2,12,13
40:14,15 49:20,24
50:4,5,10 51:5,10
81:25 112:24,25
116:14 131:18
167:5
**applications**  24:5
**applied**  49:22
**apply**  28:15,19
49:15,17
**applying**  29:10,11
51:13
**appointed**  122:9
**appointing**  123:3
123:11,12,23
125:12
**appointment**
71:23 72:1
**appraisal**  86:1,2
**appreciate**  6:8
**appropriate**  65:3
65:5 73:22 89:21
**approval**  207:3
**approve**  200:15
**approximately**
6:24 36:13 51:21
105:5 155:20
**april**  103:23
104:17 105:5
106:12 107:12
108:1 122:5
**area**  12:22 132:23
139:1 172:1
178:15,16 179:8
**areas**  26:2 124:23
**argue**  10:6
**argument**  205:19

**argumentative**
119:11
**arizona**  42:3,3
**arlington**  2:6
**armored**  68:15
**arrest**  25:11,23
27:11,25,25 28:6,9
28:12,13 30:6
31:12,13 49:2,6
58:1
**arrested**  48:14
**arresting**  27:18,21
49:4
**arrests**  48:22 49:6
49:11 57:25
210:15
**arrive**  168:21
**asac**  134:2 172:9
**asked**  9:6 11:17,24
40:1 79:15 89:7
90:15 92:23 154:9
188:25 194:4
206:18 213:15
217:7
**asking**  7:8 8:6
12:4 26:9,9 29:22
32:23 38:25 78:22
78:23 79:15 106:7
108:10,11 109:2
126:10,11 147:25
181:17 189:9,10
216:18 217:3
218:22 224:5
**asks**  208:21
**aspect**  30:22
143:23
**aspects**  25:3
**assert**  213:16
**asserting**  237:9,14
**assessing**  227:15

**asset**  2:9 18:7,11
18:25 19:10,15,19
19:20,22 21:7,24
22:2,6,12 36:8,11
36:14 37:5,9,16,21
37:23 38:2,3,4
40:25 41:13 42:25
43:9 44:2,11,19,20
45:8,10,16,23 47:4
47:21 140:9,13
141:7,23 142:22
143:2 182:18
189:16,21,24
190:3,7,12 212:19
212:21,24 214:23
215:10 216:10,20
217:7,16,19 218:4
219:1,18 220:18
220:25 221:14,20
222:19,22 227:20
227:24 228:23
230:19 231:2,13
233:5,24 235:17
235:24
**assets**  44:9 232:21
232:22 234:12
**assigned**  15:25
16:11 29:13
**assist**  7:10 138:6
151:12,13 155:22
156:1 167:25
**assistance**  106:23
107:19 144:21
**assistant**  1:13 2:9
5:17 134:2
**assisting**  132:3
**associated**  212:8
222:11
**association**  100:10
**assume**  9:13 41:18
51:16,16 149:25

**assumes**  46:14
47:23 53:24 67:21
70:3 91:1,24
94:15 95:6 100:22
101:12 123:19
125:13 130:10
204:23 207:9
213:17 214:13
215:4 219:5,19
220:24 221:24
222:24 223:22
228:7 233:18
234:8 235:1
**assuming**  100:5
145:14
**athlete**  22:21
**attached**  109:4
194:11 201:24
203:3,18 205:2
207:15
**attachment**  56:10
157:2 203:1
207:13
**attachments**  203:2
**attempt**  125:3,5
177:10
**attended**  41:13,25
**attendees**  218:14
**attention**  106:6
180:9
**attorney**  1:11 2:9
5:12,18 6:14 10:1
23:6 39:1 77:24
78:6,8,14,15 79:2
79:12,16,20 80:9
80:24 126:5,8
155:5 165:25
166:6,7 194:17
201:4 215:20,24
216:5,15,17,24
217:2,8,10 218:17

220:22 229:10 241:19,21
**attorney's** 22:3 29:4 49:19,23 50:2 105:15 113:1 142:7 212:22 227:13 229:22,23
**attorneys** 2:5 166:11,17 212:22 212:24 216:9,19 217:4,15 219:22 220:3 221:3
**attracts** 106:9
**audible** 112:19 175:3
**audibly** 7:11
**audio** 4:16
**ausa** 29:1,12 49:23 50:16 82:2,5 142:13 201:23 202:1
**ausas** 19:21
**author** 181:17 183:23 207:22
**authorities** 129:22
**authority** 56:22 135:16 230:6
**authorize** 113:15 114:15 135:24 136:5
**authorized** 100:6 120:15 123:17
**authorizes** 121:12
**automated** 72:8
**available** 72:7 84:5 100:9,18 175:11 183:16 193:24
**avoid** 112:10,12 237:10

**aware** 51:11 82:11 98:7,25 104:20,22 104:23 116:20 117:25 119:22 122:20,23,24 123:2,11 134:4 185:5 199:13 230:21,25 234:14

**b**

**b** 56:10 86:23 87:23 88:21 136:8 136:10,11 139:14 157:2 169:21
**back** 6:19 9:4 15:17 18:21 19:5 20:4,7,9 21:8 45:22 66:19 74:6 76:19 83:11 87:14 87:15 89:6 90:4 90:11 93:6 98:1 102:11 103:1 104:21 113:3,5 114:8 116:20 120:9 122:4 139:20 142:21 143:25 145:9 159:19 165:12,15 165:16 166:21 167:1 178:15 194:19,19 195:22 196:13 198:13,17 200:4 202:14 204:3 208:8,17 222:9 223:3 225:15 235:7 236:8,13,25
**background** 11:23
**backlogged** 135:12
**backpack** 34:18

**bad** 7:13 25:19 27:25 45:22
**bag** 70:22 71:17 72:5 86:7 88:17 88:18 89:20 90:9 92:18,19 159:3 177:7,7,17,24 186:7,23 188:8
**bagged** 143:6 158:16,18 163:9
**bagging** 143:7
**ballpark** 51:22 170:10,10
**bands** 192:8,9
**bane** 12:13
**bank** 16:23 47:6 112:10 140:21 192:9,17
**banker** 105:22
**bar** 14:6 73:6 76:4 86:12,23 88:21 92:7 135:21 136:7 136:14,15 139:13 169:21 177:19
**bars** 223:16
**barths** 148:18,25 168:1
**base** 79:12
**based** 10:6 36:22 46:24 47:15,19 50:21 58:15 72:20 83:20 95:3 111:7 166:4 170:21 192:16
**basic** 11:23 62:8 131:23 147:15 210:5
**basically** 16:1 30:21 72:4 105:9 123:13 154:22 155:25 168:2,22

170:1 190:2 198:6 224:15
**basis** 170:19
**bates** 41:3
**baton** 18:23 20:3
**bear** 201:16
**bearing** 76:21 237:3
**began** 16:10 103:22 106:13 107:12
**beginning** 5:12 15:16 172:20 179:20,20
**beginnings** 167:12
**begins** 41:10 115:11
**behalf** 5:18
**beings** 94:23
**belief** 83:20
**believe** 26:10 43:2 99:2 112:18 134:23 135:2,3 159:21 171:9 190:6 194:4 204:13 215:14 227:16,22 229:3 230:13,22 232:15
**believed** 230:12
**belingheri** 1:23 4:5 5:4 241:4,25
**belongs** 165:16
**beneath** 228:22
**benimoff** 2:19
**best** 8:5 42:13 58:12 96:1 127:3 128:10 130:12 138:12 183:25,25 187:22 188:23 200:10 206:22 215:14 231:20

235:9,23 241:18
**better** 11:7,8,13
  70:22 138:10
  158:5 179:19,19
  231:13 233:25
**beverly** 129:4
  144:8,14,22 145:7
  145:15 146:20
  152:23 232:17
**beyond** 187:1
**big** 22:5 28:5 31:7
  31:7 48:20 69:18
  71:3,3 111:1
  127:4 132:19
  147:13 155:24
  174:4 224:4,4
**bigger** 233:21
**biggest** 150:4
**birth** 60:24 61:6
  62:4 63:14,17
  64:23 208:10
**bit** 11:24 13:2
  16:21 23:9 29:6
  36:7,8 41:21 43:5
  68:5 69:22 99:12
  102:16,18 112:2
  112:23 131:18
  142:21 148:14
  150:12,24 151:23
  158:11 159:19
  165:20 168:5
  169:2 171:24
  194:3,18,22
  198:21 228:12
  235:17
**bitcoin** 64:14
  196:17
**black** 111:8 144:7
**bland** 55:6
**blank** 183:15,15
  183:16,17

**blind** 59:18
**block** 22:6 23:22
  26:19,20 43:10
  66:12
**blocks** 25:5 30:4
**bloody** 56:18
**blow** 68:7
**boat** 110:19
**bold** 205:13
**bolts** 29:2 45:18
  221:7
**bonanza** 4:3 241:7
**book** 30:15 35:21
  44:25 45:1 90:10
  90:11,21 93:5
  176:19,21 218:12
**booker** 34:7
**books** 26:25 88:6,7
  88:9,10,12,13,19
  88:23,25 89:2,25
  89:25 90:5,6,8,9
  90:11,22,23 91:8
  92:17,18,19,21
  93:3,5 176:24
  177:1,3,6 222:7
**border** 42:9
**born** 12:8,9
**boss** 134:1
**bottom** 99:15
  182:17 190:11
**box** 86:7 93:22
  94:10 95:19 103:9
  103:12 114:17
  116:15 123:15
  141:9 155:15
  156:21 160:24,25
  161:13,15 162:3,3
  162:16,23,25
  163:4,5,15,21
  164:2 165:2,3
  166:4,7,12 168:25

169:17 170:14
  172:17 173:14,22
  174:4,5,7 177:6,17
  177:17,18,23
  180:8,13 182:8
  184:13,22 185:7
  185:10,18,21
  186:4,15 187:3,6
  187:10,13,16,19
  187:22,23 188:8
  188:23 189:4
  191:19 199:20,25
  208:12,13,15,21
  208:22,25 209:2
  209:10,13 210:3,6
  211:19,23 212:1
  214:25 220:9
  222:3,5,6,11
  223:15,17 224:7,8
  226:22 227:14,16
  232:6
**boxed** 159:10
**boxes** 94:7,11
  118:12 120:4,7
  121:25 122:2,6
  124:5,14 149:13
  149:20 150:4,17
  150:23 151:5
  152:8 158:17
  165:5 168:15
  170:4,4,7,11,13,13
  171:20 172:25
  173:7,8,13,15,16
  173:21 174:10
  175:18,23 178:12
  178:19 184:23,25
  194:25 195:3
  199:22 205:10,15
  212:12,12 213:3,6
  213:23 215:1,11

**boyette** 143:16
**breach** 167:23
  168:4,17
**break** 10:23,25
  11:3 66:11,18
  102:1,10 151:24
  159:18 165:23
  166:20,25 197:2
  198:12,16 236:6
  236:12
**breakdown**
  169:20
**breaking** 169:24
**brent** 134:15,16
**brief** 171:24,24
**briefed** 134:4
  180:5
**briefing** 157:4,5,6
  180:5
**briefly** 66:23
  115:16,17 120:8
  160:23 167:7
  192:6
**bring** 32:6 121:8,9
  129:11 132:11
  139:20 154:9
  163:20 221:20
  223:18 226:5,18
  226:23 235:7
  236:25
**bringing** 107:7
  125:6 126:25
**brinks** 68:14
**broad** 25:3 139:7
**brothers** 164:10
**brought** 106:6
  117:22 144:10
  153:3 154:8
**brown** 79:8,23
  80:22 81:5,6 82:3
  82:6 114:23 116:7

126:4,12 142:13
142:13 160:11
200:24 201:2,7
202:2,4,22 206:24
208:4 214:4
**browser**  76:4
**bucket**  62:14
**buckets**  62:25
**bucks**  60:23
**building**  54:20
**bulk**  149:14
**bunch**  11:17 22:1
62:18 73:8 142:25
174:6 187:16
**bundled**  192:8,20
**bureau**  1:14 2:12
5:20
**bureaucratic**
136:3
**burnt**  68:8
**business**  35:10
56:16 103:10
105:4,14,25 106:4
106:8,9 111:9
117:23 118:2,19
118:20 119:13,18
120:17,19,23,23
120:24,25 121:2,3
121:6,9,14,16,22
121:23 122:5,5,7,9
122:15,24 123:4,4
123:14 124:15,16
124:16 125:6
127:12,20,24
128:1,2,14 129:4
129:10,24 130:7
130:13,14,15,15
130:17,19 131:4,6
131:11 133:21
134:22 138:23
148:20 149:17

167:23 168:3,8,8
168:10,11,11
178:20 201:24
**businesses**  112:20
122:20 127:21
130:14,20
**businessman**
105:22
**buy**  110:19

**c**

**c**  114:15
**cabinet**  87:21
**cadets**  24:23 25:1
25:4
**calendar**  218:12
**california**  1:2,12
1:22 2:11 4:24
12:16,17,20 13:7
13:18 193:20
**call**  30:18 44:20
47:24 56:10 79:13
86:23 158:1
170:18 174:5
198:23 214:24
**called**  16:5 23:4
25:6 43:23 87:22
88:23 110:1 111:6
111:7 138:6 190:2
233:23
**calls**  44:14 45:3
46:14 47:22 58:20
67:21 70:2 71:8
83:23 91:2,23
94:16 95:6 98:12
100:20,21 101:13
101:13 123:19
128:5 130:10,11
187:24 204:23
215:4 219:6,19
223:23 233:2
235:1

**camera**  4:14
108:25 175:10
177:21 185:14
186:17
**cameras**  152:11
168:24 175:7,8
176:9 178:15
**campbell**  2:13
5:19
**capable**  98:9
**capacity**  1:11,13
**capture**  87:7
152:19 176:14
177:22
**capturing**  152:19
**car**  57:24,25 68:15
110:20
**card**  16:23
**cards**  152:12
**care**  52:15 54:12
154:19 158:20
184:14
**career**  19:20 21:9
48:20 193:17
**careful**  173:10
**carlson**  126:14
216:1 220:14
**carlson's**  126:15
**cart**  138:6,10,16
138:22
**case**  1:9 4:24
18:12 19:16 28:24
29:3 34:6,7 37:23
38:20 45:14 49:4
49:12 52:6,8,17
53:5,7 60:17 74:5
103:24 104:2,8
105:2,17,24 107:8
121:7 129:2
136:18 139:10
142:13 147:10

182:5 200:13
210:7 220:10,12
220:15 234:21
235:1
**cases**  15:22 16:8
17:2,2 21:4 48:21
48:25 49:3 52:2
52:16 105:2,13,13
110:10,21,23
210:6
**cash**  45:15,21 47:5
60:21,21 61:3,19
61:22,24 62:2,13
67:3,5,10,18,23,25
68:5,6,6,12,12,16
68:17,18,18,22,23
69:2,5,8,17,22
70:6,19,22 71:3,11
71:15,17 72:4,7
84:6,7,9,12 85:16
85:16 112:5,6
137:8,9,10 140:11
140:12,18,19
141:1 142:23
177:14 181:9
182:20 183:16,19
183:21 184:1,3
189:23 190:14,18
191:1,11,21 192:8
192:20,23 193:18
211:20,21,21
220:5,6,8 222:12
222:13,20 223:15
224:1,1,2,2,4,4,5,6
224:7,9,17 227:9
231:22,22
**categories**  197:11
**categorize**  65:9
**category**  197:12
**cats**  43:22,23,24
44:1,10,19 45:2,9

Exhibit K
1018

45:23 46:5,12,21
47:12,16,20 71:18
136:10,11 140:15
140:21 141:2,6,11
141:21 182:20
184:3,4 190:14
231:23
**cause**  57:25 210:2
227:16 230:13
234:20,21
**caution**  77:22
230:1
**caveats**  236:17
**ccr**  1:23 241:25
**ceasing**  125:25
**cell**  95:14 188:4
**center**  4:4 241:8
**central**  1:2,12 4:24
108:17 109:12
**certain**  73:20
124:8 151:6
173:13 199:1
236:19
**certainly**  134:4
139:9 193:25
224:3
**certificate**  60:25
61:6 62:4 63:14
63:17 64:23
**certified**  241:4
**certify**  241:5,19
**chain**  87:1 139:12
**chair**  95:13
**chairs**  132:11
**challenge**  6:17
**chance**  40:6
165:18
**change**  83:20
89:18,18
**changed**  16:20

**changes**  34:2 35:6
239:5
**changing**  171:1
**characterize**  28:2
37:7 172:5,13
217:22 224:12,13
**charge**  132:8
134:2 172:13
193:9
**charges**  110:9
**check**  62:7 163:24
211:2
**checking**  141:16
**checks**  210:5
**chemical**  192:10
192:13
**chemicals**  191:24
**child**  176:2
**chime**  76:1
**chino**  147:2,4
232:18,18
**choose**  117:11
128:11
**circumstances**
47:9 78:25 85:15
90:18 95:17 164:6
166:9,10 185:9
227:8
**city**  128:23,25
129:4,6
**civil**  18:11,17
19:15 23:8,9,10
191:19 210:3
212:7,13 213:5,19
213:23 214:10,13
214:23 215:3,23
216:10,20 217:16
217:19 219:1,1,11
219:13,18 220:1
220:18,25 221:20
222:18,22 228:3,6

237:10
**claim**  92:16
164:24 198:23,24
199:16,18,25
200:24 203:9,13
203:16 206:8,21
208:19,24,25
209:5,15,17,25
221:17 222:5,16
225:22 229:18
**claimant**  208:13
211:13,16,25
212:9 222:12,17
**claimant's**  222:11
222:19 225:5,9
226:22,24 228:4
229:15
**claimants**  221:19
232:22
**claiming**  110:12
**claims**  85:11
188:21,24
**clarify**  9:4 10:17
**class**  5:15,15 6:17
41:14
**classification**
16:20
**classifications**
198:6
**classifying**  197:15
**classroom**  23:25
24:5
**clean**  37:20 169:20
223:4
**cleaner**  13:13
223:13
**cleanly**  187:14
**clear**  7:17 87:13
104:19 109:17
114:2 227:3

**clearly**  7:11 45:15
60:4 207:12
225:14
**cleveland**  15:20,20
15:22 17:3 36:23
**client**  77:24 78:15
79:2,2,12,13 80:9
80:24 126:8 155:5
201:4 216:17,24
217:2,10 218:17
**clients**  119:1
163:18
**clock**  150:16
152:13
**close**  88:1 99:21
115:22,24
**closer**  144:12
145:20
**closing**  128:2,2
**clothes**  111:6
**coached**  112:9
**code**  26:25 86:12
86:23 88:22
135:21 136:7,14
136:15
**coded**  177:19
**codes**  73:7 92:7
139:13 169:21
**coffee**  192:10,13
**coin**  112:18 189:7
189:12
**coins**  90:2,2 143:1
174:21 187:10,16
187:19,22,23
188:14,16 223:16
**collar**  15:4,6,7,8
15:12,14 16:16,18
16:21,22 17:21
18:1 23:9 26:20
**collard**  23:4

**Exhibit K
1019**

colleagues 200:22
collectibles 222:7
collection 100:6
college 13:3,4,6
combination 86:15
combine 86:16
174:2
come 10:15 14:6
14:13,13 18:21
19:5 20:4,7 26:18
37:14 38:2 57:23
58:2 67:18 68:21
69:12,19 71:14
105:16 123:13
125:5 126:23
135:17 143:24
155:12,13 163:18
164:14 166:21
179:24 193:16,17
193:21 198:13
199:24 202:19
204:9 211:22
236:7
comfortable 71:16
comic 44:25 45:1
88:6,7,9,10,11,13
88:19,23,25 89:2
89:25,25 90:5,6,8
90:8,10,11,11,21
90:22,23 91:8
92:17,18,19,21
93:3,5,5 176:18,21
176:24 177:1,2,3,6
222:7
coming 66:9 71:24
73:10 90:4 159:17
comment 205:3
commit 121:18
commitment
150:5

committed 165:11
165:12 204:20
common 20:22
22:10 53:22 63:1
145:3
communicate
193:2
communicated
172:10 191:2
193:4
communication
77:24 80:9,24
201:2 216:24
communications
126:11 142:11
155:4 217:9
company 103:15
111:1,1 122:7
complete 9:20,22
87:16,18 137:5
175:9 176:12
177:10 213:14
completed 124:6
137:6
completely 8:13
69:19 234:25
completion 241:12
complicated 95:8
132:16,17 133:3
140:16 165:20
complications
130:19
compound 81:23
197:3 221:23
225:24
comprehensive
133:12
computer 74:1,3
75:8 137:20
computers 120:17
120:19 122:3

135:13 138:8,24
168:21
concern 35:2
106:5 112:15
138:2 166:15
167:16
concerning 6:17
36:14 79:20 95:24
117:1 206:7,21
217:7
concerns 101:10
concert 91:11
concierge 2:18
34:20,21 38:22,25
39:4,10 74:25
75:7 76:1 196:4,8
conclude 237:17
concluded 105:10
125:17 128:9
129:1,7
concludes 237:19
237:22 238:2
conclusion 47:24
56:25 58:20 59:22
67:22 83:23 94:16
95:6 100:22
101:14 123:19
126:23 128:5
130:11 187:25
condition 191:23
192:1,19
conditions 85:21
conduct 30:22
57:18 72:23 73:2
82:13 105:24
111:19 121:15
conducted 4:13
5:1 57:10 58:8
71:7 107:13,15
conducting 35:9
73:22 83:3 93:20

101:8 123:5
confer 108:24
conferences 41:15
41:16,22,25 42:17
42:24 43:16
conferring 109:1
confident 69:9
79:14 164:23
confidential 79:14
confirm 34:20,22
70:7 176:25
confronted 180:22
confused 48:3
116:5
confusing 14:21
conjunction 16:12
53:8 121:5
connected 16:9
222:6 241:21
connecting 200:17
connection 4:14
18:16 214:24
consensus 129:15
129:17 193:12
conservator
161:18 162:4,14
162:21 163:13
164:20 179:25
180:4,6,22 185:12
188:18 209:10
consider 100:7,17
138:5
considerable
165:15
considered 37:8,9
64:12,17,23 68:4
129:7
consistent 35:10
93:18 95:25 99:1
151:18 190:10
205:20

Exhibit K
1020

consisting 241:15
constitution 35:11
constitutional
  26:4
consult 31:8,22
  81:18 158:24
consulted 140:10
  144:5 206:7,12
contact 115:14
  154:20 161:22,24
  200:1 209:11,11
  210:8
contacted 231:25
contacts 154:20
contain 61:8,8
contained 215:11
container 86:8
contains 60:11,21
  60:23 63:4,8 87:4
  186:5 197:25
contemplated
  220:8
content 80:24
  137:1 142:10
  173:8 186:9
  201:22
contents 61:11,15
  62:1 80:8 94:7
  113:15 114:16
  126:6 155:4 161:1
  161:15 166:4
  170:14 186:1
  187:1,6,13 188:23
  189:3 201:1
  211:23 212:1
  213:6 217:9
  227:16 232:5
context 27:6 187:7
continuances 20:6
continue 4:17
  91:14 109:8 121:6

121:20 171:2
continued 17:20
  121:25 169:14
continues 124:20
continuing 33:14
  33:18,23 34:1
  35:15 36:10 72:18
  114:17 122:13
  171:3
contraband 59:14
contract 68:13
  140:20
contrarily 49:2
contribute 154:6
contribution
  113:2
control 39:9,11
  75:8,22,24 76:6
  113:11 132:6
  138:1,18 139:3,19
  167:19
convenient 111:17
conversation 7:25
  11:5 126:7 215:10
  215:23 216:19
  217:14
conversations
  126:2,4 142:19
  143:17 153:16
  219:11,13,15
  220:1
convictions 210:15
cooperate 168:2
cooperation
  103:15 167:22
  168:3
cooperative 168:1
coordinate 172:2
copies 36:4 169:5
  185:14,14 190:7

copy 97:8 156:24
  157:11,14,18,21
  157:24 158:8
  163:20 189:16,18
  189:20
core 120:24
  121:22
corporation 105:4
  105:8 106:13
  109:15,19 121:15
  124:8
correct 8:25 12:21
  13:24 14:8,9,15
  17:5,6,11,23 18:5
  19:1,11,17 20:4,24
  21:22 24:8,21
  25:24,25 27:8
  28:16 29:8 31:2
  32:13,15,16 33:8
  35:12 36:20,21
  38:9 41:19,20
  42:19,20 44:6
  48:8 49:13 50:7
  50:21,22,25 51:1
  51:12 53:1,18,19
  54:25 55:15,16,20
  56:24 57:6,8
  58:14 59:8 60:12
  60:14 61:12,13
  65:16,17 66:5,6
  68:25 69:24 70:14
  70:17 72:11 73:15
  77:19 81:8 82:7
  83:17,18 84:18
  85:3,4 87:17
  88:15 93:7,9,11
  96:20 103:25
  106:14,16 107:5
  107:20,24 109:20
  109:23,24 111:25
  112:14,22 115:8,9

121:10 122:2
  127:22 131:6
  133:24 134:13
  135:8 137:18
  141:22 146:2
  148:7,10 149:21
  150:10,11,19
  151:1 152:21,25
  153:1,4,5,7 154:12
  155:16,17 156:16
  159:11,14,15
  160:13,14,17
  161:25 162:10
  163:22 164:3,8,19
  165:12 166:5
  170:3 171:15,22
  175:1,2,17 177:4
  178:9,24 179:3,6,9
  185:22 186:20
  187:3,4,8,9 190:16
  190:20 191:13
  192:4,11 193:1,2,6
  195:21 196:10
  202:6,23,24 203:9
  203:21 204:16
  206:8 207:23
  208:4,22,23
  210:11 212:3,5
  219:3 223:8
  225:22 227:22
  228:4,9 229:8,9
  230:9,11 232:19
  234:6 241:16
corrections 240:1
correctly 28:13,14
corroborate 85:2
corruption 52:16
costco 25:12
counsel 2:13 4:21
  5:10,22 38:22
  75:8 236:18

241:20,21
counselor  213:14
counselor's  40:21
count  69:2,9,11,13
  69:15,18 70:6
  71:3 72:5 85:16
  88:15,16 141:15
counterintellige...
  24:1
counters  122:3
countersign  89:21
countersignatures
  89:15 92:6
counterterrorism
  24:2
counting  69:16
  71:16 72:9 85:16
  141:15
country  174:10
county  12:23,24
  16:12 17:15,16
  42:1 241:2
couple  91:17
  113:9 165:23
  169:1,8
course  8:17 19:20
  57:23 58:2 131:5
  139:16
court  1:1 4:23 5:4
  5:21 7:8,10,14 8:1
  8:10,24 9:3 20:6
  34:6 129:20 241:4
courts  193:20
cover  24:1
covered  148:23,24
covid  155:24
crack  129:3
cracking  124:4
craft  11:13
crafted  149:5

crafting  50:4,24
cramped  179:14
  179:21
crates  178:19
create  44:10 73:5
  148:11 151:25
  174:15 178:17
  203:23
created  85:17
  88:16 149:24
  152:2 155:14
  198:10 203:25
  204:6 207:14,15
creates  69:13
creating  152:16
  191:8 231:6
creation  113:2
credit  16:23
crime  15:4,6,13,14
  17:22 24:2,3
  25:22 26:20 27:18
  27:19 45:17,21
  46:4 121:20
  133:18 220:7
  227:6,9,11,17
crimes  16:22 18:2
  26:16 111:14
  121:17,19 204:20
criminal  25:6,9,14
  25:21 26:2,15
  27:10 34:3 65:16
  73:14,19,22 74:7
  104:24 105:23,25
  106:10,10 110:9
  110:16,19 111:11
  111:16,18,19
  112:5,8,16,21
  113:14,15 114:16
  116:16,20,22
  117:19 118:1
  119:13,21 120:4,6

121:12,16 124:10
  124:12 168:10
  191:1,11 192:25
  205:8,16 210:12
  210:19,21 211:1
  212:2 219:20
  221:14 224:15
  225:13 230:11,13
criminality  59:14
criminals  104:23
  105:24 111:17
  116:22 117:2,14
  117:20,21,23
  118:1,13,17,19,20
  119:8,17,25
crowded  178:18
cruz  13:7
crypto  64:11,24
cryptocurrency
  64:11 197:16,18
ctrs  211:15
cubic  86:3
culminated  109:13
culture  52:21
currency  68:15
  140:21 174:9,9,11
  196:16,17,20
  197:2,7,23 198:1
current  98:5
currently  13:19
  14:25 15:12
custody  58:22
  59:6 87:2,8
  115:18 136:18
  139:13
customers  104:25
  105:3,11 109:23
  111:23 112:9,21
  117:10 119:13
cut  225:10

cutter  23:5
cv  1:9 4:25

**d**

d  3:1
d.c.  228:18 229:4
damage  58:24
  100:10
damaged  68:20
dangerous  59:12
  63:8,9
dangers  64:25
database  210:17
  211:1 224:14,18
  224:23 225:19
databases  210:9
  210:12,14,19,20
  210:22 211:3,4
  226:12,20
date  208:10
  218:12,20
dated  239:9
  241:23
davis  10:13 13:8
day  4:2,2 57:15
  59:25 67:6 134:7
  147:21 149:16
  150:18 167:8,24
  241:6,7,23
days  150:10,22,24
  172:25
dea  104:6,6,8,12
  104:16 105:1
  106:15,24 107:15
  107:19 126:14,16
  143:14 144:19
  145:2,6,22 146:19
  147:9 148:24
  149:1 152:7,9,10
  152:14 153:22
  154:3,22 174:24
  175:4,6 178:5,7

Exhibit K
1022

185:3,5 216:1
232:14 235:22
**deadly** 25:8,14
**deal** 207:1
**dealer** 110:11
118:4
**dealing** 42:18
129:2
**dealt** 37:12
**dear** 65:20
**decide** 10:4 86:3
213:23 225:12
**decided** 120:22
200:10
**deciding** 212:11
216:10 226:18
**decision** 129:16
212:16,23 213:2,4
214:9 217:15
225:7,20 227:4,14
232:9
**decisions** 225:16
**declare** 239:3
**declared** 128:24
**dedicated** 19:10
**deep** 188:2
**deeper** 225:14
**defendants** 1:15
2:8 5:19 11:11
75:12 76:25
236:18
**defending** 214:9
**defense** 23:9
194:17
**defensive** 23:23
**definitely** 56:20
**definition** 197:3
**degree** 13:4,15
58:16
**deny** 205:1

**depart** 201:25
**department** 17:14
102:25 106:25
144:6,8 147:1,2
**departments**
53:12 106:23
147:8 154:1,2
**depend** 95:11
**depended** 210:18
211:19 222:3,4
**dependent** 47:8
**depending** 95:16
**depends** 4:13 69:7
95:10 230:6
**deponent** 241:14
**deposed** 6:22 7:2,4
241:11
**deposit** 114:17
116:15 118:12
120:4,7 121:25
124:5,14 141:2,6
141:11 165:2
195:2 205:10,14
205:14 214:25
215:1 226:22
231:23
**deposition** 1:18
4:12,20 5:1 7:6,25
23:11 77:11,15
214:9 238:2
241:13,17
**depositions** 7:22
237:11
**deputies** 103:3
**describe** 23:20
41:24 58:17 86:10
131:17
**described** 20:25
116:19,21 221:12
**describing** 113:14

**description** 88:13
89:23 167:11
**descriptive** 86:5
**designees** 160:25
161:14
**despondent** 174:8
**detail** 235:8
**details** 54:10,21
55:2,8,18 141:4
**determination**
211:25 225:3
226:15 227:5
228:2,10 229:13
**determine** 73:2
115:23 160:7
162:7 207:22
212:6 221:19
223:18 224:8,16
**determining** 226:4
226:23
**detroit** 12:8
**device** 76:3
**devices** 194:22
195:2,16,19
**devote** 150:5
**diamond** 86:3
**dictionary** 33:1
**diego** 42:7
**difference** 48:19
121:10
**different** 20:24
21:18 23:20 24:2
28:3 33:12,19
62:12 67:23 68:5
73:12 94:3 95:2
104:25 106:23
107:1 124:1
125:16 133:5,7,19
136:11,15 146:21
147:11 148:1,14
149:15,18 158:11

162:19,20 169:2
173:25,25 174:13
174:15 177:18
178:19 225:18
228:24 232:12
**differently** 68:1
174:1
**differs** 69:22
**difficult** 8:1 52:11
88:3 132:22
133:13 158:21
**difficulty** 130:1
146:11
**digital** 60:3 167:19
176:1 194:22,23
195:2,15,16,19
196:16,17,20
197:1,6,10,12,13
197:16,19,23
198:1,8
**diligence** 224:7,16
225:11
**diog** 30:18,20 31:7
31:10,14,22 32:1,2
32:9,10,14,18,19
74:19 75:12 77:9
77:16,21 80:6,15
80:21 81:3,6,9,19
97:9,23 98:5
123:2,8,11 124:18
**direct** 37:16
189:20
**directed** 110:24
156:8,9
**direction** 139:22
**directly** 115:12
151:3
**director** 1:13
**dirty** 18:9 105:21
**disagree** 217:6

**Exhibit K
1023**

[disappeared - drugs]                                                        Page 13

**disappeared** 85:9
**disappearing**
  84:22 85:8
**disclosure** 216:24
**discovery** 75:13
  77:1
**discs** 195:17
**discuss** 123:3
  127:11 156:15
  183:3 201:7 235:7
  235:8
**discussed** 125:20
  127:10 128:18,19
  129:11 140:8
  154:15,23 163:6
  193:11 215:15
  217:23 218:4,11
  220:15,17
**discusses** 123:11
**discussing** 66:24
  126:22 127:11
  208:19 214:23
  221:4
**discussion** 76:18
  112:24 114:7
  215:18,19 216:4
  217:6,9
**discussions** 80:12
  125:23 127:2,3,4
  128:8,8 131:24
  139:4 142:7
  143:13 144:2,10
  154:17 200:4,9,12
  200:23 202:15
  219:21 220:12,22
  221:3,5,9
**dishonest** 91:6
**dismantle** 124:9
  124:11,12
**dispute** 90:13,21
  90:24

**disputes** 164:11
**disrupt** 124:11
**disseminated**
  157:22
**distinct** 83:13
**distinguish** 54:7
**distributed** 233:6
**distribution**
  235:11
**district** 1:1,2,12
  4:23,24 111:4
**divide** 154:5
**division** 1:3 4:24
  15:20
**divorce** 164:9
**document** 39:18
  40:6,21 75:18
  76:6 79:1,21 80:1
  80:6,14 81:13,23
  81:24 96:25 97:15
  109:3,3 115:1
  116:12,17 117:15
  117:17 119:10
  148:1 159:14
  162:12 176:19
  181:14,15,17,21
  182:9 183:3,23
  184:6 185:18
  186:1,15,16 188:7
  189:15 202:8
  203:17 205:1,18
  205:21 206:10
  207:6,7 208:20
**documentary**
  92:10
**documents** 11:6
  11:11 54:13 56:14
  82:9,11 87:19,20
  87:22 185:6,10,24
  186:5,6,6 187:1,6
  188:17 195:12

  203:3 222:6
  226:22 236:23,25
**dog** 193:19,23,23
**dogs** 153:6 154:11
  155:1 181:11
  182:23 183:1,3,10
  183:18 184:5
  193:7,10,15 194:7
  232:9
**doing** 22:25 24:4
  28:7,18 33:20
  35:25 44:21 47:9
  57:22 61:25 67:4
  72:17 74:14 84:3
  84:17 85:14 90:7
  105:12 110:23
  112:12 134:5
  135:2 136:24
  138:23 141:15
  146:14 151:4
  152:17,20 156:14
  159:13 168:9,25
  178:12 179:24
  180:18 190:4
  200:15 225:19,19
  227:15 232:1
**doj** 44:6 233:22
**dollars** 211:21
**domestic** 30:18
  76:24
**door** 163:21
**doors** 167:24
  168:4
**double** 13:7
  139:14 141:16
**downloaded** 97:17
**dozens** 52:24 53:2
  53:2
**draft** 81:20 114:17
  203:10,14 206:13
  207:6

**drafted** 116:7
  149:11 160:11
  182:9 206:4,10,10
  208:4
**drafting** 79:5
  80:14,17 81:10,13
  81:19 206:4
**drag** 26:25
**drawer** 87:23,23
  174:5
**drawn** 169:3
**drill** 228:12
**drive** 60:1,1,2,9,11
  73:24 74:2,3
  174:2
**drive's** 60:3
**driver's** 61:6 62:3
  63:14 162:18
  185:14
**drives** 194:24
  195:16,16
**drug** 15:21,22
  16:4,6,8,17 17:10
  21:3,4 22:11
  26:21 36:24,25
  37:1 45:14,15
  48:21 52:2 54:13
  102:25 103:1
  110:10,11,14
  111:5 118:3
  128:21,22 146:6
  153:6 154:11
  181:11 182:23
  183:1,3,10,18
  184:4,5 193:7,10
  193:15,18,23,23
  198:8 232:9
**drugs** 54:14 56:16
  71:11 84:13,16
  85:5 111:6 192:15
  192:24 197:14

Exhibit K
1024

220:8

**drunk** 174:5

**due** 224:7,15
  225:11

**dues** 14:6

**duly** 6:2 241:10

**dye** 47:5 191:24

**e**

**e** 1:23 3:1 4:5 6:11
  99:25 100:3 101:2
  101:16,17,19
  108:15 241:4,25

**earlier** 8:22
  112:24 140:15
  232:2

**early** 12:19 21:9
  48:20 50:12
  203:10,13

**easier** 15:16

**easy** 59:25 110:11
  111:16 132:22
  220:9

**edition** 89:5

**education** 12:25
  50:11

**effect** 124:22

**effective** 100:13
  105:12

**effectively** 130:16

**effectuated** 122:14

**efficiently** 130:17

**eight** 12:18 169:24
  237:24

**eimiller** 201:19,20
  202:15 206:24

**either** 9:3 38:3
  53:16 59:15 85:7
  94:12 121:5 147:9
  185:3,6,19 232:22

**el** 106:24 107:1
  144:6,14,23 145:6

145:15,20,21,25
146:20 147:1,4
148:24 152:22
232:15

**elements** 18:7

**else's** 45:19 52:7
  54:9

**email** 199:1,1
  201:18 203:1,18
  205:2

**emailed** 207:11,12
  207:12

**emails** 34:11,22
  204:8 207:5,7,10

**emphasis** 16:10

**employ** 100:2,18

**employed** 100:7

**employee** 241:21

**employees** 112:9
  132:8

**employment** 36:23

**empty** 179:18

**enabling** 105:23

**encompassed**
  149:8

**encounter** 66:25
  67:9 162:5,8

**encountered**
  162:21

**encyclopedia**
  32:24 33:1

**ended** 175:15

**ends** 41:11 56:10
  115:11

**enforcement** 43:1
  43:8 58:6 104:11
  104:20 117:21
  144:20,21 218:18
  222:23 223:24
  224:3 233:11

**engaged** 210:1

**engine** 120:25
  121:22

**english** 13:7

**ensure** 55:23
  164:18 196:21,25
  197:23

**enter** 182:19
  190:13

**entire** 42:8 86:7
  92:3 147:19
  193:17

**entitled** 213:16
  234:16 241:11

**entity** 105:4

**envelope** 60:15,16
  60:18,18,19,20
  61:2,10,11,15,19
  61:21,25 62:19,20
  62:21,23 63:3
  64:7,8,9 65:4,13

**envy** 179:22

**equally** 122:14

**equipment** 132:11

**equitable** 233:23
  234:5,17

**equivalent** 180:23

**errata** 240:1

**especially** 52:1
  66:3 129:20

**esq** 2:5,10,13

**essentially** 121:3
  127:23 152:23
  175:13

**establish** 187:2

**establishing** 169:7
  185:20 187:7

**estimate** 230:3

**et** 4:22,22

**evaluation** 85:25

**event** 87:8 161:1
  161:15

**eventually** 168:5

**everybody** 22:17
  105:9 132:14
  154:5 159:8 169:4
  197:17 235:18

**everybody's** 111:2

**evidence** 10:7 46:3
  46:3,5,9,10,11,14
  47:10,17,24 53:24
  59:14 62:17 63:1
  63:2 67:21 70:3
  73:4 86:11,22,22
  86:25,25 91:1,25
  92:10 94:16 95:7
  100:5,22 101:12
  108:4 121:13
  123:20 125:14
  130:10 132:4,5,6,8
  132:9 133:17,21
  135:11,15,17
  136:7,14,17 139:2
  139:5,7,13,16,18
  156:7 163:10
  165:13 168:20
  169:21 182:16,18
  182:19 184:15
  187:22 188:8
  190:3,12,13
  195:16 196:17,19
  196:25 197:7,12
  197:13,13 204:23
  207:9 213:18
  214:13 215:4
  219:6,19 220:24
  221:24 222:25
  223:22 227:10
  228:7 233:18
  234:9 235:1

**Exhibit K
1025**

**evidentiary** 46:20 47:3,7 121:8
**ex** 164:15
**exact** 8:23 87:5
**exactly** 26:17 28:20,21 141:5 178:11 181:1
**examination** 3:3 6:5
**examined** 6:3
**example** 21:3 47:5 87:19 88:24 91:5 106:24 110:10 111:1 128:22 135:11,19 137:2 144:6 146:6 158:20 162:18 164:19 176:19,21 176:21 192:17 220:7
**examples** 83:1 111:8
**exceeded** 190:18
**excel** 196:21 197:2 197:24,25 198:2
**exception** 65:18
**excerpt** 75:11 77:4 80:6,15,21 81:3,6 81:9,19
**exchange** 42:12 111:8 112:3 146:12
**exclude** 57:15
**exclusive** 53:14
**excuse** 219:12
**execute** 29:15,18 30:6 52:19,25 53:6,8,17,21 54:3 55:10,14 56:22 131:20,25 134:22 139:4 140:5 142:6

142:8 143:13,17 144:2 148:5,12 149:2 154:23 155:13 221:7
**executed** 51:17 54:2 55:3 134:17 167:9,20 168:10
**executing** 51:15 52:3 54:9,23 55:19 120:19 132:25 134:7 149:5,25 153:23 172:4 232:13
**execution** 6:18 133:8 137:16,22 138:19 139:8 142:20,24 143:23 144:13 147:24 153:10,12,18 154:6 155:21 167:6 172:14 204:14 219:16 220:2,16,20 221:6 231:17 234:15
**executives** 43:1
**executor** 161:18 161:23 162:14,21 163:12 164:20 180:6 185:11 209:10
**exemplars** 51:2 82:18
**exhaustive** 40:18 87:18
**exhibit** 3:8,8,9,9 3:10,10,11 38:14 38:15,18,18,18,20 39:9,22 74:24 75:3,5,11,22 76:23 76:23 97:1,3,4 99:9 109:5 113:4

113:4 114:11 159:19 161:3,5,6 161:19 180:1,1 181:23,25 182:6 189:14 194:19,20 195:22 196:1,10 196:13 199:3,4 201:10,10,11 208:8,17,18
**exhibits** 3:7 49:21
**exist** 123:8 180:7
**existed** 135:25
**existence** 12:14
**exists** 32:10,10 199:12
**expect** 8:20 88:11 95:20 150:5 173:19 186:5 193:21
**expected** 119:12 150:22,23,25 173:1,3,13
**expecting** 88:23 118:17,19 119:25 120:3
**expensive** 14:4
**experience** 22:13 24:11 32:11 47:15 47:19 50:21 53:22 130:23 131:10 192:16 224:3
**experienced** 37:1 37:4
**expert** 37:8 138:13 233:9
**expertise** 86:4
**experts** 139:23
**expired** 17:19,19 17:20
**explain** 20:8 22:15 25:1 30:5 83:6

93:19 104:18 109:25 130:2,6 140:15 151:20 197:5
**explanation** 197:17
**explodes** 47:6
**explore** 124:4 125:11
**explored** 124:17
**extend** 115:23 160:6 162:7
**extent** 27:4 34:2 57:3,4 58:19 77:23 78:6 79:1 100:15 126:3 130:16 134:11 170:18 185:18 186:24 193:21 200:25 215:19 216:13 219:21 220:14,21 224:6 237:12,12
**extra** 84:5,24 143:8 152:5 173:9 173:10
**extremely** 162:15
**eye** 59:18 103:5
**eyeball** 122:4

**f**

**fabricating** 91:12
**facilitating** 111:23 112:16,21 121:20
**facilitation** 41:15 112:8
**facilitator** 105:18 105:19,20 106:3 110:1,5,6,25 111:9 111:10,16,20
**facilities** 117:2 120:23 121:15

**Exhibit K**
**1026**

132:10 156:7
**facility** 152:24
  216:12
**fact** 10:9 33:24
  93:3 150:23,24
  166:11 177:3
**factor** 164:5
**factors** 166:8,10
**facts** 46:14 47:23
  53:24 67:21 70:3
  91:1,25 94:16
  95:7 100:22
  101:12 108:21
  123:19 125:13
  130:10 204:23
  207:9 213:17
  214:13 215:4
  219:5,19 220:24
  221:24 222:24
  223:22 228:7
  233:18 234:8
  235:1
**failed** 208:24,25
**fails** 136:18
**fair** 18:3 26:1
  27:23 28:13 32:9
  35:5 36:25 37:4
  37:18,21 46:2,19
  47:14,19 50:6
  54:23 55:3,19
  56:21 58:10 63:4
  70:5,21 71:6,19
  72:21 73:11,17
  74:8 82:4 87:13
  96:17 100:14
  101:10 107:11
  109:9 131:2 148:5
  150:25 155:2
  156:20 157:16,20
  172:12,12 185:17
  205:9 208:3

211:24 233:13
**faith** 9:12
**familiar** 18:25
  82:25 96:9 101:18
  130:22 199:12
  205:1
**familiarity** 18:10
  50:20 233:5
**family** 12:17
  164:11
**famous** 111:5
**far** 40:17 131:3
  145:14 234:20
**fast** 99:11 135:12
  135:15 137:13
**faster** 151:23,25
**fat** 31:7
**father** 164:10
**favor** 48:1
**favorite** 12:10
**fbi** 6:12 7:1 8:15
  13:23 14:1,10,13
  14:24 15:13 16:17
  20:18 22:5,16
  23:2,3,14,15,21
  26:3 30:21,21
  32:12 33:11,14,25
  35:6,10 36:20,23
  37:9 44:11 46:24
  47:15 49:15,17,20
  50:13,24 51:3,17
  53:5,8,9,15,20
  55:12 57:14 59:9
  59:11 63:23 67:14
  68:13 70:11,21
  71:2,4,22 72:6
  73:1 90:10 92:21
  93:2 95:23 96:1
  97:10 98:7,25
  100:14,16,25,25
  104:1,9 106:15

107:15 115:18
  122:8,24 127:20
  127:21,23 130:13
  131:24 133:7
  140:3 141:17
  142:4,5 143:10
  146:19 147:9
  148:24 151:4,6,7,7
  151:9,9,16 152:20
  153:15,15 154:22
  156:25 157:17,22
  158:5 159:13
  163:19,23,25
  164:25 166:1
  167:8 170:5,19
  175:8,15 178:5,7
  179:1 182:5,18
  184:17 185:3,5
  188:23 189:14
  190:12 191:19
  195:1,9 199:1,21
  200:14,17,23
  201:18 202:10
  203:13,16 205:13
  206:8,21 207:21
  208:8,20 209:6
  210:8 212:19
  221:18 222:16
  223:17 225:3
  226:21 230:22
  231:2 232:15,24
  233:16,21
**fbi's** 98:10 99:2
  100:19 101:17
  131:5 153:18
  227:21
**fd** 82:18,19,25
  83:2,7 85:10 87:4
  87:12,16 88:9,10
  90:12,17,20,22
  91:8,12,19 92:2,18

93:16,17,21,24
  94:11 95:3,20,24
  96:2,10,19 139:13
  191:17
**feasible** 128:10,10
  129:2 130:7
  131:15,15 194:2
**federal** 1:14 2:12
  5:20 8:18,18,21
  16:13 53:13,16,21
  106:15,17 107:8
  143:12 205:11
  237:10
**feel** 71:16
**feels** 60:16
**fees** 161:2,16
**fellow** 71:4,14
**felt** 141:14
**fentanyl** 61:9
  63:12 65:2
**fewer** 32:21
**field** 15:3 19:9
  21:13,16 29:3,6,25
  30:12,17 32:20
  51:3 85:14,20
  88:17 95:12
  132:13 137:18
  227:21 228:16
  229:7 231:3
**fifth** 148:20
**fifty** 12:6
**fighting** 217:12
**figure** 7:2 69:1
  74:22 76:11 87:11
  108:17 151:3
  168:16 202:12
  205:11 209:25
**figured** 49:10
**file** 20:6 87:20
**filed** 4:23 209:16
  211:12

Exhibit K
1027

[files - found]                                      Page 17

**files** 56:14,15
158:23 195:7
207:21
**filings** 182:24
**fill** 73:7 87:1 95:4
96:11 173:5,5
200:1
**filled** 82:19,19
83:1,2 93:17,18
209:5
**filling** 93:20 96:2
96:19
**financial** 68:12
211:10
**financially** 5:7
241:22
**fincen** 211:5,8,9
224:23
**find** 11:12 33:2
46:3,5,9 66:1,25
67:5 86:10,14
120:3,9 210:9
218:19 221:13
**finding** 69:5
**fine** 9:15 11:20
15:18 35:1 36:18
43:18 49:9 102:2
196:11 233:7
234:23 236:3
**fingerprint** 184:14
**fingerprints**
184:17,23
**finish** 8:3,6 9:17
11:1,2 169:20
**firearm** 198:8
**firearms** 23:23
197:14
**firm** 1:23 5:5 6:15
23:4
**first** 6:21 15:19
25:1 39:15 50:23

71:21 72:7 89:10
102:19 103:17
106:6 120:17
125:22 131:23
168:24 169:1
188:18 197:5
201:19 214:22
215:9,15 217:14
218:3 225:10
236:18
**fit** 165:3
**fitness** 23:24
**fitting** 166:5
**five** 105:10 146:21
172:21 198:12
206:18 228:24
236:6,7
**flier** 201:24 202:5
**flip** 51:14 186:16
186:16
**floor** 2:10
**flow** 7:24
**flower** 110:12,13
**fluctuated** 152:2
**flyeruspvdraft.d...**
203:6
**focus** 16:25 18:3
21:12 67:3
**focused** 41:2
**folder** 38:17 75:5
**folks** 76:3
**follow** 55:24 66:23
92:13
**followed** 92:5
**follows** 6:3
**footnote** 115:17
160:4
**force** 15:21,25
16:2,4,11,14,15
17:4,8,10,13,17,19
17:25 18:15 21:1

25:8,15,15 36:25
42:2,2,18 53:17
102:25 106:24
107:4,9,13,18,23
145:3,6,7,21 147:9
153:11,13 204:15
204:20
**forces** 20:25 21:3
42:5,10 53:10,11
58:5 147:11
**foregoing** 239:4
241:15
**foreign** 100:12
174:9,11
**forest** 4:4 241:8
**forfeited** 140:22
232:22 233:12
234:12 235:12
**forfeiture** 2:9 18:8
18:10,11,11,17,25
19:3,4,4,10,15,16
19:19,21,22 20:1
20:12,14,17 21:2,7
21:15,24 22:3,6,12
36:8,11,14 37:5,9
37:17,22,24 38:2,3
38:4 41:1,14
42:25 43:9 44:20
45:16,23 47:4,4,8
47:11,21 140:9,13
141:7,23 142:22
143:2 182:18
189:17,21,24
190:3,7,12 191:19
194:13 210:4
212:7,13,19,21,24
213:5,19,24
214:10,13,23,24
215:3,10,23
216:11,20 217:8
217:16,20 218:5

219:1,2,11,13,18
220:1,18,25
221:14,20,21,22
222:19,23 223:18
223:21 225:4,8
226:5,7,19,23
227:1,13,19,20,24
228:3,3,6,14,22,23
229:7,14 230:20
230:23 231:2,7,13
231:23 232:23,23
232:24 233:5,15
233:25 234:5
235:11,17,24
**forget** 141:11
**forgot** 98:24
**form** 68:6,16,18
83:8 140:19
198:24 199:8,9,10
199:16,18 200:1
200:24 203:9,13
206:8,21 208:19
208:24,25 209:15
210:10 222:17
225:22
**former** 164:11
**forms** 51:2 73:7
85:4 209:5,25
221:17
**forth** 20:9
**forward** 15:16
185:4 198:21
214:10 222:18
225:8 227:12
**forwarded** 204:11
**found** 141:1
142:25 181:9
185:7,10,18
188:18 210:3
224:6

Exhibit K
1028

**foundation** 26:7
44:13 45:3 46:13
47:23 53:23 67:21
70:2 91:24 95:7
98:12,12 100:21
101:13 122:18
123:18 125:14
128:4 130:9
204:22 205:17
206:18 207:9,25
213:7,17 214:14
219:5,20 220:23
222:24 223:23
228:8 233:1,18
234:8,25
**four** 12:6 24:20
33:10 52:6,8
91:10 99:22
115:11 129:15
148:16,19,23
150:10 151:16
152:5 160:19
167:20 172:24
**fourth** 64:18
151:21,22,24
**frankly** 39:23
83:11 106:5
149:15
**fraud** 16:23,23
52:15 54:12
158:20
**frequently** 16:9
52:6 192:18
**fresh** 10:20
**friday** 1:20 4:1,10
150:13 169:15,19
241:6
**friedman** 23:4
**frommer** 2:5 3:4
5:13,14 6:6,13,14
26:8 31:1,5 34:13

34:16 35:1,4
38:11,16 39:3,8,12
39:14 40:1,4,17,19
41:5,8,9 44:16
45:6 46:1,7,16,23
47:13 48:1,6,11
54:1 57:2,9 59:7
60:8 66:8,15,21,22
68:9 69:4,20 70:4
70:12,18 71:1,13
72:3,12 74:20
75:2,4,9,10,16,19
75:23 76:7,10,21
77:2 78:1,4,5,10
78:14,17,20,23,24
79:11,24 80:13
81:1 84:14 90:3
90:16 91:13 92:12
93:1,10,25 94:4,5
94:18 95:21 96:12
96:21 97:2,7,21
98:15,18,22,23
99:5,11,17,23,24
101:3,21 102:4,6
102:13,15 108:9
108:16,23 109:7
109:11 113:3,7,8
113:17,20,23
114:2,10,13 115:5
115:6 116:24
117:6 118:6,21
119:4,19 120:13
123:1 124:3
125:19 126:9
128:13 130:4,5
131:1,16 142:15
155:10 159:23
160:1,22 161:6,9
161:10 163:16
166:19 167:3
170:23 171:6

181:16,24 182:3,4
188:12 189:5
195:22 196:9,12
198:11,19 199:2,6
199:7 201:6,9,12
201:15,17 202:9
204:4 205:6,22
206:1,2,6,11,19
207:16 208:2,7
213:9,12,20,21
214:3,7,21 215:8
215:17,21 216:8
216:18,25 217:3
217:11,13 218:8
218:21 219:8,24
221:16,25 222:1
223:2,7,11 224:10
224:22 225:1,25
226:2,16 227:18
228:11 230:8
233:4 234:1,13
235:4,20 236:5,15
237:18
**front** 8:25 50:7
108:14 178:20
179:8 183:3
186:17
**full** 6:10 9:19,22
11:25 62:19,20
64:2,2 172:24
241:16
**fuller** 236:24
**fully** 119:12
**fumbling** 76:12
**fun** 24:14
**funded** 42:5,9
**funding** 42:3
**funds** 210:2
**further** 111:18
115:23 160:6
162:7 225:12

237:2 241:19
**future** 10:5 194:10
**fuzzy** 157:8

**g**

**gain** 80:5
**game** 181:20
**gang** 128:20
**gangs** 16:1
**garbage** 172:8,9
**garment** 111:4
**gasoline** 192:10,13
**geared** 26:22
**gears** 102:16
**general** 2:13 32:3
43:19 47:10 62:17
65:25 95:18
102:17 167:10
186:22 197:13,19
198:7
**generally** 25:24
28:4 36:9 51:20
57:12,24,24 65:3
67:16 69:14 71:6
74:15 82:22 84:10
120:21 146:9,14
166:8 172:2
179:12 181:18
190:17
**generate** 136:7
182:20 190:14
**generated** 121:19
135:21,23 141:7
169:22
**generates** 231:24
**generating** 190:5
**george** 148:18,25
167:21
**gestures** 7:15
**getting** 32:12 37:6
80:12 103:9,15
135:11 137:2,3

152:6 165:11
167:22 168:21
169:24 188:6
202:14,20 221:6
**give**  6:20 9:22
11:24 13:13 29:19
30:3,4 33:13 34:1
35:5 36:4 38:11
39:10 42:13 45:21
74:21 82:9,12
96:21 120:10
161:4 165:1,17
167:10 190:21
198:6 221:2
226:13 227:24
236:7
**given**  8:11 46:21
47:20 87:3,14,15
93:22 117:12
122:11 141:10
193:5 237:23
**giving**  83:11 90:11
133:12
**glebe**  2:6
**glendale**  147:2,6,7
232:16
**go**  4:18 7:5,14
10:12 11:12 13:5
14:16 15:16,17,18
28:10 29:1,18
31:6,10,15,16 32:1
32:4,24 33:2
34:24 39:8,12,13
39:19 41:1 42:14
49:5 50:15 52:10
52:18 53:24 56:3
60:2 62:15,16
66:9,12,12 67:7
68:12 76:3,7,15
87:25 92:18 97:11
102:1,6 110:3

111:10,12,14
113:3,24 114:10
114:25 116:18
117:3 120:9,11
129:20 132:12
134:9 137:4
139:22 141:19,20
143:5 151:23,25
155:18 158:20
159:19,20 160:18
167:7,15 181:12
184:11 189:16,21
193:23,23 194:19
194:19 195:22,25
201:15,16 208:17
209:20 213:19
225:14 237:12
**goal**  121:2 124:10
125:24 175:12
188:7,9
**goals**  100:19 125:9
125:18 128:11
129:8
**goes**  38:14 49:25
62:15 70:13 71:18
88:22 229:22,23
234:20
**going**  8:5 9:13
10:24 11:20 15:15
17:9 18:22 21:8
28:4 29:22 33:7
33:22 39:13,22
40:7 46:10 51:22
54:17,18,18,19,19
54:20 55:5 64:21
66:23 67:20,25
68:1,1,2 69:17
73:3,5,5,6,8 74:1,6
76:2 83:21,24
84:4 87:22,24
88:18,19,21 89:12

89:16 91:6,9,10,11
91:19,20 94:23
95:15 99:11
104:21 105:10
110:25 116:20
129:8 132:18,19
132:20,20,23
133:2 140:22
145:12 148:12
149:14 150:8
154:3,4,5,18
156:10,14 158:18
159:1,3 164:24
165:4,18,19,22
168:19 169:2,18
173:8 174:6
176:15 177:14,18
179:2 181:13
186:7,23 192:2
198:5 200:4,10
201:15 205:24
218:1,2 220:6
223:12 231:22,22
231:24 234:19,24
**gold**  59:4 112:3,5
112:6,18 143:1
146:12 164:15
187:10,15,16,19
188:14,16 223:15
223:16 224:2
**good**  4:9 9:12
22:19,19,22,23
39:6 43:14 50:9
50:11,11 52:20
84:24 102:3,14
105:12,13 110:24
163:13 164:22
170:10 171:20
208:14
**google**  211:6,7
224:14 226:12,20

**gothier**  1:6
**gotten**  21:24
141:10
**government**  10:5
100:12 128:23
222:18
**government's**  6:17
9:25
**grade**  13:1 64:18
**graduate**  13:9
**graduated**  33:10
**grand**  108:5,7,14
**grander**  200:17
**grant**  17:18,18,19
**grave**  166:15
**graveyard**  150:21
**great**  8:9 32:25
75:9 76:9 162:24
201:15 206:1
**ground**  6:20 7:5
147:16,19,23
**grounds**  155:6
201:4 217:2
218:17
**group**  42:11 103:1
126:23 132:4,5
133:15 134:16
143:16,20 154:22
179:7,10 216:3
**groups**  41:25
42:11 52:5,8
146:21 153:11
156:9 232:13
**guard**  85:11
**guess**  21:12 22:3
44:11 45:7 51:14
56:2 58:12 59:20
64:6 88:24 89:10
89:11 90:4 91:17
91:17 118:7
154:21 196:23

**Exhibit K
1030**

202:11 205:19
**guessing** 67:2
  127:21 181:20
**guidance** 31:14
  72:25 82:12
**guide** 30:19 51:3
  76:25
**guidelines** 51:9
  74:17
**guides** 30:5
**guiding** 159:12,14
**guns** 54:14 56:17
**guy** 28:9 45:22
  105:20 139:5
**guys** 7:2 76:11
  138:6 139:7
  202:18 206:25
  232:1 233:25

**h**

**h** 6:11
**habit** 7:13
**half** 15:23 145:16
  175:21
**halt** 121:9 125:7
  129:12
**hand** 20:1 37:23
  52:9,14 53:4 70:7
  139:24 159:7,9,11
**handbook** 82:15
**handcuff** 27:19
**handcuffs** 27:15
  48:24
**handed** 36:2
  157:14 193:3
**handle** 18:21 21:2
  71:10
**handled** 84:6,7,13
  87:3 144:17,19
**handlers** 146:25
  146:25 147:3

**handles** 49:19
**handling** 21:7
  24:3
**hands** 134:6 152:6
  165:16
**hang** 113:16
**happen** 37:15
  43:15 68:11 89:12
  89:17 95:16
  127:20 137:13
  172:16
**happened** 59:3
  60:23,24 95:3
  131:12 165:7
  185:1 198:4
**happening** 122:21
  122:23 137:13
**happens** 10:18
  29:10,11 37:13
  122:23
**hard** 10:25 49:7
  84:12 98:19
  103:11 150:20
  165:24 179:17
  194:24 195:16
  217:21 221:2,2
**hate** 12:4
**hawkins** 133:25
  135:6,6
**hazardous** 59:1
  62:9 64:1 163:8
**head** 7:16 133:6
  227:22
**headed** 156:17
  217:25
**header** 117:7
**headquarters**
  200:14 207:3
  227:23 228:17
  229:1,4 231:14

**health** 52:15 54:12
  158:20
**hear** 102:19
**heard** 4:15 24:7
  43:21 59:8 102:23
  103:17 110:2
  170:22 200:21
**hearing** 98:19
**heat** 88:21 143:8
**heaton** 133:14
  148:22
**heavy** 55:7
**held** 70:11 76:18
  114:7
**hello** 5:13
**help** 11:6,8,12
  43:20 49:5 51:9
  52:5,10,11,17,18
  52:19,22 81:9
  85:11 90:12 91:20
  91:21 95:13 99:20
  135:6 138:10,14
  138:23 139:18
  140:15 177:2
  180:24 225:17,18
  226:3,4
**helped** 52:25
  107:25 136:22
  137:12 146:10
  151:25 172:8
  213:23
**helpful** 25:18
  99:19 128:7
  146:13 162:15
**helping** 81:20
  107:2,9 134:8
  151:13 152:8
  168:16 172:1
  191:16
**helps** 107:6

**hereunto** 239:6
**hesitate** 58:4
**hey** 19:23 37:14
  45:20 59:3 60:22
  63:16 90:11 106:8
  164:14 209:20
**hidta** 16:5,6,7,10
**high** 16:5 17:8,9
  36:24 84:8 134:9
  142:25 172:11
**higher** 136:4
**highlighted**
  113:12
**hills** 129:4 144:8
  144:14,22 145:7
  145:15 146:20
  152:23 232:17
**hire** 127:23
**history** 36:22,23
  210:19,21 224:15
**hit** 75:6 101:24
**hitting** 165:24
**hogan's** 24:6,12
  27:9 28:7
**hold** 11:21 22:4
  34:10 51:22 75:7
  115:3 136:8
  185:13 186:6
  196:4
**holder** 162:16,25
  166:7 170:15
  180:13 184:22
  223:17 224:8
**holder's** 208:21
**holders** 123:16
  191:20 199:21,25
  208:15 209:2
  210:6 227:14
**holding** 20:20
**honestly** 52:11
  132:12 157:7

Exhibit K
1031

**hope**  29:19 102:13
  102:14
**hopefully**  38:14
**hoping**  79:25 80:2
  80:5
**hour**  4:2 41:13
  102:2 134:25
  145:16 241:7
**hours**  147:21
  150:14,18 169:24
  237:11
**house**  54:19
  128:22 129:3,4
  135:3 138:2
**huge**  143:1
**huh**  7:14 133:22
  177:15 203:7
**human**  94:22
**humanly**  68:19
**hundred**  34:4
  97:14
**hundreds**  52:24
  53:1 97:15,15,16
**husband**  164:9,15
**hypo**  176:24
**hypothetical**
  90:21 91:1,24
  95:6 96:6 101:12
  131:8 214:14
  215:5

---

**i**

**i.e.**  100:6
**idea**  64:25 176:17
  177:25 193:9,12
  193:15 199:24
  220:8 231:13
**ideal**  85:15,21,21
  151:21
**identical**  94:7
**identification**
  39:23 44:2 140:23

185:25
**identified**  20:17
  21:14 128:17
  174:10 218:23
**identifies**  115:15
**identify**  19:25
  20:12 39:21 44:2
  45:20 58:23 66:3
  86:6 89:19 99:14
  108:13 115:21
  142:9,10 184:22
  218:13 228:20
**identifying**  74:11
  79:19 86:8 103:12
  162:16 184:24
**identity**  78:14
  79:15,16 217:4
**ignore**  59:15
**iii**  50:13
**immediately**  194:2
**implicated**  124:24
**imply**  205:14
**important**  8:3 9:5
  9:19 56:9 84:5
  111:12 137:11
  158:15,25 164:7
  164:12 167:18
  209:1
**impracticality**
  131:3
**impression**  24:12
**improper**  10:6
  79:12
**inactive**  13:20,25
**inadvertently**  26:4
**inappropriate**
  65:14 73:21
  185:23 186:19
**include**  155:3
  160:24 161:13
  210:12 220:22

**included**  153:17
**includes**  25:7 74:1
  105:1 224:18
**including**  5:10
  42:25 106:15
**incomplete**  90:25
  91:24 95:5 96:6
  101:11 131:8
  214:14 215:5
**increase**  179:4
**increased**  117:24
**incredibly**  88:3
**independently**
  76:5 85:1
**indicate**  65:23
  210:15
**indicative**  163:4
  192:14,14
**indicia**  65:15
  180:8,13 185:11
  186:10,13 195:12
  195:13,18,20
**indicted**  121:16,17
**indictment**  28:6
  108:2,6,20 109:4,8
  109:14,17,22
**individual**  104:25
  105:2,11,13 158:9
**individuals**  184:25
  220:19
**inform**  81:9
  202:13
**informal**  198:23
  199:25 209:5,17
**informants**  24:3
**information**  10:17
  28:10,25 31:8
  42:12 65:20 79:21
  87:5 115:14
  137:25 138:5
  158:5 161:23,24

173:6 180:17
  181:18 191:4,5,18
  193:5 200:2 208:9
  209:4,6,7,9,12,13
  209:15,24 210:9
  221:17 222:16
  223:23 225:21
  226:21
**initial**  216:19
  219:11 225:11,11
**initialed**  239:6
**initiate**  151:8
  212:7 228:2
**initiated**  105:6
**input**  202:20
  232:5
**insane**  189:11
**inside**  60:4,19 61:3
  62:24 185:7,7,10
  185:18 186:15
  187:6 195:2 210:3
**inspect**  115:20
  195:1
**inspection**  115:22
  160:5 162:6,9
**inspector**  104:10
  107:16 126:19,20
  154:10 167:21
**instance**  31:11
  61:18 67:4,18
  72:6 73:13 90:6
  131:10,13 143:1
  173:20 186:1
  187:11,15 188:17
  194:14 210:7,14
**instances**  117:1
  162:16 165:25
  185:5 210:25
**institute**  2:4 5:16
  6:14

**institution**  68:12
68:15
**instruct**  80:10,25
126:5,6 155:5
196:24 201:3
205:25 209:20
215:20 216:7,16
217:1 218:16
220:22 234:19,24
**instructed**  78:6
136:6 209:23
235:6 236:19
**instructing**  77:24
78:12 199:17
**instruction**  23:22
23:23 25:5 26:19
26:20 29:19 35:24
43:11 78:3,19
79:10
**instructions**  55:24
56:23 80:22
155:15,18 156:2
156:21 159:10
169:4 180:21,25
181:4,11 182:8
183:4 187:11
188:10 189:20
197:6 232:6
**instructors**  24:16
**integrity**  92:11
**intelligence**  100:5
**intense**  23:15
**intensity**  16:5 17:8
17:10 36:25
**interaction**  19:15
**interdiction**  22:11
37:1
**interest**  6:15
164:12
**interested**  5:7
138:9 211:21

241:22
**interesting**  7:4
8:15 36:6 59:20
**interests**  41:17,23
**interfere**  100:10
100:11
**internal**  136:12
**internally**  45:19
**internet**  4:14
**interrupt**  7:24
63:21 218:10
**interviewing**  8:16
**intimate**  112:4
**introduce**  38:13
74:20 161:3
181:25 199:2
201:9
**introduced**  76:23
97:3
**intrude**  100:11,16
**intrusive**  98:9
99:1 100:2,8,18
123:15,25,25
124:23 125:6
126:24,24
**invades**  219:20
222:23
**invasive**  101:9
**inventoried**  83:21
85:2 169:18
170:13 171:20
175:23 196:18
213:6 214:11
**inventories**  93:16
136:25,25 156:14
156:15 178:16
**inventory**  45:1
57:10,18 58:9,18
58:21 59:13,16
60:21 61:2,16,17
63:22 67:1,4,5,9

67:11,16,17 71:6
72:14,18,23 73:2
73:12,19,21 74:4,9
74:18 82:13,20
83:2,3,9,13,19
84:1,17,22 85:24
87:9 88:8 92:8
93:20,22,24 95:4
134:23,25 135:4
149:13 151:9,16
151:18 152:8
153:2 155:15
156:4,12,21
157:15 158:12,15
159:2,10 163:3
167:13 168:25
170:5 172:17,25
174:13,24 175:10
180:6 181:8 182:8
184:17 185:4
186:3,8,11 188:11
188:21 189:19
195:5 196:19,24
197:6,22 232:6
234:22
**inventorying**
61:25 62:1 73:18
83:17,19 90:7
92:16 94:11
149:20 150:4,6,17
150:23 151:5
152:18 157:1,10
157:18,23 158:7
159:13 170:1
175:19 176:15
178:12,23 179:24
180:18 187:8
192:23
**investigate**  16:23
25:22 26:21,22
27:6 28:23,23

108:1 209:16,21
209:24 221:18
222:17 223:17
**investigated**  16:1
**investigating**
33:20 46:4 103:19
104:16 204:20
211:25
**investigation**  1:14
2:12 5:20 8:17
20:5,8,10 30:23
46:11 103:1,18
104:12 105:3,7
106:12,14,21
107:12,14,22
108:18,22 109:13
109:13,18,21
110:8 121:2,13
124:7 125:5,18
146:1,4 147:12
217:24,24 222:8
224:13
**investigations**
28:6 30:18 37:2
42:24 52:4 76:24
104:25 116:20
128:21,21
**investigative**
23:25 26:18 98:9
100:15 104:7,8
125:8 145:24
146:1
**investigator**
110:22
**investigatory**
73:20 218:18
219:20 222:24
223:24
**involve**  220:3
**involved**  18:8,16
21:5 45:24,24

Exhibit K
1033

47:21 49:11
106:18,21 128:23
131:24 132:10,10
132:14,15 133:4,7
133:10 134:8,11
134:20,21 137:21
138:16,17,19
139:3,8,9,25 140:5
142:5,7,18 143:3
143:13,16 144:2
145:25 146:18,23
158:7 172:3
194:10 200:16,18
200:22 202:18,19
212:16,21 213:2,4
213:13 214:9
216:9,19 221:15
227:23 231:6,16
231:25 232:2,13
234:15

**involvement** 134:6
231:19 232:8
**involving** 124:23
**irrational** 117:10
**irrelevant** 233:2
233:18 234:25
**ish** 169:12
**issue** 7:21 20:1
32:1 69:13 89:5
131:2 134:10
220:18
**issued** 108:20
109:18
**issues** 20:13,17
21:15 42:19 76:22
164:1 220:5
234:25
**item** 44:23 61:4
67:10 86:8,9,9,10
88:11 89:19,24,25
90:1 136:14

137:18 174:15
**items** 46:17,20
54:11 56:5,7
64:22,22 73:10,13
73:18 83:17,21
84:21 85:2,5,8,9
120:14,22 121:4,7
138:25 150:2
157:2 158:2
177:22 223:15

### j

**jam** 135:16,21
136:21
**james** 134:15,16
**jeni** 1:6
**jennifer** 1:5 5:14
**jessie** 19:13 20:12
228:21 229:6
230:6,19 231:5,16
232:4,8 235:10,16
**jewelry** 112:3
146:12 174:19,19
174:20 222:7
**job** 16:19 18:22
29:7 31:17 32:4
45:13 88:17,17
**jobs** 57:23 58:3
173:18
**john** 23:5
**johnson** 1:12
**join** 22:16 23:15
**joined** 15:14 23:2
23:14 104:13
**joining** 23:3
**joint** 204:15,19
**jointly** 107:15
**joseph** 1:6
**judge** 8:25 50:8
194:8,8,10,13,15
**judicial** 221:21
232:23

**judy** 236:1,2
**jump** 44:21
194:18 198:21
**jumping** 116:12
**jurisdiction** 13:25
25:9,12,13,18
**jury** 108:5,8,14
**justice** 2:4 5:16
6:15
**justin** 126:14
215:25 220:14

### k

**k** 1:19 4:5 6:1,11
12:1,2 146:25,25
147:3 153:4 154:8
154:9,25 239:3,13
241:9
**kathryn** 12:3
**keep** 59:11 76:12
90:4 96:23 217:11
**keeping** 116:22
**key** 163:20,20,25
164:21 165:2
166:1,5 195:6,10
195:13
**keys** 64:11,24
164:21 194:23
**kill** 138:3,18
167:17
**kind** 8:4 19:6,23
20:6 21:8 22:17
23:7 26:18 29:21
49:1 56:2 57:23
65:22 83:10 84:1
87:9 106:9,10,10
129:5 134:8 135:9
136:2,3 140:14
167:17 187:23
222:4
**kindly** 7:12

**kinds** 33:19 47:10
54:21 55:7 56:2
103:8 192:17
**kingdom** 139:15
**knew** 116:21
118:19 119:21
191:21 200:5,6
221:10,11
**knife** 56:18
**know** 7:23 8:4 9:3
9:9,10,11,14 10:19
10:24 11:9,14,23
12:13 13:1,2,4
18:6,12,13,14 19:3
19:19,20 20:11
21:6 24:22 25:2
25:10,23 27:1,18
27:20 28:25 29:18
29:21,22,22 31:11
32:6 33:9 34:8
35:13,25 36:23
37:14 38:1 40:24
42:12,13 43:17,24
43:25,25 44:3,4,7
44:8,18,24,24
45:13,17,20 48:13
48:17 49:8 50:18
51:2,7,21 52:2,5,9
52:10,16,21 53:4,4
53:12 54:8,8,10,10
54:11,18 55:2
56:1,6,21 58:15
59:4,9,10,12 60:16
60:25 61:7,9,9,24
62:2,6,14,24 63:10
63:16,17 64:2,2,10
64:11 65:4,5,11,18
65:18,19,20,23
66:8 71:23 72:25
74:12,13,17 77:13
78:16 82:8,15

**Exhibit K
1034**

84:3,8,9 85:8,22
86:16 88:5,6,9,25
89:2,8,9,10,16,23
89:24 90:7 91:19
92:7,15,16,16,17
92:17 94:22,23
96:7,8,8,22 97:11
101:24 104:5
112:23 114:20
118:15,16,16,18
118:18 119:14,14
119:17,17 122:22
123:3,13,22,22,24
123:24 124:2,18
127:1,1,2,2,3,7,14
127:16,25 128:7,7
128:7 129:3
131:10,12 132:21
132:21,22 133:4
134:4 136:2 137:7
138:8,12,14 139:5
139:6,16 140:20
141:5,10,25 142:2
145:12 146:3,23
146:24 147:18
148:9 151:11,20
154:4,18,25 157:9
157:11,19,21
158:14 159:2,3,17
159:18 161:7
163:17,17,23,24
164:16 165:13,23
166:8 168:12
169:1,9,23 170:12
170:20 171:20,23
172:24 173:6,21
176:13 179:23,24
181:25 182:22
185:2 186:22
187:11 188:6,14
194:17,23 197:18

198:8 199:3,12,18
200:7,19 201:12
202:13 203:25
204:2,25,25 205:2
205:4 206:4
207:13,20 210:17
212:7 218:2,20
220:4,7,13 226:12
227:10 229:11,16
229:20 230:4,5
231:1,8 232:2
233:7,8,23,24
235:9,23,24,25
**knowing**   166:2
184:20
**knowledge**   93:4
158:3 170:21
231:20 241:18
**known**   123:23
210:6
**knows**   31:24
235:18,18
**koons**   1:12
**kristi**   1:12
**krysti**   133:25
135:6 136:22

**l**

**l**   1:10 6:11,11
**l.a.**   12:22 15:3,9
16:12 17:13,13,15
17:16 19:9 21:13
21:16 32:19 36:24
137:18 227:21
228:16 229:7
231:3
**label**   89:20 143:8
184:13
**labeled**   177:19
**labels**   73:6
**labor**   154:5

**lack**   70:22
**lacks**   26:6 44:13
45:3 46:13 47:23
53:23 67:20 70:2
91:24 95:7 98:11
98:12 100:21
101:12 122:18
123:18 125:14
128:4 130:9
204:22 205:17
206:17 207:8,24
213:7,17 214:14
219:5,19 220:23
222:24 223:22
228:7 233:1,17
234:8,25
**lament**   14:5
**language**   114:14
114:17,18 115:10
115:11 202:5
204:19 205:13
**lapd**   145:19 147:2
147:4 232:15
**large**   71:15,15
115:1 193:17
222:12 223:14
224:6
**late**   77:17,18 79:4
230:22
**latent**   184:17,23
**laudable**   22:24
**launder**   110:15
**launderer**   110:15
110:17
**laundering**   16:8,9
16:10,11,14,16,24
16:24 17:2,13,20
18:3,7 22:2,11
37:2,8 40:25
41:14,15,17,23
42:5,9,10,19,23

43:7,10,13 105:17
105:18,20,21
106:3 110:4,5,8,9
110:20,21,22,23
110:25 111:7,9,23
**launders**   110:10
111:2
**laura**   201:20,23
202:15 206:24
**law**   2:5 6:15 8:18
8:18,21 10:9,12
13:4,8,9,15,16,19
23:4 24:23 25:2,2
25:3 26:2,15 27:5
34:2 42:25 43:8
58:5,16 104:11,20
117:21 144:20
205:16 218:17
222:23 223:23
224:3 233:11
**lawful**   100:5
**laws**   25:22 26:23
27:7 35:10
**lawsuit**   42:3
**lawyer**   9:18
105:21
**lawyers**   225:2
**lay**   164:24
**layer**   112:8
**layers**   86:18,19
**lead**   103:24 104:2
219:16
**leader**   133:15,20
134:16 148:9,22
**leaders**   148:8,11
**leading**   20:9 219:9
220:16 221:6
**learn**   29:25,25
31:20,20 32:11
50:9 60:10 79:25
80:2

**learned** 37:19,22 108:21 229:20

**learning** 24:5,11 233:8

**leave** 49:16 147:21 153:14

**leaving** 83:11

**led** 103:1

**left** 162:23 209:12

**leg** 226:11

**legal** 2:16 5:3,5 23:25 25:6 34:4 35:6 36:16 47:24 56:25 58:20 59:22 67:22 82:8,11,15 83:23 94:16 95:6 100:21 101:13 103:7 122:22 123:19 128:5 130:11 187:24 189:11 222:6 229:22 237:25

**legitimate** 105:23

**lesser** 126:24

**letter** 60:17 62:21 63:3 65:5,6,10,15 65:25 74:6,9,10,16 161:19 162:4,5,8 162:15 163:13 164:21 180:4,22 188:18

**letters** 162:22 179:25 180:7

**level** 96:18 134:3 136:4 172:11,11

**levels** 86:13 95:2 132:15

**lexis** 226:20

**lexisnexis** 211:5

**liability** 69:14

**liaison** 201:21 202:16

**lic** 1:23

**license** 61:7 62:3 63:14,18 162:18 185:14

**licensed** 13:17

**licenses** 13:19

**lie** 8:17,20

**lieu** 123:4

**life** 12:20 32:4

**lighting** 85:21

**likelihood** 84:9 196:20 197:22

**limit** 165:24 176:9

**limitation** 56:2

**limitations** 55:24 57:4

**limited** 50:4 56:22 61:21 142:23 175:6 237:11

**limits** 56:23

**line** 11:1,2 41:10 41:11 115:11,11 117:7,7 118:24 174:15 240:3

**lines** 41:2 118:23 118:23 160:19

**lions** 12:13

**list** 56:11 64:18 121:19 133:5,12 138:25 171:10 192:12 209:20 222:9

**listed** 99:18 203:3

**lists** 208:11,11

**literally** 27:17 213:10

**litigation** 23:8,9 23:10

**little** 11:24 13:2 16:21 23:9 29:6 29:19 36:7,8 41:21 43:5 48:3 64:10 67:23 68:5 69:22 94:23 99:12 102:16,18 131:18 142:21 146:12 148:14 150:12,24 151:23 157:8 158:11 159:19 165:19 168:5 169:2 187:13 188:11 194:3,18 194:22,24 198:21 223:13 228:12 235:17

**lived** 12:20

**living** 14:2

**loads** 111:5

**local** 53:11,16 58:5 104:11 106:20,23 107:8,18 129:22 144:1,20 152:22 153:1,1,25 154:2 233:11,14 234:2 234:14,15

**locals** 153:3 154:7 154:9

**locate** 86:14 146:10

**located** 112:3 168:16 195:2

**locating** 146:11,13

**location** 28:10 56:4 144:7 157:3 167:16,22

**locations** 52:6 148:23 167:20

**lock** 163:25 165:3 166:5

**locker** 165:14

**log** 87:1,2 135:16 135:20 136:21 139:13

**logistical** 55:2

**logistics** 55:18

**long** 14:10,23,23 17:25 22:5 41:14 152:13 173:22 174:7,11 179:2 236:3

**longer** 137:10 140:19 150:24 173:1,3,12,13,16 173:19

**look** 24:16 31:10 31:13 32:1 33:3 40:5 56:20 60:18 65:19 74:3 75:13 77:4 78:2,6,7 79:15 95:20 97:5 99:25 109:3 110:7 110:7 115:14 160:18 195:15,15 204:3 225:11,13 225:14 226:12,14 227:4,4

**looked** 32:18 77:8 77:16 78:22 79:4 97:22 111:15 174:7 199:13 208:20

**looking** 49:9 54:11 54:14,14,15,17 56:5,13,13,14,15 56:16,17,17,18,19 60:1,5 64:22,25 121:13 158:22,22 168:13 180:7 184:16 195:11,18 195:19 211:9,20

**Exhibit K**
**1036**

225:12 227:7,7
**looks**  64:18 75:20
 197:18
**loomis**  68:14
 69:17 70:8,23
 71:19,23 72:1,2,8
 140:20,25 141:1,6
 141:18,20,20
 191:22 192:3
**los**  1:22 2:11 15:1
 15:24 42:1,7
 111:3 129:6
 228:22
**lose**  141:3
**loss**  62:11 63:16
 63:25 85:11 91:20
 91:22 163:7
 188:22,24
**lost**  63:17 68:7,20
 190:22
**lot**  18:22 20:25
 21:3 23:22,22,23
 23:24 25:7,13,13
 25:14,17,20 37:12
 37:13 48:17 49:8
 51:24 52:1,2,14
 67:2 105:24
 106:25 107:5,10
 118:1,17 119:25
 120:3 132:14,21
 132:24 133:4,6
 137:13 148:4
 153:10 167:4
 170:11 177:13
 190:5 205:3 208:9
 220:11,12,12,15
 233:10
**lots**  31:7 53:2
 92:10 95:13,13
 104:20 202:21
 220:5

**love**  65:21 89:4
**lovers**  164:11
**low**  172:11
**luck**  75:19
**lumped**  224:2
**lunch**  66:13 96:24
 102:1,10,14
 124:18
**lyndon**  126:19
 216:1 220:14
**lynne**  1:19 4:5,20
 6:1,11 12:1 37:14
 186:14 237:23
 239:3,13 241:9

**m**

**macdonald**  132:3
 134:14 144:18
 182:12 200:14,22
 206:24 220:15
 226:10
**machines**  69:18
**madison**  132:3
 134:14 144:18
 182:11 200:14
 206:24 220:15
 226:9
**magazine**  44:24
**magnet**  117:19
**main**  34:5
**maintain**  86:17
 111:18
**majored**  13:7
**majority**  226:10
**maker**  129:16
 225:7
**making**  24:16
 69:10 110:13
 111:16
**maldonado**  139:3
**man**  152:5

**manager**  148:18
**mandatory**  33:16
**manner**  93:18
 95:25 196:18,24
 197:7
**manpower**  148:5
**manual**  30:7,11,12
 30:13,16 31:7
**manuals**  30:5
**mar**  1:9 4:25
**march**  6:19 43:4
 57:17 108:2
 219:10 220:3
**marijuana**  191:25
 192:10,12
**mark**  134:18
 135:2 137:25
 148:17,23 167:16
 167:25
**marked**  38:15,18
 75:3 97:1 144:7,9
 161:5 181:23
 199:4 201:11
**market**  111:8
**marketed**  117:20
**match**  89:24
 209:10
**material**  59:2
 62:10 64:1 79:3
 79:14,14
**materialized**
 198:2
**materials**  11:6,10
 30:3 35:15,16
 43:15 51:9 163:8
**matter**  4:21 37:8
 39:25 40:3 52:16
 60:3 64:6,8 82:1
 83:5 84:1 87:10
 92:8 103:25
 158:16,19,25

159:1 169:6
 241:11
**mean**  10:2 19:18
 27:13,14,16 28:4
 29:16 35:18 37:6
 37:25 45:7 48:19
 53:10 59:21 61:23
 63:21 64:16 67:14
 67:14 71:15 73:24
 82:22 89:9,11,17
 91:17 92:24 93:19
 93:19 96:8 97:18
 105:12 109:7
 118:16 120:3
 127:19 131:9
 132:5,5,14 133:5
 139:6 140:22
 142:12 145:9
 146:21 154:22
 157:13 168:5
 171:3 172:6
 176:17 183:2
 194:6 198:24
 199:12 202:11
 218:9 220:5,11
 227:20
**means**  10:3 34:8
 45:10 66:4
**meant**  51:3,20
 190:18 198:5
**mechanism**
 111:12 233:14,22
**media**  4:19 201:21
 202:16 237:24
**medication**  9:21
**meet**  100:19 129:8
**meeting**  155:22,23
 155:24 156:1,8,9
 218:13
**meetings**  155:25
 156:3,5,11,13,17

216:14 217:23 218:6 220:11 236:20

**meghan** 2:13 5:19

**members** 137:20 138:16 153:11 215:25

**memorialize** 186:1 187:12 188:10 189:4

**memorializing** 186:3

**mention** 181:10,11

**mentioned** 24:22 55:22 61:20 128:14 133:23 134:14 135:6 226:3 234:2 236:22

**mentions** 182:25

**merely** 47:17 79:19

**met** 42:11,11 156:14

**method** 100:7

**mexico** 42:8 111:6

**michael** 1:6

**michigan** 13:18

**middle** 9:17 11:1 189:14

**midnight** 169:18 170:2

**mike** 117:21 118:2 148:17,24

**miles** 145:18

**million** 211:20

**mind** 10:21 124:13 173:7 198:12

**mine** 216:2 225:20

**minimally** 101:9 124:22

**minute** 10:25 35:13 66:11 97:5 97:10 113:25 198:12 236:6

**minutes** 10:25 39:19 66:9 96:24 101:25 159:17 165:23 166:21 173:14,23 236:7

**miranda** 27:20

**miscellaneous** 87:22 90:2

**mischaracterizes** 117:16 119:3,9 162:11 202:7 209:19 234:7

**missed** 39:23

**missing** 59:10 90:12 178:1 183:11 232:16

**mission** 110:23 124:11 125:10

**missions** 125:18

**misstated** 182:6

**mistake** 69:10

**mistakes** 85:23

**mix** 118:5 174:20

**mixed** 191:25

**modern** 59:25

**modules** 36:10

**moment** 8:10 75:13 82:9 96:22 120:10 161:4

**monday** 150:7 170:2

**money** 16:7,9,10 16:11,13,15,24,24 17:2,12,20 18:3,6 18:9,9 21:4 22:2 22:11 37:1,8 40:25 41:14,14,16

41:23 42:5,9,10,18 42:23 43:7,10,13 54:14 56:17 70:8 105:17,18,19,21 106:3 110:4,5,8,9 110:10,13,14,15 110:16,20,21,22 110:23,25 111:2,5 111:7,9,13,13,23 122:3 164:15 192:15 194:7,11 194:12 233:6,12

**monte** 106:24 107:1 144:6,14,23 145:6,15,20,21,25 146:20 147:1,4 148:24 152:22 232:16

**months** 24:20 33:10 42:12 50:13 220:16

**morning** 4:9 150:13 163:6 169:15 221:12

**motion** 70:2,16

**motivated** 22:16

**motivation** 22:18

**move** 12:15 98:20 113:23 131:18 136:1 142:21 159:4 213:23 214:10 216:10 222:18 225:8

**moved** 12:17 169:23 197:15

**moving** 75:21 132:24 135:15 208:8

**multi** 164:5

**multiple** 15:6,7 53:6 54:22 84:17

92:4 106:14 127:19 146:9 162:20 166:10

**murray** 19:13 228:21 229:6 230:19 231:5,16 232:4,8 235:10,16

**murray's** 20:12 230:6

**n**

**n** 2:6 3:1

**name** 5:2,13 6:10 6:13 11:25 162:19 185:16 202:16 208:10 210:21 229:1 235:25

**named** 200:19

**names** 56:15,16 133:9 158:23 162:20

**nature** 103:10 167:18

**navigate** 138:24

**ncic** 210:23 211:1 212:4 224:18

**necessarily** 45:5 60:20 85:12 134:5 139:8 170:20 188:15 224:13 237:8

**necessary** 115:20 115:23 137:10 160:6 162:7 187:2

**necessitate** 140:13

**need** 13:1,22 33:2 45:19,20 49:5,5 52:8,17 54:6,9,10 54:10,16,16,18 56:6 61:2,24 62:1 62:12,24 63:2 65:11 71:23 75:6

85:17 107:9 118:4
121:1,20,21 137:4
139:20 149:4
158:13,24 163:5
176:14 177:21
179:4 184:2
194:18 197:18
225:13 231:22,24
232:1 236:25
237:7,8,9,13,14
**needed** 104:12
120:23 121:18
134:9,10 135:23
137:4,8 141:19,20
146:15 148:5
172:9,10 184:4
189:25 217:25
**needing** 163:3
**needs** 44:19 45:23
45:23 53:6 68:12
109:3 163:9
169:21,21,22
191:23 192:1
225:12,14
**neighborhood**
171:5
**nest** 121:24 122:6
123:16 124:5,14
130:8 137:1,1
158:17 162:3
168:15
**nests** 113:14
**nevada** 4:4 241:1
241:5,9,23
**never** 7:3 20:9
30:7,9,11,12 47:12
69:16 89:17
123:23 124:17
130:23 198:2,3,3,4
198:10

**new** 24:23 42:7
151:25 197:8,8
**newspapers** 111:4
**night** 169:18
**nine** 117:8
**noah** 143:20
**nodding** 7:16
**non** 62:14 161:16
216:9,19 217:4
225:2
**nonanswer** 215:22
**noncash** 68:16
72:9
**noncriminal**
117:10 119:1
**nonpayment**
161:2
**nonprofit** 6:15
**noon** 96:23 101:23
150:8
**nope** 195:8
**normal** 7:24 118:4
**normally** 7:23
155:23 158:12
**north** 2:10
**notable** 192:1
**notary** 4:5
**note** 4:12 79:11
160:25 161:14
180:12 191:14
192:7,18,23,24,24
196:19 197:22
**notebook** 186:21
**noted** 180:11
191:2,23 192:2,19
196:25 198:9
**notes** 99:18 191:15
196:21 197:24
198:1 241:17
**notice** 4:1 203:16
205:8 230:23

231:1,7
**noticed** 7:21
**notices** 209:10
**noticing** 5:12
**notification**
161:18 162:15,22
163:13 164:20
**notify** 115:12
**nuisance** 128:19
128:24 129:10,19
130:1 131:3
**number** 4:19,25
20:21 32:23 44:1
44:2,20 45:2 46:5
46:12,21 47:16
49:7,10,11 51:23
52:12 68:11 71:18
76:23 86:8,9,9,11
86:11,22,23 88:21
89:3,24,25 90:1,23
91:8 95:15 99:14
116:25 119:7
129:6 135:19,22
136:1,8,9,10,10,11
136:12,12,15,16
140:21,25 141:2,7
141:12,21 146:5
150:22 152:4
162:17 168:7
171:2 180:14
184:3,4 200:21
206:7 208:11,13
208:22,25 231:23
232:12 237:24
**numbers** 47:20
49:1 135:23
136:16 139:14
140:16 160:25
161:14 169:22
182:20 190:14
208:12 209:13

**nuts** 29:2 45:18
221:7
**nv** 1:23

**o**

**oath** 8:11,23 93:2
**object** 67:20 126:4
170:17
**objecting** 170:19
**objection** 10:1,3
26:6 30:24 31:3
44:13 46:6,13
47:22 53:23 56:25
58:19 69:3,6 70:1
71:8 78:9,21 79:9
83:22 89:7 90:15
90:25 93:23 94:14
95:5 98:11 100:20
101:11 108:7,23
116:17 117:15
119:3,9 122:18
123:18 125:13
126:3 128:4 130:3
130:9 131:7
162:11 181:13
187:24 188:25
200:25 202:7
204:1,22 205:17
205:24 206:5,9,17
207:8,24 213:7,15
214:12 215:2
216:13 217:18
219:4 222:21
223:20 225:23
226:6,25 228:5
233:1,17 234:7
235:14 237:9,13
**objections** 5:8
45:11 46:22 47:1
48:9 57:7 70:9,15
70:24 71:20 72:10
92:22 93:8 99:3

Exhibit K
1039

| | | | |
|---|---|---|---|
| 118:14 131:7 | **officer** 146:8 | 24:9,22 25:17 | 106:11 107:3,11 |
| 205:23 208:5 | **officers** 43:8 107:9 | 26:1,24 27:2,9,23 | 107:17,21,25 |
| 213:16,25 214:5 | 107:9 146:8 | 28:11,15 29:5,9,9 | 108:4,20 109:7,17 |
| 215:13 219:17 | **offices** 4:3 51:3 | 30:2,16,20 31:11 | 111:21 112:1,1,12 |
| 223:9,10 224:20 | 241:7 | 32:8,14,17,22 33:4 | 112:23 113:7,23 |
| 224:24 235:15 | **official** 1:11,13 | 33:22 34:9 35:13 | 114:20,24 115:3 |
| **objective** 98:10 | **officials** 50:24 | 35:22 36:6,18 | 115:10 116:9,11 |
| 100:6,8 | 156:25 157:10,17 | 37:18 38:1,10,11 | 117:7 118:22 |
| **objectives** 99:2 | 157:22 158:7 | 39:4,12 40:9,24 | 119:20,24 120:3 |
| 125:9 129:8 | 159:13 175:15 | 41:8,18 42:16,21 | 120:11,14 123:10 |
| **obscure** 74:23 | 185:3 | 43:12,18 44:4,6,8 | 126:21 128:14 |
| **obstructed** 117:21 | **oh** 7:1 10:12,14 | 44:9,17,25 46:2,17 | 129:9 131:17,22 |
| **obtained** 152:10 | 11:7 12:4,9,19,19 | 47:14 48:12,16 | 131:23 133:9,22 |
| **obviously** 18:8 | 13:21 16:19 17:16 | 49:9 50:3,19,23 | 134:12,20 135:5 |
| 189:22 202:15 | 17:21 22:24 24:15 | 51:8,13,25 52:20 | 137:15 138:16 |
| 207:11 232:15 | 25:17 28:11 29:5 | 53:20 54:2,22 | 139:2 141:19 |
| **occasionally** 49:21 | 30:14,20 34:6 | 55:9,12,17,21 | 142:4,16,25 |
| 128:20 185:15 | 35:1,22 36:7 | 56:21 57:20 58:10 | 143:16 144:12,16 |
| 217:23 | 52:13 55:9,12 | 59:8 60:9,15 | 144:22 145:5,7,17 |
| **occurred** 216:14 | 75:20,25 89:4,25 | 61:11 62:19,22 | 145:25 146:3,17 |
| 219:10 | 90:1,2 93:13 | 63:6 64:4,21 | 147:7,13,25 |
| **occurrence** 53:22 | 98:24 102:6 104:2 | 65:10,12,24 66:7 | 149:19,24 150:14 |
| **occurring** 24:19 | 114:24 127:13 | 66:13,14 68:21 | 151:2 152:7,22 |
| **odd** 152:4 | 145:25 151:17 | 69:21 70:13,19 | 153:3,6,8,16,22 |
| **odor** 192:9 | 171:9 172:19 | 71:2,14 72:4,13,17 | 154:7,13,21 |
| **odors** 192:13 | 176:11,23 178:7 | 72:20,25 73:17 | 155:11,18 156:13 |
| **offense** 16:16,17 | 189:8 195:24 | 74:5,17 75:9,25 | 156:17,19,24 |
| **offered** 33:21 | 199:11 218:9 | 76:14 77:6,11,13 | 157:16,20 158:4 |
| **office** 2:13 15:3,9 | 232:18,18 | 79:7 82:11 83:15 | 159:16,20 160:2 |
| 15:20,24 18:19 | **ohio** 12:9 | 84:15,20,25 85:7 | 160:10,15 161:3,6 |
| 19:9 21:13,16 | **oj's** 56:18 | 86:1,18 87:11 | 161:9,21 162:2 |
| 22:4 29:4 32:20 | **okay** 6:13 7:1,5,20 | 88:10,24 90:10,17 | 165:9 166:14,18 |
| 49:19,23 50:2 | 8:9 9:25 10:12,14 | 91:16 92:13 93:15 | 166:19,21,22 |
| 52:20 54:20 85:22 | 10:14,23 11:16,16 | 94:4,7,21,25,25 | 167:4,14 169:10 |
| 105:15 113:1 | 12:4,7,9,15,19 | 95:22 96:13,21 | 169:13 170:1,9,24 |
| 132:13 137:18 | 13:11,21,25 14:12 | 97:3,22,25 98:18 | 171:13,19 172:12 |
| 142:7 148:21 | 14:19 15:5,11,19 | 98:22 99:6,8,12,21 | 172:16,22 173:18 |
| 149:10 212:22 | 16:19 17:1,21,24 | 99:22,23,25 | 174:12,23 175:12 |
| 227:13,21 228:16 | 18:6 19:8 20:11 | 100:14 101:4,7,21 | 175:18,22 176:4,9 |
| 229:7,22,23 231:3 | 20:20 21:10,23 | 101:21 103:17,24 | 176:11 177:8,20 |
| | 22:9,15 23:7,13,18 | 104:2,14,15 | 178:1,7,7,11,22 |

179:13,22 180:3
180:20 181:2,24
182:3,11,11,15
184:10,10 185:2
185:17,23 186:24
188:20 189:6,13
190:9,21 191:10
191:18 192:5,22
193:4,7 194:16,18
195:5,18 196:15
197:20 198:11
199:6,15,24
200:21 201:15,22
202:4,22,25 203:4
204:5,8,13 206:22
207:19,21 208:3
208:17,18 209:4,5
209:14 210:14
211:18 212:18
213:9,20 214:4,8
217:11 218:24
219:9,9 221:17
222:10,14 223:2
224:11 225:17,21
226:17 227:19
228:1,12 229:6
230:21 231:5,12
231:16,19 232:4
233:13 234:2
235:24 236:2,3,8
**olympic**  112:17
**omnibus**  230:23
231:1,7
**once**  6:25 7:1
13:15 17:19 26:3
29:12 30:16 33:13
55:13 65:9,9
81:14 124:6,6
155:12 162:4,8
173:6 180:4
191:21,22 209:4,5

236:24
**ones**  42:18 153:3
154:7,16 234:4
**ongoing**  20:5
**online**  33:18 200:1
**oodles**  110:13
**ooo**  1:4 4:7 238:3
239:1
**op**  149:18
**open**  60:19 61:2
61:10 62:17 63:2
65:4 75:15 92:19
95:14 104:25
124:5 159:3
168:17 224:14
**opened**  61:18 64:9
174:7
**opening**  61:21
62:23 95:18
**operate**  122:13
179:7,17
**operating**  107:3
123:3,4
**operation**  121:25
122:10 129:12
147:13 148:12
149:5,12 150:14
**operational**  55:17
**operationally**
100:13
**operations**  30:19
76:25 107:1 126:1
126:25 127:24
128:3 146:6,9,15
149:8,19
**opinion**  27:24
117:12 118:10,11
189:11
**opportunity**  72:7
77:4

**opposed**  73:19
130:18
**options**  127:5
**orange**  12:23,24
**order**  49:25 50:1
85:7 86:16 115:12
120:16 121:8
141:1 152:3
176:12 178:17
209:25 221:19
237:9
**organization**
124:10,12
**organizations**
48:21
**organized**  154:10
154:20
**original**  178:14,22
207:22 225:15
**originally**  12:7
173:1,19 193:14
**originated**  207:7
**outcome**  5:7 124:1
**outlook**  218:12
**outside**  187:6,7
**overall**  81:25
95:16 125:24
149:7,24 177:8
**overbroad**  31:3
71:9 91:1 98:11
214:15 225:23
**overlapped**  139:1
**overly**  85:19
**oversaw**  172:7
**oversee**  165:6
**overseeing**  171:16
**overview**  177:10
**overwhelming**
119:6
**owned**  184:25

**owner**  66:4 74:11
115:15,21 117:23
118:5 161:24
164:8 166:2 180:8
185:25
**owners**  115:12
117:22 134:18
146:11 148:17
200:5
**ownership**  115:23
160:7 162:7 163:4
163:12 186:14
187:2,7 195:12,13
195:19,20
**owns**  185:20

**p**

**p.m.**  102:12 114:6
114:9 150:9
166:24 167:2
198:15,18 236:11
236:14 238:1
**pack**  47:5 191:25
**packaged**  174:1
192:21
**packaging**  139:14
**page**  3:3,7 33:7
41:1,4,7 43:3 98:6
99:8,14,14,15,18
99:22 100:1
113:12 114:11,12
115:1 117:3,5
120:11,12 159:16
159:22,25 160:4
160:19,19 161:23
161:24 186:16,17
189:14 190:11,23
190:23 219:1
240:3
**pages**  97:16,16
236:23 239:4
241:16

Exhibit K
1041

panneton 23:5,6
paper 54:15 64:10
64:12 65:6,10,13
87:25 88:1 92:6
195:11
papers 62:18,19
62:21 186:22
195:18
paperwork 88:22
89:21 151:8
163:11 169:22
173:5 189:16,21
189:25,25 190:1,5
190:5,6,8
paperworks
185:12
paragraph 100:24
101:2,16,17,19
159:20,22,23
184:1 190:24
196:15
paragraphs 117:1
paralegal 142:22
235:25
paralegals 18:20
140:9,13 141:8,23
142:22 143:2
228:23 235:17
parcel 122:6
124:15
parenthesis
160:20
part 7:24 20:10
22:17,21 29:10,17
42:4 46:10 52:4
53:17 61:16,17
67:5 68:23 86:6
88:8 97:8 103:18
108:5 109:12
112:4 113:13,18
115:8,19 120:19

120:19 121:12
122:6 124:15
127:14 134:7
145:14 148:8,13
151:3 156:22
160:15,16,16
175:19 178:19,20
184:17 186:11
195:5 199:20
200:8 212:10
214:1,1,4 221:11
partially 186:13
participants 4:15
participate 153:2
participated
134:23 135:1
145:23
participating
44:12 104:9,10
participation 50:3
particular 15:2
20:5,16 25:8
107:23 109:22
180:18 212:9
particularly 7:22
38:8 48:20 100:9
111:12 124:23
parties 4:17
241:20
partners 144:17
parts 21:9 113:9
123:2 132:24
133:7
party 5:6 162:22
164:13,14 241:14
pass 22:21
passages 115:25
passed 164:10
passport 162:20
passports 162:20
185:15

paul 1:5 5:14
134:18 138:1
148:17,23 167:16
167:25
paul's 135:3
pay 180:9
payment 161:16
payments 234:17
pd 107:1 144:14
144:14,22 145:7
146:20 147:2
148:25 232:16,16
232:17,18
pdf 99:18 182:7
pearsons 1:6
penalty 239:4
pending 9:16
people 7:23 12:4
18:19 19:19 22:11
23:15 25:23 37:13
37:17,24 38:2,5
48:14,22,25 49:4
51:9 52:8,21 84:9
84:10 85:1 89:14
92:4 104:5 106:3
107:10 112:4
117:13 118:4,11
119:6,7,7 125:4
128:17 132:3,10
132:15,20 133:4
135:14,17 136:7
140:3,4,8 146:16
146:19,19 152:4
155:1 156:7,8,13
165:16 166:16
168:8 170:22
181:4,7 190:3,4
194:24 198:25
199:17 200:15,18
200:21 202:18,21
202:22 206:7,12

207:2 209:5,21,24
210:6 212:15,18
212:19,20 213:22
216:2 222:9
228:15,15,19
229:12 231:6
233:25
people's 158:23
percent 34:4
percentage 119:7
119:16 175:18,20
210:24,24 233:15
perfect 101:25
perimeter 144:8
period 104:8
170:5 219:9
237:12
periodically 9:25
perjury 239:4
perkins 2:17 5:2
person 16:13
79:15 84:7,8,13
92:15 147:16,19
147:23 151:10,14
151:21,22,24
152:3,13,15 158:9
164:2,19 165:2,12
165:18,19 166:12
172:13 180:14
183:25 193:8
194:11 202:16
204:12 206:13,20
208:13 209:16
210:1,10 211:22
214:8 227:23
228:17 229:1
231:9,13 235:9,10
person's 66:1
115:14,19 235:25
personal 93:4
170:20 174:14,16

Exhibit K
1042

222:7

**personally**  26:9
48:24 51:11
103:19 153:20
165:6 178:25
223:16

**personnel**  53:9
107:6 130:18,20
131:14 142:5
146:15 151:4,9
152:1,11 168:16
168:20

**persons**  142:10,11
152:13

**perspective**  92:14

**pertains**  234:22

**peso**  111:8

**petition**  229:18

**phase**  144:11
145:24 146:1
231:25

**phases**  144:4

**phoenix**  42:3,6

**phone**  74:1 95:14
169:5 180:14
188:4

**photo**  180:11

**photocopy**  162:18
162:19

**photograph**  49:21
185:10,24 187:18
187:21 188:13,22

**photographed**
175:11 185:6,12
185:19

**photographer**
187:12

**photographers**
187:17

**photographing**
185:4 186:9,11

187:1,5

**photographs**
89:14 92:7,9
175:5,8,16,20
176:13 179:10
187:18 189:2

**photos**  175:7

**phrase**  135:7
160:20

**phrased**  120:1

**physical**  22:21
23:24 152:17

**pick**  163:18

**picture**  39:2,2
127:4 176:18,23
188:15 189:3

**pictures**  176:5
188:16

**piece**  21:7 46:3,3,5
46:9,10 65:10,13
86:14,21 87:25
88:1 136:16

**pieces**  86:15 92:6
174:14

**pile**  71:3 211:20
224:4,5

**piling**  137:6

**pitched**  7:22

**place**  4:17 14:2
74:22 89:22,22
103:4 112:16
122:15 128:24
137:7,12 167:12
200:6

**placed**  71:25
143:9 163:21

**places**  33:12

**plain**  59:18,18,21
60:3,7,13 61:12

**plaintiff**  23:8,10

**plaintiffs**  1:8 2:3
4:21 5:14 6:16

**plan**  55:10,13,14
55:17 149:2,5,8,13
149:18,19,20,24
176:7 178:22
201:24

**plane**  110:20

**planned**  198:3
221:13

**planning**  132:15
132:16,17 133:8
137:21 139:25
140:5 144:4,10
167:6 220:13
221:12 231:17,25

**plans**  148:12

**please**  4:12 5:9,22
6:10 7:12 9:2,14
11:9,25 31:6
38:12 39:3 74:21
78:11,18 80:9
91:14 96:22 100:3
142:10 180:9
181:14,22 194:20
195:23 201:2,12
201:16 205:23
208:17 219:22
230:2,3 235:2

**plug**  195:6

**plural**  156:11

**plus**  131:8 151:19

**pocket**  89:6

**pockets**  93:6

**point**  9:14 28:24
36:16 44:19 85:24
90:13 101:16
124:8,15 142:22
147:15,16,19,23
154:11 157:11
162:10,24 168:9

174:24 189:2
197:17 204:12
235:7 237:14

**pointing**  114:3,4

**poliak**  117:22
118:2 148:17,24

**police**  17:14 28:4
53:11 106:23,25
107:8 144:6,8
147:1,2,8 153:25
154:2

**policies**  115:13

**policy**  30:22 61:2
62:8 89:18 98:7
98:25 100:14,25
101:1,5,17,18,19
115:18 184:18

**politics**  13:8

**poorly**  47:18

**popped**  196:1

**popping**  34:12,14
34:15

**portable**  194:24

**portion**  24:4 31:14
43:7 76:24 149:10
233:12 234:11

**portions**  116:6,7
123:7

**poses**  90:25 91:23
101:11 131:8
214:14 215:4

**position**  117:18
126:15 171:20
184:1

**possession**  73:10
178:4

**possibility**  125:11

**possible**  11:9
68:17,19 97:17
137:12 184:14,21
193:19 197:1

Exhibit K
1043

204:8,9,11,12
208:3 224:16
**possibly** 191:21
216:1
**post** 201:24
**postal** 104:10
107:15 126:20
144:19 148:25
154:3,10,18
167:21 216:1
**posted** 202:5
205:5,7
**potential** 19:4
20:1,12,13 27:6
47:4,7,21 59:14
64:25 100:9
235:11
**potentially** 28:1
51:8 52:24 59:12
63:9 74:11 192:14
195:10 207:22
**powdery** 62:5
63:12
**powerpoint** 35:19
35:24 36:1
**practical** 24:4,4
44:18 45:14
129:25 221:5
**practice** 13:12,15
13:18 23:2 84:24
157:25 194:3
**practiced** 13:13
**practices** 42:14
96:2
**precise** 32:23
49:10 149:4
**prefer** 108:24
**prepare** 55:10,14
77:11 191:16
205:21

**prepared** 83:14
182:11
**prepares** 49:24
55:12
**preparing** 77:14
131:20 191:16
**presence** 140:12
196:20 197:1,1,23
216:4 217:8
**present** 5:10 57:15
71:12 89:14 92:4
108:4 134:6 157:3
157:24 216:16
217:15 219:22
227:10
**presentation**
35:19 36:1 43:11
**presentations**
42:23
**preserve** 115:21
184:14 237:13,14
**pressure** 165:15
**pretend** 59:17
**pretty** 12:19 22:10
23:15 36:15 49:7
54:8 55:6,6 69:11
104:7 105:1,1
131:23 147:20
164:22,22,22
172:24
**prevent** 84:21
85:7 121:25
**previous** 10:18
18:15
**previously** 66:24
133:23 134:14
140:8 160:10
179:25 182:23
208:19 209:1
**price** 64:15

**primarily** 16:24
23:8 104:12,14,15
**primary** 16:25
19:21 104:6
151:15,15
**principals** 133:1
134:21
**prior** 18:12 19:16
23:3 57:11 104:16
155:20,20
**priority** 137:17
**privacy** 100:11,16
101:9 124:23
182:16
**private** 6:18 18:14
19:16 20:15,16
23:2 38:20 39:17
39:24 40:3 57:11
57:16 67:12,13,15
79:6 80:18 81:11
81:25 82:21 83:4
102:20 103:2,6,19
103:25 104:16,21
104:22,23 105:4,7
105:18 106:4,13
108:1,6,17 109:14
109:19,22,23
110:1 111:15,19
111:24 112:7,10
112:17 116:15,21
116:23 117:3,13
117:19 118:12
119:8 120:5 121:3
122:1,9,12,16
123:14 124:7
125:6,25 126:25
129:12 130:17
133:1,16,21
134:18 138:1,8,20
138:20 148:21
149:6 151:5

199:17 202:6
204:21 205:10,15
208:12 214:11
215:1,11 216:12
216:12,21 217:17
219:14 220:19
230:24 232:9,21
235:13
**privilege** 78:15
79:13 126:8 155:5
201:4 216:17
217:5,10 218:17
218:18 219:21
222:24 223:24
**privileged** 79:3,17
217:10
**probable** 57:25
227:16 230:12
**probably** 8:2
15:15 16:2 17:17
22:7,14 48:18
51:6 53:1 54:8
67:2 69:10 72:21
74:13,15,16 97:24
98:1 117:25 122:5
126:19 158:9
168:6,23 169:11
172:21 180:24
184:8 194:24
218:19 226:9
**probationary** 32:7
**problem** 85:17
88:16 105:13,16
105:17 106:2
109:2 134:10
136:6
**problems** 34:24
103:8 134:8 135:7
135:9
**procedural** 139:10
220:4

procedurally 73:7
procedure 25:7,9
  25:14,21 26:2
  27:10 34:3 69:21
  89:19 158:18
  193:18 235:19
  237:11
procedures 31:13
  31:21 73:9 89:13
  89:18 92:4 163:10
proceed 5:23
  225:4 229:13
proceeded 167:11
proceeding 5:8
  232:24
proceeding's
  241:12
proceedings 212:7
  212:13 220:25
  221:20 222:19,23
  223:18,22 225:4,9
  226:5,8,19,23
  227:2 228:3,3,7
  229:14
proceeds 45:15,17
  45:20 104:24
  110:16,19 111:18
  112:6 116:22
  118:1 119:21
  120:4,7 191:2,12
  192:25 212:2
  220:7 221:14
  225:13 227:6,9,11
  227:17 230:11,14
  232:25 233:16
  234:5 235:11
process 31:20 50:4
  59:5 62:13 67:16
  73:4,4,9,15 83:7,7
  83:19 84:3 86:7
  87:10 91:21 92:2

92:3,11,11 103:7
  123:22 135:22
  136:1,8 137:4,5
  139:12 140:24
  143:7 149:12
  151:8 152:4 153:2
  159:4 163:5
  164:17 165:6
  167:13 169:2,6,7
  169:12 171:17
  172:7 173:4,14
  174:25 175:19
  176:15,20 177:12
  180:10 182:15
  186:3 188:11
  190:6 195:5
  198:24 199:20,25
  200:8 202:14,20
  206:21 214:2,4
  216:10 226:18
processed 135:12
  163:9 177:19
  192:20
processes 229:17
processing 135:14
  136:24,25 169:20
  173:9
processings 84:11
produce 93:21
  94:12
produced 75:12
  96:3 231:1
professional
  189:11
profits 117:24
program 19:5
  129:5
progress 42:13
project 152:10
proper 164:1

properly 37:22
  73:2 173:15
property 47:20
  58:22,23,24 59:5
  59:10,11,12 65:19
  65:23 66:4 83:8
  83:10,11,11 86:14
  86:15 87:4,8,13
  88:18 95:19
  115:14,19,20,21
  136:17,17 143:3,5
  156:7 163:6,19
  164:7,13,18,24
  165:1,11 166:13
  166:16 171:2,4,17
  174:14,16 177:9
  177:17 184:20
  198:25 200:4,5
  202:14 208:15
  209:2 210:3 212:8
  212:12 213:3
  214:11 215:11
  216:11,21 217:16
  219:14 222:9,20
  223:19 225:5,9
  226:24 227:6
  228:4 229:15
  230:11,13,24
proposed 49:25
proposing 127:13
protect 58:23,25
  59:2,9 60:22
  63:23,24 64:1
  89:3 163:6,7,8
  177:13 188:21
protected 100:10
  117:20 118:20
  126:7 223:23
protecting 62:9,9
  62:10 63:15

protection 188:23
protective 62:15
protects 106:10
prove 129:21
  177:2
proved 112:4
provide 7:17 9:11
  30:3 33:14,25
  35:16 79:21 82:12
  89:2 95:23 96:1
  107:6,19 126:6
  152:24 208:13
  230:3,9,10 232:5
provided 108:11
  144:6,8 146:5,7
  147:3 157:11
  195:13 209:25
provides 35:6
  49:20 115:19
  161:22
providing 146:15
proximity 192:15
prudent 193:25
  208:14
public 4:5 6:15
  52:16 182:24
  202:13
published 230:23
pull 113:5 162:3
purchases 146:7
purport 39:15
  97:8,12
purpose 10:3 35:9
  44:10 58:17 59:13
  59:16 70:15 74:11
  80:3 83:14 84:2
  87:12 100:6
  121:24 122:12,14
  184:24 185:20
  188:21 211:18
  212:4,6

Exhibit K
1045

[purposes - received]                                                                 Page 35

**purposes**  39:2
46:20 58:17 59:9
63:23 70:1 73:11
73:12 81:19 83:3
140:2,23 168:10
185:25 187:8
**pursuant**  4:1 61:1
73:13,18 82:19
205:11,15
**pursue**  191:19
213:5
**push**  227:12
**put**  27:15 41:18
48:24 49:7 52:11
62:25 63:9 67:25
68:16 71:17 86:7
88:18 89:19 90:8
112:25 121:3
136:7 137:11
140:19 151:22
169:24 176:22
182:16 186:17,17
188:8 191:4,15
198:24 199:17
203:9 222:5,8
**putting**  64:19 89:5
122:21 168:22
177:6,16,22,23

**q**

**quality**  4:13,14
139:19
**quantico**  23:17,19
28:18 29:12,14
30:1,3,10,11 33:10
35:13,23 72:15
96:9
**quarter**  34:5
**query**  226:20
**querying**  224:18
**question**  6:21 7:13
8:3,7 9:2,4,6,7,10

9:13,16 10:2,5,6
10:18 13:13 31:9
31:22,25 37:20
38:3,6,8 43:19
45:7 48:2 49:14
58:11 59:20 71:5
78:18 79:19 80:8
82:10 97:20 98:24
100:24 106:1,7
109:4 115:7 118:8
119:15 124:8
125:15 127:8,17
131:23 140:15
162:2 163:2
165:21 170:25
184:12 193:22
194:6,8 196:14,23
197:4 201:3
206:15 213:15
214:16 216:14,23
217:7 219:23
221:23 223:3,5
226:1,17 230:5,21
232:20
**questioning**  11:1,2
39:1
**questions**  7:8,9
8:12,20 11:17,18
29:24 33:6 37:13
91:18 109:2
170:18 172:7
181:14 194:21
224:5 234:20
236:16,19,21
237:1,3
**quick**  76:15
184:11 196:14
**quickly**  68:16
137:12 173:16,22
**quite**  24:11 33:12
39:23 53:11 111:4

157:8 200:18
**quote**  115:20,22
115:22,24 118:25
160:5 162:6
**quoted**  118:3

**r**

**r**  6:11
**races**  50:17
**rack**  143:1
**raise**  52:9,14 53:4
181:13
**ran**  154:11 210:18
210:19
**rare**  8:19
**reach**  129:15
144:13 154:16
155:1 199:21
**reached**  144:20
**read**  9:3 27:19
41:10 42:22 48:2
48:5 54:4,6,23
55:2,21,23 56:6
57:5 65:6,15,25
74:8,8,10,16 80:3
80:20,21 100:3,24
111:3 115:10,17
116:1 117:7
160:23 161:12
206:14,16 223:3,6
239:4
**reading**  80:5
241:12
**reads**  100:2
**ready**  237:16
**real**  32:3 76:15
105:16 106:2
160:23 179:17
**reality**  175:13
**realized**  179:1
**really**  6:8 7:25
12:9 13:22 18:15

18:16 19:14 24:10
27:12 28:2 29:2,6
29:24,25 30:7
35:14,18 91:20
99:20 110:14
118:23 127:4,15
128:10,12 129:5
140:4 151:13
158:19,21,24
159:12 163:13
164:6,12 166:2
172:19 174:11
177:13 180:17
184:19 198:22
203:19,19 205:3,4
233:7,24
**realm**  111:13
**reason**  9:22,24
14:1 27:23 44:25
52:1 55:1,21,23
58:4 63:5,7 76:11
77:23 119:1
165:10
**reasonably**  141:14
**reasons**  26:10,11
54:22 62:8 68:23
84:20 129:7 163:5
**recall**  58:6,8,12,25
75:6 96:10,13,17
96:17 127:7,9,11
166:18 193:14
200:11 206:3
214:23 217:14
218:24 229:2
236:20
**recalling**  171:11
**receipt**  83:8 87:4
**receive**  233:11,15
234:4,11,17
**received**  76:25
158:8 236:23

**receiver** 122:9,15 123:3,11,12,23 125:12 127:19
**receivership** 122:21 127:14 128:1
**receives** 55:13 86:22,23
**recognize** 77:6 199:8,16
**recognizing** 94:22 103:7
**recollection** 57:22 206:22 215:15 218:6
**recommends** 160:24 161:13
**reconceived** 16:17
**reconcile** 204:18
**reconnect** 208:15
**record** 4:10,18 5:12 6:10 7:15 10:4 44:10 48:5 58:24 66:9,17,20 73:5 76:8,12,15,16 76:18,20 79:11 102:7,8,12 113:24 114:6,7,9 152:16 166:21,23 167:2 171:11 176:12 177:12 180:17 195:25 196:3,7,11 198:14,18 206:16 223:6 236:10,14 237:8 238:1
**recorded** 4:16,20 178:16
**recording** 4:13,17 7:9
**recordings** 176:1 176:2

**records** 168:12 178:4 210:5
**recruit** 150:20
**recurrence** 20:23
**redacted** 183:12 184:7
**redactions** 190:25
**redundancies** 135:20 136:13 163:11
**redundancy** 86:13 86:19 135:25
**reference** 220:24 223:4
**referenced** 211:15
**referred** 32:18
**referring** 41:3 161:18 183:18 202:1
**reflect** 108:21
**reflected** 118:10
**refresh** 75:6
**refuse** 165:1
**regard** 82:21 139:10 147:11 163:12
**regarding** 36:11 115:13,18 137:22 164:1 217:15 236:19
**regards** 37:21 45:9 101:1 147:10 220:18
**regular** 24:2 33:23 33:24 63:1 92:9 141:17
**regularity** 130:22
**regularly** 35:6 57:23 104:23 192:18

**reinforce** 177:1
**related** 5:6
**relates** 93:24
**relationship** 145:22
**relative** 241:20
**release** 96:24
**released** 166:4
**relevance** 53:24
**relevancy** 234:19 234:23
**relevant** 31:13
**reliable** 69:19
**remains** 234:21
**remember** 10:16 11:7 21:4 36:13 36:16 53:3 72:13 72:16,17,19 157:8 181:2 203:19,19 204:7 235:21
**remote** 138:4,18
**remotely** 1:21 5:1 5:10 6:2 138:1 241:10
**remove** 124:14 184:13
**removed** 178:18
**removes** 161:1,15
**reno** 4:4 241:9,23
**rent** 162:23
**rental** 161:2,16
**rented** 117:13 118:12 166:12
**renters** 160:24 161:13
**rephrase** 9:4 46:8 47:17 57:13 93:25 94:4 95:25 213:3 217:12 221:25
**replaced** 122:3

**report** 87:6 191:11
**reported** 1:23
**reporter** 5:4,21 7:9,10,15 8:1,11 9:3 48:5 206:16 223:6 241:5
**reporting** 4:3 112:11 241:8
**reports** 42:13 211:11
**represent** 5:14 6:16 97:18,19 166:12
**representation** 40:21 166:6
**represented** 166:7
**representing** 5:3
**reps** 169:8
**reputation** 100:11
**request** 79:7 190:7
**requested** 163:20 241:13
**require** 60:4 77:23 85:4 166:10 235:6
**required** 59:15
**requirements** 112:11
**requires** 8:12 80:23 98:7,8,25 201:1 216:23 217:8
**requisite** 96:18
**residence** 134:17 146:13
**residential** 132:25 148:16,19 149:3,9 149:16 156:10 167:14
**resolution** 154:24
**resolve** 90:12,21 91:20,21 164:1

Exhibit K
1047

[resolved - rodgers]                                                    Page 37

**resolved** 17:17
**resolving** 90:24
**resource** 32:15,25
  32:25
**resources** 131:14
**respect** 94:15
  136:24 213:18
  215:3 217:19
  219:18 222:22
  223:21 225:9
  226:7 227:1 228:6
**respond** 217:2
**response** 112:19
  137:21 175:3
**responses** 7:17
**responsible** 152:9
**rest** 169:19
**resulted** 48:25
**resulting** 96:3
**retained** 237:24
**retired** 18:21
**return** 64:3 65:22
  164:7,13 171:2,4
  171:17 189:13
**returned** 164:19
  165:5 170:14
  171:5,7,21
**returning** 166:16
**reuniting** 209:2
**reveal** 77:24 80:23
  108:7 201:1
**revealing** 79:2
  80:8
**reveals** 217:4
**review** 35:16 40:6
  78:25 79:7 80:1
  81:18,22,24 158:1
  161:22 180:3
  205:18 207:5,6,21
  236:24

**reviewed** 80:15
  82:2,4 116:7
  159:7 160:15
**reviewing** 77:20
**rgk** 1:9 4:25
**ricardo** 139:3
**rich** 132:1,2
  133:23 134:1
  200:13 206:23
**richard** 202:17
**right** 8:15 9:9
  10:10,14,20 11:5
  11:20,22 12:10,24
  13:21 14:12,14
  17:3,24 19:2,2,8
  20:20 21:23 22:9
  23:1,13 24:23
  30:20 33:9 35:3
  35:22 36:19,22
  38:10,12,13,17
  43:14 47:2 48:12
  56:9 60:11,13
  61:4,16,22 65:14
  66:8,15 68:3,22
  69:8,12,23 72:13
  73:25 74:13,24
  84:2 92:2 94:9
  95:4 96:15,21
  97:6 98:6,22 99:8
  101:15,21,23
  103:14,25 107:17
  107:23 109:19
  110:20 111:16,24
  112:23 113:7,11
  114:10,14,24
  115:5,7 120:1
  124:21,25 130:12
  131:17 139:19
  140:14 141:23
  144:25 145:1,21
  148:14 149:22

  153:8,8 154:17,25
  155:11 156:15
  159:16,21 160:2
  164:2,4 167:4
  169:16,18 170:6
  171:4,10,19,23
  172:16 176:5,16
  177:25 178:2,3
  181:5,9,24 182:13
  182:21,23 184:2
  184:11 186:2,8
  188:2 189:3 190:9
  190:21,24 191:23
  194:15 196:13
  198:13,20 199:8
  199:15 205:12
  218:22 220:10
  225:15 227:4
  229:3 230:12
  231:9 232:14,18
  235:10 236:5,15
**rights** 26:5 27:20
**rings** 188:4
**road** 2:6
**rob** 2:19
**robbery** 47:6
**robert** 2:5 5:13
  6:13,13
**rod** 132:1
**rodgers** 2:10 5:17
  5:18 26:6 30:24
  31:3 34:10,14,23
  35:3 38:24 39:21
  40:7,10 41:3,7
  44:13 45:3,11
  46:6,13,22 47:1,22
  48:9 53:23 56:25
  57:7 58:19 59:22
  67:20 69:3,6 70:1
  70:9,15,24 71:8,20
  72:10 75:15,17,20

  75:25 76:9 77:22
  78:3,9,12,19,21
  79:9,18 80:7,23
  83:22 89:7 90:15
  90:25 91:23 92:22
  93:8,23 94:14
  95:5 96:5 97:6,14
  98:11 99:3,13,20
  100:20 101:11
  102:3,5 108:7,13
  109:1 113:6,16,18
  113:21 114:1,12
  115:3 116:17
  117:5,15 118:14
  119:3,9 120:12
  122:18 123:18
  125:13 126:3
  128:4 130:3,9
  131:7 142:9 155:3
  159:22,25 160:21
  161:8 162:11
  166:22 170:17,24
  181:12,20 182:2
  187:24 188:25
  199:5 200:25
  201:14 202:7
  204:1,22 205:17
  205:24 206:5,9,14
  206:17 207:8,24
  208:5 213:1,2,4,7
  213:11,14,22,25
  214:5,8,12,19
  215:2,13,19 216:7
  216:13,23 217:1,6
  217:18 218:15
  219:4,17 220:21
  221:23 222:21
  223:9,20 224:20
  224:24 225:23
  226:6,25 228:5
  230:1 233:1,17

Exhibit K
1048

234:7,18 235:14
237:7,20
**role** 134:12 142:23
144:5 146:4
152:23 153:23
172:2,6,6 212:11
212:14,15 225:16
228:25
**roll** 168:6
**rolls** 188:14,15
**room** 87:23
182:16
**roughly** 103:22
175:23
**rubber** 192:8
**ruiz** 1:6
**rule** 84:12 108:14
**rules** 6:21 7:5 10:6
25:22 237:10
**run** 18:23 19:5,6
19:23 20:3 122:15
127:23 130:20
133:9 184:4
193:19 194:7
210:8 220:2
224:15 226:12
227:25
**running** 96:22
127:21 130:15
**runs** 19:12 44:4
**ryan** 133:14,15,19
148:22

**s**

**sacramento** 23:4,6
**safe** 15:25 16:1
17:7 36:24 59:11
68:19 70:13 72:6
89:22 116:15
118:12 120:4,7
121:24 124:14
137:7,12 165:1

195:2 214:25,25
226:22
**safekeeping**
115:22
**safely** 28:14
137:11
**safety** 86:17
114:16 124:5
205:10,14,14
**sales** 110:15
**san** 42:7
**santa** 13:7
**sar** 211:12
**saw** 43:20 83:12
157:18
**saying** 24:16 47:18
69:21 72:20 89:4
111:22 122:11
125:23 131:12,12
133:6 136:21
141:20 195:11
**says** 41:21 42:21
92:18 101:17
113:13 118:22
120:17 166:11
181:21 182:17
184:7,12 189:15
190:11,25 196:16
197:21 201:22
203:5
**scan** 103:6
**scanners** 122:4
**scenario** 28:8
**scene** 193:9,15
**schedule** 140:1
**scheduled** 150:7
152:12 167:14
**scheduling** 140:1
**school** 10:9,12
13:1,5,8,9 50:12

**scott** 236:1,2
**scratch** 82:9
143:24
**screeching** 121:9
**screen** 4:16 34:15
38:23 39:1 75:21
113:6 183:15
**scroll** 75:17 183:5
**scrolling** 99:10,15
**seal** 20:7 88:21
89:20
**sealed** 60:15
139:21 143:8
**sealing** 50:1
139:14 177:7
**search** 25:23
28:16,19 29:15
40:11,12,13 52:7
53:6 56:4,7,12
58:9,21 59:13,16
60:5 73:20,25,25
74:4,7,16 80:18
81:15 83:9,10,13
84:1,2 87:9,9,19
92:8,9 109:5
113:14,15,20,21
114:16 121:11,11
121:12 132:25
133:17,20 134:17
134:20,24 135:4
138:19,23 148:15
148:16,19 149:9
156:10,12 168:9,9
168:11 182:13
188:1 195:1,14
211:6,7 219:10
234:22
**searched** 133:16
**searches** 96:9
134:24,25 147:20
224:14 225:19

226:13,20
**searching** 133:17
133:20 158:13,14
**second** 34:11
38:11 39:5 53:3
64:4 74:21 75:7
76:2 113:16 115:3
119:24 135:5
136:1 137:10
164:14 190:21
195:25 196:5,15
197:21 236:22
**secondary** 135:22
**secrete** 119:21
**secreting** 118:1
**section** 2:9 77:9,16
77:21 168:15
183:19
**secure** 73:5 85:22
150:1,1 159:4
172:1
**secured** 143:10
167:12,22 168:3
**securing** 73:15
**security** 122:6
144:6,9 152:24
182:14 208:10
**see** 11:12 18:24
19:25 30:21 32:1
34:17,17,18 38:20
43:2 59:17 60:2,6
60:19 61:3,19
63:3 65:15,19
92:1 101:22
111:21 113:4,11
118:22 120:8
127:15 136:20
159:16 160:8
161:7 163:24
176:23 177:5
180:25 182:13,17

183:9,10 187:19
195:6 198:11
199:11 203:2
204:3 208:9
222:17 224:8
**seeds** 191:25
**seeing** 14:5 34:11
34:22 61:21
**seek** 195:9
**seen** 4:15 43:21
82:18,24 83:1,1
130:23 148:1
199:9
**seize** 21:3 25:24
46:10 47:5,10,20
103:13 120:18
150:2 184:13
**seized** 44:11 46:19
46:20 54:11 73:18
85:10 87:17 88:7
89:1 93:3,4
120:22 121:7
157:3 158:2 177:3
205:10,15 216:11
216:21 217:16
219:14
**seizing** 45:15
73:13 121:14,24
130:8
**seizure** 6:18 28:16
28:19 29:15 39:17
40:14,14,16 53:6
56:8 73:14,23
74:7 79:5 80:19
81:15 113:13,19
114:16 120:9,15
121:11,13 123:5
123:16,16,17
131:19,21,25
133:18 134:22
137:1,17,22

138:20,25 139:4
140:6 142:8
143:14,17,23
144:3 148:2 149:6
149:10,17 150:1
153:9,10,12,23
155:13 156:24
157:12,14,18,21
158:8 167:5,7,10
172:4,14 204:14
205:8 220:2
231:17 232:13
234:16 235:13
**seizures** 122:12
**send** 38:4 70:8,22
155:14
**sending** 82:2,5
**senior** 31:16,19
**sense** 14:3 27:2
29:5 32:8 111:19
112:2 139:7
146:18 152:15
186:12 197:20
**sent** 81:5,6 203:2
203:21
**sentence** 41:10
42:21 189:15
190:24 197:21
**sentinel** 182:19
190:13
**separate** 69:18
86:24 87:2 103:18
144:10 149:2,18
174:3,15 189:7
221:3
**separately** 136:15
144:5
**serial** 95:15
**set** 37:22 42:2
121:17 152:6
167:19 168:20,21

168:24 169:6
178:14 179:7
189:25 190:1
**sets** 136:16
**settlement** 42:4
**seven** 160:19
237:11
**shaking** 7:16
**share** 156:24
**shared** 38:23 39:1
157:5
**sharing** 233:23
234:5,17
**sheet** 240:1
**sheriff's** 16:12,13
17:15,16 42:2
102:24 103:3
106:7
**shift** 102:16
134:24
**shifts** 134:25
135:4 142:1
150:21
**shop** 110:12,13
**shoplifting** 25:12
**short** 66:18 68:18
134:3 159:18
166:25 198:12,16
236:12
**shoulder** 34:17
**show** 19:7 35:20
92:10,11 109:8
164:24 166:1
181:14,22 186:8,8
186:20 207:5,7,11
227:25
**showed** 157:10,15
165:2 177:1 180:1
187:22
**showing** 234:18,23
235:2

**shows** 87:2
**shredded** 68:7
**shut** 34:23
**shuttering** 125:25
**side** 51:15
**sign** 166:11
**signature** 239:7
241:24
**signatures** 85:4,5
85:5 89:15 92:5
139:15,21
**significant** 105:2
**signing** 241:13
**sim** 152:12
**similar** 93:22
94:13,15 96:4
**similarly** 60:17
74:5
**simply** 10:4 79:14
122:14
**simultaneously**
84:17 167:21
**single** 44:23
129:16 189:12
206:20
**sir** 39:11 75:1
**sisyphean** 88:3
**sit** 87:25 95:14
133:4
**site** 138:10,14
139:24 140:10,13
141:24 142:24
146:25 150:1,2
152:2 157:24
168:22 182:23
193:8 232:9
**sitting** 101:1 137:9
**situation** 20:16
24:18 61:1 70:20
83:4 129:14
151:20 164:23

222:15
**situations** 8:19
20:13 21:6 83:9
116:19,21 162:17
164:8 219:25
223:14
**six** 42:12 87:7 92:6
113:12 134:25
147:17,18 148:3
**sixteen** 23:17,18
**size** 151:17,17,18
201:10
**skill** 241:18
**skills** 22:20,20,20
22:22 32:6
**sleep** 147:21
171:24,25
**slides** 36:4
**slight** 35:2
**slightly** 24:17
133:19 175:21
**slip** 141:2,6,11
231:23
**slow** 135:13
**small** 70:5 155:25
**smaller** 70:10
**smell** 60:6
**smells** 191:24
192:24
**snafus** 173:2
**sneaky** 164:16
**snitko** 1:5,5 4:22
5:15
**social** 208:10
**soil** 192:10,13
**solely** 184:24
185:20
**solid** 164:22
**solution** 136:6
**solutions** 2:16 5:3
5:5 237:25

**solve** 134:8 135:7
136:22
**solved** 134:11
**somebody** 8:16,16
25:11 27:15 49:3
52:7 54:9 58:1
136:4 138:11,13
158:4 164:20,23
165:1 207:14
**somebody's** 91:6
185:16
**someone's** 26:4
75:21,21 100:11
**someplace** 68:19
**sorry** 34:10,24
39:21 41:5 46:8
63:21 74:22 80:11
91:14 93:13 98:15
99:12 102:6 114:5
116:11 132:2
159:23 171:9
183:7,7 188:5
196:3 201:9 218:9
235:5 237:20
**sort** 12:22 16:17
18:2,23 19:5
21:14 23:20,20
24:1 25:4,21
27:21 35:15 43:19
50:17 54:7 67:3,8
71:17 89:3 107:4
110:3 117:19
119:14 121:5
123:5 127:6,16
132:13 137:17
140:15 147:9
149:12,19 151:2,8
156:8 159:12,13
167:18 172:2,13
174:4,5,24 191:5
193:8 200:17

209:18 216:3
226:11,13 228:12
230:10
**sought** 208:10
**sound** 100:13
**sounded** 150:3
**sounds** 10:24 18:2
18:24 20:22 24:9
24:9 25:17,20
33:11,23 38:1
50:19 52:23 54:22
55:1 58:11 67:6
71:17 84:15
112:15 137:16,16
147:13,13 148:4,9
153:10 163:25
179:1
**source** 224:8,14,16
**southwest** 42:6,9
42:19
**sovereignty**
100:12
**space** 22:12
148:21 165:14
178:17 179:14,19
**spanned** 106:14
**speak** 7:11 98:21
126:10 235:10
**speaking** 9:18
22:20 69:14 74:15
84:10 205:22
**speaks** 116:17
117:16 119:10
162:12
**special** 4:20 6:12
14:7,13,20,21 18:2
30:21 33:11,13
34:17 39:15 40:20
53:5 73:1 77:3
79:19 82:15 98:8
100:16 114:18

126:17 134:2
161:11 196:13
198:20 206:3
235:5 237:23
**specialists** 227:20
**specialized** 19:9
**specialty** 45:19
**specific** 20:21
33:19 51:20,23
53:5 56:4,5 57:21
58:8 83:13 85:10
85:19 90:23 95:9
96:11 102:18
103:12 117:1,1
143:7 144:5 149:2
149:12 158:3
199:10 206:25
218:6
**specifically** 22:1
23:5 42:17 96:10
117:22 157:13
158:14,22 166:9
181:21 209:18
210:17 211:3
226:4 228:19
**specificity** 85:9
95:3 96:18
**specified** 56:19
**specify** 87:23
**speculate** 230:2
**speculation** 26:6
31:4 44:14 45:4
46:14 47:23 70:3
71:9 91:2,23
98:13 100:21
101:13 130:10
170:18 204:1,23
206:5,9,17 207:8
207:24 219:6
233:2,17 235:2,14

Exhibit K
1051

**speech** 100:10
101:9
**speed** 152:3
**spelling** 64:19
**spend** 192:6
**spiderman** 89:5
91:7
**spoke** 79:20
126:12
**spoken** 19:19
**sponsored** 41:16
41:22
**spores** 65:1
**spot** 85:23
**spreadsheet** 191:7
196:22 197:2,24
197:25 198:2,9
**spring** 2:10 106:1
**squad** 15:4,6,21
16:6,7,11,18,21
102:25 132:3
225:18 228:22
**square** 232:21
**ss** 241:1
**stack** 177:6 186:21
**staff** 190:4
**stamp** 74:23
**stamped** 41:4
**stand** 39:4 140:4
**standard** 184:17
193:18 194:3
**stands** 16:5 44:1,3
**start** 8:6 15:16,17
28:8 29:17 31:18
102:19 103:19
105:5 125:21
168:24 188:6
202:13 218:24
**started** 16:7 168:7
169:12 198:4

**starting** 50:13
140:24 150:8
162:24 168:20
**state** 5:9,11 6:9
10:1 13:17,18
53:16,21 106:20
118:24 144:1
162:9 241:1,5
**stated** 6:16 209:1
**statement** 117:12
124:19 155:2
188:19
**states** 1:1,10,11
2:9 4:22,23 5:17
29:4 160:4 190:23
204:19 205:9
**status** 199:21
**stay** 196:6,11
**steal** 91:6
**stenotype** 241:17
**step** 52:21 91:21
173:9
**steps** 27:21 67:8
67:19 74:2 131:19
**stick** 74:3
**stolen** 68:11,20
**stop** 91:7,11,19
122:12 135:22
162:9 163:3
**stops** 25:11 57:24
57:25
**storage** 143:10
**storc** 1:7
**store** 72:5 104:24
**stored** 68:1,2,2
71:22
**storing** 112:7
**straight** 211:6
**street** 2:10 4:4
58:1 128:22 241:8

**streets** 15:25 16:2
17:7 36:24
**stressful** 24:18
**strike** 70:2,16
**strive** 100:17
**strong** 192:9
**strongly** 100:7
**struck** 8:22
**struggling** 188:20
**study** 30:13
**stuff** 32:18 33:18
60:5 76:11 102:17
123:13 174:6
194:25
**stuff's** 169:22
**stuffed** 173:24
**sub** 99:25 101:1,19
**subject** 18:9 37:8
45:16 56:7,7
78:15 210:3
212:12
**subjects** 23:21
**submitted** 210:10
**submitting** 160:16
**subpart** 100:3
**subsequent** 219:15
**substance** 62:5
63:12 108:10
126:11 160:12
**substantially**
93:22 94:12,15,24
94:25 95:19,20
96:4
**substantive** 26:14
26:15 27:5 38:8
**successful** 110:24
**suggest** 116:14
119:5
**suggesting** 127:18
186:14

**suggests** 191:1,11
192:25
**suite** 2:6
**summer** 77:17,18
77:21 79:1,4 80:1
80:6,15 81:3,7,14
215:7,9,16 216:15
216:20 218:5
219:12,15 220:19
**summit** 42:25
**super** 110:11
**superseded** 98:4
100:25
**supervision** 32:5
**supervisor** 19:13
50:15 132:1 134:3
135:24 136:4
143:16,20 200:13
202:17 206:23
228:21 229:6
**supervisory** 32:5
134:12
**supplemental**
149:12,20 156:21
159:9 169:4
180:21,25 181:3
181:10 182:8
183:4 189:20
232:6
**support** 34:21
40:13,15 50:5,10
51:5,10 81:10,11
81:24 116:13
190:4
**supporting** 38:19
39:16
**supposed** 31:12
67:7,9,19 71:7
93:17 152:19
181:4 198:9

**supposedly** 105:23
**supreme** 34:6
**sure** 6:11 7:11,16
  9:5 10:14 12:1
  13:6 15:15 23:22
  27:12 28:12 36:15
  37:20 41:12 42:1
  44:15 48:3 49:12
  51:7 57:3 58:21
  59:11 69:11 76:4
  92:25 99:17 100:4
  110:7 113:18
  117:9 133:11
  142:2 146:24
  157:2,17 159:6,7
  164:7 165:7 174:7
  184:8 196:15
  200:3,8,9 202:17
  203:24 218:25
  223:3 231:4,8
  233:16 236:9
**surprised** 123:7
**surrounding**
  25:22
**surveillance** 138:4
  146:7,10,14
**susan** 1:23 4:5 5:4
  48:1 223:2 241:4
  241:25
**suspect** 83:24 84:4
**suspicious** 211:10
  211:10
**swapping** 111:5
**swear** 5:22 93:2
**swearing** 50:7
  51:4
**switch** 138:3,18
  167:17
**switching** 112:6
**sworn** 6:2 8:10
  157:7 241:10

**system** 44:4,6
  86:25 111:10
  135:20 136:13
  141:3 168:22
  169:9 207:21
  233:11,24

**t**

**t** 6:11
**table** 95:13
**tables** 132:11
**tactical** 29:17
  139:9 148:11
  149:2,5
**tactics** 23:23
**tag** 88:18,19,20
  159:4
**tagged** 143:6
  158:16,18 163:9
**take** 4:17 8:24
  10:23 18:23 20:2
  33:17 39:19 40:5
  60:10,21 66:10,10
  67:19 72:1 74:2
  75:13,16 87:20
  92:9,14 97:10
  110:19 120:16
  121:1,1,21 122:20
  124:9 127:20
  128:25 132:19,20
  136:17 141:5
  150:22,24 154:19
  159:18 161:22
  165:18,22 166:19
  166:20,20 173:2,3
  173:19,22 174:6
  176:23,25 179:2
  188:15,16 189:3
  198:12 209:14,15
  209:20 215:22
  222:16 225:14
  226:14 236:6

**taken** 4:21 23:11
  66:18 87:13
  102:10 122:2,8
  129:24 131:11
  137:11 143:10
  166:25 172:9
  174:24 183:16
  184:23 188:8
  198:16 236:12
**takes** 90:9 128:25
  173:5
**talk** 7:23,23 9:15
  37:15 38:7 51:14
  67:11,12,15 96:25
  108:12 113:10
  120:8,14 125:16
  131:19 154:2
  182:15 198:22
  231:10
**talked** 7:3 13:2
  36:7,8 51:13 68:3
  74:6 83:16 124:18
  129:1 139:2,11
  142:4 148:1,2
  153:22 154:3
  167:4,6 172:9
  184:2 193:7
  194:22 206:20
**talking** 11:22
  42:16 51:19 64:24
  65:1 67:16 93:13
  102:17 114:15
  127:25 135:10
  142:5 167:9 177:8
  184:3 194:9 219:2
  221:9 228:13
**tape** 139:22
**taped** 177:18
**task** 15:21,25 16:2
  16:4,11,14,15 17:4
  17:7,10,13,17,19

  17:25 18:15 20:24
  21:1,3 36:25 42:2
  42:2,5,10,18 53:10
  53:11,17 58:5
  76:4 88:3 102:25
  106:24 107:4,9,13
  107:18,23 145:3,6
  145:7,1 147:9,11
  153:11,13 204:15
  204:20
**tasked** 156:25
  157:17,23
**taught** 72:22
**teach** 24:25,25
  25:4 26:1,14 27:5
  27:11,15,20,24
  28:11,15,19,23
  29:14
**teaching** 27:4
**team** 12:10 19:16
  20:12 44:21 49:6
  132:7 133:15,19
  133:20 134:16
  137:21 138:10
  147:17,18 148:2,3
  148:8,9,11,22
  151:9,16,22,25
  152:5,15 155:12
  155:21 157:5,6
  168:9 173:14
  175:9,9 180:18
  182:14,14,14
  189:24 190:2,7
  191:3,4,12,16
  193:1,3,5,11
  196:21,25 197:24
  202:11 212:20
  215:25 221:14
  227:13,19 228:14
  230:20 231:2,24
  232:4

**teams** 49:2,3 148:2 151:18,23 152:3 168:24 178:14,17 178:20 179:13 184:13

**tech** 34:21 202:18 206:25

**technical** 76:22 156:6 200:15 207:2

**technicians** 132:9

**technique** 98:9 100:7,15,17,18 101:8

**techniques** 99:1

**technologically** 138:12

**technology** 5:2 76:12

**techs** 139:18 168:21 182:18 190:12

**telephone** 160:25 161:14

**tell** 6:9 9:7 13:3 14:5 15:13 18:22 28:24 41:21 43:5 44:21 58:15 72:21 75:14 77:20 78:25 87:25 97:4 102:22 102:22 110:4 115:2 123:13 125:20 128:12 130:12 133:10 135:17 158:10 165:11 180:25 184:1,7 187:17 191:12 192:22,25 203:17 206:20 214:22 217:14 220:13 230:18

**teller's** 192:18

**telling** 103:4 150:3 198:25

**temporarily** 71:21 71:25

**temporary** 71:25 143:10

**ten** 20:19 21:21 32:21 49:4 66:11 155:24 166:20 188:14

**tend** 21:3

**term** 14:20 43:21 45:8,10 59:21 110:2

**terms** 12:25 87:17 117:16 131:13 139:8 162:25 176:3 177:8

**terri** 2:17 5:2 39:6

**testified** 6:3 182:24 205:21

**testify** 170:21

**testifying** 8:25

**testimony** 9:23 108:4,11 119:10 234:8 237:23

**texas** 42:8

**thank** 6:7,7 7:20 22:24 23:13 34:23 39:7 40:18 48:12 66:21 76:21 83:15 95:22 102:13 197:20 198:20 205:22 236:3,15 237:3,5

**thankfully** 27:2

**theft** 62:11 63:25 85:11 91:19,21,22 163:7 188:22,24

**thesaurus** 33:1

**thief** 89:11,12 164:16

**thing** 9:5 19:22 25:3,19 34:16 35:23 42:14 60:24 62:2 93:16 114:3 122:22 136:2,3 137:8 138:12,17 140:17 149:8 164:5 174:20 177:11 184:21 186:11 188:11 194:10 207:2 208:11 211:14 221:11 225:20 235:23

**things** 25:7,16 30:6 32:11 34:5 54:3 56:11 63:13 68:3,11 85:14 86:24 95:10 121:18 132:11,22 133:19 139:1,10 151:6 168:12 172:10 173:11,24 173:25,25 192:8 192:17,19 198:5 221:13 232:3

**think** 11:6,7 14:12 17:4,24 22:4 24:11 32:8 34:5 36:12 37:25 42:8 42:11 43:9 45:22 45:22,23 48:16 55:22 57:19 58:7 58:7 61:10,19 62:22 64:17,19 70:6 75:2 83:16 98:3,18,18 102:1 104:19 107:18

109:10 113:21 119:24,25 120:16 124:19 129:13,17 135:7 140:4 142:17 144:22 147:17 148:2 149:4 150:7 153:8 155:14 157:4,6,13 160:10,11 167:25 168:1 171:3,4,8,10 171:12,13,14,15 172:15,25 173:7 173:11,20 174:23 176:3,24 180:1 184:6,8 189:22,24 190:10 193:2,2,10 194:18 199:1 207:3,10 209:1 214:17,19 219:7 220:17 222:4 225:20 227:5,8,9 227:11 228:15,16 228:23 231:11 233:3,21,21 236:6 236:16

**thinking** 42:17 88:25 90:5 120:24 125:8 161:17

**third** 151:10,14

**thirds** 100:1

**thirty** 145:18

**thompson** 143:20

**thorough** 95:9 173:4

**thought** 22:19,21 22:22 34:23 93:13 119:6 193:25 218:1

**three** 15:23 16:3 86:13,18,21 90:2 105:14 141:15

Exhibit K
1054

151:19,20,23
152:3 197:11,11
197:11 228:23
**threshold**  141:13
**throughput**  179:4
**thumb**  60:1,1,2,3
60:9,11 73:24
74:2,3 174:2
195:16
**thursday**  150:8
169:18 170:2
**tigers**  12:10
**time**  4:10 5:9 7:2
10:24 16:7 31:24
32:7 33:21 38:15
40:5 53:7 54:20
57:14 58:7,8
66:17,18,20 68:18
71:10 75:3,16
76:16,18,20 77:8
77:16 80:15 83:23
87:3 95:13 97:1
98:19 101:23,25
102:1,9,10,12
103:11 106:22,22
107:17,17 108:2
110:3 114:6,7,9
119:22,23 130:18
132:1,19 133:2
141:25 144:12
147:19 150:4,5
152:2 161:5,22
165:17 166:24,25
167:2,12 168:6,14
168:14,18 169:19
171:24 173:5
174:7,11 179:18
181:23 189:12
192:6 194:1
198:15,16,18,21
199:4 201:11

206:23 214:22
215:15 218:3
223:12 236:11,12
236:14
**timeline**  157:7
**times**  6:24 18:22
20:17,25 21:14
32:17 50:23 53:15
86:16 95:15
106:25 107:5
139:25 172:23
180:11,11 206:18
208:21 209:11
220:17
**title**  6:10 50:12
**today**  6:7 8:22
9:23 56:13 236:16
237:3
**today's**  237:22
**todd**  143:16
**token**  8:5
**told**  78:2 183:21
190:10 191:10
193:4 197:5
204:13
**toledo**  12:9
**tome**  33:7
**tomorrow**  192:2
**top**  87:23 133:6
184:12 204:19
**topic**  102:17
**topics**  33:19
**tossed**  28:1
**total**  184:20
**totality**  164:5
166:9 227:7
**totally**  101:20
103:5 136:11
165:20
**touch**  60:7

**trace**  141:3
**track**  86:17,24
141:4
**tracy**  1:10
**trade**  111:7
**trading**  112:5
**traffic**  25:10
**trafficking**  15:21
15:22 16:6,8
26:21 48:21
**train**  23:21 24:22
**trained**  73:9 101:6
101:7,18 152:11
**training**  14:16
21:24 22:8,12
23:16,16,24,25
24:13 26:18 28:8
28:18 29:7 30:5
31:17,18 32:3,5
33:15,16,23 34:1,1
34:4 35:6,14,16
36:9,10,14 40:25
42:24 43:6,8
50:15,19,21 58:16
72:14,18 95:23
96:1,8,9,11,13,18
130:23 156:22
192:16
**trainings**  22:2,6
33:17,18,21
**transcript**  241:15
241:17
**transferred**  15:24
**transgress**  57:6
**travis**  1:7
**treat**  197:18
**treated**  141:16
**treating**  64:20
**triage**  225:10,15
227:14

**tripped**  14:19
**trouble**  75:18
146:13 165:4
**true**  19:18 41:19
67:2 74:13,15
75:14 80:21
107:25 172:15
189:22 204:17
208:24 241:16
**truthfully**  8:12
92:20
**try**  17:9 65:14
98:21 105:16
177:10 185:13
209:12 224:16
226:14
**trying**  29:23,23
58:6 67:17 69:1
74:22 75:15,17
86:2,2 87:11
103:13 120:9
146:10,17,17
151:3 181:2,3
202:12,19 205:11
208:15
**turn**  30:21 43:2
59:18 72:9 73:1
74:18 90:19,21
98:6 99:8 113:10
**turned**  162:25
163:24 180:17
**turns**  47:16
163:14
**twice**  69:12
**two**  15:10,11 16:2
22:4 25:5 41:14
62:24,25 71:7
84:9,10,19 85:1,4
85:5,5 90:1 91:9
93:20 94:2,2,6,6
94:10 95:18 97:9

Exhibit K
1055

97:11,14,15 100:1
112:20 115:25
133:19 135:3
136:16 139:1,20
141:15 148:17
151:10,15,16
152:13 161:24
164:10,11 168:24
172:20 175:7
178:14 179:13
203:2,3 216:14
229:17,17 236:17
**tyler** 1:6
**type** 23:16 28:8
33:14 42:14
110:16 174:15,17
174:20 225:19
**types** 24:2 63:13
168:12 177:9
**typical** 149:16

**u**

**u.s.** 6:18 18:14
19:16 22:3 38:19
39:17,24 40:3
49:19,22 50:2
57:11 67:11,12
79:6 80:18 81:11
81:25 82:21 83:4
102:19 103:1,6,19
103:25 104:9,16
104:21,22,23
105:4,7,15,18
106:4 107:15
108:1,6,17 109:14
109:19,22,23,25
111:15,19,24
112:7,9,17 113:1
116:15,20,23
117:2,13,18
118:12 119:8
120:5 121:3,25

122:8,12,16
123:14 124:7
125:6,25 126:20
126:25 129:11
130:17 133:1,16
133:20 134:18
138:1,8 142:7
148:21 149:6
151:5 199:17
202:5 204:21
205:10,14,15
208:11 212:22
214:11,25 215:1
215:11 216:11,12
216:21 217:17
219:14 220:18
227:13 229:22,23
230:24 232:9,21
235:12
**uc** 10:13 13:8
**uh** 7:14,14,14
133:22 177:15
203:7
**ultimate** 124:1
212:23 225:3
227:14 228:2
229:13
**ultimately** 167:25
170:14
**umbrella** 107:4
233:21
**unclear** 93:23
**uncounted** 69:17
**undercover** 146:8
**underlying** 40:2
62:8 105:17
111:11 166:2
**understand** 8:7,11
8:23 9:2,6,7,13
10:7 11:3 14:12
23:14 24:15 27:3

29:9 35:2,8 48:3
54:16 62:22 67:17
68:22 80:20 88:2
93:15 94:1 106:11
110:11 112:25
116:25 118:8
124:17 127:15
129:18,18,22,23
133:12 137:15
138:17 165:22
170:23 173:21
186:13 199:20
202:25 205:7
219:2,10 226:19
228:13 233:14
**understandable**
145:13 173:18
**understanding** 7:7
45:9 46:24 98:4
101:5 169:17
233:10 234:3,11
**understood** 26:13
132:18 137:25
138:7 149:14
177:14 231:21
**undertake** 23:16
61:14 125:1,3
**undertaken**
131:20
**undertaking**
132:19
**unfeasible** 129:19
**unfold** 65:5
**unidentified** 62:5
**union** 42:4,5
**unit** 4:19 15:2 19:9
26:18
**united** 1:1,10,11
2:9 4:22,23 5:17
29:3

**units** 15:8 144:7,9
153:4 154:8,9,25
**university** 13:6
**unknown** 115:14
115:19 132:21
**unusual** 31:23
**updates** 42:13
**usao** 41:5 115:1
117:4 120:11
159:23 212:25
**usb** 194:22 195:6
195:10,12
**use** 10:4 22:19,22
25:8,15 35:17
44:2 45:8 73:4
92:10 98:8 99:1
101:8 119:1
128:20 141:13
158:20 184:21
209:16 215:3
216:10,20 217:7
217:16,19 219:13
222:22 223:21
225:21 226:7,21
227:1 228:6
**useful** 90:18 178:2
187:2
**usp** 146:1
**uspclaimform.d...**
203:5
**uspis** 106:15
143:14,21 145:2
146:19 152:7
154:11,13,15,23
154:25 232:14
**uspv** 103:17 110:5
117:11 119:2
157:10 160:24
161:1,13,15 167:9
193:8 198:25

**Exhibit K
1056**

**usual**  131:5
**usually**  19:22 28:5
  28:8 37:16 38:6
  55:7 56:10,10
  84:11 134:9
**utility**  90:20,24

**v**

**va**  2:6
**vague**  83:22 94:14
  96:5 213:8,18
  214:12 215:2
  217:18 219:4,17
  220:23 221:24
  222:21 223:20
  226:6,25 228:5
**valuable**  45:21
  60:24 64:12,18,20
  64:22,23 67:10,18
  67:24 68:4 83:17
  83:20 84:21 88:20
  88:20 196:19,25
  197:7,16,19 198:7
  223:15
**valuables**  62:13,14
  62:16 63:2,4
  64:20 66:24,25
  67:3 68:3 71:11
  73:6 83:25 84:4,7
  84:9,12,16,16 85:6
  85:25 89:22 137:3
  137:3,6 141:17,17
  143:8 173:9
  177:14 197:13
**value**  47:3,7,8,11
  47:11 121:8
**variation**  95:16
**variations**  94:24
**varied**  151:18
**variety**  83:8 95:10
  135:1

**various**  26:16
  27:21 41:16,22
  125:24 177:22
**vasquez**  148:18,25
  167:22
**vast**  226:10
**vault**  62:16 67:7
  68:2 71:25 72:6,6
  97:10 132:23
  137:3,7 141:17
  143:11 168:15
  178:12,15,16,18
  178:23 179:13
**vaults**  6:18 18:14
  19:16 20:15,16
  38:20 39:17,25
  40:3 57:11,16
  67:12,13,15 79:6
  80:18 81:11,25
  82:21 83:4 102:20
  103:2,6,20,25
  104:16,21,22,24
  105:4,7,19 106:4
  106:13 108:1,6,18
  109:14,19,23
  110:1 111:15,19
  111:24 112:7,10
  112:17 116:15,21
  116:23 117:3,13
  117:19 118:12
  119:8 120:5 121:3
  122:1,9,12,16
  123:14 124:7
  125:6,25 126:25
  129:12 130:17
  133:1,16,21
  134:19 138:1,8,20
  138:21 148:21
  149:6 151:5
  199:17 202:6
  204:21 205:10,15

208:12 214:11
  215:1,12 216:12
  216:12,22 217:17
  219:14 220:19
  230:24 232:10,22
  235:13
**verbal**  7:17
**verbally**  7:13
**verdon**  1:6
**veritext**  2:16,18
  5:3,5 34:20 38:22
  38:25 39:4,10
  74:25 75:7 76:1
  196:4,8 237:25
**version**  97:9,22
  98:5 203:8
**versoza**  126:19
  216:1 220:14
**versus**  4:22 47:17
  66:25 175:20
  221:4 225:14
**victor**  2:10 5:18
  9:15 40:18 78:16
  93:13 102:1
  108:24 130:4
  142:18 213:1,2,4,9
  213:22 214:8
  216:25 217:3
**video**  4:16,19
  151:20 152:9,11
  152:12,13,16
  168:24 175:6,10
  176:25 177:16
  178:4,15,16
**videoconference**
  1:18 2:2 4:3,6
  241:8,10
**videographer**  2:15
  4:9 5:4,21 39:7
  66:16,19 76:14,19
  102:8,11 114:5,8

166:23 167:1
  176:22 187:12
  188:10 196:2,6
  198:14,17 236:10
  236:13 237:4,6,16
  237:19,22
**videographers**
  187:17
**videos**  178:9 189:2
**videotape**  175:5
  175:12,22 176:3,7
  176:13 185:9,24
  188:13 189:12
**videotaped**  1:18
  175:19,21 185:6
  185:13,19
**videotapes**  175:24
  175:25 177:9
**videotaping**
  174:24 179:11
  185:3 186:25,25
  187:5
**view**  44:19 59:18
  59:19,21 60:3,7,13
  61:12
**viewed**  212:1
**viewing**  75:21
**violate**  26:4
**violation**  8:18,21
  108:14 205:16
**violations**  27:6
**virtual**  5:2
**virtually**  4:13
**volunteer**  52:18
  52:21
**volunteered**
  155:22 156:1,4,12
**vs**  1:9

**w**

**wait**  8:3 136:1
  194:1
**waived**  237:15
**waiving**  237:10
**walk**  67:8 69:1
  86:19 167:8 181:4
  224:4
**wallet**  196:18
**want**  6:20 9:5,15
  10:17 11:22 15:18
  21:12,12 37:19
  38:23 39:1 45:21
  58:23,23,24,25
  59:2 63:9 67:3,12
  67:15 68:6,17,18
  68:19,23 75:1
  76:10 77:13,22
  84:16 86:5 89:11
  95:2 96:25 97:19
  98:20 102:4,16,18
  114:2,3 120:8,18
  137:5,6,6,9 140:18
  145:12 160:3
  165:13,15 170:17
  176:22,24 180:24
  181:12 192:5,6
  194:1,1 196:6
  198:21,22 214:24
  218:25 223:3
  228:12 230:1
  232:3,20 235:2
**wanted**  31:11
  32:15 49:11 109:9
  113:9,10 120:14
  159:19 167:7
  190:22
**warrant**  6:18 28:5
  28:9,16,19 29:1,11
  29:15,18 30:6
  38:19 39:16,18,24

40:2,2,11,12,13,14
40:15,16 49:15,17
49:24,25 50:3,5,10
51:5,10,14 52:11
52:19 53:17 54:3
54:4,6,9,13,13,23
55:2,3,6,11,13,14
55:19,21,23,25
56:6,19,22,24 57:5
57:5 60:5 73:14
73:20,25 74:1,7,14
74:16 79:5 80:18
80:19 81:15,15,25
87:19,20,21 92:9
103:9 109:5
112:24,25 113:13
113:19,20,22
114:15 116:14
120:10,15,20
121:11,11,12,14
123:17 131:19,20
131:21,25 133:17
134:17,20,22
135:2 137:17,22
138:19,20,23
139:4 140:6 142:6
142:8 143:18,24
144:3,3 148:5,13
149:6 150:1
153:10,12,18,23
154:6,24 155:13
156:25 157:6,12
157:14,18,22
158:8,20,24 159:6
167:5,7,10 168:11
172:4,14 195:4,17
204:14 219:16
220:2,20 231:17
232:14 234:16
**warrant's**  55:6

**warrants**  28:7
  51:17 52:3,4,15,24
  53:6,8,21 54:2
  92:7 133:1,8,18
  143:14 147:24
  148:15,16,20
  149:3,9,16 155:21
  156:10 158:1
  167:14 220:16
  221:6
**washoe**  241:2
**watch**  59:4 67:25
  164:15 174:2
**watches**  90:1,1
  143:1
**way**  15:18 37:7
  62:12,25 100:1
  117:3,14 118:13
  119:25 124:13
  125:6,9,17 126:24
  127:3 128:10,11
  129:5 139:21
  175:13 176:19
  200:10 202:12
  205:12 208:14
  217:4 221:12
**ways**  33:5 87:7
  110:18 125:16,24
  127:19 177:13
**we've**  36:15 66:23
  102:17 139:11
  154:19 165:5
  167:4,9 193:7
  236:24
**web**  76:4
**website**  97:10,18
  199:19 200:17
  208:20
**weeds**  188:3
**week**  22:5 41:14
  49:5 150:15

155:20
**weeks**  23:17,18
**went**  10:9 13:3,4,6
  13:8 42:15 59:10
  99:12 135:21
  141:17,18 150:12
  150:13 156:2
  175:7 179:18
  181:8 185:4
  191:15 230:19
**western**  1:3 4:24
  42:4,4
**wet**  68:7 191:24
**whatsoever**  80:3
**whichever**  15:18
**white**  15:4,5,7,8
  15:12,14 16:16,18
  16:21,22 17:21
  18:1 23:9 26:19
  62:5,5 63:12
  144:7
**wife**  164:9
**wilkison**  1:10
**willing**  168:2
**wind**  127:24
**windows**  76:3
**withdraw**  225:25
**witness**  1:21 4:15
  5:22 40:9,10
  44:15 45:5,12
  46:15 47:2,25
  48:10 53:25 57:1
  57:8 58:21 59:24
  66:14 67:23 69:7
  70:10,17,25 71:10
  71:21 72:11 77:22
  77:25 78:12 79:23
  80:11 83:24 84:24
  89:8 91:4 92:1,24
  93:9 94:1,17 95:8
  96:7 98:14,17,21

Exhibit K
1058

99:4,10 100:23
101:15 108:25
116:19 117:18
118:15 119:12
122:19 123:21
125:15 126:5,6
128:6 130:12
131:9 142:12
155:8 162:13
170:20 171:1
188:1,5 189:1
201:1,5 204:2,24
205:18,20 207:10
208:1,6 214:1,6,17
215:7,14 216:7,16
217:1,21 218:16
218:19 219:7
221:1 223:1 224:1
224:21,25 226:9
227:3 228:9 230:2
230:4 233:3,20
234:10 235:16
236:9 237:5
**witnesses** 84:5
108:13
**wondering** 41:24
88:5 110:2 114:14
135:9 182:22,25
184:16 205:8
**word** 32:25 70:22
163:1,14 171:14
215:3 217:19
222:22 223:21
226:7 227:1
**words** 64:19 162:5
162:8 213:18
228:6
**work** 14:25 15:2
18:17,25 23:7
29:3,3 32:7 49:3
50:24 53:10,12

76:22 103:3
149:15 160:16
226:11 228:24
**worked** 15:21,22
16:1,4,6 18:1 23:3
23:5 48:25 49:4
58:4 125:4 141:25
178:21 201:23
202:4
**working** 13:23
16:7,10 17:20
18:14 20:24 21:1
48:20 49:23 50:16
52:1 53:20 102:24
145:22 182:19
190:13
**works** 45:18 53:15
141:5
**world** 105:19
197:9
**worse** 8:2
**worth** 109:10
**wow** 23:18 48:23
150:17
**wrapped** 173:7
192:24
**write** 50:9,20 51:9
89:1 90:8 95:14
95:24 115:25
**writer** 50:11
**writing** 22:20 51:4
91:7 94:3
**written** 30:13
55:24 56:23 87:5
89:2 101:19 193:3
**wrong** 24:17 59:9
69:13 72:22 85:17
85:20 91:8 148:10
164:13 165:17,18
171:15 196:1

**wrongdoing** 65:16
**wrote** 50:12,12,16
54:7 116:6 149:18
149:19 180:12
184:6

| x |
| --- |

**x** 3:1

| y |
| --- |

**yard** 145:9
**yeah** 7:3 12:12
13:17 23:3 26:13
27:17,17 32:22
34:20 36:7 37:25
37:25 38:6,9 39:3
41:5 51:19,19
57:12 61:5,7
63:11 64:16 75:23
76:10,12 80:11
81:17 87:15 88:11
91:15 98:2,4,20
102:6,24 112:12
113:11,17 126:21
128:6 132:7
142:24 145:11
147:25 151:19
154:21 170:11
172:23 174:18
176:21 178:1
179:12 182:15
188:6 195:25
196:4,9,10 197:8
201:21 203:10
221:1 229:19,25
232:18 234:14
**year** 33:17 37:12
106:1 184:6 197:9
229:20
**years** 15:23 16:3
46:25 52:12
105:10

**yesterday** 11:11
77:10,14 171:3
236:23
**youth** 12:11
**yup** 203:22

| z |
| --- |

**z** 6:11
**zellhart** 1:19 4:6
4:20 6:1,11 12:1
34:18 38:18 39:15
40:20 77:3 79:19
97:4 114:18
161:11 196:14
198:20 206:3
235:5 237:23
239:3,13 241:9
**zero** 58:13
**zirconia** 86:3
**zoom** 7:22 76:5

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is stenographically recorded, the deposition officer shall send written notice to the deponent and to all parties attending the deposition when the Original transcript of the testimony for each session of the deposition is available for reading, correcting, and signing, unless the deponent and the attending parties agree on the record that the reading, correcting, and signing of the transcript of the testimony will be waived or that the reading, correcting, and signing of a transcript of the testimony will take place after the entire deposition has been concluded or at some other specific time.

(b) For 30 days following each notice under subdivision (a), unless the attending parties and the deponent agree on the record or otherwise in writing to a longer or shorter time period, the deponent may change the form or the substance of the answer to a question, and may either approve the transcript of the deposition by signing it, or

**Exhibit K**
**1060**

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit K**
**1062**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit K**
**1063**