STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
VICTOR A. RODGERS (Cal. Bar No. 101281)
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorneys
Major Frauds/Asset Forfeiture Sections
    1100/1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0102/2569/1785
    Facsimile: (213) 894-6269/0142
    E-mail: Andrew.Brown@usdoj.gov
          Victor.Rodgers@usdoj.gov
          Maxwell.Coll@usdoj.gov

Attorneys for Defendants
UNITED STATES OF AMERICA, and
TRACY L. WILKISON and KRISTI KOONS JOHNSON
IN THEIR OFFICIAL CAPACITY ONLY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| PAUL SNITKO, JENNIFER SNITKO, JOSEPH RUIZ, TYLER GOTHIER, JENI VERDON-PEARSONS, MICHAEL STORC and TRAVIS MAY,<br><br>       Plaintiffs,<br><br>       v.<br><br>UNITED STATES OF AMERICA, <u>ET AL.</u>,<br><br>       Defendants. | Case No. 2:21-cv-04405-RGK-MAR<br><br>**DEFENDANTS' OPPOSITION BRIEF TO PLAINTIFFS' OPENING BRIEF AND DECLARATIONS; REQUEST FOR JUDICIAL NOTICE FILED UNDER SEPARATE COVER** |

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    A.    The April 2019 Commencement Of Criminal Investigation Against USPV............................................................................................................ 2

        1.    Background Regarding USPV .................................................... 3

        2.    USPV's 2019-2020 Activities Revealed By The Criminal Investigation. ............................................................................ 4

    B.    Criminal Investigative Agents First Speak With Asset Forfeiture Agent ..................................................................................................... 5

    C.    The March 2021 Grand Jury Indictment Against USPV ..................... 6

    D.    The Operation Order Search Plan and Supplemental Inventory Instructions. ......................................................................................... 6

    E.    The Applications For Search And Seizure Warrants And Warrants' Execution. ............................................................................................ 7

    F.    Inventorying Agents' Compliance With FBI's Inventory Policy ........ 8

    G.    The Two Remaining Claims In This Case. ......................................... 10

ARGUMENT ............................................................................................................ 11

    A.    Plaintiffs Have Not Established A Fourth Amendment Violation............. 11

        1.    An Inventory's Lawfulness Is Determined By Analyzing A Written. ............................................................................... 11

        2.    Plaintiffs Have Not Established Pretext........................................ 12

            a.    Dual Motives Do Not Establish Pretext, Which Instead Requires Plaintiffs Show The Government's Motive To Search The Individual Boxes Without Probable Cause Was The But For Cause Of Its Decision To Seize The Nests Of Safety Deposit Boxes. ............................................. 12

            b.    Collecting Forfeiture Information About Cash, General Inventory Property Descriptions And Drug Dogs Do Not Establish Pretext. ....................................................... 13

        3.    Plaintiffs Failed To Show The Government Misled The Magistrate By Failing To Disclose Material Facts Or Exceeded The Warrants' Terms. ...................................................... 15

i

        4.     The Failure To Use Alternatives Does Not Show An Unlawful Inventory. ........................................................................................... 18

   B.    A Segregation Of Documents Order Is Unwarranted. ................................ 19

DECLARATION OF AUSA VICTOR A. RODGERS ..................................................... 22

DECLARATION OF SPECIAL AGENT LYNNE ZELLHART ................................. 601

ii

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Burum v. United States*,
    2014 WL 12596719 (C.D. Cal. Apr. 2, 2014) ............................................................. 17

*Colorado v. Bertine*,
    479 U.S. 367 (1987) .................................................................................... 11, 13

*Doe v. United States*,
    2021 WL 3206807 (C.D. Cal. Apr. 22, 2021) ............................................................. 15

*Fendler v. U.S. Parole Com.*,
    774 F.2d 975 (9th Cir. 1985) ...................................................................... 19

*Florida v. Wells*,
    495 U.S. 1 (1990) ............................................................................................ 11

*Illinois v. Lafayette*,
    462 U.S. 640 (1983) .......................................................................... 11, 18-19

*Laird v. Tatum*,
    408 U.S. 1 (1972) .......................................................................................... 19

*Miranda v. City of Cornelius*,
    429 F.3d 858 (9th Cir. 2005) ...................................................................... 18

*Ordonez v. United States*,
    680 F.3d 1135 (9th Cir. 2012) .................................................................... 11

*Ramsden v. United States*,
    2 F.3d 322 (9th Cir. 1993) .................................................................. 17, 20

*Search & Seizure of Box No. 8309 at U.S. Priv. Vaults v. United States*,
    2021 WL 7707761 (C.D. Cal. Aug. 30, 2021) ............................................. 11

*In re Search of 4801 Flyer Ave.*,
    879 F.2d 385 (8th Cir. 1989) ...................................................................... 20

*South Dakota v. Opperman*,
    428 U.S. 364 (1976) ...................................................................................... 11

iii

## TABLE OF AUTHORITIES (cont'd)

*United States v. Bowhay*,
  992 F.2d 229 (9th Cir. 1993) ................................................ 12, 13, 15

*United States v. Christensen*,
  624 F. App'x 466 (9th Cir. 2015) ......................................... 15

*United States v. Comprehensive Drug Testing, Inc.*,
  621 F.3d 1162 (9th Cir. 2010) .............................................. 1

*United States v. Dean*,
  669 F. App'x 891 (9th Cir. 2016) ......................................... 20

*United States v. Garay*,
  938 F.3d 1108 (9th Cir. 2019) .............................................. 15

*United States v. Johnson*,
  889 F.3d 1120 (9th Cir. 2018) .............................................. 13

*United States v. Leon*,
  468 U.S. 897 (1984) ............................................................ 18

*United States v. Lopez*,
  547 F.3d 364 (2d Cir. 2008) ................................................. 14, 15

*United States v. Orozco*,
  858 F.3d 1204 (9th Cir. 2017) .............................................. 13

*United States v. Rettig*,
  589 F.2d 418 (9th Cir. 1978) ............................................... 17

*United States v. Smith*,
  940 F.2d 395 (9th Cir. 1991) ............................................... 19

*United States v. Torres*,
  828 F.3d 1113 (9th Cir. 2016) .............................................. 12, 19

## <u>TABLE OF AUTHORITIES</u> (cont'd)

**Federal Statutes**

18 U.S.C. § 983(a)(1)(A)(i) ........................................... 16

18 U.S.C. § 983(j)(1)(B)(i) ........................................... 19

18 U.S.C. § 1963(d)(1)(B)(i) ........................................... 19

**Rules**

Fed. R. Civ. P. 30(b)(6) ........................................... 25

Fed. R. Crim. P. 41(g) ........................................... *passim*

# INTRODUCTION

Plaintiffs make the extraordinary argument that the inventory search here, which was specifically described in an affidavit for a search and seizure warrant, approved by a federal magistrate judge, and conducted in conformity with FBI's written inventory policy, constituted a "flagrant violation" of the Constitution.  This "flagrant violation" nomenclature is a misplaced attempt to invoke United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162 (9th Cir. 2010) ("CDT"), to argue the government exceeded the terms of the warrants and thus "callously disregarded" the rights of boxholders at US Private Vaults ("USPV").  But the argument fails on all fronts.

Plaintiffs do not even bother to discuss the relevant terms of the inventory policy to show a violation thereof; accordingly, the only remaining terms of the warrant allegedly exceeded are those stating the warrants do not authorize a "seizure" or "criminal search" of the contents of the individual boxes.  But that is a legal standard, not the specific factual restrictions and factual search protocols added to the warrant by the federal judge in CDT that agents "flagrantly violated" and "utterly failed" to follow, leading to a finding of agents' "callous disregard" (which is a higher standard than a mere violation) of a Fed. R. Crim. P. 41(g) movant's rights.  Here, by contrast, Plaintiffs argue that a warrant that explicitly sets forth what every warrant implicitly prohibits (i.e., that agents cannot execute a warrant in violation of the Constitution) can somehow rise to the level of a "callous disregard" finding against inventorying agents.  However, the determination of a Fourth Amendment violation is a legal question and conclusion for the courts, not a factual question for agents to decide in performing their duties.

Plaintiffs' discussion of inventory policy violations is also fatally flawed because, while claiming the government violated inventory policy, they do not even discuss the relevant portions of the policy that dictate how the inventory must be conducted, including that agents were required to conduct "a prompt and thorough search of the contents of property, including searching any locked or unlocked containers and inventorying their contents."  Agents did so here.  Plaintiffs have not shown otherwise,

and ignore this provision altogether, instead raising irrelevant arguments regarding whether particular agency actions advance the general purposes of an inventory.

Unable to establish a violation of the relevant inventory policy, plaintiffs argue the inventory was pretextual, yet they ignore the standards for proving pretext.  They do not show that the government's sole motive in seizing USPV's business equipment was for an unlawful purpose, and dual motives (i.e., to inventory and criminally investigate) do not establish pretext.  Nor do they show the government's purported motive to search the individual boxes without probable cause was the "but for" cause of the government's decision to seize the nests of safety deposit boxes, as required to prove pretext.  The criminal investigation against USPV, a money laundering facilitator and magnet for criminal activity began in April 2019, or well before criminal investigating agents spoke with an asset forfeiture agent about forfeiture.  When the nests of safety deposit boxes were seized, the goal of the criminal investigation was fulfilled--USPV was immediately and effectively terminated.  The claim that agents would not have seized USPV's business equipment "but for" the government's alleged motive to forfeit boxholder assets is completely belied by the facts.  Plaintiffs' innuendos that the government wanted to use forfeited assets to enhance police department revenues lacks evidentiary support and is refuted by the government's transmission of millions of dollars seized during the inventory and subject to forfeiture proceedings to pay victims of crime.  See Defendants' Request For Judicial Notice Exhibits A-D.

## STATEMENT OF FACTS

A.   The April 2019 Commencement Of Criminal Investigation Against USPV.

The government, through three federal agencies, commenced its criminal investigation of USPV, the business entity, in April 2019.  Ex. GG[1] at 526:17-23; 527:14-528:5; 529:11-19; 530:25-531:3; Ex. FF at 507:21-508:13; 509:1-25.  See also Ex. HH at 551:18-552:23.  Before the USPV investigation began, law enforcement had investigated individual USPV customers, but those investigations had been ineffective at

---

[1] Exhibit references are to the Rodgers Decl.

1  stopping criminal conduct at USPV.  Ex. GG at 528:6-12: Ex. II at 561:4-23.

2  Accordingly, the FBI, DEA and USPIS attempted to come up with a strategy to address

3  USPV, the business, as USPV was operating as a money laundering facilitator that

4  attracted, protected and enabled a large number of criminals. Ex. GG at 528:12-529:10;

5  532:25-535:22; Ex. II at 561:23-562:4.  USPV was a criminal magnet; the company

6  marketed itself to and protected criminals and obstructed law enforcement.  Ex. GG at

7  536:7-537:5.  During the investigation, the lead criminal agents from their respective

8  agencies, Zellhart, Carlson and Versoza, spoke by telephone about their activities, and

9  the DEA and USPIS conducted field surveillance work and undercover operations while

10  the FBI collected data and drafted the affidavit which would be used to obtain warrants.

11  Ex. HH at 551:18-552:23; 553:24-554:24; Ex. JJ at 576:14-579:9; 582:19-583:6.  The

12  affidavit for warrants relative to USPV submitted to the magistrate judge discussed the

13  criminal investigation, as set forth below.

14      1.   Background Regarding USPV

15      In 2015, law enforcement agencies learned that criminal investigation targets were

16  employing USPV, a company that rented safe deposit boxes, to store criminal proceeds.

17  Ex. B ¶¶ 8 and 10 at 59-61.  By providing and promoting total anonymity, USPV

18  catered to and attracted criminals who sought to keep their identities and cash beyond the

19  reach of banks, the IRS, and law enforcement.  Id. ¶ 11 and 16-19 at 62, 64-66.  USPV's

20  primary pitch to customers was anonymity, as reflected in its website that provided

21  "Complete Privacy; Biometric Identification; No ID Required" and boasted "Our

22  business is one of the very few where we don't even want to know your name.  For your

23  privacy and the security of your assets in our vault, the less we know the better."  Id.

24  ¶¶ 11 and 12 at 62 (Emphasis in original).  The underscored statement appealed to

25  persons engaged in activities they wished to hide.  Id. ¶ 12 at 62.

26      USPV website posts showed it was marketing its services to criminals and those

27  operating outside the law, by comparing itself to banks and law-abiding financial

28  institutions, in order to hide their money and avoid paying taxes. Id.  ¶¶ 12-14 and 21 at

3

62-63 and 76.  In one post USPV stated "As government chartered institutions, banks are now required to file 'suspicious activity reports.' . . . U.S. Private Vaults is not subject to federal banking laws and would only cooperate with the government under court order." Id. ¶ 14 at 63.  Also, USPV charged customers a premium for its service because, unlike legitimate banks, it offered anonymity, assistance in avoiding law enforcement, money laundering services, a willingness to look the other way regarding criminal conduct and a place to store illegally obtained cash.  Id. ¶¶ 22 and 27 at 67 and 78.

   2.   USPV's 2019-2020 Activities Revealed By The Criminal Investigation.

   Mark Paul, USPV's owner and founder, told a cooperating witness that USPV's best customers were "bookies," "prostitutes" and "weed guys[,]" told a CI in November 2019 that about one-third of USPV's business came from the cannabis industry and told a CI in December 2019 "you don't want every drug dealer in your place either.  You need normal people too," thus suggesting USPV needed to attract some non-criminal clientele to avoid being an obvious haven for criminals.  Id. ¶¶ 21, 27 and 29a at 76, 78-80.  On December 17, 2019, Michael Poliak, who became a USPV co-owner in 2019, told a CI that before then, USPV made no money, with two thirds of its boxes empty, but now they were 60-63% full and revenues had increased from $3,000 to $30,000 monthly from referrals he obtained by calling marijuana lawyers, and USPV intended to expand. Id. ¶¶ 9b, 29, 29a, 29d at 59-60, 79-81.

   In July 2019 and while at USPV, USPV's manager showed a CI USPV's security monitors and pointed out a number of vehicles the manager believed belonged to law enforcement and in the area because of the CI.  Id. ¶¶ 9c and 98 at 60, 130.  While at USPV, USPV's manager on August 9, 2019 instructed a CI on how to structure a cash purchase of gold, and on January 13, 2020 another USPV principal instructed a CI on how to structure a jewelry purchase; and on January 28 and February 25, 2020, USPV principals had similar structuring conversations.  Id. at ¶¶ 83 and 85-88 at 110-115. During surveillance at USPV between February 1, 2020 and February 26, 2021, agents identified many USPV customers likely engaged in criminal activity and storing criminal

proceeds or evidence of crimes at USPV. <u>Id.</u> ¶ 20j at 74. Officers seized and forfeited from USPV boxes 400 silver coins and 26 silver bars found September 9, 2015; $500,000, 22 gold bars and 15 gold coins seized in October 2015; $200,100 seized November 3, 2015; $1,543,400 seized in November 2015; $592,450 and $435,190 seized in September 2016 and used to pay restitution to victims; $101,080 and 26 gold bars seized March 6, 2018; and $1,448,700 seized in July 2019. <u>Id.</u> at ¶ 20a-i at 68-74.

B.   <u>Criminal Investigative Agents First Speak With Asset Forfeiture Agent About One And Half Years After The USPV Criminal Investigative Began</u>.

As set forth above, criminal investigative agents started investigating USPV in April 2019. In the summer of 2020, criminal investigative agents and the criminal major frauds AUSA who would present the matter to the grand jury discussed indicting USPV and obtaining warrants as to it. Ex. II at 563:6-564:15. No asset forfeiture agent was involved in the discussions, as conversations with asset forfeiture agent Murray, the agent in the FBI Los Angeles field office involved in civil administrative asset forfeiture, occurred later in the summer or fall of 2020. Ex. II at 565:14-16; 566:3-12.

In the fall of 2020, or about one and one half years after the USPV criminal investigation began, the FBI forfeiture agent <u>first</u> became involved in discussions with criminal investigating agents, and spoke with her supervisor shortly before the discussion. Ex. KK at 586:25-587:19; 589:19-591:25 and 82:9-14; Ex. II at 565:17-23. The asset forfeiture agent, who was not involved in the investigation, decided she would need to see the final affidavit before concluding there was probable cause to seize assets in boxes to pursue FBI administrative forfeiture. Ex. KK at 588:22-581:13; 592:19-593:14. Upon reviewing the final affidavit in February or March 2021, the forfeiture agent decided probable cause existed to seize boxholder assets [Ex. KK at 594:14-595:12 and 596:7-16], but she of course did not know what assets were in any box. FBI administrative forfeiture proceedings against specific assets were commenced May 20, 2021 (not as plaintiffs falsely state upon the warrants' execution [PB at 14:26-28] but instead 60 days later), by sending a notice letter to USPV. Ex. J at 328-346.

5

C.   The March 2021 Grand Jury Indictment Against USPV

On March 9, 2021, the grand jury returned an indictment against USPV, charging USPV with a conspiracy to launder money, distribute controlled substances and structure financial transactions, and reflected the grand jury's finding that probable cause existed to forfeit USPV's business equipment.  Ex. F.  The indictment provided that USPV's business was predicated on "attract[ing] customers in possession of proceeds from criminal offenses" which it did by "touting the anonymity of the safety deposit rentals" and "boasting that, unlike banks, its anonymous safety deposit box rentals did not require customer information that 'can be easily accessed by government agencies (such as the IRS)[.]' "  Id. ¶ 3a at 277.  The indictment also noted that USPV conspired with others to launder money, and alleged acts between 2019 and November 2020, including December 2019 structuring and cocaine transactions.  Id. at ¶¶ 1-11 at 275-284.

D.   The Operation Order Search Plan and Supplemental Inventory Instructions.

Agent Zellhart prepared an "Operation Order Search Plan" and "Supplemental Instructions on Box Inventory," dated March 12, 2021, and discussed them with agents in meetings held one week before the search.  Exs. GG at 541:12-542:23, G and H.  The search plan noted USPV was a "hub of criminal activity" "knowing facilitator" of money laundering and "safe harbor for criminal conduct of every kind."  Ex. G at 292.  The instructions comported with the FBI Domestic Investigations and Operations Guide's ("DIOG") inventory policy, stating agents would "search and inventory all boxes according to FBI policies and procedures," and process box contents "as described in this memo[.]" Ex. H at 305; Ex. II at 559:7-560:17; Exs. GG at 523:17-19; 524:11-14; 525:3-19.  The instructions explained how agents should handle and inventory cash, non-cash valuables, digital currency, firearms, drugs and hazardous items, directing agents to create an "inventory list" for each box "bagg[ing . . . [and] label[ing]" the inventoried items and completing a FD-597 (receipt of property), FD-886 (evidence log), FD-1004 (chain of custody) and FD-302.  Ex. H at 306-308.  The instructions told agents to note "if the box includes a USPV notification form identifying a contact person for the box.

Bag and tag the contents form.  Agents cannot search the contents of boxes for evidence, but may examine the contents to identify the box owner." Id. at 306.  Thus, the instructions were not limited to forfeiture matters as plaintiffs falsely suggest.

E.     The Applications For Search And Seizure Warrants And Warrants' Execution.

In March 2021, the government submitted a common affidavit with separate applications for search and seizure warrants as to USPV's business equipment (i.e., USPV's business computers, money counters, nests of safety deposit boxes, digital and video surveillance and security equipment and biometric scanners).  Exs. B and D.  The applications contained the language in the attachments to the search warrant and seizure warrant regarding the business equipment that the magistrate judge adopted without change in issuing them.  Exs. A at 32-33; B at ¶ 1k at 45-46; C at 163; and D at 165.

Plaintiffs cite selective portions of the warrants and affidavit, yet ignore others which discuss that inventorying had multiple purposes, separate from identifying owners.  The warrants attachments the government drafted and the magistrate judge adopted state that the warrants do "not authorize a criminal search or seizure of the contents of the safe deposit boxes[,]" and then provide:

In seizing the nests of safety deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property.  (Emphasis added).

Ex. A at 32-33; Ex. C at 163.  The affidavit also discussed that agents would follow written inventory policy, as well as the multiple purposes of an inventory:

The search and seizure warrants the government seeks list the nests of safety deposit boxes at USPV among the items to be seized.  These nests of safety deposit boxes are evidence and instrumentalities of USPV's criminality.  The warrants authorize the seizure of the nests of the boxes themselves, not their contents.  By seizing the nests of safety deposit boxes,

7

the government will necessarily end up with custody of what is inside those boxes initially.  Agents will follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner. Ex. B ¶ 108 at 137 (emphasis in original).

The affidavit also stated (1) the FBI would comply with its written inventory policies concerning an unknown person's property, but did not (nor could it) state that that policy somehow cancelled other portions of the policy, as plaintiffs suggest; and (2) the FBI had set up an informal procedure for boxholders to make an immediate request for the return of their property, although there was no legal obligation to do so:

Agents will attempt to notify the lawful owners of the property stored in the boxes how to claim their property, such as by posting that information on the internet or at USPV itself, or by contacting the owners directly.

In order to notify the owners directly, agents will, in accordance with their policies regarding an unknown person's property, look for contact information or something which identifies the owner.  (Footnote omitted).

Id. at 137-38.  The footnote provides "The FBI policy regarding taking custody of an unknown person's property provides, in part, that agents 'inspect the property as necessary to identify the owner and preserve the property for safekeeping.'  The inspection 'should extend no further than necessary to determine ownership.' " Id.

Hundreds of officers were at USPV between March 22 and 26, 2021, while officers executed the warrants.  Ex. FF at 510:2-511:22.  Agents prepared written inventory documents for about 700 boxes.  Ex. GG at 545:1-11.  Agents found firearms, ammunition and fentanyl in boxes. Zellhart Decl. ¶ 6; Exs. DD and EE.

F.    Inventorying Agents' Compliance With FBI's Inventory Policy

Plaintiffs argue the inventory policy provides that "agents 'inspection [of the box contents] should extend no further than necessary to determine ownership" and violated that policy when they found an executor notification letter in a box but continued

8

inventorying.  PB 8:1-4; see also 5:1-12.  But this portion of the policy pertains, as the affidavit noted, to an unknown person's property.  Plaintiffs also ignore pertinent policy provisions, including DIOG § 18.6.12.4.1 discussed below that specifically direct agents how to conduct the inventory, which showed agents had to perform additional tasks, other than looking for ownership indicia like the executor letters, when inventorying:

> As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents.  A written summary showing the results of the inventory must be recorded in an FD-302, an FD-597 ("Receipt for Property"), or an FD-653 ("Motor Vehicle Inspection Inventory Record").  The written summary must include, but is not limited to, a description of the property and the items secured for safekeeping.  Ex. E at 273-74 (emphasis added).[2]

Plaintiffs' argument that agents had to stop inventorying when executor letters were found is wrong.  While the letters helped to identify owners, multiple situations existed where agents found photographs of driver's licenses and passports with different names and letters from prior box renters.  Ex. GG at 543:2-23.  "So it's a - - it's a great starting point in terms of who the box holder is, but it, as it turned out, is not the last word on it."  Ex. GG at 543:24-544:1.  (Indeed, three plaintiffs' letters were over 3 years old [Ex. N at 371-372; Ex. U at 412-413 and Ex. W at 421-22]).  Even if a letter were found, agents still had to continue inventorying per policy requiring a "thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents," meaning "everything still needs to be bagged and tagged and processed according to our evidence procedures, with all of the redundancies and paperwork."  Ex. GG at 544:2-15; and Ex. FF at 514:23-518:21.

---

[2] The policy then states "Agents must provide receipts for all items retrieved during inventory searches.  Agents should also memorialize facts pertinent to other activities undertaken during the inventory process, such as . . . a non-inventory-related search conducted and any evidence collected (i.e., FD-1087, "Collected Evidence Log" [Sentinel]) that are relevant to the investigation.  Id. (emphasis added).

Plaintiffs also misstate additional policy terms, arguing that the policy "states that, if 'there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents' should seek a warrant allowing them to conduct the criminal search." PB 5:15-18.  But the policy begins with "Agents may not perform inventory searches solely for investigative purposes" and then provides (with plaintiffs' omissions *italicized*):

> Whenever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a *search* warrant *when feasible.  Searches conducted pursuant to a warrant are presumptively valid.  Obtaining a search warrant eliminates any later argument that the inventory search was conducted solely for investigative purposes and thus unjustified.*  Ex. E at 274.

Here it would not have been feasible for the government to obtain search warrants in advance for individual boxes because the boxes were rented anonymously, and so the government knew neither what was in specific boxes nor even who controlled them.  But the government did follow this preference for search warrants and obtained them for dozens of individual boxes that appeared to warrant criminal investigations, after the inventorying was complete.  Zellhart Decl. ¶ 5.

G.    The Two Remaining Claims In This Case.

Plaintiffs' remaining claims in their first amended complaint ("FAC") are their class claim in Count I under the APA, Declaratory Judgments Act and Constitution (ECF 33 [FAC ¶¶ 1 and 152-171]) alleging that the government's search violated the Fourth Amendment, and their individual claim in Count VII under Fed. R. Crim. P. 41(g) ("Rule 41(g)") and the Court's equitable power for return of property that only seeks the return the individual plaintiffs' seized property (ECF 33 [FAC ¶¶ 2, 231-241 and ¶ L at 52:4-8]).  Five plaintiffs admit their property has been returned (making their individual claim moot) and Rule 41(g) relief is unavailable for the other two plaintiffs who claim

$2,000 has was not returned, because the government does not possess those funds.[3]

# ARGUMENT

A.  Plaintiffs Have Not Established A Fourth Amendment Violation.[4]

    1.  An Inventory's Lawfulness Is Determined By Analyzing A Written Inventory Policy, Not By Whether Officers' Actions In Conformity Therewith Advance The General Purposes Of An Inventory.

Plaintiffs proceed on the flawed premise that courts must consider whether inventorying agents' actions advance the general purposes of an inventory.  However, the determining factor on an inventory's lawfulness is whether inventorying agents' actions conformed to a standardized inventory policy, which as a result limits agent discretion in conducting the inventory.  Caselaw regarding the rationale for upholding inventory searches as lawful, despite the absence of probable cause, reveals this is so.

Inventory searches are "a well-defined exception to the warrant requirement of the Fourth Amendment."  Colorado v. Bertine, 479 U.S. 367, 371 (1987).  Accord, Illinois v. Lafayette, 462 U.S. 640, 643 (1983) (same).  In order to avoid concerns about "an inventory search [being used as] a ruse for a general rummaging in order to discover incriminating evidence[,]" the inventory must be conducted pursuant to an inventory policy that has "standard criteria" or an "established routine" and thus sufficiently guides the inventorying officers' discretion and avoids a general rummaging.  Florida v. Wells, 495 U.S. 1, 4 (1990).  Accord, South Dakota v. Opperman, 428 U.S. 364, 372 (1976).

Except as to pretext (which requires analysis of subjective intent), proof that

---

[3] Ex. M at 361:10-362:12; Ex. P at 377:23-378:19; Ex. X at 425-426; Ex. Y at 430-433; Ex. S at 398:2-15; Ex. T at 404:16-405:8; 407:23-408:7; Ex. V at 417:9-418:10; Ordonez v. United States, 680 F.3d 1135, 1137-40 (9th Cir. 2012); Search and Seizure of Box No. 8309 at U.S. Private Vaults v. United States, 2021 WL 7707761, *2 n.1 (C.D. Cal. Aug. 30, 2021); Zellhart Decl. ¶ 2.

[4] Plaintiffs must prove their Fourth Amendment claim by a preponderance of the evidence [see Ninth Circuit Model Civil Jury Instructions Nos. 9.12 and 9.19], not under the summary judgment standard they suggest.  A "trial-on-the-briefs" means exactly that- -a trial on the briefs; the parties agreed thereto at the scheduling conference (Ex. L at 350-355) and is consistent with the parties filing opening, opposition and reply briefs with extensive evidentiary citations.

officers conducted an inventory consistently with a standard inventory policy validates
the inventory as lawful and ends the inquiry; that is, officers' subjective motivations in
conducting the inventory are irrelevant in that circumstance.  United States v. Torres,
828 F.3d 1113 (9th Cir. 2016).  In explaining the irrelevance of subjective officer intent
where officers comply with inventory policy, the Ninth Circuit noted in United States v.
Bowhay, 992 F.2d 229 (9th Cir. 1993), that where officers follow a standardized
inventory policy which thus guides and delimits officers' discretion, "the police conduct
would have been the same regardless of the officer's subjective state of mind, [and] no
purpose is served by attempting to tease out the officer's 'true' motivation."  Id. at 231
(citing Horton v. California, 496 U.S. 128 (1990)).

Therefore, the validity of an inventory begins with analyzing an inventory policy
and officer compliance therewith, not whether officer actions advance general inventory
purposes.  Where a standardized inventory policy exists, officers need not exercise their
discretion (nor do Courts need to analyze officer intent) in conducting the inventory.
Plaintiffs' claim that officers must stop, analyze each item they find and decide whether
what they are doing in compliance with policy advances general inventory purposes
would require officers to exercise discretion, thereby creating the very risk that the
rationale for upholding inventory searches without probable cause seeks to avoid.

       2.   Plaintiffs Have Not Established Pretext.

       a.   Dual Motives Do Not Establish Pretext, Which Instead Requires
          Plaintiffs Show The Government's Motive To Search The Individual
          Boxes Without Probable Cause Was The But For Cause Of Its
          Decision To Seize The Nests Of Safety Deposit Boxes.

"[T]he presence of an investigative motive," or a "dual bona fide motive[s]" [(i.e.,
to inventory and to criminally investigate)] "does not invalidate the inventory search."
Bowhay, 992 F.2d at 231.  While Bowhay acknowledged that "an inventory search is
invalid if it was a pretext for an investigative search," "pretext" cases involve only an
investigative motive.  Id.  Accord, Bertine, 479 U.S. at 372 (inventory search lawful

1   where officers follow standard inventory procedure and not acting "for the sole purpose

2   of investigation").  Thus, even if the police are partly motivated by a subjective

3   investigatory intent, "the presence of [such] an investigative motive does not invalidate

4   [an otherwise valid] inventory search."  Bowhay at 231.  Accord, United States v.

5   Orozco, 858 F.3d 1204, 1213 (9th Cir. 2017).

6        Plaintiffs cite no case regarding the standards to show pretext.  To prove pretext,

7   plaintiffs must show that but for the government's desire to search the boxes without

8   probable cause so it could criminally investigate boxholders based on evidence found

9   during the inventory (i.e., the alleged improper motive), the government would not have

10  seized the nests of safety deposit boxes (i.e., the legal action).  Orozco, 858 F.3d at 1213

11  (defendant arguing pretext must "show that the stop would not have occurred in the

12  absence of an impermissible reason" to "prove that a stop is unreasonably pretextual");

13  United States v. Johnson, 889 F.3d 1120, 1126 (9th Cir. 2018) (pretext for inventory

14  search requires showing "officers would not have searched and seized items from the car

15  [defendant] was driving but for an impermissible motive").

16              b.    Collecting Forfeiture Information About Cash, General Inventory

17                    Property Descriptions And Drug Dogs Do Not Establish Pretext.

18       Plaintiffs offer two arguments to support pretext: (1) Zellhart's supplemental

19  inventory instructions and the agent observation notes form used during the inventory

20  discussed capturing characteristics of cash that could support forfeiture, and drug dogs

21  were at the scene; and (2) general descriptions of "miscellaneous" items did not set forth

22  exactly how many items were seized and thus failed to advance the general inventory

23  purpose of protecting officers against theft or loss claims.  Neither proves pretext.

24       The supplemental inventory instructions contain a significant amount of

25  information concerning USPV and the inventorying process that is indisputably

26  unrelated to forfeiture.  See infra.  At best, plaintiffs could argue agents had a dual

27  motive, but dual motives are not pretext under Bowhay's sole motive to criminally

28  investigate pretext test, or the Orozco/Johnson but for pretext test as discussed below.

The evidence discussed above establishes that the government would have seized the nests of safety deposit boxes, which resulted in USPV's closure, even if it was unable to, as plaintiffs contend, conduct an illegal search of the boxes without probable cause. In summary, the USPV criminal investigation began in April 2019; criminal investigative agents took substantial steps in furtherance of the investigation, including surveillance, controlled drug buys and structuring discussions; no forfeiture agent was involved in the criminal investigation, and no discussions between the criminal investigative agents and the forfeiture agent occurred until one and one half years after the USPV investigation began.  This is woefully inadequate to prove "but for" pretext.

Ignoring the "but for" pretext test entirely and again irrelevantly focusing on whether agent actions advanced general inventory purposes, plaintiffs argue that officers' general "miscellaneous" descriptions prove pretext because agents had to write down information about every single item, no matter how many, in a box for the inventory be lawful.  That argument is clearly wrong on the law.  United States v. Lopez, 547 F.3d 364, 371 (2d Cir. 2008) (finding "no merit" to argument officers could not generally describe all items as "personal belongings[,]" noting "[t]he concept of an inventory does not demand the separate itemization of every single object").  It also ignores the policy which merely directs officers to include in the inventory documents "a description of the property and the items secured for safekeeping."  Agents were not required under the policy to provide the detailed descriptions plaintiffs suggest nor an exhaustive list of every single item in a box. Ex. II at 567:23-568:9; 569:16-25; Ex. FF at 500:20-502:17.[5]  Further, the idea that agents as a pretext would have hundreds of officers execute the warrant for a week and produce tens of thousands of pages of inventory documents (Rodgers Decl. ¶ 39)  and videos is pure folly.

---

[5] In any event, the general descriptions did help protect against theft and loss claims because they together with photos, videos documenting the inventory process, chain of custody documents and sealing and assigning bar codes to item assisted in locating items.  Ex. FF at 477:4-479:10; 502:12-503:1; 504:1-505:4; 506:3-10; 512:6-513:1; Ex. II at 567:23-569:15; 570:10-571:3; Ex. GG at 546:8-14.

Also, drug dogs at an inventory does not invalidate it. <u>Does 1 v. United States</u>, 2021 WL 3206807, *3 (C.D. Cal. Apr. 22, 2021) ("[t]he Ninth Circuit has found the use of a drug dog during an inventory search is generally not unreasonable under the Fourth Amendment") (citing <u>United States v. Nieto-Rojas</u>, 470 F. App'x 674 (9th Cir. 2012)). This comports with the rule that expecting to find criminal evidence during an inventory does not render it unlawful. <u>United States v. Garay</u>, 938 F.3d 1108, 1112-13 (9th Cir. 2019) ("[g]iven the circumstances leading up to the search, the officers no doubt expected to find evidence of criminal activity inside the vehicle. But that expectation would not invalidate an otherwise reasonable inventory search") (citing <u>Bowhay</u> at 231); <u>Lopez</u>, 547 F.3d at 372. "Penalizing officers who are candid enough to admit that they hope to find evidence of a crime can only encourage obfuscation and dishonesty, without protecting reasonable expectations of privacy." <u>Bowhay</u>, 992 F.2d at 231.[6]

      3.    <u>Plaintiffs Failed To Show The Government Misled The Magistrate By Failing To Disclose Material Facts Or Exceeded The Warrants' Terms.</u>

Plaintiffs argue that the government breached a duty of candor because it failed to disclose the "material" fact that it intended to seek civil forfeiture in the future. But the warrants were directed to USPV, <u>not</u> the boxholders, so as a matter of law the non-disclosure regarding boxholder assets could not be material because the information has no bearing on the probable cause finding for the warrants directed to USPV. <u>United States v. Christensen</u>, 624 F. App'x 466, 474 (9th Cir. 2015). Moreover, while plaintiffs contend that Zellhart, a criminal investigator, misled the magistrate because her affidavit for the warrants directed at USPV did not disclose that forfeiture agents were prepared to seek forfeiture of some of USPV customers' assets (or for that matter criminally investigate and charge some customers) later if the facts supported such action, plaintiffs

---

[6] Likewise, plaintiffs' videos prove nothing, as agents had multiple purposes for inventorying beyond owner identification and, even if agents inadvertently made a mistake on some of the 700 boxes inventoried, minor non-compliance with inventory policy does not invalidate an inventory. <u>Garay</u>, 938 F.3d at 1112.

offer no authority for the extraordinary proposition that agents must disclose in an affidavit for one court how its fruits might lead to other actions in the future.

To be sure, agents owe a duty of candor to courts, but that is about known facts that have already occurred.  Here, the government took the highly unusual step of explicitly telling the magistrate it would inventory the boxes within the nests that it sought permission to seize from USPV.  The government went beyond the purpose of the affidavit, which was to establish probable cause for the warrants against USPV, because USPV was custodian for customers whose property would be taken into custody.  But just because the government went beyond its obligations to ensure that the magistrate understood the warrants would result in an inventory in no way imposes on the government the further obligation to announce how later actions, such as criminal investigations against boxholders or forfeiture of box contents, would play out.

Furthermore, the affidavit extensively discusses prior criminal convictions and forfeitures from boxholders, thus leading to the inference that the inventoried boxes could lead to future forfeiture, which occurred 60 days later on May 20, 2021 consistent with 18 U.S.C. § 983(a)(1)(A)(i)'s deadline. While the forfeiture agent as of the March 2021 warrants' execution believed probable cause existed to forfeit boxes containing large sums of cash, that is beside the point because the warrants were directed to USPV, not the boxholders.  The forfeiture agent's opinion about probable cause at most shows she expected boxes would contain criminal proceeds, which is certainly true given the hundreds of boxes and USPV's efforts to market itself to criminals.

Plaintiffs say nothing about the inventory policy provisions defining how to conduct the inventory, so their only argument based on CDT is that the government callously disregarded boxholders' constitutional rights by exceeding the terms of the warrants (that the government itself prepared) by conducting a "seizure" or "criminal search" of the boxes.  Both the high standard for proving "callous disregard for

constitutional rights"[7] and <u>CDT</u>'s different facts show plaintiffs' argument is wrong.

In <u>CDT</u>, the government was conducting an investigation into a drug testing company's supplying steroids to baseball players, and had probable cause to seize the company's electronic records for ten players whose tests were performed pursuant to a collective bargaining agreement.  Because it was difficult to identify on-site the electronic data relevant to only the ten players, the government sought broad authority to seize the company's data for all players, representing it would examine and segregate the data off-site to ensure it only seized evidence relevant to the ten players.  <u>Id.</u> at 1167-68. The magistrate granted the broad search warrant requested but, unlike the present case, specifically added to the warrant "significant restrictions on how the seized data" was to be handled and segregated by the government, such as requiring non-investigative agents with computer expertise to review and segregate the electronic materials.  <u>Id.</u> at 1168.

However, the government "completely ignored" the specific factual restrictions the magistrate added to the warrant, "utterly failed to follow the [search] warrant's protocol" and "rooted out information pertaining to all professional baseball players" to find information identifying players testing positive for steroids.  <u>Id.</u> at 1171-72.   In affirming the grant of a Rule 41(g) motion ordering the government to return and sequester the records of all but the ten players, the Court noted three separate district court judges reviewing the matter had concluded the government had callously disregarded the affected players' constitutional rights, which was the only <u>Ramsden v. United States</u>, 2 F.3d 322 (9th Cir. 1993) factor seriously in dispute.  <u>Id.</u> at 1170, 1174.[8]

---

[7] A "<u>callous disregard</u> for Movant's constitutional rights is a higher threshold than a mere <u>violation</u> of Movant's constitutional rights. . . .if the government sought to comply with the terms [of the warrant] in good faith, a discrepancy would not constitute 'callous disregard' for Movant's constitutional rights." <u>Burum v. United States</u>, 2014 WL 12596719, *4 (C.D. Cal. Apr. 2, 2014) (emphasis in original and citations omitted).

[8] In <u>United States v. Rettig</u>, 589 F.2d 418 (9th Cir. 1978). agents obtained a federal arrest warrant for defendant on cocaine conspiracy charges, but were denied a search warrant for defendant's residence.  Without disclosing the denial, agents the next day sought a search warrant from a State judge, advising defendant had flushed marijuana down the toilet when arrested, and the warrant issued authorizing a search specifically

*(footnote cont'd on next page)*

By contrast, unlike in <u>CDT</u>, there were no restrictions added by the magistrature and no <u>factual</u> restrictions whatsoever in the USPV warrants, except that they provide that agents would execute them in conformity with inventory policy (and plaintiffs offer nothing showing agents did not), that the government "completely ignored" as in <u>CDT</u>. Accordingly, plaintiffs' argument is that the government exceeded the warrants because it violated the legal conclusion that a "criminal search" or "seizure" was conducted.  But the determination of whether agents' agents engaged in a "criminal search" or "seizure" is a legal one based on the facts.  Plaintiffs' argument is like claiming warrants prohibiting "violations of the Constitution" can constitute "callous disregard" if officers are later shown to have engaged in acts that do not pass constitutional muster.  Violation of the "criminal search" or "seizure" warrants depends upon applying facts to caselaw to decide whether agents activities constitute an lawful inventory not requiring probable cause (as the government contends) or an unlawful seizure or criminal search without probable cause (as plaintiffs contend).  Agents are not lawyers, and thus the government could argue in a later criminal case against a boxholder that agent actions are justified under the good faith exception because agents objectively reasonably relied on a facially-valid warrant that provides agents could inventory the boxes according to inventory policy.  <u>United States v. Leon</u>, 468 U.S. 897 (1984).

4.     <u>The Failure To Use Alternatives Does Not Show An Unlawful Inventory.</u>

Plaintiffs' argument that seizing a locked vault did not advance general inventory purposes is irrelevant, and likewise unavailing is their claim that the government could have sought a receiver to take over USPV.  Officers need not consider "the existence of alternative less intrusive means" before seizing and inventorying property.  <u>Miranda v. City of Cornelius</u>, 429 F.3d 858, 866 n.6 (9th Cir. 2005) (quoting <u>Bertine</u>, 479 U.S. at 374).  <u>Accord</u>, <u>LaFayette</u>, 462 U.S. at 647 ("[t]he reasonableness of any particular

---

for marijuana.  Agents executed the warrant, spending hours looking for cocaine conspiracy evidence and seizing over 2,000 items, which was unlawful because "the agents did not confine their search in good faith to the objects of the warrant" and "substantially exceeded any reasonable interpretation of its provisions."  <u>Id.</u> at 423

1    governmental activity does not necessarily or invariably turn on the existence of

2    alternative 'less intrusive' means"); Torres, 828 F.3d at 1119 n.2.  Also, agents did

3    consider alternatives, including nuisance abatement and the FBI taking over USPV, but

4    they were not feasible and less effective than seizing USPV's business equipment [Ex.

5    GG at 128:14-129:13;130:6-24], and a receivership is not even legally available.[9]

6        Ignoring the DIOG inventory policy section, plaintiffs instead point to a section

7    titled Least Intrusive Method ("LIM"), arguing agents were required to choose the LIM

8    capable of achieving the government's objections because seizure intruded on boxholder

9    privacy rights.  But plaintiffs' again completely ignore provisions refuting their

10   position.[10]  Further, even if agents failed to comply with discretion-requiring LIM

11   provisions, LIM provisions (unlike the discretion-prohibiting inventory policy) have no

12   independent legal significance.  In other words, while inventory policy violations can

13   under caselaw constitute a constitutional violation, LIM provision violations do not.

14   B.    A Segregation Of Documents Order Is Unwarranted.[11]

15       Plaintiffs segregation remedy request fails; it is available only for Rule 41(g)

16   claims and their FAC shows their class claim is not, and plaintiffs' Rule 41(g) individual

17   claim does not seek the remedy.  ECF 78 (class certification order at 5:7-12, citing CDT)

18   and ECF 33 (FAC ¶¶ 1, 2, 153 and 232 and ¶ L at 52:4-8).  Also, plaintiffs seek the

19/20/21  [9] Receivership required a showing that the safe deposit box nests were in danger of being destroyed, removed or otherwise unavailable for forfeiture [see 18 U.S.C. §§ 983(j)(1)(B)(i) and 1963(d)(1)(B)(i)], and they were not, as USPV intended to continue operating and had expansion plans.  Seizure immediately terminated USPV.

22/23/24/25  [10] The LIM provisions state agents should "[e]mploy the least intrusive means that do not otherwise compromise FBI operations; should "strongly consider the method (technique) employed to achieve that objective that is the least intrusive available, while still being operationally sound and effective"; the LIM principle "is intended to encourage investigators to choose the least intrusive - - but still reasonable - - means from the available options[;]" and "[i]n the final analysis, choosing the method that must [sic] appropriately balances the impact on privacy and civil liberties with operational needs, is a matter of judgment, based on training and experience.  Ex. I at 309, 323, 326.

26/27/28  [11] The destruction of records remedy is unavailable; it is "used only in extreme circumstances" [United States v. Smith, 940 F.2d 395, 396 (9th Cir. 1991)], involving a "real and immediate threat of irreparable harm" [Fendler v. U.S. Parole Comm'n, 774 F.2d 975, 979 (9th Cir. 1985), and a vague possibility that the government might take some action in the future does not confer standing [Laird v. Tatum, 408 U.S. 1 (1972)].

1  remedy for some universe of all documents created "as a result of" the inventory (PB

2  12:15-18 at n.2), but their FAC only requests an injunction as to "records created

3  through the inventory documents," meaning the inventory documents alone. ECF 33,

4  (FAC ¶ I at 51:1-3).  Moreover, plaintiffs' only case, <u>CDT</u>, does not support the remedy.

5      <u>CDT</u> relied upon <u>Ramsden</u>'s analysis of Rule 41(g) motions, which are civil

6  equitable proceedings. <u>Id.</u> at 324.  To guide courts in exercising their discretion to

7  prevent courts "from exercising their equitable jurisdiction too liberally" (<u>id.</u> at 324),

8  courts should consider whether (1) the government displayed a callous disregard for the

9  movant's constitutional rights (discussed above); (2) the movant has an individual

10  interest in and need for the property; (3) the movant would be irreparably injured by

11  denying return of property; and (4) the movant has an adequate remedy at law [(<u>id.</u>) at

12  324-325], and plaintiffs must prove the factors.  <u>See</u> <u>United States v. Dean</u>, 669 F. App'x

13  891 (9th Cir. 2016); <u>In re Search of 4801 Flyer Ave.</u>, 879 F.2d 385, 388 (8th Cir. 1989).

14      As to (2), even though some class members have heightened privacy interests in

15  box contents, others do not as non-private items routinely displayed in public (like

16  jewelry) raise no privacy interests.  As to (3), if "[t]he mere threat of criminal

17  prosecution is not sufficient to constitute irreparable harm" [<u>Ramsden,</u> 2 F.3d at 326],

18  then fear of a data breach (which everyone faces) or conclusory emotional distress

19  allegations do not show irreparable injury; anyone could claim these injuries.  <u>In re</u>

20  <u>Search of 4801 Flyer Ave.</u>, 879 F.2d at 389; Exs. Z and AA; BB and CC (identical injury

21  claimed).  As to (4), an adequate legal remedy exists because persons can sue for

22  damages.  Finally, unlike ballplayers whose positive steroid test results were unknown,

23  having the public know about a player's steroid use could seriously harm a ballplayer's

24  career and leaks had already occurred about three players' positive steroid test results

25  (which proved "equitable considerations" justifying sequestration in <u>CDT</u> at 1174), and

26  plaintiffs offer nothing comparable about the heightened sensitivity, or any leaks, of the

27  inventory documents.  Ex. M at 364:8-19; 365:13-366:2; Ex. P at 380:18-381:14; Ex. R

28  at 392:2-13.

Dated: August 9, 2022

Respectfully submitted,

STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____
ANDREW BROWN
VICTOR A. RODGERS
MAXWELL COLL
Assistant United States Attorneys

Attorneys for Defendants
UNITED STATES OF AMERICA and
TRACY L. WILKISON and KRISTI
KOONS JOHNSON IN THEIR OFFICIAL
CAPACITY ONLY