```
ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 04-10-2014 BY NSICG/F64M92K24
```

# 4 (U) PRIVACY AND CIVIL LIBERTIES, AND LEAST INTRUSIVE METHODS

## 4.1 (U) CIVIL LIBERTIES AND PRIVACY

### 4.1.1 (U) OVERVIEW

(U) The FBI is responsible for protecting the security of our nation and its people from crime and terrorism while maintaining rigorous obedience to the Constitution. *The Attorney General's Guidelines for Domestic FBI Activities* (AGG-Dom) establish a set of basic principles that serve as the foundation for all FBI mission-related activities. When these principles are applied, they demonstrate respect for civil liberties and privacy as well as adherence to the Constitution and laws of the United States. These principles are as follows:

> A) **(U) Protecting the public includes protecting their rights and liberties.** FBI investigative activity is premised upon the fundamental duty of government to protect the public, which must be performed with care to protect individual rights and to ensure that investigations are confined to matters of legitimate government interest.
>
> B) **(U) Only investigate for a proper purpose.** All FBI investigative activity must have an authorized law enforcement, national security, or foreign intelligence purpose.
>
> C) **(U) Race, ethnicity, religion, or national origin alone can never constitute the sole basis for initiating investigative activity.** Although these characteristics may be taken into account under certain circumstances, there must be an independent authorized law enforcement or national security purpose for initiating investigative activity.
>
> D) **(U) Only perform authorized activities in pursuit of investigative objectives.** Authorized activities conducted as part of a lawful assessment or investigation include the ability to: collect criminal and national security information, as well as foreign intelligence; provide investigative assistance to federal, state, local, tribal, and foreign agencies; conduct intelligence analysis and planning; and retain and share information.
>
> E) **(U) Employ the least intrusive means that do not otherwise compromise FBI operations.** Assuming a lawful intelligence or evidence collection objective, i.e., an authorized purpose, strongly consider the method (technique) employed to achieve that objective that is the least intrusive available (particularly if there is the potential to interfere with protected speech and association, damage someone's reputation, intrude on privacy, or interfere with the sovereignty of foreign governments) while still being operationally sound and effective.
>
> F) **(U) Apply best judgment to the circumstances at hand to select the most appropriate investigative means to achieve the investigative goal.** The choice of which investigative method to employ is a matter of judgment, but the FBI must not hesitate to use any lawful method consistent with the AGG-Dom when the degree of intrusiveness is warranted in light of the seriousness of the matter concerned.

### 4.1.2 (U) PURPOSE OF INVESTIGATIVE ACTIVITY

(U) One of the most important safeguards in the AGG-Dom—one that is intended to ensure that FBI employees respect the constitutional rights of Americans—is the threshold requirement that

**EXHIBIT I**
**309**

all investigative activities be conducted for an authorized purpose. Under the AGG-Dom that authorized purpose must be an authorized national security, criminal, or foreign intelligence collection purpose.

(U) Simply stating such a purpose, however, is not sufficient to ensure compliance with this requirement. The authorized purpose must be well-founded and well-documented. In addition, the information sought and the investigative method used to obtain it must be focused in scope, time, and manner to achieve the underlying purpose. Furthermore, the Constitution sets limits on what that purpose may be. It may not be solely to monitor the exercise of constitutional rights, such as the free exercise of speech, religion, assembly, press and petition, and, equally important, the authorized purpose may not be based solely on the race, ethnicity, national origin or religious beliefs of an individual, group, or organization or a combination of only those factors.

(U) It is important to understand how the "authorized purpose" requirement and these constitutional limitations relate to one another. For example, individuals or groups who communicate with each other or with members of the public in any form in pursuit of social or political causes—such as opposing war or foreign policy, protesting government actions, or promoting certain religious beliefs—have a First Amendment right to do so. No investigative activity may be conducted for the sole purpose of monitoring the exercise of these rights. If a well-founded basis to conduct investigative activity exists, however, and that basis is not solely activity that is protected by the First Amendment or on the race, ethnicity, national origin or religion of the participants—FBI employees may assess or investigate these activities, subject to other limitations in the AGG-Dom and the DIOG. In such a situation, the investigative activity would not be based solely on constitutionally-protected conduct or on race, ethnicity, national origin or religion. Finally, although investigative activity would be authorized in this situation, it is important that it be conducted in a manner that does not materially interfere with the ability of the individuals or groups to engage in the exercise of constitutionally-protected rights.

### *4.1.3*     *(U) OVERSIGHT AND SELF-REGULATION*

(U) Every FBI employee has the responsibility to ensure that the activities of the FBI are lawful, appropriate and ethical as well as effective in protecting the civil liberties and privacy of individuals in the United States. Strong oversight mechanisms are in place to assist the FBI in carrying out this responsibility. Department of Justice (DOJ) oversight is provided through provisions of the AGG-Dom, other Attorney General Guidelines, and oversight by other DOJ components. DOJ and the FBI's Inspection Division, and the FBI's Office of Integrity and Compliance (OIC) and Office of the General Counsel (OGC), also provide substantial monitoring and guidance. In the criminal investigation arena, prosecutors and district courts exercise oversight of FBI activities. In the national security and foreign intelligence arenas, the DOJ National Security Division (NSD) exercises that oversight. The DOJ NSD's Oversight Section and the FBI's OGC are responsible for conducting regular reviews of all aspects of FBI national security and foreign intelligence activities. These reviews, conducted at FBI field offices and FBI Headquarters (FBIHQ) divisions, broadly examine such activities for compliance with the AGG-Dom and other applicable requirements. In addition, the AGG-Dom creates additional requirements, including:

   A) (U) Required notification by the FBI to the DOJ NSD concerning a Full Investigation that involves foreign intelligence collection, a Full Investigation of a United States person

Case 2:21-cv-04405-RGK-MAR Document 122-10 Filed 08/09/22 Page 3 of 19 Page ID #:4702

Case 2:21-cv-04405-RGK-MAR Document 122-10 Filed 08/09/22 Page 3 of 19 Page ID #:4702

UNCLASSIFIED – FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide §4

(USPER) in relation to a threat to the national security, or a national security investigation involving a "sensitive investigative matter" (SIM) (see DIOG Section 10).

B) (U) An annual report by the FBI to the DOJ NSD concerning the FBI's foreign intelligence collection program, including information reflecting the scope and nature of foreign intelligence collection activities in each FBI field office.

C) (U) Access by the DOJ NSD to information obtained by the FBI through national security or foreign intelligence activities.

D) (U) General authority for the Assistant Attorney General for National Security to obtain reports from the FBI concerning these activities. (AGG-Dom, Intro. C)

(U) Further examples of oversight mechanisms include the involvement of both FBI and prosecutorial personnel in the review of undercover operations involving sensitive circumstances; notice requirements for investigations involving sensitive investigative matters; and notice and oversight provisions for Enterprise Investigations, which involve a broad examination of groups implicated in criminal and national security threats. These requirements and procedures help to ensure that the rule of law is respected in the FBI's activities and that public confidence is maintained in these activities. (AGG-Dom, Intro. C)

(U) In addition to the above-described oversight mechanisms, the FBI is subject to a regime of oversight, legal limitations, and self-regulation designed to ensure strict adherence to the Constitution. This regime is comprehensive and has many facets, including the following:

A) (U) The Foreign Intelligence Surveillance Act of 1978, as amended, and Title III of the Omnibus Crime Control and Safe Streets Act of 1968. These laws establish the processes for obtaining judicial approval of electronic surveillance and physical searches for the purpose of collecting foreign intelligence and electronic surveillance for the purpose of collecting evidence of crimes.

B) (U) The Whistleblower Protection Acts of 1989 and 1998. These laws protect whistleblowers from retaliation.

C) (U) The Freedom of Information Act of 1966. This law provides the public with access to FBI documents not covered by a specific statutory exemption.

D) (U) The Privacy Act of 1974. This law balances the government's need to maintain information about United States citizens and legal permanent resident aliens with the rights of those individuals to be protected against unwarranted invasions of their privacy stemming from the government's collection, use, maintenance, and dissemination of that information. The Privacy Act forbids the FBI and other federal agencies from collecting information about how individuals exercise their First Amendment rights, unless that collection is expressly authorized by statute or by the individual, or is pertinent to and within the scope of an authorized law enforcement activity (5 U.S.C. § 552a[e][7]). Activities authorized by the AGG-Dom – with the exception of Positive Foreign Intelligence collection (see DIOG Section 9.3) – are authorized law enforcement activities or activities for which there is otherwise statutory authority for purposes of the Privacy Act.

E) (U) Documents describing First Amendment activity that are subsequently determined to have been collected or retained in violation of the Privacy Act must be destroyed as set forth in Records Management Division's (RMD) policy, Handling of Information Gathered in Violation of the Privacy Act (Policy Directive 0356D).

EXHIBIT I
311

UNCLASSIFIED – FOR OFFICIAL USE ONLY
§4 Domestic Investigations and Operations Guide

(U) Congress, acting primarily through the Judiciary and Intelligence Committees, exercises regular, vigorous oversight into all aspects of the FBI's operations. To this end, the National Security Act of 1947 requires the FBI to keep the intelligence committees (for the Senate and House of Representatives) fully and currently informed of substantial intelligence activities. This oversight has significantly increased in breadth and intensity since the 1970's, and it provides important additional assurance that the FBI conducts its investigations according to the law and the Constitution. Advice on what activities fall within the supra of required congressional notification can be obtained from OCA [A Corporate Policy Directive is forthcoming].

(U) The FBI's intelligence activities (as defined in Section 3.4(e) of Executive Order (EO) 12333 [see DIOG Appendix B]) are subject to significant self-regulation and oversight beyond that conducted by Congress. The Intelligence Oversight Board (IOB), comprised of members from the President's Intelligence Advisory Board (PIAB), also conducts oversight of the FBI's intelligence activities. Among its responsibilities, the IOB must inform the President of intelligence activities the IOB believes: (i)(a) may be unlawful or contrary to EO or Presidential National Security Directive (PNSD), and (b) are not being adequately addressed by the Attorney General, the Director of National Intelligence (DNI), or the head of the department concerned; or (ii) should be immediately reported to the President. The requirements and procedures for reporting potential IOB matters to OGC/NSLB can be found in Corporate Policy Directive 0188D (Guidance on IOB Matters), and the Policy Implementation Guide (PG) 0188PG.

(U) Internal FBI safeguards include:

A) (U) the OGC's Privacy and Civil Liberties Unit (PCLU), which reviews plans for any proposed FBI record system for compliance with the Privacy Act and related privacy protection requirements and policies and which provides legal advice on civil liberties questions;

B) (U) the criminal and national security undercover operations review committees, comprised of senior DOJ and FBI officials, which review all proposed undercover operations that involve sensitive circumstances;

C) (U) the Sensitive Operations Review Committee (SORC), comprised of senior DOJ and FBI officials, which provides oversight of those investigative activities that may impact civil liberties and privacy and that are not otherwise subject to high level FBI and DOJ review;

D) (U) the FBI requirement that all FBI employees report departures from and non-compliance with the DIOG to their supervisor, other management officials, or appropriate authorities as set forth in DIOG Sections 2.6 – 2.8 and 3.1.1; and

E) (U) training new FBI employees on privacy and periodic training for all FBI employees to maintain currency on the latest guidelines, changes to laws and regulations, and judicial decisions related to constitutional rights and liberties.

## 4.2 (U) PROTECTION OF FIRST AMENDMENT RIGHTS

(U) A fundamental principle of the Attorney General's Guidelines for FBI investigations and operations since the first guidelines were issued in 1976 has been that investigative activity may not be based solely on the exercise of rights guaranteed by the First Amendment to the United States Constitution. This principle carries through to the present day in the AGG-Dom. The Privacy Act contains a corollary principle – the government is prohibited from retaining

information describing how a person exercises rights under the First Amendment, unless that information is pertinent to or within the scope of an authorized law enforcement activity. 5 U.S.C. § 552a(e)(7).

(U) The First Amendment states:

> *(U) Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.*

(U) Although the amendment appears literally to apply only to Congress, the Supreme Court made clear long ago that it also applies to activities of the Executive Branch, including law enforcement agencies. Therefore, for FBI purposes, it would be helpful to read the introduction to the first sentence as: "The FBI shall take no action respecting..." In addition, the word "abridging" must be understood. "Abridging," as used here, means "diminishing." Thus, it is not necessary for a law enforcement action to destroy or totally undermine the exercise of First Amendment rights for it to be unconstitutional; significantly diminishing or lessening the ability of individuals to exercise these rights without an authorized investigative purpose is sufficient.

(U) This is not to say that any diminution of First Amendment rights is unconstitutional. The Supreme Court has never held that the exercise of these rights is absolute. In fact, the Court has realistically interpreted the level and kind of government activity that violates a First Amendment right. For example, taken to an extreme, one could argue that the mere possibility of an FBI agent being present at an open forum (or as an on-line presence) would diminish the right of free speech by a participant in the forum because he/she would be afraid to speak freely. The Supreme Court, however, has never found an "abridgement" of First Amendment rights based on such a subjective fear. Rather, the Court requires an action that, from an objective perspective, truly diminishes the speaker's message or his/her ability to deliver it (e.g., pulling the plug on the sound system). For another example, requiring protestors to use a certain parade route may diminish their ability to deliver their message in a practical sense, but the Court has made it clear, that for legitimate reasons (e.g., public safety), the government may impose reasonable limitations in terms of time, place and manner on the exercise of such rights, as long as the ability to deliver the message remains.

(U) While the language of the First Amendment prohibits action that would abridge the enumerated rights, the implementation of that prohibition in the AGG-Dom reflects the Supreme Court's opinions on the constitutionality of law enforcement action that may impact the exercise of First Amendment rights. As stated above, the AGG-Dom prohibits investigative activity for the sole purpose of monitoring the exercise of First Amendment rights. The importance of the distinction between this language and the actual text of the First Amendment is two-fold: (i) the line drawn by the AGG-Dom prohibits even "monitoring" the exercise of First Amendment rights (far short of abridging those rights) as the sole purpose of FBI activity; and (ii) the requirement of an authorized purpose for all investigative activity provides additional protection for the exercise of constitutionally protected rights.

(U) The AGG-Dom classifies investigative activity that involves a religious or political organization (or an individual prominent in such an organization) or a member of the news media as a "sensitive investigative matter." That designation recognizes the sensitivity of

EXHIBIT I
313

UNCLASSIFIED – FOR OFFICIAL USE ONLY
§4                    Domestic Investigations and Operations Guide

conduct that traditionally involves the exercise of First Amendment rights by groups, e.g., who associate for political or religious purposes or by the press. The requirements for opening and pursuing a "sensitive investigative matter" are set forth in DIOG Section 10. It should be clear, however, from the discussion below just how pervasive the exercise of First Amendment rights is in American life and that not all protected First Amendment activity will fall within the definition of a "sensitive investigative matter." Therefore, it is essential that FBI employees recognize when investigative activity may have an impact on the exercise of these fundamental rights and be especially sure that any such investigative activity has a valid law enforcement or national security purpose, even if it is not a "sensitive investigative matter" as defined in the AGG-Dom and the DIOG.

(U) Finally, it is important to note that individuals in the United States (and organizations comprised of such individuals) do not forfeit their First Amendment rights simply because they also engage in criminal activity or in conduct that threatens national security. For example, an organization suspected of engaging in acts of domestic terrorism may also pursue legitimate political goals and may also engage in lawful means to achieve those goals. The pursuit of these goals through constitutionally protected conduct does not insulate them from legitimate investigative focus for unlawful activities—but the goals and the pursuit of their goals through lawful means remain protected from unconstitutional infringement.

(U) When allegations of First Amendment violations are brought to a court of law, it is usually in the form of a civil suit in which a plaintiff has to prove some actual or potential harm. See, *e.g.*, *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989) (challenging INS surveillance of churches). In a criminal trial, a defendant may seek either or both of two remedies as part of a claim that his or her First Amendment rights were violated: suppression of evidence gathered in the alleged First Amendment violation, a claim typically analyzed under the "reasonableness" clause of the Fourth Amendment, and dismissal of the indictment on the basis of "outrageous government conduct" in violation of the Due Process Clause of the Fifth Amendment.

(U) The scope of First Amendment rights and their impact on FBI investigative activity are discussed below. The First Amendment's "establishment clause"—the prohibition against the government establishing or sponsoring a specific religion—has little application to the FBI and, therefore, is not discussed here.

### 4.2.1    (U) FREE SPEECH

(U) The exercise of free speech includes far more than simply speaking on a controversial topic in the town square. It includes such activities as carrying placards in a parade, sending letters to a newspaper editor, posting information on the Internet, wearing a tee shirt with a political message, placing a bumper sticker critical of the President on one's car, and publishing books or articles. The common thread in these examples is conveying a public message or an idea through words or deeds. Law enforcement activity that diminishes a person's ability to communicate in any of these ways may interfere with his or her freedom of speech—and thus may not be undertaken by the FBI solely for that purpose.

(U) It is important to understand the line between constitutionally protected speech and advocacy of violence or of conduct that may lead to violence or other unlawful activity. In *Brandenburg v.*

Version Dated:
October 15, 2011

4-6
UNCLASSIFIED – FOR OFFICIAL USE ONLY

EXHIBIT I
314

*Ohio, 395 U.S. 444 (1969)*, the Supreme Court established a two-part test to determine whether such speech is constitutionally protected: the government may not prohibit advocacy of force or violence except when such advocacy (i) is intended to incite imminent lawless action, and (ii) is likely to do so. Therefore, even heated rhetoric or offensive provocation that could conceivably lead to a violent response in the future is usually protected. Suppose, for example, a politically active group advocates on its web site taking unspecified "action" against persons or entities it views as the enemy, who thereafter suffer property damage and/or personal injury. Under the *Brandenburg* two-part test, the missing specificity and imminence in the message may provide it constitutional protection. For that reason, law enforcement may take no action that, in effect, blocks the message or punishes its sponsors.

(U) Despite the high standard for interfering with free speech or punishing those engaged in it, the law does not preclude FBI employees from observing and collecting any of the forms of protected speech and considering its content—as long as those activities are done for a valid law enforcement or national security purpose and are conducted in a manner that does not unduly infringe upon the ability of the speaker to deliver his or her message. To be an authorized purpose it must be one that is authorized by the AGG-Dom— i.e. to further an FBI Assessment, Predicated Investigation, or other authorized function such as providing assistance to other agencies. Furthermore, by following the standards for opening or approving an Assessment or Predicated Investigation as contained in the DIOG, the FBI will ensure that there is a rational relationship between the authorized purpose and the protected speech to be collected such that a reasonable person with knowledge of the circumstances could understand why the information is being collected.

(U) Returning to the example posed above, because the group's advocacy of action could be directly related by circumstance to property damage suffered by one of the group's known targets, collecting the speech—although constitutionally protected—can lawfully occur. Similarly, listening to and documenting the public talks by a religious leader, who is suspected of raising funds for a terrorist organization, may yield clues as to his motivation, plan of action, and/or hidden messages to his followers. FBI employees should not, therefore, avoid collecting First Amendment protected speech if it is relevant to an authorized AGG-Dom purpose— as long as FBI employees do so in a manner that does not inhibit the delivery of the message or the ability of the audience to hear it, and so long as the collection is done in accordance with the discussion of least intrusive means or method in Section 4.4.

(U) In summary, during the course of lawful investigative activities, the FBI may lawfully collect, retain, and consider the content of constitutionally protected speech, so long as: (i) the collection is logically related to an authorized investigative purpose; (ii) the collection does not actually infringe on the ability of the speaker to deliver his or her message; and (iii) the method of collection complies with the least intrusive method policy.

### 4.2.2    (U) EXERCISE OF RELIGION

(U) Like the other First Amendment freedoms, the "free exercise of religion" clause is broader than commonly believed. First, it covers any form of worship of a deity—even forms that are commonly understood to be cults or fringe sects, as well as the right not to worship any deity. Second, protected religious exercise also extends to dress or food that is required by religious edict, attendance at a facility used for religious practice (no matter how unlikely it appears to be

EXHIBIT I
315

intended for that purpose), observance of the Sabbath, raising money for evangelical or missionary purposes, and proselytizing. Even in controlled environments like prisons, religious exercise must be permitted—subject to reasonable restrictions as to time, place, and manner. Another feature of this First Amendment right is that religion is a matter of heightened sensitivity to some Americans—especially to devout followers. For this reason, religion is a matter that is likely to provoke an adverse reaction if the right is violated—regardless of which religion is involved. Therefore, when essential investigative activity may impact this right, the investigative activity must be conducted in a manner that avoids the actual—and the appearance of—interference with religious practice to the maximum extent possible.

(U) While there must be an authorized purpose for any investigative activity that could have an impact on religious practice, this does not mean religious practitioners or religious facilities are completely free from being examined as part of an Assessment or Predicated Investigation. If such practitioners are involved in—or such facilities are used for—activities that are the proper subject of FBI-authorized investigative or intelligence collection activities, their religious affiliation does not "immunize" them to any degree from these efforts. It is paramount, however, that the authorized purpose of such efforts be properly documented. It is also important that investigative activity directed at religious leaders or at conduct occurring within religious facilities be focused in time and manner so as not to infringe on legitimate religious practice by any individual but especially by those who appear unconnected to the activities under investigation.

(U) Furthermore, FBI employees may take appropriate cognizance of the role religion may play in the membership or motivation of a criminal or terrorism enterprise. If, for example, affiliation with a certain religious institution or a specific religious sect is a known requirement for inclusion in a violent organization that is the subject of an investigation, then whether a person of interest is a member of that institution or sect is a rational and permissible consideration. Similarly, if investigative experience and reliable intelligence reveal that members of a terrorist or criminal organization are known to commonly possess or exhibit a combination of religion-based characteristics or practices (e.g., group leaders state that acts of terrorism are based in religious doctrine), it is rational and lawful to consider such a combination in gathering intelligence about the group—even if any one of these, by itself, would constitute an impermissible consideration. By contrast, solely because prior subjects of an investigation of a particular group were members of a certain religion and they claimed a religious motivation for their acts of crime or terrorism, other members' mere affiliation with that religion, by itself, is not a basis to assess or investigate—absent a known and direct connection to the threat under Assessment or investigation. Finally, the absence of a particular religious affiliation can be used to eliminate certain individuals from further investigative consideration in those scenarios where religious affiliation is relevant.

### 4.2.3　　(U) FREEDOM OF THE PRESS

(U) Contrary to what many believe, this well-known First Amendment right is not owned by the news media; it is a right of the American people. Therefore, this right covers such matters as reasonable access to news-making events, the making of documentaries, and various other forms of publishing the news. Although the news media typically seek to enforce this right, freedom of the press should not be viewed as a contest between law enforcement or national security, on the

EXHIBIT I
316

UNCLASSIFIED – FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide                                §4

one hand, and the interests of news media, on the other. That said, the news gathering function is the aspect of freedom of the press most likely to intersect with law enforcement and national security investigative activities.

(U) The interest of the news media in protecting confidential sources and the interest of agencies like the FBI in gaining access to those sources who may have evidence of a crime or national security intelligence often clash. The seminal case in this area is *Branzburg v. Hayes,* 408 U.S. 665 (1972), in which the Supreme Court held that freedom of the press does not entitle a news reporter to refuse to divulge the identity of his source to a federal grand jury. The Court reasoned that, as long as the purpose of law enforcement is not harassment or vindictiveness against the press, any harm to the news gathering function of the press (by revealing source identity) is outweighed by the need of the grand jury to gather evidence of crime.

(U) Partially in response to *Branzburg*, the Attorney General promulgated regulations that govern the issuance of subpoenas for reporter's testimony and telephone toll records, the arrest of a reporter for a crime related to news gathering, and the interview of a reporter as a suspect in a crime arising from the news gathering process. In addition, an investigation of a member of the news media in his official capacity, the use of a reporter as a source, and posing as a member of the news media are all sensitive circumstances in the AGG-Dom, DIOG and other applicable AGGs.

(U) These regulations are not intended to insulate reporters and other news media from FBI Assessments or Predicated Investigations. They are intended to ensure that investigative activity that seeks information from or otherwise involves members of the news media:

   A) (U) Is appropriately authorized;
   B) (U) Is necessary for an important law enforcement or national security objective;
   C) (U) Is the least intrusive means to obtain the information or achieve the goals; and
   D) (U) Does not unduly infringe upon the news gathering aspect of the constitutional right to freedom of the press.

### 4.2.4   (U) FREEDOM OF PEACEFUL ASSEMBLY AND TO PETITION THE GOVERNMENT FOR REDRESS OF GRIEVANCES

(U) Freedom of peaceful assembly, often called the right to freedom of association, presents unique issues for law enforcement agencies, including the FBI. Individuals who gather with others to protest government action, or to rally or demonstrate in favor of, or in opposition to, a social cause sometimes present a threat to public safety by their numbers, by their actions, by the anticipated response to their message, or by creating an opportunity for individuals or other groups with an unlawful purpose to infiltrate and compromise the legitimacy of the group for their own ends. The right to peaceful assembly includes more than just public demonstrations—it includes, as well, the posting of group web sites on the Internet, recruiting others to a cause, marketing a message, and fund raising. All are protected First Amendment activities if they are conducted in support of the organization or political, religious or social cause.

(U) The right to petition the government for redress of grievances is so linked to peaceful assembly and association that it is included in this discussion. A distinction between the two is

EXHIBIT I
317

UNCLASSIFIED – FOR OFFICIAL USE ONLY
§4              Domestic Investigations and Operations Guide

that an individual may exercise the right to petition the government by himself whereas assembly necessarily involves others. The right to petition the government includes writing letters to Congress, carrying a placard outside city hall that delivers a political message, recruiting others to one's cause, and lobbying Congress or an executive agency for a particular result.

(U) For the FBI, covert presence or action within associations or organizations, also called "undisclosed participation," has the greatest potential to impact this constitutional right. The Supreme Court addressed this issue as a result of civil litigation arising from one of the many protests against the Vietnam War. In *Laird v. Tatum,* 408 U.S. 1 (1972), the Court found that the mere existence of an investigative program—consisting of covert physical surveillance in public areas, infiltration of public assemblies by government operatives or sources, and the collection of news articles and other publicly available information—for the purpose of determining the existence and scope of a domestic threat to national security does not, by itself, violate the First Amendment rights of the members of the assemblies. The subjective "chill" to the right to assembly, based on the suspected presence of government operatives, did not by itself give rise to legal "standing" for plaintiffs to argue that their constitutional rights had been abridged. Instead, the Court required a showing that the complained-of government action would reasonably deter the exercise of that right.

(U) Since *Laird v. Tatum* was decided, the lower courts have examined government activity on many occasions to determine whether it gave rise to a "subjective chill" or an "objective deterrent." The basic standing requirement establish by *Laird* remains unchanged today. The lower courts, however, have often imposed a very low threshold of objective harm to survive a motion to dismiss the case. For example, plaintiffs who have shown a loss of membership in an organization, loss of financial support, loss to reputation and status in the community, and loss of employment by members have been granted standing to sue.

(U) More significant for the FBI than the standing issue has been the lower courts' evaluation of investigative activity into First Amendment protected associations since *Laird*. The courts have held the following investigative activities to be constitutionally permissible under First Amendment analysis:

    A) (U) Undercover participation in group activities;

    B) (U) Physical and video surveillance in public areas;

    C) (U) Properly authorized electronic surveillance;

    D) (U) Recruitment and operation of sources;

    E) (U) Collection of information from government, public, and private sources (with consent); and

    F) (U) The dissemination of information for a valid law enforcement purpose.

(U) However, these decisions were not reached in the abstract. In every case in which the courts have found government action to be proper, the government proved that the action was conducted for an authorized law enforcement or national security purpose and that the action was conducted in substantial compliance with controlling regulations. In addition, in approving these techniques, the courts have often considered whether a less intrusive technique was available to the agency, and the courts have balanced the degree of intrusion or impact against the importance of the law enforcement or national security objective.

**EXHIBIT I**
**318**

UNCLASSIFIED – FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide §4

(U) By contrast, since *Laird*, the courts have found these techniques to be legally objectionable:

A) (U) Opening an investigation solely because of the group's social or political agenda (even if the agenda made the group susceptible to subversive infiltration);

B) (U) Sabotaging or neutralizing the group's legitimate social or political agenda;

C) (U) Disparaging the group's reputation or standing;

D) (U) Leading the group into criminal activity that otherwise probably would not have occurred; and

E) (U) Undermining legitimate recruiting or funding efforts.

(U) In every such case, the court found the government's purpose was not persuasive, was too remote, or was too speculative to justify the intrusion and the potential harm to the exercise of First Amendment rights.

(U) Once again, the message is clear that investigative activity that involves assemblies or associations of individuals in the United States exercising their First Amendment rights must have an authorized purpose under the AGG-Dom—and one to which the information sought and the technique to be employed are rationally related. Less intrusive techniques should always be explored first and those authorizing such activity (which, as discussed above, will almost always constitute a sensitive investigative matter) should ensure that the investigative activity is focused as narrowly as feasible and that the purpose is thoroughly documented.

## 4.3 (U) EQUAL PROTECTION UNDER THE LAW

### 4.3.1 (U) INTRODUCTION

(U) The Equal Protection Clause of the United States Constitution provides in part that: "No State shall make or enforce any law which shall deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court and the lower courts have made it clear that the Equal Protection Clause applies to the official acts of United States government law enforcement agents. See, *e.g.*, *Whren v. United States*, 517 U.S. 806 (1996); see also *Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001).

Specifically, government employees are prohibited from engaging in invidious discrimination against individuals on the basis of race, ethnicity, national origin, or religious affiliation. This principle is further reflected and implemented for federal law enforcement in the United States Department of Justice's *Guidance Regarding the Use of Race by Federal Law Enforcement Agencies* (hereinafter "DOJ Guidance on the Use of Race").

(U) Investigative and intelligence collection activities must not be based solely on race, ethnicity, national origin, or religious affiliation. Any such activities that are based solely on such considerations are invidious by definition, and therefore, unconstitutional. This standard applies to all investigative and collection activity, including collecting and retaining information, opening investigations, disseminating information, and indicting and prosecuting defendants. It is particularly applicable to the retention and dissemination of personally identifying information about an individual—as further illustrated in the examples enumerated below.

EXHIBIT I
319

UNCLASSIFIED – FOR OFFICIAL USE ONLY
§4          Domestic Investigations and Operations Guide

(U) The constitutional prohibition against invidious discrimination based on race, ethnicity, national origin or religion is relevant to both the national security and criminal investigative programs of the FBI. National security investigations often have ethnic aspects; members of a foreign terrorist organization may be primarily or exclusively from a particular country or area of the world. Similarly, ethnic heritage is frequently the common thread running through violent gangs or other criminal organizations. It should be noted that this is neither a new nor isolated phenomenon. Ethnic commonality among criminal and terrorist groups has been relatively constant and widespread across many ethnicities throughout the history of the FBI.

### 4.3.2     *(U) POLICY PRINCIPLES*

(U) To ensure that Assessment and investigative activities and strategies consider racial, ethnic, national origin and religious factors properly and effectively and to help assure the American public that the FBI does not engage in invidious discrimination, the DIOG establishes the following policy principles:

A) (U) The prohibition on basing investigative activity solely on race or ethnicity is not avoided by considering it in combination with other prohibited factors. For example, a person of a certain race engaging in lawful public speech about his religious convictions is not a proper subject of investigative activity based solely on any one of these factors—or by their combination. Before collecting and using information on race, religion or other prohibited factors, a well-founded and authorized investigative purpose must exist beyond these prohibited factors.

B) (U) When race or ethnicity is a relevant factor to consider, it should not be the dominant or primary factor. Adherence to this standard will not only ensure that it is never the sole factor—it will also preclude undue and unsound reliance on race or ethnicity in investigative analysis. It reflects the recognition that there are thousands and, in some cases, millions of law abiding people in American society of the same race or ethnicity as those who are the subjects of FBI investigative activity, and it guards against the risk of sweeping them into the net of suspicion without a sound investigative basis.

C) (U) The FBI will not collect or use behavior or characteristics common to a particular racial or ethnic community as investigative factors unless the behavior or characteristics bear clear and specific relevance to a matter under Assessment or investigation. This policy is intended to prevent the potential that collecting ethnic characteristics or behavior will inadvertently lead to individual identification based solely on such matters, as well as to avoid the appearance that the FBI is engaged in ethnic or racial profiling.

### 4.3.3     *(U) GUIDANCE ON THE USE OF RACE AND ETHNIC IDENTITY IN ASSESSMENTS AND PREDICATED INVESTIGATIONS*

(U) Considering the reality of common ethnicity or race among many criminal and terrorist groups, some question how the prohibition against racial or ethnic profiling is to be effectively applied—and not violated—in FBI Assessments and Predicated Investigations. The question arises generally in two contexts: (i) with respect to an individual or a group of individuals; and (ii) with respect to ethnic or racial communities as a whole.

Version Dated:
October 15, 2011

4-12
UNCLASSIFIED – FOR OFFICIAL USE ONLY

EXHIBIT I
320

UNCLASSIFIED – FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide §4

#### 4.3.3.1 (U) INDIVIDUAL RACE OR ETHNICITY AS A FACTOR

(U) The DOJ Guidance on the Use of Race permits the consideration of ethnic and racial identity information based on specific reporting—such as from an eyewitness. As a general rule, race or ethnicity as an identifying feature of a suspected perpetrator, subject, and in some cases, a victim, is relevant if it is based on reliable evidence or information—not conjecture or stereotyped assumptions. In addition, the DOJ Guidance on the Use of Race permits consideration of race or ethnicity in other investigative or collection scenarios if it is relevant. These examples illustrate:

A) (U) The race or ethnicity of suspected members, associates, or supporters of an ethnic-based gang or criminal enterprise may be collected and retained when gathering information about or investigating the organization.

B) (U) Ethnicity may be considered in evaluating whether a subject is—or is not—a possible associate of a criminal or terrorist group that is known to be comprised of members of the same ethnic grouping—as long as it is not the dominant factor for focusing on a particular person. It is axiomatic that there are many members of the same ethnic group who are not members of the criminal or terrorist group; for that reason, there must be other information beyond race or ethnicity that links the individual to the terrorist or criminal group or to the other members of the group. Otherwise, racial or ethnic identity would be the sole criterion, and that is impermissible.

#### 4.3.3.2 (U) COMMUNITY RACE OR ETHNICITY AS A FACTOR

##### *4.3.3.2.1 (U) COLLECTING AND ANALYZING DEMOGRAPHICS*

(U) The DOJ Guidance on the Use of Race and FBI policy permit the FBI to identify locations of concentrated ethnic communities in the field office's domain, if these locations will reasonably aid the analysis of potential threats and vulnerabilities, and, overall, assist domain awareness for the purpose of performing intelligence analysis. If, for example, intelligence reporting reveals that members of certain terrorist organizations live and operate primarily within a certain concentrated community of the same ethnicity, the location of that community is clearly valuable—and properly collectible—data. Similarly, the locations of ethnic-oriented businesses and other facilities may be collected if their locations will reasonably contribute to an awareness of threats and vulnerabilities, and intelligence collection opportunities. Also, members of some communities may be potential victims of civil rights crimes and, for this reason, community location may aid enforcement of civil rights laws. Information about such communities should not be collected, however, unless the communities are sufficiently concentrated and established so as to provide a reasonable potential for intelligence collection that would support FBI mission programs (e.g., where identified terrorist subjects from certain countries may relocate to blend in and avoid detection).

##### *4.3.3.2.2 (U) GEO-MAPPING ETHNIC/RACIAL DEMOGRAPHICS*

(U) As a general rule, if information about community demographics may be collected, it may be "mapped." Sophisticated computer geo-mapping technology visually depicts lawfully collected information and can assist in showing relationships among disparate data. By itself,

EXHIBIT I
321

Case 2:21-cv-04405-RGK-MAR Document 122-10 Filed 08/09/22 Page 14 of 19 Page ID #:4713

mapping raises no separate concerns about racial or ethnic profiling, assuming the underlying information that is mapped was properly collected. It may be used broadly - e.g., for domain awareness of all relevant demographics in the field office's area of responsibility or to track crime trends – or narrowly to identify specific communities or areas of interest to inform a specific Assessment or investigation. In each case, the relevance of the ethnic or racial information mapped to the authorized purpose of the Assessment or investigation must be clearly demonstrated and documented.

#### 4.3.3.2.3     (U) GENERAL ETHNIC/RACIAL BEHAVIOR

(U) The authority to collect ethnic community location information does not extend to the collection of cultural and behavioral information about an ethnic community that bears no rational relationship to a valid investigative or analytical need. Every ethnic community in the Nation that has been associated with a criminal or national security threat has a dominant majority of law-abiding citizens, resident aliens, and visitors who may share common ethnic behavior but who have no connection to crime or terrorism (as either subjects or victims). For this reason, a broad-brush collection of racial or ethnic characteristics or behavior is not helpful to achieve any authorized FBI purpose and may create the appearance of improper racial or ethnic profiling.

#### 4.3.3.2.4     (U) SPECIFIC AND RELEVANT ETHNIC BEHAVIOR

(U) On the other hand, knowing the behavioral and life style characteristics of known individuals who are criminals or who pose a threat to national security may logically aid in the detection and prevention of crime and threats to the national security within the community and beyond. Focused behavioral characteristics reasonably believed to be associated with a particular criminal or terrorist element of an ethnic community (not with the community as a whole) may be collected and retained. For example, if it is known through intelligence analysis or otherwise that individuals associated with an ethnic-based terrorist or criminal group conduct their finances by certain methods, travel in a certain manner, work in certain jobs, or come from a certain part of their home country that has established links to terrorism, those are relevant factors to consider when investigating the group or assessing whether it may have a presence within a community. It is recognized that the "fit" between specific behavioral characteristics and a terrorist or criminal group is unlikely to be perfect— that is, there will be members of the group who do not exhibit the behavioral criteria as well as persons who exhibit the behaviors who are not members of the group. Nevertheless, in order to maximize FBI mission relevance and to minimize the appearance of racial or ethnic profiling, the criteria used to identify members of the group within the larger ethnic community to which they belong must be as focused and as narrow as intelligence reporting and other circumstances permit. If intelligence reporting is insufficiently exact so that it is reasonable to believe that the criteria will include an unreasonable number of people who are not involved, then it would be inappropriate to use the behaviors, standing alone, as the basis for FBI activity.

EXHIBIT I
322

*4.3.3.2.5*     *(U) EXPLOITIVE ETHNIC BEHAVIOR*

(U) A related category of information that can be collected is behavioral and cultural information about ethnic or racial communities that is reasonably likely to be exploited by criminal or terrorist groups who hide within those communities in order to engage in illicit activities undetected. For example, the existence of a cultural tradition of collecting funds from members within the community to fund charitable causes in their homeland at a certain time of the year (and how that is accomplished) would be relevant if intelligence reporting revealed that, unknown to many donors, the charitable causes were fronts for terrorist organizations or that terrorist supporters within the community intended to exploit the unwitting donors for their own purposes.

### 4.4     (U) LEAST INTRUSIVE METHOD

*4.4.1*     *(U) OVERVIEW*

(U) The AGG-Dom requires that the "least intrusive" means or method be considered and—if reasonable based upon the circumstances of the investigation—used to obtain intelligence or evidence in lieu of a more intrusive method. This principle is also reflected in See Appendix B: Executive Order 12333, which governs the activities of the United States Intelligence Community. The concept of least intrusive method applies to the collection of all information. Regarding the collection of foreign intelligence that is not collected as part of the FBI's traditional national security or criminal missions, the AGG-Dom further requires that open and overt collection activity must be used with USPERs, if feasible.

(U) By emphasizing the use of the least intrusive means to obtain information, FBI employees can effectively execute their duties while mitigating potential negative impact on the privacy and civil liberties of all people encompassed within the investigation, including targets, witnesses, and victims. This principle is not intended to discourage FBI employees from seeking relevant and necessary information, but rather is intended to encourage investigators to choose the least intrusive—but still reasonable—means from the available options to obtain the information.

(U) This principle is embodied in statutes and DOJ policies on a variety of topics including electronic surveillance, the use of tracking devices, the temporary detention of suspects, and forfeiture. In addition, the concept of least intrusive method can be found in case law as a factor to be considered in assessing the reasonableness of an investigative method in the face of a First Amendment or due process violation claim. See *Clark v. Library of Congress*, 750 F.2d 89, 94-5 (D.C. Cir. 1984); *Alliance to End Repression v. City of Chicago*, 627 F. Supp. 1044, 1055 (N.D. Ill. 1985), citing *Elrod v. Burns*, 427 U.S. 347, 362-3 (1976).

*4.4.2*     *(U) GENERAL APPROACH TO LEAST INTRUSIVE METHOD CONCEPT*

(U) Determining what constitutes the least intrusive method in an investigative or intelligence collection scenario is both a logical process and an exercise in judgment. It is logical in the sense that the FBI employee must first confirm that the selected technique will:

   A) (U) Gather information that is relevant to the Assessment or Predicated Investigation;

EXHIBIT I
323

B) (U) Acquire the information within the time frame required by the assessment or Predicated Investigation;

C) (U) Gather the information consistent with operational security and the protection of sensitive sources and methods; and

D) (U) Gather information in a manner that provides confidence in its accuracy.

(U) Determining the least intrusive method also requires sound judgment because the factors discussed above are not fixed points on a checklist. They require careful consideration based on a thorough understanding of investigative objectives and circumstances.

### 4.4.3    (U) DETERMINING INTRUSIVENESS

(U) The degree of procedural protection that established law and the AGG-Dom provide for the use of the method helps to determine its intrusiveness. Using this factor, search warrants, wiretaps, and undercover operations are very intrusive. By contrast, investigative methods with limited procedural requirements, such as checks of government and commercial data bases and communication with established sources, are less intrusive.

(U) The following guidance is designed to assist FBI personnel in judging the relative intrusiveness of different methods:

A) (U) *Nature of the information sought:* Investigative objectives generally dictate the type of information required and from whom it should be collected. This subpart is not intended to address the situation where the type of information needed and its location are so clear that consideration of alternatives would be pointless. When the option exists to seek information from any of a variety of places, however, it is less intrusive to seek information from less sensitive and less protected places. Similarly, obtaining information that is protected by a statutory scheme (e.g., financial records) or an evidentiary privilege (e.g., attorney/client communications) is more intrusive than obtaining information that is not so protected. In addition, if there exists a reasonable expectation of privacy under the Fourth Amendment (i.e., private communications), obtaining that information is more intrusive than obtaining information that is knowingly exposed to public view as to which there is no reasonable expectation of privacy.

B) (U) *Scope of the information sought:* Collecting information regarding an isolated event— such as a certain phone number called on a specific date or a single financial transaction—is less intrusive or invasive of an individual's privacy than collecting a complete communications or financial "profile." Similarly, a complete credit history is a more intrusive view into an individual's life than a few isolated credit charges. In some cases, of course, a complete financial and credit profile is exactly what the investigation requires (for example, investigations of terrorist financing or money laundering). If so, FBI employees should not hesitate to use appropriate legal process to obtain such information if the predicate requirements are satisfied. Operational security—such as source protection—may also dictate seeking a wider scope of information than is absolutely necessary for the purpose of protecting a specific target or source. When doing so, however, the concept of least intrusive method still applies. The FBI may obtain more data than strictly needed, but it should obtain no more data than is needed to accomplish the investigative or operational security purpose.

C) (U) *Scope of the use of the method:* Using a method in a manner that captures a greater picture of an individual's or a group's activities are more intrusive than using the same method or a different one that is focused in time and location to a specific objective. For example, it is

**EXHIBIT I**
**324**

UNCLASSIFIED – FOR OFFICIAL USE ONLY
Domestic Investigations and Operations Guide §4

less intrusive to use a tracking device to verify point-to-point travel than it is to use the same device to track an individual's movements over a sustained period of time. Sustained tracking on public highways would be just as lawful but more intrusive because it captures a greater portion of an individual's daily movements. Similarly, surveillance by closed circuit television that checks a discrete location within a discrete time frame is less intrusive than 24/7 coverage of a wider area. For another example, a computer intrusion device that captures only host computer identification information is far less intrusive than one that captures file content.

D) (U) ***Source of the information sought:*** It is less intrusive to obtain information from existing government sources (such as state, local, tribal, international, or federal partners) or from publicly-available data in commercial data bases, than to obtain the same information from a third party (usually through legal process) that has a confidential relationship with the subject—such as a financial or academic institution. Similarly, obtaining information from a reliable confidential source who is lawfully in possession of the information and lawfully entitled to disclose it (such as obtaining an address from an employee of a local utility company) is less intrusive than obtaining the information from an entity with a confidential relationship with the subject. It is recognized in this category that the accuracy and procedural reliability of the information sought is an important factor in choosing the source of the information. For example, even if the information is available from a confidential source, a grand jury subpoena, national security letter, ex parte order, or other process may be required in order to ensure informational integrity and accuracy.

E) (U) ***The risk of public exposure:*** Seeking information about an individual or group under circumstances that create a risk that the contact itself and the information sought will be exposed to the individual's or group's detriment and/or embarrassment—particularly if the method used carries no legal obligation to maintain silence—is more intrusive than information gathering that does not carry that risk. Interviews with employers, neighbors, and associates, for example, or the issuance of grand jury subpoenas at a time when the investigation has not yet been publicly exposed are more intrusive than methods that gather information covertly. Similarly, interviews of a subject in a discrete location would be less intrusive than an interview at, for example, a place of employment or other location where the subject is known.

(U) There is a limit to the utility of this list of intrusiveness factors. Some factors may be inapplicable in a given investigation and, in many cases, the choice and scope of the method will be dictated wholly by investigative objectives and circumstances. The foregoing is not intended to provide a comprehensive checklist or even an overall continuum of intrusiveness. It is intended instead to identify the factors involved in a determination of intrusiveness and to attune FBI employees to select, within each applicable category, a less intrusive method if operational circumstances permit. In the end, selecting the least intrusive method that will accomplish the objective is a matter of sound judgment. In exercising such judgment, however, consideration of these factors should ensure that the decision to proceed is well founded.

### *4.4.4* (U) STANDARD FOR BALANCING INTRUSION AND INVESTIGATIVE REQUIREMENTS

(U) Once an appropriate method and its deployment have been determined, reviewing and approving authorities should balance the level of intrusion against investigative requirements. This balancing test is particularly important when the information sought involves clearly established constitutional, statutory, or evidentiary rights or sensitive circumstances (such as obtaining information from religious or academic institutions or public fora where First

4-17
UNCLASSIFIED – FOR OFFICIAL USE ONLY

Version Dated:
October 15, 2011

EXHIBIT I
325

Amendment rights are being exercised), but should be applied in all circumstances to ensure that the least intrusive method if reasonable based upon the circumstances of the investigation is being utilized.

(U) Balancing the factors discussed above with the considerations discussed below will help determine whether the method and the extent to which it intrudes into privacy or threatens civil liberties are proportionate to the significance of the case and the information sought.

(U) Considerations on the investigative side of the balancing scale include the:

    A) (U) Seriousness of the crime or national security threat;

    B) (U) Strength and significance of the intelligence/information to be gained;

    C) (U) Amount of information already known about the subject or group under investigation; and

    D) (U) Requirements of operational security, including protection of sources and methods.

(U) If, for example, the threat is remote, the individual's involvement is speculative, and the probability of obtaining probative information is low, intrusive methods may not be justified, and, in fact, they may do more harm than good. At the other end of the scale, if the threat is significant and possibly imminent (e.g., a bomb threat), aggressive measures would be appropriate regardless of intrusiveness.

(U) In addition, with respect to the investigation of a group, if the terrorist or criminal nature of the group and its membership is well established (e.g., al Qaeda, Ku Klux Klan, Colombo Family of La Cosa Nostra), there is less concern that pure First Amendment activity is at stake than there would be for a group whose true character is not yet known (e.g., an Islamic charity suspected of terrorist funding) or many of whose members appear to be solely exercising First Amendment rights (anti-war protestors suspected of being infiltrated by violent anarchists). This is not to suggest that investigators should be less aggressive in determining the true nature of an unknown group that may be engaged in terrorism or other violent crime. Indeed, a more aggressive and timely approach may be in order to determine whether the group is violent or to eliminate it as a threat. Nevertheless, when First Amendment rights are at stake, the choice and use of investigative methods should be focused in a manner that minimizes potential infringement of those rights. Finally, as the investigation progresses and the subject's or group's involvement becomes clear, more intrusive methods may be justified. Conversely, if reliable information emerges refuting the individual's involvement or the group's criminal or terrorism connections, the use of any investigative methods must be carefully reconsidered.

(U) Another consideration to be balanced is operational security: if a less intrusive but reasonable method were selected, would the subject detect its use and alter his activities— including his means of communication—to thwart the success of the operation? Operational security—particularly in national security investigations—should not be undervalued and may, by itself, justify covert tactics which, under other circumstances, would not be the least intrusive.

### 4.4.5 *(U) CONCLUSION*

(U) The foregoing guidance is offered to assist FBI employees in navigating the often unclear course to select the least intrusive investigative method that effectively accomplishes the operational objective at hand. In the final analysis, choosing the method that must appropriately

**EXHIBIT I**
**326**

balances the impact on privacy and civil liberties with operational needs, is a matter of judgment, based on training and experience. Pursuant to the AGG-Dom, other applicable laws and policies, and this guidance, FBI employees may use any lawful method allowed, even if intrusive, where the intrusiveness is warranted by the threat to the national security or to potential victims of crime and/or the strength of the information indicating the existence of that threat.

4-19
UNCLASSIFIED – FOR OFFICIAL USE ONLY

Version Dated:
October 15, 2011

**EXHIBIT I**
**327**