```
                                            Page 1

  1              IN THE UNITED STATES DISTRICT COURT
  2             FOR THE CENTRAL DISTRICT OF CALIFORNIA
  3                      WESTERN DIVISION
  4
      PAUL SNITKO, JENNIFER SNITKO, )
  5   JOSEPH RUIZ, TYLER GOTHIER,   )
      JENI VERDON-PEARSONS, MICHAEL )
  6   STORC, and TRAVIS MAY,        )  Case No.
                                    )  2:21-cv-04405-RGK-MAR
  7                 Plaintiffs,     )
                                    )
  8   vs.                           )
                                    )
  9   UNITED STATES OF AMERICA,     )
      TRACY L. WILKISON, in her     )
 10   official capacity as Acting   )
      United States Attorney for    )
 11   the Central District of       )
      California, and KRISTI KOONS  )
 12   JOHNSON, in her official      )
      capacity as an Assistant      )
 13   Director of the Federal       )
      Bureau of Investigation,      )
 14                                 )
                    Defendants.     )
 15   _____)
 16
 17
 18          REMOTE DEPOSITION OF JUSTIN PALMERTON
 19                   April 28, 2022
 20
 21
 22
 23
 24
 25   Reported By: Amy E. Simmons, CSR, RPR, CRR, CRC
```

Page 2

1          REMOTE DEPOSITION OF JUSTIN PALMERTON

2

3          BE IT REMEMBERED that the remote deposition of

4     JUSTIN PALMERTON was taken via videoconference by the

5     Plaintiffs before Veritext Legal Solutions, Amy E.

6     Simmons, Court Reporter and Notary Public in and for

7     the County of Ada, State of Idaho, on Thursday, the

8     28th day of April, 2022, commencing at the hour of

9     9:19 a.m. Pacific Daylight Time in the above-entitled

10    matter.

11

12

13    APPEARANCES (Remotely):

14

      For the Plaintiffs:    THE INSTITUTE FOR JUSTICE

15                           By:  Robert Frommer, Esq.
                                  Joseph R. Gay, Esq.

16                           901 North Glebe Road, Suite 900
                             Arlington, Virginia  22203

17                           Telephone:  (703) 682-9320
                             rfrommer@ij.org

18                           jgay@ij.org

19

                             THE INSTITUTE FOR JUSTICE

20                           By:  Robert E. Johnson, Esq.
                             16781 Chagrin Blvd., Suite 256

21                           Shaker Heights, Ohio  44120
                             Telephone:  (703) 682-9320

22                           rjohnson@ij.org

23

24

25

**EXHIBIT FF**
**494**

Page 3

```
 1     APPEARANCES (Contd.):

 2

       For the Defendants:    UNITED STATES ATTORNEY'S OFFICE
 3                            By:  Victor Rodgers, AUSA
                                   Maxwell Coll, AUSA
 4                                 Andrew Brown, AUSA
                            312 North Spring Street, 14th Floor
 5                          Los Angeles, California  90012
                            Telephone:  (213) 894-2569
 6                          Facsimile:  (213) 894-0142
                            victor.rodgers@usdoj.gov
 7                          maxwell.coll@usdoj.gov
                            andrew.brown@usdoj.gov

 8

 9                          FEDERAL BUREAU OF INVESTIGATION
                            OFFICE OF GENERAL COUNSEL
10                          By:  Meghan Campbell
                            935 Pennsylvania Avenue N.W., Room 10140
11                          Washington, District Columbia  20535
                            Telephone: (202) 324-8952
12                          mcampbell5@fbi.gov

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT FF**
**495**

Page 4

1                          I N D E X

2                    E X A M I N A T I O N

3

    JUSTIN PALMERTON                                    PAGE

4

5    By:  Mr. Frommer.......................................5

6

7                       E X H I B I T S

8    NO.                                                PAGE

9    1.    Excerpt from Domestic Investigations............61

           and Operations Guide (2 pages)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT FF**
**496**

1

2

3

4     Q.   (BY MR. FROMMER)  Well, how would an

5     inventory that doesn't provide a complete and

6     accurate list of the items that have been taken

7     serve the purpose of protecting the FBI from

8     claims of theft and loss?

9          MR. RODGERS:  Objection; lacks

10    foundation, assumes facts not in evidence, poses

11    an incomplete hypothetical, calls for a legal

12    conclusion, argumentative.

13         THE WITNESS:  Well, again, I mentioned

14    the photos and videos of the items that are taken.

15         In addition to that, the FD-597 and

16    inventory property list is put together.

17         It's then handed to our evidence

18    technicians, and those items are then assigned a

19    bar code and they're sealed up.  And those -- then

20    they're shipped to, again, our facility.

21         So the bar code is connected to those

22    items which are connected to wherever we seized it

23    from or took it from.

24    Q.   (BY MR. FROMMER)  Okay.  I get that.

25         So you're saying that the inventory

Page 73

1   sheet, the FD-597 -- is it fair to say that the

2   FD-597 is one piece of evidence that the FBI uses

3   in order to protect itself against claims of loss

4   and theft?

5         A.   That's one piece, yes.

6         Q.   And that the videos and photographs would

7   be additional evidence they would use to protect

8   themselves against claims of loss and theft?

9         A.   Yes.

10        Q.   So to the extent you're going to use a

11  video for that purpose, the video would need to

12  completely and accurately capture the things that

13  are being seized, correct?

14        A.   Yes.

15        Q.   Thank you.

16             So how does the inventorying process

17  change, if at all, based on the value of the items

18  that are being inventoried?

19             MR. RODGERS:  Objection; lacks

20  foundation, calls for a legal conclusion, assumes

21  facts not in evidence, poses an incomplete

22  hypothetical.

23             THE WITNESS:  Yeah, so there are

24  different classifications of items in that --

25  there's general items and there's also valuable

Page 74

1    items.  We would treat valuable items differently.

2         Q.   (BY MR. FROMMER)  How do you treat

3    valuable items differently?

4              MR. RODGERS:  Same objections.

5              THE WITNESS:  For one, they're sent to a

6    different storage facility that's more secure, and

7    they're also sealed up in plastic bags, sealed so

8    they can't be opened.  And if they are opened, it

9    has to be documented as to when and why they're

10   opened.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT FF**
**499**

Page 76



```
20        Q.   So does an inventory that you put

21   together, is it supposed to be complete in terms

22   of the items that were seized?

23             MR. RODGERS:  Objection, overbroad,

24   assumes facts, lacks foundation, poses an

25   incomplete hypothetical.
```

Page 77

1              THE WITNESS:  Yeah, I don't know what you

2       mean by complete.

3          Q.   (BY MR. FROMMER)  Let's say I have 100

4       items there -- okay? -- that are being seized.

5              Should the inventory sheet be completed

6       in the sense -- the FD-597, should that fully list

7       out the items that were being seized?

8              MR. RODGERS:  Same objections.

9              THE WITNESS:  No.

10         Q.   (BY MR. FROMMER)  Why do you say no?

11         A.   That's just how we do it, or how I've

12      done it.

13         Q.   Would an incomplete inventory, FD-597, be

14      useful to protect the FBI against claims of loss

15      and theft?

16             MR. RODGERS:  Objection; poses an

17      incomplete hypothetical, argumentative, lacks

18      foundation, assumes facts not in evidence, calls

19      for a legal conclusion.

20             THE WITNESS:  Yeah, it's not an

21      incomplete 597 if it generally lists all of the

22      items that were there.

23         Q.   (BY MR. FROMMER)  What do you mean

24      by -- let's drill down on that word "generally,"

25      because I'm a little confused by that.

1           So let's say I have -- I don't know.  I'm

2      just trying to come up with something.  Let's say

3      I have comic books in there.  Let's say I have 20

4      comic books.

5           Would it be sufficient just to write "20

6      comic books," or -- would that be sufficient on an

7      FD-597?

8           MR. RODGERS:  Objection.  Same

9      objections.

10          THE WITNESS:  That would be sufficient,

11     yes.

12      Q.   (BY MR. FROMMER)  What if it just

13     said -- what if the 597 just said "Miscellaneous

14     comic books," didn't provide a number?

15          MR. RODGERS:  Same objections.

16          THE WITNESS:  Yeah, I think that would be

17     sufficient.

18      Q.   (BY MR. FROMMER)  Why do you say that?

19          MR. RODGERS:  Same objections,

20     argumentative, calls for a legal conclusion.

21          THE WITNESS:  Partially because we're

22     relying on the other pieces of documentation that

23     we have in place to preserve.  So there's the

24     chain of custody, for one, which tracks that item,

25     as well as our evidence bar code and any photos

Page 79

1    and videos we took.



**EXHIBIT FF**
**503**

Page 81

1        Q.   (BY MR. FROMMER)   Welcome back, Special

2    Agent Palmerton.   I wanted to go back to something

3    we were talking about before.

4            We were talking about the whole inventory

5    chain, as it were, from the inventory, the

6    photographs, the videos.   And then you were

7    talking about some of the steps involved in the

8    chain of custody as part of it.

9            And I was wondering if you could sort of,

10   for my own edification, explain once an inventory

11   has been completed, what happens in terms of chain

12   of custody going forward.

13       A.   Once the inventory is complete, you have

14   the documentation prepared, we have the FD-597

15   inventory list and then we have the chain of

16   custodies prepared, which is essentially exactly

17   what it states, just chain of custody, keeping

18   track of that item, where it was discovered and

19   then where it went and where it, you know, could

20   go in the future, and then who may have

21   transported it or opened or had custody of it at a

22   certain time.

23           I mean, and generally, like, as an

24   example, it's collected at a spot, says it was

25   found here in this spot at this date and time by

Page 82

1    this person.  And then it's transported to the FBI

2    evidence facility, and then it's checked into our

3    FBI evidence facility.  And that's it.  That's all

4    the chain of custody document is.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT FF**
**505**

1

2

3      Q.   Okay.  So is it fair to say that the main

4   way that the FBI guards against claims of theft

5   and loss is through that chain of custody control?

6        MR. RODGERS:  Objection; speculation,

7   lacks foundation, calls for a legal conclusion.

8        THE WITNESS:  I would say it's that as

9   well as all the other documentation we use to

10  track pieces of evidence or items that are taken.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT FF**
**506**

Page 85



21          I believe you said you first heard about

22     the US Private Vaults case or investigation back

23     in 2019; is that right?

24          A.   Yes.

25          Q.   Can you tell me what you recall hearing

Page 86

1    in 2019 about the US Private Vaults matter?

2        A.    Yeah.   I mean, my first, I guess becoming

3    aware of the USPV case is from Agent Lynne

4    Zellhart.   She mentioned she was working a case

5    regarding USPV.   I was a newer agent at the time,

6    and she asked if I wanted to do what's called the

7    spot check, which is just a drive-by to kind of

8    note the location and any activity.

9            And then she just drove me there.   We

10   looked at it.   She said, you know, this is a spot

11   for, you know, potential money laundering, and

12   we're looking at investigating it, and then drove

13   me back to the office.



**EXHIBIT FF**
**508**

Page 91

1         Q.   Okay.  Going back to the origins of this,
2    you said on the spot check, I believe it was
3    called, that Zellhart drove past and said that
4    there was suspicion of money laundering, and
5    that's what she was investigating.

6              Who exactly did she -- well, let me ask
7    this based on your knowledge:  Did she identify to
8    you who she suspected of engaging in money
9    laundering?

10        A.   I mean, I want to say it was the business
11   itself.

12        Q.   Are you just -- do you recall her saying
13   that, or are you just --

14        A.   No.

15        Q.   -- guessing?

16        A.   No, I don't recall specifically who she
17   said or what she said.  This was my recollection
18   of conversations I've had with Lynne, you know,
19   over the course of my time there in the
20   investigation.

21        Q.   I don't want to put words in your mouth.

22             So you believe that the investigation was
23   regarding money laundering offenses by US Private
24   Vaults, the corporation itself; is that correct?

25        A.   That was my understanding at the time.

**EXHIBIT FF**
**509**

1  ████████████████████████████████

2          How many FBI officials were involved in

3  executing the search warrant or the warrant?  A

4  rough approximation.

5          A.   I mean, yeah, I would say dozens if not

6  over 100 different agents throughout the course of

7  that week.

8          Q.   So over 100 agents over the course of the

9  week, you think?

10         A.   Yeah.

11         Q.   And in terms of that, we're just talking

12  for that, just FBI agents, correct?

13         A.   Yes.

14         Q.   How many -- and again, I'm not trying to

15  pin you down on a specific number.  I understand

16  that's very difficult.

17         But approximately how many individuals

18  from agencies other than the FBI would you say

19  were involved in the execution of the warrant?

20         A.   I mean, yeah, total other agencies, yeah,

21  probably -- I mean, yeah, broken record, but I'm

22  thinking dozens of other law enforcement officers

23  and just officials, law enforcement employees.

24         Q.   So between the FBI agents involved and

25  individuals from other organizations, we're

Page 110

1    talking well over 100 individuals, it sounds like.

2            Is that a relatively accurate number?

3        A.   Yes.  And again, that's -- I just want to

4    clarify, over the course of the week.  So there

5    wasn't, like, over 100 people there in one day.

6        Q.   Oh, okay.  So let's say the day of, the

7    day everything got kicked off, which I believe was

8    March 22nd, how many FBI agents went to US Private

9    Vaults that morning, roughly?

10       A.   Our squad -- yeah, I mean, I would just

11   again say there were dozens of agents.  Our squad,

12   which was the agents I listed, as well as other

13   squads that showed up subsequent.

14       Q.   So there were dozens of FBI officials

15   down there on March 22nd?

16       A.   Yes.

17       Q.   Okay.  And is it fair to say there were

18   dozens of officials from other organizations also

19   there on March 22nd?

20       A.   Yes.

21       Q.   So a lot of people in a parking lot?

22       A.   There was a lot of people there, yes.

23   

24   

25

Page 143

1

2

3

4

5

6          Q.   (BY MR. FROMMER)  Well, the FD-597 says
7     "Miscellaneous" and the camera does not show all
8     the comic books.
9          A.   Right.
10          Q.   How do I have a complete record?
11          A.   You have a chain of custody that says
12     that it was taken or seized by this agent on this
13     date at this time from this place.  This is the
14     evidence item.
15               Here's the FD-597 associated with that.
16               Here's the bar code associated with that
17     597.
18               Here's the chain of custody that shows it
19     being transported to our evidence facility where
20     it's been stored securely for X number of days.
21               And then here's a video that shows a
22     fleeting picture of what appears to be a comic
23     book.
24               To me, I think that's a pretty secure way
25     of determining what was in your box, if that's

**EXHIBIT FF**
**512**

Page 144

1     what we're discussing.



**EXHIBIT FF**
**513**

Page 149



```
23        Q.   Okay.  So you would see the slip or
24   envelope.  It would have, like, the box holder's
25   name on it.  And I know that you'd end up
```

**EXHIBIT FF**
**514**

Page 150

1    reporting that information on the inventory sheet.

2            But would you continue to go through a

3    box after encountering one of those slips or

4    envelopes?  Would you continue the inventorying

5    process with respect to the rest of the -- to the

6    contents inside the interior sleeve?

7         A.   Yes.

8         Q.   Sorry, just give me a second.

9            All right.  So let's move past that

10   initial slip.  You've opened the interior sleeve,

11   and now you're looking at the contents of the box.

12           And let's say you found another envelope

13   inside, like, a letter, standard letter, envelope

14   that -- standard letter envelope.

15           Would you open an envelope that -- like

16   that that you found inside the box?

17        A.   Yes.

18        Q.   Were you instructed to do that?

19        A.   I don't recall if we were instructed to

20   do that.

21        Q.   Okay.  I guess the question is, why did

22   you do that?

23        A.   Kind of -- and I go back to the incident

24   to arrest inventory procedures, kind of for agent

25   safety.  We don't know if there's drugs in there,

Page 151

1    plus we don't know if there's valuables in there,

2    plus anything else that could be dangerous.  Also

3    just to accurately reflect what could be in that

4    envelope.

5         Q.   Okay.  So you're opening an envelope to

6    see if there's any, like --

7         A.   Drugs, valuables, or dangerous items,

8    essentially.

9         Q.   Yeah, like hazardous items or things that

10   you want to make sure don't disappear.  Okay.  I

11   get that.

12            So let's say you get into the envelope.

13   You open the envelope.  And surprise, surprise,

14   the envelope just has, you know, well, papers.

15   Just papers in it.  It doesn't have anything else.

16            What would you do at that point with the

17   letter?

18        A.   Honestly, it was kind of nice if we did

19   find something like that because we could just

20   write "Miscellaneous paper" as opposed to it being

21   a bunch of cash, drugs, or something dangerous,

22   because it was just less paperwork to fill out and

23   less steps to do.  So it would be "Miscellaneous

24   paperwork," and it goes in the general evidence

25   bag, which is sealed and sent to the general

**EXHIBIT FF**

**516**

Page 152

1    evidence facility.

2         Q.   Now, would you take, like, a picture of

3    the letter or anything like that?

4         A.   No.

5         Q.   Do you know if other agents did videotape

6    or photograph the letters that they came across?

7         A.   Not specifically, no.

8         Q.   What do you mean "not specifically"?

9         A.   I'm thinking they could have taken a

10   picture of -- you know, laid out all of the items

11   that are in the box and taken just an overview

12   shot of everything that was in there.  And yeah,

13   they may have opened the envelope and pulled the

14   papers out to show there was no cash inside the

15   envelope or any valuables or anything like that.

16        Q.   But you agree it would be inappropriate

17   to, like, record or take a photograph of a letter

18   such that you just have a photograph with that

19   letter?

20             MR. RODGERS:  Objection; calls for a

21   legal conclusion.

22        Q.   (BY MR. FROMMER)  I'm asking your

23   personal opinion.  Would that be appropriate or

24   not?

25             MR. RODGERS:  Same objection.  Poses an

**EXHIBIT FF**
**517**

Page 153

1     incomplete hypothetical as well.

2              THE WITNESS:  Yeah, I mean, my personal

3     opinion, I don't know if it would be improper,

4     necessarily.  I mean, just -- again, just depends

5     on what's on the letter.  If there's, like, a

6     manifest on there of, like, blowing something up,

7     I think we're going to take a picture of it.  You

8     can't turn a blind eye to something like that.

9         Q.   (BY MR. FROMMER)  Okay.  Would there be

10    any instance in which it would be appropriate for

11    you to read the letter?

12             MR. RODGERS:  Same objection.

13             THE WITNESS:  I just don't think we would

14    generally read the letter if we saw it was

15    miscellaneous paperwork.  We would probably move

16    on unless we saw -- if you opened it and you saw

17    something that said "kill" or "death" or "murder"

18    or something, then we would probably read the

19    letter.  But otherwise we were just confirming

20    there was nothing dangerous or valuable in that

21    envelope.

22

23

24

25

Page 180

1                         REPORTER'S CERTIFICATE

2

    STATE OF IDAHO  )

3                   )  ss.

    COUNTY OF ADA   )

4

5       I, AMY E. SIMMONS, Certified Shorthand Reporter

6    and Notary Public in and for the State of Idaho, do

7    hereby certify:

8       That prior to being examined, the witness named in

9    the foregoing deposition was by me duly sworn remotely to

10   testify to the truth, the whole truth and nothing but the

11   truth;

12      That said deposition was taken down by me in

13   shorthand at the time and place therein named and

14   thereafter reduced to typewriting under my direction, and

15   that the foregoing transcript contains a full, true

16   and verbatim record of said deposition.

17      I further certify that I have no interest in the

18   event of the action.

19      WITNESS my hand and seal this 3rd day of May,

20   2022.

21

22                      AMY E. SIMMONS

                        CSR, RPR, CRR, CRC and Notary

23                      Public in and for the

                        State of Idaho.

24

25   My Commission Expires: 06-13-2022

**EXHIBIT FF**
**519**