Page 1

1              IN THE UNITED STATES DISTRICT COURT
2             FOR THE CENTRAL DISTRICT OF CALIFORNIA
3                       WESTERN DIVISION
4                            -oOo-
5

    PAUL SNITKO, JENNIFER SNITKO, :
6   JOSEPH RUIZ, TYLER GOTHIER,   :
    JENI VERDON-PEARSONS, MICHAEL :
7   STORC, AND TRAVIS MAY,        :
                                  :
8                   Plaintiffs,   :
                                  :
9   vs.                           :   Case No.
                                  :   2:21-cv-04405-RGK-MAR
10  UNITED STATES OF AMERICA,     :
    TRACY L. WILKISON, in her     :
11  official capacity as Acting   :
    United States Attorney for the:
12  Central District of California:
    and KRISTI KOONS JOHNSON, in  :
13  her official capacity as an   :
    Assistant Director of the     :
14  Federal Bureau of             :
    Investigation,                :
15                                :
                    Defendants.   :
16  =================================================
17
18        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
19                   LYNNE K. ZELLHART
20                  FRIDAY, MAY 6, 2022
21            WITNESS APPEARING REMOTELY FROM
22                LOS ANGELES, CALIFORNIA
23  REPORTED BY:        SUSAN E. BELINGHERI, CCR #655
                             NV Firm Lic. #1F
24
25

**EXHIBIT GG**
**520**

```
 1                        APPEARANCES:
 2              (all appearances via videoconference)
 3
                      For the Plaintiffs:
 4
                 THE INSTITUTE FOR JUSTICE
 5                    Attorneys at Law
                  By:  ROBERT FROMMER, ESQ.
 6               901 N. Glebe Road, Suite 900
                     Arlington, VA 22203
 7
 8                   For the Defendants:
 9           ASSISTANT UNITED STATES ATTORNEY
                  ASSET FORFEITURE SECTION
10               By:  VICTOR RODGERS, ESQ.
             312 North Spring Street, 14th Floor
11              Los Angeles, California 90012
12
                FEDERAL BUREAU OF INVESTIGATION
13                OFFICE OF GENERAL COUNSEL
                 By:  MEGHAN CAMPBELL, ESQ.
14
15
                      The Videographer:
16
                 VERITEXT LEGAL SOLUTIONS
17                   By:  TERRI PERKINS
18
                  The Veritext Concierge:
19
                      ROB BENIMOFF
20
21
22
23
24
25
```

**EXHIBIT GG**
**521**

1                               I N D E X

2

3        EXAMINATION:                                    PAGE

4        By Mr. Frommer                                     6

5

6

7        EXHIBITS:                                       PAGE

8        Exhibit 3........................................  38

         Exhibit 4........................................  75

9        Exhibit 5........................................  97

         Exhibit 6........................................ 161

10       Exhibit 7........................................ 181

         Exhibit 8........................................ 199

11       Exhibit 9........................................ 201

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT GG**
**522**

Page 74



17    Q.  Okay.  Do you know if there are guidelines out

18  there that you could turn to for how to do an inventory?

19    A.  Yes.  It's addressed in the DIOG.

Page 75



1

2

3

4

5

6

7

8

9

10

11    Q.  So this is Exhibit 4.  I -- this is an excerpt

12    from the DIOG that Defendants produced to us during

13    discovery.  Can you take a moment, look through it, and

14    tell me if that seems true and accurate?

15

16

17

18

19

20

21

22

23

24

25

1

2

3    Q.   Special Agent Zellhart, have you had an

4    opportunity to look over this excerpt?

5    A.   I have.

6    Q.   Okay.  And do you recognize it?

7    A.   Yes.

8    Q.   When would you say is the last time you looked at

9    this section of the DIOG?

10    A.   Yesterday.

11    Q.   Okay.  To prepare for this deposition?

12    A.   Yes.

13    Q.   Okay.  Don't want to know anything about that.

14    But other than yesterday when you were preparing

15    for the deposition, when was -- when -- when was the

16    last time you looked at this section of the DIOG?

17    A.   In the late summer of 2020.

18    Q.   In the late summer of 2020?

19    A.   Correct.

20

21

22

23

24

25

**EXHIBIT GG**
**525**

Page 103



Q.   Okay.  So you first heard about USPV in 2015 as part of a separate investigation.  When did you personally start -- begin investigating U.S. Private Vaults?

A.   2019.

Q.   Could you say roughly when in 2019 you began?

A.   Around April.

Page 104

Q.  Okay.  I'm -- so -- so this was primarily --
well, I -- I -- okay.  So it was primarily -- so was the
DEA already investigating U.S. Private Vaults prior to
April of 2019?

A.  Yes.  And I -- I can -- if I can explain this, I
think it will -- it will make it clear.

        Lots of law enforcement agencies were aware of
U.S. Private Vaults, going back to 2015.  And many
agencies had -- were aware of U.S. Private Vaults, were
aware that criminals were regularly using U.S. Private
Vaults to store criminal proceeds, and agencies had
different investigations open on individual customers,

**EXHIBIT GG**
**527**

Page 105

1   and that includes the DEA, who had a pretty -- a pretty

2   significant case, or cases, against some individual

3   customers.  But the -- the investigation against the

4   corporation, U.S. Private Vaults as a business entity,

5   didn't start until approximately April of 2019.

6       Q.  So was it you who were -- the one who initiated

7   the investigation of U.S. Private Vaults the

8   corporation?

9       A.  No.  It was everybody together.  So basically we

10  concluded that after almost five years of -- of going

11  after individual customers, we weren't -- we weren't

12  doing anything effective.  I mean, there's some good

13  cases, some good individual cases, but the problem was

14  the business itself.  And so we -- the three agencies

15  came together, along with the U.S. Attorney's Office, to

16  try to come up with how do we address the real problem.

17       The underlying problem in a money laundering case

18  is the money laundering facilitator, and U.S. Private

19  Vaults was a facilitator.  In my world of money

20  laundering, the facilitator is not the guy who's

21  laundering his own dirty money, it's the lawyer, the

22  accountant, the banker, the businessman who is -- is

23  supposedly legitimate but is enabling the criminal, or

24  in this case, a lot of criminals, to conduct their

25  criminal business.

Page 106

1        So the question was, in that spring of that year,

2    how do we address the real problem here, which isn't all

3    these people, but it's the money laundering facilitator,

4    which is U.S. Private Vaults, the business.   And

5    frankly, that was -- that was the concern when it was

6    first brought to my attention in 2015.   That's the --

7    that's the question the sheriff's were asking as well.

8    It was, like:   Hey, what do we do about this business?

9    We can't have this kind of business that attracts this

10    kind of criminal and protects this kind of criminal.

11       Q.   Okay.   I understand that.

12            So in April 2019, then, the investigation of

13    Private Vaults, the corporation, began.   And is it

14    correct to say that that investigation spanned multiple

15    federal agencies, including DEA, FBI, and USPIS?

16       A.   Correct.

17       Q.   Are there other federal agencies that were

18    involved?

19       A.   No.



**EXHIBIT GG**
**529**

Page 107



Q.  Okay.  And so is it true, then, that you helped

**EXHIBIT GG**
**530**

Page 108

1     investigate U.S. Private Vaults from April 2019 all the

2     time up until its indictment in March 2021?

3          A.   Yes.

**EXHIBIT GG**
**531**

Page 109



Q.   And can you explain to me, like, with U.S.

**EXHIBIT GG**
**532**

Page 110

1    Private Vaults -- you called them a facilitator.  And I

2    hadn't heard that term before, so I was wondering if you

3    could just sort of go through it for me one more time.

4    Tell me, like, how -- what -- what a money laundering

5    facilitator is and how USPV was a money laundering

6    facilitator.

7        A.   Sure.  So when you look at -- when you look at a

8    money laundering investigation, you can have -- you can

9    have money laundering charges against a criminal who

10   launders their own money.  So, for example -- drug cases

11   are super easy to understand.  So I'm a drug dealer, but

12   I also have a flower shop, and I'm claiming that my

13   flower shop is making oodles of money, but it doesn't

14   really do anything.  All of that money is from my drug

15   sales.  So I'm the money launderer, but I launder my own

16   criminal proceeds.  So that's one type of -- of money

17   launderer.

18            And -- and there's other ways.  You can -- you

19   can take your criminal proceeds and buy a boat, or a

20   plane, or a car.  That's also money laundering.  Right?

21   But in those cases you're laundering your own money.

22            And as a -- as a money laundering investigator

23   doing money laundering cases, we're -- our mission is

24   more directed, if we're good and we're successful, at

25   the money laundering facilitator.  And this is going to

**EXHIBIT GG**
**533**

Page 111

1    be the company, the big company, for example, that

2    launders everybody's money.

3         Here in Los Angeles, the -- you may read in the

4    newspapers, the garment district here is -- is quite

5    famous for taking loads of drug money and swapping

6    clothes in Mexico for drugs up here.  It's called

7    trade-based money laundering, or sometimes it's called

8    black market peso exchange.  Those are examples of a

9    money laundering facilitator.  The business is the

10   facilitator.  They make the system go.  So they are not

11   the underlying criminal, but they are the -- the

12   mechanism that makes it go.  Particularly important in

13   the money realm, because money is what makes this --

14   what makes the crimes go.

15        So we looked at U.S. Private Vaults as a -- a

16   criminal facilitator.  Right?  They're making it easy

17   and accessible and very convenient for criminals to

18   maintain their criminal proceeds and further their

19   criminal conduct.  So in that sense, U.S. Private Vaults

20   was a facilitator.

21     Q.  I see.  Okay.  I get it.

22        And so -- and what you're saying they were

23   facilitating is money laundering by the customers of

24   U.S. Private Vaults; is that right?

25     A.  Correct.

Page 112

```
 1       Q.  Got it.  Okay.  Okay.  That -- that -- that makes

 2    a bit more sense to me.

 3       A.  And the co-located gold and jewelry exchange was

 4    an intimate part of it because, as we proved, people

 5    were also trading their cash for gold, their criminal

 6    proceeds, and switching them from cash into gold, and

 7    then storing them at U.S. Private Vaults.  So it was

 8    another layer of the criminal facilitation.  And the

 9    customers were being coached by the employees at U.S.

10    Private Vaults on how to do this and avoid bank

11    reporting requirements.

12       Q.  Okay.  Yeah.  Like how to avoid -- doing it under

13    a $10,000 amount?

14       A.  Correct.

15       Q.  So it sounds, then, like your concern about this

16    place is that it was facilitating the criminal

17    activities -- U.S. Private Vaults and -- was it Olympic

18    Gold and Coin, I believe?

19       A.  (No audible response.)

20       Q.  That those two businesses together were

21    facilitating criminal activity by customers.

22       A.  Correct.

23

24

25
```

Page 117

1

2

3

4

5

6

7      Q.   Okay.   Can you read me the header on line -- line

8   nine?

9      A.   Sure.

10        It would be irrational for noncriminal customers

11   to choose USPV.

12      Q.   So given that statement, was it your opinion that

13   most of the people who rented from U.S. Private Vaults

14   were criminals in some way?

15             MR. RODGERS:   Objection.   The document

16   speaks for itself, mischaracterizes the terms of the

17   document.

18             THE WITNESS:   It was our position that U.S.

19   Private Vaults was a -- sort of a criminal magnet.   That

20   they marketed themselves to criminals, they protected

21   criminals, they obstructed law enforcement.   Mike

22   Poliak, one of the co-owners, specifically brought

23   criminals into the business when he became a co-owner,

24   which increased their profits.

25             So I was aware that there were probably a

**EXHIBIT GG**
**536**

Page 118

1    lot of criminals secreting criminal proceeds at this

2    business.  But I would add that Mike Poliak himself

3    said, and I quoted in here:  You can't have every drug

4    dealer in here, you need normal people, too.  So even

5    the co-owner acknowledged that it was a mix.

Page 128

Q.  Okay.  So you mentioned taking over the business
as an alternative.

Were there any other alternatives that were --
that you and the other people you identified, that you
discussed?

A.  Yes.  We discussed nuisance abatement, which is
something that we occasionally use in gang
investigations when -- or in drug investigations where,
for example, you have a -- a drug house on the street.
You can sometimes get the city government involved and
get the place declared a nuisance, and then they, like,
they take it.  The city takes it and they abate it.

**EXHIBIT GG**
**538**

Page 129

1      We talked about that, but concluded it wasn't

2  feasible in this case because we weren't dealing with a

3  house where there was -- you know, it wasn't a crack

4  house, it was a business.  And the City of Beverly Hills

5  doesn't really have that kind of a program the way, say,

6  the City of Los Angeles does.  There was a number of

7  reasons why we considered that and concluded it was not

8  going to meet our goals and objectives.

9      Q.  Were there -- okay.  So I have taking over the

10  business and nuisance abatement.  Were there any other

11  alternatives that you discussed about how to bring U.S.

12  Private Vaults' operation to a halt?

13      A.  Not that I can think of.



**EXHIBIT GG**
**539**

1

2

3

4

5

6      Q.   So can you explain to me why -- what wasn't

7   feasible about taking over the business as an

8   alternative to seizing the nest?

9          MR. RODGERS:   Objection, lacks foundation,

10   calls for speculation, assumes facts not in evidence,

11   and calls for a legal conclusion.

12          THE WITNESS:   Right.  The best I can tell

13   you is that the FBI is just not in the business of

14   taking over businesses.  We're not in the business of

15   running a business, or taking over a business.  And to

16   the -- the extent -- what we did effectively and

17   efficiently took U.S. Private Vaults out of business, as

18   opposed to the amount of just the personnel and the time

19   and the complications of taking over a business.  We

20   don't run businesses.  We don't have the personnel for

21   it.  We don't, like -- it's just not something that we

22   do with any regularity.  And I'm not familiar with it.

23   And in my training and experience, I've never seen it

24   done.

25

1

2

3

4

5

6

7

8

9

10

11

12         So once you had come up, you and the team, had

13    come up with how to execute the seizure warrant, did you

14    send out -- well, I think you said you had created

15    instructions on how to do the box inventory; is that

16    correct?

17        A.   Correct.

18        Q.   Okay.  And -- and who did those instructions go

19    out to?

20        A.   So prior to -- approximately a week prior to the

21    execution of the warrants, we had a, like a team

22    meeting, and agents who had volunteered to assist came

23    to the meeting.  I'll say normally we would have had one

24    big meeting, but because of COVID we had, like, ten

25    small meetings.  But basically agents who had -- who had

**EXHIBIT GG**
**541**

Page 156

1    volunteered to assist came to a meeting, and we -- and I

2    went through the instructions with them.

3          And I'll say not just the -- there was meetings

4    for the agents who had volunteered to do the inventory,

5    but there were also meetings with the -- with the --

6    with the more technical, with the -- with the

7    property -- the facilities people, and the evidence

8    people.  And there was the meeting sort of directed at

9    that, there was a meeting directed at the groups that

10   were going to do the residential search warrants, and

11   then there was meetings, plural, for the agents who had

12   volunteered to do inventory search.

13     Q.   Okay.  So there were meetings where the people

14   who were going to be doing the inventories met to

15   discuss how to do those inventories; is that right?

16     A.   Correct.  Yes.

17     Q.   Okay.  And who headed up those meetings?

18     A.   I did.

19     Q.   Okay.  You did.

20          And is it fair to say, then, that you were using

21   those supplemental instructions on box inventory to --

22   as part of that training?

23     A.   Yes.

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████

**EXHIBIT GG**
**542**

1  ████████████████████████████████████████

2      Q.  Okay.  So my question is this:  Let's say agents

3  pull out a box from the nest, and on this box is the

4  conservator letter, like this one here.  Once agents

5  encounter a letter like this, your words in your

6  affidavit that the inspection should, quote, should

7  extend no further than necessary to determine ownership,

8  once agents encounter a letter like this, your own words

9  state that the inspection of that should stop at that

10  point; correct?

11              MR. RODGERS:  Objection, mischaracterizes

12  the document, which speaks for itself.

13              THE WITNESS:  So I'll just say, having done

14  this, that where there was an executor conservator

15  notification letter, that was extremely helpful to us,

16  in most instances, in identifying the box holder.

17  However, there were a number of situations where there

18  was also, for example, a photocopy of a driver's license

19  with a different name on it, or a photocopy of a

20  passport, or multiple passports, with different names on

21  it.  We also encountered executor conservator

22  notification letters that were from the last party to

23  rent that box and it got left in there.

24              So it's a -- it's a great starting point in

25  terms of who the box holder is, but it, as it turned

Page 163

1    out, is not the last word in it.

2             And then also to answer your question, it

3    doesn't -- it doesn't stop us from needing to inventory

4    the box.  It's indicative of ownership, but we still

5    need to process what's in the box for all the reasons we

6    discussed this morning, such as to protect the property

7    itself, to protect us from accusations of loss or theft,

8    to protect us from hazardous materials.  So everything

9    still needs to be bagged and tagged and processed

10   according to our evidence procedures, with all of the

11   redundancies and paperwork.

12            But with regard to ownership, the executor

13   conservator notification letter is -- is really good,

14   but, as it turns out, not the last word in the every

15   box.

16

17

18

19

20

21

22

23

24

25



**EXHIBIT GG**
**544**

Page 170

1      Q.   Okay.  So the inventorying took basically from
2   Monday at 10:00 a.m. until Thursday at midnight.
3      A.   That's correct.
4      Q.   How many boxes -- I don't -- how many boxes did
5   the -- did the FBI inventory over that period?
6      A.   Right around 700.
7      Q.   Around 700 boxes?
8      A.   That's --
9      Q.   Okay.
10      A.   -- ballpark.  But it's -- it's a good ballpark.
11      Q.   Yeah.  It's a lot of boxes.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT GG**
**545**

Page 177

8      Q.   Okay.  So we're still talking in terms of overall

9    types of property.  It's -- so the videotapes weren't an

10   attempt to try to get a complete overview of, like, how

11   much of each thing was there?

12      A.   No.  They were to -- to record the process,

13   really, in a lot of ways, to protect us, because we

14   understood there was going to be cash and valuables.

Page 241

```
 1    STATE OF NEVADA      )

                           ) ss.

 2    COUNTY OF WASHOE     )

 3

 4         I, SUSAN E. BELINGHERI, a Certified Court

 5    Reporter for the State of Nevada, do hereby certify;

 6         That on Friday, the 6th day of May, 2022, at the

 7    hour of 9:08 a.m. of said day, at the offices of Bonanza

 8    Reporting & Videoconference Center, 1111 Forest Street,

 9    Reno, Nevada, appeared LYNNE K. ZELLHART via

10    videoconference, who was duly remotely sworn by me, was

11    thereupon deposed in the matter entitled herein, and

12    that before the proceeding's completion the reading and

13    signing of the deposition has not been requested by the

14    deponent or party;

15         That the foregoing transcript, consisting of

16    pages 1 through 241, is a full, true, and correct

17    transcript of my stenotype notes of said deposition to

18    the best of my knowledge, skill, and ability.

19         I further certify that I am not an attorney or

20    counsel for any of the parties, nor a relative or

21    employee of any attorney or counsel connected with the

22    action, nor financially interested in the action.

23         DATED:  At Reno, Nevada, this 6th day of May,

24    2022.

                    <%406,Signature%>

25         _____

                    SUSAN E. BELINGHERI, CCR #241
```

**EXHIBIT GG**
**547**