```
                                                              Page 1

 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                    WESTERN DIVISION
 4                         -oOo-
 5
    PAUL SNITKO, JENNIFER SNITKO,    :
 6  JOSEPH RUIZ, TYLER GOTHIER,      :
    JENI VERDON-PEARSONS, MICHAEL    :
 7  STORC, AND TRAVIS MAY,           :
                                     :
 8              Plaintiffs,          :
                                     :
 9  vs.                              :   Case No.
                                     :   2:21-cv-04405-RGK-MAR
10  UNITED STATES OF AMERICA,        :
    TRACY L. WILKISON, in her        :
11  official capacity as Acting      :
    United States Attorney for the   :
12  Central District of California   :
    and KRISTI KOONS JOHNSON, in     :
13  her official capacity as an      :
    Assistant Director of the        :
14  Federal Bureau of                :
    Investigation,                   :
15                                   :
                Defendants.          :
16  ========================================================
17
18        VIDEOCONFERENCE 30(B)(6) DEPOSITION OF
19                    LYNNE ZELLHART
20                FRIDAY, JUNE 30, 2022
21        WITNESS APPEARING REMOTELY FROM
22              THOUSAND OAKS, CALIFORNIA
23
24
25  REPORTED BY:          SUSAN E. BELINGHERI, CCR #655
                          NV Firm Lic. #053F
```

```
 1              APPEARANCES:
 2     (all appearances via videoconference)
 3
             For the Plaintiffs:
 4
           THE INSTITUTE FOR JUSTICE
 5              Attorneys at Law
          By:  ROBERT FROMMER, ESQ.
 6        By:  ROBERT E. JOHNSON, ESQ.
          901 N. Glebe Road, Suite 900
 7              Arlington, VA 22203
 8
             For the Defendants:
 9
       ASSISTANT UNITED STATES ATTORNEY
10           ASSET FORFEITURE SECTION
          By:  VICTOR RODGERS, ESQ.
11     312 North Spring Street, 14th Floor
           Los Angeles, California 90012
12
       FEDERAL BUREAU OF INVESTIGATION
13           OFFICE OF GENERAL COUNSEL
          By:  MEGHAN CAMPBELL, ESQ.
14        935 Pennsylvania Avenue NW
                Washington, DC 20535
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2
 3   EXAMINATION:                                    PAGE
 4   By Mr. Frommer                                    4
 5
 6
 7   EXHIBITS:    DESCRIPTION                        PAGE
 8   (previously marked)
 9   Exhibit 3    Warrant By Telephone or Other
                  Reliable Electronic Means, USAO00001-
10                00246.................................  11
     Exhibit 8    FBI, U.S. Private Vaults Claim Form....  56
11   Exhibit 10   Agent Observations and Notes,
                  FBI0000446............................  44
12
     (marked)
13
     Exhibit 12   Plaintiffs' Amended Notice of
14                30(b)(6) Deposition................    8
15
16
17
18
19
20
21
22
23
24
25
```

1  [redacted]
2
3
4
5
6

7     Q.  So Special Agent Zellhart, I understand that the
8  government looked at the FBI DIOG as the basis for its
9  inventory policy when conducting inventory at U.S.
10 Private Vaults.
11     My question is, who created the supplemental
12 instructions on the box inventory?
13    A.  I did.
14    Q.  Okay.  You did.
15     And when you created those, did you create those
16 instructions especially, or particularly for executing
17 the U.S. Private Vaults seizure warrant?
18    A.  Yes.
19    Q.  Okay.  And did you design the supplemental
20 instructions to track the inventory policy that's listed
21 in the DIOG?
22    A.  So I don't want to give the wrong impression,
23 here.  I didn't have the DIOG in my hand, looking at it,
24 while I was creating the supplemental instructions, but
25 I understood the policy and I wrote the supplemental

```
 1   instructions for the team to follow based on that we
 2   were doing an inventory search.
 3        Q.   Okay.  So the DIOG is sort of the general policy,
 4   and it sounds like the supplemental instructions were
 5   sort of the operative policy, the policy that was in
 6   place on the ground and that the agents who were doing
 7   the inventorying, they were supposed to follow that.  Is
 8   that fair to say?
 9        A.   Correct.  The DIOG is a reference, it's a
10   resource.  It's like a dictionary or a thesaurus.  We
11   don't -- you know, we don't walk around with it in our
12   hands.  But the supplemental instructions were created
13   to help the team focus in on what we were doing and how
14   we were doing it.
15        Q.   Okay.
16        A.   And the supplemental instructions comply with
17   the -- I mean, they do comply with the DIOG.
18
19
20
21
22
23
24
25
```



Page 22

| | |
|---|---|
| 1 | ▉ |
| 2 | ▉ |
| 3 | ▉ |
| 4 | So I understand, like, that -- can you explain to |
| 5 | me the -- with U.S. Private Vaults, originally the |
| 6 | case -- the investigation was not against the company |
| 7 | itself; is that correct? |
| 8 | A.  Well, that's not quite true.  So it is and it |
| 9 | isn't.  So many different law enforcement agencies were |
| 10 | aware of U.S. Private Vaults, including the DEA, LAPD, |
| 11 | L.A. Sheriff's.  I know those three for sure had an |
| 12 | interest in what was going on at U.S. Private Vaults. |
| 13 | And those agencies were conducting different |
| 14 | investigations into customers at U.S. Private Vaults. |
| 15 | So I think they were sort of using USPV as a -- |
| 16 | as an ant hill, or a honey pot, however you want to |
| 17 | think about it.  They were -- they were finding |
| 18 | criminals at that business.  But they were not |
| 19 | investigating the business. |
| 20 | That project, having been unsuccessful throughout |
| 21 | law enforcement, in about 2019, DEA, U.S. Postal |
| 22 | Inspector, and FBI kind of got together and said: |
| 23 | That's not working.  What we need to do is we need to |
| 24 | figure out how we can take out the criminal facilitator, |
| 25 | which is U.S. Private Vaults itself, the business. |

1    And so from 2019 forward, which is when I became
2    involved in the investigation, the -- the investigation
3    was into the corporation. It was into the company
4    itself, the business.

1 [REDACTED]
2
3
4
5

6 Q. So Special Agent Zellhart, can you tell me, how
7 long did you -- did you and the other agencies
8 investigate before you started to come together and say
9 we should start moving towards an indictment and
10 applying for a search -- search and seizure warrants.
11 A. Uh-huh. So that happened in about the summer of
12 2020. About the summer of 2020, June, July, in that
13 phase, we started talking about -- at that point we had
14 quite a lot of pretty good evidence, and then we started
15 talking about moving this into indictments and warrants.
16 Q. Okay. And that's what I -- yeah, started talking
17 about moving to indictments.
18 And who's -- who were the people involved in
19 those conversations?
20 A. AUSA Andrew Brown, myself, DEA Special Agent
21 Justin Carlson, and U.S. Postal Inspector Lyndon
22 Versoza.
23 Q. Okay. So Versoza was in on those summer of 2020
24 meetings.
25 A. I believe so. And --

```
 1      Q.  Okay.
 2      A.  -- if I can add real quick, because that was
 3  during COVID, all those meetings pretty much took place
 4  over the phone.
 5      Q.  Yeah.
 6      A.  And it's a little more difficult to remember who
 7  was there because we were not physically in a room
 8  together, we were holding these meetings over a phone.
 9  We weren't even doing them virtually, we were basically
10  in a phone call-in line.  So it's a little bit difficult
11  to remember.
12          But basically the three of us were the case
13  agents, and Andrew Brown was the AUSA, and that was
14  the -- that's the -- that's the decision making
15  committee.
16
17
18
19
20
21
22
23
24
25
```

```
 1  ████████████████████████████████████████
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14       Did the topic of civil forfeiture come up in the
15  context of applying for a seizure warrant for the nest?
16     A.  No.
17     Q.  When did the United States begin planning for the
18  use of civil forfeiture, whether administrative or
19  judicial forfeiture, against some or all of the property
20  that was located at U.S. Private Vaults?
21     A.  And so I'm -- I'm giving you my best estimate
22  here, that it would have been late summer or fall of
23  2020.
24  ████████████████████████████████████████
25
```

1 ■
2 ■
3    Q.  So I believe right before the break you testified
4 that the United States had been considering -- began
5 considering a potential use of civil forfeiture as to
6 some or all of the safe deposit boxes in -- sometime in
7 the late summer of 2020.  Is that accurate?
8    A.  I think I -- I think I said that we discussed,
9 you know, seizing the nest of the boxes and doing an
10 inventory on them in summer of 2020.  And then
11 discussions about asset forfeiture took place a little
12 bit later in the summer or fall.
13 ■
14 ■
15 ■
16 ■
17 ■
18 ■
19 ■
20 ■
21 ■
22 ■
23 ■
24 ■
25 ■



23 BY MR. FROMMER:
24     Q. Okay. But it's not the policy of the United
25 States to have the inventorying agents provide a

1  complete list of all items seized; is that correct?  And
2  by that I mean if I had 50 gold coins, the agents would
3  not necessarily record that I have 50 gold coins, they
4  might simply say that I had miscellaneous gold coins; is
5  that correct?
6      A.  That's correct.  And they might also call them
7  gold-colored coins, or yellow-colored coins, because
8  they wouldn't necessarily assume that they were gold, as
9  opposed to something else.  But -- but, yes.
10         The -- the idea is that for each particular item
11 number in a container, whether it's a bag or a box or
12 whatever we're containing it in, is enough description
13 so that you know from that place, or in this case from
14 that specific box, this item number contains papers, not
15 jewelry or watches or phones.  So it's enough of a
16 description so that you could find that item number and
17 line it up with the actual property, but not an
18 exhaustive list.
19    Q.  Okay.  And is that -- the reason there isn't an
20 exhaustive list, is that just -- is that a manpower
21 issue?
22         MR. ROGERS:  Objection, calls for a legal
23 conclusion, overbroad.
24         THE WITNESS:  So it -- it -- I mean, I don't
25 know how to actually answer that.  If you -- the goal --

1  the goal is to identify the contents of the item number.
2  And a number of other things, too. Where it came from.
3  You know, there's other information on each -- each
4  label. It gets an item number, it gets the case number,
5  it gets the date, it gets the location.
6         I mean, and with U.S. Private Vaults, we
7  were treating each box as a -- like a separate location.
8  And I briefed that in my briefing. Like, you should
9  treat this box like it's -- it's an apartment unit. It
10 is a separate thing. It is like a -- each one is a
11 separate inventory process. And so within that, you are
12 identifying the property. So that you can --
13 BY MR. FROMMER:
14    Q.  I see.
15    A.  -- find it again.
16    Q.  So if you had, let's say, some gold-colored coins
17 and some silver-colored coins in a box, would the
18 agents -- would the U.S. policy then be that the agent
19 should denote how many of each color there are, or would
20 they simply say: Miscellaneous coins?
21         MR. ROGERS: Objection, overbroad, poses an
22 incomplete hypothetical, calls for a legal conclusion.
23         THE WITNESS: I don't think there's a policy
24 on it. I think that it's very likely going to be
25 described as miscellaneous coins. Or box of coins.

Page 53

1-9 [redacted]

10 Q. Let me -- I have a -- and -- sorry. I just want
11 to...
12     And then once the items are bagged and tagged, as
13 you put it, what additional steps did the United States
14 undertake to ensure that the property wouldn't get
15 misplaced?
16 A. Right. So each item received both a bar code
17 from our evidence techs, which then gets recorded into
18 our system, and also a 1-B number, which is just an
19 identification number. It's a redundancy. There are
20 two separate ways of tracking the same -- the same item.
21 But -- and there's actually probably three ways of doing
22 it, because you could actually just go to the -- the
23 paperwork and the item numbers. But the redundancies
24 are built in so that if one fails, if the bar code falls
25 off, the sticker falls off, you can just track it a

1  different way.  So -- so those are -- so those things
2  are generated for each item number, and then put inside
3  our -- our evidence system so that they can be tracked.

Page 88

1  STATE OF NEVADA      )
                         ) ss.
2  COUNTY OF WASHOE     )

3

4        I, SUSAN E. BELINGHERI, a Certified Court
5  Reporter for the State of Nevada, do hereby certify;
6        That on Thursday, the 30th day of June, 2022, at
7  the hour of 9:08 a.m. of said day, at the offices of
8  Bonanza Reporting & Videoconference Center, 1111 Forest
9  Street, Reno, Nevada, appeared 30(b)(6) LYNNE ZELLHART
10 via videoconference, who was duly remotely sworn by me,
11 was thereupon deposed in the matter entitled herein, and
12 that before the proceeding's completion the reading and
13 signing of the deposition has been requested by the
14 deponent or party;
15       That the foregoing transcript, consisting of
16 pages 1 through 88, is a full, true, and correct
17 transcript of my stenotype notes of said deposition to
18 the best of my knowledge, skill, and ability.
19       I further certify that I am not an attorney or
20 counsel for any of the parties, nor a relative or
21 employee of any attorney or counsel connected with the
22 action, nor financially interested in the action.
23       DATED:  At Reno, Nevada, this 6th day of July,
24 2022.
                /s/ Susan Belingheri
25             _____
                SUSAN E. BELINGHERI, CCR #655