AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>SAFETY DEPOSIT BOX 8107 AND ITS CONTENTS, previously taken from U.S. Private Vaults, and now in storage at the DEA | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.  2:21-MJ-01841

**FILED**
CLERK, U.S. DISTRICT COURT

April 15, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY:  _____ CD _____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See caption above*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956, 21 U.S.C. §§  841 and 846 | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Justin Carlson
_____
*Applicant's signature*

Special Agent Justin Carlson
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  April 15, 2021
_____

*Judge's signature*

City and state: Los Angeles, CA
_____

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

**RJN EXHIBIT E**
**11**

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of <u>18 U.S.C. § 1956</u> (Money Laundering) and <u>21 U.S.C. §§ 841</u>, <u>846</u> (drug trafficking) (the "Target Offenses") namely:

a.    Evidence of wealth, such as cash over $5,000, financial instruments, cryptocurrencies, and other valuables including jewelry and fine watches, and documents and records referring or relating to the same; and

b.    Records or items containing indicia of ownership or control of BOX 8107 or its contents such as rental agreements or references to specific persons or their contact information.

c.    Narcotics and controlled substances, such as fentanyl, and related paraphernalia such as scales, packaging, pay-owe sheets, and documents and records referring or relating to them.

**RJN EXHIBIT E**
**12**

**AFFIDAVIT**

I, Justin Carlson, Your Affiant, being duly sworn and under oath, declare and state as follows:

**INTRODUCTION/TRAINING AND EXPERIENCE**

1.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and I have been employed by the DEA since November 2012.  I am currently assigned to the DEA's Los Angeles Field Division, Enforcement Group 5, which investigates drug trafficking and money laundering offenses in violation of Titles 18 and 21 of the United States Code.  I have received 16 weeks of specialized training in Quantico, Virginia, pertaining to drug trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.  I have participated in numerous investigations of drug trafficking and the laundering of drug proceeds.  Prior to joining the DEA, I was employed by the Dallas Police Department as a police officer and narcotics detective in Dallas, Texas, for approximately seven years.

2.   I have participated in numerous investigations of criminal enterprises, including violent criminal street gangs, domestic and international drug-trafficking organizations, and businesses and organizations that are facilitating the laundering of narcotics proceeds.  During the course of these investigations, I have identified co-conspirators through the use of surveillance, telephone records and bills, financial records, photographs, and other documents.  I have directed and assisted in the handling of confidential sources to successfully infiltrate various-sized criminal enterprises via intelligence gathering, undercover operations, participation in consensual recordings, and the monitored

1  purchase of a controlled substance.  I have participated in
2  debriefings of cooperating defendants.  I have executed search
3  warrants for controlled substances, documents, digital records and
4  the proceeds of drug trafficking and other crimes.  I have conducted
5  physical and electronic surveillance.  I have also conducted
6  investigations in which I have used Global Positioning System ("GPS")
7  information to locate and track persons who are the subjects of
8  criminal investigations.  I have directed and participated in
9  investigations involving the use of court-authorized interception of
10 wire communications.  I have engaged in extensive document-based
11 investigations, collecting, reviewing and analyzing bank documents,
12 wire transfers, employment records, e-mail, and database research.
13     3.   To successfully conduct these investigations, I have
14 utilized a variety of these investigative techniques.  Through my
15 training, experience, and continued interaction with experienced
16 SA's, TFO's and other investigators over the past 16 years, I have
17 become familiar with methods employed by narcotic traffickers in
18 general, to smuggle, safeguard, and distribute narcotics, and to
19 collect and launder narcotic-related proceeds. Further, I have been
20 the affiant for and have assisted in numerous drug trafficking
21 investigations in which cellular telephone communications played a
22 major role in the communication network of drug trafficking
23 organizations.
24     4.   I am familiar with the facts and circumstances described
25 herein.  This affidavit is based upon my personal involvement in this
26 investigation, my training and experience, and information obtained
27 from various law enforcement personnel and witnesses, including
28

RJN EXHIBIT E
14

1  information that has been reported to me either directly or

2  indirectly.  This affidavit does not purport to set forth my complete

3  knowledge or understanding of the facts related to this

4  investigation.  Unless specifically indicated otherwise, all

5  conversations and statements described in this affidavit are related

6  in substance and part only.  All figures, times, and calculations set

7  forth herein are approximate.

8  **I. <u>PURPOSE OF AFFIDAVIT: SEARCH WARRANT</u>**

9      5.  This affidavit is made in support of an application for a

10  warrant to search Safety Deposit Box Number 8107 (hereinafter "BOX

11  8107"), believed to be used by Andrew TABLACK, and which was

12  previously seized from U.S. Private Vaults, Inc., for violations of

13  21 U.S.C. §§ 841 and 846 (drug trafficking), and 18 U.S.C. § 1956

14  (money laundering) (the "Target Offenses").  BOX 8107 is currently

15  held in the custody of the DEA in Los Angeles, CA.

16  **II. <u>PROBABLE CAUSE STATEMENT</u>**

17  **SUMMARY**

18      6.  During the execution of a federal seizure warrant for the

19  nests of safety deposit boxes of an indicted safety deposit box

20  company US Private Vaults Inc. (USPV), federal agents inventoried BOX

21  8107.  BOX 8107 was found to have an emergency contact form attached

22  to it.  This form is utilized by the business in lieu of official

23  records to contact box holders in an event that the company were to

24  have a reason to access the contents of the safety deposit box, such

25  as nonpayment or abandonment.  USPV's safety deposit box holders can,

26  but are not required, to list themselves as the box holder and

27  another point of contact of their choosing.  BOX 8107 had this form

28

RJN EXHIBIT E
15

attached to the outer portion of the bond tin contained inside the safety deposit box drawer, so that it would be visible only to someone who unlocked the box.  This form listed Andrew TABLACK as the box holder.  BOX 8107 contained a package of white powdery substance encased in two plastic transparent bags. The outer plastic bag had a metallic sheen similar to mylar.  The double packaging of the white powder was suspicious to FBI SA Leslie Buchan due to what she described as a strong chemical smell.  SA Buchan brought BOX 8107 to the attention of Your Affiant and DEA Group Supervisor Todd Boyett. An open source internet search of the name "Andrew TABLACK" utilizing the Google.com cellphone application by Your Affiant showed a press release from the United States Attorney's Office for the District of New Jersey on the website www.justice.gov entitled, "Two California Men Charged in Large-Scale Opioid Distribution Ring".  The press release listed TABLACK as being arrested on December 20, 2017 in Beverly Hills pursuant to a federal arrest warrant issued in the District of New Jersey for alleged distribution of fentanyl pills to New Jersey from California. Due to the information in the press release and the observations of Your Affiant and GS Boyett, a decision was made to conduct a presumptive field test of the substance using the TruNarc handheld narcotics analyzer which utilizes a laser that can penetrate transparent plastic, thus safely determining the contents of the bags.  The result of the TruNarc scan showed positive for the presence of Cyclopropyl Fentanyl, which is the same form of fentanyl attributed in the above listed article to TABLACK and his coconspirator.  After the presumptive test showed positive for Fentanyl, BOX 8107 was taken into DEA custody for

4

1   processing.

2   **A.    Seizure of Nests of Safety Deposit Boxes from USPV**

3       7.    From my role as a case agent in the investigation as well

4   as from speaking with the case agents from the Federal Bureau of

5   Investigation ("FBI") and US Postal Inspections Service ("USPIS") and

6   reading their reports, I know that U.S. Private Vaults is a business

7   in a strip mall that rents safety deposit boxes anonymously. It is

8   owned and managed by criminals who engage in money laundering, drug

9   trafficking, and structuring, among other offenses. Its business

10  model is designed to appeal to criminals for customers. It charges

11  many times what banks do for similar safety deposit box rentals, but

12  staff conduct countersurveillance for customers, alert them to law

13  enforcement investigations, and structure transactions for them to

14  avoid filing currency reports--in addition to providing them a place

15  to store criminal proceeds anonymously. USPV also launders for its

16  customers cash that is purported to be drug proceeds by converting it

17  into precious metals or wire transfers. The great majority of USPV

18  customers pay cash to rent their safety deposit boxes, at least some

19  of which USPV then deposits into their own bank account, which it

20  uses to pay its operating expenses. By using its customers' criminal

21  proceeds to maintain its own anonymous facility for the storage of

22  criminal proceeds, USPV engages in money laundering.

23      8.    I know from reading the indictment that on March 9, 2021,

24  USPV was indicted by a federal grand jury for conspiring with its

25  customers and others to launder money, distribute drugs, and

26  structure financial transactions to avoid currency reporting

27  requirements.  A copy of that indictment is attached and

28

1  incorporated.

2      9.    Beginning on March 22 through March 26, 2021, Your

3  Affiant, along with agents from USPIS, FBI and DEA executed federal

4  search and seizure warrants at USPV which authorized, among other

5  things, seizing the nests of safety deposit boxes at USPV as evidence

6  and instrumentalities of the offenses committed by USPV.  The

7  warrants did not authorize criminal searches of the contents of the

8  individual boxes but specified that agents would conduct an inventory

9  of the contents in accordance with their written procedures, and were

10  authorized to look for contact information in those individual boxes

11  in order to notify the boxholders of the seizure so that they could

12  seek the return of their property. An inventory search was conducted

13  on all the boxes at USPV, including BOX 8107, where indicia listing

14  Andrew TABLACK was observed by the inventorying agents.

15      **B.    TABLACK's Contact Information Was Found in BOX 8107**

16      10.    On or about March 24, 2021, while the seizure warrant on

17  USPV was being executed, FBI SA Buchan found a Cartier invoice inside

18  BOX 8107 with the name Andrew TABLACK as purchaser of Cartier

19  merchandise costing $40,346.25 on April 14, 2017.  Also observed

20  inside the box was a CitiBank Transaction Receipt bearing TABLACK's

21  name.  Based on these two pieces of indicia, as well as the affixed

22  emergency contact form, it is the opinion of Your Affiant that

23  TABLACK is the likely renter of BOX 8107.

24      **C.    TABLACK Is In Jail on Drug Charges**

25      11.    I reviewed TABLACK's criminal history.  TABLACK has one

26  previous arrest for narcotics-related charges, as referenced in the

27  December 20, 2017 press release..  A review of DEA reports stated

28

6

1   that on December 20, 2017, Andrew TABLACK was arrested by DEA Special

2   Agents from New Jersey and Los Angeles at his home in Beverly Hills

3   pursuant to a federal arrest warrant for conspiracy to distribute

4   fentanyl.

5       **D.   TABLACK Would Not Confirm or Deny any Connection with USPV**

6       12.   On April 8, 2021, Your Affiant placed a recorded phone call

7   to TABLACK, who is currently awaiting trial and in custody at

8   Monmouth County Jail, Freehold, New Jersey.[1]  TABLACK, who was

9   representing himself at the time of this phone interview, was

10  informed of the seizure of US Private Vaults Inc by the Federal

11  Government and that in the course of this seizure several safety

12  deposit boxes and their contents were inventoried.  Your Affiant

13  assured TABLACK that the conversation was voluntary and that he did

14  not have to speak with Your Affiant.  TABLACK was asked if he knew of

15  the business US Private Vaults in Beverly Hills to which he responded

16  "I don't recall".  Your Affiant asked TABLACK if he held a box at US

17  Private Vaults Inc, to which he responded robotically, "I don't

18  recall".  At this point it was clear to Your Affiant that TABLACK

19  would respond with this answer to anything Your Affiant asked him, so

20  Your Affiant asked TABLACK the open ended question if TABLACK had any

21  questions for Your Affiant, to which TABLACK responded, "no sir".  It

22  was at this point that Your Affiant ended the phone call.  At no time

23

24      [1] On May 20, 2018, a federal grand jury sitting in Newark, New
    Jersey charged TABLACK in a two-count Indictment, Crim. No. 19-374

25  (MAS).  Count One charged conspiracy to manufacture and distribute a
    controlled substance analogue, namely N-(1-phenethylpiperidin-4-yl)-

26  N-phenylcyclopropanecarboxamide ("cyclopropyl fentanyl"), contrary to
    21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 21 U.S.C. § 813, in

27  violation of 21 U.S.C. § 846.  Count Two charged TABLACK with
    manufacturing and distributing cyclopropyl fentanyl, in violation of

28  21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 21 U.S.C. § 813.

during the phone conversation did Your Affiant mention that suspected fentanyl was recovered from Box 8107.  TABLACK's responses of "I don't recall" without any follow up contextual questions on his part suggests to Your Affiant, in my training and experience that TABLACK was aware of BOX 8107 and its contents and was not wanting to answer any questions that would link himself to the contents.

**E.   TABLACK Made Large Cash Purchases and Appears to Have Structured Transaction**

13.  On April 12, 2021, I reviewed banking and financial records related to TABLACK.  From my review I learned the following:

a.   From reading records from CitiBank, N.A., I learned that between October 2, 2017, and December 4, 2017 TABLACK's account showed multiple deposits of cash and money orders that appeared to be structured under the CTR reporting threshold.  Moreover these deposits occurred on the same day or consecutive days in Florida and California.  This activity is suspicious due to TABLACK being the only signer to the account.  The total amount deposited in this time frame was approximately $43,413.18.  Your Affiant knows from training and experience that drug traffickers will often find ways for other conspirators to deposit funds into their account via ATM or other methods rather than risk the transport of these funds.  These deposits are structured to avoid reporting requirements and allow for instant access to funds by the account holder who is likely located in a source city such as Los Angeles.

b.   Bank records also revealed rapid movement of cash below the CTR threshold within this time frame.  On December 18, 2017, $9,000 was credited to TABLACK's account and a corresponding withdrawal of $9,000 was made the following day.  Your affiant knows

8

through his training and experience that drug traffickers will often receive deposits from coconspirators for expenses or payment for narcotics that is immediately withdrawn by the account holder.  These transactions are often done below the CTR threshold to avoid the reporting requirement.

14.  Your Affiant read an IRS 8300 Report[2] filed by O'Gara Coach Co., LLC.  From this filing, I learned that in August of 2017, TABLACK paid $103,840 cash for a 2015 Rolls-Royce Wraith automobile.  Another 8300 reviewed by Your Affiant filed by Richemont North America Inc, DBA Cartier.  From this filing, I learned that on April 14, 2017, TABLACK paid cash for jewelry in the amount of $40,346.  This is likely the transaction that was documented on the invoice located within BOX 8107 listing TABLACK's contact information found by inventorying agents at US Private Vaults Inc.

**CONCLUSION**

15.  For all of the above reasons, there is also probable cause to believe that evidence of the Target Offenses, as described more particularly in Attachment B, are in BOX 8107.

---

[2] I know that each person engaged in a trade or business who, in the course of that trade or business, receives more than $10,000 in cash in one transaction or in two or more related transactions, must file this form.

9

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this __15th__ day of April, 2021.


_____
UNITED STATES MAGISTRATE JUDGE

10

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:_____DM_____DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>U.S. PRIVATE VAULTS, INC.,<br>  California Corporate<br>  Number C3405297,<br><br>          Defendant. | CR 2:21-cr-00106-MCS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy to Launder Money; 21 U.S.C. § 846: Conspiracy to Distribute Controlled Substances; 18 U.S.C. 371: Conspiracy to Structure Transactions; 18 U.S.C. § 982(a)(1), 21 U.S.C. §§ 853 and 881(a)(6), 28 U.S.C. § 2461(c) and 31 U.S.C. § 5317(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.    INTRODUCTORY ALLEGATIONS

1.    At times relevant to this Indictment:

          a.    Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

          b.    Co-conspirator USPV Officer was an officer of USPV and

1   one of its owners.  USPV Officer dealt in marijuana, in violation of
2   the laws of California, as well as cocaine.

3            c.   Co-conspirator USPV Manager was the manager of USPV.
4   USPV Manager helped USPV Officer arrange drug deals within USPV, and
5   helped USPV customers avoid detection by law enforcement, including
6   by advising them to structure their cash purchases to avoid reporting
7   requirements.

8            d.   Co-conspirator Gold Business was a dealer in precious
9   metals and jewelry, and shared the same space as USPV, as well as
10  some employees.  Gold Business helped USPV customers convert their
11  cash into gold, and structured their cash transactions to avoid
12  federal reporting requirements.

13           e.   Co-conspirator USPV Representative One was a
14  representative of USPV, and an owner of co-conspirator Gold Business.
15  USPV Representative One instructed USPV customers how to structure
16  transactions to avoid federal reporting requirements.

17           f.   Co-conspirator USPV Representative Two was a
18  representative of USPV, and an owner of co-conspirator Gold Business.
19  USPV Representative Two instructed USPV customers how to structure
20  transactions to avoid federal reporting requirements.

21  B.   THE OBJECTS OF THE CONSPIRACY

22       2.   Beginning in or before 2019, and continuing through the
23  date of this Indictment, in Los Angeles County, within the Central
24  District of California, and elsewhere, defendant USPV conspired with
25  others known and unknown to the Grand Jury to launder money, in
26  violation of Title 18, United States Code, Section 1956, namely:

27           a.   to knowingly conduct and attempt to conduct financial
28  transactions involving the proceeds of a specified unlawful activity,

2

1  that is, the distribution of controlled substances, with the intent

2  to promote the carrying on of that specified unlawful activity, in

3  violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

4          b.   to knowingly conduct and attempt to conduct financial

5  transactions involving the proceeds of specified unlawful activity,

6  that is, the distribution of controlled substances, knowing that the

7  transactions were designed in whole or in part to conceal and

8  disguise the nature, location, source, ownership, and control of the

9  proceeds of specified unlawful activity, in violation of Title 18,

10  United States Code, Section 1956(a)(1)(B)(i); and

11          c.   to knowingly conduct and attempt to conduct financial

12  transactions involving the proceeds of specified unlawful activity,

13  that is, the distribution of controlled substances, knowing that the

14  transactions were designed in whole or in part to avoid a transaction

15  reporting requirement under Federal law, in violation of Title 18,

16  United States Code, Section 1956(a)(1)(B)(ii).

17  C.   MANNER AND MEANS OF THE CONSPIRACY

18          3.   The objects of the conspiracy were carried out and were to

19  be carried out, in substance, as follows:

20          a.   Defendant USPV would adopt business practices that

21  attracted customers in possession of proceeds from criminal offenses,

22  including drug trafficking, and not law-abiding persons.  Such

23  practices included: (1) touting the anonymity of the safety deposit

24  rentals that defendant USPV would provide, including by advertising

25  "we don't even want to know your name"; (2) boasting that, unlike

26  banks, its anonymous safety deposit box rentals did not require

27  customer information that "can be easily accessed by government

28  agencies (such as the IRS)"; (3) making arrangements for the payment

3

of the rental fees in cash and other ways that would be untraceable; (4) issuing safety deposit box keys that were unmarked and unnumbered so that law enforcement could not determine that the keys unlocked safety deposit boxes at USPV; and (5) charging safety deposit box rental rates several times higher than those at banks.

   b.   USPV Officer would capitalize defendant USPV with the proceeds of his illegal drug trafficking.

   c.   USPV Officer would invite other drug traffickers who knew and trusted him because of his illegal drug trafficking to store the proceeds of their drug trafficking at defendant USPV.

   d.   Employees of defendant USPV would conduct counter surveillance of the neighborhood and warn customers when they observed law enforcement.

   e.   Agents of defendant USPV would instruct customers to structure transactions to avoid currency transaction reports including by purchasing gold and other precious metals through Gold Business, which would structure transactions and not file required currency reports.

   f.   If agents of defendant USPV learned that law enforcement was interested in searching or seizing the contents of a particular customer's safety deposit box, they would attempt to warn the customer, delay law enforcement, or even remove all but a nominal amount of cash from the box for the customer, to prevent law enforcement from discovering and seizing the bulk of the cash.

   g.   Defendant USPV would deposit the cash proceeds it received from its customers for safety deposit box rentals, which included proceeds from the distribution of controlled substances, into its bank account, and then use those proceeds to maintain USPV's

4

1  anonymous storage facilities for its criminal customers.

2          h.  USPV Officer and USPV Manager would negotiate drug

3  deals illegal under California law within the secured space of USPV,

4  and USPV Officer would store the cash proceeds from drug deals within

5  a safety deposit box at USPV.

6          i.  USPV Manager would accept cash purportedly from

7  illegal drug sales, and structure transfers of it to Gold Business in

8  amounts not greater than $10,000 at a time in exchange for wire

9  transfers that purported to be for the sale of precious metals.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RJN EXHIBIT E**
**27**

1                               COUNT TWO

2                          [21 U.S.C. § 846]

3     4.   The Grand Jury realleges paragraph 1 of this Indictment

4 here.

5 A.   OBJECTS OF THE CONSPIRACY

6     5.   Beginning in or before 2019, and continuing through the

7 date of this Indictment, in Los Angeles County, within the Central

8 District of California, and elsewhere, defendant U.S. PRIVATE VAULTS,

9 INC. conspired with others known and unknown to the Grand Jury to

10 distribute controlled substances, including marijuana, a Schedule I

11 controlled substance, and cocaine, a Schedule II narcotic drug

12 controlled substance, in violation of Title 21, United States Code,

13 Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

14 B.   MANNER AND MEANS OF THE CONSPIRACY

15     6.   The objects of the conspiracy were carried out, and to be

16 carried out, as described in paragraph 3 of this Indictment, which

17 the Grand Jury realleges here.

18 C.   OVERT ACTS

19     7.   In furtherance of the conspiracy and to accomplish the

20 objects of the conspiracy, on or about the following dates, defendant

21 USPV, acting through its officers and managers, committed various

22 overt acts within the Central District of California, including but

23 not limited to the following:

24     Overt Act No. 1:  On June 28, 2019, USPV Manager distributed

25 within USPV's business location six different butane hash oil vape

26 cartridges containing THC to someone he believed to be a drug

27 trafficker, but who was, in fact, a confidential informant working

28 with law enforcement ("Confidential Informant 3"), as samples of what

6

1  defendant USPV could provide in bulk.

2    Overt Act No. 2:  On July 26, 2019, USPV Officer met

3  Confidential Informant 3 within USPV to sell him 1,000 vape

4  cartridges containing THC.  USPV Officer delivered the cartridges in

5  the parking lot of USPV, and received in exchange $8,000 in cash

6  within USPV's business location.

7    Overt Act No. 3:  On or about December 11, 2019, during

8  discussions for the sale of cocaine, USPV Officer instructed the

9  buyer, Confidential Informant 3, to use a wireless communication

10  application called "Signal," which is encrypted to communicate with

11  him regarding the transaction.

12    Overt Act No. 4:  On or about December 16, 2019, USPV Officer

13  instructed Confidential Informant 3 to come to USPV to complete the

14  exchange.

15    Overt Act No. 5:  On or about December 16, 2019, USPV Manager

16  called Confidential Informant 3 and explained that co-conspirator

17  USPV Officer was not being careful enough, and could bring unwanted

18  law enforcement attention to defendant USPV by conducting this drug

19  deal onsite.

20    Overt Act No. 6:  On or about December 18, 2019, USPV Officer

21  sold an ounce of cocaine to Confidential Informant 3 through

22  intermediaries.

23

24

25

26

27

28

COUNT THREE

[18 U.S.C. § 371]

8.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

9.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.   MANNER AND MEANS OF THE CONSPIRACY

10.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

11.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

Overt Act No. 1: On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2: On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3: On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4: On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each: "That way you don't have to give no social security, no ID. All that shit goes to the IRS." USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5: On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

$10,000:  "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

10

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.    Defendant USPV shall forfeit to the United States the following property:

    a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

    b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

    a.   The business computers;

    b.   The money counters;

    c.   The nests of safety deposit boxes and keys;

    d.   The digital and video surveillance and security equipment; and

    e.   The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

RJN EXHIBIT E
33

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

**RJN EXHIBIT E**
**34**

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.  All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.  used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.  A sum of money equal to the total value of the property described in subparagraph a above.

///

13

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

a.    The business computers;

b.    The money counters;

c.    The nests of safety deposit boxes and keys;

d.    The digital and video surveillance and security equipment; and

e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

14

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.  Defendant USPV shall forfeit to the United States the following property:

     a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

     b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.  The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

     a.  The business computers;

     b.  The money counters;

     c.  The nests of safety deposit boxes and keys;

     d.  The digital and video surveillance and security equipment; and

     e.  The biometric scanners

4.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

1   5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),

2   defendant USPV shall forfeit substitute property, up to the value of

3   the property described in paragraph 2 above if, as the result of any

4   act or omission of defendant USPV, the property described in

5   paragraph 2 above or any portion thereof (a) cannot be located upon

6   the exercise of due diligence; (b) has been transferred, sold to, or

7   deposited with a third party; (c) has been placed beyond the

8   jurisdiction of the court; (d) has been substantially diminished in

9   value; or (e) has been commingled with other property that cannot be

10  divided without difficulty.

11                          A TRUE BILL

12  _____/S/_____

13                          Foreperson

14  TRACY L. WILKISON
    Acting United States Attorney

15

16  _Brandon Fox_

17  BRANDON D. FOX
    Assistant United States Attorney

18  Chief, Criminal Division

19  RANEE A. KATZENSTEIN
    Assistant United States Attorney

20  Chief, Major Frauds Section

21  ANDREW BROWN
    Assistant United States Attorney

22  Major Frauds Section

23

24

25

26

27

28

                            16

**RJN EXHIBIT E
38**