1

**THE INSTITUTE FOR JUSTICE**
Robert Frommer*

2

rfrommer@ij.org
Michael Greenberg*

3

mgreenberg@ij.org
Joseph Gay*

4

jgay@ij.org
901 N. Glebe Rd., Suite 900

5

Arlington, VA 22203
Tel. (703) 682-9320

6

Robert E. Johnson*

7

rjohnson@ij.org
16781 Chagrin Blvd., Suite 256

8

Shaker Heights, OH 44120
Tel. (703) 682-9320

9

*Admitted pro hac vice.*

10

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)

11

nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)

12

jatteberry@voralaw.com
201 Santa Monica Blvd., Suite 300

13

Santa Monica, CA 90401
Tel. (424) 258-5190

14

*Attorneys for Plaintiffs*

15

IN THE UNITED STATES DISTRICT COURT

16

FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

17

| | |
|---|---|
| **PAUL SNITKO, JENNIFER SNITKO, JOSEPH RUIZ, TYLER GOTHIER, JENI VERDON-PEARSONS, MICHAEL STORC, and TRAVIS MAY,** | Case No. 2:21-cv-04405-RGK-MAR |
| Plaintiffs, | **JOINT SEPARATE STATEMENT OF CONTESTED AND UNCONTESTED FACTS** |
| v. | |
| **UNITED STATES OF AMERICA, TRACY L. WILKISON, in her official capacity as Acting United States Attorney for the Central District of California, and KRISTI KOONS JOHNSON, in her official capacity as an Assistant Director of the Federal Bureau of Investigation,** | Judge: Hon. R. Gary Klausner |
| Defendants. | Trial: August 23, 2022 |
| | Complaint Filed: May 27, 2021 |
| | Amended Complaint Filed: June 9, 2021 |

18

19

20

21

22

23

24

25

26

27

28

Pursuant to this Court's orders of November 12, 2021 (ECF 82) and May 17, 2022 (ECF 103), the parties hereby submit the following Joint Separate Statement of Contested and Uncontested Facts.

| **Plaintiffs' Statements of Fact and Supporting Evidence** | **Defendants' Responses and Supporting Evidence** |
|---|---|
| | |
| 1. Agencies had been aware of U.S. Private Vaults (USPV) as early as 2015, and different agencies had conducted investigations of individual USPV customers. (Frommer Decl., ECF 112-19, Ex. K ("Zellhart Dep.") at 874:20–875:3). | **1.** Undisputed.  However**,** Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 2. The government described those earlier investigations as using USPV "as an ant hill, or a honey pot." (Frommer Decl., ECF 112-21, Ex. M ("Zellhart 30(b)(6) Dep.") at 1221:13-19). | 2. Undisputed that Lynne Zellhart testified to the following: "And those agencies were conducting different investigations into customers at U.S. Private Vaults. So I think they were sort of using USPV as a -- as an ant hill, or a honey pot, however you want to think about it. They were -- they were finding criminals at that business. But they were not investigating the business." (Frommer Decl., ECF 112-21, Ex. M ("Zellhart 30(b)(6) Dep.") at 1221:13-19). |
| 3. Special Agent Lynne Zellhart has been a special agent with the Federal Bureau of Investigation, a federal law enforcement agency, since 2004. (Zellhart | 3. Undisputed.  However**,** Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| Dep., ECF 112-19, Ex. K at 784:7–11). | |
| 4. After "almost five years" of investigating individual customers, the government began its investigation of US Private Vaults, the company, in about April 2019. (Zellhart Dep., ECF 112-19, Ex. K at 875:3–12). | 4. Undisputed. |
| 5. The government shifted its focus to the business itself after deciding that its initial approach of investigating box holders was not "effective." (Zellhart Dep., ECF 112-19, Ex. K at 875:12; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1221:20–23). | 5. Undisputed that Zellhart testified to the following: "So basically we concluded that after almost five years of -- of going after individual customers, we weren't -- we weren't doing anything effective. I mean, there's some good cases, some good individual cases, but the problem was the business itself. And so we -- the three agencies came together, along with the U.S. Attorney's Office, to try to come up with how do we address the real problem." Zellhart also testified that the individual investigations were "not working," and that they needed to figure out how to "take out the criminal facilitator, which is U.S. Private Vaults itself, the business." (Zellhart Dep., ECF 112-19, Ex. K at 875:9–16; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1221:20–25). |
| 6. Inspector Versoza is a postal inspector with the U.S. Postal Inspection Service, a federal law | 6. Undisputed. However, Plaintiffs failed to include this citation in their opening brief; the addition |

2

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| enforcement agency. (Frommer Decl., ECF 112-20, Ex. L ("Versoza Dep.") at 1076:11–22). | of this fact here violates the 20-page limit. |
| 7. Inspector Versoza was involved in investigating USPV as early as about 2015, helped plan to execute the seizure warrant at USPV, and participated in executing the seizure warrant. (Versoza Dep., ECF 112-20, Ex. L at 1105:7–22, 1110:18–1111:5). | 7. Undisputed.  However, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 8. After the government shifted the focus of its investigation from individual box holders to USPV, the business, Inspector Versoza agreed that the investigation would "go after U.S. Private Vaults, the company, and then also, to the extent that there's criminality by box renters, to identify that and, well, enforce the law." (Versoza Dep., ECF 112-20, Ex. L at 1122:18–23). | 8. Undisputed. |
| 9. Special Agent Zellhart "anticipated that there would be criminal proceeds in the safe deposit boxes." (Zellhart Dep., ECF 112-19, Ex. K at 873:24–874:1, 890:3-7). | 9. Undisputed. |
| 10. Inspector Versoza testified that the DEA and USPIS were "doing a lot of the field work, meaning they were conducting surveillance, they were conducting enforcement actions" | 10. Undisputed in part; Versoza testified that DEA was "doing a lot of field work."  He clarified that he was supporting DEA as well, and participated in some operations.  (Versoza Dep., ECF |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| as part of the investigation of USPV. (Versoza Dep., ECF 112-20, Ex. L at 1120:22–1121:22). | 112-20, Ex. L at 1120:22–1121:22).  And, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 11. Inspector Versoza testified that the FBI was put in charge of the USPV investigation. (Versoza Dep., ECF 112-20, Ex. L at 1120:3-9). | 11. Disputed.  Versoza did not testify that FBI was "put in charge" of the investigation. ECF 112-20, Ex. L at 1120:3-9). |
| 12. Inspector Versoza testified that "generally the reason FBI took over is because their jurisdiction is larger and does not just cover drug crimes. FBI also investigates basically every federal statute. And it was pretty clear that many box holders were involved in not just drug crimes, but other crimes." (Versoza Dep., ECF 112-20, Ex. L at 1116:11–16). | 12. Undisputed. |
| 13. The decision to place the FBI in charge was made in consultation with the U.S. Attorney's Office, FBI management, and DEA management. (Versoza Dep., ECF 112-20, Ex. L at 1118:5–8, 1119:8–1120:1). | 13. Disputed.  Versoza testified that there were conversations to which he was not privy, that he did not "know how it proceeded," but that at some point "it was determined FBI would be better suited to spearhead the investigation." (Versoza Dep., ECF 112-20, Ex. L at 1118:5 to 1120:-1).  And, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| 14. Since 2019, FBI Supervisory Agent Jessie Murray has been the supervisor of the asset forfeiture unit of the Los Angeles office of the FBI. (Frommer Decl., ECF 112-23, Ex. O ("Murray 30(b)(6) Dep.") at 1468:20–22). | 14. Undisputed. |
| 15. The government, through its designee Supervisory Special Agent Jessie Murray, testified that FBI Special Agent in Charge Matthew Moon asked Murray in the summer of 2020 whether her asset forfeiture unit could handle the seizure and administrative forfeiture of hundreds of box renters' property. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1525:15-1526:5, 1526:9–1527:3, 1527:10–18). | 15. Undisputed in part.  Undisputed Agent Murray testified that FBI Special Agent in Charge Moon asked her "if the Los Angeles asset forfeiture was capable of handling a possible large-scale seizure" and asked whether the FBI field office had "the capacity to handle civil forfeiture regarding U.S. Private Vaults" (Murray 20(b)(6) Dep. ECF 112-23, Ex. O at 1526:15-1526:5.  Disputed that the testimony states the forfeiture unit could handle "the seizure and administrative forfeiture of hundreds of box renters' property." |
| 16. Supervisory Special Agent Murray told Moon that her unit could handle a "large-scale seizure," testifying that the asset forfeiture unit was "established" and had been in existence "for many, many years," and had "a large complement of asset forfeiture employees capable of handling and processing this type of large-scale seizure." (Murray 30(b)(6) Dep., ECF 112-23, Ex. | 16. Undisputed |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| O at 1526:16–1527:3). | |
| 17. The government discussed "seizing the nest of the boxes and doing an inventory on them in summer of 2020." (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1239:9-10). | 17. Undisputed that Zellhart testified that she thought she said that "we discussed, you know, seizing the nest of the boxes and doing an inventory on them in summer of 2020." (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1239:9-10). |
| 18. The government also began to discuss the potential use of civil forfeiture against safe-deposit box renters' property in the summer of 2020. ((Zellhart Dep., ECF 112-19, Ex. K at 985:14-16); *see also* Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1239:15-18 ("In the late summer or fall of 2020 is when the United States began considering the potential use of civil forfeiture as to the nest of safe deposit boxes.  A. I think that's right, yes.")). | 18. Undisputed that Zellhart testified that "I think I - - I think I said that we discussed, you know, seizing the nests of the boxes and doing the inventory of them in summer of 2020.  And then discussions about asset forfeiture took place a little bit later in the summer or fall." (Zellhart 30(b)(6) Dep. ECF 112-21, Ex. M at 1239:8-12).  Dispute the remainder of the Fact. |
| 19. The FBI's lead agent for the USPV investigation, Special Agent Zellhart, understood that FBI policy requires special agents to use the least intrusive investigative technique that is capable of achieving the FBI's objective. (Zellhart Dep., ECF 112-19, Ex. K at 868:7–14, 870:2–871:2) | 19. Undisputed that Zellhart testified she was aware of an FBI policy and testified that the policy is "sitting there in sub paragraph E." (Zellhart Dep., ECF 112-19, Ex. K at 868:7–14, 870:2–871:2). Dispute the remainder of the Fact. |
| 20. Section 4.1.1(E) of the 2013 version of the FBI's Domestic Investigations and Operations | 20. Undisputed. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| Guide states that agents should **"Employ the least intrusive means that do not otherwise compromise FBI operations.** Assuming a lawful intelligence or evidence collection objective, i.e., an authorized purpose, strongly consider the method (technique) employed to achieve that objective that is the least intrusive available (particularly if there is the potential to interfere with protected speech and association, damage someone's reputation, intrude on privacy, or interfere with the sovereignty of foreign governments) while still being operationally sound and effective." (FBI, Domestic Investigations and Operations Guide § 4.1.1(e) (2013), *available at* https://perma.cc/RWD8-XHDC; Zellhart Dep., ECF 112-19, Ex. K at 870:2–871:2). | |
| 21. Special Agent Zellhart testified that the government did not consider appointing a receiver to wind down USPV's operations and return box holders' property without the need to search the boxes. (Zellhart Dep., ECF 112-19, Ex. K at 899:9–13; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1230:20–24). | 21. Undisputed that Zellhart testified she was not aware of a discussion of alternatives. (Zellhart Dep., ECF 112-19, Ex. K at 899:9–13; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1230:20–24).   And, Plaintiffs failed to include this full citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 22. Inspector Versoza testified that | 22. Undisputed that Versoza |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| the government did "not really" consider alternatives to executing the seizure warrant and breaking open customers' safe-deposit boxes. (Versoza Dep., ECF 112-20, Ex. L at 1132:19–1133:2) | answered "not really" when asked if "you all discuss[ed] . . . [m]aybe we should do something that would be a little less – you know, where we're not cracking so many eggs." Versoza also testified that this was because discussions were focused on the investigation of the company and it was "never really about seizures." (Versoza Dep., ECF 112-20, Ex. L at 1132:19–1133:8) |
| 23. Inspector Versoza explained that when planning to execute the USPV seizure warrant, they "were working on orders above us," meaning instructions from the U.S. Attorney's Office or management of the FBI. (Versoza Dep., ECF 112-20, Ex. L at 1135:10–25). | 23. Disputed. The cited testimony, and the question asked, do not support this fact, as it has nothing to do with planning for the warrant execution nor does it describe who provided the "orders above us." |
| 24. The government, through its designee Supervisory Special Agent Jessie Murray, testified that Murray, as the head of the forfeiture unit, "evaluated the seizure warrant [application], the finalized version that was going to be presented to the magistrate," to determine whether there was probable cause to proceed with potential civil forfeiture actions. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1533:8–14). | 24. Undisputed Murray testified: "Q. Okay, And so you needed to evaluate the affidavit that was submitted in support of the seizure warrant in order to determine whether you felt that there was probable cause to move forward with potential forfeiture actions? Is that accurate? A. Yes." Dispute the remainder of the Fact. |
| 25. Supervisory Special Agent Jessie | 25. Undisputed in part. Dispute the |

8

| **Plaintiffs' Statements of Fact and Supporting Evidence** | **Defendants' Responses and Supporting Evidence** |
|---|---|
| Murray estimates having reviewed the draft warrant application in early 2021, prior to its submission to Magistrate Judge Kim. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1534:19-24). | date of the review and her reviewing the application for a seizure warrant.  Murray testified to the seizure warrant affidavit (not the application for a seizure warrant) in "early 2021, maybe February 2021." (Murray 30(b)(6) Dep. ECF 112-23, Ex. O at 1534:14-24). |
| 26. The government admitted that "the United States was prepared to move forward with the potential use of civil forfeiture as to the nest of safe-deposit boxes, provided that" Supervisory Special Agent Murray felt that "the seizure warrant affidavit supplied sufficient probable cause to do so." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1533:23-1534:9) | 26. Undisputed, except that the fact omits part of the question.  While the fact begins "the United States was prepared to move forward with the potential use of civil forfeiture as to the nests of safe-deposit boxes" the question reads "in the fall of 2020, after this meeting is it fair to say the United States . . ."  (Murray 30(b)(6) Dep. ECF 112-23, Ex. O at 1533:22-1534:9). |
| 27. After evaluating the seizure warrant affidavit, Supervisory Special Agent Jessie Murray "made a determination that there was probable cause to proceed on assets seized in the investigation from U.S. Private Vaults." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1535:5-12). | 27. Undisputed, but this Fact contradicts and omits testimony. Agent Murray testified "Having evaluated the seizure warrant affidavit, <u>the finalized version that was going to be presented to the magistrate</u>, I made a determination that there was probable cause to proceed on assets seized in the investigation from USPV." (Murray 30(b)(6) Dep. ECF 112-23, Ex. O at 1535:7-12). |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| 28. The government, through its designee Supervisory Special Agent Murray, testified that Murray's internal probable cause determination extended to "the contents of the boxes at that location." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1537:14–16). | 28. Undisputed that Murray testified, "I determined that there was probable cause to seize the assets of U.S. Private Vaults and the contents of the boxes at that location." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1537:14–16). |
| 29. The government has a "minimum monetary threshold for" its "asset forfeiture seizures." The threshold for currency is $5,000. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1493:22–23, 1495:1–7). | 29. Disputed.  Murray testified that "we" meaning the FBI (and not the government generally) have a minimum threshold for proceeding with FBI administrative forfeiture proceedings. |
| 30. The "minimum monetary threshold" exists because, for lower amounts, "the cost [to forfeit] would be more than the value of the asset." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1494:3–1495:7). | 30. Undisputed. |
| 31. The government admitted, through its designee Supervisory Special Agent Murray, that due to its probable-cause determination, the government "initiated civil administrative forfeiture against all of the boxes that met the minimum monetary threshold." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1562:1–17). | 31. Undisputed. |
| 32. The government agreed, through its designee Supervisory Special Agent Murray, that "the FBI | 32. Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| pursued administrative forfeiture" against "basically any cash that was seized that was above the -- that $5,000 FBI minimum." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1563:16-21). | |
| 33. The government stated, through its designee Supervisory Special Agent Murray, that it "proceeded against all of the non-currency valuables [in renters' safe-deposit boxes] if it looks like it was worth -- if the value would meet our minimum monetary threshold." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1564:4-7). | 33. Undisputed. |
| 34. On or about March 17, 2021, the government applied for the seizure warrant for USPV. (Frommer Decl., ECF 112-14, Ex. F, ("Warrant Application and Supporting Affidavit"). | 34. Undisputed. |
| 35. The affidavit in support of the seizure warrant application was drafted by the lead FBI case agent, Lynne Zellhart, and by AUSA Andrew Brown. (Zellhart Dep., ECF 112-19, Ex. K at 850:17–19, 851:13–16, 884:14–23, 886:5–8). | 35. Undisputed. |
| 36. That affidavit in support of the USPV warrant application alleged acts of wrongdoing by USPV and its principals, but it made no such allegations against | 36. Disputed.  The affidavit made allegations against USPV, and forfeitures of assets from USPV customers. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| the customers. (Warrant Application and Supporting Affidavit, ECF 112-14, Ex. F; Zellhart Dep., ECF 112-19, Ex. K at 879:17-24). | |
| 37. Neither the USPV warrant application nor the affidavit in support disclosed the government's plans to initiate forfeiture proceedings for any cash seized from the USPV boxes meeting the minimum monetary threshold of $5,000 and for any valuables that looked like their value would meet the minimum monetary threshold. (Warrant Application and Supporting Affidavit, ECF 112-14, Ex. F). | 37. Undisputed the affidavit does not state that in the future the government may seek to commence administrative forfeiture proceedings on assets found in boxholder boxes. |
| 38. AUSA Brown wrote the language in paragraph 108 of the affidavit supporting the USPV warrant application. (Zellhart Dep., ECF 112-19, Ex. K at 884:14–23, 886:5–8). | 38. Undisputed. |
| 39. Paragraph 108 of the affidavit in support of the USPV warrant application states that "[t]he warrants authorize the seizure of the nests of the boxes themselves, not their contents. By seizing the nests of safety deposit boxes, the government will necessarily end up with custody of what is inside those boxes initially. Agents will follow their written inventory | 39. Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner. Agents will attempt to notify the lawful owners of the property stored in the boxes how to claim their property, such as by posting that information on the internet or at USPV itself, or by contacting the owners directly. In order to notify the owners directly, agents will, in accordance with their policies regarding an unknown person's property, look for contact information or something which identifies the owner.[40] (USPV recommends that box renters include their or their designees' telephone numbers on a note in the box in the event that USPV removes the contents for nonpayment of rental fees.)" (Warrant Application and Supporting Affidavit, ECF 112-14, Ex.F at 501:15–502:7). | |
| 40. Footnote 40 to the government's affidavit in support of the USPV warrant application further states that "The FBI policy regarding taking custody of an unknown person's property provides, in part, that agents 'inspect the property as necessary to identify the owner and preserve the | 40. Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| property for safekeeping.' The inspection 'should extend no further than necessary to determine ownership.'" (Warrant Application and Supporting Affidavit, ECF 112-14, Ex. F at 502 n.40). | |
| 41. The seizure warrant signed by Judge Kim included limiting language regarding the government's authority to seize the "nests of safety deposit boxes and keys," stating that "[t]his warrant does not authorize a criminal search or seizure of the contents of the safety deposit boxes. In seizing the nests of safety deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes. Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property." (Frommer Decl., ECF 112-13, Ex. E ("USPV Seizure Warrant") at 289). | 41. Undisputed that the seizure warrant, and the terms of the warrant speak for themselves. |
| 42. When Magistrate Kim signed the USPV seizure warrant in March 2021, he was unaware that the government had already determined that it would initiate forfeiture proceedings against the contents of the boxes. (Warrant | 42. Disputed. Calls for speculation. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| Application and Supporting Affidavit, ECF 112-14, Ex. F at 501:15–502:7 & n.40; Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1525:15-1526:5, 1526:9–1527:3, 1527:10–18, 1533:8–14, 1534:21–1535:12, 1537:14–16, 1560:2–15, 1562:1–17, 1563:16–1564:12; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M 1239: 3–18; Zellhart Dep., ECF 112-19, Ex. K at 985: 9–16). | |
| 43. Nothing in the warrant application or supporting affidavit advised Magistrate Kim that the government planned to initiate forfeiture proceedings against any cash seized from the USPV boxes meeting the minimum monetary threshold of $5,000 and for any valuables that looked like their value would meet the minimum monetary threshold. (Warrant Application and Supporting Affidavit, ECF 112-14, Ex. F at 501:15–502:7 & n.40). | 43. Disputed.  The warrant application discusses that an inventory would be conducted and prior forfeitures of boxes at USPV. |
| 44. The FBI's Domestic Investigative and Operations Guide states: "Whenever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible." (Frommer Decl., ECF 112-15, Ex. G ("FBI DIOG") at 527). | 44. Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| 45. The government's lead case agent, Lynne Zellhart, created a document called "Supplemental Instructions on Box Inventory." (Zellhart Dep., ECF 112-19, Ex. K at 919:11–16). | 45. Undisputed. |
| 46. The government agreed that the "Supplemental Instructions on Box Inventory" served as the "operative policy" that the government used to guide agents' behavior in executing the warrant, including inventorying the contents of renters' safe-deposit boxes. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1215:3–9). | 46. Disputed. See government's Fact No. 32. |
| 47. Zellhart stated that, prior to her May 2022 deposition, the last time she had looked at the portion of the FBI's Domestic Investigations and Operations Guide concerning inventory searches was "in the late summer of 2020." (Zellhart Dep., ECF 112-19, Ex. K at 847:13–17) | 47. Disputed. See government's Fact No. 32. |
| 48. Zellhart admitted that she drafted the "Supplemental Instructions on Box Inventory" approximately two weeks before the March 22 execution of the seizure warrant. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M 1218:17–21). | 48. Disputed that Zellhart testified the document was prepared approximately "two weeks" before the search, as she testified it took place above "ten days to two weeks" prior to the March 22, 2021 search and the document is dated March 12, 2021. (Zellhart (30)(b)(6) Dep., ECF 112-21, Ex. M 1218:17-21). |
| 49. Zellhart has helped execute | 49. Undisputed. |

16

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| "[l]ots of dozens" of criminal search warrants. (Zellhart Dep., ECF 112-19, Ex. K at 822:23–823:2). | |
| 50. Zellhart testified she could not recall ever having conducted an inventory apart from the one at USPV. (Zellhart Dep., ECF 112-19, Ex. K at 827:10–19; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1220:7-12). | 50. Undisputed.  However**,** Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 51. The Supplemental Instructions on Box Inventory had a section on "Cash" that advised that "[a]gents anticipate USPV boxes to contain a large amount of US Currency. US Currency over $5,000 will be placed in an evidence bag (or bags), uncounted." (Frommer Decl., ECF 112-12, Ex. D ("Supplemental Instructions on Box Inventory") at 284). | 51. Undisputed. |
| 52. The Supplemental Instructions on Box Inventory also instructed that "[s]earch/inventory agents should note the condition of the cash and make notes on a separate piece of paper which will be handed to the Admin Team with the other completed paperwork. Agents should note things such as how the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.); if there appears | 52. Undisputed. |

17

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| to be drug residue present; if a gun is also present; or anything else of note. Anything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." (Supplemental Instructions on Box Inventory, ECF 112-12, Ex. D at 284). | |
| 53. The Supplemental Instructions on Box Inventory also instructed that "[s]earch/inventory agents should also note the presence or absence of instructions affixed to the box regarding contact information or ownership. This information should also be communicated to the Admin team." (Supplemental Instructions on Box Inventory, ECF 112-12, Ex. D at 284). | 53. Undisputed. |
| 54. Special Agent Zellhart agreed that the Instructions told agents to note the condition of the cash, including qualities like odors and bank tellers notes and how it was bundled, because they are "potentially indicative of that money being in the proximity of drugs." (Zellhart Dep., ECF 112-19, Ex. K at 962:12–16). | 54. Undisputed. |
| 55. The government admitted it wanted to collect the information identified in the "Cash" section of its "Supplemental Instructions on Box Inventory" for potential use in civil forfeiture | 55. Undisputed.  However, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| proceedings, because once currency left the facility, the cash would be deposited and the government's ability to collect this evidence would disappear. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1218:12–16; *see also* Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1547:19–1548:2 (agreeing that the government wanted this information because it "could be probative later on regarding whether—you think there's probable cause to think this is forfeitable currency")). | |
| 56. The government explained that, while the head of the forfeiture unit at the FBI's Los Angeles office had already determined that it would pursue forfeiture against all property above the minimum monetary threshold, collecting additional evidence from the contents of the boxes would provide the government with "supplemental information" to bolster that earlier probable cause determination. (Murray Dep., ECF 112-23, Ex. O at 1556:13–16, 1557:16–23). | 56. Undisputed that Murray testified to this fact. However**,** Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 57. The Supplemental Instructions on Box Inventory further explained that "[t]here will be canine units on scene," and provided instructions on taking any cash above $5,000 to a dog | 57. Undisputed. |

19

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| for a drug sniff. (Supplemental Instructions on Box Inventory, ECF 112-12, Ex. D at 284). | |
| 58. The government arranged with multiple local police departments to ensure that canine units would be on site to conduct drug sniffs of all currency above $5,000. (Zellhart Dep., ECF 112-19, Ex. K at 924:7–20; Versoza Dep., ECF 112-20, Ex. L at 1152:8-23). | 58. Undisputed. |
| 59. The government testified that multiple local police departments who assisted with execution of the seizure warrant have submitted DAG-71 forms, which allow the federal government to "equitably share" forfeiture proceeds with local partners who assisted with the raid. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1573:20–1574:2). | 59. Undisputed. However, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 60. For how to conduct the inventory, the "Supplemental Instructions on Box Inventory" stated that agents, while "taking care to preserve possible fingerprint evidence," should "identify the contents of each box, creating an inventory list," and that "[a] copy of the paperwork will go to Asset Forfeiture." (Supplemental Instructions on Box Inventory, ECF 112-12, Ex. D. at 283). | 60. Undisputed. |
| 61. The "Supplemental Instructions | 61. Disputed. The Supplemental |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| **Plaintiffs' Statements of Fact and Supporting Evidence** | **Defendants' Responses and Supporting Evidence** |
|---|---|
| on Box Inventory" do not provide guidance about how agents should go about "creating an inventory list." (*See* Supplemental Instructions on Box Inventory, ECF 112-12, Ex. D. at 282–85). | Instructions advise that agents are to complete standard forms, such as a FD-597 and chain of custody forms, that are part of the DIOG and thus instruct how agents are to go about creating the inventory list. |
| 62. The government admitted that "the United States didn't have anything in the supplemental instructions advising inventorying agents about how to do those kinds of counts," stating that the issue "was not addressed." (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1252:2–9). | 62. Undisputed. |
| 63. The designee for the government testified that "I don't think there's a policy" as to how detailed an inventory description should be. Instead, if there are 50 gold coins, the agent would not necessarily record that there were 50 gold coins, and might instead say "miscellaneous coins," "yellow-colored coins," or "box of coins." (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1249:24–1250:9, 1251:16–25). | 63. Undisputed. |
| 64. FBI Special Agent Justin Palmerton, who helped inventory safe-deposit boxes at USPV, could not recall ever receiving any training on how to conduct an inventory that was not | 64. Disputed.  The testimony says that Palmerton could not recall ever having seen <u>continuing</u> training, not training, on how to conduct an inventory. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| incident to arrest. (Frommer Decl., ECF 112-18, Ex. J ("Palmerton Dep.") at 584:14-18). | |
| 65. The government also specially created another form, "Agent Observations and Notes," for use in executing the warrant at USPV. (Frommer Decl., ECF 112-23, Ex. Q ("Agent Observations and Notes") at 1627; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1244:15–20). | 65. Undisputed. |
| 66. The "Agent Observations and Notes" form included space for "Cash Observations," and instructed agents to "note things such as how the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.); if there appears to be drug residue present; a gun is also present; or anything else of note). (Agent Observations and Notes, ECF 112-25, Ex. Q at 1627). | 66. Undisputed. |
| 67. The "Agent Observations and Notes" form also included space for agents to note a drug dog alert. (Agent Observations and Notes, ECF 112-25, Ex. Q at 1627). | 67. Undisputed. |
| 68. Government agents admitted that a drug dog alert on currency does not help identify the owner or forestall claims of theft and loss, | 68. Undisputed that Versoza so testified. |

22

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| but it could help facilitate the use of administrative or civil forfeiture against the property. (Versoza Dep., ECF 112-20, Ex. L at 1153:22-1154:12). | |
| 69. The "Agent Observations and Notes" form had no place to record information that would be used to defend against claims of theft and loss. (Agent Observations and Notes, ECF 112-25, Ex. Q at 1627). | 69. Disputed. There were lines where agents could record notes. |
| 70. The government agreed that it used the information agents collected on the "Agent Observations and Notes" form "as part of the -- as the asset forfeiture process and part of the probable cause story as supplement to the probable cause." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1557:16–23). | 70. Undisputed. |
| 71. Inspector Versoza testified that he viewed "the seizure warrant is just -- it's not the end of it, it's just another tool in our gathering of -- of evidence." (Versoza Dep., ECF 112-20, Ex. L at 1128:16-19). | 71. Undisputed.  However, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 72. On March 22, 2021, the government executed the US Private Vaults seizure warrant. (Defs' Amended Answer to First Amended Complaint, ECF 80 at ¶ 50). | 72. Undisputed. |
| 73. In doing so, the government | 73. Undisputed.  However, Plaintiffs |

23

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| encountered approximately 1,400 safe-deposit boxes, about half of which were empty. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1275:15-1276:13). | failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 74. The government removed about 700 boxes from the USPV vault that contained items and searched through those boxes' contents. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1275:15-1276:13). | 74. Disputed.  The government conducted an inventory of the boxes' contents.  And, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 75. Some box holders had taped an executor letter—a document identifying both the box renter and his or her beneficiary—to the outside of the box's interior sleeve. (Palmerton Dep., ECF 112-18, Ex. J at 695:15-18, 697:1-4). | 75. Undisputed. |
| 76. Special Agent Zellhart testified that the government knew the executor letters existed before executing the warrant at USPV. (Zellhart Dep., ECF 112-19, Ex. K at 950:5-9). | 76. Undisputed. |
| 77. Many of the government's pictures and written inventory records, in fact, reflect whether the inventorying agent found an executor letter or emergency contact form affixed to the top of the box. (*E.g.*, Frommer Decl., ECF 112-9, Ex. A ("Inventory Records"), at 55, 145, 191). | 77. Undisputed. |
| 78. Agents regularly continued the search of USPV boxes after | 78. Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| encountering executor letters. (Palmerton Dep., ECF 112-18, Ex. J at 701:2-7; *see also, e.g.,* Inventory Records, ECF 112-9, Ex. A at 44, 145, 177, 224, 247). | |
| 79. Video recordings of the government's inventorying of boxes confirm that agents would sometimes open and examine the contents of boxes before examining the affixed executor letter. (*E.g.,* Frommer Decl., ECF 112-10 ("Inventory Videos"), Ex. B.5 at 0:30, 3:30-4:00; *id.* Ex. B.7 at 0:20, 1:00-1:25). | 79. Undisputed. |
| 80. Agents made photographic and video records of personal documents or other possessions contained within the boxes. (*See generally* Inventory Records, ECF 112-9, Ex. A; *see generally* Inventory Videos, ECF 112-10, Ex. B). | 80. Undisputed. |
| 81. In creating its inventory records, the government took photographs of password lists for online accounts. (Inventory Records, ECF 112-9, Ex. A at 176, 178, 223, 227). | 81. Undisputed with respect to the Exhibit A pages cited by Plaintiffs in this Fact, as the photographs assist in identifying box owners. |
| 82. In creating its inventory records, the government took photographs of what appear to be hand-written notes of financial transactions. (Inventory Records, ECF 112-9, Ex. A at 17, 18, 140, 144, 215, 217). | 82. Undisputed with respect to the Exhibit A pages cited by Plaintiffs in this Fact, as the photographs assist in identifying box owners. |
| 83. In creating inventory records, the | 83. Undisputed with respect to the |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| government took photographs of debit cards and checks. (Inventory Records, ECF 112-9, Ex. A at 170, 172, 173). | Exhibit A pages cited by Plaintiffs in this Fact, as the photographs assist in identifying box owners. |
| 84. In creating inventory records, the government took photographs of vaccination records. (Inventory Records, ECF 112-9, Ex. A at 220). | 84. Undisputed with respect to the Exhibit A pages cited by Plaintiffs in this Fact, as the photographs assist in identifying box owners. |
| 85. In creating inventory records, the government took photographs of a prenuptial agreement. (Inventory Records, ECF 112-9, Ex. A at 171). | 85. Disputed.  The pages reflect a single page, which reflect identity of persons, and not the entire agreement, is depicted in the photograph. |
| 86. In creating inventory records, the government took photographs of a will. (Inventory Records, ECF 112-9, Ex. A at 175). | 86. Disputed.  The pages reflect a single page, which reflect identity of persons, and not the entire will, is depicted in the photograph. |
| 87. In creating inventory records, the government took photographs of a letter to a judge in a family-law case. (Inventory Records, ECF 112-9, Ex. A at 239). | 87. Disputed.  The pages reflect a single page, which reflect identity of persons, and not the entire letter, is depicted in the photograph. |
| 88. In creating inventory records, the government took photographs of a receipt for goods deposited with a pawn shop. (Inventory Records, ECF 112-9, Ex. A at 137-39). | 88. Disputed.  The pages reflect a single page, which reflect identity of persons, and not the entire receipt, is depicted in the photograph. |
| 89. In creating inventory records, the government took photographs of a commercial real estate agreement. (Inventory Records, ECF 112-9, Ex. A at 174). | 89. Disputed.  The pages reflect a single page, which reflect identity of persons, and not the entire agreement, is depicted in the photograph. |

26

| **Plaintiffs' Statements of Fact and Supporting Evidence** | **Defendants' Responses and Supporting Evidence** |
|---|---|
| 90. In creating inventory records, the government took photographs of a personal note concerning the establishment of a financial trust. (Inventory Records, ECF 112-9, Ex. A at 141). | 90. Undisputed with respect to the Exhibit A pages cited by Plaintiffs in this Fact, as the photographs assist in identifying box owners. |
| 91. In creating inventory records, the government took photographs of trust documents, photographed alongside a receipt from a coin exchange. (Inventory Records, ECF 112-9, Ex. A at 206). | 91. Disputed. The pages reflect a single page, which reflect identity of persons, and not the entirety of documents, is depicted in the photograph. |
| 92. In creating inventory records, the government took photographs of a newspaper clipping about a criminal case, photographed alongside a personal note. (Inventory Records, ECF 112-9, Ex. A at 143). | 92. Disputed. The pages reflect a single page, which reflect identity of persons, and not the entire note, is depicted in the photograph. |
| 93. In creating the inventory record for one box, the government took dozens of close-up photographs of various personal documents, including receipts and personal ledgers containing handwritten notes, pay stubs, immigration paperwork, a marriage license, and bank statements. (Inventory Records, ECF 112-9, Ex. A at 48-130). | 93. Disputed. The exhibits are in a foreign language and are not translated. |
| 94. In examining one box—a box which had an executor letter affixed to the outside—agents went inside the box and opened a sack containing a person's cremated remains. (Inventory Records, ECF 112-9, Ex. A at 7- | 94. Disputed that the pages cited in Exhibit A reflect that a sack was opened. |

| **Plaintiffs' Statements of Fact and Supporting Evidence** | **Defendants' Responses and Supporting Evidence** |
|---|---|
| 10). | |
| 95. In examining another box, the government took a photograph of a "Receipt of Cremated Remains." (Inventory Records, ECF 112-9, Ex. A at 221). | 95. Undisputed with respect to the Exhibit A pages cited by Plaintiffs in this Fact, as the photographs assist in identifying box owners. |
| 96. For some boxes, the government's examination and inventorying of box contents was video recorded, rather than photographed. (*See generally* Inventory Videos, ECF 112-10, Ex. B). | 96. Undisputed. |
| 97. In one video, an agent holds each document in a large stack up to the camera one-by-one, flipping upside-down documents over so that the camera would capture the front. (*See* Inventory Videos, ECF 112-10, Ex. B.2 at 5:55-9:15). | 97. Undisputed. |
| 98. In another, an agent holds up to the camera each card in a stack of debit or credit cards, flipping some over so that the camera can capture both sides. (*See* Inventory Videos, ECF 112-10, Ex. B.8 at 15:15-16:50). | 98. Undisputed. |
| 99. In another, the agent captures video recordings of password lists. (*See* Inventory Videos, ECF 112-10, Ex. B.8 at 11:15, 12:30, 12:50). | 99. Undisputed. |
| 100.    In one video, the inventorying agent can be seen studying a document found inside a box before holding it up | 100.    Undisputed. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| for the camera. (*See* Inventory Videos, ECF 112-10, Ex. B.3, at 1:43-1:55). | |
| 101.    In other instances, agents filed through and emptied the contents of wallets found inside the boxes. (*See* Inventory Videos, ECF 112-10, Ex. B.4 at 14:00-14:45; Ex. B.8 at 3:00-3:40). | 101.    Undisputed. |
| 102.    Agents also used the "Agent Observations and Notes" form to document the condition of cash found inside boxes. Zellhart 30(b)(6) Dep., Ex. M at 1246:1-17. | 102.    Undisputed. |
| 103.    Agents noted on one form that the cash for one box was "$20 bills bound by rubber bands, partitioned in $2000 bundles." (Inventory Records, ECF 112-9, Ex. A at 11). | 103.    Undisputed. |
| 104.    For another box, an agent noted the cash was "Assorted denomination held in bundles and wrapped in paper, with rubber bands." (Inventory Records, ECF 112-9, Ex. A at 15). | 104.    Undisputed. |
| 105.    For another box, agents noted that cash was "sealed in bank pouches." (Inventory Records, ECF 112-9, Ex. A at 25). | 105.    Undisputed. |
| 106.    For another box, agents noted cash was "[p]laced in different envelopes, broken down | 106.    Undisputed. |

29

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| by ~1000, sticky notes w/amounts." (Inventory Records, ECF 112-9, Ex. A at 29). | |
| 107.    Agents took photographs to document the condition of cash and, in several instances, photographed hand-written notes containing apparent financial information that were found alongside cash. (*See* Inventory Records, ECF 112-9, Ex. A at 58, 60, 199, 200, 201, 215, 216). | 107.    Undisputed. |
| 108.    Agents ran currency seized from USPV customers' boxes by drug dogs. (Palmerton Dep., ECF 112-18, Ex. J at 683:21-684:12). | 108.    Undisputed. |
| 109.    The government explained that the drug dogs were located in the parking lot outside USPV. (Palmerton Dep., ECF 112-18, Ex. J at 684:2-7). | 109.    Undisputed. |
| 110.    The government testified that while drug dog agents wanted to have their dogs sniff unsealed currency, inventorying agents could not take unsealed bags of currency outside USPV. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1253:16-20). | 110.    Undisputed. |
| 111.    The government explained that to facilitate drug-dog sniffs, agents would rub currency found in renters' boxes on the outside of evidence bags prior to their sealing. (Palmerton Dep., ECF 112-18, Ex. J at 687:4-14; Zellhart 30(b)(6) Dep., ECF 112- | 111.    Undisputed. |

| **Plaintiffs' Statements of Fact and Supporting Evidence** | **Defendants' Responses and Supporting Evidence** |
|---|---|
| 21, Ex. M at 1253:15-23) | |
| 112.　　Agents would note positive drug dog alerts on the "Agent Observations and Notes" form. (*See*, *e.g.*, Inventory Records, ECF 112-9, Ex. A at 11, 15, 19, 25, 29). | 112.　　Undisputed. |
| 113.　　Agents affixed affidavits from drug-dog handlers to the government's written inventory records. (*See*, *e.g.*, Inventory Records, ECF 112-9, Ex. A at 12-13, 20-22, 26, 30-31). | 113.　　Undisputed with respect to the Exhibit A pages cited by Plaintiffs in this Fact. |
| 114.　　In creating inventory records, agents often used general terms to describe what had been seized from box renters' boxes, even for valuable items. (*See*, *e.g.*, Inventory Records, ECF 112-9, Ex. A at 131-133 ("Miscellaneous coins" and "Miscellaneous jewelry,")); (*id.* at 134-136 ("Miscellaneous jewelry" and "Miscellaneous coins")); (*id.* at 177 ("assorted jewelry and packaging" and "miscellaneous cash and coin")); (*id.* at 228 ("misc jewelry and metal bars/coin")). | 114.　　Undisputed. |
| 115.　　Some inventories refer only to "miscellaneous items." (Inventory Records, ECF 112-9, Ex. A at 44 ("Miscellaneous general items"), at 6 ("miscellaneous itmes [sic]")). | 115.　　Undisputed. |
| 116.　　Photographs taken of valuable property by agents often | 116.　　Disputed. Argumentative. |

31

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| failed to display the property in a way that would allow others to subsequently determine the quantity of property that had been seized. One inventory, for instance, lists "uncounted gold coins" and the corresponding photograph depicts a jumble of coins. (Inventory Records, ECF 112-9, Ex. A at 179, 184). | |
| 117.    Another box's inventory similarly describes "white metal coins" and the corresponding photograph shows a jumble of coins. (Inventory Records, ECF 112-9, Ex. A at 32-39). | 117.    Disputed. Argumentative. |
| 118.    Another box's inventory lists "[y]ellow metal coins and silver-colored metal coins- uncounted" and the corresponding photograph shows stacks of indeterminate height. (Inventory Records, ECF 112-9, Ex. A at 153-64). | 118.    Disputed. Argumentative. |
| 119.    Other inventories contain generic descriptors and photographs that do not capture all the items seized. (*E.g.* Inventory Records, ECF 112-9, Ex. A at 185-192 (inventory lists "Jewelry" and photograph shows pile of bags)); (*id.* at 193-197 (inventory lists "Gold Color metal plates and coins" and photograph shows stack of plates of indeterminate number)); (*id.* at 207-212 (inventory lists | 119.    Disputed. Argumentative. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| "precious metals" and photograph shows stack of bars, where only top of stack is visible)); (*id.* at 229-237 (inventory lists coins and jewelry, but no such items are photographed)). | |
| 120.     Agents closely involved with the investigation of US Private Vaults and seizure warrant execution testified that one of the primary purposes for an inventory search is to protect agents from claims of theft or lost property. (Palmerton Dep., ECF 112-18, Ex. J at 581:22-582:5; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1215:19-1216:4; Frommer Decl., ECF 112-22, Ex. N, ECF 112-22 ("Carlson Dep."), at 1343:25-1344:21). | 120.     Disputed.  The testimony reflects that protecting agents from claims of theft or lost is one of the purposes of an inventory. |
| 121.     The government's Rule 30(b)(6) designee also testified, though, that it is not the "policy" of the government to generate a complete list of property during an inventory. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1249:24-1250:9). | 121.     Disputed. Mischaracterizes testimony and argumentative.  Zellhart testified that it is correct that it is not the policy of the United States to have inventorying agents provide a complete list of items seized, meaning "50 gold coins" versus "simply say[ing] that I had miscellaneous gold coins[.]" (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1249:24-1250:9). |
| 122.     Agents closely involved with the seizure warrant's | 122.     Disputed.  Zellhart testified it was the whole |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| execution testified that the FBI relied on the integrity of its chain-of-custody procedures—*not* the inventory—to protect against claims of theft and loss. (*See*, *e.g.*, Zellhart Dep., ECF 112-19, Ex. K at 861:17-862:11; Palmerton Dep., ECF 112-18, Ex. J at 623:4-23). | process.  Zellhart Dep., ECF 112-19, Ex. K at 861:17-862:11. |
| 123.       After completing its execution of the seizure warrant, the government created a flyer directing box renters who wanted to be reunited with their property to fill out a form with their contact information to the FBI. (Zellhart Dep., ECF 112-19, Ex. K at 969:16-23); Frommer Decl. ECF 112-16, Ex. H ("FBI Claim Form"). | 123.       Undisputed. |
| 124.       A link to the FBI claim form was posted at US Private Vaults, on the US Private Vaults website, and on the FBI's website after the government completed execution of the seizure. (FBI Claim Form, ECF 112-16, Ex. H; J. Snitko Decl., ECF 112-2 at ¶¶ 8-9). | 124.       Undisputed. |
| 125.       Plaintiffs Paul and Jennifer Snitko stored family heirlooms and other personal items in their safe-deposit box at USPV, including items like college class rings and backups of home PC hard drives. (J. Snitko Decl., ECF 112-2 at ¶ 4). | 125.       Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
| --- | --- |
| 126.      Upon learning of the seizure from an article in the LA Times, Paul and Jennifer promptly submitted a claim to their property using the FBI's online form. (J. Snitko Decl., ECF 112-2 at ¶ 9). | 126.      Undisputed. |
| 127.      On May 27, 2021, just hours after filing this lawsuit, the FBI called Jennifer Snitko offering to return the Snitkos' property. (J. Snitko Decl., ECF 112-2 at ¶ 12.) | 127.      Undisputed. |
| 128.      Plaintiff Tyler Gothier stored silver and other personal property in his safe-deposit box at USPV. (Gothier Decl., ECF 112-3 at ¶¶ 4, 7). | 128.      Undisputed. |
| 129.      Soon after learning of the seizure, Tyler submitted a claim form for his property, identifying himself and his preferred contact information, through the FBI's website. (Gothier Decl., ECF 112-3 at ¶ 7). | 129.      Undisputed. |
| 130.      In June 2021, just after Tyler became a Plaintiff in this action, the FBI sent Tyler a letter, signed by Special Agent Lynne Zellhart, indicating that the FBI was willing to return his property. (Gothier Decl., ECF 112-3 at ¶ 8). | 130.      Undisputed. |
| 131.      The letter the FBI sent to Tyler went to a prior address that Tyler had never provided to the FBI, which left Tyler feeling | 131.      Undisputed. |

35

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| disturbed and surveilled. (Gothier Decl., ECF 112-3 at ¶ 8). | |
| 132. Plaintiff Joseph Ruiz held approximately $57,000 in cash in his rented USPV box. (Ruiz Decl., ECF 112-4 at ¶ 4). | 132. Undisputed. |
| 133. Joseph learned of the seizure when he drove to the USPV facility on the day of the seizure. (Ruiz Decl., ECF 112-4 at ¶ 8). | 133. Undisputed. |
| 134. Joseph spoke to law-enforcement agents outside USPV, who told him that he could not access his box while the seizure was underway. (Ruiz Decl., ECF 112-4 at ¶ 8). | 134. Undisputed. |
| 135. Joseph subsequently saw the notice on USPV's door about submitting a claim for his property through the FBI's website, and he followed the instructions to do so. (Ruiz Decl., ECF 112-4 at ¶¶ 8-9). | 135. Undisputed. |
| 136. Plaintiff Travis May stored approximately $63,000 in cash, gold worth approximately $100,000 and documents in sealed envelopes at the time the time of the government's seizure. (May Decl., ECF 112-7 at ¶ 4). | 136. Undisputed. |
| 137. Travis submitted a claim for his property through the FBI's website on June 8, 2021. (May Decl., ECF 112-7 at ¶ 6). | 137. Undisputed. |
| 138. Plaintiffs Jeni Verdon- | 138. Disputed. |

36

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| Pearsons and Michael Storc held approximately $2,000 cash, about $20,000 worth of silver, and personal documents in their rented USPV box. (Pearsons Decl., ECF 112-6 at ¶ 4). | |
| 139. Shortly after learning of the seizure, Jeni submitted a claim to her and Michael's property through the FBI's online claim form; in so doing, she provided the FBI her contact information. (Pearsons Decl., ECF 112-6 at ¶ 6). | 139. Undisputed. |
| 140. On or about May 20, 2021, the government began issuing notices which "initiated civil administrative forfeiture against all of the boxes that met the minimum monetary threshold" of $5,000. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1562:1-17; *see also id.* at 1563:22-1564:7). | 140. Undisputed. |
| 141. USPV itself received an omnibus forfeiture notice identifying more than 400 boxes for forfeiture. (Frommer Decl., ECF 112-17, Ex. I ("USPV Administrative Forfeiture Notice")). | 141. Undisputed. |
| 142. The USPV omnibus forfeiture notice included property contained in the boxes rented by Plaintiffs Travis May, Joseph Ruiz, and Jeni Verdon-Pearsons and Michael Storc. (USPV Administrative Forfeiture | 142. Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| Notice, ECF 112-17, Ex. I). | |
| 143.    Some, but not all, of those Plaintiffs also received individual notice of the administrative forfeiture proceeding. (May Decl., ECF 112-7 at ¶ 8; Ruiz Decl., ECF 112-4 at ¶ 14; Storc Decl., ECF 112-5 at ¶ 8; Pearsons Decl., ECF 112-6 at ¶ 9). | 143.    Undisputed. |
| 144.    USPV, the business, filed a judicial claim to all the box contents in its capacity as a bailee. *See* USPV Claim at https://usprivatevaults.com/ 210610_Forfeiture_Claim.pdf (last visited Aug 3, 2022). | 144.    Undisputed. |
| 145.    USPV agreed to withdraw that claim on behalf of its customers' property as a condition of its criminal plea agreement. *See United States v. U.S. Private Vaults, Inc.*, No. 2:21-cr-00106-MCS, ECF No. 85, at 4-5 (Mar. 3, 2022) (plea agreement). | 145.    Disputed.  Rodgers Decl. Ex. LL. |
| 146.    On June 22, 2021, this Court held that the government's forfeiture notices did not provide sufficient notice to property owners, and enjoined the government from forfeiting Travis's, Joseph's, or Jeni and Michael's property based upon those notices. (ECF 52 (TRO Order)). | 146.    Disputed.  The order speaks for itself. |
| 147.    A few days after entry of | 147.    Undisputed. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| the preliminary injunction, the government emailed counsel for Plaintiffs a letter stating that it would not proceed with forfeiture proceedings against Travis's property. (May Decl., ECF 112-7 at ¶ 12). | |
| 148.    Because Jeni and Michael had filed a claim to their property, the administrative forfeiture proceeding against their silver was terminated. (Pearsons Decl., ECF 112-6 at ¶ 9; ECF 58 at 4). | 148.    Undisputed. |
| 149.    In an August 16, 2021 filing, the government indicated it would no longer be "going forward" with judicial forfeiture proceedings as to Jeni and Michael's silver. (Zellhart Decl., ECF 68-1 at ¶ 3). | 149.    Undisputed. |
| 150.    The government has since returned Jeni and Michael's silver and personal documents, but failed to return $2,000 cash Jeni and Michael maintain was stored inside their box at the time of the seizure. (Storc Decl., ECF 112-6 at ¶¶ 16-17). | 150.    Disputed.  The government returned the funds. |
| 151.    On July 23, 2021, this Court issued a preliminary injunction ordering the government to either return the contents of the box Joseph rented from USPV or show cause "as to why the Government continues to seize" those contents. (ECF 60 | 151.    Undisputed. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| (Order Granting Preliminary Injunction) at 8). | |
| 152.    The government at first did not return Joseph's property, instead responding to the show-cause order by using information it had acquired from Joseph and his box to investigate him—including the use of a drug-sniffing dog during the seizure of USPV, as well as its examination of employment records, insurance claims records, and currency transaction reports after the fact. (Defs' Response to Show Cause Order (ECF 64); Zellhart Decl. (ECF 64-1)). | 152.    Disputed there was any "investigation" except to determine, as in any forfeiture action, whether the evidence was sufficient to prove by a preponderance of the evidence that the asset was subject to forfeiture, within the applicable 90-day deadline. |
| 153.    The government's investigation of Joseph in deciding whether to seek judicial forfeiture of his property was not unique; as the head of the FBI's asset forfeiture unit explained, the agency used "evidence it collected on the agent observation notes form and in other ways, from box renters' boxes" as "part of the—as the asset forfeiture process." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1557:16-23). | 153.    Disputed.  The testimony does not support this fact. |
| 154.    The lead FBI investigator confirmed that, where box holders came forward and provided their identities, the FBI used that information to conduct additional investigation, | 154.    The administrative agency does not decide whether sufficient evidence exists to pursue judicial forfeiture.  Once a claim is filed, the administrative agency must refer |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| including by running those individuals through government databases for "criminal history" or other "[s]uspicious activity" that might help agents determine whether "property found inside the box [would] be subject to civil forfeiture." (Zellhart Dep., ECF 112-19, Ex. K at 979:22-981:11). | the matter to the USAO for it to decide whether to pursue judicial forfeiture, within 90 days after a claim is filed. |
| 155.    Special Agent Zellhart agreed that the FBI was "investigating the claimant[s] so as to make a determination about whether [it] viewed the contents of the box to be criminal proceeds or not." (Zellhart Dep., ECF 112-19, Ex. K at 981:24-982:3). | 155.    Undisputed. |
| 156.    DEA Special Agent Justin Carlson likewise testified to his "understanding" that "boxes that arose to the suspicion of any criminal activity would be investigated before being returned." (Carlson Dep., ECF 112-22, Ex. N at 1425:12-25). | 156.    Undisputed.  However, Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 157.    The government later agreed to return Joseph's property after he countered the government's submission by submitting documents supporting his claim to the legitimacy of his property. (*See* Defs.' Resp. (ECF 66)). | 157.    Undisputed that the government agreed to return the content of the box. |
| 158.    Named Plaintiffs are members of the certified class | 158.    Undisputed. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| because property was seized from their rented USPV boxes, they identified themselves to the government after the seizure, and their property has since been returned to them. (P. Snitko Decl., ECF 112-1 at ¶¶ 3-5, 9-10, 14; Gothier Decl., ECF 113-3 at ¶¶ 3-4, 6-7, 9-11; Ruiz Decl., ECF 112-4 at ¶¶ 3-4, 8-9, 19; Storc Decl., ECF 112-5 at ¶¶ 3-4, 6, 13-17; May Decl., ECF 112-7 at ¶¶ 3-4, 6, 15-19; *see also* Frommer Supplemental Decl., Ex. A, Govt's Supp. Response to Pls.' Rog #9 at 5:8, 9:9, 10:6, 13:28, 14:5). | |
| 159.      Per a government interrogatory response dated April 19, 2022, the government identified 389 unique USPV rented boxes (1) from which the government had seized property in March 2021, (2) for which the government knew the identity of the owner, and (3) for which the government had returned the seized contents. (Govt's Supp. Response to Pls.' Rog #9 at pp. 2-16). Several of these boxes had multiple listed owners. (*Id*). | 159.      Disputed.  The interrogatory response specifically provides it was unclear whether the government knew the actual identify of the owner.  USPV was a company that touted its anonymity, so the government does not know that whatever identifying information it found in a box is actually that of the true owner. |
| 160.      In a subsequent response to a request for admission that the government's "best estimate" that the total number of persons identified as "Box Holders" in that interrogatory response | 160.      Undisputed. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| "exceeds 360 persons," the government responded that the interrogatory "responses speak for themselves." (Frommer Supplemental Decl., Ex. B, Govt's May 25 Response to Pls.' RFA No. 5). | |
| 161.     Lynne Zellhart, the lead case agent, later testified at the government's 30(b)(6) deposition that the contents of about 430 boxes had been returned, though some of these were "unidentified person[s] represented by counsel." (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1268:4-13; 1271:9-13). | 161.     Disputed, the testimony does not support the Fact and there is no indication that the testimony applies to box returns for class members. And Plaintiffs failed to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 162.     As with the broader class, the government generated records in connection with its search and seizure of the contents of Plaintiffs' rented boxes at USPV, including photographs of class members' property. (*See generally* Inventory Records, ECF 112-9, Ex. A (broader class); *see also id*. at 32-43, 145-152, 240-246, 247-256 (named plaintiffs)). | 162.     Undisputed with respect to the cited Ex. A pages that the government took photographs and prepared written documents reflecting the inventorying of box contents.  Dispute the remainder of this fact. |
| 163.     The records created by the government also include written records of the condition of class members' property and the drug-dog sniffs conducted thereon. (*See generally* Inventory Records, ECF 112-9, Ex. A | 163.     Undisputed with respect to the cited Exhibit A pages that inventory records included written documents and drug sniffs.  Dispute the remainder of this fact. |

43

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| (broader class); *see also id*. at 148-149, 250, 254-56 (named plaintiffs)). | |
| 164.      These records additionally include video recordings of the search and seizure of their property. (*See generally* Inventory Videos, ECF 112-10, Ex. B (broader class)). | 164.      Undisputed that with respect to the videos produced as Exhibit B, the government videotaped the boxes, and some boxes were videotaped while others were photographed. Dispute remainder of the fact. |
| 165.      These records further include information the government obtained after—and because of—the government's seizure of class members' USPV boxes. It contains, for instance, the additional documentary evidence Named Plaintiffs Jeni Pearsons and Michael Storc submitted along with the claim to terminate the government's administrative forfeiture proceedings against their property. (Pearsons Decl., ECF 112-6, at ¶ 11; Storc Decl., ECF 112-5 at ¶ 10). | 165.      Undisputed that Jeni Persons and Michael Storc submitted an administrative claim that, while not required, included information to support their contention that the assets at issue were legally derived. Dispute remainder of the fact. |
| 166.      The government's evidentiary databases also include any records the government created—after class members identified themselves to the FBI—in its "investigati[ons of] claimants so as to make a determination about whether [the FBI] viewed the contents of the box to be criminal proceeds," | 166.      Disputed.  The testimony does not support the facts, as there is no reference to "evidentiary" databases in the testimony.  The Fact is overbroad and unclear in its reference to evidentiary databases, as including notes generated through criminal or financial databases. And  Plaintiffs failed |

44

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| including any notes generated from searches through criminal or financial databases. (Zellhart Dep., ECF 112-19, Ex. K at 979:22-981:11, 981:24-982:3). | to include this citation in their opening brief; the addition of this fact here violates the 20-page limit. |
| 167.    Plaintiffs fear that, even though their property has been returned to them, the government has copies of their private information contained in its evidentiary databases that it can use for investigative purposes. (*See* P. Snitko Decl. ¶¶ 19-20; J. Snitko Decl. ¶¶ 18-19; Ruiz Decl. ¶¶ 21-22, Gothier Decl. ¶¶ 12-13; May Decl. ¶¶ 20-21; Pearsons Decl. ¶¶ 21-23; Storc. Decl. ¶¶ 20-21). | 167.    Undisputed. |
| 168.    Plaintiffs fear that the government will use these files to investigate them again, that the government may misuse or misplace these files, and that the government may fail to adequately guard their private information from cyberbreaches. (*See* P. Snitko Decl. ¶¶ 19-20; J. Snitko Decl. ¶¶ 18-19; Ruiz Decl. ¶¶ 21-22, Gothier Decl. ¶¶ 12-13; May Decl. ¶¶ 20-21; Pearsons Decl. ¶¶ 21-23; Storc. Decl. ¶¶ 20-21). | 168.    Undisputed. |
| 169.    The government has already described in detail how it used the information it gathered from seizing Plaintiff Joseph Ruiz's box to investigate whether | 169.    Disputed.  There is no page cited to ECF 64-1, which advises that the government conducted a public search and could not locate any insurance |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| the cash seized from his box was connected to criminal activity, including by running his information through various databases. (*See* Zellhart Decl., ECF 64-1; *see also* Ruiz Decl. ¶¶ 15-17). | settlement payment as Joseph Ruiz claimed was the source of the funds in his box.  There was no criminal investigation, as this Fact presupposes. |
| 170.    Plaintiffs feel that the government's retention of records it gathered because of the seizure at USPV is an unwarranted invasion on their privacy, which causes them distress. (P. Snitko Decl. ¶ 17, 19; J. Snitko Decl. ¶ 16, 18; Ruiz Decl. ¶ 21; Gothier Decl. ¶ 12; May Decl. ¶ 20; Pearsons Decl. ¶ 21-22; Storc Decl. ¶ 20). | 170.  Undisputed. |
| 171.    The government has used the information it gleaned and retained from the seizure of USPV boxes to support other, subsequent warrant applications. (*E.g.*, Application for Warrant, *In the Matter of the Search of 621 E. 99th Street, Unit 4, Inglewood, California 90301*, No. 2:21-MJ-03481, ECF 15 at 15 (C.D. Cal. July 27, 2021)). | 171.        Undisputed. |
| 172.    Agents have testified that, absent an order from this Court, the government will retain Plaintiffs' and the broader class' information on an FBI database called Sentinel, a computerized system that "provides capabilities for search and intelligence | 172.  Disputed.  This statement, about agents testifying based on a 2014 website article is not evidence, nor does this Fact purport to set forth any page of the article or anything else that would allow a response. |

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| analysis" and that "can be used to identify connections between cases and patterns of activity." (FBI, *Privacy Impact Assessment for the SENTINEL System* (2014), https://perma.cc/8D9W-YFC5). | |
| 173.     Special Agent Justin Palmerton testified that the case file for USPV exists on a "central server" called Sentinel, and because the FBI tries "not to get rid of anything," information gathered from USPV "would be stored there for a significant period of time"—"for decades, potentially." (Palmerton Decl., ECF 112-18, Ex. J at 715:3-21, 717:23-718:22). | 173. Undisputed. |
| 174.     Special Agent Lynne Zellhart, testifying for the United States as a 30(b)(6) witness, likewise agreed that documents or pictures generated during the seizure of USPV boxes "would be uploaded into Sentinel, where they would remain indefinitely." (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1279:23-1280:3). | 174. Undisputed. |
| 175.     Special Agent Zellhart also testified that the FBI's "general rule" regarding Sentinel allows that government officials will be able to access that information for investigative purposes unless instructed | 175. Undisputed. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Plaintiffs' Statements of Fact and Supporting Evidence | Defendants' Responses and Supporting Evidence |
|---|---|
| otherwise. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1281:15-22; 1282:4-1283:17 ("the information about that box … would be accessible to somebody … who had an investigative need, yes.")). | |
| 176. DEA Special Agent Justin Carlson additionally testified to his belief that the DEA—in addition to the FBI—maintained copies of video recordings of the government's inventorying of USPV boxes. (Carlson Dep. ECF 112-22, Ex. N at 1415:7-13). | 176. Undisputed. |
| 177. Special Agent Carlson further testified that the typical DEA policy is to retain video recordings until they can "have no evidentiary purpose." (Carlson Dep. ECF 112-22, Ex. N at 1417:13-22). | 177. Undisputed. |
| 178. Plaintiffs want to secure assurance that the government will destroy all physical and digital records it acquired in connection with searching the USPV box, or else segregate those records so they can only be used to respond to claims for lost, stolen, or missing property and not for investigative purposes. (P. Snitko Decl. ¶ 20; J. Snitko Decl. ¶ 19; Ruiz Decl. ¶ 22; Gothier Decl. ¶ 13; May Decl. ¶ 21; Pearsons Decl. ¶ 23; Storc Decl. ¶ 21.) | 178. Undisputed that plaintiffs so testified. |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| Defendants' Statements of Fact and Supporting Evidence | Plaintiffs' Responses and Supporting Evidence |
|---|---|
| 1.     The government, through three federal agencies, commenced its criminal investigation of USPV, the business entity, in April 2019. Rodgers Decl.  Ex. GG at 526:17-23; 527:14-528:5; 529:11-19; 530:25-531:3; Ex. FF at 507:21-508:13; 509:1-25.  See also Ex. HH at 551:18-552:23. | 1. Uncontested |
| 2.     Before the USPV investigation began, law enforcement had investigated individual USPV customers, but those investigations had been ineffective at stopping criminal conduct at USPV.  Rodgers Decl. Ex. GG at 528:6-12: Ex. II at 561:4-23. | 2.  Plaintiffs do not dispute that the government viewed investigations of individual USPV customers to have been ineffective.  The evidence does not establish the degree to which the earlier investigations were or were not effective, and Zellhart testified that there were "some good cases, some good individual cases." (Zellhart Dep., ECF 112-19, Ex. K at 875:12–13). |
| 3.     Because the investigation of individual USPV customers was ineffective, the FBI, DEA and USPIS attempted to come up with a strategy to address USPV, the business, as USPV was operating as a money laundering facilitator that attracted, protected and enabled a large number of criminals. Rodgers Decl. Ex. GG at 528:12-529:10; 532:25-535:22; Ex. II at 561:23-562:4. | 3. Plaintiffs do not dispute that the government viewed USPV as a money laundering facilitator.  The cited evidence does not otherwise establish whether USPV attracted or enabled a "large number" of criminals. To the contrary, the government has returned the property of hundreds of box renters, many of whom are members of Plaintiffs' class. (Declaration of Robert Frommer in Support of Joint SOF and Opening Trial Brief, Ex. R ("Govt's Supp. Response to Pls.' Rog #9") at pp. 2-16). And in fact, many customers chose to rent from US Private Vaults for innocuous reasons like convenience. (*E.g.,* P. Snitko Decl., ECF 112-1 at ¶¶ 6-7 (identifying waiting list at bank and |

49

| | |
|---|---|
| | security of establishment as reasons to rent from USPV); J. Snitko Decl., ECF 112-2 at ¶¶ 6-7 (same); Gothier Decl., ECF 112-3 at ¶ 5 (choosing USPV because it was at a convenient location); Ruiz Decl., ECF 112-4 at ¶¶ 6-7 (choosing USPV out of concern of bank closures, plus convenient location); Storc Decl., ECF 112-5 at ¶ 5 (choosing USPV as a secure location outside of home); Pearsons Decl., ECF 112-6 at ¶ 5 (same)). |
| 4.    USPV was a criminal magnet; the company marketed itself to and protected criminals and obstructed law enforcement.  Rodgers Decl. Ex. GG at 536:7-537:5. | 4.  Plaintiffs do not dispute that the government viewed USPV as "a criminal magnet" and that it "marketed itself to and protected criminals and obstructed law enforcement." The cited evidence does not establish the remainder of Defendants' statement of fact. The government has returned the property of hundreds of box renters, many of whom are members of Plaintiffs' class. (Ex. R , Govt's Supp. Response to Pls.' Rog #9 at pp. 2-16). And many customers chose to rent from US Private Vaults for innocuous reasons like convenience. *(E.g.*, P. Snitko Decl., ECF 112-1 at ¶¶ 6-7 (identifying waiting list at bank and security of establishment as reasons to rent from USPV); J. Snitko Decl., Ex. 112-2 at ¶¶ 6-7 (same); Gothier Decl., ECF 112-3 at ¶ 5 (choosing USPV because it was at a convenient location); Ruiz Decl., ECF 112-4 at ¶¶ 6-7 (choosing USPV out of concern of bank closures, plus convenient location); Storc Decl., ECF 112-5 at ¶ 5 (choosing USPV as a secure location outside of home); Pearsons Decl., ECF 112-6 at ¶ 5 (same)). |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| | |
|---|---|
| 5.      During the investigation, the lead criminal agents from their respective agencies, Zellhart, Carlson and Versoza, spoke by telephone about their activities, and the DEA and USPIS conducted field surveillance work and undercover operations while the FBI collected data and drafted the affidavit which would be used to obtain warrants.  Rodgers Decl. Ex. HH at 551:18-552:23; 553:24-554:24; Ex. JJ at 576:14-579:9; 582:19-583:6. | 5.  Uncontested |
| 6.      In 2015, law enforcement agencies learned that criminal investigation targets were employing USPV, a company that rented safe deposit boxes, to store criminal proceeds.  Rodgers Decl. Ex. B ¶¶ 8 and 10 at 59-61. | 6.  Uncontested |
| 7.      By providing and promoting total anonymity, USPV catered to and attracted criminals who sought to keep their identities and cash beyond the reach of banks, the IRS, and law enforcement.  Rodgers Decl. Ex B ¶ 11 and 16-19 at 62, 64-66. | 7. Plaintiffs do not dispute that the government thought USPV "catered to and attracted criminals who sought to keep their identities and cash beyond the reach of banks, the IRS, and law enforcement" by "providing and promoting total anonymity."  The cited evidence does not establish the remainder of Defendants' statement of fact. Plaintiffs will note that the government has returned the property of hundreds of box renters, many of whom are members of Plaintiffs' class. (Govt's Supp. Response to Pls.' Rog #9 at pp. 2-16). And Plaintiffs' declarations demonstrate that they, in fact, chose to rent from US Private Vaults for innocuous reasons like convenience.  (*E.g.*, P. Snitko Decl., |

| | |
|---|---|
| | ECF 112-1 at ¶¶ 6-7 (identifying waiting list at bank and security of establishment as reasons to rent from USPV); J. Snitko Decl., Ex. 112-2 at ¶¶ 6-7 (same); Gothier Decl., ECF 112-3 at ¶ 5 (choosing USPV because it was at a convenient location); Ruiz Decl., ECF 112-4 at ¶¶ 6-7 (choosing USPV out of concern of bank closures, plus convenient location); Storc Decl., ECF 112-5 at ¶ 5 (choosing USPV as a secure location outside of home); Pearsons Decl., ECF 112-6 at ¶ 5 (same)). |
| 8.     USPV's primary pitch to customers was anonymity, as reflected in its website that provided "Complete Privacy; Biometric Identification; No ID Required" and boasted "Our business is one of the very few where we don't even want to know your name.  For your privacy and the security of your assets in our vault, <u>the less we know the better</u>."  Rodgers Decl. Ex. B ¶¶ 11 and 12 at 62 (Emphasis in original). | 8.  Plaintiffs admit that the quoted language appeared on USPV's website, but dispute that USPV's "primary" pitch was anonymity.  Plaintiffs' declarations demonstrate that they, in fact, chose to rent from US Private Vaults for innocuous reasons like convenience. *(E.g.*, P. Snitko Decl., ECF 112-1 at ¶¶ 6-7 (identifying waiting list at bank and security of establishment as reasons to rent from USPV); J. Snitko Decl., Ex. 112-2 at ¶¶ 6-7 (same); Gothier Decl., ECF 112-3 at ¶ 5 (choosing USPV because it was at a convenient location); Ruiz Decl., ECF 112-4 at ¶¶ 6-7 (choosing USPV out of concern of bank closures, plus convenient location); Storc Decl., ECF 112-5 at ¶ 5 (choosing USPV as a secure location outside of home); Pearsons Decl., ECF 112-6 at ¶ 5 (same)). |
| 9.     The above-referenced underscored statement appealed to persons engaged in activities they wished to hide.  Rodgers Decl. Ex. B ¶ 12 at 62. | 9.  Plaintiffs do not dispute that the government thought that the phrase "the less we know the better" would appeal to individuals who were engaging in activities they wished to |

52

| | |
|---|---|
| | hide. The cited evidence does not establish whether the underscored statement, in fact, appealed to such persons. The desire for financial privacy, standing alone, is not criminal, and many customers rented from USPV for reasons other than anonymity. (*E.g.*, P. Snitko Decl., ECF 112-1 at ¶¶ 6-7 (identifying waiting list at bank and security of establishment as reasons to rent from USPV); J. Snitko Decl., Ex. 112-2 at ¶¶ 6-7 (same); Gothier Decl., ECF 112-3 at ¶ 5 (choosing USPV because it was at a convenient location); Ruiz Decl., ECF 112-4 at ¶¶ 6-7 (choosing USPV out of concern of bank closures, plus convenient location); Storc Decl., ECF 112-5 at ¶ 5 (choosing USPV as a secure location outside of home); Pearsons Decl., ECF 112-6 at ¶ 5 (same)). |
| 10.   USPV website posts showed it was marketing its services to criminals and those operating outside the law, by comparing itself to banks and law-abiding financial institutions, in order to hide their money and avoid paying taxes. Rodgers Decl. Ex. B ¶¶ 12-14 and 21 at 62-63 and 76. | 10.  Plaintiffs do not dispute that the government thought that USPV was "marketing its services to criminals and those operating outside the law." But Plaintiffs dispute the truth of this characterization, and its implication that they and hundreds of other class members are suspect simply because they chose to rent from USPV. Again, the government has returned the property of hundreds of box renters, many of whom are members of Plaintiffs' class. And many customers rented from USPV for wholly legitimate reasons.  (*E.g.,* P. Snitko Decl., ECF 112-1 at ¶¶ 6-7 (identifying waiting list at bank and security of establishment as reasons to rent from USPV); J. Snitko Decl., Ex. 112-2 at ¶¶ 6-7 (same); Gothier Decl., ECF 112-3 |

| | |
|---|---|
| | at ¶ 5 (choosing USPV because it was at a convenient location); Ruiz Decl., ECF 112-4 at ¶¶ 6-7 (choosing USPV out of concern of bank closures, plus convenient location); Storc Decl., ECF 112-5 at ¶ 5 (choosing USPV as a secure location outside of home); Pearsons Decl., ECF 112-6 at ¶ 5 (same)). |
| 11.    In one post USPV stated "As government chartered institutions, banks are now required to file 'suspicious activity reports.' . . . U.S. Private Vaults is not subject to federal banking laws and would only cooperate with the government under court order." Rodgers Decl. Ex. B ¶ 14 at 63. | 11.  Uncontested. |
| 12.    In addition, USPV charged customers a premium for its service because, unlike legitimate banks, it offered anonymity, assistance in avoiding law enforcement, money laundering services, a willingness to look the other way regarding criminal conduct and a place to store illegally obtained cash. Rodgers Decl. Ex. B ¶¶ 22 and 27 at 67 and 78. | 12. Plaintiffs do not dispute that the government thought that USPV charged a premium for its service because, among other things, "it offered anonymity, assistance in avoiding law enforcement, money laundering services, a willingness to look the other way regarding criminal conduct and a place to store illegally obtained cash." The cited evidence does not establish the truth or falsity of whether USPV's charges were due to anonymity versus other features such as location, hours, and availability to rent without a waitlist. Moreover, the desire for financial privacy, standing alone, is not criminal. This statement runs counter to the fact that the government returned the property of hundreds of box renters, including Plaintiffs. (Ex. R, Govt's Supp. Response to Pls.' Rog #9 at pp. 2-16). Moreover, as Plaintiff Paul Snitko declared, he rented from USPV after learning his bank did not have a |

| | |
|---|---|
| | safe-deposit box available. (*E.g.*, P. Snitko Decl., ECF 112-1 at ¶ 6.] |
| 13.    Mark Paul, USPV's owner and founder, told a cooperating witness that USPV's best customers were "bookies," "prostitutes" and "weed guys[,]" told a CI in November 2019 that about one-third of USPV's business came from the cannabis industry and told a CI in December 2019 "you don't want every drug dealer in your place either.  You need normal people too," thus suggesting USPV needed to attract some non-criminal clientele to avoid being an obvious haven for criminals. Rodgers Decl. Ex. B ¶¶ 21, 27 and 29a at 76, 78-80. | 13. Plaintiffs do not dispute that Mr. Paul made the quoted statements. But the government returned the property of hundreds of box renters, including Plaintiffs, showing the massive overreach caused by the government's blanket seizure of the contents of every safe-deposit box. However, Mr. Paul's statements are irrelevant to the underlying legal issue in this case, which asks whether the government violated the Fourth Amendment rights of Plaintiffs and the broader class. Insofar as the statements are relevant, they demonstrate that the government knew it would not be justified in seizing the contents of every safe-deposit box because most USPV customers had no connection to criminal activity. |
| 14.    On December 17, 2019, Michael Poliak, who became a USPV co-owner of in 2019, told a CI that before he became an owner, USPV made no money, with two thirds of its boxes empty, but now they were 60-63% full and revenues had increased from $3,000 to $30,000 monthly from referrals he obtained by calling marijuana lawyers, and USPV intended to expand. Rodgers Decl. Ex. B ¶¶ 9b, 29, 29a, 29d at 59-60, 79-81. | 14. Plaintiffs do not dispute that Mr. Poliak made the quoted statements. However, Mr. Poliak's statements are irrelevant to the underlying legal issue in this case, which asks whether the government violated the Fourth Amendment rights of Plaintiffs and the broader class. |
| 15.    In July 2019 and while at USPV, USPV's manager showed a confidential informant ("CI") USPV's security monitors and pointed out a number of vehicles the manager believed belonged to law enforcement and in the area because of the CI.  Rodgers Decl. Ex. B | 15. Plaintiffs do not dispute this statement of fact, but believe it is irrelevant to the underlying legal issue in this case, which asks whether the government violated the Fourth Amendment rights of Plaintiffs and the broader class. |

| | |
|---|---|
| ¶¶ 9c and 98 at 60, 130. | |
| 16. While at USPV, USPV's manager on August 9, 2019 instructed a CI on how to structure a cash purchase of gold. Rodgers Decl. Ex. B ¶¶ 83 and 85-88 at 110-115. | 16. Plaintiffs do not dispute this statement of fact, but believe it is irrelevant to the underlying legal issue in this case, which asks whether the government violated the Fourth Amendment rights of Plaintiffs and the broader class. |
| 17. While at USPV and on January 13, 2020, another USPV principal instructed a CI on how to structure a jewelry purchase. Rodgers Decl. Ex. B ¶¶ 83 and 85-88 at 110-115. | 17. Plaintiffs do not dispute this statement of fact, but believe it is irrelevant to the underlying legal issue in this case, which asks whether the government violated the Fourth Amendment rights of Plaintiffs and the broader class. |
| 18. While at USPV and on January 28, 29 and February 25, 2020, USPV principals had similar structuring conversations, including structuring regarding currency derived from methamphetamine sales. Rodgers Decl. Ex. B ¶¶ 83 and 85-88 at 110-115. | 18. Plaintiffs do not dispute this statement of fact, but believe it is irrelevant to the underlying legal issue in this case, which asks whether the government violated the Fourth Amendment rights of Plaintiffs and the broader class. |
| 19. During surveillance at USPV between February 1, 2020 and February 26, 2021, agents identified many USPV customers who were likely engaged in criminal activity and storing criminal proceeds or evidence of crimes at USPV. Rodgers Decl. Ex. B, ¶ 20j at 74. | 19. Plaintiffs do not dispute that agents identified many USPV customers, but the cited evidence does not establish whether those customers "were likely engaged in criminal activity" or were "storing criminal proceeds or evidence of crimes at USPV." To the extent that the government believed those persons were violating the law, it should have sought and obtained search and/or seizure warrants based on an individualized determination of probable cause. Ultimately, Plaintiffs believe this fact is irrelevant to the underlying legal issue in this case, which asks whether the government violated the Fourth Amendment rights of Plaintiffs and the broader class by seizing all of their property wholesale. |

| | |
|---|---|
| 20.    Officers seized and forfeited 400 silver coins and 26 silver bars found September 9, 2015; $500,000, 22 gold bars and 15 gold coins seized in October 2015; $200,100 seized November 3, 2015; $1,543,400 seized in November 2015; $592,450 and $435,190 seized in September 2016 and used to pay restitution to victims; $101,080 and 26 gold bars seized March 6, 2018; and $1,448,700 seized in July 2019.  Rodgers Decl. Ex. B ¶ 20j at 74, and ¶ 20a-i at 68-74. | 20. Uncontested, but irrelevant to the underlying legal issue in this case. |
| 21.    In the summer of 2020, criminal investigative agents and the criminal major frauds AUSA who would present the matter to the grand jury discussed indicting USPV and obtaining warrants as to it.  Rodgers Decl. Ex. II at 563:6-564:15. | 21. Uncontested. |
| 22.    No asset forfeiture agent was involved in the discussions, as conversations with asset forfeiture agent Murray, the agent in the FBI Los Angeles field office involved in civil administrative asset forfeiture, occurred later in the summer or fall of 2020. Rodgers Decl. Ex. II at 565:14-16; 566:3-12. | 22. Plaintiffs cannot contest this statement of fact, as Defendants repeatedly instructed witnesses not to answer questions about those conversations pursuant to the attorney-client privilege. Also, Supervisory Special Agent Murray testified that she spoke with FBI Special Agent in Charge Matt Moon in the "summer of 2020." As part of determining "what agency was going to lead the seizure of assets in the case," SAC Moon asked Murray if "the Los Angeles asset forfeiture unit was capable of handling a possible large-scale seizure." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1524-25). |
| 23.    In the fall of 2020, the FBI forfeiture agent first became involved in discussions with criminal | 23. Plaintiffs partially dispute the timing concerning this statement of fact, but do not believe any such |

| | |
|---|---|
| investigating agents, and spoke with her supervisor before the discussion. Rodgers Decl. Ex. KK at 586:25-587:19; 589:19-591:25 and 82:9-14; Ex. II at 565:17-23. | dispute to be material. Plaintiffs note that Supervisory Special Agent Murray testified that she spoke with FBI Special Agent in Charge Matt Moon in the "summer of 2020." As part of determining "what agency was going to lead the seizure of assets in the case," SAC Moon asked Murray if "the Los Angeles asset forfeiture unit was capable of handling a possible large-scale seizure." (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1524-25). |
| 24.    The asset forfeiture agent, who was not involved in the criminal USPV investigation, decided she would need to see the final affidavit before concluding there was probable cause to seize assets in boxes to pursue FBI administrative forfeiture.  Rodgers Decl. Ex. KK at 588:22-581:13; 592:19-593:14. | 24. Uncontested. |
| 25.    Upon reviewing a draft of the affidavit in February 2021 or some time later but before the March 2021 takedown, the asset forfeiture agent decided that probable cause existed to seize assets within boxes at USPV, but the agent did not know what was inside any of the boxes.  Rodgers Decl. Ex. KK at 594:14-595:12 and 596:7-16. | 25. Uncontested. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1535:7-12 (stating that, "[h]aving evaluated the seizure warrant affidavit, the finalized version that was going to be presented to the magistrate, I made a determination that there was probable cause to proceed on assets seized in the investigation from U.S. Private Vaults"); *id.* at 1537:14-16 (stating that she "determined that there was probable cause to seize the assets of U.S. Private Vaults and the contents of the boxes at that location"); *id.* at 1562:11-17 (stating that the government "initiated civil administrative forfeiture against all of the boxes that met the minimum monetary threshold")). |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| | |
|---|---|
| 26.    FBI administrative forfeiture proceedings against specific assets were commenced on May 20, 2021, sixty days after the commencement of the warrants' execution on March 20, 2021, by the FBI sending a notice letter dated May 20, 2021 to USPV. Rodgers Decl. Ex. J at 328-346. | 26. Uncontested, although Defendants' statement of fact fails to state that, by the time of the March 22, 2021 warrant execution at US Private Vaults, the government had already decided to pursue administrative forfeiture against every box with contents that exceeded the government's minimum monetary threshold. (Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1535:7-12 (stating that "[h]aving evaluated the seizure warrant affidavit, the finalized version that was going to be presented to the magistrate, I made a determination that there was probable cause to proceed on assets seized in the investigation from U.S. Private Vaults"); *id.* at 1562:1-9 (testifying that "[w]e had already determined that there was probable cause to move forward and the factor whether or not it was going to our shop versus evidence was if it met the minimum monetary threshold")). This statement of fact also fails to note that the government sought to forfeit these boxes despite knowing that many of them were not connected to criminal activity. (Zellhart Dep., ECF 112-19, Ex. K at 888:2–5 (describing evidence that many "normal people" rented USPV boxes)) |
| 27.    On March 9, 2021, the grand jury returned an indictment against USPV, charging USPV with a conspiracy to launder money, distribute controlled substances and structure financial transactions, and reflected the grand jury's finding that probable cause existed to forfeit USPV's business | 27. Uncontested |

59

| | |
|---|---|
| equipment.   Rodgers Decl. Ex. F. | |
| 28.    The indictment provided that USPV's business was predicated on "attract[ing] customers in possession of proceeds from criminal offenses" which it did by "touting the anonymity of the safety deposit rentals" and "boasting that, unlike banks, its anonymous safety deposit box rentals did not require customer information that 'can be easily accessed by government agencies (such as the IRS)[.]'"  Rodgers Decl. Ex. F ¶ 3a at 277. | 28. Uncontested that the indictment makes these characterizations, but the evidence cited here and elsewhere does not establish the characterizations about whether USPV's business was "predicated" on certain things. Other evidence shows that customers chose USPV for a variety of reasons, including location, convenience, availability without a waitlist, and privacy. (*E.g.*, P. Snitko Decl., ECF 112-1 at ¶¶ 6-7 (identifying waiting list at bank and security of establishment as reasons to rent from USPV); J. Snitko Decl., Ex. 112-2 at ¶¶ 6-7 (same); Gothier Decl., ECF 112-3 at ¶ 5 (choosing USPV because it was at a convenient location); Ruiz Decl., ECF 112-4 at ¶¶ 6-7 (choosing USPV out of concern of bank closures, plus convenient location); Storc Decl., ECF 112-5 at ¶ 5 (choosing USPV as a secure location outside of home); Pearsons Decl., ECF 112-6 at ¶ 5 (same)). And the government has returned the property of hundreds of box renters, many of whom are members of Plaintiffs' class. (Govt's Supp. Response to Pls.' Rog #9 at pp. 2-16, Ex. R). |
| 29.    The indictment also noted that USPV conspired with others to launder money, and alleged acts between 2019 and November 2020, including December 2019 structuring and cocaine transactions.  Rodgers Decl. Ex. F at ¶¶ 1-11 at 275-284. | 29. Uncontested |
| 30.    Agent Zellhart prepared an "Operation Order Search Plan" and "Supplemental Instructions on Box | 30. Uncontested |

| | |
|---|---|
| Inventory," dated March 12, 2021, and discussed them with agents in meetings held one week before the search. Rodgers Decl. Exs. GG at 541:12-542:23, G and H. | |
| 31.   The operation order search plan noted USPV was a "hub of criminal activity" "knowing facilitator" of money laundering and "safe harbor for criminal conduct of every kind." Rodgers Decl. Ex. G at 292. | 31. Uncontested that the government made these statements about USPV in its operation order search plan. |
| 32.   The supplemental inventory instructions comported with the FBI Domestic Investigations and Operations Guide's ("DIOG") inventory policy, stating agents would "search and inventory all boxes according to FBI policies and procedures," and process box contents "as described in this memo[.]" Rodgers Decl. Ex. H at 305; Ex. II at 559:7-560:17; Exs. GG at 523:17-19; 524:11-14: 525:3-19. | 32. Contested.  Plaintiffs dispute that the "Supplemental Instructions for Box Inventory" comported with the requirements of the FBI's DIOG inventory policy or the limits of Magistrate Judge Kim's warrant. That warrant, for instance, stated that it "does not authorize a criminal search or seizure of the contents of the safety deposit boxes," (USPV Seizure Warrant, ECF 112-13, Ex. E at 289), but the government admitted it had agents collect information asked for by the Supplemental Instructions for potential use in civil forfeiture proceedings. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1218:12–16; *see also* Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1547:19–1548:2 (agreeing that the government wanted this information because it "could be probative later on regarding whether—you think there's probable cause to think this is forfeitable currency")). In addition, although the DIOG requires that the inventory "must include, but is not limited to, a description of the property and the items secured for safekeeping," (DIOG, ECF 112-15, Ex. G at 527), the government admitted that |

| | |
|---|---|
| | "the United States didn't have anything in the supplemental instructions advising inventorying agents about how to do those kinds of counts," stating that the issue "was not addressed" (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1252:2–9). The government's 30(b)(6) designee who wrote the Supplemental Instructions testified that "I don't think there's a policy" as to how detailed an inventory description should be. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1249:24–1250:9, 1251:16–25).  In fact, that designee did not even look at the DIOG when drafting the Supplemental Instructions for Box Inventory.  (Zellhart Dep., ECF 112-19, Ex. K at 847:13–17).  Nor could that designee recall ever having conducted an inventory apart from the one at USPV. (Zellhart Dep., ECF 112-19, Ex. K at 827:10–19; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1220:7-12). |
| 33.    The supplemental inventory instructions explained how agents should handle and inventory cash, non-cash valuables, digital currency, firearms, drugs and hazardous items, directing agents to create an "inventory list" for each box "bagg[ing . . . [and] label[ing]" the inventoried items and completing a FD-597 (receipt of property), FD-886 (evidence log), FD-1004 (chain of custody) and FD-302. Rodgers Decl. Ex. H at 306-308. | 33. Uncontested that the supplemental instructions contain statements like those contained in the statement of fact. But the supplemental instructions also tell agents to collect evidence that the government admits it wanted to collect for potential use in civil forfeiture proceedings. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1218:12–16; *see also* Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1547:19–1548:2). Nor do those supplemental instructions provide any detail as to how agents should create that "inventory list." (*See* Supplemental Instructions, ECF 112-12, Ex. D at 281-85). That is in part because Special Agent Zellhart, the |

| | |
|---|---|
| | lead investigative agent, did not even look at the DIOG when drafting the Supplemental Instructions for Box Inventory.  (Zellhart Dep., ECF 112-19, Ex. K at 847:13–17). |
| 34.    The supplemental inventory instructions told agents to note "if the box includes a USPV notification form identifying a contact person for the box.  Bag and tag the contents form.  Agents cannot search the contents of boxes for evidence, but may examine the contents to identify the box owner."  Rodgers Decl. Ex. H at 306. | 34. Uncontested that the supplemental instructions contain statements like those contained in the statement of fact.  But the supplemental instructions explicitly tell agents to search the boxes for evidence, as the government admitted wanting that evidence for potential use in civil forfeiture proceedings. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1218:12–16; *see also* Murray 30(b)(6) Dep., ECF 112-23, Ex. O at 1547:19–1548:2).  Moreover, although the government promised that its inventory would "extend no further than necessary to determine ownership," (Warrant Application, ECF 112-14, Ex. F at 502 n.40), agents regularly continued their search of USPV boxes after encountering executor letters. (Palmerton Dep., ECF 112-18, Ex. J at 701:2-7; *see also, e.g.*, Inventory Records, ECF 112-9, Ex. A at 44, 145, 177, 224, 247). |
| 35.    In March 2021, the government submitted a common affidavit with separate applications for search and seizure warrants as to USPV's business equipment (i.e., USPV's business computers, money counters, nests of safety deposit boxes, digital and video surveillance and security equipment and biometric scanners).  Rodgers Decl. Exs. B and D. | 35. Uncontested |
| 36.    The applications contained the language in the attachments to the | 36. Uncontested |

| | |
|---|---|
| search warrant (Attachment B) and seizure warrant (Attachment) regarding the business equipment that the magistrate judge adopted without change in issuing them.  Rodgers Decl. Exs. A at 32-33; B at ¶ 1k at 45-46; C at 163; and D at 165. | |
| 37.    The warrant attachments to the issued search warrant and seizure warrant both provide:  This warrant does not authorize a criminal search or seizure of the contents of the safety deposit boxes.  In seizing the nests of safety deposit boxes, agents shall follow their written inventory policies to protect their agencies and the contents of the boxes.  Also in accordance with their written policies, agents shall inspect the contents of the boxes in an effort to identify their owners in order to notify them so that they can claim their property.  Rodgers Decl. Ex. A at 32-33; Ex. C at 163. | 37. Uncontested |
| 38.    Paragraph 108 of the common affidavit the government submitted with its separate application for a search, and application for a seizure warrant, provides as follows:  The search and seizure warrants the government seeks list the nests of safety deposit boxes at USPV among the items to be seized.  These nests of safety deposit boxes are evidence and instrumentalities of USPV's criminality.  The warrants authorize the seizure of the nests of the boxes themselves, not their contents.  By seizing the nests of safety deposit boxes, the government will necessarily end up with custody of what is inside | 38. Uncontested |

| | |
|---|---|
| those boxes initially.  Agents will follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner.  Agents will attempt to notify the lawful owners of the property stored in the boxes how to claim their property, such as by posting that information on the internet or at USPV itself, or by contacting the owners directly.  In order to notify the owners directly, agents will, in accordance with their policies regarding an unknown person's property, look for contact information or something which identifies the owner.  (footnote omitted).  (USPV recommends that box renters include their or their designees' telephone numbers on a note in the box in the event that USPV removes the contents for nonpayment of rental fees.) Rodgers Decl. Ex. B ¶ 108 at 137-38. | |
| 39.    The omitted footnote referenced above provides "The FBI policy regarding taking custody of an unknown person's property provides, in part, that agents 'inspect the property as necessary to identify the owner and preserve the property for safekeeping.' The inspection 'should extend no further than necessary to determine ownership.'"  Rodgers Decl. Ex. B ¶ 108 at 137-38. | 39. Uncontested |
| 40.    Hundreds of officers were at USPV between March 22 and 26, 2021, while officers executed the warrants. Rodgers Decl. Ex. FF at 510:2-511:22. | 40. Uncontested |
| 41.    Agents prepared written inventory documents for about 700 | 41. Uncontested, although Plaintiffs dispute whether the resulting |

| | |
|---|---|
| boxes during the inventory between March 22 and 26, 2021.  Rodgers Decl. Ex. GG at 545:1-11. | documents can reasonably be described as "inventories" for many boxes. |
| 42.     Section 18.6.12.4.1 of the DIOG provides: As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents.  A written summary showing the results of the inventory must be recorded in an FD-302, an FD-597 ("Receipt for Property"), or an FD-653 ("Motor Vehicle Inspection Inventory Record").  The written summary must include, but is not limited to, a description of the property and the items secured for safekeeping. Agents must provide receipts for all items retrieved during inventory searches.  Agents should also memorialize facts pertinent to other activities undertaken during the inventory process, such as an interview (i.e., FD-302), or a non-inventory-related search conducted and any evidence collected (i.e., FD-1087, "Collected Evidence Log" [Sentinel]) that are relevant to the investigation.                   *                          *            * Agents may not perform inventory searches solely for investigative purposes.  Whenever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible.  Searches conducted pursuant to a warrant are | 42. Uncontested |

| | |
|---|---|
| presumptively valid.  Obtaining a search warrant eliminates any later argument that the inventory search was conducted solely for investigative purposes and thus unjustified.  Rodgers Decl. Ex. E at 273-74. | |
| 43.     Agents encountered many executor notification letters during the inventory.  While the executor notification letters helped to identify owners, multiple situations existed where agents found photographs of driver's license and passports with different names and letters from prior box renters, so while the letters were a great starting point for identifying box owners, it was not the last word on the subject.  Rodgers Decl. Ex. GG at 543:24-544:1. | 43. Plaintiffs do not contest that agents encountered many executor letters during the inventory. Per the government's warrant application, its search should have ended there, as it promised that its inventory would "extend no further than necessary to determine ownership." (Warrant Application, ECF 112-14, Ex. F at 502 n. 40). Indeed, agents noted that, in returning property, they have typically used the renter's key to verify ownership, thereby showing there was no need to continue further. (Palmerton Dep., ECF 112-18, Ex. J at 723:24-24:2 (agreeing that "having the key was an important part of getting property back")). Plaintiffs also contest the government's characterization that it used the letters as a "starting point for identifying box owners" at all, as numerous video recordings show agents opening and examining the contents of boxes before bothering to examine executor letters affixed to the outside of the box. (*E.g.*, Inventory Videos, ECF 112-10, Ex. B.5 at 0:30, 3:30-4:00; Ex. B.7 at 0:20; 1:00-1:25). |
| 44.     If an executor letter was found, the inventory policy, requiring a "thorough search of the contents of property, including searching any locked or unlocked containers and inventorying the contents," still required agents to continue the | 44. Plaintiffs do not contest that agents continued searching class members' boxes after encountering executor letters during an inventory. This was contrary to the government's warrant application, which promised that its inventory would "extend no further |

| | |
|---|---|
| inventory and "everything still needs to be bagged and tagged and processed according to our evidence procedures, with all of the redundancies and paperwork." Rodgers Decl. Ex. GG at 544:2-15; and Ex. FF at 514:23-518:21. | than necessary to determine ownership." (Warrant Application, ECF 112-14, Ex. F at 502 n. 40). Indeed, agents noted that, in returning property, they have typically used the renter's key to verify ownership, thereby showing there was no need to continue further. (Palmerton Dep., ECF 112-18, Ex. J at 723:24-24:2 (agreeing that "having the key was an important part of getting property back")). |
| 45.    Plaintiffs Michael Storc and Jeni Verdon-Pearsons' executor notification letter that agents found in their USPV box number 4301 is dated September 9, 2017.  Rodgers Decl. Ex. U at 412-413. | 45. Uncontested |
| 46.    Plaintiff Travis May's executor notification letter that was taped to his USPV box number 713 when agents conducted the inventory is dated July 29, 2017.  Rodgers Decl. Ex. W at 421-22. | 46. Uncontested |
| 47.    Plaintiffs Paul and Jennifer Snitko's executor notification letter that Paul Snitko taped to their USPV box number 7701 is dated April 26, 2017. Rodgers Decl. Ex. N at 371-372. | 47. Uncontested |
| 48.    Plaintiffs' remaining claims in their first amended complaint ("FAC") are their class claim in Count I under the Administrative Procedure Act, Declaratory Judgments Act and Constitution alleging that the government's search violated the Fourth Amendment, and their individual claim in Count VII under Fed. R. Crim. P. 41(g) and the Court's equitable power for return of property that seeks the return the individual plaintiffs' seized property.  ECF 33 [FAC] ¶¶ 1, 2, 152-171, 231-241 and | 48. Uncontested |

| | |
|---|---|
| ¶ L at 52:4-8. | |
| 49.    All of the individual plaintiffs' admit that their property has been returned, except plaintiffs Michael Storc and Jeni Verdon-Pearsons who assert that $2,000 was in their USPV box that has not been returned and plaintiffs Travis May and Joseph Ruiz who admit that substitute funds in an amount equaling or exceeding the funds in their box have been returned but the actual bills stored inside their box have not.  Rodgers Decl., Exs. M at 361:10-362:12; Ex. P at 377:23-378:19; Ex. X at 425-426; Ex. Y at 430-433; Ex. S at 398:2-15; Ex. T at 404:16-405:8; 407:23-408:7; Ex. V at 417:9-418:10;. | 49. Uncontested, although Plaintiffs are still aggrieved by the government's continued retention of their personal information, including information regarding the contents of their safe-deposit boxes and other information obtained only due to the fact that the government ignored the limits of its seizure warrant at US Private Vaults. *(E.g.*, P. Snitko Decl. at ¶ 19 (stating that retention of personal records has caused him "severe distress"); J. Snitko Decl. at ¶ 16; Gothier Decl. at ¶ 12 ("knowing that anonymous government agents have knowledge of and access to my personal details is a significant invasion of my privacy"); Ruiz Decl. at ¶ 21 (stating that the government's retention of his records is "extremely troubling" given that the government had "already used that information once to investigate me, accuse me of criminal wrongdoing, and cast shade on my name")). |
| 50.    Section 4.1.1(E) of the DIOG section titled Privacy And Civil Liberties, And Least Intrusive Methods (the "LIM") provides:<br><br> Employ the least intrusive means that do not otherwise compromise FBI operations.<br> Assuming a lawful intelligence or evidence collection objective (i.e., an authorized purpose), strongly consider the method (technique) employed to achieve that objective that is the least intrusive available (particularly if there is the potential to  . . . intrude on privacy) while still being operationally | 50. Uncontested |

69

| | |
|---|---|
| sound and effective.  Rodgers Decl. Ex. Ex. I at 309, 323, 326. | |
| 51.     Section 4.4.1 of the LIM provides "[t]his [LIM] principle is not intended to discourage FBI employees from seeking relevant and necessary information, but rather is intended to encourage investigators to choose the least intrusive-but still reasonable-means from the available options to obtain the information."  Rodgers Decl. Ex. I at 309, 323, 326. | 51. Uncontested that this accurately reflects Section 4.4.1 of the LIM contained in the DIOG.  But Plaintiffs dispute that the sort of information sought by the government, including drug-dog sniffs and information regarding the sight and smell of any currency, was "relevant and necessary information," as its purpose was to facilitate the use of civil forfeiture, not reuniting box renters with their property. (*See, e.g*, Versoza Dep., ECF 112-20, Ex. L at 1153:22-1154:12 (admitting that drug dog alert on currency does not help identify the owner or forestall claims of theft and loss)). Likewise, the "Agent Observations and Notes" form had no place to record information that would be used to defend against claims of theft and loss. (Agent Observations and Notes, ECF 112-25, Ex. Q at 1627). Indeed, Inspector Versoza characterized "the seizure warrant is just -- it's not the end of it, it's just another tool in our gathering of -- of evidence." (Versoza Dep., ECF 112-20, Ex. L at 1128:16-19). |
| 52.     Section 4.4.5 of the LIM provides "[i]n the final analysis, choosing the method that must [sic] appropriately balances the impact on privacy and civil liberties with operational needs, is a matter of judgment, based on training and experience."  Rodgers Decl. Ex. I at 309, 323, 326. | 52. Uncontested that this accurately reflects Section 4.4.5 of the LIM contained in the DIOG. |
| 53.     Agents considered alternatives to seizing the nests of safety deposit | 53. Uncontested that the agents considered some alternatives to seizing |

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS

| | |
|---|---|
| boxes, including nuisance abatement and the FBI taking over USPV, but concluded those were not feasible and less effective than seizing USPV's business equipment and immediately terminating USPV's operations. Rodgers Decl. Ex. GG at 128:14-129:13;130:6-24. | the nest, although Plaintiffs dispute the seriousness with which these alternatives were considered. Inspector Versoza testified, for instance, that the government did "not really" consider alternatives to executing the seizure warrant. (Versoza Dep., ECF 112-20, Ex. L at 1132:19–1133:2).  He explained that when planning to execute the USPV seizure warrant, they "were working on orders above us," meaning instructions from the U.S. Attorney's Office or management of the FBI. (Versoza Dep., ECF 112-20, Ex. L at 1135:10–25) And Special Agent Zellhart testified that the government did not consider the option of appointing a receiver to wind down USPV's operations and return box holders' property without the need to search the boxes. (Zellhart Dep., ECF 112-19, Ex. K at 899:9–13; Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1230:20–24). |
| 54.    Agents found firearms, ammunition and fentanyl in boxes during the inventory at USPV.  Zellhart Decl. ¶ 6; Exs. DD and EE. | 54. Uncontested that agents found the items described here. The government has also admitted that it has returned the contents of about 430 safe-deposit boxes. (Zellhart 30(b)(6) Dep., ECF 112-21, Ex. M at 1268:4-13; 1271:9-13). |
| 55.    None of the plaintiffs who have claimed they are fearful of a cyber breach have any evidence that there has been any cyber breach of any of the inventory records.  Rodgers Decl. Ex. Ex. M at 364:8-19; 365:13-366:2; Ex. P at 380:18-381:14; Ex. R at 392:2-13. | 55. Plaintiffs do not contest that they do not have evidence of a cyber breach, but would note that they would have no way to determine if any such cyber breach occurred. |
| 56.    None of the plaintiffs who claim to be fearful that a rogue agent may misuse the inventory information, are | 56. Plaintiffs do not contest that they do not have evidence of rogue agents accessing or misusing their inventory |

| | |
|---|---|
| aware of any facts that a rogue agent has leaked any information or used the information from the inventory to publicly shame them or to share it with plaintiffs' business or political rivals. Rodgers Decl. Ex. M at 364:8-19; 365:13-366:2; Ex. P at 380:18-381:14; Ex. R at 392:2-13 | information, but would note that they would have no way to determine if any such misuse occurred. |
| 57.    None of the plaintiffs have any personal knowledge of the government conducting a criminal investigation against them as a result of the knowledge it gained from the contents of their box.  Rodgers Dec. Ex. M at 364:8-19; 365:13-366:2; Ex. P at 380:18-381:14; Ex. R at 392:2-13. | 57. Plaintiffs dispute this statement of fact. The government has already described in detail how it used the information it gathered from seizing Plaintiff Joseph Ruiz's box to investigate whether the cash seized from his box was connected to criminal activity, including by running information obtained from Ruiz as part of the claim process through various databases. (*See* Zellhart Decl., ECF 64-1; <u>see also</u> Ruiz Decl. ¶¶ 15-17 (describing experience of being investigated), 21 (stating that he is worried, based on government's prior actions that it "may do so again"). |
| 58.    None of the plaintiffs have any personal knowledge that the government intends in the future to conduct a criminal investigation against them as a result of the knowledge it gained from the contents of their box. Rodgers Dec. Ex. Ex. M at 364:8-19; 365:13-366:2; Ex. P at 380:18-381:14; Ex. R at 392:2-13. | 58. Plaintiffs do not contest that they do not have evidence that the government may intend to criminally investigate them in the future, but would note that they would have no way to determine if such an investigation was occurring. |
| 59.    According to plaintiffs Paul and Jennifer Snitko's answers to the government's interrogatories, each of them will suffer the exact same harm if the defendants' are allowed to retain the inventory records created during the search at USPV.  Rodgers Decl. Ex. Z at 434. 437 and Ex. AA at 441, 443- | 59. Uncontested that Paul and Jennifer Snitko, a married couple, both stated the following when asked to state "all facts to support your contention that you have suffered harm as a result of defendant's retention of records created during the search at USPV": |

| | |
|---|---|
| 444to Interrog. No. 14). | RESPONSE: Like all Americans, I have a right to not have the government seize and hold private information concerning my affairs in violation of the Fourth Amendment. I am injured because the government is retaining information that it has no right to possess and may use that information for its criminal investigative purposes. Knowing that the government has copies of very personal information about my family and me—and seems to want to retain that information forever—is very emotionally distressing. My mind races at the improper uses the government may make of that information: Will they use it to criminally investigate me again? Will a rogue agent use it to publicly shame me, or share it with business or political rivals? What if the records are lost, mishandled, or subject to a cyberbreach? These possibilities cause me severe distress. The government should not have these records at all because they are the result of an illegal intrusion into my privacy. The government's initial violation of my privacy and investigation of me shook me to my core. I shudder every day at the thought that the government will use what it learned from that improper search and investigation against me in some way in the future. |
| 60.    According to plaintiffs Michael Storc and Jeni Verdon-Pearsons' answers to the government's interrogatories, each of them will suffer the exact same harm if the defendants' are allowed to retain the inventory records created during the search at | 60. Uncontested that Michael Storc and Jeni Verdon-Pearsons, a married couple, both stated the following when asked to state "all facts to support your contention that you have suffered harm as a result of defendant's retention of |

| | |
|---|---|
| USPV.  Rodgers Decl. Ex. BB at 448, 450-51 and Ex. CC at 455, 457-58. | records created during the search at USPV":<br><br>RESPONSE: Like all Americans, I have a right to not have the government seize and hold private information concerning my affairs in violation of the Fourth Amendment. I am injured because the government is retaining information that it has no right to possess and may use that information for its criminal investigative purposes. I am deeply worried about the government's continued retention of records created during its search and seizure of my safe-deposit box at USPV because I have no way of knowing to what the government will use those records for and what the downstream consequences for me will be. The government already conducted a criminal investigation into me and sought to civilly forfeit my legally obtained property after it illegally searched and seized my safe-deposit box. I am a law-abiding citizen, but the government's investigating me was a very scary process. I am fearful that the government will use the records it is retaining—that it never should have obtained in the first place—to wrongfully subject me to investigation all over again. |

Dated: August 9, 2022                    Respectfully Submitted,

                                         /s/ Robert Frommer

                                         **THE INSTITUTE FOR JUSTICE**
                                         Robert Frommer*
                                         rfrommer@ij.org
                                         Michael Greenberg*
                                         mgreenberg@ij.org
                                         Joseph Gay*
                                         jgay@ij.org
                                         901 N. Glebe Rd., Suite 900
                                         Arlington, VA 22203
                                         Tel. (703) 682-9320

                                         Robert E. Johnson*
                                         rjohnson@ij.org
                                         16781 Chagrin Blvd., Suite 256
                                         Shaker Heights, OH 44120
                                         Tel. (703) 682-9320

                                         *Admitted pro hac vice.

                                         **THE VORA LAW FIRM, P.C.**
                                         Nilay U. Vora (SBN 268339)
                                         nvora@voralaw.com
                                         Jeffrey Atteberry (SBN 266728)
                                         jatteberry@voralaw.com
                                         201 Santa Monica Blvd., Suite 300
                                         Santa Monica, CA 90401
                                         Tel. (424) 258-5190

                                         *Attorneys for Plaintiffs*

75

Dated: August 9, 2022

Respectfully Submitted,

**STEPHANIE S. CHRISTENSEN**
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_____/s/ Victor A. Rodgers_____

ANDREW BROWN
VICTOR A. RODGERS
MAXWELL COLL
Assistant United States Attorneys

Attorneys for Defendants
UNITED STATES OF
AMERICA and
TRACY L. WILKISON and
KRISTI KOONS JOHNSON IN
THEIR OFFICIAL CAPACITY
ONLY

In compliance with Local Rule 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed, on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED: August 9, 2022

By: ___/s/ Robert Frommer_____
Robert Frommer
Attorney for Plaintiffs

JOINT STATEMENT OF CONTESTED AND UNCONTESTED FACTS