**THE INSTITUTE FOR JUSTICE**
Robert Frommer*
rfrommer@ij.org
Michael Greenberg*
mgreenberg@ij.org
Joseph Gay*
jgay@ij.org
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

* Admitted pro hac vice.

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Tel. (424) 258-5190

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **PAUL SNITKO, JENNIFER SNITKO, JOSEPH RUIZ, TYLER GOTHIER, JENI VERDON-PEARSONS, MICHAEL STORC, and TRAVIS MAY,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, TRACY L. WILKISON, in her official capacity as Acting United States Attorney for the Central District of California, and KRISTI KOONS JOHNSON, in her official capacity as an Assistant Director of the Federal Bureau of Investigation,**<br><br>Defendants. | Case No. 2:21-cv-04405-RGK-MAR<br><br>**PLAINTIFFS' REPLY BRIEF PURSUANT TO COURT'S ORDER OF NOVEMBER 12, 2021**<br><br><br><br>Judge: Hon. R. Gary Klausner<br>Trial: August 23, 2022<br>Complaint Filed: May 27, 2021<br>Amended Complaint Filed: June 9, 2021 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

I.     INTRODUCTION ....................................................................... 1

II.    ARGUMENT ............................................................................ 1

    A.   The Fourth Amendment Violation. ........................................... 1

          i.   The Government Misled The Magistrate ............................. 1

          ii.   The Government Violated The Warrant ............................. 3

         iii.   The "Inventory" Was A Sham And A Pretext ..................... 5

         iv.   There Was No Need To Inventory A Locked Vault ............. 8

    B.   The Appropriate Remedy. ...................................................... 9

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Demaree v. Pederson,*
  887 F.3d 870 (9th Cir. 2018)................................................................5

*Doe v. Groody,*
  361 F.3d 232 (3d Cir. 2004)................................................................4

*Florida v. Wells,*
  495 U.S. 1 (1990).........................................................................7, 9

*Marron v. United States,*
  275 U.S. 192 (1927).......................................................................4

*Ramsden v. United States,*
  2 F.3d 322 (9th Cir. 1993)................................................................10

*United States v. Bulacan,*
  156 F.3d 963 (9th Cir. 1998)...............................................................6

*United States v. Comprehensive Drug Testing,*
  621 F.3d 1162 (9th Cir. 2010)..........................................................5, 10

*United States v. Garay,*
  938 F.3d 1108 (9th Cir. 2019).............................................................6

*United States v. Grey,*
  959 F.3d 1166 (9th Cir. 2020).............................................................2

*United States v. Lopez,*
  547 F.3d 364 (2d Cir. 2008)...............................................................7

*United States v. McCarty,*
  648 F.3d 820 (9th Cir. 2011)............................................................6, 7

*United States v. Ramirez,*
  976 F.3d 946 (9th Cir. 2020)..............................................................4

*United States v. Rettig,*
  589 F.2d 418 (9th Cir. 1978)..............................................................5

*United States v. Roberts,*
  430 F. Supp. 3d 693 (D. Nev. 2019).......................................................7

*United States v. Spilotro,*
  800 F.2d 959 (9th Cir. 1986)..............................................................9

## STATUTES

18 U.S.C. § 983(a)(1)(A)(i)..................................................................2

18 U.S.C. §§ 1963(d)(1)(a)...................................................................9

## I.     INTRODUCTION

The United States asks this Court to treat its week-long rummaging through hundreds of safe deposit boxes as no different than a standard warrantless inventory incident to an arrest. But the government's seizure warrant affidavit contained evidence of criminal conduct by USPV, the business, *not* individual box renters. That's why the government specifically assured the Magistrate that it would not conduct a "criminal search or seizure" of box renters' property. Yet when it executed the seizure warrant, the government devised special procedures just for USPV, special procedures that called for exactly the kind of "criminal search or seizure" that the government promised it would not conduct. In other words, the government misled the Magistrate in obtaining the warrant and violated its terms when executing it. Such deliberate misbehavior mandates the destruction or sequestration of records containing class members' private information.

## II.     ARGUMENT

### A.     THE FOURTH AMENDMENT VIOLATION.

#### 1.     The Government Misled The Magistrate.

The Opening Brief explained that the government misled Magistrate Kim when it claimed to be focused solely on USPV the business, despite having *already determined* that it would forfeit everything in renters' boxes worth more than $5,000. *See* Op. Br. 3-5. The government concedes that "the forfeiture agent as of the March 2021 warrants' execution believed probable cause existed to forfeit boxes containing large sums of cash," Resp. 16, but this ignores the fact that the government did not know who rented those boxes or what they contained. The affidavit contained no allegations about Plaintiffs or class members, yet the government's official determination was that it could seize and forfeit *all* renters' property, so long as it exceeded the FBI's minimum forfeiture threshold. Ex. O at 1535:5-12, 1562:1-17.[1]

---

[1] Citations to "Ex." refer to exhibits to the Declaration of Robert Frommer, filed contemporaneously with Plaintiffs' Opening Brief.

The government claims it was not obligated "to announce how later actions, such as criminal investigations against box renters or forfeiture of box contents, would play out." Resp. 16. But the withheld information pertained to the ***execution of the warrant*** itself, not to "later actions." During the search, cash under $5,000 was "bagged and went to evidence," whereas cash over $5,000 was assigned a forfeiture tracking ID. Ex. O at 1553:2-17; *see also id.* at 1502:24-1503:6 (explaining that cash is assigned a forfeiture tracking ID only if it's "going through the asset forfeiture process"). Similarly, agents determined whether gold or other property was valued over $5,000, with all property over $5,000 being assigned a forfeiture tracking ID. *Id.* at 1566:4-8, 14-23.[2] The government instructed agents to look for indicia of drug trafficking and to have drug dogs sniff cash over $5,000. *See* Ex. D at 284. It did all of this to facilitate its forfeiture plans yet failed to disclose any of it. *See United States v. Grey*, 959 F.3d 1166, 1183 (9th Cir. 2020) (stating that Fourth Amendment violation would occur where improper investigatory motive affected "the scope of the search or the manner in which a warrant was executed").

The government also notes—as if it were somehow exonerating—that the forfeiture head "of course did not know what assets were in any box" when she made her determination. Resp. 5:25; *see id.* at 10:13-14 ("it would not have been feasible for the government to obtain search warrants in advance for individual boxes because the boxes were rented anonymously"). But that is the root of the problem. The government did not know what was in those boxes, who owned them, or what, if anything, those people had done. That's why the warrant application did not even attempt to argue there was probable cause to seize and forfeit box renters' property, and instead promised the Magistrate it would merely "inventory" the boxes.

---

[2] The government points out that it did not send the administrative forfeiture notice to USPV until 60 days after the seizure, but that is simply an artifact of the deadlines set by federal forfeiture law. *See* 18 U.S.C. § 983(a)(1)(A)(i). Testimony makes clear the government began processing property for forfeiture during the search itself. *See* Ex. O at 1566:4-8 (forfeiture tracking IDs were assigned "on site").

### 2.   The Government Violated The Warrant.

The Opening Brief further explained that the government violated the warrant's terms, which expressly stated that it "does not authorize a criminal search or seizure of the contents of the safety deposit boxes." Op. Br. 14-16. The search was a "criminal search" because agents were instructed to seek out evidence of wrongdoing, and it was a "criminal seizure" because all property over $5,000 was seized for civil forfeiture purposes. *See id.*[3]

The government notes with emphasis, as if it were a defense, that "the government itself prepared" the warrant language imposing these limitations. Resp. 16 (underlining in original). But this only underscores the extent to which the government misled the Magistrate, as it presumably included this language to reassure the Magistrate that it would substantively limit the scope of its search. And yet the signatory of the warrant application now states that "the procedure for processing the contents of a box are ***no different*** if it is a [sic] inventory search" or a criminal search. Zellhart Decl., ECF 122-40 at 601:15-17 (emphasis added). In other words, the government's position is that its reassurances were only empty words.

The government also contends that the language in the warrant imposing these limitations was just legal jargon intended to incorporate case law about pretextual inventory searches, which (it claims) allows the government to engage in inventory searches with dual motives. *See* Resp. 18. But this reading makes no sense. First, the "dual motives" inventory rationale applies only when the government conducts a warrantless inventory, such as one incident to arrest or when towing a vehicle. It has no place here, as agents are strictly bound to follow the instructions in a warrant, including its limitations. *See Marron v. United States*, 275 U.S. 192, 196 (1927); *see also United States v. Ramirez*, 976 F.3d 946, 952 (9th Cir. 2020) (holding that a

---

[3] Presumably because it has no explanation why this was not a "criminal seizure," the government reads the restriction to prohibit a "'seizure' or 'criminal search.'" Resp. 16. However, that reframing does not help its case. If the warrant prohibited ***any*** "seizure" of the contents of the boxes, whether "criminal" or not, then the government even more clearly violated the warrant.

3

"search or seizure pursuant to an otherwise valid warrant is unreasonable" when it exceeds the scope of that warrant). Second, the government's stilted reading would render its own words a nullity and would mean the warrant imposed *no limitations* on the scope of the search beyond those that would *already apply* as a matter of law. Indeed, the government's claim that its language is mere surplusage directly conflicts with a warrant's purpose of guiding and limiting officer discretion. *See Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004) (holding that "a warrant must be read in a common sense, non-technical fashion," but not "in a way that violates its fundamental purposes").[4] To avoid reading this language out of the warrant, one need only read it in a natural, common sense manner: A "criminal search" is a search for evidence, and a "criminal seizure" is a seizure for forfeiture. Under that reading, there is no real question that the government blew past the warrant's terms when it expressly instructed agents to search for evidence of criminal wrongdoing and to process property over $5,000 for civil forfeiture.

In addition, the government's argument disregards its representation that its intrusion into renters' boxes would "extend no further than necessary to determine ownership." Ex. F at 502 n.40. The government argues that this "portion of the policy pertains, as the affidavit noted, to an unknown person's property." Resp. 9. But virtually all the box renters were "unknown" at the time of the search, as the government admits elsewhere. *See* Resp. 10. The government also argues that executor letters were "not the last word" on ownership. *Id.* at 9. But the truth is that the "last word" on ownership was possession of a working key, which has nothing to do with any other evidence that might be found in the box. *See, e.g.*, Ex. M at 1265:13-21, 1272:1-10; Ex. J at 723:24-724:2. Once officers found an executor letter, they knew who to notify, and should have ended the search there.

---

[4] This reading of the warrant is also particularly appropriate because, as discussed *infra* pp. 8-9, if the warrant is read to authorize the government's bait-and-switch, then the warrant itself plainly violates the Fourth Amendment.

4

1      For this reason, the *en banc* Ninth Circuit decision in *CDT* is directly on point.

2   *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010),

3   *overruled in part on other grounds as recognized by Demaree v. Pederson*, 887 F.3d

4   870, 876 (9th Cir. 2018). The government attempts to distinguish *CDT* on the grounds

5   that "unlike in *CDT*, there were no restrictions added by the magistrature [sic] and

6   no <u>factual</u> restrictions whatsoever in the USPV warrants." Resp. 18 (underlining in

7   original). But that bears no weight: Even if the restrictions were not "added" by the

8   Magistrate to the draft warrant, they were nonetheless ***signed*** by the Magistrate and

9   thus equally binding. And it is not clear what the government means that these were

10   not "<u>factual</u> restrictions." They were restrictions on the warrant's scope and, as such,

11   the government had to follow them. But just as in *CDT*, the government engaged in

12   an "obvious case of deliberate overreaching … in an effort to seize data as to which

13   it lacked probable cause." 621 F.3d at 1172.

14      The Opening Brief also explained that this case bears a striking resemblance

15   to *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978) (Kennedy, J.). Op. Br. 15-16.

16   The government addresses that case in a footnote but, in doing so, it simply recites

17   the facts of the case without any analysis at all. As in *Rettig*, the government's

18   deception "deprived [the magistrate] of the opportunity to exercise meaningful

19   supervision over their conduct and to define the proper limits of the warrant," and,

20   "[a]s interpreted and executed by the agents, this warrant became an instrument for

21   conducting a general search." 589 F.2d at 422, 423.

22   **3.    The "Inventory" Was A Sham And A Pretext.**

23      Plaintiffs' Opening Brief also showed that—apart from the warrant's

24   limitations—the government's "inventory" was a sham and a pretext. *See* Op. Br. 16-

25   18. Written instructions specifically directed agents to search for evidence of criminal

26   wrongdoing, *see id.* at 17, and the records they generated contain detailed notes

27   relevant to criminal investigations but are practically useless as inventories, *see id.* at

28

1   17-18. In other words, the search was used as an impermissible "excuse to rummage

2   for evidence." *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019).

3        In response, the government argues that the "validity of an inventory begins

4   with analyzing an inventory policy and officer compliance therewith," and that a

5   search is valid so long as conducted under a "standardized inventory policy." Resp.

6   12. Of course, any inventory policy must comport with the Fourth Amendment. And

7   here, the problem with the government's argument is that its search of renters' boxes

8   was ***not*** conducted under the FBI's "standardized inventory policy" but, rather, under

9   policies that were formulated ***specifically*** for the USPV search. After all, the

10  government testified that the "Supplemental Instructions" were the operative policy

11  for the search, *see* Ex. M at 1215:3-9, and Special Agent Zellhart made clear she did

12  not even review the DIOG when formulating the instructions, *see* Ex. K at 847:13-

13  17. The supplemental instructions told officers to take steps—such as noting indicia

14  of drug trafficking or running all cash past drug dogs—that are not required by the

15  FBI's ***actual*** inventory procedures (in the DIOG) and serve no valid inventory

16  purpose. *See United States v. McCarty*, 648 F.3d 820, 835 (9th Cir. 2011) ("where an

17  action is taken that cannot serve the administrative purpose … the action clearly

18  exceeds the scope of the permissible search").[5]

19       The government next argues it may conduct an inventory with "dual motives."

20  Resp. 12-13. This argument flies in the face of the warrant. *See supra* at 3-5. Nor are

21  dual motives permissible when the official policies guiding the search (like the

22  supplemental instructions here) incorporate the impermissible motivation. *See United*

23  *States v. Bulacan,* 156 F.3d 963, 969 (9th Cir. 1998) (explaining that "an unlawful

24  secondary purpose invalidates an otherwise permissible administrative search

25

26      [5] The Opening Brief explained that, while the mere presence of drug dogs does
27  not invalidate an inventory, the drug dogs at USPV were brought there and
    specifically incorporated into the procedures for the search. *See* Op. Br. 17 & n.8.
    Notably, the government does not try to suggest that the FBI's general inventory
28  policies require the use of drug dogs. The FBI adopted these procedures—which have
    no relation to a valid inventory—specially for the search at USPV.

scheme"). Again, the instructions specifically directed agents to look for and record evidence of criminal wrongdoing. *See* Ex. D at 284. The search thus was ***not*** conducted under a "standardized inventory policy" but, instead, under a USPV-specific "policy [that] injected into the administrative search scheme—at the programmatic level—an impermissible secondary purpose." *McCarty*, 648 F.3d at 834.

Indeed, the record evidence suggests that the government's search for criminal evidence was the "sole" or "but for" cause for its actions. Notably, the government does not even try to argue that the filled-out inventory forms are meaningful records of the property in the boxes.[6] It is hard to see how a search can be justified as an inventory when it ***did not actually produce a useful inventory***. *See Florida v. Wells*, 495 U.S. 1, 4 (1990) (inventory searches "should be designed to produce an inventory"); *see also United States v. Roberts*, 430 F. Supp. 3d 693, 705-07 (D. Nev. 2019). The government instead claims that a useful inventory is not required. *See* Resp. 14. But the case it cites held only that officers need not separately record items such as "a bunch of road maps, pens and a notepad, a bottle opener, packs of chewing gum or candy" and approved the use of "a catch-all to cover objects of little or no value." *United States v. Lopez*, 547 F.3d 364, 371 (2d Cir. 2008). Even if an inventory need not "identify each item separately, regardless of lack of value," *id.* at 372, it's untenable to suggest that it is reasonable for inventorying agents to describe valuable precious metals as "miscellaneous coins." Op. Br. 10 (citing examples). The vagueness of these descriptions, when compared to the thoroughness with which officers recorded incriminating facts (such as how cash was packaged), shows that agents focused on locating evidence of criminality, just as the instructions required.

---

[6] Indeed, while the government contends that agents produced "tens of thousands of pages of inventory documents," Resp. 14, the inventory documents produced in discovery (which fell far short of "tens of thousands" of pages) largely consist of drug dog affidavits, observations about how cash was packaged, photographs of personal documents, or other items that bear no connection to a valid inventory. *See generally* Ex. A (Inventory Records).

The chronology of events confirms this conclusion. The government emphasizes that it began its investigation of USPV, the business, before it decided to forfeit the box contents. *See* Resp. 14. But the government began its investigation of USPV only *after* deciding that investigations of individual box renters were "not working," Ex. M at 1221:20-25, and it admitted that it anticipated that its search would lead to further actions against individual box renters, Ex. L at 122:18-23—which of course would not have been the case without the "inventory." Contrary to the government's suggestions in its brief (*see* Resp. 5, 14), the government also made plans to seize the nest of boxes during the *same* timeframe when the head of the FBI field office first approached the forfeiture head about a large-scale forfeiture of box renters' property. *See* Ex. K at 985:9-16; Ex. M at 1239:8-18; Ex. O at 1525:15-1526:15, 1527:10-18. While the government repeatedly invoked attorney-client privilege to shield further details of its planning, it is clear that its desire to go after individual box renters was the impetus for its investigation and—at a minimum—for the "inventory" search.

### 4.    There Was No Need To Inventory A Locked Vault.

Finally, the Opening Brief also argued that the warrant itself was unreasonable (and thus violated the Fourth Amendment) insofar as there should be no need to inventory a locked vault. *See* Op. Br. 18-19. Cases involving inventory searches typically involve the search of a person or a vehicle, *not* an entire safety deposit vault, and the goals of the inventory search exception would have been better served by leaving the property safely locked away.

This argument assumes greater importance given the reading of the warrant advanced by the government. In the government's view, the warrant's prohibition on a "criminal search or seizure" was meaningless, and agents could use their "inventory" to collect evidence of criminal wrongdoing. In Plaintiffs' view, that misreads the warrant. But if the government's reading is correct, that would mean the warrant itself authorized a general search of every single USPV box absent *any*

showing of individualized probable cause. That would fly in the face of the Supreme Court's instruction that "an inventory search must not be a ruse for a general rummaging," *Wells*, 495 U.S. at 4, as well as the fundamental rule that the scope of a warrant should not exceed the scope of the government's probable cause, *see*, *e.g.*, *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). Just as the government may not search every apartment in a building upon indicting the landlord, neither could the government here search every box upon indicting USPV.

The government argues in response that a search or seizure need not employ (or even consider) available "less intrusive means." Resp. 18 (marks omitted).[7] But that misses the point, which is that the inventory exception to the warrant requirement does not apply in the face of a warrant, nor could it ever be stretched to allow the government to break open and criminally search an entire nest of safe deposit boxes without any showing of individualized probable cause. The government's search is unprecedented; it certainly does not cite any analogous "inventory" in any other case. Whether "less intrusive means" were available or not (and they surely were), the government's actions required a warrant supported by individualized probable cause.

## B. THE APPROPRIATE REMEDY.

This Court has already determined, in disposing of the government's motion to dismiss, that it can order the government to "sequester and return" records to remedy a Fourth Amendment violation. ECF 75 at 6; *see also* Op. Br. 19-20.

The government argues, in response, that this relief should be unavailable absent a showing of "heightened privacy interests in box contents," as well as

---

[7] The government's claim it could not appoint a receiver is wrong. Both provisions it cites (Resp. 19 n.9) concern pre-indictment or pre-complaint actions. But both statutes let the government move for a receivership or similar order immediately upon filing an indictment against USPV and its principals. *See, e.g.*, 18 U.S.C. § 1963(d)(1)(A) ("Upon application of the United States, the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of property … upon the filing of an indictment … alleging that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture").

9

"irreparable harm." Resp. 20. But this is flatly wrong; as *CDT* makes clear, when "the government has obtained the evidence through intentional wrongdoing—rather than through a technical or good faith mistake", courts should grant Plaintiffs relief "without the need for balancing that is applicable in the more ordinary case." 621 F.3d at 1174. The government's behavior justifies granting relief on this basis alone.

Even if *CDT*'s "intentional wrongdoing" standard did not control, Plaintiffs would still be entitled to relief. The decision in *Ramsden v. United States* makes clear that the four factors listed by the government in its brief are just **factors**, not requirements for relief, and that the "balance of equities" may favor relief regardless of whether each factor is met. Indeed, the court in *Ramsden* awarded relief **without** a showing of irreparable harm. 2 F.3d 322, 326 (9th Cir. 1993).

And it is beyond serious debate that box renters have a "heightened privacy interest" in the contents of their safe deposit boxes—which contain both sensitive financial information (such as a person's possession of gold, silver, or coins) as well as deeply personal items like wills, vaccination records, and password lists. *See* Op. Br. 8-9. Meanwhile, while it is true that a "mere threat of prosecution is not sufficient to constitute irreparable harm," *Ramsden*, 2 F.3d at 326, the harm to the class members here is far more sweeping—as some of their most sensitive data will be held indefinitely in a law enforcement database, even though that data was wrongly obtained. At least one Named Plaintiff has already been publicly accused of criminal wrongdoing in a declaration submitted by an FBI agent **in this very case** based on information found in his box. *See* Zellhart Decl., ECF 64-1 at 1-3. More fundamentally, however, it is simply an unconscionable invasion of privacy for the FBI to be able to retain all this sensitive information when the information was obtained under false pretexts, by guise of a warrant application that misled a federal magistrate.

Dated: August 16, 2022                    Respectfully Submitted,

                                          /s/ Robert Frommer

                                          **THE INSTITUTE FOR JUSTICE**
                                          Robert Frommer*
                                          rfrommer@ij.org
                                          Michael Greenberg*
                                          mgreenberg@ij.org
                                          Joseph Gay*
                                          jgay@ij.org
                                          901 N. Glebe Rd., Suite 900
                                          Arlington, VA 22203
                                          Tel. (703) 682-9320

                                          Robert E. Johnson*
                                          rjohnson@ij.org
                                          16781 Chagrin Blvd., Suite 256
                                          Shaker Heights, OH 44120
                                          Tel. (703) 682-9320

                                          *Admitted pro hac vice.*

                                          **THE VORA LAW FIRM, P.C.**
                                          Nilay U. Vora (SBN 268339)
                                          nvora@voralaw.com
                                          Jeffrey Atteberry (SBN 266728)
                                          jatteberry@voralaw.com
                                          201 Santa Monica Blvd., Suite 300
                                          Santa Monica, CA 90401
                                          Tel. (424) 258-5190

                                          *Attorneys for Plaintiffs*

PLAINTIFFS' REPLY BRIEF