**THE INSTITUTE FOR JUSTICE**
Robert Frommer*
rfrommer@ij.org
Michael Greenberg*
mgreenberg@ij.org
Joseph Gay^
jgay@ij.org
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

* *Admitted pro hac vice.*
^*Pro hac vice application pending.*

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Tel. (424) 258-5190

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| **PAUL SNITKO, JENNIFER SNITKO, JOSEPH RUIZ, TYLER GOTHIER, JENI VERDON-PEARSONS, MICHAEL STORC, and TRAVIS MAY,**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES OF AMERICA, TRACY L. WILKISON, in her official capacity as Acting United States Attorney for the Central District of California, and KRISTI KOONS JOHNSON, in her official capacity as an Assistant Director of the Federal Bureau of Investigation,**<br><br>Defendants. | Case No. 2:21-cv-04405-RGK-MAR<br><br><br>**PLAINTIFFS' OPENING BRIEF PURSUANT TO COURT'S ORDER OF NOVEMBER 12, 2021**<br><br><br><br>Judge: Hon. R. Gary Klausner<br>Trial: August 23, 2022<br>Complaint Filed: May 27, 2021<br>Amended Complaint Filed: June 9, 2021 |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... ii

I.      INTRODUCTION ......................................................................... 1

II.     FACTS ....................................................................................... 2

    A.   The Government's Investigation of US Private Vaults. .............. 2

    B.   The Pre-Seizure Forfeiture Determination. ............................... 3

    C.   The Government Fails To Share Its Plan With Magistrate Kim. ............................................................................... 4

    D.   The Government Prepares To Strike. ........................................ 5

    E.   The Government's "Inventory" Search.................................... 7

    F.   Forfeiture Proceedings, Investigation, and Property Return. ................................................................................... 10

    G.   The Instant Litigation. .......................................................... 12

III.    LEGAL STANDARD ................................................................ 13

IV.     ARGUMENT ............................................................................. 13

    A.   THE GOVERNMENT FLAGRANTLY VIOLATED THE FOURTH AMENDMENT .................................................... 13

        i.    The Government Misled The Magistrate And Disregarded The Express Limits Of The Warrant........................................ 14

        ii.   The Government's Inventory Was A Sham And A Pretext.... 16

        iii.  There Should Be No Need To Inventory A Locked Vault. .... 18

    B.   THE SEGRAGATION OR DESTRUCTION OF RECORDS IS AN APPROPRIATE REMEDY FOR THIS VIOLATION ............... 19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bernhard v. City of Ontario,*
  270 F. App'x 518 (9th Cir. 2008) ........................................................ 13

*Colorado v. Bertine,*
  479 U.S. 367 (1987) .............................................................................. 16

*Commonwealth v. Davis,*
  481 Mass. 210, 114 N.E.3d 556 (2019) ............................................... 17

*Demaree v. Pederson,*
  887 F.3d 870 (9th Cir. 2018) ............................................................... 15

*Florida v. Royer,*
  460 U.S. 491 (1983) .............................................................................. 16

*Florida v. Wells,*
  495 U.S. 1 (1990) .................................................................................. 16

*Ramsden v. United States,*
  2 F.3d 322 (9th Cir. 1993) .................................................................... 20

*Residential Funding Corp. v. DeGeorge Financial Corp.,*
  306 F.3d 99 (2d Cir. 2002) ................................................................... 12

*South Dakota v. Opperman,*
  428 U.S. 364 (1976) .............................................................................. 19

*United States v. Comprehensive Drug Testing, Inc.,*
  621 F.3d 1162 (9th Cir. 2010) (*en banc*) ............................... 15, 19, 20

*United States v. Garay,*
  938 F.3d 1108 (9th Cir. 2019) ............................................................. 16

*United States v. Gladding,*
  775 F.3d 1149 (9th Cir. 2014) ............................................................. 20

*United States v. Johnson,*
  889 F.3d 1120 (9th Cir. 2018) ............................................................. 16

*United States v. Mancera-Londono,*
  912 F.2d 373 (9th Cir. 1990) ............................................................... 16

*United States v. McCarty,*
  648 F.3d 820 (9th Cir. 2011) ............................................................... 17

*United States v. Nieto-Rojas,*
  470 F. App'x 674 (9th Cir. 2012) ......................................................... 17

*United States v. Rettig,*
  589 F.2d 418 (9th Cir. 1978) ............................................................... 15

ii

*United States v. Roberts*,
  430 F. Supp. 3d 693 (D. Nev. 2019)..........................................................18

*United States v. Roberts*,
  No. 20-10026 (9th Cir. Mar. 18, 2020)....................................................18

*United States v. Stanert*,
  762 F.2d 775 (9th Cir. 1985)...................................................................14

*United States v. Tamura*,
  694 F.2d 591 (9th Cir. 1982)...................................................................14

*United States v. U.S. Private Vaults, Inc.*,
  No. 2:21-cr-00106-MCS (Mar. 3, 2022)..................................................11

*United States v. Wanless*,
  882 F.2d 1459 (9th Cir. 1989)..................................................................16

*United States v. Zucker*,
  161 U.S. 475 (1896).................................................................................15

**Rules**

Fed. R. Civ. P. 43(a)....................................................................................13

**Statutes**

18 U.S.C. § 983(j)........................................................................................18

18 U.S.C. § 1963(d).....................................................................................18

**Other Authorities**

FBI, *Privacy Impact Assessment for the SENTINEL System* (2014),
  https://perma.cc/8D9W-YFC5..................................................................13

# I.    INTRODUCTION

On March 22, 2021, the government indiscriminately seized the contents of hundreds of safe-deposit boxes based on allegations that the company offering the boxes—US Private Vaults, Inc., or USPV—had engaged in wrongdoing. Now, as a result, the government retains the sensitive personal information of hundreds of box renters. The government will retain that information indefinitely for agents to access for investigative purposes.

The government has callously disregarded the Fourth Amendment rights of Plaintiffs and the broader class. It deliberately misled Magistrate Judge Kim in its warrant application by failing to disclose that—before seeking the warrant—it had ***already decided*** to commence forfeiture against class members' property. The government promised its search would "extend no further than necessary to determine ownership," Ex. F at 502:26-28 n.40,[1] but it rummaged through class members' boxes even after finding letters identifying them. And the government ignored the warrant's express statement that it did "not authorize a criminal search or seizure of the contents of the safety deposit boxes." Ex. E at 289. It told agents that "[a]nything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." Ex. D. at 284. It arranged to have drug dogs on site to sniff currency. *Id.* And it collected that evidence while seizing every single box renter's property as part of its previously undisclosed plans to commence civil forfeiture against all valuable property in the boxes.

Indeed, the evidence shows that the search—while justified as an inventory—was not conducted as an inventory at all. Agents took detailed notes of facts (such as how cash was packaged, or its smell) with no valid inventory purpose, but made only cursory notes of the amount or type of property in the boxes. The resulting records are practically worthless as inventories, but invaluable as investigative

---

[1] Citations to "Ex." refer to exhibits to the Declaration of Robert Frommer filed contemporaneously with this brief.

tools. In other words, the "inventory" was a sham. Indeed, the whole idea of inventorying the vault was unreasonable on its face, as the best way to serve the purposes of an inventory would have been to leave the property safely locked away and appoint a receiver to wind down USPV's business without invasion of privacy.

Because the search violated the Fourth Amendment, Plaintiffs are entitled to have the government "sequester and return," or otherwise destroy, records containing personal information about class members and their property that it possesses as a result of its search. ECF 75 at 6 (order on MTD). The Court should enter judgment ordering the government to do exactly that.

## II.   FACTS

### A.   The Government's Investigation of US Private Vaults.

The government began its investigation of US Private Vaults, the company, in 2019, after "almost five years of—of going after individual customers." Ex. K at 875:3-12. Those earlier investigations of USPV customers had used "USPV as a—as an ant hill, or a honey pot." Ex. M at 1221:13-19. The government shifted its focus to the business itself after deciding that its initial approach of investigating box holders was not "effective." Ex. K at 875:12; Ex. M at 1221:20-23.

Even after the government shifted focus to the business, the government remained interested in box holders. As one agent agreed, the investigation would "go after U.S. Private Vaults, the company, and then also, to the extent that there's criminality by box renters, to identify that and, well, enforce the law." Ex. L at 1122:18-23. The lead agent on the case "anticipated that there would be criminal proceeds in the safe deposit boxes." Ex. K at 890:3-7. Although the actual investigation of the business was mostly conducted by the DEA and USPIS, *see* Ex. L at 1121:14-19, the government (at the direction of the USAO) put the FBI in charge of the overall investigation because "their jurisdiction … does not just cover drug crimes" and the government anticipated that "many box holders were involved in not just drug crimes, but other crimes." Ex. L at 1116:4-16.

2

## B.     The Pre-Seizure Forfeiture Determination.

During the summer of 2020—months before the warrant application was submitted—FBI Special Agent in Charge Matthew Moon spoke to the head of the FBI LA Field Office's asset forfeiture unit, FBI Supervisory Special Agent Jessie Murray, and asked whether her unit could handle the seizure and administrative forfeiture of hundreds of box renters' property. Ex. O at 1525:15-1526:5; *see also id.* at 1527:10-18. Murray confirmed her unit could handle a "large-scale seizure," as they "have a large complement of asset forfeiture employees." *Id.* at 1526:23-1527:3.

During that same timeframe, "[i]n the late summer or fall of 2020," the government also made plans to apply for a warrant to seize the relatively worthless nest of safe-deposit boxes—*i.e.*, the superstructure that held box renters' property. Ex. M at 1239:8-18; *see also* Ex. K at 985:9-16. The FBI's own Domestic Investigations and Operations Guide mandates that agents employ the least intrusive technique that would let them fulfill their investigative purpose. Ex. K at 868:7-14.[2] And, in this case, a less intrusive option was available: The government could have seized the entire business of USPV, sought the appointment of a receiver to wind down its operations, and returned property without any need to search the boxes. However, the government failed to consider this or any other less-intrusive option. Ex. L at 1132:19-1133:2 (explaining that government did "not really" explore alternatives to seizure warrant); Ex. K at 899:9-13; Ex. M at 1230:20-24. This, in the words of one agent, was because superiors had instructed agents that they were going to break open the nest, period. Ex. L at 1135:10-19 ("[W]e were working on orders above"); *id.* at 1135:22-25 (stating that above meant USAO or FBI leadership).

Once the affidavit to support the application for a seizure warrant was drafted, Murray, the head of the forfeiture unit, "evaluated the seizure warrant, the finalized version that was going to be presented to the magistrate," and "made a determination

---

[2] *See* FBI, Domestic Investigations and Operations Guide § 4.1.1(e) (2013), *available at* https://perma.cc/RWD8-XHDC.

3

that there was probable cause to proceed [with administrative forfeiture] on assets seized in the investigation." Ex. O at 1534:25-1535:12; *see also id.* at 1533:8-14, *id.* at 1534:21-24. This internal probable cause determination extended not just to USPV's assets, but also to "the contents of the boxes." *Id.* at 1537:14-16.

In other words, as Murray explained, by the time the search occurred, "[w]e had already determined that there was probable cause to move forward" with civil administrative forfeiture actions against the box contents, and, consistent with that pre-seizure determination, "we initiated civil administrative forfeiture against ***all of the boxes*** that met the minimum monetary threshold." *Id.* at 1562:1-17 (emphasis added); *see also id.* at 1560:2-15, *id.* at 1563:16-21, *id.* at 1564:4-7. That "minimum monetary threshold" is set at $5,000, and it exists because, for lower amounts, "the cost [to forfeit] would be more than the value of the asset." *Id.* at 1494:3-1495:7. So long as the government estimated that it would make money, it planned to seize and administratively forfeit every box renter's property, even though it had no idea who those box renters were or what, if anything, they may have done.

## C.   The Government Fails To Share Its Plan With Magistrate Kim.

Months later, in early 2021, the government applied for the seizure warrant. The affidavit in support was drafted by the lead FBI case agent, Lynne Zellhart, and by AUSA Andrew Brown. Ex. K at 884:14-23. That affidavit alleged acts of wrongdoing by USPV and its principals, but it made no such allegations against the customers. Nor did the warrant application or the affidavit in support ever hint at the government's forfeiture plans.

Instead, AUSA Brown wrote in the affidavit that the government merely intended to conduct an inventory of box renters' property. *See* Ex. K at 884:14-23. The supporting affidavit asserted that "[t]he warrants authorize the seizure of the nests of the boxes themselves, not their contents." Ex. F at 501:15-16. It stated that agents would "follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous

items are unknowingly stored in a dangerous manner." *Id.* at 501:19-22. It also claimed that agents would try to "notify the lawful owners of the property stored in the boxes [about] how to claim their property," *id*. at 501:22-24, and that, pursuant to FBI policy, the "inspection" of the boxes "should extend no further than necessary to determine ownership." *Id.* at 502:26-28 n.40.

In line with those representations, the seizure warrant signed by Judge Kim stated that it "***does not authorize*** a criminal search or seizure of the contents of the safety deposit boxes." Ex. E at 289. It instructed agents to "follow their written inventory policies to protect their agencies and the contents of the boxes," and it clarified that agents could "inspect the contents of the boxes," not to search for potential violations of law, but simply to "identify their owners in order to notify them so that they can claim their property." *Id*. The government had already determined at that point that it would seek to forfeit the contents of the boxes, but Magistrate Kim was unaware of that fact, as the government did not disclose it.

Notably, this was contrary to FBI policy. The FBI's Domestic Investigative and Operations Guide states that, if "there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents" should seek a warrant allowing them to conduct a criminal search. Ex. G at 527. The government, however, did not do so here, presumably because it knew its pre-seizure probable cause determination would not stand up to judicial scrutiny.

**D.    The Government Prepares To Strike.**

The government's plan in place, it started taking steps to execute the warrant. The government's lead case agent, Lynne Zellhart, created "Supplemental Instructions on Box Inventory" that the government used to guide agents' behavior in executing the warrant. Ex. K at 919:11-12; Ex. M at 1215:3-9 (testifying that the Supplemental Instructions were "the operative policy"). Zellhart failed to even look at the DIOG while drafting these Instructions. Ex. K at 847:13-17; Ex. M 1218:17-21. In addition, while Zellhart has helped to execute "[l]ots of dozens" of criminal

5

search warrants, Ex. K at 822:23-823:2, she could not recall *ever* having conducted an inventory search apart from the search at USPV, *id.* at 827:17-19.

The Supplemental Instructions instructed the agents to look for information that would be relevant to forfeiture proceedings. The instructions stated that "[a]gents anticipate USPV boxes to contain a large amount of US Currency" and instructed that "[a]nything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team." Ex. D. at 284. In particular, the Instructions told agents to note "how the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.)." *Id.*; *see also* Ex. M at 1217:12-17. Zellhart agreed that the Instructions told agents to note these odors because they are "potentially indicative of that money being in the proximity of drugs." Ex. K at 962:12-16. The Supplemental Instructions also instructed that cash over $5,000 should be sniffed by a "canine unit," Ex. D at 284, and the government arranged with multiple local police departments to ensure that canine units would in fact be available for the search. Ex. K at 924:7-20; Ex. L at 1152:8-23.[3]

The government admitted it wanted to collect this information for potential use in civil forfeiture proceedings, noting that once currency left the facility, the cash would be deposited and the government's ability to collect this evidence would disappear. Ex. K at 1218:12-16; *see also* Ex. O at 1547:23-1548:2 (agreeing the government wanted this evidence since it "could be probative later on regarding whether—you think there's probable cause to think this is forfeitable currency"). The head of the forfeiture unit explained that, while the government had *already* determined that it would pursue forfeiture, the contents of the boxes provided "supplemental information" to bolster that pre-made probable cause determination. Ex. O at 1554:4-11, 1556:13-16, 1557:21-23.

---

[3] The local agencies who supplied the drug dogs can also get a share of the proceeds coming from the government's forfeiture of box renters' property. The government testified that numerous local agencies have submitted DAG-71 forms, which allow the federal government to "equitably share" forfeiture proceeds with local partners who assisted with the raid. Ex. O at 1573:20-1574:2.

In contrast to these detailed instructions for gathering evidence to support forfeiture, the "Supplemental Instructions on Box Inventory" offered only cursory guidance as to how to conduct an inventory. The Instructions stated that agents, while "taking care to preserve possible fingerprint evidence," should "identify the contents of each box, creating an inventory list," and that "[a] copy of the paperwork will go to Asset Forfeiture." Ex. D. at 283. But the Instructions offered almost no guidance as to **how** agents should go about "creating an inventory list." *Id.*; *see also* Ex. M at 1252:2-9. After the fact, in a subsequent deposition, the lead case agent stated that "I don't think there's a policy" as to how detailed an inventory description should be. Ex. M at 1251:16-25. As a result, "if I had 50 gold coins, the agents would not necessarily record that I have 50 gold coins." *Id.* at 1249:24-1250:9.

The government also specially created another form, "Agent Observations and Notes," for use in executing the search. *See* Ex. Q at 1627. This form included space for "Cash Observations," where "[a]gents should note things such as how the cash is bundled," "if it has a strong odor," or "if there appears to be drug residue." *Id.* The form also included space for agents to note a drug dog alert. *Id.* Such information does not help identify the owner or forestall claims of theft and loss, as one agent admitted. Ex. L at 1153:22-1154:12. Instead, as the head of the forfeiture unit agreed, the information on the form was used "as part of the—as the asset forfeiture process." Ex. O at 1557:16-23. By contrast, the form had no place to record information that would actually be useful to defend against claims of theft and loss.

**E.    The Government's "Inventory" Search.**

On March 22, 2021, the government executed the US Private Vaults seizure warrant. In doing so, the government removed the door from every single safe-deposit box in the USPV facility and then scoured the contents of the boxes.

In many cases, box holders had taped an executor letter—a document identifying both the box renter and his or her beneficiary—to the outside of the box's interior sleeve. Ex. J at 695:15-18, 697:1-4. The government knew these letters

existed even before the search. Ex. K at 950:5-9. However, even though both internal FBI policies and the government's warrant application state that agents' "inspection should extend no further than necessary to determine ownership," Ex. F 502:26-28 n.40, agents continued the search even after encountering these letters. Ex. J at 701:2-7; *see also, e.g.*, Ex. A at 44, 145, 177, 224, 247. Video-recordings confirm that agents would even open and examine the contents of boxes *before* bothering to examine the affixed executor letter. *E.g.*, Ex. B.5 at 0:30, 3:30-4:00; Ex. B.7 at 0:20, 1:00-1:25.

Once inside that interior sleeve, agents searched through—and made photographic records of—personal documents or other possessions contained within the boxes. As examples, the FBI's inventory record contains photographs of password lists for online accounts, Ex. A at 176, 178, 223, 227; what appear to be hand-written notes of financial transactions, *id.* at 17, 18, 140, 144, 215, 217; debit cards and checks, *id.* at 170, 172, 173; vaccination records, *id.* at 220; a prenuptial agreement, *id.* at 171; a will, *id.* at 175; a letter to a judge in a family-law case, *id.* at 239; a receipt for goods deposited with a pawn shop, *id.* at 137-139; a commercial real estate agreement, *id.* at 174; a personal note concerning the establishment of a financial trust, *id.* at 141; trust documents, photographed alongside a receipt from a coin exchange, *id.* at 206; and a newspaper clipping about a criminal case, photographed alongside a personal note, *id.* at 143. The inventory record for one box alone contains dozens of close-up photographs of intimate, personal documents, including receipts and personal ledgers containing handwritten notes, pay stubs, immigration paperwork, a marriage license, and bank statements. *Id.* at 48-130. In another box, agents encountered an executor letter affixed to the outside, *see id.* at 7-8, but pressed on to open a sack containing a person's cremated remains, *see id.* at 9-10. In another box, agents photographed a "Receipt of Cremated Remains." *Id.* at 221.

Video records of the searches show this intrusive foray into box holders' personal lives. In one video, an agent holds each document in a large stack up to the camera one-by-one, flipping upside-down documents over so that the camera would

8

capture the text. *See* Ex. B.2 at 5:55-9:15. In another, an agent holds up to the camera each card in a stack of debit or credit cards, flipping some over so that the camera can capture both sides. *See* Ex. B.8 at 15:15-16:50. In another, the agent captures video recordings of password lists. Ex. B.8 at 11:15, 12:30, 12:50. In one video, the inventorying agent can be seen studying a document found inside a box before holding it up for the camera. *See* Ex. B.3 at 1:43-1:55. In other instances, agents rifled through and emptied the contents of wallets found inside the boxes. *See* Ex. B.4 at 14:00-14:45; Ex. B.8 at 3:00-3:40.

As instructed, agents also documented the condition of cash. Agents took notes on the cash on the "Observations and Notes" form. *See*, *e.g.*, Ex. A at 11 ("$20 bills bound by rubber bands, partitioned in $2000 bundles"), at 15 ("Assorted denomination held in bundles and wrapped in paper, with rubber bands"), at 25 ("sealed in bank pouches"), at 29 ("[p]laced in different envelopes, broken down by ~1000, sticky notes w/amounts"). Agents also took photographs to document the condition of the cash; in several instances, for example, agents took photographs of hand-written notes containing apparent financial information that were found alongside cash. *See id.* at 58, 60, 199, 200, 201, 215, 216. Agents also ran the cash by drug dogs, *see* Ex. J at 683:21-684:12, made note of positive alerts on the Observations and Notes, *see*, *e.g.*, Ex. A at 11, 15, 19, 25, 29, and affixed affidavits from drug-dog handlers to the inventory documents, *see id.* at 12-13, 20-22, 26, 30-31.

In contrast with the above, the inventory records do ***not*** provide anything even approaching a complete inventory of the property. Rather than documenting details that might be helpful to guard against claims of theft and loss—like the quantity of an item or a specific description—agents used terms like "miscellaneous coins" and "miscellaneous jewelry." *E.g.*, Ex. A at 131-133 ("Miscellaneous coins" and "Miscellaneous jewelry,"); *id.* at 134-136 ("Miscellaneous jewelry" and "Miscellaneous coins"); *id.* at 177 ("assorted jewelry and packaging" and

"miscellaneous cash and coin"); *id.* at 228 ("misc jewelry and metal bars/coin"). Even less helpfully, some inventories refer only to "miscellaneous items." *E.g., id.* at 44 ("Miscellaneous general items"), 6 ("miscellaneous itmes [sic]").

Similarly, when agents photographed valuable property in the box, they often photographed it in a way that makes it impossible to tell the amount of the property from the photograph. *E.g., id.* at 179, 184 (inventory lists "uncounted gold coins" and photograph depicts a jumble of coins); *id.* at 32-39 (inventory lists "white metal coins" and photograph shows a jumble of coins); *id.* at 153-164 (inventory lists "[y]ellow metal coins and silver-colored metal coins-uncounted" and photograph shows stacks of indeterminate height); *id.* at 185-192 (inventory lists "Jewelry" and photograph shows pile of bags); *id.* at 193-197 (inventory lists "Gold Color metal plates and coins" and photograph shows stack of plates of indeterminate number); *id.* at 207-212 (inventory lists "precious metals" and photograph shows stack of bars, where only top of stack is visible); *id.* at 229-237 (inventory lists coins and jewelry, but no such items are photographed).

Ultimately, it appears the FBI did not even try to generate a meaningful inventory of the contents of the boxes. *See* Ex. M at 1249:24-1250:9 (agreeing that it is not the "policy" of the government to generate a complete list of property during an inventory). Rather, the FBI relied on the integrity of its chain-of-custody procedures—*not* the inventory—to protect against claims of theft and loss. *See, e.g.*, Ex. K at 861:17-862:11; Ex. J at 623:4-23.

**F.      Forfeiture Proceedings, Investigation, And Property Return.**

As noted above, the government had already decided that it had probable cause to forfeit *all* the contents of the safe-deposit boxes before it conducted the raid at USPV, and, consistent with that decision, "initiated civil administrative forfeiture against all of the boxes that met the minimum monetary threshold" of $5,000. Ex. O at 1562:1-17; *see also id.* at 1563:22-1564:7. The government's administrative forfeiture plans were largely frustrated, however, after a series of legal setbacks,

10

including this Court's ruling that the government's administrative forfeiture notices did not satisfy due process. *See* ECF 52; ECF 58; ECF 60.[4]

The government thus began a process of determining which of the boxes should be subjected to additional *judicial* forfeiture proceedings, and, in doing so, made use of information gathered during the "inventory." As the head of the FBI's asset forfeiture unit explained, the agency used "evidence it collected on the agent observation notes form and in other ways, from box renters' boxes" as "part of the—as the asset forfeiture process." Ex. O at 1557:16-23. Where box holders came forward and provided their identities, the FBI also used that information to conduct additional investigation, including by running those individuals through government databases. Ex. K at 980:7-20. However, the investigation was ultimately driven by the information gleaned from the "inventory"; as the lead case agent testified, "if I'm looking at a pile of cash … I'm interested in where did that cash come from," so "it had less to do with the person than with the contents of the box." *Id*. at 981:19-23; *see also* Ex. M at 1255:12-18.

The experience of one named Plaintiff, Joseph Ruiz, shows how information from the "inventory" factored into the forfeiture determination. After this Court ordered the government to show cause why it should not be forced to return the cash seized from Joseph's box, *see* ECF 60, the government filed an affidavit from the lead case agent asserting the government's belief that it had probable cause based on a positive drug-dog sniff (obtained during the inventory) and based on the results of a Google search of Joseph's email address, which the government learned from paperwork in the box, *see* ECF 64-1. The government only agreed to return Joseph's

---

[4] USPV, the business, also filed a claim to all the box contents in its capacity as a bailee, which should have had the effect of terminating all administrative forfeiture proceedings. However, it appears the government forced USPV to withdraw that claim as a condition of its plea agreement—a dubious tactic that essentially used USPV's legal exposure to force USPV to compromise its duties to its customers. *See United States v. U.S. Private Vaults, Inc.*, No. 2:21-cr-00106-MCS, ECF No. 85, at 4-5 (Mar. 3, 2022) (plea agreement).

11

property after he filed a declaration with supporting exhibits proving an innocent source for the property. *See* ECF 65-1; ECF 65-2; ECF 65-3.

### G.   The Instant Litigation.

In this case, the Court has certified a class consisting of all USPV box renters who have identified themselves to the government and had their property returned. *See* ECF 78. This class consists of hundreds of individuals. *See id.* at 7.

Named Plaintiffs are members of the certified class. As with the broader class, the government's inventory records include (among other things) photographs of their property, *see* Ex. A at 32-43, 145-152, 240-246, 247-256, videos of the search of their property, *see id.* at 202,[5] and records of drug-dog sniffs conducted on their property, *see id.* at 148-149, 250, 254-256. The retention of this information is an invasion of their privacy rights and causes them anxiety and stress. *See* P. Snitko Decl. ¶¶ 19-20; J. Snitko Decl. ¶¶ 18-19; Ruiz Decl. ¶¶ 21-22, Gothier Decl. ¶¶ 12-13; May Decl. ¶¶ 20-21; Pearsons Decl. ¶¶ 21-23; Storc. Decl. ¶¶ 20-21.

As a remedy for the violation of their Fourth Amendment rights, named plaintiffs and the class seek an order requiring the destruction or segregation of records generated during—or as a result of—the government's unconstitutional actions. ECF 33 ¶ I.[6] The government will retain such information indefinitely in the FBI's files, including a database called Sentinel, *see* Ex. J at 715:3-21; Ex. M at

---

[5] The inventory of Plaintiff Tyler Gothier's box was videotaped, *see* Ex. A at 202, but, despite representations that videos would be timely produced, *see e.g.*, ECF 101 at ¶ 12, the government failed to produce that video in time for it to be included in the record for this case, *see* ECF 109 ¶ 13. The same is true of numerous other videos. *See id.* The appropriate remedy for the government's discovery violation is an adverse inference that these videos would have shown additional violations of class members' privacy rights. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) (holding that "purposeful sluggishness" resulting in failure to produce discovery materials could support adverse inference instruction); *see also* ECF 99 (questioning why Defendants brought discovery "to a screeching halt").

[6] This includes the government inventory records, and it also includes information that was submitted to the government in subsequent proceedings that only occurred because of the Fourth Amendment violation. Named Plaintiffs Jeni Pearsons and Michael Storc, for instance, submitted additional documentary evidence along with the claim that they submitted to terminate the government's administrative forfeiture proceedings. *See* Pearsons Decl. ¶ 11; Storc Decl. ¶ 10.

1279:23-1280:3—a computerized system that "provides capabilities for search and intelligence analysis" and that "can be used to identify connections between cases and patterns of activity." FBI, *Privacy Impact Assessment for the SENTINEL System* (2014), https://perma.cc/8D9W-YFC5. Unless instructed otherwise, government officials will be able to access those files for investigative purposes. *Id.*; *see also* Ex. M at 1281:15-22.

## III. LEGAL STANDARD

In the current procedural posture of this case, the Court should apply the standard for motions for summary judgment—meaning that the Court must determine whether the undisputed facts are sufficient to establish a constitutional violation. *See*, *e.g.*, *Bernhard v. City of Ontario*, 270 F. App'x 518, 519 (9th Cir. 2008). If there are disputed issues of material fact, the Court should set the case for trial with live testimony. *See* Fed. R. Civ. P. 43(a). Plaintiffs believe, however, that the facts showing Plaintiffs' entitlement to relief should be undisputed, such that the case can properly be resolved under the summary judgment standard.[7]

## IV. ARGUMENT

Section A explains that the government's behavior towards Plaintiffs and the broader class deliberately violated their Fourth Amendment rights. Section B then addresses the issue of remedy and explains that this Court is authorized to order the segregation or destruction of records containing class members' private personal information due to these shocking Fourth Amendment violations.

### A. THE GOVERNMENT FLAGRANTLY VIOLATED THE FOURTH AMENDMENT.

The government's behavior before, during, and after execution of the USPV seizure warrant has been an affront to both Plaintiffs and the broader class. It also

---

[7] Plaintiffs note that the Court's scheduling order directed the parties to file a "Joint Separate Statement of Undisputed and Disputed Facts" on the date that opposition briefs are due. ECF 82 at 6. Plaintiffs understand this direction to supersede the separate statement requirement of L.R. 56-1.

violated the Fourth Amendment. The government misled the Court about its forfeiture plans when applying for the seizure warrant, intentionally disregarded the warrant's substantive limitations, and conducted a pretextual sham "inventory" while searching for evidence of criminality. The government's entire scheme was unreasonable, given that it had no need to "inventory" a locked safe-deposit vault and, instead, could have appointed a receiver to wind down USPV's operations.

### 1. The Government Misled The Magistrate And Disregarded The Express Limits Of The Warrant.

Officials owe courts a duty of candor in seeking a warrant. They must present facts truthfully, and not fail to disclose material facts. *See*, *e.g.*, *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). Then, once a warrant is issued, officials also must comply with any limitations imposed by the warrant. *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982).

The government's conduct failed on both counts. As described *supra* pp. 3-4, the government had "already determined" that it had probable cause to pursue administrative forfeiture of the contents of the USPV safe-deposit boxes. Ex. O at 1562:1-17. Yet the government failed to disclose that fact and, instead, suggested that the purpose of its search was merely to conduct an "inventory." Then, when Judge Kim issued a warrant directing that officials should not conduct "a criminal search or seizure of the contents of the safety deposit boxes," Ex. E at 289, the government proceeded to scour the contents of each box for evidence to support its forfeiture plans. *See supra* p. 7-10. Indeed, the plans for the search gave agents detailed instructions on how to collect evidence that might show an unlawful source for seized cash, *see* Ex. D at 284, and the government also went so far as to bring in drug dogs from across Southern California for the search, *see* Ex. K at 924:7-20.

This was a "criminal search," in violation of the warrant, and it was also a "criminal seizure." After all, when the government executed the warrant, it "initiated civil administrative forfeiture against *all of the boxes* that met the [$5,000] minimum

monetary threshold." Ex. O at 1562:1-17 (emphasis added). Given that "suits for penalties and forfeitures" fall "within the reason of criminal proceedings for all the purposes of the fourth amendment," *United States v. Zucker*, 161 U.S. 475, 479 (1896), seizure of property with a purpose to initiate forfeiture procedures plainly constituted the type of "criminal seizure" prohibited by the warrant. Indeed, it is hard to imagine what other type of "criminal seizure" the warrant might forbid.

All of this is strikingly analogous to an *en banc* Ninth Circuit case, *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010), *overruled in part on other grounds as recognized by Demaree v. Pederson*, 887 F.3d 870, 876 (9th Cir. 2018) (hereinafter, "*CDT*"). There, the government applied for a search warrant in an investigation into steroid use by baseball players but, in doing so, failed to disclose certain facts in order to create the false impression that "unless the data were seized at once, it would be lost." *Id.* at 1178 (Kozinski, J., concurring). Unsurprisingly, the warrant issued, but it also specified procedures to be followed during the search to avoid unnecessary exposure of data beyond the ten players who were the investigative focus. *Id.* at 1171 (majority op.). The government disregarded those limits and seized records for hundreds of players on the ground that they were in "plain view." *Id.* Indeed, the Ninth Circuit observed that the "agents obviously were counting on the search to bring constitutionally protected data into the plain view of the investigating agents." *Id.* This violated the Fourth Amendment, as "an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." *Id.* at 1172.

This case is also analogous to *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978) (Kennedy, J.). In *Rettig*, after officials unsuccessfully applied for a federal warrant to search a home for evidence of cocaine trafficking, the officials asked a different court for a warrant to investigate a separate charge of marijuana possession. *Id.* at 420. Yet when agents executed the warrant, their focus remained on the initial cocaine charge. *Id.* at 421. The Ninth Circuit held this to be unreasonable, stating that

in "determining whether or not a search is confined to its lawful scope, it is proper to consider both the purpose disclosed in the application for a warrant's issuance and the manner of its execution." *Id*. at 423 (cleaned up). The Court criticized the failure "to disclose an intent to conduct a search the purposes and dimensions of which are beyond that set forth in the affidavits," as it made it impossible for the court to "perform the function of issuing a warrant particularly describing the places to be searched and the things to be seized." *Id*. Moreover, because the agents did not truthfully disclose their intentions, they failed to "confine their search in good faith to the objects of the warrant" and instead "substantially exceeded any reasonable interpretation of its provisions." *Id*. So too here.

### 2.    The Government's Inventory Was A Sham And A Pretext.

The government sought to justify its foray into the class members' private safe-deposit boxes as an "inventory," but inventory searches "are consistent with the Fourth Amendment only if they are not used as an excuse to rummage for evidence." *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 976 (2020). The facts of this case show that the government designed its search to engage in just such impermissible rummaging here.

The scope of an inventory search must be "limited in scope to that which is justified by the particular purposes" served by the inventory. *Florida v. Royer*, 460 U.S. 491, 500 (1983). In other words, the "purpose of such a search must be unrelated to criminal investigation." *United States v. Johnson*, 889 F.3d 1120, 1128 (9th Cir. 2018). To ensure that non-investigatory purpose, all "[i]nventory searches must be conducted according to standard agency procedures," *United States v. Mancera-Londono*, 912 F.2d 373, 375 (9th Cir. 1990), and any discretion exercised by officials must be exercised "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id*. (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)). Inventory searches not carried out according to those criteria

PLAINTIFFS' OPENING BRIEF

are unconstitutional. *See Florida v. Wells*, 495 U.S. 1, 4 (1990); *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989).

The government's instructions to agents conducting the search demonstrate that this was planned, from the start, as a search for evidence of wrongdoing. The instruction to agents specifically directed that "[a]nything which suggests the cash may be criminal proceeds should be noted and communicated to the Admin team" and specifically instructed agents to take notes on facts that courts often view as indicia of drug trafficking. Ex. D at 284. At the same time, the government specifically planned to have "canine units on scene," and the instructions for the search provided that all cash over $5,000 should be run past the drug dogs. Ex. D at 284.[8] The government also specifically created a form—separate and apart from the usual inventory forms—to record the results of this criminal search. *See* Ex. Q. Then, during the inventory, the agents made records of the contents of a host of personal documents. *See supra* pp. 8-9 (citing examples). None of this is consistent with an inventory search. *See United States v. McCarty*, 648 F.3d 820, 836 (9th Cir. 2011) (finding that actions taken with investigatory motive "clearly fell outside the permissible scope of the lawful administrative search and violated McCarty's Fourth Amendment rights").

Moreover, the government did not just add a criminal search onto its inventory, but also failed to conduct any meaningful inventory. Agents marked down only the most basic of information; they failed to count how many items were present, and

---

[8] The uniform, pre-meditated nature of these drug-dog sniffs distinguishes this case from *United States v. Nieto-Rojas*, 470 F. App'x 674 (9th Cir. 2012), where the dog's presence had been requested for independent reasons and was not a pre-planned extension of an inventory search. *See Commonwealth v. Davis*, 481 Mass. 210, 219, 114 N.E.3d 556, 566 (2019) (holding inventory search invalid after stating that "[t]he use of a drug detection dog to conduct what is supposedly a search to safeguard property – and not a search for drugs – raises a red flag"). The use of drug dogs also departed from the FBI's own policies, as the Domestic Investigations and Operations Guide does not contemplate using drug dogs for an inventory. *See* Ex. G at 526-527.

17

instead would write down vague, useless descriptors like "Miscellaneous general items." Ex. A at 44; *see also supra* pp. 9-10 (citing examples). The photographs that agents took of property likewise often make it impossible to determine the amount of property seized. *See supra* p. 10 (citing examples); *see also United States v. Roberts*, 430 F. Supp. 3d 693, 707 (D. Nev. 2019), appeal voluntarily dismissed, No. 20-10026 (9th Cir. Mar. 18, 2020) (failure to properly and completely document property indicated that inventory search was pretextual).[9] During depositions, when pressed to explain how exactly the records from the search helped to guard against claims of theft and loss, the lead case agent pointed to "the integrity of our process," including there being "multiple people present," "signatures," "countersignatures," and "bar codes." Ex. K at 861:17-862:11; *see also* Ex. J at 635:3-10. Of course, none of that has anything to do with the search of class members' property, which was not, in point of fact, an inventory search. Instead, the search was a pretext for an unconstitutional investigation into Plaintiffs and other class members.

### 3. There Should Be No Need To Inventory A Locked Vault.

Lastly, the entire premise of the government's search was objectively unreasonable and cannot be squared with the premise of an inventory search. Plaintiffs' property was not lying about unsecured; it was locked inside a vault. The entire reason Plaintiffs and the broader class kept their property in that vault was because it safeguarded their property from the possibility of theft and loss. Therefore, by seizing the nest and cracking open the boxes inside, agents created the very risk of theft and loss that their actions were meant to guard against.

As an alternative to seizing the nest, the government could have applied to the court to appoint a receiver to take possession of the vault, and the receiver could then have wound down USPV's business and allowed customers to retrieve their property

---

[9] This is, perhaps, unsurprising given that the lead case agent could not recall having ever conducted an inventory search before, *see* Ex. K at 827:10-19, and one of the agents who conducted the inventory could not recall ever receiving any training on how to conduct an inventory other than a search incident to arrest, *see* Ex. J at 583:1-4, 584:14-18.

in an orderly way. *See* 18 U.S.C. §§ 983(j), 1963(d). In doing so, the government would have better advanced all the purposes traditionally associated with an inventory: (1) the protection of the owner's property; (2) the protection of the police against claims of lost or stolen property; and (3) the protection of the police from potential danger. *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976). After all, there would have been far less risk of theft or loss if property had been kept locked in the vault, and, similarly, it is difficult to imagine what realistic "danger" would have been posed by leaving the property locked away.[10] Yet the government failed to even consider this alternative, even though the FBI's Domestic Investigations and Operations Guide tells agents that, when their actions would "intrude on privacy," they should employ the least intrusive investigative technique capable of achieving the government's objective. Ex. K at 868:6-14, 870:2-871:2. Presumably this was because the determination to crack open the boxes had already been made.

## B.     THE SEGREGATION OR DESTRUCTION OF RECORDS IS AN APPROPRIATE REMEDY FOR THIS VIOLATION

The government has captured the fruits of its search—the personal information of Plaintiffs and hundreds of class members—inside its Sentinel database, and that information will remain in the government's files unless this Court orders otherwise. *See supra* pp. 12-13. This Court can, and should, exercise its inherent "civil equitable jurisdiction," *CDT*, 621 F.3d at 1172, to remedy this violation by directing the government to "sequester and return" the records, ECF 75 at 6.

Specifically, as set out in the proposed judgment, Plaintiffs propose that the government be ordered to sequester records obtained as a result of its search so that they are no longer available for investigative use. While these records are—as detailed above, *supra* pp. 9-10—practically useless as inventories, some pictures or video generated in the search might nevertheless be of some limited use to box

---

[10] Arguably, conducting the search exposed officers to additional danger. *See, e.g.*, Ex. M at 1217:9 (stating that officers found Fentanyl in one box). Such hazard could have been avoided by leaving the boxes locked.

holders to address claims of theft and loss (claims of theft and loss that, it bears repeating, would not exist but for the decision to "inventory" the boxes). The records should remain available only for the limited, constitutionally valid purpose of responding to such claims. Then, when all such claims have been resolved, the government should be ordered to return or destroy the records.

There can be no real question that the Court has authority to enter this relief. *See CDT*, 621 F.3d at 1172 (citing *Ramsden v. United States*, 2 F.3d 322, 325 (9th Cir. 1993)); *see also United States v. Gladding*, 775 F.3d 1149, 1152 (9th Cir. 2014). In fact, the Court already decided that such relief is potentially available. The government previously moved to dismiss on the ground that the Court lacked authority or jurisdiction to enter the requested relief. ECF 75 at 5-6. The Court disagreed, noting that, in *CDT*, the Ninth Circuit had upheld equitable relief ordering the government to "sequester and return" unlawfully obtained evidence. *Id*. at 6. Whether that relief was in fact available would, of course, depend on whether the evidence bore out Plaintiffs' Fourth Amendment allegations.

As explained above, the evidence more than bears out Plaintiffs' allegations, with the result that the remedy awarded in *CDT* is equally applicable in this case. As in this case, the government in *CDT* made "representation[s] in the warrant … obviously designed to reassure the issuing magistrate that the government wouldn't sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize." 621 F.3d at 1172. Also as in this case, the government in *CDT* then "failed to follow the warrant's protocol." *Id*. As in this case, the search in *CDT* was an "obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause." *Id*. Finally, as in this case, the Fourth Amendment violations exhibit a "callous disregard for the rights of third parties." *Id*. at 1174. Given these violations, the government "must not be allowed to benefit from its own wrongdoing by retaining the wrongfully obtained evidence or any fruits thereof." *Id*.

Dated: July 19, 2022

Respectfully Submitted,

/s/ Robert Frommer

**THE INSTITUTE FOR JUSTICE**
Robert Frommer*
rfrommer@ij.org
Michael Greenberg*
mgreenberg@ij.org
Joseph Gay^
jgay@ij.org
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

*Admitted pro hac vice.*
*^Motion for pro hac vice pending.*

**THE VORA LAW FIRM, P.C.**
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Suite 300
Santa Monica, CA 90401
Tel. (424) 258-5190

*Attorneys for Plaintiffs*