# Exhibit L

**to Declaration of Robert Frommer**

**Exhibit L**
**1064**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                      WESTERN DIVISION
 4                          -oOo-
 5
    PAUL SNITKO, JENNIFER SNITKO, :
 6  JOSEPH RUIZ, TYLER GOTHIER,   :
    JENI VERDON-PEARSONS, MICHAEL :
 7  STORC, AND TRAVIS MAY,        :
                                  :
 8                  Plaintiffs,   :
                                  :
 9  vs.                           :   Case No.
                                  :   2:21-cv-04405-RGK-MAR
10  UNITED STATES OF AMERICA,     :
    TRACY L. WILKISON, in her     :
11  official capacity as Acting   :
    United States Attorney for the:
12  Central District of California:
    and KRISTI KOONS JOHNSON, in  :
13  her official capacity as an   :
    Assistant Director of the     :
14  Federal Bureau of             :
    Investigation,                :
15                                :
                    Defendants.   :
16  =======================================================
17
18           VIDEOCONFERENCE DEPOSITION OF
19                  LYNDON VERSOZA
20             TUESDAY, JUNE 28, 2022
21          WITNESS APPEARING REMOTELY FROM
22              LOS ANGELES, CALIFORNIA
23
24
25  REPORTED BY:          SUSAN E. BELINGHERI, CCR #655
                          NV Firm Lic. #053F
```

**Exhibit L**
**1065**

Page 2

1                    APPEARANCES:
2            (all appearances via videoconference)
3
                     For the Plaintiffs:
4
             THE INSTITUTE FOR JUSTICE
5                   Attorneys at Law
             By:  ROBERT FROMMER, ESQ.
6          By:  ROBERT E. JOHNSON, ESQ.
            901 N. Glebe Road, Suite 900
7                 Arlington, VA 22203
8
                     For the Defendants:
9
           ASSISTANT UNITED STATES ATTORNEY
10             ASSET FORFEITURE SECTION
               By:  MAXWELL COLL, ESQ.
11         312 North Spring Street, 14th Floor
            Los Angeles, California 90012
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Exhibit L
1066

Page 3

1                           I N D E X

2

3      EXAMINATION:                                    PAGE

4      By Mr. Frommer                                      4

5

6

7      EXHIBITS:        DESCRIPTION                    PAGE

8      Exhibit 10       Agent Observations and Notes,

                        FBI0000446,                        78

9      Exhibit 11       Affidavit of Handler Brendan

                        Rowland and K-9 Kobra, FBI0004973..  96

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit E**
**1067**

Page 4

1          PURSUANT TO NOTICE, and on Tuesday, the 28th

2     day of June, 2022, at the hour of 10:06 a.m. of said

3     day, at the offices of Bonanza Reporting &

4     Videoconference Center, 1111 Forest Street, Reno,

5     Nevada, before me, Susan E. Belingheri, a notary public,

6     appeared LYNDON VERSOZA via videoconference.

7                         -oOo-

8

9                    LYNDON VERSOZA,

10               having been duly sworn,

11           was examined and testified as follows:

12

13                    EXAMINATION

14    BY MR. FROMMER:

15     Q.  Thank you for joining us today, Mr. Versoza.  I

16    am Robert Frommer.  I am a senior attorney at the

17    Institute for Justice.  The Institute for Justice is a

18    nonprofit public interest law firm that's been around

19    for 30 years.  We've worked on behalf of people's

20    constitutional rights.

21          And the reason we are here today is that we are

22    representing the plaintiffs -- just trying to get all my

23    system set up, here -- we're representing the plaintiffs

24    in this class action challenge, which concerns the

25    government's execution of a seizure warrant at U.S.

Exhibit E
1068

Page 5

1    Private Vaults back in 2021.  Are you familiar with

2    those activities?

3        A.  I am.

4              MR. COLL:  Hey, Robert.  I just want to -- I

5    just want to put on the record.  So this is Assistant

6    United States Attorney Maxwell Coll here, and I'm here

7    on behalf of defendants.

8              You can go ahead.  Thanks.

9              MR. FROMMER:  Thank you.

10   BY MR. FROMMER:

11       Q.  Okay.  And -- all right.  Inspector Versoza --

12   actually, do you go by Agent Versoza, Inspector Versoza?

13   I don't know the proper term.

14       A.  Inspector is fine.

15       Q.  Inspector?  Okay.  Great.

16           Well, Inspector Versoza -- let me ask this to get

17   started.  Have you ever been deposed before?

18       A.  I have.

19       Q.  How many times, would you say?

20       A.  One time.

21       Q.  Oh, okay.  Was it as part of your job?

22       A.  No.  Private matter.

23       Q.  Oh, all right.  So -- all right.  Well, if you've

24   only done -- I'm always interested in the fact that

25   government agents rarely have been deposed.  In almost

Page 6

1    all the situations, either they haven't or they've only

2    done, like, one or two.

3         So in any event, let me -- because you're

4    relatively new to this, let me sort of walk through some

5    ground rules for the deposition, just so that we have

6    the same understanding and things move smoothly.  Okay?

7         A.   (No audible response.)

8         Q.   Let me start at the very basics.  I'm going to be

9    asking you questions, and the court reporter will be

10   reporting my questions, as well as your answers.  It's

11   important, to assist the court reporter, to speak

12   clearly and audibly.  So I would ask that you -- I'll

13   try to do that.  I would ask that you do that as well.

14        And also, please answer each question verbally.

15   The court reporter won't be able to record gestures.  I

16   understand that's pretty common, but -- so shaking your

17   head like no, or nodding your head yes, or even

18   responses like "uh-huh" or "uh-uh," things like that,

19   they can't get reported by the -- by the court reporter.

20   So will you be sure to provide clear and verbal

21   responses?

22        A.   Yes.

23        Q.   Okay.  Now, normally another issue in

24   depositions, particularly these remote depositions, is

25   when we -- normally when we talk over people -- or with

Page 7

1    people, we talk over each other.  You know, we'll

2    interrupt as part of the normal flow of conversation.

3    But in a deposition, particularly a Zoom deposition, it

4    makes it -- that makes -- that kind of cross talk makes

5    it very difficult for the court reporter to take down an

6    accurate record.

7          Therefore, it's -- it's important that you wait

8    until I finish my question before you begin answering,

9    even if you think you know where I'm going to go with

10   the rest of the question.  And by the same token -- and

11   I'll try my best with this -- I'll let you finish your

12   answer before starting another question.  Do you

13   understand?

14     A.  Yes.

15     Q.  Okay.  Now, you were sworn in a moment ago by the

16   court reporter.  Do you understand that this oath

17   requires you to answer my questions truthfully and

18   completely?

19     A.  Yes.

20     Q.  In fact, do you understand it's the same exact

21   oath you would take if you were in a courtroom and you

22   were testifying in front of a judge?

23     A.  Yes.

24     Q.  Okay.  Now, I said I'll try to ask questions,

25   make them clear and understandable, but if you don't

Page 8

1  understand the question, if I've said something and it's

2  just gobbledygook, just let me know.  I'll either ask

3  the court reporter to read the question back, or, more

4  likely, I'll probably rephrase the question in order to

5  try clarify it some.  So will you tell me if you don't

6  understand a question?

7      A.  Yes.

8      Q.  All right.  Now, if you don't know the answer to

9  the question, if you honestly don't know the answer to a

10  question, you can say that, "I don't know."  "I don't

11  know" is fine if you truly don't know the answer to a

12  question.  But if you do know the answer, then you have

13  to provide that answer in good faith.  So just as a

14  general matter, unless you say otherwise, unless you

15  tell me that you don't understand one of my questions,

16  I'll assume that you understood it.

17          Now, if you want to talk to Max there, your

18  lawyer, that's fine.  Now, there's only a few rules with

19  that.  If there's a question pending, if I have a

20  question to you and it's pending, or if you're in the

21  middle of an answer, well, you have to finish the answer

22  before talking to your attorney.  So in other words, if

23  I have a question out, you can answer -- you answer the

24  question, then you can talk to the attorney.

25          Let me ask you this.  It's important for us to be

Page 9

1   able to get full, complete, and accurate answers, so

2   with that, I have to ask, are you taking any medication

3   today that would make it difficult for you to understand

4   or answer my questions?

5       A.   No.

6       Q.   Is there any other reason why you would have

7   difficulty in understanding and answering my questions?

8       A.   No.

9       Q.   Okay.  So there's really no reason you can't give

10  full, complete, and accurate testimony today.

11      A.   That's correct.

12      Q.   Okay.  Good.

13           Periodically, Max might state objections after I

14  answer -- ask a question.  Now, that typically doesn't

15  mean that you can avoid answering the question.  What

16  the purpose of that objection really is is to simply put

17  it on the record, that the question was formed poorly,

18  so that if we decide to use an answer to your question,

19  the government could say that the question was improper

20  based on the rules of evidence.  Do you understand?

21      A.   Yes.

22      Q.   Okay.  Yeah, if there's any instructions not to

23  answer, that would only come into play when it's on the

24  grounds of, like, a privilege, like attorney-client

25  privilege, or something like that.

Exhibit L
1073

1      Now, sometimes you'll -- it's very possible that

2  you'll answer a question, and then after you're done

3  you'll be, like:  Oh, I remember something else.  Or:

4  Oh, I want to clarify what I said previously.  If that

5  happens, you know, don't sit on it forever.  Instead,

6  you know, when you have the first opportunity, just let

7  me know that there's some additional statement you want

8  to make, or clarification.  That way we can get it --

9  give you an opportunity to get that out while it's still

10  fresh in your mind.  Will you do that in case it comes

11  up?

12    A.  Yes.

13    Q.  All right.  Now, we'll go -- from time to time we

14  will take breaks during this.  If you, for whatever

15  reason, you need to go to the bathroom, anything like

16  that, you would like to take a break at any time, just

17  let me know.  I'll finish my line of questioning, if

18  we're in the middle of a line, and I'll let you finish

19  your answer, and then you can go off.  I just want to

20  avoid a situation where we're in the middle of a line of

21  questioning and then we have to -- that gets

22  interrupted.  So do you understand?

23    A.  Yes.

24    Q.  All right.  Lastly, during our conversation --

25  and this comes up quite often -- you might think of some

Exhibit L
1074

Page 11

1   documents and materials, like a calendar or an

2   appointment book, that would help give you a more

3   accurate answer.  If that is the case, if you could let

4   us know, in that situation, because it's possible that

5   we have some of those materials available to us, and we

6   could share them with you to make your life easier and

7   to help you be able to provide a complete and accurate

8   answer.  So just let me know if that -- if that arises,

9   and we'll see if we -- if we can't get the document for

10  your use.  Is that okay?

11      A.  Yes.

12      Q.  Okay.  Now, I know I've gone on a long, long time

13  here, with all sorts of rules and how we're going to do

14  things, but I want to give you a chance to, really, just

15  ask, do you have any questions about the process?  Do

16  you have anything you want to sort of ask about before

17  we get started?

18      A.  No.

19      Q.  Okay.  All right.  That's fine.

20          Now, before we start talking about -- about --

21  before we really start talking about a lot of issues in

22  the case, I just want to, really, get some -- some sort

23  of background information about you, understand where

24  you're coming from.  So can you tell me what your full

25  name is?

Exhibit L
1075

Page 12

1    A.  My full name is Lyndon Versoza.  It's the name I

2    go by.  I have a middle name as well, Angelo.

3    Q.  Angelo?

4    A.  Uh-huh.

5    Q.  You don't use the middle name too often?

6    A.  Not too often.

7    Q.  Oh, okay.

8        Well, Inspector Versoza, if I may ask, how old

9    are you?

10   A.  I am 43.

11   Q.  And did you -- and you are -- and make sure I get

12   this right.  Are you a special agent at the U.S. Postal

13   Inspection Service?

14   A.  I am a postal inspector.  Postal Inspection

15   Service do not have special agents; however, it's just a

16   title.  We are -- at one point called special agents.

17   Now we're all postal inspectors.  We are federal law

18   enforcement agents.  We carry guns, we search, we make

19   arrests, just like other federal law enforcement agents.

20   Q.  Okay.  So the USPIS is a federal law enforcement

21   agency; is that correct?

22   A.  Correct.

23   Q.  Okay.  And you are a postal inspector at the

24   USPIS.

25       How long have you been a postal inspector at

Exhibit E
1076

Page 13

1   USPIS?

2        A.   Seventeen years.

3        Q.   Oh, okay.   How -- how did you -- how did you end

4   up there?

5        A.   I -- out of college, I actually worked at a few

6   places, small places, then I ended up applying to the

7   United States Immigration and Naturalization Service.

8   So I was an officer for INS for about three years, but I

9   was not an agent, I was an armed officer at the ports of

10  entry.   And then I wanted to do investigative work, then

11  I applied to various agencies, and the Postal Inspection

12  Service was the first one to hire me.

13       Q.   Okay.   So you were over at INS, and you said you

14  were doing, like, a port of entry?   You were a uniformed

15  officer at a port of entry?

16       A.   I was.   I was at LAX, I was at the Long Beach,

17  San Pedro Harbor, and then I was also at an intelligence

18  center.

19       Q.   Oh, okay.

20            And how long did you do that for?

21       A.   Approximately three years.

22       Q.   Okay.   And then you decided, I want to get into

23  something where I can actually do some investigative

24  work; is that correct?

25       A.   Correct.

Page 14

1      Q.  And that's what led you to USPIS.

2          Is there some -- was there a reason, like, you

3  wanted to go to USPIS, as opposed to other agencies?

4  Was it --

5      A.  No.

6      Q.  Go ahead.

7      A.  Yeah, I didn't -- didn't even know what Postal

8  Inspection Service was.  It was just -- it was highly

9  recommended by other law enforcement, and I applied to

10  many agencies.  Just, it's -- they're all a few years --

11  the process takes a few years to transfer into an

12  investigative position, and so I was -- had applied to

13  different agencies, and this was the first one that

14  hired me.  I wasn't sure if I'd stick around, and

15  17 years later I'm still here.

16      Q.  I know how that goes.  You know, you walk in the

17  first day and you're, like:  I don't know if I'm going

18  to be here in six months.  And then the next thing you

19  know, you look and it's a decade later.

20          So -- so -- okay.  So you came over to USPIS

21  because it had been recommended as a place to do

22  investigative work.  And so did you get to do that

23  investigative work at USPIS?

24      A.  I did.  I do.

25      Q.  Like, what kind of investigative work do you do?

Page 15

1      A.   Over my career it's been different types of

2   investigations.   Currently I am assigned to investigate

3   money laundering.

4      Q.   Uh-huh.

5           And what do you mean, assigned to investigate

6   money laundering?   Like, is that -- I'm trying to figure

7   out what you mean by that.   Are you, like, assigned to a

8   particular unit at USPIS that focuses on money

9   laundering, or --

10      A.   In essence, you could say that.   I am, however,

11   the only one in my unit that does money laundering

12   investigations.   I'm the only one in the Los Angeles

13   division that does money laundering investigations.

14      Q.   Oh, okay.   So you're the only person who does

15   money laundering at -- at the L.A. office?

16      A.   For my agency, yes.

17      Q.   Yeah, for USPIS.   Okay.

18           Is that -- is that -- so I know with the FBI, the

19   FBI has field offices.   Like they have the L.A. field

20   office, you know.   And does USPIS work similar --

21      A.   Yes.

22      Q.   -- where you have field offices?

23      A.   We call them divisions, but it's the same

24   concept.

25      Q.   And so how big is the Los Angeles division, I

Exhibit L
1079

Page 16

1    guess, for USPIS?

2       A.  I think our complement is about 110 agents, or

3    inspectors.  I don't know how many we have at the

4    moment, due to attrition.

5       Q.  Okay.  But you're saying the L.A. division would

6    have, you think, around 100, 110 agents or inspectors.

7       A.  Uh-huh.

8       Q.  And of those, you're the one who focuses on money

9    laundering; is that right?

10      A.  Correct.

11      Q.  How does that -- can you explain to me, how

12   does -- how does -- what does a focus on money

13   laundering, what does that look like?  How does that

14   make your job different than, like, the typical USPIS

15   inspector?

16      A.  Well, the Postal Inspection Service covers

17   several -- I mean, the agency says 200 federal statutes.

18   I don't know how accurate that is, but that's what they

19   market, anyway.  Over my career, I've done -- I've been

20   assigned to violent crimes work, where postal carriers

21   get robbed or raped or beat up.  And then I've

22   investigated identity theft and mail theft, where people

23   steal your mail and your credit cards, and do that.

24          And a report comes in of some type of crime like

25   that and it's in my area of responsibility, I would

1    investigate that.  I've done, for five years, child

2    exploitation, where people would have servers where

3    you're selling child porn, sort of being mailed around

4    the country, and you investigate the people who receive

5    them, the people who produce them, and the people who,

6    you know, host those websites.

7          And most recently, I want to say about five

8    years, I've been doing the money laundering

9    investigations, and that usually stems from either

10   people laundering money through the U.S. mail, or people

11   laundering money through the post office.  Sometimes,

12   you know, financial instruments, such as USPS money

13   orders.

14   Q.  Okay.  So this is where people -- okay.  So

15   the -- what -- can you sort of give me sort of a

16   run-of-the-mill, like, kind of case that you would

17   inspect, just part of money laundering?  Just sort of

18   like a regular -- for lack of a better term, like a

19   bread and butter case, just so I have an understanding.

20   A.  Probably don't want to go into specifics of a

21   criminal investigation, but generally, you know, all

22   financial institutions, such as banks, including

23   financial institutions such as Western Union and -- and

24   MoneyGram, or even Walmart, who sell financial transfer,

25   or means to transfer value, have to report those

Exhibit L
1081

Page 18

1   transactions to the Treasury.  The Postal Service has

2   that same requirement.  And so when the Postal Service

3   notices that somebody is conducting suspicious activity,

4   that's generally forwarded to the treasury, and also my

5   agency keeps track of those types of reports.

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████    ████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████████████

12    ██   ████

13    █   ███████

14    ████████████████████████████████████████   ████

15  ████████  ████████████████████████████████████████

16  ████████████████████████████████████████████████

17  █████████████████████████████████████████████

18  █████████████████████████████████████████████████████

19  ██████████████████████████████████████   ████████████

20  ██████████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ██████████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ██████████████████████████████████

25      Q.  I see.  So a lot of your investigations involve

Exhibit L
1082

Page 19

1   when people are transferring sums of money and it

2   appears they're doing so in a way to evade the reporting

3   requirements; is that --

4      A.  Yes, that's how I initiate some of my

5   investigations, but not always.  But yes.

6      Q.  Okay.  So -- but a lot of it has to do with,

7   basically, the money is -- there's a lot of situations

8   where they're either engaged in some sort of fraud,

9   where they're having multiple people purchase on their

10  behalf so as to evade the reporting, or -- or they're

11  engaged in structuring the transactions to avoid the

12  reporting.

13     A.  Right.

14     Q.  And so in those situations you're investigating

15  the failure to report?

16     A.  It's -- essentially that's what I start my

17  investigations, but it's probably obvious that it's not

18  just that fact that they're structuring, but, I mean,

19  they're structuring because there's probably -- those

20  funds, in my experience, are likely illicit.  So they're

21  trying to hide it and trying to inject it into the

22  financial system so they can use it.

23     Q.  Okay.

24     A.  Because otherwise you have a bunch of cash that

25  you can't walk in to buy -- go out to a realtor and buy

Exhibit L
1083

Page 20

1    a house.  Right?

2        Q.  Yeah.  You can't do anything with this dirty

3    money, so you got to clean it up somehow, is what you're

4    saying.

5        A.  In the Service, yes.  It sometimes becomes a

6    vehicle in their process of cleaning the dirty money, as

7    you said.

8        Q.  Okay.  So as part of -- all right.  So you do a

9    lot of this money laundering work at USPIS.  I'm

10   assuming there's a decent amount of it.

11            I would assume that, as part of that -- I know

12   with structuring, for instance, structuring frequently

13   results in, like, you know, the filing of forfeiture --

14   a forfeiture complaint against the structured funds.

15   And since you're talking how you're the money laundering

16   expert, or specialist, at your division, I was

17   wondering, like, how -- how common is your -- how often

18   do you have to deal with civil forfeiture?

19       A.  Most of my cases have a forfeiture element to

20   them, at least.  As a money laundering investigator,

21   many of them have a forfeiture element.

22       Q.  And is that just -- is that due to the nature of

23   the offenses that you're investigating?

24       A.  Correct.

25       Q.  And so the forfeiture comes in on the back end of

Page 21

1    the investigation; is that right?

2        A.  Yes.

3        Q.  So can you walk me through, like -- I don't

4    really -- I haven't worked in an office like this, so I

5    don't -- so let's say you make your charges against

6    somebody and -- who's making the decision, like, on one

7    of your investigations -- for instance, let's say you

8    have a structuring situation.  In that -- in that

9    situation, after you've charged the guy and all that,

10   like, who's making the call about whether to forfeit, or

11   try to forfeit, the -- the -- the razz, the money that

12   was at issue here?

13              MR. COLL:  I'll object -- I'm just going to

14   object to form here.

15              MR. FROMMER:  Excuse me?  I couldn't hear

16   that.

17              MR. COLL:  Thanks, Robert.  I'm just

18   throwing in -- I'm going to start putting in some form

19   objections.  I'll just object to form, and instruct him

20   to answer.  You can go ahead.

21              MR. FROMMER:  Okay.

22              THE WITNESS:  I don't make those decisions,

23   it's usually a conversation with the U.S. Attorney's

24   Office.

25              And as far as order, a seizure can occur

Exhibit L
1085

Page 22

1   before charges are brought.  It just depends on the

2   case.  And it's up to, really, the U.S. Attorney's

3   Office.

4   BY MR. FROMMER:

5      Q.  Okay.  So you're not making the call about

6   whether to -- yourself about whether to pursue civil

7   forfeiture?

8      A.  Correct.

9      Q.  And that is something that happens, you're

10  saying, at the United States Attorney's Office?

11     A.  Correct.

12     Q.  Okay.  I mean, I would assume, as part of that,

13  do you make recommendations as to whether you think,

14  like, yeah, we should go after this, no, we shouldn't go

15  after this?

16     A.  I guess I do, but not really.  The process is me

17  relating the facts to the Assistant United States

18  Attorney, and then went we'll have a conversation about

19  the assets, and then strategically if it would hurt our

20  criminal case.  I'm a criminal investigator, so the

21  forfeiture is just a small part of it.  We do have

22  forfeiture investigators, but that's not what I do.

23     Q.  Oh, so USPIS has investigators that focus

24  specifically on forfeiture?

25     A.  Correct.

Exhibit L
1086

Page 23

1    Q.  And how does -- how is their job different than

2    your job?  I'm a little confused by that.

3    A.  They're not sworn, they're just hired

4    specifically to deal with the forfeiture process.  So

5    they are actually much more familiar with the forfeiture

6    process than me.  They deal directly with the U.S.

7    Attorney's Office.  There's a process that the U.S.

8    Attorney's Office has established that all agencies in

9    their district will follow.  You know, there are

10   different contractors, there are different employees.

11       I -- generally, if the U.S. Attorney's Office in

12   the criminal case tells me that we should seize

13   something, then I would speak with them, but I would

14   often draft an affidavit, or do something like that, to

15   do the enforcement action.

16   Q.  And when you say "them," you mean if -- if

17   somebody on the criminal side says to seize an item, you

18   might talk to the forfeiture people and put together an

19   affidavit in support of, like, any subsequent forfeiture

20   efforts?

21   A.  Yes.  Say the U.S. Attorney's Office, the

22   Assistant United States Attorney, and I have a

23   conversation, and I let him know that we've followed

24   dirty money from fraud, for example, into a bank

25   account, and it's significant enough, and I can show

Page 24

1   that it's dirty, then I'll have that conversation with

2   him or her.

3        And then they can decide whether it's worth,

4   strategically and for other considerations that they

5   have -- I'm not going to get into it because I don't

6   know what their thought process is.  But they'll tell

7   me, yes, we should go after or we shouldn't and we

8   should leave it alone.  And that's it.

9      Q.  I see.  So -- but -- so do conversations

10  regarding the use of forfeiture, are they a frequent

11  part of your conducting of money laundering

12  investigations?

13            MR. COLL:  I'll object to form.

14            THE WITNESS:  It's a case-by-case basis.

15  I've done many cases that have no forfeiture, and -- or

16  the money's gone, so the conversations don't come up.

17  But oftentimes, if the money is there, then I do have

18  those conversations.

19  BY MR. FROMMER:

20     Q.  So the -- the existence, or the presence of

21  money, would affect the likelihood of forfeiture

22  conversations taking place?

23            MR. COLL:  Object to form.

24  BY MR. FROMMER:

25     Q.  Is that fair?

Exhibit L
1088

Page 25

1     A.  The existing -- can you rephrase the question?

2     Q.  Well, it sounded to me that you said, like, if

3   there's a lot of money there then it's more likely that

4   you would have conversations with forfeiture folks about

5   whether you should proceed with some form of civil

6   forfeiture.  I'm just wondering if that's an accurate

7   statement.

8               MR. COLL:  Same objection.

9               THE WITNESS:  So the proceeding of civil

10   forfeiture -- I guess we're confusing terms.  I don't

11   determine forfeiture.  I proceed with seizures.  Seizure

12   warrants.  So I make no determination of how -- to seize

13   assets, they get forfeited or not forfeited.

14   BY MR. FROMMER:

15     Q.  But you did discuss -- I thought you said a few

16   minutes ago that you would have conversations, for

17   instance, with the AUSA about whether, in your opinion,

18   the AUSA should move forward, you know, trying to --

19   move forward on forfeiture, trying to forfeit a

20   particular piece of property.

21               MR. COLL:  Object to form.  Go ahead.

22               THE WITNESS:  My -- maybe I misspoke, but

23   what I was saying was my conversations with the U.S.

24   Attorneys -- and I probably should be more specific so

25   we're less confused, on both ends.  My conversation with

Page 26

1    the U.S. Attorney's Office is not about forfeiture, it's

2    about seizures.  And then forfeiture is determined by

3    the forfeiture investigator in the civil side of the

4    U.S. Attorney's Office.  So my conversations are with

5    the criminal prosecutor regarding seizing an asset.

6    Seizing an asset would be, say we find a bank account

7    that I feel is tainted with dirty funds.  This is just a

8    hypothetical.

9    BY MR. FROMMER:

10       Q.  Yeah.

11       A.  And if he says we should move forward with the

12   seizure, I will then draft the seizure warrant based on

13   my findings, or my investigation.

14          However, once that bank account is seized, it's

15   out of my hands and a forfeiture investigator takes

16   over.

17       Q.  Okay.  So your involvement is in -- when you're

18   involved with the forfeiture process, is it fair to say,

19   then, that you're involved not so much in the decision

20   about whether to move to forfeit the property, as to

21   seize the property, and whether to seize the property in

22   the first place.

23       A.  Correct.

24       Q.  Okay.

25          So you said you're the money laundering sort of

Page 27

1    specialist in your division, and I'm trying to get a

2    sense of -- it sounds like, in those cases, there

3    frequently is some forfeiture element in it.  So in your

4    work at USPIS on money laundering, in what percentage of

5    cases would you say issues regarding civil forfeiture

6    arise?

7                   MR. COLL:  Object to form.

8                   THE WITNESS:  I actually don't know.  I

9    don't know -- I -- I don't -- I did not count, I didn't

10   look, so I don't know how to answer without speculating.

11   BY MR. FROMMER:

12     Q.  Yeah.  Well, let me ask you this:  Is it, for

13   your cases -- how many -- how many money laundering

14   cases do you think you've done while at USPIS?

15     A.  Most of my cases are years long investigations,

16   but in the five years I've been assigned -- or

17   approximately five years I've been assigned to work

18   money laundering, I want to say 20, maybe 30 cases.

19     Q.  And of those 20 or 30 cases, how many involved,

20   at some point, the use of civil forfeiture?  Either that

21   civil forfeiture has occurred or is being -- is being

22   contemplated to be used in that investigation.

23                   MR. COLL:  Object to form.

24                   THE WITNESS:  I -- I don't know,

25   necessarily, because many of them I did do seizure of

Page 28

1  funds.  I don't know what happens after the fact.  I

2  don't always know.  I don't -- I'm not consulted, at

3  that point, all the time.

4  BY MR. FROMMER:

5     Q.  Okay.  So you're just consulted about the initial

6  decision to seize the funds?

7     A.  Correct.

8     Q.  Okay.  So you don't know in what -- what

9  percentage of instances where you recommend a seizure

10  that it ultimately results in a forfeiture proceeding.

11     A.  Correct.

12     Q.  Okay.  Is it fair to say, though, that issues

13  regarding seizure and forfeiture of property constitute

14  a substantial portion of your structuring money

15  laundering work at USPIS?

16              MR. COLL:  Objection, vague.

17              THE WITNESS:  Well -- I'm sorry.  Rephrase.

18  You said is it fair to say.

19  BY MR. FROMMER:

20     Q.  Yeah.  I'm just wondering, is it fair to say that

21  issues regarding civil forfeiture, you know, whether to

22  seize, whether to move for forfeiture, I'm asking is

23  that -- are those issues that often come up in the

24  context of your work at USPIS?

25     A.  Yes.

Page 29

1          MR. COLL:  Same objection.

2          THE WITNESS:  Yes.

3    BY MR. FROMMER:

4       Q.  All right.  All right.  I just wanted to make

5    sure I understood that.

6          So you said you've been at USPIS for 17 years;

7    right?

8       A.  Correct.

9       Q.  And -- so you're a federal law enforcement

10   officer; is that -- that's correct?

11      A.  Yes.

12      Q.  So that means you carry a gun and have the whole

13   host of powers of arrest that an other federal law

14   enforcement officer would have?

15      A.  Yes.

16      Q.  Can you tell me a little bit -- I'm interested.

17   Like, I don't know anything about -- I have heard about

18   FBI training, and training at other places, but what

19   kind of training did you have to undertake to become a

20   postal inspector?

21      A.  We attend an academy.  At that time it was a

22   12-week academy in Maryland.  And then --

23      Q.  So you're -- you went to an academy for three

24   months?

25      A.  Correct.

Page 30

1    Q.  What kind of things do you -- what did they teach

2   you?

3    A.  Generally investigations.  Criminal

4   investigations.  It's a modular training in which some

5   blocks we'd deal with interviews, other blocks would

6   deal with surveillance, or with the law, or with, you

7   know, a search warrant.  Just over the 12 months they

8   teach different aspects, and by the end of the academy

9   we --

10    Q.  Oh, okay.

11          MR. COLL:  Twelve weeks.

12          THE WITNESS:  Oh, I'm sorry.  12 weeks.  I'm

13   sorry.  Correct.

14          By the end of the academy, they would test

15   us in the various things they taught us.

16   BY MR. FROMMER:

17    Q.  Oh, okay.  So what would the tests be, like how

18   to arrest someone?

19    A.  It was multiple choice, actually.

20    Q.  Oh.  So it's -- okay.  So you take this 12-week

21   course, and then you have a test at the end.

22       Do they teach you how to conduct arrests?

23    A.  They do.

24    Q.  Okay.  And do they teach you how to apply for

25   search and seizure warrants?

Exhibit L
1094

Page 31

1        A.  They teach us not how to apply, but they teach

2    us -- I mean, we have affidavit writing courses, if

3    that's what you mean.

4        Q.  Oh, okay.

5        A.  But the application is different in each

6    district, so they leave it to the district.

7        Q.  Oh, you mean like the specifics of, like, how any

8    particular jurisdiction wants their affidavits framed?

9        A.  Right.

10       Q.  Okay.  But they would teach you about how to --

11   how to write warrants generally.

12       A.  Uh-huh.

13       Q.  Okay.

14       A.  Correct.

15       Q.  And would they teach you about how to execute a

16   search or a seizure warrant?

17       A.  Yes.

18       Q.  And is that -- what -- what kind of things are

19   they teaching you in -- in there?

20       A.  Generally -- it's been 17 years, so my

21   recollection of actually what was taught is pretty vague

22   now, so I rely mostly on my work experience now.  But at

23   that time they would -- I don't know how to answer

24   without guessing, but --

25       Q.  That's fine.  I don't need you to guess.

Page 32

1        So is it fair to say that -- I know it's a long

2   time ago, but, like, when you were learning how to

3   execute a warrant, was one of the reasons for that so as

4   to not violate someone's constitutional rights?

5      A.  Yes.

6      Q.  Okay.  And have you -- so -- okay.

7        We've seen arrests from you, we've seen warrants,

8   we've seen you execute warrants, apply for warrants.

9        We talked a little bit about forfeiture before,

10  but have you been involved in any civil forfeiture

11  proceedings before?

12        And let me clarify that, just because I -- I can

13  see that -- and by that I mean in how many proceedings,

14  forfeiture proceedings, did you submit an affidavit or

15  otherwise provide some form of testimony?

16     A.  I guess I'm still trying to understand, because

17  what you call a proceeding.  I've submitted declarations

18  to facts in a handful -- when I say a handful, maybe

19  five different cases, but not much more than that.  I

20  have not had any civil forfeiture trials, or had to

21  testify otherwise.  Like I mentioned earlier, this is my

22  first deposition.

23     Q.  So --

24     A.  I'm sorry.  My first deposition in my line of

25  work.

Page 33

1    Q.  Yeah.  In your professional capacity.  I get

2    that.

3         So -- so you -- so you have submitted

4    declarations in -- in civil forfeiture cases; is that

5    correct?

6    A.  Correct.

7    Q.  And approximately how many declarations do you

8    think you have submitted in civil forfeiture proceedings

9    over the course of your career?

10   A.  I'm trying to recall if declarations were

11   pursuant to the criminal aspect or the civil forfeiture

12   aspect, but I have submitted declarations in this case,

13   and I've submitted declarations in one other case, that

14   I recall.  There might have been one or two others, but

15   I -- I'm not sure if those were for the criminal

16   purposes or for civil forfeiture purposes.

17   Q.  Oh.  So is this case a little bit different,

18   then, than previous cases in terms of you filing

19   declarations in support of civil forfeiture proceedings?

20        MR. COLL:  I'll object to form.

21        THE WITNESS:  No.  Yes, it is different in

22   the sense that I am not forfeiture investigator, I did

23   not do the forfeiture in this case.  I am -- in this

24   investigation, I am only a criminal investigator.  I did

25   not really have anything to do with the forfeiture.  FBI

Exhibit L
1097

Page 34

1    handled the majority of that.

2    BY MR. FROMMER:

3        Q.  Well, why are you getting involved here -- why

4    are you involved in the civil forfeiture process with

5    regards to U.S. Private Vaults?

6               MR. COLL:  Object to form.

7               THE WITNESS:  I don't understand.  I

8    don't -- I do -- so my involvement in the civil

9    forfeiture has to do with my declarations related to

10   criminal investigations.  I don't know if I can discuss

11   more than that, because they're ongoing criminal

12   investigations, but I have nothing else to do with the

13   civil forfeiture in this case.

14   BY MR. FROMMER:

15       Q.  But is it typical for you to file declarations in

16   civil forfeiture proceedings as a part -- in the course

17   of your work?

18               MR. COLL:  Object to form.

19               THE WITNESS:  Declarations are part of my

20   job, it's just not often done.  But I have done it in

21   one other case, definitely.  Maybe a couple others

22   outside of that.

23   BY MR. FROMMER:

24       Q.  Okay.  So you've been at USPIS for 17 years?

25       A.  Yes.

Page 35

1    Q.  And how many cases would you say that you've been

2   involved with over the course of those 17 years?

3    A.  I can't estimate, but -- I don't know for -- for

4   sure, I should say.  My guess is hundreds.

5    Q.  Okay.  So you've been involved in hundreds of

6   cases over the past 17 years.  Is it fair to say that,

7   from your testimony just now, that you only recall

8   submitting declarations in support of civil forfeiture

9   proceedings in the U.S. Private Vaults matter and in one

10   other matter; is that correct?

11          MR. COLL:  Objection, misstates testimony.

12   ████████████    ██████████████████

13   ████████    ████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████

17      ████████████    ████████████████████████

18   ████████████████████████████████████

19   ████████████    ████████████████

20      ████████████    ████████████████

21   ████████████████████████████████████

22   ████████████████████████████████

23   ██████████████

24   BY MR. FROMMER:

25    Q.  Okay.  But it -- it is fair to say, of the

Exhibit L
1099

1    hundreds of criminal -- criminal investigations you've

2    undertaken during the course of your career, there's

3    only been a handful of cases in which you submitted

4    declarations in support of civil forfeiture proceedings;

5    is that correct?

6              MR. COLL:  Object to form.

7              THE WITNESS:  To be fair, I have not been

8    doing civil forfeiture my entire career because, for

9    example, child exploitation, or other crimes I've

10   investigated, did not really have forfeiture.  So in,

11   really, the past five or six years that I've been doing

12   money laundering investigations is when I encountered

13   the most seizures.  And in those few years, yes,

14   correct, it's not often that I have submitted

15   declarations or done anything related to civil

16   forfeiture.

17   BY MR. FROMMER:

18      Q.  Okay.  Have you ever gotten any awards or

19   accolades for being part of a team that brought in a

20   large amount of forfeiture revenue?

21      A.  No, I've never gotten any awards for forfeiture.

22      Q.  Okay.  When you were at -- when they were

23   training you for USPIS -- and we'll take a break in a

24   few minutes, here -- when -- when you were training at

25   USPIS, did they teach you how to do an inventory search?

Page 37

```
 1      A.  They did.

 2      Q.  They did?  Okay.

 3          And did they -- what -- do you recall what it was

 4   that -- well, that -- no, that's too vague.

 5          Have you conducted inventory searches before?

 6      A.  I have.

 7      Q.  How many, would you say?

 8      A.  I don't know, because it's not often.

 9      Q.  Is it more than ten times, do you think?

10      A.  Yes.  Likely.  I -- I don't know.

11      Q.  So you think it's over ten times.  Do you think

12   it's less than 25 times?

13      A.  Yes.

14      Q.  Okay.  All right.  I'm not going to hold you to

15   this, you know.  The fact that you said somewhere

16   between 10 and 25, if it turned out to be 26, I'm not

17   going to, you know, give you some kind of -- give you

18   any grief about that.

19          And have you done those both with and without a

20   seizure warrant?

21      A.  Well, with a seizure warrant -- I'm just trying

22   to recall.  The only inventory search I can still

23   remember doing is impounding a vehicle, and we had to do

24   an inventory search then.  But it's been a few years, so

25   I don't remember even if we had a seizure warrant or
```

Exhibit E
1101

```
 1    not.
 2        Q.  And that one, I'm assuming, was not pursuant to a
 3    warrant.
 4        A.  Yeah, I -- I don't want to assume, but --
 5        Q.  It's fine.
 6        A.  -- it makes sense.
 7        Q.  Okay.  So but you have done inventory searches
 8    before.  You're familiar with them; is that fair to say?
 9        A.  Yes.
10        Q.  Okay.  Can you explain to me, sir, what's the
11    purpose for an inventory search?
12        A.  We conduct inventory searches when we take
13    possession of property, and we do it for a couple
14    reasons.  One is to make sure there's nothing dangerous
15    in there, and to make sure that we won't be accused of
16    stealing things later on.  And then sometimes to help
17    find the owner of, say, abandoned property.
18        Q.  Okay.  So you'd agree that a purpose for an
19    inventory search is making sure the property that's
20    being stored is safe; is that fair to say?
21            MR. COLL:  Object to form.
22            THE WITNESS:  Yes.  The inventory -- the
23    property being inventoried is safe for law enforcement,
24    safe for purpose of storage, and -- at least to answer
25    your safe question.
```

```
 1   BY MR. FROMMER:

 2       Q.  Okay.  And -- and you also said that the purpose

 3   of the search -- of an inventory is to protect the

 4   government from accusations of property being lost or

 5   stolen; is that correct?

 6       A.  Yes.

 7       Q.  Is the purpose of an inventory search to look for

 8   contraband, or evidence that property might be

 9   contraband?

10               MR. COLL:  Object to form.

11               THE WITNESS:  No, that's not the purpose.

12   BY MR. FROMMER:

13       Q.  Okay.  Are there any other purposes for an

14   inventory search other than the ones we've discussed?

15       A.  Not to my knowledge.

16       Q.  Okay.  And you said at USPIS they trained you how

17   to do an inventory search; is that right?

18       A.  Yes.

19       Q.  Okay.  Did you ever teach anyone else how to do

20   an inventory search?

21       A.  No.

22       Q.  If you needed to go do an inventory search

23   tomorrow, do you have any, like, guidance, any

24   guidebooks or manuals you could look at to get yourself

25   up to speed?
```

Exhibit E
1103

Page 40

```
 1      A.  Yes --
 2              MR. COLL:  Object to form.
 3              THE WITNESS:  Yes, we have a manual.
 4   BY MR. FROMMER:
 5      Q.  What's that called?
 6      A.  It's just part of my agency's general manual.
 7   It's called Inspection Service Manual.
 8      Q.  Does the manual -- and did you look at -- did you
 9   use the manual at all in preparing to execute the
10   seizure warrant at U.S. Private Vaults?
11              MR. COLL:  Object to form, lacks foundation.
12              THE WITNESS:  No.  I am not the seizing
13   agent, I did not do seizures in this case, and I didn't
14   do forfeitures.  That was handled by the FBI.
15   BY MR. FROMMER:
16      Q.  But you were at U.S. Private Vaults the day that
17   they executed the seizure warrant; is that right?
18              MR. COLL:  Object to form, lacks foundation.
19              THE WITNESS:  I was there, yes.
20   BY MR. FROMMER:
21      Q.  Okay.  You were there.  And we'll get into this a
22   little bit more in a second, here.
23          And you were involved in discussions about how
24   to -- how to execute the seizure warrant; isn't that
25   correct?
```

                                                    Page 41

1              MR. COLL:  Object to form.

2              THE WITNESS:  Yes.  I said yes.

3    BY MR. FROMMER:

4       Q.  Oh, sorry.  Couldn't hear you.  I just looked at

5    you.  I figured you said something.  I wasn't quite

6    sure.

7           So you were involved in the planning for how to

8    execute the seizure warrant at U.S. Private Vaults; is

9    that correct?

10      A.  Yes.

11      Q.  And you were there -- you were at U.S. Private

12   Vaults when the seizure warrant was being executed; is

13   that correct?

14      A.  Yes.

15      Q.  Were you there the whole -- how many days was

16   that?  I think they were there for four or five days.

17   Were you there the whole four or five days?

18      A.  In between sleeping, yes.

19      Q.  Oh, okay.  You, like Lynne, were -- basically it

20   was eat, sleep, you know, go to -- go to U.S. Private

21   Vaults, repeat.  Got it.

22      A.  Right.

23              MR. COLL:  Hey, Robert.  We're at the

24   11:00 o'clock mark.  If you're sort of done with the

25   training module, maybe we can take a break.

Exhibit L
1105

Page 42

1           MR. FROMMER:  Yeah.  Okay.  Yeah, sure.

2    Let's take -- let's take, like, 15 minutes, and we'll

3    come on back at 2:15.  Okay?

4           MR. COLL:  All right.  Thank you.

5        (A short break was taken at this time.)

6           MR. FROMMER:  Let's go back on the record,

7    then, at 2:16.

8    BY MR. FROMMER:

9      Q.  I had a question.  I understand that -- we were

10   talking about forfeiture before the break, and I

11   understand the -- the civil forfeiture, that is decided

12   by the Assistant United States Attorneys, but from my

13   understanding, administrator forfeiture happens at the

14   agency level.  So did you have any involvement in USPIS

15   or other agencies' decisions about whether to pursue

16   administrative forfeiture as to property?

17           MR. COLL:  Object to form.

18           THE WITNESS:  Do you mean generally, or in

19   this case?  Or what --

20   BY MR. FROMMER:

21     Q.  Well, let's start with -- let's start with

22   generally.

23        So generally would you advise either USPIS or

24   other agencies about whether, in your opinion, they

25   should pursue administrative forfeiture against a

1    particular -- particular pieces of property?

2                MR. COLL:  Object to form.

3                THE WITNESS:  So I think that the order --

4    the sequence order isn't -- isn't correct, in that, yes,

5    I've had those discussions, but those discussions would

6    occur after a seizure is made.  And then -- so a seizure

7    is made.  It is always initiated as an administrative

8    forfeiture.  When I say "always," if the agency moves

9    forward it's an administrative forfeiture, and if that

10   forfeiture is contested, then a referral is made to the

11   U.S. Attorney's Office.

12   BY MR. FROMMER:

13     Q.  I understand that, but what I'm trying to figure

14   out is that -- let's say that there's been property

15   seized by USPIS, and then USPIS needs to make a

16   determination of whether it's going to either give that

17   property back or pursue administrative forfeiture

18   against it.  And I'm wondering, are you involved in

19   conversations regarding that decision?

20               MR. COLL:  Objection, vague.

21               THE WITNESS:  Yes.  I produce my seizure

22   warrant, search warrant to the civil forfeiture

23   investigator.  Those are the extent of our

24   conversations.  They might have questions pursuant to my

25   warrant.  And then they make their decisions with our

Page 44

1    internal counsel.

2    BY MR. FROMMER:

3        Q.  So you speak with -- is it fair to say that in

4    situations where you're helping USPIS determine whether

5    to pursue administrative forfeiture, you speak with a

6    forfeiture specialist at USPIS, provide your analysis,

7    and then they ultimately make the decision about whether

8    to undertake administrative forfeiture?

9              MR. COLL:  Objection, vague.

10             THE WITNESS:  I provide my affidavit and my

11   seizure or search warrant.  And then they review it, and

12   if they have questions regarding my seizure or search

13   warrant, I answer it.  But generally they work off the

14   seizure warrant, and that's what -- they prepare their

15   own paperwork that goes to our internal counsel.

16   BY MR. FROMMER:

17       Q.  Okay.  And "internal counsel," you mean USPIS --

18       A.  Uh-huh.

19       Q.  -- internal counsel?

20       A.  Uh-huh.

21       Q.  Okay.

22       A.  Correct.

23       Q.  I do have a quick question, because I'm a little

24   confused by one aspect, and that is USPIS is about,

25   well, postal inspectors, right, inspecting items that go

Exhibit L
1108

Page 45

1    through the mail; correct?

2       A.  No.  I think that's a misnomer.  "Postal

3    Inspector" is just a title we have, but we don't

4    actually inspect the mail the way you've described it.

5       Q.  You investigate -- is it fair to say that USPIS

6    is meant to investigate potential violations of federal

7    law that are facilitated using the mails?

8       A.  Correct.

9       Q.  Okay.  I know this sounds silly, but U.S. Private

10   Vaults isn't a post office; right?

11      A.  Correct.

12      Q.  It's a -- it was just a bunch of safe deposit

13   boxes; right?

14      A.  Correct.  Yes.

15      Q.  Right.

16           MR. COLL:  Object to form.

17   BY MR. FROMMER:

18      Q.  I'm -- can you explain to me why USPIS was

19   involved in the investigation of U.S. Private Vaults,

20   given that it was just a bunch of safe deposit boxes?

21      A.  Yes.  Actually, before we investigated the

22   company of U.S. Private Vaults, the DEA was conducting

23   numerous investigations on box holders of U.S. Private

24   Vaults, and some of these box holders were trafficking

25   drugs through the mail or laundering their proceeds

Page 46

1    through Postal Service money orders, and so they invited

2    my agency to help them investigate these crimes.

3        Q.  Okay.  All right.  So I think I'm starting to get

4    how this works.

5            So you're saying -- is this prior to the

6    investigation of U.S. Private Vaults, the company, DEA

7    was investigating individual box holders and invited

8    USPIS into that investigation?

9        A.  Correct.

10       Q.  And when was that, approximately?

11       A.  Approximately 2015.

12       Q.  So DEA invited USPIS into the -- and at that

13   point -- well, let me -- let me do this one at a time.

14           So DEA, in 2015, was investigating U.S. Private

15   Vaults, the company, or just the individual box renters?

16               MR. COLL:  Objection, calls for speculation.

17   Go ahead.

18               THE WITNESS:  DEA invited me into an

19   investigation in which they were investigating box

20   holders at U.S. Private Vaults in 2015.

21   BY MR. FROMMER:

22       Q.  Okay.  So in 20 -- all right.  That's what I

23   wanted just to make sure I understood.

24           So in 2015 DEA is investigating a number of

25   individual box holders, says to you:  Inspector Versoza,

**Exhibit L**
**1110**

Page 47

1    we're inspecting -- we're investigating a lot of these

2    people.  Some of them seem to be using the mails.

3    Please come in and join our investigation.  Is that

4    accurate?

5        A.  Yes.

6        Q.  And how long -- and were there other members of

7    this multi-agency team back in 2015?

8        A.  Yes.  The IRS criminal investigative division was

9    involved, and a few local police departments.  I'm

10   trying to recall if there were other law enforcement

11   agencies at that time.  There might have been, but

12   primarily it was the DEA and IRS when I was invited

13   in -- or my agency was invited in.

14       Q.  Okay.  So back in 2014 we're dealing mostly with

15   individual boxes, but it's a DEA investigation, they

16   bring you in, and USPIS in, they bring in -- and I

17   understand you don't know the -- precisely when they

18   bring in IRS criminal investigation as well.  And this

19   is all occurring in the 2015 time frame; is that

20   correct?

21       A.  Right.

22       Q.  Do I have that accurate?  Okay.

23       A.  Yes.

24       Q.  All right.  So is the FBI, at this stage, are

25   they part of the investigation?

Page 48

1    A.  No.

2    Q.  Okay.  And -- FBI not yet part of it.

3        When did they get to be part -- when did the FBI

4    get moved into the investigation?

5    A.  At some point the DEA had conversations with

6    their management, but I'm not privy.  And then also

7    there were conversations with the U.S. Attorney's Office

8    about the criminal conduct of the business itself.

9    Q.  Okay.  So --

10   A.  And then --

11   Q.  All right.  So --

12   A.  -- at that point -- go ahead.

13   Q.  Sorry.  I missed that last part.

14   A.  I said at that point, when it became apparent

15   that the business itself was involved in criminal

16   activity, the FBI was invited into the investigation.

17   Q.  All right.  So I think -- yeah.  Because I'm just

18   trying to understand how this all works chronologically.

19       So back in 2015, DEA is looking at some

20   individuals who use U.S. Private Vaults.  You come in,

21   IRS criminal investigation comes in.  You're still

22   focused in on individual box holders.  Then subsequent

23   to that there start to be conversations at the DEA with,

24   it sounded like at least the AUSAs, the United States

25   Attorney's Office, and some other agencies.

Exhibit E
1112

Page 49

1       And is it fair to say that the consequence of

2   those conversations was that an investigation was

3   undertaken of U.S. Private Vaults, the business?

4     A.   Yes.  I wasn't at all the conversations, but

5   generally, in my discussions with the DEA case agent, it

6   appeared that's what the U.S. Attorney's Office was

7   interested in, our investigating of the company itself.

8             MR. COLL:  Robert I'm just going to caution

9   the witness here.

10            To -- you know, to the extent that these

11  conversations involved the U.S. Attorney's Office and

12  involved any attorney-client privilege, to not answer

13  with content of that email.  That's just a caution at

14  this point.

15            You can continue, Robert.

16  BY MR. FROMMER:

17    Q.   Okay.  So -- what time -- like, what rough time

18  frame are we talking about these conversations taking

19  place where, you know, the DEA is talking with the AUSA,

20  talking with, I think, the FBI, and people decide, okay,

21  let's actually start investigating U.S. Private Vaults,

22  the company, and bring the FBI in on this.  When was

23  that occurring?

24    A.   About 2018, is my estimation.

25    Q.   All right.  So -- all right.  So in 2015 we have

Page 50

1    investigations of individuals.  Then between 2015 and

2    2018, it sounds that there were conversations that sort

3    of changed the tenor of the direction of -- of the

4    investigation, such that now the DEA, USPIS, FBI, USAO,

5    at that point in 2018, are starting to look at U.S.

6    Private Vaults, the company; is that correct?

7        A.  Yes.

8        Q.  Okay.  And at that 2018 point, once the focus

9    turned from individual box holders to the company, I

10   understand that DEA was involved, USPIS was involved.

11   It sounds like this is when, in 2018 is when the FBI got

12   first involved.  Is that generally accurate?

13       A.  Yes.  But if I recall, you know.

14       Q.  Are there -- are there other agencies that got

15   involved in the 2018 time frame that --

16       A.  Local --

17       Q.  -- weren't previously?

18       A.  Local police departments.

19       Q.  Okay.  And when you have, like, an investigation

20   like this -- because -- right?  You're talking about a

21   lot of groups.  You're talking about DEA, USPIS, you're

22   talking about IRS criminal investigation, you're talking

23   FBI, you've got the USAO, you've got the local PD.  I'm

24   trying to figure out, how does this entire -- how does

25   an investigation like this get structured?  Like, is

Exhibit E
1114

Page 51

1    it -- who -- is there a single agency that is in charge

2    of the overall investigation?  How does this work?  I

3    have no familiarity here.

4        A.   Generally, yes, an agency or an agent spearheads

5    the investigation.  But sometimes different agencies and

6    different agents within the -- the ad hoc task force,

7    I'll call it, take on different roles, based on their

8    specialties.

9        Q.   I see.

10        So is it fair to say that Lynne Zellhart

11   spearheaded the investigation of U.S. Private Vaults,

12   the company?

13            MR. COLL:  Object to form.

14            THE WITNESS:  At that time it was still DEA

15   spearheading the investigation.

16   BY MR. FROMMER:

17       Q.   Okay.  So DEA -- or in 2018 DEA is still

18   spearheading the investigation of U.S. Private Vaults,

19   the company.

20       A.   Yeah.  Correct.

21       Q.   Does that -- does the agency that's in charge of

22   the investigation of U.S. Private Vaults, the company,

23   subsequently change after 2018, or does it always remain

24   spearheaded by the DEA?

25       A.   It eventually changed and became the FBI.

Exhibit L
1115

Page 52

1    Q.  Do you know when that was, roughly?

2    A.  I don't know the date, but I want to say late

3    2020.

4    Q.  And do you know, was there -- was there a reason

5    for the shift, that -- that DEA took more of a back seat

6    and FBI came to the floor?

7         MR. COLL:  So I'm going to just caution the

8    witness again to the extent that this involves

9    attorney-client conversations, not to divulge anything

10   that's protected by attorney-client privilege.

11        THE WITNESS:  With that in mind, generally

12   the reason FBI took over is because their jurisdiction

13   is larger and does not just cover drug crimes.  FBI also

14   investigates basically every federal statute.  And it

15   was pretty clear that many box holders were involved in

16   not just drug crimes, but other crimes.

17        Also, many of the crimes being committed by

18   the owners of the company involved other types of

19   violations, not just drugs.

20   BY MR. FROMMER:

21   Q.  Okay.  So you're saying that in, like, the 2020

22   time frame the FBI began spearheading the investigation

23   because -- and -- and feel free to correct me if I get

24   any of this wrong -- because it seemed that the

25   violations of law by U.S. Private Vaults' box holders

Exhibit E
1116

Page 53

1   would extend beyond the limited drug crime jurisdiction

2   of the DEA.  Is that accurate?

3       A.  Box holders and administrators of the business.

4       Q.  And administrators of the business.  Oh, okay.

5           For instance, like, the DEA wouldn't handle,

6   like, a structuring or a money laundering charge,

7   whereas the FBI might.  Is that...

8       A.  DEA handles money laundering charges as it

9   pertains to drug trafficking, but they would not handle

10  a money laundering charge as it pertains to fraud.

11      Q.  As -- as it pertains to what?

12      A.  Fraud, for example.

13      Q.  Oh, okay.

14          So it's just that the FBI has a broader

15  jurisdictional palate; is that accurate?

16      A.  Correct.

17      Q.  Okay.

18      A.  And expertise.

19      Q.  And expertise.

20          So it was thought that the FBI would have more

21  expertise in determining whether any given box holder

22  had -- was violating the law in -- you know, for -- as

23  to nondrug crimes.

24              MR. COLL:  Object to form.

25              THE WITNESS:  Generally the DEA -- I mean,

Exhibit L
1117

Page 54

1   I'm speaking for agencies that I don't belong to.  But,

2   yes, generally the DEA's function is drug

3   investigations, and FBI focuses on many other statutes.

4   BY MR. FROMMER:

5       Q.  And do you know who decided to shift who was

6   spearheading the investigation from DEA to the FBI?

7       A.  This is where conversations with the U.S.

8   Attorney's Office took place.

9               MR. COLL:  So I'm going to advise the

10  witness not to divulge the content of communications

11  that are protected by the attorney client privilege, to

12  the extent that these conversations included AUSAs.

13              Do you want to repeat your question, Robert?

14              MR. FROMMER:  Yeah, let me try to repeat

15  because I'm not sure where that leaves me.

16  BY MR. FROMMER:

17      Q.  I'm basically asking, you know, who decided that

18  instead of having the FBI spearhead the investigation of

19  Private Vaults, that it had should be the FBI?

20              MR. COLL:  And again, Robert, you're going

21  towards the content of these communications that are had

22  between AUSAs.  I mean, first of all, you should maybe

23  lay some foundation about your question first and see

24  if, you know, he understands what you're asking.  If he

25  can answer it.

Page 55

1               MR. FROMMER:  I understand that, Max, but

2     the witness just testified that in 2020 the DEA stopped

3     spearheading the investigation and the FBI began

4     spearheading it.  All I'm asking is who made that call.

5               MR. COLL:  Right, but are you asking about

6     any specific conversation?  That's why I'm trying to

7     understand --

8               MR. FROMMER:  I am not asking about any

9     specific conversation.  I don't need to know the content

10    of any specific conversation.  I'm asking about an

11    operative decision, which is:  Before the DEA was

12    running the Vaults' investigation, and afterwards it was

13    FBI, and I'm just asking who made that call.

14              THE WITNESS:  There were multiple

15    conversations, many I was not privy to, that happened

16    with management between the FBI, the DEA, and the U.S.

17    Attorney's Office.  I don't know how it proceeded, but

18    at some point it was determined FBI would be better

19    suited to spearhead the investigation.

20              Although to be fair, FBI has always -- it

21    was always the agreement between FBI and DEA that FBI

22    would handle the drafting of the affidavit from the

23    onset of the investigation in 2018.  So they were

24    already in a position of decision making, so to speak.

25    Because if you're writing the affidavit, you're

Page 56

1    essentially dictating the investigation.

2    BY MR. FROMMER:

3        Q.  Oh, okay.  So you're saying the initial -- the

4    initial affidavit by Lynne Zellhart, essentially

5    accusing U.S. Private Vaults, the company, of multiple

6    criminal acts, that that was because she was the one who

7    was writing it, that she functionally was -- or the FBI

8    was functionally running the investigation.

9        A.  Correct.

10       Q.  Okay.  And you -- and you said that decision,

11   that the FBI would draft the affidavit, that occurred

12   all the way back in 2018?

13       A.  Correct.

14       Q.  Okay.  So this was just at the beginning of the

15   time where the investigation turned from box holders to

16   U.S. Private Vaults, the company.

17       A.  Yeah.  Correct.

18       Q.  Okay.  And from 2018 through 2020, you were part,

19   then, of this multi-agency investigation into U.S.

20   Private Vaults; is that correct?

21       A.  Yes.

22       Q.  Okay.  And did the different agencies -- I'm just

23   interested in just figuring out how this works.  Do

24   different agencies specialize in terms of what -- how --

25   how they contributed to the investigation?

Page 57

1    A.  Yes.

2    Q.  Could you describe that for me a bit?

3    A.  So at that time DEA was doing a lot of the field

4    work, meaning they were conducting surveillance, they

5    were conducting enforcement actions.  And I was

6    supporting DEA as well, doing similar type of work.  And

7    DEA and the Postal Inspection Service provided money to

8    do undercover buys, undercover purchases, undercover --

9    we raised undercover funds to test the company of their

10   money laundering violations.

11        FBI, at that point, was primarily focused on

12   basically collecting the information we were gathering

13   and putting together an affidavit, among other things.

14   Q.  Okay.  So DEA and USPIS, during this 2018 to 2020

15   time frame, were doing active investigation of the

16   company, including controlled buys, and the FBI was

17   collecting the information for the purposes of

18   ultimately submitting that affidavit.  Is that accurate?

19   A.  Yes.  I might have missed some details, but

20   generally that's about how --

21   Q.  And I'm not -- I'm not asking for --

22   A.  Right.

23   Q.  -- you know, a hundred percent.

24        So how often would -- how often would these --

25   the members of this multi-agency team meet, from its

1    inception, it sounds, in 2018?

2        A.  As in a formal meeting, not often, because things

3    would happen over phone calls, and we just had our

4    understanding of how to conduct an investigation.  And

5    in this case it was determined that we were trying to

6    prove and determine criminality of the owners.

7        Q.  The owners --

8        A.  Of the company.

9        Q.  Of the company.  Okay.

10       A.  Yes.

11       Q.  But not trying to prove the guilt of owners of

12   the safe deposit boxes.  Or was that also a motivation?

13       A.  It was both.  Our -- our focus was the owners,

14   but in the course of our investigation, I think -- and I

15   didn't -- I wasn't necessarily part of these, but I

16   believe law enforcement uncovered other criminal

17   activities by box holders during that time.

18       Q.  Okay.  So the point of this investigation is

19   obviously, you know, to go after U.S. Private Vaults,

20   the company, and then also, to the extent that there's

21   criminality by box renters, to identify that and, well,

22   enforce the law; is that correct?

23       A.  Correct.

24       Q.  And so you said most of the time these were --

25   you wouldn't really have formal meetings, it would just

Page 59

1    be over email or phone calls?

2       A.  Yeah, mostly phone calls, and mostly because we

3    just have our understanding of how -- what needed to be

4    done.  So only when -- Justin at the DEA was

5    spearheading the field work, generally, and when he

6    needed additional assistance he might call and say, hey,

7    can you help on surveillance, or do you have -- can you

8    help -- can your agency put up money to, you know, buy

9    some drugs, or pay an informant.  Those types of

10   conversations.

11         And we wouldn't be present for all the

12   surveillance operations, or for all the undercover

13   meetings.  It just -- whatever was necessary, Justin

14   would let us know.  Or if we had ideas, we would let him

15   know.

16      Q.  Oh, okay.  All right.

17         So it's more of a -- it's a working group, where

18   you're -- it's not so much formal meetings, but, like,

19   informal requests for assistance and things like that.

20      A.  Yes.

21      Q.  Okay.  And you said the FBI was -- the affidavit

22   for the warrant application for U.S. Private Vaults, was

23   that -- did you have any involvement in that?

24      A.  No.  FBI drafted that.

25      Q.  Okay.  So that would be --

**Exhibit E**
**1123**

Page 60

1      A.  From the --

2      Q.  I'm sorry.  Go ahead.

3      A.  I said from the beginning I might have -- I

4  believe I reviewed it, at some point when it was nearly

5  done, for accuracy.

6      Q.  All right.  Were you involved in -- I mean, did

7  you guys -- did the team have discussions about, like,

8  how to apply for the seizure warrant?

9      A.  I don't --

10     Q.  Let me just -- let me --

11     A.  Yeah.

12     Q.  Let me make that more general.

13         Did the team ever -- did the multi-agency team

14  ever discuss the warrant application process?

15     A.  I'm trying to figure out the -- I'm not trying to

16  avoid your question, I'm trying to figure out what you

17  mean.  Because I think we're all seasoned agents and we

18  know the process, so we didn't have to discuss that

19  process.  Is that what you're asking?

20     Q.  Well, a little.

21         What I'm trying to figure out more is, like, you

22  know -- you're going to put a bunch of things in the

23  affidavit, and you have to decide what things you want

24  to put in the affidavit, what things you want to focus

25  on.  You have to articulate, like, you know, are we

Page 61

1   just, for instance, going after Poliak and Paul, are we

2   going -- are we talking about the box holders more

3   generally.

4          And I just wanted to know, like, when -- when you

5   all were, say, we're going to apply for this seizure

6   warrant, you know, did you have discussions about, like,

7   what should we include in the warrant, what should we

8   ask for in the warrant?  You know, are there limitations

9   we should put in the warrant?  I'm wondering if, like,

10  any of those conversations occurred.

11                 MR. COLL:  Object to form.

12                 THE WITNESS:  Generally, those conversations

13  do occur.  Lynne had those conversations -- and I wasn't

14  present in all of those conversations -- with the U.S.

15  Attorney's Office.

16  BY MR. FROMMER:

17    Q.  Okay.  So those conversations would have been

18  between Lynne and -- Lynne Zellhart, that is, just for

19  the record --

20    A.  Correct.

21    Q.  -- and individuals at the U.S. Attorney's Office.

22          Would -- other agencies would not be involved in

23  those sorts of discussions?

24    A.  Sometimes.  I don't remember specifically in this

25  case, but generally I think it's easier when U.S.

Exhibit L
1125

Page 62

1    Attorney's Office is dealing with one agent rather than

2    numerous agents, and we might have had conversations

3    with the U.S. attorneys, I just don't remember

4    specifics.  But generally Lynne Zellhart was in charge

5    of the affidavit, and she would tell us what was

6    deficient in our investigation, or where we had holes or

7    intelligence gaps, and we would try to -- we would carry

8    the investigation to fill those gaps.

9        Q.  Okay.  Do you ever recall being, you personally,

10   being involved in discussions about what should we ask

11   for in this seizure warrant in terms of, like, what

12   seizure authority or search authority we should try to

13   obtain?

14       A.  I -- I don't recall specifically.  I knew we

15   are -- we were investigating the company itself.  I

16   don't remember discussing, you know, what we were asking

17   for.  That's usually a conversation with the U.S.

18   Attorney's Office, because they're the ones that -- you

19   know, I don't remember what district you are in, sir,

20   but in the central district the U.S. Attorney's Office

21   centrally spearheads the investigation, especially an

22   investigation that takes this long.  So the U.S.

23   Attorney's Office and the case agent, or the lead agent,

24   have those discussions.  And they're --

25       Q.  So you're --

Exhibit L
1126

Page 63

1      A.  -- they're more familiar with --

2      Q.  I'm sorry.  Go ahead.

3      A.  They're more familiar with the law, and they know

4    what's required by our judges in our -- in our, I guess,

5    our district.

6      Q.  So are you saying, then, that the two people with

7    the most knowledge about, like, why the warrant

8    application was structured the way it was would be Lynne

9    Zellhart and Andrew Brown?

10     A.  That would be speculation, but I could tell it's

11   not --

12     Q.  Isn't that essentially what you just said in the

13   answer to your previous question?

14          MR. COLL:  Object to form, misstates prior

15   testimony.

16          THE WITNESS:  So Lynne Zellhart is the

17   case -- is the lead agent in this case, she's the case

18   agent, and Andrew Brown is the AUSA in this case, and

19   they had discussions that I was not present for.  But

20   generally AUSAs and agents decide and discuss what's in

21   an affidavit.  In this district an affidavit isn't

22   submitted by an agent to a judge without discussions

23   with the U.S. Attorney's Office.

24   BY MR. FROMMER:

25     Q.  Well, were there any discussions between the

Exhibit L
1127

Page 64

1    members of the team -- I -- but, like, between the

2    members of the team about -- well, maybe I've already

3    gone -- I'm just trying to figure out, like, did you and

4    DEA and FBI ever sit down just to discuss the seizure

5    warrant and, like, what you wanted to have in the

6    seizure warrant?

7        A.   We sat down and discussed during the phase of the

8    investigation the progress of the investigation.

9            And you keep saying "seizure warrant," but really

10   we were seeking search warrants.  But I guess it is

11   seizure and search warrant, to your point.

12           So we have had discussions over, again, what was

13   sufficient, or what was needed in an investigation

14   generally, but I don't know how better to answer your

15   question.  So we did have conversations, we had

16   discussions, and -- about the investigation.  Most of

17   our conversation was about the investigation, and the

18   seizure warrant is just -- it's not the end of it, it's

19   just another tool in our gathering of -- of evidence.

20       Q.   I see.  And so -- I mean, do you -- I'm just

21   wondering, like, do you recall any actual physical

22   meetings where you were -- members of different agencies

23   sort of sat down in the same room to talk through these

24   issues?

25       A.   I'm trying to remember.  Part of it -- this was

Exhibit L
1128

Page 65

1    during COVID.

2        Q.  Oh, yeah.

3        A.  So there was not a lot of meetings held anywhere.

4    So a lot of phone calls.  And, you know, FBI is in

5    Westwood, and I don't remember, sir, where you are

6    located geographically, if you're here in L.A. or not,

7    but...

8        Q.  Other side of the country.

9        A.  Okay.  Well, Westwood is not easy to get to.

10   It's an hour or more any time of the day to get there.

11   And then DEA agent and myself, we're in downtown L.A.

12   but in separate buildings.  So it was never convenient

13   for us to really meet, it was just more efficient to go

14   conduct an investigation and then, say, we have a

15   surveillance operation, we might -- three case agents

16   might be present that day during the surveillance

17   operation and we might have a conversation then.

18       Q.  Okay.  Do you recall ever being in on any

19   conversations about possible alternatives -- let me --

20   let me -- let me back up.  Because that was a horrible

21   question.

22           I understand the seizure warrant in this case --

23   the seizure warrant that was issued for U.S. Private

24   Vaults.  I'm wondering, did any members of the

25   multi-agency team discuss alternatives to seizing every

Exhibit L
1129

Page 66

1   safe deposit box -- the contents of every safe deposit

2   box at U.S. Private Vaults?

3                  MR. COLL:  Object to form.

4                  THE WITNESS:  I don't remember any

5   discussions about alternatives in terms of whether the

6   seizure was going to, I guess -- I'm trying to remember

7   your question.  I don't remember alternatives discussed

8   about how a seizure was going to take place.  Was that

9   what you said?  I'm sorry.

10  BY MR. FROMMER:

11    Q.  Well, it is.

12       Like, for instance, was there ever any discussion

13  that in lieu of breaking open all the safe deposit boxes

14  and taking the contents, that the government could

15  apply -- could simply appoint a receiver to operate the

16  business, and then have people come in and collect their

17  items in the normal course of business?

18                 MR. COLL:  Object to form.

19                 THE WITNESS:  I don't know about that

20  specifically.  I don't recall.  I do know there was --

21  there were conversations and agencies -- I mean, FBI had

22  their own conversations with their management, the DEA

23  had their own conversations with their management, and I

24  had conversations with my management.  But our

25  conversations together between agents, I don't recall --

Page 67

1   I remember discussing logistically how -- what would

2   have been better, whether moving the boxes to a

3   warehouse, or doing it on site was the type of

4   conversations I remember having.

5   BY MR. FROMMER:

6      Q.  And those conversations about the logistics of

7   how to execute the warrant, those were occurring between

8   you and members of other agencies?

9      A.  It did, but, you know, there were multiple

10   conversations happening at the same time between --

11   because each -- you know, Lynne Zellhart would have to

12   get her management on board, or they would tell her how

13   it needs to be done, and she would have discussions with

14   her counsel.  And so it would be hearsay for me.  I just

15   know at some point I was speaking with Justin and Lynne,

16   and we were trying to figure out logistics.  Because it

17   is not something any of us have ever done.

18      Q.  Executing a warrant the size of the U.S. Private

19   Vaults' warrant was something unprecedented?

20            MR. COLL:  Objection, misstates testimony.

21            THE WITNESS:  Executing a warrant in which

22   we were having to move boxes, or open boxes, or serve a

23   warrant on the safety deposit box business, it's not

24   something I have done, Lynne Zellhart has done, or

25   Justin -- Justin has done.

Exhibit L
1131

1    BY MR. FROMMER:

2        Q.  Did you all discuss, like, is there a way we can

3    do this where we don't have to break open all the boxes?

4        A.  My understanding is our marching orders at that

5    point, when we were having these discussions, was -- the

6    warrant was already signed, or was close to be signed,

7    close to being -- close to getting a signature from a

8    judge, basically.  And the way it was drafted, is we

9    were seizing these boxes.  And so our logistical

10   discussions was about how we were going to do it.

11       Q.  Okay.  But I --

12       A.  That was -- that was our mission.

13       Q.  I get that, but that's -- I mean, would you say

14   it's fair to say that the warrant was -- the seizure

15   warrant was obtained roughly the middle of March, 2021?

16       A.  Yeah, that -- that sounds about fair.

17       Q.  So before I -- what I'm asking about is not so

18   much like in that time period immediately before you

19   executed the warrant.  I'm talking about in the months

20   leading up to applying for the warrant did you all

21   discuss, you know, maybe we shouldn't go in and break

22   open 800 safe deposit boxes.  Maybe that -- you know,

23   maybe that's a little bit of a Pandora's box.  Maybe we

24   should do something that would be a little less -- you

25   know, where we're not cracking so many eggs.

Page 69

1              MR. COLL:  Objection -- object to form.

2              THE WITNESS:  So, no, not really.  Our focus

3    has always been the investigation of the company, and so

4    it was never really about seizures, if that's what

5    you're getting at.  So the seizure and the actual -- I

6    guess the goal post always moves.  But our -- our goal

7    during the investigation phase was always proving the

8    criminal activity of the owners of the business.

9    BY MR. FROMMER:

10     Q.  And I'm -- what I'm wondering about is if the

11   goal is to prove the criminal activity of the owners of

12   the business, why was it necessary to seize the physical

13   contents, not of the owners of the business, but of the

14   hundreds of box renters?

15              MR. COLL:  Object to form.

16              THE WITNESS:  This is probably a question

17   you should be asking Lynne Zellhart, but my

18   understanding at that time -- still is my understanding,

19   actually -- that the box holders -- I'm sorry.

20              My understanding is the business was, during

21   our investigation, committing illegal activity, and they

22   were committing illegal activity and it was apparent

23   that many of the box holders were also doing so.

24   BY MR. FROMMER:

25     Q.  So the purpose, then, was to investigate some of

Page 70

```
 1    the many box holders who were -- who you felt were

 2    engaged in illegal activity.

 3                  MR. COLL:  Objection, misstates the

 4    testimony.

 5                  THE WITNESS:  The purpose was to investigate

 6    the box holders only as far -- I'm sorry.  The purpose

 7    was to investigate the owners.  The box holders

 8    investigation kind of happened as we were investigating

 9    the owners.  They -- the owners were dealing with the

10    box holders, and they were part of some conspiracy, at

11    times, to commit illegal conduct.

12    BY MR. FROMMER:

13       Q.  So you -- so the investigation of the box holders

14    was -- was done as part of the larger investigation of

15    the owners; is that correct?

16                  MR. COLL:  Objection, vague, misstates the

17    testimony.

18                  THE WITNESS:  The owners were being

19    investigated for their conspiracy and various

20    violations, and part of their conspiracy is then

21    conspiring with the box holders.

22    BY MR. FROMMER:

23       Q.  Okay.  So the purpose, then, of opening the

24    boxes, then, was to conduct some investigation of the

25    box holders as part of the investigation of the box --
```

Exhibit E
1134

Page 71

1    of the -- of the owners of the company.

2              MR. COLL:  Objection, vague, misstates the

3    testimony.

4              THE WITNESS:  No, that's not what the

5    purpose was.  The purpose of opening the boxes was to

6    conduct inventory searches because the business was

7    being seized.

8    BY MR. FROMMER:

9       Q.  I understand that, that the business was being

10   seized.  Wouldn't you agree that if the government had

11   simply appointed a receiver to operate the business

12   that -- would it have had to have broken open all those

13   hundreds of boxes in that situation?

14             MR. COLL:  Objection, argumentative, vague,

15   incomplete hypothetical.

16             THE WITNESS:  I can't agree because I've

17   never done anything, I've never dealt with any type of

18   receivership, and I don't know if that's -- we were

19   working on orders above us.

20   BY MR. FROMMER:

21      Q.  Orders above you -- so were the instructions

22   about how to execute these warrants, they were coming

23   from above your pay grade?

24      A.  When I say "above," they were coming from either

25   the U.S. Attorney's Office or management of the FBI, and

Page 72

1    I'm not in their chain of command, or DEA.  So that's

2    just how -- you know, I fall into this as a small piece,

3    but there are a lot of other pieces that make decisions.

4    I did not make any of these decisions.

5        Q.  Okay.

6        A.  Again, my -- when we got close to signing the

7    warrant, or once the warrant was signed, I knew we had

8    to take those boxes, and we were just dealing with

9    logistics.  I was dealing with logistics on how to

10   physically do that.

11       Q.  Okay.  So once the warrant was -- essentially was

12   about to be signed, your thoughts turned to how am I

13   actually going to execute this thing.

14       A.  Correct.

15       Q.  Okay.

16           MR. FROMMER:  Let's take a -- let's take a

17   short break.  Just, like -- let's take ten minutes, and

18   then we'll come back.  Okay?

19           (A lunch break was taken at this time.)

20   BY MR. FROMMER:

21       Q.  Thank you so much, Inspector Versoza.  Thank you

22   for -- I hope your lunch went well.

23           I wanted to sort of shift gears.  Before we were

24   talking about sort of the planning for applying for the

25   warrant, and we had just started talking about the

Page 73

1    execution of the seizure warrant at U.S. Private Vaults.

2    And so I wanted to walk a bit through that day, the day,

3    March, I believe it's 22nd, 2021, when all the warrants

4    were unsealed and executed.

5         Now, I think you had mentioned this before, but

6    the day that the seizure and search warrants were

7    executed in the U.S. Private Vaults matter, were you at

8    U.S. Private Vaults?

9    A.  Eventually I made it there, yes.

10   Q.  So where -- where did you start the day?

11   A.  At a residence of one of the -- the office

12   managers of -- I'm sorry.  At the office manager's

13   house, who's an employee of U.S. Private Vaults.

14   Q.  Oh.

15   A.  George Vasquez.

16   Q.  Oh, okay.  George?  Yeah.  At George's house.

17        And then, so, what time would you say you got

18   over to USPV?

19   A.  Just a guess, it's been a couple years, about

20   8:30 or 9:00 a.m.

21   Q.  Oh, okay.  Got there -- so you were there -- at

22   that point I know that they had -- I don't even think at

23   that point they had started inventorying boxes yet.  Is

24   that your -- is that correct?  Is that what you recall?

25   A.  Correct.  The reason I was there is I brought

Page 74

1  George with me, and he had to open the business for us.

2  Or he agreed to help open the business.

3     Q.  Oh.  So you brought George, and George opened?

4  Oh, okay.

5     A.  Yeah.

6     Q.  Was that because the alternative was, like, to

7  basically force your way in --

8     A.  Correct.

9     Q.  -- to the business?  Okay.

10        Okay.  So -- so you started the day over at

11  George Vasquez's house.  Then you grabbed him, brought

12  him over to U.S. Private Vaults around 8:30 or 9:00, and

13  where -- at which he opened it up so you guys -- so

14  the -- the agencies could get inside.

15            MR. COLL:  I'll object to form.

16            THE WITNESS:  Yes.  Although my time -- my

17  recollection of time might be off by an hour, before or

18  after.

19  BY MR. FROMMER:

20     Q.  Sure.  Yeah.

21     A.  But generally we did not grab George and force

22  him there.

23     Q.  Okay.  To clarify -- and it doesn't --

24     A.  Yeah.

25     Q.  It doesn't matter whether it's, like, a

Exhibit E
1138

Page 75

1   particular half-hour window or --

2       A.   Right.   But to clarify, we did not force George

3   there.   We asked for his consent, and he agreed.

4       Q.   Sure.

5           Okay.   So you bring George there, George opens

6   the business so that everyone can go inside.

7           Did you -- were you involved in the inventorying

8   process yourself?

9       A.   No.

10      Q.   So you didn't help inventory any boxes?

11      A.   No.

12      Q.   And -- okay.   So if you're at U.S. Private

13  Vaults, and you're not inventorying boxes, can you tell

14  me what your responsibilities were at U.S. Private

15  Vaults while the warrant was being executed?

16      A.   I was primarily a utility guy, I guess is the

17  best way to describe it, or maintenance.   I was helping

18  get the boxes opened so the teams can focus on

19  inventorying.

20      Q.   Okay.   So what do you mean by helping getting

21  boxes opened?

22      A.   We cut them open, or drilled them open, or we

23  would pry them open.   We tried -- were trying different

24  methods to be efficient, until we figured out the best

25  way to do it.   But that was -- that was my primary job

Page 76

1   there.

2       Q.  Had you had any discussions about how to do that,

3   about how to open the boxes, before the day of the

4   warrant execution?

5       A.  We did.  We spoke with FBI experts, and we also

6   met with locksmiths and safe experts, who had given us

7   suggestions.

8       Q.  Okay.  So before you, the day of, were prying

9   open boxes, you had had conversations with the other

10  agencies and other -- and other knowledgeable people

11  about how to open those boxes.  Okay.

12          And did -- so did you count any currency,

13  yourself --

14      A.  No.

15      Q.  -- when you were there?

16      A.  No.

17      Q.  Do you know, did the agents count currency

18  themselves?  The agents who were involved with the

19  inventorying, that is.

20              MR. COLL:  Object to form.

21              THE WITNESS:  I -- I did not -- I did not

22  participate in the count.  And there was a lot going on,

23  but I believe they did not count on scene.

24  BY MR. FROMMER:

25      Q.  Did not count what?

Page 77

```
 1      A.  They didn't count on scene.

 2      Q.  Oh, okay.

 3          And why do you -- why is that your understanding?

 4      A.  So I guess part of the thing is I didn't do any

 5   of that, because that's FBI, and they followed their

 6   policy.  So I don't want to speak to their policy, that

 7   I've never been trained on.

 8          But my agency didn't count on the scene because

 9   we, in the past, used to, and there would be miscounts.

10   And because you're counting bundles of cash, once you

11   get -- my agency policy, once you get over a certain

12   threshold, they say just seize it, and then you count it

13   where it's, I guess, less room for error, or with a

14   machine available, things like that.  Or you take it to

15   the bank and they count it.

16          So I'm speaking about my agency.  I can't speak

17   to the FBI's policy, and I did not receive training from

18   the FBI on their policy and I did not do any counting

19   that day.

20      Q.  Okay.  So let me -- there's a -- there's a few

21   things I want to unpack there.

22          The first one is, so I understand that you

23   weren't involved in the inventorying boxes.  Were there

24   any other U.S. Postal Inspection Service employees, or

25   inspectors, who were involved in inventorying?
```

Page 78

1       A.   They were part of the inventory teams.   There

2   were a few.   We didn't have that many personnel.   We're

3   a small agency.   But we did have a few there.   And so we

4   might have had one inspector to a team of two or three

5   FBI agents and one DEA agent.   Something to that effect.

6       Q.   Okay.   All right.   So you think that some

7   people -- some USPIS employees may have been involved,

8   but is it fair to say that they would have been the

9   minority of people who were inventorying boxes?

10      A.   Correct.

11      Q.   Okay.

12      A.   I think we only provided two inspectors, or three

13  inspectors, per six-hour shift.

14      Q.   Oh, okay.   So -- and -- okay.

15          Let me actually -- I haven't introduced anything

16  yet, but let me introduce an exhibit.   Give me just a

17  second, here, since I haven't done this.   And I had a

18  question about a document that we received in discovery.

19  So give me just a second.

20      A.   Sure.

21          (Exhibit 10 was marked at this time.)

22  BY MR. FROMMER:

23      Q.   All right.   I have introduced what should be

24  listed as Exhibit 10.   This is because we used numbering

25  in previous -- up through Exhibit 9 in previous

Page 79

1    depositions.

2         Please take a look and let me know when you have

3    access to the document.

4              MR. COLL:  Hey, Robert.  So did you drop it

5    in the chat function, are you sharing your screen, or is

6    there another way that we can view this document?

7              MR. FROMMER:  Oh.  Did you guys not do the

8    exhibit share training?

9              MR. COLL:  I'm not sure how to do it.  In my

10   experience, either you share it on your screen or you

11   could drop it into the chat function if you have a PDF.

12             MR. FROMMER:  Okay.  In the past we have

13   used exhibit share for that.  Let me --

14             MR. COLL:  Is it through -- is it through My

15   Veritext?

16             MR. FROMMER:  Yeah, it is through My

17   Veritext.

18             Let's go off the record.

19    (An off the record discussion was held at this time.)

20             MR. FROMMER:  So let's go back on the

21   record.

22   BY MR. FROMMER:

23    Q.  Inspector Versoza, if you can take a minute,

24   please look through this.  Just let me know when you're

25   ready.

Page 80

1      A.  Go ahead.

2      Q.  Okay.  Do you know what this document is?

3      A.  Yes, it's the form the FBI was using to document

4   their inventory search.

5      Q.  Well, that leads me to my next question, is do

6   you know who created this document?

7      A.  I don't know.

8      Q.  But -- but you believe that it is an FBI

9   document?

10      A.  Correct.

11      Q.  Do you know if this document was created for the

12   purposes of executing the U.S. Private Vaults seizure

13   warrant?

14      A.  I don't know if this was a document they used in

15   any other case, or it's just used for U.S. Private

16   Vaults.

17      Q.  Okay.  So were you involved in the creation of

18   this document?

19      A.  No.

20           MR. COLL:  Objection, asked and answered.

21   Go ahead.

22   BY MR. FROMMER:

23      Q.  Did you have any conversations with anyone about

24   this document?

25      A.  No.  Well --

Page 81

1    Q.  By "this document," I don't mean this specific

2    filled out instance, I mean the form more generally.

3    Just so we're on the same page.

4    A.  I was not involved in any conversations in the

5    creation of this document, although -- this specific

6    document or the document that they used to fill these

7    forms.

8        FBI -- I was present when FBI briefed their

9    agents on how to fill this out.

10   Q.  What did they tell their agents about how to fill

11   this out?

12   A.  Honestly -- and I'm not trying to avoid the

13   question -- I don't remember.  I was focused on -- there

14   was a lot of things happening in the days before the

15   search warrant.

16   Q.  Sure.

17       Did they explain to the agents why they wanted

18   this information filled out?

19            MR. COLL:  Objection, asked and answered.

20            THE WITNESS:  I don't remember.

21   BY MR. FROMMER:

22   Q.  Okay.  Before we had talked about the purposes

23   for an inventory search, or inventorying; correct?

24   A.  Correct.

25   Q.  And you had testified that there were, really,

Exhibit L
1145

Page 82

1    two purposes.  One is to keep government officials safe

2    from dangerous property; and two, to protect both

3    property owners and the government from accusations of

4    lost or misplaced property.  Is that accurate?

5                    MR. COLL:  Object to form.  Go ahead.

6                    THE WITNESS:  Yes, that's what I said.

7    BY MR. FROMMER:

8       Q.  Are there other purposes, beyond those, for an

9    inventory search?

10      A.  Yes.  To identify --

11      Q.  Okay.  So --

12      A.  -- ownership.  Those are the three --

13      Q.  All right.  So the three purposes for an

14   inventory would be to identify the owner, to make sure

15   that there are no items that are dangerous to be stored

16   to the -- to the government officials, and to protect

17   both the government and property owners from claims of

18   lost or misplaced property; is that right?

19      A.  Correct.

20      Q.  Okay.  I wanted to look at this very briefly.  Do

21   you see the -- the section about a third of the way up

22   on this page that says the phrase "Cash Observations"?

23      A.  I do.

24      Q.  Could you read the "e.g.," the three lines there,

25   that are -- begin with "e.g."?

Page 83

```
 1      A.  Of course.

 2          Agents should note things such as how the cash is

 3      bundled, (rubber bands, bank bands); if it has a strong

 4      odor (marijuana, soil, gasoline, coffee, chemical); if

 5      there appears to be drug residue present; a gun is also

 6      present; or anything else of note.

 7      Q.  Okay.  Are these observations -- would these

 8      observations be useful in -- in order to identify who

 9      owns property?

10              MR. COLL:  Object to form.

11              THE WITNESS:  Sorry.  I'm just rereading it.

12              It could be.  If there's a gun present, then

13      you could look at the registered owner of the gun.

14      BY MR. FROMMER:

15      Q.  Okay.  Does -- does the section that is listed

16      "Cash Observations" say to note -- so the gun -- so

17      you're saying that it could identify an owner if there

18      is a gun and the gun was -- could be traced back to the

19      owner; is that correct?

20              MR. COLL:  Object to form.

21              THE WITNESS:  Yes.

22      BY MR. FROMMER:

23      Q.  Can you explain to me -- I'm -- I'm a little --

24      why are they -- you've done a decent bit of money

25      laundering and other investigations.  What is -- what is
```

Page 84

1    the import of cash having a strong odor, such as

2    marijuana, soil, gasoline, coffee or chemical?  Based on

3    your training and experience.

4              MR. COLL:  Objection, vague.

5              THE WITNESS:  Well, if there's chemicals

6    involved with cash, it probably has to be treated

7    differently.  I don't know about gasoline.  Coffee could

8    indicate a masking agent.  Marijuana is

9    self-explanatory.  If it has an odor of marijuana, then

10   it's likely to have been beside marijuana.  Soil, I'm

11   not sure what they were getting at when they wrote that.

12   BY MR. FROMMER:

13     Q.  Okay.  Is it fair to say that these various --

14   under "Cash Observations," the -- the list of items --

15   let me rephrase.

16        Are the strong odors identified in the "Cash

17   Observations" language often indicia that money was in

18   proximity to drugs?

19              MR. COLL:  Objection, vague, lacks

20   foundation.

21              THE WITNESS:  Can you repeat that first part

22   again?

23   BY MR. FROMMER:

24     Q.  I'm trying to determine how -- how does noting

25   the odor of cash help further any of the inventory

Page 85

1    purposes that you previously identified as being the

2    basis for an inventory search?

3              MR. COLL:  Objection, foundation.

4              THE WITNESS:  I -- I think I'm just trying

5    to -- I know what you're getting at, I'm just trying to

6    figure out how to explain this.

7              The process FBI had put in place with their

8    cash, it's my understanding, was to deposit the cash

9    into a bank.  Basically they will no longer have in

10   their possession the cash once it's deposited, and it

11   will be commingled with other cash.  And this is their

12   only time to document what was found in the box for the

13   purpose of safety, identifying the owners, or -- what do

14   you call this? -- avoiding accusations of theft, or

15   being able to refute accusations of theft.

16   BY MR. FROMMER:

17     Q.  I -- I understand that the money is going to go

18   to Loomis and get deposited, but --

19     A.  Right.

20     Q.  -- and this is their one opportunity to gather

21   this evidence.

22          My question is:  How does this evidence actually

23   move forward any of the inventory rationales that you

24   previously discussed?

25     A.  I don't --

Page 86

1           MR. COLL:  Object to form.

2           THE WITNESS:  -- know.  Yeah, I don't know.

3     BY MR. FROMMER:

4       Q.  Okay.  Is it more consistent that this would be

5     information or evidence that would be useful should the

6     government, at some point in the future, decide to bring

7     civil forfeiture proceedings against the property?

8           MR. COLL:  Object to form.

9           THE WITNESS:  I don't know.  I mean,

10    additional information is helpful, in general,

11    because --

12    BY MR. FROMMER:

13      Q.  Is this the -- oh, sorry.  Go ahead.

14      A.  When we do -- when I do inventory searches, we

15    document everything that we see.  And I -- my assumption

16    is whoever drafted this at the FBI was just trying to

17    capture everything, or with agents who are not familiar

18    with the case.

19      Q.  Have you --

20      A.  So --

21      Q.  -- used information regarding the smell of cash

22    or how cash was bundled, have you submitted that in any

23    affidavits in support of a conclusion that the property

24    was subject to forfeiture?

25          MR. COLL:  Objection, vague.

Page 87

1               THE WITNESS:  I have.

2    BY MR. FROMMER:

3        Q.  Okay.  So information about how cash is bundled

4    or how cash smells is probative, in your opinion, in a

5    civil forfeiture proceeding?

6        A.  It is relevant, not -- see, I don't do civil

7    forfeiture proceedings generally.  I have written

8    affidavits for criminal cases, and I have described how

9    cash is bundled, how it smells, in criminal cases.

10       Q.  So when you're investigating how cash is -- or

11   when you're declaring how cash is bundled, how it

12   smells, you're doing that in the context of a criminal

13   case in order to justify the grant of a warrant, either

14   a search warrant or an arrest warrant or a seizure

15   warrant; is that correct?

16              MR. COLL:  Objection's vague, lacks

17   foundation.

18              THE WITNESS:  It could.

19   BY MR. FROMMER:

20       Q.  Okay.  But you'd agree that observations -- would

21   you agree that observations about how money smells or

22   how it's bundled is useful in criminal investigations?

23              MR. COLL:  Objection, vague.

24              THE WITNESS:  All information is useful in

25   criminal investigations.

Page 88

1   BY MR. FROMMER:

2      Q.   Okay.  Now, if you look down a little bit below,

3   you'll see three lines -- well, four lines, really --

4   but all are listed as "K-9"?

5      A.   Uh-huh.

6      Q.   Do you see those?

7      A.   I do.

8      Q.   Okay.  Now, were you involved in getting drug

9   dogs -- having local police bring drug dogs to U.S.

10  Private Vaults?

11     A.   I was.

12     Q.   And who did you speak -- or what agencies did you

13  speak to for that purpose?

14     A.   Glendale Police Department, El Monte Police

15  Department, Chino, and Los Angeles Police Department.

16     Q.   And did you go and talk to these local police to

17  get these K-9s?  Did you do that on your own initiative?

18     A.   No.

19     Q.   On whose initiative did you go and talk to these

20  police?

21     A.   I was asked to -- I was asked by -- I don't

22  remember -- Justin or Lynne, to see if I can locate K-9

23  officers who can assist during the search.

24     Q.   Justin is -- who --

25     A.   I'm sorry.  Justin Carlson of the DEA.

Page 89

1      Q.   Okay.  So you think -- so it's your recollection,

2   and I'm not trying to put words in your mouth -- but you

3   believe that you were asked, either by Lynne Zellhart at

4   the FBI or Carlson at the DEA, to get drug dogs to be at

5   U.S. Private Vaults; is that right?

6      A.   Yes.

7      Q.   Did they explain to you why they wanted drug dogs

8   at U.S. Private Vaults?

9      A.   Yes.  We assumed there was going to be drugs at

10  some of these boxes, and also the assumption that some

11  of the funds were tainted with drugs.

12     Q.   And the purpose of having the drug dogs there is

13  so that you could record evidence that the drug -- that

14  the -- that currency smelled like drugs?

15              MR. COLL:  Object to form.

16              THE WITNESS:  The purpose of having the drug

17  dogs there -- I'm not a K-9 officer, but they had the

18  drugs -- drug dogs there to sniff the currency to see if

19  they had been tainted with odors of drugs that had been

20  imprinted in those dogs.

21  BY MR. FROMMER:

22     Q.   Does whether a dog alerts to the smell of drugs,

23  does that help identify an owner?

24              MR. COLL:  Objection, vague.

25              THE WITNESS:  No.

1  BY MR. FROMMER:

2      Q.  Does a drug dog alerting to the smell of drugs on

3  currency help prevent accusations of theft or loss?

4              MR. COLL:  Same objection.

5              THE WITNESS:  No.

6  BY MR. FROMMER:

7      Q.  Does the -- having a drug dog alert to the

8  presence of narcotics on currency help facilitate the

9  possible use of administrative or civil forfeiture

10  against that property?

11              MR. COLL:  Same objection.

12              THE WITNESS:  It could.

13  BY MR. FROMMER:

14      Q.  Was your understanding that drug dogs -- that you

15  were supposed to get drug dogs there at U.S. Private

16  Vaults so that you could -- so that the government could

17  determine -- let's scratch that.  Scratch that.

18          What was the first time you remember talking

19  about use of civil forfeiture as to any of the property

20  at U.S. Private Vaults?

21      A.  I'm trying to remember.  But those conversations

22  would have been with AUSAs, probably a month before the

23  search warrants were executed.

24      Q.  So you don't recall any conversations about civil

25  forfeiture occurring prior to the year 2021?

Exhibit L
1154

1    A.  So I guess to try to clarify, we don't -- agents

2    don't really talk in terms of civil forfeiture.  We -- I

3    mean, we have to, it's part of our job, but it's not

4    really the forefront of our thought.  We would talk

5    about seizures, we would talk about search warrants, we

6    would talk about our arrests.  So I'm trying to remember

7    specifically discussing civil forfeiture, and I feel

8    like those were done with attorneys present who would

9    have those more in their, I guess -- those are

10   considerations that they seem to think more about.

11   Q.  And I'm not asking for the contents of any

12   particular statement by an attorney or anything like

13   that, I'm just wondering when -- when did those

14   conversations occur?  When did -- when did you discuss,

15   either with attorneys, or Lynne Zellhart, or Carlton,

16   or, you know, any of the other people who were involved

17   in the U.S. Private Vaults investigation and warrant

18   process, when do you first recall talking with any of

19   them about maybe we could use forfeiture as -- as

20   against some of the property of the box renters at U.S.

21   Private Vaults?

22         MR. COLL:  Well, I'm just going to object as

23   it's compound and -- and asked and answered, to an

24   extent.  But also -- I appreciate, Robert, you starting

25   with this, but I do want to caution again the witness to

1   not divulge the content of any conversation with AUSAs.

2   But you can answer when such conversation did occur, if

3   it did occur.

4               THE WITNESS:  There's a lot to unpack there,

5   and with Max interceding, I'm kind of confused now.

6   What was the question again?

7   BY MR. FROMMER:

8       Q.  Essentially, when is the first time you talked

9   with anyone --

10      A.  Okay.

11      Q.  -- whether that's people in the AUSA -- in the

12  USAO, or people in the FBI, or DEA, or IRS, or any of

13  the other groups that were involved in Private Vaults,

14  when was the first time you recall someone saying, hey,

15  you know, we could -- we think a lot of these people are

16  no-goodniks.  We think a lot of the people that rent

17  these boxes are up to no good.  We could, potentially,

18  use civil forfeiture to essentially take away property

19  that we think is connected to crime.

20              MR. COLL:  Objection, lacks foundation, same

21  objections as before.  Go ahead.

22              THE WITNESS:  So we had early conversations

23  about seizing and forfeiture on the owners of the

24  business and other assets.  I don't recall when -- or

25  when we -- we did have discussions about forfeiture of

Exhibit L
1156

1   the boxes themselves, but I feel like those were closer

2   to when the warrant got signed, and those were with the

3   U.S. Attorney's Office.

4   BY MR. FROMMER:

5      Q.  So you think that conversations that the -- any

6   conversations that you had -- you and members of other

7   agencies had about the use of civil forfeiture as

8   against box renters' property, as opposed to the owners

9   of the company, that that took place around the time of

10  applying for the warrant?  Is that fair to say?

11     A.  I'll just repeat what I said, because I'm not

12  sure you're restating accurately.

13          When we were discussing forfeiture of the owners'

14  property --

15              MR. COLL:  I'm going to interject here again

16  and just caution the witness, if you're getting into

17  content of discussions that you had with AUSAs, that is

18  protected by the attorney-client privilege.  You should

19  not talk about the content of those discussions.

20              He's asking you when any conversations

21  occurred.  But he's kind of -- Robert, you're kind of

22  getting into content here, and we're in sort of a murky

23  area.  So I just want to caution the witness not to get

24  into any content conversations that you had with AUSAs

25  on this topic.

Page 94

1            THE WITNESS:  I'm trying to figure out how

2   to answer and be accurate, here.  And without divulging

3   what was discussed with the U.S. Attorney's Office.

4            So I'll say yes, we did have discussions of

5   forfeiture of the owners' properties early on, and we

6   had discussions closer to when the warrant was executed

7   on the nest of boxes at the business.

8   BY MR. FROMMER:

9     Q.   About using civil forfeiture as to the nest of

10  boxes, or at least some of them?

11           MR. COLL:  Well, I'm going to object here.

12  Robert, you're getting into -- you're asking about

13  content of conversations now --

14           MR. FROMMER:  Well --

15           MR. COLL:  -- so I'm going to instruct

16  him --

17           MR. FROMMER:  -- he just -- I'm just -- he

18  just said "the nest of boxes."  I'm just trying to

19  understand what he means about that.

20           MR. COLL:  Yeah.  Well, you're asking about

21  the content of conversations that was had with AUSAs.

22  I'm going to instruct the witness not to answer.

23  BY MR. FROMMER:

24    Q.   Were these conversations with AUSAs?

25    A.   Yes.

Page 95

1    Q.  Did you always only have these conversations with

2    AUSAs?

3    A.  Generally the discussions about seizure was

4    usually with AUSAs.  I don't recall -- it's hard for me

5    to recollect instances where an AUSA wasn't present,

6    versus an instance where it was only agents.

7    Q.  So it's -- okay.  All right.

8        So I know I talked about this before, a second

9    ago, so I apologize for going back, but I think you said

10   that Carlson and Zellhart were the ones who said to go

11   get the drug dogs, or bring the drug dogs; is that

12   correct?

13   A.  Yes.

14   Q.  Do you know if AUSAs were involved in that

15   decision, to bring drug dogs?

16   A.  They were involved in that decision and those

17   discussions.

18   Q.  Give me just a second.

19        MR. COLL:  Robert, are we done with the

20   document, or should we keep this?

21        MR. FROMMER:  I might be introducing a new

22   things in a second, but let me -- I'm just -- let me --

23   BY MR. FROMMER:

24   Q.  So are you saying that you really don't remember

25   any instance where you and other agents talked about the

Page 96

1   use of civil forfeiture as to box renters' property?

2   Are you saying that -- let me rephrase.

3        Do you recall any conversations in which you

4   discussed the use of civil forfeiture against box

5   renters' property in any situation where there wasn't an

6   AUSA present?

7   A.   You know, it's been -- has it been three years?

8   No, just a year.  Yeah.  This case has been going since

9   2018.  It's hard -- it's hard for me to recall when --

10  because the AUSA's office, the U.S. Attorney's Office,

11  is very much a part of this case, so it's hard for me to

12  recall instances, or separate instances with accuracy,

13  when they were present and when they were not.

14  Q.   So the answer is you don't -- you can't remember

15  one way or the other whether there was conversations

16  with just agents?

17  A.   Yes.

18            MR. FROMMER:  All right.  Let me switch

19  exhibits.  So give me just a second.

20            And I want to talk about -- all right.  This

21  is Exhibit 11.  So let me know when you have that.

22            (Exhibit 11 marked at this time.)

23            MR. COLL:  Yes, we have it.

24  BY MR. FROMMER:

25  Q.   Okay.  Why don't you take a second to review the

Exhibit L
1160

1  document, and let me know when you're ready.

2      A.  I'm ready.

3      Q.  Okay.  So this is Exhibit 11.  I purport that

4  it's a K-9 affidavit that had been turned over to us by

5  the government.  I would note that near the bottom -- do

6  you see on what's March 23rd, 2021, near the bottom of

7  the -- of the -- of the exhibit?

8      A.  Yes.

9      Q.  And I believe it says:

10         Postal Inspector Versoza asked that I and my drug

11  detection K-9 Kobra to assist in a drug investigation.

12     A.  Uh-huh.

13     Q.  So is this accurate, did you -- did you -- when

14  you were at U.S. Private Vaults, did you ask the drug

15  dog handlers to sniff particular parcels of currency?

16     A.  So like we discussed earlier, I was -- I

17  coordinated -- or I found the K-9 units, the K-9

18  officers to bring their drug dogs to U.S. Private

19  Vaults, so I think many of their forms will say it was

20  my request that they do this sniff of the crime scene.

21     Q.  Okay.

22     A.  So -- so yes.

23     Q.  And your -- so your explanation -- in fact, I

24  found one where your name was typewritten in there.

25     A.  Uh-huh.

1    Q.  And you're saying that the frequency of that is

2    because of your role in getting all the drug dogs there.

3    A.  Correct.  I think their form requires they put

4    somebody down, and so it was logical for -- that they

5    use my name, since I requested their presence.

6    Q.  Why was it you?  Why was it you who was set on

7    drug dog duty?

8    A.  So postal inspectors deal with a lot of K-9

9    units, because of drugs and -- drugs that go through the

10   U.S. mail system.  So we have partnerships with K-9

11   units across various cities and counties.  And so it was

12   logical that I, versus FBI, who does not do drug parcel

13   investigations, or DEA, when they do they usually

14   request our assistance anyway, it was logical that they

15   ask me to do that.

16   Q.  Okay.  These local agencies that you reached out

17   to, are they, like, all involved in some, like, state

18   and local drug task force?  I'm trying to figure out

19   what's their connection -- what -- are -- the members --

20   the local police units you reached out to to solicit

21   drug dog help, are they in -- are those units in a

22   group, or an association?

23   A.  I can't really speak to each one.  Presumably

24   they all go to the same academy for K-9 training, or

25   something to that --

Page 99

```
 1      Q.  Well --

 2      A.  -- effect, or have the same standards.

 3      Q.  What I'm trying to figure out here is, like,

 4   you've got -- you brought in a lot of drug dogs from all

 5   around Southern California, and some of them, like, I

 6   think the one -- I forget which one, maybe Chino, is

 7   almost an hour away.  It's, like, really far.  And I'm

 8   trying to understand -- what --

 9      A.  Okay.

10      Q.  -- I'm trying to understand is, like, what did

11   you -- what -- when you went and asked these -- these

12   drug dog handlers to come, were they just doing this out

13   of the goodness of their heart?

14      A.  So --

15              MR. COLL:  I'll object to form.  Go ahead.

16              THE WITNESS:  Chino police is a member of a

17   task force that we host, El Monte PD was a member of the

18   DEA task force, and El Monte PD now also has K-9

19   officers assigned to a Postal Inspection Service task

20   force as well, so we do have relationships with these

21   departments, and for me it was logical to see -- call --

22   I wasn't going to recreate relationships when agents or

23   inspectors in my office had already connections with K-9

24   officers.

25
```

Exhibit E
1163

Page 100

1   BY MR. FROMMER:

2     Q.  So let me make sure I understand, then, because I

3   don't think I understood this previously.  So the

4   various police departments that you reached out to,

5   USPIS already has relationships with those police

6   departments; is that correct?

7     A.  Correct.

8     Q.  And the local police departments that you reached

9   out to, they're members of different area task force; is

10  that correct?

11    A.  Yes.  For example, LAPD, although they've

12  reshuffled recently, used to be housed in the same

13  office I am in, and the same floor.  We used to share

14  the shame break room, for specifically drug

15  investigations through U.S. mail.  So their K-9 officers

16  would come to my office and train there, with drug

17  parcels.  So there's already a relationship there.

18        I -- the Chino PD, it's the same thing with our

19  office in that part of town.  And El Monte, DEA already

20  had that relationship with them.  Glendale PD, I used to

21  work on a task force with some Glendale PD guys.  And

22  then -- I'm trying the remember who else.  Did I miss

23  someone?  I said Glendale, I said LAPD, I said Chino, I

24  said El Monte.  I feel like I'm missing one.

25  Regardless --

Page 101

1    Q.  Yeah.

2    A.  -- basically we had relationships already with

3    them.

4        If you -- I don't think we even had -- we were in

5    Beverly Hills, but we didn't use Beverly Hills PD, and

6    I'm saying that as an example.  It's because I never

7    worked with them, I didn't have a relationship with

8    them.  And so it was just easier to use guys my agency

9    already had a relationship with, rather than drafting,

10   you know -- or not drafting, but having to make those

11   contacts in the few moments -- the few weeks or days we

12   had to make this happen.

13   Q.  Okay.  I mean there's got to be -- I mean, for

14   some of these drug dog units -- right? -- I mean, some

15   of these drug dog units must have been there dozens of

16   hours; isn't that correct?

17   A.  Sorry.  Something popped up on the screen saying

18   Webex disconnected, but it looks like you're still on.

19   Q.  Yeah, I'm here.

20       MR. COLL:  We're okay.  This is Zoom, so

21   just --

22       THE WITNESS:  Oh, okay.  Okay.

23       I'm sorry, can you repeat that question?

24   BY MR. FROMMER:

25   Q.  Well, I just -- I had a question -- I'm just

Page 102

1    wondering, like, some of these drug dog units must have

2    been out there for dozens of hours.

3        A.  Correct.

4        Q.  I mean, isn't that going to be really expensive

5    on the local police department who sent the drug dog and

6    the handler out there?

7        A.  So yes and no.  I think some of them were funded

8    by federal government through a program called OCDETF.

9             O-C-D-E-T-F, for Susan there.

10       Q.  What is that program?

11       A.  I'm no expert in it, I just have kind of a

12   familiar -- vague familiarization with it, so I don't

13   want to be -- you know, to be taken as an expert if I

14   misspeak.  But essentially it's a funding by the

15   Department of Justice that provides for investigations.

16       Q.  Okay.  And did you say O-C-D-T-F?

17       A.  It stands for Organized Crime Drug Enforcement

18   Task Force.  So whatever that acronym is.

19       Q.  All right.  So they were --

20       A.  Yeah, OCDETF.

21       Q.  So the local -- a lot of these local drug dogs,

22   their agencies, their local police departments would

23   have been reimbursed through this federal program you're

24   discussing.

25       A.  That's -- that's the idea.  And the ones that are

Page 103

1   in task forces are paid by the federal agencies that

2   host the task force.

3       Q.  Oh, okay.  So if some of these local police

4   departments were part of task force, then they could

5   just get paid directly by the task force for the time

6   they spent at U.S. Private Vaults?

7       A.  Correct.

8       Q.  Okay.  I didn't -- didn't understand how -- why

9   people would -- it just seemed like a really large

10  amount of time to break out for the goodness of your

11  heart.

12          MR. FROMMER:  All right.  Let's take just,

13  like, a brief five-minute break.  Okay?  I'll -- let's

14  come back -- we'll come back at 2:00, my time.  All

15  right?

16          MR. COLL:  Okay.

17          MR. FROMMER:  Off the record.

18      (A short break was taken at this time.)

19          MR. FROMMER:  Let's go back on the record.

20  BY MR. FROMMER:

21      Q.  Inspector Versoza, we talked awhile -- for awhile

22  about your role in getting K-9s to U.S. Private Vaults,

23  working your contacts with local PDs.

24          When the K-9 units were there, how did you

25  determine which box -- which bundles of currency they

Page 104

1    should -- should be subjected to a dog sniff and which

2    bundles of currency wouldn't be subjected to a dog

3    sniff?

4        A.  I didn't make any of those determinations.

5    Nothing was brought to me.  The dogs were available.  I

6    believe FBI put all cash in front of the dogs, but I

7    don't know that firsthand.

8        Q.  Okay.  Were you involved in any discussions about

9    under what situations money would be presented to the

10   drug dogs versus not?

11       A.  I'm trying to recall the FBI's briefing.  I feel

12   like they set a threshold of how much money, but I don't

13   recall specifically.  And again, I was not -- although I

14   did request the dogs to be there, I was not doing any of

15   the K-9 sniffs.  I had my own job, opening boxes inside.

16       Q.  Okay.  All right.  So who would be -- who do you

17   think would be the -- a better person to speak to if I

18   wanted to learn more about that?

19       A.  I think Lynne Zellhart, although I know she

20   didn't inventory -- or maybe she did.  I don't know.

21   Maybe I shouldn't speak.  Her primary function wasn't to

22   inventory, although it's possible she might have done

23   some to help speed things up.

24          But I -- it was largely the FBI's operation that

25   they -- and they were following their policies and their

Page 105

1    procedures, and things that they had discussed

2    internally.  So a lot of questions you have for me I

3    can't answer, because those are things that took place

4    within the FBI.

5        Q.   Okay.  So those are topics you think it would be

6    better to bring up with Lynne and the FBI.

7        A.   Correct.

8        Q.   You know, I know they did the vaults -- you know,

9    you seized the boxes.  I think it's something like about

10   800 boxes altogether.  Were you involved in any of the

11   conversations to decide on how -- what property should

12   be returned or how -- well, let me ask -- start there.

13       Were you involved in any discussions about

14   what -- what property should be returned --

15       A.   No.

16       Q.   -- to the box holders?

17       A.   No.

18       Q.   Were you involved in any conversations involving

19   the post-seizure disposition of box renters' property?

20       A.   No.

21       Q.   So nobody asked -- ever asked you, like, what you

22   should do, what -- what should be done with respect to a

23   particular box renter's property?

24       A.   So those are conversations, in my understanding,

25   even in cases outside of this, that happens between

Exhibit L
1169

Page 106

1    forfeiture people and the U.S. Attorney's Office, and I

2    was not part of that.  I mean, that was done with FBI's

3    forfeiture people.  So I'm not in the chain of command

4    at the FBI, so at no point did they consult me to say,

5    hey, what do you think of box 301, or 202 or -- yeah.

6    Throwing random numbers out.

7        Q.  So you weren't making any decisions about which

8    boxes to move for forfeiture upon or not; is that right?

9        A.  Correct.

10       Q.  And was that --

11       A.  I had --

12       Q.  Is that the -- was the decision about which boxes

13   to move forward on forfeiture upon, that was within --

14   that was the FBI?

15       A.  The FBI and the U.S. Attorney's Office.

16       Q.  Okay.

17               MR. FROMMER:  All right.  Give me, like,

18   just two minutes.  I think we're -- we're about ready to

19   wrap up.  Okay?

20               THE WITNESS:  Thank you.

21          (A short break was taken at this time.)

22               MR. FROMMER:  All right.  Back on the

23   record.

24               Investigator Versoza, that's all the

25   questions I have for you today.  It's possible,

Page 107

1   depending on the documents that we receive, I might have

2   to call you back at some point, but for today -- as of

3   right now, we are complete.  So thank you for taking

4   time today to prepare for my questions, and for being so

5   patient with me.

6              THE WITNESS:  Thank you so much.

7              MR. COLL:  Thanks, Robert.

8              No questions for me.  And we can go off the

9   record.

10             (Deposition concludes at 2:11 p.m.)

11                         -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit L
1171

Page 108

1                              -oOo-

2

3          I, LYNDON VERSOZA, hereby declare under

4    penalty of perjury that I have read the foregoing pages

5    4 through 107; that any changes made herein were made

6    and initialed by me; that I have hereunto affixed my

7    signature.

8

9          Dated: _____

10

11

12         _____

13                    LYNDON VERSOZA

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit L
1172

Page 109

1                    ERRATA SHEET/CORRECTIONS

2

3    PAGE    LINE

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   _____   _____   _____

Exhibit D
1173

Page 110

1  STATE OF NEVADA      )

                       ) ss.

2  COUNTY OF WASHOE     )

3

4       I, SUSAN E. BELINGHERI, a Certified Court

5  Reporter for the State of Nevada, do hereby certify;

6       That on Tuesday, the 28th day of June, 2022, at

7  the hour of 10:06 a.m. of said day, at the offices of

8  Bonanza Reporting & Videoconference Center, 1111 Forest

9  Street, Reno, Nevada, appeared LYNDON VERSOZA via

10 videoconference, who was duly sworn by me, was thereupon

11 deposed in the matter entitled herein, and that before

12 the proceeding's completion the reading and signing of

13 the deposition has not been requested by the deponent or

14 party;

15      That the foregoing transcript, consisting of

16 pages 1 through 110, is a full, true, and correct

17 transcript of my stenotype notes of said deposition to

18 the best of my knowledge, skill, and ability.

19      I further certify that I am not an attorney or

20 counsel for any of the parties, nor a relative or

21 employee of any attorney or counsel connected with the

22 action, nor financially interested in the action.

23 DATED:  At Reno, Nevada, this 5th day of July, 2022.

24

25      SUSAN E. BELINGHERI, CCR #655

**Exhibit E**
**1174**

[& - agencies]                                                                                          Page 1

**&**

**&**   4:3 110:8

**0**

**04405**   1:9
**053f**   1:25

**1**

**1**   110:16
**10**   3:8 37:16 78:21 78:24
**10,000**   18:10
**100**   16:6
**107**   108:5
**10:06**   4:2 110:7
**11**   3:9 96:21,22 97:3
**110**   16:2,6 110:16
**1111**   4:4 110:8
**11:00**   41:24
**12**   29:22 30:7,12 30:20
**14th**   2:11
**15**   42:2
**17**   14:15 29:6 31:20 34:24 35:2 35:6

**2**

**2,500**   18:16
**20**   27:18,19 46:22
**200**   16:17
**2014**   47:14
**2015**   46:11,14,20 46:24 47:7,19 48:19 49:25 50:1
**2018**   49:24 50:2,5 50:8,11,15 51:17 51:23 55:23 56:12 56:18 57:14 58:1 96:9
**202**   106:5

**2020**   52:3,21 55:2 56:18 57:14
**2021**   5:1 68:15 73:3 90:25 97:6
**2022**   1:20 4:2 110:6,23
**22203**   2:7
**22nd**   73:3
**23rd**   97:6
**25**   37:12,16
**26**   37:16
**28**   1:20
**28th**   4:1 110:6
**2:00**   103:14
**2:11**   107:10
**2:15**   42:3
**2:16**   42:7
**2:21**   1:9

**3**

**3,000**   18:15
**30**   4:19 27:18,19
**301**   106:5
**312**   2:11

**4**

**4**   3:4 108:5
**406**   110:24
**43**   12:10

**5**

**5th**   110:23

**6**

**655**   1:25 110:25

**7**

**78**   3:8

**8**

**800**   68:22 105:10
**8:30**   73:20 74:12

**9**

**9**   3:9 78:25 88:4 88:22 89:17 97:4 97:11,17,17 99:8 98:10,24 99:18,23 100:15 103:24 104:15
**900**   2:6
**90012**   2:11
**901**   2:6
**96**   3:9
**9:00**   73:20 74:12
**9s**   88:17 103:22

**a**

**a.m.**   4:2 73:20 110:7
**abandoned**   38:17
**ability**   110:18
**able**   6:15 9:1 11:7 85:15
**academy**   29:21,22 29:23 30:8,14 98:24
**access**   79:3
**accolades**   36:19
**account**   23:25 26:6,14
**accuracy**   60:5 96:12
**accurate**   7:6 9:1 9:10 11:3,7 16:18 25:6 47:4,22 50:12 53:2,15 57:18 82:4 94:2 97:13
**accurately**   93:12
**accusations**   39:4 82:3 85:14,15 90:3

**accused**   38:15
**accusing**   56:5
**acronym**   102:18
**acting**   1:11
**action**   4:24 23:15 110:22,22
**actions**   57:5
**active**   57:15
**activities**   5:2 58:17
**activity**   18:3 48:16 69:8,11,21,22 70:2
**acts**   56:6
**actual**   64:21 69:5
**ad**   51:6
**additional**   10:7 59:6 86:10
**administrative**   42:16,25 43:7,9,17 44:5,8 90:9
**administrator**   42:13
**administrators**   53:3,4
**advise**   42:23 54:9
**affect**   24:21
**affidavit**   3:9 23:14 23:19 31:2 32:14 44:10 55:22,25 56:4,11 57:13,18 59:21 60:23,24 62:5 63:21,21 97:4
**affidavits**   31:8 86:23 87:8
**affixed**   108:6
**agencies**   13:11 14:3,10,13 23:8 42:15,24 47:11 48:25 50:14 51:5 54:1 56:22,24

Exhibit E
1175

61:22 64:22 66:21
67:8 74:14 76:10
88:12 93:7 98:16
102:22 103:1
**agency** 12:21
15:16 16:17 18:5
42:14 43:8 46:2
47:7,13 51:1,4,21
56:19 57:25 59:8
60:13 65:25 77:8
77:11,16 78:3
101:8
**agency's** 40:6
**agent** 3:8 5:12
12:12 13:9 40:13
49:5 51:4 62:1,23
62:23 63:17,18,22
65:11 78:5 84:8
**agents** 5:25 12:15
12:16,18,19 16:2,6
51:6 60:17 62:2
63:20 65:15 66:25
76:17,18 78:5
81:9,10,17 83:2
86:17 91:1 95:6
95:25 96:16 99:22
**ago** 7:15 25:16
32:2 95:9
**agree** 38:18 71:10
71:16 87:20,21
**agreed** 74:2 75:3
**agreement** 55:21
**ahead** 5:8 14:6
21:20 25:21 46:17
48:12 60:2 63:2
80:1,21 82:5
86:13 92:21 99:15
**alert** 90:7
**alerting** 90:2
**alerts** 89:22

**alternative** 74:6
**alternatives** 65:19
65:25 66:5,7
**altogether** 105:10
**america** 1:10
**amount** 20:10
36:20 103:10
**analysis** 44:6
**andrew** 63:9,18
**angeles** 1:22 2:11
15:12,25 88:15
**angelo** 12:2,3
**answer** 6:14 7:12
7:17 8:8,9,11,12
8:13,21,21,23,23
9:4,14,18,23 10:2
10:19 11:3,8
21:20 27:10 31:23
35:16 38:24 44:13
49:12 54:25 63:13
64:14 92:2 94:2
94:22 96:14 105:3
**answered** 80:20
81:19 91:23
**answering** 7:8 9:7
9:15
**answers** 6:10 9:1
**anyway** 16:19
98:14
**apologize** 95:9
**apparent** 48:14
69:22
**appearances** 2:1,2
**appeared** 4:6 49:6
110:9
**appearing** 1:21
**appears** 18:23
19:2 83:5
**application** 31:5
59:22 60:14 63:8

**applied** 13:11 14:9
14:12
**apply** 30:24 31:1
32:8 60:8 61:5
66:15
**applying** 13:6
68:20 72:24 93:10
**appoint** 66:15
**appointed** 71:11
**appointment** 11:2
**appreciate** 91:24
**approximately**
13:21 27:17 33:7
46:10,11
**area** 16:25 93:23
100:9
**argumentative**
71:14
**arises** 11:8
**arlington** 2:7
**armed** 13:9
**arrest** 29:13 30:18
87:14
**arrests** 12:19
30:22 32:7 91:6
**articulate** 60:25
**asked** 75:3 80:20
81:19 88:21,21
89:3 91:23 97:10
99:11 105:21,21
**asking** 6:9 28:22
54:17,24 55:4,5,8
55:10,13 57:21
60:19 62:16 68:17
69:17 91:11 93:20
94:12,20
**aspect** 33:11,12
44:24
**aspects** 30:8
**asset** 2:10 26:5,6

**assets** 22:19 25:13
92:24
**assigned** 15:2,5,7
16:20 27:16,17
99:19
**assist** 6:11 88:23
97:11
**assistance** 59:6,19
98:14
**assistant** 1:13 2:9
5:5 22:17 23:22
42:12
**association** 98:22
**assume** 8:16 20:11
22:12 38:4
**assumed** 89:9
**assuming** 20:10
38:2
**assumption** 86:15
89:10
**attend** 29:21
**attorney** 1:11 2:9
4:16 5:6 8:22,24
9:24 22:18 23:22
49:12 52:9,10
54:11 91:12 93:18
110:19,21
**attorney's** 21:23
22:2,10 23:7,8,11
23:21 26:1,4
43:11 48:7,25
49:6,11 54:8
55:17 61:15,21
62:1,18,20,23
63:23 71:25 93:3
94:3 96:10 106:1
106:15
**attorneys** 2:5
25:24 42:12 62:3
91:8,15

Exhibit E
1176

attrition   16:4
audible   6:7
audibly   6:12
ausa   25:17,18
  49:19 63:18 92:11
  95:5 96:6
ausa's   96:10
ausas   48:24 54:12
  54:22 63:20 90:22
  92:1 93:17,24
  94:21,24 95:2,4,14
authority   62:12,12
automatic   18:13
available   11:5
  77:14 104:5
avoid   9:15 10:20
  18:23 19:11 60:16
  81:12
avoiding   85:14
awards   36:18,21
awhile   103:21,21

**b**

back   5:1 8:3 20:25
  42:3,6 43:17 47:7
  47:14 48:19 52:5
  56:12 65:20 72:18
  79:20 83:18 95:9
  103:14,14,19
  106:22 107:2
background   11:23
bands   83:3,3
bank   23:24 26:6
  26:14 77:15 83:3
  85:9
banks   17:22
based   9:20 26:12
  51:7 84:2
basically   19:7
  41:19 52:14 54:17
  57:12 68:8 74:7
  85:9 101:2

basics   6:8
basis   24:14 85:2
bathroom   10:15
beach   13:16
beat   16:21
began   52:22 55:3
beginning   56:14
  60:3
behalf   4:19 5:7
  19:10
believe   58:16 60:4
  73:3 76:23 80:8
  89:3 97:9 104:6
belingheri   1:25
  4:5 110:4,25
belong   54:1
best   7:11 75:17,24
  110:18
better   17:18 55:18
  64:14 67:2 104:17
  105:6
beverly   101:5,5
beyond   53:1 82:8
big   15:25
bit   29:16 32:9
  33:17 40:22 57:2
  68:23 73:2 83:24
  88:2
blocks   30:5,5
board   67:12
bonanza   4:3 110:8
book   11:2
bottom   97:5,6
box   45:23,24 46:7
  46:15,19,25 48:22
  50:9 52:15,25
  53:3,21 56:15
  58:17,21 61:2
  66:1,2 67:23
  68:23 69:14,19,23
  70:1,6,7,10,13,21

70:25,25 85:12
  91:20 93:8 96:1,4
  103:25 105:16,19
  105:23 106:5
boxes   45:13,20
  47:15 58:12 66:13
  67:2,22,22 68:3,9
  68:22 70:24 71:5
  71:13 72:8 73:23
  75:10,13,18,21
  76:3,9,11 77:23
  78:9 89:10 92:17
  93:1 94:7,10,18
  104:15 105:9,10
  106:8,12
bread   17:19
break   10:16 36:23
  41:25 42:5,10
  68:3,21 72:17,19
  100:14 103:10,13
  103:18 106:21
breaking   66:13
breaks   10:14
brendan   3:9
brief   103:13
briefed   81:8
briefing   104:11
briefly   82:20
bring   47:16,16,18
  49:22 75:5 86:6
  88:9 95:11,15
  97:18 105:6
broader   53:14
broken   71:12
brought   22:1
  36:19 73:25 74:3
  74:11 99:4 104:5
brown   63:9,18
buildings   65:12
bunch   19:24 45:12
  45:20 60:22

bundled   83:3
  86:22 87:3,9,11,22
bundles   77:10
  103:25 104:2
bureau   1:14
business   48:8,15
  49:3 53:3,4 66:16
  66:17 67:23 69:8
  69:12,13,20 71:6,9
  71:11 74:1,2,9
  75:6 92:24 94:7
butter   17:19
buy   19:25,25 59:8
buying   18:16
buys   57:8,16

**c**

c   102:9,16
calendar   11:1
california   1:2,12
  1:22 2:11 99:5
call   15:23 21:10
  22:5 32:17 51:7
  55:4,13 59:6
  85:14 99:21 107:2
called   12:16 40:5,7
  102:8
calls   46:16 58:3
  59:1,2 65:4
capacity   1:11,13
  33:1
capture   86:17
cards   16:23
career   15:1 16:19
  33:9 36:2,8
carefully   35:16
carlson   88:25 89:4
  95:10
carlton   91:15
carriers   16:20
carry   12:18 29:12
  62:7

**case** 1:9 10:10
11:3,22 17:16,19
22:2,20 23:12
24:14,14 33:12,13
33:17,23 34:13,21
35:15,21 40:13
42:19 49:5 58:5
61:25 62:23 63:17
63:17,17,18 65:15
65:22 80:15 86:18
87:13 96:8,11
**cases** 18:7 20:19
24:15 27:2,5,13,14
27:15,18,19 32:19
33:4,18 35:1,6
36:3 87:8,9
105:25
**cash** 18:8,24 19:24
77:10 82:22 83:2
83:16 84:1,6,14,16
84:25 85:8,8,10,11
86:21,22 87:3,4,9
87:10,11 104:6
**caution** 49:8,13
52:7 91:25 93:16
93:23
**ccr** 1:25 110:25
**center** 4:4 13:18
110:8
**central** 1:2,12
62:20
**centrally** 62:21
**certain** 77:11
**certified** 110:4
**certify** 110:5,19
**chain** 72:1 106:3
**challenge** 4:24
**chance** 11:14
**change** 51:23
**changed** 50:3
51:25

**changes** 108:5
**charge** 51:1,21
53:6,10 62:4
**charged** 21:9
**charges** 21:5 22:1
53:8
**chat** 79:5,11
**chemical** 83:4
84:2
**chemicals** 84:5
**child** 17:1,3 36:9
**chino** 88:15 99:6
99:16 100:18,23
**choice** 30:19
**chronologically**
48:18
**cities** 98:11
**civil** 20:18 22:6
25:5,9 26:3 27:5
27:20,21 28:21
32:10,20 33:4,8,11
33:16,19 34:4,8,13
34:16 35:8,13
36:4,8,15 42:11
43:22 86:7 87:5,6
90:9,19,24 91:2,7
92:18 93:7 94:9
96:1,4
**claims** 82:17
**clarification** 10:8
**clarify** 8:5 10:4
32:12 35:13 74:23
75:2 91:1
**class** 4:24
**clean** 20:3
**cleaning** 20:6
**clear** 6:20 7:25
52:15
**clearly** 6:12 18:23
**client** 9:24 49:12
52:9,10 54:11

93:18
**close** 68:6,7,7 72:6
**closer** 93:1 94:6
**coffee** 83:4 84:2,7
**coll** 2:10 5:4,6
21:13,17 24:13,23
25:8,21 27:7,23
28:16 29:1 30:11
33:20 34:6,18
35:11,17 36:6
38:21 39:10 40:2
40:11,18 41:1,23
42:4,17 43:2,20
44:9 45:16 46:16
49:8 51:13 52:7
53:24 54:9,20
55:5 61:11 63:14
66:3,18 67:20
69:1,15 70:3,16
71:2,14 74:15
76:20 79:4,9,14
80:20 81:19 82:5
83:10,20 84:4,19
85:3 86:1,8,25
87:16,23 89:15,24
90:4,11 91:22
92:20 93:15 94:11
94:15,20 95:19
96:23 99:15
101:20 103:16
107:7
**collect** 66:16
**collecting** 57:12
57:17
**college** 13:5
**come** 9:23 24:16
28:23 42:3 47:3
48:20 66:16 72:18
99:12 100:16
103:14,14

**comes** 10:10,25
16:24 20:25 48:21
**coming** 11:24
71:22,24
**command** 72:1
106:3
**commingled** 85:11
**commit** 70:11
**committed** 52:17
**committing** 69:21
69:22
**common** 6:16
20:17
**communications**
54:10,21
**company** 45:22
46:6,15 49:7,22
50:6,9 51:12,19,22
52:18 56:5,16
57:9,16 58:8,9,20
62:15 69:3 71:1
93:9
**complaint** 20:14
**complement** 16:2
**complete** 9:1,10
11:7 107:3
**completely** 7:18
**completion** 110:12
**compound** 91:23
**concept** 15:24
**concerns** 4:24
**concludes** 107:10
**conclusion** 86:23
**conduct** 30:22
38:12 48:8 58:4
65:14 70:11,24
71:6
**conducted** 37:5
**conducting** 18:3
24:11 45:22 57:4
57:5

Exhibit L
1178

**confused**  23:2
  25:25 44:24 92:5
**confusing**  25:10
**connected**  92:19
  110:21
**connection**  98:19
**connections**  99:23
**consent**  75:3
**consequence**  49:1
**considerations**
  24:4 91:10
**consistent**  86:4
**consisting**  110:15
**conspiracy**  70:10
  70:19,20
**conspiring**  70:21
**constitute**  28:13
**constitutional**
  4:20 32:4
**consult**  106:4
**consulted**  28:2,5
**contacts**  101:11
  103:23
**contemplated**
  27:22
**content**  49:13
  54:10,21 55:9
  92:1 93:17,19,22
  93:24 94:13,21
**contents**  66:1,14
  69:13 91:11
**contested**  43:10
**context**  28:24
  87:12
**continue**  49:15
**contraband**  39:8,9
**contractors**  23:10
**contributed**  56:25
**controlled**  57:16
**convenient**  65:12

**conversation**  7:2
  10:24 21:23 22:18
  23:23 24:1 25:25
  55:6,9,10 62:17
  64:17 65:17 91:1
  92:2
**conversations**
  24:9,16,18,22 25:4
  25:16,23 26:4
  43:19,24 48:5,7,23
  49:2,4,11,18 50:2
  52:9 54:7,12
  55:15 59:10 61:10
  61:12,13,14,17
  62:2 64:15 65:19
  66:21,22,23,24,25
  67:4,6,10 76:9
  80:23 81:4 90:21
  90:24 91:14 92:22
  93:5,6,20,24 94:13
  94:21,24 95:1
  96:3,15 105:11,18
  105:24
**coordinated**  97:17
**correct**  9:11 12:21
  12:22 13:24,25
  16:10 20:24 22:8
  22:11,25 26:23
  28:7,11 29:8,10,25
  30:13 31:14 33:5
  33:6 35:10,12
  36:5,14 39:5
  40:25 41:9,13
  43:4 44:22 45:1,8
  45:11,14 46:9
  47:20 50:6 51:20
  52:23 53:16 56:9
  56:13,17,20 58:22
  58:23 61:20 70:15
  72:14 73:24,25
  74:8 78:10 80:10

  81:23,24 82:19
  83:19 87:15 95:12
  98:3 100:6,7,10
  101:16 102:3
  103:7 105:7 106:9
  110:16
**corrections**  109:1
**counsel**  44:1,15,17
  44:19 67:14
  110:20,21
**count**  27:9 76:12
  76:17,22,23,25
  77:1,8,12,15
**counties**  98:11
**counting**  77:10,18
**country**  17:4 65:8
**county**  110:2
**couple**  34:21
  38:13 73:19
**course**  30:21 33:9
  34:16 35:2 36:2
  58:14 66:17 83:1
**courses**  31:2
**court**  1:1 6:9,11
  6:15,19 7:5,16 8:3
  110:4
**courtroom**  7:21
**cover**  52:13
**covers**  16:16
**covid**  65:1
**cracking**  68:25
**created**  80:6,11
**creation**  80:17
  81:5
**credit**  16:23
**crime**  16:24 53:1
  92:19 97:20
  102:17
**crimes**  16:20 36:9
  46:2 52:13,16,16
  52:17 53:23

**criminal**  17:21
  22:20,20 23:12,17
  26:5 30:3 33:11
  33:15,24 34:10,11
  35:15,18,21,22
  36:1,1 47:8,18
  48:8,15,21 50:22
  56:6 58:16 69:8
  69:11 87:8,9,12,22
  87:25
**criminality**  58:6
  58:21
**cross**  7:4
**currency**  76:12,17
  89:14,18 90:3,8
  97:15 103:25
  104:2
**currently**  15:2
**cut**  75:22
**cv**  1:9

**d**

**d**  3:1 102:9,16
**dangerous**  38:14
  82:2,15
**date**  52:2
**dated**  108:9
  110:23
**day**  4:2,3 14:17
  18:17,18 40:16
  65:10,16 73:2,2,6
  73:10 74:10 76:3
  76:8 77:19 110:6
  110:7,23
**days**  41:15,16,17
  81:14 101:11
**dea**  45:22 46:6,12
  46:14,18,24 47:12
  47:15 48:5,19,23
  49:5,19 50:4,10,21
  51:14,17,17,24
  52:5 53:2,5,8,25

**Exhibit E**
**1179**

54:6 55:2,11,16,21
57:3,6,7,14 59:4
64:4 65:11 66:22
72:1 78:5 88:25
89:4 92:12 98:13
99:18 100:19
**dea's** 54:2
**deal** 20:18 23:4,6
30:5,6 98:8
**dealing** 47:14 62:1
70:9 72:8,9
**dealt** 71:17
**decade** 14:19
**decent** 20:10
83:24
**decide** 9:18 24:3
49:20 60:23 63:20
86:6 105:11
**decided** 13:22
42:11 54:5,17
**decision** 21:6
26:19 28:6 43:19
44:7 55:11,24
56:10 95:15,16
106:12
**decisions** 21:22
42:15 43:25 72:3
72:4 106:7
**declarations** 32:17
33:4,7,10,12,13,19
34:9,15,19 35:8,13
35:21 36:4,15
**declare** 108:3
**declaring** 87:11
**defendants** 1:15
2:8 5:7
**deficient** 62:6
**definitely** 34:21
**department** 88:14
88:15,15 102:5,15

**departments** 47:9
50:18 99:21 100:4
100:6,8 102:22
103:4
**depending** 107:1
**depends** 22:1
**deponent** 35:17
110:13
**deposed** 5:17,25
110:11
**deposit** 45:12,20
58:12 66:1,1,13
67:23 68:22 85:8
**deposited** 85:10
85:18
**deposition** 1:18
6:5 7:3,3 32:22,24
107:10 110:13,17
**depositions** 6:24
6:24 79:1
**describe** 57:2
75:17
**described** 45:4
87:8
**description** 3:7
**details** 57:19
**detection** 97:11
**determination**
25:12 43:16
**determinations**
104:4
**determine** 25:11
44:4 58:6 84:24
90:17 103:25
**determined** 26:2
55:18 58:5
**determining** 53:21
**dictating** 56:1
**different** 14:13
15:1 16:14 18:17
23:1,10,10 30:8

31:5 32:19 33:17
33:21 51:5,6,7
56:22,24 64:22
75:23 100:9
**differently** 84:7
**difficult** 7:5 9:3
**difficulty** 9:7
**direction** 50:3
**directly** 23:6
103:5
**director** 1:13
**dirty** 20:2,6 23:24
24:1 26:7
**disconnected**
101:18
**discovery** 78:18
**discuss** 25:15
34:10 60:14,18
63:20 64:4 65:25
68:2,21 91:14
**discussed** 39:14
64:7 66:7 85:24
94:3 96:4 97:16
105:1
**discussing** 62:16
67:1 91:7 93:13
102:24
**discussion** 66:12
79:19
**discussions** 40:23
43:5,5 49:5 60:7
61:6,23 62:10,24
63:19,22,25 64:12
64:16 66:5 67:13
68:5,10 76:2
92:25 93:17,19
94:4,6 95:3,17
104:8 105:13
**disposition** 105:19
**district** 1:1,2,12
23:9 31:6,6 62:19

62:20 63:5,21
**division** 1:3 15:13
15:25 16:5 20:16
27:1 47:8
**divisions** 15:23
**divulge** 52:9 54:10
92:1
**divulging** 94:2
**document** 11:9
78:18 79:3,6 80:2
80:3,6,9,11,14,18
80:24 81:1,5,6,6
85:12 86:15 95:20
97:1
**documents** 11:1
107:1
**dog** 89:22 90:2,7
97:15 98:7,21
99:12 101:14,15
102:1,5 104:1,2
**dogs** 88:9,9 89:4,7
89:12,17,18,20
90:14,15 95:11,11
95:15 97:18 98:2
99:4 102:21 104:5
104:6,10,14
**doing** 13:14 17:8
18:16,18 19:2
36:8,11 37:23
57:3,6,15 67:3
69:23 87:12 99:12
104:14
**dollars** 18:8
**downtown** 65:11
**dozens** 101:15
102:2
**draft** 23:14 26:12
56:11
**drafted** 59:24 68:8
86:16

[drafting - fbi]                                                                              Page 7

**drafting** 55:22
101:9,10
**drilled** 75:22
**drop** 79:4,11
**drug** 52:13,16
53:1,9 54:2 83:5
88:8,9 89:4,7,12
89:13,16,18 90:2,7
90:14,15 95:11,11
95:15 97:10,11,14
97:18 98:2,7,12,18
98:21 99:4,12
100:14,16 101:14
101:15 102:1,5,17
102:21 104:10
**drugs** 45:25 52:19
59:9 84:18 89:9
89:11,14,18,19,22
90:2 98:9,9
**due** 16:4 20:22
**duly** 4:10 110:10
**duty** 98:7

**e**

**e** 1:25 2:6 3:1 4:5
102:9 110:4,25
**e.g.** 82:24,25
**earlier** 32:21
97:16
**early** 92:22 94:5
**easier** 11:6 61:25
101:8
**easy** 65:9
**eat** 41:20
**effect** 78:5 99:2
**efficient** 65:13
75:24
**efforts** 23:20
**eggs** 68:25
**either** 6:1 8:2 17:9
19:8 27:20 42:23
43:16 71:24 79:10

87:13 89:3 91:15
**el** 88:14 99:17,18
100:19,24
**element** 20:19,21
27:3
**email** 49:13 59:1
**employee** 73:13
110:21
**employees** 23:10
77:24 78:7
**encountered** 36:12
**ended** 13:6
**ends** 25:25
**enforce** 58:22
**enforcement**
12:18,19,20 14:9
23:15 29:9,14
38:23 47:10 57:5
58:16 102:17
**engaged** 19:8,11
70:2
**entire** 36:8 50:24
**entitled** 110:11
**entry** 13:10,14,15
**errata** 109:1
**error** 77:13
**especially** 62:21
**esq** 2:5,6,10
**essence** 15:10
**essentially** 19:16
56:1,4 63:12
72:11 92:8,18
102:14
**established** 23:8
**estimate** 35:3
**estimation** 49:24
**evade** 19:2,10
**event** 6:3
**eventually** 51:25
73:9

**evidence** 9:20 39:8
64:19 85:21,22
86:5 89:13
**exact** 7:20
**examination** 3:3
4:13
**examined** 4:11
**example** 23:24
36:9 53:12 100:11
101:6
**excuse** 21:15
**execute** 31:15 32:3
32:8 40:9,24 41:8
67:7 71:22 72:13
**executed** 40:17
41:12 68:19 73:4
73:7 75:15 90:23
94:6
**executing** 67:18
67:21 80:12
**execution** 4:25
73:1 76:4
**exhibit** 3:8,9 78:16
78:21,24,25 79:8
79:13 96:21,22
97:3,7
**exhibits** 3:7 96:19
**existence** 24:20
**existing** 25:1
**expensive** 102:4
**experience** 19:20
31:22 79:10 84:3
**expert** 20:16
102:11,13
**expertise** 53:18,19
53:21
**experts** 76:5,6
**explain** 16:11
38:10 45:18 81:17
83:23 85:6 89:7

**explanation** 97:23
**explanatory** 84:9
**exploitation** 17:2
36:9
**extend** 53:1
**extent** 43:23 49:10
52:8 54:12 58:20
91:24

**f**

**f** 102:9,16
**facilitate** 90:8
**facilitated** 45:7
**fact** 5:24 7:20
19:18 28:1 37:15
97:23
**facts** 22:17 32:18
**failure** 19:15
**fair** 24:25 26:18
28:12,18,20 32:1
35:6,25 36:7 38:8
38:20 44:3 45:5
49:1 51:10 55:20
68:14,16 78:8
84:13 93:10
**faith** 8:13
**fall** 72:2
**familiar** 5:1 23:5
38:8 63:1,3 86:17
102:12
**familiarity** 51:3
**familiarization**
102:12
**far** 21:25 70:6
99:7
**fashion** 18:22
**fbi** 15:18,19 29:18
33:25 40:14 47:24
48:2,3,16 49:20,22
50:4,11,23 51:25
52:6,12,13,22 53:7
53:14,20 54:3,6,18

54:19 55:3,13,16
55:18,20,21,21
56:7,11 57:11,16
59:21,24 64:4
65:4 66:21 71:25
76:5 77:5,18 78:5
80:3,8 81:8,8 85:7
86:16 89:4 92:12
98:12 104:6 105:4
105:6 106:4,14,15
**fbi's** 77:17 104:11
104:24 106:2
**fbi0000446** 3:8
**fbi0004973** 3:9
**federal** 1:14 12:17
12:19,20 16:17
29:9,13 45:6
52:14 102:8,23
103:1
**feel** 26:7 52:23
91:7 93:1 100:24
104:11
**felt** 70:1
**field** 15:19,19,22
57:3 59:5
**figure** 15:6 35:15
43:13 50:24 60:15
60:16,21 64:3
67:16 85:6 94:1
98:18 99:3
**figured** 41:5 75:24
**figuring** 56:23
**file** 34:15
**filing** 20:13 33:18
**fill** 18:11 62:8 81:6
81:9,10
**filled** 81:2,18
**financial** 17:12,22
17:23,24 19:22
**financially** 110:22

**find** 26:6 38:17
**findings** 26:13
**fine** 5:14 8:11,18
11:19 31:25 38:5
**finish** 7:8,11 8:21
10:17,18
**firm** 1:25 4:18
**first** 10:6 13:12
14:13,17 26:22
32:22,24 50:12
54:22,23 77:22
84:21 90:18 91:18
92:8,14
**firsthand** 104:7
**five** 17:1,7 27:16
27:17 32:19 36:11
41:16,17 103:13
**flags** 18:19
**floor** 2:11 52:6
100:13
**flow** 7:2
**focus** 16:12 22:23
50:8 58:13 60:24
69:2 75:18
**focused** 48:22
57:11 81:13
**focuses** 15:8 16:8
54:3
**folks** 25:4
**follow** 23:9
**followed** 23:23
77:5
**following** 104:25
**follows** 4:11
**force** 51:6 74:7,21
75:2 98:18 99:17
99:18,20 100:9,21
102:18 103:2,4,5
**forces** 103:1
**forefront** 91:4

**foregoing** 108:4
110:15
**forest** 4:4 110:8
**forever** 10:5
**forfeit** 21:10,11
25:19 26:20
**forfeited** 25:13,13
**forfeiture** 2:10
20:13,14,18,19,21
20:25 22:7,21,22
22:24 23:4,5,18,19
24:10,15,21 25:4,6
25:10,11,19 26:1,2
26:3,5,15,18 27:3,5
27:20,21 28:10,13
28:21,22 32:9,10
32:14,20 33:4,8,11
33:16,19,22,23,25
34:4,9,13,16 35:8
35:14,22,23 36:4,8
36:10,16,20,21
42:10,11,13,16,25
43:8,9,10,17,22
44:5,6,8 86:7,24
87:5,7 90:9,19,25
91:2,7,19 92:18,23
92:25 93:7,13
94:5,9 96:1,4
106:1,3,8,13
**forfeitures** 40:14
**forget** 99:6
**form** 18:11 21:14
21:18,19 24:13,23
25:5,21 27:7,23
32:15 33:20 34:6
34:18 36:6 38:21
39:10 40:2,11,18
41:1 42:17 43:2
45:16 51:13 53:24
61:11 63:14 66:3
66:18 69:1,15

**foregoing** 108:4
110:15
74:15 76:20 80:3
81:2 82:5 83:10
83:20 86:1,8
89:15 98:3 99:15
**formal** 58:2,25
59:18
**formed** 9:17
**forms** 81:7 97:19
**forward** 25:18,19
26:11 43:9 85:23
106:13
**forwarded** 18:4
**found** 85:12 97:17
97:24
**foundation** 40:11
40:18 54:23 84:20
85:3 87:17 92:20
**four** 41:16,17 88:3
**frame** 47:19 49:18
50:15 52:22 57:15
**framed** 31:8
**fraud** 19:8 23:24
53:10,12
**free** 52:23
**frequency** 98:1
**frequent** 24:10
**frequently** 20:12
27:3
**fresh** 10:10
**friends** 18:18
**frommer** 2:5 3:4
4:14,16 5:9,10
21:15,21 22:4
24:19,24 25:14
26:9 27:11 28:4
28:19 29:3 30:16
34:2,14,23 35:24
36:17 39:1,12
40:4,15,20 41:3
42:1,6,8,20 43:12
44:2,16 45:17

46:21 49:16 51:16
52:20 54:4,14,16
55:1,8 56:2 61:16
63:24 66:10 67:5
68:1 69:9,24
70:12,22 71:8,20
72:16,20 74:19
76:24 78:22 79:7
79:12,16,20,22
80:22 81:21 82:7
83:14,22 84:12,23
85:16 86:3,12
87:2,19 88:1
89:21 90:1,6,13
92:7 93:4 94:8,14
94:17,23 95:21,23
96:18,24 100:1
101:24 103:12,17
103:19,20 106:17
106:22
**front** 7:22 104:6
**full** 9:1,10 11:24
12:1 110:16
**function** 54:2 79:5
79:11 104:21
**functionally** 56:7
56:8
**funded** 102:7
**funding** 102:14
**funds** 19:20 20:14
26:7 28:1,6 57:9
89:11
**further** 84:25
110:19
**future** 86:6

### g

**gaps** 62:7,8
**gasoline** 83:4 84:2
84:7
**gather** 85:20

**gathering** 57:12
64:19
**gears** 72:23
**general** 8:14 40:6
60:12 86:10
**generally** 17:21
18:4 23:11 30:3
31:11,20 42:18,22
42:23 44:13 49:5
50:12 51:4 52:11
53:25 54:2 57:20
59:5 61:3,12,25
62:4 63:20 64:14
74:21 81:2 87:7
95:3
**geographically**
65:6
**george** 73:15,16
74:1,3,3,11,21
75:2,5,5
**george's** 73:16
**gestures** 6:15
**getting** 34:3 35:20
68:7 69:5 75:20
84:11 85:5 88:8
93:16,22 94:12
98:2 103:22
**give** 9:9 10:9 11:2
11:14 17:15 37:17
37:17 43:16 78:16
78:19 95:18 96:19
106:17
**given** 45:20 53:21
76:6
**glebe** 2:6
**glendale** 88:14
100:20,21,23
**go** 5:8,12 7:9
10:13,15,19 12:2
14:3,6 17:20
19:25 21:20 22:14

22:14 24:7 25:21
39:22 41:20,20
42:6 44:25 46:17
48:12 58:19 60:2
63:2 65:13 68:21
75:6 79:18,20
80:1,21 82:5
85:17 86:13 88:16
88:19 92:21 95:10
98:9,24 99:15
103:19 107:8
**goal** 69:6,6,11
**gobbledygook** 8:2
**goes** 14:16 44:15
**going** 6:8 7:9
11:13 14:17 18:15
21:13,18 24:5
37:14,17 43:16
49:8 52:7 54:9,20
60:22 61:1,2,5
66:6,8 68:10
72:13 76:22 85:17
89:9 91:22 93:15
94:11,15,22 95:9
96:8 99:22 102:4
**good** 8:13 9:12
92:17
**goodness** 99:13
103:10
**goodniks** 92:16
**gothier** 1:6
**gotten** 36:18,21
**government** 5:25
9:19 39:4 66:14
71:10 82:1,3,16,17
86:6 90:16 97:5
102:8
**government's** 4:25
**grab** 74:21
**grabbed** 74:11

**grade** 71:23
**grant** 87:13
**great** 5:15
**grief** 37:18
**ground** 6:5
**grounds** 9:24
**group** 59:17 98:22
**groups** 50:21
92:13
**guess** 16:1 22:16
25:10 31:25 32:16
35:4 63:4 64:10
66:6 69:6 73:19
75:16 77:4,13
91:1,9
**guessing** 31:24
**guidance** 39:23
**guidebooks** 39:24
**guilt** 58:11
**gun** 29:12 83:5,12
83:13,16,18,18
**guns** 12:18
**guy** 21:9 75:16
**guys** 60:7 74:13
79:7 100:21 101:8

### h

**half** 75:1
**handful** 32:18,18
36:3
**handle** 53:5,9
55:22
**handled** 34:1
40:14
**handler** 3:9 102:6
**handlers** 97:15
99:12
**handles** 53:8
**hands** 26:15
**happen** 58:3
101:12

Exhibit E
1183

happened 55:15 70:8
happening 67:10 81:14
happens 10:5 22:9 28:1 42:13 105:25
harbor 13:17
hard 95:4 96:9,9 96:11
head 6:17,17
hear 21:15 41:4
heard 18:10 29:17
hearsay 67:14
heart 99:13 103:11
held 65:3 79:19
help 11:2,7 18:19 38:16 46:2 59:7,8 74:2 75:10 84:25 89:23 90:3,8 98:21 104:23
helpful 86:10
helping 44:4 75:17 75:20
hereunto 108:6
hey 5:4 41:23 59:6 79:4 92:14 106:5
hide 19:21
highly 14:8
hills 101:5,5
hire 13:12
hired 14:14 23:3
hoc 51:6
hold 37:14
holder 53:21
holders 45:23,24 46:7,20,25 48:22 50:9 52:15,25 53:3 56:15 58:17 61:2 69:19,23 70:1,6,7,10,13,21

70:25 105:16
holes 62:6
honestly 8:9 81:12
hope 72:22
horrible 65:20
host 17:6 29:13 99:17 103:2
hour 4:2 65:10 74:17 75:1 78:13 99:7 110:7
hours 101:16 102:2
house 20:1 73:13 73:16 74:11
housed 100:12
huh 6:18 12:4 15:4 16:7 31:12 44:18 44:20 88:5 97:12 97:25
hundred 57:23
hundreds 35:4,5 36:1 69:14 71:13
hurt 22:19
hypothetical 26:8 71:15

**i**

idea 102:25
ideas 59:14
identified 84:16 85:1
identify 58:21 82:10,14 83:8,17 89:23
identifying 85:13
identity 16:22
illegal 69:21,22 70:2,11
illicit 19:20
immediately 68:18
immigration 13:7

import 84:1
important 6:11 7:7 8:25
impounding 37:23
imprinted 89:20
improper 9:19
inception 58:1
include 61:7
included 54:12
including 17:22 57:16
incomplete 71:15
indicate 84:8
indicia 84:17
individual 46:7,15 46:25 47:15 48:22 50:9
individuals 48:20 50:1 61:21
informal 59:19
informant 59:9
information 11:23 57:12,17 81:18 86:5,10,21 87:3,24
initial 28:5 56:3,4
initialed 108:6
initiate 19:4
initiated 43:7
initiative 88:17,19
inject 19:21
ins 13:8,13
inside 74:14 75:6 104:15
inspect 17:17 45:4
inspecting 44:25 47:1
inspection 12:13 12:14 13:11 14:8 16:16 40:7 57:7 77:24 99:19

inspector 5:11,12 5:14,15,16 12:8,14 12:23,25 16:15 29:20 45:3 46:25 72:21 78:4 79:23 97:10 103:21
inspectors 12:17 16:3,6 44:25 77:25 78:12,13 98:8 99:23
instance 20:12 21:7 25:17 53:5 61:1 66:12 81:2 95:6,25
instances 28:9 95:5 96:12,12
institute 2:4 4:17 4:17
institutions 17:22 17:23
instruct 21:19 94:15,22
instructing 35:17
instructions 9:22 71:21
instruments 17:12
intelligence 13:17 62:7
interceding 92:5
interest 4:18
interested 5:24 29:16 49:7 56:23 110:22
interject 93:15
internal 44:1,15 44:17,19
internally 105:2
interrupt 7:2
interrupted 10:22
interviews 30:5

Exhibit E
1184

**introduce** 78:16
**introduced** 78:15
  78:23
**introducing** 95:21
**inventoried** 38:23
**inventory** 36:25
  37:5,22,24 38:7,11
  38:12,19,22 39:3,7
  39:14,17,20,22
  71:6 75:10 78:1
  80:4 81:23 82:9
  82:14 84:25 85:2
  85:23 86:14
  104:20,22
**inventorying**
  73:23 75:7,13,19
  76:19 77:23,25
  78:9 81:23
**investigate** 15:2,5
  17:1,4 18:7 45:5,6
  46:2 69:25 70:5,7
**investigated** 16:22
  36:10 45:21 70:19
**investigates** 52:14
**investigating**
  19:14 20:23 46:7
  46:14,19,24 47:1
  49:7,21 62:15
  70:8 87:10
**investigation** 1:14
  17:21 21:1 26:13
  27:22 33:24 35:19
  35:22 45:19 46:6
  46:8,19 47:3,15,18
  47:25 48:4,16,21
  49:2 50:4,19,22,25
  51:2,5,11,15,18,22
  52:22 54:6,18
  55:3,12,19,23 56:1
  56:8,15,19,25
  57:15 58:4,14,18

62:6,8,21,22 64:8
  64:8,13,16,17
  65:14 69:3,7,21
  70:8,13,14,24,25
  91:17 97:11
**investigations**
  15:2,12,13 17:9
  18:25 19:5,17
  21:7 24:12 27:15
  30:3,4 34:10,12
  36:1,12 45:23
  50:1 54:3 83:25
  87:22,25 98:13
  100:15 102:15
**investigative**
  13:10,23 14:12,22
  14:23,25 47:8
**investigator** 20:20
  22:20 26:3,15
  33:22,24 43:23
  106:24
**investigators**
  22:22,23
**invited** 46:1,7,12
  46:18 47:12,13
  48:16
**involve** 18:25
**involved** 26:18,19
  27:19 32:10 34:3
  34:4 35:2,5 40:23
  41:7 43:18 45:19
  47:9 48:15 49:11
  49:12 50:10,10,12
  50:15 52:15,18
  60:6 61:22 62:10
  75:7 76:18 77:23
  77:25 78:7 80:17
  81:4 84:6 88:8
  91:16 92:13 95:14
  95:16 98:17 104:8
  105:10,13,18

**involvement** 26:17
  34:8 42:14 59:23
**involves** 52:8
**involving** 105:18
**irs** 47:8,12,18
  48:21 50:22 92:12
**issue** 6:23 21:12
**issued** 65:23
**issues** 11:21 27:5
  28:12,21,23 64:24
**item** 23:17
**items** 44:25 66:17
  82:15 84:14

**j**

**jeni** 1:6
**jennifer** 1:5
**job** 5:21 16:14
  23:1,2 34:20
  75:25 91:3 104:15
**johnson** 1:12 2:6
**join** 47:3
**joining** 4:15
**joseph** 1:6
**judge** 7:22 63:22
  68:8
**judges** 63:4
**july** 110:23
**june** 1:20 4:2
  110:6
**jurisdiction** 31:8
  52:12 53:1
**jurisdictional**
  53:15
**justice** 2:4 4:17,17
  102:15
**justify** 87:13
**justin** 59:4,13
  67:15,25,25 88:22
  88:24,25

**k**

**k** 3:9 88:4,17,22
  89:17 97:4,11,17
  97:17 98:8,10,24
  99:18,23 100:15
  103:22,24 104:15
**keep** 64:9 82:1
  95:20
**keeps** 18:5
**kind** 7:4 14:25
  17:16 29:19 30:1
  31:18 37:17 70:8
  92:5 93:21,21
  102:11
**knew** 62:14 72:7
**know** 5:13 7:1,9
  8:2,8,9,10,11,11
  8:12 10:5,6,7,17
  11:4,8,12 14:7,16
  14:16,17,19 15:18
  15:20 16:3,18
  17:6,12,21 18:8,20
  20:11,13 23:9,23
  24:6 25:18 27:8,9
  27:10,24 28:1,2,8
  28:21 29:17 30:7
  31:23 32:1 34:10
  35:3 37:8,10,15,17
  41:20 45:9 47:17
  49:10,19 50:13
  52:1,2,4 53:22
  54:5,17,24 55:9,17
  57:23 58:19 59:8
  59:14,15 60:18,22
  60:25 61:4,6,8
  62:16,19 63:3
  64:14 65:4 66:19
  66:20 67:9,11,15
  68:21,22,25 71:18
  72:2 73:22 76:17
  79:2,24 80:2,6,7

Exhibit E
1185

80:11,14 84:7
85:5 86:2,2,9
91:16 92:15 95:8
95:14 96:7,21
97:1 101:10
102:13 104:7,19
104:20 105:8,8,8
**knowledge** 39:15
63:7 110:18
**knowledgeable**
76:10
**kobra** 3:9 97:11
**koons** 1:12
**kristi** 1:12

**l**

**l** 1:10
**l.a.** 15:15,19 16:5
65:6,11
**lack** 17:18
**lacks** 40:11,18
84:19 87:16 92:20
**language** 84:17
**lapd** 100:11,23
**large** 36:20 103:9
**largely** 104:24
**larger** 52:13 70:14
**lastly** 10:24
**late** 52:2
**laundering** 15:3,6
15:9,11,13,15 16:9
16:13 17:8,10,11
17:17 20:9,15,20
24:11 26:25 27:4
27:13,18 28:15
36:12 45:25 53:6
53:8,10 57:10
83:25
**law** 2:5 4:18 12:17
12:19,20 14:9
29:9,13 30:6
38:23 45:7 47:10

52:25 53:22 58:16
58:22 63:3
**lawyer** 8:18
**lax** 13:16
**lay** 54:23
**lead** 18:19 62:23
63:17
**leading** 68:20
**leads** 80:5
**learn** 104:18
**learning** 32:2
**leave** 24:8 31:6
**leaves** 54:15
**led** 14:1
**level** 42:14
**lic** 1:25
**lieu** 66:13
**life** 11:6
**likelihood** 24:21
**limitations** 61:8
**limited** 53:1
**line** 10:17,18,20
32:24 109:3
**lines** 82:24 88:3,3
**list** 84:14
**listed** 78:24 83:15
88:4
**little** 23:2 29:16
32:9 33:17 40:22
44:23 60:20 68:23
68:24 83:23 88:2
**local** 47:9 50:16,18
50:23 88:9,16
98:16,18,20 100:8
102:5,21,21,22
103:3,23
**locate** 88:22
**located** 65:6
**locksmiths** 76:6
**logical** 98:4,12,14
99:21

**logistical** 68:9
**logistically** 67:1
**logistics** 67:6,16
72:9,9
**long** 11:12,12
12:25 13:16,20
27:15 32:1 47:6
62:22
**longer** 85:9
**look** 14:19 16:13
27:10 39:7,24
40:8 50:5 79:2,24
82:20 83:13 88:2
**looked** 41:4
**looking** 48:19
**looks** 101:18
**loomis** 85:18
**los** 1:22 2:11 15:12
15:25 88:15
**loss** 90:3
**lost** 39:4 82:4,18
**lot** 11:21 18:25
19:6,7 20:9 25:3
47:1 50:21 57:3
65:3,4 72:3 76:22
81:14 92:4,15,16
98:8 99:4 102:21
105:2
**lunch** 72:19,22
**lyndon** 1:19 4:6,9
12:1 108:3,13
110:9
**lynne** 41:19 51:10
56:4 61:13,18,18
62:4 63:8,16
67:11,15,24 69:17
88:22 89:3 91:15
104:19 105:6

**m**

**machine** 77:14
**mail** 16:22,23
17:10 45:1,4,25
98:10 100:15
**mailed** 17:3
**mails** 45:7 47:2
**maintenance**
75:17
**majority** 34:1
**making** 21:6,10
22:5 38:19 55:24
106:7
**management** 48:6
55:16 66:22,23,24
67:12 71:25
**manager's** 73:12
**managers** 73:12
**manual** 40:3,6,7,8
40:9
**manuals** 39:24
**mar** 1:9
**march** 68:15 73:3
97:6
**marching** 68:4
**marijuana** 83:4
84:2,8,9,10
**mark** 41:24
**marked** 78:21
96:22
**market** 16:19
**maryland** 29:22
**masking** 84:8
**materials** 11:1,5
**matter** 5:22 8:14
35:9,10 73:7
74:25 110:11
**max** 8:17 9:13
55:1 92:5
**maxwell** 2:10 5:6

Exhibit E
1186

**mean**   9:15 15:5,7
  16:17 19:18 22:12
  23:16 31:2,3,7
  32:13 42:18 44:17
  53:25 54:22 60:6
  60:17 64:20 66:21
  68:13 75:20 81:1
  81:2 86:9 91:3
  101:13,13,14
  102:4 106:2
**meaning**   57:4
**means**   17:25 18:21
  29:12 94:19
**meant**   45:6
**medication**   9:2
**meet**   57:25 65:13
**meeting**   58:2
**meetings**   58:25
  59:13,18 64:22
  65:3
**member**   99:16,17
**members**   47:6
  57:25 64:1,2,22
  65:24 67:8 93:6
  98:19 100:9
**mentioned**   32:21
  73:5
**met**   76:6
**methods**   75:24
**michael**   1:6
**middle**   8:21 10:18
  10:20 12:2,5
  68:15
**mill**   17:16
**million**   18:8
**mind**   10:10 52:11
**minority**   78:9
**minute**   79:23
  103:13
**minutes**   25:16
  36:24 42:2 72:17

  106:18
**miscounts**   77:9
**misnomer**   45:2
**misplaced**   82:4,18
**missed**   48:13
  57:19
**missing**   100:24
**mission**   68:12
**misspeak**   102:14
**misspoke**   25:22
**misstates**   35:11
  63:14 67:20 70:3
  70:16 71:2
**modular**   30:4
**module**   41:25
**moment**   7:15 16:4
**moments**   101:11
**money**   15:3,6,8,11
  15:13,15 16:8,12
  17:8,10,11,12,17
  18:9,14 19:1,7
  20:3,6,9,15,20
  21:11 23:24 24:11
  24:17,21 25:3
  26:25 27:4,13,18
  28:14 36:12 46:1
  53:6,8,10 57:7,10
  59:8 83:24 84:17
  85:17 87:21 104:9
  104:12
**money's**   24:16
**moneygram**   17:24
**monte**   88:14 99:17
  99:18 100:19,24
**month**   90:22
**months**   14:18
  29:24 30:7 68:19
**motivation**   58:12
**mouth**   89:2
**move**   6:6 25:18,19
  26:11,20 28:22

  67:22 85:23 106:8
  106:13
**moved**   48:4
**moves**   43:8 69:6
**moving**   67:2
**multi**   47:7 56:19
  57:25 60:13 65:25
**multiple**   19:9
  30:19 55:14 56:5
  67:9
**murky**   93:22

**n**

**n**   2:6 3:1
**name**   11:25 12:1,1
  12:2,5 97:24 98:5
**narcotics**   90:8
**naturalization**
  13:7
**nature**   20:22
**near**   97:5,6
**nearly**   60:4
**necessarily**   27:25
  58:15
**necessary**   59:13
  69:12
**need**   10:15 31:25
  55:9
**needed**   39:22 59:3
  59:6 64:13
**needs**   43:15 67:13
**nest**   94:7,9,18
**nevada**   4:5 110:1
  110:5,9,23
**never**   36:21 65:12
  69:4 71:17,17
  77:7 101:6
**new**   6:4 95:21
**nodding**   6:17
**nondrug**   53:23
**nonprofit**   4:18

**normal**   7:2 66:17
**normally**   6:23,25
**north**   2:11
**notary**   4:5
**note**   83:2,6,16
  97:5
**notes**   3:8 110:17
**notice**   4:1
**notices**   18:3
**noting**   84:24
**number**   46:24
**numbering**   78:24
**numbers**   106:6
**numerous**   45:23
  62:2
**nv**   1:25

**o**

**o**   102:9,16
**o'clock**   41:24
**oath**   7:16,21
**object**   21:13,14,19
  24:13,23 25:21
  27:7,23 33:20
  34:6,18 36:6
  38:21 39:10 40:2
  40:11,18 41:1
  42:17 43:2 45:16
  51:13 53:24 61:11
  63:14 66:3,18
  69:1,15 74:15
  76:20 82:5 83:10
  83:20 86:1,8
  89:15 91:22 94:11
  99:15
**objection**   9:16
  25:8 28:16 29:1
  35:11 43:20 44:9
  46:16 67:20 69:1
  70:3,16 71:2,14
  80:20 81:19 84:4
  84:19 85:3 86:25

87:23 89:24 90:4
90:11 92:20
**objection's** 87:16
**objections** 9:13
21:19 92:21
**observations** 3:8
82:22 83:7,8,16
84:14,17 87:20,21
**obtain** 62:13
**obtained** 68:15
**obvious** 19:17
**obviously** 58:19
**occur** 21:25 43:6
61:13 91:14 92:2
92:3
**occurred** 27:21
56:11 61:10 93:21
**occurring** 47:19
49:23 67:7 90:25
**ocdetf** 102:8,20
**odor** 83:4 84:1,9
84:25
**odors** 84:16 89:19
**offenses** 20:23
**office** 15:15,20
17:11 18:15 21:4
21:24 22:3,10
23:7,8,11,21 26:1
26:4 43:11 45:10
48:7,25 49:6,11
54:8 55:17 61:15
61:21 62:1,18,20
62:23 63:23 71:25
73:11,12 93:3
94:3 96:10,10
99:23 100:13,16
100:19 106:1,15
**officer** 13:8,9,15
29:10,14 89:17
**officers** 88:23
97:18 99:19,24

100:15
**offices** 4:3 15:19
15:22 18:17 110:7
**official** 1:11,13
**officials** 82:1,16
**oftentimes** 24:17
**oh** 5:21,23 10:3,4
12:7 13:3,19
15:14 22:23 30:10
30:12,17,20 31:4,7
33:17 41:4,19
53:4,13 56:3
59:16 65:2 73:14
73:16,21 74:3,4
77:2 78:14 79:7
86:13 101:22
103:3
**okay** 5:11,15,21
6:6,23 7:15,24 9:9
9:12,22 11:10,12
11:19 12:7,20,23
13:3,13,19,22
14:20 15:14,17
16:5 17:14,14
19:6,23 20:8
21:21 22:5,12
26:17,24 28:5,8,12
30:10,17,20,24
31:4,10,13 32:6,6
34:24 35:5,25
36:18,22 37:2,14
38:7,10,18 39:2,13
39:16,19 40:21
41:19 42:1,3
44:17,21 45:9
46:3,22 47:14,22
48:2,9 49:17,20
50:8,19 51:17
52:21 53:4,13,17
56:3,10,14,18,22
57:14 58:9,18

59:16,21,25 61:17
62:9 65:9,18
68:11 70:23 72:5
72:11,15,18 73:16
73:21 74:4,9,10,23
75:5,12,20 76:8,11
77:2,20 78:6,11,14
78:14 79:12 80:2
80:17 81:22 82:11
82:20 83:7,15
84:13 86:4 87:3
87:20 88:2,8 89:1
92:10 95:7 96:25
97:3,21 98:16
99:9 101:13,20,22
101:22 102:16
103:3,8,13,16
104:8,16 105:5
106:16,19
**old** 12:8
**once** 26:14 50:8
72:7,11 77:10,11
85:10
**ones** 39:14 62:18
95:10 102:25
**ongoing** 34:11
35:18
**onset** 55:23
**ooo** 1:4 4:7 107:11
108:1
**open** 66:13 67:22
68:3,22 71:12
74:1,2 75:22,22,23
76:3,9,11
**opened** 74:3,13
75:18,21
**opening** 70:23
71:5 104:15
**opens** 75:5
**operate** 66:15
71:11

**operation** 65:15
65:17 104:24
**operations** 59:12
**operative** 55:11
**opinion** 25:17
42:24 87:4
**opportunity** 10:6
10:9 85:20
**opposed** 14:3 93:8
**order** 8:4 21:25
43:3,4 83:8 87:13
**orders** 17:13 18:9
18:14 46:1 68:4
71:19,21
**organized** 102:17
**outside** 34:22
35:23 105:25
**overall** 51:2
**owner** 38:17 82:14
83:13,17,19 89:23
**owners** 52:18 58:6
58:7,11,13 69:8,11
69:13 70:7,9,9,15
70:18 71:1 82:3
82:17 85:13 92:23
93:8,13 94:5
**ownership** 82:12
**owns** 83:9

**p**

**p.m.** 107:10
**page** 3:3,7 81:3
82:22 109:3
**pages** 108:4
110:16
**paid** 103:1,5
**palate** 53:15
**pandora's** 68:23
**paperwork** 44:15
**parcel** 98:12
**parcels** 97:15
100:17

**part** 5:21 7:2
17:17 20:8,11
22:12,21 24:11
34:16,19 36:19
40:6 47:25 48:2,3
48:13 56:18 58:15
64:25 70:10,14,20
70:25 77:4 78:1
84:21 91:3 96:11
100:19 103:4
106:2
**participate** 76:22
**particular** 15:8
25:20 31:8 43:1,1
75:1 91:12 97:15
105:23
**particularly** 6:24
7:3
**parties** 110:20
**partnerships**
98:10
**party** 110:14
**patient** 107:5
**paul** 1:5 61:1
**pay** 59:9 71:23
**pd** 50:23 99:17,18
100:18,20,21
101:5
**pdf** 79:11
**pds** 103:23
**pearsons** 1:6
**pedro** 13:17
**penalty** 108:4
**pending** 8:19,20
**people** 6:25 7:1
16:22 17:2,4,5,5
17:10,10,14 19:1,9
23:18 47:2 49:20
63:6 66:16 76:10
78:7,9 91:16
92:11,12,15,16

103:9 106:1,3
**people's** 4:19
**percent** 57:23
**percentage** 27:4
28:9
**period** 68:18
**periodically** 9:13
**perjury** 108:4
**person** 15:14
18:20 104:17
**personally** 62:9
**personnel** 78:2
**pertains** 53:9,10
53:11
**phase** 64:7 69:7
**phone** 58:3 59:1,2
65:4
**phrase** 82:22
**physical** 64:21
69:12
**physically** 72:10
**piece** 25:20 72:2
**pieces** 43:1 72:3
**place** 14:21 24:22
26:22 49:19 54:8
66:8 85:7 93:9
105:3
**places** 13:6,6
29:18
**plaintiffs** 1:8 2:3
4:22,23
**planning** 41:7
72:24
**play** 9:23
**please** 6:14 47:3
79:2,24
**point** 12:16 27:20
28:3 46:13 48:5
48:12,14 49:14
50:5,8 55:18
57:11 58:18 60:4

64:11 67:15 68:5
73:22,23 86:6
106:4 107:2
**poliak** 61:1
**police** 47:9 50:18
88:9,14,14,15,16
88:20 98:20 99:16
100:4,5,8 102:5,22
103:3
**policies** 104:25
**policy** 77:6,6,11
77:17,18
**poorly** 9:17
**popped** 101:17
**porn** 17:3
**port** 13:14,15
**portion** 28:14
**ports** 13:9
**position** 14:12
55:24
**possession** 38:13
85:10
**possible** 10:1 11:4
65:19 90:9 104:22
106:25
**post** 17:11 18:15
18:17 45:10 69:6
105:19
**postal** 12:12,14,14
12:17,23,25 13:11
14:7 16:16,20
18:1,2 29:20
44:25 45:2 46:1
57:7 77:24 97:10
98:8 99:19
**potential** 45:6
**potentially** 92:17
**powers** 29:13
**precisely** 47:17
**prepare** 44:14
107:4

**preparing** 40:9
**presence** 24:20
90:8 98:5
**present** 59:11
61:14 63:19 65:16
81:8 83:5,6,12
91:8 95:5 96:6,13
**presented** 104:9
**presumably** 98:23
**pretty** 6:16 31:21
52:15
**prevent** 90:3
**previous** 33:18
63:13 78:25,25
**previously** 10:4
50:17 85:1,24
100:3
**primarily** 47:12
57:11 75:16
**primary** 75:25
104:21
**prior** 46:5 63:14
90:25
**private** 5:1,22
34:5 35:9,14
40:10,16 41:8,11
41:20 45:9,19,22
45:23 46:6,14,20
48:20 49:3,21
50:6 51:11,18,22
52:25 54:19 56:5
56:16,20 58:19
59:22 65:23 66:2
67:18 73:1,7,8,13
74:12 75:12,14
80:12,15 88:10
89:5,8 90:15,20
91:17,21 92:13
97:14,18 103:6,22
**privilege** 9:24,25
49:12 52:10 54:11

Exhibit E
1189

93:18
**privy** 48:6 55:15
**probably** 8:4
17:20 18:9 19:17
19:19 25:24 69:16
84:6 90:22
**probative** 87:4
**procedures** 105:1
**proceed** 25:5,11
35:19
**proceeded** 55:17
**proceeding** 25:9
28:10 32:17 87:5
**proceeding's**
110:12
**proceedings** 32:11
32:13,14 33:8,19
34:16 35:9 36:4
86:7 87:7
**proceeds** 45:25
**process** 11:15
14:11 20:6 22:16
23:4,6,7 24:6
26:18 34:4 60:14
60:18,19 75:8
85:7 91:18
**produce** 17:5
43:21
**professional** 33:1
**program** 102:8,10
102:23
**progress** 64:8
**proper** 5:13
**properties** 94:5
**property** 25:20
26:20,21,21 28:13
38:13,17,19,23
39:4,8 42:16 43:1
43:14,17 82:2,3,4
82:17,18 83:9
86:7,23 90:10,19

91:20 92:18 93:8
93:14 96:1,5
105:11,14,19,23
**prosecutor** 26:5
**protect** 35:15 39:3
82:2,16
**protected** 52:10
54:11 93:18
**prove** 58:6,11
69:11
**provide** 6:20 8:13
11:7 32:15 44:6
44:10
**provided** 57:7
78:12
**provides** 102:15
**proving** 69:7
**proximity** 84:18
**pry** 75:23
**prying** 76:8
**public** 4:5,18
**purchase** 18:21
19:9
**purchases** 18:9
57:8
**purport** 97:3
**purpose** 9:16
38:11,18,24 39:2,7
39:11 69:25 70:5
70:6,23 71:5,5
85:13 88:13 89:12
89:16
**purposes** 33:16,16
39:13 57:17 80:12
81:22 82:1,8,13
85:1
**pursuant** 4:1
33:11 38:2 43:24
**pursue** 22:6 42:15
42:25 43:17 44:5

**put** 5:5 9:16 23:18
59:8 60:22,24
61:9 85:7 89:2
98:3 104:6
**putting** 21:18
57:13

### q

**question** 6:14 7:8
7:10,12 8:1,3,4,6,9
8:10,12,19,20,23
8:24 9:14,15,17,18
9:19 10:2 25:1
38:25 42:9 44:23
54:13,23 60:16
63:13 64:15 65:21
66:7 69:16 78:18
80:5 81:13 85:22
92:6 101:23,25
**questioning** 10:17
10:21
**questions** 6:9,10
7:17,24 8:15 9:4,7
11:15 43:24 44:12
105:2 106:25
107:4,8
**quick** 44:23
**quite** 10:25 41:5

### r

**raised** 57:9
**random** 106:6
**raped** 16:21
**rarely** 5:25
**rationales** 85:23
**razz** 21:11
**reached** 98:16,20
100:4,8
**read** 8:3 82:24
108:4
**reading** 110:12

**ready** 79:25 97:1,2
106:18
**really** 9:9,16 11:14
11:21,22 21:4
22:2,16 33:25
36:10,11 58:25
64:9 65:13 69:2,4
81:25 88:3 91:2,4
95:24 98:23 99:7
102:4 103:9
**realtor** 19:25
**reason** 4:21 9:6,9
10:15 14:2 52:4
52:12 73:25
**reasons** 32:3 38:14
**recall** 33:10,14
35:7 37:3,22
47:10 50:13 62:9
62:14 64:21 65:18
66:20,25 73:24
90:24 91:18 92:14
92:24 95:4 96:3,9
96:12 104:11,13
**receive** 17:4 77:17
107:1
**received** 78:18
**receiver** 66:15
71:11
**receivership** 71:18
**recollect** 95:5
**recollection** 31:21
74:17 89:1
**recommend** 28:9
**recommendations**
22:13
**recommended**
14:9,21
**record** 5:5 6:15
7:6 9:17 42:6
61:19 79:18,19,21
89:13 103:17,19

Exhibit E
1190

106:23 107:9
**recreate** 99:22
**red** 18:19
**referral** 43:10
**refute** 85:15
**regarding** 24:10
26:5 27:5 28:13
28:21 43:19 44:12
86:21
**regardless** 100:25
**regards** 34:5
**registered** 83:13
**regular** 17:18
**reimbursed**
102:23
**related** 34:9 36:15
**relating** 22:17
**relationship**
100:17,20 101:7,9
**relationships**
99:20,22 100:5
101:2
**relative** 110:20
**relatively** 6:4
**relevant** 87:6
**rely** 31:22
**remain** 51:23
**remember** 10:3
37:23,25 61:24
62:3,16,19 64:25
65:5 66:4,6,7 67:1
67:4 81:13,20
88:22 90:18,21
91:6 95:24 96:14
100:22
**remote** 6:24
**remotely** 1:21
**reno** 4:4 110:9,23
**rent** 92:16
**renter's** 105:23

**renters** 46:15
58:21 69:14 91:20
93:8 96:1,5
105:19
**repeat** 41:21 54:13
54:14 84:21 93:11
101:23
**rephrase** 8:4 25:1
28:17 84:15 96:2
**report** 16:24 17:25
19:15
**reported** 1:25 6:19
**reporter** 6:9,11,15
6:19 7:5,16 8:3
110:5
**reporting** 4:3 6:10
18:24 19:2,10,12
110:8
**reports** 18:5
**representing** 4:22
4:23
**request** 97:20
98:14 104:14
**requested** 98:5
110:13
**requests** 59:19
**required** 18:11
63:4
**requirement** 18:2
**requirements** 19:3
**requires** 7:17 98:3
**rereading** 83:11
**reshuffled** 100:12
**residence** 73:11
**residue** 83:5
**respect** 105:22
**response** 6:7
**responses** 6:18,21
**responsibilities**
75:14

**responsibility**
16:25
**rest** 7:10
**restating** 93:12
**results** 20:13
28:10
**returned** 105:12
105:14
**revenue** 36:20
**review** 44:11
96:25
**reviewed** 60:4
**rgk** 1:9
**right** 5:11,23,23
8:8 10:13,24
11:19 12:12 16:9
19:13 20:1,8 21:1
29:4,4,7 31:9
37:14 39:17 40:17
41:22 42:4 44:25
45:10,13,15 46:3
46:22 47:21,24
48:11,17 49:25,25
50:20 55:5 57:22
59:16 60:6 75:2
78:6,23 82:13,18
85:19 89:5 95:7
96:18,20 101:14
102:19 103:12,15
104:16 106:8,17
106:22 107:3
**rights** 4:20 32:4
**road** 2:6
**robbed** 16:21
**robert** 2:5,6 4:16
5:4 21:17 41:23
49:8,15 54:13,20
79:4 91:24 93:21
94:12 95:19 107:7
**role** 98:2 103:22

**roles** 51:7
**room** 64:23 77:13
100:14
**rough** 49:17
**roughly** 52:1
68:15
**rowland** 3:9
**rubber** 83:3
**ruiz** 1:6
**rules** 6:5 8:18 9:20
11:13
**run** 17:16
**running** 55:12
56:8

**s**

**safe** 38:20,23,24
38:25 45:12,20
58:12 66:1,1,13
68:22 76:6 82:1
**safety** 67:23 85:13
**san** 13:17
**sat** 64:7,23
**saying** 16:5 20:4
22:10 25:23 46:5
52:21 56:3 63:6
64:9 83:17 92:14
95:24 96:2 98:1
101:6,17
**says** 16:17 23:17
26:11 46:25 82:22
97:9
**scene** 76:23 77:1,8
97:20
**scratch** 90:17,17
**screen** 79:5,10
101:17
**search** 12:18 30:7
30:25 31:16 36:25
37:22,24 38:11,19
39:3,7,14,17,20,22
43:22 44:11,12

62:12 64:10,11
73:6 80:4 81:15
81:23 82:9 85:2
87:14 88:23 90:23
91:5
**searches** 37:5 38:7
38:12 71:6 86:14
**seasoned** 60:17
**seat** 52:5
**second** 40:22
78:17,19 95:8,18
95:22 96:19,25
**section** 2:10 82:21
83:15
**see** 11:9 18:20,25
24:9 32:13 51:9
54:23 64:20 82:21
86:15 87:6 88:3,6
88:22 89:18 97:6
99:21
**seeking** 64:10
**seen** 32:7,7,8
**seize** 23:12,17
25:12 26:21,21
28:6,22 69:12
77:12
**seized** 26:14 43:15
71:7,10 105:9
**seizing** 26:5,6
40:12 65:25 68:9
92:23
**seizure** 4:25 21:25
25:11 26:12,12
27:25 28:9,13
30:25 31:16 37:20
37:21,25 40:10,17
40:24 41:8,12
43:6,6,21 44:11,12
44:14 60:8 61:5
62:11,12 64:4,6,9
64:11,18 65:22,23

**signed** 68:6,6 72:7
72:12 93:2
**significant** 23:25
**signing** 72:6
110:12
**silly** 45:9
**similar** 15:20 57:6
**simply** 9:16 66:15
71:11
**single** 51:1
**sir** 38:10 62:19
65:5
**sit** 10:5 64:4
**site** 67:3
**situation** 10:20
11:4 21:8,9 71:13
96:5
**situations** 6:1 19:7
19:14 44:4 104:9
**six** 14:18 36:11
78:13
**size** 67:18
**skill** 110:18
**sleep** 41:20
**sleeping** 41:18
**small** 13:6 22:21
72:2 78:3
**smell** 86:21 89:22
90:2
**smelled** 89:14
**smells** 87:4,9,12
87:21
**smoothly** 6:6
**sniff** 89:18 97:15
97:20 104:1,3
**sniffs** 104:15
**snitko** 1:5,5
**soil** 83:4 84:2,10
**solicit** 98:20
**somebody** 18:3,7
18:15 21:6 23:17

66:6,8 68:14 69:5
73:1,6 80:12
87:14 95:3 105:19
**seizures** 25:11
26:2 36:13 40:13
69:4 91:5
**self** 84:9
**sell** 17:24
**selling** 17:3
**senior** 4:16
**sense** 27:2 33:22
38:6
**sent** 102:5
**separate** 65:12
96:12
**sequence** 43:4
**serve** 67:22
**servers** 17:2
**service** 12:13,15
13:7,12 14:8
16:16 18:1,2 20:5
40:7 46:1 57:7
77:24 99:19
**set** 4:23 98:6
104:12
**seventeen** 13:2
**shaking** 6:16
**shame** 100:14
**share** 11:6 79:8,10
79:13 100:13
**sharing** 79:5
**sheet** 109:1
**shift** 52:5 54:5
72:23 78:13
**short** 42:5 72:17
103:18 106:21
**show** 23:25
**side** 23:17 26:3
65:8
**signature** 68:7
108:7 110:24

**98:4**
**someone's** 32:4
**sorry** 28:17 30:12
30:13 32:24 41:4
48:13 60:2 63:2
66:9 69:19 70:6
73:12 83:11 86:13
88:25 101:17,23
**sort** 6:4 11:16,22
17:3,15,15,17 19:8
26:25 41:24 50:2
64:23 72:23,24
93:22
**sorts** 11:13 61:23
**sounded** 25:2
48:24
**sounds** 27:2 45:9
50:2,11 58:1
68:16
**southern** 99:5
**speak** 6:11 23:13
44:3,5 55:24 77:6
77:16 88:12,13
98:23 104:17,21
**speaking** 54:1
67:15 77:16
**spearhead** 54:18
55:19
**spearheaded**
51:11,24
**spearheading**
51:15,18 52:22
54:6 55:3,4 59:5
**spearheads** 51:4
62:21
**special** 12:12,15
12:16
**specialist** 20:16
27:1 44:6
**specialize** 56:24

[specialties - terms]                                                Page 19

**specialties** 51:8
**specific** 25:24 55:6
  55:9,10 81:1,5
**specifically** 22:24
  23:4 61:24 62:14
  66:20 91:7 100:14
  104:13
**specifics** 17:20
  31:7 35:18,21
  62:4
**speculating** 27:10
**speculation** 46:16
  63:10
**speed** 39:25
  104:23
**spent** 103:6
**spoke** 76:5
**spring** 2:11
**ss** 110:1
**stage** 47:24
**standards** 99:2
**stands** 102:17
**start** 6:8 11:20,21
  19:16 21:18 42:21
  42:21 48:23 49:21
  73:10 105:12
**started** 5:17 11:17
  72:25 73:23 74:10
**starting** 7:12 46:3
  50:5 91:24
**state** 9:13 98:17
  110:1,5
**statement** 10:7
  25:7 91:12
**states** 1:1,10,11
  2:9 5:6 13:7 22:10
  22:17 23:22 42:12
  48:24
**statute** 52:14
**statutes** 16:17
  54:3

**steal** 16:23
**stealing** 38:16
**stems** 17:9
**stenotype** 110:17
**stick** 14:14
**stolen** 39:5
**stopped** 55:2
**storage** 38:24
**storc** 1:7
**stored** 38:20 82:15
**strategically** 22:19
  24:4
**street** 2:11 4:4
  110:9
**strong** 83:3 84:1
  84:16
**structured** 20:14
  50:25 63:8
**structuring** 18:8
  18:22 19:11,18,19
  20:12,12 21:8
  28:14 53:6
**subject** 86:24
**subjected** 104:1,2
**submit** 32:14
**submitted** 32:17
  33:3,8,12,13 35:13
  36:3,14 63:22
  86:22
**submitting** 35:8
  57:18
**subsequent** 23:19
  48:22
**subsequently**
  51:23
**substantial** 28:14
**sufficient** 64:13
**suggestions** 76:7
**suite** 2:6
**suited** 55:19

**sums** 19:1
**support** 23:19
  33:19 35:8 36:4
  86:23
**supporting** 57:6
**supposed** 90:15
**sure** 6:20 12:11
  14:14 29:5 33:15
  35:4 38:14,15,19
  41:6 42:1 46:23
  54:15 74:20 75:4
  78:20 79:9 81:16
  82:14 84:11 93:12
  100:2
**surveillance** 30:6
  57:4 59:7,12
  65:15,16
**susan** 1:25 4:5
  102:9 110:4,25
**suspicious** 18:3
**switch** 96:18
**sworn** 4:10 7:15
  23:3 110:10
**system** 4:23 19:22
  98:10

**t**

**t** 102:9,16
**tainted** 26:7 89:11
  89:19
**take** 7:5,21 10:14
  10:16 30:20 36:23
  38:12 41:25 42:2
  42:2 51:7 66:8
  72:8,16,16,17
  77:14 79:2,23
  92:18 96:25
  103:12
**taken** 42:5 72:19
  102:13 103:18
  106:21

**takes** 14:11 26:15
  62:22
**talk** 6:25 7:1,4
  8:17,24 23:18
  64:23 88:16,19
  91:2,4,5,6 93:19
  96:20
**talked** 32:9 81:22
  92:8 95:8,25
  103:21
**talking** 8:22 11:20
  11:21 20:15 42:10
  49:18,19,20 50:20
  50:21,22,22 61:2
  68:19 72:24,25
  90:18 91:18
**task** 51:6 98:18
  99:17,18,19 100:9
  100:21 102:18
  103:1,2,4,5
**taught** 30:15
  31:21
**teach** 30:1,8,22,24
  31:1,1,10,15 36:25
  39:19
**teaching** 31:19
**team** 36:19 47:7
  57:25 60:7,13,13
  64:1,2 65:25 78:4
**teams** 75:18 78:1
**tell** 8:5,15 11:24
  24:6 29:16 62:5
  63:10 67:12 75:13
  81:10
**tells** 23:12
**ten** 18:17 37:9,11
  72:17
**tenor** 50:3
**term** 5:13 17:18
**terms** 25:10 33:18
  56:24 62:11 66:5

91:2

**test** 30:14,21 57:9

**testified** 4:11 55:2
81:25

**testify** 32:21

**testifying** 7:22

**testimony** 9:10
32:15 35:7,11
63:15 67:20 70:4
70:17 71:3

**tests** 30:17

**thank** 4:15 5:9
42:4 72:21,21
106:20 107:3,6

**thanks** 5:8 21:17
107:7

**theft** 16:22,22
85:14,15 90:3

**thing** 14:18 72:13
77:4 100:18

**things** 6:6,18
11:14 30:1,15
31:18 38:16 57:13
58:2 59:19 60:22
60:23,24 77:14,21
81:14 83:2 95:22
104:23 105:1,3

**think** 7:9 10:25
16:2,6 22:13
27:14 33:8 37:9
37:11,11 41:16
43:3 45:2 46:3
48:17 49:20 58:14
60:17 61:25 73:5
73:22 78:6,12
85:4 89:1 91:10
92:15,16,19 93:5
95:9 97:19 98:3
99:6 100:3 101:4
102:7 104:17,19
105:5,9 106:5,18

**third** 82:21

**thought** 24:6
25:15 53:20 91:4

**thoughts** 72:12

**three** 13:8,21
29:23 65:15 78:4
78:12 82:12,13,24
88:3 96:7

**threshold** 77:12
104:12

**throwing** 21:18
106:6

**time** 5:20 10:13,13
10:16 11:12 18:16
28:3 29:21 31:23
32:2 42:5 46:13
47:11,19 49:17,17
50:15 51:14 52:22
56:15 57:3,15
58:17,24 65:10
67:10 68:18 69:18
72:19 73:17 74:16
74:17 78:21 79:19
85:12 90:18 92:8
92:14 93:9 96:22
103:5,10,14,18
106:21 107:4

**times** 5:19 37:9,11
37:12 70:11

**title** 12:16 45:3

**today** 4:15,21 9:3
9:10 106:25 107:2
107:4

**token** 7:10

**tomorrow** 39:23

**tool** 64:19

**topic** 93:25

**topics** 105:5

**town** 100:19

**traced** 83:18

**track** 18:5

**tracy** 1:10

**trafficking** 45:24
53:9

**train** 100:16

**trained** 39:16 77:7

**training** 29:18,18
29:19 30:4 36:23
36:24 41:25 77:17
79:8 84:3 98:24

**transaction** 18:10

**transactions** 18:1
18:22 19:11

**transcript** 110:15
110:17

**transfer** 14:11
17:24,25

**transferring** 19:1

**travis** 1:7

**treasury** 18:1,4

**treated** 84:6

**trials** 32:20

**tried** 75:23

**true** 110:16

**truly** 8:11

**truthfully** 7:17

**try** 6:13 7:11,24
8:5 21:11 54:14
62:7,12 91:1

**trying** 4:22 15:6
18:23 19:21,21
25:18,19 27:1
32:16 33:10 35:14
35:15 37:21 43:13
47:10 48:18 50:24
55:6 58:5,11
60:15,15,16,21
64:3,25 66:6
67:16 75:23 81:12
84:24 85:4,5
86:16 89:2 90:21

91:6 94:1,18
98:18 99:3,8,10
100:22 104:11

**tuesday** 1:20 4:1
110:6

**turned** 37:16 50:9
56:15 72:12 97:4

**twelve** 30:11

**two** 6:2 33:14 63:6
78:4,12 82:1,2
106:18

**tyler** 1:6

**type** 16:24 57:6
67:3 71:17

**types** 15:1 18:5
52:18 59:9

**typewritten** 97:24

**typical** 16:14
34:15

**typically** 9:14

**u**

**u.s.** 4:25 12:12
17:10 21:23 22:2
23:6,7,11,21 25:23
26:1,4 34:5 35:9
35:14 40:10,16
41:8,11,20 43:11
45:9,19,22,23 46:6
46:14,20 48:7,20
49:3,6,11,21 50:5
51:11,18,22 52:25
54:7 55:16 56:5
56:16,19 58:19
59:22 61:14,21,25
62:3,17,20,22
63:23 65:23 66:2
67:18 71:25 73:1
73:7,8,13 74:12
75:12,14 77:24
80:12,15 88:9
89:5,8 90:15,20

Exhibit E
1194

91:17,20 93:3
94:3 96:10 97:14
97:18 98:10
100:15 103:6,22
106:1,15
**uh**  6:18,18,18 12:4
15:4 16:7 31:12
44:18,20 88:5
97:12,25
**ultimately**  28:10
44:7 57:18
**uncovered**  58:16
**undercover**  57:8,8
57:8,9 59:12
**understand**  6:16
7:13,16,20 8:1,6
8:15 9:3,20 10:22
11:23 32:16 34:7
42:9,11 43:13
47:17 48:18 50:10
55:1,7 65:22 71:9
77:22 85:17 94:19
99:8,10 100:2
103:8
**understandable**
7:25
**understanding**  6:6
9:7 17:19 42:13
58:4 59:3 68:4
69:18,18,20 77:3
85:8 90:14 105:24
**understands**  54:24
**understood**  8:16
29:5 46:23 100:3
**undertake**  29:19
44:8
**undertaken**  36:2
49:3
**uniformed**  13:14
**union**  17:23

**unit**  15:8,11
**united**  1:1,10,11
2:9 5:6 13:7 22:10
22:17 23:22 42:12
48:24
**units**  97:17 98:9
98:11,20,21
101:14,15 102:1
103:24
**unpack**  77:21 92:4
**unprecedented**
67:19
**unsealed**  73:4
**usao**  50:4,23 92:12
**use**  9:18 11:10
12:5 19:22 24:10
27:20 40:9 48:20
90:9,19 91:19
92:18 93:7 96:1,4
98:5 101:5,8
**useful**  83:8 86:5
87:22,24
**uspis**  12:20,24
13:1 14:1,3,20,23
15:8,17,20 16:1,14
20:9 22:23 27:4
27:14 28:15,24
29:6 34:24 36:23
36:25 39:16 42:14
42:23 43:15,15
44:4,6,17,24 45:5
45:18 46:8,12
47:16 50:4,10,21
57:14 78:7 100:5
**usps**  17:12
**uspv**  73:18
**usually**  17:9 21:23
62:17 95:4 98:13
**utility**  75:16

## v

**va**  2:7
**vague**  28:16 31:21
37:4 43:20 44:9
70:16 71:2,14
84:4,19 86:25
87:16,23 89:24
102:12
**value**  17:25 18:14
**various**  13:11
30:15 70:19 84:13
98:11 100:4
**vasquez**  73:15
**vasquez's**  74:11
**vaults**  5:1 34:5
35:9,14 40:10,16
41:8,12,21 45:10
45:19,22,24 46:6
46:15,20 48:20
49:3,21 50:6
51:11,18,22 52:25
54:19 55:12 56:5
56:16,20 58:19
59:22 65:24 66:2
67:19 73:1,7,8,13
74:12 75:13,15
80:12,16 88:10
89:5,8 90:16,20
91:17,21 92:13
97:14,19 103:6,22
105:8
**vehicle**  20:6 37:23
**verbal**  6:20
**verbally**  6:14
**verdon**  1:6
**veritext**  79:15,17
**versoza**  1:19 4:6,9
4:15 5:11,12,12,16
12:1,8 46:25
72:21 79:23 97:10
103:21 106:24

108:3,13 110:9
**versus**  95:6 98:12
104:10
**videoconference**
1:18 2:2 4:4,6
110:8,10
**view**  79:6
**violate**  32:4
**violating**  53:22
**violations**  45:6
52:19,25 57:10
70:20
**violent**  16:20
**vs**  1:9

## w

**wait**  7:7
**walk**  6:4 14:16
19:25 21:3 73:2
**walmart**  17:24
**want**  5:4,5 8:17
10:4,7,19 11:14,16
11:22 13:22 17:7
17:20 27:18 38:4
52:2 54:13 60:23
60:24 77:6,21
91:25 93:23 96:20
102:13
**wanted**  13:10 14:3
29:4 46:23 61:4
64:5 72:23 73:2
81:17 82:20 89:7
104:18
**wants**  31:8
**warehouse**  67:3
**warrant**  4:25
26:12 30:7 31:16
32:3 37:20,21,25
38:3 40:10,17,24
41:8,12 43:22,22
43:25 44:11,13,14
59:22 60:8,14

Exhibit E
1195

61:6,7,8,9 62:11
63:7 64:5,6,9,11
64:18 65:22,23
67:7,18,19,21,23
68:6,14,15,19,20
72:7,7,11,25 73:1
75:15 76:4 80:13
81:15 87:13,14,14
87:15 91:17 93:2
93:10 94:6
**warrants**  25:12
30:25 31:11 32:7
32:8,8 64:10
71:22 73:3,6
90:23 91:5
**washoe**  110:2
**way**  10:8 19:2
45:4 56:12 63:8
68:2,8 74:7 75:17
75:25 79:6 82:21
96:15
**we've**  4:19 23:23
32:7,7,8 39:14
**webex**  101:18
**websites**  17:6
**week**  29:22 30:20
**weeks**  30:11,12
101:11
**went**  22:18 29:23
72:22 99:11
**western**  1:3 17:23
**westwood**  65:5,9
**wilkison**  1:10
**window**  75:1
**witness**  1:21 21:22
24:14 25:9,22
27:8,24 28:17
29:2 30:12 33:21
34:7,19 35:12,20
36:7 38:22 39:11
40:3,12,19 41:2

42:18 43:3,21
44:10 46:18 49:9
51:14 52:8,11
53:25 54:10 55:2
55:14 61:12 63:16
66:4,19 67:21
69:2,16 70:5,18
71:4,16 74:16
76:21 81:20 82:6
83:11,21 84:5,21
85:4 86:2,9 87:1
87:18,24 89:16,25
90:5,12 91:25
92:4,22 93:16,23
94:1,22 99:16
101:22 106:20
107:6
**wondering**  20:17
25:6 28:20 43:18
61:9 64:21 65:24
69:10 91:13 102:1
**words**  8:22 89:2
**work**  13:10,24
14:22,23,25 15:20
16:20 20:9 27:4
27:17 28:15,24
31:22 32:25 34:17
44:13 51:2 57:4,6
59:5 100:21
**worked**  4:19 13:5
21:4 101:7
**working**  59:17
71:19 103:23
**works**  46:4 48:18
56:23
**worth**  24:3
**wrap**  106:19
**write**  31:11
**writing**  31:2 55:25
56:7

**written**  87:7
**wrong**  52:24
**wrote**  84:11

| x |
|---|

**x**  3:1

| y |
|---|

**yeah**  9:22 14:7
15:17 18:12 20:2
22:14 26:10 27:12
28:20 33:1 38:4
42:1,1 48:17
51:20 54:14 56:17
59:2 60:11 65:2
68:16 73:16 74:5
74:20,24 79:16
86:2 94:20 96:8
101:1,19 102:20
106:5
**year**  90:25 96:8
**years**  4:19 13:2,8
13:21 14:10,11,15
17:1,8 27:15,16,17
29:6 31:20 34:24
35:2,6 36:11,13
37:24 73:19 96:7

| z |
|---|

**zellhart**  51:10
56:4 61:18 62:4
63:9,16 67:11,24
69:17 89:3 91:15
95:10 104:19
**zoom**  7:3 101:20

Exhibit E
1196

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit L**
**1197**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit L**
**1198**