# Exhibit M

**to Declaration of Robert Frommer**

```
                                                    Page 1

 1             IN THE UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3                      WESTERN DIVISION
 4                          -oOo-
 5
     PAUL SNITKO, JENNIFER SNITKO, :
 6   JOSEPH RUIZ, TYLER GOTHIER,   :
     JENI VERDON-PEARSONS, MICHAEL :
 7   STORC, AND TRAVIS MAY,        :
                                   :
 8                   Plaintiffs,   :
                                   :
 9   vs.                           :   Case No.
                                   :   2:21-cv-04405-RGK-MAR
10   UNITED STATES OF AMERICA,     :
     TRACY L. WILKISON, in her     :
11   official capacity as Acting   :
     United States Attorney for the:
12   Central District of California:
     and KRISTI KOONS JOHNSON, in  :
13   her official capacity as an   :
     Assistant Director of the     :
14   Federal Bureau of             :
     Investigation,                :
15                                 :
                     Defendants.   :
16   =================================================
17
18         VIDEOCONFERENCE 30(B)(6) DEPOSITION OF
19                     LYNNE ZELLHART
20               FRIDAY, JUNE 30, 2022
21           WITNESS APPEARING REMOTELY FROM
22              THOUSAND OAKS, CALIFORNIA
23
24
25   REPORTED BY:          SUSAN E. BELINGHERI, CCR #655
                           NV Firm Lic. #053F
```

Page 2

```
 1                    APPEARANCES:
 2          (all appearances via videoconference)
 3
                 For the Plaintiffs:
 4
              THE INSTITUTE FOR JUSTICE
 5                 Attorneys at Law
              By:  ROBERT FROMMER, ESQ.
 6           By:  ROBERT E. JOHNSON, ESQ.
             901 N. Glebe Road, Suite 900
 7                Arlington, VA 22203
 8
                 For the Defendants:
 9
            ASSISTANT UNITED STATES ATTORNEY
10              ASSET FORFEITURE SECTION
              By:  VICTOR RODGERS, ESQ.
11           312 North Spring Street, 14th Floor
              Los Angeles, California 90012
12
13           FEDERAL BUREAU OF INVESTIGATION
                OFFICE OF GENERAL COUNSEL
14            By:  MEGHAN CAMPBELL, ESQ.
              935 Pennsylvania Avenue NW
15                Washington, DC 20535
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                          I N D E X

2

3    EXAMINATION:                                        PAGE

4    By Mr. Frommer                                         4

5

6

7    EXHIBITS:    DESCRIPTION                             PAGE

8    (previously marked)

9    Exhibit 3    Warrant By Telephone or Other

                  Reliable Electronic Means, USAO00001-

10                00246..................................   11

     Exhibit 8    FBI, U.S. Private Vaults Claim Form....   56

11   Exhibit 10   Agent Observations and Notes,

                  FBI0000446.............................   44

12

     (marked)

13

     Exhibit 12   Plaintiffs' Amended Notice of

14                30(b)(6) Deposition................    8

15

16

17

18

19

20

21

22

23

24

25

**Exhibit M**
**1202**

                                                                Page 4

1              PURSUANT TO NOTICE, and on Thursday, the

2       30th day of June, 2022, at the hour of 10:05 a.m. of

3       said day, at the offices of Bonanza Reporting &

4       Videoconference Center, 1111 Forest Street, Reno,

5       Nevada, before me, Susan E. Belingheri, a notary public,

6       appeared LYNNE ZELLHART via videoconference.

7                              -oOo-

8

9                          LYNNE ZELLHART,

10                       having been duly sworn,

11              was examined and testified as follows:

12

13                          EXAMINATION

14      BY MR. FROMMER:

15         Q.  Thank you, Special Agent Zellhart.

16              If you could, just for the record, could you

17      state your full name, title, and address please?

18         A.  Sure.  My name is Lynne, L-y-n-n-e, Zellhart,

19      Z-e-l-l-h-a-r-t.  I'm a special agent with the FBI in

20      Los Angeles.  And the address there is 11000 Wilshire

21      Boulevard, Suite 17, Los Angeles, California 90024.

22         Q.  Okay.  All right.  Well, thank you so much for

23      that.

24              We've met before, obviously.  As you know, my

25      name is Robert Frommer.  I'm an attorney at the

Page 5

1    Institute for Justice.  We're a nonprofit public

2    interest law firm, and we're representing the plaintiffs

3    in this class action challenge concerning the execution

4    of a search warrant at U.S. Private Vaults in March

5    2021.

6         Now, I know last time when we talked I went

7    through a bunch of rules about how to conduct a

8    deposition, and I'm just going to run through those

9    really briefly.  I mean, at this point you're an old hat

10   at it, but, like, it's always good for -- to be

11   refreshed.

12        So I'm going to ask questions, and the court

13   reporter is going to be reporting both my questions and

14   the answers, and in order to do that, we have to speak

15   clearly and audibly by saying "yes" or "no," not

16   "uh-huh" or "uh-uh," because the court reporter can't

17   take that down.

18        Similarly, usually in normal conversation we'll

19   often interrupt one another as part of the normal flow

20   of conversation, but if you do that with a court

21   reporter, the entire record gets messed.  So it's

22   important that you wait until I finish answering --

23   asking my question, even if you think you know where I'm

24   going to go, and at the same time I will -- I will wait

25   until you are complete with your answer before I ask

Page 6

1   another question.  Does that sound reasonable?

2       A.  Yes.

3       Q.  Okay.  Now, you were sworn in a moment ago by the

4   court reporter, and you understand that that oath

5   requires you to answer my questions truthfully and

6   completely; right?

7       A.  Yes.

8       Q.  And, in fact, that's the same oath you would take

9   if you were to testify in court before a judge.  You

10  understand that?

11      A.  Yes.

12      Q.  Okay.  If you don't understand a question while

13  you're going -- going along, just let me know.  I'll try

14  to rephrase.  If -- if you don't know the answer to a

15  question, if you honestly don't know the answer to a

16  question, you can say that, but if you do know the

17  answer, then you have to provide that answer in good

18  faith.

19          And generally I'll assume, unless you say

20  something to me, that you understood what my question

21  was.  If you want to talk to Victor or Ms. Campbell,

22  that's fine.  All I'd say is that if there's a question

23  pending to wait until -- or if you're in middle of an

24  answer, to finish the answer, or a line of questions,

25  and then you can speak to the attorney.

1          Because it's important to get full, complete, and
2     accurate answers, I have to ask, I know that you've
3     been -- you've been sick.  Is there anything about the
4     sickness or any medications that you're taking that
5     would make it difficult for you to understand and answer
6     my questions today?
7          A.  No.
8          Q.  Okay.  Is there any other reason why you couldn't
9     give full, complete, and accurate testimony today?
10         A.  No.
11         Q.  Okay.
12         A.  No reason.
13         Q.  All right.  And I will say periodically Victor or
14    Ms. Campbell might state objections.  You still have to
15    answer the question, generally, unless they specifically
16    instruct you not to answer.  Those are just to put it on
17    the record for later.
18         And if you would like to take a break at any
19    time, just let me know.  I'll finish up a line of
20    questioning, if we're in the middle of it, and then we
21    can take a break.  Okay?
22         A.  Yes.
23         Q.  All right.  All right.  With sort of that out of
24    the way -- well, before I begin in earnest, do you have
25    any questions of me today?

Page 8

```
 1    A.  No.

 2           MR. FROMMER:  Okay.  All right.  Well, then

 3    I'm going to start by introducing an exhibit.  So give

 4    me just a minute, here.

 5           All right.  And that should be listed as

 6    Exhibit 12.  You should see it come up.  Let me know

 7    when you have that, a copy of that.

 8           (Exhibit 12 marked at this time.)

 9           THE WITNESS:  I don't, and I'm not sure --

10    you started with the hard stuff, here.  I'm not sure how

11    to get to the exhibits.  I don't have anything up.

12           MR. FROMMER:  Okay.  Let's go off the record

13    for just a couple minutes, so that way we can get you

14    set up.

15      (An off the record discussion was held at this time.)

16           MR. FROMMER:  All right.  Let's go back on

17    the record.

18    BY MR. FROMMER:

19      Q.  All right.  Special Agent Zellhart, I just

20    introduced what is Exhibit 12.  It is an amended

21    30(b)(6) notice of deposition that we sent to the

22    government.

23           Have you seen this document before?

24      A.  Yes.

25      Q.  Okay.  And is it your understanding that you're
```

**Exhibit M**
**1207**

Page 9

1   appearing today on behalf of the United States to answer

2   questions regarding the topics listed in this notice?

3       A.  Yes.

4       Q.  Okay.  And are there any topics -- I can go

5   through these one by one.  Are there -- but let me ask

6   this first:  Are there any topics listed in deposition

7   notice that you're not prepared to testify on today?

8           MR. ROGERS:  I'll answer that question.  She

9   is not going to testify on topics eight and ten, but she

10  will testify on the rest of the topics.

11          MR. FROMMER:  Okay.  So no eight, no ten.

12  Okay.  All right.  All right.

13  BY MR. FROMMER:

14      Q.  Now, other than for topics eight and ten, which I

15  understand the government is designating someone else to

16  testify about, can you generally describe your

17  qualifications to speak on the topics identified in the

18  notice?

19          MR. ROGERS:  Objection, compound.

20          THE WITNESS:  Sure.  So I'm the case agent.

21  I'm the FBI case agent for U.S. Private Vaults, and as

22  the -- as the case agent I'm the head person on this

23  case.  So I am the person most knowledgeable about these

24  aspects of the case, and I think I can speak to

25  everything that's in here.

Exhibit M
1208

                                                          Page 10

1    BY MR. FROMMER:

2        Q.  Okay.  Great.

3            And can you -- do you think there's anyone who

4    you believe would be more knowledgeable than you on the

5    topics listed in the deposition notice?  Other than

6    topics eight and ten, obviously.

7                 MR. ROGERS:  Same objection.

8                 THE WITNESS:  No, I think I'm the best

9    person.

10   BY MR. FROMMER:

11       Q.  Okay.

12           Could you tell me, what did you do to prepare for

13   this deposition today?

14       A.  I spoke with attorneys for the United States

15   Attorney's Office, I reviewed some exhibits from, I

16   think -- I think from my past deposition, I spoke with

17   Special Agent Madison MacDonald, who was co-case agent

18   with me on this, to get some information from her about

19   something that I thought she knew more about than I did,

20   or as much, that she had some information about.  And I

21   think that's all.

22       Q.  Okay.  All right.  Do you remember -- you said

23   you reviewed some of the exhibits that were in your

24   previous deposition.  Do you recall which ones you

25   reviewed?

Exhibit M
**1209**

Page 11

1    A.  Yeah.  I looked at the -- the -- one of the --

2    the paragraph -- paragraph 108 from the seizure warrant

3    affidavit again, and I looked at the FBI inventory

4    policy again.

5    Q.  Okay.  All right.  In fact, we're going to

6    probably be discussing both of those today, so that's

7    understandable.

8        Any other documents that you can recall?

9    A.  No.

10   Q.  Okay.  That's fine.  Okay.  And I'm not going

11   to -- I'm going to skip some of the basic background

12   questions, because we've already discussed those at your

13   previous deposition, and I understand that you're the

14   case agent and you've been the case agent on this case

15   for a number of years.

16       MR. FROMMER:  So with that, let me introduce

17   -- well, let me ask a -- give me just a second.  I want

18   to introduce another exhibit.

19       All right.  This is -- has been previously

20   marked at your -- as Exhibit 3.  This was, in fact, the

21   seizure warrant we were just discussing.  So it's a

22   large file, so let me know when you have access to it.

23       (Exhibit 3 was previously marked.)

24       THE WITNESS:  Okay.  I have it.

25       MR. FROMMER:  All right.  Great.

Exhibit M
1210

```
                                                      Page 12

 1              MR. ROGERS:  I'm sorry.  Give me just a

 2    second.

 3              MR. FROMMER:  Sure.

 4              MR. ROGERS:  I have it, too.  Thank you.

 5              MR. FROMMER:  All right.  I am --

 6    unfortunately, it is slowly working its way to me.  Give

 7    me just a second.  I can just pull it up as a PDF.

 8              All right.  Okay.  Sorry about the delay.

 9    BY MR. FROMMER:

10       Q.  If you could go to page 223, paragraph 108 of

11    Exhibit 3, please.

12              Were you able to locate those pages?

13       A.  It's thinking.

14       Q.  Yeah.

15       A.  I think it might still be loading.  But, I mean,

16    I have that -- I have that paragraph.

17       Q.  Yeah.

18       A.  I printed it.

19       Q.  Okay.  Well, then let's just keep talking --

20       A.  Sure.

21       Q.  -- since you know exactly what paragraph I'm

22    talking about.

23       A.  Yeah.  I do.

24       Q.  Yeah.  Can you -- can you read me the sentence

25    that begins on line 19, please?
```

**Exhibit M**
**1211**

Page 13

1        A.   Sure.

2             Agents will follow their written inventory

3    policies to protect their agencies from claims of theft

4    or damage to the contents of the boxes, and to ensure

5    that no hazardous items are unknowingly stored in a

6    dangerous manner.

7        Q.   Okay.  And what I'm -- what I'm wondering about

8    in that sentence -- and it says:

9             Agents will follow the written inventory

10   policies.

11            So what was the inventory policy that the

12   government followed in conducting the inventory search

13   in U.S. Private Vaults?

14       A.   Right.  So it's the inventory policy in the DIOG

15   section -- I don't know the section numbers.  But it's

16   written -- it's formally written in a section of the --

17   of the Domestic Investigations Operations Guide of the

18   FBI.

19       Q.   And then you used that section from the DIOG to

20   create the supplemental instructions on box inventory;

21   is that correct?

22            MR. ROGERS:  Just a second.  I just want to

23   object, because this is a 30(b)(6) deposition pertaining

24   to particular categories.  I understand that this

25   question might pertain to a particular category, but it

Page 14

```
 1   hasn't been linked to any category.  And this deals with
 2   the substance of the categories.  And so I want to
 3   object on that basis.
 4              MR. FROMMER:  I'm not clear what you're
 5   asking for, Victor.
 6              MR. ROGERS:  So she -- so this is a 30(b)(6)
 7   deposition of the witness on ten different categories,
 8   and my understanding is that in these depositions you go
 9   from category to category.  You just don't ask questions
10   about -- that might pertain to any of these ten
11   categories.  Now, I understand --
12              MR. FROMMER:  No.  That's --
13              MR. ROGERS:  -- this is --
14              MR. FROMMER:  That's not my understanding.
15   I've never done a 30(b)(6) deposition that way, and I've
16   done multiple, numerous 30(b)(6) depositions.
17              MR. ROGERS:  So I've done a number of them
18   as well, and to the extent, you know, you want to go
19   into questioning, linking it to a category, I mean,
20   that's fine.  But this is going to require me to object
21   on the basis that this is outside the scope of a
22   particular category, not knowing which category you're
23   referencing in this.  I mean, I'm happy to do that, but
24   it just -- it doesn't seem to be the most expeditious
25   way of handling this.
```

Page 15

1          MR. FROMMER:  All right.  Let's go off the

2     record for a minute.

3      (An off the record discussion was held at this time.)

4          MR. FROMMER:  Let's go back on the record,

5     please.

6     BY MR. FROMMER:

7      Q.  So Special Agent Zellhart, I understand that the

8     government looked at the FBI DIOG as the basis for its

9     inventory policy when conducting inventory at U.S.

10    Private Vaults.

11         My question is, who created the supplemental

12    instructions on the box inventory?

13     A.  I did.

14     Q.  Okay.  You did.

15         And when you created those, did you create those

16    instructions especially, or particularly for executing

17    the U.S. Private Vaults seizure warrant?

18     A.  Yes.

19     Q.  Okay.  And did you design the supplemental

20    instructions to track the inventory policy that's listed

21    in the DIOG?

22     A.  So I don't want to give the wrong impression,

23    here.  I didn't have the DIOG in my hand, looking at it,

24    while I was creating the supplemental instructions, but

25    I understood the policy and I wrote the supplemental

Exhibit M
1214

Page 16

1   instructions for the team to follow based on that we

2   were doing an inventory search.

3       Q.  Okay.  So the DIOG is sort of the general policy,

4   and it sounds like the supplemental instructions were

5   sort of the operative policy, the policy that was in

6   place on the ground and that the agents who were doing

7   the inventorying, they were supposed to follow that.  Is

8   that fair to say?

9       A.  Correct.  The DIOG is a reference, it's a

10  resource.  It's like a dictionary or a thesaurus.  We

11  don't -- you know, we don't walk around with it in our

12  hands.  But the supplemental instructions were created

13  to help the team focus in on what we were doing and how

14  we were doing it.

15      Q.  Okay.

16      A.  And the supplemental instructions comply with

17  the -- I mean, they do comply with the DIOG.

18      Q.  Okay.  I see.

19          And -- so, again, let me just -- I know I asked

20  this a bit before, when you were here in your personal

21  capacity.  I want to ask it now that you're here as a

22  30(b)(6) representative.  What are the -- what are the

23  permissible purposes for an inventorying?  Is it --

24  well, if you could just identify those for me.

25      A.  So the -- when you're doing the inventory, it's

1    for several reasons.  One, you're protecting the

2    property for the other person, keeping it safe, you're

3    protecting the agents from accusations of theft or

4    damage, and you're protecting the agents, and whoever

5    else, from the possibility that you might run into

6    hazardous materials, such as -- such as weapons or, you

7    know, unexploded hand grenades or Fentanyl or anthrax or

8    whatever.  So you're -- so it's a protective prong.

9        Q.  Okay.  So here the purposes were to protect the

10    safety of the officers and to protect against

11    accusations of lost or misplaced property.  I assume

12    it's also, another purpose was to try to identify the

13    owners of the property.

14        A.  I mean, that's not specifically -- so that was

15    specifically contemplated in this case because we

16    understood that the whole point of the business was

17    anonymity.  So anonymity was -- was the thing they

18    advertised.  So we understood going in that we may be

19    running into a situation where we may or may not know

20    who the box holder is, and we were going to need to

21    figure that out in order to return their property to

22    them.

23        Q.  Okay.  And also, the purpose of the inventory

24    search here was, in part, to gather evidence regarding

25    the condition of currency and cash and other property

Page 18

1   found in the boxes; is that correct?

2       A.   That is a -- like, observations about it are sort

3   of separate.  That gets into, like, what agents are

4   seeing in plain view.  That's not the purpose of it.

5   The purpose of it is the three things that I said, but

6   we're not required to ignore what we see.

7           So, for example, when we see currency with dye

8   pack on it, which we did see, or we see it's not

9   currency, it's Fentanyl, which we found, that is -- that

10  is in plain view of what we're doing, but it's not the

11  purpose of what we're doing.

12      Q.   Okay.  But one purpose -- but you want -- is it

13  true that you wanted agents to gather information

14  concerning, for instance, whether the money smelled like

15  drugs, or if it was banded -- packaged in an unusual

16  manner.

17      A.   Right.  So because of the nature of what we were

18  doing, we did expect, based on our experience, that

19  there was going to be cash there, and we were getting

20  cash out of the form of cash as quickly as possible and

21  into a banking institution.  And we understood that, and

22  as I think I said in my -- in my last deposition, that

23  the trust -- you don't want to have cash on hand.

24  There's too many things that can go wrong.  You want to

25  get that cash into an institution.

Exhibit M
1217

1          But once that happens, it's gone.  It's gone

2     gone.  So anything you may have observed about it is

3     also gone.  So, again, if it has dye pack on it, if it

4     has flakes of -- of, you know, marijuana leaf, if it

5     smells, if it's oily, if it's wet, whatever the

6     condition of it, it will -- you if you don't make a note

7     about it right now, it will be gone and you won't -- you

8     will never be able to go look at that again.

9          So yes, we anticipated that the cash might be in

10    some interesting conditions, and if that was the case,

11    we asked the agents to make a note of that, please.

12    Q.  So to the extent that cash displayed indicia that

13    made it look like it might be criminal proceedings, you

14    wanted to record that contemporaneously before the money

15    went off to Loomis.

16    A.  Correct.

17    Q.  Okay.  Can I ask -- I know that -- do you recall

18    when you created the supplemental instructions for box

19    inventory, roughly?

20    A.  Yeah, it was about ten days to two weeks prior to

21    execution of search warrants.

22    Q.  Okay.  So this would have been early March, 2021,

23    then?

24    A.  I think that's right, yes.

25    Q.  Okay.

Page 20

1      A.  As close as a week before, and as far as two

2   weeks before, but right in that range.

3      Q.  Okay.  That's fine.  I don't need a precise date,

4   I just wanted to get a sense.

5         Did you have anybody help you draft the

6   supplemental instructions?

7      A.  No.  I drafted them.  I may have gotten input

8   from Special Agent Madison MacDonald, who was helping

9   me, and there may have been input from my supervisor at

10   the time, Richard Alexander.  But if -- if there was any

11   input from either of them, it was -- I think it was

12   minimal.  It was pretty much my document.

13      Q.  Okay.  All right.  And so you said a couple weeks

14   before the raid got executed -- or the seizure warrant

15   got executed, you prepared this.

16         And then how did the supplemental inventory -- or

17   supplemental instructions for box inventory, how did

18   those get disseminated to the people who were actually

19   going to be doing the inventories?

20      A.  So I held a meeting -- and, again, this is in the

21   same time frame, within a week to maybe ten days prior

22   to execution of warrants, we had a meeting with all of

23   the agents who had volunteered to participate in box

24   inventory.  And they came to the meeting, and they

25   received a copy of the supplemental instructions, and we

Exhibit M
1219

1   went through them in the meeting.

2      Q.  Okay.  And so you went through -- did -- was

3   there any practical training, where you created, like, a

4   box to show them how to do an inventory, or was it just

5   walking through the instructions?

6      A.  We just walked through the instructions.

7      Q.  Okay.  All right.  And -- and you previously -- I

8   just want to see if I remember this correctly.  You

9   previously -- you had -- had or had not conducted an

10  inventory search previously?

11     A.  So I don't -- so we talked about this.  I

12  don't -- I don't specifically recall having done one.

13     Q.  Okay.

14     A.  And I think I told you in my early career I

15  worked a lot of drug and drug task forces, so it's

16  possible it came up in the context of working with local

17  police officers, but I don't specifically recall having

18  done one --

19     Q.  Okay.

20     A.  -- prior.

21     Q.  All right.  That's fine.  I just wanted -- I

22  couldn't remember.

23         Let me -- I'm going to shift gears a little bit

24  and move back to -- for the sake of Victor, we'll say

25  this is -- where is the investigation?  And this is

Exhibit M
1220

Page 22

1   about just the general investigation of U.S. Private

2   Vaults.  I think that probably is set up in number

3   one -- one and two of the topics.

4        So I understand, like, that -- can you explain to

5   me the -- with U.S. Private Vaults, originally the

6   case -- the investigation was not against the company

7   itself; is that correct?

8      A.  Well, that's not quite true.  So it is and it

9   isn't.  So many different law enforcement agencies were

10  aware of U.S. Private Vaults, including the DEA, LAPD,

11  L.A. Sheriff's.  I know those three for sure had an

12  interest in what was going on at U.S. Private Vaults.

13  And those agencies were conducting different

14  investigations into customers at U.S. Private Vaults.

15        So I think they were sort of using USPV as a --

16  as an ant hill, or a honey pot, however you want to

17  think about it.  They were -- they were finding

18  criminals at that business.  But they were not

19  investigating the business.

20        That project, having been unsuccessful throughout

21  law enforcement, in about 2019, DEA, U.S. Postal

22  Inspector, and FBI kind of got together and said:

23  That's not working.  What we need to do is we need to

24  figure out how we can take out the criminal facilitator,

25  which is U.S. Private Vaults itself, the business.

1        And so from 2019 forward, which is when I became

2   involved in the investigation, the -- the investigation

3   was into the corporation.  It was into the company

4   itself, the business.

5        Q.   Okay.  So prior to -- I think I had heard 2018

6   before, but okay.  So prior to that, there had been

7   investigations into box renters, and it was around this

8   2018-2019 framework where you, the DEA, USPIS, other

9   groups came together and said we need to investigate the

10  company, because they're the ones who are facilitating

11  all of this activity.

12       A.   Correct.

13       Q.   Okay.  And at that point were you the lead

14  person -- were you point person on the investigation at

15  that point?

16       A.   I became the FBI point person in about April of

17  2019.

18       Q.   Okay.  And what does that mean, to become the

19  point person?

20       A.   I became the case agent at that point.

21       Q.   And so you're the person at the FBI who's chiefly

22  responsible for investigating U.S. Private Vaults?

23       A.   Yes.

24       Q.   Okay.  And you were working that along with

25  Special Agent MacDonald?

Page 24

1    A.  She didn't really join the investigation until --

2    until, really, right before we were getting ready to --

3    to execute warrants.  So she kind of came in because I

4    needed help, like in getting this organized and -- and

5    getting the warrants ready to go and executed.  So she

6    was actually not part of -- not part of the

7    investigation.

8    Q.  So when would you say that she got looped into

9    the investigation, then?

10   A.  Probably around January of 2021.  Maybe December

11   of 2020.

12   Q.  Okay.  So fairly late in the process.

13   A.  Yeah.  Yes.

14   Q.  Okay.  So back in 2019, then, were there other

15   FBI agents who were working with you on the

16   investigation, or were you the -- really, the sole

17   person on it?

18   A.  No, it was just me.  With DEA and Postal.  But I

19   was --

20   Q.  Okay.

21   A.  -- the only FBI investigator in the investigative

22   phase.

23   Q.  All right.  And you were investigating in order

24   to determine, like -- well, I believe before you said

25   you have a specialty in money laundering; right?  Is

Page 25

1    that correct?

2        A.   Correct.

3        Q.   And so was part of your investigation to

4    determine -- or to investigate to see if you could find

5    violations of structuring laws, other -- or other money

6    laundering laws?

7        A.   Yeah.  We -- we did feel that there was money

8    laundering going on, yes.

9        Q.   Now, did the different agencies sort of

10   specialized as to what they would investigate?  And by

11   that I mean did you have a different investigatory focus

12   than the DEA, for instance, or USPIS?

13       A.   I would say no, we investigated together.  But

14   there's certainly things that they're better at than --

15   than -- there's certain things DEA is better at than FBI

16   is.  So to the extent where we did controlled drug buys,

17   which we did a number of in this case, DEA is certainly

18   the better agency to handle that.  They do it all the

19   time.  They're very, very good at it.  To the extent we

20   were looking at sort of bank documents and a little bit

21   of follow the money, you know, FBI is a little bit

22   better at that.

23            It just -- it -- but everybody was looking at the

24   company.  Everybody was looking at -- and it didn't

25   matter.  If we never found money laundering, then we

Page 26

1    never would have found money laundering.  We weren't

2    targeting the fence, we were looking at the criminal

3    activity of the corporation, of the company.  And its

4    principals, frankly.

5        Q.  I get that.

6            And so -- so we're talking -- and then you sort

7    of take the reins on the FBI side around, I think you

8    said roughly April 2019, and you're working in

9    conjunction with DEA, USPIS.  Were there other agencies

10   involved in the investigation at that point?

11       A.  So yes and no.  I mean, those are the three

12   federal agencies.  We used local agencies, local police

13   agencies for different things.  So, for example,

14   sometimes Beverly Hills Police Department assisted us

15   with -- with different things.  I think I mentioned that

16   the El Monte Police Department is in a task force with

17   the DEA folks.  So they were out with us on different

18   portions of the investigation.  I believe LAPD assisted

19   us at one juncture.

20           So we would get the assistance of local police

21   agencies.  That's pretty common.  I mean, that's --

22   that's -- federal works that way a lot, you know, just

23   using the manpower of -- of local forces.  So -- but I

24   wouldn't I wouldn't necessarily say they were -- they

25   were part of the investigation.  With the exception,

Page 27

1   probably, of El Monte Police Department, because they

2   are attached with DEA.  For example, one of their

3   agents -- or one of their officers was an undercover.

4   So was --

5       Q.  Wow.

6       A.  -- was actively involved in the investigation.

7       Q.  Okay.  So --

8       A.  But as a task force officer.  So if that makes --

9   it's distinction to me.

10      Q.  Yeah.  I -- I -- I understand that.  And, you

11  know, we might explore that a little bit more, because

12  that is a little -- either with you or with someone

13  else, because that is a little confusing.

14          So can you tell me -- you get in, you're --

15  you're the point person beginning April of 2019.  And so

16  how long are you, DEA, USPIS, how long are you

17  investigating Private Vaults for?

18              MR. ROGERS:  Let me just assert an

19  objection.  These questions that go back to 2019 do not

20  appear to relate to any of the topics in the 30(b)(6)

21  notice.  Topic number one deals with all planning by the

22  government to apply for a warrant to authorize the

23  seizure of nests.  I don't think that back in 2019 they

24  were -- with respect to the investigation of USPV,

25  engaged in planning to apply for a warrant.

1          MR. FROMMER:  Well, that's exactly where I

2    was about to go, is I was going to ask her about when

3    they began talking about applying for the warrant.  So

4    that was what my question was leading up to.

5    BY MR. FROMMER:

6    Q.  So Special Agent Zellhart, can you tell me, how

7    long did you -- did you and the other agencies

8    investigate before you started to come together and say

9    we should start moving towards an indictment and

10   applying for a search -- search and seizure warrants.

11   A.  Uh-huh.  So that happened in about the summer of

12   2020.  About the summer of 2020, June, July, in that

13   phase, we started talking about -- at that point we had

14   quite a lot of pretty good evidence, and then we started

15   talking about moving this into indictments and warrants.

16   Q.  Okay.  And that's what I -- yeah, started talking

17   about moving to indictments.

18          And who's -- who were the people involved in

19   those conversations?

20   A.  AUSA Andrew Brown, myself, DEA Special Agent

21   Justin Carlson, and U.S. Postal Inspector Lyndon

22   Versoza.

23   Q.  Okay.  So Versoza was in on those summer of 2020

24   meetings.

25   A.  I believe so.  And --

Page 29

1       Q.  Okay.

2       A.  -- if I can add real quick, because that was

3   during COVID, all those meetings pretty much took place

4   over the phone.

5       Q.  Yeah.

6       A.  And it's a little more difficult to remember who

7   was there because we were not physically in a room

8   together, we were holding these meetings over a phone.

9   We weren't even doing them virtually, we were basically

10  in a phone call-in line.  So it's a little bit difficult

11  to remember.

12      But basically the three of us were the case

13  agents, and Andrew Brown was the AUSA, and that was

14  the -- that's the -- that's the decision making

15  committee.

16      Q.  Okay.  And so the decision making committee

17  starts convening in summer of 2020.  Do you remember how

18  many times you all spoke about how to -- about moving

19  towards indictments and executing warrants?

20      A.  I don't.  I don't remember.  You know, a couple

21  times at least.  Two, three times at least.  But it had

22  been decided that I was going to write -- I was going to

23  do the writing.  So I was going to be in charge of

24  drafting the affidavit, and that I would be working

25  directly with Andrew Brown.

Page 30

1      Q.  Okay.  All right.  And was -- was Jessie Murray

2    in on those summer of 2020 calls?

3      A.  I don't -- I don't think so.  Not -- not

4    anything -- not any of the calls where we would have

5    been discussing the -- the warrants and the indictments.

6    I -- I don't remember when she got in on calls.

7      Q.  Okay.  All right.

8          And at those meetings when you were discussing,

9    okay, it's time to move for indictments, it's time to

10   move for search and seizure warrants, I think we had

11   talked about this previously, but what was the team's

12   purpose for acquiring a seizure warrant for the items at

13   U.S. Private Vaults?

14     A.  So our objective was to basically dismantle U.S.

15   Private Vaults as a business, as a -- basically what we

16   considered a criminal facilitator.  So our job was to

17   remove from them whatever business tools they had that

18   made their business go.  So we -- we chose to seize the

19   items that they needed in order to make their business,

20   their business.

21     Q.  Okay.  And so you -- so the -- the team's goal

22   was to bring U.S. Private Vaults' ability to act as a

23   criminal facilitator to an end; is that right?

24     A.  Correct.

25     Q.  Okay.  Now, we did talk about this as well, but

Page 31

1   one alternative, which we had discussed, to the seizure

2   warrant and taking the nest of safe deposit boxes was

3   either appointing a receiver to run the business or

4   having the FBI run the business itself.  And you

5   previously testified that ultimately that was a decision

6   that the team decided not to pursue; is that correct?

7           MR. ROGERS:  Objection, assumes facts not in

8   evidence.  But go ahead.

9           THE WITNESS:  I don't -- I mean, I know I

10  had trouble answering this the last time.  We didn't --

11  I'm not familiar with that process.  I've never known it

12  to be done.  I don't think you can characterize this as

13  having decided not to do it, because I don't think it's,

14  like -- I don't think we considered it.  I don't think

15  it was feasible.  Like, FBI doesn't run businesses.  We

16  don't, like, take over businesses and run them.  I'm not

17  familiar with that ever happening.  I wouldn't know how

18  to do it.  I wouldn't know who to ask how to do it.

19  I've never seen it done.

20          So that -- that wasn't -- like, a

21  receivership is sort of a legal concept I'm not even

22  that familiar with.  So that -- I, I don't even know if

23  you can characterize us as having chosen to not do that,

24  because I don't think we considered it.

25

Page 32

1    BY MR. FROMMER:

2        Q.  Oh, okay.  Because I thought you had previously

3    testified that you -- the team had considered whether to

4    appoint a receiver.  It was that --

5        A.  We never had that discussion.  I don't think

6    there was ever a discussion about a receiver.

7        Q.  Okay.  All right.

8            So was there any -- was there ever -- did anyone

9    in the team ever think that there should be -- that the

10   team should undertake some alternative other than

11   seizing the nest of safe deposit boxes?

12       A.  To us, seizing the nest of safe deposit boxes was

13   the thing that made U.S. Private Vaults go.  So that was

14   part of taking their business out.  That, the eye

15   scanners, the money counter, that was what made their

16   business go.  So, I mean, there's lots of discussions

17   that we had, and I can't, you know, I can't recall every

18   part of every discussion, but taking the nest of safe

19   deposit boxes was, I think, always part of the idea.

20       Q.  Okay.  And I know we talked about this

21   previously, but was it during those same conversations

22   that you had with team members in the summer of 2020

23   that the topic of using -- potentially using civil

24   forfeiture against some or all of the contents of the

25   safe deposit boxes, did that -- were those -- let me

Exhibit M
1231

Page 33

1    restate.  That was a horrible question.

2         Did you have conversations in summer of 2020

3    about the potential use of civil forfeiture against some

4    or all of the property found in box renters' safe

5    deposit boxes?

6    A.  So --

7              MR. ROGERS:  I just want to object that the

8    use of the term "civil forfeiture" is vague and

9    ambiguous.  There's administrative and judicial.  But,

10   yeah, you can answer.

11             THE WITNESS:  I don't know exactly when

12   those -- we had those discussions.  They would have been

13   later.  And they would not -- so -- so, I mean, one

14   thing that I can clarify for you is that as -- I guess

15   as the team members, myself and Agent Carlson and

16   Inspector Versoza, would not have been talking about

17   that, because, I think as I explained to you, as

18   investigators, our knowledge of asset forfeiture is just

19   to identify it.  Our whole job is to just say, hey,

20   looks like we might have a situation here, we might have

21   proceeds of a crime.  I better get the asset forfeiture

22   guys involved.  And then that's it.

23             So there would be no discussions among --

24   among us as investigators.  Discussions did happen, and

25   they happened later, and they would have always included

Exhibit M
1232

Page 34

1    members of the United States Attorney's Office, because

2    that's where we would have needed to go with it.  So --

3    so I don't know exactly when.  I'm going to say later,

4    like maybe late summer -- if your question is when -- of

5    2020, or maybe in the fall there.  And I don't exactly

6    remember.

7    BY MR. FROMMER:

8        Q.  So is it -- so I just want to make sure I

9    understand, because this is -- before we had used the

10   term "summer of 2020," and that could be a broad term

11   that spans several months, so it might be the -- did the

12   team that we -- did the team that we previously were

13   talking about, the Brown, Carlson, Zellhart, Versoza

14   team, when you were talking in that June, July time

15   frame, were there discussions about the potential use of

16   administrative or judicial forfeiture against some of

17   the property located in the boxes?

18            MR. ROGERS:  I want to object and -- I want

19   to object and caution the witness.  You can testify to

20   any discussions where no attorneys were present.  To the

21   extent there were any discussions where attorneys were

22   present, those are attorney-client privileged and I am

23   instructing you not to answer.  You can go ahead.

24   BY MR. FROMMER:

25       Q.  Yeah.  I mean, the -- I --

Page 35

1    A.  The answer is no.  The answer to the question is

2    no.

3    Q.  What?

4    A.  We were just -- with Andrew Brown, and -- and

5    Carlson and Versoza and myself in those summer of 2020

6    discussions, the answer is no, we were not discussing

7    asset forfeiture.

8    Q.  Okay.  So the four of you were not discussing

9    asset forfeiture back then.  When did you start

10    discussing asset forfeiture?

11          MR. ROGERS:  Same objection.  To the extent

12    these discussions -- there was an attorney present

13    during these discussions, I object on attorney-client

14    privilege grounds, and I instruct the witness not to

15    answer.

16    BY MR. FROMMER:

17    Q.  Special Agent Zellhart, I'm asking when did --

18    when did you discuss -- when did you, personally,

19    discuss the use of civil forfeiture, whether

20    administrative forfeiture or judicial forfeiture, as to

21    some or all of the property that was located in the safe

22    deposit boxes at U.S. Private Vaults?

23          MR. ROGERS:  I'm asserting the same

24    objection.  Again, to make clear, if there was an

25    attorney present during the discussion, Ms. Zellhart,

Page 36

1    that you had, then I instruct you not to answer.

2              MR. FROMMER:   And asking when she spoke

3    about this.  I'm not asking who she spoke to it about --

4    or with, and I'm not asking for the contents of any of

5    that communication.  None of this is a-c privileged.

6              MR. ROGERS:  Same objection.  Same

7    instruction.

8    BY MR. FROMMER:

9      Q.  Special Agent Zellhart, when did you talk about

10   civil forfeiture with the -- with regards to U.S.

11   Private Vaults?

12             MR. ROGERS:  Same objections, same

13   instruction.

14             MR. FROMMER:  I -- I mean, Victor, we can go

15   to the judge about this if we have to, but the mere --

16   the mere presence of an attorney, the mere identity of

17   conversations, whether they existed or not, that

18   didn't -- that -- you can't instruct a witness not to

19   answer because she might have had a conversation with an

20   attorney when I'm not asking who she had it with and I'm

21   not asking what she -- what anyone said.

22             MR. ROGERS:  How about this question:

23   Ms. Zellhart, did you have any communications outside

24   the presence of an AUSA in which civil forfeiture,

25   administrative or judicial, was discussed relative to

1    USPV?  How about getting an answer to that first.

2              MR. FROMMER:  Sure.

3    BY MR. FROMMER:

4        Q.  Did you have conversations with non-attorneys

5    about the use of civil forfeiture at U.S. Private --

6    with regards to the -- some of the property at U.S.

7    Private Vaults?

8        A.  No.  I mean, the conference calls we had, there

9    were attorneys present.

10       Q.  So you did have conversations, there were just

11   attorneys present.  Thank you.  I mean, you previously

12   testified as to your conversations on this specific

13   topic.

14           Did the topic of civil forfeiture come up in the

15   context of applying for a seizure warrant for the nest?

16       A.  No.

17       Q.  When did the United States begin planning for the

18   use of civil forfeiture, whether administrative or

19   judicial forfeiture, against some or all of the property

20   that was located at U.S. Private Vaults?

21       A.  And so I'm -- I'm giving you my best estimate

22   here, that it would have been late summer or fall of

23   2020.

24       Q.  Okay.  So late summer or fall of 2020 is -- okay.

25           And when did you begin the actual process of

Exhibit M
1236

Page 38

1   applying for the seizure warrant, do you recall?

2      A.  So applying for -- you know, we started drafting

3   the -- we started drafting the affidavit in summer of

4   2020.  And, as you see, it's a hundred-page document,

5   with quite a lot of investigation.  And, in fact, the

6   investigation wasn't even complete when we started

7   drafting it.  There were still -- there was -- different

8   things happened after that.  So it was a process.

9      Q.  Okay.  So it was a -- so you began the process of

10  applying for a warrant in summer of 2020, and it

11  continued all the way until -- well, you actually

12  applied for the warrants in 2021?

13     A.  I mean, that's not really -- that's not how I

14  would characterize it.  Applying for the warrant happens

15  in, like, a day, or a week, or whatever.

16     Q.  That's fair.

17     A.  The United States Attorney's Office puts it all

18  together, and they get their cover sheets and they make

19  the right number of copies, and that process probably

20  took place the same week that the warrant was obtained.

21  But I'm -- but the process of drafting the affidavit

22  took place over many months.

23     Q.  And you -- when the team, the original

24  investigative team decided to seize the nest, had you

25  started drafting that affidavit yet?

Page 39

1      A.  I'm not really sure.

2      Q.  Okay.  Do you -- so was the decision that we

3  should -- was the decision by the team that we should

4  seize the nest of safe deposit boxes, that happened in

5  summer of 2020; is that accurate?

6      A.  I think that's probably right.

7      Q.  Okay.  And -- give me just a second.

8          And it was -- so I'm assuming at that point, once

9  you -- once the team decided to seize the nest of safe

10  deposit boxes, that it realized that it would have to do

11  an inventory of the contents of those boxes; is that

12  right?

13     A.  Yes.

14     Q.  Okay.  So in summer of 2020, the investigative

15  team realized:  We're going to seize the nest, we're

16  going to have to do an inventory of all of the contents.

17     A.  Correct.

18     Q.  Okay.

19             MR. FROMMER:  All right.  Well, let's --

20  let's take a short break.  Let's take, like, ten

21  minutes, if that works.

22             MR. ROGERS:  Sure.

23             MR. FROMMER:  Okay.  All right.

24         (A short break was taken at this time.)

25             MR. FROMMER:  Back on the record.  Thank

Page 40

1    you.

2    BY MR. FROMMER:

3        Q.  So I believe right before the break you testified

4    that the United States had been considering -- began

5    considering a potential use of civil forfeiture as to

6    some or all of the safe deposit boxes in -- sometime in

7    the late summer of 2020.  Is that accurate?

8        A.  I think I -- I think I said that we discussed,

9    you know, seizing the nest of the boxes and doing an

10   inventory on them in summer of 2020.  And then

11   discussions about asset forfeiture took place a little

12   bit later in the summer or fall.

13       Q.  Okay.  Yeah, that's -- sorry.  I should have been

14   more specific.

15           In the late summer or fall of 2020 is when the

16   United States began considering the potential use of

17   civil forfeiture as to the nest of safe deposit boxes.

18       A.  I think that's right, yes.

19       Q.  Okay.  And can you describe what steps, once that

20   decision had been made in late fall -- or late summer,

21   fall of 2020, to potentially use civil forfeiture

22   against the safe -- some of the safe deposit boxes.

23   Can you describe what steps the United States took to

24   facilitate the potential use of civil forfeiture as to

25   that property?

1 of 110

```
 1              MR. ROGERS:  Objection, outside the scope of

 2    the topics.

 3    BY MR. FROMMER:

 4       Q.  You can answer.

 5       A.  So at that point in the -- better recollection, I

 6    do think it was fall.  It might even have been

 7    September, October.  I'm kind of vaguely thinking

 8    October.

 9          We -- every -- we didn't know who -- we didn't

10    know what agency was going to take the lead at this

11    point, or if all agencies were going to be

12    participating.  So all of the agencies got their asset

13    forfeiture people looped in.

14          So in terms of what steps did we take, we

15    contacted our asset forfeiture people.  So on my end, I

16    contacted -- I forget which guy.  It was not Jessie

17    Murray, but it was one of the other, like, asset

18    forfeiture people that I had worked with before, and

19    looped him in.  And DEA did the same on their side.  And

20    I'm not sure if Postal did as well.

21          But -- but basically we got -- we got our -- our

22    asset forfeiture people together.  And then also with

23    the, you know, people at the U.S. Attorney's Office who

24    do that as well.  So we basically looped in all of the

25    people who would probably need to know about this.
```

Page 42

1    Q.  And was the purpose for looping all of these

2    people together so that you made sure to gather the

3    information that you would need in the event you wanted

4    to bring forfeiture proceedings against some or all of

5    the property?

6              MR. ROGERS:  Objection, beyond the scope of

7    the topic, vague and ambiguous relative to "forfeiture

8    proceedings."

9              THE WITNESS:  Yeah, so -- so as I've said,

10   from an agent's point of view, this isn't -- this

11   isn't -- like, what we know is -- we know we might have

12   a forfeiture situation, and you go get the people who

13   know about that and who -- it's a specialty.  Right?

14   Asset forfeiture is a specialty, and, like, you -- so --

15   so what we did was we got the people in our agencies who

16   do that involved.

17              And they -- they will tell you, you know,

18   they'd rather be involved sooner than later.  They do

19   get aggravated when you don't let them know and they

20   don't have a chance to either help you, or prepare, or

21   smooth the way, or whatever it is they do.  They like to

22   know sooner than later, so that's what we did.  We

23   looped in our -- our specialists with regard to asset

24   forfeiture.

25

Exhibit M
1241

Page 43

1   BY MR. FROMMER:

2       Q.  Okay.  And this was, again, in, like, the fall of

3   2020 time frame?

4       A.  I think that's correct, yes.

5       Q.  Okay.  And, again, this was -- it sounds like

6   they wanted to be in early so that they made sure that

7   you -- that the investigators did all the things that

8   would be necessary such that, you know, a forfeiture

9   proceeding wouldn't -- that they decided to undertake

10  wouldn't somehow flounder?

11      A.  Right.  I think that's --

12              MR. ROGERS:  I'm --

13              THE WITNESS:  -- right.

14              MR. ROGERS:  I'm -- sorry.

15              Objection, vague and ambiguous.  Outside the

16  scope of the topics.

17  BY MR. FROMMER:

18      Q.  And just to remind me, when did the United States

19  apply for the search and seizure warrants?

20      A.  That would have been March, I want to say 17th.

21  16th or 17th of 2021.

22      Q.  Okay.  So the application for the search and

23  seizure warrants for U.S. Private Vaults was roughly a

24  week before the execution of those warrants.

25      A.  Correct.

Page 44

1      Q.  And -- but you and the other -- but the United

2    States was already -- had spent several months already,

3    prior to the execution of the warrant, planning how to

4    execute that warrant; is that correct?

5      A.  That's correct.

6      Q.  Okay.  So do you remember when Jessie Murray --

7    did Jessie Murray ever get looped in about the execution

8    of the warrants -- of the seizure warrant at U.S.

9    Private Vaults?

10     A.  Yes, but I don't know when.

11     Q.  You don't know when precisely?  Okay.

12         Let me ask -- I do have a question -- let me

13   introduce -- this has been previously introduced in

14   another deposition, so give me just one moment, please.

15             (Exhibit 10 was previously marked.)

16   BY MR. FROMMER:

17     Q.  All right.  You should be able to see that.  This

18   is -- it's supposed to be Exhibit 10, but it's actually

19   listed as Exhibit 14 because I messed it up, But we'll

20   muddle through that the best we can.

21         So it should be listed -- in the folder it should

22   be listed as Exhibit 14, and it's a document called

23   "Agent's Observations and Notes."

24     A.  Uh-huh.  Yes.

25     Q.  Okay.  You have that?

Exhibit M
1243

```
                                                    Page 45

 1      A.  Yes.

 2      Q.  All right.  I just had some --

 3              MR. ROGERS:  I'm sorry.  I -- I'm sorry.  I

 4   don't.  What folder is in?  Is it in the deposition

 5   folder?

 6              MR. FROMMER:  Yes.  It's under -- it's in

 7   the marked exhibits, deposition of Lynne Zellhart 6/30.

 8              MR. ROGERS:  Oh.  Hold on just a second.

 9              Okay.  Go ahead.

10   BY MR. FROMMER:

11      Q.  All right.  And this is -- this was previously

12   introduced as a exhibit to the deposition of Lyndon

13   Versoza.  I just had a -- some basic questions about

14   this form.

15          Who drafted the Agent's Observations and Notes

16   page that inventorying agents used?

17      A.  It probably was me.

18      Q.  Okay.  So was this -- was this a form that you

19   created for the purposes of the USPV inventorying?

20      A.  Yes.

21      Q.  Okay.  All right.  So it has different areas

22   about observing cash, and K-9, and also the possible

23   identifying information for the -- and was it -- was the

24   purpose of this just to acquire information about

25   ownership and the state of the property?
```

1    A.  The purpose of this was to help write the 302,

2    which captures that information as well.  So, you know,

3    one of the things that -- that we try to do in the 302

4    is, you know, capture whatever else.  The 302 is

5    everything about the inventory search, and then it's

6    the:  And whatever else.

7         And so this was designed to help the agents write

8    the 302s.  And we understood that there were going to be

9    hundreds and hundreds of 302s written, and that we were

10   going to need -- you know, we were going to need some --

11   some cues to go by.

12   Q.  Okay.  Did the asset forfeiture people who you

13   looped in in the fall of 2020, were they the ones who

14   suggested that -- the observations about cash and the

15   K-9, that those be included in the observation --

16   observation and notes form?

17   A.  No.

18   Q.  So who -- whose idea was it to include entries

19   about cash observations and K-9s?

20   A.  Mine and the case agents.  I mean, mine in

21   conjunction with Carlson and Versoza.  I mean, this is

22   what we would have wanted to know.

23   Q.  Okay.  And is that because this is information

24   that would be potentially -- potentially be used in

25   civil forfeiture proceedings?

Page 47

1      A.   Well, again, with the cash, so the cash is

2    disappearing and it's never coming back again, so

3    whatever observations you have about it, you need to

4    make them now.  So that was -- that -- that was

5    important.

6         We knew, from our investigation, that we were

7    likely to find drugs and drug proceeds.  And so things

8    like -- you know, some of the things listed here, the

9    odor of marijuana, soil, gasoline, coffee, that's --

10   that's frequently found in drug proceeds.  So those are

11   just the kinds of things we were looking for.

12        I know I briefed the idea of dye pack.  In fact,

13   like I said, we did find cash with exploded dye pack on

14   it.

15        So with the cash, it was like we have to capture

16   this information now, because it's gone.  Once it's

17   gone, it's gone, and that's it.

18      Q.   Okay.

19      A.   Go ahead.

20      Q.   Oh, no.  I'm sorry.

21        So the idea is that we have this -- we have the

22   cash in front of us now.  If we don't capture this

23   information about the cash, it will be -- that

24   information will be lost forever; is that fair --

25      A.   Correct.

Page 48

1      Q.  -- to say?

2      A.  Correct.

3      Q.  And, therefore, we wouldn't have this information

4   available for any subsequent legal proceeding that we

5   might want to introduce that.

6      A.  Correct.

7      Q.  Okay.

8      A.  Yes.

9      Q.  Makes sense.

10          MR. FROMMER:  All right.  Let me take

11   just -- I'm sorry about this.  Let me take a quick

12   five-minute break, and then we'll come back.  Okay?

13          THE WITNESS:  Sure.

14       (A short break was taken at this time.)

15          MR. FROMMER:  Let's go back on the record,

16   then.

17   BY MR. FROMMER:

18      Q.  All right.  Special Agent Zellhart, I want to --

19   I want to go to the day of the execution of the seizure

20   warrant in March of 2021.  And my understanding is that

21   FBI agents were meant -- were to inventory the contents

22   of safe deposit boxes pursuant to the DIOG and your

23   supplemental instructions; is that correct?

24      A.  Correct.

25      Q.  And did the United States have the position that

Exhibit M
1247

Page 49

1   agents, when inventorying safe deposit boxes, should

2   make a comprehensive accounting of all the items that

3   were located within that box?

4           MR. ROGERS:  Objection, vague and ambiguous.

5           THE WITNESS:  So the process -- the -- the

6   process for processing the contents of boxes is not

7   different if it's an inventory search or if it's a

8   search pursuant to a search warrant, or if it's a

9   consent search.  The -- the so-called, you know, what we

10  call a "bag and tag," that process is -- is the same.

11  So we have certain protocols that we follow.  We have to

12  have a chain of custody, we have to have an evidence

13  log, we have to have labels on each item, we have to

14  have an FD-597, which is a receipt of property, and we

15  have to write a 302.

16           In addition to that, you know, our evidence

17  technicians generate both a 1-B number, which is for

18  identification purposes, and a separate bar code for

19  identification purposes, all of which happens -- in

20  addition to, you know, the way we package things depends

21  on whether it's valuables, or if it's drugs, or if it's

22  a weapon, or if it's digital evidence, or if it's just

23  general evidence.  And all of those procedures are

24  followed regardless of -- of whether the search is

25  coming from an inventory or it's coming from some other

Exhibit M
1248

Page 50

1   place.  And all of those -- all of those policies were

2   followed.

3   BY MR. FROMMER:

4       Q.  Okay.  So the approach that the agents took in

5   conducting the inventory is essentially the same, you're

6   saying, as -- the same approach they would take if they

7   were conducting, like, a criminal search, or a criminal

8   seizure.  A seizure pursuant to a criminal warrant.

9               MR. ROGERS:  Objection, mischaracterizes the

10  testimony, it calls for a legal conclusion, overbroad.

11              THE WITNESS:  Yeah.  So the -- the bag --

12  the so-called bag and tag procedures are substantially

13  the same, yes.

14  BY MR. FROMMER:

15      Q.  Okay.  All right.  So the -- the mechanics by

16  which the agents seize the items and list the contents

17  of the -- the items that they're seizing on the forms,

18  that is the largely the same, regardless of whether it's

19  for the purpose of an inventory or pursuant to, like, a

20  criminal seizure warrant?

21              MR. ROGERS:  Overbroad.  Same objections.

22              THE WITNESS:  Correct.

23  BY MR. FROMMER:

24      Q.  Okay.  But it's not the policy of the United

25  States to have the inventorying agents provide a

1   complete list of all items seized; is that correct?  And

2   by that I mean if I had 50 gold coins, the agents would

3   not necessarily record that I have 50 gold coins, they

4   might simply say that I had miscellaneous gold coins; is

5   that correct?

6      A.   That's correct.  And they might also call them

7   gold-colored coins, or yellow-colored coins, because

8   they wouldn't necessarily assume that they were gold, as

9   opposed to something else.  But -- but, yes.

10         The -- the idea is that for each particular item

11   number in a container, whether it's a bag or a box or

12   whatever we're containing it in, is enough description

13   so that you know from that place, or in this case from

14   that specific box, this item number contains papers, not

15   jewelry or watches or phones.  So it's enough of a

16   description so that you could find that item number and

17   line it up with the actual property, but not an

18   exhaustive list.

19      Q.   Okay.  And is that -- the reason there isn't an

20   exhaustive list, is that just -- is that a manpower

21   issue?

22              MR. ROGERS:  Objection, calls for a legal

23   conclusion, overbroad.

24              THE WITNESS:  So it -- it -- I mean, I don't

25   know how to actually answer that.  If you -- the goal --

Page 52

1   the goal is to identify the contents of the item number.

2   And a number of other things, too.  Where it came from.

3   You know, there's other information on each -- each

4   label.  It gets an item number, it gets the case number,

5   it gets the date, it gets the location.

6            I mean, and with U.S. Private Vaults, we

7   were treating each box as a -- like a separate location.

8   And I briefed that in my briefing.  Like, you should

9   treat this box like it's -- it's an apartment unit.  It

10  is a separate thing.  It is like a -- each one is a

11  separate inventory process.  And so within that, you are

12  identifying the property.  So that you can --

13  BY MR. FROMMER:

14      Q.  I see.

15      A.  -- find it again.

16      Q.  So if you had, let's say, some gold-colored coins

17  and some silver-colored coins in a box, would the

18  agents -- would the U.S. policy then be that the agent

19  should denote how many of each color there are, or would

20  they simply say:  Miscellaneous coins?

21            MR. ROGERS:  Objection, overbroad, poses an

22  incomplete hypothetical, calls for a legal conclusion.

23            THE WITNESS:  I don't think there's a policy

24  on it.  I think that it's very likely going to be

25  described as miscellaneous coins.  Or box of coins.

```
 1   BY MR. FROMMER:
 2       Q.   Okay.   So -- and you didn't have anything in the
 3   supplemental instructions -- the United States didn't
 4   have anything in the supplemental instructions advising
 5   inventorying agents about how to do those kinds of
 6   counts; is that correct?
 7       A.   That's correct.
 8       Q.   Okay.
 9       A.   It was not addressed.
10       Q.   Let me -- I have a -- and -- sorry.  I just want
11   to...
12           And then once the items are bagged and tagged, as
13   you put it, what additional steps did the United States
14   undertake to ensure that the property wouldn't get
15   misplaced?
16       A.   Right.  So each item received both a bar code
17   from our evidence techs, which then gets recorded into
18   our system, and also a 1-B number, which is just an
19   identification number.  It's a redundancy.  There are
20   two separate ways of tracking the same -- the same item.
21   But -- and there's actually probably three ways of doing
22   it, because you could actually just go to the -- the
23   paperwork and the item numbers.  But the redundancies
24   are built in so that if one fails, if the bar code falls
25   off, the sticker falls off, you can just track it a
```

Exhibit M
1252

Page 54

1    different way.  So -- so those are -- so those things

2    are generated for each item number, and then put inside

3    our -- our evidence system so that they can be tracked.

4        Q.  Okay.  And is that evidence system, is that

5    Sentinel?

6        A.  It's a part of Sentinel.

7        Q.  Okay.  Can I ask, did the United States have a

8    policy of wiping cash that it found in safe deposit

9    boxes on the outside of the bags that were going to be

10   transported to Loomis?

11               MR. ROGERS:  Objection, poses an incomplete

12   hypothetical, calls for a legal conclusion.

13               THE WITNESS:  That was not a policy.

14   BY MR. FROMMER:

15       Q.  What was it?

16       A.  So the K-9 handlers preferred that the bags of

17   cash be open so that the K-9 could -- could sniff it

18   better.  And for safety and security purposes, I said

19   no.  The bags of cash are not leaving unsealed.  They

20   will not go anywhere outside this room unsealed.  And so

21   the compromise was to rub the cash on the outside of the

22   bag so that the K-9 could still detect scent without the

23   bag having to leave the premises open.

24       Q.  And whose -- who came up with that compromise

25   position?

Page 55

1     A.  I'm not sure.

2     Q.  Okay.  That's fine.

3         Did you ever hear anyone discuss the safe deposit

4     boxes being -- describing them as, like, clean or dirty?

5     A.  No.

6     Q.  Never heard anyone just say that that looks like

7     a clean box, I think that's a dirty box?

8     A.  No.

9     Q.  Okay.  Before -- before the execution of the

10    seizure warrant, did -- did any of the United States

11    agents discuss using what they -- what might be found in

12    the safe deposit boxes to conduct further investigations

13    of box holders?

14             MR. ROGERS:  Objection, vague and ambiguous

15    with respect to the use of the word "investigations."

16             THE WITNESS:  So I know that we contemplated

17    the idea that we would find contraband in some of the

18    USPV boxes, and that -- I mean, I don't think we

19    discussed it as such, but I'm sure we understood that if

20    we found contraband in a box, that that would lead to

21    additional investigation.

22    BY MR. FROMMER:

23    Q.  Okay.  But do you recall any agent ever stating

24    that, you know, depending on what's inside the box, we

25    might want to investigate the box holders more?

Page 56

1          MR. ROGERS:  Same objection.

2          THE WITNESS:  I mean, I don't know that

3    anybody said that, but I think that's true.

4    BY MR. FROMMER:

5      Q.  Okay.

6      A.  Depending on what was in a box.  I mean,

7    obviously we found Fentanyl in a box.  Well, we

8    conducted additional investigation into whose box that

9    was and how the Fentanyl got there, and a whole bunch of

10   other things.  So -- so, yeah.  And we contemplated that

11   we would find drugs in these boxes.

12     Q.  Okay.  And so the thought of the -- of the United

13   States and its agents was that to the extent we find

14   inculpatory items in a box, that might cause us to

15   investigate the box holder.  Is that accurate?

16         MR. ROGERS:  Same objection.

17         THE WITNESS:  Yes.  Yes, I think that's

18   accurate.

19         MR. FROMMER:  Let me -- I'm going to move a

20   little bit forward in time.  Let me introduce another

21   exhibit.  Give me just a second, here.

22         Sorry, just one second.  Technology is...

23         (Exhibit 8 was previously marked.)

24   BY MR. FROMMER:

25     Q.  All right.  This was previously Exhibit 8 in your

Page 57

1   May deposition.  So please let me know when that is up

2   for you.

3       A.  Yes, I have this.

4       Q.  When did the United States come up -- decide to

5   post a claim form for those box holders whose property

6   had been seized?

7       A.  So I'm not exactly sure when, but in the planning

8   phases in, you know, in early 2021, we knew we had to

9   come up with some kind of a system for -- for people to

10  reach out to us to get their property back.  And the

11  L.A. office being what it is, and the size and

12  everything, that, you know, doing a phone -- having

13  our -- our phone personnel do that was not going to

14  work.

15          And so we -- we came up with this idea, well,

16  let's post something and have them reach out to us over,

17  like, an email or a website type of thing where we can

18  collect the information.

19      Q.  Okay.  And when you're saying "we," who -- who

20  are the -- who are the U.S. officials who are involved

21  in -- in this decision to create a claim form?

22      A.  So Special Agent Madison MacDonald and I probably

23  would have had the original discussions, probably with

24  our supervisor at the time, Richard Alexander, in terms

25  of what -- what do we want to do, how do we do this.

1          There's -- there's two -- there were two paths to

2     it in terms of who all was involved.  So one side of it

3     was technical, in terms of how can we do this

4     technologically, IT.  We had to reach out to our IT

5     guys.

6          So by "we," I think I'm basically talking SA

7     MacDonald and myself.  I don't know who else besides us

8     would have even been involved in this.

9          But -- but we reached out to Dave Bigelow, who's

10    the IT guy at the FBI in Los Angeles, and told him what

11    we were -- what we were thinking to do.  And then he

12    contacted IT people at FBI headquarters, because we

13    were -- we were going to be using a .FBIgov site, so

14    that had to go through headquarters.  All of this had to

15    go through headquarters.

16          And then separately, you know, we went with --

17    with the content.  Like what do -- what information do

18    we want.  How is this going to look.

19    Q.  Is there some content, or some information that

20    officials considered including on this claim form but

21    ultimately chose not to include?

22    A.  Yes.

23    Q.  Like what?

24    A.  So I wanted, in addition to name, address, and

25    phone number, I wanted some personal identifiers so that

1    I could tell the difference between a John Williams and

2    a John Williams, or a Juan Rivera and a Juan Rivera.

3    This comes up a lot in Los Angeles.  It's a huge place,

4    and there's people with a lot of the same name.

5          So I wanted personal identifiers, I wanted box

6    number, I wanted some description of a box content, and

7    also who else had access to the box, because I had a

8    tremendous concern of having more than one party

9    interested, or, you know, ex-spouses, all kinds of

10   things.  So that was -- that was what I had

11   contemplated.

12   Q.  I do recall you previously mentioning the utility

13   of having a box number on the form, but yet -- why --

14   why -- why is there no box number that ultimately was

15   put on the claim form?

16   A.  Right.  So I think I drafted something, or SA

17   MacDonald did, one of us drafted something that went

18   probably to our supervisor, Richard Alexander, and then

19   to Laura Eimiller, who is our -- our media liaison.

20   She's our face to the public.  She elevated it to FBI

21   headquarters, Office of Public Affairs, to a woman named

22   ███████████, whose title I don't know.  But she's in

23   the Office of Public Affairs.

24         She told ███████████ that her conversations

25   with FBI civil rights and privacy, we can't ask for

Exhibit M
1258

Page 60

```
 1   anything but name, address, and phone number, and I

 2   think an email address.  That we -- we could only ask

 3   for those things, we couldn't ask for anything else.  We

 4   could not ask for box number.  And that was pushed down

 5   to us from headquarters, and -- and then that was it.

 6       Q.  Okay.  So the -- the contours of the claim form,

 7   then, are -- are a product of negotiations, both at the

 8   L.A. field office and also at FBI headquarters?

 9       A.  I wouldn't call it a negotiation.

10       Q.  Oh, okay.  More of -- okay.

11           Is -- the claim form -- was -- was altered based

12   on the opinions of the FBI main office in D.C.

13       A.  Yeah.  And they were firm.  You can't do it.

14   This is all you can ask for, period.

15       Q.  Oh, okay.  And when they came back to the L.A.

16   field office and said this is all you can have, nothing

17   else, what was the reaction amongst the officials who

18   were helping put this together?

19       A.  I -- you know, I don't know.  So this was

20   happening within days of execution of the warrant, and

21   it was -- I had a hundred other things that needed

22   attention sooner.  By the time I got -- it got to me,

23   there was -- I didn't have any reaction.  There was

24   nothing I can do about it.  My job has many aspects like

25   that.  There was nothing -- there was nothing to be
```

Exhibit M
1259

Page 61

1    done.  It is what it is.  Deal with it.

2         If I had known a month earlier, you know, I

3    probably, may well have come up with some totally

4    different way of doing this.  Because as it was, the

5    form was of extremely limited use to me.  But -- but,

6    you know, by the time we got down -- got that word, it

7    was -- like, we kind of had already going down this path

8    and we were, like:  Okay.  Well, this is what -- this is

9    what we can do, so we'll just do it.  We'll just make

10   the best of it.

11       Q.  So were you in the middle of executing the

12   seizure warrant when all this -- all this back and forth

13   about the claim form was happening?

14       A.  Or it was getting very -- very close.  Within

15   days.  So it might have been a few days before.  And

16   then I know that it got -- the system got put up and

17   tested, I think, Wednesday the 24th, or possibly

18   Thursday the 25th.  So we were still in the middle of --

19   of executing the seizure warrants when the -- when the

20   web -- or the email site went active.  So there was a

21   lot of back and forth in that time frame when I -- when

22   I had quite a lot on my plate.

23       Q.  I can imagine.

24            You said a second ago -- and I'm paraphrasing

25   here, so pardon my exact words.  But you said you found

Page 62

```
 1    the -- the form ultimately to be of limited utility.
 2    And I was wondering if you could explain why -- why the
 3    form ended up being of limited utility to the -- to the
 4    United States.
 5       A.  Because it -- well, sometimes -- sometimes it was
 6    helpful.  Sometimes we'd have a name and we already had
 7    that name and we could match it up.  We could match up
 8    the box right away.  But a lot of the times we just --
 9    we had to get on the phone and contact the person and --
10    and find out what their box number is.  To get to the
11    next step of anything, you need the box number.
12           And so that put us where I didn't want us to be,
13    which is having to have, like, individual phone calls
14    with all of these folks, you know, at a -- at a time
15    when there's so much else going on.  So I -- I wish we
16    could have solicited the box number.
17       Q.  Did it slow down returning boxes to the rightful
18    owners?
19       A.  Yeah.  I mean -- yes.
20       Q.  Okay.
21       A.  Eventually we got organized on it, but it -- it
22    slowed -- it stalled it out a little bit.
23       Q.  How long would you say it stalled things out for?
24              MR. ROGERS:  Objection --
25              THE WITNESS:  It's hard to say --
```

Page 63

1            MR. ROGERS:  Objection, overbroad, poses an

2      incomplete hypothetical.

3            THE WITNESS:  Yeah.  It was -- it was a

4      really busy -- those first weeks after execution of the

5      warrants were very, very busy.  It's hard to put a

6      number on it.  But -- but having to go through that

7      extra step of reaching out and contacting people.  And a

8      lot of times they weren't home and, you know, now you're

9      playing phone tag, and you're having a person have to do

10     this.  Like, I'm losing, you know, personnel hours on

11     this.  It just was not very efficient.  I would have

12     preferred a process that was more efficient.

13     BY MR. FROMMER:

14        Q.  I can understand that.

15            So let me make sure I understand.  So when --

16     when the team sent the proposed claim form to the FBI

17     main office, it contained things like box number and

18     other personal identifying information; is that correct?

19        A.  I think so.  And my hesitation is that it went up

20     a chain of command.  So I would have sent it to my

21     supervisor, who sent it to ███████████, I think who

22     sent it to headquarters.  But I don't know that, because

23     I only sent it to my supervisor.

24        Q.  All right.  And you said, I believe, that you

25     worked on this primarily with Special Agent MacDonald;

Page 64

1    is that right?

2       A.   Correct.

3       Q.   And I'm assuming that you also worked a bit with

4    Andrew Brown on this?  I'm not asking about what he said

5    or anything, I'm just asking, did you work with him on

6    this?

7       A.   I don't think he had any input on the claim form.

8       Q.   Okay.  That's fine.

9            And do you know, did the United States ever use

10   any of the information that was provided -- that box

11   owners provided through the claim form?  Did the United

12   States ever use that to investigate the box holder to

13   see if maybe the -- maybe what was in the box is

14   criminal proceeds?

15      A.   So that's a little hard to answer without --

16   because not everybody used this system.  Not by a long

17   shot.  So without the list in front of me of -- of who

18   used the claim form, I'm not sure I can -- can answer

19   that.

20      Q.   Well, are you aware of any instances where United

21   States officials took information off of a claim form

22   and said, "I'm going to look this person up.  I'm going

23   to do some investigation to see who this person is"?

24      A.   So it wouldn't be because they put a claim in, it

25   would have to do with the contents of the box.  So if

1    there was something about the box that suggested further

2    investigation was needed, then -- then that, married up

3    to the information on the claim form, may have resulted

4    in further -- further, like, database checks and that

5    type of thing.

6        Q.   Okay.  So if you run into, let's say, a box with,

7    I don't know, $100,000 in there, and the money stinks

8    and it's wrapped funny and the dog alerts, and then

9    someone sends in a claim form for that, you're going to

10   do some investigation to see who this person is; is that

11   right?

12       A.   Yes.  Yes.

13       Q.   And so then you can determine whether the

14   property is legitimately owned or not; is that right?

15       A.   Or -- and also if it's legitimately theirs.  But

16   yes.  All of those things, yes.  We learned just because

17   somebody claimed a box doesn't mean it was theirs.

18       Q.   Oh, did that happen?

19       A.   Uh-huh.  Yes.

20       Q.   Are you guys prosecuting that person who tried to

21   file for an inappropriate form?  Or --

22            MR. ROGERS:  I'm sorry.  I have to object

23   and instruct --

24            MR. FROMMER:  Okay.  That's fine.  That's

25   fine.  I was just more -- I'm more interested than

Exhibit M
1264

```
                                                              Page 66

  1    anything else.

  2               MR. ROGERS:  That's what I thought.

  3               MR. FROMMER:  Yeah.  Yeah, it's not germane

  4    to my case.

  5               Man, some people got some -- anyway.

  6               All right.  Let me take, like, five minutes.

  7    I think we're getting kind of close to being done, but

  8    let me confer with people.  And I'll be back in, like,

  9    five -- five or six minutes.

 10               MR. ROGERS:  Okay.

 11          (A short break was taken at this time.)

 12    BY MR. FROMMER:

 13      Q.  Okay.  I wanted to talk just a little bit,

 14    Special Agent Zellhart, about the process of returning

 15    property, which we were talking about a little bit

 16    before our most recent break.  And I had a question

 17    about -- is it the case that when -- when people would

 18    come to collect their property, the government would

 19    typically require that person to bring one or more keys

 20    to the pertinent safe deposit box; is that correct?

 21      A.  Yes.  That was one of the things.  There were a

 22    number of things that we used to try to verify that we

 23    had, in fact, the correct owner, and both -- one or both

 24    keys was -- was one of them, yes.

 25      Q.  Were there instances -- were there -- and, in
```

Page 67

1   fact, there were instances when property was returned to

2   a lawyer who presented a key on behalf of his client; is

3   that correct?

4       A.  So yes, but not in the beginning.  I think that's

5   something that kind of came about later after much time

6   had passed, and under -- under various circumstances.

7   But, yes, that has happened, but it didn't happen up

8   front in the first, probably, six months of box returns.

9       Q.  Well, what were the circumstances that led to

10  that change in policy?

11      A.  It wasn't a policy change.

12      Q.  Well, let me restate.

13          For the first few months it sounds like if a

14  lawyer showed up with a key they said was from their

15  client, the government wouldn't release the property,

16  and then you're saying after a few months that shifted

17  such that they would release -- the government would

18  release the property, and I'm just wondering what

19  precipitated the change.

20      A.  The -- okay, so that's not --

21              MR. ROGERS:  I -- I just want -- okay.  Go

22  ahead.

23              MR. FROMMER:  I'm sorry.

24              MR. ROGERS:  Objection, overbroad, vague and

25  ambiguous with respect to the use of the word "client."

1    Go ahead.

2              THE WITNESS:  Okay.  So I guess it kind of

3    mischaracterizes the -- the sort of process of box

4    returns, which -- which has, I guess, evolved, for a

5    number of reasons.

6              So the -- all of the initial box returns

7    were returned, you know, based on the contents.  These

8    contents -- the -- there's nothing that suggests this is

9    proceeds of a crime, give it back.  And then it was a

10   matter of identifying the correct person.  Either

11   through indicia that they left in the box, the USPV

12   paperwork, or a copy, photocopy of a driver's license,

13   or -- or whatever.

14             Attorneys -- and even with that, for extra

15   security for us, we asked people to bring a key, because

16   a key is just -- that's just one more thing.  We were

17   trying to have as many things as we can to satisfy

18   ourselves that we are, in fact, giving the property to

19   the correct person.

20             Later in time, property which -- where the

21   person was -- was not identified, we -- we have an

22   unidentified person represented by counsel, but where

23   the U.S. Attorney's Office has declined to pursue the

24   contents of the box in any kind of forfeiture manner,

25   and then we are told to return it.  And then this puts

Page 69

1  us in a bit of -- even though I was told to return it,

2  it still puts us into a situation where I need to make

3  sure that I'm returning it to the correct party.

4          And so we would, in fact, return it to an

5  attorney, and we worked out what we would -- we asked

6  for, for example, something from that attorney showing

7  that they actually represented the party.  Even if it

8  was still a John Doe party, something from an attorney

9  saying yes, I represent the -- the box holder, the

10  person whose stuff this is.  And then also keys.  Two

11  keys, of course, are better than one, because our fear

12  on this is that we have two parties competing for an

13  interest in the box.

14          It's been a very -- and, again, if I can add

15  one other thing, is that we're now 15 months past the

16  execution of warrants.  I am not getting new people

17  coming forward -- extremely rarely.  I'm not expecting a

18  lot of new people to pop out.  But that was not the case

19  in the first six to eight months.  I really was less

20  willing to do something because I didn't know if I had

21  competing parties.

22          So that's a roundabout way of trying to

23  explain the -- the return process.  We tried to be as --

24  as fair as we could, but also protecting ourselves

25  against the possibility of competing claims.

Exhibit M
1268

Page 70

1    BY MR. FROMMER:

2       Q.  Okay.  That makes sense.  And I -- so it sounds

3    like having two keys would be sort of the gold standard,

4    because it shows that you have the key to the -- that

5    fits this box, and there's no other person who has a

6    similar key.  Is that fair?

7       A.  And something from the attorney saying that they

8    in fact represent this person.

9       Q.  Okay.  And you said that that shifted -- the

10   anonymous attorney situation started coming up a few

11   months afterward, after the execution of the seizure

12   warrant; is that correct?

13      A.  Yeah.  Yes.  I would say it was not in the first

14   wave -- the first wave of returns -- the first wave, I

15   think of it, probably the first two waves, was, like,

16   the easy ones.  Like, let's get these people their stuff

17   back.  Like, there's no -- there's no chance that this

18   is contraband, we know who they are, because they left

19   indicia, we know how to contact them.  To me, that's

20   first wave.  The first -- give them their -- get all

21   these people their stuff back first.  And then we

22   will -- then we'll go to second wave, which may present

23   a few more challenges, and then kind of on from there.

24      Q.  Okay.  That makes sense to me.

25           So -- well, let's say -- let's say I had a box

Page 71

1    there.  Okay?  And I didn't have any ID in the box, but

2    I come -- I come forward and I say:  Hi, I'm Robert

3    Frommer.  I rented a box at U.S. Private Vaults.  It's

4    this box number.  Here's my key.

5        A.  Uh-huh.

6        Q.  Like, would that be good enough to get my

7    property back?

8            MR. ROGERS:  Objection, poses an incomplete

9    hypothetical.

10           THE WITNESS:  So there's other things we --

11   we could ask.  Like, can you describe -- can you

12   describe the contents.  Can you describe what was in the

13   box.  Can you tell us where at USPV it was.  And we've

14   showed people maps.  We had a detailed sketch of the

15   entire interior of the vault, and we have had people say

16   it was on this wall, or it was, you know, the third from

17   the bottom, or, you know, like -- we want as much as we

18   can.  So I don't -- like, there's no -- there's no rules

19   here, there's nothing written down.  It's -- it's a

20   totality of circumstances of we need to be satisfied

21   that we're giving the property back to the correct

22   person.

23   BY MR. FROMMER:

24       Q.  I see.  So with everything single box you had to

25   convince yourselves, really, that this is the right

Page 72

1   person for the right box.

2       A.   That's correct.

3       Q.   And it sounds like that was a rather arduous

4   process.

5       A.   Once in awhile it was tricky, but -- but the vast

6   majority of them we had pretty good -- we had some

7   indicia.   There was -- so most of the time it was not

8   tricky, but sometimes it was.

9       Q.   Just as an aside, approximately how many boxes

10  have been -- the property of how many boxes has been

11  returned, as of this point?   Roughly.   I'm not asking --

12      A.   Yeah.   No, I think it's around four -- 430, I

13  think.

14      Q.   Okay.   So a little over half, if that's -- my

15  numbers are -- if my understanding is correct.

16      A.   Yeah, I guess that's -- well, so there's a

17  different -- there's other categories.   Like, some

18  people waived their property.   There's good number of

19  people who just said:   I don't want it.   So --

20      Q.   How many of those are there?   Roughly, again.

21      A.   I think there was 20 or 30 of those.

22      Q.   Okay.

23      A.   They just don't want it, don't want anything.   To

24  take it, get rid of it, whatever.

25           Yes.   I -- so, yes.   The answer's yes.

Exhibit M
1271

Page 73

```
 1      Q.  Okay.  And so would the -- the anonymous

 2   attorneys who would show up with a key and a letter,

 3   would you accept -- was it that the key and letter were

 4   acceptable once the United States had determined it

 5   wasn't going to engage in any form of forfeiture

 6   proceedings against the property?

 7              MR. ROGERS:  I just want to object, beyond

 8   the scope of the class.  Go ahead.

 9              THE WITNESS:  Yes.  I think that's -- that's

10   generally true, yes.

11   BY MR. FROMMER:

12      Q.  Okay.  So prior -- so does that mean, then, that

13   prior to the time the United States had to make a

14   determination about whether to move forward with

15   forfeiture proceedings to any given property, would it

16   refuse to return property to an -- an attorney with a

17   key and a letter on behalf of an anonymous client?

18              MR. ROGERS:  Objection, incomplete

19   hypothetical, calls for a legal conclusion.

20              THE WITNESS:  So I don't want to say that it

21   never happened, because I don't know that without

22   checking, but I'm going to say that I would not have

23   liked it.  Like, I -- I would have tried to put that

24   off.  I would have tried to say we need more

25   information, we need something to confirm this.  But I'm
```

Exhibit M
1272

Page 74

1    not going to say it never happened because without

2    checking, you know, in -- in, you know, whatever time

3    frame we're talking about, I can't say with a hundred

4    percent certainty that it never happened.

5             But I would not have wanted that to happen.

6    Again, because of competing claims.  We were still

7    getting people coming out all over the place, and I

8    would have had some heartburn about that.

9    BY MR. FROMMER:

10    Q.  Okay.  So prior to the -- prior to forfeiture

11   determination being made on the property, you would be

12   very -- you, the United States, would have been very

13   reluctant to return property to an anonymous box holder

14   via their attorney.

15    A.  I feel --

16             MR. ROGERS:  Same -- same objections,

17   outside the scope of the class.  Go ahead.

18             THE WITNESS:  I still don't love it.  Right?

19   I -- I still have this fear that another attorney is

20   going to show up who represents the ex-wife, or

21   whatever.  Or the feuding brother, the other twin.  So

22   I -- I still don't like it.  But the fact of the matter

23   is, particularly as time passes, we need to get the

24   property returned.  So -- so you have to do what you

25   have to do.

Page 75

```
 1   BY MR. FROMMER:
 2       Q.  Yeah.  No, I understand that.  And I -- well, and
 3   you've returned -- you've returned, it sounds like,
 4   hundreds of -- of boxes worth of property at this point.
 5           I was wondering, were there any instances
 6   where -- well, were there any instances where you
 7   accidentally returned the wrong property to the wrong
 8   person?  Not you personally, but where the United States
 9   inadvertently gave -- you know, box A to person B.
10       A.  I'm not aware of that.
11       Q.  Okay.  Let me jump back a little bit to the -- to
12   the actual execution of the seizure warrant and some of
13   the mechanics around the inventorying process.  And I
14   understand the -- the 302 to be the sort of
15   all-encompassing form, the form of the overall
16   encounter.  And for -- my question is:  Should there be
17   a 302 form associated with every box that was
18   inventoried at U.S. Private Vaults?
19       A.  Yes.
20       Q.  Okay.  There should be -- so there should be one
21   for each -- so each box would have its own separate 302.
22       A.  Yes.
23       Q.  Okay.
24       A.  Yes.
25       Q.  And I also -- I think we talked about this
```

Page 76

1    beforehand, the last time we spoke, but I just wanted to

2    confirm, just from the United States, that it's the

3    understanding of the United States that every box

4    inventoried, that inventorying process was captured

5    either by photographs or via video recording.

6        A.  Yes, with a very, very few exceptions.  I think

7    there might be fewer than five that, for some reason,

8    didn't have either.  Or the photos didn't -- something

9    happened.  There's -- there's probably about five that

10   have neither.  Everything else was captured either by

11   videotape or photograph.

12       Q.  Do you know, like, why those, in those five

13   instances it didn't happen?

14       A.  I don't.

15       Q.  Okay.  How many boxes altogether were

16   inventoried?  Roughly.  I'm not -- I'm not holding you

17   to a number.

18       A.  So -- so about 700 were inventoried, and about

19   700 were empty.  So -- so we -- they -- so they were

20   taken -- they were taken, but there's nothing in --

21   there's no contents to them.

22       Q.  Oh, okay.  Oh, so there were a total of, roughly,

23   1,400 safe deposit boxes in the nest?

24       A.  Yes.

25       Q.  And about half of them were -- had something in

Page 77

1    them?

2        A.  Yes.

3        Q.  Oh, okay.  Did not know that.

4            MR. FROMMER:  All right.  Give me, like,

5    give me five minutes.  I think we're about done, but

6    I'll be able to let you know on the back side of this.

7            (A short break was taken at this time.)

8            MR. FROMMER:  Back on the record.

9    BY MR. FROMMER:

10       Q.  All right.  Thank you, Special Agent Zellhart.  I

11   think I only have a couple more questions, or lines of

12   questions.

13           But I wanted to ask you, I know U.S. Private

14   Vaults obviously was a secure -- it was supposed to be a

15   secure business, and -- it was a vault, after all.  And

16   as part of that, the facility had a system of security

17   cameras up to monitor ongoings.  And I wanted to ask,

18   where is that footage from the day of the raid?

19       A.  I don't know.  I don't have it.  I've never seen

20   it.  I don't have any information about that at all.

21       Q.  The government took over the -- the facility

22   early on on the -- the day of the execution of the

23   seizure warrant; right?

24       A.  Correct.

25       Q.  And did it ever gain access to the security

Exhibit M
1276

Page 78

1    camera feed?

2        A.  No.  Not as far as I know.

3        Q.  Did you -- did the United States -- was the

4    United States concerned about someone being able to have

5    remote access to be able to see them over the security

6    camera footage?

7        A.  I think we covered the camera lenses, or took the

8    camera lenses -- the cameras out.  I think our team did

9    that.  But the -- the security company, I think, was

10   remote, and I don't -- I don't have any information

11   about it.

12       Q.  Oh, so you think that the day of the -- the day

13   the warrant was, the seizure warrant was executed, that

14   agents removed the security cameras that were inside

15   U.S. Private Vaults?

16       A.  Or covered them.

17       Q.  Or covered them.  Okay.

18           So it's your understanding that there were --

19   agents, the day of the raid, either covered or removed

20   the security cameras over at U.S. Private Vaults.

21       A.  That would be our standard practice if we can't

22   get to, you know, the -- sort of the brains of it, which

23   I don't know where they were.  And I also didn't do

24   that.  I wasn't a part of the -- the team that executed

25   the search warrant of the office space.  But I'm just

Page 79

1    telling, our standard practice would be to cover the

2    cameras or to remove them if we can.

3        Q.  Okay.  All right.  And who was in charge of the

4    search warrant, was that Ryan Heaton?

5        A.  Yes.  But I think the SWAT team breached.  Well,

6    we didn't breach because we had a key.

7        Q.  Yeah.  My understanding is that George came down.

8        A.  George came down and let us in, but I'm not sure

9    that -- I'm not sure that Ryan Heaton's team -- I guess

10   where I'm going with this, so you get the right people,

11   I'm not sure Ryan Heaton's team were the first ones to

12   sweep through and clear.  So I'm not sure they would

13   have been the ones who covered or removed the cameras.

14       Q.  It might have been, like, a SWAT team that went

15   in earlier, as opposed to him.

16       A.  Correct.

17       Q.  He might have -- his team might have gone in as

18   part of the second wave.  I got -- I got what you mean.

19       A.  Right.  To do the search for the documents and

20   the other things.

21       Q.  But sitting here as, you know, the representative

22   of the United States, it's your understanding that, to

23   the extent there were security cameras at U.S. Private

24   Vaults, they would have either been removed or covered

25   during the initial stages of executing the -- the

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 80

1    warrants.

2        A.   That's our standard procedure, yes.

3        Q.   Okay.  All right.

4        I did have a question about another aspect of the

5    government's policies and procedures, and that's

6    regarding the retention and use of records obtained.

7        Now, specifically I'm thinking of the

8    inventorying records, the 302, the 597s, the pictures

9    and videos attached to that.  And I was -- wanted you to

10   state, what's the position of the United States as to

11   how long it can retain those records?

12              MR. ROGERS:  I just want to object to the

13   extent it calls for a legal conclusion, but she can

14   answer.

15              THE WITNESS:  So the -- those documents are

16   in our interior system called Sentinel, and as far as I

17   know, they stay in Sentinel.  And -- and the -- I mean,

18   the only thing I know is, you know, when I get Freedom

19   of Information Act requests to go into things, I go look

20   for them.  So as far as I know, they just stay in

21   Sentinel.

22   BY MR. FROMMER:

23       Q.   Okay.  So it's under -- your understanding, the

24   understanding of the United States, that documents such

25   as a 302 or a 597, or pictures that are associated with

Page 81

1   those forms, would be uploaded into Sentinel, where they

2   would remain indefinitely; is that accurate?

3       A.   I believe that's accurate.

4       Q.   Okay.  And is there -- with regards -- does the

5   United States have any limitations as to how the

6   documents in Sentinel can be used?  And by that -- let

7   me be a little more -- could -- can agents access

8   documents in Sentinel for any investigative purpose?

9       A.   Sometimes -- cases can be restricted in Sentinel

10  for a variety of things.  There are restrictions you can

11  tag them with.  And you can't -- you certainly can't

12  just be, like, joyriding through Sentinel.  You need a

13  purpose -- you need an investigative purpose.  So if you

14  have an investigative purpose and you're not restricted,

15  or there are not restrictions placed on a file, yes, you

16  can search the information.

17      Q.   Okay.  So so long as an agent had investigative

18  purpose, they could search and access the file unless it

19  had some sort of special access restriction placed upon

20  it.

21      A.   Correct.

22      Q.   And a special access restriction, that -- does

23  that happen as a general matter, or only in limited

24  situations?

25              MR. ROGERS:  Objection, beyond the scope of

Exhibit M
1280

Page 82

1      the topics, calls for a legal conclusion.

2                    THE WITNESS:  There's different -- there's

3      different kinds of restrictions.  And, for example,

4      grand jury sub files are restricted to named people.  So

5      that's an example of you can't -- you can't look at

6      those unless you're on a named list.

7                    Sometimes the whole file can be restricted.

8      It's a sensitive matter and it gets restriction placed

9      on the whole thing.  Sometimes sections of a file will

10     have a caveat put on it, like you can't -- you can use

11     it for this but you can't use it for that.  We get that

12     with certain types of FinCEN records.  So there's a --

13     there's a big variety of types of restrictions.

14     BY MR. FROMMER:

15       Q.  Okay.  So there might be -- so the documents

16     contained in Sentinel might be restricted to some people

17     for some purposes, but the general -- the general rule

18     is that if an agent has an investigative purpose, they

19     can access the documents.

20                    MR. ROGERS:  Same objections, outside the

21     scope of the topics, calls for a legal conclusion.

22                    THE WITNESS:  Yeah.  And I would also limit

23     what I'm saying to criminal -- unclassified criminal

24     cases.  I surely can't speak to the -- the -- the

25     classified counterintelligence, counterterrorism bucket

Page 83

1   of stuff, because I don't work that.  So I'm talking

2   only about criminal -- unclassified criminal files, yes.

3   BY MR. FROMMER:

4     Q.  Let me -- well, let me make this a little more

5   specific.  Like my clients, Paul and Jennifer Snitko.

6   Right?  They have a file, they're a 302 and 597, other

7   documents are in Sentinel, I presume.  Those files would

8   be generally -- is it fair to say -- is it correct to

9   say that those files would be generally accessible to

10  those -- to those agents who are conducting a criminal

11  investigation and have an investigative purpose for

12  looking at those files?

13    A.  Yes.

14    Q.  Okay.  And is -- is that the -- the same would be

15  true equally of other U.S. Private Vaults box renters

16  whose property has been returned?

17          MR. ROGERS:  Objection, overbroad, calls for

18  a legal conclusion, beyond the scope of the class.

19          THE WITNESS:  Yes, I guess that's generally

20  true.

21  BY MR. FROMMER:

22    Q.  Okay.  Yeah, all I'm asking, really, is there's

23  nothing special about Paul and Jennifer Snitko.  The

24  other class members, like-wise, could expect that their

25  files would be accessed -- could be accessed by an agent

Page 84

1    with a valid investigative purpose.  And I'm --

2              MR. ROGERS:  Same objection.

3    BY MR. FROMMER:

4       Q.  -- just asking, is that correct?

5              MR. ROGERS:  Same objections.

6              THE WITNESS:  Right.  And I would just add,

7    just for clarity, that it would be the box -- it's by

8    box.  Right?  So there -- yes, the information about

9    that box, their box, would be -- theoretically would be

10   accessible to somebody --

11   BY MR. FROMMER:

12      Q.  Okay.

13      A.  -- who had an investigative need, yes.

14      Q.  All right.  And I think -- and as you mentioned

15   before, once it's on Sentinel, it generally stays on

16   Sentinel.

17      A.  As far as I know, yes.

18             MR. FROMMER:  All right.  Well, with that, I

19   don't think I have anything else for you right now,

20   Special Agent Zellhart.  Again, I really appreciate you

21   coming and doing this, especially since you are sick.

22   So -- but thank you for that.

23             Victor, did you have anything?

24             MR. ROGERS:  I do not.

25             MR. FROMMER:  Okay.  All right.  Well, with

Exhibit M
1283

Page 85

1    that, then, I will release Special Agent Zellhart.  I

2    hope you feel better and have a -- hope you have a good

3    Independence Day weekend.

4                    THE WITNESS:  Thank you.  Appreciate it.

5                         (Deposition concludes.)

6                              -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit M
1284

Page 86

1                              -oOo-

2

3          I, LYNNE ZELLHART, hereby declare under

4   penalty of perjury that I have read the foregoing pages

5   4 through 85; that any changes made herein were made and

6   initialed by me; that I have hereunto affixed my

7   signature.

8

9          Dated:  _____

10

11

12          _____

13                    LYNNE ZELLHART

14

15

16

17

18

19

20

21

22

23

24

25

Page 87

1               ERRATA SHEET/CORRECTIONS

2

3    PAGE    LINE

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   _____   _____   _____

**Exhibit M**
**1286**

Page 88

```
 1   STATE OF NEVADA      )

                          ) ss.

 2   COUNTY OF WASHOE     )

 3

 4        I, SUSAN E. BELINGHERI, a Certified Court

 5   Reporter for the State of Nevada, do hereby certify;

 6        That on Thursday, the 30th day of June, 2022, at

 7   the hour of 9:08 a.m. of said day, at the offices of

 8   Bonanza Reporting & Videoconference Center, 1111 Forest

 9   Street, Reno, Nevada, appeared 30(b)(6) LYNNE ZELLHART

10   via videoconference, who was duly remotely sworn by me,

11   was thereupon deposed in the matter entitled herein, and

12   that before the proceeding's completion the reading and

13   signing of the deposition has been requested by the

14   deponent or party;

15        That the foregoing transcript, consisting of

16   pages 1 through 88, is a full, true, and correct

17   transcript of my stenotype notes of said deposition to

18   the best of my knowledge, skill, and ability.

19        I further certify that I am not an attorney or

20   counsel for any of the parties, nor a relative or

21   employee of any attorney or counsel connected with the

22   action, nor financially interested in the action.

23        DATED:  At Reno, Nevada, this 6th day of July,

24   2022.

                   /s/ Susan Belingheri

25              _____

                   SUSAN E. BELINGHERI, CCR #655
```

[& - agent]                                                              Page 1

### &

**&**   4:3 88:8

### 0

**00246**   3:10
**04405**   1:9
**053f**   1:25

### 1

**1**   49:17 53:18
  88:16
**1,400**   76:23
**10**   3:11 44:15,18
**100,000**   65:7
**108**   11:2 12:10
**10:05**   4:2
**11**   3:10
**11000**   4:20
**1111**   4:4 88:8
**12**   3:13 8:6,8,20
**14**   44:19,22
**14th**   2:11
**15**   69:15
**16th**   43:21
**17**   4:21
**17th**   43:20,21
**19**   12:25

### 2

**20**   72:21
**2018**   23:5
**2018-2019**   23:8
**2019**   22:21 23:1,17
  24:14 26:8 27:15
  27:19,23
**2020**   24:11 28:12
  28:12,23 29:17
  30:2 32:22 33:2
  34:5,10 35:5
  37:23,24 38:4,10
  39:5,14 40:7,10,15
  40:21 43:3 46:13

**2021**   5:5 19:22
  24:10 38:12 43:21
  48:20 57:8
**2022**   1:20 4:2 88:6
  88:24
**20535**   2:15
**22203**   2:7
**223**   12:10
**24th**   61:17
**25th**   61:18
**2:21**   1:9

### 3

**3**   3:9 11:20,23
  12:11
**30**   1:18,20 3:14
  8:21 13:23 14:6
  14:15,16 16:22
  27:20 72:21 88:9
**302**   46:1,3,4 49:15
  75:14,17,21 80:8
  80:25 83:6
**302s**   46:8,9
**30th**   4:2 88:6
**312**   2:11

### 4

**4**   3:4 86:5
**430**   72:12
**44**   3:11

### 5

**50**   51:2,3
**56**   3:10
**597**   49:14 80:25
  83:6
**597s**   80:8

### 6

**6**   1:18 3:14 8:21
  13:23 14:6,15,16
  16:22 27:20 88:9

**6/30**   45:7
**655**   1:25 88:25
**6th**   88:23

### 7

**700**   76:18,19

### 8

**8**   3:10,14 56:23,25
**85**   86:5
**88**   88:16

### 9

**9**   45:22 46:15
  54:16,17,22
**900**   2:6
**90012**   2:11
**90024**   4:21
**901**   2:6
**935**   2:14
**9:08**   88:7
**9s**   46:19

### a

**a.m.**   4:2 88:7
**ability**   30:22 88:18
**able**   12:12 19:8
  44:17 77:6 78:4,5
**accept**   73:3
**acceptable**   73:4
**access**   11:22 59:7
  77:25 78:5 81:7
  81:18,19,22 82:19
**accessed**   83:25,25
**accessible**   83:9
  84:10
**accidentally**   75:7
**accounting**   49:2
**accurate**   7:2,9
  39:5 40:7 56:15
  56:18 81:2,3
**accusations**   17:3
  17:11

**acquire**   45:24
**acquiring**   30:12
**act**   30:22 80:19
**acting**   1:11
**action**   5:3 88:22
  88:22
**active**   61:20
**actively**   27:6
**activity**   23:11 26:3
**actual**   37:25 51:17
  75:12
**add**   29:2 69:14
  84:6
**addition**   49:16,20
  58:24
**additional**   53:13
  55:21 56:8
**address**   4:17,20
  58:24 60:1,2
**addressed**   53:9
**administrative**
  33:9 34:16 35:20
  36:25 37:18
**advertised**   17:18
**advising**   53:4
**affairs**   59:21,23
**affidavit**   11:3
  29:24 38:3,21,25
**affixed**   86:6
**afterward**   70:11
**agencies**   13:3 22:9
  22:13 25:9 26:9
  26:12,12,13,21
  28:7 41:11,12
  42:15
**agency**   25:18
  41:10
**agent**   3:11 4:15,19
  8:19 9:20,21,22
  10:17,17 11:14,14
  15:7 20:8 23:20

Exhibit M
1288

[agent - basic]

Page 2

23:25 28:6,20
33:15 35:17 36:9
48:18 52:18 55:23
57:22 63:25 66:14
77:10 81:17 82:18
83:25 84:20 85:1
**agent's** 42:10
44:23 45:15
**agents** 13:2,9 16:6
17:3,4 18:3,13
19:11 20:23 24:15
27:3 29:13 45:16
46:7,20 48:21
49:1 50:4,16,25
51:2 52:18 53:5
55:11 56:13 78:14
78:19 81:7 83:10
**aggravated** 42:19
**ago** 6:3 61:24
**ahead** 31:8 34:23
45:9 47:19 67:22
68:1 73:8 74:17
**alerts** 65:8
**alexander** 20:10
57:24 59:18
**altered** 60:11
**alternative** 31:1
32:10
**altogether** 76:15
**ambiguous** 33:9
42:7 43:15 49:4
55:14 67:25
**amended** 3:13
8:20
**america** 1:10
**andrew** 28:20
29:13,25 35:4
64:4
**angeles** 2:11 4:20
4:21 58:10 59:3

**anonymity** 17:17
17:17
**anonymous** 70:10
73:1,17 74:13
**answer** 5:25 6:5
6:14,15,17,17,24
6:24 7:5,15,16 9:1
9:8 33:10 34:23
35:1,1,6,15 36:1
36:19 37:1 41:4
51:25 64:15,18
80:14
**answer's** 72:25
**answering** 5:22
31:10
**answers** 5:14 7:2
**ant** 22:16
**anthrax** 17:7
**anticipated** 19:9
**anybody** 20:5 56:3
**anyway** 66:5
**apartment** 52:9
**appear** 27:20
**appearances** 2:1,2
**appeared** 4:6 88:9
**appearing** 1:21
9:1
**application** 43:22
**applied** 38:12
**apply** 27:22,25
43:19
**applying** 28:3,10
37:15 38:1,2,10,14
**appoint** 32:4
**appointing** 31:3
**appreciate** 84:20
85:4
**approach** 50:4,6
**approximately**
72:9

**april** 23:16 26:8
27:15
**arduous** 72:3
**areas** 45:21
**arlington** 2:7
**aside** 72:9
**asked** 16:19 19:11
68:15 69:5
**asking** 5:23 14:5
35:17 36:2,3,4,20
36:21 64:4,5
72:11 83:22 84:4
**aspect** 80:4
**aspects** 9:24 60:24
**assert** 27:18
**asserting** 35:23
**asset** 2:10 33:18
33:21 35:7,9,10
40:11 41:12,15,17
41:22 42:14,23
46:12
**assistance** 26:20
**assistant** 1:13 2:9
**assisted** 26:14,18
**associated** 75:17
80:25
**assume** 6:19 17:11
51:8
**assumes** 31:7
**assuming** 39:8
64:3
**attached** 27:2 80:9
**attention** 60:22
**attorney** 1:11 2:9
4:25 6:25 34:22
35:12,13,25 36:16
36:20 69:5,6,8
70:7,10 73:16
74:14,19 88:19,21
**attorney's** 10:15
34:1 38:17 41:23

68:23
**attorneys** 2:5
10:14 34:20,21
37:4,9,11 68:14
73:2
**audibly** 5:15
**ausa** 28:20 29:13
36:24
**authorize** 27:22
**available** 48:4
**avenue** 2:14
**aware** 22:10 64:20
75:10
**awhile** 72:5

**b**

**b** 1:18 3:14 8:21
13:23 14:6,15,16
16:22 27:20 49:17
53:18 75:9 88:9
**back** 8:16 15:4
21:24 24:14 27:19
27:23 35:9 39:25
47:2 48:12,15
57:10 60:15 61:12
61:21 66:8 68:9
70:17,21 71:7,21
75:11 77:6,8
**background** 11:11
**bag** 49:10 50:11
50:12 51:11 54:22
54:23
**bagged** 53:12
**bags** 54:9,16,19
**banded** 18:15
**bank** 25:20
**banking** 18:21
**bar** 49:18 53:16,24
**based** 16:1 18:18
60:11 68:7
**basic** 11:11 45:13

Exhibit M
1289

**basically**   29:9,12
  30:14,15 41:21,24
  58:6
**basis**   14:3,21 15:8
**began**   28:3 38:9
  40:4,16
**beginning**   27:15
  67:4
**begins**   12:25
**behalf**   9:1 67:2
  73:17
**believe**   10:4 24:24
  26:18 28:25 40:3
  63:24 81:3
**belingheri**   1:25
  4:5 88:4,24,25
**best**   10:8 37:21
  44:20 61:10 88:18
**better**   25:14,15,18
  25:22 33:21 41:5
  54:18 69:11 85:2
**beverly**   26:14
**beyond**   42:6 73:7
  81:25 83:18
**big**   82:13
**bigelow**   58:9
**bit**   16:20 21:23
  25:20,21 27:11
  29:10 40:12 56:20
  62:22 64:3 66:13
  66:15 69:1 75:11
**bonanza**   4:3 88:8
**bottom**   71:17
**boulevard**   4:21
**box**   13:20 15:12
  17:20 19:18 20:17
  20:23 21:4 23:7
  33:4 49:3 51:11
  51:14 52:7,9,17,25
  55:7,7,13,20,24,25
  56:6,7,8,14,15

57:5 59:5,6,7,13
  59:14 60:4 62:8
  62:10,11,16 63:17
  64:10,12,13,25
  65:1,6,17 66:20
  67:8 68:3,6,11,24
  69:9,13 70:5,25
  71:1,3,4,13,24
  72:1 74:13 75:9
  75:17,21 76:3
  83:15 84:7,8,9,9
**boxes**   13:4 18:1
  31:2 32:11,12,19
  32:25 33:5 34:17
  35:22 39:4,10,11
  40:6,9,17,22 48:22
  49:1,6 54:9 55:4
  55:12,18 56:11
  62:17 72:9,10
  75:4 76:15,23
**brains**   78:22
**breach**   79:6
**breached**   79:5
**break**   7:18,21
  39:20,24 40:3
  48:12,14 66:11,16
  77:7
**briefed**   47:12 52:8
**briefing**   52:8
**briefly**   5:9
**bring**   30:22 42:4
  66:19 68:15
**broad**   34:10
**brother**   74:21
**brown**   28:20
  29:13,25 34:13
  35:4 64:4
**bucket**   82:25
**built**   53:24
**bunch**   5:7 56:9

**bureau**   1:14 2:13
**business**   17:16
  22:18,19,25 23:4
  30:15,17,18,19,20
  31:3,4 32:14,16
  77:15
**businesses**   31:15
  31:16
**busy**   63:4,5
**buys**   25:16

## c

**c**   36:5
**california**   1:2,12
  1:22 2:11 4:21
**call**   29:10 49:10
  51:6 60:9
**called**   44:22 49:9
  50:12 80:16
**calls**   30:2,4,6 37:8
  50:10 51:22 52:22
  54:12 62:13 73:19
  80:13 82:1,21
  83:17
**camera**   78:1,6,7,8
**cameras**   77:17
  78:8,14,20 79:2,13
  79:23
**campbell**   2:14
  6:21 7:14
**capacity**   1:11,13
  16:21
**capture**   46:4
  47:15,22
**captured**   76:4,10
**captures**   46:2
**career**   21:14
**carlson**   28:21
  33:15 34:13 35:5
  46:21
**case**   1:9 9:20,21
  9:22,23,24 10:17

11:14,14,14 17:15
  19:10 22:6 23:20
  25:17 29:12 46:20
  51:13 52:4 66:4
  66:17 69:18
**cases**   81:9 82:24
**cash**   17:25 18:19
  18:20,20,23,25
  19:9,12 45:22
  46:14,19 47:1,1,13
  47:15,22,23 54:8
  54:17,19,21
**categories**   13:24
  14:2,7,11 72:17
**category**   13:25
  14:1,9,9,19,22,22
**cause**   56:14
**caution**   34:19
**caveat**   82:10
**ccr**   1:25 88:25
**center**   4:4 88:8
**central**   1:2,12
**certain**   25:15
  49:11 82:12
**certainly**   25:14,17
  81:11
**certainty**   74:4
**certified**   88:4
**certify**   88:5,19
**chain**   49:12 63:20
**challenge**   5:3
**challenges**   70:23
**chance**   42:20
  70:17
**change**   67:10,11
  67:19
**changes**   86:5
**characterize**   31:12
  31:23 38:14
**charge**   29:23 79:3

Exhibit M
1290

**checking** 73:22 74:2

**checks** 65:4

**chiefly** 23:21

**chose** 30:18 58:21

**chosen** 31:23

**circumstances** 67:6,9 71:20

**civil** 32:23 33:3,8 35:19 36:10,24 37:5,14,18 40:5,17 40:21,24 46:25 59:25

**claim** 3:10 57:5,21 58:20 59:15 60:6 60:11 61:13 63:16 64:7,11,18,21,24 65:3,9

**claimed** 65:17

**claims** 13:3 69:25 74:6

**clarify** 33:14

**clarity** 84:7

**class** 5:3 73:8 74:17 83:18,24

**classified** 82:25

**clean** 55:4,7

**clear** 14:4 35:24 79:12

**clearly** 5:15

**client** 34:22 35:13 67:2,15,25 73:17

**clients** 83:5

**close** 20:1 61:14 66:7

**code** 49:18 53:16 53:24

**coffee** 47:9

**coins** 51:2,3,4,7,7 52:16,17,20,25,25

**collect** 57:18 66:18

**color** 52:19

**colored** 51:7,7 52:16,17

**come** 8:6 28:8 37:14 48:12 57:4 57:9 61:3 66:18 71:2,2

**comes** 59:3

**coming** 47:2 49:25 49:25 69:17 70:10 74:7 84:21

**command** 63:20

**committee** 29:15 29:16

**common** 26:21

**communication** 36:5

**communications** 36:23

**company** 22:6 23:3,10 25:24 26:3 78:9

**competing** 69:12 69:21,25 74:6

**complete** 5:25 7:1 7:9 38:6 51:1

**completely** 6:6

**completion** 88:12

**comply** 16:16,17

**compound** 9:19

**comprehensive** 49:2

**compromise** 54:21 54:24

**concept** 31:21

**concern** 59:8

**concerned** 78:4

**concerning** 5:3 18:14

**concludes** 85:5

**conclusion** 50:10 51:23 52:22 54:12 73:19 80:13 82:1 82:21 83:18

**condition** 17:25 19:6

**conditions** 19:10

**conduct** 5:7 55:12

**conducted** 21:9 56:8

**conducting** 13:12 15:9 22:13 50:5,7 83:10

**confer** 66:8

**conference** 37:8

**confirm** 73:25 76:2

**confusing** 27:13

**conjunction** 26:9 46:21

**connected** 88:21

**consent** 49:9

**considered** 30:16 31:14,24 32:3 58:20

**considering** 40:4,5 40:16

**consisting** 88:15

**contact** 62:9 70:19

**contacted** 41:15 41:16 58:12

**contacting** 63:7

**contained** 63:17 82:16

**container** 51:11

**containing** 51:12

**contains** 51:14

**contemplated** 17:15 55:16 56:10 59:11

**contemporaneou...** 19:14

**content** 58:17,19 59:6

**contents** 13:4 32:24 36:4 39:11 39:16 48:21 49:6 50:16 52:1 64:25 68:7,8,24 71:12 76:21

**context** 21:16 37:15

**continued** 38:11

**contours** 60:6

**contraband** 55:17 55:20 70:18

**controlled** 25:16

**convening** 29:17

**conversation** 5:18 5:20 36:19

**conversations** 28:19 32:21 33:2 36:17 37:4,10,12 59:24

**convince** 71:25

**copies** 38:19

**copy** 8:7 20:25 68:12

**corporation** 23:3 26:3

**correct** 13:21 16:9 18:1 19:16 22:7 23:12 25:1,2 30:24 31:6 39:17 43:4,25 44:4,5 47:25 48:2,6,23,24 50:22 51:1,5,6 53:6,7 63:18 64:2 66:20,23 67:3 68:10,19 69:3 70:12 71:21 72:2

Exhibit M
1291

[correct - documents]                                                                    Page 5

72:15 77:24 79:16 81:21 83:8 84:4 88:16
**corrections** 87:1
**correctly** 21:8
**counsel** 2:13 68:22 88:20,21
**counter** 32:15
**counterintellige...** 82:25
**counterterrorism** 82:25
**counts** 53:6
**county** 88:2
**couple** 8:13 20:13 29:20 77:11
**course** 69:11
**court** 1:1 5:12,16 5:20 6:4,9 88:4
**cover** 38:18 79:1
**covered** 78:7,16 78:17,19 79:13,24
**covid** 29:3
**create** 13:20 15:15 57:21
**created** 15:11,15 16:12 19:18 21:3 45:19
**creating** 15:24
**crime** 33:21 68:9
**criminal** 19:13 22:24 26:2 30:16 30:23 50:7,7,8,20 64:14 82:23,23 83:2,2,10
**criminals** 22:18
**cues** 46:11
**currency** 17:25 18:7,9
**custody** 49:12

**customers** 22:14
**cv** 1:9

### d

**d** 3:1
**d.c.** 60:12
**damage** 13:4 17:4
**dangerous** 13:6
**database** 65:4
**date** 20:3 52:5
**dated** 86:9 88:23
**dave** 58:9
**day** 4:2,3 38:15 48:19 77:18,22 78:12,12,19 85:3 88:6,7,23
**days** 19:20 20:21 60:20 61:15,15
**dc** 2:15
**dea** 22:10,21 23:8 24:18 25:12,15,17 26:9,17 27:2,16 28:20 41:19
**deal** 61:1
**deals** 14:1 27:21
**december** 24:10
**decide** 57:4
**decided** 29:22 31:6,13 38:24 39:9 43:9
**decision** 29:14,16 31:5 39:2,3 40:20 57:21
**declare** 86:3
**declined** 68:23
**defendants** 1:15 2:8
**delay** 12:8
**denote** 52:19
**department** 26:14 26:16 27:1

**depending** 55:24 56:6
**depends** 49:20
**deponent** 88:14
**deposed** 88:11
**deposit** 31:2 32:11 32:12,19,25 33:5 35:22 39:4,10 40:6,17,22 48:22 49:1 54:8 55:3,12 66:20 76:23
**deposition** 1:18 3:14 5:8 8:21 9:6 10:5,13,16,24 11:13 13:23 14:7 14:15 18:22 44:14 45:4,7,12 57:1 85:5 88:13,17
**depositions** 14:8 14:16
**describe** 9:16 40:19,23 71:11,12 71:12
**described** 52:25
**describing** 55:4
**description** 3:7 51:12,16 59:6
**design** 15:19
**designating** 9:15
**designed** 46:7
**detailed** 71:14
**detect** 54:22
**determination** 73:14 74:11
**determine** 24:24 25:4 65:13
**determined** 73:4
**dictionary** 16:10
**difference** 59:1
**different** 14:7 22:9 22:13 25:9,11

26:13,15,17 38:7 45:21 49:7 54:1 61:4 72:17 82:2,3
**difficult** 7:5 29:6 29:10
**digital** 49:22
**diog** 13:14,19 15:8 15:21,23 16:3,9,17 48:22
**directly** 29:25
**director** 1:13
**dirty** 55:4,7
**disappearing** 47:2
**discuss** 35:18,19 55:3,11
**discussed** 11:12 31:1 36:25 40:8 55:19
**discussing** 11:6,21 30:5,8 35:6,8,10
**discussion** 8:15 15:3 32:5,6,18 35:25
**discussions** 32:16 33:12,23,24 34:15 34:20,21 35:6,12 35:13 40:11 57:23
**dismantle** 30:14
**displayed** 19:12
**disseminated** 20:18
**distinction** 27:9
**district** 1:1,2,12
**division** 1:3
**document** 8:23 20:12 38:4 44:22
**documents** 11:8 25:20 79:19 80:15 80:24 81:6,8 82:15,19 83:7

doe 69:8
dog 65:8
doing 16:2,6,13,14
16:25 18:10,11,18
20:19 29:9 40:9
53:21 57:12 61:4
84:21
domestic 13:17
draft 20:5
drafted 20:7 45:15
59:16,17
drafting 29:24
38:2,3,7,21,25
driver's 68:12
drug 21:15,15
25:16 47:7,10
drugs 18:15 47:7
49:21 56:11
duly 4:10 88:10
dye 18:7 19:3
47:12,13

**e**

e 1:25 2:6 3:1 4:5
4:18,19 88:4,25
earlier 61:2 79:15
early 19:22 21:14
43:6 57:8 77:22
earnest 7:24
easy 70:16
efficient 63:11,12
eight 9:9,11,14
10:6 69:19
eimiller 59:19,24
63:21
either 20:11 27:12
31:3 42:20 68:10
76:5,8,10 78:19
79:24
el 26:16 27:1
electronic 3:9

elevated 59:20
email 57:17 60:2
61:20
employee 88:21
empty 76:19
encompassing
75:15
encounter 75:16
ended 62:3
enforcement 22:9
22:21
engage 73:5
engaged 27:25
ensure 13:4 53:14
entire 5:21 71:15
entitled 88:11
entries 46:18
equally 83:15
errata 87:1
especially 15:16
84:21
esq 2:5,6,10,14
essentially 50:5
estimate 37:21
event 42:3
eventually 62:21
everybody 25:23
25:24 64:16
evidence 17:24
28:14 31:8 49:12
49:16,22,23 53:17
54:3,4
evolved 68:4
ex 59:9 74:20
exact 61:25
exactly 12:21 28:1
33:11 34:3,5 57:7
examination 3:3
4:13
examined 4:11

example 18:7
26:13 27:2 69:6
82:3,5
exception 26:25
exceptions 76:6
execute 24:3 44:4
executed 20:14,15
24:5 78:13,24
executing 15:16
29:19 61:11,19
79:25
execution 5:3
19:21 20:22 43:24
44:3,7 48:19 55:9
60:20 63:4 69:16
70:11 75:12 77:22
exhaustive 51:18
51:20
exhibit 3:9,10,11
3:13 8:3,6,8,20
11:18,20,23 12:11
44:15,18,19,22
45:12 56:21,23,25
exhibits 3:7 8:11
10:15,23 45:7
existed 36:17
expect 18:18 83:24
expecting 69:17
expeditious 14:24
experience 18:18
explain 22:4 62:2
69:23
explained 33:17
exploded 47:13
explore 27:11
extent 14:18 19:12
25:16,19 34:21
35:11 56:13 79:23
80:13
extra 63:7 68:14

extremely 61:5
69:17
eye 32:14

**f**

face 59:20
facilitate 40:24
facilitating 23:10
facilitator 22:24
30:16,23
facility 77:16,21
fact 6:8 11:5,20
38:5 47:12 66:23
67:1 68:18 69:4
70:8 74:22
facts 31:7
fails 53:24
fair 16:8 38:16
47:24 69:24 70:6
83:8
fairly 24:12
faith 6:18
fall 34:5 37:22,24
40:12,15,20,21
41:6 43:2 46:13
falls 53:24,25
familiar 31:11,17
31:22
far 20:1 78:2
80:16,20 84:17
fbi 3:10 4:19 9:21
11:3 13:18 15:8
22:22 23:16,21
24:15,21 25:15,21
26:7 31:4,15
48:21 58:10,13
59:20,25 60:8,12
63:16
fbi0000446 3:11
fbigov 58:13
fd 49:14

Exhibit M
1293

**fear** 69:11 74:19
**feasible** 31:15
**federal** 1:14 2:13
    26:12,22
**feed** 78:1
**feel** 25:7 74:15
    85:2
**fence** 26:2
**fentanyl** 17:7 18:9
    56:7,9
**feuding** 74:21
**fewer** 76:7
**field** 60:8,16
**figure** 17:21 22:24
**file** 11:22 65:21
    81:15,18 82:7,9
    83:6
**files** 82:4 83:2,7,9
    83:12,25
**financially** 88:22
**fincen** 82:12
**find** 25:4 47:7,13
    51:16 52:15 55:17
    56:11,13 62:10
**finding** 22:17
**fine** 6:22 11:10
    14:20 20:3 21:21
    55:2 64:8 65:24
    65:25
**finish** 5:22 6:24
    7:19
**firm** 1:25 5:2
    60:13
**first** 9:6 37:1 63:4
    67:8,13 69:19
    70:13,14,14,15,20
    70:20,21 79:11
**fits** 70:5
**five** 48:12 66:6,9,9
    76:7,9,12 77:5

**flakes** 19:4
**floor** 2:11
**flounder** 43:10
**flow** 5:19
**focus** 16:13 25:11
**folder** 44:21 45:4
    45:5
**folks** 26:17 62:14
**follow** 13:2,9 16:1
    16:7 25:21 49:11
**followed** 13:12
    49:24 50:2
**follows** 4:11
**footage** 77:18 78:6
**force** 26:16 27:8
**forces** 21:15 26:23
**foregoing** 86:4
    88:15
**forest** 4:4 88:8
**forever** 47:24
**forfeiture** 2:10
    32:24 33:3,8,18,21
    34:16 35:7,9,10,19
    35:20,20 36:10,24
    37:5,14,18,19 40:5
    40:11,17,21,24
    41:13,15,18,22
    42:4,7,12,14,24
    43:8 46:12,25
    68:24 73:5,15
    74:10
**forget** 41:16
**form** 3:10 18:20
    45:14,18 46:16
    57:5,21 58:20
    59:13,15 60:6,11
    61:5,13 62:1,3
    63:16 64:7,11,18
    64:21 65:3,9,21
    73:5 75:15,15,17

**formally** 13:16
**forms** 50:17 81:1
**forth** 61:12,21
**forward** 23:1
    56:20 69:17 71:2
    73:14
**found** 18:1,9 25:25
    26:1 33:4 47:10
    54:8 55:11,20
    56:7 61:25
**four** 35:8 72:12
**frame** 20:21 34:15
    43:3 61:21 74:3
**framework** 23:8
**frankly** 26:4
**freedom** 80:18
**frequently** 47:10
**friday** 1:20
**frommer** 2:5 3:4
    4:14,25 8:2,12,16
    8:18 9:11,13 10:1
    10:10 11:16,25
    12:3,5,9 14:4,12
    14:14 15:1,4,6
    28:1,5 32:1 34:7
    34:24 35:16 36:2
    36:8,14 37:2,3
    39:19,23,25 40:2
    41:3 43:1,17
    44:16 45:6,10
    48:10,15,17 50:3
    50:14,23 52:13
    53:1 54:14 55:22
    56:4,19,24 63:13
    65:24 66:3,12
    67:23 70:1 71:3
    71:23 73:11 74:9
    75:1 77:4,8,9
    80:22 82:14 83:3
    83:21 84:3,11,18
    84:25

**front** 47:22 64:17
    67:8
**full** 4:17 7:1,9
    88:16
**funny** 65:8
**further** 55:12 65:1
    65:4,4 88:19

**g**

**gain** 77:25
**gasoline** 47:9
**gather** 17:24
    18:13 42:2
**gears** 21:23
**general** 2:13 16:3
    22:1 49:23 81:23
    82:17,17
**generally** 6:19
    7:15 9:16 73:10
    83:8,9,19 84:15
**generate** 49:17
**generated** 54:2
**george** 79:7,8
**germane** 66:3
**getting** 18:19 24:2
    24:4,5 37:1 61:14
    66:7 69:16 74:7
**give** 7:9 8:3 11:17
    12:1,6 15:22 39:7
    44:14 56:21 68:9
    70:20 77:4,5
**given** 73:15
**giving** 37:21 68:18
    71:21
**glebe** 2:6
**go** 5:24 8:12,16
    9:4 12:10 14:8,18
    15:1,4 18:24 19:8
    24:5 27:19 28:2
    30:18 31:8 32:13
    32:16 34:2,23
    36:14 42:12 45:9

46:11 47:19 48:15
48:19 53:22 54:20
58:14,15 63:6
67:21 68:1 70:22
73:8 74:17 80:19
80:19
**goal**  30:21 51:25
52:1
**going**  5:8,12,13,24
6:13,13 8:3 9:9
11:5,10,11 14:20
17:18,20 18:19
20:19 21:23 22:12
25:8 28:2 29:22
29:22,23 34:3
39:15,16 41:10,11
46:8,10,10 52:24
54:9 56:19 57:13
58:13,18 61:7
62:15 64:22,22
65:9 73:5,22 74:1
74:20 79:10
**gold**  51:2,3,4,7,8
52:16 70:3
**good**  5:10 6:17
25:19 28:14 71:6
72:6,18 85:2
**gothier**  1:6
**gotten**  20:7
**government**  8:22
9:15 13:12 15:8
27:22 66:18 67:15
67:17 77:21
**government's**  80:5
**grand**  82:4
**great**  10:2 11:25
**grenades**  17:7
**ground**  16:6
**grounds**  35:14
**groups**  23:9

**guess**  33:14 68:2,4
72:16 79:9 83:19
**guide**  13:17
**guy**  41:16 58:10
**guys**  33:22 58:5
65:20

## h

**h**  4:19
**half**  72:14 76:25
**hand**  15:23 17:7
18:23
**handle**  25:18
**handlers**  54:16
**handling**  14:25
**hands**  16:12
**happen**  33:24
65:18 67:7 74:5
76:13 81:23
**happened**  28:11
33:25 38:8 39:4
67:7 73:21 74:1,4
76:9
**happening**  31:17
60:20 61:13
**happens**  19:1
38:14 49:19
**happy**  14:23
**hard**  8:10 62:25
63:5 64:15
**harrison**  59:22
**hat**  5:9
**hazardous**  13:5
17:6
**head**  9:22
**headquarters**
58:12,14,15 59:21
60:5,8 63:22
**hear**  55:3
**heard**  23:5 55:6
**heartburn**  74:8

**heaton**  79:4
**heaton's**  79:9,11
**held**  8:15 15:3
20:20
**help**  16:13 20:5
24:4 42:20 46:1,7
**helpful**  62:6
**helping**  20:8 60:18
**hereunto**  86:6
**hesitation**  63:19
**hey**  33:19
**hi**  71:2
**hill**  22:16
**hills**  26:14
**hold**  45:8
**holder**  17:20
56:15 64:12 69:9
74:13
**holders**  55:13,25
57:5
**holding**  29:8 76:16
**home**  63:8
**honestly**  6:15
**honey**  22:16
**hope**  85:2,2
**horrible**  33:1
**hour**  4:2 88:7
**hours**  63:10
**huge**  59:3
**huh**  5:16 28:11
44:24 65:19 71:5
**hundred**  38:4
60:21 74:3
**hundreds**  46:9,9
75:4
**hypothetical**
52:22 54:12 63:2
71:9 73:19

## i

**idea**  32:19 46:18
47:12,21 51:10
55:17 57:15
**identification**
49:18,19 53:19
**identified**  9:17
68:21
**identifiers**  58:25
59:5
**identify**  16:24
17:12 33:19 52:1
**identifying**  45:23
52:12 63:18 68:10
**identity**  36:16
**ignore**  18:6
**imagine**  61:23
**important**  5:22
7:1 47:5
**impression**  15:22
**inadvertently**  75:9
**inappropriate**
65:21
**include**  46:18
58:21
**included**  33:25
46:15
**including**  22:10
58:20
**incomplete**  52:22
54:11 63:2 71:8
73:18
**inculpatory**  56:14
**indefinitely**  81:2
**independence**
85:3
**indicia**  19:12
68:11 70:19 72:7
**indictment**  28:9
**indictments**  28:15
28:17 29:19 30:5

Exhibit M
1295

30:9
**individual** 62:13
**information** 10:18
  10:20 18:13 42:3
  45:23,24 46:2,23
  47:16,23,24 48:3
  52:3 57:18 58:17
  58:19 63:18 64:10
  64:21 65:3 73:25
  77:20 78:10 80:19
  81:16 84:8
**initial** 68:6 79:25
**initialed** 86:6
**input** 20:7,9,11
  64:7
**inside** 54:2 55:24
  78:14
**inspector** 22:22
  28:21 33:16
**instance** 18:14
  25:12
**instances** 64:20
  66:25 67:1 75:5,6
  76:13
**institute** 2:4 5:1
**institution** 18:21
  18:25
**instruct** 7:16
  35:14 36:1,18
  65:23
**instructing** 34:23
**instruction** 36:7
  36:13
**instructions** 13:20
  15:12,16,20,24
  16:1,4,12,16 19:18
  20:6,17,25 21:5,6
  48:23 53:3,4
**interest** 5:2 22:12
  69:13

**interested** 59:9
  65:25 88:22
**interesting** 19:10
**interior** 71:15
  80:16
**interrupt** 5:19
**introduce** 11:16
  11:18 44:13 48:5
  56:20
**introduced** 8:20
  44:13 45:12
**introducing** 8:3
**inventoried** 75:18
  76:4,16,18
**inventories** 20:19
**inventory** 11:3
  13:2,9,11,12,14,20
  15:9,9,12,20 16:2
  16:25 17:23 19:19
  20:16,17,24 21:4
  21:10 39:11,16
  40:10 46:5 48:21
  49:7,25 50:5,19
  52:11
**inventorying** 16:7
  16:23 45:16,19
  49:1 50:25 53:5
  75:13 76:4 80:8
**investigate** 23:9
  25:4,10 28:8
  55:25 56:15 64:12
**investigated** 25:13
**investigating**
  22:19 23:22 24:23
  27:17
**investigation** 1:14
  2:13 21:25 22:1,6
  23:2,2,14 24:1,7,9
  24:16 25:3 26:10
  26:18,25 27:6,24
  38:5,6 47:6 55:21

56:8 64:23 65:2
  65:10 83:11
**investigations**
  13:17 22:14 23:7
  55:12,15
**investigative**
  24:21 38:24 39:14
  81:8,13,14,17
  82:18 83:11 84:1
  84:13
**investigator** 24:21
**investigators**
  33:18,24 43:7
**investigatory**
  25:11
**involved** 23:2
  26:10 27:6 28:18
  33:22 42:16,18
  57:20 58:2,8
**issue** 51:21
**item** 49:13 51:10
  51:14,16 52:1,4
  53:16,20,23 54:2
**items** 13:5 30:12
  30:19 49:2 50:16
  50:17 51:1 53:12
  56:14

**j**

**january** 24:10
**jeni** 1:6
**jennifer** 1:5 83:5
  83:23
**jessie** 30:1 41:16
  44:6,7
**jewelry** 51:15
**job** 30:16 33:19
  60:24
**john** 59:1,2 69:8
**johnson** 1:12 2:6
**join** 24:1

**joseph** 1:6
**joyriding** 81:12
**juan** 59:2,2
**judge** 6:9 36:15
**judicial** 33:9 34:16
  35:20 36:25 37:19
**july** 28:12 34:14
  88:23
**jump** 75:11
**juncture** 26:19
**june** 1:20 4:2
  28:12 34:14 88:6
**jury** 82:4
**justice** 2:4 5:1
**justin** 28:21

**k**

**k** 45:22 46:15,19
  54:16,17,22
**keep** 12:19
**keeping** 17:2
**key** 67:2,14 68:15
  68:16 70:4,6 71:4
  73:2,3,17 79:6
**keys** 66:19,24
  69:10,11 70:3
**kind** 22:22 24:3
  41:7 57:9 61:7
  66:7 67:5 68:2,24
  70:23
**kinds** 47:11 53:5
  59:9 82:3
**knew** 10:19 47:6
  57:8
**know** 4:24 5:6,23
  6:13,14,15,16 7:2
  7:19 8:6 11:22
  12:21 13:15 14:18
  16:11,19 17:7,19
  19:4,17 22:11
  25:21 26:22 27:11
  29:20 31:9,17,18

Exhibit M
1296

31:22 32:17,20
33:11 34:3 38:2
40:9 41:9,10,23,25
42:11,11,13,17,19
42:22 43:8 44:10
44:11 46:2,4,10,22
47:8,12 49:9,16,20
51:13,25 52:3
55:16,24 56:2
57:1,8,12 58:7,16
59:9,22 60:19,19
61:2,6,16 62:14
63:8,10,22 64:9
65:7 68:7 69:20
70:18,19 71:16,17
73:21 74:2,2 75:9
76:12 77:3,6,13,19
78:2,22,23 79:21
80:17,18,18,20
84:17
**knowing** 14:22
**knowledge** 33:18
88:18
**knowledgeable**
9:23 10:4
**known** 31:11 61:2
**koons** 1:12
**kristi** 1:12

**l**

**l** 1:10 4:18,19,19
**l.a.** 22:11 57:11
60:8,15
**label** 52:4
**labels** 49:13
**lapd** 22:10 26:18
**large** 11:22
**largely** 50:18
**late** 24:12 34:4
37:22,24 40:7,15
40:20,20

**laundering** 24:25
25:6,8,25 26:1
**laura** 59:19,24
63:21
**law** 2:5 5:2 22:9
22:21
**laws** 25:5,6
**lawyer** 67:2,14
**lead** 23:13 41:10
55:20
**leading** 28:4
**leaf** 19:4
**learned** 65:16
**leave** 54:23
**leaving** 54:19
**led** 67:9
**left** 68:11 70:18
**legal** 31:21 48:4
50:10 51:22 52:22
54:12 73:19 80:13
82:1,21 83:18
**legitimately** 65:14
65:15
**lenses** 78:7,8
**letter** 73:2,3,17
**liaison** 59:19
**lic** 1:25
**license** 68:12
**liked** 73:23
**limit** 82:22
**limitations** 81:5
**limited** 61:5 62:1,3
81:23
**line** 6:24 7:19
12:25 29:10 51:17
87:3
**lines** 77:11
**linked** 14:1
**linking** 14:19
**list** 50:16 51:1,18
51:20 64:17 82:6

**listed** 8:5 9:2,6
10:5 15:20 44:19
44:21,22 47:8
**little** 21:23 25:20
25:21 27:11,12,13
29:6,10 40:11
56:20 62:22 64:15
66:13,15 72:14
75:11 81:7 83:4
**loading** 12:15
**local** 21:16 26:12
26:12,20,23
**locate** 12:12
**located** 34:17
35:21 37:20 49:3
**location** 52:5,7
**log** 49:13
**long** 27:16,16 28:7
62:23 64:16 80:11
81:17
**look** 19:8,13 58:18
64:22 80:19 82:5
**looked** 11:1,3 15:8
**looking** 15:23
25:20,23,24 26:2
47:11 83:12
**looks** 33:20 55:6
**loomis** 19:15
54:10
**looped** 24:8 41:13
41:19,24 42:23
44:7 46:13
**looping** 42:1
**los** 2:11 4:20,21
58:10 59:3
**losing** 63:10
**lost** 17:11 47:24
**lot** 21:15 26:22
28:14 38:5 59:3,4
61:21,22 62:8
63:8 69:18

**lots** 32:16
**love** 74:18
**lyndon** 28:21
45:12
**lynne** 1:19 4:6,9
4:18 45:7 86:3,13
88:9

**m**

**macdonald** 10:17
20:8 23:25 57:22
58:7 59:17 63:25
**madison** 10:17
20:8 57:22
**main** 60:12 63:17
**majority** 72:6
**making** 29:14,16
**man** 66:5
**manner** 13:6
18:16 68:24
**manpower** 26:23
51:20
**maps** 71:14
**mar** 1:9
**march** 5:4 19:22
43:20 48:20
**marijuana** 19:4
47:9
**marked** 3:8,12 8:8
11:20,23 44:15
45:7 56:23
**married** 65:2
**match** 62:7,7
**materials** 17:6
**matter** 25:25
68:10 74:22 81:23
82:8 88:11
**mean** 5:9 12:15
14:19,23 16:17
17:14 23:18 25:11
26:11,21 31:9
32:16 33:13 34:25

36:14 37:8,11 38:13 46:20,21 51:2,24 52:6 55:18 56:2,6 62:19 65:17 73:12 79:18 80:17
**means** 3:9
**meant** 48:21
**mechanics** 50:15 75:13
**media** 59:19
**medications** 7:4
**meeting** 20:20,22 20:24 21:1
**meetings** 28:24 29:3,8 30:8
**meghan** 2:14
**members** 32:22 33:15 34:1 83:24
**mentioned** 26:15 84:14
**mentioning** 59:12
**mere** 36:15,16,16
**messed** 5:21 44:19
**met** 4:24
**michael** 1:6
**middle** 6:23 7:20 61:11,18
**mine** 46:20,20
**minimal** 20:12
**minute** 8:4 15:2 48:12
**minutes** 8:13 39:21 66:6,9 77:5
**miscellaneous** 51:4 52:20,25
**mischaracterizes** 50:9 68:3
**misplaced** 17:11 53:15

**moment** 6:3 44:14
**money** 18:14 19:14 24:25 25:5 25:7,21,25 26:1 32:15 65:7
**monitor** 77:17
**monte** 26:16 27:1
**month** 61:2
**months** 34:11 38:22 44:2 67:8 67:13,16 69:15,19 70:11
**move** 21:24 30:9 30:10 56:19 73:14
**moving** 28:9,15,17 29:18
**muddle** 44:20
**multiple** 14:16
**murray** 30:1 41:17 44:6,7

**n**

**n** 2:6 3:1 4:18,18
**name** 4:17,18,25 58:24 59:4 60:1 62:6,7
**named** 59:21 82:4 82:6
**nature** 18:17
**necessarily** 26:24 51:3,8
**necessary** 43:8
**need** 17:20 20:3 22:23,23 23:9 41:25 42:3 46:10 46:10 47:3 62:11 69:2 71:20 73:24 73:25 74:23 81:12 81:13 84:13
**needed** 24:4 30:19 34:2 60:21 65:2

**negotiation** 60:9
**negotiations** 60:7
**neither** 76:10
**nest** 31:2 32:11,12 32:18 37:15 38:24 39:4,9,15 40:9,17 76:23
**nests** 27:23
**nevada** 4:5 88:1,5 88:9,23
**never** 14:15 19:8 25:25 26:1 31:11 31:19 32:5 47:2 55:6 73:21 74:1,4 77:19
**new** 69:16,18
**non** 37:4
**nonprofit** 5:1
**normal** 5:18,19
**north** 2:11
**notary** 4:5
**note** 19:6,11
**notes** 3:11 44:23 45:15 46:16 88:17
**notice** 3:13 4:1 8:21 9:2,7,18 10:5 27:21
**number** 11:15 14:17 22:2 25:17 27:21 38:19 49:17 51:11,14,16 52:1,2 52:4,4 53:18,19 54:2 58:25 59:6 59:13,14 60:1,4 62:10,11,16 63:6 63:17 66:22 68:5 71:4 72:18 76:17
**numbers** 13:15 53:23 72:15
**numerous** 14:16

**nv** 1:25
**nw** 2:14

**o**

**oaks** 1:22
**oath** 6:4,8
**object** 13:23 14:3 14:20 33:7 34:18 34:19 35:13 65:22 73:7 80:12
**objection** 9:19 10:7 27:19 31:7 35:11,24 36:6 41:1 42:6 43:15 49:4 50:9 51:22 52:21 54:11 55:14 56:1,16 62:24 63:1 67:24 71:8 73:18 81:25 83:17 84:2
**objections** 7:14 36:12 50:21 74:16 82:20 84:5
**objective** 30:14
**observation** 46:15 46:16
**observations** 3:11 18:2 44:23 45:15 46:14,19 47:3
**observed** 19:2
**observing** 45:22
**obtained** 38:20 80:6
**obviously** 4:24 10:6 56:7 77:14
**october** 41:7,8
**odor** 47:9
**office** 2:13 10:15 34:1 38:17 41:23 57:11 59:21,23 60:8,12,16 63:17 68:23 78:25

Exhibit M
1298

**officer** 27:8
**officers** 17:10
  21:17 27:3
**offices** 4:3 88:7
**official** 1:11,13
**officials** 57:20
  58:20 60:17 64:21
**oh** 32:2 45:8 47:20
  60:10,15 65:18
  76:22,22 77:3
  78:12
**oily** 19:5
**okay** 4:22 6:3,12
  7:8,11,21 8:2,12
  8:25 9:4,11,12
  10:2,11,22 11:5,10
  11:10,24 12:8,19
  13:7 15:14,19
  16:3,15,18 17:9,23
  18:12 19:17,22,25
  20:3,13 21:2,7,13
  21:19 23:5,6,13,18
  23:24 24:12,14,20
  27:7 28:16,23
  29:1,16 30:1,7,9
  30:21,25 32:2,7,20
  35:8 37:24,24
  38:9 39:2,7,14,18
  39:23 40:13,19
  43:2,5,22 44:6,11
  44:25 45:9,18,21
  46:12,23 47:18
  48:7,12 50:4,15,24
  51:19 53:2,8 54:4
  54:7 55:2,9,23
  56:5,12 57:19
  60:6,10,10,15 61:8
  62:20 64:8 65:6
  65:24 66:10,13
  67:20,21 68:2
  70:2,9,24 71:1

**old** 5:9
**once** 19:1 39:8,9
  40:19 47:16 53:12
  72:5 73:4 84:15
**ones** 10:24 23:10
  46:13 70:16 79:11
  79:13
**ongoings** 77:17
**ooo** 1:4 4:7 85:6
  86:1
**open** 54:17,23
**operations** 13:17
**operative** 16:5
**opinions** 60:12
**opposed** 51:9
  79:15
**order** 5:14 17:21
  24:23 30:19
**organized** 24:4
  62:21
**original** 38:23
  57:23
**originally** 22:5
**outside** 14:21
  36:23 41:1 43:15
  54:9,20,21 74:17
  82:20
**overall** 75:15
**overbroad** 50:10
  50:21 51:23 52:21
  63:1 67:24 83:17
**owned** 65:14
**owner** 66:23

**owners** 17:13
  62:18 64:11
**ownership** 45:25

**p**

**pack** 18:8 19:3
  47:12,13
**package** 49:20
**packaged** 18:15
**page** 3:3,7 12:10
  38:4 45:16 87:3
**pages** 12:12 86:4
  88:16
**papers** 51:14
**paperwork** 53:23
  68:12
**paragraph** 11:2,2
  12:10,16,21
**paraphrasing**
  61:24
**pardon** 61:25
**part** 5:19 17:24
  24:6,6 25:3 26:25
  32:14,18,19 54:6
  77:16 78:24 79:18
**participate** 20:23
**participating**
  41:12
**particular** 13:24
  13:25 14:22 51:10
**particularly** 15:16
  74:23
**parties** 69:12,21
  88:20
**party** 59:8 69:3,7
  69:8 88:14
**passed** 67:6
**passes** 74:23
**path** 61:7
**paths** 58:1
**paul** 1:5 83:5,23

**pdf** 12:7
**pearsons** 1:6
**penalty** 86:4
**pending** 6:23
**pennsylvania** 2:14
**people** 20:18
  28:18 41:13,15,18
  41:22,23,25 42:2
  42:12,15 46:12
  57:9 58:12 59:4
  63:7 66:5,8,17
  68:15 69:16,18
  70:16,21 71:14,15
  72:18,19 74:7
  79:10 82:4,16
**percent** 74:4
**period** 60:14
**periodically** 7:13
**perjury** 86:4
**permissible** 16:23
**person** 9:22,23
  10:9 17:2 23:14
  23:14,16,19,21
  24:17 27:15 62:9
  63:9 64:22,23
  65:10,20 66:19
  68:10,19,21,22
  69:10 70:5,8
  71:22 72:1 75:8,9
**personal** 16:20
  58:25 59:5 63:18
**personally** 35:18
  75:8
**personnel** 57:13
  63:10
**pertain** 13:25
  14:10
**pertaining** 13:23
**pertinent** 66:20
**phase** 24:22 28:13

Exhibit M
1299

**phases** 57:8
**phone** 29:4,8,10
   57:12,13 58:25
   60:1 62:9,13 63:9
**phones** 51:15
**photocopy** 68:12
**photograph** 76:11
**photographs** 76:5
**photos** 76:8
**physically** 29:7
**pictures** 80:8,25
**place** 16:6 29:3
   38:20,22 40:11
   50:1 51:13 59:3
   74:7
**placed** 81:15,19
   82:8
**plain** 18:4,10
**plaintiffs** 1:8 2:3
   3:13 5:2
**planning** 27:21,25
   37:17 44:3 57:7
**plate** 61:22
**playing** 63:9
**please** 4:17 12:11
   12:25 15:5 19:11
   44:14 57:1
**point** 5:9 17:16
   23:13,14,15,16,19
   23:20 26:10 27:15
   28:13 39:8 41:5
   41:11 42:10 72:11
   75:4
**police** 21:17 26:12
   26:14,16,20 27:1
**policies** 13:3,10
   50:1 80:5
**policy** 11:4 13:11
   13:14 15:9,20,25
   16:3,5,5 50:24
   52:18,23 54:8,13

67:10,11
**pop** 69:18
**portions** 26:18
**poses** 52:21 54:11
   63:1 71:8
**position** 48:25
   54:25 80:10
**possibility** 17:5
   69:25
**possible** 18:20
   21:16 45:22
**possibly** 61:17
**post** 57:5,16
**postal** 22:21 24:18
   28:21 41:20
**pot** 22:16
**potential** 33:3
   34:15 40:5,16,24
**potentially** 32:23
   40:21 46:24,24
**practical** 21:3
**practice** 78:21
   79:1
**precipitated** 67:19
**precise** 20:3
**precisely** 44:11
**preferred** 54:16
   63:12
**premises** 54:23
**prepare** 10:12
   42:20
**prepared** 9:7
   20:15
**presence** 36:16,24
**present** 34:20,22
   35:12,25 37:9,11
   70:22
**presented** 67:2
**presume** 83:7
**pretty** 20:12 26:21
   28:14 29:3 72:6

**previous** 10:24
   11:13
**previously** 3:8
   11:19,23 21:7,9,10
   30:11 31:5 32:2
   32:21 34:12 37:11
   44:13,15 45:11
   56:23,25 59:12
**primarily** 63:25
**principals** 26:4
**printed** 12:18
**prior** 19:20 20:21
   21:20 23:5,6 44:3
   73:12,13 74:10,10
**privacy** 59:25
**private** 3:10 5:4
   9:21 13:13 15:10
   15:17 22:1,5,10,12
   22:14,25 23:22
   27:17 30:13,15,22
   32:13 35:22 36:11
   37:5,7,20 43:23
   44:9 52:6 71:3
   75:18 77:13 78:15
   78:20 79:23 83:15
**privilege** 35:14
**privileged** 34:22
   36:5
**probably** 11:6
   22:2 24:10 27:1
   38:19 39:6 41:25
   45:17 53:21 57:22
   57:23 59:18 61:3
   67:8 70:15 76:9
**procedure** 80:2
**procedures** 49:23
   50:12 80:5
**proceeding** 43:9
   48:4
**proceeding's**
   88:12

**proceedings** 19:13
   42:4,8 46:25 73:6
   73:15
**proceeds** 33:21
   47:7,10 64:14
   68:9
**process** 24:12
   31:11 37:25 38:8
   38:9,19,21 49:5,6
   49:10 52:11 63:12
   66:14 68:3 69:23
   72:4 75:13 76:4
**processing** 49:6
**product** 60:7
**project** 22:20
**prong** 17:8
**property** 17:2,11
   17:13,21,25 33:4
   34:17 35:21 37:6
   37:19 40:25 42:5
   45:25 49:14 51:17
   52:12 53:14 57:5
   57:10 65:14 66:15
   66:18 67:1,15,18
   68:18,20 71:7,21
   72:10,18 73:6,15
   73:16 74:11,13,24
   75:4,7 83:16
**proposed** 63:16
**prosecuting** 65:20
**protect** 13:3 17:9
   17:10
**protecting** 17:1,3
   17:4 69:24
**protective** 17:8
**protocols** 49:11
**provide** 6:17
   50:25
**provided** 64:10,11
**public** 4:5 5:1
   59:20,21,23

**pull** 12:7
**purpose** 17:12,23
18:4,5,11,12 30:12
42:1 45:24 46:1
50:19 81:8,13,13
81:14,18 82:18
83:11 84:1
**purposes** 16:23
17:9 45:19 49:18
49:19 54:18 82:17
**pursuant** 4:1
48:22 49:8 50:8
50:19
**pursue** 31:6 68:23
**pushed** 60:4
**put** 7:16 53:13
54:2 59:15 60:18
61:16 62:12 63:5
64:24 73:23 82:10
**puts** 38:17 68:25
69:2

**q**

**qualifications** 9:17
**question** 5:23 6:1
6:12,15,16,20,22
7:15 9:8 13:25
15:11 28:4 33:1
34:4 35:1 36:22
44:12 66:16 75:16
80:4
**questioning** 7:20
14:19
**questions** 5:12,13
6:5,24 7:6,25 9:2
11:12 14:9 27:19
45:13 77:11,12
**quick** 29:2 48:11
**quickly** 18:20
**quite** 22:8 28:14
38:5 61:22

**r**

**r** 4:19
**raid** 20:14 77:18
78:19
**range** 20:2
**rarely** 69:17
**reach** 57:10,16
58:4
**reached** 58:9
**reaching** 63:7
**reaction** 60:17,23
**read** 12:24 86:4
**reading** 88:12
**ready** 24:2,5
**real** 29:2
**realized** 39:10,15
**really** 5:9 24:1,2
24:16 38:13 39:1
63:4 69:19 71:25
83:22 84:20
**reason** 7:8,12
51:19 76:7
**reasonable** 6:1
**reasons** 17:1 68:5
**recall** 10:24 11:8
19:17 21:12,17
32:17 38:1 55:23
59:12
**receipt** 49:14
**received** 20:25
53:16
**receiver** 31:3 32:4
32:6
**receivership** 31:21
**recollection** 41:5
**record** 4:16 5:21
7:17 8:12,15,17
15:2,3,4 19:14
39:25 48:15 51:3
77:8

**recorded** 53:17
**recording** 76:5
**records** 80:6,8,11
82:12
**redundancies** 53:23
**redundancy** 53:19
**reference** 16:9
**referencing** 14:23
**refreshed** 5:11
**refuse** 73:16
**regard** 42:23
**regarding** 9:2
17:24 80:6
**regardless** 49:24
50:18
**regards** 36:10
37:6 81:4
**reins** 26:7
**relate** 27:20
**relative** 36:25 42:7
88:20
**release** 67:15,17
67:18 85:1
**reliable** 3:9
**reluctant** 74:13
**remain** 81:2
**remember** 10:22
21:8,22 29:6,11,17
29:20 30:6 34:6
44:6
**remind** 43:18
**remote** 78:5,10
**remotely** 1:21
88:10
**remove** 30:17 79:2
**removed** 78:14,19
79:13,24
**reno** 4:4 88:9,23
**rented** 71:3

**renters** 23:7 33:4
83:15
**rephrase** 6:14
**reported** 1:25
**reporter** 5:13,16
5:21 6:4 88:5
**reporting** 4:3 5:13
88:8
**represent** 69:9
70:8
**representative** 16:22 79:21
**represented** 68:22
69:7
**representing** 5:2
**represents** 74:20
**requested** 88:13
**requests** 80:19
**require** 14:20
66:19
**required** 18:6
**requires** 6:5
**resource** 16:10
**respect** 27:24
55:15 67:25
**responsible** 23:22
**rest** 9:10
**restate** 33:1 67:12
**restricted** 81:9,14
82:4,7,16
**restriction** 81:19
81:22 82:8
**restrictions** 81:10
81:15 82:3,13
**resulted** 65:3
**retain** 80:11
**retention** 80:6
**return** 17:21
68:25 69:1,4,23
73:16 74:13

**returned** 67:1 68:7 72:11 74:24 75:3,3,7 83:16
**returning** 62:17 66:14 69:3
**returns** 67:8 68:4 68:6 70:14
**reviewed** 10:15,23 10:25
**rgk** 1:9
**richard** 20:10 57:24 59:18
**rid** 72:24
**right** 4:22 6:6 7:13 7:23,23 8:2,5,16 8:19 9:12,12 10:22 11:5,19,25 12:5,8 13:14 15:1 18:17 19:7,24 20:2,13 21:7,21 24:2,23,25 30:1,7 30:23 32:7 38:19 39:6,12,19,23 40:3 40:18 42:13 43:11 43:13 44:17 45:2 45:11,21 48:10,18 50:15 53:16 56:25 59:16 62:8 63:24 64:1 65:11,14 66:6 71:25 72:1 74:18 77:4,10,23 79:3,10,19 80:3 83:6 84:6,8,14,18 84:19,25
**rightful** 62:17
**rights** 59:25
**rivera** 59:2,2
**road** 2:6
**robert** 2:5,6 4:25 71:2

**rodgers** 2:10
**rogers** 9:8,19 10:7 12:1,4 13:22 14:6 14:13,17 27:18 31:7 33:7 34:18 35:11,23 36:6,12 36:22 39:22 41:1 42:6 43:12,14 45:3,8 49:4 50:9 50:21 51:22 52:21 54:11 55:14 56:1 56:16 62:24 63:1 65:22 66:2,10 67:21,24 71:8 73:7,18 74:16 80:12 81:25 82:20 83:17 84:2,5,24
**room** 29:7 54:20
**roughly** 19:19 26:8 43:23 72:11 72:20 76:16,22
**roundabout** 69:22
**rub** 54:21
**ruiz** 1:6
**rule** 82:17
**rules** 5:7 71:18
**run** 5:8 17:5 31:3 31:4,15,16 65:6
**running** 17:19
**ryan** 79:4,9,11

**s**

**s** 88:24
**sa** 58:6 59:16
**safe** 17:2 31:2 32:11,12,18,25 33:4 35:21 39:4,9 40:6,17,22,22 48:22 49:1 54:8 55:3,12 66:20 76:23

**safety** 17:10 54:18
**sake** 21:24
**satisfied** 71:20
**satisfy** 68:17
**saying** 5:15 50:6 57:19 67:16 69:9 70:7 82:23
**says** 13:8
**scanners** 32:15
**scent** 54:22
**scope** 14:21 41:1 42:6 43:16 73:8 74:17 81:25 82:21 83:18
**search** 5:4 13:12 16:2 17:24 19:21 21:10 28:10,10 30:10 43:19,22 46:5 49:7,8,8,9,24 50:7 78:25 79:4 79:19 81:16,18
**second** 11:17 12:2 12:7 13:22 39:7 45:8 56:21,22 61:24 70:22 79:18
**section** 2:10 13:15 13:15,16,19
**sections** 82:9
**secure** 77:14,15
**security** 54:18 68:15 77:16,25 78:5,9,14,20 79:23
**see** 8:6 16:18 18:6 18:7,8,8 21:8 25:4 38:4 44:17 52:14 64:13,23 65:10 71:24 78:5
**seeing** 18:4
**seen** 8:23 31:19 77:19

**seize** 30:18 38:24 39:4,9,15 50:16
**seized** 51:1 57:6
**seizing** 32:11,12 40:9 50:17
**seizure** 11:2,21 15:17 20:14 27:23 28:10 30:10,12 31:1 37:15 38:1 43:19,23 44:8 48:19 50:8,8,20 55:10 61:12,19 70:11 75:12 77:23 78:13
**sends** 65:9
**sense** 20:4 48:9 70:2,24
**sensitive** 82:8
**sent** 8:21 63:16,20 63:21,22,23
**sentence** 12:24 13:8
**sentinel** 54:5,6 80:16,17,21 81:1,6 81:8,9,12 82:16 83:7 84:15,16
**separate** 18:3 49:18 52:7,10,11 53:20 75:21
**separately** 58:16
**september** 41:7
**set** 8:14 22:2
**sheet** 87:1
**sheets** 38:18
**sheriff's** 22:11
**shift** 21:23
**shifted** 67:16 70:9
**short** 39:20,24 48:14 66:11 77:7
**shot** 64:17

Exhibit M
1302

**show**  21:4 73:2 74:20
**showed**  67:14 71:14
**showing**  69:6
**shows**  70:4
**sick**  7:3 84:21
**sickness**  7:4
**side**  26:7 41:19 58:2 77:6
**signature**  86:7
**signing**  88:13
**silver**  52:17
**similar**  70:6
**similarly**  5:18
**simply**  51:4 52:20
**single**  71:24
**site**  58:13 61:20
**sitting**  79:21
**situation**  17:19 33:20 42:12 69:2 70:10
**situations**  81:24
**six**  66:9 67:8 69:19
**size**  57:11
**sketch**  71:14
**skill**  88:18
**skip**  11:11
**slow**  62:17
**slowed**  62:22
**slowly**  12:6
**smelled**  18:14
**smells**  19:5
**smooth**  42:21
**sniff**  54:17
**snitko**  1:5,5 83:5 83:23
**soil**  47:9
**sole**  24:16
**solicited**  62:16

**somebody**  65:17 84:10
**sooner**  42:18,22 60:22
**sorry**  12:1,8 40:13 43:14 45:3,3 47:20 48:11 53:10 56:22 65:22 67:23
**sort**  7:23 16:3,5 18:2 22:15 25:9 25:20 26:6 31:21 68:3 70:3 75:14 78:22 81:19
**sound**  6:1
**sounds**  16:4 43:5 67:13 70:2 72:3 75:3
**space**  78:25
**spans**  34:11
**speak**  5:14 6:25 9:17,24 82:24
**special**  4:15,19 8:19 10:17 15:7 20:8 23:25 28:6 28:20 35:17 36:9 48:18 57:22 63:25 66:14 77:10 81:19 81:22 83:23 84:20 85:1
**specialists**  42:23
**specialized**  25:10
**specialty**  24:25 42:13,14
**specific**  37:12 40:14 51:14 83:5
**specifically**  7:15 17:14,15 21:12,17 80:7
**spent**  44:2
**spoke**  10:14,16 29:18 36:2,3 76:1

**spouses**  59:9
**spring**  2:11
**ss**  88:1
**stages**  79:25
**stalled**  62:22,23
**standard**  70:3 78:21 79:1 80:2
**start**  8:3 28:9 35:9
**started**  8:10 28:8 28:13,14,16 38:2,3 38:6,25 70:10
**starts**  29:17
**state**  4:17 7:14 45:25 80:10 88:1 88:5
**states**  1:1,10,11 2:9 9:1 10:14 34:1 37:17 38:17 40:4 40:16,23 43:18 44:2 48:25 50:25 53:3,13 54:7 55:10 56:13 57:4 62:4 64:9,12,21 73:4,13 74:12 75:8 76:2,3 78:3,4 79:22 80:10,24 81:5
**stating**  55:23
**stay**  80:17,20
**stays**  84:15
**stenotype**  88:17
**step**  62:11 63:7
**steps**  40:19,23 41:14 53:13
**sticker**  53:25
**stinks**  65:7
**storc**  1:7
**stored**  13:5
**street**  2:11 4:4 88:9

**structuring**  25:5
**stuff**  8:10 69:10 70:16,21 83:1
**sub**  82:4
**subsequent**  48:4
**substance**  14:2
**substantially**  50:12
**suggested**  46:14 65:1
**suggests**  68:8
**suite**  2:6 4:21
**summer**  28:11,12 28:23 29:17 30:2 32:22 33:2 34:4 34:10 35:5 37:22 37:24 38:3,10 39:5,14 40:7,10,12 40:15,20
**supervisor**  20:9 57:24 59:18 63:21 63:23
**supplemental**  13:20 15:11,19,24 15:25 16:4,12,16 19:18 20:6,16,17 20:25 48:23 53:3 53:4
**supposed**  16:7 44:18 77:14
**sure**  4:18 8:9,10 9:20 12:3,20 13:1 22:11 34:8 37:2 39:1,22 41:20 42:2 43:6 48:13 55:1,19 57:7 63:15 64:18 69:3 79:8,9,11,12
**surely**  82:24
**susan**  1:25 4:5 88:4,24,25

Exhibit M
1303

swat  79:5,14
sweep  79:12
sworn  4:10 6:3
   88:10
system  53:18 54:3
   54:4 57:9 61:16
   64:16 77:16 80:16

**t**

t  4:19
tag  49:10 50:12
   63:9 81:11
tagged  53:12
take  5:17 6:8 7:18
   7:21 22:24 26:7
   31:16 39:20,20
   41:10,14 48:10,11
   50:6 66:6 72:24
taken  39:24 48:14
   66:11 76:20,20
   77:7
talk  6:21 30:25
   36:9 66:13
talked  5:6 21:11
   30:11 32:20 75:25
talking  12:19,22
   26:6 28:3,13,15,16
   33:16 34:13,14
   58:6 66:15 74:3
   83:1
tamara  59:22
targeting  26:2
task  21:15 26:16
   27:8
team  16:1,13 31:6
   32:3,9,10,22 33:15
   34:12,12,14 38:23
   38:24 39:3,9,15
   63:16 78:8,24
   79:5,9,11,14,17
team's  30:11,21

technical  58:3
technicians  49:17
technologically
   58:4
technology  56:22
techs  53:17
telephone  3:9
tell  10:12 27:14
   28:6 42:17 59:1
   71:13
telling  79:1
ten  9:9,11,14 10:6
   14:7,10 19:20
   20:21 39:20
term  33:8 34:10
   34:10
terms  41:14 57:24
   58:2,3
tested  61:17
testified  4:11 31:5
   32:3 37:12 40:3
testify  6:9 9:7,9,10
   9:16 34:19
testimony  7:9
   50:10
thank  4:15,22 12:4
   37:11 39:25 77:10
   84:22 85:4
theft  13:3 17:3
theirs  65:15,17
theoretically  84:9
thesaurus  16:10
thing  17:17 32:13
   33:14 52:10 57:17
   65:5 68:16 69:15
   80:18 82:9
things  18:5,24
   25:14,15 26:13,15
   38:8 43:7 46:3
   47:7,8,11 49:20
   52:2 54:1 56:10

59:10 60:3,21
62:23 63:17 65:16
66:21,22 68:17
71:10 79:20 80:19
81:10
think  5:23 9:24
   10:3,8,16,16,21
   12:15 18:22 19:24
   20:11 21:14 22:2
   22:15,17 23:5
   26:7,15 27:23
   30:3,10 31:12,13
   31:14,14,24 32:5,9
   32:19 33:17 39:6
   40:8,8,18 41:6
   43:4,11 52:23,24
   55:7,18 56:3,17
   58:6 59:16 60:2
   61:17 63:19,21
   64:7 66:7 67:4
   70:15 72:12,13,21
   73:9 75:25 76:6
   77:5,11 78:7,8,9
   78:12 79:5 84:14
   84:19
thinking  12:13
   41:7 58:11 80:7
third  71:16
thought  10:19
   32:2 56:12 66:2
thousand  1:22
three  18:5 22:11
   26:11 29:12,21
   53:21
thursday  4:1
   61:18 88:6
time  5:6,24 7:19
   8:8,15 15:3 20:10
   20:21 25:19 30:9
   30:9 31:10 34:14
   39:24 43:3 48:14

56:20 57:24 60:22
61:6,21 62:14
66:11 67:5 68:20
72:7 73:13 74:2
74:23 76:1 77:7
times  29:18,21,21
   62:8 63:8
title  4:17 59:22
today  7:6,9,25 9:1
   9:7 10:13 11:6
told  21:14 58:10
   59:24 68:25 69:1
tools  30:17
topic  27:21 32:23
   37:13,14 42:7
topics  9:2,4,6,9,10
   9:14,17 10:5,6
   22:3 27:20 41:2
   43:16 82:1,21
total  76:22
totality  71:20
totally  61:3
track  15:20 53:25
tracked  54:3
tracking  53:20
tracy  1:10
training  21:3
transcript  88:15
   88:17
transported  54:10
travis  1:7
treat  52:9
treating  52:7
tremendous  59:8
tricky  72:5,8
tried  65:20 69:23
   73:23,24
trouble  31:10
true  18:13 22:8
   56:3 73:10 83:15
   83:20 88:16

**trust** 18:23
**truthfully** 6:5
**try** 6:13 17:12
  46:3 66:22
**twin** 74:21
**two** 19:20 20:1
  22:3 29:21 53:20
  58:1,1 69:10,12
  70:3,15
**tyler** 1:6
**type** 57:17 65:5
**types** 82:12,13
**typically** 66:19

**u**

**u.s.** 3:10 5:4 9:21
  13:13 15:9,17
  22:1,5,10,12,14,21
  22:25 23:22 28:21
  30:13,14,22 32:13
  35:22 36:10 37:5
  37:6,20 41:23
  43:23 44:8 52:6
  52:18 57:20 68:23
  71:3 75:18 77:13
  78:15,20 79:23
  83:15
**uh** 5:16,16,16
  28:11 44:24 65:19
  71:5
**ultimately** 31:5
  58:21 59:14 62:1
**unclassified** 82:23
  83:2
**undercover** 27:3
**understand** 6:4,10
  6:12 7:5 9:15
  11:13 13:24 14:11
  15:7 22:4 27:10
  34:9 63:14,15
  75:2,14

**understandable**
  11:7
**understanding**
  8:25 14:8,14
  48:20 72:15 76:3
  78:18 79:7,22
  80:23,24
**understood** 6:20
  15:25 17:16,18
  18:21 46:8 55:19
**undertake** 32:10
  43:9 53:14
**unexploded** 17:7
**unfortunately**
  12:6
**unidentified** 68:22
**unit** 52:9
**united** 1:1,10,11
  2:9 9:1 10:14 34:1
  37:17 38:17 40:4
  40:16,23 43:18
  44:1 48:25 50:24
  53:3,13 54:7
  55:10 56:12 57:4
  62:4 64:9,11,20
  73:4,13 74:12
  75:8 76:2,3 78:3,4
  79:22 80:10,24
  81:5
**unknowingly** 13:5
**unsealed** 54:19,20
**unsuccessful**
  22:20
**unusual** 18:15
**uploaded** 81:1
**usao00001** 3:9
**use** 33:3,8 34:15
  35:19 37:5,18
  40:5,16,21,24
  55:15 61:5 64:9
  64:12 67:25 80:6

82:10,11
**uspis** 23:8 25:12
  26:9 27:16
**uspv** 22:15 27:24
  37:1 45:19 55:18
  68:11 71:13
**usually** 5:18
**utility** 59:12 62:1
  62:3

**v**

**va** 2:7
**vague** 33:8 42:7
  43:15 49:4 55:14
  67:24
**vaguely** 41:7
**valid** 84:1
**valuables** 49:21
**variety** 81:10
  82:13
**various** 67:6
**vast** 72:5
**vault** 71:15 77:15
**vaults** 3:10 5:4
  9:21 13:13 15:10
  15:17 22:2,5,10,12
  22:14,25 23:22
  27:17 30:13,15,22
  32:13 35:22 36:11
  37:7,20 43:23
  44:9 52:6 71:3
  75:18 77:14 78:15
  78:20 79:24 83:15
**verdon** 1:6
**verify** 66:22
**versoza** 28:22,23
  33:16 34:13 35:5
  45:13 46:21
**victor** 2:10 6:21
  7:13 14:5 21:24
  36:14 84:23

**video** 76:5
**videoconference**
  1:18 2:2 4:4,6
  88:8,10
**videos** 80:9
**videotape** 76:11
**view** 18:4,10 42:10
**violations** 25:5
**virtually** 29:9
**volunteered** 20:23
**vs** 1:9

**w**

**wait** 5:22,24 6:23
**waived** 72:18
**walk** 16:11
**walked** 21:6
**walking** 21:5
**wall** 71:16
**want** 6:21 11:17
  13:22 14:2,18
  15:22 16:21 18:12
  18:23,24 21:8
  22:16 33:7 34:8
  34:18,18 43:20
  48:5,18,19 53:10
  55:25 57:25 58:18
  62:12 67:21 71:17
  72:19,23,23 73:7
  73:20 80:12
**wanted** 18:13
  19:14 20:4 21:21
  42:3 43:6 46:22
  58:24,25 59:5,5,6
  66:13 74:5 76:1
  77:13,17 80:9
**warrant** 3:9 5:4
  11:2,21 15:17
  20:14 27:22,25
  28:3 30:12 31:2
  37:15 38:1,10,14
  38:20 44:3,4,8

48:20 49:8 50:8 50:20 55:10 60:20 61:12 70:12 75:12 77:23 78:13,13,25 79:4
**warrants** 19:21 20:22 24:3,5 28:10,15 29:19 30:5,10 38:12 43:19,23,24 44:8 61:19 63:5 69:16 80:1
**washington** 2:15
**washoe** 88:2
**watches** 51:15
**wave** 70:14,14,14 70:20,22 79:18
**waves** 70:15
**way** 7:24 8:13 12:6 14:15,25 26:22 38:11 42:21 49:20 54:1 61:4 69:22
**ways** 53:20,21
**we've** 4:24 11:12 71:13
**weapon** 49:22
**weapons** 17:6
**web** 61:20
**website** 57:17
**wednesday** 61:17
**week** 20:1,21 38:15,20 43:24
**weekend** 85:3
**weeks** 19:20 20:2 20:13 63:4
**went** 5:6 19:15 21:1,2 58:16 59:17 61:20 63:19 79:14

**western** 1:3
**wet** 19:5
**wife** 74:20
**wilkison** 1:10
**williams** 59:1,2
**willing** 69:20
**wilshire** 4:20
**wiping** 54:8
**wise** 83:24
**wish** 62:15
**witness** 1:21 8:9 9:20 10:8 11:24 14:7 31:9 33:11 34:19 35:14 36:18 42:9 43:13 48:13 49:5 50:11,22 51:24 52:23 54:13 55:16 56:2,17 62:25 63:3 68:2 71:10 73:9,20 74:18 80:15 82:2 82:22 83:19 84:6 85:4
**woman** 59:21
**wondering** 13:7 62:2 67:18 75:5
**word** 55:15 61:6 67:25
**words** 61:25
**work** 57:14 64:5 83:1
**worked** 21:15 41:18 63:25 64:3 69:5
**working** 12:6 21:16 22:23 23:24 24:15 26:8 29:24
**works** 26:22 39:21
**worth** 75:4
**wow** 27:5

**wrapped** 65:8
**write** 29:22 46:1,7 49:15
**writing** 29:23
**written** 13:2,9,16 13:16 46:9 71:19
**wrong** 15:22 18:24 75:7,7
**wrote** 15:25

**x**

**x** 3:1

**y**

**y** 4:18
**yeah** 11:1 12:14 12:17,23,24 19:20 24:13 25:7 27:10 28:16 29:5 33:10 34:25 40:13 42:9 50:11 56:10 60:13 62:19 63:3 66:3,3 70:13 72:12,16 75:2 79:7 82:22 83:22
**years** 11:15
**yellow** 51:7

**z**

**z** 4:19
**zellhart** 1:19 4:6,9 4:15,18 8:19 15:7 28:6 34:13 35:17 35:25 36:9,23 45:7 48:18 66:14 77:10 84:20 85:1 86:3,13 88:9

Universal Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit M**
**1307**

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit M**
**1308**