# Exhibit N

## to Declaration of Robert Frommer

Page 1

```
1        UNITED STATES DISTRICT COURT
     FOR THE CENTRAL DISTRICT CALIFORNIA
2            WESTERN DIVISION
3    PAUL SNITKO, JENNIFER SNITKO,
     JOSEPH RUIZ, TYLER GOTHIER, JENI
4    VERDON-PEARSONS, MICHAELS STORC,
     and TRAVIS MAY,
5
              Plaintiffs,
6
     vs.
7
     UNITED STATES OF AMERICA, TRACY L.
8    WILKISON, in her official capacity as
     Acting United States Attorney for the
9    Central District of California, and KRISTI
     KOONS JOHNSON, in her capacity as an
10   Assistant Director of the Federal Bureau
     of Investigation,
11
              Defendants.
12
        ****************************************
13    ZOOM VIDEOTAPED DEPOSITION OF JUSTIN CARLSON
                 July 6, 2022
14               10:00 a.m. PST
        ****************************************
15
16
17   TAKEN BY:
18       MICHAEL GREENBERG, ESQ.
         ATTORNEY FOR PLAINTIFFS
19
20   REPORTED BY:
21       BELLE VIVIENNE, RPR, CRR, NJ-CRR,
         WA/CO/NM-CCR
22       NATIONALLY CERTIFIED REALTIME
         COURT REPORTER
23       VERITEXT LEGAL SOLUTIONS
         JOB NO. 5311223
24       866 299-5127
25
```

Page 2

```
 1              A P P E A R A N C E S
 2
     FOR THE PLAINTIFFS:
 3
         MICHAEL GREENBERG
 4       ROBERT FROMMER
         ROB JOHNSON
 5       THE INSTITUTE FOR JUSTICE
         901 North Glebe Road, Suite 900
 6       Arlington, Virginia 22203
         703.682.9320
 7       rfrommer@ij.org
 8   FOR THE DEFENDANTS:
 9       MAXWELL COLL
         VICTOR RODGERS
10       ANDREW BROWN
         Assistant United States Attorney
11       Asset Forfeiture Section
         312 North Spring Street, 14th Floor
12       Los Angeles, California 90012
         maxwell.coll@usdoj.gov
13       victor.rodgers@usdoj.gov
14
15
16
17
18
19
20
21
22
23
24
25
```

**Exhibit N**
**1311**

Page 3

```
1                            -   -   -
2                        I N D E X
3                            -   -   -
4

5    Testimony of:
6        JUSTIN CARLSON
7      MR. GREENBERG..........................5
8

9                            -   -   -
10                      E X H I B I T S
11                           -   -   -
12

13      NO.            DESCRIPTION                 PAGE
14    Exhibit 15    Agent Observations and
15                  Notes Bates numbered
16                  FBI0000301............... 84
17    Exhibit 16    FBI 302 document......... 99
18
19
20
21
22
23
24
25
```

Exhibit N
1312

Page 4

```
 1                            -   -   -

 2                  DEPOSITION  SUPPORT  INDEX

 3                            -   -   -

 4

 5        Directions  to  Witness  Not  to  Answer

 6        Page Line

 7        none

 8           77      6

 9

10        Request  for  Production  of  Documents

11        Page Line

12        none

13

14

15        Stipulations

16        Page Line

17        none

18

19

20        Question  Marked

21        Page Line

22        none

23

24

25
```

Exhibit N
1313

Page 5

1                    JUSTIN CARLSON,

2       having been first duly sworn by the

3       Certified Stenographic Realtime Reporter,

4       testified as follows:

5                 MR. GREENBERG:  Thank you, Madam

6            Court Reporter.

7                         EXAMINATION

8       BY MR. GREENBERG:

9            Q.    Just before we get started, can

10      you state your full name and your title

11      for the record, please?

12           A.    My name is Justin Carlson.  I'm

13      a special agent with the Drug Enforcement

14      Administration.

15                 (Whereupon, a brief discussion

16            is held off the record.)

17      BY MR. GREENBERG:

18           Q.    Thank you, Special Agent

19      Carlson, for being here.  My name is Mike

20      Greenberg.  I'm an attorney with the

21      Institute for Justice.  We're a nonprofit

22      public interest law firm.  We represent

23      the plaintiffs in the class action

24      challenge concerning the government's

25      execution of a seizure warrant of U.S.

Page 6

1    Private Vaults back March of 2021, and

2    I'll be taking your deposition today.  Let

3    me just start off with this question.

4    Have you ever had your deposition taken

5    before?

6        A.    No.

7        Q.    Oh, wow.  Interesting.  Okay.

8    So let me just kind of go over some of the

9    kind of the ground rules for a deposition

10   that will help it run more smoothly and

11   help it get recorded as easily as

12   possible.  I'll be asking questions and

13   the court reporter will be recording my

14   questions and your answers to those

15   questions.  To assist her in making it go

16   as smoothly as possible, I'll do my best

17   to speak as clearly as I can and audibly,

18   and I would just ask that you kindly do

19   the same now that we seem to have the

20   audio issues worked out.  I'll also ask

21   that you please answer each question

22   verbally.  The court reporter can't really

23   record gestures or nodding of the head or

24   shaking of the head or even responses like

25   "uh-huh."  So can you please provide clear

Page 7

1    and verbal responses to each question?

2         A.    Yes.

3         Q.    So we'll do our best to be as

4    clear and verbal possible.  Other thing

5    normally when we talk with people,

6    sometimes we kind of talk over each other

7    and this is the part of the flow of normal

8    conversation, but it can be very difficult

9    to report what's being said when we talk

10   over each other in a deposition.  So could

11   you please do your best to -- before you

12   begin answering my question, you might

13   think you know what the rest of the

14   question will be, just wait until the

15   question is over to begin your answer and,

16   by the same token, I'll do my best to let

17   you finish your answer before I start

18   asking another question; is that fair?

19        A.    That's fair.

20        Q.    You were sworn in a moment ago

21   by the court reporter.  You understand

22   that you've given an oath that requires

23   you to answer questions truthfully and

24   completely?

25        A.    Yes.

Page 8

1        Q.    And that's the same oath that
2    you would take as if you were testifying
3    in court under oath in front of a judge?
4        A.    Yes.
5        Q.    If you don't understand a
6    question, please just let me know.  I'll
7    either ask the court reporter to read it
8    back or I'll rephrase and try and clarify
9    the question.  You'll tell me if you don't
10   understand any question?
11       A.    Yes, I will.
12       Q.    If you don't know the answer to
13   a question, please say so, but if you do
14   know the answer, you have to provide the
15   answer in good faith.  Unless you say
16   otherwise, I'll just assume that you do
17   understand the question.  If you want to
18   talk to Max, that's totally fine, but if
19   there is a question pending or if you're
20   in the middle of an answer, please finish
21   that answer before talking to Max.
22   Because it's important to get full and
23   complete and accurate answers, it's a
24   question we have to ask at the start of
25   every deposition.  Are you taking any

Page 9

1    medications that might make it difficult

2    for you to understand and answer any

3    questions today?

4        A.    No, no medications.

5        Q.    Is there any other reason why

6    you wouldn't be able to give full,

7    complete and accurate testimony today?

8        A.    Not that I know of.

9            THE COURT REPORTER:  Can you

10       guys hear him?

11           (Whereupon, a brief discussion

12       is held off the record.)

13   BY MR. GREENBERG:

14       Q.    I think where we left off was

15   that you agreed that there was no reason

16   you wouldn't be able to give full,

17   complete and accurate testimony today?

18       A.    Yes.

19       Q.    Great.

20           Periodically, Max may state

21   objections after I ask a question.  That

22   doesn't mean that you shouldn't answer the

23   question.  The purpose of that objection

24   is simply to record it for later for legal

25   purposes.  Unless Max instructs you not to

Page 10

1    answer a question, you should answer it;

2    is that fair?

3         A.    That's fair.

4         Q.    Sometimes you'll remember

5    additional information or some kind of

6    clarification to an earlier question.  If

7    that happens, please just let me know

8    and -- that you'd like to do that and we

9    can do that while it's fresh in your mind,

10   okay?

11        A.    Okay.

12        Q.    And if you'd like to take a

13   break at any time, just let me know.  I

14   prefer to finish my line of questioning if

15   we're in the middle of a series of

16   questions, then we can adjourn for a quick

17   break; is that fair?

18        A.    That's fair.

19        Q.    And we'll break for lunch at

20   probably, you know, sometime around

21   lunchtime your time as well.

22             And then during our

23   conversation, you might think of some

24   documents or materials, maybe a calendar

25   book or something like that that might

Exhibit N
1319

1    help you answer a question or give you

2    a -- help you give a more accurate answer.

3    If you do, please tell me.  We might be

4    able to help you get those materials.  If

5    that happens, please just let me know,

6    okay?

7         A.    Okay.

8         Q.    I've been rambling a lot.  We've

9    been kind of going through the preliminary

10   stuff for a little while.  Do you have any

11   questions of me before we get started?

12        A.    No, I'm good.  I'm ready to go.

13        Q.    Cool.  Let's go ahead and get

14   started, and I'd like to get started by

15   getting some background about you.

16              You stated your name for the

17   record already, but just one more time can

18   you state your full name, please?

19        A.    Yes, Justin Carlson.

20        Q.    And your official position is a

21   special agent with the DEA; is that right?

22        A.    Yes, sir.

23        Q.    How long have you been with the

24   DEA for?

25        A.    Since 2012 so just shy of ten

Page 12

```
 1    years.
 2         Q.     Just shy of ten years.
 3    Congratulations on the upcoming
 4    anniversary.
 5               Have you always been a special
 6    agent while with the DEA?
 7         A.     Yes.  With DEA always a special
 8    agent.
 9         Q.     That's like the -- the position
10    you come in as basically?
11         A.     Right, to be a criminal
12    investigator, yeah.
13         Q.     Got it.  What did you do prior
14    to working with DEA?
15         A.     I was a Dallas police officer.
16         Q.     Got it.  Cool.  Are you from
17    Dallas?
18         A.     Roundabout.  I'm about an hour
19    and a half south, southwest.
20         Q.     Cool.  Got it.  Nice.
21               Did you do anything prior to
22    working as a Dallas police officer
23    work-wise?
24         A.     I was a Marine and then college,
25    but --
```

Exhibit N
1321

Page 13

1      Q.    Got you.  So always been in law
2   enforcement as far as your career goes?
3      A.    Yes.
4      Q.    Cool.
5            So you -- how did you get
6   started working with DEA?
7      A.    I spent about eight and a half
8   years with -- actually just shy of eight
9   years with the Dallas PD and during the
10  course of my career, I became a narcotics
11  detective and started working narcotics
12  cases.  Became interested in, you know,
13  continuing those types of investigations
14  but at the federal level.  Applied for the
15  DEA, got hired and left for the academy in
16  2012, I believe it was in July.
17     Q.    Did you get started working
18  in -- with DEA in Texas and then moved to
19  California later or did you start in LA?
20     A.    So the way that DEA does it, is
21  whatever office you hire out of, so for
22  instance I hired out of the Dallas field
23  division, you complete your basic DEA
24  training, you go back to your office of
25  hire for anywhere from four to eight weeks

Page 14

1    while you kind of get your residence

2    established in wherever you were assigned.

3    So the easy answer is, yes, I hired on,

4    went straight to LA, but in actuality

5    there's about a two-month period where you

6    work with a group out of your office of

7    hire while you, you know, do your house

8    hunting, while you make arrangements to

9    get any family or anything situated in

10   your new office.

11        Q.    Got it.  That makes sense.

12             So now you work out of

13   Los Angeles --

14        A.    Could you repeat that; you kind

15   of cut out.

16        Q.    Yes, sorry.  It looked like you

17   froze as well for a second.  So now you

18   work out of the DEA's Los Angeles field

19   office; is that correct?

20        A.    Not currently, no.  I left to

21   come to the Dallas division in July of

22   2020 -- it was actually July of 2021.  So

23   it was three months after the search

24   warrant at U.S. Private Vaults -- or four

25   months, whatever, I believe it was the

Exhibit N
1323

Page 15

```
 1    warrant was executed in March.  I put in
 2    for a transfer.  It was accepted and I
 3    left in July.
 4         Q.    Is there a reason you put in for
 5    a transfer?
 6         A.    Dallas is home.
 7         Q.    Fair enough.
 8         A.    I was in LA long enough.
 9               Are you still there?
10         Q.    We lost video on you.
11         A.    Yeah, we're trying to pull it
12    back up.
13               (Whereupon, a brief discussion
14         is held off the record.)
15    BY MR. GREENBERG:
16         Q.    So you left for the Dallas field
17    office a few months after the executing
18    the warrant of U.S. Private Vaults because
19    Dallas is home.  Are you still doing
20    basically the same work in Dallas that you
21    were doing in the LA field office?
22         A.    I'm still a special agent with
23    DEA.  I'm still doing drug investigations,
24    yeah.
25         Q.    So what does that look like on a
```

Page 16

1    day-to-day basis?  What is being a special
2    agent doing drug investigations look like?
3         A.    Well, you know, we're tasked
4    with working the bigger cases so obviously
5    we're tasked with drug investigations that
6    can be charged federally and we're tasked
7    with money laundering besides drug
8    investigations, so the laundering of drug
9    proceeds.
10              MR. COLL:  Lost video again.
11              MR. GREENBERG:  Let's go off the
12         record for a moment if we can.
13              (Whereupon, a brief recess is
14         taken.)
15   BY MR. GREENBERG:
16         Q.    So I think where we left off was
17   you were talking about you had transferred
18   to Dallas which has been a theme for the
19   last hour or so.  When did you put in or
20   apply for that transfer to Dallas?  Just
21   curious.
22         A.    I believe it was spring of 2021.
23   It was around about that time frame, yeah.
24         Q.    Sorry.  I cut you off there.
25         A.    It would have been late winter,

1    early spring 2021.

2         Q.     Do you remember if it was before

3    or after the -- the -- the execution of

4    the warrant of Private Vaults, just

5    curious?

6         A.     I believe I submitted the formal

7    paperwork shortly after the search

8    warrant.

9         Q.     Got it.  Okay.

10             And I think right before we

11   stopped for a break as well, you were

12   talking about the kind of work that you do

13   on like a day-to-day basis with DEA.  And

14   you said you -- do I recall you saying you

15   specialize in money laundering work?

16        A.     No, not at all.

17        Q.     Oh, no, okay.  Are you assigned

18   to a particular unit or a particular type

19   of crimes that you investigate?

20        A.     So at the time in LA, I was in a

21   general enforcement group, which means we

22   investigate pretty much, you know, the

23   entire gamut of narcotics investigations.

24   However, we don't really specialize in

25   anything.

1      Q.    Is that still true in Dallas now

2   or --

3      A.    Currently I'm with HIDTA which

4   tries to focus more on local impact.

5      Q.    Okay.  So you mentioned that you

6   joined DEA around 2012 and you mentioned

7   going to an academy.  I'm assuming that's

8   where, you know, basic training for being

9   a DEA special agent takes place; is that

10   about right?

11      A.    Yes.

12      Q.    Okay.  What kind of training did

13   you receive at that academy?

14      A.    It's an introductory in, you

15   know, into federal investigations so we

16   learn about federal law, what DEA is

17   allowed to investigate and, you know, the

18   basics of how to investigate drug crimes

19   at the federal level.

20      Q.    About how long is the academy?

21      A.    I was in there from July to

22   November.  So just around four months.

23      Q.    Oh, okay.

24            Do you receive formal training

25   after finishing up the academy or is it --

Page 19

1   is the academy kind of the -- the

2   end-all/be-all of the formal training for

3   how to be a special agent?

4        A.    So we get training at our office

5   that we're assigned to.  It's basically

6   another agent walks you through kind of

7   how to do it there at that office as well

8   as make sure that you retained what you

9   learned in the academy.

10       Q.    Got you.

11             And then like, at the academy,

12   is it kind of practical training?  Is it

13   written examinations, classroom training,

14   kind of all of the above?  What's that

15   training like?

16       A.    All of the above, all of the

17   above.

18       Q.    Okay.  So in your nearly ten

19   years at DEA, have you participated in

20   arrests?

21       A.    Yes.

22       Q.    How do you know what to do when

23   going to arrest someone?

24       A.    Can you be more specific?

25       Q.    Is it from training you receive

Exhibit N
1328

Page 20

1    or something like that that you learn how

2    to properly conduct an arrest?

3         A.    Yes.

4         Q.    Is it fair to say that at least

5    part of the reason to be trained on

6    something like that is so that you or

7    someone in your shoes doesn't violate

8    someone's constitutional rights?

9              MR. COLL:  Object to form.

10             (Whereupon, the question is read

11        back by the reporter.)

12        A.    Yes, I mean, the training

13   obviously is -- is in with accordance to

14   arrest search and seizure law.

15   BY MR. GREENBERG:

16        Q.    Okay.  So you participated in

17   arrests before.  Have you applied for

18   warrants before?

19        A.    Yes.

20        Q.    And have you executed warrants

21   before?  I'm not talking about the U.S.

22   Private Vaults' warrant, just in general.

23        A.    Yes.

24        Q.    Okay.  Have you been involved in

25   civil forfeiture proceedings before

Page 21

1     whether administrative or judicial?
2          A.    Yes.
3          Q.    Ballpark, I'm not looking for an
4     exact answer, but about how many times
5     would you say you've been involved in
6     civil forfeiture proceedings whether
7     administrative or judicial?
8          A.    Can you clarify whether or not
9     that means applied for forfeiture of items
10    or actually been to court to testify in a
11    civil forfeiture case?
12         Q.    Both.  I guess answer apply
13    forfeiture items first and then been to
14    court separately after that, I guess.
15         A.    I've submitted, I don't know,
16    more than a dozen, but I wouldn't be
17    really comfortable putting a number on
18    anything much above a dozen different
19    items for forfeiture.  And I've never
20    testified in civil court on a forfeiture
21    case.
22         Q.    Okay.  Just in general, can you
23    walk me through the kind of involvement
24    you've had when applying for -- for
25    forfeiture of items?

Page 22

1    A.    Whenever we've made arrests or

2    executed search warrants and there's been

3    real property that we have deemed to

4    either have been proceeds of drug

5    trafficking, used in the connection of

6    drug trafficking, for instance, a car that

7    was used to drive drugs from point A to

8    point B is subject to forfeiture for

9    facilitating that.  That's generally the

10   type of forfeiture we do.

11       Q.    Okay.  So is it fair to say that

12   you have experience in knowing what to

13   look for to help you determine whether the

14   government might ultimately be interested

15   in moving forward with civil forfeiture

16   proceedings as to a particular asset?

17            MR. COLL:  Object to form.

18       A.    I mean, I -- I do have

19   experience in identifying assets that

20   could be subject to forfeiture by the

21   government, if that's what you're asking.

22   BY MR. GREENBERG:

23       Q.    Yeah.  What kind of things would

24   you ordinarily look for or -- scratch that

25   question.  I'll rephrase.

Exhibit N
1331

Page 23

1          What kind of things would you --
2     like would ultimately help you decide
3     whether to move forward on whether a
4     particular asset was proceeds of drug
5     trafficking or something like that?
6          MR. COLL:  Object to form.
7     A.     Generally, when we're trying to
8     determine whether or not, for instance,
9     currency or high-value items are connected
10    to drug trafficking and subject to
11    forfeiture is, you know, we try to show
12    that it is packaged in a manner consistent
13    with previous drug investigations, whether
14    we can show, you know, other affirmative
15    links to the drug trafficking.  For
16    instance, you know, whether it was found
17    in proximity of the drugs, that kind of
18    thing.
19    BY MR. GREENBERG:
20    Q.     Have you done forfeiture or --
21    scratch that.
22          Have you applied for forfeiture
23    for assets in both Los Angeles and in
24    Dallas?
25    A.     I'm trying to think if I've done

Page 24

```
 1     one here yet.  I do not believe so.  I
 2     might have done them previously when I was
 3     a Dallas police detective, but I can't
 4     recall if I have.
 5          Q.    But you have done that in LA?
 6          A.    Yes, sir.
 7          Q.    Okay.  So collecting evidence to
 8     show that an asset is connected to drug
 9     trafficking; is that -- is that a major
10     part of your job?
11               MR. COLL:  Object to form.
12          A.    Case specific.  It depends on
13     the case.
14     BY MR. GREENBERG:
15          Q.    It depends on the case.  Okay.
16               But that's a thing you've done
17     often in the past is identifying or
18     collecting evidence to determine whether a
19     particular asset might be connected to
20     drug trafficking?
21               MR. COLL:  Object to form.
22          A.    That is part of our job, yes.
23     BY MR. GREENBERG:
24          Q.    Okay.  When you say that it
25     depends on the case, does it depend on the
```

Exhibit N
1333

Page 25

1    asset under question or does it depend on

2    the type of case?  I guess I wasn't quite

3    clear on that answer.

4        A.    It's really both because certain

5    assets have a different way of showing

6    connectivity to somebody's drug

7    trafficking and every drug trafficking

8    case is different.  So what worked in

9    case 1 may not be applicable in case 2.

10       Q.    Can you kind of explain a little

11   more about what you mean by that?  What --

12   what -- what are some things that might

13   make an asset more likely to be subject to

14   being deemed drug trafficking proceeds?

15              MR. COLL:  Object to form.

16       A.    Again, it's one of those things.

17   It varies from case to case on how and why

18   you know.  You just know from your

19   training and experience that this

20   particular item for this particular case

21   could be subject to forfeiture.

22   BY MR. GREENBERG:

23       Q.    Would the way that a particular

24   asset is packaged perhaps give you an

25   indication as to whether that asset is

Exhibit N
1334

Page 26

```
1    related to drug proceeds?
2         A.    That is one -- one of the things
3    that we determine, yes.
4         Q.    Would the way that a particular
5    asset smells be something that you take
6    into account in determining whether it's
7    drug proceeds?
8         A.    That is occasionally applicable
9    as well.
10         Q.    Would the indication of a
11    drug-sniffing K-9 be an indication that
12    you use to determine whether an asset is
13    related to drug proceeds?
14         A.    Yes, that's another factor.
15         Q.    Okay.  Would the value of the
16    asset in question be something that you
17    take into account in whether you --
18    scratch that.
19              Would the value of the asset in
20    question be something that could help you
21    determine whether it's related to drug
22    proceeds?
23         A.    No.
24         Q.    You would never take into
25    account, for example, how much cash is at
```

Page 27

1    issue in determining whether that is drug
2    proceeds or not?
3        A.    The trouble I have with the
4    question is we don't look at a -- you
5    know, say a suitcase full of cash and say,
6    well, that's only $10,000.  That's not
7    drug proceeds.  That's -- the amount is --
8    is only applicable in whether or not it
9    looks like it's over threshold amount.
10       Q.    What do you mean by "threshold
11   amount"?
12       A.    So per the DEA's policy, we
13   can't seize anything from somebody as drug
14   proceeds are subject to forfeiture
15   without -- without an arrest under 2,000
16   or less, and I believe the threshold for
17   with an arrest is 2,000 and without an
18   arrest is 5,000.  So as long as it's over
19   that amount, the amount of the currency,
20   we don't even count that.
21       Q.    So let me just make sure I got
22   all that down correctly.  So you said you
23   can't seize cash without an arrest if it's
24   under $2,000?
25       A.    No, under 5.  So in order to

Page 28

1    seize cash that's less than $5,000, I have

2    to have an arrest so -- or under $2,000

3    or -- I have to have arrested the person

4    in possession.  Anything over $5,000, we

5    do not have to have an arrest and that's

6    DEA policy, and I'm not a hundred percent

7    sure on those thresholds, but I believe

8    it's 5 and 2.

9         Q.    Okay.  So just to hash that out

10   again.  To seize cash over $5,000, you do

11   not need to have an arrest; is that

12   correct?

13        A.    Correct.

14        Q.    Okay.

15        A.    To the best of my recollection

16   of our rules.

17        Q.    Sure.  Totally fair.  But to

18   seize cash under $2,000, you must have

19   arrested the person on which that cash was

20   found; is that correct?

21        A.    Between 2 and 5.  So over

22   $2,000, under $5,000, I have to have made

23   an arrest.

24        Q.    Okay.  And you can't seize cash

25   under $2,000 at all; am I understanding

Page 29

1    that correctly?

2         A.    You can -- you can apply to have

3    it seized.

4         Q.    I see.  I cut you off, Special

5    Agent Carlson.  You said to seize cash

6    under $2,000, you have to apply for that.

7    What does that mean?

8         A.    You just have to show -- you

9    have to write a memo that shows that

10   there's still reason to seize it even

11   though it's below the $2,000 mark.

12        Q.    Okay.  Do you know why those

13   thresholds exist or what the policy behind

14   those is?

15        A.    I do not.

16        Q.    Could it be that cash below

17   certain threshold is not worth DEA's time

18   or something like that?

19             MR. COLL:  Object to form.

20        A.    I believe it's just something to

21   do with limiting how many -- it's an

22   administrative thing.  It's to limit the

23   amount of seizures, I believe, because

24   they take time, they take resources and

25   they want to utilize those resources more

Exhibit N
1338

Page 30

```
 1    efficiently.
 2    BY MR. GREENBERG:
 3        Q.    Okay.  Going back to the
 4    questions I had about collecting evidence
 5    for potential use and civil forfeiture,
 6    are all pieces of evidence that you
 7    collect for the potential use of evidence
 8    in civil forfeiture proceedings?
 9             MR. COLL:  Object to form.
10        A.    We collect evidence in general,
11    not for a specific purpose.  We -- we
12    collect evidence to show criminality.
13    BY MR. GREENBERG:
14        Q.    Okay.  So all of the pieces, the
15    potential hallmarks I mentioned earlier, a
16    drug -- all of the potential hallmarks
17    that I mentioned earlier, a -- like a drug
18    dog's positive indication or the way that
19    assets are packaged or the way that assets
20    smell, all of those things are things you
21    would use to indicate potential
22    criminality; is that fair to say?
23        A.    Yes.
24        Q.    Okay.  Have you ever gotten any
25    awards or accolades for your forfeiture
```

Page 31

```
 1     activity?
 2          A.     I've gotten awards but not
 3     specifically for forfeitures.
 4          Q.     Oh.  What kind of awards have
 5     you gotten?
 6          A.     Just, you know, general case
 7     work, you know, good -- good cases and,
 8     you know, that kind of thing.
 9          Q.     Okay.  Have you ever conducted
10     an inventory search before?
11          A.     Yes.
12          Q.     Just a ballpark, I'm not looking
13     for an exact number.  About how many would
14     you say that you've conducted?
15          A.     More than 100.
16          Q.     Oh, wow, okay.
17                 What kind of context have you
18     typically conducted inventory searches
19     before?
20          A.     I would say the largest is of
21     vehicles.
22          Q.     Have those been most -- scratch
23     that.
24                 The inventory searches that
25     you've conducted, have those all been with
```

Exhibit N
1340

Page 32

1    DEA or are you including your time as a

2    Dallas police officer as well?

3          A.    I'm including my time as a

4    Dallas police officer as well.

5          Q.    Okay.  Let me narrow that down

6    then to your time with the DEA.  About

7    ballpark, how many inventory searches

8    would you say you conducted with DEA?

9          A.    Ballpark probably a couple

10   dozen.

11         Q.    And you said that the most

12   common context in which you'll conduct an

13   inventory search is of a vehicle.  Is that

14   true with DEA as well?

15         A.    Yes.

16         Q.    How does that kind of situation

17   arise?

18         A.    A lot of times when somebody's

19   arrested driving a vehicle, we will

20   impound the vehicle and/or seize it.  It

21   applies in both circumstances.  And in

22   order to impound a vehicle, we have to

23   inventory it to determine, you know,

24   what's in the vehicle before we tow it.

25         Q.    Okay.  Is that typically just

Exhibit N
1341

Page 33

1    like one vehicle at a time that you would

2    inventory?

3         A.    Occasionally it's more, but the

4    vast majority of situations, it's one at a

5    time.

6         Q.    Okay.  What other contexts have

7    you conducted inventory searches before?

8    Sorry, I'll narrow that to your time with

9    DEA.  Sorry to cut you off.

10        A.    Anytime an arrestee has a

11   backpack or a purse or something that's

12   going to be held in safekeeping before it

13   can be returned to a loved one or an

14   attorney, that kind of thing, bags, you

15   know, bags and other, you know, things of

16   that nature tend to be the other majority

17   of our inventory searches.

18        Q.    Have you ever conducted an

19   inventory search not involving the

20   inventorying of property from someone who

21   is being arrested?

22             MR. COLL:  Object to form.

23        A.    Can you repeat the question?

24   I'm not sure I'm understanding what you're

25   asking.

Page 34

1    BY MR. GREENBERG:

2        Q.    I'll rephrase it.

3              It sounds like the most common

4    instances in which you conducted inventory

5    search involves the person whose property

6    it is being arrested at that time.  Have

7    you ever conducted an inventory search not

8    involving someone who is being arrested at

9    that time?

10       A.    Yes.

11       Q.    What kind of context has that

12   arisen in?

13       A.    Anytime we're seizing something,

14   you know, subject to a seizure warrant, we

15   have -- we will inventory like a vehicle

16   that we had determined previously in the

17   investigation it was used in drug

18   trafficking and we're seizing it.  A lot

19   of times we're not arresting the person or

20   the person's already been arrested and

21   then, when we get that vehicle, we have to

22   inventory it before we take it into our

23   custody.

24       Q.    Got you.

25              So what's your understanding of

Page 35

```
1    what the purpose for an inventory search
2    is?
3         A.    The purpose that I understand it
4    is, one, officer safety, we have to make
5    sure there's nothing in the item that
6    we're searching that can harm the
7    investigators or harm anybody that would
8    be in custody of it at the storage
9    facility.  We have to also determine
10   ownership because if we are planning to
11   return it or serve notice of seizure, we
12   have to identify who it belongs to.  So
13   we're looking for indicia of ownership or
14   indicia of custody and we're also
15   inventorying for an itemized account of
16   what's there for our liability.
17        Q.    When you say for "our
18   liability," that's to protect officers
19   with the government from claims of lost or
20   stolen property?
21        A.    Yes.
22        Q.    Okay.  So I have the three
23   purposes then behind the inventory
24   searches.  It's officer safety, to
25   determine ownership, and to itemize the
```

Exhibit N
1344

Page 36

1    property to protect the government or

2    officers from claims of lost or stolen

3    property; is that correct?

4        A.    Yes, to the best of my

5    recollection, yes.

6        Q.    Okay.  So the purpose of an

7    inventory search is not to necessarily

8    search for evidence of criminality or

9    something like that, right?

10       A.    No.

11       Q.    Okay.  Did you get training on

12   how to do an inventory search when you

13   were at the academy?

14       A.    Yes.

15       Q.    What did you learn about how to

16   do an inventory search?

17       A.    I mean, other than the, you

18   know, the reasons you just stated as to

19   why we do them, just to be thorough, to

20   always keep -- keep in mind that you're

21   still an investigator, and that you have

22   an -- you have a -- the word I'm looking

23   for -- you have a responsibility to do the

24   best job that you possibly can in

25   inventorying that and to document it as

Exhibit N
1345

Page 37

1   best as possible.

2      Q.   Okay.  Have you ever taught

3   others how to do an inventory search?

4      A.   Not formally.

5      Q.   Informally?

6      A.   Yes.

7      Q.   What did you teach that person

8   or those people?

9      MR. COLL:  Object to form.

10      A.   The same things that I just

11   articulated as to why we do it.

12   BY MR. GREENBERG:

13   █████  ████  ████  ████  ████  ████  ██  ███

14   ███████  ██  █████████  █████

15   ███  ████

16   ███  ████  ██████  ██  █████  ████  ███

17   █████████  ████████  █████  ██  ██  ███

18   ██████  ██████████

19   ███  █████  █████  ██  █████  ████  ████

20   ██  ████  ██  ████  ███████  ██  ████  ███

21   ███████  ███  ██  ████████  ████  ███

22   ██████  █████  ████  ███████  █████

23   ██████  ████  ████████  █████  █████  █

24   ████████  ████  █████  ████████  ████

25   ██████  ████  ██████  █████████

**Exhibit N**
**1346**

1        Q.     Okay.  In terms of itemizing the

2   content, what kind of records does one

3   need to take to conduct a valid inventory?

4             MR. COLL:  Object to form.

5        A.     It -- it differs from agency to

6   agency.  DEA's policy is we fill out

7   basically an itemized receipt that we

8   either leave with the person that we're

9   seizing it from or retain an order to

10  provide it to somebody at a later date.

11  BY MR. GREENBERG:

12       Q.     Is it fair to say that it's

13  helpful to be specific on that itemized

14  receipt as to what the property at issue

15  is so it's clear what property was taken?

16            MR. COLL:  Objection,

17       argumentative.

18       A.     That's going to -- that's

19  probably going to differ from agency to

20  agency and individual to individual as to

21  what they consider specific.

22  BY MR. GREENBERG:

23       Q.     Fair enough.

24            Is it something that you've been

25  taught at DEA to be specific as to what

Exhibit N
1347

Page 39

1    property was taken and inventoried?

2       A.    We try to be specific enough to

3    be able to identify the items, but that,

4    again, there's -- that's subjective to

5    whoever's actually taking the inventory,

6    what they consider, you know, specific.

7       Q.    Okay.  Do DEA records during an

8    inventory search typically identify all of

9    the items that were seized?

10           MR. COLL:  Objection, vague.

11      A.    If you mean -- I'm not sure what

12   you're asking.

13   BY MR. GREENBERG:

14      Q.    To conduct a proper inventory

15   search, is it fair to say that all of the

16   items that were seized during that

17   inventory search should be documented on

18   the itemized receipt?

19           MR. COLL:  Same objection.

20      A.    Again, that's going to -- that's

21   going to vary from agency to agency and

22   agent to agent how they articulate the

23   items found.

24   BY MR. GREENBERG:

25      Q.    Okay.  So there's no overarching

Page 40

```
 1    DEA policy to your knowledge that in
 2    conducting an inventory search every
 3    single item must -- that was seized must
 4    be documented on the inventory receipt?
 5              MR. COLL:  Object to form.
 6        A.    I think the problem I have with
 7    the question is the use of the word
 8    "seize" because just because we take it
 9    into custody doesn't mean we're seizing
10    it.  We may be holding it for -- you know,
11    to protect that item until it can be
12    returned to its owner or it could be being
13    held for another agency.  Essentially what
14    we're trying to do is if we remove items
15    from say a car, we try to articulate the
16    items that we took from that vehicle so
17    that later, when somebody comes and
18    requests the items that were taken out of
19    that vehicle, we have a list of what they
20    are so that as we give them back, we can,
21    you know, make sure that we give them back
22    everything that we had in our custody.
23    BY MR. GREENBERG:
24        Q.    Right.  I understand that.  I'm
25    sorry if I'm using the word "seized" in
```

Page 41

```
 1     what sounds like a legalistic matter.
 2     That's not exactly what I mean.  I mean,
 3     it just -- in the way that you would, you
 4     know, take an item, or as you said, take
 5     it into custody or something like that,
 6     and so it sounds like what you're saying
 7     is that, you know, when you want to give
 8     inventoried items back, you want to make
 9     sure that there's a full account of
10     everything that was taken into custody; is
11     that -- is that correct?
12          A.    Yes.
13          Q.    So is there some like
14     overarching DEA policy that in conducting
15     an inventory search every item taken into
16     custody should be documented on the
17     inventory receipt?
18               MR. COLL:  Object to form.
19          A.    Without having the policy in
20     front of me to be able to actually read
21     the specifics, I believe the essence of
22     our policy would be, yes, if you're taking
23     it into custody, it should be documented
24     what you took into custody.
25     BY MR. GREENBERG:
```

Page 42

1      Q.    Understood.  Thank you.

2            So if two DEA special agents

3      inventoried the same car, for example,

4      would you expect that their documenting of

5      the items seized from that car or taken

6      from that car would look substantially the

7      same?

8            MR. COLL:  Objection, incomplete

9         hypothetical, vague.

10     A.    I guess if what you're asking is

11     that two individuals independently

12     inventorying the same item or the same

13     vehicle, and what I further said was like,

14     for instance, for the sake of this

15     scenario, a car, those two agents, if they

16     are -- if they took the same articles

17     would probably in essence be the same, but

18     it might be articulated differently.

19     BY MR. GREENBERG:

20     Q.    Can you give a little more on

21     how they might articulate their

22     inventorying differently?

23           MR. COLL:  Object to form.

24     A.    The -- what I'm getting at is,

25     the way that we -- I'm sorry.  Repeat.  I

Page 43

1    actually lost track of what you asked.

2    BY MR. GREENBERG:

3       Q.    That's okay.

4             You said that -- I'm

5    paraphrasing a little bit so forgive me,

6    but I recall you saying two agents

7    inventorying the exact same property,

8    they -- they're inventorying what -- or

9    their documenting of what they inventory

10   would be substantially the same, but they

11   might document it a little differently.

12   And I was wondering if you could explain a

13   little more about what you meant by how

14   they would explain things differently?

15            MR. COLL:  Objection, misstates

16       prior testimony.

17       A.    Basically like somebody if they

18   were inventorying a car and let's say

19   there was a laptop in the car.  One agent

20   may go as far as to write the serial

21   number, the make, the model, the year, the

22   color, everything that they can get his

23   hands on.  Another agent may just say

24   gray, Apple laptop and that's it.  So when

25   you're talking to specifics, some -- some

Exhibit N
1352

Page 44

1    agents get more specific than others.

2    One's not wrong.  One's not, you know --

3    one another are not wrong.  They're

4    documenting the property.  It's just one

5    gets more specific than the other.

6    BY MR. GREENBERG:

7        Q.    Got it.

8              Let's take a few-minute break

9    here and let's come back at -- it's 3:15.

10   I'm assuming 2:15 in Dallas; is that

11   right?

12             MR. GREENBERG:  Off the record.

13             (Whereupon, a brief recess is

14      taken.)

15   BY MR. GREENBERG:

16       Q.    I want to pivot now to U.S.

17   Private Vaults in particular.  Can you

18   tell me when did you first hear about U.S.

19   Private Vaults?

20       A.    Fall of 2015.

21       Q.    Wow, a while ago.  What did you

22   hear?

23       A.    That it was a private safety

24   deposit box that did not require any kind

25   of identification to be left on record.

Page 45

1      Q.     And what did you think about
2    that?
3               MR. COLL:   Form.
4      A.     I was interested to know more
5    about it only because we had a target of
6    investigation that had a box there.
7    BY MR. GREENBERG:
8      Q.     Oh, okay.
9               What kind of investigation?
10     A.     It was a marijuana dispensary
11   investigation, I believe.
12     Q.     And so you were investigating
13   someone who had a box at U.S. Private
14   Vaults; is that correct?
15     A.     Well, more or less, yes.  It was
16   somebody we were investigating as part of
17   a DEA investigation and that person had
18   mentioned another individual who might be
19   involved, and in LA, you have a
20   deconfliction process so that you don't
21   cross paths with other agencies.  So when
22   I put that individual into the
23   clearinghouse, which we call LA CLEAR
24   there, it turned out that Dallas County
25   had been investigating that individual and

Page 46

```
1     had conducted a search warrant as part of
2     a marijuana case that led them to U.S.
3     Private Vaults.
4         Q.     So was it Dallas County that
5     alerted you to U.S. Private Vaults; is
6     that what you said?
7         A.     I'm sorry, did I say Dallas
8     County?
9         Q.     Yeah.
10        A.     Okay.  So it's Los Angeles
11    County.  I'm still within a year of my
12    transfer.  I will probably do this again.
13    I'll try to make sure that I don't do that
14    again.  It was Los Angeles County
15    Sheriff's Department.
16        Q.     That would have been quite a
17    coincidence.  So it was Los Angeles County
18    Sheriff's Department that alerted you to
19    U.S. Private Vaults, the company; is that
20    correct?
21        A.     Yes.
22        Q.     Okay.  And so what -- what
23    happened next once you learned about U.S.
24    Private Vaults?  What actions did you
25    take?
```

Exhibit N
1355

Page 47

1          A.    We just continued working that

2     particular individual, the -- the case

3     and --

4          Q.    By working the case, what

5     exactly do you mean by that?

6          A.    Well, mainly just, you know, we

7     just took into account that this might be

8     an area that they store their proceeds or

9     possible narcotics, you know, and kept

10    that in mind.

11         Q.    And so what happened next?

12         A.    Well, I think we did some

13    surveillances at U.S. Private Vaults to

14    see if any of our other targets of

15    investigation might be clientele.

16         Q.    And what did that surveillance

17    lead to as to U.S. Private Vaults?

18              MR. COLL:   Object to form.

19         A.    It led to a few other drug

20    traffickers being identified.

21    BY MR. GREENBERG:

22         Q.    And these were people who were

23    customers of U.S. Private Vaults; is that

24    correct?

25         A.    Yes.

Page 48

1       Q.    Okay.  And so what actions were

2   you taking as to those customers and as to

3   U.S. Private Vaults?

4              MR. COLL:  Object to form.

5       A.    I mean, we were conducting

6   follow-up investigations, you know, some

7   of it, you know, would have been traffic

8   stops or, you know, just looking into the

9   individual that we observed on

10  surveillance to see what kind of criminal

11  activity they might have been involved in,

12  if it related to our case or not.

13  BY MR. GREENBERG:

14      Q.    Did you execute any warrants at

15  U.S. Private Vaults at this time?

16      A.    Yes.

17      Q.    What was the result of those?

18      A.    The two or three that I remember

19  that were actual search warrants, some

20  were consent searches, but they resulted

21  in bulk cash seizures.

22      Q.    About when were those searches

23  executed?

24      A.    So a couple were done really

25  close within each other.  I want to say

Exhibit N
1357

Page 49

1    November of 2015 or '16.  I'd have to have

2    the reports in front of me to remember

3    exactly which year.

4         Q.    Sure.

5         A.    And then some again in -- I

6    believe there was another one done later,

7    a couple years later.

8         Q.    Okay.  What was the result of

9    those bulk cash seizures that you

10   mentioned?  What wound up happening after

11   that?

12        A.    In regards to what?

13        Q.    I believe you said that a couple

14   searches at U.S. Private Vaults resulted

15   in bulk cash seizures; am I stating that

16   correctly?

17        A.    Yes.

18        Q.    So what happened with those --

19   what happened with that cash eventually?

20        A.    I believe all of it was

21   forfeited.

22        Q.    So it was determined in DEA's

23   eyes that it was the result of drug

24   proceeds?

25        A.    Yes.

Exhibit N
1358

Page 50

1        Q.    And what made you determine that
2    that cash was the result of drug proceeds?
3        A.    Defendant admissions.
4        Q.    Anything else?
5        A.    Manner in which it was packaged,
6    but mainly it's the defendant admitted
7    that that's what it was from.
8        Q.    Did you personally seize that
9    cash at U.S. Private Vaults?
10       A.    I'm trying to think.  It depends
11   on what you mean by "seized" again.  If --
12   if I was the one who physically took it
13   into custody, not on all of them, but I
14   might have been the case agent on the case
15   that -- that resulted in their forfeiture
16   in which case I would be listed as the
17   seizing agent because it was me who
18   processed the paperwork to get it
19   forfeited.
20       Q.    Got it.
21             So -- so just based on the
22   defendant admitting that it was the result
23   of drug proceeds and the manner that it
24   was packaged, you helped facilitate that
25   cash being forfeited?

1          A.     Yes.

2          Q.     Okay.  Were there any other box

3    holders that you were investigating at

4    U.S. Private Vaults around that time?

5          A.     Yes, I believe so.

6          Q.     Can you tell me about those

7    investigations?

8          A.     Again, similar to the ones that

9    started it.  They -- drug traffickers that

10   were looking for, you know, locations to

11   hide drug proceeds that began utilizing

12   this business and once it, you know,

13   became known that there was -- there was

14   multiple people that came across DEA's

15   radar that were -- that were identified as

16   clientele there.

17         Q.     Okay.  And just so I'm clear on

18   the timeline, what time period are we

19   talking for these next investigations?

20         A.     It would be between 2016, 2017.

21         Q.     Okay.  Were any other agencies

22   involved in investigating those box

23   holders at U.S. Private Vaults around that

24   time?

25         A.     Are you talking about in general

Exhibit N
1360

```
                                          Page 52

 1    were other agencies involved in

 2    investigating box holders at U.S. Private

 3    Vaults are the same box holders that I'm

 4    investing?

 5          Q.    Let's do first the same box

 6    holders that you were investigating.  Were

 7    any other agencies investigating those

 8    same box holders?

 9          A.    Yes.

10          Q.    Which agencies were those?

11          A.    You would have to give me a

12    specific target of investigation because

13    as -- as is the case a lot in Los Angeles,

14    the same guys get investigated by multiple

15    agencies.  So to give you a specific

16    agency, I would need to have the specific

17    target of investigation.

18          Q.    Okay.  Can you just, I guess,

19    give me some examples of some of the other

20    agencies that were involved in

21    investigating these box holders with you?

22                MR. COLL:  Object to form.

23          A.    Of the federal agencies that I

24    had come across, either specifically with

25    the box holders that I was investigating,
```

Exhibit N
1361

Page 53

1    I would say FBI, DEA, state and locals,

2    whether it be Los Angeles Police

3    Department, Los Angeles County sheriffs,

4    HSI as well as Postal Inspector Service

5    and there may be some others that I'm

6    leaving out.

7    BY MR. GREENBERG:

8         Q.    I'm sorry.  You said HSI?

9         A.    Yeah, Homeland Security

10   Investigations.

11        Q.    Got it.

12        A.    Thanks.  And I believe IRS was a

13   common one as well.

14        Q.    And this is all in this that

15   2015-2017, I believe, you said period?

16        A.    Yes.

17        Q.    Okay.

18        A.    Oh, and I left out one that was

19   more or less came across quite a bit and

20   they've changed their name a few times,

21   but it's essentially the Department of

22   Consumer Affairs, Cannabis Enforcement

23   Unit of the State of California.

24        Q.    Interesting, okay.

25        A.    It's a newer agency.  They've

Page 54

1    changed their acronym a few times.

2         Q.    I imagine I can understand

3    generally what they tend to investigate.

4         A.    Correct.

5         Q.    And so were all of these

6    agencies working with you investigating

7    the same box holders or were they

8    conducting their own investigations into

9    box holders?

10        A.    Again, that's -- you had a --

11   have to give me a specific -- a specific

12   target of investigation, but in some cases

13   like I've mentioned before, the Los

14   Angeles CLEAR deconfliction tool that we

15   all are supposed to use, a lot of times

16   they would hear that I had an

17   investigation on suspect X and then they

18   would call me and be like, Hey, we're also

19   investigating suspect X; what do you know

20   about them, and then we would discuss.

21   And then U.S. Private Vaults would come up

22   and they would say something to -- oh, one

23   of our surveillances, one of his workers

24   led us there.  So it was a lot of that.

25   It was a lot of kind of, you know, this

Exhibit N
1363

Page 55

1    agency's investigating this person.  They

2    didn't know about U.S. Private Vaults

3    until they followed their target there.

4    In some cases they had found indicia of or

5    other paperwork related to U.S. Private

6    Vaults in the course of search warrants

7    that they had conducted and had, you know,

8    asked to deconflict that target or it

9    shown up at the business and my agency or

10   myself had gotten the word.  A lot of

11   crossing paths like that as far as other

12   agencies.

13        Q.    Okay.  Can you tell me more

14   about the Los Angeles deconfliction tool

15   and exactly how it operates?  I'm not

16   quite sure I'm familiar with it.

17        A.    So in this -- there's an

18   apparatus for this that exists in almost

19   every city.  And it's to prevent what we

20   call "blue on blue," which means, in the

21   best way that I can articulate it is the

22   way that it was articulated to me.

23   There's an episode of some crime show

24   where you have this one agency that's

25   following this one guy and they trail him

Page 56

```
 1    to a business.  They go in to make the
 2    arrest and another agency arrests that
 3    other agency because that other -- the guy
 4    they were following was actually a cop and
 5    it turns out all four of them were
 6    investigating each other because nobody
 7    had deconflicted the -- the targets of
 8    investigation.  So LA CLEAR exists so that
 9    if I'm investigating suspect X and I'm
10    conducting surveillance on them and let's
11    say FBI is also doing the same thing and
12    in the course of their investigation, we
13    cross paths, well, we may, you know, we
14    may not know who each other are and then
15    when you start drawing guns in plain
16    clothes.  That can be dangerous.  So
17    apparatus like LA CLEAR, I don't know
18    exactly when they started.  I was hired on
19    2004 with Dallas PD and Dallas had a
20    similar situation, they just deconflicted
21    with HIDTA, High Intensity Drug
22    Trafficking Area.  So the nuts and bolts
23    of it is, it allows us to not step on each
24    other's toes, but it also allows us to
25    make investigative connections so that,
```

Exhibit N
1365

Page 57

1    you know, if -- if I'm investigating

2    somebody and somebody else is

3    investigating somebody as part of a much

4    bigger investigation, my investigation

5    doesn't compromise theirs and vice versa.

6         Q.    I understand.

7              So it's a very large law

8    enforcement coordination tool basically?

9         A.    Yes.

10        Q.    With these other agencies that

11   were also investigating U.S. Private

12   Vaults box holders, were you generally

13   working with the same people at those

14   other agencies or was it a mishmash of

15   contacts from those other agencies?

16             MR. COLL:  Object to form.

17        A.    I would say more of a mishmash,

18   you know, kind of -- a little bit of both,

19   like, there -- there was a couple of

20   investigators that I repeatedly talked to

21   and then I would get, you know, random

22   investigators that would come across that

23   tool.

24   BY MR. GREENBERG:

25        Q.    Do you recall any of the people

Exhibit N
1366

Page 58

1    that you repeatedly came across in -- in

2    investigating U.S. Private Vaults in those

3    earlier days?

4         A.    Mainly Los Angeles County

5    sheriffs.

6         Q.    So no one at any of the federal

7    agencies that you saw repeatedly in that

8    2015-2017 time period?

9         A.    Well, FBI was a frequent cross,

10   but it would be different groups within

11   FBI.  So not the same group every time.

12   So lots of FBI agents, but not the same

13   FBI agent.

14        Q.    That makes sense.

15             So we're right about 2017 in the

16   investigation into box holders at U.S.

17   Private Vaults.  As time went on, did you

18   continue to investigate new box holders at

19   U.S. Private Vaults?

20        A.    I would say yes.

21        Q.    What was generally going on with

22   those investigations?  What was the result

23   of those investigations?

24             MR. COLL:  Object to form.

25        A.    Some of which are still ongoing

Page 59

1    and I'm no longer privy to the case file

2    having transferred.  So at the risk of

3    talking about ongoing investigations, I

4    don't feel comfortable asking -- you know,

5    answering any questions about those just

6    because I don't know the status of those

7    investigations right now.

8    BY MR. GREENBERG:

9         Q.    That's totally fair.

10             Were there others that resolved

11   themselves in that time period while you

12   were still there?

13        A.    Not that -- well, maybe the one

14   in 2019.  That one, yeah, he -- that one

15   was done.

16        Q.    And was that also a -- a bulk

17   cash seizure situation?

18        A.    Yes.

19        Q.    Okay.  And did that also lead to

20   that bulk cash being forfeited?

21        A.    Yes.

22        Q.    Okay.  About how many different

23   investigations into -- into box holders

24   would you say that you conducted in that

25   early 2015-2017 time period into box

Exhibit N
1368

Page 60

1    holders at U.S. Private Vaults?

2        A.    Well, for the purposes of our

3    investigation, I would say, one, like

4    what -- depending on what your definition

5    of "investigation," like there's -- you

6    know, your -- your quick check kind of

7    like, Hey, this person was observed on

8    surveillance.  Let's look into them.

9    Either it was determined they weren't a

10   big enough target or they were somebody

11   else's target, you know, that -- in that

12   aspect, probably dozens, but as far as the

13   DEA actually pursued, just a handful that

14   I can remember.

15       Q.    About how many boxes at U.S.

16   Private Vaults in that time period would

17   you say that you or people you worked with

18   seized the contents of?

19       A.    The DEA seized that I took part

20   in, it would be three box holders for sure

21   that I can remember for -- and I believe

22   that would be five to six separate boxes.

23       Q.    Okay.  So based on your

24   understanding of the number of boxes at

25   U.S. Private Vaults, not a significant

Exhibit N
1369

Page 61

```
 1    number of them; is that fair to say?
 2              MR. COLL:  Object to form.
 3         A.    I mean, the boxes that DEA
 4    searched were not significant, no.
 5    BY MR. GREENBERG:
 6         Q.    Okay.  So around this 2017 time
 7    period, you investigated a number of U.S.
 8    Private Vaults box holders.  What's your
 9    kind of opinion of U.S. Private Vaults,
10    the company, around that time?
11              MR. COLL:  Object to form,
12         vague.
13         A.    Specifically what are you
14    talking about as far as my opinion of the
15    company?
16    BY MR. GREENBERG:
17         Q.    Yeah.  Sorry.  I'll rephrase.
18              From a law enforcement
19    perspective, did you have the impression
20    that only criminals would be renting from
21    U.S. Private Vaults boxes?
22              MR. COLL:  Object to form.
23         A.    My opinion was formed based on
24    my investigation from, you know, the
25    interviews of people that were arrested or
```

Exhibit N
1370

Page 62

1    had assets seized from U.S. Private

2    Vaults.  It was my opinion that the

3    business of -- was very attractive to

4    criminals looking to hide assets and

5    contraband.

6    BY MR. GREENBERG:

7        Q.    And so based on that opinion,

8    what happened next in your investigation

9    into U.S. Private Vaults's box holders or

10   the company itself?

11            MR. COLL:  Form.

12       A.    As far as my investigations

13   went, we continued to look at U.S. Private

14   Vaults as a business in which drug

15   traffickers would utilize to store bulk

16   proceeds as well as contraband, whether it

17   be drugs or guns or, you know, hard

18   drives, whatever, based on, you know, our

19   investigations, we heard that that's what

20   that business was used for by a large

21   majority of criminals in the Los Angeles

22   area.

23   BY MR. GREENBERG:

24       Q.    So it's fair to say that DEA

25   viewed U.S. Private Vaults as a place that

Page 63

1    criminals would conduct business and kind

2    of hide their business?

3              MR. COLL:  Objection, vague,

4        misstates prior testimony.

5        A.    I don't believe the DEA as an

6    organization had an opinion one way or the

7    other in the initial stages of the

8    investigation, but like I said, we had

9    ascertained from, you know, proffered

10   statements as well as just informants and

11   undercovers that the business was very

12   attractive to the criminal element in

13   Southern California and Los Angeles in

14   particular.

15   BY MR. GREENBERG:

16       Q.    Okay.  So is it fair to say that

17   you, in your law enforcement capacity,

18   viewed U.S. Private Vaults as a place that

19   criminals conducted their business and hid

20   their criminal business?

21       A.    In my experience, yes.

22       Q.    Okay.  And that's because you

23   found in some boxes at U.S. Private

24   Vaults, criminal proceeds or indicia that

25   criminal proceeds were stored there?

Page 64

1          MR. COLL:   Misstates prior

2      testimony.

3          A.    That definitely played a role in

4      why I believe that criminals would use it,

5      yes.

6      BY MR. GREENBERG:

7          Q.    It's my understanding that at a

8      certain point, the focus of the

9      investigation into U.S. Private Vaults

10     turned from individual box holders to the

11     company; is that correct?

12         A.    Yes.

13         Q.    About when would you say that

14     happened?

15         A.    Again, without having the

16     reports in front of me and -- I would

17     believe it was shortly after a particular

18     person was -- one of the owners was -- was

19     observed coming and going when he was

20     identified as one of the owners, then we

21     started looking at it as a potential

22     criminal case against the company.

23         Q.    Okay.  Can you tell me a little

24     bit more about how that flip happened?

25     What about the owner coming and going led

Page 65

1      to that flip?

2                  MR. COLL:  Object to form.

3          A.     The particular owner that I'm

4      talking about in question was a known drug

5      trafficker.  He had been involved in

6      previous DEA and FBI cases and our

7      intelligence suggested that he was

8      actively recruiting members of his

9      criminal enterprise to become customers of

10     U.S. Private Vaults because the way the

11     business was set up is particularly

12     attractive to those trying to hide drug

13     proceeds and contraband.

14     BY MR. GREENBERG:

15         Q.     And so who was involved in that

16     decision to shift the focus of the

17     investigation from box holders to the

18     company itself?

19         A.     I believe it was a joint

20     investigation -- or joint -- joint

21     decision with all of the investigative

22     team.  So there was DEA involved, FBI,

23     U.S. Postal Inspectors that, you know,

24     were the heavy lifters on the

25     investigation, but it also involved some

Exhibit N
1374

Page 66

1    local -- local law enforcement such as

2    Beverly Hills PD, LAPD and LA County

3    sheriffs.

4        Q.    Do you remember who first came

5    up with the idea of switching the

6    investigation from box holders to the

7    company?

8        A.    I don't believe I can put a name

9    on it because it was just the next logical

10   step and it was kind of seen as, yeah,

11   this is the next -- the next phase of the

12   investigation.

13       Q.    Okay.  Do you remember

14   specifically who was involved in that

15   conversation at least?

16       A.    It would have been myself, my

17   bosses, FBI, their chain of command,

18   postal, their chain of command, U.S.

19   Attorney's Office, that kind of thing.

20       Q.    Do you remember any particular

21   people in those agencies who was involved

22   in those conversations?

23       A.    Myself and Todd Boyett were the

24   DEA individuals, then Lynne Zellhart from

25   FBI and her boss Rich, his last name

Page 67

```
 1    escapes me right now, and then Lyndon
 2    Versoza from U.S. Postal, and his boss
 3    Noah, and I want -- I can't remember his
 4    last name either.  And from the U.S.
 5    Attorney's Office, Anthony Brown and his
 6    staff.
 7         Q.    Might you be referring to Andrew
 8    Brown?
 9         A.    Did I say Anthony?  Yeah, I
10    meant Andrew.  Sorry.  I'm one year
11    removed.
12         Q.    It's all good.  It's a rather
13    common name as well so it totally happens.
14              Okay.  So that's a lot of people
15    involved in kind of making that decision.
16    What steps did the group take in kind of
17    shifting its focus from individual box
18    holders to the business?  What -- what
19    were the next steps then once the decision
20    to investigate the business took hold?
21              MR. COLL:  Hey, Mike, this is
22         Max, I just want to clarify the
23         question here.  We're talking about
24         before a conversation that included
25         Andrew Brown.  I just want to caution
```

Page 68

```
1          the witness, if you're still talking
2          about that conversation to not divulge
3          anything that is protected by the
4          attorney-client privilege, but maybe
5          you can clarify.  Are you talking
6          outside of the conversation that
7          you're just asking about or -- or
8          where are you headed with this?
9                    MR. GREENBERG:  Yeah, I'm not
10         talking about any particular
11         conversation.  Just from -- from
12         Special Agent Carlson's perspective.
13    BY MR. GREENBERG:
14         Q.    What steps were taken next once
15    the focus from individuals to the business
16    took hold?
17                    MR. COLL:  Okay.  So I'll allow
18         you to answer but not with respect to
19         what was discussed in that meeting,
20         but -- or outside of that meeting now,
21         you can respond to the question if you
22         understand.
23         A.    My understanding is you're
24    asking what did the individual
25    investigators do next; is that correct?
```

Exhibit N
1377

Page 69

```
1     BY MR. GREENBERG:
2          Q.    That's -- that's great, yeah.
3          A.    So based on the intelligence
4     that we were getting from undercovers and
5     confidential sources and what we knew
6     about this new owner recruiting other
7     criminals that he had connections with to
8     the business, we began mainly
9     investigating that owner and making steps
10    like we would any other drug trafficker.
11    We're going to try to infiltrate that
12    organization whether it's with, you know,
13    the exploitation of bank records, the
14    exploitation of phones, insertion of
15    cooperating -- or sorry -- confidential
16    informants and undercovers.
17         Q.    And just so I'm clear, I want to
18    go back to some of that.  I thought I
19    heard you mention, you mentioned that this
20    was a new owner?
21         A.    Right, our understanding was
22    then at one point this owner bought out
23    half of the business and then it became,
24    you know, the -- just the two owners at
25    the time.
```

1        Q.    Okay.  And so it was when that

2    new owner came into the business that the

3    decision to shift the focus of the

4    investigation from individuals to the

5    business itself took hold?

6        A.    I don't know that the decision

7    was made before or after that because,

8    again, the investigation was leading up to

9    this business catering towards the

10   criminal element, but it was once this

11   owner came into place, then -- then I know

12   that the shift was -- from my perspective,

13   more directly focused at not just the

14   individuals as a drug trafficker, but the

15   individual drug trafficker as it pertained

16   to their role at U.S. Private Vaults.

17   Does that make sense?

18       Q.    Yeah.  Yeah, thanks for that.

19             So it was the new owner and the

20   new owner's kind of relationship to box

21   holders or to -- let's scratch that

22   question.

23             It was the new owner's

24   relationship to customers at U.S. Private

25   Vaults that played a role in shifting

Exhibit N
1379

Page 71

1     the -- the focus of the investigation to

2     the company itself?

3              MR. COLL:   Object to form.

4         A.     I would say that it played a

5     role in that it was one of, you know, a

6     few different factors that we determined

7     to utilize the -- or to direct the

8     investigation as an investigation of a

9     business.

10    BY MR. GREENBERG:

11        Q.     What other factors were

12    considered at that time?

13        A.     For us it was the -- just the

14    shear amount of law enforcement crossings.

15    So the deconflictions that we talked

16    about.  If we were conducting surveillance

17    at the business, it seemed like the vast

18    majority, and, again, this is not a

19    technical -- I didn't do any statistical

20    analysis of this, I'm just saying, from my

21    perspective, it seemed like the vast

22    majority of people we were seeing as

23    patrons of U.S. Private Vaults on our

24    surveillances had been or were currently

25    being investigated by one or more law

Exhibit N
1380

Page 72

1     enforcement agencies.  And when we came
2     into contact with these individuals, some
3     of them flat-out said, yeah, I heard about
4     U.S. Private Vaults from other criminals
5     and it's a great place to keep your money
6     to hide it from law enforcement.
7          Q.    And the reasons why they were
8     hiding their money from law enforcement is
9     because it was criminal proceeds?
10         A.    That was my understanding.
11         Q.    Okay.  And you said earlier
12    there was about a couple dozen box holders
13    that were connected to U.S. Private Vaults
14    that you were -- you and other federal
15    agencies were investigating around that
16    time before the switch of the focus to the
17    company itself?
18         A.    I -- yes, and I'm talking it --
19    when I say that I investigated, I mean I
20    did some sort of investigation into it.
21    Whether it meant that I just ran their
22    criminal history, checked it for wants and
23    warrants, you know, see if their phone
24    numbers that they had in public record had
25    been identified in any investigations, but

Page 73

1    there were several that once, you know, we

2    ran a license plate, they immediately

3    showed up on other people's investigations

4    so we did no investigation.

5        Q.    Okay.  And so it seemed like

6    there was quite a bit of amount of time

7    between the start of the shift of the

8    investigation to the business and when the

9    seizure warrant at U.S. Private Vaults was

10   executed.  Because I believe you said that

11   you started investigating the business

12   around 2018?

13       A.    Correct, there -- the -- the --

14   the focus of the -- of the investigation

15   being the business was somewhere around

16   the 2018-2019 or at least the possibility

17   of investigating -- of targeting the

18   business had been -- you know, had been

19   addressed.  But as you remember, something

20   happened in 2020 that delayed everything.

21   So the -- the investigation was

22   significantly delayed by COVID.

23       Q.    Totally makes sense.

24             So you mentioned the team that

25   kind of got involved in investigating the

Exhibit N
1382

Page 74

```
 1    business or helped to make the decision to
 2    investigate the business.  About when did
 3    that team decide that it was ready to
 4    apply for a seizure warrant?
 5         A.    I would have to have the, you
 6    know, the case documents in front of me to
 7    give you a very specific date.  I know it
 8    was prior to COVID that we were
 9    considering it and looking at where our
10    probable cause was and -- and that kind of
11    thing.  So somewhere 2019, you know, early
12    2020, we were considering it.
13         Q.    Okay.  Were you involved in any
14    discussions about how to apply for that
15    seizure warrant?
16         MR. COLL:  Mike, I'm going to
17         step in here again.  Are you asking
18         about conversations that occurred with
19         the U.S. Attorney's Office?  It sounds
20         now you're getting into sort of legal
21         decisions here.
22         MR. GREENBERG:  I'm just asking
23         if he was involved in the decisions.
24         I'm not asking for any content
25         whatsoever.
```

Exhibit N
1383

Page 75

```
 1          MR. COLL:  Okay.  I'm going to
 2     let him answer this, but we kind of
 3     ran into this in a previous deposition
 4     where y'all, you know, asked
 5     substance -- you asked if substance
 6     was discussed.  It's kind of a gray
 7     area here where you're getting into
 8     potentially privileged conversations.
 9     I'm going to let him answer this, but
10     just alerting you to that issue.
11     A.    So my input was taken, but the
12     decision was made above my pay grade.
13     BY MR. GREENBERG:
14     Q.    Okay.  Were you involved in any
15     discussions about how to apply for the
16     warrant?
17     A.    Once the -- once the decision
18     was made for FBI to be the lead agency on
19     that for -- as far as the agency that
20     would draft the warrant, information from
21     my previous cases was obviously utilized,
22     but the ultimate decision on how that
23     would be made and who would do it and how
24     the warrant would be structured was not up
25     to me, no.  It wasn't -- or I wasn't as
```

Exhibit N
1384

Page 76

1    involved other than my previous case work.

2         Q.    You're saying you weren't as

3    involved.  Were you involved at all?  It

4    sounds like you were involved a little bit

5    maybe by giving input to your prior cases.

6    Any involvement beyond that?

7         A.    Not substantive.  I mean, my

8    opinions, you know, were asked, but it

9    wasn't -- it was more of wording of my

10   previous case work.

11        Q.    Okay.  You mentioned that it was

12   decided that FBI would be the lead agency

13   to draft a warrant; is that correct?

14             MR. COLL:  Mike, you know, I

15        think again you're asking about

16        content of communications that were

17        had with attorneys present.  I'm going

18        to instruct him not to answer that

19        question.

20             MR. GREENBERG:  I just want to

21        know if I'm understanding his previous

22        testimony correctly.

23             MR. COLL:  Okay.  You can ask

24        the question.  Go ahead.

25   BY MR. GREENBERG:

Page 77

1          Q.     You mentioned earlier that it
2     was decided that FBI would be the lead
3     agency to draft the warrant; is that
4     correct?
5          A.     Yes.
6          Q.     Who made that decision?
7               MR. COLL:  Again, I'm going to
8          instruct him not to answer that
9          question.  You're asking about the
10         content of conversations that were had
11         and decisions that were had during
12         conversations with attorneys present,
13         and I'm going to instruct him not to
14         answer that.
15              MR. GREENBERG:  Okay.
16    BY MR. GREENBERG:
17         Q.     When was that decision made?
18         A.     I don't know if there is a
19    formal time stamp when that was made, but
20    I believe it was in the months leading up
21    to the decision to file for the warrants
22    so probably summer of 2020, maybe into the
23    fall of 2020.
24         Q.     Okay.  So based on your earlier
25    experience with U.S. Private Vaults, was

Exhibit N
1386

Page 78

1    it your impression that a large amount of
2    criminal proceeds would be found at U.S.
3    Private Vaults when that warrant was
4    eventually executed?
5              MR. COLL:  Object to form.
6         A.    I don't know that it would be
7    classified as a large amount.  I knew
8    there would likely be some.  To what
9    extent, you know, that, you know, the
10   business being as large as it was, I guess
11   is subjective.  What do you consider large
12   could be different than what, you know, I
13   consider large, but I knew there would be
14   illegal proceeds and likely contraband
15   present.
16   BY MR. GREENBERG:
17        Q.    Okay.  And you expected criminal
18   proceeds and contraband inside the boxes
19   at U.S. Private Vaults; is that correct?
20             MR. COLL:  Object to form.
21        A.    Based on my investigation, I
22   believed there would be, yes.
23   BY MR. GREENBERG:
24        Q.    Okay.  Was it your impression
25   that the government would seek to use

Exhibit N
1387

Page 79

1    civil forfeiture against some of those

2    criminal proceeds?

3              MR. COLL:  Object to form,

4       vague.

5       A.    My understanding would be that

6    to the extent that we identified criminal

7    proceeds, that we would attempt to forfeit

8    them if they were identified as criminal

9    proceeds.

10   BY MR. GREENBERG:

11      Q.    And what was that understanding

12   based on?

13      A.    Based on understanding, I --

14   could you be a little more specific?  I'm

15   trying to understand what you're asking.

16      Q.    So it sounds like you just

17   testified earlier that it was your

18   understanding that, to the extent criminal

19   proceeds were found in the boxes at U.S.

20   Private Vaults, the government would seek

21   to have those proceeds forfeited using

22   civil forfeiture.  Where did you get that

23   understanding from?

24             MR. COLL:  Object to form.

25      A.    It's the same -- any inventory

Exhibit N
1388

Page 80

```
1    search.  If I'm inventorying a vehicle
2    that I'm seizing and in the course of that
3    inventory, we look in the trunk and
4    there's, you know, bulk cash that has
5    in -- you know, is indicative of drug
6    proceeds, then we would seek to forfeit
7    it.  My understanding would be that the
8    same process would take place at U.S.
9    Private Vaults.  It's an inventory search,
10   but to the extent that we identify
11   suspected drug proceeds, we were prepared
12   to do the same thing that we would do if
13   we were inventorying a vehicle.
14   BY MR. GREENBERG:
15        Q.    Okay.
16            MR. GREENBERG:  Let's take a
17        five-minute break.  Let's come back at
18        I guess 3:06 your time, all right?
19            THE WITNESS:  Okay.
20            MR. GREENBERG:  Thanks.
21            (Whereupon, a brief recess is
22        taken.)
23   BY MR. GREENBERG:
24        Q.    So I want to shift forward in
25   our timeline a little bit now to the team
```

Page 81

```
 1    has drafted the affidavit for the warrant
 2    and I want to get to the team's
 3    preparation for executing the warrant now.
 4    Were you assigned any particular role in
 5    the lead-up to the execution of the
 6    warrant at U.S. Private Vaults?
 7        A.    DEA's primary function during
 8    the execution of the warrant was the -- to
 9    coordinate the videography of the
10    inventories.  So we -- we made
11    arrangements and provided digital cameras
12    to videotape inventory searches and our
13    personnel were also, you know, on hand to
14    assist as FBI needed.
15        Q.    Okay.  Was there a particular
16    reason why DEA was assigned that role?
17        A.    Just kind of division of labor,
18    like, you know, what -- what needed to be
19    done and who would do it was more just
20    kind of -- I don't want to say that it was
21    not intentional for one agency to handle
22    one thing or another, but it was just --
23    we knew we needed the inventories to be as
24    documented as we could possibly make them
25    and we made the decision that the best way
```

Page 82

```
 1      to do that was through video and DEA had
 2      the video equipment.  So we, you know, we
 3      obviously volunteered to -- to be in
 4      charge of that particular aspect of it.
 5           Q.    Got it.
 6                 I want to -- so -- so you were
 7      in charge of kind of gathering all the
 8      video and camera equipment basically?
 9           A.    Right, as far as pre-search
10      warrant and the preparation for the search
11      warrant and seizure warrant, yes, that's
12      one of our roles, yeah.
13           Q.    Okay.  And I just want to
14      clarify going forward.  When I use the
15      word "warrant," to the extent there's a
16      distinction in your head, I'm referring to
17      the seizure warrant rather than the search
18      warrant.
19                 Were there any other particular
20      roles or tasks that you were assigned in
21      the lead-up to the execution of the
22      seizure warrant?
23           A.    Based on, you know, my previous
24      statements of, you know, informants,
25      undercovers and proffered statements of
```

Page 83

```
 1     cooperating defendants suggesting that
 2     there -- that the business had been and
 3     previous -- right, that the business had
 4     previously been utilized to store drugs
 5     and other drug-related contraband.  DEA
 6     was present to process anything like that.
 7          Q.    So that was during the execution
 8     of the four days of the seizure warrant
 9     while all the boxes were being inventoried
10     or was this a separate time that you're
11     referring to?
12          A.    Both really.  So it was
13     determined ahead of time that there was a
14     high likelihood that during the seizure
15     warrant and the inventories that we would
16     come across -- and by "we," I mean the
17     investigative team comprised of all
18     agencies present -- would come into
19     contact with drugs and drug paraphernalia,
20     precursor chemicals, that kind of thing,
21     in which time -- so prior to the seizure
22     warrant, a determination was made that DEA
23     needed to be present at all times,
24     somebody from DEA needed to be present at
25     all times to make a determination as to
```

Page 84

```
 1    maybe what the substance was, how
 2    dangerous it was, and that we would
 3    actually take it into custody and process
 4    it.
 5         Q.    Understood.  Okay.
 6              Okay.  I -- sorry.
 7              Any other particular roles other
 8    than video and processing and analyzing
 9    potential narcotics?
10         A.    Not specifically that I can
11    recall.
12         Q.    Okay.  I'd like to pull up a
13    document real quick.  I'm not sure --
14              MR. GREENBERG:  Did you guys get
15         Exhibit Share figured out on this --
16         on this new setup, Max?
17              MR. COLL:  Hold on.  We'll give
18         it a shot.
19              MR. GREENBERG:  All right.  Let
20         me go ahead and introduce something
21         and we'll see what happens.  Just bear
22         with me one moment.
23              MR. FROMMER:  What do we need?
24              MR. GREENBERG:  Exhibit 15.
25              (Exhibit 15, Agent Observations
```

Page 85

```
 1        and Notes Bates numbered FBI0000301,
 2        marked for identification.)
 3    BY MR. GREENBERG:
 4        Q.    I got a notification that my
 5    exhibit has been introduced so let me know
 6    if you guys are seeing it.
 7             MR. COLL:  Give us a moment.
 8        We're trying to log on.  We got it
 9        pulled up.  It's titled Agent
10        Observations and Notes?
11             MR. GREENBERG:  Yes, correct.
12    BY MR. GREENBERG:
13        Q.    Special agent Carlson, are you
14    familiar with this form, not
15    necessarily -- sorry.  I'll clarify.
16             Are you familiar with this form
17    in general, not necessarily this version
18    of it filled out, but this form in
19    general?
20        A.    No, this is an FBI form.
21        Q.    So you've never seen it before?
22        A.    It's not that I've never seen
23    it.  I'm not just that familiar with it.
24        Q.    But you have seen this before,
25    correct?
```

Page 86

```
 1        A.    Yes.
 2        Q.    Do you know who created it?
 3        A.    I don't know who by name created
 4    it, but I know it was an FBI -- an FBI
 5    form so I imagine somebody at FBI.
 6        Q.    Okay.  When have you seen it in
 7    the past?
 8        A.    I observed FBI agents filling
 9    them out during the inventory search,
10    searches of U.S. Private Vaults.
11        Q.    Okay.  And separate from this
12    form, were -- are you aware whether any
13    DEA agents were also conducting
14    inventories of boxes during the execution
15    of the seizure warrant?
16        A.    Yes.  DEA agents would
17    participate in inventory searches, yes,
18    because just the shear volume.
19        Q.    Okay.  Did you?
20        A.    Yes.
21        Q.    Okay.  Have you ever filled out
22    one of these forms before?
23        A.    I do not recall if I did
24    particularly.  I mean, it was, again, it
25    was four days of five hours of sleep at
```

Exhibit N
1395

Page 87

1    max, but I believe the FBI agents present
2    were the ones handling the paperwork.
3         Q.    Okay.  But you've observed this
4    doc -- sorry -- this document as being
5    filled out during the inventory of U.S.
6    Private Vaults boxes?
7              MR. COLL:  Vague.
8         A.    Yeah, the only time that I've
9    seen these are -- not the only time maybe,
10   I don't know, the only time I recall
11   seeing these -- these documents were
12   during the inventory searches at USPV.
13   BY MR. GREENBERG:
14        Q.    Okay.  And just to make sure I
15   understand what you just said, you said
16   you haven't or can't recall any other
17   times seeing this particular form?
18        A.    No.
19        Q.    Okay.  Can you -- I want to
20   point you to the heading Cash
21   Observations.  And I'm just going to read
22   some of the words here.  It says "e.g.,
23   Agents should note things such as how the
24   cash is bundled," and "if it has a strong
25   odor."  Are you seeing that text?

Page 88

```
 1        A.    Yes.
 2        Q.    Earlier you testified -- and I'm
 3    sure I'm paraphrasing -- but you testified
 4    that noting how cash is bundled or noting
 5    the odor of cash could help you determine
 6    whether it is -- it has any indications of
 7    criminality; is that basically right?
 8              MR. COLL:  Object to form,
 9        vague.
10        A.    Those are certainly things that
11    we would utilize in making a decision on
12    whether or not cash was potential drug
13    proceeds, yes.
14    BY MR. GREENBERG:
15        Q.    Okay.  So noting the way the
16    cash is bundled and whether it has an odor
17    could help inventorying agents at U.S.
18    Private Vaults understand or form an
19    opinion as to whether that cash is
20    potentially criminal proceeds; is that
21    fair to say?
22              MR. COLL:  Object to form.
23        A.    I mean, these are -- these are
24    generic things that we use in all
25    inventory searches when we come across
```

**Exhibit N
1397**

Page 89

1   bulk cash is, you know, does it have

2   residue on it?  Does it smell, is it

3   rubber-banded, these are things that we

4   would use in any inventory search to

5   determine whether cash had the potential

6   to be bulked or to be drug proceeds.

7   BY MR. GREENBERG:

8       Q.    Okay.  And this form seems to be

9   asking agents to note the manner in which

10  cash is bundled and whether it has an odor

11  or something like that, correct?

12      A.    Yes.

13      Q.    Okay.  So asking kind of in an

14  off-kilter way earlier, just to confirm,

15  you were at U.S. Private Vaults while the

16  seizure warrant was being executed?

17      A.    For much of the time, yes.  I

18  would go home to sleep.  That's about it.

19      Q.    Yeah, I've heard it was a long

20  four days and, you know, eat, sleep and be

21  at U.S. Private Vaults basically, right?

22      A.    Yep.

23      Q.    So you mentioned that you helped

24  inventory some of the boxes; is that

25  right?

Exhibit N
1398

Page 90

1      A.    Yes.

2      Q.    Did you have any other role over

3  the course of those four days of the

4  seizure warrant being executed?

5      A.    My primary role was just kind of

6  making sure that the logistics of things

7  were moving along.  You know, do we have

8  enough forms and, if so or if not, I

9  should say, I would get with somebody from

10  FBI to make sure that the inventory -- the

11  inventorying agents had what they needed

12  whether it was dry erase boards, dry erase

13  markers, water, kind of supervising shifts

14  of the DEA personnel that were coming and

15  going that were handling videography,

16  basically kind of just making sure things

17  were moving as efficiently and as smoothly

18  as possible.

19      Q.    Okay.  So kind of a supervisory

20  role?

21      A.    There were supervisors on-site

22  that were more supervisors as far as

23  making decisions on how things were done.

24  My role was mainly to kind of facilitate

25  those decisions.  So if the decision was

Page 91

```
 1      made to start utilizing still cameras,
 2      then I would make sure we had still
 3      cameras and that we had memory chips for
 4      those still cameras.  Whether they came
 5      from DEA or whether they were brought in
 6      by FBI or if, you know, if we needed more
 7      water and, you know, somebody needed to go
 8      get water, I would designate somebody to
 9      go get water because my boss said we
10      needed more water.  That kind of thing.
11          Q.    And just so I'm clear, you
12      referenced your bosses at the time of the
13      execution.  Who are you referring to
14      exactly in doing so?
15          A.    So my -- my direct supervisor
16      was Todd Boyett.  He was on-site to
17      supervise DEA, you know, DEA's role, like
18      I said before, the identifying of
19      potential drugs, drug contraband,
20      precursor chemicals, whether it was safe
21      to handle, that kind of thing, as well as
22      the FBI supervisors that were present,
23      Rich and some of those guys.
24          Q.    Okay.  I want to go back now to
25      this Agent Observations and Notes form and
```

Exhibit N
1400

Page 92

1    if I can have you look at the section just
2    below the cash observation section.  There
3    are four lines there that say K-9 Agency,
4    K-9 Handler, K-9 Name and K-9 Hit (Circle
5    One).  Is that right?
6         A.    Yes, that's what I'm observing,
7    yep.
8         Q.    So does that indicate that there
9    were drug-detection K-9s on-site during
10   the inventorying of boxes at U.S. Private
11   Vaults?
12        A.    Yes.
13        Q.    Whose idea was that to have
14   drug-detection K-9s during the
15   inventorying of boxes?
16        A.    I'm not sure who made the final
17   decision as to why we would have them, but
18   in preparation, we knew this was going to
19   be a big undertaking and when you're -- if
20   you're -- if you've ever investigated drug
21   crimes, like DEA and FBI, Postal has,
22   sometimes in LA, it can take hours to get
23   a drug-sniffing K-9 to the scene of an
24   arrest or a search warrant or anything
25   like that.  In anticipation of that, we

Page 93

```
 1    knew we needed to have them on scene.
 2    Whose ultimate decision it was to -- to
 3    have them there 24/7 was not my call to
 4    make.  I just know that we needed to make
 5    sure that we were working as efficiently
 6    as possible and in so doing to be prepared
 7    for all contingencies, and it's something
 8    we do on every search warrant or seizure
 9    warrant.  We -- we game plan.  What's the
10    worst case scenario that can happen?
11    What's the best scenario that can happen?
12    What's an anomaly that we may encounter?
13    And then we try to prepare for that well
14    in advance so that if and when it happens,
15    we are prepared so it doesn't prolong our
16    time in execution of our duties.
17         Q.    That makes sense.  Sounds like
18    something like Vince Lombardi would
19    probably profess or something like that.
20              So the decision to have K-9s
21    on-site was made prior to the beginning of
22    the warrant's execution?
23         A.    Yes.
24         Q.    Okay.  And the dogs were there
25    to facilitate the possible collection
```

Page 94

1       of -- of indicia of criminality attached

2       to cash found in boxes; is that correct?

3               MR. COLL:  Object to form.

4           A.    The K-9s were there in the event

5       that a box during its inventory alluded to

6       potential criminal activity, specifically

7       drug trafficking.

8       BY MR. GREENBERG:

9           Q.    Okay.  So to detect indicia of

10      that criminal activity specifically drug

11      trafficking?

12              MR. COLL:  Object to form.

13          A.    Yes, and the opposite as well.

14      To, you know, if the drug dog was used and

15      it didn't alert, then it's also not

16      indicating that it wasn't drug proceeds,

17      but obviously it's a double-edge sword

18      essentially.  So if a drug dog sniffs bulk

19      cash and the drug dog alerts, that could

20      be used as, you know, evidence of drug

21      trafficking, but the fact that a drug dog

22      did not alert could then be used as

23      evidence that it's not drug trafficking.

24      BY MR. GREENBERG:

25          Q.    Okay.  Fair.

Exhibit N
1403

Page 95

1          So -- but the reason for running

2     a dogs over cash found in a box was to

3     help determine whether that cash has any

4     indicia of drug trafficking?

5               MR. COLL:   Object to form.

6     BY MR. GREENBERG:

7          Q.   It's not necessarily -- sorry.

8     I'll clarify.

9               It's not necessarily to

10    eliminate the possibility but it's to

11    determine whether there might be any

12    indicia of drug trafficking?

13              MR. COLL:   Object to form.

14         A.   The -- the drug dogs were there

15    to add another -- I don't want to say

16    another level, but another indication.  So

17    if we observed two or three things during

18    the inventory that led us to believe that

19    it was criminal proceeds and the drug dogs

20    were used to do a sniff search, that was

21    just one more element to -- to the

22    determination.

23    BY MR. GREENBERG:

24         Q.   Okay.  So -- sorry.  Hang on one

25    second.

Page 96

1             MR. COLL:   No problem.   Take

2        your time.

3    BY MR. GREENBERG:

4        Q.    Okay.   Do you know if it was

5    practice for inventorying agents to run a

6    dog alert or run a dog sniff on all cash

7    found in boxes at U.S. Private Vaults?

8        A.    I can't speak to what FBI does.

9    I'm a drug detective or drug investigator.

10   So it's highly common when investigating

11   crimes of alleged drug activity to have a

12   drug dog on standby in the event that you

13   come across both currency or a locked

14   container or something that you need the

15   drug dog to determine whether or not that

16   potential -- or that particular item has

17   the potential to be involved in drug

18   trafficking.   It's something that, as a

19   DEA agent, we do very often in our

20   investigations is if it especially if a

21   search warrant of this scope that it's

22   going to be a large -- a large business, a

23   large house, a large storage container,

24   that because drug dogs are not a commodity

25   that can be called on, you know, short

Exhibit N
1405

Page 97

1    notice, sometimes -- most of the time, we
2    try to have them on standby if possible.
3        Q.    That makes sense and it makes
4    sense that it sounds like you were
5    investigating potential drug activity or
6    drug trafficking activity at U.S. Private
7    Vaults.  So I understand that, but do you
8    know if it was practice -- during the
9    inventorying of -- of U.S. Private Vaults'
10   boxes in particular, do you know if it was
11   practice of the inventorying agents to run
12   a dog sniff on all cash that was seized
13   from boxes or just whether it was practice
14   instead to only run a dog sniff on
15   particular cash found in boxes?  I'm just
16   trying to get a sense for -- for when dog
17   sniffs were run at U.S. Private Vaults, I
18   guess.
19             MR. COLL:  Objection, asked and
20        answered.
21        A.    I can't speak to if all cash was
22   sniff searched.  One, because I wasn't
23   there 24/7 and, two, I wasn't actually
24   partaking in every single inventory or
25   present for every single inventory.  So I

Page 98

1    can't -- I can't answer that question the

2    way it was phrased.

3    BY MR. GREENBERG:

4        Q.    Okay.  And you're not aware of

5    any, like, particular, like, pre-discussed

6    policy for -- for how or -- sorry, scratch

7    that.

8              If -- you're not aware of any

9    particular policy that the investigative

10   team came up with about what cash should

11   get a dog sniff and what cash should not

12   get a dog sniff at U.S. Private Vaults?

13       A.    It was my understanding that FBI

14   made that decision.  If they called us to

15   look into a box and we asked them that,

16   you know, anything that looked like drugs,

17   drug paraphernalia or precursor chemicals

18   or anything that -- that was of that

19   nature, then we would come in and make a

20   decision of how it would be handled mainly

21   because we experienced it more often and

22   we would know if it was fentanyl or some

23   sort of acetone that might harm the dog or

24   harm the inventory searchers, but as far

25   as any other determinations by DEA, that

Exhibit N
1407

Page 99

1    was not our call.

2         Q.    And you're not aware of any

3    conversations among, let's say, like Lynne

4    Zellhart and you and Lyndon Versoza where

5    a policy about which -- which cash would

6    get a dog sniff and which cash would not

7    took place?

8         A.    I don't believe a discussion

9    took place where any sort of observation

10   would be codified in a way that would

11   immediately warrant a sniff search or not.

12   I believe it was just going to be up to

13   the FBI agents conducting the inventory as

14   to which -- which boxes got sniff searched

15   or not.  That was my understanding.

16             MR. GREENBERG:  I'm going to

17        introduce a different exhibit now real

18        quick then.  Sorry.  Bear with me just

19        a second.  And this will be marked as

20        Exhibit 16.

21             (Exhibit 16, FBI 302 document,

22        marked for identification.)

23   BY MR. GREENBERG:

24        Q.    That should be coming up.

25             MR. GREENBERG:  Let me know when

Page 100

```
 1        you have it, Max.
 2              MR. COLL:  We have it pulled up.
 3              MR. GREENBERG:  Okay.  Great.
 4      BY MR. GREENBERG:
 5        Q.    Have you ever seen a form that
 6      looked like this before?
 7        A.    Is this 302 -- yeah, this to me
 8      looks like an FBI 302.  I believe that's
 9      what it is.  That's what it looks like.
10        Q.    Yeah, it is.  And this was
11      produced to us in discovery from the
12      government.
13              Are you familiar with this at
14      least in part because of the inventorying
15      of boxes at U.S. Private Vaults?
16        A.    I've worked multiple cases with
17      FBI even before U.S. Private Vaults and
18      their 302 is analogous to our DEA 6.  It's
19      their -- it's their report form.
20        Q.    Okay.  I just want to know if
21      you could see if you could read me the
22      line, the bottom middle in -- of this that
23      says "Agent Note" or begins with "Agent
24      Note"?
25        A.    So it's on page 1?
```

Page 101

1       Q.    Yeah.  I think there's only one
2    page here.
3       A.    Oh, okay.  Okay.  So "Agent
4    Note" says "DEA did not want to send money
5    to dog."
6       Q.    I recognize that you weren't at
7    U.S. Private Vaults the entire time, but
8    I -- I just wanted to ask about this.  Do
9    you know why a note like that might be in
10    an FBI 302?
11       A.    Without knowing exactly what
12    they found, I can't speak to why this
13    particular 302 reads this or has this
14    statement in it, but normally when we make
15    a determination to specifically say do not
16    send this to the dog, it's because there
17    might be a hazard to the dog.  For
18    instance, if this was some sort of
19    chemical, you know, DEA does not -- itself
20    does not have drug dogs assigned to it,
21    but we obviously work with them quite a
22    bit, and we know certain things.  Like if
23    I find a kilo of powdered fentanyl, I'm
24    not going to send that to a drug dog
25    because it's a hazard.  So I could say

Page 102

```
 1      that is one of the reasons why we wouldn't
 2      send it to a dog.  It might be that it's
 3      too sharp.  Dogs are hard to control.
 4      When they get excited, they start sniffing
 5      hard and sometimes a dog will just shove
 6      his nose into the seat of a car and, you
 7      know, there's a razor blade there and he
 8      cuts his face.  So if there's a note that
 9      says DEA did not want to send money to
10      dog, that could be one of the reasons
11      that -- that there was a hazard to the
12      dog.  But without knowing what was found
13      in this box, I couldn't tell you.
14           Q.    Okay.  Can you think of any
15      other instance where you personally told
16      FBI or anybody else not to send cash to a
17      dog at U.S. Private Vaults?
18           A.    I mean, I imagine we could have
19      made determinations in that, you know
20      there was indicia in the box that spoke to
21      the source of funds or there was indicia
22      in the box that, you know, could have led
23      that there was something on the money that
24      we don't want the dogs to come in to
25      contact with or that, you know, it just --
```

Page 103

1    it wasn't a suspicious box, but, again,

2    without knowing this particular box

3    whatever was in 2601, I couldn't speak to

4    as why this particular note was made.

5         Q.   Yeah.  And I appreciate that.

6    I'm not asking you to speculate.  I was

7    just asking you if there were any, like,

8    concrete examples of -- that you can

9    recall of you personally telling someone

10   not to send cash to a dog at U.S. Private

11   Vaults?

12        A.   I don't remember a specific

13   situation where I told somebody not to

14   send it to -- to a dog, no.

15        Q.   Okay.  Is it generally fair to

16   say that it was more likely that cash

17   would be sent to a dog at U.S. Private

18   Vaults if there were more indicia of

19   criminality found in the box?

20             MR. COLL:  Objection, vague.

21        A.   I mean, it's up to the

22   inventorying agent as to what they

23   consider suspicious, you know, their

24   training and their observation but more

25   importantly their experience varies from

Page 104

1    agent to agent, so I can't speak to -- as
2    to why somebody would say yes or no one
3    way or the other.
4    BY MR. GREENBERG:
5        Q.    Okay.  But generally in that
6    agent's training and experience, is it
7    more likely they would have sent a -- cash
8    found in a box at U.S. Private Vaults to a
9    dog if they were suspicious of that cash?
10            MR. COLL:  Vague, calls for
11        speculation, asked and answered.
12       A.    It's my understanding that, as
13    the inventories were being conducted, if
14    the box arose suspicion of drug
15    trafficking, that a drug dog would be
16    available if possible to do a sniff
17    search.
18   BY MR. GREENBERG:
19       Q.    Okay.  Okay.
20            MR. GREENBERG:  Let's take five
21        and then we'll come back at 4:55.
22            (Whereupon, a brief recess is
23        taken.)
24   BY MR. GREENBERG:
25       Q.    Just one quick question on the

Exhibit N
1413

Page 105

1    execution of the warrant that I meant to
2    ask earlier:  Prior to the start of the
3    execution of the warrant, was the actual
4    warrant ever shared with you?
5        A.    I believe so.
6        Q.    Do you recall if you had a
7    chance to review it prior to the
8    execution?
9        A.    Yes.
10       Q.    Yes, you did or yes, you recall
11   and --
12       A.    Yes, I recall reviewing at least
13   the portions of the warrant that pertained
14   to my part of the investigation.
15       Q.    Do you remember which -- when
16   you reviewed the warrant, did anything in
17   particular stand out to you about it?
18           MR. COLL:  Objection, vague.
19       A.    And, no, not that I recall
20   anything.
21   BY MR. GREENBERG:
22       Q.    Okay.  Okay.  I want to go back
23   to our earlier conversation or kind of
24   brief conversation about your role or
25   DEA's role as being in charge of the video

1    recording.  As I recall, you said that DEA

2    was tasked with gathering and coordinating

3    the video equipment for inventorying boxes

4    just because DEA had a lot of that video

5    equipment.  Does that sound right?

6        A.    Yes.

7        Q.    Okay.  Was DEA also tasked with

8    maintaining recordings of the inventorying

9    of boxes after the execution of the

10   warrant was over?

11       A.    I know we turned the recordings

12   over to FBI and I'm -- I believe we may

13   have kept copies of that as well.

14       Q.    Okay.  Do you know who at DEA

15   has access to the copies of those

16   recordings?

17       A.    Right now, I do not.

18       Q.    What's your understanding of

19   what the video recordings of those box

20   inventories will be used for?

21       A.    My understanding is that the

22   video would be used to -- more or less for

23   the liability in case allegations were

24   made of theft or damage, we could review

25   the video to see if, in fact, anything was

Exhibit N
1415

Page 107

1    stolen or damaged by the inventorying

2    agents.

3         Q.    Is there any reason, to your

4    knowledge, that those videos couldn't be

5    used for subsequent investigations into

6    any particular box holder?

7              MR. COLL:  Object to form.

8         A.    The videos would be used in the

9    same way we would use any surveillance

10   video or video of a search warrant that we

11   were conducting.  It's a way to go back

12   and refresh recollections of observations

13   but now you actually have the tangible

14   video to show what you saw.  So I would

15   imagine that the video served multiple

16   purposes, both to document the -- the

17   inventory, to, you know, be retained for

18   liability in the event that a box arose to

19   the suspicion that it might be involved in

20   criminal activity, to document the

21   observations of those agents.  It -- it

22   was kind of a cover-all for all of those

23   things.

24   BY MR. GREENBERG:

25        Q.    Got it.  That makes sense.

Exhibit N
1416

Page 108

1          So basically any valid DEA

2     purpose, those videos could be used for?

3               MR. COLL:   Objection, misstates

4        prior testimony, vague.

5        A.    I mean, the videos would be used

6     by whichever agency would be investigating

7     that box holder or any kind of, you know,

8     liability issues that came back.

9     BY MR. GREENBERG:

10       Q.    Okay.  So by -- is there any DEA

11    policy that would require -- sorry --

12    scratch that question.

13             Are you aware of any DEA policy

14    that would require DEA to get rid of the

15    copies of those videos after some period

16    of time?

17       A.    I know it's DEA policy that once

18    a case is closed and there are no more

19    appeals left or -- or forfeiture aspects

20    or that essentially once the -- they have

21    no evidentiary purpose, then they are

22    destroyed.

23       Q.    So as long as there could be an

24    evidentiary purpose going forward, DEA, to

25    your understanding, will continue to

Page 109

1      maintain videos like that?

2             MR. COLL:   Objection to the form

3          of the question.

4          A.    I can't speak to the videos for

5      this particular inventory or -- or seizure

6      warrant that was executed because DEA

7      wasn't the lead agency, but in the event

8      that DEA is the lead agency, we do not

9      destroy any kind of evidence until the

10     case is completely closed, there are no

11     more forfeitures, there are no more

12     appeals and there are no more

13     investigative leads to that case, at which

14     point we destroy all evidence to include

15     the drug evidence or whatever.  I think

16     the only exception to that would be

17     wiretap evidence.

18     BY MR. GREENBERG:

19         Q.    So you said something about you

20     can't speak to this particular case

21     because the DEA is not the lead agency on

22     it.  Does that mean that FBI or -- sorry,

23     that DEA is following the FBI's document

24     retention policy with regard to the videos

25     for this case?

Exhibit N
1418

Page 110

1        A.    I can't speak to what DEA is

2    doing with this evidence now because I'm

3    no longer the case agent.  I would, you

4    know, I'd have to point you in the

5    direction of the current case agent or

6    supervisor of the group that has the case.

7        Q.    Okay.  Before you transferred

8    from Los Angeles to Dallas, was there any

9    reason you were given to understand that

10   the typical DEA retention policy would not

11   hold for these videos?

12           MR. COLL:  Objection, vague.

13       A.    No discussion of that was -- was

14   brought to my attention.  We never

15   discussed how we would retain or not

16   retain the videos.

17   BY MR. GREENBERG:

18       Q.    Okay.  Just one other question

19   on videos.  You mentioned a bit earlier I

20   believe something about gathering still

21   cameras in addition to video cameras.  Am

22   I recalling that correctly?

23       A.    Yes, sir.

24       Q.    Okay.  It's the case that

25   some -- some box inventories were video

                                                        Page 111

1      recorded and some were photo

2      inventoried -- sorry, scratch that

3      question.

4              It's the case that some box

5      inventories were video recorded and some

6      were recorded with photographs; is that

7      correct?

8          A.    Yes.

9          Q.    Is there any particular reason

10     why a box would have been recorded with

11     video as opposed to a still photograph or

12     vice versa?

13         A.    No.  It was -- it was

14     essentially, we -- we realized that in

15     order to more efficiently conduct the

16     inventory, we needed more teams conducting

17     inventory.  So FBI brought in more people

18     to assist in this and in order to

19     facilitate that, we handed out or I say

20     we -- FBI handed out still cameras to

21     those teams and then whatever box they

22     inventoried, that team used a still

23     camera.  The boxes did not determine which

24     camera was used.  It was the teams that

25     dictated which camera was used.  Whatever

Page 112

1    camera they were given is the camera they

2    used.

3         Q.    That makes sense.

4              And then to your knowledge, so

5    is DEA also maintaining records of

6    photographs from box inventories or is it

7    just the video recordings that DEA has?

8         A.    Without actually looking in our

9    evidence or looking at the case file, I

10   can't tell you which stills we have.  I

11   know those were FBI cameras in some

12   instances that were used.  So because FBI

13   was the lead agency, I don't know that

14   they would give us stills unless we

15   requested them.  I know we obviously

16   turned over our video evidence to them or

17   our video recordings to them, but I'm not

18   a hundred percent sure as to whether or

19   not we got all still inventory photos.

20        Q.    Okay.  And then just one last

21   question on this.  In your experience with

22   DEA, I -- I -- I understand DEA's

23   retention policy with regard to videos in

24   a typical case.  Is that same policy true

25   with regard to photos?

Exhibit N
1421

Page 113

1           MR. COLL:  Objection, vague.

2      A.    As I said, DEA destroys evidence

3    once the case is closed and there are no

4    more investigative leads.  The only

5    exception to that is, to my understanding,

6    is going to be Title 3 wiretap intercepts

7    are retained for a certain period of time

8    after the case is closed.

9    BY MR. GREENBERG:

10      Q.    Understood.

11           And just one other question

12    speaking to your experience while you were

13    at U.S. Private Vaults during the

14    execution of the warrant, are you aware of

15    anyone who came to U.S. Private Vaults to

16    try to collect their property during the

17    execution of the warrant?

18      A.    Yes.

19      Q.    Do you know what happened in

20    that circumstance?

21      A.    I know the -- that in most

22    circumstances, we tried to get contact

23    information and by "we," I mean the

24    investigative team.  I may not have

25    personally been there.  And if they knew a

Page 114

1    box number or something of that nature,

2    then we would -- we would document it so

3    that that could facilitate the later

4    transfer of items back to that individual

5    if applicable.

6         Q.    So those people could claim

7    their property and had it returned to them

8    at that time, though?

9              MR. COLL:   Object to form.

10        A.    No.

11             MR. GREENBERG:   I'm sorry.

12        Could you go back and read that last

13        answer before "no" for me?

14             (Requested portion of the record

15        is read back by the reporter.)

16   BY MR. GREENBERG:

17        Q.    Just curious, I missed

18   something.  What do you mean by if

19   applicable -- sorry?  That's the whole

20   question.

21        A.    So as you can imagine, a

22   business that operates with anonymous box

23   holders, it's very hard to determine if

24   the person walking up is the actual owner

25   of the box.  So we made it a policy that

Exhibit N
1423

Page 115

1    we wouldn't return things at the scene so

2    by "applicable," I mean if they are the

3    actual owner and they can prove it, then

4    the items would be returned to them if the

5    government deemed necessary, I guess.

6         Q.    What do you mean by "deemed

7    necessary"?

8         A.    So if the items were not

9    contraband or drug proceeds or evidence of

10   the crime that we were investigating of

11   U.S. Private Vaults, then the items could

12   be returned.

13        Q.    So the government would kind of

14   conduct an investigation into whether

15   perhaps the contents of that box were drug

16   proceeds first and if the government

17   determined that they were not, then the

18   government would return that property to

19   that box holder?

20             MR. COLL:  Objection, vague,

21        lacks foundation.

22        A.    So what I mean by returning the

23   items if they weren't evidence, I mean, it

24   didn't just qualify it for cash.  If there

25   was a kilo of fentanyl in your box, I'm

Page 116

1    not going to give it back to you.  So the
2    determination of whether or not items got
3    returned was, you know, the way the
4    question was phrased is a little too vague
5    because if it's, you know, evidence of a
6    crime, if it's a stolen firearm, if it's,
7    you know, child pornography, you know,
8    still photos, we're not going to give
9    those back.  That's evidence of a crime
10   and that they would be retained.
11   BY MR. GREENBERG:
12       Q.    That's totally fair.  I get that
13   you don't want to return contraband.
14   Let's put contraband to the side.  When it
15   was cash, would the government conduct an
16   investigation into whether that cash was
17   drug proceeds before deciding that it was
18   necessary to turn that property back to
19   the person who was claiming it?
20             MR. COLL:  Objection, vague,
21       lacks foundation.
22       A.    My understanding is that boxes
23   that arose to the suspicion of any
24   criminal activity would be investigated
25   before being returned.

```
 1    BY MR. GREENBERG:
 2         Q.    Got it.  That makes sense.
 3               Okay.  Let's take a quick five.
       I think I'm about done, but I just want to
 4
       confirm real quick and then we should be
 5
       wrapped up here pretty soon.  So let's go
 6
       off the record and come back at 4:20 in
 7
       Dallas.
 8
               (Whereupon, a brief recess is
 9
          taken.)
10
               MR. GREENBERG:  That's all that
11
          I have for the moment, Special Agent
12
          Carlson.  I really appreciate you
13
          taking the time to chat today.
14
               Max, anything on your end?
15
               MR. COLL:  No, that's fine.
16
               MR. GREENBERG:  Okay.
17
               MR. FROMMER:  Off the record.
18
               THE COURT REPORTER:  Max, do you
19
          want a rough draft and expedite?
20
               MR. COLL:  Yes.
21
               (Time noted:  4:20 p.m.)
22
23
24
25
```

**Exhibit N**
**1426**

Page 118

1
————————————————————————
       JUSTIN CARLSON

2

3


————————————————————————

4
Subscribed and sworn to

before me this _____

5
day of _____ 2022.

6
————————————————————————
       Notary Public

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit N
1427

Page 119

1                         CERTIFICATION

2

3        I, BELLE VIVIENNE, a Nationally

4    Certified Realtime Reporter, do hereby

5    certify:

6        That the witness whose testimony as

7    herein set forth, was duly sworn by me;

8    and that the within transcript is a true

9    record of the testimony given by said

10   witness.

11       I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome of

15   this matter.

16       IN WITNESS WHEREOF, I have hereunto

17   set my hand this 10th day of July 2022.

18       *Belle Vivienne*

19   _____

20   BELLE VIVIENNE, CRR, CCR, RPR

21

22              *       *       *

23

24

25

Page 120

1    Maxwell Coll, Esquire

2    maxwell.coll@usdoj.gov

3                         July 11, 2022

4    RE:    Snitko, Paul Et Al  v. United States Of America Et Al

5         7/6/2022, Justin Carlson (#5311223)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

```
                                                Page 121

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Justin Carlson (#5311223)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Justin Carlson                              Date

25
```

Page 122

1   Snitko, Paul Et Al  v. United States Of America Et Al

2   Justin Carlson (#5311223)

3                   ACKNOWLEDGEMENT OF DEPONENT

4       I, Justin Carlson, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____   _____

12   Justin Carlson                          Date

13   *If notary is required

14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                   _____ DAY OF _____, 20___.

16

17

18                   _____

19                   NOTARY PUBLIC

20

21

22

23

24

25

[1 - agents]                                                                 Page 1

**1**

**1**   25:9 100:25
**10,000**   27:6
**100**   31:15
**10:00**   1:14
**10th**   119:17
**11**   120:3
**14th**   2:11
**15**   3:14 84:24,25
**16**   3:17 49:1 99:20
  99:21

**2**

**2**   25:9 28:8,21
**2,000**   27:15,17,24
  28:2,18,22,25 29:6
  29:11
**20**   122:15
**2004**   56:19
**2012**   11:25 13:16
  18:6
**2015**   44:20 49:1
**2015-2017**   53:15
  58:8 59:25
**2016**   51:20
**2017**   51:20 58:15
  61:6
**2018**   73:12
**2018-2019**   73:16
**2019**   59:14 74:11
**2020**   14:22 73:20
  74:12 77:22,23
**2021**   6:1 14:22
  16:22 17:1
**2022**   1:13 118:5
  119:17 120:3
**22203**   2:6
**24/7**   93:3 97:23
**25368**   119:18
**2601**   103:3

**299-5127**   1:24
**2:15**   44:10

**3**

**3**   113:6
**30**   120:17
**302**   3:17 99:21
  100:7,8,18 101:10
  101:13
**312**   2:11
**3:06**   80:18
**3:15**   44:9

**4**

**4:20**   117:7,22
**4:55**   104:21

**5**

**5**   3:7 27:25 28:8
  28:21
**5,000**   27:18 28:1,4
  28:10,22
**5311223**   1:23
  120:5 121:2 122:2

**6**

**6**   1:13 4:8 100:18

**7**

**7/6/2022**   120:5
**703.682.9320**   2:6
**77**   4:8

**8**

**84**   3:16
**866**   1:24

**9**

**9**   26:11 92:3,4,4,4
  92:23
**900**   2:5
**90012**   2:12
**901**   2:5
**99**   3:17

**9s**   92:9,14 93:20
  94:4

**a**

**a.m.**   1:14
**able**   9:6,16 11:4
  37:20 39:3 41:20
**academy**   13:15
  18:7,13,20,25 19:1
  19:9,11 36:13
**accepted**   15:2
**access**   106:15
**accolades**   30:25
**account**   26:6,17
  26:25 35:15 41:9
  47:7
**accuracy**   120:9
**accurate**   8:23 9:7
  9:17 11:2
**acetone**   98:23
**acknowledgement**
  122:3
**acknowledgment**
  120:12
**acronym**   54:1
**acting**   1:8
**action**   5:23 119:13
**actions**   46:24 48:1
**actively**   65:8
**activity**   31:1 48:11
  94:6,10 96:11
  97:5,6 107:20
  116:24
**actual**   48:19 105:3
  114:24 115:3
**actuality**   14:4
**add**   95:15
**addition**   110:21
**additional**   10:5
**additions**   122:6
**addressed**   73:19

**adjourn**   10:16
**administration**
  5:14
**administrative**
  21:1,7 29:22
**admissions**   50:3
**admitted**   50:6
**admitting**   50:22
**advance**   93:14
**affairs**   53:22
**affidavit**   81:1
**affirmative**   23:14
**agencies**   45:21
  51:21 52:1,7,10,15
  52:20,23 54:6
  55:12 57:10,14,15
  58:7 66:21 72:1
  72:15 83:18
**agency**   38:5,6,19
  38:20 39:21,21
  40:13 52:16 53:25
  55:9,24 56:2,3
  75:18,19 76:12
  77:3 81:21 92:3
  108:6 109:7,8,21
  112:13
**agency's**   55:1
**agent**   3:14 5:13,18
  11:21 12:6,8
  15:22 16:2 18:9
  19:3,6 29:5 39:22
  39:22 43:19,23
  50:14,17 58:13
  68:12 84:25 85:9
  85:13 91:25 96:19
  100:23,23 101:3
  103:22 104:1,1
  110:3,5 117:12
**agent's**   104:6
**agents**   37:17 42:2
  42:15 43:6 44:1

[agents - back]                                                                                           Page 2

58:12 86:8,13,16
87:1,23 88:17
89:9 90:11 96:5
97:11 99:13 107:2
107:21
**ago** 7:20 44:21
**agreed** 9:15
**ahead** 11:13 76:24
83:13 84:20
**al** 120:4,4 121:1,1
122:1,1
**alert** 94:15,22 96:6
**alerted** 46:5,18
**alerting** 75:10
**alerts** 94:19
**allegations** 106:23
**alleged** 96:11
**allotted** 120:20
**allow** 68:17
**allowed** 18:17
**allows** 56:23,24
**alluded** 94:5
**america** 1:7 120:4
121:1 122:1
**amount** 27:7,9,11
27:19,19 29:23
71:14 73:6 78:1,7
**analogous** 100:18
**analysis** 71:20
**analyzing** 84:8
**andrew** 2:10 67:7
67:10,25
**angeles** 2:12 14:13
14:18 23:23 46:10
46:14,17 52:13
53:2,3 54:14
55:14 58:4 62:21
63:13 110:8
**anniversary** 12:4
**anomaly** 93:12

**anonymous**
114:22
**answer** 4:5 6:21
7:15,17,23 8:12,14
8:15,20,21 9:2,22
10:1,1 11:1,2 14:3
21:4,12 25:3
68:18 75:2,9
76:18 77:8,14
98:1 114:13
**answered** 97:20
104:11
**answering** 7:12
59:5
**answers** 6:14 8:23
**anthony** 67:5,9
**anticipation** 92:25
**anybody** 35:7
102:16
**anytime** 33:10
34:13
**apparatus** 55:18
56:17
**appeals** 108:19
109:12
**appended** 122:7
**apple** 43:24
**applicable** 25:9
26:8 27:8 114:5
114:19 115:2
120:8
**applied** 13:14
20:17 21:9 23:22
**applies** 32:21
**apply** 16:20 21:12
29:2,6 74:4,14
75:15
**applying** 21:24
**appreciate** 103:5
117:13

**area** 47:8 56:22
62:22 75:7
**argumentative**
38:17
**arisen** 34:12
**arlington** 2:6
**arose** 104:14
107:18 116:23
**arrangements**
14:8 81:11
**arrest** 19:23 20:2
20:14 27:15,17,18
27:23 28:2,5,11,23
56:2 92:24
**arrested** 28:3,19
32:19 33:21 34:6
34:8,20 61:25
**arrestee** 33:10
**arresting** 34:19
**arrests** 19:20
20:17 22:1 56:2
**articles** 42:16
**articulate** 39:22
40:15 42:21 55:21
**articulated** 37:11
42:18 55:22
**ascertained** 63:9
**asked** 43:1 55:8
75:4,5 76:8 97:19
98:15 104:11
**asking** 6:12 7:18
22:21 33:25 39:12
42:10 59:4 68:7
68:24 74:17,22,24
76:15 77:9 79:15
89:9,13 103:6,7
**aspect** 60:12 82:4
**aspects** 108:19
**asset** 2:11 22:16
23:4 24:8,19 25:1
25:13,24,25 26:5

26:12,16,19
**assets** 22:19 23:23
25:5 30:19,19
62:1,4
**assigned** 14:2
17:17 19:5 81:4
81:16 82:20
101:20
**assist** 6:15 81:14
111:18
**assistant** 1:10 2:10
**assume** 8:16
**assuming** 18:7
44:10
**attached** 94:1
120:11
**attempt** 79:7
**attention** 110:14
**attorney** 1:8,18
2:10 5:20 33:14
68:4 120:13
**attorney's** 66:19
67:5 74:19
**attorneys** 76:17
77:12
**attractive** 62:3
63:12 65:12
**audibly** 6:17
**audio** 6:20
**available** 104:16
120:6
**awards** 30:25 31:2
31:4
**aware** 86:12 98:4
98:8 99:2 108:13
113:14

**b**

**b** 3:10 22:8
**back** 6:1 8:8 13:24
15:12 20:11 30:3
40:20,21 41:8

Exhibit N
1433

**[back - case]**                                                                 Page 3

| | | | c |
|---|---|---|---|

44:9 69:18 80:17
91:24 104:21
105:22 107:11
108:8 114:4,12,15
116:1,9,18 117:7
**background** 11:15
**backpack** 33:11
**bags** 33:14,15
**ballpark** 21:3
31:12 32:7,9
**banded** 89:3
**bank** 69:13
**based** 50:21 60:23
61:23 62:7,18
69:3 77:24 78:21
79:12,13 82:23
**basic** 13:23 18:8
**basically** 12:10
15:20 19:5 38:7
43:17 57:8 82:8
88:7 89:21 90:16
108:1
**basics** 18:18
**basis** 16:1 17:13
**bates** 3:15 85:1
**bear** 84:21 99:18
**began** 51:11 69:8
**beginning** 93:21
**begins** 100:23
**believe** 13:16
14:25 16:22 17:6
24:1 27:16 28:7
29:20,23 41:21
45:11 49:6,13,20
51:5 53:12,15
60:21 63:5 64:4
64:17 65:19 66:8
73:10 77:20 87:1
95:18 99:8,12
100:8 105:5
106:12 110:20

**believed** 78:22
**belle** 1:21 119:3,20
**belongs** 35:12
**best** 6:16 7:3,11,16
28:15 36:4,24
37:1 55:21 81:25
93:11
**beverly** 66:2
**beyond** 76:6
**big** 60:10 92:19
**bigger** 16:4 57:4
**bit** 43:5 53:19
57:18 64:24 73:6
76:4 80:25 101:22
110:19
**blade** 102:7
**blood** 119:13
**blue** 55:20,20
**boards** 90:12
**bolts** 56:22
**book** 10:25
**boss** 66:25 67:2
91:9
**bosses** 66:17 91:12
**bottom** 100:22
**bought** 69:22
**box** 44:24 45:6,13
51:2,22 52:2,3,5,8
52:21,25 54:7,9
57:12 58:16,18
59:23,25 60:20
61:8 62:9 64:10
65:17 66:6 67:17
70:20 72:12 94:5
95:2 98:15 102:13
102:20,22 103:1,2
103:19 104:8,14
106:19 107:6,18
108:7 110:25
111:4,10,21 112:6
114:1,22,25

115:15,19,25
**boxes** 60:15,22,24
61:3,21 63:23
78:18 79:19 83:9
86:14 87:6 89:24
92:10,15 94:2
96:7 97:10,13,15
99:14 100:15
106:3,9 111:23
116:22
**boyett** 66:23 91:16
**break** 10:13,17,19
17:11 44:8 80:17
**brief** 5:15 9:11
15:13 16:13 44:13
80:21 104:22
105:24 117:9
**brought** 91:5
110:14 111:17
**brown** 2:10 67:5,8
67:25
**bulk** 48:21 49:9,15
59:16,20 62:15
80:4 89:1 94:18
**bulked** 89:6
**bundled** 87:24
88:4,16 89:10
**bureau** 1:10
**business** 51:12
55:9 56:1 62:3,14
62:20 63:1,2,11,19
63:20 65:11 67:18
67:20 68:15 69:8
69:23 70:2,5,9
71:9,17 73:8,11,15
73:18 74:1,2
78:10 83:2,3
96:22 114:22

**c** 2:1
**calendar** 10:24
**california** 1:1,9
2:12 13:19 53:23
63:13
**call** 45:23 54:18
55:20 93:3 99:1
**called** 96:25 98:14
**calls** 104:10
**camera** 82:8
111:23,24,25
112:1,1
**cameras** 81:11
91:1,3,4 110:21,21
111:20 112:11
**cannabis** 53:22
**capacity** 1:8,9
63:17
**car** 22:6 40:15
42:3,5,6,15 43:18
43:19 102:6
**career** 13:2,10
**carlson** 1:13 3:6
5:1,12,19 11:19
29:5 85:13 117:13
118:1 120:5 121:2
121:24 122:2,4,12
**carlson's** 68:12
**case** 21:11,21
24:12,13,15,25
25:2,8,9,9,17,17
25:20 31:6 46:2
47:2,4 48:12
50:14,14,16 52:13
59:1 64:22 74:6
76:1,10 93:10
106:23 108:18
109:10,13,20,25
110:3,5,6,24 111:4
112:9,24 113:3,8

**cases** 13:12 16:4 31:7 54:12 55:4 65:6 75:21 76:5 100:16
**cash** 26:25 27:5,23 28:1,10,18,19,24 29:5,16 48:21 49:9,15,19 50:2,9 50:25 59:17,20 80:4 87:20,24 88:4,5,12,16,19 89:1,5,10 92:2 94:2,19 95:2,3 96:6 97:12,15,21 98:10,11 99:5,6 102:16 103:10,16 104:7,9 115:24 116:15,16
**catering** 70:9
**cause** 74:10
**caution** 67:25
**ccr** 1:21 119:20
**central** 1:1,9
**certain** 25:4 29:17 64:8 101:22 113:7
**certainly** 88:10
**certification** 119:1
**certified** 1:22 5:3 119:4
**certify** 119:5,11
**chain** 66:17,18
**challenge** 5:24
**chance** 105:7
**change** 121:4,7,10 121:13,16,19
**changed** 53:20 54:1
**changes** 120:10 122:6
**charge** 82:4,7 105:25

**charged** 16:6
**chat** 117:14
**check** 60:6
**checked** 72:22
**chemical** 101:19
**chemicals** 83:20 91:20 98:17
**child** 116:7
**chips** 91:3
**circle** 92:4
**circumstance** 113:20
**circumstances** 32:21 113:22
**city** 55:19
**civil** 20:25 21:6,11 21:20 22:15 30:5 30:8 79:1,22
**claim** 114:6
**claiming** 116:19
**claims** 35:19 36:2
**clarification** 10:6
**clarify** 8:8 21:8 67:22 68:5 82:14 85:15 95:8
**class** 5:23
**classified** 78:7
**classroom** 19:13
**clear** 6:25 7:4 25:3 38:15 45:23 51:17 54:14 56:8,17 69:17 91:11
**clearinghouse** 45:23
**clearly** 6:17
**client** 68:4
**clientele** 47:15 51:16
**close** 48:25
**closed** 108:18 109:10 113:3,8

**clothes** 56:16
**codified** 99:10
**coincidence** 46:17
**coll** 2:9 16:10 20:9 22:17 23:6 24:11 24:21 25:15 29:19 30:9 33:22 37:9 38:4,16 39:10,19 40:5 41:18 42:8 42:23 43:15 45:3 47:18 48:4 52:22 57:16 58:24 61:2 61:11,22 62:11 63:3 64:1 65:2 67:21 68:17 71:3 74:16 75:1 76:14 76:23 77:7 78:5 78:20 79:3,24 84:17 85:7 87:7 88:8,22 94:3,12 95:5,13 96:1 97:19 100:2 103:20 104:10 105:18 107:7 108:3 109:2 110:12 113:1 114:9 115:20 116:20 117:16,21 120:1
**collect** 30:7,10,12 113:16
**collecting** 24:7,18 30:4
**collection** 93:25
**college** 12:24
**color** 43:22
**come** 12:10 14:21 44:9 52:24 54:21 57:22 80:17 83:16 83:18 88:25 96:13 98:19 102:24

104:21 117:7
**comes** 40:17
**comfortable** 21:17 59:4
**coming** 64:19,25 90:14 99:24
**command** 66:17 66:18
**commodity** 96:24
**common** 32:12 34:3 53:13 67:13 96:10
**communications** 76:16
**company** 46:19 61:10,15 62:10 64:11,22 65:18 66:7 71:2 72:17
**complete** 8:23 9:7 9:17 13:23 122:8
**completed** 120:17
**completely** 7:24 109:10
**comprised** 83:17
**compromise** 57:5
**concerning** 5:24
**concrete** 103:8
**conduct** 20:2 32:12 37:14 38:3 39:14 63:1 111:15 115:14 116:15
**conducted** 31:9,14 31:18,25 32:8 33:7,18 34:4,7 46:1 55:7 59:24 63:19 104:13
**conducting** 40:2 41:14 48:5 54:8 56:10 71:16 86:13 99:13 107:11 111:16

[confidential - dea]                                                                 Page 5

**confidential** 69:5 69:15
**confirm** 89:14 117:5
**congratulations** 12:3
**connected** 23:9 24:8,19 72:13
**connection** 22:5
**connections** 56:25 69:7
**connectivity** 25:6
**consent** 48:20
**consider** 38:21 39:6 78:11,13 103:23
**considered** 71:12
**considering** 74:9 74:12
**consistent** 23:12
**constitutional** 20:8
**consumer** 53:22
**contact** 72:2 83:19 102:25 113:22
**contacts** 57:15
**container** 96:14 96:23
**content** 37:25 38:2 74:24 76:16 77:10
**contents** 60:18 115:15
**context** 31:17 32:12 34:11
**contexts** 33:6
**contingencies** 93:7
**continue** 58:18 108:25
**continued** 47:1 62:13

**continuing** 13:13
**contraband** 62:5 62:16 65:13 78:14 78:18 83:5 91:19 115:9 116:13,14
**control** 102:3
**conversation** 7:8 10:23 66:15 67:24 68:2,6,11 105:23 105:24
**conversations** 66:22 74:18 75:8 77:10,12 99:3
**cool** 11:13 12:16 12:20 13:4
**cooperating** 69:15 83:1
**coordinate** 81:9
**coordinating** 106:2
**coordination** 57:8
**cop** 56:4
**copies** 106:13,15 108:15 120:14
**correct** 14:19 28:12,13,20 36:3 41:11 45:14 46:20 47:24 54:4 64:11 68:25 73:13 76:13 77:4 78:19 85:11 85:25 89:11 94:2 111:7 122:8
**corrections** 122:6
**correctly** 27:22 29:1 49:16 76:22 110:22
**counsel** 120:14
**count** 27:20
**county** 45:24 46:4 46:8,11,14,17 53:3 58:4 66:2

**couple** 32:9 48:24 49:7,13 57:19 72:12
**course** 13:10 55:6 56:12 80:2 90:3
**court** 1:1,22 5:6 6:13,22 7:21 8:3,7 9:9 21:10,14,20 117:19
**cover** 107:22
**covid** 73:22 74:8
**created** 86:2,3
**crime** 55:23 115:10 116:6,9
**crimes** 17:19 18:18 92:21 96:11
**criminal** 12:11 48:10 63:12,20,24 63:25 64:22 65:9 70:10 72:9,22 78:2,17 79:2,6,8 79:18 88:20 94:6 94:10 95:19 107:20 116:24
**criminality** 30:12 30:22 36:8 88:7 94:1 103:19
**criminals** 61:20 62:4,21 63:1,19 64:4 69:7 72:4
**cross** 45:21 56:13 58:9
**crossing** 55:11
**crossings** 71:14
**crr** 1:21,21 119:20
**cs** 120:15
**curious** 16:21 17:5 114:17
**currency** 23:9 27:19 96:13

**current** 110:5
**currently** 14:20 18:3 71:24
**custody** 34:23 35:8,14 40:9,22 41:5,10,16,23,24 50:13 84:3
**customers** 47:23 48:2 65:9 70:24
**cut** 14:15 16:24 29:4 33:9
**cuts** 102:8

## d

**d** 3:2
**dallas** 12:15,17,22 13:9,22 14:21 15:6,16,19,20 16:18,20 18:1 23:24 24:3 32:2,4 44:10 45:24 46:4 46:7 56:19,19 110:8 117:8
**damage** 106:24
**damaged** 107:1
**dangerous** 56:16 84:2
**date** 38:10 74:7 121:24 122:12
**day** 16:1,1 17:13 17:13 118:5 119:17 122:15
**days** 58:3 83:8 86:25 89:20 90:3 120:17
**dea** 11:21,24 12:6 12:7,14 13:6,15,18 13:20,23 15:23 17:13 18:6,9,16 19:19 28:6 32:1,6 32:8,14 33:9 37:13 38:25 39:7

**Exhibit N**
**1436**

40:1 41:14 42:2
45:17 53:1 60:13
60:19 61:3 62:24
63:5 65:6,22
66:24 81:16 82:1
83:5,22,24 86:13
86:16 90:14 91:5
91:17 92:21 96:19
98:25 100:18
101:4,19 102:9
106:1,4,7,14 108:1
108:10,13,14,17
108:24 109:6,8,21
109:23 110:1,10
112:5,7,22 113:2
**dea's**  14:18 27:12
29:17 38:6 49:22
51:14 81:7 91:17
105:25 112:22
**decide**  23:2 74:3
**decided**  76:12
77:2
**deciding**  116:17
**decision**  65:16,21
67:15,19 70:3,6
74:1 75:12,17,22
77:6,17,21 81:25
88:11 90:25 92:17
93:2,20 98:14,20
**decisions**  74:21,23
77:11 90:23,25
**declare**  122:4
**deconflict**  55:8
**deconflicted**  56:7
56:20
**deconfliction**
45:20 54:14 55:14
**deconflictions**
71:15
**deemed**  22:3
25:14 115:5,6

122:6
**defendant**  50:3,6
50:22
**defendants**  1:11
2:8 83:1
**definitely**  64:3
**definition**  60:4
**delayed**  73:20,22
**department**  46:15
46:18 53:3,21
**depend**  24:25 25:1
**depending**  60:4
**depends**  24:12,15
24:25 50:10
**deponent**  120:13
122:3
**deposing**  120:13
**deposit**  44:24
**deposition**  1:13
4:2 6:2,4,9 7:10
8:25 75:3
**description**  3:13
**designate**  91:8
**destroy**  109:9,14
**destroyed**  108:22
**destroys**  113:2
**detect**  94:9
**detection**  92:9,14
**detective**  13:11
24:3 96:9
**determination**
83:22,25 95:22
101:15 116:2
**determinations**
98:25 102:19
**determine**  22:13
23:8 24:18 26:3
26:12,21 32:23
35:9,25 50:1 88:5
89:5 95:3,11
96:15 111:23

114:23
**determined**  34:16
49:22 60:9 71:6
83:13 115:17
**determining**  26:6
27:1
**dictated**  111:25
**differ**  38:19
**different**  21:18
25:5,8 58:10
59:22 71:6 78:12
99:17
**differently**  42:18
42:22 43:11,14
**differs**  38:5
**difficult**  7:8 9:1
**digital**  81:11
**direct**  71:7 91:15
**direction**  110:5
**directions**  4:5
**directly**  70:13
**director**  1:10
**discovery**  100:11
**discuss**  54:20
**discussed**  68:19
75:6 98:5 110:15
**discussion**  5:15
9:11 15:13 99:8
110:13
**discussions**  74:14
75:15
**dispensary**  45:10
**distinction**  82:16
**district**  1:1,1,9
**division**  1:2 13:23
14:21 81:17
**divulge**  68:2
**doc**  87:4
**document**  3:17
36:25 43:11 84:13
87:4 99:21 107:16

107:20 109:23
114:2
**documented**  39:17
40:4 41:16,23
81:24
**documenting**  42:4
43:9 44:4
**documents**  4:10
10:24 74:6 87:11
**dog**  94:14,18,19
94:21 96:6,6,12,15
97:12,14,16 98:11
98:12,23 99:6
101:5,16,17,24
102:2,5,10,12,17
103:10,14,17
104:9,15
**dog's**  30:18
**dogs**  93:24 95:2,14
95:19 96:24
101:20 102:3,24
**doing**  15:19,21,23
16:2 56:11 91:14
93:6 110:2
**double**  94:17
**dozen**  21:16,18
32:10 72:12
**dozens**  60:12
**draft**  75:20 76:13
77:3 117:20
**drafted**  81:1
**drawing**  56:15
**drive**  22:7
**drives**  62:18
**driving**  32:19
**drug**  5:13 15:23
16:2,5,7,8 18:18
22:4,6 23:4,10,13
23:15 24:8,20
25:6,7,14 26:1,7
26:11,13,21 27:1,7

[drug - familiar]                                                                                           Page 7

27:13 30:16,17
34:17 47:19 49:23
50:2,23 51:9,11
56:21 62:14 65:4
65:12 69:10 70:14
70:15 80:5,11
83:5,19 88:12
89:6 91:19 92:9
92:14,20,23 94:7
94:10,14,16,18,19
94:20,21,23 95:4
95:12,14,19 96:9,9
96:11,12,15,17,24
97:5,6 98:17
101:20,24 104:14
104:15 109:15
115:9,15 116:17
**drugs** 22:7 23:17
62:17 83:4,19
91:19 98:16
**dry** 90:12,12
**duly** 5:2 119:7
**duties** 93:16

**e**

**e** 2:1,1 3:2,10
121:3,3,3
**e.g.** 87:22
**earlier** 10:6 30:15
30:17 58:3 72:11
77:1,24 79:17
88:2 89:14 105:2
105:23 110:19
**early** 17:1 59:25
74:11
**easily** 6:11
**easy** 14:3
**eat** 89:20
**edge** 94:17
**efficiently** 30:1
90:17 93:5 111:15

**eight** 13:7,8,25
**either** 8:7 22:4
38:8 52:24 60:9
67:4
**element** 63:12
70:10 95:21
**eliminate** 95:10
**else's** 60:11
**encounter** 93:12
**enforcement** 5:13
13:2 17:21 53:22
57:8 61:18 63:17
66:1 71:14 72:1,6
72:8
**enterprise** 65:9
**entire** 17:23 101:7
**episode** 55:23
**equipment** 82:2,8
106:3,5
**erase** 90:12,12
**errata** 120:11,13
120:17
**erratas** 120:15
**escapes** 67:1
**especially** 96:20
**esq** 1:18
**esquire** 120:1
**essence** 37:21
41:21 42:17
**essentially** 40:13
53:21 94:18
108:20 111:14
**established** 14:2
**et** 120:4,4 121:1,1
122:1,1
**event** 94:4 96:12
107:18 109:7
**eventually** 49:19
78:4
**evidence** 24:7,18
30:4,6,7,10,12

36:8 94:20,23
109:9,14,15,17
110:2 112:9,16
113:2 115:9,23
116:5,9
**evidentiary**
108:21,24
**exact** 21:4 31:13
43:7
**exactly** 37:21 41:2
47:5 49:3 55:15
56:18 91:14
101:11
**examination** 5:7
**examinations**
19:13
**example** 26:25
42:3
**examples** 52:19
103:8
**exception** 109:16
113:5
**excited** 102:4
**execute** 48:14
**executed** 15:1
20:20 22:2 48:23
73:10 78:4 89:16
90:4 109:6
**executing** 15:17
81:3
**execution** 5:25
17:3 81:5,8 82:21
83:7 86:14 91:13
93:16,22 105:1,3,8
106:9 113:14,17
**exhibit** 3:14,17
84:15,24,25 85:5
99:17,20,21
**exist** 29:13
**exists** 55:18 56:8

**expect** 42:4
**expected** 78:17
**expedite** 117:20
**experience** 22:12
22:19 25:19 63:21
77:25 103:25
104:6 112:21
113:12
**experienced** 98:21
**explain** 25:10
43:12,14
**exploitation** 69:13
69:14
**extent** 78:9 79:6
79:18 80:10 82:15
**eyes** 49:23

**f**

**face** 102:8
**facilitate** 50:24
90:24 93:25
111:19 114:3
**facilitating** 22:9
**facility** 35:9
**fact** 94:21 106:25
**factor** 26:14
**factors** 71:6,11
**fails** 120:19
**fair** 7:18,19 10:2,3
10:17,18 15:7
20:4 22:11 28:17
30:22 38:12,23
39:15 59:9 61:1
62:24 63:16 88:21
94:25 103:15
116:12
**faith** 8:15
**fall** 44:20 77:23
**familiar** 55:16
85:14,16,23
100:13

Exhibit N
1438

**family**  14:9
**far**  13:2 43:20
  55:11 60:12 61:14
  62:12 75:19 82:9
  90:22 98:24
**fbi**  3:17 53:1 56:11
  58:9,11,12,13 65:6
  65:22 66:17,25
  75:18 76:12 77:2
  81:14 85:20 86:4
  86:4,5,8 87:1
  90:10 91:6,22
  92:21 96:8 98:13
  99:13,21 100:8,17
  101:10 102:16
  106:12 109:22
  111:17,20 112:11
  112:12
**fbi's**  109:23
**fbi0000301**  3:16
  85:1
**federal**  1:10 13:14
  18:15,16,19 52:23
  58:6 72:14
**federally**  16:6
**feel**  59:4
**fentanyl**  98:22
  101:23 115:25
**field**  13:22 14:18
  15:16,21
**figured**  84:15
**file**  59:1 77:21
  112:9
**fill**  38:6
**filled**  85:18 86:21
  87:5
**filling**  86:8
**final**  92:16
**find**  101:23
**fine**  8:18 117:16

**finish**  7:17 8:20
  10:14
**finishing**  18:25
**firearm**  116:6
**firm**  5:22
**first**  5:2 21:13
  44:18 52:5 66:4
  115:16
**five**  60:22 80:17
  86:25 104:20
  117:3
**flat**  72:3
**flip**  64:24 65:1
**floor**  2:11
**flow**  7:7
**focus**  18:4 64:8
  65:16 67:17 68:15
  70:3 71:1 72:16
  73:14
**focused**  70:13
**follow**  48:6
**followed**  55:3
**following**  55:25
  56:4 109:23
**follows**  5:4
**foregoing**  122:5
**forfeit**  79:7 80:6
**forfeited**  49:21
  50:19,25 59:20
  79:21
**forfeiture**  2:11
  20:25 21:6,9,11,13
  21:19,20,25 22:8
  22:10,15,20 23:11
  23:20,22 25:21
  27:14 30:5,8,25
  50:15 79:1,22
  108:19
**forfeitures**  31:3
  109:11

**forgive**  43:5
**form**  20:9 22:17
  23:6 24:11,21
  25:15 29:19 30:9
  33:22 37:9 38:4
  40:5 41:18 42:23
  45:3 47:18 48:4
  52:22 57:16 58:24
  61:2,11,22 62:11
  65:2 71:3 78:5,20
  79:3,24 85:14,16
  85:18,20 86:5,12
  87:17 88:8,18,22
  89:8 91:25 94:3
  94:12 95:5,13
  100:5,19 107:7
  109:2 114:9
**formal**  17:6 18:24
  19:2 77:19
**formally**  37:4
**formed**  61:23
**forms**  86:22 90:8
**forth**  119:7
**forward**  22:15
  23:3 80:24 82:14
  108:24
**found**  23:16 28:20
  39:23 55:4 63:23
  78:2 79:19 94:2
  95:2 96:7 97:15
  101:12 102:12
  103:19 104:8
**foundation**  115:21
  116:21
**four**  13:25 14:24
  18:22 56:5 83:8
  86:25 89:20 90:3
  92:3
**frame**  16:23
**frequent**  58:9

**fresh**  10:9
**frommer**  2:4
  84:23 117:18
**front**  8:3 37:19
  41:20 49:2 64:16
  74:6
**froze**  14:17
**full**  5:10 8:22 9:6
  9:16 11:18 27:5
  41:9
**function**  81:7
**funds**  102:21
**further**  42:13
  119:11

**g**

**game**  93:9
**gamut**  17:23
**gathering**  82:7
  106:2 110:20
**general**  17:21
  20:22 21:22 30:10
  31:6 51:25 85:17
  85:19
**generally**  22:9
  23:7 54:3 57:12
  58:21 103:15
  104:5
**generic**  88:24
**gestures**  6:23
**getting**  11:15
  42:24 69:4 74:20
  75:7
**give**  9:6,16 11:1,2
  25:24 40:20,21
  41:7 42:20 52:11
  52:15,19 54:11
  74:7 84:17 85:7
  112:14 116:1,8
**given**  7:22 110:9
  112:1 119:9 122:9

**giving**  76:5
**glebe**  2:5
**go**  6:8,15 11:12,13
  13:24 16:11 43:20
  56:1 69:18 76:24
  84:20 89:18 91:7
  91:9,24 105:22
  107:11 114:12
  117:6
**goes**  13:2
**going**  11:9 18:7
  19:23 30:3 33:12
  38:18,19 39:20,21
  58:21 64:19,25
  69:11 74:16 75:1
  75:9 76:17 77:7
  77:13 82:14 87:21
  90:15 92:18 96:22
  99:12,16 101:24
  108:24 113:6
  116:1,8
**good**  8:15 11:12
  31:7,7 67:12
**gothier**  1:3
**gotten**  30:24 31:2
  31:5 55:10
**government**  22:14
  22:21 35:19 36:1
  78:25 79:20
  100:12 115:5,13
  115:16,18 116:15
**government's**  5:24
**grade**  75:12
**gray**  43:24 75:6
**great**  9:19 69:2
  72:5 100:3
**greenberg**  1:18
  2:3 3:7 5:5,8,17
  5:20 9:13 15:15
  16:11,15 20:15
  22:22 23:19 24:14

24:23 25:22 30:2
30:13 34:1 37:12
38:11,22 39:13,24
40:23 41:25 42:19
43:2 44:6,12,15
45:7 47:21 48:13
53:7 57:24 59:8
61:5,16 62:6,23
63:15 64:6 65:14
68:9,13 69:1
71:10 74:22 75:13
76:20,25 77:15,16
78:16,23 79:10
80:14,16,20,23
84:14,19,24 85:3
85:11,12 87:13
88:14 89:7 94:8
94:24 95:6,23
96:3 98:3 99:16
99:23,25 100:3,4
104:4,18,20,24
105:21 107:24
108:9 109:18
110:17 113:9
114:11,16 116:11
117:1,11,17
**ground**  6:9
**group**  14:6 17:21
  58:11 67:16 110:6
**groups**  58:10
**guess**  21:12,14
  25:2 42:10 52:18
  78:10 80:18 97:18
  115:5
**guidance**  37:13,17
**guns**  56:15 62:17
**guy**  55:25 56:3
**guys**  9:10 52:14
  84:14 85:6 91:23

**h**

**h**  3:10 121:3
**half**  12:19 13:7
  69:23
**hallmarks**  30:15
  30:16
**hand**  81:13 119:17
**handed**  111:19,20
**handful**  60:13
**handle**  81:21
  91:21
**handled**  98:20
**handler**  92:4
**handling**  87:2
  90:15
**hands**  43:23
**hang**  95:24
**happen**  93:10,11
**happened**  46:23
  47:11 49:18,19
  62:8 64:14,24
  73:20 113:19
**happening**  49:10
**happens**  10:7 11:5
  67:13 84:21 93:14
**hard**  62:17 102:3
  102:5 114:23
**harm**  35:6,7 98:23
  98:24
**hash**  28:9
**hazard**  101:17,25
  102:11
**head**  6:23,24
  82:16
**headed**  68:8
**heading**  87:20
**hear**  9:10 44:18,22
  54:16
**heard**  62:19 69:19
  72:3 89:19

**heavy**  65:24
**held**  5:16 9:12
  15:14 33:12 40:13
**help**  6:10,11 11:1
  11:2,4 22:13 23:2
  26:20 88:5,17
  95:3
**helped**  50:24 74:1
  89:23
**helpful**  38:13
**hereto**  122:7
**hereunto**  119:16
**hey**  54:18 60:7
  67:21
**hid**  63:19
**hide**  51:11 62:4
  63:2 65:12 72:6
**hiding**  72:8
**hidta**  18:3 56:21
**high**  23:9 56:21
  83:14
**highly**  96:10
**hills**  66:2
**hire**  13:21,25 14:7
**hired**  13:15,22
  14:3 56:18
**history**  72:22
**hit**  92:4
**hold**  67:20 68:16
  70:5 84:17 110:11
**holder**  107:6
  108:7 115:19
**holders**  51:3,23
  52:2,3,6,8,21,25
  54:7,9 57:12
  58:16,18 59:23
  60:1,20 61:8 62:9
  64:10 65:17 66:6
  67:18 70:21 72:12
  114:23

Exhibit N
1440

**holding** 40:10
**home** 15:6,19
  89:18
**homeland** 53:9
**hour** 12:18 16:19
**hours** 86:25 92:22
**house** 14:7 96:23
**hsi** 53:4,8
**huh** 6:25
**hundred** 28:6
  112:18
**hunting** 14:8
**hypothetical** 42:9

**i**

**idea** 66:5 92:13
**identification**
  44:25 85:2 99:22
**identified** 47:20
  51:15 64:20 72:25
  79:6,8
**identify** 35:12
  39:3,8 80:10
**identifying** 22:19
  24:17 91:18
**ij.org** 2:7
**illegal** 78:14
**imagine** 54:2 86:5
  102:18 107:15
  114:21
**immediately** 73:2
  99:11
**impact** 18:4
**important** 8:22
**importantly**
  103:25
**impound** 32:20,22
**impression** 61:19
  78:1,24
**include** 109:14
**included** 67:24

**including** 32:1,3
**incomplete** 42:8
**independently**
  42:11
**index** 4:2
**indicate** 30:21
  92:8
**indicating** 94:16
**indication** 25:25
  26:10,11 30:18
  95:16
**indications** 88:6
**indicative** 80:5
**indicia** 35:13,14
  37:23 55:4 63:24
  94:1,9 95:4,12
  102:20,21 103:18
**individual** 38:20
  38:20 45:18,22,25
  47:2 48:9 64:10
  67:17 68:24 70:15
  114:4
**individuals** 42:11
  66:24 68:15 70:4
  70:14 72:2
**infiltrate** 69:11
**informally** 37:5
**informants** 63:10
  69:16 82:24
**information** 10:5
  75:20 113:23
**initial** 63:7
**input** 75:11 76:5
**insertion** 69:14
**inside** 78:18
**inspector** 53:4
**inspectors** 65:23
**instance** 13:22
  22:6 23:8,16
  42:14 101:18
  102:15

**instances** 34:4
  112:12
**institute** 2:5 5:21
**instruct** 76:18
  77:8,13
**instructs** 9:25
**intelligence** 65:7
  69:3
**intensity** 56:21
**intentional** 81:21
**intercepts** 113:6
**interest** 5:22
**interested** 13:12
  22:14 45:4 119:14
**interesting** 6:7
  53:24
**interviews** 61:25
**introduce** 84:20
  99:17
**introduced** 85:5
**introductory**
  18:14
**inventoried** 39:1
  41:8 42:3 83:9
  111:2,22
**inventories** 81:10
  81:23 83:15 86:14
  104:13 106:20
  110:25 111:5
  112:6
**inventory** 31:10
  31:18,24 32:7,13
  32:23 33:2,7,17,19
  34:4,7,15,22 35:1
  35:23 36:7,12,16
  37:3,14,18 38:3
  39:5,8,14,17 40:2
  40:4 41:15,17
  43:9 79:25 80:3,9
  81:12 86:9,17
  87:5,12 88:25

  89:4,24 90:10
  94:5 95:18 97:24
  97:25 98:24 99:13
  107:17 109:5
  111:16,17 112:19
**inventorying**
  33:20 35:15 36:25
  42:12,22 43:7,8,18
  80:1,13 88:17
  90:11 92:10,15
  96:5 97:9,11
  100:14 103:22
  106:3,8 107:1
**investigate** 17:19
  17:22 18:17,18
  54:3 58:18 67:20
  74:2
**investigated** 52:14
  61:7 71:25 72:19
  92:20 116:24
**investigating**
  45:12,16,25 51:3
  51:22 52:2,6,7,21
  52:25 54:6,19
  55:1 56:6,9 57:1,3
  57:11 58:2 69:9
  72:15 73:11,17,25
  96:10 97:5 108:6
  115:10
**investigation** 1:10
  34:17 45:6,9,11,17
  47:15 52:12,17
  54:12,17 56:8,12
  57:4,4 58:16 60:3
  60:5 61:24 62:8
  63:8 64:9 65:17
  65:20,25 66:6,12
  70:4,8 71:1,8,8
  72:20 73:4,8,14,21
  78:21 105:14
  115:14 116:16

Exhibit N
1441

**investigations**
13:13 15:23 16:2
16:5,8 17:23
18:15 23:13 48:6
51:7,19 53:10
54:8 58:22,23
59:3,7,23 62:12,19
72:25 73:3 96:20
107:5
**investigative**
56:25 65:21 83:17
98:9 109:13 113:4
113:24
**investigator** 12:12
36:21 96:9
**investigators** 35:7
57:20,22 68:25
**investing** 52:4
**involved** 20:24
21:5 45:19 48:11
51:22 52:1,20
65:5,15,22,25
66:14,21 67:15
73:25 74:13,23
75:14 76:1,3,3,4
96:17 107:19
**involvement** 21:23
76:6
**involves** 34:5
**involving** 33:19
34:8
**irs** 53:12
**issue** 27:1 38:14
75:10
**issues** 6:20 108:8
**item** 25:20 35:5
40:3,11 41:4,15
42:12 96:16
**itemize** 35:25
**itemized** 35:15
38:7,13 39:18

**itemizing** 37:24
38:1
**items** 21:9,13,19
21:25 23:9 37:22
39:3,9,16,23 40:14
40:16,18 41:8
42:5 114:4 115:4
115:8,11,23 116:2

**j**

**jeni** 1:3
**jennifer** 1:3
**job** 1:23 24:10,22
36:24
**johnson** 1:9 2:4
**joined** 18:6
**joint** 65:19,20,20
**joseph** 1:3
**judge** 8:3
**judicial** 21:1,7
**july** 1:13 13:16
14:21,22 15:3
18:21 119:17
120:3
**justice** 2:5 5:21
**justin** 1:13 3:6 5:1
5:12 11:19 118:1
120:5 121:2,24
122:2,4,12

**k**

**k** 26:11 92:3,4,4,4
92:9,14,23 93:20
94:4
**keep** 36:20,20 72:5
**kept** 47:9 106:13
**kilo** 101:23 115:25
**kilter** 89:14
**kind** 6:8,9 7:6 10:5
11:9 14:1,14
17:12 18:12 19:1
19:6,12,14 21:23

22:23 23:1,17
25:10 31:4,8,17
32:16 33:14 34:11
37:16 38:2 44:24
45:9 48:10 54:25
57:18 60:6 61:9
63:1 66:10,19
67:15,16 70:20
73:25 74:10 75:2
75:6 81:17,20
82:7 83:20 89:13
90:5,13,16,19,24
91:10,21 105:23
107:22 108:7
109:9 115:13
**kindly** 6:18
**knew** 69:5 78:7,13
81:23 92:18 93:1
113:25
**know** 7:13 8:6,12
8:14 9:8 10:7,13
10:20 11:5 13:12
14:7 16:3 17:22
18:8,15,17 19:22
21:15 23:11,14,16
25:18,18 27:5
29:12 31:6,7,8
32:23 33:15,15
34:14 36:18 39:6
40:10,21 41:4,7
44:2 45:4 47:6,9
48:6,7,8 51:10,12
54:19,25 55:2,7
56:13,14,17 57:1
57:18,21 59:4,6
60:6,11 61:24
62:17,18 63:9
65:23 69:12,24
70:6,11 71:5
72:23 73:1,18
74:6,7,11 75:4

76:8,14,21 77:18
78:6,9,9,12 80:4,5
81:13,18 82:2,23
82:24 85:5 86:2,3
86:4 87:10 89:1
89:20 90:7 91:6,7
91:17 93:4 94:14
94:20 96:4,25
97:8,10 98:16,22
99:25 100:20
101:9,19,22 102:7
102:19,22,25
103:23 106:11,14
107:17 108:7,17
110:4 112:11,13
112:15 113:19,21
116:3,5,7,7
**knowing** 22:12
101:11 102:12
103:2
**knowledge** 40:1
107:4 112:4
**known** 51:13 65:4
**koons** 1:9
**kristi** 1:9

**l**

**l** 1:7
**la** 13:19 14:4 15:8
15:21 17:20 24:5
45:19,23 56:8,17
66:2 92:22
**labor** 81:17
**lacks** 115:21
116:21
**lapd** 66:2
**laptop** 43:19,24
**large** 57:7 62:20
78:1,7,10,11,13
96:22,22,23,23
**largest** 31:20

Exhibit N
1442

late   16:25
laundering   16:7,8
  17:15
law   5:22 13:1
  18:16 20:14 57:7
  61:18 63:17 66:1
  71:14,25 72:6,8
lead   47:17 59:19
  75:18 76:12 77:2
  81:5 82:21 109:7
  109:8,21 112:13
leading   70:8 77:20
leads   109:13 113:4
learn   18:16 20:1
  36:15
learned   19:9 46:23
leave   38:8
leaving   53:6
led   46:2 47:19
  54:24 64:25 95:18
  102:22
left   9:14 13:15
  14:20 15:3,16
  16:16 44:25 53:18
  108:19
legal   1:23 9:24
  74:20 120:23
legalistic   41:1
level   13:14 18:19
  95:16
liability   35:16,18
  37:25 106:23
  107:18 108:8
license   73:2
lifters   65:24
likelihood   83:14
limit   29:22
limiting   29:21
line   4:6,11,16,21
  10:14 100:22
  121:4,7,10,13,16

121:19
lines   92:3
links   23:15
list   40:19
listed   50:16
little   11:10 25:10
  42:20 43:5,11,13
  57:18 64:23 76:4
  79:14 80:25 116:4
local   18:4 66:1,1
locals   53:1
locations   51:10
locked   96:13
log   85:8
logical   66:9
logistics   90:6
lombardi   93:18
long   11:23 15:8
  18:20 27:18 89:19
  108:23
longer   59:1 110:3
look   15:25 16:2
  22:13,24 27:4
  42:6 60:8 62:13
  80:3 92:1 98:15
looked   14:16
  98:16 100:6
looking   21:3 31:12
  35:13 36:22 37:22
  37:23 48:8 51:10
  62:4 64:21 74:9
  112:8,9
looks   27:9 100:8,9
los   2:12 14:13,18
  23:23 46:10,14,17
  52:13 53:2,3
  54:13 55:14 58:4
  62:21 63:13 110:8
lost   15:10 16:10
  35:19 36:2 43:1

lot   11:8 32:18
  34:18 52:13 54:15
  54:24,25 55:10
  67:14 106:4
lots   58:12
loved   33:13
lunch   10:19
lunchtime   10:21
lyndon   67:1 99:4
lynne   66:24 99:3

**m**

madam   5:5
maintain   109:1
maintaining   106:8
  112:5
major   24:9
majority   33:4,16
  62:21 71:18,22
making   6:15 67:15
  69:9 88:11 90:6
  90:16,23
manner   23:12
  50:5,23 89:9
march   6:1 15:1
marijuana   45:10
  46:2
marine   12:24
mark   29:11
marked   4:20 85:2
  99:19,22
markers   90:13
marriage   119:13
materials   10:24
  11:4
matter   41:1
  119:15
max   8:18,21 9:20
  9:25 67:22 84:16
  87:1 100:1 117:15
  117:19

maxwell   2:9 120:1
maxwell.coll   2:12
  120:2
mean   9:22 20:12
  22:18 25:11 27:10
  29:7 36:17 39:11
  40:9 41:2,2 47:5
  48:5 50:11 61:3
  72:19 76:7 83:16
  86:24 88:23
  102:18 103:21
  108:5 109:22
  113:23 114:18
  115:2,6,22,23
means   17:21 21:9
  55:20
meant   43:13 67:10
  72:21 105:1
medications   9:1,4
meeting   68:19,20
members   65:8
memo   29:9
memory   91:3
mention   69:19
mentioned   18:5,6
  30:15,17 45:18
  49:10 54:13 69:19
  73:24 76:11 77:1
  89:23 110:19
michael   1:18 2:3
michaels   1:4
middle   8:20 10:15
  100:22
mike   5:19 67:21
  74:16 76:14
mind   10:9 36:20
  47:10
minute   44:8 80:17
mishmash   57:14
  57:17

Exhibit N
1443

**missed** 114:17
**misstates** 43:15
  63:4 64:1 108:3
**model** 43:21
**moment** 7:20
  16:12 84:22 85:7
  117:12
**money** 16:7 17:15
  72:5,8 101:4
  102:9,23
**month** 14:5
**months** 14:23,25
  15:17 18:22 77:20
**move** 23:3
**moved** 13:18
**moving** 22:15 90:7
  90:17
**multiple** 51:14
  52:14 100:16
  107:15

**n**

**n** 2:1 3:2
**name** 5:10,12,19
  11:16,18 53:20
  66:8,25 67:4,13
  86:3 92:4
**narcotics** 13:10,11
  17:23 47:9 84:9
**narrow** 32:5 33:8
**nationally** 1:22
  119:3
**nature** 33:16
  98:19 114:1
**nearly** 19:18
**necessarily** 36:7
  85:15,17 95:7,9
**necessary** 115:5,7
  116:18 122:6
**need** 28:11 38:3
  52:16 84:23 96:14

**needed** 81:14,18
  81:23 83:23,24
  90:11 91:6,7,10
  93:1,4 111:16
**never** 21:19 26:24
  85:21,22 110:14
**new** 14:10 58:18
  69:6,20 70:2,19,20
  70:23 84:16
**newer** 53:25
**nice** 12:20
**nj** 1:21
**nm** 1:21
**noah** 67:3
**nodding** 6:23
**nonprofit** 5:21
**normal** 7:7
**normally** 7:5
  101:14
**north** 2:5,11
**nose** 102:6
**notary** 118:6
  122:13,19
**note** 87:23 89:9
  100:23,24 101:4,9
  102:8 103:4
  120:10
**noted** 117:22
  122:7
**notes** 3:15 85:1,10
  91:25
**notice** 35:11 97:1
**notification** 85:4
**noting** 88:4,4,15
**november** 18:22
  49:1
**number** 21:17
  31:13 43:21 60:24
  61:1,7 114:1
**numbered** 3:15
  85:1

**numbers** 72:24
**nuts** 56:22

**o**

**oath** 7:22 8:1,3
**object** 20:9 22:17
  23:6 24:11,21
  25:15 29:19 30:9
  33:22 37:9 38:4
  40:5 41:18 42:23
  47:18 48:4 52:22
  57:16 58:24 61:2
  61:11,22 65:2
  71:3 78:5,20 79:3
  79:24 88:8,22
  94:3,12 95:5,13
  107:7 114:9
**objection** 9:23
  38:16 39:10,19
  42:8 43:15 63:3
  97:19 103:20
  105:18 108:3
  109:2 110:12
  113:1 115:20
  116:20
**objections** 9:21
**observation** 92:2
  99:9 103:24
**observations** 3:14
  84:25 85:10 87:21
  91:25 107:12,21
**observed** 48:9
  60:7 64:19 86:8
  87:3 95:17
**observing** 92:6
**obviously** 16:4
  20:13 75:21 82:3
  94:17 101:21
  112:15
**occasionally** 26:8
  33:3

**occurred** 74:18
**odor** 87:25 88:5,16
  89:10
**office** 13:21,24
  14:6,10,19 15:17
  15:21 19:4,7
  66:19 67:5 74:19
**officer** 12:15,22
  32:2,4 35:4,24
  37:22
**officers** 35:18 36:2
**official** 1:8 11:20
**oh** 6:7 17:17 18:23
  31:4,16 45:8
  53:18 54:22 101:3
**okay** 6:7 10:10,11
  11:6,7 17:9,17
  18:5,12,23 19:18
  20:16,24 21:22
  22:11 24:7,15,24
  26:15 28:9,14,24
  29:12 30:3,14,24
  31:9,16 32:5,25
  33:6 35:22 36:6
  36:11 37:2 38:1
  39:7,25 43:3 45:8
  46:10,22 48:1
  49:8 51:2,17,21
  52:18 53:17,24
  55:13 59:19,22
  60:23 61:6 63:16
  63:22 64:23 66:13
  67:14 68:17 70:1
  72:11 73:5 74:13
  75:1,14 76:11,23
  77:15,24 78:17,24
  80:15,19 81:15
  82:13 84:5,6,12
  86:6,11,19,21 87:3
  87:14,19 88:15
  89:8,13 90:19

[okay - pornography]                                                                 Page 14

91:24 93:24 94:9
94:25 95:24 96:4
98:4 100:3,20
101:3,3 102:14
103:15 104:5,19
104:19 105:22,22
106:7,14 108:10
110:7,18,24
112:20 117:3,17
**once** 46:23 51:12
67:19 68:14 70:10
73:1 75:17,17
108:17,20 113:3
**one's** 44:2,2
**ones** 51:8 87:2
**ongoing** 58:25
59:3
**operates** 55:15
114:22
**opinion** 61:9,14,23
62:2,7 63:6 88:19
**opinions** 76:8
**opposed** 111:11
**opposite** 94:13
**order** 27:25 32:22
38:9 111:15,18
**ordinarily** 22:24
**organization** 63:6
69:12
**outcome** 119:14
**outside** 68:6,20
**overarching** 39:25
41:14
**owner** 40:12 64:25
65:3 69:6,9,20,22
70:2,11,19 114:24
115:3
**owner's** 70:20,23
**owners** 64:18,20
69:24

**ownership** 35:10
35:13,25 37:24

**p**

**p** 2:1,1
**p.m.** 117:22
**packaged** 23:12
25:24 30:19 50:5
50:24
**page** 3:13 4:6,11
4:16,21 100:25
101:2 121:4,7,10
121:13,16,19
**paperwork** 17:7
50:18 55:5 87:2
**paraphernalia**
83:19 98:17
**paraphrasing** 43:5
88:3
**part** 7:7 20:5
24:10,22 45:16
46:1 57:3 60:19
100:14 105:14
**partaking** 97:24
**participate** 86:17
**participated** 19:19
20:16
**particular** 17:18
17:18 22:16 23:4
24:19 25:20,20,23
26:4 44:17 47:2
63:14 64:17 65:3
66:20 68:10 81:4
81:15 82:4,19
84:7 87:17 96:16
97:10,15 98:5,9
101:13 103:2,4
105:17 107:6
109:5,20 111:9
**particularly** 65:11
86:24

**parties** 119:12
**paths** 45:21 55:11
56:13
**patrons** 71:23
**paul** 1:3 120:4
121:1 122:1
**pay** 75:12
**pd** 13:9 56:19 66:2
**pearsons** 1:4
**pending** 8:19
**people** 7:5 37:8
47:22 51:14 57:13
57:25 60:17 61:25
66:21 67:14 71:22
111:17 114:6
**people's** 73:3
**percent** 28:6
112:18
**period** 14:5 51:18
53:15 58:8 59:11
59:25 60:16 61:7
108:15 113:7
**periodically** 9:20
**person** 28:3,19
34:5,19 37:7 38:8
45:17 55:1 60:7
64:18 114:24
116:19
**person's** 34:20
**personally** 50:8
102:15 103:9
113:25
**personnel** 81:13
90:14
**perspective** 61:19
68:12 70:12 71:21
**pertained** 70:15
105:13
**phase** 66:11
**phone** 72:23

**phones** 69:14
**photo** 111:1
**photograph**
111:11
**photographs**
111:6 112:6
**photos** 112:19,25
116:8
**phrased** 98:2
116:4
**physically** 50:12
**pieces** 30:6,14
**pivot** 44:16
**place** 18:9 62:25
63:18 70:11 72:5
80:8 99:7,9
**plain** 56:15
**plaintiffs** 1:5,18
2:2 5:23
**plan** 93:9
**planning** 35:10
**plate** 73:2
**played** 64:3 70:25
71:4
**please** 5:11 6:21
6:25 7:11 8:6,13
8:20 10:7 11:3,5
11:18
**point** 22:7,8 64:8
69:22 87:20
109:14 110:4
**police** 12:15,22
24:3 32:2,4 53:2
**policy** 27:12 28:6
29:13 38:6 40:1
41:14,19,22 98:6,9
99:5 108:11,13,17
109:24 110:10
112:23,24 114:25
**pornography**
116:7

**portion** 114:14
**portions** 105:13
**position** 11:20
  12:9
**positive** 30:18
**possession** 28:4
**possibility** 73:16
  95:10
**possible** 6:12,16
  7:4 37:1 47:9
  90:18 93:6,25
  97:2 104:16
**possibly** 36:24
  81:24
**postal** 53:4 65:23
  66:18 67:2 92:21
**potential** 30:5,7,15
  30:16,21 64:21
  84:9 88:12 89:5
  91:19 94:6 96:16
  96:17 97:5
**potentially** 75:8
  88:20
**powdered** 101:23
**practical** 19:12
**practice** 96:5 97:8
  97:11,13
**pre** 82:9 98:5
**precursor** 83:20
  91:20 98:17
**prefer** 10:14
**preliminary** 11:9
**preparation** 81:3
  82:10 92:18
**prepare** 93:13
**prepared** 80:11
  93:6,15
**present** 76:17
  77:12 78:15 83:6
  83:18,23,24 87:1
  91:22 97:25

**pretty** 17:22 117:6
**prevent** 55:19
**previous** 23:13
  65:6 75:3,21 76:1
  76:10,21 82:23
  83:3
**previously** 24:2
  34:16 83:4
**primary** 81:7 90:5
**prior** 12:13,21
  43:16 63:4 64:1
  74:8 76:5 83:21
  93:21 105:2,7
  108:4
**private** 6:1 14:24
  15:18 17:4 20:22
  44:17,19,23 45:13
  46:3,5,19,24 47:13
  47:17,23 48:3,15
  49:14 50:9 51:4
  51:23 52:2 54:21
  55:2,5 57:11 58:2
  58:17,19 60:1,16
  60:25 61:8,9,21
  62:1,9,13,25 63:18
  63:23 64:9 65:10
  70:16,24 71:23
  72:4,13 73:9
  77:25 78:3,19
  79:20 80:9 81:6
  86:10 87:6 88:18
  89:15,21 92:10
  96:7 97:6,9,17
  98:12 100:15,17
  101:7 102:17
  103:10,17 104:8
  113:13,15 115:11
**privilege** 68:4
**privileged** 75:8
**privy** 59:1

**probable** 74:10
**probably** 10:20
  32:9 38:19 42:17
  46:12 60:12 77:22
  93:19
**problem** 40:6 96:1
**proceedings** 20:25
  21:6 22:16 30:8
**proceeds** 16:9
  22:4 23:4 25:14
  26:1,7,13,22 27:2
  27:7,14 47:8
  49:24 50:2,23
  51:11 62:16 63:24
  63:25 65:13 72:9
  78:2,14,18 79:2,7
  79:9,19,21 80:6,11
  88:13,20 89:6
  94:16 95:19 115:9
  115:16 116:17
**process** 45:20 80:8
  83:6 84:3
**processed** 50:18
**processing** 84:8
**produced** 100:11
**production** 4:10
**profess** 93:19
**proffered** 63:9
  82:25
**prolong** 93:15
**proper** 39:14
**properly** 20:2
**property** 22:3
  33:20 34:5 35:20
  36:1,3 38:14,15
  39:1 43:7 44:4
  113:16 114:7
  115:18 116:18
**protect** 35:18 36:1
  40:11

**protected** 68:3
**prove** 115:3
**provide** 6:25 8:14
  38:10
**provided** 81:11
**proximity** 23:17
**pst** 1:14
**public** 5:22 72:24
  118:6 122:19
**pull** 15:11 84:12
**pulled** 85:9 100:2
**purpose** 9:23
  30:11 35:1,3 36:6
  108:2,21,24
**purposes** 9:25
  35:23 60:2 107:16
**purse** 33:11
**pursued** 60:13
**put** 15:1,4 16:19
  45:22 66:8 116:14
**putting** 21:17

**q**

**qualify** 115:24
**question** 4:20 6:3
  6:21 7:1,12,14,15
  7:18 8:6,9,10,13
  8:17,19,24 9:21,23
  10:1,6 11:1 20:10
  22:25 25:1 26:16
  26:20 27:4 33:23
  40:7 65:4 67:23
  68:21 70:22 76:19
  76:24 77:9 98:1
  104:25 108:12
  109:3 110:18
  111:3 112:21
  113:11 114:20
  116:4
**questioning** 10:14
**questions** 6:12,14
  6:15 7:23 9:3

Exhibit N
1446

10:16 11:11 30:4
59:5
**quick**   10:16 60:6
84:13 99:18
104:25 117:3,5
**quite**   25:2 46:16
53:19 55:16 73:6
101:21

**r**

**r**   2:1 121:3,3
**radar**   51:15
**rambling**   11:8
**ran**   72:21 73:2
75:3
**random**   57:21
**razor**   102:7
**read**   8:7 20:10
41:20 87:21
100:21 114:12,15
120:9 122:5
**reads**   101:13
**ready**   11:12 74:3
**real**   22:3 84:13
99:17 117:5
**realized**   111:14
**really**   6:22 17:24
21:17 25:4 48:24
83:12 117:13
**realtime**   1:22 5:3
119:4
**reason**   9:5,15 15:4
20:5 29:10 81:16
95:1 107:3 110:9
111:9 120:11
121:6,9,12,15,18
121:21
**reasons**   36:18
37:25 72:7 102:1
102:10
**recall**   17:14 24:4
43:6 57:25 84:11

86:23 87:10,16
103:9 105:6,10,12
105:19 106:1
**recalling**   110:22
**receipt**   38:7,14
39:18 40:4 41:17
120:18
**receive**   18:13,24
19:25
**recess**   16:13 44:13
80:21 104:22
117:9
**recognize**   101:6
**recollection**   28:15
36:5
**recollections**
107:12
**record**   5:11,16
6:23 9:12,24
11:17 15:14 16:12
44:12,25 72:24
114:14 117:7,18
119:9
**recorded**   6:11
111:1,5,6,10
**recording**   6:13
106:1
**recordings**   106:8
106:11,16,19
112:7,17
**records**   38:2 39:7
69:13 112:5
**recruiting**   65:8
69:6
**referenced**   91:12
120:6
**referring**   67:7
82:16 83:11 91:13
**refresh**   107:12
**regard**   109:24
112:23,25

**regards**   49:12
**related**   26:1,13,21
48:12 55:5 83:5
119:12
**relationship**   70:20
70:24
**remember**   10:4
17:2 48:18 49:2
60:14,21 66:4,13
66:20 67:3 73:19
103:12 105:15
**remove**   40:14
**removed**   67:11
**renting**   61:20
**repeat**   14:14 33:23
42:25
**repeatedly**   57:20
58:1,7
**rephrase**   8:8
22:25 34:2 61:17
**report**   7:9 100:19
**reported**   1:20
**reporter**   1:22 5:3
5:6 6:13,22 7:21
8:7 9:9 20:11
114:15 117:19
119:4
**reports**   49:2 64:16
**represent**   5:22
**request**   4:10
**requested**   112:15
114:14
**requests**   40:18
**require**   44:24
108:11,14
**required**   122:13
**requires**   7:22
**residence**   14:1
**residue**   89:2
**resolved**   59:10

**resources**   29:24
29:25
**respect**   68:18
**respond**   68:21
**responses**   6:24 7:1
**responsibility**
36:23
**rest**   7:13
**result**   48:17 49:8
49:23 50:2,22
58:22
**resulted**   48:20
49:14 50:15
**retain**   38:9 110:15
110:16
**retained**   19:8
107:17 113:7
116:10
**retention**   109:24
110:10 112:23
**return**   35:11
115:1,18 116:13
120:13,17
**returned**   33:13
40:12 114:7 115:4
115:12 116:3,25
**returning**   115:22
**review**   105:7
106:24 120:7
**reviewed**   105:16
**reviewing**   105:12
**rfrommer**   2:7
**rich**   66:25 91:23
**rid**   108:14
**right**   11:21 12:11
17:10 18:10 36:9
40:24 44:11 58:15
59:7 67:1 69:21
80:18 82:9 83:3
84:19 88:7 89:21
89:25 92:5 106:5

106:17
rights   20:8
risk   59:2
road   2:5
rob   2:4
robert   2:4
rodgers   2:9
role   64:3 70:16,25
    71:5 81:4,16 90:2
    90:5,20,24 91:17
    105:24,25
roles   82:12,20
    84:7
rough   117:20
roundabout   12:18
rpr   1:21 119:20
rubber   89:3
ruiz   1:3
rules   6:9 28:16
run   6:10 96:5,6
    97:11,14,17
running   95:1

s

s   2:1 3:10 121:3
safe   91:20
safekeeping   33:12
safety   35:4,24
    37:23 44:23
sake   42:14
saw   58:7 107:14
saying   17:14 41:6
    43:6 71:20 76:2
says   87:22 100:23
    101:4 102:9
scenario   42:15
    93:10,11
scene   92:23 93:1
    115:1
scope   96:21
scratch   22:24
    23:21 26:18 31:22

70:21 98:6 108:12
    111:2
search   14:23 17:7
    20:14 22:2 31:10
    32:13 33:19 34:5
    34:7 35:1 36:7,8
    36:12,16 37:3,14
    37:18 39:8,15,17
    40:2 41:15 46:1
    48:19 55:6 80:1,9
    82:9,10,17 86:9
    89:4 92:24 93:8
    95:20 96:21 99:11
    104:17 107:10
searched   61:4
    97:22 99:14
searchers   98:24
searches   31:18,24
    32:7 33:7,17
    35:24 48:20,22
    49:14 81:12 86:10
    86:17 87:12 88:25
searching   35:6
seat   102:6
second   14:17
    95:25 99:19
section   2:11 92:1,2
security   53:9
see   29:4 47:14
    48:10 72:23 84:21
    100:21 106:25
seeing   71:22 85:6
    87:11,17,25
seek   78:25 79:20
    80:6
seen   66:10 85:21
    85:22,24 86:6
    87:9 100:5
seize   27:13,23 28:1
    28:10,18,24 29:5
    29:10 32:20 40:8

50:8
seized   29:3 39:9
    39:16 40:3,25
    42:5 50:11 60:18
    60:19 62:1 97:12
seizing   34:13,18
    38:9 40:9 50:17
    80:2
seizure   5:25 20:14
    34:14 35:11 59:17
    73:9 74:4,15
    82:11,17,22 83:8
    83:14,21 86:15
    89:16 90:4 93:8
    109:5
seizures   29:23
    48:21 49:9,15
send   101:4,16,24
    102:2,9,16 103:10
    103:14
sense   14:11 58:14
    70:17 73:23 93:17
    97:3,4,16 107:25
    112:3 117:2
sent   103:17 104:7
    120:14
separate   60:22
    83:10 86:11
separately   21:14
serial   43:20
series   10:15
serve   35:11
served   107:15
service   53:4
set   65:11 119:7,17
setup   84:16
shaking   6:24
share   84:15
shared   105:4
sharp   102:3

shear   71:14 86:18
sheet   120:11
sheriff's   46:15,18
sheriffs   53:3 58:5
    66:3
shift   65:16 70:3,12
    73:7 80:24
shifting   67:17
    70:25
shifts   90:13
shoes   20:7
short   96:25
shortly   17:7 64:17
shot   84:18
shove   102:5
show   23:11,14
    24:8 29:8 30:12
    55:23 107:14
showed   73:3
showing   25:5
shown   55:9
shows   29:9
shy   11:25 12:2
    13:8
side   116:14
sign   120:12
signature   119:18
signed   120:20
significant   60:25
    61:4
significantly   73:22
similar   51:8 56:20
simply   9:24
single   40:3 97:24
    97:25
sir   11:22 24:6
    110:23
site   90:21 91:16
    92:9 93:21
situated   14:9

situation   32:16 56:20 59:17 103:13
situations   33:4
six   60:22
sleep   86:25 89:18 89:20
smell   30:20 89:2
smells   26:5
smoothly   6:10,16 90:17
sniff   95:20 96:6 97:12,14,22 98:11 98:12 99:6,11,14 104:16
sniffing   26:11 92:23 102:4
sniffs   94:18 97:17
snitko   1:3,3 120:4 121:1 122:1
solutions   1:23 120:23
somebody   27:13 38:10 40:17 43:17 45:16 57:2,2,3 60:10 83:24 86:5 90:9 91:7,8 103:13 104:2
somebody's   25:6 32:18
someone's   20:8
soon   117:6
sorry   14:16 16:24 33:8,9 40:25 42:25 46:7 53:8 61:17 67:10 69:15 84:6 85:15 87:4 95:7,24 98:6 99:18 108:11 109:22 111:2 114:11,19

sort   72:20 74:20 98:23 99:9 101:18
sound   106:5
sounds   34:3 41:1,6 74:19 76:4 79:16 93:17 97:4
source   102:21
sources   69:5
south   12:19
southern   63:13
southwest   12:19
speak   6:17 96:8 97:21 101:12 103:3 104:1 109:4 109:20 110:1
speaking   113:12
special   5:13,18 11:21 12:5,7 15:22 16:1 18:9 19:3 29:4 42:2 68:12 85:13 117:12
specialize   17:15 17:24
specific   19:24 24:12 30:11 38:13 38:21,25 39:2,6 44:1,5 52:12,15,16 54:11,11 74:7 79:14 103:12
specifically   31:3 52:24 61:13 66:14 84:10 94:6,10 101:15
specifics   41:21 43:25
speculate   103:6
speculation   104:11
spent   13:7

spoke   102:20
spring   2:11 16:22 17:1
staff   67:6
stages   63:7
stamp   77:19
stand   105:17
standby   96:12 97:2
start   6:3 7:17 8:24 13:19 56:15 73:7 91:1 102:4 105:2
started   5:9 11:11 11:14,14 13:6,11 13:17 51:9 56:18 64:21 73:11
state   5:10 9:20 11:18 53:1,23
stated   11:16 36:18
statement   101:14
statements   63:10 82:24,25
states   1:1,7,8 2:10 120:4 121:1 122:1
stating   49:15
statistical   71:19
status   59:6
stenographic   5:3
step   56:23 66:10 74:17
steps   67:16,19 68:14 69:9
stills   112:10,14
stipulations   4:15
stolen   35:20 36:2 107:1 116:6
stopped   17:11
stops   48:8
storage   35:8 96:23
storc   1:4

store   47:8 62:15 83:4
stored   63:25
straight   14:4
street   2:11
strong   87:24
structured   75:24
stuff   11:10
subject   22:8,20 23:10 25:13,21 27:14 34:14
subjective   39:4 78:11
submitted   17:6 21:15
subscribed   118:4 122:14
subsequent   107:5
substance   75:5,5 84:1
substantially   42:6 43:10
substantive   76:7
suggested   65:7
suggesting   83:1
suitcase   27:5
suite   2:5
summer   77:22
supervise   91:17
supervising   90:13
supervisor   91:15 110:6
supervisors   90:21 90:22 91:22
supervisory   90:19
support   4:2
supposed   54:15
sure   19:8 27:21 28:7,17 33:24 35:5 39:11 40:21 41:9 46:13 49:4

Exhibit N
1449

55:16 60:20 84:13
87:14 88:3 90:6
90:10,16 91:2
92:16 93:5 112:18
**surveillance** 47:16
48:10 56:10 60:8
71:16 107:9
**surveillances**
47:13 54:23 71:24
**suspect** 54:17,19
56:9
**suspected** 80:11
**suspicion** 104:14
107:19 116:23
**suspicious** 103:1
103:23 104:9
**switch** 72:16
**switching** 66:5
**sword** 94:17
**sworn** 5:2 7:20
118:4 119:7
122:14

**t**

**t** 3:10 121:3,3
**take** 8:2 10:12
26:5,17,24 29:24
29:24 34:22 38:3
40:8 41:4,4 44:8
46:25 67:16 80:8
80:16 84:3 92:22
96:1 104:20 117:3
**taken** 1:17 6:4
16:14 38:15 39:1
40:18 41:10,15
42:5 44:14 68:14
75:11 80:22
104:23 117:10
**takes** 18:9
**talk** 7:5,6,9 8:18
**talked** 57:20 71:15

**talking** 8:21 16:17
17:12 20:21 43:25
51:19,25 59:3
61:14 65:4 67:23
68:1,5,10 72:18
**tangible** 107:13
**target** 45:5 52:12
52:17 54:12 55:3
55:8 60:10,11
**targeting** 73:17
**targets** 47:14 56:7
**tasked** 16:3,5,6
106:2,7
**tasks** 82:20
**taught** 37:2 38:25
**teach** 37:7
**team** 65:22 73:24
74:3 80:25 83:17
98:10 111:22
113:24
**team's** 81:2
**teams** 111:16,21
111:24
**technical** 71:19
**tell** 8:9 11:3 37:17
37:20 44:18 51:6
55:13 64:23
102:13 112:10
**telling** 103:9
**ten** 11:25 12:2
19:18
**tend** 33:16 54:3
**terms** 38:1
**testified** 5:4 21:20
79:17 88:2,3
**testify** 21:10
**testifying** 8:2
**testimony** 3:5 9:7
9:17 43:16 63:4
64:2 76:22 108:4
119:6,9 120:9,18

122:8
**texas** 13:18
**text** 87:25
**thank** 5:5,18 42:1
**thanks** 53:12
70:18 80:20
**theft** 106:24
**theirs** 57:5
**theme** 16:18
**thing** 7:4 23:18
24:16 29:22 31:8
33:14 56:11 66:19
74:11 80:12 81:22
83:20 91:10,21
**things** 22:23 23:1
25:12,16 26:2
30:20,20 33:15
37:10,16 43:14
87:23 88:10,24
89:3 90:6,16,23
95:17 101:22
107:23 115:1
**think** 7:13 9:14
10:23 16:16 17:10
23:25 40:6 45:1
47:12 50:10 76:15
101:1 102:14
109:15 117:4
**thorough** 36:19
**thought** 69:18
**three** 14:23 35:22
48:18 60:20 95:17
**threshold** 27:9,10
27:16 29:17
**thresholds** 28:7
29:13
**time** 10:13,21
11:17 16:23 17:20
29:17,24 32:1,3,6
33:1,5,8 34:6,9
48:15 51:4,18,24

58:8,11,17 59:11
59:25 60:16 61:6
61:10 69:25 71:12
72:16 73:6 77:19
80:18 83:10,13,21
87:8,9,10 89:17
91:12 93:16 96:2
97:1 101:7 108:16
113:7 114:8
117:14,22 120:19
**timeframe** 120:8
**timeline** 51:18
80:25
**times** 21:4 32:18
34:19 53:20 54:1
54:15 83:23,25
87:17
**title** 5:10 113:6
**titled** 85:9
**today** 6:2 9:3,7,17
117:14
**todd** 66:23 91:16
**toes** 56:24
**token** 7:16
**told** 102:15 103:13
**tool** 54:14 55:14
57:8,23
**totally** 8:18 28:17
59:9 67:13 73:23
116:12
**tow** 32:24
**track** 43:1
**tracy** 1:7
**traffic** 48:7
**trafficker** 65:5
69:10 70:14,15
**traffickers** 47:20
51:9 62:15
**trafficking** 22:5,6
23:5,10,15 24:9,20
25:7,7,14 34:18

[trafficking - verbal]

56:22 94:7,11,21
94:23 95:4,12
96:18 97:6 104:15
**trail** 55:25
**trained** 20:5
**training** 13:24
18:8,12,24 19:2,4
19:12,13,15,25
20:12 25:19 36:11
103:24 104:6
**transcript** 119:8
120:6,20 122:5,8
**transfer** 15:2,5
16:20 46:12 114:4
**transferred** 16:17
59:2 110:7
**travis** 1:4
**tried** 113:22
**tries** 18:4
**trouble** 27:3
**true** 18:1 32:14
112:24 119:8
122:8
**trunk** 80:3
**truthfully** 7:23
**try** 8:8 23:11 39:2
40:15 46:13 69:11
93:13 97:2 113:16
**trying** 15:11 23:7
23:25 40:14 50:10
65:12 79:15 85:8
97:16
**turn** 116:18
**turned** 45:24
64:10 106:11
112:16
**turns** 56:5
**two** 14:5 42:2,11
42:15 43:6 48:18
69:24 95:17 97:23

**tyler** 1:3
**type** 17:18 22:10
25:2
**types** 13:13
**typical** 110:10
112:24
**typically** 31:18
32:25 39:8

**u**

**u.s.** 5:25 14:24
15:18 20:21 44:16
44:18 45:13 46:2
46:5,19,23 47:13
47:17,23 48:3,15
49:14 50:9 51:4
51:23 52:2 54:21
55:2,5 57:11 58:2
58:16,19 60:1,15
60:25 61:7,9,21
62:1,9,13,25 63:18
63:23 64:9 65:10
65:23 66:18 67:2
67:4 70:16,24
71:23 72:4,13
73:9 74:19 77:25
78:2,19 79:19
80:8 81:6 86:10
87:5 88:17 89:15
89:21 92:10 96:7
97:6,9,17 98:12
100:15,17 101:7
102:17 103:10,17
104:8 113:13,15
115:11
**uh** 6:25
**ultimate** 75:22
93:2
**ultimately** 22:14
23:2
**undercovers** 63:11
69:4,16 82:25

**understand** 7:21
8:5,10,17 9:2 35:3
40:24 54:2 57:6
68:22 79:15 87:15
88:18 97:7 110:9
112:22
**understanding**
28:25 33:24 34:25
60:24 64:7 68:23
69:21 72:10 76:21
79:5,11,13,18,23
80:7 98:13 99:15
104:12 106:18,21
108:25 113:5
116:22
**understood** 42:1
84:5 113:10
**undertaking** 92:19
**unit** 17:18 53:23
**united** 1:1,7,8 2:10
120:4 121:1 122:1
**upcoming** 12:3
**usdoj.gov** 2:12,13
120:2
**use** 26:12 30:5,7
30:21 40:7 54:15
64:4 78:25 82:14
88:24 89:4 107:9
**uspv** 87:12
**utilize** 29:25 62:15
71:7 88:11
**utilized** 75:21 83:4
**utilizing** 51:11
91:1

**v**

**v** 120:4 121:1
122:1
**vague** 39:10 42:9
61:12 63:3 79:4
87:7 88:9 103:20
104:10 105:18

108:4 110:12
113:1 115:20
116:4,20
**valid** 38:3 108:1
**value** 23:9 26:15
26:19
**varies** 25:17
103:25
**vary** 39:21
**vast** 33:4 71:17,21
**vaults** 6:1 14:24
15:18 17:4 20:22
44:17,19 45:14
46:3,5,19,24 47:13
47:17,23 48:3,15
49:14 50:9 51:4
51:23 52:3 54:21
55:2,6 57:12 58:2
58:17,19 60:1,16
60:25 61:8,9,21
62:2,14,25 63:18
63:24 64:9 65:10
70:16,25 71:23
72:4,13 73:9
77:25 78:3,19
79:20 80:9 81:6
86:10 87:6 88:18
89:15,21 92:11
96:7 97:7,9,17
98:12 100:15,17
101:7 102:17
103:11,18 104:8
113:13,15 115:11
**vaults's** 62:9
**vehicle** 32:13,19
32:20,22,24 33:1
34:15,21 40:16,19
42:13 80:1,13
**vehicles** 31:21
**verbal** 7:1,4

Exhibit N
1451

[verbally - zoom]

**verbally** 6:22
**verdon** 1:4
**verify** 120:9
**veritext** 1:23
 120:14,23
**veritext.com.**
 120:15
**versa** 57:5 111:12
**version** 85:17
**versoza** 67:2 99:4
**vice** 57:5 111:12
**victor** 2:9
**victor.rodgers**
 2:13
**video** 15:10 16:10
 82:1,2,8 84:8
 105:25 106:3,4,19
 106:22,25 107:10
 107:10,14,15
 110:21,25 111:5
 111:11 112:7,16
 112:17
**videography** 81:9
 90:15
**videos** 107:4,8
 108:2,5,15 109:1,4
 109:24 110:11,16
 110:19 112:23
**videotape** 81:12
**videotaped** 1:13
**viewed** 62:25
 63:18
**vince** 93:18
**violate** 20:7
**virginia** 2:6
**vivienne** 1:21
 119:3,20
**volume** 86:18
**volunteered** 82:3
**vs** 1:6

**w**

**wa** 1:21
**wait** 7:14
**walk** 21:23
**walking** 114:24
**walks** 19:6
**want** 8:17 29:25
 41:7,8 44:16
 48:25 67:3,22,25
 69:17 76:20 80:24
 81:2,20 82:6,13
 87:19 91:24 95:15
 100:20 101:4
 102:9,24 105:22
 116:13 117:4,20
**wanted** 101:8
**wants** 72:22
**warrant** 5:25
 14:24 15:1,18
 17:4,8 20:22
 34:14 46:1 73:9
 74:4,15 75:16,20
 75:24 76:13 77:3
 78:3 81:1,3,6,8
 82:10,11,11,15,17
 82:18,22 83:8,15
 83:22 86:15 89:16
 90:4 92:24 93:8,9
 96:21 99:11 105:1
 105:3,4,13,16
 106:10 107:10
 109:6 113:14,17
**warrant's** 93:22
**warrants** 20:18,20
 22:2 48:14,19
 55:6 72:23 77:21
**water** 90:13 91:7,8
 91:9,10
**way** 13:20 25:5,23
 26:4 30:18,19
 41:3 42:25 55:21

55:22 63:6 65:10
 81:25 88:15 89:14
 98:2 99:10 104:3
 107:9,11 116:3
 119:14
**we've** 11:8 22:1
**weeks** 13:25
**went** 14:4 58:17
 62:13
**western** 1:2
**whatsoever** 74:25
**whereof** 119:16
**whichever** 108:6
**whoever's** 39:5
**wilkison** 1:8
**winter** 16:25
**wiretap** 109:17
 113:6
**wise** 12:23
**witness** 4:5 68:1
 80:19 119:6,10,16
 120:8,10,12,19
**wondering** 43:12
**word** 36:22 40:7
 40:25 55:10 82:15
**wording** 76:9
**words** 87:22
**work** 12:23 14:6
 14:12,18 15:20
 17:12,15 31:7
 76:1,10 101:21
**worked** 6:20 25:8
 60:17 100:16
**workers** 54:23
**working** 12:14,22
 13:6,11,17 16:4
 47:1,4 54:6 57:13
 93:5
**worst** 93:10
**worth** 29:17

**wound** 49:10
**wow** 6:7 31:16
 44:21
**wrapped** 117:6
**write** 29:9 43:20
**written** 19:13
**wrong** 44:2,3

**x**

**x** 3:2,10 54:17,19
 56:9

**y**

**y'all** 75:4
**yeah** 12:12 15:11
 15:24 16:23 22:23
 46:9 53:9 59:14
 61:17 66:10 67:9
 68:9 69:2 70:18
 70:18 72:3 82:12
 87:8 89:19 100:7
 100:10 101:1
 103:5
**year** 43:21 46:11
 49:3 67:10
**years** 12:1,2 13:8
 13:9 19:19 49:7
**yep** 89:22 92:7

**z**

**zellhart** 66:24
 99:4
**zoom** 1:13

Exhibit N
1452

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

**Exhibit N**
**1454**

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit N**
**1455**

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit N**
**1456**