# Exhibit O

**to Declaration of Robert Frommer**

Page 1

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA

2
              Case No. 2:21-cv-04405-RGK-MAR

3

4     PAUL SNITKO, et al.,

5                    Plaintiffs,

6     vs.

7     UNITED STATES OF AMERICA; TRACY
      L. WILKISON, in her official

8     capacity as Acting United States
      Attorney for the Central

9     District of California; and
      KRISTI KOONS JOHNSON, in her

10    official capacity as an
      Assistant Director of the

11    Federal Bureau of Investigation,

12                   Defendants.
      _____/

13

14

                    REMOTE DEPOSITION OF

15

        SUPERVISORY SPECIAL AGENT JESSIE MURRAY, AS A

16      30(B)(6) REPRESENTATIVE OF THE UNITED STATES OF
            AMERICA FEDERAL BUREAU OF INVESTIGATION

17

18                 Monday, July 11, 2022
              10:00 a.m. - 3:04 p.m. (PDT)

19

20

21

22

23              Stenographically Reported By:

24              Kimberly Fontalvo, RPR,CLR

25              Realtime Systems Administrator

```
                                              Page 2

1      APPEARANCES:

2

3      On behalf of Plaintiff:

4      THE INSTITUTE FOR JUSTICE
       By:  ROBERT FROMMER, ESQ.

5      By:  ROBERT E. JOHNSON, ESQ.
       By:  Michael Greenberg, ESQ>

6      901 N. Glebe Road, Suite 900
       Arlington, VA 22203

7

8      On behalf of the Defendants:

9      ASSISTANT UNITED STATES ATTORNEY
       ASSET FORFEITURE SECTION

10     By:  VICTOR RODGERS, ESQ.
       312 North Spring Street, 14th Floor

11     Los Angeles, California 90012

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
1                        I N D E X
2

     Examination                               Page
3

     SUPERVISORY SPECIAL AGENT JESSIE MURRAY
4    Direct              By Mr. Frommer           3
5    Instruction not to answer                   73
6    Instruction not to answer                   74
7    Instruction not to answer                  113
8    Instruction not to answer                  114
9    Certificate of Oath                        131
     Certificate of Reporter                    132
10   Read and Sign Letter to Witness            133
     Errata Sheet (forwarded upon execution)    134
11
12                        EXHIBITS
13
14   No.                                       Page
15   Exhibit 7      Supplemental Memorandum       91
                    on Box Inventory
16
     Exhibit 10     Agent Observations and        85
17                  Notes form
18   Exhibit 12     Plaintiffs' Amended            9
                    Notice of 30(b)(6)
19                  Deposition
20   Exhibit 15     USPV Notice of Forfeiture    120
21
22
23
24
25
```

Page 4

1              THE COURT REPORTER:  Please raise your

2       right hand.

3              Do you swear that the testimony you are

4       about to give will be the truth, the whole

5       truth, and nothing but the truth?

6              THE WITNESS:  I do.

7                      DIRECT EXAMINATION

8    BY MR. FROMMER:

9       Q.   Hello.  Thank you for joining me today.

10             If you could, could you state your full

11    name, title, and address for the record, please?

12       A.   Jessie T. Murray, 4000 West Metropolitan

13    Drive, Suite 200, Orange, California 92868.

14       Q.   Thank you for that.

15             My name is Robert Frommer.  I'm an

16    attorney with The Institute for Justice.  We're a

17    non-profit public interest law firm.  And we're

18    representing the Plaintiffs in this class action

19    challenge concerning the government's execution of

20    seizure warrant at U.S. Private Vaults in

21    March 2021.

22             Before we begin, I want to go over some

23    ground rules with you for this deposition to make

24    sure that it -- we have the same understanding.

25             Actually, can I ask you a question before

Exhibit O
1461

Page 5

1    we begin?  Have you had your deposition taken

2    before?

3         A.   No.

4         Q.   Okay.  All right.  I am constantly

5    surprised by that.  A number of the government

6    officials haven't been deposed, and I figured you

7    guys did that all the time.

8              Okay.  Well, then, let me go through some

9    of the ground rules since you haven't done this

10   before.  And hopefully that will keep things smooth

11   and efficient.

12             So, I'm going to be asking you questions

13   and the court reporter is going to be recording both

14   my questions as well as your answers.  To assist the

15   court reporter, I'll be sure to speak clearly and

16   audibly, and would ask that you kindly do the same.

17   Okay?

18        A.   Okay.

19        Q.   All right.  Now, when you are answering

20   the questions make sure, please, to answer each

21   question verbally.  You can hear it with me right

22   now, the court reporter can't record gestures or

23   things like "uh-huh" or "huh-uh," stuff like that,

24   but, you know, even though that's part of our usual

25   conversation, we need to be careful to say, "yes,"

Page 6

1    "no," so the court reporter can get that down.  So

2    will you be sure to provide clear and verbal

3    responses?

4         A.   Yes.

5         Q.   All right.  Great.

6              Normally, when we talk, like we're -- it's

7    not quite as bad on Zoom, but normally when we talk

8    with people, we often talk over each other, a lot of

9    cross-talk and interrupt as part of the normal flow

10   of conversation.  In normal circumstances that's

11   fine.  But with a Zoom deposition, that can make it

12   almost impossible for the court reporter to get down

13   what we're saying.

14             So, therefore, it's real important that

15   you wait until I finish a question before you begin

16   answering.  And I'd say that even if you think you

17   know where I'm going to go with the rest of it.  And

18   by the same token, I will do my best to make sure to

19   let you finish your answers before I start up with

20   another question.  Do you understand?

21        A.   Yes.

22        Q.   Okay.  Great.

23             Now, you were sworn in by Kimberly, the

24   court reporter, just a moment ago.  Do you

25   understand that you have given an oath that says you

Exhibit O
1463

Page 7

1    have to answer my questions truthfully and

2    completely?

3         A.   Yes.

4         Q.   All right.  In fact, do you understand

5    that's the exact same oath you would be taking if

6    you were testifying in court in front of the judge?

7         A.   Yes.

8         Q.   All right.  Now, if you don't understand a

9    question I ask, which could very well happen, please

10   just let me know.  Depending on, well, if it was a

11   good question or not, I'll either ask the court

12   reporter to ask that question back or to repeat the

13   question back, or I will rephrase to try to clarify

14   the question.  So, please, will you tell me when you

15   don't understand a question?

16        A.   I will.

17        Q.   Okay.  Great.

18             Now, and if you don't know the answer to a

19   question, it's fine to say so.  It's fine to say "I

20   don't know."  But if you do know the answer, or if

21   you actually do know the answer, then under the oath

22   you just took, you have you to provide that answer,

23   a full and complete answer in good faith.  So I'm

24   going to assume, unless you say otherwise, that you

25   understand my questions when I ask them.

Page 8

1          Now, if you want to talk to your lawyer,

2     Victor, that's fine.  The only thing I'd say is if

3     there's a question pending, or if you are in the

4     middle of a response, you have to finish your answer

5     and then we can take a break -- we can take a quick

6     break; you can speak to Victor.  Okay?

7          A.   Okay.

8          Q.   All right.  Because it's important to get

9     full, complete, and accurate testimony, I have to

10    ask, is there -- are you taking any medication that

11    would -- might make it difficult for you to

12    understand or answer my questions today?

13         A.   No.

14         Q.   Okay.  And is there any other reason why

15    you might not be able to give full, complete, and

16    accurate testimony today?

17         A.   No.

18         Q.   Now, sometimes the government's attorney,

19    Victor, may state an objection after I ask a

20    question.  That doesn't mean you don't have to

21    answer it.  If he's -- he will specifically instruct

22    you not to answer a question.  But an objection --

23    you still have to answer, even if Victor makes an

24    objection, because the purpose of the objection is

25    to simply record it so that if I want to use your

Page 9

1   answer to a question later on, the government can

2   say that question was improper under the rules of

3   evidence.  Do you understand?

4        A.   Yes.

5        Q.   All right.  Sometimes -- happens all the

6   time -- after you've answered a question, you might

7   remember additional information or a clarification

8   about some earlier question.  If that happens, it's

9   fine, just let me know and -- that you would like to

10  add something, and we'll make sure to do that while

11  it's still fresh in your mind.  Okay?

12       A.   Okay.

13       Q.   If you would like to take a break at any

14  time, just let me know.  I will finish my line of

15  questioning, if we're in the middle of a line, and

16  let you finish your answer and then we can adjourn

17  for a break.  Okay?

18       A.   Okay.

19       Q.   All right.  Good.

20            And I understand that it's 10:09 out

21  there.  I will try to get you out for lunch around

22  noon, so we'll try to have a -- hard break in about

23  two hours, okay?

24       A.   Okay.

25       Q.   Now, during our conversation, you may

Page 10

1    think of some documents or materials like a calendar

2    or appointment book that might help you remember

3    your answer, if you can think of something like

4    that, please tell me about it because we might have

5    that material in our files and we might be able to

6    provide it to you.  Okay?

7         A.   Okay.

8         Q.   All right.  Now, with all that said, do

9    you have any questions for me?

10        A.   No.

11        Q.   All right.  Well, then, let's start out by

12   introducing an exhibit.

13             MR. FROMMER:  This is listed as

14        Exhibit 12.  It was previously introduced at

15        the deposition on June 30th.  It is an amended

16        30(b)(6) notice.

17             When you have a moment, if you could take

18        a look at that, get a chance to familiarize

19        yourself with the document, please.

20             (Thereupon, marked as Exhibit 12.)

21             MR. RODGERS:  For the record, I'm just

22        handing her a copy of the amended notice of

23        deposition that I have.

24             MR. FROMMER:  That's fine.

25

Exhibit O
1467

Page 11

1      BY MR. FROMMER:

2          Q.    When you are ready, just let me know.

3          A.    I'm ready.

4          Q.    Do you recognize this document?

5          A.    Yes.

6          Q.    Can you tell me what it is?

7          A.    Plaintiffs' Amended Notice of 30(b)(6)

8      Deposition.

9          Q.    Okay.  Is it your understanding that you

10     are appearing today on behalf of the United States

11     to answer questions regarding the topics listed in

12     this notice?

13              MR. RODGERS:  I'll speak for the witness.

14          She's here today to answer the questions on

15          Topic Numbers 8 and 10.

16     BY MR. FROMMER:

17         Q.    Okay.  Can you describe your

18     qualifications to speak on Topics 8 and 10 that are

19     listed in the exhibit?

20         A.    I am currently the supervisor of the asset

21     forfeiture units of the Los Angeles office of the

22     FBI.  I have been so since 2019.

23              Prior to that, I was a special agent on

24     the asset forfeiture squad for a number of years.

25     And going back to '96, for about four or five years,

Page 12

1     I was also an asset forfeiture agent.

2          Q.   Oh, so you've been -- and was this all at

3     the FBI?

4          A.   Correct, all at the FBI, Los Angeles

5     office.

6          Q.   Okay.  So how many years, total, while

7     you've been at the FBI field office in Los Angeles

8     office, have you been involved in work regarding

9     asset forfeiture?

10         A.   Approximately ten years as an agent, and

11    three years or so as a supervisor.

12         Q.   Okay.  All right.  And do you get training

13    to -- is there specialized training that's involved

14    with doing asset forfeiture work at the FBI?

15         A.   Yes.

16         Q.   Can you describe that for me?

17         A.   There are annual asset forfeiture

18    conferences and then there are different trainings

19    throughout the year on different topics in different

20    locations that you either are invited to or request

21    to attend.

22         Q.   So there's periodic trainings that occur

23    that are specific to asset forfeiture; is that

24    correct?

25         A.   Yes.

Exhibit O
1469

Page 13

1          Q.    Okay.  And with all that, is there anyone

2     who you believe would be more knowledgeable than you

3     on -- to be able to discuss Topics 8 and 10 in the

4     amended 30(b)(6) notice?

5          A.    Do you mean more knowledgeable in the FBI

6     LA office or the FBI in general?

7          Q.    Well, Topic 8 is about the administrative

8     forfeiture process with regards to

9     U.S. Private Vaults.  Topic 10 is about how the

10    disposition -- disposition of forfeiture proceeds to

11    constituent agencies who were involved in the

12    U.S. Private Vaults action.  So I'm focused

13    specifically on the LA field office.

14              So with that, can you think of anyone who

15    would be more knowledgeable than you on Topics 8 and

16    10.

17         A.    I am qualified to speak on those topics.

18    I don't know if I would say I am the most qualified

19    person to speak on those topics.

20         Q.    Well, do you think there is someone who is

21    more qualified than you to speak on those topics?

22         A.    In the Los Angeles office, I am most

23    likely the person most knowledgeable about these,

24    but there are perhaps other people most qualified.

25    I wouldn't say that I am the best person

Exhibit O
1470

1    knowledgeable about all of these topics.

2         Q.   Okay.  I am not -- I understand.  I am not

3    trying to put you out to be like the world's

4    foremost authority on civil forfeiture.  But you do

5    have good knowledge about the administrative

6    forfeiture proceedings, both in this case and then

7    the forfeiture process generally; is that fair to

8    say?

9         A.   Yes.

10        Q.   Okay.  There you go.

11             Can you tell me:  What did you do to

12   prepare for today's deposition?

13        A.   I spoke with Victor and I also read this

14   Plaintiffs' Amended Notice of 30(b)(6) Deposition.

15        Q.   Did you read any other documents besides

16   the amended notice?

17        A.   Specifically with regards to

18   U.S. Private Vaults?

19        Q.   Specifically with regards to -- in

20   preparing for this deposition.

21        A.   No.

22        Q.   So you didn't happen to look at the -- any

23   of the -- scratch that.

24             So your preparation for today was talking

25   to the counsel for United States and reviewing the

Exhibit O
1471

Page 15

1      amended 30(b)(6) notice; is that correct?

2            A.   Yes.

3            Q.   All right.  But no other documents; is

4      that correct?

5            A.   Correct.

6            Q.   Before we begin talking, I understand that

7      you are here today as the representative of the

8      United States.  And what that means is that, unless

9      I say otherwise, your answers are the answers of the

10     United States.  But right now I want to get some

11     background about you, the person, as opposed to you

12     the representative.

13               You may have already done this, but could

14     you tell me your full name, please?

15           A.   Jessie.  My middle initial is T-S-U-I,

16     dash, S-H-I-H.  Last name, Murray, M-U-R-R-A-Y.

17           Q.   Okay.  Great.

18               Do you mind tell me your age, please?

19           A.   52.

20           Q.   And are you from Los Angeles originally?

21           A.   Yes.

22           Q.   So did you -- are you born and raised

23     Angeleno?

24           A.   Yes.

25           Q.   Where did you go to -- could you tell me

Exhibit O
1472

Page 16

1      your school history, your educational history?

2          A.   Starting from where?

3          Q.   Oh, let's start with college.  I don't

4      need to know where you went to fourth grade.

5          A.   I went to and graduated from UC Irvine and

6      then I went to McGeorge Law School.

7          Q.   And did you finish law school?

8          A.   Yes.

9          Q.   So you have a law degree?

10         A.   Yes.

11         Q.   When did you graduate from McGeorge,

12     roughly?

13         A.   1994.

14         Q.   And can you tell me, after you got the

15     degree from McGeorge, what did you do after law

16     school?

17         A.   I held a temporary job while my

18     application process was going through at the FBI.

19         Q.   So you had applied immediately after law

20     school to become a special agent at the FBI?

21         A.   Yes.

22         Q.   And so when did you get accepted to join

23     the FBI?

24         A.   About a month before I started Quantico,

25     which was September 17, 1995.

Page 17

1          Q.   You know exactly where I'm going next.  So
2     you went to Quantico in September of '95.
3               How long does the FBI training at Quantico
4     last?
5          A.   Right now it's about four months.
6          Q.   How about when were you doing it?
7          A.   I graduated January 17th, so it was a
8     little bit longer back then, closer to five months.
9          Q.   Okay.  All right.  And what sort of
10    things -- is that where they teach you sort of the
11    nuts and bolts of being an FBI agent?
12         A.   Yes.
13         Q.   Okay.  And did you have practice doing
14    arrests in Hogan's Alley?
15         A.   Yes.
16         Q.   And did they teach you there how to, like,
17    execute a warrant, a search or seizure warrant?
18         A.   Yes.
19         Q.   And generally -- and did they teach you
20    about -- did they -- one thing I'm interested in
21    when you go through this FBI training is, are there
22    any modules about, like, constitutional rights,
23    like, here's people constitutional rights, here's
24    how we should act so as to avoid infringing on them?
25         A.   Yes.

Exhibit O
1474

Page 18

1          Q.   And did that, if you recall, include some

2     discussion of how to avoid violating someone's

3     Fourth Amendment rights?

4          A.   Yes.

5          Q.   And what is your official position name

6     now?

7          A.   Supervisory special agent.

8          Q.   Supervisory special agent.

9               And is that term basically a --

10    supervisory special agent is just -- it's, like, a

11    supervisor of multiple special agents, it's one

12    level up; is that an accurate description?

13         A.   Yes.

14         Q.   So who is it that you are supervising as a

15    supervisory special agent?

16         A.   The asset forfeiture squad of the

17    Los Angeles office.

18         Q.   Can you tell me a bit about that squad?  I

19    don't know much about it.  What is -- can you just

20    describe to me the asset forfeiture unit in the LA

21    FBI field office, like how many agents are there,

22    how -- just -- I mean, I just want you to sort of

23    tell me about it generally because I don't know

24    anything about it.

25         A.   There are two special agents on the squad

Exhibit O
1475

Page 19

1     and other staff positions.

2           Q.   And what do the special agents do?

3           A.   They work with the criminal case agents on

4     asset forfeiture investigations.

5           Q.   And are they -- so they work with criminal

6     investigators.  And is the -- what are the two

7     special agents' names?  Your two asset forfeiture

8     squad agents who work under you, what are their

9     names?

10          A.   Heather Campbell and Doris Webster.

11          Q.   And you said -- so you have two -- and

12    they're -- you said they're special agents, right,

13    so they're full FBI special agents.

14               And then you mentioned some other staff

15    positions, and I was wondering if you can tell me

16    who those people are?

17          A.   We have four paralegal specialists.

18          Q.   Okay.

19          A.   Do you want their names?

20          Q.   Sure.

21          A.   Judy Scott, Steven Olson, Karla Adachi

22    Adoche, and Katherine Pimentel.

23          Q.   Can you tell me:  What is their job, the

24    paralegal specialists, and how does it differ from

25    the special agents we talked about previously?

Exhibit O
1476

Page 20

1          A.   The paralegal specialists are support

2     staff positions and they process the case, they

3     handle the paperwork, they get asset ID numbers, get

4     reports, upload it, send letters, more of the

5     administrative part of the asset forfeiture

6     investigation.

7          Q.   So they are the ones -- are they the ones

8     who are, like, processing the evidence as part --

9     I'm trying to figure out a good way to say this.

10              So the asset forfeiture paralegals, are

11    they involved in collecting and assembling the

12    evidence that could be used at a potential

13    forfeiture proceeding?

14         A.   No.

15         Q.   So what are they doing?  I really don't

16    understand then.

17         A.   They receive the reports, description of

18    the assets.  They work with the United States

19    Attorney's Office and the Marshals Service, with all

20    the various communications about the status of the

21    investigation, arranging the transfer of custody,

22    gathering reports, sending notice letters,

23    communicating with attorneys and sometimes claimants

24    and victims.  Doing petition investigations when

25    victims are requesting for money back that we've

Exhibit O
1477

Page 21

1      seized from the defendants.  So they handle the

2      paperwork, the processing of the case

3      administratively.

4          Q.   Okay.  So they're deeply involved in the

5      administrative processing of forfeiture matters in

6      your unit; is that right?

7          A.   Yes.

8          Q.   And so you said that they were -- you

9      mentioned a lot about reports and I'm little

10     confused what you mean by "a report" there.  So I'm

11     trying to understand this generally.

12              Let's just walk through -- I'm just trying

13     to understand what asset -- the special agents, I

14     think I understand.  Although can you describe to me

15     a little more clearly, you said that the special

16     agents, your two asset forfeiture special agents,

17     work in conjunction with the criminal investigators;

18     is that correct?

19         A.   Yes.

20         Q.   And what are they doing when they're

21     working in conjunction with the criminal

22     investigators?

23         A.   They're talking to them about their case.

24     They're either asking them or helping them identify

25     assets that could potentially be subject to seizure,

Page 22

1      reviewing bank records regarding tracing of the

2      criminal proceeds to a particular type of assets.

3      And at times they're working on seizure warrant

4      affidavits and then getting those seizure warrant

5      affidavits sworn out and executing seizure warrants.

6          Q.    Okay.  So they're working pretty

7      closely -- your asset forfeiture special agents, it

8      sounds like they're working pretty close with the

9      criminal investigators, helping the investigators

10     identify assets that might be subject to seizure and

11     potential forfeiture activity, and helping move that

12     process along, the potential of seizure and

13     forfeiture, that process along.  Is that an accurate

14     statement?

15         A.    That is a common role that they play.  And

16     it depends on the type of investigation.  Sometimes

17     they don't have that opportunity to be so fully

18     involved.  Sometimes we don't find out about

19     something until right before.  So it can vary the

20     level of involvement.

21         Q.    So it's better than -- it's best practice

22     to get your asset forfeiture people involved in

23     investigation as early as possible; is that

24     generally good practice?

25         A.    Yes.

Exhibit O
**1479**

Page 23

1          Q.    If the asset -- and the reason -- I just
2     want to make this explicit because I want to make
3     sure I'm correct.  The reason is because if the
4     asset forfeiture people are brought into the process
5     too late, you might not be able to, like, capture
6     the information or otherwise gather the information
7     you would need to be able to make a meaningful
8     decision about whether to seize and/or forfeit a
9     particular item of property?
10         A.    That could be one of the reasons, yes.
11         Q.    What's another reason?
12         A.    We might not be able to get notice letters
13    out on time if we don't have the information on a
14    timely basis.  So that's another reason.
15         Q.    Oh, so you are saying that if the criminal
16    people don't loop you in early enough, it might be
17    that the statutory period for sending out an
18    administrative forfeiture notice might lapse before
19    you really have a chance to get involved?  Is that a
20    fair summary of what you are saying?
21         A.    Yes.
22         Q.    Makes sense to get you in early.
23               So you said before you became the
24    supervisory special agent, you were actually the
25    special agent on asset forfeiture; is that right?

Exhibit O
1480

Page 24

1          A.   One of the special agents on the asset

2     forfeiture squad.

3          Q.   And there's usually what, two?

4          A.   There have been three at times and more in

5     the past.  Right now there are two.

6          Q.   Okay.  Is there a reason that the number

7     of special agents tasked to asset forfeiture changes

8     over time, or is it just the demands of the job?

9          A.   That is a management question.

10          Q.   Okay.

11          A.   Higher level executive management, above

12     my pay grade.

13          Q.   Okay.  So you know times you've got two

14     agents, sometimes you've got three agents.  You

15     don't know why.  That's just what it is.

16          And then you said you have four paralegal

17     specialists right now; is that correct?

18          A.   Yes.

19          Q.   Is that number also subject to some

20     variations?

21          A.   That has stayed the same throughout my

22     time on the squad.

23          Q.   Okay.  All right.

24          It sounds to me like you are really

25     involved in asset forfeiture, like, stem to stern,

Exhibit O
1481

Page 25

1      like the whole process.  Would you say that's -- is

2      that accurate?  Are you familiar with the overall

3      forfeiture process?

4              MR. RODGERS:  Objection.  Vague and

5          ambiguous.  Beyond the scope of the topics.

6          A.   So now I answer, correct?

7      BY MR. FROMMER:

8          Q.   Yes.  Now you answer.

9          A.   I know, generally, the asset forfeiture

10     process.  I have been involved in the asset

11     forfeiture squad in the Los Angeles office for many

12     years.

13         Q.   So it's fair to say that you are familiar

14     with the process for seizing items for forfeiture

15     purposes, correct?

16         A.   From the agent's perspective, yes.

17         Q.   And you're familiar with the process of

18     sending out an administrative forfeiture notice,

19     correct?

20         A.   The agents don't send those out.  I am

21     familiar with the notice letter, but I don't have a

22     hand in those getting sent out.

23         Q.   Okay.  But have you a supervisory role,

24     correct?

25         A.   Yes.

Exhibit O
1482

Page 26

1        Q.   I understand that you yourself are not
2    writing out the administrative forfeiture notices,
3    but that's -- members of your staff do that; is that
4    correct?
5        A.   Not my staff.  They do not generate those
6    notice letters.
7        Q.   Oh, where do administrative forfeiture
8    notice letters get originated from then?
9        A.   From our headquarters in Washington, D.C.
10       Q.   Okay.  So an administrative forfeiture
11   notice that someone receives, comes out of the D.C.
12   headquarters; is that fair to say?
13       A.   Yes.
14       Q.   And now is that the case just for your
15   field office, or is that generally how it works for
16   the FBI altogether?
17           MR. RODGERS:  Objection.  Beyond the scope
18       of the deposition notices.
19       A.   Generally, all the FBI office
20   administrative forfeiture notices get sent from
21   headquarters in Washington, D.C.
22     BY MR. FROMMER:
23       Q.   So you're involved in the seizure
24   decisions.  I assume -- are you also involved in the
25   decision of whether to move for administrative

Page 27

1    forfeiture as to any given piece of property?

2         A.   I as a supervisor of the asset forfeiture

3    squad. I make the call, along with our special

4    agents, about whether or not we go forward.

5    Sometimes the agents make the decision on their own.

6    Sometimes we discuss it.

7         Q.   I'm actually -- I'm quite interested in

8    this because it's something that I just don't

9    understand.

10        So let's say that -- let's say the FBI has

11   seized an asset, okay?  And you are thinking maybe

12   potentially we want to pursue administrative

13   forfeiture on this.  Can you just walk mow through

14   the process by which you and your team decide

15   whether, in your opinion, the FBI should pursue or

16   not pursue administrative forfeiture?  I don't know

17   anything about this process.

18        MR. RODGERS:  Objection.  Calls for a

19        narrative.

20        A.   We look at the facts of the investigation

21   and whether or not there's probable cause for the

22   seizure.

23   BY MR. FROMMER:

24        Q.   So if there is -- okay.  Well, I get that.

25   Let's say you have a seized item.  The item has

Exhibit O
1484

Page 28

1    already been seized.  Then you -- so you have the

2    seized item.  It's in some warehouse.  I don't know.

3    And you are deciding whether to recommend -- whether

4    to recommend pursuing administrative forfeiture on

5    that property, on that piece of property.  Can you

6    just -- what I'm trying to understand is sort of

7    that process by which you make those determinations.

8    Can you describe to me how you work with the special

9    agents to decide whether, yes, we should recommend

10   that this go through administrative forfeiture or

11   instead it should be returned?

12          MR. RODGERS:  Same objection.

13       A.   It depends on if we have a seizure

14   warrant, then the seizure warrant, there's been an

15   affidavit that's been reviewed by a magistrate

16   judge, and the magistrate judge has signed off on

17   that, that's one of the ways.  And then another way

18   is a probable cause seizure pursuant to an arrest or

19   search warrant.  So we look at the facts of the

20   investigation to decide whether we pursue it.

21     BY MR. FROMMER:

22       Q.   Pursue it is what -- that's what I'm

23   getting at.  I'm not talking so much about the

24   seizure.  I'm assuming the FBI already has the item

25   in its custody.  I'm talking about more the decision

Page 29

1    on whether to move on forfeiture.  That's what I'm

2    trying to understand.  So I'm little confused by

3    your word "it" there.

4         A.   So if I have gone -- if we have gone

5    through the effort to get a seizure warrant, then

6    the decision has been made that we're going to seize

7    and attempt to ultimately forfeit that.  And the

8    same with a probable cause seizure via an arrest or

9    search warrant.

10            If the agent has decided at that time that

11   they are going to seize the items and that there's

12   probable cause to believe that the asset represents

13   proceeds of the criminal activity, then we have

14   decided to go forward with that the asset forfeiture

15   process.

16        Q.   Okay.  I think I understand.  So basically

17   once an item is in your custody, once the property

18   is in your custody, then you're determining do we

19   have probable cause to believe that this is -- this

20   property is either -- either criminal proceeds or,

21   you know, otherwise forfeitable.  And if that's the

22   case, then the office recommends pursuing

23   administrative forfeiture.  Is that an accurate

24   summary?

25        A.   Yes.

Exhibit O
1486

Page 30

1          Q.   And you said that when you have a seizure
2     warrant, that's sort of already -- that's sort of
3     already answers that question?  I think that's what
4     you said.  Like when you have a seizure warrant,
5     that sort of already determines that, what, that you
6     can and should move forward on forfeiture?
7               MR. RODGERS:  Objection.  Beyond the scope
8          of the topics.
9          A.   For the most part, if we have a seizure
10    warrant, then there's been a determination that
11    there's probable cause for the seizure and we would
12    take that through the asset forfeiture process,
13    whatever asset has been seized pursuant to the
14    seizure warrant.
15      BY MR. FROMMER:
16         Q.   Okay.  Are there ever, like, situations
17    where there could be something seized pursuant to a
18    seizure warrant, but the government -- what I'm --
19    I'm a little confused by here is -- you are saying
20    you have the seizure warrant.  Once you seize the
21    item, then you basically have probable cause to move
22    forward on the forfeiture.
23              I'm wondering is there any subsequent
24    investigation by the special agents or paralegal
25    specialists into the facts and circumstances

Page 31

1    surrounding the property that you are considering

2    whether to forfeit or not?

3              MR. RODGERS:  Objection.  Beyond the scope

4         of the topics.

5         A.   Yes, there are times when we do

6    investigations after the seizure has been effected.

7      BY MR. FROMMER:

8         Q.   And what kind of situations would you

9    conduct that sort of the investigation?

10             MR. RODGERS:  Same objections.

11        A.   Generally, those, in my experience, occur

12   when there's a probable cause seizure pursuant to an

13   arrest or search warrant.

14     BY MR. FROMMER:

15        Q.   Now, why is it more likely in that

16   situation as opposed to the one we talked about

17   before?

18             MR. RODGERS:  Same objection.

19        A.   For instance, if we execute a search

20   warrant, there may be items that we didn't expect to

21   find, but the investigation and perhaps items at the

22   search warrant or events that occurred at the search

23   warrant provide probable cause to seize that item.

24     BY MR. FROMMER:

25        Q.   And then in that situation, the special

Page 32

```
 1    agents might conduct additional investigation to
 2    determine whether to move forward on forfeiture or
 3    not; is that correct?
 4              MR. RODGERS:  Same objection.
 5         A.   To do a little more investigation to
 6    supplement the probable cause.
 7       BY MR. FROMMER:
 8         Q.   Oh, okay.  I see.
 9              So you've seized the item, but you're
10    investigating to try to get a bit more evidence that
11    this is criminal proceeds or otherwise forfeitable,
12    and then if you can find that evidence, then you're
13    more likely to bring the administrative forfeiture
14    action; is that fair?
15              MR. RODGERS:  Same objections.
16         A.   Not always the probable cause will be
17    there, then it can strengthen the probable cause,
18    and sometimes just one piece of evidence leads to
19    other pieces of evidence, so there's still other
20    things, other stones left unturned, so there's going
21    to be some additional investigation sometimes after
22    the fact, after the seizure has been made.
23       BY MR. FROMMER:
24         Q.   Okay.  And all this requires, you know --
25    and I'm assuming to conduct this sort of
```

Exhibit O
1489

Page 33

1      investigation, you need to collect evidence; is that

2      fair to say?

3              MR. RODGERS:  Same objection.

4          A.   Not always will it be about collecting

5      evidence.  More investigation if it is warranted.

6        BY MR. FROMMER:

7          Q.   Well, yeah.  And by that I -- that's fair.

8      I mean, in that situation, you are conducting an

9      investigation to see if you can collect more

10     evidence that points to whether you should pursue

11     forfeiture or not.  Is that fair?

12             MR. RODGERS:  Same objection.

13         A.   Not always collecting evidence.  But doing

14     more work.

15         Q.   Okay.

16         A.   Because we can interview someone and write

17     a report, and I wouldn't characterize that as

18     collecting evidence.  To me, collecting evidence is

19     more I take a tangible object versus I'm

20     investigating and writing a report.

21       BY MR. FROMMER:

22         Q.   Okay.  That's fine.  But there is

23     sometimes subsequent investigation in order to make

24     a decision about whether to move for forfeiture or

25     not.

Page 34

1          Can you explain to me one thing I'm a

2    little confused by in the overall forfeiture process

3    is the U.S. Marshals Service.  Can you explain to me

4    how -- what their role is in the forfeiture process?

5               MR. RODGERS:  Objection.  Beyond the scope

6          of the topics.

7          A.   The marshals have custody of the assets as

8    they go through the asset forfeiture process.

9      BY MR. FROMMER:

10         Q.   Okay.  So the marshals are the ones who

11   hold, physically possess the items that are going

12   through the forfeiture process?

13              MR. RODGERS:  Same objection.

14         A.   Yes, except for currency.  The currency

15   gets deposited into the bank.  So they don't

16   physically hold the currency in its original state.

17     BY MR. FROMMER:

18         Q.   So do the U.S. Marshals -- so the U.S.

19   Marshals, when you say they physically possess

20   property, other than currency, is that all property

21   that's been seized or is it just that property that

22   is potentially subject to forfeiture proceeding?

23              MR. RODGERS:  Objection.  Beyond the scope

24         of the deposition topics.

25         A.   The marshals take custody of seized assets

Page 35

```
1     that are going through the asset forfeiture process.
2       BY MR. FROMMER:
3         Q.   Okay.  Other than currency?
4              MR. RODGERS:  Same objection.
5         A.   They take custody of it, but it's not the
6     physical asset anymore because the currency has been
7     deposited into the Marshals Service bank account.
8       BY MR. FROMMER:
9         Q.   Okay.  And I was wondering about this.  So
10    when there's currency, and the Marshals Service, you
11    know -- I understand that -- that you take the
12    currency and then you deposit it in a bank, into the
13    marshal -- into the marshal's account.  So is the
14    money -- so is that money at that point in the asset
15    forfeiture fund?  Or is it in a separate account
16    that's just controlled by the marshals?
17        A.   As far as I know, it's in the Marshals
18    Service bank account, and not the asset forfeiture
19    funds.
20        Q.   Okay.  Now, when that cash you said --
21    when that cash is seized and deposited, does all
22    cash that's seized and deposited get put into CATS?
23        A.   Each asset that is currency that gets
24    deposited with the Marshals Service has its own
25    CATS ID number.
```

Exhibit O
1492

Page 36

1      Q.   And are there situations where cash would

2    not be deposited with the U.S. Marshals Service?

3      A.   In general, there may be -- I don't know

4    how broad you are asking.

5

6

7

8      Q.   Well, that's why I was wondering, and let

9    me actually turn here because I know that with

10   U.S. Private Vaults, some money -- some currency

11   didn't get into CATS, it just went to -- from what I

12   understand, just went into evidence, and it didn't

13   get put into CATS.  Is that your understanding?

14          MR. RODGERS:   Objection.  Beyond the scope

15      of the topics.

16      A.   I know that there are some currency assets

17   that were seized and just went to our evidence and

18   did not go to the Marshals Service.

19    BY MR. FROMMER:

20      Q.   Do you know why?

21          MR. RODGERS:   Same objections.

22      A.   We have generally minimum monetary

23   threshold for our asset forfeiture seizures.

24    BY MR. FROMMER:

25      Q.   But why is that?

```
 1                MR. RODGERS:  Objection.  Beyond the scope
 2           of the topics.  Calls for speculation.
 3           A.    Sometimes because the asset forfeiture
 4      process is lengthy and involves a lot of resources,
 5      if we seize a hundred dollars, we're not going to
 6      take that through the asset forfeiture process
 7      because it's more costly -- it's going to cost us
 8      more than a hundred dollars to take that ultimately
 9      through the asset forfeiture process.
10        BY MR. FROMMER:
11           Q.    So the government would end up losing
12      money pursuing that forfeiture?
13                MR. RODGERS:  Same objection.  Poses an
14           incomplete hypothetical.
15           A.    Well, the cost would be more than the
16      value of the asset.
17        BY MR. FROMMER:
18           Q.    Okay.  I think we're on the same page with
19      that.
20                Typically, where is that cut-off where the
21      value of the currency or the amount of currency
22      isn't enough to make the potentially, you know,
23      going through forfeiture worth it?
24                MR. RODGERS:  Objection.  Beyond the scope
25           of the deposition topics.  Vague and ambiguous.
```

**Exhibit O**
**1494**

Page 38

1          A.    For currency, it's $5,000.

2      BY MR. FROMMER:

3          Q.    Okay.  So $5,000 is -- is that the FBI's

4      policy?

5              MR. RODGERS:   Same objection.

6          A.    Yes.   Generally, that's our minimum

7      threshold.

8      BY MR. FROMMER:

9          Q.    Okay.

10             MR. FROMMER:   Let's just take a

11         five-minute break, if you don't mind.   Okay?

12             MR. RODGERS:   Sure.

13       (Recess was held from 10:53 a.m. until 11:01 a.m.)

14      BY MR. FROMMER:

15         Q.    Let's go back on the record.

16             Now, Special Agent Murray, you were

17     talking before about sometimes there would be an

18     investigation.   Sometimes there's an investigation

19     subsequent to the seizure of an asset in order to

20     determine whether to pursue forfeiture,

21     administrative forfeiture, judicial forfeiture.   And

22     I was -- can you tell me, when you are conducting

23     that investigation, what is it that your agents are

24     attempting to determine?

25             MR. RODGERS:   Objection.   Beyond the

Page 39

1          scope.  Calls for a narrative.

2          A.   It's more not starting another

3     investigation.  It's continuing the same

4     investigation and it's just to find out additional

5     information.  Generally, that situation I spoke

6     about, is when we are executing a search warrant and

7     we come across an asset that we didn't know about,

8     but it's -- there's probable cause.  So then if it's

9     a car, then we might follow up with, you know,

10    title, registration, financing other -- gathering

11    facts about that asset that we did not know about

12    beforehand.  That's an example.

13    BY MR. FROMMER:

14         Q.   Okay.  And the purpose for that

15    investigation is to determine whether you believe

16    that there's probable cause that it's connected to

17    criminal activity and could be forfeited?

18              MR. RODGERS:  Same objection.

19         A.   When we've seized it, we've already made

20    that -- I've already -- we, agents, together, alone,

21    we've made that determination that there is probable

22    cause.  So this is just additional information that

23    will support the existing probable cause.

24    BY MR. FROMMER:

25         Q.   Okay.  So you are attempting to identify

Page 40

1     additional information through the subsequent

2     investigation to buttress the idea that there's

3     probable cause that this property is forfeitable; is

4     that accurate?

5               MR. RODGERS:  Same objection.

6          A.   Yes, to strengthen the probable cause.

7       BY MR. FROMMER:

8          Q.   All right.  Who does that subsequent

9     investigation you are talking about?

10         A.   Sometimes it's the paralegal specialists,

11    sometimes it's the criminal agents, sometimes it's

12    the asset forfeiture agent or other agents on the

13    squad, various people.

14         Q.   I'm trying to figure out, like, when

15    they're conducting this investigation, what are the

16    types of things that an agent or a paralegal

17    specialist would look at to potentially buttress the

18    probable cause determination?

19              MR. RODGERS:  Objection.  Calls for a

20              narrative.  Overbroad.  Beyond the scope of the

21              topics.

22         A.   Looking at interview reports, bank

23    records, other type of financial records, database

24    checks, things like that.

25

**Exhibit O
1497**

Page 41

1        BY MR. FROMMER:

2            Q.   When you say "database checks," like a

3        criminal -- like NCIC, would be an example of a

4        database that would be queried?

5                    MR. RODGERS:   Same objections.

6            A.   Yes.

7        BY MR. FROMMER:

8            Q.   How about the FinCEN database?   Would that

9        be a database that would be queried?

10                   MR. RODGERS:   Same objections.

11           A.   Sometimes.

12       BY MR. FROMMER:

13           Q.   Are there other databases that your agents

14       frequently query other than NCIC and FinCEN?

15           A.   DMV, LexisNexis, Accurint.

16           Q.   What is Accurint?   I haven't heard of

17       that.

18                   MR. RODGERS:   Same objection.

19           A.   I think it's just one for addresses, phone

20       numbers, identifiers.

21       BY MR. FROMMER:

22           Q.   Okay.  And this is all part of

23       understanding how the government conducts its

24       administrative -- its investigation and initiation

25       of administrative forfeiture proceedings.

Exhibit O
1498

Page 42

```
 1            So you've seized an asset, the government
 2      seized an asset.  It's conducted some subsequent
 3      investigation.  It collects all the information.
 4      And at that point, how does the government decide
 5      whether to pursue administrative forfeiture as
 6      against a particular asset?
 7            MR. RODGERS:  Same objections.
 8        A.   Once again, the acquisition of the seizure
 9      warrant, that's one way where probable cause has
10      been determined and we're going to go forward.  And
11      then during the execution of the arrest or search
12      warrant, if we seize something based on probable
13      cause, at that time, that's when a decision has been
14      made that there's probable cause, that that asset
15      represents proceeds of criminal activity and we plan
16      to go forward with the asset forfeiture process.
17        BY MR. FROMMER:
18        Q.   And who is making the decision about
19      whether to pursue administrative forfeiture as to a
20      particular piece of property?  Is that happening at
21      the field office level or at the FBI headquarters?
22      If you could just provide me some explanation for
23      that.
24        A.   Generally, at the field office level.
25        Q.   And when would the decision to pursue
```

Page 43

1      forfeiture be made at the headquarters level instead

2      of the field office?

3          A.   There may be times where there's a

4      disagreement, if at the field office level I think

5      this there's enough PC and headquarters disagrees.

6          Q.   Okay.  And you keep saying -- so

7      probably -- is -- probable cause is the standard.

8      That's the standard that's used to decide whether to

9      pursue administrative forfeiture or not, whether the

10     government believes it has probable cause that this

11     property is tied to some forfeitable activity?

12         A.   Probable cause to believe that the asset

13     represents proceeds of criminal activity, yes, tied

14     to a forfeiture statute.

15         Q.   Okay.  All right.  I got that.

16              So now we've made the decision, and let's

17     say the government has decided to pursue

18     administrative forfeiture against a particular

19     asset, either at the field office level or HQ, or

20     everybody agrees.

21              Once that decision is made, can you tell

22     me, what does the government do next?

23         A.   Just a second.  We're making sure we are

24     plugged in because we have low battery.

25              (Discussion off the record.)

Exhibit O
1500

Page 44

1            MR. FROMMER:  Off the record for a second.

2            (Requested portion read back.)

3            MR. RODGERS:  Objection.  That question is

4        overbroad.  It is beyond the scope of the

5        topics.  It's vague and ambiguous.

6            But you can answer to the extent you can.

7        A.   We do the administrative part, assign a

8    CATS ID number, we gather reports, we figure out

9    who's going to get noticed, we input that

10    information into the FBI computer database.  We

11    write a probable cause statement.  There -- mainly

12    we gather the reports from the criminal case agents

13    to support the asset forfeiture process.

14      BY MR. FROMMER:

15        Q.   Okay.  So you're filling out the notice

16    and -- now, you said something about CATS ID numbers

17    because -- and I'm little confused, so maybe you can

18    explain this to me.

19            You said, during your answer just now,

20    that you would assign a CATS ID number.  Now, my

21    understanding from your previous testimony was that

22    cash -- all cash above 5,000 gets a CATS ID number

23    as it's processed in the system.

24            So when you are talking about CATS ID

25    numbers in this context, are you talking about for

Exhibit O
1501

Page 45

1      items which aren't currency?

2            A.    Every asset gets a CATS ID number,

3      currency or otherwise.

4            Q.    And when does that occur?

5            A.    Generally, at the time of seizure.

6            Q.    Okay.  All right.  So -- okay.  I think I

7      understand.

8                  Is that the case even if something is

9      processed as evidence?  Does it gets a CATS ID

10     number even if it's been processed as evidence?

11           A.    Generally, no.

12           Q.    So in what situations does an asset get a

13     CATS ID number?

14           A.    When there's been a determination that the

15     asset is going through the asset forfeiture process.

16           Q.    Okay.  So CATS ID number is generated when

17     there's a preliminary determination that this asset

18     is going to go through the asset forfeiture process;

19     is that accurate?

20           A.    Yes.

21           Q.    And is that true for -- and that's also

22     true for cash over $5,000; is that accurate?

23           A.    Yes.

24           Q.    Now, would there be a situation where you

25     would find cash above $5,000, but it wouldn't result

Page 46

1    in a CATS ID number being generated?

2         A.   If that cash is collected and seized as

3    part of the criminal investigation and retained as

4    evidence, then it's not going through the asset

5    forfeiture process, so it won't get a CATS ID

6    number.

7         Q.   Okay.  I see.  So once an item has been

8    determined that this asset is going through the

9    asset forfeiture process, that's when it gets -- at

10   that moment of determination, that's when a CATS ID

11   number is created for it; is that accurate?

12        A.   Yes.

13        Q.   All right.  So you prepare the

14   administrative forfeiture notice and you pursue the

15   administrative forfeiture notice -- you fill it out,

16   and then that gets sent out to -- who does that

17   administrative forfeiture notice get sent to?

18        A.   All interested parties.

19        Q.   And what does the government do to

20   determine which parties are interested?

21        A.   We review the reports from -- surrounding

22   the seizure to figure out who those parties are.

23        Q.   Okay.  And then the notice gets sent to

24   those people and they have -- how much time do they

25   have to respond once they receive the administrative

Exhibit O
1503

1     forfeiture notice?  If you remember offhand.

2          A.   I don't.  Maybe 45 days.

3          Q.   Okay.  All right.

4               And it's my understanding that once

5     someone receives an administrative forfeiture

6     notice, that they have really three options:  One

7     would be to simply to walk away from the money or

8     the asset; the second would be to file -- submit a

9     judicial claim; and then the third one would be to

10    zero submit a petition for remission and/or

11    mitigation.  Is that accurate?

12         A.   Yes.

13         Q.   So let's say the FBI files an admin for

14    notice, sends it to a claimant, and a claimant files

15    a judicial claim.  What happens at that point?

16              MR. RODGERS:  Objection.  Vague and

17         ambiguous.

18         A.   When somebody receives a notice of

19    administrative forfeiture by the FBI, and they

20    respond by filing a valid claim with our office,

21    then we gather all of the reports from the field

22    office and we prepare a packet and refer it to the

23    United States Attorney's Office.

24      BY MR. FROMMER:

25         Q.   And then once they receive it, they

Exhibit O
1504

Page 48

1    independently review whether to pursue judicial

2    forfeiture; is that correct?

3              MR. RODGERS:  Objection.  Speculation.

4         Poses an incomplete hypothetical.

5         A.   We refer it to the United States

6    Attorney's Office and they decide whether or not to

7    continue the process.

8     BY MR. FROMMER:

9         Q.   And let's say instead that the property,

10   the claimant, instead files a petition for remission

11   or mitigation.  My understanding of that is -- can

12   you tell me -- scratch that.  Let me think how to

13   say this in a cleaner way.

14             Okay.  So let's say instead of filing a

15   claim, the titular property owner files a petition

16   for remission or mitigation.  Once the FBI receives

17   that petition, what are -- what next steps do the

18   FBI take?

19             MR. RODGERS:  Objection.  Beyond the scope

20        of the topics.

21        A.   Generally, conduct a petition

22   investigation.

23    BY MR. FROMMER:

24        Q.   And how does -- what is a petition

25   investigation?  How does that differ from the

Exhibit O
1505

Page 49

1     investigation we were talking about earlier where

2     the government is deciding --

3               (Discussion off the record.)

4      (Recess was held from 11:20 p.m. until 11:27 p.m.)

5               (Requested portion read back.)

6      BY MR. FROMMER:

7          Q.   I will finish it.  Which is, deciding

8      whether to pursue forfeiture in the first place?

9               MR. RODGERS:  Objection.  Vague and

10          ambiguous.  Beyond the scope of the topics.

11         A.   Additional investigation is completed to

12     find out if the petition should be granted and

13     oftentimes the petitioner will submit additional

14     documentation that is reviewed.

15     BY MR. FROMMER:

16         Q.   Okay.  So the remission investigation is

17     looking at any additional information to better

18     inform whether the permission -- the petition should

19     be granted or not; is that accurate?

20              MR. RODGERS:  Same objection.

21         A.   Yes.

22     BY MR. FROMMER:

23         Q.   Can you tell me what is the -- so

24     ultimately the government looks at all this

25     information, conducts this investigation, and it has

Exhibit O
1506

Page 50

1      to make a decision about whether to grant or deny a

2      petition.  And I'm trying to figure out, like,

3      what's the standard by which the government decides

4      whether to grant a petition for remission or not?

5                   MR. RODGERS:  Objection.  Beyond the scope

6           of the topics.  Calls for a legal conclusion.

7           A.   So we look at all the facts after probable

8      cause has been determined and are there other facts,

9      documentation, supporting evidence that warrant the

10     petition being granted and the money being returned

11     or some portion of it being returned.

12        BY MR. FROMMER:

13          Q.   I get that.  I guess what I'm trying to

14     figure out is, like, is the decision whether to

15     grant a petition something more than just a gut

16     call?  Are there objective indicia that the

17     government looks at in deciding whether to grant a

18     petition for remission?

19                  MR. RODGERS:  Objection.  Beyond the scope

20          of the topics.  Calls for a legal conclusion.

21          Vague and ambiguous.

22          A.   I can only offer an explanation of, okay,

23     we have seized money from somebody.  We have

24     probable cause to believe that it's proceeds of drug

25     trafficking, but then the petitioner submits

Exhibit O
1507

Page 51

1    documentation showing that his grandmother just

2    bequeathed him the same amount of money that was

3    seized and he has additional supporting

4    documentation from the bank, maybe showing a

5    deposit, withdrawal, et cetera, to show that this

6    money, in his opinion, does not represent proceeds

7    of drug trafficking.  And then so that is viewed in

8    light of everything, and it's not really just a gut

9    instinct.  It's based on the facts whether or not

10   the petition should be granted.

11     BY MR. FROMMER:

12        Q.   Who makes that decision about whether to

13   grant a petition for remission?  Is that happening

14   at the agency level?  Well, it must be.  But who at

15   the agency is deciding whether to grant or deny a

16   petition for remission?

17             MR. RODGERS:  Objection.  Beyond the scope

18        of the topics.  Lacks foundation.

19        A.   At the field office level, the paralegal

20   specialist conducts the petition investigation and

21   recommends whether or not the petition should be

22   granted or denied, and that is forwarded to our

23   headquarters office and legal forfeiture unit makes

24   the ultimate decision.

25

Exhibit O
1508

Page 52

1      BY MR. FROMMER:

2          Q.   So the field office, the paralegals make

3      the initial investigation determination, and then

4      that is reviewed by officials at FBI headquarters;

5      is that accurate?

6              MR. RODGERS:   Same objection.

7          A.   The paralegal specialist makes the

8      recommendation.  It gets sent to headquarters.

9      Legal forfeiture unit and our Office of General

10     Counsel makes the ultimate determination.

11     BY MR. FROMMER:

12         Q.   Okay.  All right.  So let's say that

13     someone has gone through this process and a petition

14     for remission ultimately is denied.  At that point,

15     what happens to the seized funds at that point?  Or

16     property, I guess it could be -- it could be

17     property other than cash.

18             MR. RODGERS:   Objection.  Beyond the scope

19         of the topics.  Calls for a legal conclusion.

20         Lacks foundation.  Poses an incomplete

21         hypothetical.

22         A.   The asset remains in the custody of the

23     Marshals Service, and the asset forfeiture

24     process -- administrative asset forfeiture process

25     continues.

Exhibit O
1509

Page 53

1        BY MR. FROMMER:

2            Q.   Well, I'm saying, like, the petition --

3        they filed an administrative forfeiture, they filed

4        a petition.  Let's say we only have one person

5        filing a petition.  And then the FBI denies that

6        petition.  It's my understanding at that point, the

7        forfeiture process is at an end; is that correct?

8               MR. RODGERS:  Objection.  Poses an

9               incomplete hypothetical.  Beyond the claims of

10              the class.  Irrelevant.  Assumes facts not in

11              evidence.

12           A.   If the petition is denied, the asset

13       forfeiture process continues.  And the asset remains

14       in the custody of the Marshals Service until the

15       conclusion of that process.

16       BY MR. FROMMER:

17           Q.   What remains in that process?  That's what

18       I'm confused about.  Let's say we have an asset that

19       was seized from somebody.  You think you have

20       probable cause, that it's forfeitable.  That person

21       submits a petition.  You deny that petition.  No

22       other claimants have come forward to file a petition

23       or a claim.  What's left of the process at that

24       point?

25              MR. RODGERS:  Same objections.

Page 54

1          A.    We send out the notices.  We wait for a
2     time to expire.  We package up our part and it goes
3     to the legal forfeiture unit.  And so it's just
4     waiting out that process.  Just because a petition
5     investigation is denied, does not mean the next day
6     the process is done and the item is forfeited.
7       BY MR. FROMMER:
8          Q.    Well, that's what I'm wondering.  What
9     else is left after the -- because my understanding
10    is that by filling -- submitting a petition, the
11    claimant is, in essence, saying that the government
12    can forfeit this property and it's just asking that
13    it be returned to them.  And I'm wondering, like,
14    once the government says no to that, what -- I'm
15    still -- you keep saying that there's more to the
16    forfeiture process, but I'm not sure what of the
17    forfeiture process is left at that point.
18              MR. RODGERS:   Objection.  Speculation.
19        Beyond the scope of the topics.  Calls for a
20        legal conclusion.  Lacks foundation.
21         A.    Sometimes it's just time.  The legal
22    forfeiture unit has thousands of cases, so it's a
23    matter of workload and when they have that
24    particular case on their desk and make the final
25    determination.

Page 55

1        BY MR. FROMMER:

2            Q.   Okay.  I see.  I see.

3                 And once that final determination is made,

4        is it at that point when the property, whether that

5        be funds or -- let me rephrase.

6                 Once there's been a final determination

7        and the property is forfeited -- let's talk about

8        currency because it's simpler -- at that point, is

9        the now forfeited currency transferred from the U.S.

10       Marshals Service to the asset forfeiture fund?

11           A.   I don't know about the movement of money

12       once the declaration of forfeiture has been issued.

13       I'm just not familiar with that process.

14           Q.   Okay.  Does your -- so is that all

15       handled -- is that handled at all at the FBI field

16       office level, or is that all happening at FBI HQ?

17           A.   FBI HQ issues the declaration of

18       forfeiture.  Then we get the letter.  And then

19       that's really more the paralegal specialists, their

20       duties.  So then they ultimately inform the Marshals

21       Service of the declaration of forfeiture.  So I

22       don't know exactly what happens after that.

23           Q.   Okay.  All right.

24                 Do you have -- do you have any familiarity

25       with the process by which money is released from the

Exhibit O
1512

Page 56

```
 1    asset forfeiture fund and sent to participating
 2    agencies?
 3         A.   Generally, after an item has been declared
 4    forfeited and then if the local agency has submitted
 5    their forms, then I know, generally, then they would
 6    get the approved percentage.  How or what form,
 7    whether it's check or wire, I don't know.
 8         Q.   Oh, yeah, I don't care about the
 9    particulars of how the -- how an agency ultimately
10    gets the money.  I am just wondering -- so if
11    there's an agency -- are you talking here
12    specifically about local agencies that might have
13    been involved in a seizure and forfeiture, or are
14    you also talking about the federal forfeiture
15    agencies that were involved?
16         A.   For anybody who is putting in a sharing
17    request, whether it's other federal agencies or
18    locals, after the declaration of forfeiture occurs,
19    then after that is when they would receive any
20    proceeds.  But like I said, I don't know the
21    particulars about that.
22         Q.   Okay.  Are you involved in that process at
23    all, the process of requesting forfeiture funds from
24    AFF?
25         A.   I am not involved in the process of
```

Exhibit O
1513

Page 57

1      requesting money.  I don't know -- do you mean the

2      sharing program?

3          Q.   Yeah, the sharing.  That's exactly that I

4      meant.  After the -- there's been a final

5      declaration of forfeiture.  Let's say there's

6      million dollars.  Let's just use a hypothetical just

7      because it's a little bit easier.

8               So let's say there's a million dollars.

9      There's been a final declaration of forfeiture.  And

10     then -- let's use the agencies here.  So you have

11     the DEA, USPIS, FBI, and some local agencies

12     involved.

13               I might be forgetting one.

14               In that situation, those agencies want to

15     get their share of the million dollars.  What do

16     they do?

17         A.   After the seizure, there's a timeline they

18     have to submit the DAG-71 form, and that is a form

19     requesting a certain percentage of the seized asset

20     based on -- and then they have to write a narrative

21     of the work that they did that contributed to the

22     asset seizure.

23         Q.   Are sometimes those DAGs will -- let's say

24     you have three our four agencies involved and they

25     have an agreement whereby they're going to split

Exhibit O
1514

Page 58

```
1     whatever is forfeited by a certain percentage.  So
2     in that situation, would they -- would the
3     requesting agency on the DAG-71 include -- we have
4     a -- the participating agencies in the seizure and
5     forfeiture agreed to split the money, I don't know,
6     25 percent each four ways?  Or --
7               This is what I -- I don't understand this.
8     This is why I'm asking.  So the more you can help
9     explain it to me, the more helpful it would be.
10              MR. RODGERS:  Objection.  Assumes facts
11         not in evidence.  Poses an incomplete
12         hypothetical.  Lacks foundation.
13         A.   There's no agreement beforehand.  Each
14    agency requests a certain percentage based on the
15    work hours, various factors, manpower.  What -- did
16    they have confidential informant information?
17    What's unique assistance that contributed to the
18    seizure?  Did they do other types of investigative
19    activity that resulted in it?  So there's no
20    predetermined agreement.  They request from the lead
21    agency, FBI, that based on this narrative, I am
22    requesting 20 percent.
23      BY MR. FROMMER:
24         Q.   Gotcha.
25         A.   So each agency does that individually.
```

Exhibit O
1515

1      Q.   Okay.  I think I understand.

2           And who -- so do they request -- so the

3      other agencies, here, just keeping with this, like

4      USPIS and DEA, they would send in requests to FBI;

5      is that correct?

6      A.   Yes, they fill out the DAG-71 form and

7      submit it to us.

8      Q.   And is that the like -- you know, I

9      mentioned, like, the DEA or USPIS, but is it the

10     overall agency that is sending the DAG71, or is it

11     the particular office that helped participate in the

12     seizure and forfeiture?

13     A.    I don't know who, whether it's, you know,

14     DEA headquarters or DEA local, but the local DEA

15     office is going to have the particulars of what they

16     contributed to the investigation.  But I don't know

17     who ultimately sends it to us.

18     Q.   Got it.  Okay.  That makes sense, right?

19     The locals would be the ones who actually have the

20     facts.  And I wasn't really asking about, like, who

21     is the one person who -- the agent -- whether it's

22     technically the agency that sends it to you or the

23     field office.  What I'm interested in is -- well,

24     let's say the FBI.  In an instance where the FBI --

25     you know, if the FBI were going to put in -- let's

Exhibit O
1516

1    say they were involved in a forfeiture and getting a

2    percentage, they're going to put in a DAG-71 to get

3    a percentage.  Would that DAG-71 -- am I using that

4    term right, by the way?  Is a DAG-71 a

5    cross-governmental form?

6          A.    I don't know, across what?

7          Q.    Okay.

8          A.    But, yes, it's familiar through the

9    federal agencies.

10         Q.    So what I'm wondering is, you know, FBI LA

11   field office participates in some activity, leads to

12   seizure, leads to forfeitures.  Let's say the

13   forfeiture of that million dollars that we were

14   talking about before.

15               Is it the FBI field office that sends --

16   that would fill out and send in the DAG-71 seeking a

17   certain percentage of that million dollars?

18               MR. RODGERS:  Objection.  Beyond the scope

19         of the topics.  Poses an incomplete

20         hypothetical.  Vague and ambiguous.  Overbroad.

21         A.    Yes.

22      BY MR. FROMMER:

23         Q.    And so let's say that DAG-71 has been

24   approved by whatever agency.  Does that percentage

25   of funds, you know -- you said 20 percent.  So let's

Page 61

1    say our 20 percent.  Does our 20 percent then go to

2    the FBI headquarters?  Or does it go to the FBI

3    field office?

4            MR. RODGERS:  Same objections.  Also vague

5        and ambiguous.

6        A.    After you submit the DAG, then that's just

7    part of the file.  Nothing gets distributed until

8    the declaration of forfeiture.

9      BY MR. FROMMER:

10       Q.    Yeah.

11       A.    And then I -- generally, I don't know.  I

12   think ours goes to the asset forfeiture fund, but I

13   don't know the particulars about where the money

14   goes, whether it goes back to FBI LA or

15   headquarters.  My understanding is that it goes into

16   our general asset forfeiture fund.

17       Q.    Okay.  Well, I understand that the funds

18   get into the AFF once there's been a declaration of

19   forfeiture.  Marshal sends that over into the AFF.

20            I'm wondering, like, when the FBI says we

21   want -- we think we deserve 20 percent of what was

22   forfeited because of our activities, because of our

23   participation in the investigation.  And what I'm

24   wondering is at that point, you know, you submit the

25   DAG-71, it's reviewed by the primary agency, they

**Exhibit O**
**1518**

Page 62

1    approve it, money is released -- that 20 percent is

2    released from the AFF, and I'm just wondering, does

3    it go to the FBI -- does it go into the FBI overall

4    budget?  Does it go into the budget for the LA field

5    office?  That's why -- I'm just trying to figure

6    that out.

7           MR. RODGERS:  Same objections.

8        A.   I don't know.

9     BY MR. FROMMER:

10       Q.   Do you have any idea who might know

11   something like that?

12       A.   Perhaps our headquarters legal forfeiture

13   unit.

14       Q.   Who is your main point of contact with the

15   legal forfeiture unit?

16       A.   Stephanie Woods.

17       Q.   Do you think she would be the right person

18   to ask -- do you think she would know the answers to

19   these questions?

20           MR. RODGERS:  Objection.  Speculation.

21       A.   I don't know.  I think she might.

22    BY MR. FROMMER:

23       Q.   Okay.  But you are saying, sitting here as

24   the representative of the U.S., you are not sure

25   whether forfeiture proceeds would go to the

Page 63

1    individual field office that participated in the

2    seizure versus the overall agency; is that correct?

3              MR. RODGERS:  Objection.  Beyond the scope

4         of the topics.  Lacks foundation.  Calls for

5         speculation.

6         A.   My understanding is it goes to the general

7    asset forfeiture fund.  And I am not aware of LA

8    office, in particular, getting disbursements as the

9    declaration of forfeitures are issued.

10    BY MR. FROMMER:

11        Q.   Okay.  And you said that that process that

12   we have been discussing applies both to federal and

13   local agencies that were involved in the seizure of

14   the forfeited asset; is that correct?

15        A.   Local agencies and federal agencies can

16   both submit a DAG for one of our investigations if

17   sharing is appropriate.

18        Q.   And do you know who makes the

19   determination of whether the sharing would be

20   appropriate?

21        A.   It depends on if it's a civil

22   administrative case, the FBI does; or civil judicial

23   case, then the United States Attorney's Office does.

24        Q.   Okay.  So how the property was forfeited

25   determines who considers the request that are

Page 64

1    encompassed on the DAG-71; is that accurate?

2         A.   Right.  And it also depends on the amount.

3    So under a million, civil administrative, the FBI is

4    the final decision maker.  Under a million, civil

5    judicial, United States Attorney's Office is the

6    final decision maker, but they take into account

7    what the lead law enforcement agency recommends.

8         Q.   I see.  And then for amounts above a

9    million, is it that -- is headquarters that's making

10   that determination?

11        A.   Over a million and under five, it's the

12   chief of the AFMLS.  And over five million, it's the

13   Assistant Attorney General that is the final

14   decision maker.

15        Q.   Is there a document that sort of contains

16   that sort of information in it?

17        A.   I'm sure that there's an asset forfeiture

18   policy guide or some sort of manual.

19        Q.   Do you have, like, an asset forfeiture

20   policy manual that you reference in conjunction with

21   your work?

22        A.   I do have an asset forfeiture policy guide

23   that I reference.

24        Q.   And does that -- is that your document in

25   particular, or is this the asset forfeiture manual,

Page 65

1    this -- is this an FBI publication?

2         A.   I got it through my work at the FBI.  I

3    don't know.

4         Q.   If you don't know --

5         A.   Yeah.

6         Q.   Yeah, if you don't know whether it's FBI

7    or DOJ, that's fine.

8              But do you remember what that document is

9    called?

10        A.   I think it's the Asset Forfeiture Policy

11   Guide.

12        Q.   Okay.  All right.

13             And do you recall -- I understand that you

14   can't recall everything about how money gets

15   released to constituent -- or to participating

16   agencies, but is it your understanding or is it your

17   belief that the asset policy -- asset forfeiture

18   policy manual you are discussing would talk about

19   that?

20        A.   I think it would reference sharing.

21        Q.   Okay.  All right.  Great.

22             MR. FROMMER:  Now, you guys are almost

23        near lunchtime; is that right?  It's 11:53?

24             MR. RODGERS:  Yeah.  But do you have any

25        indication as to how much more you have.

Exhibit O
1522

Page 66

1          Because I think our preference is to just keep

2          going through.

3                MR. FROMMER:  You guys are going to want

4          to do lunch.  I have more to do than -- more to

5          do than -- you should go get lunch.

6                MR. RODGERS:  Do you think you have more

7          than a couple of hours?

8                MR. FROMMER:  At least more -- I mean, it

9          all depends on how it goes.  But at least a

10         couple of hours.

11               MR. RODGERS:  Okay.  Let's do lunch then.

12         When should we come back?

13               MR. FROMMER:  Why don't you be back at --

14         it's 11:54 your time now, so how about

15         1:00 p.m. your time?

16               MR. RODGERS:  Okay.

17               MR. FROMMER:  Okay?  Thank you so much,

18         Agent Murray.  I'll see you in about an hour.

19       (Recess was held from 11:54 p.m. until 12:59 p.m.)

20        BY MR. FROMMER:

21         Q.   All right.  So this morning we were

22      talking a bit about forfeiture generally and now I

23      want to talk a little bit more specifically about

24      the U.S. Private Vaults matter.

25                Let me just start with this:  When did you

Page 67

1      first hear about U.S. Private Vaults?

2            A.    I don't remember what month and I believe

3      that it was 2020.

4            Q.    So you -- could it have been, perhaps, in,

5      like, the summer of 2020, sometime around then?

6            A.    The summer sounds about right.

7            Q.    Can you tell me what you heard about

8      U.S. Private Vaults back in summer of 2020?

9            A.    The first time I heard about

10     Private Vaults was on a phone call with my SAC.  And

11     he told me a summary of the facts in the

12     investigation.

13           Q.    Who was your -- SAC is special agent in

14     charge?

15           A.    Yes.

16           Q.    And who is your SAC?

17           A.    At that time the SAC that spoke to me

18     about it wasn't my SAC.  It was the criminal SAC.

19     Matt Moon, M-O-O-N.

20           Q.    So, Matt Moon, who is the SAC for the

21     criminal side in FBI, called you up and told you

22     about the background of the U.S. Private Vaults

23     investigation; is that right?

24           A.    Yes.

25           Q.    What else did he talk about?  Did he talk

Page 68

1   about any plans going forward?

2        A.   He talked about what agency was going to

3   lead the seizure of assets in the case.

4        Q.   And did he tell you that the FBI was going

5   to be the lead agency on the seizure warrant?

6             MR. RODGERS:  Go ahead and answer.

7        A.   That was what we were discussing, who was

8   going to be the --

9   BY MR. FROMMER:

10       Q.   Oh, so had it not yet been determined

11  which agency would be the lead agency?

12            MR. RODGERS:  Objection.  Speculation.

13       A.   Not at the time of that phone call.

14  BY MR. FROMMER:

15       Q.   So what exactly was he advising you of on

16  that call?

17       A.   He wasn't advising me of anything.  He was

18  telling me the facts of the investigation and asking

19  me if the Los Angeles asset forfeiture unit was

20  capable of handling a possible large-scale seizure.

21       Q.   Oh, okay.  So in summer of 2020, Matt Moon

22  called you, talked to you about the

23  U.S. Private Vaults investigation, and asked whether

24  the FBI LA field office had the capacity to handle

25  civil forfeiture regarding U.S. Private Vaults; is

Exhibit O
1525

Page 69

1    that accurate?

2              MR. RODGERS:   Objection.   Slight

3         mischaracterization with respect to the date.

4         A.   During that phone call, that's what we

5    discussed.

6         Q.   Okay.

7              (Discussion off the record.)

8      BY MR. FROMMER:

9         Q.   So he asked, like, does the LA field

10   office have capacity to handle civil forfeiture with

11   regards to the nest of safe-deposit boxes?   Is that

12   accurate?

13        A.   Yes.

14        Q.   And what did you tell him?

15        A.   I told him yes.

16        Q.   And why did you think that the LA field

17   office had capacity to handle processing civil

18   forfeiture proceedings for the hundreds of safe-

19   deposit boxes at U.S. Private Vaults?

20              MR. RODGERS:   Objection, slight

21         mischaracterization of her testimony.

22              Go ahead and answer.

23        A.   We were capable of handling a large-scale

24   seizure because we have an established asset

25   forfeiture unit, and have had that unit for many,

Page 70

1    many years, and we have a large complement of asset

2    forfeiture employees capable of handling and

3    processing this type of large-scale seizure.

4        BY MR. FROMMER:

5            Q.   Okay.  And that makes sense, because you

6    said you've been in that of office for number of

7    years, and it sounds like you have a decent number

8    of both special agents and paralegal specialists

9    that you have in the unit.

10               So when were you discussing could the LA

11   field office handle civil forfeiture with regards to

12   U.S. Private Vaults, the two of you were -- is it

13   fair to say that you two were -- the two of you were

14   referencing not just necessarily any property owned

15   by U.S. Private Vaults, the company, but also

16   potentially the contents of some of the safe-deposit

17   boxes?

18           A.   Correct.

19           Q.   All right.  Now, were you involved -- let

20   me just ask you this.  This is just a little aside.

21   I think the answer is almost certainly no.

22               Did you help investigate

23   U.S. Private Vaults at all prior to the securing of

24   the indictment in March 2021?

25           A.   No.

Page 71

1          Q.   I figured not.  Just wanted to clear that
2      up.
3               Were you involved in discussions about
4      applying for a seizure warrant -- for the seizure
5      warrant for the U.S. Private Vaults nest of boxes?
6          A.   No.
7          Q.   Okay.  So you didn't have any
8      conversations about getting a seizure warrant?
9          A.   I was not involved in conversations
10     regarding the substance of the affidavit which would
11     lead to the seizure warrant.  But I have discussed
12     and have had discussions regarding the seizure
13     warrant.
14         Q.   Okay.  But not that -- but was that after
15     the government got the seizure warrant or was that
16     beforehand?
17         A.   It was leading up to and, you know,
18     regarding the execution of the seizure warrant.
19         Q.   Okay.  So you -- you weren't involved in
20     the discussions about applying for a seizure
21     warrant.
22              So after your initial discussion with
23     Special Agent in Charge Matt Moon, when was the next
24     time you recall discussing the potential use of
25     civil forfeiture with respect to the nest of

Exhibit O
1528

Page 72

1      safe-deposit boxes at U.S. Private Vaults?

2          A.   There was a conference call and I don't

3      remember what the date was.  Obviously prior to the

4      execution of the search and seizure warrants.  But a

5      conference call where we were discussing the

6      logistics of effecting the warrants.

7          Q.   So was that call, was that close in time

8      to the actual execution of the warrant in

9      March 2021?

10         A.   Yes.

11         Q.   So do you recall between the time you

12     spoke with Special Agent in Charge Matt Moon

13     regarding U.S. Private Vaults in summer of 2020 and

14     this conference call that was -- sounds like it was

15     occurring in the run-up to the execution of the

16     warrant, so probably in, like, March of 2021, do you

17     remember any other conversations about the potential

18     use of civil forfeiture with regards to box renters'

19     property at U.S. Private Vaults?

20         A.   I recall that there was one other

21     conference call and that occurred prior to the phone

22     call/conference call that you referenced right

23     before the takedown, so I would guess that that

24     occurred late in 2020.

25         Q.   I'm assuming that these different calls

Exhibit O
1529

Page 73

1    had slightly different purposes and conversations.

2    Like the one that happened right before the

3    execution obviously is probably really focused in

4    on, like, how are we going to execute this.

5            This call that we're talking about in fall

6    of 2020, sometime in fall, late fall of 2020, what

7    was the focus of that conversation?

8            MR. RODGERS:  I want to -- I'm sorry.  Go

9        ahead.

10      BY MR. FROMMER:

11          Q.   Well, let me ask first:  Who -- with

12   whom -- who was on that -- in that conversation with

13   you?

14          A.   Asset forfeiture, the criminal side, the

15   other partnering agencies, some locals, some

16   federals.  Did I mention the United States

17   Attorney's Office?  Maybe even our legal forfeiture

18   unit at headquarters in D.C. and some of my squad as

19   well and maybe some FBI evidence personnel.

20          Q.   Oh, wow.  This is a big call.  It seems

21   like a lot -- do you usually have calls of that

22   size?

23          A.   When we have a large-scale investigation,

24   we have a large conference call with lots of

25   parties.

Page 74

1        Q.   Makes sense.  That's fair.

2             And this was considered a large-scale

3   investigation; is that correct?

4        A.   I considered this a large-scale

5   investigation.

6        Q.   I think that's fair to say by any account.

7             So in that fall conversation, where you

8   had the other agencies and some of the locals and

9   your asset forfeiture people, and I think you said

10  legal forfeiture, and the USAO, what was the topic

11  of conversation in that fall -- fall 2020 phone

12  call?

13           MR. RODGERS:  Objection.  Instruct the

14           witness not to call on the attorney-client

15           privilege grounds.

16           MR. FROMMER:  I'm asking about the general

17           subject matter of the -- I'm not asking about

18           any particular attorney statements.  I'm just

19           asking what was the general topic of

20           conversation on that call.

21           MR. RODGERS:  If you want to go through

22           the topics one by one, that is fine.  The

23           problem with the way you asked the question is

24           it requires the witness to advise you of the

25           topics.  That advice to you may, in fact,

Page 75

```
 1          disclose the contents of an attorney-client
 2          communication.  I'm not willing to allow her to
 3          speak generally about the topics without more
 4          directed questions.
 5     BY MR. FROMMER:
 6          Q.   Okay.  Did you discuss -- were the
 7     different people on that fall 2020 call, were they
 8     talking about potential use of civil forfeiture
 9     at -- strike that.
10               On that fall 2020 call, were participants
11     in that call discussing the potential use of civil
12     forfeiture as to the nest of safe-deposit boxes at
13     U.S. Private Vaults?
14               MR. RODGERS:  Objection.  Instruct the
15          witness not to answer that question.  Clearly
16          requires the witness to disclose the contents
17          of attorney-client communications.
18     BY MR. FROMMER:
19          Q.   After that fall 2020 call, was it your
20     understanding that you were going to pursue -- not
21     you personally -- but that the FBI was going to
22     pursue civil forfeiture against some or all of the
23     contents of the safe-deposit boxes?
24               MR. RODGERS:  Would you repeat that
25          question, please?
```

Exhibit O
1532

1             (Requested portion read back.)

2         A.    Generally speaking, that was an option,

3    but in the fall of 2020, that wasn't determined

4    because I needed to see the final draft of the

5    affidavit before I would make a determination as to

6    whether or not there was probable cause.

7      BY MR. FROMMER:

8         Q.    Okay.  And so you needed to evaluate the

9    affidavit that was submitted in support of the

10   seizure warrant in order to determine whether you

11   felt that there was probable cause to move forward

12   with potential forfeiture actions?  Is that

13   accurate?

14        A.    Yes.

15        Q.    Okay.  And you had not seen that -- the

16   affidavit in support of a seizure warrant at that

17   point; had you?

18        A.    I don't know when I saw the first draft,

19   if it was late 2020 or early 2021.  But I wanted to

20   wait, and did wait, until I saw the finalized

21   version of the affidavit.

22        Q.    Okay.  So you are -- in the fall of 2020,

23   after this meeting, is it fair to say that the

24   United States was prepared to move forward with the

25   potential use of civil forfeiture as to the nest of

Page 77

1      safe-deposit boxes, provided that, in your opinion,

2      the seizure warrant affidavit supplied sufficient

3      probable cause to do so?

4              MR. RODGERS:  Objection.  Poses an

5          incomplete hypothetical.  Calls for

6          speculation.  Beyond the scope of the topics of

7          this deposition.

8              Go ahead and answer.

9          A.   Yes.

10       BY MR. FROMMER:

11         Q.   So during that -- during any of your calls

12     or meetings in the run-up to the -- well, actually,

13     let me scratch that.

14              So you ultimately ended up reviewing the

15     seizure warrant affidavit; is that correct?

16         A.   Yes.

17         Q.   And do you remember when that was,

18     approximately?

19         A.   I would estimate early 2021, maybe

20     February.

21         Q.   Okay.  So this would have been, like, a

22     draft version of the affidavit, because it hadn't

23     yet been submitted, right?

24         A.   Right.

25         Q.   Okay.  And you said you reviewed that

Exhibit O
1534

1    affidavit to determine whether there was probable

2    cause to proceed with potential civil forfeiture as

3    against the nest of safe-deposit boxes, right?

4         A.    Yes.

5         Q.    And what was your conclusion having

6    evaluated that seizure warrant affidavit?

7         A.    Having evaluated the seizure warrant

8    affidavit, the finalized version that was going to

9    be presented to the magistrate, I made a

10   determination that there was probable cause to

11   proceed on assets seized in the investigation from

12   U.S. Private Vaults.

13        Q.    Now, when you say "assets seized," are you

14   making any distinction between assets that were

15   owned by United States Private Vaults, the company,

16   versus items that were stored inside the nest of

17   safe-deposit boxes, or did you just feel that there

18   was probable cause to move for forfeiture on all of

19   it?

20            MR. RODGERS:   Objection.   Beyond the scope

21        of the topics.   Poses an incomplete

22        hypothetical.

23            You can answer.

24        A.    I was looking at all of the assets of

25   U.S. Private Vaults, and within that I was

Exhibit O
1535

Page 79

1      considering the contents of the boxes.

2         BY MR. FROMMER:

3         Q.   Okay.  And when you were considering the

4      contents of the boxes, as opposed to the rest of

5      U.S. Private Vaults' assets, were you looking at the

6      same sort of evidence to make that probable cause

7      determination?

8              MR. RODGERS:  Objection.  Vague and

9          ambiguous with respect to same sorts of

10         evidence.

11        BY MR. FROMMER:

12        Q.   Well, sorry if my question is unclear.

13             What I'm trying to figure out is you said

14     you reviewed the seizure warrant affidavit, and

15     based on that, you had determined that there was

16     probable cause to move forward with potential

17     forfeiture as to the assets at U.S. Private Vaults.

18             I'm just asking, did you do one analysis

19     as to all the property, or do you do a separate

20     probable cause analysis as to U.S. Private Vaults,

21     the company's property, versus the nest of

22     safe-deposit boxes and the property therein?

23             MR. RODGERS:  Objection.  The question

24         goes beyond the scope of the topics.  Lacks

25         foundation.

Exhibit O
1536

1           You can answer.

2      A.    Prior to the takedown, I was looking at

3   probable cause, the same lens for both the assets of

4   U.S. Private Vaults and the contents of the box,

5   after the takedown was a different analysis.

6      BY MR. FROMMER:

7      Q.    But prior to the takedown, you had

8   determined -- or at least -- you had determined that

9   there was probable cause to potentially pursue

10  forfeiture against some of the property contained

11  within the nest of safe-deposit boxes.  Is that

12  accurate?

13          MR. RODGERS:   Same objections.

14      A.    I determined that there was probable cause

15  to seize the assets of U.S. Private Vaults and the

16  contents of the boxes at that location.

17     BY MR. FROMMER:

18     Q.    Okay.  So I think I understand that.  Now

19  I want to -- want to figure out -- okay.  So let's

20  move past the fall -- that fall 2020 and let's get a

21  little bit closer in time towards the takedown, as

22  you call it, the execution of the seizure warrant.

23          So as the FBI was preparing to execute the

24  seizure warrant, can you just describe to me, how

25  was your asset forfeiture team involved in the

Page 81

1    preparations to execute the warrant?

2         A.    We weren't involved in preparations to

3    execute the warrants.  We were involved in once the

4    warrants were executed and assets were seized, then

5    what was happening after that.

6         Q.    During this preparation stage, did you --

7    were there any discussions about what evidence

8    agents should collect from the individual

9    safe-deposit boxes?

10        A.    I don't recall any particular conversation

11   about that topic.

12        Q.    Well, do you recall anybody ever saying,

13   you know, we should have the agents -- we should

14   have them note if any currency that's in there

15   smells like marijuana.  Do you remember any

16   conversations like that?

17        A.    I do not.

18        Q.    Do you recall any conversations about

19   maybe we should take notes about how the money was

20   packaged or bundled?

21        A.    I don't remember a particular conversation

22   about that.

23        Q.    Do you recall -- do you recall more

24   generally discussions about, you know, once we're

25   opening these boxes and going through there, we

Exhibit O
1538

Page 82

1    really should, you know, make observations, we

2    should record our observations, make some notes

3    about the box for potential future use?

4         A.   I don't recall any ticking conversation

5    about that.

6         Q.   You don't ever recall discussing this with

7    Lynne Zellhart?

8         A.   No.

9         Q.   When was the first time you recall talking

10   with Lynne Zellhart about the U.S. Private Vaults

11   investigation?

12        A.   Sometime after that first phone call with

13   SAC Moon, so I would estimate it could be to be fall

14   of 2020.

15        Q.   Okay.  And can you tell me, did -- I'm

16   just going to ask this rather generally.  What, if

17   anything, can you recall from that conversation?

18        A.   It was a while ago, so I don't recall any

19   specifics.  Just generally, this is -- these are the

20   facts of the investigation against

21   U.S. Private Vaults to date and we're planning a

22   takedown.  In general, that's what I recall.

23        Q.   And why did -- what was Lynne's purpose in

24   talking to you about this?

25             MR. RODGERS:  Objection.  Speculation.

Page 83

1      BY MR. FROMMER:

2          Q.   What is your understanding as to why you

3      spoke with Lynne Zellhart about the

4      U.S. Private Vaults matter in late-summer 2020?

5               MR. RODGERS:  Same objection.  Lacks

6          foundation.

7          A.   It was because her investigation could

8      lead to the seizure of assets.

9      BY MR. FROMMER:

10         Q.   Okay.  And was she touching base with you

11     sort of early in the process so as to make sure she

12     did things -- that the government collected the

13     information it might need for potential forfeiture

14     proceedings?

15              MR. RODGERS:  Objection.  Speculation.

16         Lacks foundation.

17         A.   It was just touching base to make sure if

18     that was the direction that we were headed, that I

19     as the supervisor of the asset forfeiture squad,

20     that I had people in place to process and handle if

21     we ended up having a large-scale seizure.

22     BY MR. FROMMER:

23         Q.   Now, did she -- at that point, were there

24     any conversations during that phone call or later

25     about what steps agents should take to help

Exhibit O
1540

Page 84

1    facilitate the potential use of civil forfeiture as

2    to -- I'll leave it there.

3         A.   I don't remember the particulars because

4    it was a little bit of time ago.  So I don't recall.

5         Q.   Let me ask you this:  Is the asset

6    forfeiture unit that you run, do you generally

7    advise agents about how to -- about best practices,

8    what are best practices in preparing for potential

9    use of civil forfeiture?

10             MR. RODGERS:  Objection.  Beyond the scope

11        of the topics.  Overbroad.  Poses an incomplete

12        hypothetical.

13        A.   Yes.

14   BY MR. FROMMER:

15        Q.   What kinds of things does your office tell

16   agents who are contemplating the potential future

17   use of civil forfeiture about what they should do to

18   help ensure that they're able to do that.

19             MR. RODGERS:  Same objections.

20        A.   Generally, is first to talk to us as soon

21   as they think that they might have some assets in

22   their investigation, share with us their probable

23   cause and their records, keep us in contact with

24   regards to the date of the takedown and other law

25   enforcement activities taking place.  Is it a

Page 85

1    search, an arrest?  Are there multiple locations?

2    Is it just our office, other offices involved, other

3    agencies involved?  On the day of the takedown,

4    looking at receipts, taking pictures, where the item

5    came from, what room, completion of reports, the

6    parties that are present.

7      BY MR. FROMMER:

8        Q.   Okay.  And is the purpose of all that

9    advice so as to help facilitate the potential use of

10   civil forfeiture potentially against the property

11   being seized?

12           MR. RODGERS:  Same objections.

13       A.   Not necessarily to facilitate, but just to

14   have a complete record of what happened.  But, yes,

15   if we pursue asset forfeiture, then we're going to

16   rely on those facts and reports and observations.

17           MR. FROMMER:  I want to actually introduce

18           another exhibit.  Give me just a second,

19           please.

20           You should have a new exhibit.

21           Unfortunately, it's listed as Exhibit 0.  But

22           it's really Exhibit 10 from a previous

23           deposition.

24           MR. RODGERS:  Hold on just a second.

25           We're trying to get into ExhibitShare.

**Exhibit O**
**1542**

Page 86

```
 1              MR. FROMMER:  Oh, okay.  There should be
 2         one that just says Exhibit 10.
 3              Are you having problems?
 4              MR. RODGERS:  Yeah, we are logging into
 5         ExhibitShare.
 6              MR. FROMMER:  Let's just go off the record
 7         for a minute.
 8              (Discussion off the record.)
 9              MR. RODGERS:  We have Exhibit 10.
10              MR. FROMMER:  Yeah, it's the same
11         document.
12              (Thereupon, marked as Exhibit 10.)
13      BY MR. FROMMER:
14         Q.   Special Agent Murray, have you had a
15      chance to look over Exhibit 10?
16         A.   Yes.
17         Q.   Have you seen not this specific document
18      before, but have you seen this agent observations
19      and notes from before?
20         A.   Yes.
21         Q.   When did you see it?
22         A.   Post-takedown.
23         Q.   Post-takedown.  How did you see it?
24         A.   As we were receiving the cases, each --
25      each box that we received had one of these
```

Exhibit O
1543

Page 87

1    attachments.

2         Q.   Okay.  So this was a form that was filled

3    out for each box, to your understanding; is that

4    correct?

5         A.   Yes.

6         Q.   Now, if you could, do you see this -- it's

7    four down.  It's called "Cash Observations."

8         A.   Yes.

9         Q.   Okay?  And it says:  "Agents should note

10   things such as how the cash is bundled; if it has a

11   strong odor; if there appears to be drug residue

12   present; a gun is also present; or anything else of

13   note."

14            And since you work in asset forfeiture,

15   and you have years of experience in this area, I

16   wanted to ask a few questions.  So is how cash is

17   bundled, is that probative as to whether it's

18   potentially forfeitable criminal proceeds?

19        A.   It is a factor.

20        Q.   Can you explain to me?  Why is it a

21   factor?

22        A.   It's part of the overall picture that I'm

23   looking at for probable cause.  So just that in and

24   of itself may not be, as you said, probative, but

25   it's part of the overall picture to determine

Exhibit O
1544

Page 88

1    whether probable cause has been met.

2         Q.   So, is it fair to say then that cash

3    might -- it might be more likely to be criminal

4    proceeds if it's bundled using rubber bands, for

5    instance?  Is that generally -- is that your general

6    understanding?

7         A.   Can you please repeat the question?

8         Q.   Yeah.  It was a bad question.

9              Can you explain to me how cash is bundled,

10   how is that -- how does that relate to whether funds

11   are potential criminal proceeds?

12        A.    In most of the times where that is

13   relevant is drug trafficking cases, narcotics cases.

14   And how they're bundled, whether they're with

15   PAYOU sheets, whether there's a sticky note with a

16   dollar amount and a name, maybe this is money that's

17   going to someone to purchase drugs, maybe it's money

18   received from someone to purchase drugs, and how

19   it's bundled is just part of the overall picture of

20   what I'm looking at when I do a probable cause

21   assessment.

22        Q.   Okay.

23        A.   Because --

24        Q.   So information like -- oh, sorry.  Please

25   go ahead.  I didn't mean to cut you off.

Page 89

1          A.    It's okay.

2                Individuals dealing with large amounts of

3     currency, that, to me, would fit the bill of someone

4     who is a narcotics trafficker.  That doesn't

5     necessarily mean that's definite, but it's just one

6     factor.

7          Q.    Okay.  So even this -- even if it's not

8     determinative, this is evidence which may either

9     bolster the idea that there's probable cause that

10    this is criminal proceeds or not; is that right?

11         A.    Yes.

12         Q.    And how about the next part where it says:

13    "If it has a strong odor, marijuana, soil, gas" --

14    you'll have to explain the soil one to me --

15    "gasoline, coffee and chemical."

16                How -- is that information, noting that

17    cash smells of marijuana or soil or gasoline or

18    coffee or chemicals, is that also information that's

19    useful in determining whether there's probable cause

20    to believe that property is criminal proceeds or

21    otherwise forfeitable?

22         A.    Yes.

23         Q.    And I would assume if drug residue appears

24    on money, that that's pretty probative of -- that

25    this might be criminal proceeds, right?

Page 90

1          A.    Yes.

2          Q.    So all of these cash observations, is it

3    fair to say that all these cash observations are

4    looking for information which might help show that

5    there is probable cause to believe that the cash at

6    issue is criminal proceeds?  Is that fair?

7          A.    No, because it's really just noting the

8    cash because once we give it to the marshals, that

9    cash -- if we're going to process as a forfeiture,

10   that cash, we can no longer refer to it to see how

11   does it look, how does it smell, what was near it,

12   what was of note, how was it bundled, what were --

13   you know, what did it look like.  So these are

14   observation notes because this is the last time --

15   generally this is the last time it's going to be in

16   that form because then it's going to go to the

17   Marshals Service and get deposited to the bank

18   account.

19         Q.    Yeah, and then the money is gone and you

20   wouldn't be able to collect any of that information

21   afterward, right?

22         A.    Yes.

23         Q.    Okay.  So this is your one opportunity to

24   record information that could be probative later on

25   regarding whether -- you think there's probable

Exhibit O
1547

1   cause to think this is forfeitable currency, right?

2        A.    Yes.

3        Q.    And let's go down a little bit.  You see

4   all the canine, canine, canine, and this is

5   relatively straightforward.

6             I know, as we talked about, you're an

7   expert in asset forfeiture.  You've done asset

8   forfeiture for a number of years.  You've done a lot

9   of asset forfeiture cases, I presume.  Is that fair

10  to say?

11       A.    I have done a lot of asset forfeiture

12  cases.  Even though I have done asset forfeiture

13  investigations for a long time, I wouldn't be so

14  bold as to classify myself as an expert.

15       Q.    That's fine.  That's fine.  And I don't

16  want to -- I don't mean to classify you as an

17  expert.  But you do have a good familiarity with

18  asset forfeiture.  You've been involved with it for

19  a number of years.

20            And I think you would agree with me

21  whether a canine unit does a sniff, a positive sniff

22  versus a negative sniff on currency, that is often

23  probative as to whether that currency is potentially

24  criminal proceeds, correct?

25       A.    That is a factor that we look at to

Exhibit O
1548

Page 92

1    determine probable cause.

2         Q.   And this is another example of the money

3    was going to go to Loomis and then to the marshals,

4    it was going to disappear, so if you wanted to get a

5    canine sniff and record that, you had to do it

6    before the money left the facility; is that correct?

7         A.   We had to do it before it went to the

8    Marshals Service, yes.

9         Q.   So that's why there were canine units on

10   site at U.S. Private Vaults, right, to collect that

11   information before the money went off to the

12   Marshals Service?

13        A.    Correct.

14             MR. FROMMER:  Give me just a second.  I am

15        going to introduce another exhibit.  Hopefully

16        I do a better job of it this time.  I'm just

17        going to copy this.  You should see what is

18        labeled now as Exhibit 7.

19             (Thereupon, marked as Exhibit 7.)

20             MR. FROMMER:  Let me know when you have

21        run across that.

22             MR. RODGERS:  We have it.

23      BY MR. FROMMER:

24        Q.   All right.  Take a minute, Special Agent

25   Murray, and familiarize yourself with the document,

Page 93

1    if you wouldn't mind.  Just let me know when you are

2    ready.

3         A.   Okay.  I'm ready.

4         Q.   All right.  Have you seen this document

5    before?

6         A.    It looks familiar.  I think it was

7    included in something I received, probably in the

8    big attachment of paperwork close in time to the

9    actual takedown.

10        Q.   So you think you would have received this

11   close in time to the execution of the seizure

12   warrant?

13        A.   Yes.

14        Q.   Do you remember reviewing this at all?

15        A.   No.

16        Q.   Do you know who wrote this?

17        A.    I don't know who drafted -- who authored

18   this.

19        Q.   Okay.  Did you have any involvement in

20   helping create this?

21        A.   No.

22        Q.   I figured not, given you barely remember

23   it.

24             Let me see.  Okay.  If you could go to

25   page -- it's 58.  It's FBI 58, which I think is like

Page 94

1    Page 3 or 4 of this thing.

2         A.   Okay.

3         Q.   The bottom paragraph here, okay, it says:

4    "FBI evidence techs and asset forfeiture agents will

5    be working to enter evidence into Sentinel and

6    generate CATS ID numbers for all cash."

7              So you had asset forfeiture agents on

8    site; is that correct?  At U.S. Private Vaults?

9         A.   I was the only one on-site.  The other

10   members of the team were paralegal specialists.

11        Q.   So you were the only asset forfeiture

12   agent on site.  Is that fair to say?

13        A.   Yes.

14        Q.   And then you had -- your asset forfeiture

15   paralegals were on-site.  And what were they doing

16   there?

17        A.   There was one of us present at all times,

18   so we took shifts.  We received the asset and

19   assigned a CATS number to each bag, which

20   represented each box, and we gave a deposit ticket

21   with the CATS ID number to go with that bag, so it

22   could get tracked to Loomis.

23        Q.   And is your understanding that bags is

24   when there was more than $5,000 in currency?

25        A.   No.  Everything was bagged.  Whether or

Page 95

```
1      not --
2            Q.    Even $50?
3            A.    Yes, everything was bagged.
4            Q.    Everything was bagged.  Okay.
5                  And so you had -- so the currency would
6      get bagged -- well, you were on site, so you can
7      tell me this.
8                  Can you just walk me through the process.
9      The currency gets bagged.  And then what would
10     happen with the currency?
11           A.    The contents were bagged and heat-sealed.
12     A label was put on.  Then they came over to the tent
13     and we gave them the CAPS number ID assigned to that
14     asset, and generated a Loomis ticket to go with that
15     bag.  And then they were compiling the bags and when
16     there was a large enough group of bags, then there
17     was -- there were agents that transported the
18     multiple bags to Loomis.
19           Q.    Yeah, I understand that, I think Special
20     Agent Palmerton was in charge of that aspect.
21                 Now, I do have a question about the
22     timing.  When the bags are brought to you, were they
23     getting CATS ID numbers before they were subjected
24     to a dog sniff or after or would it really be either
25     way?
```

Exhibit O
1552

1          A.    I believe it was after the dog sniff.

2          Q.    And regardless of now the dog sniff turned

3     out, it would get a CATS ID number and get shipped

4     off to Loomis; is that correct?

5          A.    Only if there was estimated to have money

6     over $5,000.

7          Q.    Had this is what I want to explore.

8     Because a second ago you said that they bagged all

9     money.  But then you are saying that only money that

10    was over $5,000 ended up at Loomis.  I'm trying to

11    end up to that sub $5,000.

12         A.    That money got bagged and went to

13    evidence.

14         Q.    Okay.  And that money would not have

15    generated -- you would not have generated a CATS ID

16    for that money, correct?

17         A.    Correct.

18         Q.    Okay.  Got it.

19               Did you ever inventory any boxes yourself?

20         A.    No.

21         Q.    Can you look on 59, it's the next page.

22    It's about halfway down.  It's the last sentence of

23    the big paragraph, "Search/inventory agents."

24               And it reads:  "Anything which suggests

25    the cash may be criminal proceeds should be noted

Exhibit O
1553

1     and communicated to the admin team."

2              And I just had a question.  Is that

3     consistent with your general understanding of how

4     whenever you execute a seizure warrant, that you

5     would note this information and communicate it to an

6     administrative -- sorry.  I'm going all over the

7     place.  Let me clean this up.

8              When they say "admin team" here, should we

9     understand that to mean your asset forfeiture

10    paralegals?  Or someone else?

11             MR. RODGERS:  Objection.  Calls for

12        speculation.  Lacks foundation.

13        A.   I think she means case agents,

14    supervisors, so Lynne or whoever, Madison, basically

15    people familiar with the case that were this charge

16    of the case.  Because there were agents who didn't

17    belong to Lynne's squad that were helping since it

18    was a 24/7 operation for multiple days.  So admin

19    team is someone who is privy to the case and the

20    investigation.

21      BY MR. FROMMER:

22        Q.   Okay.  All right.  So that's different

23    then than your asset forfeiture paralegals?

24             MR. RODGERS:  Same objection.

25        Speculation.  Lacks foundation.

Exhibit O
1554

```
                                                    Page 98

  1         A.   It could include us, but not necessarily.

  2       BY MR. FROMMER:

  3         Q.   Okay.  So it might -- this sentence might

  4     mean that anything that suggests that cash may be

  5     criminal proceeds, the agent should note that and

  6     provide it to your team, the asset forfeiture team?

  7              MR. RODGERS:  Objection.  Lacks

  8         foundation.  Calls for speculation.

  9         A.   No, not necessarily our team, just someone

 10     familiar with the case, whether it's the case agent,

 11     or it could include me or the paralegal specialists.

 12     But not necessarily.

 13       BY MR. FROMMER:

 14         Q.   And then let me just go back to 58,

 15     Page 58, so one page up.  It's the paragraph in the

 16     middle that starts "team leader."  And it -- I think

 17     it's the fourth sentence.  It's halfway in the

 18     paragraph.

 19              And it basically is talking about all the

 20     paperwork that should be prepared, and it says:  "A

 21     copy of the paperwork will go to asset forfeiture."

 22              And my question is, why is a copy of all

 23     the paperwork being created here going to asset

 24     forfeiture?

 25              MR. RODGERS:  Objection.  Lacks
```

Page 99

1          foundation.  Assumes facts not in evidence.

2          Calls for speculation.  Beyond the scope of the

3          topics.

4          A.   A copy of the paperwork is the seizure 302

5    or those agent observations that you referenced as

6    an exhibit because that's part of our probable cause

7    story.

8     BY MR. FROMMER:

9          Q.   Your probable cause story as to whether

10   there's probable cause to think that the assets in

11   question are forfeitable or not?

12               MR. RODGERS:  Same objections.

13          A.   A determination was already made that

14   there was probable cause, so any other information

15   supplements the existing probable cause.  So this

16   would be supplemental information.

17    BY MR. FROMMER:

18          Q.   Okay.  All right.  Give me just one

19   second, please.

20               Now, I understand that the government

21   collected this information.  It was a bit of a

22   use-it-or-lose-it situation, and so the government

23   was collecting this information that's on the

24   observation -- agent observation notes and other

25   forms.

Exhibit O
1556

Page 100

1              Is it fair to say the United States has

2      used the evidence it collected from box renters'

3      boxes in forfeiture proceedings against some box

4      renters' property?

5              MR. RODGERS:  Objection.  Beyond the scope

6         of the topics of this deposition.  If this

7         question is limited to administrative

8         forfeiture proceedings, that is fine, but to

9         the extent --

10             MR. FROMMER:  Yes.  Okay.  Fine.  Victor,

11        I get you.  Let me rephrase.  I'll just

12        rephrase it then.  I'm fine with what you are

13        saying.

14             MR. RODGERS:  Okay.  Sure.

15      BY MR. FROMMER:

16        Q.   So has the United States used evidence it

17      collected on the agent observation notes form and in

18      other ways, from box renters' boxes, to pursue

19      administrative forfeiture against some box renters'

20      property?

21        A.   We used it as part of the -- as the asset

22      forfeiture process and part of the probable cause

23      story as supplement to the probable cause, yes.

24        Q.   And do you know if the United States has

25      used the evidence it collected from box renters'

**Exhibit O**
**1557**

Page 101

1    boxes to apply for other search and/or seizure

2    warrants?

3           A.   I don't know.

4           Q.   Okay.  That's fine.  How many days were

5    you at U.S. Private Vaults?

6           A.   I had a shift that started on Tuesday

7    until Friday.

8           Q.   How many hours a day?

9           A.   I think we did maybe six-hour or

10   eight-hour shifts.  I don't recall.

11          Q.   Okay.  And so if you could, just -- and we

12   talked about this a little, but I just want to come

13   back to it.

14               Can you sort of just tell generally what

15   were your responsibilities during the execution of

16   the warrant, of the seizure warrant?

17          A.   I was there as an asset forfeiture body

18   doing a shift, along with the paralegal specialists,

19   so just assigning CATS numbers to the bags and

20   logging them into our logbook what CATS number

21   equaled what box.

22          Q.   So you were processing the bags of

23   currency, giving them CATS numbers, sending them

24   along to Loomis.  Were you collecting these agent

25   observation and notes forms and 302s?

Exhibit O
1558

Page 102

1          A.   Not at the takedown site or that week.

2     They came to me later on.

3          Q.   So subsequent to the time of the execution

4     of the seizure warrant.  Do you remember about how

5     long after the warrant was executed that asset

6     forfeiture, your team, got copies of the 302s and

7     other paperwork?

8          A.   They would come in batches, but we were

9     getting them as soon as the week after, and then

10    they would come -- there were a lot of boxes, a lot

11    of paperwork, so they were coming in in phases.

12         Q.   I'm sure.  So now you have the -- let's

13    move a little bit past the takedown, as you call it.

14              So now the boxes have all been processed.

15    You finally get to leave Olympic and you are back at

16    the office.  You start getting the 302s and other

17    paperwork that's associated with the takedown.  And

18    at that point, I'm wondering what did the asset

19    forfeiture unit do next with regard to investigating

20    the boxes and their owners?

21         A.   We were drafting up probable cause

22    statements for each box.  We were inputting the

23    information into the CATS database for notice

24    purposes.  We were communicating with the criminal

25    side as to other information pertaining to each box,

Page 103

1    if they had additional information.
2          Q.   And when you say that, when you say you
3    were interfacing with the criminal side to see if
4    they had additional information, is that if you are
5    not quite sure whether there's probable cause to
6    move forward as to forfeiture for a particular piece
7    of property, you would interface with the criminal
8    people to see if they had any additional evidence?
9    Is that accurate?
10         A.   No.  There was already a determination
11   that probable cause has been met, and so any other
12   information that was coming from the criminal side
13   or coming from the agent observation and notes at
14   the takedown, then all of that was to supplement
15   what we already had.
16         Q.   Well, let me ask this.  The one thing I
17   guess I'm confused by.  We've talked about this
18   probable cause determination.  Was the probable
19   cause determination done box by box and property by
20   property, or was it one determination across the
21   entire U.S. Private Vaults entity and customers?
22         A.   The probable cause determination was based
23   on the finalized version of the affidavit and it was
24   for U.S. Private Vaults as that business and its
25   contents as its business assets.

Page 104

1          Q.   Well, I guess that's what I'm getting at.

2     Is the stuff that's inside people's rented

3     safe-deposit boxes, was that considered part of the

4     business' assets?

5          A.   Yes.

6          Q.   All right.  So when you are deciding -- so

7     I get it, you are evaluating the evidence, you are

8     looking at the evidence to decide.  And I think you

9     previously testified that the administrator

10    forfeiture determination about whether to pursue

11    administrative forfeiture, it happens at the field

12    office level, but we can explore that.

13              What I'm wondering is -- so you are doing

14    this investigation.  You've got the evidence, you

15    are doing further investigation -- oh, that's a good

16    question.

17              Your team, your asset forfeiture team, are

18    they conducting additional investigation as to box

19    renters to -- for potential additional evidence to

20    support a probable cause determination?

21         A.   No.

22         Q.   Are they investigating or are they looking

23    at box -- are they doing any investigation of box

24    holders or box renters?

25         A.   We did not for this case.

Page 105

1   Q.   So when you were making your probable
2   cause determination about what pieces of property to
3   move forward on through administrative forfeiture,
4   what was it that your team, you and your team were
5   looking at?
6   A.   We had already determined that there was
7   probable cause to move forward and the factor
8   whether or not it was going to our shop versus
9   evidence was if it met the minimum monetary
10  threshold.
11  Q.   Okay.  Is there any box that had -- is
12  there any amount of currency that was above $5,000
13  that the FBI did not move for administrative
14  forfeiture upon?
15  A.   No, we initiated civil administrative
16  forfeiture against all of the boxes that met the
17  minimum monetary threshold.
18  Q.   Okay.  Thank you.
19      That initial administrative forfeiture
20  determination, whether they get on the only omnibus
21  list or not, is that your team, is that the LA field
22  office making that call, or is that FBI
23  headquarters?  Just if you can give me some idea?
24  A.   I don't know what you mean by who gets on
25  the omnibus --

Exhibit O
1562

Page 106

1      Q.   Oh, sorry.  Sorry.  I know that there's

2   ultimately an omnibus administrative forfeiture

3   notice that was sent to U.S. Private Vaults that had

4   about 400 boxes on it.

5      A.   Okay.

6      Q.   And I don't really want to talk about

7   that.  What I'm trying to determine is when -- there

8   was a determination made that, yes, we should move

9   on admin forfeiture, we should pursue administrative

10  forfeiture against this particular box, was that a

11  decision that was being made solely by the LA field

12  office?  Was that decision that was also being made

13  at FBI HQ?  That's what I'm trying to get more

14  understanding of.

15     A.   It was made at the field office level.

16     Q.   Okay.  And I understand about cash.  And I

17  understand that you said that basically any cash

18  that was seized that was above the -- that $5,000

19  FBI minimum, that the FBI pursued administrative

20  forfeiture against that.  Is that a fair statement?

21     A.   Yes.

22     Q.   Okay.  Now I have a slightly different

23  question about, you know, the gold and the silver in

24  there, you know, non-currency property.  How did

25  your office determine whether to pursue

1    administrative forfeiture as against, you know,

2    precious metals or jewelry or other valuables of

3    that nature.

4         A.   Generally, we proceeded against all of the

5    non-currency valuables if it looks like it was

6    worth -- if the value would meet our minimum

7    monetary threshold.  If there was one little tiny

8    ring that looked like it came from Cracker Jack box,

9    then we wouldn't.  If there was one coin, one-dollar

10   gold coin, then we wouldn't.  But the boxes that

11   contained silver bars and gold nuggets, then those

12   got bagged and went to valuable evidence.

13        Q.   And so long as -- is it fair to say then,

14   so long as the asset -- your asset forfeiture team

15   looked at that gold or silver that was in the box

16   and it was above the jurisdictional minimum of

17   $5,000, that, in those situations, you would pursue

18   administrative forfeiture against that gold or

19   silver?  Is that fair?

20        A.   We didn't review every single bag.  The

21   agents would make that determination.  If it was a

22   close call, they might come and say, hey, this bag

23   has this in it.  Yes or no.

24        Q.   Okay.

25        A.   But many of the bags were getting --

Page 108

1    having that determination made by the agents

2    themselves.

3        Q.   And by the agents, you are talking

4    Lynne Zellhart and Madison MacDonald; is that right?

5        A.   The agents at the search -- at the

6    takedown.

7        Q.   The agents at the takedown were themselves

8    determining whether they thought the precious metals

9    were potentially forfeitable through administrative

10   forfeiture?

11       A.   Yes, because they received their tasking

12   and guidelines before of this is what's going to go

13   to asset forfeiture, this is what's going to go to

14   evidence.  So an agent was able to determine this

15   bag containing 20 silver bars, you know, that's

16   going to go through asset forfeiture.

17       Q.   Okay.  So they run it -- it's your

18   agent -- I get what are you saying.  So you have the

19   agent with the box.  And the agent is going through

20   the box and sees a bunch of gold and silver that

21   appears to be like $10,000 worth.  Just off the top

22   of my head.  In that situation, what would that

23   agent do?  I'm trying to figure out, like, would

24   that agent then somehow note that the gold and

25   silver was above the jurisdictional minimum?  How

**Exhibit O**
**1565**

Page 109

1     would they communicate that to you?

2          A.   They would bring it to the table and say,

3     I need a CATS ID.

4          Q.   So gold and silver that was above the

5     jurisdictional minimum was getting CATS ID numbers?

6          A.   Yes.

7          Q.   And that was happening on site?

8          A.   Yes.

9          Q.   I'm assuming, though, that you took that

10    silver and gold, instead of taking it to Loomis,

11    that just went to your valuables vault; is that

12    correct?

13         A.   Yes.

14         Q.   But the agents are saying -- so to your

15    understanding, the agents were instructed, open the

16    box, if the box has -- obviously if it has more than

17    $5,000 in cash, bag, it bring it out, we'll CATS

18    number it.

19              If it's gold and silver, if you think it's

20    above 5,000, then come and ask for a CATS ID number

21    and we'll get it in the asset forfeiture system.  Is

22    that a fair summary?

23         A.   Yes.

24              MR. FROMMER:  Let me take like five

25         minutes.  We've got a little bit more to go,

```
                                              Page 110

  1           Victor, but it won't be all that terrible.  Let

  2           me get five minutes, okay?

  3                 (Recess was held from 2:15 p.m. until

  4           p.m.)

  5      BY MR. FROMMER:

  6           Q.   Thank you so much.  Sorry for the quick

  7      break.

  8                 I had a question -- I want to jump back

  9      for a second to the petition process.  When people

 10      would file a petition, is it fair to say they would

 11      often provide paperwork in support of their

 12      petition?

 13           A.   That's what they're supposed to do.

 14      Sometimes petitioners just say, I would like my

 15      money back and provide no additional information.

 16           Q.   Okay.  I understand that.  Some people

 17      just file bare-bones petition, don't provide

 18      anything in support.  But let's talk about the

 19      people who, you know, put actual paperwork in place.

 20                 What I'm trying to do is, okay, so you get

 21      a petition for remission or mitigation, and it has

 22      some papers attached to it, you know, some documents

 23      that are filed in support.  What happens to those --

 24      who reviews those documents?

 25                 MR. RODGERS:  I just want to object.
```

Page 111

1      Beyond the scope of the topics.  And beyond the

2      scope of this proceeding.

3           Go ahead.

4      A.   The paralegal specialist receives them and

5  reviews them.

6    BY MR. FROMMER:

7      Q.   And does that paperwork get uploaded into

8  some file system?

9           MR. RODGERS:  Same objections.

10     A.   Yes, it does.

11   BY MR. FROMMER:

12     Q.   So is it fair to say that papers that

13  people file as part of the petition process, are

14  those retained on FBI servers, those documents?

15          MR. RODGERS:  Objection.  Beyond the scope

16     of this litigation.  Objection beyond the

17     topics in the deposition notice.  Lacks

18     foundation.  Irrelevant.

19          You can answer.

20     A.   It's on our FBI computer.

21   BY MR. FROMMER:

22     Q.   Is it held -- do you know if those

23  documents are held inside Sentinel?

24          MR. RODGERS:  Same objections.

25     A.   Our documents go in Sentinel.

Page 112

```
 1      BY MR. FROMMER:
 2          Q.   Your document -- so these documents would
 3      go into Sentinel.
 4              Is it your understanding that -- scratch
 5      that.
 6              Are you aware of any mechanism by which
 7      documents are -- that people submit as part of the
 8      petition process, are they ever removed from
 9      Sentinel?
10              MR. RODGERS:  Objection.  Beyond the scope
11          of the topics.  Beyond the scope of this
12          litigation.  Pertains to topics for which this
13          witness has not been offered today.  Lacks
14          foundation.  Assumes facts not in evidence.
15          Calls for speculation.
16              You can answer.
17          A.   Not that I'm aware of.
18      BY MR. FROMMER:
19          Q.   Now I can't remember what my question was.
20              MR. FROMMER:  Can you repeat my question,
21          please?
22              (Requested portion read back.)
23          A.   The answer is not that I'm aware of.
24      BY MR. FROMMER:
25          Q.   I thought that's what you said before.  I
```

Exhibit O
1569

Page 113

1        just wanted to make sure.

2                Let me jump a little bit.  And we were

3        talking about this before.  I want to go back to

4        that -- it sounded like there were sort of three

5        meetings that occurred around -- prior to the

6        takedown, as you call it.  And I understand that

7        there was a meeting, a big multi-agency meeting in

8        fall.  I think said it was with the other agencies,

9        with some local agencies, and some people from the

10       USAO.

11               Do you recall the meeting that I'm talking

12       about?

13            A.   Yes.

14            Q.   Okay.  And what I want to figure out is

15       did any of the local agencies discuss or ask -- why

16       were the local agencies there?  Why were local

17       agencies at that fall 2020 meeting?

18               MR. RODGERS:  Objection.  Calls for

19           speculation.  To the extent the reason that

20           these local agencies were at the meeting was at

21           the request of any attorney, I instruct you not

22           to answer.

23            A.   Because they were a part of the

24       investigation.

25

Page 114

```
 1      BY MR. FROMMER:
 2          Q.   And how were they part of the
 3      investigation?
 4          A.   I am not privy to how each local agency
 5      contributed to the investigation.  I just know that
 6      there were locals and postal and DEA, and I don't
 7      know how they played a part, but that they were part
 8      of the investigation.
 9          Q.   Okay.  That's fair.  I understand that you
10      weren't involved in the investigatory part of the
11      case.
12              So did the -- at that meeting, were the
13      local agencies asked about -- to be involved in the
14      takedown, as you call it?
15              MR. RODGERS:  Objection.  Instruct the
16          witness not to respond on attorney-client
17          privilege grounds.
18              MR. FROMMER:  I didn't ask any contents of
19          any attorney communication.  I simply asked --
20          I asked an operative thing.  Were these local
21          agencies asked to be part of the takedown?
22              MR. RODGERS:  You asked whether those
23          local agencies during the course of a meeting
24          in which attorneys were present asked to be
25          part of the takedown.  That is the exact
```

Page 115

1          content of a conversation.

2       BY MR. FROMMER:

3          Q.   Do you recall any non-attorney discussing

4    the potential use of civil forfeiture at that fall

5    2020 meeting?

6               MR. RODGERS:  Same objection.  Same

7               instruction.

8               MR. FROMMER:  Victor, I would like to

9               point out now that I've asked numerous

10              questions that don't go to any attorney-client

11              communication.  You're using the privilege to

12              simply prevent any inquiry into meetings where

13              attorneys were simply present, even though

14              that's not the -- that is simply not the

15              contour of the attorney-client privilege.

16              MR. RODGERS:  My instruction stands.  You

17              can ask questions and you already have.  It is

18              obvious locals were at the execution of the

19              warrant.  I'm not sure why there's a need to go

20              into attorney-client communications concerning

21              the locals.  Because you already have the

22              information from another source.

23              MR. FROMMER:  Let me ask a different

24              question then.

25

Exhibit O
1572

Page 116

1          BY MR. FROMMER:

2               Q.   Were the local agencies told if they

3     participated in the excuse of the seizure warrant,

4     that they would be entitled to receive some of the

5     asset forfeiture proceeds that may accrue as a

6     result?

7               A.   Not that I'm aware of.

8               Q.   Do you know how the local agencies got

9     paid for their time that they spent at

10    U.S. Private Vaults during the takedown?

11              MR. RODGERS:  Objection.  Speculation.

12              A.   I presume they were paid --

13              MR. RODGERS:  Don't presume.  If you know,

14         tell him.  It doesn't help if you guess.  But

15         if you have an estimate, please go ahead and

16         say it.  But if not, please don't speculate.

17              A.   They got paid by their employer to do

18    their job.

19          BY MR. FROMMER:

20              Q.   Have you received any DAG-71s from any of

21    the local agencies that participated in the takedown

22    at U.S. Private Vaults?

23              A.   Yes.

24              Q.   Which agencies?

25              A.   I don't remember all of them.  I think

Page 117

1    Beverly Hills, maybe Almonte, DEA, postal, maybe

2    Monrovia.  I don't remember.

3        Q.   And in those DAG-71s, are they requesting

4    a certain percentage of any and all property that

5    was seized and forfeited from the nest of security

6    boxes?

7            MR. RODGERS:  Objection.  Overbroad.

8            You can answer.

9        A.   They requested percentage of particular

10   assets.

11    BY MR. FROMMER:

12       Q.   Particular assets?

13       A.   Right.  So one at a time.  So a DAG for

14   each asset.

15       Q.   Okay.  So as assets are forfeited and

16   become -- get deposited in the asset forfeiture

17   fund, then these local agencies will submit DAG-71s

18   for a percentage of the particular asset that's been

19   forfeited; is that correct?

20       A.   No, you have to submit the DAG within a

21   certain amount of days after the time of seizure.

22   So you have to put that in place.  And then you wait

23   to see if the assets gets forfeited.

24       Q.   Okay.  So these agencies then, did they

25   send in, like -- did they each send in, like, 400 or

Page 118

1     400 different DAG-71s?  Did they send in a different

2     DAG-71 for each and every box?

3          A.   I am not privy to the inner workings of

4     the DAG form, but it's online, so I -- however you

5     submit it.  But my understanding is that you have to

6     submit a request for each asset.  But you may be can

7     do that with one push of a button.

8          Q.   So when you say "asset," would they --

9     these local agencies, would they be -- by the term

10    "asset," do we mean like -- because you said before

11    that currency got a CATS ID.  And gold and silver,

12    for instance, that appeared to be above the

13    jurisdictional minimum would get a CATS ID.

14              So when referring to an asset, like they

15    are asking for a percentage of the asset, does that

16    tie back to the specific CATS number that was

17    assigned?  Is that -- I just want to make sure we're

18    using the term "asset" the same way.

19         A.   Yes.

20         Q.   Okay.  So there would be a CATS number

21    for, let's say, $100,000 of currency, that gets --

22    and then within a certain amount of time of the

23    seizure of that $100,000, all these local agencies

24    would submit DAG-71s asking for a certain percentage

25    of whatever is ultimately forfeited; is that

Exhibit O
1575

Page 119

1    correct?

2         A.   Yes.

3         Q.   And then, I guess, you sit and wait to see

4    what ultimately happens to the asset and then

5    distribute if the asset is ultimately forfeited.  Is

6    that an accurate statement?

7         A.   Once the declaration of forfeiture has

8    been issued, then -- I don't know how soon after,

9    but then the sharing occurs.

10        Q.   And this is for the state and locals.  So

11   you would have received then -- I think I asked this

12   before, so I apologize.  So roughly how many DAG-71s

13   has your office received as a result of the actions

14   of U.S. Private Vaults?

15        A.   I am not -- once again, I don't know -- I

16   don't work in that database that has the DAG, but

17   every asset that we had in U.S. Private Vaults, if

18   someone put in a request, then they put in a request

19   for all of the assets that we seized.

20        Q.   Okay.

21        A.   But I don't get 500 pieces of paper across

22   my desk.  In the database.

23        Q.   Yeah, I get that.  I'm just trying to

24   figure out how many DAG-71s actually got filed with

25   you, I guess.  Because it sounds like there's

Page 120

1      different DAG-71 for everything that has its own

2      CATS ID number.  And then you have, for each asset

3      with its own CATS ID, you have multiple agencies

4      that were involved in the takedown.  So it seems, if

5      you multiply those numbers together, that you have

6      potentially thousands of DAG-71s that you have

7      received as -- that the LA field office has received

8      as a consequence of U.S. Private Vaults' takedown.

9      I'm just asking if that seems accurate.

10              MR. RODGERS:   Objection.  Speculation.

11          Lacks foundation.

12          A.    There's a lot of DAGs but they're in the

13      database.  They get submitted online.  So they're

14      there, but I'm not seeing them across my desk on a

15      daily basis.

16        BY MR. FROMMER:

17          Q.    Okay.

18          A.    But all of the agencies that put in for

19      sharing for all of the Private Vaults assets, that

20      information is in whatever database holds the DAG.

21          Q.    Okay.  All right.  I got that.  I was just

22      asking more a number question.  I was just trying to

23      get at -- how many -- you are in a unique position

24      to know this.  How many assets got CATS ID numbers

25      as a result of the U.S. Private Vaults takedown?

**Exhibit O**
**1577**

Page 121

1      I'm not asking you for a precise number.  Just give

2      me a ballpark.

3                  MR. RODGERS:  Objection.  Lacks

4           foundation.  Calls for speculation.

5           A.   I think there was around 400.

6        BY MR. FROMMER:

7           Q.   And were all of those 400 CATS ID numbers,

8      did they -- let me rephrase.

9                  The government put out an administrative

10     forfeiture notice in late May of 2021, correct?

11          A.   I don't know the exact dates, but I know

12     they sent out notice.

13          Q.   And actually, let me go back.  Let me

14     introduce that because I do want to --

15                  MR. FROMMER:  I'm going to introduce

16          another exhibit.  Give me just a second.

17                  I think we're on 15.  You should have that

18          in a just a second.  Let me know when you have

19          received it.  This is, I think, Exhibit 15.

20                  (Thereupon, marked as Exhibit 15.)

21                  MR. RODGERS:  We have it.

22        BY MR. FROMMER:

23          Q.   Just take a look at it.  Take a minute and

24     look through it.

25          A.   I see the date of May 20.

Page 122

1          Q.   And are you familiar with this document?

2          A.   Yes.

3          Q.   Can you describe to me what this document

4     is?

5          A.   It's the initial -- the start of our

6     administrative forfeiture process for FBI and this

7     is for U.S. Private Vaults.

8          Q.   Were you involved in putting this

9     together?

10         A.   I was not involved in putting this

11     together.  Staff members on my squad input the

12     information that then fills, populates, this notice

13     letter that I said gets sent out by our headquarters

14     in Washington, D.C.

15         Q.   Okay.  So this document would have been

16     transmitted by asset forfeiture headquarters in

17     D.C.; is that correct?

18         A.   I think it's the FSPU, forfeiture seized

19     property unit, they generate the notice letters.  In

20     Washington, D.C., at our headquarters.

21         Q.   What's their name again?

22         A.   It's the FSPU, forfeiture and seized

23     property unit.

24         Q.   Never heard of that before.  Forfeiture

25     and seized property unit.

Page 123

1          And what is their -- what is their -- what

2     are their responsibilities?  Do they process

3     forfeiture notices?  Is that their job?

4          A.    They process the notices and they process

5     the cases from our office.

6          Q.    What do you mean when they process the

7     cases from your office?

8          A.    They generate the notice letters.  They

9     oversee the information that we put in on the case.

10    They send letters to us about deadlines or things

11    that have been accomplished in the case.  They kind

12    of oversee the field office as a forfeiture cases.

13         Q.    So they are a unit in the headquarters.

14    They are providing support and also helping oversee

15    the asset forfeiture process.

16          So this would have come out of the FSPU

17    based on information that you and your team

18    collected and input; is that correct?

19         A.    Yes.

20         Q.    And this reflects you and your team's

21    judgments about property for which there was

22    probable cause to move for forfeiture; is that

23    correct?

24         A.    Well, every case that we submitted to

25    them, that was our statement that we believed there

Exhibit O
1580

Page 124

1    was probable cause for asset forfeiture.

2         Q.   Do you recall if there are any boxes or

3    any CATS ID numbers, assets, that you submitted

4    saying we believe there's probable cause for

5    forfeiture here, where the FSPU overruled you or

6    said, no, this property should just be returned?

7         A.   Are you asking about just Private Vaults?

8         Q.   Yeah, just Private Vaults.

9         A.   The entity that would do that is the legal

10   forfeiture unit, and, no, they did not in the

11   U.S. Private Vaults case.

12        Q.   So the legal forfeiture unit took your

13   list of we believe these assets should be pursued

14   via administrative forfeiture, and they approved it

15   and didn't disapprove any of your suggestions; is

16   that correct?

17             MR. RODGERS:   Objection.   Lacks

18        foundation.   Calls for speculation.

19             You can answer.

20        A.   They did not order us to return any

21   particular box and they approved our cases going

22   forward.

23      BY MR. FROMMER:

24        Q.   And once the government sent out -- can

25   you explain to me how -- I do want to walk back a

Exhibit O
1581

Page 125

```
 1      little bit just for a second on the administrative

 2      forfeiture process because I -- I understand there's

 3      a thing called a petition.  Then I understand

 4      there's a thing called a claim.  And I think you

 5      testified earlier that once a claim is filed, then

 6      the property has to go through judicial forfeiture;

 7      is that correct?

 8           A.   No, it doesn't have to.  Once a claim is

 9      filed, the case goes from civil administrative, then

10      we refer it to the United States Attorney's Office

11      for them to decide whether or not it should continue

12      as a civil judicial case.

13           Q.   That's what I meant.  Thank you for that.

14               So do you understand if

15      U.S. Private Vaults, the company, did it file any

16      sort of judicial claim in response to this asset

17      forfeiture notice?

18               MR. RODGERS:  Objection.  Beyond the

19          scope.

20               You can answer.

21           A.   I think it did.

22        BY MR. FROMMER:

23           Q.   So you terminated -- pursuant to what you

24      are saying then, you terminated all the

25      administrative forfeiture proceedings that were
```

Exhibit O
1582

```
                                            Page 126

 1       underway and forwarded the information along to

 2       Victor and the U.S. Attorney's Office, correct?

 3              MR. RODGERS:  Objection.  Calls for a

 4          legal conclusion.  Potentially deals with

 5          matters that invoke the work-product doctrine.

 6              I will allow you to -- I will allow the

 7          witness to answer the question yes or no.

 8              THE WITNESS:  Can you repeat the question,

 9          please?

10              MR. FROMMER:  I'd love to know what the

11          question was myself.

12              (Requested portion read back.)

13       A.   Yes.

14     BY MR. FROMMER:

15       Q.   So you terminated all the administrative

16     forfeiture proceedings that were underway?

17              MR. RODGERS:  Objection.  Calls for a

18          legal conclusion.  The witness doesn't

19          terminate proceedings.  The law terminates

20          proceedings.

21              But the witness can answer the question,

22          without speculating, whether all these cases

23          were transferred to the United States

24          Attorney's Office, if the witness knows.

25          Because this is beyond the scope of the
```

Page 127

1          deposition notice.
2          A.   I know not all of them were because we
3    still have administrative forfeiture cases going
4    forward from U.S. Private Vaults.
5       BY MR. FROMMER:
6          Q.   You still have administrative forfeiture
7    proceedings going forward?
8          A.   Yes.
9          Q.   Is there any like time limit about how
10   long an administrative forfeiture proceeding can
11   last?
12             MR. RODGERS:   Objection.   Calls for a
13         legal conclusion.   Calls for speculation.
14         Lacks foundation.
15         A.   I don't know if there's a timeline that it
16   has to be concluded.   But there are timelines for,
17   you know, notice, and then response timelines, and
18   there are timelines within that process, but I don't
19   know from start to finish if there is a set
20   deadline.
21      BY MR. FROMMER:
22         Q.   Approximately how many administrative
23   forfeiture cases that involve U.S. Private Vaults
24   would you say are still circulating within the FBI?
25             MR. RODGERS:   Okay.   Objection.   This goes

Page 128

1           beyond the scope of any topic.  This witness

2           isn't prepared to testify on this issue,

3           doesn't know anything about this issue.  It's a

4           legal conclusion.

5                This is a case involving property that has

6           been returned to people.  Those have all been

7           terminated.  This question has anything to do

8           with that.

9           A.   I don't know.

10     BY MR. FROMMER:

11           Q.   Okay.  That's fine.  I just had a

12     question.  That's all there was.

13                MR. FROMMER:  I think we're almost done.

14           Why don't you give me five minutes so I can

15           sort of collect myself.  If we have more

16           questions, I think it's probably only a few

17           more.  Okay?

18       (Recess was held from 2:56 p.m. until 3:00 p.m.)

19                MR. FROMMER:  I do think that we are

20           pretty much done.  I do have one or two more

21           questions and that should be it.

22     BY MR. FROMMER:

23           Q.   I just want to go back.  We were talking a

24     little bit before about when someone receives a

25     petition or receives an administrative forfeiture

Page 129

1    notice and they file a petition with papers in

2    support.  You had testified that those papers make

3    their way into Sentinel and they stay there for some

4    indeterminate time.

5         My question is:  Let's say someone instead

6    of filing a petition for remission, they file a

7    judicial claim and provide documents in support of

8    their judicial claim.  What happens to those

9    documents they filed in support in that

10   circumstance?

11        A.   It's just a claim.  So when somebody

12   receives notice of an administrative forfeiture

13   case, and they file a claim, it comes to us, and

14   then we make copies of our files and we fill out a

15   referral notice, request, letter, and we send it to

16   United States Attorney's Office, and they get a copy

17   of everything that we have on the case, and then we

18   also keep that in our FBI database and note that

19   claim was filed, case was referred to United States

20   Attorney's Office, judicial packet, and that's noted

21   in our case database.

22        Q.   Got it.  So it sounds like in that

23   situation, judicial claim -- you get a judicial

24   claim, FBI keeps a copy of the paperwork that was

25   filed in support of the claim, and also sends a copy

Exhibit O
1586

Page 130

1    of that paperwork to the United States Attorney's

2    Office along with the referral.  Is that accurate?

3         A.   The claim, yes.  Not judicial claim, but

4    just, yes, straight claim, yes, we keep a copy, and

5    then we make a copy and we send it to the United

6    States Attorney's Office.

7         Q.   Okay.  And the copy that you keep, that

8    goes into Sentinel, I guess, I'm assuming; is that

9    right?

10        A.   Yes.

11        Q.   So it ends up the same place that papers

12   submitted in support of a petition ends up.  Because

13   you said previously those go into Sentinel, too.

14        A.   It goes to Sentinel.

15        Q.   Okay.  All right.

16             MR. FROMMER:  All right.  You know, I

17        think that's it.  I think I have what I need.

18        I will say thank you so much, Special Agent --

19        Supervisory Special Agent Murray for coming.  I

20        really appreciate it.  I hope not to have to

21        bring you back, but there were a lot, as you

22        know, Victor and I had some back and forth

23        about attorney-client privilege and whether

24        that was appropriate.  It might be that I need

25        to bring you back depending on how that

Page 131

1          resolves itself.  But for today, we're all

2          done.  Thank you so much for your testimony.

3          It's been very, very helpful.

4                  THE WITNESS:  Thank you.

5                  MR. RODGERS:  Thank you.

6                  (Discussion off the record.)

7                  MR. RODGERS:  I believe so.  But, quite

8          frankly, I have to have my paralegal get in

9          touch with you.

10          (The deposition concluded at 3:04 p.m. PDT)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit O
1588

Page 132

1                    CERTIFICATE OF OATH

2

3

4

5

6           I, the undersigned authority, certify

7

8     that SUPERVISORY SPECIAL AGENT JESSIE MURRAY

9

10    appeared remotely before me and was sworn on the

11

12    11th day of July, 2022.

13

14           Signed this 13th day of July, 2022.

15

16

17

18

19

20           _____

21

22           KIMBERLY FONTALVO, RPR

23           Notary Public, State of Colorado

24           My Commission No. 20214007135

25           Expires: 2/23/2025

Exhibit O
1589

Page 133

1                          CERTIFICATE OF REPORTER

2

3          STATE OF COLORADO

4

5                     I, KIMBERLY FONTALVO, Registered

6          Professional Reporter, do hereby certify that I

7          was authorized to and did stenographically report

8          the foregoing remote deposition of SUPERVISORY

9          SPECIAL AGENT JESSIE MURRAY; that a review of the

10         transcript was requested; and that the transcript

11         is a true record of my stenographic notes.

12                    I FURTHER CERTIFY that I am not a

13         relative, employee, attorney, or counsel of any

14         of the parties, nor am I a relative or employee

15         of any of the parties' attorneys or counsel

16

17         connected with the action, nor am I financially

18

19         interested in the action.

20

21                    Dated this 13th day of July, 2022.

22

23                         *KFl*

24

25                         KIMBERLY FONTALVO, RPR, CLR

**Exhibit O**
**1590**

Page 134

1    Victor Rodgers, Esquire

2    victor.rodgers@usdoj.gov

3                          July 14, 2022

4    Snitko, Paul Et Al  v. United States Of America Et Al

5        7/11/2022, Jessie  Murray (#5312932)

6        The watermarked transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

**Exhibit O**
**1591**

```
                                           Page 135

 1   Snitko, Paul Et Al  v. United States Of America Et Al

 2   Jessie  Murray (#5312932)

 3                  E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Jessie  Murray                                Date

25
```

Exhibit O
1592

Page 136

1    Snitko, Paul Et Al  v. United States Of America Et Al

2    Jessie  Murray (#5312932)

3              ACKNOWLEDGEMENT OF DEPONENT

4       I, Jessie  Murray, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Jessie  Murray                           Date

13   *If notary is required

14                  SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                  _____ DAY OF _____, 20___.

16

17

18                  _____

19                  NOTARY PUBLIC

20

21

22

23

24

25

Exhibit O
1593

[0 - acknowledgment]

| **0** |
| --- |
| **0**  85:21 |
| **04405**  1:2 |

| **1** |
| --- |
| **10**  3:16 11:15,18 13:3,9,16 85:22 86:2,9,12,15 |
| **10,000**  108:21 |
| **100,000**  118:21,23 |
| **10:00**  1:18 |
| **10:09**  9:20 |
| **10:53**  38:13 |
| **11**  1:18 |
| **113**  3:7 |
| **114**  3:8 |
| **11:01**  38:13 |
| **11:20**  49:4 |
| **11:27**  49:4 |
| **11:53**  65:23 |
| **11:54**  66:14,19 |
| **11th**  132:12 |
| **12**  3:18 10:14,20 |
| **120**  3:20 |
| **12:59**  66:19 |
| **131**  3:9 |
| **132**  3:9 |
| **133**  3:10 |
| **134**  3:10 |
| **13th**  132:14 133:21 |
| **14**  134:3 |
| **14th**  2:10 |
| **15**  3:20 121:17,19 121:20 |
| **17**  16:25 |
| **17th**  17:7 |
| **1994**  16:13 |
| **1995**  16:25 |
| **1:00**  66:15 |

| **2** |
| --- |
| **2/23/2025**  132:25 |
| **20**  58:22 60:25 61:1,1,21 62:1 108:15 121:25 136:15 |
| **200**  4:13 |
| **2019**  11:22 |
| **2020**  67:3,5,8 68:21 72:13,24 73:6,6 74:11 75:7 75:10,19 76:3,19 76:22 80:20 82:14 83:4 113:17 115:5 |
| **2021**  4:21 70:24 72:9,16 76:19 77:19 121:10 |
| **20214007135**  132:24 |
| **2022**  1:18 132:12 132:14 133:21 134:3 |
| **22203**  2:6 |
| **24/7**  97:18 |
| **25**  58:6 |
| **2:15**  110:3 |
| **2:21**  1:2 |
| **2:56**  128:18 |

| **3** |
| --- |
| **3**  3:4 94:1 |
| **30**  1:16 3:18 10:16 11:7 13:4 14:14 15:1 134:17 |
| **302**  99:4 |
| **302s**  101:25 102:6 102:16 |
| **30th**  10:15 |
| **312**  2:10 |
| **3190**  133:24 |

| **3:00**  128:18 |
| --- |
| **3:04**  1:18 131:10 |

| **4** |
| --- |
| **4**  94:1 |
| **400**  106:4 117:25 118:1 121:5,7 |
| **4000**  4:12 |
| **45**  47:2 |

| **5** |
| --- |
| **5,000**  38:1,3 44:22 45:22,25 94:24 96:6,10,11 105:12 106:18 107:17 109:17,20 |
| **50**  95:2 |
| **500**  119:21 |
| **52**  15:19 |
| **5312932**  134:5 135:2 136:2 |
| **58**  93:25,25 98:14 98:15 |
| **59**  96:21 |

| **6** |
| --- |
| **6**  1:16 3:18 10:16 11:7 13:4 14:14 15:1 |

| **7** |
| --- |
| **7**  3:15 92:18,19 |
| **7/11/2022**  134:5 |
| **71**  57:18 58:3 59:6 60:2,3,4,16,23 61:25 64:1 118:2 120:1 |
| **71s**  116:20 117:3 117:17 118:1,24 119:12,24 120:6 |
| **73**  3:5 |
| **74**  3:6 |

| **8** |
| --- |
| **8**  11:15,18 13:3,7 13:15 |
| **85**  3:16 |

| **9** |
| --- |
| **9**  3:18 |
| **900**  2:6 |
| **90012**  2:11 |
| **901**  2:6 |
| **91**  3:15 |
| **92868**  4:13 |
| **95**  17:2 |
| **96**  11:25 |

| **a** |
| --- |
| **a.m.**  1:18 38:13,13 |
| **able**  8:15 10:5 13:3 23:5,7,12 84:18 90:20 108:14 |
| **accepted**  16:22 |
| **accomplished**  123:11 |
| **account**  35:7,13 35:15,18 64:6 74:6 90:18 |
| **accrue**  116:5 |
| **accuracy**  134:9 |
| **accurate**  8:9,16 18:12 22:13 25:2 29:23 40:4 45:19 45:22 46:11 47:11 49:19 52:5 64:1 69:1,12 76:13 80:12 103:9 119:6 120:9 130:2 |
| **accurint**  41:15,16 |
| **acknowledgement**  136:3 |
| **acknowledgment**  134:12 |

Exhibit O
1594

**acquisition** 42:8
**act** 17:24
**acting** 1:8
**action** 4:18 13:12
  32:14 133:17,19
**actions** 76:12
  119:13
**activities** 61:22
  84:25
**activity** 22:11
  29:13 39:17 42:15
  43:11,13 58:19
  60:11
**actual** 72:8 93:9
  110:19
**adachi** 19:21
**add** 9:10
**additional** 9:7
  32:1,21 39:4,22
  40:1 49:11,13,17
  51:3 103:1,4,8
  104:18,19 110:15
**additions** 136:6
**address** 4:11
**addresses** 41:19
**adjourn** 9:16
**admin** 47:13 97:1
  97:8,18 106:9
**administrative**
  13:7 14:5 20:5
  21:5 23:18 25:18
  26:2,7,10,20,25
  27:12,16 28:4,10
  29:23 32:13 38:21
  41:24,25 42:5,19
  43:9,18 44:7
  46:14,15,17,25
  47:5,19 52:24
  53:3 63:22 64:3
  97:6 100:7,19
  104:11 105:3,13

105:15,19 106:2,9
  106:19 107:1,18
  108:9 121:9 122:6
  124:14 125:1,9,25
  126:15 127:3,6,10
  127:22 128:25
  129:12
**administratively**
  21:3
**administrator**
  1:25 104:9
**adoche** 19:22
**advice** 74:25 85:9
**advise** 74:24 84:7
**advising** 68:15,17
**aff** 56:24 61:18,19
  62:2
**affidavit** 28:15
  71:10 76:5,9,16,21
  77:2,15,22 78:1,6
  78:8 79:14 103:23
**affidavits** 22:4,5
**afmls** 64:12
**afterward** 90:21
**age** 15:18
**agencies** 13:11
  56:2,12,15,17
  57:10,11,14,24
  58:4 59:3 60:9
  63:13,15,15 65:16
  73:15 74:8 85:3
  113:8,9,15,16,17
  113:20 114:13,21
  114:23 116:2,8,21
  116:24 117:17,24
  118:9,23 120:3,18
**agency** 51:14,15
  56:4,9,11 58:3,14
  58:21,25 59:10,22
  60:24 61:25 63:2
  64:7 68:2,5,11,11

113:7 114:4
**agent** 1:15 3:3,16
  11:23 12:1,10
  16:20 17:11 18:7
  18:8,10,15 23:24
  23:25 29:10 38:16
  40:12,16 59:21
  66:18 67:13 71:23
  72:12 86:14,18
  92:24 94:12 95:20
  98:5,10 99:5,24
  100:17 101:24
  103:13 108:14,18
  108:19,19,23,24
  130:18,19 132:8
  133:9
**agent's** 25:16
**agents** 18:11,21,25
  19:2,3,7,8,12,13
  19:25 21:13,16,16
  22:7 24:1,7,14,14
  25:20 27:4,5 28:9
  30:24 32:1 38:23
  39:20 40:11,12
  41:13 44:12 70:8
  81:8,13 83:25
  84:7,16 87:9 94:4
  94:7 95:17 96:23
  97:13,16 107:21
  108:1,3,5,7 109:14
  109:15
**ago** 6:24 82:18
  84:4 96:8
**agree** 91:20
**agreed** 58:5
**agreement** 57:25
  58:13,20
**agrees** 43:20
**ahead** 68:6 69:22
  73:9 77:8 88:25
  111:3 116:15

**al** 1:4 134:4,4
  135:1,1 136:1,1
**alley** 17:14
**allotted** 134:20
**allow** 75:2 126:6,6
**almonte** 117:1
**altogether** 26:16
**ambiguous** 25:5
  37:25 44:5 47:17
  49:10 50:21 60:20
  61:5 79:9
**amended** 3:18
  10:15,22 11:7
  13:4 14:14,16
  15:1
**amendment** 18:3
**america** 1:7,16
  134:4 135:1 136:1
**amount** 37:21
  51:2 64:2 88:16
  105:12 117:21
  118:22
**amounts** 64:8 89:2
**analysis** 79:18,20
  80:5
**angeleno** 15:23
**angeles** 2:11 11:21
  12:4,7 13:22
  15:20 18:17 25:11
  68:19
**annual** 12:17
**answer** 3:5,6,7,8
  5:20 7:1,18,20,21
  7:22,23 8:4,12,21
  8:22,23 9:1,16
  10:3 11:11,14
  25:6,8 44:6,19
  68:6 69:22 70:21
  75:15 77:8 78:23
  80:1 111:19
  112:16,23 113:22

**Exhibit O**
**1595**

117:8 124:19
125:20 126:7,21
**answered** 9:6
**answering** 5:19
6:16
**answers** 5:14 6:19
15:9,9 30:3 62:18
**anybody** 56:16
81:12
**anymore** 35:6
**apologize** 119:12
**appearances** 2:1
**appeared** 118:12
132:10
**appearing** 11:10
**appears** 87:11
89:23 108:21
**appended** 136:7
**applicable** 134:8
**application** 16:18
**applied** 16:19
**applies** 63:12
**apply** 101:1
**applying** 71:4,20
**appointment** 10:2
**appreciate** 130:20
**appropriate** 63:17
63:20 130:24
**approve** 62:1
**approved** 56:6
60:24 124:14,21
**approximately**
12:10 77:18
127:22
**area** 87:15
**arlington** 2:6
**arranging** 20:21
**arrest** 28:18 29:8
31:13 42:11 85:1
**arrests** 17:14

**aside** 70:20
**asked** 68:23 69:9
74:23 114:13,19
114:20,21,22,24
115:9 119:11
**asking** 5:12 21:24
36:4 54:12 58:8
59:20 68:18 74:16
74:17,19 79:18
118:15,24 120:9
120:22 121:1
124:7
**aspect** 95:20
**assembling** 20:11
**assessment** 88:21
**asset** 2:9 11:20,24
12:1,9,14,17,23
18:16,20 19:4,7
20:3,5,10 21:13,16
22:7,22 23:1,4,25
24:1,7,25 25:9,10
27:2,11 29:12,14
30:12,13 34:8
35:1,6,14,18,23
36:5,23 37:3,6,9
37:16 38:19 39:7
39:11 40:12 42:1
42:2,6,14,16 43:12
43:19 44:13 45:2
45:12,15,15,17,18
46:4,8,9 47:8
52:22,23,24 53:12
53:13,18 55:10
56:1 57:19,22
61:12,16 63:7,14
64:17,19,22,25
65:10,17,17 68:19
69:24 70:1 73:14
74:9 80:25 83:19
84:5 85:15 87:14
91:7,7,9,11,12,18

94:4,7,11,14,18
95:14 97:9,23
98:6,21,23 100:21
101:17 102:5,18
104:17 107:14,14
108:13,16 109:21
116:5 117:14,16
117:18 118:6,8,10
118:14,15,18
119:4,5,17 120:2
122:16 123:15
124:1 125:16
**assets** 20:18 21:25
22:2,10 34:7,25
36:16 68:3 78:11
78:13,14,24 79:5
79:17 80:3,15
81:4 83:8 84:21
99:10 103:25
104:4 117:10,12
117:15,23 119:19
120:19,24 124:3
124:13
**assign** 44:7,20
**assigned** 94:19
95:13 118:17
**assigning** 101:19
**assist** 5:14
**assistance** 58:17
**assistant** 1:10 2:9
64:13
**associated** 102:17
**assume** 7:24 26:24
89:23
**assumes** 53:10
58:10 99:1 112:14
**assuming** 28:24
32:25 72:25 109:9
130:8
**attached** 110:22
134:11

**attachment** 93:8
**attachments** 87:1
**attempt** 29:7
**attempting** 38:24
39:25
**attend** 12:21
**attorney** 1:8 2:9
4:16 8:18 64:13
74:14,18 75:1,17
113:21 114:16,19
115:3,10,15,20
130:23 133:13
134:13
**attorney's** 20:19
47:23 48:6 63:23
64:5 73:17 125:10
126:2,24 129:16
129:20 130:1,6
**attorneys** 20:23
114:24 115:13
133:15
**audibly** 5:16
**authored** 93:17
**authority** 14:4
132:6
**authorized** 133:7
**available** 134:6
**avoid** 17:24 18:2
**aware** 63:7 112:6
112:17,23 116:7

**b**

**b** 1:16 3:18 10:16
11:7 13:4 14:14
15:1
**back** 7:12,13
11:25 17:8 20:25
38:15 44:2 49:5
61:14 66:12,13
67:8 76:1 98:14
101:13 102:15
110:8,15 112:22

Exhibit O
1596

[back - case]                                                                 Page 4

113:3 118:16
121:13 124:25
126:12 128:23
130:21,22,25
**background** 15:11
67:22
**bad** 6:7 88:8
**bag** 94:19,21
95:15 107:20,22
108:15 109:17
**bagged** 94:25 95:3
95:4,6,9,11 96:8
96:12 107:12
**bags** 94:23 95:15
95:16,18,22
101:19,22 107:25
**ballpark** 121:2
**bands** 88:4
**bank** 22:1 34:15
35:7,12,18 40:22
51:4 90:17
**bare** 110:17
**barely** 93:22
**bars** 107:11
108:15
**base** 83:10,17
**based** 42:12 51:9
57:20 58:14,21
79:15 103:22
123:17
**basically** 18:9
29:16 30:21 97:14
98:19 106:17
**basis** 23:14 120:15
**batches** 102:8
**battery** 43:24
**behalf** 2:3,8 11:10
**belief** 65:17
**believe** 13:2 29:12
29:19 39:15 43:12
50:24 67:2 89:20

90:5 96:1 124:4
124:13 131:7
**believed** 123:25
**believes** 43:10
**belong** 97:17
**bequeathed** 51:2
**best** 6:18 13:25
22:21 84:7,8
**better** 22:21 49:17
92:16
**beverly** 117:1
**beyond** 25:5 26:17
30:7 31:3 34:5,23
36:14 37:1,24
38:25 40:20 44:4
48:19 49:10 50:5
50:19 51:17 52:18
53:9 54:19 60:18
63:3 77:6 78:20
79:24 84:10 99:2
100:5 111:1,1,15
111:16 112:10,11
125:18 126:25
128:1
**big** 73:20 93:8
96:23 113:7
**bill** 89:3
**bit** 17:8 18:18
32:10 57:7 66:22
66:23 80:21 84:4
91:3 99:21 102:13
109:25 113:2
125:1 128:24
**body** 101:17
**bold** 91:14
**bolster** 89:9
**bolts** 17:11
**bones** 110:17
**book** 10:2
**born** 15:22

**bottom** 94:3
**box** 3:15 72:18
80:4 82:3 86:25
87:3 94:20 100:2
100:3,18,19,25
101:21 102:22,25
103:19,19 104:18
104:23,23,24
105:11 106:10
107:8,15 108:19
108:20 109:16,16
118:2 124:21
**boxes** 69:11,19
70:17 71:5 72:1
75:12,23 77:1
78:3,17 79:1,4,22
80:11,16 81:9,25
96:19 100:3,18
101:1 102:10,14
102:20 104:3
105:16 106:4
107:10 117:6
124:2
**break** 8:5,6 9:13
9:17,22 38:11
110:7
**bring** 32:13 109:2
109:17 130:21,25
**broad** 36:4
**brought** 23:4
95:22
**budget** 62:4,4
**bunch** 108:20
**bundled** 81:20
87:10,17 88:4,9,14
88:19 90:12
**bureau** 1:11,16
**business** 103:24
103:25 104:4
**button** 118:7

**buttress** 40:2,17

**c**

**calendar** 10:1
**california** 1:1,9
2:11 4:13
**call** 27:3 50:16
67:10 68:13,16
69:4 72:2,5,7,14
72:21,22,22 73:5
73:20,24 74:12,14
74:20 75:7,10,11
75:19 80:22 82:12
83:24 102:13
105:22 107:22
113:6 114:14
**called** 65:9 67:21
68:22 87:7 125:3
125:4
**calls** 27:18 37:2
39:1 40:19 50:6
50:20 52:19 54:19
63:4 72:25 73:21
77:5,11 97:11
98:8 99:2 112:15
113:18 121:4
124:18 126:3,17
127:12,13
**campbell** 19:10
**canine** 91:4,4,4,21
92:5,9
**capable** 68:20
69:23 70:2
**capacity** 1:8,10
68:24 69:10,17
**caps** 95:13
**capture** 23:5
**car** 39:9
**care** 56:8
**careful** 5:25
**case** 1:2 14:6 19:3
20:2 21:2,23

[case - complete]                                                                                    Page 5

26:14 29:22 44:12
45:8 54:24 63:22
63:23 68:3 97:13
97:15,16,19 98:10
98:10 104:25
114:11 123:9,11
123:24 124:11
125:9,12 128:5
129:13,17,19,21
**cases** 54:22 86:24
88:13,13 91:9,12
123:5,7,12 124:21
126:22 127:3,23
**cash** 35:20,21,22
36:1,5 44:22,22
45:22,25 46:2
52:17 87:7,10,16
88:2,9 89:17 90:2
90:3,5,8,9,10 94:6
96:25 98:4 106:16
106:17 109:17
**cats** 35:22,25
36:11,13 44:8,16
44:20,22,24 45:2,9
45:13,16 46:1,5,10
94:6,19,21 95:23
96:3,15 101:19,20
101:23 102:23
109:3,5,17,20
118:11,13,16,20
120:2,3,24 121:7
124:3
**cause** 27:21 28:18
29:8,12,19 30:11
30:21 31:12,23
32:6,16,17 39:8,16
39:22,23 40:3,6,18
42:9,13,14 43:7,10
43:12 44:11 50:8
50:24 53:20 76:6
76:11 77:3 78:2

78:10,18 79:6,16
79:20 80:3,9,14
84:23 87:23 88:1
88:20 89:9,19
90:5 91:1 92:1
99:6,9,10,14,15
100:22,23 102:21
103:5,11,18,19,22
104:20 105:2,7
123:22 124:1,4
**central** 1:1,8
**certain** 57:19 58:1
58:14 60:17 117:4
117:21 118:22,24
**certainly** 70:21
**certificate** 3:9,9
132:1 133:1
**certify** 132:6
133:6,12
**cetera** 51:5
**challenge** 4:19
**chance** 10:18
23:19 86:15
**change** 135:4,7,10
135:13,16,19
**changes** 24:7
134:10 136:6
**characterize** 33:17
**charge** 67:14
71:23 72:12 95:20
97:15
**check** 56:7
**checks** 40:24 41:2
**chemical** 89:15
**chemicals** 89:18
**chief** 64:12
**circulating** 127:24
**circumstance**
129:10
**circumstances**
6:10 30:25

**civil** 14:4 63:21,22
64:3,4 68:25
69:10,17 70:11
71:25 72:18 75:8
75:11,22 76:25
78:2 84:1,9,17
85:10 105:15
115:4 125:9,12
**claim** 47:9,15,20
48:15 53:23 125:4
125:5,8,16 129:7,8
129:11,13,19,23
129:24,25 130:3,3
130:4
**claimant** 47:14,14
48:10 54:11
**claimants** 20:23
53:22
**claims** 53:9
**clarification** 9:7
**clarify** 7:13
**class** 4:18 53:10
**classify** 91:14,16
**clean** 97:7
**cleaner** 48:13
**clear** 6:2 71:1
**clearly** 5:15 21:15
75:15
**client** 74:14 75:1
75:17 114:16
115:10,15,20
130:23
**close** 22:8 72:7
93:8,11 107:22
**closely** 22:7
**closer** 17:8 80:21
**clr** 1:24 133:25
**coffee** 89:15,18
**coin** 107:9,10
**collect** 33:1,9 81:8
90:20 92:10

128:15
**collected** 46:2
83:12 99:21 100:2
100:17,25 123:18
**collecting** 20:11
33:4,13,18,18
99:23 101:24
**collects** 42:3
**college** 16:3
**colorado** 132:23
133:3
**come** 39:7 53:22
66:12 101:12
102:8,10 107:22
109:20 123:16
**comes** 26:11
129:13
**coming** 102:11
103:12,13 130:19
**commission**
132:24
**common** 22:15
**communicate** 97:5
109:1
**communicated**
97:1
**communicating**
20:23 102:24
**communication**
75:2 114:19
115:11
**communications**
20:20 75:17
115:20
**company** 70:15
78:15 125:15
**company's** 79:21
**compiling** 95:15
**complement** 70:1
**complete** 7:23 8:9
8:15 85:14 136:8

Exhibit O
1598

[completed - dash]                                                                 Page 6

**completed** 49:11 134:17
**completely** 7:2
**completion** 85:5
**computer** 44:10 111:20
**concerning** 4:19 115:20
**concluded** 127:16 131:10
**conclusion** 50:6,20 52:19 53:15 54:20 78:5 126:4,18 127:13 128:4
**conduct** 31:9 32:1 32:25 48:21
**conducted** 42:2
**conducting** 33:8 38:22 40:15 104:18
**conducts** 41:23 49:25 51:20
**conference** 72:2,5 72:14,21,22 73:24
**conferences** 12:18
**confidential** 58:16
**confused** 21:10 29:2 30:19 34:2 44:17 53:18 103:17
**conjunction** 21:17 21:21 64:20
**connected** 39:16 133:17
**consequence** 120:8
**considered** 74:2,4 104:3
**considering** 31:1 79:1,3

**considers** 63:25
**consistent** 97:3
**constantly** 5:4
**constituent** 13:11 65:15
**constitutional** 17:22,23
**contact** 62:14 84:23
**contained** 80:10 107:11
**containing** 108:15
**contains** 64:15
**contemplating** 84:16
**content** 115:1
**contents** 70:16 75:1,16,23 79:1,4 80:4,16 95:11 103:25 114:18
**context** 44:25
**continue** 48:7 125:11
**continues** 52:25 53:13
**continuing** 39:3
**contour** 115:15
**contributed** 57:21 58:17 59:16 114:5
**controlled** 35:16
**conversation** 5:25 6:10 9:25 73:7,12 74:7,11,20 81:10 81:21 82:4,17 115:1
**conversations** 71:8,9 72:17 73:1 81:16,18 83:24
**copies** 102:6 129:14 134:14

**copy** 10:22 92:17 98:21,22 99:4 129:16,24,25 130:4,5,7
**correct** 12:4,24 15:1,4,5 21:18 23:3 24:17 25:6 25:15,19,24 26:4 32:3 48:2 53:7 59:5 63:2,14 70:18 74:3 77:15 87:4 91:24 92:6 92:13 94:8 96:4 96:16,17 109:12 117:19 119:1 121:10 122:17 123:18,23 124:16 125:7 126:2 136:8
**corrections** 136:6
**cost** 37:7,15
**costly** 37:7
**counsel** 14:25 52:10 133:13,15 134:14
**couple** 66:7,10
**course** 114:23
**court** 1:1 4:1 5:13 5:15,22 6:1,12,24 7:6,11
**cracker** 107:8
**create** 93:20
**created** 46:11 98:23
**criminal** 19:3,5 21:17,21 22:2,9 23:15 29:13,20 32:11 39:17 40:11 41:3 42:15 43:13 44:12 46:3 67:18 67:21 73:14 87:18 88:3,11 89:10,20

89:25 90:6 91:24 96:25 98:5 102:24 103:3,7,12
**cross** 6:9 60:5
**cs** 134:15
**currency** 34:14,14 34:16,20 35:3,6,10 35:12,23 36:10,16 37:21,21 38:1 45:1,3 55:8,9 81:14 89:3 91:1 91:22,23 94:24 95:5,9,10 101:23 105:12 106:24 107:5 118:11,21
**currently** 11:20
**custody** 20:21 28:25 29:17,18 34:7,25 35:5 52:22 53:14
**customers** 103:21
**cut** 37:20 88:25
**cv** 1:2

**d**

**d** 3:1
**d.c.** 26:9,11,21 73:18 122:14,17 122:20
**dag** 57:18 58:3 59:6 60:2,3,4,16 60:23 61:6,25 63:16 64:1 116:20 117:3,13,17,20 118:1,2,4,24 119:12,16,24 120:1,6,20
**dag71** 59:10
**dags** 57:23 120:12
**daily** 120:15
**dash** 15:16

[database - document]                                                              Page 7

**database** 40:23
  41:2,4,8,9 44:10
  102:23 119:16,22
  120:13,20 129:18
  129:21
**databases** 41:13
**date** 69:3 72:3
  82:21 84:24
  121:25 135:24
  136:12
**dated** 133:21
**dates** 121:11
**day** 54:5 85:3
  101:8 132:12,14
  133:21 136:15
**days** 47:2 97:18
  101:4 117:21
  134:17
**dea** 57:11 59:4,9
  59:14,14,14 114:6
  117:1
**deadline** 127:20
**deadlines** 123:10
**dealing** 89:2
**deals** 126:4
**decent** 70:7
**decide** 27:14 28:9
  28:20 42:4 43:8
  48:6 104:8 125:11
**decided** 29:10,14
  43:17
**decides** 50:3
**deciding** 28:3 49:2
  49:7 50:17 51:15
  104:6
**decision** 23:8
  26:25 27:5 28:25
  29:6 33:24 42:13
  42:18,25 43:16,21
  50:1,14 51:12,24
  64:4,6,14 106:11

106:12
**decisions** 26:24
**declaration** 55:12
  55:17,21 56:18
  57:5,9 61:8,18
  63:9 119:7
**declare** 136:4
**declared** 56:3
**deemed** 136:6
**deeply** 21:4
**defendants** 1:12
  2:8 21:1
**definite** 89:5
**degree** 16:9,15
**demands** 24:8
**denied** 51:22
  52:14 53:12 54:5
**denies** 53:5
**deny** 50:1 51:15
  53:21
**depending** 7:10
  130:25
**depends** 22:16
  28:13 63:21 64:2
  66:9
**deponent** 134:13
  136:3
**deposed** 5:6
**deposing** 134:13
**deposit** 35:12 51:5
  69:11,19 70:16
  72:1 75:12,23
  77:1 78:3,17
  79:22 80:11 81:9
  94:20 104:3
**deposited** 34:15
  35:7,21,22,24 36:2
  90:17 117:16
**deposition** 1:14
  3:19 4:23 5:1 6:11
  10:15,23 11:8

14:12,14,20 26:18
  34:24 37:25 77:7
  85:23 100:6
  111:17 127:1
  131:10 133:8
**describe** 11:17
  12:16 18:20 21:14
  28:8 80:24 122:3
**description** 18:12
  20:17
**deserve** 61:21
**desk** 54:24 119:22
  120:14
**determination**
  30:10 39:21 40:18
  45:14,17 46:10
  52:3,10 54:25
  55:3,6 63:19
  64:10 76:5 78:10
  79:7 99:13 103:10
  103:18,19,20,22
  104:10,20 105:2
  105:20 106:8
  107:21 108:1
**determinations**
  28:7
**determinative**
  89:8
**determine** 32:2
  38:20,24 39:15
  46:20 76:10 78:1
  87:25 92:1 106:7
  106:25 108:14
**determined** 42:10
  46:8 50:8 68:10
  76:3 79:15 80:8,8
  80:14 105:6
**determines** 30:5
  63:25
**determining** 29:18
  89:19 108:8

**differ** 19:24 48:25
**different** 12:18,19
  12:19 72:25 73:1
  75:7 80:5 97:22
  106:22 115:23
  118:1,1 120:1
**difficult** 8:11
**direct** 3:4 4:7
**directed** 75:4
**direction** 83:18
**director** 1:10
**disagreement** 43:4
**disagrees** 43:5
**disappear** 92:4
**disapprove** 124:15
**disbursements**
  63:8
**disclose** 75:1,16
**discuss** 13:3 27:6
  75:6 113:15
**discussed** 69:5
  71:11
**discussing** 63:12
  65:18 68:7 70:10
  71:24 72:5 75:11
  82:6 115:3
**discussion** 18:2
  43:25 49:3 69:7
  71:22 86:8 131:6
**discussions** 71:3
  71:12,20 81:7,24
**disposition** 13:10
  13:10
**distinction** 78:14
**distribute** 119:5
**distributed** 61:7
**district** 1:1,1,9
**dmv** 41:15
**doctrine** 126:5
**document** 10:19
  11:4 64:15,24

Exhibit O
1600

[document - fair]

65:8 86:11,17
92:25 93:4 112:2
122:1,3,15
**documentation**
49:14 50:9 51:1,4
**documents** 10:1
14:15 15:3 110:22
110:24 111:14,23
111:25 112:2,7
129:7,9
**dog** 95:24 96:1,2
**doing** 12:14 17:6
17:13 20:15,24
21:20 33:13 94:15
101:18 104:13,15
104:23
**doj** 65:7
**dollar** 88:16 107:9
**dollars** 37:5,8 57:6
57:8,15 60:13,17
**doris** 19:10
**draft** 76:4,18
77:22
**drafted** 93:17
**drafting** 102:21
**drive** 4:13
**drug** 50:24 51:7
87:11 88:13 89:23
**drugs** 88:17,18
**duties** 55:20

**e**

**e** 2:5 3:1 135:3,3,3
**earlier** 9:8 49:1
125:5
**early** 22:23 23:16
23:22 76:19 77:19
83:11
**easier** 57:7
**educational** 16:1
**effected** 31:6

**effecting** 72:6
**efficient** 5:11
**effort** 29:5
**eight** 101:10
**either** 7:11 12:20
21:24 29:20,20
43:19 89:8 95:24
**employee** 133:13
133:14
**employees** 70:2
**employer** 116:17
**encompassed** 64:1
**ended** 77:14 83:21
96:10
**ends** 130:11,12
**enforcement** 64:7
84:25
**ensure** 84:18
**enter** 94:5
**entire** 103:21
**entitled** 116:4
**entity** 103:21
124:9
**equaled** 101:21
**errata** 3:10 134:11
134:13,17
**erratas** 134:15
**esq** 2:4,5,5,10
**esquire** 134:1
**essence** 134:11
**established** 69:24
**estimate** 77:19
82:13 116:15
**estimated** 96:5
**et** 1:4 51:5 134:4,4
135:1,1 136:1,1
**evaluate** 76:8
**evaluated** 78:6,7
**evaluating** 104:7
**events** 31:22

**everybody** 43:20
**evidence** 9:3 20:8
20:12 32:10,12,18
32:19 33:1,5,10,13
33:18,18 36:6,12
36:17 45:9,10
46:4 50:9 53:11
58:11 73:19 79:6
79:10 81:7 89:8
94:4,5 96:13 99:1
100:2,16,25 103:8
104:7,8,14,19
105:9 107:12
108:14 112:14
**exact** 7:5 114:25
121:11
**exactly** 17:1 55:22
57:3 68:15
**examination** 3:2
4:7
**example** 39:12
41:3 92:2
**excuse** 116:3
**execute** 17:17
31:19 73:4 80:23
81:1,3 97:4
**executed** 81:4
102:5
**executing** 22:5
39:6
**execution** 3:10
4:19 42:11 71:18
72:4,8,15 73:3
80:22 93:11
101:15 102:3
115:18
**executive** 24:11
**exhibit** 3:15,16,18
3:20 10:12,14,20
11:19 85:18,20,21
85:22 86:2,9,12,15

92:15,18,19 99:6
121:16,19,20
**exhibits** 3:12
**exhibitshare**
85:25 86:5
**existing** 39:23
99:15
**expect** 31:20
**experience** 31:11
87:15
**expert** 91:7,14,17
**expire** 54:2
**expires** 132:25
**explain** 34:1,3
44:18 58:9 87:20
88:9 89:14 124:25
**explanation** 42:22
50:22
**explicit** 23:2
**explore** 96:7
104:12
**extent** 44:6 100:9
113:19

**f**

**facilitate** 84:1 85:9
85:13
**facility** 92:6
**fact** 7:4 32:22
74:25
**factor** 87:19,21
89:6 91:25 105:7
**factors** 58:15
**facts** 27:20 28:19
30:25 39:11 50:7
50:8 51:9 53:10
58:10 59:20 67:11
68:18 82:20 85:16
99:1 112:14
**fails** 134:19
**fair** 14:7 23:20
25:13 26:12 32:14

**Exhibit O**

**1601**

33:2,7,11 70:13
74:1,6 76:23 88:2
90:3,6 91:9 94:12
100:1 106:20
107:13,19 109:22
110:10 111:12
114:9
**faith** 7:23
**fall** 73:5,6,6 74:7
74:11,11 75:7,10
75:19 76:3,22
80:20,20 82:13
113:8,17 115:4
**familiar** 25:2,13
25:17,21 55:13
60:8 93:6 97:15
98:10 122:1
**familiarity** 55:24
91:17
**familiarize** 10:18
92:25
**far** 35:17
**fbi** 11:22 12:3,4,7
12:14 13:5,6
16:18,20,23 17:3
17:11,21 18:21
19:13 26:16,19
27:10,15 28:24
42:21 44:10 47:13
47:19 48:16,18
52:4 53:5 55:15
55:16,17 57:11
58:21 59:4,24,24
59:25 60:10,15
61:2,2,14,20 62:3
62:3 63:22 64:3
65:1,2,6 67:21
68:4,24 73:19
75:21 80:23 93:25
94:4 105:13,22
106:13,19,19

111:14,20 122:6
127:24 129:18,24
**fbi's** 38:3
**february** 77:20
**federal** 1:11,16
56:14,17 60:9
63:12,15
**federals** 73:16
**feel** 78:17
**felt** 76:11
**field** 12:7 13:13
18:21 26:15 42:21
42:24 43:2,4,19
47:21 51:19 52:2
55:15 59:23 60:11
60:15 61:3 62:4
63:1 68:24 69:9
69:16 70:11
104:11 105:21
106:11,15 120:7
123:12
**figure** 20:9 40:14
44:8 46:22 50:2
50:14 62:5 79:13
80:19 108:23
113:14 119:24
**figured** 5:6 71:1
93:22
**file** 47:8 53:22
61:7 110:10,17
111:8,13 125:15
129:1,6,13
**filed** 53:3,3 110:23
119:24 125:5,9
129:9,19,25
**files** 10:5 47:13,14
48:10,15 129:14
**filing** 47:20 48:14
53:5 129:6
**fill** 46:15 59:6
60:16 129:14

**filled** 87:2
**filling** 44:15 54:10
**fills** 122:12
**final** 54:24 55:3,6
57:4,9 64:4,6,13
76:4
**finalized** 76:20
78:8 103:23
**finally** 102:15
**financial** 40:23
**financially** 133:17
**financing** 39:10
**fincen** 41:8,14
**find** 22:18 31:21
32:12 39:4 45:25
49:12
**fine** 6:11 7:19,19
8:2 9:9 10:24
33:22 65:7 74:22
91:15,15 100:8,10
100:12 101:4
128:11
**finish** 6:15,19 8:4
9:14,16 16:7 49:7
127:19
**firm** 4:17
**first** 49:8 67:1,9
73:11 76:18 82:9
82:12 84:20
**fit** 89:3
**five** 11:25 17:8
38:11 64:11,12
109:24 110:2
128:14
**floor** 2:10
**flow** 6:9
**focus** 73:7
**focused** 13:12 73:3
**follow** 39:9
**fontalvo** 1:24
132:22 133:5,25

**foregoing** 133:8
136:5
**foremost** 14:4
**forfeit** 23:8 29:7
31:2 54:12
**forfeitable** 29:21
32:11 40:3 43:11
53:20 87:18 89:21
91:1 99:11 108:9
**forfeited** 39:17
54:6 55:7,9 56:4
58:1 61:22 63:14
63:24 117:5,15,19
117:23 118:25
119:5
**forfeiture** 2:9 3:20
11:21,24 12:1,9,14
12:17,23 13:8,10
14:4,6,7 18:16,20
19:4,7 20:5,10,13
21:5,16 22:7,11,13
22:22 23:4,18,25
24:2,7,25 25:3,9
25:11,14,18 26:2,7
26:10,20 27:1,2,13
27:16 28:4,10
29:1,14,23 30:6,12
30:22 32:2,13
33:11,24 34:2,4,8
34:12,22 35:1,15
35:18 36:6,23
37:3,6,9,12,23
38:20,21,21 40:12
41:25 42:5,16,19
43:1,9,14,18 44:13
45:15,18 46:5,9,14
46:15,17 47:1,5,19
48:2 49:8 51:23
52:9,23,24 53:3,7
53:13 54:3,16,17
54:22 55:10,12,18

Exhibit O
1602

55:21 56:1,13,14
56:18,23 57:5,9
58:5 59:12 60:1
60:13 61:8,12,16
61:19 62:12,15,25
63:7 64:17,19,22
64:25 65:10,17
66:22 68:19,25
69:10,18,25 70:2
70:11 71:25 72:18
73:14,17 74:9,10
75:8,12,22 76:12
76:25 78:2,18
79:17 80:10,25
83:13,19 84:1,6,9
84:17 85:10,15
87:14 90:9 91:7,8
91:9,11,12,18 94:4
94:7,11,14 97:9,23
98:6,21,24 100:3,8
100:19,22 101:17
102:6,19 103:6
104:10,11,17
105:3,14,16,19
106:2,9,10,20
107:1,14,18
108:10,13,16
109:21 115:4
116:5 117:16
119:7 121:10
122:6,16,18,22,24
123:3,12,15,22
124:1,5,10,12,14
125:2,6,17,25
126:16 127:3,6,10
127:23 128:25
129:12
**forfeitures**   60:12
63:9
**forgetting**   57:13

**form**   3:17 56:6
57:18,18 59:6
60:5 87:2 90:16
100:17 118:4
**forms**   56:5 99:25
101:25
**forth**   130:22
**forward**   27:4
29:14 30:6,22
32:2 42:10,16
53:22 68:1 76:11
76:24 79:16 103:6
105:3,7 124:22
127:4,7
**forwarded**   3:10
51:22 126:1
**foundation**   51:18
52:20 54:20 58:12
63:4 79:25 83:6
83:16 97:12,25
98:8 99:1 111:18
112:14 120:11
121:4 124:18
127:14
**four**   11:25 17:5
19:17 24:16 57:24
58:6 87:7
**fourth**   16:4 18:3
98:17
**frankly**   131:8
**frequently**   41:14
**fresh**   9:11
**friday**   101:7
**frommer**   2:4 3:4
4:8,15 10:13,24
11:1,16 25:7
26:22 27:23 28:21
30:15 31:7,14,24
32:7,23 33:6,21
34:9,17 35:2,8
36:19,24 37:10,17

38:2,8,10,14 39:13
39:24 40:7 41:1,7
41:12,21 42:17
44:1,14 47:24
48:8,23 49:6,15,22
50:12 51:11 52:1
52:11 53:1,16
54:7 55:1 58:23
60:22 61:9 62:9
62:22 63:10 65:22
66:3,8,13,17,20
68:9,14 69:8 70:4
73:10 74:16 75:5
75:18 76:7 77:10
79:2,11 80:6,17
83:1,9,22 84:14
85:7,17 86:1,6,10
86:13 92:14,20,23
97:21 98:2,13
99:8,17 100:10,15
109:24 110:5
111:6,11,21 112:1
112:18,20,24
114:1,18 115:2,8
115:23 116:1,19
117:11 120:16
121:6,15,22
124:23 125:22
126:10,14 127:5
127:21 128:10,13
128:19,22 130:16
**front**   7:6
**fspu**   122:18,22
123:16 124:5
**full**   4:10 7:23 8:9
8:15 15:14 19:13
**fully**   22:17
**fund**   35:15 55:10
56:1 61:12,16
63:7 117:17

**funds**   35:19 52:15
55:5 56:23 60:25
61:17 88:10
**further**   104:15
133:12
**future**   82:3 84:16

g

**gas**   89:13
**gasoline**   89:15,17
**gather**   23:6 44:8
44:12 47:21
**gathering**   20:22
39:10
**general**   13:6 36:3
36:4 52:9 61:16
63:6 64:13 74:16
74:19 82:22 88:5
97:3
**generally**   14:7
17:19 18:23 21:11
22:24 25:9 26:15
26:19 31:11 36:22
38:6 39:5 42:24
45:5,11 48:21
56:3,5 61:11
66:22 75:3 76:2
81:24 82:16,19
84:6,20 88:5
90:15 101:14
107:4
**generate**   26:5 94:6
122:19 123:8
**generated**   45:16
46:1 95:14 96:15
96:15
**gestures**   5:22
**getting**   22:4 25:22
28:23 60:1 63:8
71:8 95:23 102:9
102:16 104:1
107:25 109:5

**give** 4:4 8:15 85:18
90:8 92:14 99:18
105:23 121:1,16
128:14
**given** 6:25 27:1
93:22 136:9
**giving** 101:23
**glebe** 2:6
**go** 4:22 5:8 6:17
14:10 15:25 17:21
27:4 28:10 29:14
34:8 36:5,7,18
38:15 42:10,16
45:18 61:1,2 62:3
62:3,4,25 66:5
68:6 69:22 73:8
74:21 77:8 86:6
88:25 90:16 91:3
92:3 93:24 94:21
95:14 98:14,21
108:12,13,16
109:25 111:3,25
112:3 113:3
115:10,19 116:15
121:13 125:6
128:23 130:13
**goes** 36:6 54:2
61:12,14,14,15
63:6 66:9 79:24
125:9 127:25
130:8,14
**going** 5:12,13 6:17
7:24 11:25 16:18
17:1 29:6,11
32:20 34:11 35:1
37:5,7,23 42:10
44:9 45:15,18
46:4,8 57:25
59:15,25 60:2
66:2,3 68:1,2,4,8
73:4 75:20,21

78:8 81:25 82:16
85:15 88:17 90:9
90:15,16 92:3,4,15
92:17 97:6 98:23
105:8 108:12,13
108:16,19 121:15
124:21 127:3,7
**gold** 106:23
107:10,11,15,18
108:20,24 109:4
109:10,19 118:11
**good** 7:11,23 9:19
14:5 20:9 22:24
91:17 104:15
**gotcha** 58:24
**government** 5:5
9:1 30:18 37:11
41:23 42:1,4
43:10,17,22 46:19
49:2,24 50:3,17
54:11,14 71:15
83:12 99:20,22
121:9 124:24
**government's** 4:19
8:18
**governmental**
60:5
**grade** 16:4 24:12
**graduate** 16:11
**graduated** 16:5
17:7
**grandmother** 51:1
**grant** 50:1,4,15,17
51:13,15
**granted** 49:12,19
50:10 51:10,22
**great** 6:5,22 7:17
15:17 65:21
**greenberg** 2:5
**ground** 4:23 5:9

**grounds** 74:15
114:17
**group** 95:16
**guess** 50:13 52:16
72:23 103:17
104:1 116:14
119:3,25 130:8
**guide** 64:18,22
65:11
**guidelines** 108:12
**gun** 87:12
**gut** 50:15 51:8
**guys** 5:7 65:22
66:3

**h**

**h** 15:16,16 135:3
**halfway** 96:22
98:17
**hand** 4:2 25:22
**handing** 10:22
**handle** 20:3 21:1
68:24 69:10,17
70:11 83:20
**handled** 55:15,15
**handling** 68:20
69:23 70:2
**happen** 7:9 14:22
95:10
**happened** 73:2
85:14
**happening** 42:20
51:13 55:16 81:5
109:7
**happens** 9:5,8
47:15 52:15 55:22
104:11 110:23
119:4 129:8
**hard** 9:22
**head** 108:22
**headed** 83:18

**headquarters** 26:9
26:12,21 42:21
43:1,5 51:23 52:4
52:8 59:14 61:2
61:15 62:12 64:9
73:18 105:23
122:13,16,20
123:13
**hear** 5:21 67:1
**heard** 41:16 67:7,9
122:24
**heat** 95:11
**heather** 19:10
**held** 16:17 38:13
49:4 66:19 110:3
111:22,23 128:18
**hello** 4:9
**help** 10:2 58:8
70:22 83:25 84:18
85:9 90:4 116:14
**helped** 59:11
**helpful** 58:9 131:3
**helping** 21:24 22:9
22:11 93:20 97:17
123:14
**hereto** 136:7
**hey** 107:22
**higher** 24:11
**hills** 117:1
**history** 16:1,1
**hogan's** 17:14
**hold** 34:11,16
85:24
**holders** 104:24
**holds** 120:20
**hope** 130:20
**hopefully** 5:10
92:15
**hour** 66:18 101:9
101:10

Exhibit O
1604

**hours**  9:23 58:15 66:7,10 101:8
**hq**  43:19 55:16,17 106:13
**huh**  5:23,23
**hundred**  37:5,8
**hundreds**  69:18
**hypothetical** 37:14 48:4 52:21 53:9 57:6 58:12 60:20 77:5 78:22 84:12

## i

**idea**  40:2 62:10 89:9 105:23
**identifiers**  41:20
**identify**  21:24 22:10 39:25
**immediately**  16:19
**important**  6:14 8:8
**impossible**  6:12
**improper**  9:2
**include**  18:1 58:3 98:1,11
**included**  93:7
**incomplete**  37:14 48:4 52:20 53:9 58:11 60:19 77:5 78:21 84:11
**independently** 48:1
**indeterminate** 129:4
**indication**  65:25
**indicia**  50:16
**indictment**  70:24
**individual**  63:1 81:8
**individually**  58:25

**individuals**  89:2
**inform**  49:18 55:20
**informant**  58:16
**information**  9:7 23:6,6,13 39:5,22 40:1 42:3 44:10 49:17,25 58:16 64:16 83:13 88:24 89:16,18 90:4,20 90:24 92:11 97:5 99:14,16,21,23 102:23,25 103:1,4 103:12 110:15 115:22 120:20 122:12 123:9,17 126:1
**infringing**  17:24
**initial**  15:15 52:3 71:22 105:19 122:5
**initiated**  105:15
**initiation**  41:24
**inner**  118:3
**input**  44:9 122:11 123:18
**inputting**  102:22
**inquiry**  115:12
**inside**  78:16 104:2 111:23
**instance**  31:19 59:24 88:5 118:12
**instinct**  51:9
**institute**  2:4 4:16
**instruct**  8:21 74:13 75:14 113:21 114:15
**instructed**  109:15
**instruction**  3:5,6,7 3:8 115:7,16

**interest**  4:17
**interested**  17:20 27:7 46:18,20 59:23 133:19
**interface**  103:7
**interfacing**  103:3
**interrupt**  6:9
**interview**  33:16 40:22
**introduce**  85:17 92:15 121:14,15
**introduced**  10:14
**introducing**  10:12
**inventory**  3:15 96:19,23
**investigate**  70:22
**investigating** 32:10 33:20 102:19 104:22
**investigation**  1:11 1:16 20:6,21 22:16,23 27:20 28:20 30:24 31:9 31:21 32:1,5,21 33:1,5,9,23 38:18 38:18,23 39:3,4,15 40:2,9,15 41:24 42:3 46:3 48:22 48:25 49:1,11,16 49:25 51:20 52:3 54:5 59:16 61:23 67:12,23 68:18,23 73:23 74:3,5 78:11 82:11,20 83:7 84:22 97:20 104:14,15,18,23 113:24 114:3,5,8
**investigations** 19:4 20:24 31:6 63:16 91:13

**investigative** 58:18
**investigators**  19:6 21:17,22 22:9,9
**investigatory** 114:10
**invited**  12:20
**invoke**  126:5
**involve**  127:23
**involved**  12:8,13 13:11 20:11 21:4 22:18,22 23:19 24:25 25:10 26:23 26:24 56:13,15,22 56:25 57:12,24 60:1 63:13 70:19 71:3,9,19 80:25 81:2,3 85:2,3 91:18 114:10,13 120:4 122:8,10
**involvement**  22:20 93:19
**involves**  37:4
**involving**  128:5
**irrelevant**  53:10 111:18
**irvine**  16:5
**issue**  90:6 128:2,3
**issued**  55:12 63:9 119:8
**issues**  55:17
**item**  23:9 27:25,25 28:2,24 29:17 30:21 31:23 32:9 46:7 54:6 56:3 85:4
**items**  25:14 29:11 31:20,21 34:11 45:1 78:16

Exhibit O
1605

| **j** | **kimberly** 1:24 | **kristi** 1:9 | **legal** 50:6,20 51:23 |
|---|---|---|---|
| | 6:23 132:22 133:5 | **l** | 52:9,19 54:3,20,21 |

**j**

**jack** 107:8
**january** 17:7
**jessie** 1:15 3:3
  4:12 15:15 132:8
  133:9 134:5 135:2
  135:24 136:2,4,12
**jewelry** 107:2
**job** 16:17 19:23
  24:8 92:16 116:18
  123:3
**johnson** 1:9 2:5
**join** 16:22
**joining** 4:9
**judge** 7:6 28:16,16
**judgments** 123:21
**judicial** 38:21 47:9
  47:15 48:1 63:22
  64:5 125:6,12,16
  129:7,8,20,23,23
  130:3
**judy** 19:21
**july** 1:18 132:12
  132:14 133:21
  134:3
**jump** 110:8 113:2
**june** 10:15
**jurisdictional**
  107:16 108:25
  109:5 118:13
**justice** 2:4 4:16

**k**

**karla** 19:21
**katherine** 19:22
**keep** 5:10 43:6
  54:15 66:1 84:23
  129:18 130:4,7
**keeping** 59:3
**keeps** 129:24

**kimberly** 1:24
  6:23 132:22 133:5
  133:25
**kind** 31:8 123:11
**kindly** 5:16
**kinds** 84:15
**know** 5:24 6:17
  7:10,18,20,20,21
  9:9,14 11:2 13:18
  16:4 17:1 18:19
  18:23 24:13,15
  25:9 27:16 28:2
  29:21 32:24 35:11
  35:17 36:3,9,16,20
  37:22 39:7,9,11
  55:11,22 56:5,7,20
  57:1 58:5 59:8,13
  59:13,16,25 60:6
  60:10,25 61:11,13
  61:24 62:8,10,18
  62:21 63:18 65:3
  65:4,6 71:17
  76:18 81:13,24
  82:1 90:13 91:6
  92:20 93:1,16,17
  100:24 101:3
  105:24 106:1,23
  106:24 107:1
  108:15 110:19,22
  111:22 114:5,7
  116:8,13 119:8,15
  120:24 121:11,11
  121:18 126:10
  127:2,15,17,19
  128:3,9 130:16,22
**knowledge** 14:5
**knowledgeable**
  13:2,5,15,23 14:1
**knows** 126:24
**koons** 1:9

**kristi** 1:9

**l**

**l** 1:7
**la** 13:6,13 18:20
  60:10 61:14 62:4
  63:7 68:24 69:9
  69:16 70:10
  105:21 106:11
  120:7
**label** 95:12
**labeled** 92:18
**lacks** 51:18 52:20
  54:20 58:12 63:4
  79:24 83:5,16
  97:12,25 98:7,25
  111:17 112:13
  120:11 121:3
  124:17 127:14
**lapse** 23:18
**large** 68:20 69:23
  70:1,3 73:23,24
  74:2,4 83:21 89:2
  95:16
**late** 23:5 72:24
  73:6 76:19 83:4
  121:10
**law** 4:17 16:6,7,9
  16:15,19 64:7
  84:24 126:19
**lawyer** 8:1
**lead** 58:20 64:7
  68:3,5,11 71:11
  83:8
**leader** 98:16
**leading** 71:17
**leads** 32:18 60:11
  60:12
**leave** 84:2 102:15
**left** 32:20 53:23
  54:9,17 92:6

**legal** 50:6,20 51:23
  52:9,19 54:3,20,21
  62:12,15 73:17
  74:10 124:9,12
  126:4,18 127:13
  128:4 134:23
**lengthy** 37:4
**lens** 80:3
**letter** 3:10 25:21
  55:18 122:13
  129:15
**letters** 20:4,22
  23:12 26:6,8
  122:19 123:8,10
**level** 18:12 22:20
  24:11 42:21,24
  43:1,4,19 51:14,19
  55:16 104:12
  106:15
**lexisnexis** 41:15
**light** 51:8
**limit** 127:9
**limited** 100:7
**line** 9:14,15 135:4
  135:7,10,13,16,19
**list** 105:21 124:13
**listed** 10:13 11:11
  11:19 85:21
**litigation** 111:16
  112:12
**little** 17:8 21:9,15
  29:2 30:19 32:5
  34:2 44:17 57:7
  66:23 70:20 80:21
  84:4 91:3 101:12
  102:13 107:7
  109:25 113:2
  125:1 128:24
**local** 56:4,12 57:11
  59:14,14 63:13,15
  113:9,15,16,16,20

Exhibit O
1606

114:4,13,20,23 116:2,8,21 117:17 118:9,23

**locals** 56:18 59:19 73:15 74:8 114:6 115:18,21 119:10

**location** 80:16

**locations** 12:20 85:1

**logbook** 101:20

**logging** 86:4 101:20

**logistics** 72:6

**long** 17:3 91:13 102:5 107:13,14 127:10

**longer** 17:8 90:10

**look** 10:18 14:22 27:20 28:19 40:17 50:7 86:15 90:11 90:13 91:25 96:21 121:23,24

**looked** 107:8,15

**looking** 40:22 49:17 78:24 79:5 80:2 85:4 87:23 88:20 90:4 104:8 104:22 105:5

**looks** 49:24 50:17 93:6 107:5

**loomis** 92:3 94:22 95:14,18 96:4,10 101:24 109:10

**loop** 23:16

**los** 2:11 11:21 12:4 12:7 13:22 15:20 18:17 25:11 68:19

**lose** 99:22

**losing** 37:11

**lot** 6:8 21:9 37:4 73:21 91:8,11

102:10,10 120:12 130:21

**lots** 73:24

**love** 126:10

**low** 43:24

**lunch** 9:21 66:4,5 66:11

**lunchtime** 65:23

**lynne** 82:7,10 83:3 97:14 108:4

**lynne's** 82:23 97:17

**m**

**m** 15:16 67:19

**macdonald** 108:4

**madison** 97:14 108:4

**magistrate** 28:15 28:16 78:9

**main** 62:14

**maker** 64:4,6,14

**making** 42:18 43:23 64:9 78:14 105:1,22

**management** 24:9 24:11

**manpower** 58:15

**manual** 64:18,20 64:25 65:18

**mar** 1:2

**march** 4:21 70:24 72:9,16

**marijuana** 81:15 89:13,17

**marked** 10:20 86:12 92:19 121:20

**marshal** 35:13 61:19

**marshal's** 35:13

**marshals** 20:19 34:3,7,10,18,19,25 35:7,10,16,17,24 36:2,7,18 52:23 53:14 55:10,20 90:8,17 92:3,8,12

**material** 10:5

**materials** 10:1

**matt** 67:19,20 68:21 71:23 72:12

**matter** 54:23 66:24 74:17 83:4

**matters** 21:5 126:5

**mcgeorge** 16:6,11 16:15

**mean** 8:20 13:5 18:22 21:10 33:8 54:5 57:1 66:8 88:25 89:5 91:16 97:9 98:4 105:24 118:10 123:6

**meaningful** 23:7

**means** 15:8 97:13

**meant** 57:4 125:13

**mechanism** 112:6

**medication** 8:10

**meet** 107:6

**meeting** 76:23 113:7,7,11,17,20 114:12,23 115:5

**meetings** 77:12 113:5 115:12

**members** 26:3 94:10 122:11

**memorandum** 3:15

**mention** 73:16

**mentioned** 19:14 21:9 59:9

**met** 88:1 103:11 105:9,16

**metals** 107:2 108:8

**metropolitan** 4:12

**michael** 2:5

**middle** 8:4 9:15 15:15 98:16

**million** 57:6,8,15 60:13,17 64:3,4,9 64:11,12

**mind** 9:11 15:18 38:11 93:1

**minimum** 36:22 38:6 105:9,17 106:19 107:6,16 108:25 109:5 118:13

**minute** 38:11 86:7 92:24 121:23

**minutes** 109:25 110:2 128:14

**mischaracterizat...** 69:3,21

**mitigation** 47:11 48:11,16 110:21

**modules** 17:22

**moment** 6:24 10:17 46:10

**monday** 1:18

**monetary** 36:22 105:9,17 107:7

**money** 20:25 35:14,14 36:10 37:12 47:7 50:10 50:23 51:2,6 55:11,25 56:10 57:1 58:5 61:13 62:1 65:14 81:19 88:16,17 89:24 90:19 92:2,6,11

Exhibit O
1607

96:5,9,9,12,14,16
110:15
**monrovia** 117:2
**month** 16:24 67:2
**months** 17:5,8
**moon** 67:19,20
68:21 71:23 72:12
82:13
**morning** 66:21
**move** 22:11 26:25
29:1 30:6,21 32:2
33:24 76:11,24
78:18 79:16 80:20
102:13 103:6
105:3,7,13 106:8
123:22
**movement** 55:11
**mow** 27:13
**multi** 113:7
**multiple** 18:11
85:1 95:18 97:18
120:3
**multiply** 120:5
**murray** 1:15 3:3
4:12 15:16 38:16
66:18 86:14 92:25
130:19 132:8
133:9 134:5 135:2
135:24 136:2,4,12

**n**

**n** 2:6 3:1 67:19
**name** 4:11,15
15:14,16 18:5
88:16 122:21
**names** 19:7,9,19
**narcotics** 88:13
89:4
**narrative** 27:19
39:1 40:20 57:20
58:21

**nature** 107:3
**ncic** 41:3,14
**near** 65:23 90:11
**necessarily** 70:14
85:13 89:5 98:1,9
98:12
**necessary** 136:6
**need** 5:25 16:4
23:7 33:1 83:13
109:3 115:19
130:17,24
**needed** 76:4,8
**negative** 91:22
**nest** 69:11 71:5,25
75:12 76:25 78:3
78:16 79:21 80:11
117:5
**never** 122:24
**new** 85:20
**non** 4:17 106:24
107:5 115:3
**noon** 9:22
**normal** 6:9,10
**normally** 6:6,7
**north** 2:10
**notary** 132:23
136:13,19
**note** 81:14 87:9,13
88:15 90:12 97:5
98:5 108:24
129:18 134:10
**noted** 96:25
129:20 136:7
**notes** 3:17 81:19
82:2 86:19 90:14
99:24 100:17
101:25 103:13
133:11
**notice** 3:18,20
10:16,22 11:7,12
13:4 14:14,16

15:1 20:22 23:12
23:18 25:18,21
26:6,8,11 44:15
46:14,15,17,23
47:1,6,14,18
102:23 106:3
111:17 121:10,12
122:12,19 123:8
125:17 127:1,17
129:1,12,15
**noticed** 44:9
**notices** 26:2,18,20
54:1 123:3,4
**noting** 89:16 90:7
**nuggets** 107:11
**number** 5:5 11:24
24:6,19 35:25
44:8,20,22 45:2,10
45:13,16 46:1,6,11
70:6,7 91:8,19
94:19,21 95:13
96:3 101:20
109:18,20 118:16
118:20 120:2,22
121:1
**numbers** 11:15
20:3 41:20 44:16
44:25 94:6 95:23
101:19,23 109:5
120:5,24 121:7
124:3
**numerous** 115:9
**nuts** 17:11

**o**

**o** 67:19,19
**oath** 3:9 6:25 7:5
7:21 132:1
**object** 33:19
110:25
**objection** 8:19,22
8:24,24 25:4

26:17 27:18 28:12
30:7 31:3,18 32:4
33:3,12 34:5,13,23
35:4 36:14 37:1
37:13,24 38:5,25
39:18 40:5,19
41:18 44:3 47:16
48:3,19 49:9,20
50:5,19 51:17
52:6,18 53:8
54:18 58:10 60:18
62:20 63:3 68:12
69:2,20 74:13
75:14 77:4 78:20
79:8,23 82:25
83:5,15 84:10
97:11,24 98:7,25
100:5 111:15,16
112:10 113:18
114:15 115:6
116:11 117:7
120:10 121:3
124:17 125:18
126:3,17 127:12
127:25
**objections** 31:10
32:15 36:21 41:5
41:10 42:7 53:25
61:4 62:7 80:13
84:19 85:12 99:12
111:9,24
**objective** 50:16
**observation** 90:14
99:24,24 100:17
101:25 103:13
**observations** 3:16
82:1,2 85:16
86:18 87:7 90:2,3
99:5
**obvious** 115:18

**obviously** 72:3
73:3 109:16
**occur** 12:22 31:11
45:4
**occurred** 31:22
72:21,24 113:5
**occurring** 72:15
**occurs** 56:18
119:9
**odor** 87:11 89:13
**offer** 50:22
**offered** 112:13
**offhand** 47:1
**office** 11:21 12:5,7
12:8 13:6,13,22
18:17,21 20:19
25:11 26:15,19
29:22 42:21,24
43:2,4,19 47:20,22
47:23 48:6 51:19
51:23 52:2,9
55:16 59:11,15,23
60:11,15 61:3
62:5 63:1,8,23
64:5 68:24 69:10
69:17 70:6,11
73:17 84:15 85:2
102:16 104:12
105:22 106:12,15
106:25 119:13
120:7 123:5,7,12
125:10 126:2,24
129:16,20 130:2,6
**offices** 85:2
**official** 1:7,10 18:5
**officials** 5:6 52:4
**oftentimes** 49:13
**oh** 12:2 16:3 23:15
26:7 32:8 56:8
68:10,21 73:20
86:1 88:24 104:15

106:1
**okay** 5:4,8,17,18
6:22 7:17 8:6,7,14
9:11,12,17,18,23
9:24 10:6,7 11:9
11:17 12:6,12
13:1 14:2,10
15:17 17:9,13
19:18 21:4 22:6
24:6,10,13,23
25:23 26:10 27:11
27:24 29:16 30:16
32:8,24 33:15,22
34:10 35:3,9,20
37:18 38:3,9,11
39:14,25 41:22
43:6,15 44:15
45:6,6,16 46:7,23
47:3 48:14 49:16
50:22 52:12 55:2
55:14,23 56:22
59:1,18 60:7
61:17 62:23 63:11
63:24 65:12,21
66:11,16,17 68:21
69:6 70:5 71:7,14
71:19 75:6 76:8
76:15,22 77:21,25
79:3 80:18,19
82:15 83:10 85:8
86:1 87:2,9 88:22
89:1,7 90:23 93:3
93:19,24 94:2,3
95:4 96:14,18
97:22 98:3 99:18
100:10,14 101:4
101:11 105:11,18
106:5,16,22
107:24 108:17
110:2,16,20
113:14 114:9

117:15,24 118:20
119:20 120:17,21
122:15 127:25
128:11,17 130:7
130:15
**olson** 19:21
**olympic** 102:15
**omnibus** 105:20
105:25 106:2
**once** 29:17,17
30:20 42:8 43:21
46:7,25 47:4,25
48:16 54:14 55:3
55:6,12 61:18
81:3,24 90:8
119:7,15 124:24
125:5,8
**ones** 20:7,7 34:10
59:19
**online** 118:4
120:13
**open** 109:15
**opening** 81:25
**operation** 97:18
**operative** 114:20
**opinion** 27:15 51:6
77:1
**opportunity** 22:17
90:23
**opposed** 15:11
31:16 79:4
**option** 76:2
**options** 47:6
**orange** 4:13
**order** 33:23 38:19
76:10 124:20
**original** 34:16
**originally** 15:20
**originated** 26:8
**overall** 25:2 34:2
59:10 62:3 63:2

87:22,25 88:19
**overbroad** 40:20
44:4 60:20 84:11
117:7
**overruled** 124:5
**oversee** 123:9,12
123:14
**owned** 70:14
78:15
**owner** 48:15
**owners** 102:20

**p**

**p.m.** 1:18 49:4,4
66:15,19,19 110:3
110:4 128:18,18
131:10
**package** 54:2
**packaged** 81:20
**packet** 47:22
129:20
**page** 3:2,14 37:18
93:25 94:1 96:21
98:15,15 135:4,7
135:10,13,16,19
**paid** 116:9,12,17
**palmerton** 95:20
**paper** 119:21
**papers** 110:22
111:12 129:1,2
130:11
**paperwork** 20:3
21:2 93:8 98:20
98:21,23 99:4
102:7,11,17
110:11,19 111:7
129:24 130:1
**paragraph** 94:3
96:23 98:15,18
**paralegal** 19:17,24
20:1 24:16 30:24
40:10,16 51:19

Exhibit O
1609

52:7 55:19 70:8
94:10 98:11
101:18 111:4
131:8
**paralegals** 20:10
52:2 94:15 97:10
97:23
**part** 5:24 6:9 20:5
20:8 30:9 41:22
44:7 46:3 54:2
61:7 87:22,25
88:19 89:12 99:6
100:21,22 104:3
111:13 112:7
113:23 114:2,7,7
114:10,21,25
**participants** 75:10
**participate** 59:11
**participated** 63:1
116:3,21
**participates** 60:11
**participating** 56:1
58:4 65:15
**participation**
61:23
**particular** 22:2
23:9 42:6,20
43:18 54:24 59:11
63:8 64:25 74:18
81:10,21 103:6
106:10 117:9,12
117:18 124:21
**particulars** 56:9
56:21 59:15 61:13
84:3
**parties** 46:18,20
46:22 73:25 85:6
133:14,15
**partnering** 73:15
**paul** 1:4 134:4
135:1 136:1

**pay** 24:12
**payou** 88:15
**pc** 43:5
**pdt** 1:18 131:10
**pending** 8:3
**people** 6:8 13:24
17:23 19:16 22:22
23:4,16 40:13
46:24 74:9 75:7
83:20 97:15 103:8
110:9,16,19
111:13 112:7
113:9 128:6
**people's** 104:2
**percent** 58:6,22
60:25 61:1,1,21
62:1
**percentage** 56:6
57:19 58:1,14
60:2,3,17,24 117:4
117:9,18 118:15
118:24
**period** 23:17
**periodic** 12:22
**permission** 49:18
**person** 13:19,23
13:25 15:11 53:4
53:20 59:21 62:17
**personally** 75:21
**personnel** 73:19
**perspective** 25:16
**pertaining** 102:25
**pertains** 112:12
**petition** 20:24
47:10 48:10,15,17
48:21,24 49:12,18
50:2,4,10,15,18
51:10,13,16,20,21
52:13 53:2,4,5,6
53:12,21,21,22
54:4,10 110:9,10

110:12,17,21
111:13 112:8
125:3 128:25
129:1,6 130:12
**petitioner** 49:13
50:25
**petitioners** 110:14
**phases** 102:11
**phone** 41:19 67:10
68:13 69:4 72:21
74:11 82:12 83:24
**physical** 35:6
**physically** 34:11
34:16,19
**picture** 87:22,25
88:19
**pictures** 85:4
**piece** 27:1 28:5
32:18 42:20 103:6
**pieces** 32:19 105:2
119:21
**pimentel** 19:22
**place** 49:8 83:20
84:25 97:7 110:19
117:22 130:11
**plaintiff** 2:3
**plaintiffs** 1:5 3:18
4:18 11:7 14:14
**plan** 42:15
**planning** 82:21
**plans** 68:1
**play** 22:15
**played** 114:7
**please** 4:1,11 5:20
7:9,14 10:4,19
15:14,18 75:25
85:19 88:7,24
99:19 112:21
116:15,16 126:9
**plugged** 43:24

**point** 35:14 42:4
47:15 52:14,15
53:6,24 54:17
55:4,8 61:24
62:14 76:17 83:23
102:18 115:9
**points** 33:10
**policy** 38:4 64:18
64:20,22 65:10,17
65:18
**populates** 122:12
**portion** 44:2 49:5
50:11 76:1 112:22
126:12
**poses** 37:13 48:4
52:20 53:8 58:11
60:19 77:4 78:21
84:11
**position** 18:5
120:23
**positions** 19:1,15
20:2
**positive** 91:21
**possess** 34:11,19
**possible** 22:23
68:20
**post** 86:22,23
**postal** 114:6 117:1
**potential** 20:12
22:11,12 71:24
72:17 75:8,11
76:12,25 78:2
79:16 82:3 83:13
84:1,8,16 85:9
88:11 104:19
115:4
**potentially** 21:25
27:12 34:22 37:22
40:17 70:16 80:9
85:10 87:18 91:23
108:9 120:6 126:4

**practice** 17:13
22:21,24
**practices** 84:7,8
**precious** 107:2
108:8
**precise** 121:1
**predetermined**
58:20
**preference** 66:1
**preliminary** 45:17
**preparation** 14:24
81:6
**preparations** 81:1
81:2
**prepare** 14:12
46:13 47:22
**prepared** 76:24
98:20 128:2
**preparing** 14:20
80:23 84:8
**present** 85:6 87:12
87:12 94:17
114:24 115:13
**presented** 78:9
**presume** 91:9
116:12,13
**pretty** 22:6,8
89:24 128:20
**prevent** 115:12
**previous** 44:21
85:22
**previously** 10:14
19:25 104:9
130:13
**primary** 61:25
**prior** 11:23 70:23
72:3,21 80:2,7
113:5
**private** 4:20 13:9
13:12 14:18 36:10
66:24 67:1,8,10,22

68:23,25 69:19
70:12,15,23 71:5
72:1,13,19 75:13
78:12,15,25 79:5
79:17,20 80:4,15
82:10,21 83:4
92:10 94:8 101:5
103:21,24 106:3
116:10,22 119:14
119:17 120:8,19
120:25 122:7
124:7,8,11 125:15
127:4,23
**privilege** 74:15
114:17 115:11,15
130:23
**privy** 97:19 114:4
118:3
**probable** 27:21
28:18 29:8,12,19
30:11,21 31:12,23
32:6,16,17 39:8,16
39:21,23 40:3,6,18
42:9,12,14 43:7,10
43:12 44:11 50:7
50:24 53:20 76:6
76:11 77:3 78:1
78:10,18 79:6,16
79:20 80:3,9,14
84:22 87:23 88:1
88:20 89:9,19
90:5,25 92:1 99:6
99:9,10,14,15
100:22,23 102:21
103:5,11,18,18,22
104:20 105:1,7
123:22 124:1,4
**probably** 43:7
72:16 73:3 93:7
128:16

**probative** 87:17
87:24 89:24 90:24
91:23
**problem** 74:23
**problems** 86:3
**proceed** 78:2,11
**proceeded** 107:4
**proceeding** 20:13
34:22 111:2
127:10
**proceedings** 14:6
41:25 69:18 83:14
100:3,8 125:25
126:16,19,20
127:7
**proceeds** 13:10
22:2 29:13,20
32:11 42:15 43:13
50:24 51:6 56:20
62:25 87:18 88:4
88:11 89:10,20,25
90:6 91:24 96:25
98:5 116:5
**process** 13:8 14:7
16:18 20:2 22:12
22:13 23:4 25:1,3
25:10,14,17 27:14
27:17 28:7 29:15
30:12 34:2,4,8,12
35:1 36:6 37:4,6,9
42:16 44:13 45:15
45:18 46:5,9 48:7
52:13,24,24 53:7
53:13,15,17,23
54:4,6,16,17 55:13
55:25 56:22,23,25
63:11 83:11,20
90:9 95:8 100:22
110:9 111:13
112:8 122:6 123:2
123:4,4,6,15 125:2

127:18
**processed** 44:23
45:9,10 102:14
**processing** 20:8
21:2,5 69:17 70:3
101:22
**product** 126:5
**professional** 133:6
**profit** 4:17
**program** 57:2
**property** 23:9
27:1 28:5,5 29:17
29:20 31:1 34:20
34:20,21 40:3
42:20 43:11 48:9
48:15 52:16,17
54:12 55:4,7
63:24 70:14 72:19
79:19,21,22 80:10
85:10 89:20 100:4
100:20 103:7,19
103:20 105:2
106:24 117:4
122:19,23,25
123:21 124:6
125:6 128:5
**provide** 6:2 7:22
10:6 31:23 42:22
98:6 110:11,15,17
129:7
**provided** 77:1
**providing** 123:14
**public** 4:17 132:23
136:19
**publication** 65:1
**purchase** 88:17,18
**purpose** 8:24
39:14 82:23 85:8
**purposes** 25:15
73:1 102:24

Exhibit O
1611

**pursuant** 28:18
  30:13,17 31:12
  125:23
**pursue** 27:12,15
  27:16 28:20,22
  33:10 38:20 42:5
  42:19,25 43:9,17
  46:14 48:1 49:8
  75:20,22 80:9
  85:15 100:18
  104:10 106:9,25
  107:17
**pursued** 106:19
  124:13
**pursuing** 28:4
  29:22 37:12
**push** 118:7
**put** 14:3 35:22
  36:13 59:25 60:2
  95:12 110:19
  117:22 119:18,18
  120:18 121:9
  123:9
**putting** 56:16
  122:8,10

**q**

**qualifications**
  11:18
**qualified** 13:17,18
  13:21,24
**quantico** 16:24
  17:2,3
**queried** 41:4,9
**query** 41:14
**question** 4:25 5:21
  6:15,20 7:9,11,12
  7:13,14,15,19 8:3
  8:20,22 9:1,2,6,8
  24:9 30:3 44:3
  74:23 75:15,25
  79:12,23 88:7,8

  95:21 97:2 98:22
  99:11 100:7
  104:16 106:23
  110:8 112:19,20
  115:24 120:22
  126:7,8,11,21
  128:7,12 129:5
**questioning** 9:15
**questions** 5:12,14
  5:20 7:1,25 8:12
  10:9 11:11,14
  62:19 75:4 87:16
  115:10,17 128:16
  128:21
**quick** 8:5 110:6
**quite** 6:7 27:7
  103:5 131:7

**r**

**r** 15:16,16 135:3,3
**raise** 4:1
**raised** 15:22
**read** 3:10 14:13,15
  44:2 49:5 76:1
  112:22 126:12
  134:9 136:5
**reads** 96:24
**ready** 11:2,3 93:2
  93:3
**real** 6:14
**really** 20:15 23:19
  24:24 47:6 51:8
  55:19 59:20 73:3
  82:1 85:22 90:7
  95:24 106:6
  130:20
**realtime** 1:25
**reason** 8:14 23:1,3
  23:11,14 24:6
  113:19 134:11
  135:6,9,12,15,18
  135:21

**reasons** 23:10
**recall** 18:1 65:13
  65:14 71:24 72:11
  72:20 81:10,12,18
  81:23,23 82:4,6,9
  82:17,18,22 84:4
  101:10 113:11
  115:3 124:2
**receipt** 134:18
**receipts** 85:4
**receive** 20:17
  46:25 47:25 56:19
  116:4
**received** 86:25
  88:18 93:7,10
  94:18 108:11
  116:20 119:11,13
  120:7,7 121:19
**receives** 26:11
  47:5,18 48:16
  111:4 128:24,25
  129:12
**receiving** 86:24
**recess** 38:13 49:4
  66:19 110:3
  128:18
**recognize** 11:4
**recommend** 28:3
  28:4,9
**recommendation**
  52:8
**recommends**
  29:22 51:21 64:7
**record** 4:11 5:22
  8:25 10:21 38:15
  43:25 44:1 49:3
  69:7 82:2 85:14
  86:6,8 90:24 92:5
  131:6 133:11
**recording** 5:13

**records** 22:1 40:23
  40:23 84:23
**refer** 47:22 48:5
  90:10 125:10
**reference** 64:20,23
  65:20
**referenced** 72:22
  99:5
**referencing** 70:14
**referral** 129:15
  130:2
**referred** 129:19
**referring** 118:14
**reflects** 123:20
**regard** 102:19
**regarding** 11:11
  12:8 22:1 68:25
  71:10,12,18 72:13
  90:25
**regardless** 96:2
**regards** 13:8
  14:17,19 69:11
  70:11 72:18 84:24
**registered** 133:5
**registration** 39:10
**relate** 88:10
**relative** 133:13,14
**relatively** 91:5
**released** 55:25
  62:1,2 65:15
**relevant** 88:13
**rely** 85:16
**remains** 52:22
  53:13,17
**remember** 9:7
  10:2 47:1 65:8
  67:2 72:3,17
  77:17 81:15,21
  84:3 93:14,22
  102:4 112:19
  116:25 117:2

**remission**  47:10
48:10,16 49:16
50:4,18 51:13,16
52:14 110:21
129:6
**remote**  1:14 133:8
**remotely**  132:10
**removed**  112:8
**rented**  104:2
**renters**  72:18
100:2,4,18,19,25
104:19,24
**repeat**  7:12 75:24
88:7 112:20 126:8
**rephrase**  7:13
55:5 100:11,12
121:8
**report**  21:10 33:17
33:20 133:7
**reported**  1:23
**reporter**  3:9 4:1
5:13,15,22 6:1,12
6:24 7:12 133:1,6
**reports**  20:4,17,22
21:9 40:22 44:8
44:12 46:21 47:21
85:5,16
**represent**  51:6
**representative**
1:16 15:7,12
62:24
**represented**  94:20
**representing**  4:18
**represents**  29:12
42:15 43:13
**request**  12:20
56:17 58:20 59:2
63:25 113:21
118:6 119:18,18
129:15

**requested**  44:2
49:5 76:1 112:22
117:9 126:12
133:10
**requesting**  20:25
56:23 57:1,19
58:3,22 117:3
**requests**  58:14
59:4
**required**  136:13
**requires**  32:24
74:24 75:16
**residue**  87:11
89:23
**resolves**  131:1
**resources**  37:4
**respect**  69:3 71:25
79:9
**respond**  46:25
47:20 114:16
**response**  8:4
125:16 127:17
**responses**  6:3
**responsibilities**
101:15 123:2
**rest**  6:17 79:4
**result**  45:25 116:6
119:13 120:25
**resulted**  58:19
**retained**  46:3
111:14
**return**  124:20
134:13,17
**returned**  28:11
50:10,11 54:13
124:6 128:6
**review**  46:21 48:1
107:20 133:9
134:7
**reviewed**  28:15
49:14 52:4 61:25

77:25 79:14
**reviewing**  14:25
22:1 77:14 93:14
**reviews**  110:24
111:5
**rgk**  1:2
**right**  4:2 5:4,19,21
6:5 7:4,8 8:8 9:5
9:19 10:8,11
12:12 15:3,10
17:5,9 19:12 21:6
22:19 23:25 24:5
24:17,23 40:8
43:15 45:6 46:13
47:3 52:12 55:23
59:18 60:4 62:17
64:2 65:12,21,23
66:21 67:6,23
70:19 72:22 73:2
77:23,24 78:3
89:10,25 90:21
91:1 92:10,24
93:4 97:22 99:18
104:6 108:4
117:13 120:21
130:9,15,16
**rights**  17:22,23
18:3
**ring**  107:8
**road**  2:6
**robert**  2:4,5 4:15
**rodgers**  2:10
10:21 11:13 25:4
26:17 27:18 28:12
30:7 31:3,10,18
32:4,15 33:3,12
34:5,13,23 35:4
36:14,21 37:1,13
37:24 38:5,12,25
39:18 40:5,19
41:5,10,18 42:7

44:3 47:16 48:3
48:19 49:9,20
50:5,19 51:17
52:6,18 53:8,25
54:18 58:10 60:18
61:4 62:7,20 63:3
65:24 66:6,11,16
68:6,12 69:2,20
73:8 74:13,21
75:14,24 77:4
78:20 79:8,23
80:13 82:25 83:5
83:15 84:10,19
85:12,24 86:4,9
92:22 97:11,24
98:7,25 99:12
100:5,14 110:25
111:9,15,24
112:10 113:18
114:15,22 115:6
115:16 116:11,13
117:7 120:10
121:3,21 124:17
125:18 126:3,17
127:12,25 131:5,7
134:1
**role**  22:15 25:23
34:4
**room**  85:5
**roughly**  16:12
119:12
**rpr**  1:24 132:22
133:25
**rubber**  88:4
**rules**  4:23 5:9 9:2
**run**  72:15 77:12
84:6 92:21 108:17

**s**

**s**  15:15,16 135:3
**sac**  67:10,13,16,17
67:18,18,20 82:13

**safe**  69:11,18
70:16 72:1 75:12
75:23 77:1 78:3
78:17 79:22 80:11
81:9 104:3
**saw**  76:18,20
**saying**  6:13 23:15
23:20 30:19 43:6
53:2 54:11,15
62:23 81:12 96:9
100:13 108:18
109:14 124:4
125:24
**says**  6:25 54:14
61:20 86:2 87:9
89:12 94:3 98:20
**scale**  68:20 69:23
70:3 73:23 74:2,4
83:21
**school**  16:1,6,7,16
16:20
**scope**  25:5 26:17
30:7 31:3 34:5,23
36:14 37:1,24
39:1 40:20 44:4
48:19 49:10 50:5
50:19 51:17 52:18
54:19 60:18 63:3
77:6 78:20 79:24
84:10 99:2 100:5
111:1,2,15 112:10
112:11 125:19
126:25 128:1
**scott**  19:21
**scratch**  14:23
48:12 77:13 112:4
**sealed**  95:11
**search**  17:17
28:19 29:9 31:13
31:19,22,22 39:6
42:11 72:4 85:1

96:23 101:1 108:5
**second**  43:23 44:1
47:8 85:18,24
92:14 96:8 99:19
110:9 121:16,18
125:1
**section**  2:9
**securing**  70:23
**security**  117:5
**see**  32:8 33:9 46:7
55:2,2 64:8 66:18
76:4 86:21,23
87:6 90:10 91:3
92:17 93:24 103:3
103:8 117:23
119:3 121:25
**seeing**  120:14
**seeking**  60:16
**seen**  76:15 86:17
86:18 93:4
**sees**  108:20
**seize**  23:8 29:6,11
30:20 31:23 37:5
42:12 80:15
**seized**  21:1 27:11
27:25 28:1,2
30:13,17 32:9
34:21,25 35:21,22
36:17 39:19 42:1
42:2 46:2 50:23
51:3 52:15 53:19
57:19 78:11,13
81:4 85:11 106:18
117:5 119:19
122:18,22,25
**seizing**  25:14
**seizure**  4:20 17:17
21:25 22:3,4,5,10
22:12 26:23 27:22
28:13,14,18,24
29:5,8 30:1,4,9,11

30:14,18,20 31:6
31:12 32:22 38:19
42:8 45:5 46:22
56:13 57:17,22
58:4,18 59:12
60:12 63:2,13
68:3,5,20 69:24
70:3 71:4,4,8,11
71:12,15,18,20
72:4 76:10,16
77:2,15 78:6,7
79:14 80:22,24
83:8,21 93:11
97:4 99:4 101:1
101:16 102:4
116:3 117:21
118:23
**seizures**  36:23
**send**  20:4 25:20
54:1 59:4 60:16
117:25,25 118:1
123:10 129:15
130:5
**sending**  20:22
23:17 25:18 59:10
101:23
**sends**  47:14 59:17
59:22 60:15 61:19
129:25
**sense**  23:22 59:18
70:5 74:1
**sent**  25:22 26:20
46:16,17,23 52:8
56:1 106:3 121:12
122:13 124:24
134:14
**sentence**  96:22
98:3,17
**sentinel**  94:5
111:23,25 112:3,9
129:3 130:8,13,14

**separate**  35:15
79:19
**september**  16:25
17:2
**servers**  111:14
**service**  20:19 34:3
35:7,10,18,24 36:2
36:18 52:23 53:14
55:10,21 90:17
92:8,12
**set**  127:19
**share**  57:15 84:22
**sharing**  56:16 57:2
57:3 63:17,19
65:20 119:9
120:19
**sheet**  3:10 134:11
**sheets**  88:15
**shift**  101:6,18
**shifts**  94:18
101:10
**shipped**  96:3
**shop**  105:8
**show**  51:5 90:4
**showing**  51:1,4
**side**  67:21 73:14
102:25 103:3,12
**sign**  3:10 134:12
**signature**  133:24
**signed**  28:16
132:14 134:20
**silver**  106:23
107:11,15,19
108:15,20,25
109:4,10,19
118:11
**simpler**  55:8
**simply**  8:25 47:7
114:19 115:12,13
115:14

**single** 107:20
**sit** 119:3
**site** 92:10 94:8,9
  94:12,15 95:6
  102:1 109:7
**sitting** 62:23
**situation** 31:16,25
  33:8 39:5 45:24
  57:14 58:2 99:22
  108:22 129:23
**situations** 30:16
  31:8 36:1 45:12
  107:17
**six** 101:9
**size** 73:22
**slight** 69:2,20
**slightly** 73:1
  106:22
**smell** 90:11
**smells** 81:15 89:17
**smooth** 5:10
**sniff** 91:21,21,22
  92:5 95:24 96:1,2
**snitko** 1:4 134:4
  135:1 136:1
**soil** 89:13,14,17
**solely** 106:11
**solutions** 134:23
**somebody** 47:18
  50:23 53:19
  129:11
**someone's** 18:2
**soon** 84:20 102:9
  119:8
**sorry** 73:8 79:12
  88:24 97:6 106:1
  106:1 110:6
**sort** 17:9,10 18:22
  28:6 30:2,2,5 31:9
  32:25 64:15,16,18
  79:6 83:11 101:14

113:4 125:16
  128:15
**sorts** 79:9
**sounded** 113:4
**sounds** 22:8 24:24
  67:6 70:7 72:14
  119:25 129:22
**source** 115:22
**speak** 5:15 8:6
  11:13,18 13:17,19
  13:21 75:3
**speaking** 76:2
**special** 1:15 3:3
  11:23 16:20 18:7
  18:8,10,11,15,25
  19:2,7,12,13,25
  21:13,15,16 22:7
  23:24,25 24:1,7
  27:3 28:8 30:24
  31:25 38:16 67:13
  70:8 71:23 72:12
  86:14 92:24 95:19
  130:18,19 132:8
  133:9
**specialist** 40:17
  51:20 52:7 111:4
**specialists** 19:17
  19:24 20:1 24:17
  30:25 40:10 55:19
  70:8 94:10 98:11
  101:18
**specialized** 12:13
**specific** 12:23
  86:17 118:16
**specifically** 8:21
  13:13 14:17,19
  56:12 66:23
**specifics** 82:19
**speculate** 116:16
**speculating**
  126:22

**speculation** 37:2
  48:3 54:18 62:20
  63:5 68:12 77:6
  82:25 83:15 97:12
  97:25 98:8 99:2
  112:15 113:19
  116:11 120:10
  121:4 124:18
  127:13
**spent** 116:9
**split** 57:25 58:5
**spoke** 14:13 39:5
  67:17 72:12 83:3
**spring** 2:10
**squad** 11:24 18:16
  18:18,25 19:8
  24:2,22 25:11
  27:3 40:13 73:18
  83:19 97:17
  122:11
**staff** 19:1,14 20:2
  26:3,5 122:11
**stage** 81:6
**standard** 43:7,8
  50:3
**stands** 115:16
**start** 6:19 10:11
  16:3 66:25 102:16
  122:5 127:19
**started** 16:24
  101:6
**starting** 16:2 39:2
**starts** 98:16
**state** 4:10 8:19
  34:16 119:10
  132:23 133:3
**statement** 22:14
  44:11 106:20
  119:6 123:25
**statements** 74:18
  102:22

**states** 1:1,7,8,16
  2:9 11:10 14:25
  15:8,10 20:18
  47:23 48:5 63:23
  64:5 73:16 76:24
  78:15 100:1,16,24
  125:10 126:23
  129:16,19 130:1,6
  134:4 135:1 136:1
**status** 20:20
**statute** 43:14
**statutory** 23:17
**stay** 129:3
**stayed** 24:21
**stem** 24:25
**stenographic**
  133:11
**stenographically**
  1:23 133:7
**stephanie** 62:16
**steps** 48:17 83:25
**stern** 24:25
**steven** 19:21
**sticky** 88:15
**stones** 32:20
**stored** 78:16
**story** 99:7,9
  100:23
**straight** 130:4
**straightforward**
  91:5
**street** 2:10
**strengthen** 32:17
  40:6
**strike** 75:9
**strong** 87:11 89:13
**stuff** 5:23 104:2
**sub** 96:11
**subject** 21:25
  22:10 24:19 34:22
  74:17

Exhibit O
1615

**subjected** 95:23

**submit** 47:8,10
49:13 57:18 59:7
61:6,24 63:16
112:7 117:17,20
118:5,6,24

**submits** 50:25
53:21

**submitted** 56:4
76:9 77:23 120:13
123:24 124:3
130:12

**submitting** 54:10

**subscribed** 136:14

**subsequent** 30:23
33:23 38:19 40:1
40:8 42:2 102:3

**substance** 71:10

**sufficient** 77:2

**suggestions**
124:15

**suggests** 96:24
98:4

**suite** 2:6 4:13

**summary** 23:20
29:24 67:11
109:22

**summer** 67:5,6,8
68:21 72:13 83:4

**supervising** 18:14

**supervisor** 11:20
12:11 18:11 27:2
83:19

**supervisors** 97:14

**supervisory** 1:15
3:3 18:7,8,10,15
23:24 25:23
130:19 132:8
133:8

**supplement** 32:6
100:23 103:14

**supplemental** 3:15
99:16

**supplements**
99:15

**supplied** 77:2

**support** 20:1
39:23 44:13 76:9
76:16 104:20
110:11,18,23
123:14 129:2,7,9
129:25 130:12

**supporting** 50:9
51:3

**supposed** 110:13

**sure** 4:24 5:15,20
6:2,18 9:10 19:20
23:3 38:12 43:23
54:16 62:24 64:17
83:11,17 100:14
102:12 103:5
113:1 115:19
118:17

**surprised** 5:5

**surrounding** 31:1
46:21

**swear** 4:3

**sworn** 6:23 22:5
132:10 136:14

**system** 44:23
109:21 111:8

**systems** 1:25

**t**

**t** 4:12 15:15 135:3
135:3

**table** 109:2

**take** 8:5,5 9:13
10:17 30:12 33:19
34:25 35:5,11
36:5 37:6,8 38:10
48:18 64:6 81:19
83:25 92:24

109:24 121:23,23

**takedown** 72:23
80:2,5,7,21 82:22
84:24 85:3 86:22
86:23 93:9 102:1
102:13,17 103:14
108:6,7 113:6
114:14,21,25
116:10,21 120:4,8
120:25

**taken** 5:1

**talk** 6:6,7,8,9 8:1
55:7 65:18 66:23
67:25,25 84:20
106:6 110:18

**talked** 19:25 31:16
68:2,22 91:6
101:12 103:17

**talking** 14:24 15:6
21:23 28:23,25
38:17 40:9 44:24
44:25 49:1 56:11
56:14 60:14 66:22
73:5 75:8 82:9,24
98:19 108:3 113:3
113:11 128:23

**tangible** 33:19

**tasked** 24:7

**tasking** 108:11

**teach** 17:10,16,19

**team** 27:14 80:25
94:10 97:1,8,19
98:6,6,9,16 102:6
104:17,17 105:4,4
105:21 107:14
123:17

**team's** 123:20

**technically** 59:22

**techs** 94:4

**tell** 7:14 10:4 11:6
14:11 15:14,18,25

16:14 18:18,23
19:15,23 38:22
43:21 48:12 49:23
67:7 68:4 69:14
82:15 84:15 95:7
101:14 116:14

**telling** 68:18

**temporary** 16:17

**ten** 12:10

**tent** 95:12

**term** 18:9 60:4
118:9,18

**terminate** 126:19

**terminated** 125:23
125:24 126:15
128:7

**terminates** 126:19

**terrible** 110:1

**testified** 104:9
125:5 129:2

**testify** 128:2

**testifying** 7:6

**testimony** 4:3 8:9
8:16 44:21 69:21
131:2 134:9,18
136:8

**thank** 4:9,14 66:17
105:18 110:6
125:13 130:18
131:2,4,5

**thing** 8:2 17:20
34:1 94:1 103:16
114:20 125:3,4

**things** 5:10,23
17:10 32:20 40:16
40:24 83:12 84:15
87:10 123:10

**think** 6:16 10:1,3
13:14,20 21:14
29:16 30:3 37:18
41:19 43:4 45:6

[think - understand]

48:12 53:19 59:1
61:12,21 62:17,18
62:21 65:10,20
66:1,6 69:16
70:21 74:6,9
80:18 84:21 90:25
91:1,20 93:6,10,25
95:19 97:13 98:16
99:10 101:9 104:8
109:19 113:8
116:25 119:11
121:5,17,19
122:18 125:4,21
128:15,16,19
130:17,17
**thinking**  27:11
**third**  47:9
**thought**  108:8
112:25
**thousands**  54:22
120:6
**three**  12:11 24:4
24:14 47:6 57:24
113:4
**threshold**  36:23
38:7 105:10,17
107:7
**ticket**  94:20 95:14
**ticking**  82:4
**tie**  118:16
**tied**  43:11,13
**time**  5:7 9:6,14
23:13 24:8,22
29:10 42:13 45:5
46:24 54:2,21
66:14,15 67:9,17
68:13 71:24 72:7
72:11 80:21 82:9
84:4 90:14,15
91:13 92:16 93:8
93:11 102:3 116:9

117:13,21 118:22
127:9 129:4
134:19
**timeframe**  134:8
**timeline**  57:17
127:15
**timelines**  127:16
127:17,18
**timely**  23:14
**times**  22:3 24:4,13
31:5 43:3 88:12
94:17
**timing**  95:22
**tiny**  107:7
**title**  4:11 39:10
**titular**  48:15
**today**  4:9 8:12,16
11:10,14 14:24
15:7 112:13 131:1
**today's**  14:12
**token**  6:18
**told**  67:11,21
69:15 116:2
**top**  108:21
**topic**  11:15 13:7,9
74:10,19 81:11
128:1
**topics**  11:11,18
12:19 13:3,15,17
13:19,21 14:1
25:5 30:8 31:4
34:6,24 36:15
37:2,25 40:21
44:5 48:20 49:10
50:6,20 51:18
52:19 54:19 60:19
63:4 74:22,25
75:3 77:6 78:21
79:24 84:11 99:3
100:6 111:1,17
112:11,12

**total**  12:6
**touch**  131:9
**touching**  83:10,17
**tracing**  22:1
**tracked**  94:22
**tracy**  1:7
**trafficker**  89:4
**trafficking**  50:25
51:7 88:13
**training**  12:12,13
17:3,21
**trainings**  12:18,22
**transcript**  133:10
133:10 134:6,20
136:5,8
**transfer**  20:21
**transferred**  55:9
126:23
**transmitted**
122:16
**transported**  95:17
**true**  45:21,22
133:11 136:8
**truth**  4:4,5,5
**truthfully**  7:1
**try**  7:13 9:21,22
32:10
**trying**  14:3 20:9
21:11,12 28:6
29:2 40:14 50:2
50:13 62:5 79:13
85:25 96:10 106:7
106:13 108:23
110:20 119:23
120:22
**tuesday**  101:6
**turn**  36:9
**turned**  96:2
**two**  9:23 18:25
19:6,7,11 21:16
24:3,5,13 70:12,13

70:13 128:20
**type**  22:2,16 40:23
70:3
**types**  40:16 58:18
**typically**  37:20

**u**

**u**  15:15,16
**u.s.**  4:20 13:9,12
14:18 34:3,18,18
36:2,10 55:9
62:24 66:24 67:1
67:8,22 68:23,25
69:19 70:12,15,23
71:5 72:1,13,19
75:13 78:12,25
79:5,17,20 80:4,15
82:10,21 83:4
92:10 94:8 101:5
103:21,24 106:3
116:10,22 119:14
119:17 120:8,25
122:7 124:11
125:15 126:2
127:4,23
**uc**  16:5
**uh**  5:23,23
**ultimate**  51:24
52:10
**ultimately**  29:7
37:8 49:24 52:14
55:20 56:9 59:17
77:14 106:2
118:25 119:4,5
**unclear**  79:12
**undersigned**  132:6
**understand**  6:20
6:25 7:4,8,15,25
8:12 9:3,20 14:2
15:6 20:16 21:11
21:13,14 26:1
27:9 28:6 29:2,16

35:11 36:12 45:7
58:7 59:1 61:17
65:13 80:18 95:19
97:9 99:20 106:16
106:17 110:16
113:6 114:9 125:2
125:3,14
**understanding**
4:24 11:9 36:13
41:23 44:21 47:4
48:11 53:6 54:9
61:15 63:6 65:16
75:20 83:2 87:3
88:6 94:23 97:3
106:14 109:15
112:4 118:5
**underway** 126:1
126:16
**unfortunately**
85:21
**unique** 58:17
120:23
**unit** 18:20 21:6
51:23 52:9 54:3
54:22 62:13,15
68:19 69:25,25
70:9 73:18 84:6
91:21 102:19
122:19,23,25
123:13 124:10,12
**united** 1:1,7,8,16
2:9 11:10 14:25
15:8,10 20:18
47:23 48:5 63:23
64:5 73:16 76:24
78:15 100:1,16,24
125:10 126:23
129:16,19 130:1,5
134:4 135:1 136:1
**units** 11:21 92:9

**unturned** 32:20
**upload** 20:4
**uploaded** 111:7
**usao** 74:10 113:10
**usdoj.gov** 134:2
**use** 8:25 57:6,10
71:24 72:18 75:8
75:11 76:25 82:3
84:1,9,17 85:9
99:22 115:4
**useful** 89:19
**uspis** 57:11 59:4,9
**uspv** 3:20
**usual** 5:24
**usually** 24:3 73:21

**v**

**v** 134:4 135:1
136:1
**va** 2:6
**vague** 25:4 37:25
44:5 47:16 49:9
50:21 60:20 61:4
79:8
**valid** 47:20
**valuable** 107:12
**valuables** 107:2,5
109:11
**value** 37:16,21
107:6
**variations** 24:20
**various** 20:20
40:13 58:15
**vary** 22:19
**vault** 109:11
**vaults** 4:20 13:9
13:12 14:18 36:10
66:24 67:1,8,10,22
68:23,25 69:19
70:12,15,23 71:5
72:1,13,19 75:13
78:12,15,25 79:5

79:17,20 80:4,15
82:10,21 83:4
92:10 94:8 101:5
103:21,24 106:3
116:10,22 119:14
119:17 120:8,19
120:25 122:7
124:7,8,11 125:15
127:4,23
**verbal** 6:2
**verbally** 5:21
**verify** 134:9
**veritext** 134:14,23
**veritext.com.**
134:15
**version** 76:21
77:22 78:8 103:23
**versus** 33:19 63:2
78:16 79:21 91:22
105:8
**victims** 20:24,25
**victor** 2:10 8:2,6
8:19,23 14:13
100:10 110:1
115:8 126:2
130:22 134:1
**victor.rodgers**
134:2
**viewed** 51:7
**violating** 18:2
**vs** 1:6

**w**

**wait** 6:15 54:1
76:20,20 117:22
119:3
**waiting** 54:4
**walk** 21:12 27:13
47:7 95:8 124:25
**want** 4:22 8:1,25
15:10 18:22 19:19
23:2,2 27:12

57:14 61:21 66:3
66:23 73:8 74:21
80:19,19 85:17
91:16 96:7 101:12
106:6 110:8,25
113:3,14 118:17
121:14 124:25
128:23
**wanted** 71:1 76:19
87:16 92:4 113:1
**warehouse** 28:2
**warrant** 4:20
17:17,17 22:3,4
28:14,14,19 29:5,9
30:2,4,10,14,18,20
31:13,20,22,23
39:6 42:9,12 50:9
68:5 71:4,5,8,11
71:13,15,18,21
72:8,16 76:10,16
77:2,15 78:6,7
79:14 80:22,24
81:1 93:12 97:4
101:16,16 102:4,5
115:19 116:3
**warranted** 33:5
**warrants** 22:5
72:4,6 81:3,4
101:2
**washington** 26:9
26:21 122:14,20
**watermarked**
134:6
**way** 20:9 28:17
42:9 48:13 60:4
74:23 95:25
118:18 129:3
**ways** 28:17 58:6
100:18
**we've** 20:25 39:19
39:19,21 43:16

Exhibit O
1618

103:17 109:25
**webster** 19:10
**week** 102:1,9
**went** 16:4,5,6 17:2
  36:11,12,17 92:7
  92:11 96:12
  107:12 109:11
**west** 4:12
**wilkison** 1:7
**willing** 75:2
**wire** 56:7
**withdrawal** 51:5
**witness** 3:10 4:6
  11:13 74:14,24
  75:15,16 112:13
  114:16 126:7,8,18
  126:21,24 128:1
  131:4 134:8,10,12
  134:19
**wondering** 19:15
  30:23 35:9 36:8
  54:8,13 56:10
  60:10 61:20,24
  62:2 102:18
  104:13
**woods** 62:16
**word** 29:3
**work** 12:8,14 19:3
  19:5,8 20:18
  21:17 28:8 33:14
  57:21 58:15 64:21
  65:2 87:14 119:16
  126:5
**working** 21:21
  22:3,6,8 94:5
**workings** 118:3
**workload** 54:23
**works** 26:15
**world's** 14:3
**worth** 37:23 107:6
  108:21

**wow** 73:20
**write** 33:16 44:11
  57:20
**writing** 26:2 33:20
**wrote** 93:16

| x |
|---|

**x** 3:1

| y |
|---|

**y** 15:16
**yeah** 33:7 56:8
  57:3 61:10 65:5,6
  65:24 86:4,10
  88:8 90:19 95:19
  119:23 124:8
**year** 12:19
**years** 11:24,25
  12:6,10,11 25:12
  70:1,7 87:15 91:8
  91:19

| z |
|---|

**zellhart** 82:7,10
  83:3 108:4
**zero** 47:10
**zoom** 6:7,11

Exhibit O
1619

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

**Exhibit O**
**1620**

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**Exhibit O**
**1622**

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**Exhibit O**
**1623**