UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Krystal Hernandez | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendant: |
| Not Present | | Not Present |

**Proceedings:** (IN CHAMBERS) Order re Court Trial [DE 112]

## I.  INTRODUCTION

On June 9, 2021, Paul Snitko, Jennifer Snitko, Joseph Ruiz, Tyler Gothier, Jeni-Verdon Pearsons, Michael Storc, and Travis May (collectively, "Plaintiffs") filed a First Amended Class Action Complaint against the United States of America, acting United States Attorney Tracy L. Wilkison, and Assistant Director of the FBI Kristi Koons Johnson (collectively, "Defendants" or "the Government"). (ECF No. 33.) Plaintiffs allege Fourth Amendment violations arising from the Federal Bureau of Investigation's ("FBI") search and seizure of Plaintiffs' property located in safe deposit boxes on the premises of non-party US Private Vaults ("USPV"). On October 12, 2021, the Court certified a class of Plaintiffs: USPV box renters who had their property seized, had identified themselves to the FBI, and had their property returned. (*See* Order re: Pls' Mot. Class Certification at 5, 10, ECF No. 78.)

The parties have submitted briefs to the Court for a bench trial. (ECF Nos. 112, 122, 130.) For the following reasons, the Court grants judgment in favor of Defendants.

## II.  FINDINGS OF FACT[1]

### A.  USPV's Business and Customers

USPV operated a business in Beverly Hills, California, that rented safety deposit boxes to customers anonymously. (*See* Rodgers Decl., Ex. B at 57, ECF No. 122-3.) To maintain customer

---

[1] This opinion serves as the findings of fact and conclusions of law required by Federal Rule of Civil Procedure ("Rule") 52. Fed. R. Civ. P. 52. Any finding of fact that actually constitutes a conclusion of law is adopted as such, and vice-versa.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

anonymity, USPV did not require customers to provide personal information, social security numbers, driver's licenses, or any other form of identification in order to rent a box. (*Id.* at 61.) Customers kept all keys to the boxes—USPV could only access a rented box by drilling it open. (*Id.*) USPV's facility was also outfitted with significant security measures, including iris-scan vault access, 24/7 electronic monitoring, 24/7 armed response, and a time lock on the vault itself. (*Id.*)

Due to USPV's anonymity, its boxes were used regularly by unsavory characters to store criminal proceeds, a fact both known to and desired by USPV's principals. (*See id.* at 57, 76–81; Frommer Decl., Ex. K at 874–75, ECF No. 112-19.) In fact, USPV seemingly targeted criminal clientele on its website, noting that "the less we know [about our customers] the better," and that their service helped customers avoid "government agencies (such as the IRS) or attorneys armed with court orders." (Rodgers Decl., Ex. B at 62.) Government investigations of individual USPV boxholders resulted in the execution of numerous federal search warrants on the premises, along with the forfeiture of box contents that were the criminal proceeds of, *inter alia*, ransoms, gambling and prostitution rings, drug operations, and identity theft schemes. (*See id.* at 68–74.)

However, USPV did not solely rent to criminal customers. Many USPV customers used its services for legitimate reasons. Those customers included the named plaintiffs and class members in this case. For example:

- Paul and Jennifer Snitko used their USPV box to store legal documents, watches with sentimental value, hard-drive backups, coins, and gold jewelry. They used USPV "because [their] bank had a waiting list for a safe deposit box, [they] live in a wildfire prone area . . . and [they] require a place to store [their] wedding bands when engaging in sports activities . . . ." (P. Snitko Decl. ¶¶ 4–6, ECF No. 112-1; J. Snitko Decl. ¶¶ 4–6, ECF No. 112-2.)
- Tyler Gothier stored "silver and other personal property" in his box and used USPV due to its convenient location. (Gothier Decl. ¶¶ 4–5, ECF No. 112-3.)
- Joseph Ruiz stored $57,000 in cash in his box and used USPV because he was concerned that "the COVID pandemic would make it impossible for [him] to withdraw [his] funds from a bank account." (Ruiz Decl. ¶¶ 4–6, ECF No. 112-4.)
- Michael Storc and Jeni-Verdon Pearsons stored "approximately $2,000 in cash, as well as approximately $20,000 worth of silver," along with "personal documents" in their

---

In addition, Defendants made numerous objections to Plaintiffs' evidence. (*See* ECF No. 133.) To the extent that the Court has relied on any objected-to evidence, those objections are overruled. To the extent that the Court has not do so, those objections are denied as moot.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

box. They used USPV because they needed a safe place to keep the silver. (Store Decl. ¶¶ 4–5, ECF No. 112-5; Verdon-Pearsons Decl. ¶¶ 4–5, ECF No. 112-6.)
- Travis May stored $63,000 in cash, $100,000 in gold, and various documents in sealed envelopes in his box, and used USPV as an "alternative location to access valuables in case of emergencies." (May Decl. ¶¶ 4–5, ECF No. 112-7.)

**B.     The Government's Investigation of USPV**

From 2015 to 2019, the Government individually investigated "criminals [that were] regularly using [USPV] to store criminal proceeds." (Frommer Decl., Ex. K at 874.) Several different agencies, including the FBI, the Drug Enforcement Administration ("DEA"), and the United States Postal Inspection Service ("USPIS"), had "different investigations open on individual customers." (*Id.*) However, after "almost five years of" investigating individual boxholders, the various agencies concluded that they "weren't doing anything effective," because "the problem was the business itself." (*Id.* at 875.) The agencies determined that, because the "real problem" was the "money laundering facilitator, which is [USPV], the business," they should open an investigation into the business and its principals. (*Id.* at 876.) That investigation began in April 2019. (*Id.*)

The investigation of the business uncovered that USPV's principals were aware of, and indeed actively solicited, the use of their deposit boxes by criminals. (Rodgers Decl., Ex. B at 76–134.) In fact, USPV principals were themselves engaged in criminal conduct. (*See id.*) By June or July 2020, the agencies had "quite a lot of pretty good evidence" against USPV, and thus began discussions about obtaining indictments and warrants against the company. (Frommer Decl., Ex. M at 1227, ECF No. 135-1.) The agencies discussed that they wanted to seize "the thing that made [USPV] go" and take "their business out," which involved seizing "eye scanners, the money counter," and "the nest[s] of safe deposit boxes." (*Id.* at 1231.)

Because the agencies intended to seize the box nests, they began discussing the potential to civilly forfeit both the nests and the individual box contents in "late summer . . . of 2020, or maybe in the fall there." (*Id.* at 1233.) In connection with these plans, Jessie Murray ("Murray"), an FBI forfeiture agent, was asked by her supervisor if the Los Angeles field office had the capacity to "handl[e] and process[]" a "large-scale seizure" of USPV property and the contents of USPV's deposit boxes. (Frommer Decl., Ex. O at 1527, ECF No. 135-4.) Murray stated that the office could indeed handle a large-scale seizure, but she could not offer an opinion on whether there was probable cause to forfeit the assets until she reviewed the finalized warrant affidavit. (*Id.* at 1533–34.) Upon review of the affidavit[2]

---

[2] The contents of the affidavit are discussed in full below.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

in February 2021 (prior to its submission to the magistrate), Murray determined that there was indeed probable cause to seize the contents of the safe deposit boxes. (*Id.* at 1537.)

    **C.**    **The Indictment Against USPV and the FBI's Warrant Application**

On March 9, 2021, a grand jury returned an indictment against USPV. (*See* Rodgers Decl., Ex. F, ECF No. 122-7.) The indictment charged USPV with conspiracy to money launder, distribute controlled substances, and structure financial transactions. (*Id.* at 276–77, 280, 282.) The indictment also included two forfeiture allegations, both of which reflected a finding of "probable cause to believe" that the computers, money counters, surveillance equipment, biometric scanners, and the nests of safety deposit boxes were "subject to forfeiture." (*Id.* at 285, 288.)

A little more than a week later, on March 17, 2021, the Government submitted applications to Magistrate Judge Steve Kim ("Judge Kim") for search and seizure warrants, both of which included a common affidavit by Special Agent Lynne Zellhart ("Zellhart"), the agent in charge of the FBI's investigation. (*See* Rodgers Decl., Exs. B, D, ECF Nos. 122-3, 122-5.) While the affidavit primarily discussed the fruits of the investigation, it also noted that the Government sought to seize the box nests as "evidence and instrumentalities of USPV's criminality." (Rodgers Decl., Ex. B at 137.) While the warrants would authorize the seizure of the boxes, Zellhart declared that she was not seeking to authorize the seizure of the *contents* of those boxes. (*Id.*) However, by seizing the nests, Zellhart noted that "the government will necessarily end up with custody of what is inside those boxes initially," and that "[a]gents will follow their written inventory policies to protect their agencies from claims of theft or damage to the contents of the boxes, and to ensure that no hazardous items are unknowingly stored in a dangerous manner." (*Id.*) Agents would also, "in accordance with their policies regarding an unknown person's property, look for contact information or something which identifies the owner," and then would "attempt to notify the lawful owners of the property . . . how to claim their property." (*Id.* at 137–38.)

Judge Kim subsequently issued the warrants, which identified the items to be seized as, *inter alia*, the "[n]ests of safety deposit boxes and keys." (Rodgers Decl, Ex. A at 32.) The warrant did not "authorize a criminal search or seizure of the contents of the safety deposit boxes," but did allow for agents to "follow their written inventory policies" to both "protect their agencies and the contents of the boxes" and allowed for an "inspect[ion] of the contents of the boxes in an effort to identify their owners in order to notify them so they can claim their property." (*Id.* at 32–33.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

### D. The FBI's Written Policies

Because the warrants provided that agents must "follow their written inventory policies" and identify box owners "in accordance with their written [unknown persons] policy," a brief summary of those policies is warranted here. In addition, Agent Zellhart drafted "Supplemental Instructions on Box Inventory" specifically for the USPV search and seizure, and agents were to follow those instructions while inventorying box contents. The Court discusses each in turn.

#### 1. *Written Inventory Policy*

The FBI's inventory policy is contained within its Domestic Investigations and Operations Guide ("DIOG"), a "dictionary or a thesaurus" for FBI agents. (Frommer Decl., Ex. M at 1215.) The DIOG instructs agents that, after "lawfully taking custody of property," they must "conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents." (Rodgers Decl., Ex. E at 273, ECF No. 122-6.) Agents must then record the results of the inventory on certain specified forms, and the summary "must include, but is not limited to, a description of the property and the items secured for safekeeping." (*Id.* at 274.) In addition to providing a summary of the property, agents "should also memorialize facts pertinent to other activities undertaken during the inventory process, such as . . . a non-inventory-related search conducted and any evidence collected (*i.e.*, FD-1087, "Collected Evidence Log" [Sentinel]) that are relevant to the investigation." (*Id.*) Finally, the DIOG instructs that agents may not conduct inventories "solely for investigative purposes," and that "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible." (*Id.*)

#### 2. *Policy Regarding Custody of an Unknown Person's Property*

The FBI also has a policy on the proper procedure to follow should agents come into possession of an unknown person's property. That policy states that agents should "inspect the property as necessary to identify the owner and preserve the property for safekeeping," and such an inspection should "extend no further than necessary to determine ownership." (Rodgers Decl., Ex. B at 138.) The "unknown persons" policy is separate from the FBI's inventory policy, and an inspection done to identify the property owner "doesn't stop [the FBI] from needing to inventory the [property] . . . to protect the property itself, to protect [the FBI] from accusations of loss or theft, [and] to protect [the FBI] from hazardous materials." (Frommer Decl., Ex. K at 933.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

3. *Supplemental Instructions on Box Inventory*

In preparation for the raid on USPV, Zellhart drafted a set of supplemental inventory instructions (the "Supplemental Instructions"), which used the DIOG as a "reference" or a "resource" and "were created to help the team focus in on what we were doing and how we were doing it." (Frommer Decl., Ex. M at 1214–15.) The Supplemental Instructions ordered agents to "search and inventory all boxes according to FBI policies and procedures," to process "all inventoried contents . . . as described in this memo," and to complete all required inventory paperwork. (Frommer Decl., Ex. D at 282, ECF No. 112-12.) The Supplemental Instructions included the following mandates:

- The inventory of each box was to be video recorded.
- In removing the boxes, teams were to "tak[e] care to preserve possible fingerprint evidence." (*Id.* at 283.)
- The team would then "identify the contents of each box, creating an inventory list," bagging and labeling each item, and completing forms for receipt of property, an evidence log, specific agent notes, and for chain of custody. (*Id.*) Agents were also to identify cash and drugs with red and green labels, respectively.
- Agents were to note if a box included a "USPV notification form identifying a contact person for the box." (*Id.*) They were to "bag and tag" the form and were not allowed to "search the content of boxes for evidence, but may examine the contents to identify the box owner." (*Id.*)
- Each inventory was to include the box door with its lock, any form with emergency contact information, the physical deposit box, and the box's contents.
- Any item recovered was to be submitted to FBI evidence technicians and asset forfeiture agents, who would enter evidence into the FBI's database and generate forfeiture identification numbers, respectively.
- Any amount of cash over $5,000 was to be placed in an evidence bag and given a forfeiture identification number.
- There "will be canine units on scene," and any cash "will be taken . . . to the canine unit." (*Id.* at 284.) Further, agents were to take notes on the "condition of cash," including on how "the cash is bundled (rubber bands, bank bands); if it has a strong odor (marijuana, soil, gasoline, coffee, chemical, etc.); if there appears to be a drug residue present; if a gun is also present." (*Id.*)
- Non-cash valuables were to be collected, inventoried, and transported to "Evidence Control . . . where they will be stored until claimed or otherwise disposed as determined appropriate." (*Id.* at 284.) Evidence relating to digital currency was to be inventoried in the same manner.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

- Drugs had to be "processed according to normal procedures for seizing illegal drugs. Inventory teams should take care to preserve packaging of drug evidence (and external box if possible) for possible fingerprints." (*Id.*)

(*See id.* at 282–84.)

### E. Execution of the Warrants

The Government executed the search and seizure warrants from March 22 to March 26, 2021. (Frommer Decl., Ex. J at 665–66, ECF No. 112-18.) Over that period of time, the FBI inventoried the contents of over 700 safe deposit boxes. (Frommer Decl., Ex. K at 940.) In performing the inventory, agents occasionally found letters taped to the inside sleeve of the deposit box, purportedly identifying the owner of the box and providing the owner's contact information. (Frommer Decl., Ex. J at 695.) Even after finding these letters, agents would break open the interior of the box and inventory the box's contents. (*Id.* at 701.)

Once they had opened the interior of the boxes, agents would examine the box contents, take photographs, and show the contents to a video camera that was recording the inventory. (*See, e.g.*, Frommer Decl., Ex. A at 140, 176, 220, 239, ECF Nos. 136-1–3; *see also* Frommer Decl., Ex. B.2 at 6:00–8:30, ECF No. 136-4; Frommer Decl., Ex. B.4 at 14:00–14:45.) When they encountered cash, agents documented its condition and presented the cash to drug-sniffing dogs, noting if the dogs alerted. (Frommer Decl., Ex. A at 29; *see also* Frommer Decl., Ex. J at 683–84.)

### F. Forfeiture Proceedings and the Instant Litigation

After seizing the nests of boxes and their contents, the Government initiated administrative forfeiture proceedings on May 20, 2021, against any box contents that met a minimum monetary threshold of $5,000. (*See* Rodgers Decl., Ex. J, ECF No. 122-11; Frommer Decl., Ex. O at 1562–63.) Soon thereafter, on May 27, 2021, Plaintiffs filed this action. (*See* Compl., ECF No. 1.) Four plaintiffs quickly filed an Application for a Temporary Restraining Order asking the Court to enjoin the Government from continuing with the forfeiture proceedings. (Pls.' Appl. for TRO, ECF No. 44.) In granting the Application, the Court found that those movants had demonstrated a likelihood of success on their claim that the Government's "anemic" administrative forfeiture notices, which provided no factual basis or statutory authority for the seizure of Plaintiffs' property, violated their constitutional rights. (Order re: TRO Appl. at 3–4, ECF No. 52.) Through the pendency of this litigation, nearly all

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

Plaintiffs and class members have had their seized property returned.[3] (*See, e.g.*, Rodgers Decl. Ex. M at 361–62, ECF No. 122-17; Rodgers Decl. Ex. Y at 430–33, ECF No. 122-26.)

### III. CONCLUSIONS OF LAW

Plaintiffs argue that the Government's actions in the USPV investigation "callously disregarded the[ir] Fourth Amendment rights," and they seek an injunction ordering the Government to "sequester and return" the records generated during the inventory of the USPV deposit boxes. (Pls.' Trial Br. at 19.) Plaintiffs' Fourth Amendment argument is two-pronged: (1) that the Government's search and seizure exceeded the limitations set out in the USPV warrant; and (2) that the Government breached its duty of candor by misleading Judge Kim in its warrant application. The Court addresses each argument in turn.

#### A. Whether the Government Exceeded the Bounds of the Warrant

The first question is whether the Government's actions exceeded the bounds of the warrant. The warrant, while authorizing the seizure of the nests of boxes at USPV, did not "authorize a criminal search or seizure of" their contents. (Rodgers Decl., Ex. A at 32.) However, it authorized agents to "follow their written inventory policies," both to "protect their agencies and contents of the boxes" and to "identify [box] owners." (*Id.* at 33.) Plaintiffs argue that the Government ignored the warrant's strictures against criminal search and seizure because any purported inventory was a sham—a mere pretext to rummage through box contents for evidence. (Pls.' Trial Brief at 16.) The Government counters that the inventory complied with written policy and was not pretextual. (Defs.' Opp'n at 12–15, ECF No. 122.) Accordingly, to determine whether the Government's search exceeded the bounds of the warrant, the Court must ascertain whether the Government conducted a constitutionally proper inventory search.

##### 1. *Legal Standard*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search and seizure by law enforcement officers is "*per se* unreasonable . . . subject only to a few

---

[3] Plaintiffs Michael Storc and Jeni Verdon-Pearsons declare that they have not received $2,000 in cash that was in their box. (*See* Storc Decl. ¶ 17.) Zellhart, on the other hand, declares that the Government never found $2,000 in their box and does not possess those funds. (Zellhart Decl. ¶ 2, ECF No. 122-40.) This dispute notwithstanding, those plaintiffs are not seeking individualized relief in this class action trial. (*See* Pls.' Trial Br. at 2, ECF No. 112 ("Plaintiffs are entitled to have the government 'sequester and return,' or otherwise destroy, records containing personal information about class members and their property that it possesses as a result of its search . . . . The Court should enter judgment ordering the government to do exactly that.").)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

specifically established and well-delineated exceptions." *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir. 2012). One such exception is the inventory search, which is intended to "produce an inventory" of property that law enforcement has legally taken possession of to "protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Because an inventory search fulfills law enforcement's "community caretaking" function, such a search must be undertaken "on the basis of something other than suspicion of evidence of criminal activity." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). Accordingly, the search must be performed pursuant to "standard [written] criteria," and those criteria must not give officers discretion in determining the scope of the search. *Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987).

Because an inventory search must be non-investigative in nature, the Ninth Circuit has held that an "inventory search is invalid if it was a pretext for an investigative search." *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993). An inventory is pretextual when the "only reason" law enforcement performs an inventory is to find evidence of criminality. *United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017). There is, however, a critical wrinkle to the pretext analysis; "the mere presence of a criminal investigatory motive or a dual-motive—one valid and one impermissible—does not render an . . . [inventory] search invalid; instead, the Court asks whether the challenged search or seizure *would have occurred in the absence of an impermissible reason*." *United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020) (emphasis added). The "underlying principle" that a Court should look to is whether it appears that "the police raised the inventory search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence." *United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019). Situations where an officer "no doubt expect[s] to find evidence of criminal activity," but conducts an otherwise reasonable inventory search, are not constitutionally impermissible. *Id; see also Bowhay*, 992 F.2d at 231 ("Penalizing officers who are candid enough to admit they hope to find evidence of a crime can only encourage obfuscation and dishonesty, without protecting reasonable expectations of privacy.")

    2.    <u>Analysis</u>

Plaintiffs argue that the Government's inventory was constitutionally improper for two different reasons: (1) the record establishes the true motive of the "inventory" was to uncover evidence of criminality; and (2) the Government's inventory failed to make a fulsome record of the box contents, indicating pretext. (*See* Pls.' Trial Brief at 17–18.) The Court analyzes each below.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

        *a.*    *Improper Investigatory Motive*

      Whether an inventory was impermissibly pretextual hinges one question: would the challenged search have occurred but for the Government's allegedly improper investigatory purpose? Here, the answer is yes. The warrant authorized the Government to seize the nests of deposit boxes and inventory the contents of those boxes in accordance with standardized policy. (Rodgers Decl., Ex. A at 32–33.) The FBI's inventory policy requires that when an agent "lawfully take[s] custody of property," he or she must "conduct a prompt and thorough search of the contents of the property, *including searching any locked or unlocked containers.*" (Rodgers Decl., Ex. E at 273.) Thus, because the Government had lawfully taken custody of the box nests (due to the warrant's authorization to seize them), the inventory policy mandated that agents examine the locked containers within. Agents had no discretion to determine which boxes should be inventoried and which should not—indeed, a policy granting such discretionary authority would run afoul of the Supreme Court's inventory search jurisprudence. *See Bertine*, 479 U.S. at 375–76. It therefore seems clear that the agents would have cracked the deposit boxes and searched their contents whether or not they had an impermissible investigatory motive.[4]

      Plaintiffs make much of the FBI's policy regarding custody of an unknown person's property, which was alluded to in both the affidavit and the warrants. That policy requires agents to "inspect the property as necessary to identify the owner," but which should "extend no further than necessary to determine ownership." (Rodgers Decl., Ex. B at 138.) Plaintiffs argue that on numerous occasions during the USPV raid, agents continued rummaging through boxes even after they were able to determine who the boxholder was. But Plaintiffs ignore critical language in the warrant and affidavit—that, *in addition* to examining box contents to identify owners, agents were to conduct an inventory of the boxes, which required them to examine the contents of locked containers. Thus, the fact that agents continued to examine box contents even after identifying the owners' identity does not indicate that the inventory search was pretextual.

      Plaintiffs also point to numerous instances in the record indicating that the Government expected to find evidence of criminality during its inventory. For example, investigating agents candidly admitted that they "fully expected there to be criminal customers at this business," and thus they anticipated "that there would be criminal proceeds in the safe deposit boxes." (Frommer Decl., Ex. K at 889–890.) In addition, the Supplemental Instructions drafted by Agent Zellhart gave guidance on how to handle items

---

[4] The FBI's standardized policy tells agents that, "where feasible," they should obtain a warrant for property that may be subject to an inventory search. (Rodgers Decl., Ex. E at 274.) Here, the anonymous nature of the boxes prevented the Government from determining who owned a specific box or what was inside, and thus prevented them from describing with particularity "both the place to be searched and the . . . things to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). As such, the policy's warrant section does not change the Court's "but-for" analysis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

with indicia of criminality, along with instructing agents on how to properly inventory the seized property. The agents executing the warrant also arranged for drug-sniffing dogs to be present at USPV, a tactic that would be unnecessary unless agents expected to discover drugs or drug-adjacent cash.

Given this evidence, there can be no question that the Government expected, or even hoped, to find criminal evidence during its inventory. Unfortunately for Plaintiffs, the mere presence of such a motive is not by itself enough. An impermissible investigatory motive must be the *only* reason the agents conducted the inventory. *Compare Garay*, 938 F.3d at 1112 ("Given the circumstances leading up to the search, the officers no doubt expected to find evidence of criminal activity inside the vehicle. But that expectation would not invalidate an otherwise reasonable inventory search.") *with Johnson*, 889 F.3d at 1128, 1129 n.1 (finding inventory search invalid where officers admittedly seized items "simply because they believe[d] the items might be of evidentiary value."); *see also United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003) ("Law enforcement called for a drug-sniffing dog to be brought to the scene . . . [and law enforcement officers] testified the search was partly conducted to investigate the possibility Rowland might be trafficking narcotics. Clearly, therefore, police had an investigative motive. Such a motive alone, however, does not sour an inventory search.")

Plaintiffs must establish that the Government would not have seized the nests and opened the boxes *but for* the impermissible investigatory motive, and they have failed to do so here. The Government's purpose in seizing the nests—which it was authorized to do—was to "take [USPV] out of business . . . [i]f we had not taken the boxes, they could have replaced the computers, the money counters, the eyeball scanners, and they would have been back in business on April 1st . . . . So the nest of security boxes was part and parcel of taking this company out of business." (Frommer Decl., Ex. K at 891–92.) Once the nests were seized, the warrant authorized the agents to inventory their contents, an inventory which was intended to "protect the FBI, [] to get an accounting of what's actually there, [] to protect us against an accusation of theft or loss, [] to protect us against hazardous material, and . . . to get a full, you know, a full accounting of what's there when we return it." (*Id.* at 833–34.) That the Government had a legitimate inventory motive is evidenced by the fact that the 4-day process, wherein agents recorded the contents of 700 boxes,[5] resulted in the Government being able to successfully return property claimed by hundreds of box owners, including the class members here. (*See* Frommer Decl., Ex. K at 935 ("[W]e've returned about 500 boxes . . . . We were committed to getting the property back to the correct person.").) It beggars belief that agents would have worked in this manner *solely* to invent a pretext for a criminal search of the box contents.

---

[5] The Court also notes that inventorying one box could take "up to 45-minutes to process . . . properly." (Frommer Decl., Ex. K at 943.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

In all, Plaintiffs have certainly shown that the Government had a dual motive in inventorying the contents of each deposit box. But that is not enough. They must demonstrate that the improper investigatory motive was the *only* reason that the Government opened the safety deposit boxes, and they have not done so.[6] Thus, they have so far failed to show that the inventory was pretextual.

    b.  *Failure to Conduct a Meaningful Inventory*

Plaintiffs' other pretext argument is that the Government's "inventory" did not, in fact, meaningfully record the contents of the deposit boxes. They point to the fact that agents would sometimes fail to specifically count the items that were in a box and instead use a catch-all descriptor on inventory forms such as "miscellaneous general items." (Frommer Decl., Ex. A at 44.) In addition, the photographs agents took occasionally made it either difficult or impossible to determine how much property was in the box. (*See* Frommer Decl., Ex. A at 179, 184 (inventory lists "uncounted gold color coins" and photograph shows pile of coins).)

This argument is also unavailing. First, the FBI inventory policy does not require an enumerated list of all items being inventoried. Rather, it simply mandates "a written summary," which must include "a description of the property and the items secured for safekeeping." (Rodgers Decl., Ex. E at 274.) Where a law enforcement policy does not require a detailed, itemized inventory list, an officer's failure to "record all items recovered on a specific form or in a particular fashion" does not invalidate the inventory search. *United States v. Garner*, 181 F.3d 988, 992 (8th Cir. 1999); *cf. United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (finding inventory search invalid where, despite policy that "require[d] officers to create a detailed, itemized inventory," police officer listed property only as "misc. tools").

Nonetheless, Plaintiffs cite *United States v. Roberts*, 430 F. Supp. 3d 693 (D. Nev. 2019), for the proposition that a "failure to properly and completely document property indicated that inventory search was pretextual." (Pls.' Trial Br. at 18.) At the outset, the Ninth Circuit's recent precedent disagrees with Plaintiffs' statement of law, holding that "minor noncompliance with department policies does not invalidate an otherwise lawful inventory search." *Magdirila*, 962 F.3d at 1157 (finding valid inventory where officers did not document "all property" on the inventory form). This is true even where "officers

---

[6] In their Reply Brief, Plaintiffs argue that the "dual motive" analysis is only applicable to warrantless searches, and thus inapposite here. Plaintiffs are incorrect: the Ninth Circuit has recently applied the dual-motive framework to searches conducted pursuant to a warrant. *See Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019) (finding a plaintiff's suspicionless detention, which occurred during the execution of a search warrant, would not have occurred but for law enforcement's sole improper purpose of deporting immigrant workers).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

listed only some property . . . though they booked additional property as evidence." *Garay*, 938 F.3d at 1111. Controlling law aside, *Roberts* is factually distinguishable from the instant matter. In that case, the officer made no attempts to actually document the items he found during the purported inventory, whereas the agents here contemporaneously documented the contents of all 700 safety deposit boxes. *Roberts*, 430 F. Supp. at 699. Further, the officer in *Roberts* "merely ruffled things around" with "apparent carelessness," whereas the agents here took four days to document every box, write down the contents within, take photographs, and show the property to a video camera. *Id.* at 705. Finally, the officer in *Roberts* "did not even attempt to use his body camera . . . to document items . . . . [which] would surely have been more consistent with policy." *Id.* Here, of course, the agents documented the inventory with both photographs and a video camera to supplement the written forms they used.

To the extent the agents here failed to comply with the inventory policy (if at all), their non-compliance is far closer to the permissible non-compliance of officers in *Magdirila* and *Garay* than it is to the officer's actions in *Roberts*. Accordingly, the Court finds that the Government's failure to document every item taken from the boxes in exacting detail does not indicate that the inventory search was pretextual.[7]

### 3. Conclusion

For the foregoing reasons, the Court finds that Plaintiffs have failed to prove that the Government's inventory search was a pretext for an impermissible investigatory motive. And as the Court noted above, Plaintiffs' claim that the Government exceeded the bounds of the warrant hinges on whether the Government's actions were a valid inventory. Having found a valid inventory, the Court necessarily finds that the Government did not exceed the bounds of the warrant. Plaintiffs have failed to prove this prong of their Fourth Amendment argument.

---

[7] On Reply, Plaintiffs argued that the investigating agents were not actually following their standardized inventory policies because Zellhart had crafted Supplemental Instructions that superseded the DIOG and were the operative policy for the raid. (*See* Frommer Decl., Ex. M at 1215.) The Court is not convinced. While the Supplemental Instructions provide more detailed guidance than the DIOG does, they do not seem to contradict the DIOG. For example, the Supplemental Instructions order agents to show all cash to drug-sniffing dogs and to note any indicia that the cash may have been involved in drug trafficking. But the DIOG contemplates that, when inventorying property, agents may have to "memorialize facts pertinent to other activities undertaken during the inventory process, such as . . . any evidence collected . . . that are relevant to the investigation." (Rodgers Decl., Ex. E at 274.) The DIOG also contemplates the discovery of contraband or evidence during an inventory, which "should be immediately seized." (*Id.*) In all, it does not appear that agents failed to follow the FBI's written inventory policy merely because they *also* followed case-specific instructions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

### B. Whether the Government Breached its Duty of Candor in its Warrant Application

Plaintiffs' other Fourth Amendment argument is that the Government misled Judge Kim in its warrant affidavit, thus breaching its duty of candor. Specifically, Plaintiffs note that the affidavit states only that the Government intended to inventory the box contents, while omitting the fact that investigators were making preparations to forfeit much of that property.

Naturally, law enforcement agents may not submit warrant affidavits that contain "material falsities or omissions." *United States v. Garcia-Cruz*, 978 F.2d 537, 540 (9th Cir. 1992). The test for determining whether a false statement or omission was material is "whether an affidavit containing the omitted material would have provided a basis for a finding of probable cause." *Id.* If probable cause would have remained even if the omitted facts were included in the affidavit, an omission is "immaterial." *Id.* Further, an omission relating to "how the search would be conducted," rather than relating to "whether a warrant should issue" in the first place, is also immaterial. *United States v. Mittelman*, 999 F.2d 440, 444 (9th Cir. 1993) (finding misstatement immaterial where "no one disputes that there was ample cause to conduct the search, and where the only dispute is over how that search was conducted").

Here, Plaintiffs do not argue that the purported omission—that the Government had made certain preparations to forfeit boxholder contents—had any effect on the existence of probable cause to search and seize USPV's property, including the nests of boxes. Rather, they base their argument on two Ninth Circuit cases that address alternative types of improper affidavit omissions.

First, they cite to *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010) (overruled in part on other grounds by *Hamer v. Neighborhood Hous. Servs. Of Chi.*, 138 S. Ct. 13, 16–17 (2017)) (hereafter, "*CDT*"). In *CDT*, the Government sought a warrant to search the defendant's computers, which contained data on steroid tests conducted on professional baseball players. *Id.* at 1166. However, the Government only had probable cause to retrieve the electronic files of ten players. *Id.* In its affidavit, the Government informed the magistrate that there was a significant risk the data it sought might be destroyed, which required a broad seizure of all data on CDT's servers, including that for which the Government had no probable cause. *Id.* at 1168. What the Government failed to tell the magistrate, however, was that CDT had "agreed to keep the data intact" for a certain amount of time, an omission that "created the false impression that, unless the data were seized at once, it would be lost." *Id.* at 1178 (Kozinski, J., concurring). The Court found that this omission caused the magistrate to issue a warrant he may not otherwise have issued. *Id.*

Here, by contrast, the omission of the Government's forfeiture preparations did not "create[] [a] false impression." *Id.* The affidavit was rife with details of prior investigations into individual USPV

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

boxholders that resulted in forfeiture, and it noted that the agents executing the warrant would inventory the contents of all individual boxes. Any reasonable magistrate would have inferred that the inventory could lead to the potential discovery of criminal proceeds in certain boxes, which would then lead to forfeiture.[8]

Plaintiffs next cite to *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978). In that case, law enforcement officials unsuccessfully applied to a federal judge for a search warrant based on suspected cocaine trafficking. *Id.* at 420. Faced with rejection, they immediately went to a state court and sought a warrant for the same property, this time based on suspected marijuana possession. *Id.* In doing so, the agents made no mention of their failed attempt to obtain a warrant in a different court. *Id.* The state court warrant issued, and agents used it to search primarily for evidence of cocaine trafficking. *Id.* at 421. The Ninth Circuit held that the omission of the rejected warrant application from the state court affidavit would not, by itself, be reason to invalidate the warrant. *Id.* at 422. Indeed, even the Government's "continued [undisclosed] purpose to discover evidence" of the cocaine trafficking scheme would not have been improper. *Id.* Rather, the violation came when the agents "did not confine their search in good faith to the objects of the warrant . . . [and] they substantially exceeded any reasonable interpretation of its provisions." *Id.* at 423. That, of course, is not the case here, where the Court has found that the Government did, in fact, confine its search to the warrants' requirements.

In all, Plaintiffs have not demonstrated either that: (1) the omission of the Government's forfeiture plans from the affidavit was material to a finding of probable cause as to USPV; or (2) that the Government's conduct in this matter was equal to or greater than the violative conduct in *CDT* or *Rettig*. Thus, the Court finds that Plaintiffs' second Fourth Amendment argument fails.

---

[8] The *CDT* Court also took umbrage with the Government's blatant disregard of certain restrictions the magistrate had put in the warrant. *Id.* at 1171. Here, as discussed above, the Government did not exceed the scope of the warrant, much less blatantly disregard its strictures.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:21-cv-04405-RGK-MAR | Date | September 29, 2022 |
|---|---|---|---|
| Title | *Paul Snitko, et al v. United States of America, et al* | | |

### IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS JUDGMENT TO DEFENDANTS.** Defendants shall lodge a proposed judgment that accords with this Order by **October 7, 2022.**

**IT IS SO ORDERED.**

|  | : |
|---|---|
| Initials of Preparer | kmh |